# EXHIBIT A

Chancery Division Civil Cover Sheet - General Chancery Section      (Rev. 6/15/09) CCCH 0623

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
## COUNTY DEPARTMENT, CHANCERY DIVISION

JACQUELINE GOLDGERG

_____ Plaintiff

v.

401 NORTH WABASH VENTURE LLC, a Delaware Limited
Liability Company; TRUMP CHICAGO MANAGING MEMBER,
LLC, a Delaware Limited Liability Company; and DEUTSCHE BANK
TRUST COMPANY AMERICAS,        Defendant
a New York Banking Corporation

No. **09CH32851**

No. _____

## CHANCERY DIVISION CIVIL COVER SHEET
## GENERAL CHANCERY SECTION

A Chancery Division Civil Cover Sheet - General Chancery Section shall be filed with the initial complaint in all actions filed in the General Chancery Section of Chancery Division. The information contained herein is for administrative purposes only. Please check the line in front of the appropriate category which best characterizes your action being filed.

0005 _____ Administrative Review
0001 _____ Class Action
0002 _____ Declaratory Judgment
0004 __X__ Injunction

| | | | | |
|---|---|---|---|---|
| 0007 _____ | General Chancery | | | |
| 0010 _____ | Accounting | 0019 _____ | Partition | |
| 0011 _____ | Arbitration | 0020 _____ | Quiet Title | |
| 0012 _____ | Certiorari | 0021 _____ | Quo Warranto | |
| 0013 _____ | Dissolution of Corporation | 0022 _____ | Redemption Rights | |
| 0014 _____ | Dissolution of Partnership | 0023 _____ | Reformation of a Contract | |
| 0015 _____ | Equitable Lien | 0024 _____ | Rescission of a Contract | |
| 0016 _____ | Interpleader | 0025 _____ | Specific Performance | |
| 0017 _____ | Mandamus | 0026 _____ | Trust Construction | |
| 0018 _____ | Ne Exeat | | _____ | Other (specify)_____ |

By: _____
           Attorney            Pro Se

Atty. No.: 43136

Name: Kulwin, Masciopinto & Kulwin, LLP

Atty. for: Plaintiff

Address: 161 N. Clark Street, Suite 2500

City/State/Zip: Chicago, Illinois 60601

Telephone: 312-641-0300

**DOROTHY BROWN, CLERK OF THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS**

1910 - No Fee Paid
1919 - Fee Paid
Jury Demand                    CCG N067-10M-6/09/04 (                    )

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS

JACQUELINE GOLDGERG,

} No. 09CH32851

v.

401 NORTH WABASH VENTURE LLC, a Delaware Limited
Liability Company; TRUMP CHICAGO MANAGING MEMBER,
LLC, a Delaware Limited Liability Company; and DEUTSCHE
BANK TRUST COMPANY AMERICAS,
a New York Banking Corporation

### JURY DEMAND

The undersigned demands a jury trial.

_____
                (Signature)

Dated: ____9/10/09____, _____

Atty. No.: 43136

Name: Mark Semisch, Kulwin, Masciopinto & Kulwin

Atty. for: Plaintiff

Address: 161 N. Clark Street, Suite 2500

City/State/Zip: Chicago, IL 60601

Telephone: 312-641-0300

**DOROTHY BROWN, CLERK OF THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS**

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT, CHANCERY DIVISION

JACQUELINE GOLDBERG,                        )
                                            )
            Plaintiff,                      )
                                            )
      v.                                    )       No. _____ 09CH32851
                                            )
401 NORTH WABASH VENTURE LLC,               )
a Delaware Limited Liability Company;       )
TRUMP CHICAGO MANAGING                      )
MEMBER, LLC, a Delaware Limited             )       Jury Demand (Law Counts)
Liability Company; and DEUTSCHE BANK        )
TRUST COMPANY AMERICAS,                     )
a New York State Banking Corporation,       )
                                            )
            Defendants.                     )

## AFFIDAVIT OF DAMAGES

The undersigned being first duly sworn upon oath, deposes and states that Plaintiff is a party to

the above-entitled cause of action seeking, among other relief, money damages or collection of taxes

and states that this cause of action DOES EXCEED $50,000.00.

By: _____

Signed and sworn before me

SEPTEMBER 10, 2009

_____
(Notary Public)

Shelly B. Kulwin
One of the Attorneys for Plaintiff
KULWIN, MASCIOPINTO & KULWIN, LLP.
161 N. Clark Street, #2500
Chicago, IL. 60601
T: 312.641.0300; F: 312-855.0350
E: amasciopinto@kmklawllp.com
Firm ID 43136

"OFFICIAL SEAL"
ANGELA VANDLEN
NOTARY PUBLIC, STATE OF ILLINOIS
MY COMMISSION EXPIRES 5/8/2011

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS,
COUNTY DEPARTMENT, CHANCERY DIVISION

JACQUELINE GOLDBERG,                        )
                                            )
            Plaintiff,                      )
                                            )
    v.                                      )
                                            )   No. 09CH32851
401 NORTH WABASH VENTURE LLC,               )
a Delaware Limited Liability Company;       )
TRUMP CHICAGO MANAGING                      )
MEMBER, LLC, a Delaware Limited             )   Jury Demand (Law Counts)
Liability Company; and DEUTSCHE BANK        )
TRUST COMPANY AMERICAS,                     )
a New York State Banking Corporation,       )
                                            )
            Defendants.                      )

## COMPLAINT

Plaintiff, JACQUELINE GOLDBERG ("Goldberg" or "Plaintiff"), hereby complains against

Defendants, 401 North Wabash Venture, LLC, a Delaware Limited Liability Company ("401 North

Wabash"), Trump Chicago Managing Member, LLC, a Delaware Limited Liability Company

("Trump"), (collectively hereinafter referred to as the "Trump Defendants"), and Deutsche Bank

Trust Company Americas, a New York State Banking Corporation, ("Deutsche Bank"), as follows:

### NATURE OF THE ACTION

1.      This action is brought pursuant to the Illinois Condominium Act, 765 ILCS §§ 605/1

*et seq.*, the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS §§ 505 *et seq.*,

the Federal Interstate Land Sales Full Disclosure Act, 15 U.S.C. §§ 1701 *et seq.*, the Illinois

Securities Act, 815 ILCS §§ 5/1 *et seq.*, and Illinois common law. Plaintiff seeks rescission and

injunctive relief, as well as compensatory and punitive damages, against the Trump Defendants,

arising out of the Trump Defendants' material misrepresentations and fraudulent inducements to

-1-

cause Plaintiff to enter into certain hotel condominium purchase agreements, the Trump Defendants'

breach of those agreements, as well as the Trump Defendants' failure to properly register the sales

of those hotel condominiums as securities sales under applicable Illinois law. Plaintiff also seeks

imposition of a constructive trust on all monies paid to the Trump Defendants that are currently

being held in escrow by Deutsche Bank.

## JURISDICTION and VENUE

2.        Jurisdiction is proper in this court pursuant to 735 ILCS § 5/2-209 because, *inter alia*,

Plaintiff is a citizen of and located in the State of Illinois, the Trump Defendants transact business

within this state, own real estate situated within this State, entered into real estate contracts that are

the subject of this action within this State and are limited liability corporations doing business within

this state, while Deutsche Bank is a New York State Banking Corporation that is licensed to do, and

is doing, business within this State.

3.        Venue is proper within this county pursuant to § 5/2-101 and § 5/2-102, because, *inter

alia*, all or part of the transactions out of which this action arose occurred within Cook County,

and/or the Trump Defendants are limited liability corporations doing business within Cook County,

while Deutsche Bank is a New York State Banking Corporation doing business within Cook County.

## FACTS

### A.   The Parties

4.        Plaintiff, Jacqueline Goldberg, is an individual who resides in the State of Illinois.

5.        Defendant, 401 North Wabash, is a Delaware limited liability company whose

principal business is the construction of Trump International Hotel and Tower ("Trump Tower") at

401 North Wabash, Chicago, Illinois, as well as the marketing for sale and sale of hotel

condominiums within Trump Tower to the general public.

6.      Defendant Trump is a Delaware limited liability company and the managing member of 401 North Wabash whose principal business is to operate and manage 401 North Wabash's construction of Trump Tower as well as the marketing for sale and sale of hotel condominiums within Trump Tower.

7.      Deutsche Bank is a New York State Banking Corporation that transacts business within the State of Illinois, including receiving funds to hold in escrow from the Trump Defendants that they received from, among others, the Plaintiff in connection with her purchases of hotel condominium units in Trump Tower.

**B.     Trump Tower**

8.      Trump Tower is a ninety-two (92) story glass and steel building located at 401 North Wabash, Chicago, Illinois.

9.      Trump Tower consists of private condominium residences, hotel condominium units, a health club, spa, meeting rooms, ballrooms, a public parking garage, a parking garage for the private condominium residences, retail space, restaurants, and various other areas including a concierge desk, reception area and lobby.

10.     The hotel condominium units ("HCUs") are located on floors fourteen (14) to twenty-seven (27) plus an additional mezzanine level above the twenty-seventh floor (27M) of Trump Tower.

11.     There are approximately 339 HCUs within Trump Tower. The Trump Defendants sold approximately fifty-five percent (55%) of those units between 2003 and the present and are currently offering the remaining HCUs for sale at prices ranging between $545,400.00 and

$3,306,572.00.

12.      The Trump Defendants contractually agreed to convey to each purchaser a hotel condominium unit within Trump Tower, in addition to the HCU itself, an undivided percentage interest attributable to such unit in the common elements of the 401 North Wabash condominiums ("HCU Ownership"), as well as other items located within the HCU, such as furniture, fixtures, appliances, kitchenware and electronic equipment (television, DVD and CD players) ("the Personal Property" or the "F, F & E").

13.      The Trump Defendants retain ownership of, and the right to all revenues from, all HCUs within Trump Tower that are not sold.

### C.      The Trump Defendants' Sales Tactics

14.      The Trump Defendants made various written and oral statements, either directly and/or through their sales agents, to Plaintiff in order to induce her to purchase HCUs in Trump Tower and before she agreed to purchase such HCUs.

15.      The Trump Defendants provided to Plaintiff a sales packet that included various written materials to induce her to purchase Trump Tower HCUs (the "Trump Tower Sales Packets") and before she agreed to purchase such HCUs.

16.      The Trump Tower Sales Packets included documents entitled "Trump International Hotel Owner Use and Rental" or "Hotel Program" which touted a potential HCU buyer's ability to both occupy his unit "as much or as little as desirable" and to have it rented as a hotel room in the Trump International Hotel "when not occupied." *A copy of relevant portions of Trump Tower Sales Packets is attached hereto as Exhibit A.*

17.      The Trump Tower Sales Packets also included a document entitled, "Frequently

-4-

Asked Questions" ("Trump FAQs").

18.     The Trump FAQs touted a potential HCU buyer's ability to occupy his HCU without in any way adversely affecting his ability to have it rented as a hotel room when he was not occupying it.

19.     Specifically, the Trump FAQs contained the following language:

a.     **When can owners use their hotel guestroom?**
The hotel program is highly flexible with no minimum or maximum stays required. You may use your personal guestroom as many nights as you wish or not at all....

b.     **How is the hotel rental program managed?**
The hotel rental program will be managed through a specialized computer reservation system that assigns "rotation points" to guestrooms as they are occupied. The hotel rooms with the least number of rotation points are the next to be rented in the system. Through this program, guestrooms will be fairly reserved throughout the hotel.

c.     **How does an owner's stay in a personal guestroom affect the rental program?**
When an owner, or the designated guest of an owner, occupies their personal guestroom, the reservation system does not assign any points for that night. Therefore, you are encouraged to stay in your personal guestroom since the reservation system will make up for the "vacancy" of the room after your departure.

20.     In addition, the Trump Tower Sales Packets contain documents called "Project Overview." The Project Overview documents described numerous features of Trump Tower including a 60,000 square foot Health Club and Spa which is "a world class facility with state of the art equipment and service," Meeting Rooms featuring state of the art telecommunication systems and Grand and Junior Ballrooms with 30-foot ceilings.

21.     The Trump Defendants, directly and/or through their agents, made various oral and written representations to Plaintiff including those contained in the Trump Tower Sales Packets and

in Property Reports and Amended Property Reports they issued to Plaintiff, touting the advantages

of HCU ownership, in addition to those set forth in ¶¶ 16-20 above, in order to induce her to

purchase Trump Tower HCUs before she agreed to purchase such HCUs, including that:

a.   Every HCU owner would obtain a membership to the Trump Tower Health Club that
     would enable him to use the health club facilities at any time at no additional charges
     over and above his monthly condominium assessments;

b.   Each HCU purchaser would also own a percentage of the common elements of the
     condominium space, which included the Hotel's Meeting/Function Rooms and the
     planned Hotel Ballrooms;

c.   The 401 North Wabash HCU Condominium Association ("HCU Condominium
     Association") would be paid its proportional share of revenues generated by the
     Trump Tower Meeting Rooms and Ballrooms – which were estimated to be
     approximately five million dollars ($5,000,000.00) per year – that it could use to,
     among other things, keep HCU owners' monthly assessments lower than they would
     be in the absence of such revenue;

d.   HCU owners would only be responsible to pay the Trump Defendants and/or their
     agents a fixed "per use" fee for each night their unit was rented through Trump
     Towers' HCU Rental Reservation Program or used by them – $55.00 per night for
     studio HCUs; $72.00 per night for one bedroom HCUs with city views; $98.00 per
     night for one bedrooms with water views; and $140.00 per night for two bedroom
     HCUs (the "Per Use Fee") – over and above the monthly costs associated with HCU
     ownership: (i) "common charges" (i.e., monthly assessments), (ii) hotel expenses,
     and (iii) real estate taxes (the HCU Monthly Costs);

e.   HCU owners who participated in the HCU Rental Reservation Program would
     receive the gross revenue for the daily rental of their HCUs, which the Trump
     Defendants defined as a rental rate such as those charged at other comparable luxury
     hotels, less only the Per Use Fee, the HCU Monthly Costs and credit card and/or
     travel agent fees payable to "third parties"; and,

f.   They would promote fair allocation of rental opportunities assigning requests for
     reservations on a rotating basis among all HCUs enrolled in the HCU Rental
     Reservation Program, "unless a particular Hotel Unit or type of unit is requested" "by
     the "prospective Hotel Guest" "or a rental agent authorized by the unit owner" ("the
     Reservation Allocation Representations").

### D.    Property Reports

22.    Between September 15, 2003 and October 31, 2007, the Trump Defendants prepared and issued eight separate documents called Property Reports or Amended Property Reports concerning Trump Tower.

23.    The Trump Defendants distributed these Property Reports and Amended Property Reports, according to them, pursuant to the requirements of, among other things, the Federal Interstate Land Sales Full Disclosure Act (the "Interstate Land Sales Act").

24.    The Property Reports the Trump Defendants issued provided details about various aspects of each potential purchaser's and/or purchaser's ownership interest in the HCU, associated costs of owning an HCU and estimated revenue for the HCU Condominium Association that could be used to, among other things, reduce the monthly assessments charged to the HCU owners.

25.    On or about September 15, 2003, the Trump Defendants prepared and issued an initial Property Report as required under the Interstate Land Sales Act (the "September 15, 2003 Property Report"). *A copy of relevant portions of the September 15, 2003 Property Report is attached hereto as Exhibit B.*

26.    On or about September 24, 2003, the Trump Defendants prepared and issued another more detailed Property Report (the "September 24, 2003 Property Report"). *A copy of relevant portions of the September 24, 2003 Property Report is attached hereto as Exhibit C.*

27.    The September 24, 2003 Property Report contained an introductory section describing various aspects of the provisions of the report itself. The September 24, 2003 Property Report also contained twelve exhibits, including Exhibit A, the Declaration of Condominium Ownership and of Easements, Restrictions, Covenants and By-Laws for 401 North Wabash Avenue Hotel

-7-

Condominium (this exhibit will hereafter be referred to in the September 24, 2003 and all subsequent Property Reports issued by the Trump Defendants that contained it as the "Declaration of Condominium"); Exhibit D, a Standard Condominium Purchase Agreement ("HCU Standard Purchase Agreement"); and Exhibit H, Condominium Association's Estimated Operating Budget.

28.    The September 24, 2003 Property Report and the Declaration of Condominium defined the common elements, a percentage of which each HCU purchaser received attributable to their unit with the purchase of their units, as including, among other things, Trump Tower's:

        a.     Meeting/Function Rooms;

        b.     Storage areas; and

        c.     Laundry Facilities.

29.    In addition, the September 24, 2003 Property Report and the Declaration of Condominium stated that all HCU purchasers were required to become members of the health club, with their club membership paid out of their monthly assessments, and that all HCUs would have the right to use the health club amenities at any time (including use of the swimming pool, steam room, sauna, exercise equipment and locker room facilities) for so long as they owned their unit.

30.    The September 15 and 24, 2003 Property Reports also contain the Reservation Allocation Representations.

31.    On February 25, 2004, the Trump Defendants prepared and issued a First Amended Property Report (the "February 2004 Property Report"). *A copy of relevant portions of the February 2004 Property Report is attached hereto as Exhibit D.*

32.    The February 2004 Property Report and the Declaration of Condominium further defined the common elements that each HCU purchaser would obtain with his HCU to include

Trump Tower ballroom facilities as the Trump Defendants and/or their agents had previously represented to induce individuals to purchase Trump Tower HCUs.

33.     In addition, the February 2004 Property Report contained an HCU Condominium Association Estimated Operating Budget that reflected that the HCU Condominium Association would earn over five million dollars ($5,000,000.00) per year in commissions and rental fees from Trump Tower's Meeting Room rentals. The February 2004 Property Report continued to include the Meeting/Function Rooms within the common elements being conveyed to HCU purchasers and also contained the Reservation Allocation Representations.

34.     On or about March 17, 2004, the Trump Defendants prepared and issued another Property Report as required under the Interstate Land Sales Act (the "March 2004 Property Report"). *A copy of relevant portions of the March 2004 Property Report is attached hereto as Exhibit E.* The March 2004 Property Report contained a summary of some of the points set forth in the February 2004 Property Report and included, among other things, the Trump Defendants' Reservation Allocation Representations, a designation of the common elements, which included the Trump Towers' meeting and function rooms and ballrooms, and the estimated budget for the HCU Condominium Association which included as annual gross revenue for the HCU Condominium Association approximately $5,000,000.00 in Meeting Room rental fees.

35.     On or about August 18, 2004, the Trump Defendants prepared and issued a Second Amended Property Report (the "August 2004 Property Report"). *A copy of relevant portions of the August 2004 Property Report is attached hereto as Exhibit F.* The August 2004 Property Report, both in the Report and in the Declaration of Condominium, continued to define the Common Elements that each HCU purchaser would obtain as part of their HCU ownership to include all of

-9-

the Common Elements listed in the February 2004 Property Report. The August 2004 Property Report also contained an HCU Condominium Association Estimated Operating Budget that reflected that the HCU Condominium Association would earn over 4.5 million dollars ($4,500,000.00) in Trump Tower's Meeting Room rental income. The August 2004 Property Report also contained the Reservation Allocation Representations.

36.     On or about January 10, 2005, the Trump Defendants prepared and issued a Third Amended Property Report (the "January 2005 Property Report"). *A copy of relevant portions of the January 2005 Property Report is attached hereto as Exhibit G.* The January 2005 Property Report, both in the Report and in the Declaration of Condominium, continued to define the Common Elements that each HCU purchaser would obtain as part of their HCU ownership to include all of the Common Elements listed in the February 2004 Property Report. The January 2005 Property Report also contained an HCU Condominium Association Estimated Operating Budget that reflected that the HCU Condominium Association would earn approximately five million dollars ($5,000,000.00) per year on Trump Tower's Meeting Room rental income. The January 2005 Property Report also contained the Reservation Allocation Representations.

37.     The Plaintiff received the Property Reports, described above in ¶¶ 22 through 36 of this Complaint, on and before the date she signed agreements to purchase HCUs from the Defendants.

### E.    The October 2007 Property Reports

38.     On or about October 25, 2007, the Trump Defendants prepared and issued to Plaintiff what they referred to as the "latest version" of the Property Report for Trump Tower, which they had filed with the United States Department of Housing and Urban Development (HUD) under the

Interstate Land Sales Act (the "October 25, 2007 Property Report"). *A copy of relevant portions of the October 25, 2007 Property Report is attached hereto as Exhibit H.*

    39.    The Trump Defendants prepared and filed the October 25, 2007 Property Report to reflect the material changes they had made to the March 2004 Property Report, as required under the Interstate Land Sales Act, including the following:

        a.    the Estimated Operating Budget for the HCU Condominium Association no longer contained an income stream of approximately $5,000,000.00 per annum for Meeting/Function Room rentals; and

        b.    the Common Elements being sold to the HCU purchasers no longer included the hotel (i) Meeting/Function Rooms and (ii) Ballrooms.

    40.    On or about October 1, 2007, the Trump Defendants prepared and issued to Plaintiff the Fourth Amended Trump Tower Property Report (the "October 1, 2007 Property Report"). *A copy of relevant portions of the October 1, 2007 Property Report is attached hereto as Exhibit I.*

    41.    The October 1, 2007 Property Report made numerous material changes to the September 15 and September 24, 2003 Property Reports, and the Declaration of Condominium within those Reports, including the following:

        a.    The Meeting/Function Rooms were removed from the common elements that the Trump Defendants had represented they would convey to HCU purchasers and transferred to the "Commercial Property" within Trump Tower owned by the Trump Defendants;

        b.    The individual storage areas for each HCU were removed from the common elements that the Trump Defendants had represented they would convey to HCU purchasers;

        c.    The laundry facilities were removed from the common elements that the Trump Defendants had represented they would convey to HCU purchasers and transferred to the Commercial Property within Trump Tower owned by the Trump Defendants; and

      d.     The HCU owners were stripped of their ability to use their health club
               memberships except when they were in occupancy in their HCUs.

42.    The October 1, 2007 Property Report made numerous material changes to the February 2004, August 2004 and January 2005 Property Reports, and the Declaration of Condominium contained in those Reports, including the following:

      a.     The Meeting/Function Rooms were removed from the common elements that the Trump Defendants had represented they would convey to HCU purchasers and transferred to the "Commercial Property" within Trump Tower owned by the Trump Defendants;

      b.     The Ballrooms were removed from the common elements that the Trump Defendants had represented they would convey to the HCU purchasers and transferred to the "Commercial Property" within Trump Tower owned by the Trump Defendants;

      c.     The individual storage areas for each HCU were removed from the common elements that the Trump Defendants had represented they would convey to HCU purchasers;

      d.     The laundry facilities were removed from the common elements that the Trump Defendants had represented they would convey to HCU purchasers and transferred to the Commercial Property within Trump Tower owned by the Trump Defendants;

      e.     The HCU owners were stripped of their ability to use their health club memberships except when they were in occupancy in their HCUs; and

      f.     The HCU Condominium Association Estimated Budget was stripped of the previously estimated approximately five million dollars ($5,000,000.00) of Meeting/Function Room yearly income and such income was now going to be kept by the Trump Defendants.

43.    None of the material changes in the October 1, 2007 and October 25, 2007 Property Reports as described in ¶¶ 39-42 of this Complaint were disclosed in any prior Property Reports and Amended Reports the Trump Defendants gave to Plaintiff before she agreed to purchase her HCUs or approved by seventy-five (75%) of the buyers then owning an interest in Trump Tower HCUs at

the time these material changes were made.

### F.    The Material Changes in the HCU Rental Program

44.    At or near the time the Trump Defendants prepared the October 2007 Property Reports, they and/or their agents also prepared a "Hotel Condominium Rental Management Agreement" ("HCU Rental Agreement").

45.    In approximately October, 2007, the Trump Defendants and/or their agents issued the HCU Rental Agreement to each HCU purchaser, including Plaintiff, with their unit number affixed to it on the front page.

46.    The HCU Rental Agreement required HCU purchasers, including Plaintiff, to agree to the terms and conditions of the manner in which, among other things, the Trump Defendants and/or their agents would agree to operate the HCU Rental Reservation Program if the HCU purchasers wanted to rent their units through that program when they were not occupying them. At that same time, the Trump Defendants and/or their agents issued with the HCU Rental Agreement, "Hotel Rental Program Highlights," which further defines terms set forth in the HCU Rental Agreement.

47.    The Trump Defendants and/or their agents placed terms and/or conditions in the HCU Rental Agreement as further defined in the Hotel Rental Program Highlights that materially changed the manner in which they, and/or their agents, had at all times prior to its issuance represented they would operate the HCU Rental Reservation Program, including as follows:

> a.    Contrary to all prior representations made to potential purchasers and purchasers of Trump Tower HCUs, including Plaintiff, the HCU Rental Agreement now specifically stated that the extent of an owner's use of his HCU would adversely impact his unit's ability to be rented;

-13-

b.  Specifically, contrary to all prior representations the Trump Defendants and/or their agents made to induce members of the general public, including Plaintiff, to purchase Trump Tower HCUs, including those contained in the Trump Sales Packet and Trump FAQs, that an owner could use his unit as much as he wanted without having any negative impact on the priority given such unit to be rented in the Trump Defendants' HCU Rental Reservation Program, the Trump Defendants now required from all HCU purchasers as a condition of participation in the HCU Rental Reservation Program, the following agreement:

> "Owner acknowledges that the extent of the use of the Subject Unit [the HCU purchaser's own unit] by Owner or by an Owner's Guest during an Owner Occupancy Period **will have an adverse impact on . . . . [that] Unit's priority in allocation by Hotel Management for reservations** as the . . . Unit's availability for rental by Hotel Guests is a factor having an impact upon allocation of reservations";

c.  contrary to all prior representations the Trump Defendants and/or their agents made to the general public, including Plaintiff, to induce them to purchase Trump Tower HCUs, the HCU Rental Agreement now set forth previously undisclosed charges – which were "estimates" and "subject to change" – that an HCU owner would incur whenever he rented his HCU through the HCU Rental Reservation Program, including the following:

   (1)  a Rental Program Administrative Fee "equal to three percent (3%)" of the Gross Room Rental Revenue;
   (2)  Reservation Fees of $6.00 per night; and
   (3)  marketing costs of $30.00 per night

d.  contrary to all prior representations the Trump Defendants and/or their agents made to the general public, including Plaintiff, to induce them to purchase Trump Tower HCUs, that their HCUs would be rented strictly on the basis of a "rotation points" system that equitably allocated rental opportunities based on that system, the HCU Rental Agreement required HCU owners, including Plaintiff, to agree as a condition of participation in the HCU Rental Reservation Program that the Trump Defendants' designated Hotel Manager had "sole discretion" "to allocate [HCU] reservations and occupancy" among HCU units that were participating in the HCU Rental Reservation Program on any factors the "Hotel Manager" "deemed appropriate"; and, that the "Hotel Manager" had the "absolute right," "in its sole discretion" to allocate such reservations in any manner it deemed "necessary" "to administer the Rental Program"; and disclosed for the first time that the Trump Defendants

-14-

and/or their agents would have the right to change the Hotel Rental Reservation Program in any manner whatsoever, including cancelling it in its entirety; and

e.   contrary to the Reservation Allocation Representations the Trump Defendants made in all of the Property Reports they prepared and issued to induce individuals and/or entities, including Plaintiff, to purchase Trump Tower HCUs, the HCU Rental Agreement now stated that the Trump Defendants and/or their agents had the right to allocate rental opportunities in any manner they deemed "necessary," to change the way such rental opportunities are distributed in any manner whatsoever and/or to cancel the whole promised method of equitable distribution of such rental opportunities among all HCUs and HCU owners.

*A copy of relevant portions of the HCU Rental Agreements, for Units 2238 and 2240, is attached hereto, respectively, as Exhibits J1 and J2. A copy of the Hotel Rental Program Highlights is attached hereto as Exhibit K.*

48.     The material changes to the HCU Rental Reservation Program set forth in ¶ 47, above, completely stripped all material advantages of owning a Trump Tower HCU, as opposed to any non-hotel condominium, because, among other things, directly contrary to the Trump Defendants' prior representations, an HCU owner could no longer use his own Trump Tower Unit "as much as they wanted" without having "an adverse impact" on his ability to earn rental revenue from that unit when he was not occupying it.

49.     In addition, the changes in the HCU Rental Reservation Program set forth in ¶ 47, above, also materially altered the value of HCU ownership because, among other things, directly contrary to the Trump Defendants' and/or their agents' prior oral and written representations, they:

a.   gave the Trump Defendants and/or their agents the ability to obtain all rental opportunities for HCUs which they continued to own and/or operate, over those owned by other HCU owners, including Plaintiff, thus substantially and materially reducing HCU owners', including Plaintiff's, ability to earn any rental revenue from their HCUs;

-15-

b.   imposed previously undisclosed charges – which the Trump Defendants could raise at any time – that materially reduced any rental revenue HCU owners, including Plaintiff, could receive from their HCUs; and

c.   allowed the Trump Defendants and/or their agents the previously undisclosed authority to change in any manner and/or cancel the Rental Reservation Program in its entirety, thereby significantly reducing HCU owners', including Plaintiff's, ability to ever rent their HCUs or to earn any revenue from any such rentals through the HCU Rental Reservation Program in the future.

## ILLINOIS CONDOMINIUM ACT CLAIMS
### COUNT I:

1-49.   Plaintiff, Goldberg, hereby incorporates and re-alleges ¶¶ 1-49 of this Complaint as ¶¶ 1-49 of this Count I against the Trump Defendants.

50.   On or about August 2, 2006, Goldberg entered into a Trump Tower Standard HCU Purchase Agreement to purchase HCU 2238 within Trump Tower for $1,239,500.00 (the "Goldberg 2238 Purchase Agreement"). *A copy of the Goldberg 2238 Purchase Agreement is attached hereto as Exhibit L.*

51.   On or about August 8, 2006, Goldberg entered into a Trump Tower Standard HCU Purchase Agreement to purchase HCU 2240 within Trump Tower for $971,687.00 (the "Goldberg 2240 Purchase Agreement"). *A copy of the Goldberg 2240 Purchase Agreement is attached hereto as Exhibit M.* (The Goldberg 2240 Purchase Agreement and the Goldberg 2238 Purchase Agreement are referred to hereinafter collectively as the "Goldberg Purchase Agreements.")

52.   In the Goldberg 2238 Purchase Agreement, the Trump Defendants agreed to convey HCU 2238, a storage space, personal property (referred to as F, F & E) and "an undivided percentage interest" attributable to such unit as a tenant-in-common in the common elements of Trump Tower.

53.   In the Goldberg 2240 Purchase Agreement, the Trump Defendants agreed to convey

-16-

HCU 2240, a storage space, personal property (referred to as F, F & E) and "an undivided percentage interest" attributable to such unit as a tenant-in-common in the common elements of Trump Tower.

54. On or about August 2, 2006, at the time Goldberg executed the Goldberg 2238 Purchase Agreement, she paid the Trump Defendants $114,950.00 as the "Initial Earnest Money Deposit" for her purchase of HCU 2238. At that same time, Goldberg tendered to the Trump Defendants $9,000.00 for the Personal Property, or F, F & E, she was acquiring with her HCU.

55. On or about August 8, 2006, at the time Goldberg executed the Goldberg 2240 Purchase Agreement, she paid the Trump Defendants $92,668.70 as the "Initial Earnest Money Deposit" for her purchase of HCU 2240. At that same time, Goldberg tendered to the Trump Defendants $4,500.00 for the Personal Property, or F, F & E, she was acquiring with her HCU.

56. The aforementioned September 15 and September 24, 2003 Property Reports, and Declaration of Condominium within the September 24, 2003 Report which the Trump Defendants provided to Goldberg prior to her execution of the Goldberg Purchase Agreements defined the common elements being conveyed to Goldberg in accordance with her percentage ownership of the Trump Tower Condominiums by virtue of her purchase of her HCUs 2238 and 2240 to include, among other things, Meeting/Function Rooms, storage rooms (including one for use by each HCU owner on the floor on which their unit was located) and laundry facilities.

57. In addition, the September 15 and September 24, 2003 Property Reports the Trump Defendants provided to Goldberg prior to her execution of the Goldberg Purchase Agreements stated that Goldberg would receive, by virtue of her purchase of her HCUs, a membership in the Trump Tower health club, at no additional cost over her monthly assessments, including use of all of the health club's amenities (swimming pool, steam room, sauna, locker rooms, etc.) at any time while

-17-

she owned her HCUs 2238 and 2240.

58.    On or about August 2, 2006, Goldberg received the February 2004 Property Report through the Trump Defendants and/or their agents.

59.    The February 2004 Property Report and Declaration of Condominium advised Goldberg that she would own, as part of her percentage share of the common elements ownership, the Trump Tower Ballrooms planned for the Trump Tower Hotel.

60.    The February 2004 Property Report Goldberg received from the Trump Defendants and/or their agents also contained an HCU Condominium Association Estimated Budget with a projection of over five million dollars ($5,000,000.00) per year in income being received from Meeting Room rentals.

61.    The February 2004 Property Report and Declaration of Condominium also continued to include in their definition of the common elements the Trump Defendants were conveying to Goldberg the Hotel's Meeting/Function Rooms, a storage area on the floor of her unit and the laundry facilities; they also continued to advise Goldberg that she would be able to use the Trump Tower health club facilities at any time while she owned her HCU.

62.    On or about August 2, 2006, Goldberg received through the Trump Defendants and/or their agents the March 2004 Property Report.

63.    On or about August 2, 2006, Goldberg received from the Trump Defendants and/or their agents the August 2004 Property Report.

64.    On or around October 1, 2006, as required under the Goldberg 2238 Purchase Agreement, Goldberg tendered to the Trump Defendants an additional $9,000.00 for the Personal Property, or F, F & E, they were conveying to Goldberg with her HCU.

65.     On or about October 1, 2006, as required under the Goldberg 2240 Purchase Agreement, Goldberg tendered to the Trump Defendants an additional $4,500.00 for the Personal Property, or F, F & E, they were conveying to Goldberg with her HCU.

66.     On or about February 1, 2007, as required under the Goldberg 2238 Purchase Agreement, Goldberg made a second earnest money deposit of $57,475.00

67.     On or about February 1, 2007, as required under the Goldberg 2238 Purchase Agreement, Goldberg tendered to the Trump Defendants an additional $49,500.00 for the Personal Property, or F, F & E, they were conveying to Goldberg with her HCU.

68.     On or around February 1, 2007, as required under the Goldberg 2240 Purchase Agreement, Goldberg tendered to the Trump Defendants an additional $24,750.00 for the Personal Property, or F, F & E, they were conveying to Goldberg with her HCU.

69.     On or about February 8, 2007, as required under the Goldberg 2240 Purchase Agreement, Goldberg made a second earnest money deposit of $46,334.35.

70.     On or about February 2, 2008, as required under the Goldberg 2238 Purchase Agreement, Goldberg made a third earnest money deposit of $57,475.00.

71.     On or around February 8, 2008, as required under the Goldberg 2240 Purchase Agreement, Goldberg made a third earnest money deposit of $46,334.35.

72.     By April 2009, Goldberg had tendered to the Trump Defendants a total of approximately $ 516,487.40 towards her HCU purchases.

73.     On or about October 31, 2007, Goldberg received from the Trump Defendants and/or their agents the October 1, 2007 Property Report.

74.     On or about November 26, 2007, Goldberg received from the Trump Defendants

-19-

and/or their agents the October 25, 2007 Property Report.

75.     Pursuant to an agreement entered into between Goldberg and the Trump Defendants or around June 3, 2009, the Trump Defendants agreed not to proceed with the closings on her HCUs.

76.     The changes contained in the October 2007 Property Reports and the Declaration of Condominium are changes that materially affect Goldberg's rights and the value of her units.

77.     The changes contained in the October 2007 Property Reports and the Declaration of Condominium, as described in ¶¶ 39-42 of this Count, was information that was required to be provided under the Illinois Condominium Act before Goldberg executed the Goldberg Purchase Agreements.

78.     By failing to disclose the information contained in the October 2007 Property Reports and the Declaration of Condominium before Goldberg executed the Goldberg Purchase Agreements, the Trump Defendants violated § 22 of the Illinois Condominium Act.

79.     Further, the Trump Defendants, by making the material changes contained in the October 2007 Property Reports and the Declaration of Condominium without approval of seventy-five percent (75%) of the buyers then owning an interest in Trump Tower HCUs, violated § 22 of the Illinois Condominium Act.

80.     Under § 22 of the Illinois Condominium Act, the Trump Defendants' failure to make full disclosure of the information contained in the October 2007 Property Reports and the Declaration of Condominium before Goldberg executed the Goldberg Purchase Agreements, entitles Goldberg to rescind the Goldberg Purchase Agreements before the closing on her HCUs, receive all of her deposit monies from the Trump Defendants, plus any interest due her under the Goldberg Purchase Agreements, along with interest at the current post-judgment interest rate effective in

-20-

Illinois.

81.    Alternatively, the Trump Defendants' failure to obtain approval from seventy-five percent (75%) of the buyers then owning an interest in Trump Tower HCUs of the material changes to the Trump Tower Declaration of Condominium contained in the October 2007 Property Reports entitles Goldberg to rescind the Goldberg Purchase Agreements before the closing on her HCUs, receive all of her deposit monies from the Trump Defendants, plus any interest due her under the Goldberg Purchase Agreements along with interest at the current post-judgment interest rate effective in Illinois.

WHEREFORE, Goldberg respectfully requests this Court to enter an order:

a.    enjoining the closing on her HCUs;

b.    allowing Goldberg to rescind the Goldberg Purchase Agreements before the closing on her HCUs;

c.    directing the Trump Defendants to tender to Goldberg all of the deposit monies paid to them under the Goldberg Purchase Agreements, a sum of $516,487.40, along with any interest due her under either or both of those Agreements, plus judgment interest as allowed by law on all such deposited monies, and any other monetary damages available under applicable law; and

d.    awarding reasonable costs and attorney's fees.

## CONSUMER FRAUD AND DECEPTIVE PRACTICES ACT CLAIMS
### COUNT II

(Illinois Consumer Fraud and Deceptive Practices Act Violations)

1- 81.  Plaintiff, Goldberg, hereby incorporates and re-alleges ¶¶ 1-81 of Count I of this Complaint as ¶¶ 1-81 of this Count II.

82.    The Trump Sales Packet, including the Trump FAQs, and the September 2003, February 2004, March 2004, August 2004 and January 2005 Property Reports constitute

-21-

"advertisements" under § 1(a) of the Illinois Consumer Fraud and Deceptive Business Practices Act

(the "Consumer Fraud Act").

83. The Trump Tower HCUs constitute "merchandise" under § 1(g) of the Consumer

Fraud Act.

84. The Trump Defendants are "persons" under § 1(c) of the Consumer Fraud Act.

85. The Trump Defendants' sale of HCU 2238 and/or 2240 to Goldberg is a "sale" under

§ 1(d) of the Consumer Fraud Act.

86. Goldberg is a "consumer" under § 1(e) of the Consumer Fraud Act.

87. The Trump Defendants' sale and/or attempts to sell and/or offer for sale of Trump

Tower HCUs constitute "trade" and "commerce" under § 1(f) of the Consumer Fraud Act.

88. The Trump Defendants' statements to Goldberg, as set forth in ¶¶ 14-36 of this Count

constituted false statements, deceptive and/or materially misleading statements, material

misrepresentations and/or false promises, in that, among other things, they advised Goldberg that:

    a.    she would be able to use her HCU as much as she wanted without adversely affecting her ability to rent it through the Trump Defendants' HCU Rental Reservation Program when she was not using it, when in fact, any such use would adversely affect her ability to so rent it;

    b.    the Trump Defendants and/or their agents were going to "promote fair allocation of rental opportunities" among HCUs based on a rotating basis using a system of "rotation points" that would ensure HCU owners, including Goldberg, of an equitable share of HCU rental opportunities for their units, when in fact, under the Rental Reservation Program the Trump Defendants and/or their agents reserve the right to allocate HCU opportunities in any manner they see fit, to change the HCU Rental Allocation System, to cancel it in its entirety and/or to allocate all such rental opportunities to HCUs owned and/or operated by the Trump Defendants over HCU owners such as Goldberg, thereby reducing, if not eliminating Goldberg's ability to obtain any HCU rental opportunities and/or income;

    c.    HCU owners who participated in the HCU Rental Reservation Program would

-22-

receive the gross revenue for daily rental of their HCU, which the Trump Defendants defined as a rental rate such as those charged at other comparable luxury hotels, less the Per Use Fee, the HCU monthly costs, and credit and/or travel agent fees payable to "third parties," when in fact HCU owners who so participate will also be charged:

(1)    a Rental Program Administrative Fee "equal to three percent (3%)" of the Gross Room Rental Revenue;

(2)    Reservation Fees of $6.00 per night; and

(3)    marketing costs of $30.00 per night

with the Trump Defendants reserving the right to add even more changes thereafter;

d.    Goldberg would receive her proportionate share of the Trump Tower Common Elements that included Meeting/Function Rooms, Ballrooms, storage areas and laundry facilities, when in fact, Goldberg will not receive such common elements with her HCU;

e.    the HCU Condominium Association would receive approximately five million dollars ($5,000,000.00) in commissions and rental fees generated by the Trump Tower Meeting/Function Rooms and Ballrooms, when in fact, the Condominium Association will receive no such income; and

f.    Goldberg's Trump Tower Health Club membership, which she was required to purchase with her HCU, entitled her to use the Trump Tower Health Club at any time, when in fact, Goldberg can only use it when she is occupying her HCU.

89.    In addition, the Trump Defendants concealed, suppressed and/or omitted material facts from Goldberg concerning her potential purchase of a Trump Tower HCU and her decision to continue to make her earnest money and F, F & E payments to the Trump Defendants, in that, among other things, they failed to reveal, concealed and/or suppressed that:

a.    directly contrary to their statements that Goldberg could use her HCU as much as she wanted without adversely affecting her ability to rent her HCU through the Trump Defendants' HCU Rental Reservation Program, they were going to require Goldberg to contractually agree, as a condition of her participation in the HCU Rental Reservation Program, that each use of her HCUs would adversely affect her ability to rent her HCUs through the Trump Defendants' HCU Rental Reservation Program when they were not in use;

b.    they were going to require Goldberg to contractually agree, as a condition of her

-23-

participation in the HCU Rental Reservation Program, to additional previously undisclosed daily charges that she would have to pay the Trump Defendants and/or their agents, in connection with her HCUs rental;

c. they were going to require Goldberg to contractually agree, as a condition of her participation in the HCU Rental Reservation Program, to allow the Trump Defendants and/or their agents, to have complete discretion on how to allocate HCU rental opportunities without regard to any equitable distribution of such opportunities based on the previously promised rotation points system, or any rotation system at all;

d. they were going to remove the Hotel Meeting/Function Rooms, Ballrooms, storage areas and laundry facilities from the common elements Goldberg was promised she was receiving with her HCUs and convert them into commercial property that would be owned by the Trump Defendants;

e. they were going to keep all rental fees and commissions generated by the Trump Tower Meeting/Function Rooms and Ballrooms that were previously promised to be given to the Trump Tower Condominium Association;

f. that Goldberg's membership to the Trump Tower Health Club, that she was required to purchase with her HCU, would only entitle Goldberg to use it when she was actually occupying her unit; and

g. they were going to require Goldberg to contractually agree, as a condition of her participation in the HCU Rental Reservation Program, to pay for all damages to her unit caused by any guests to which the Trump Defendants and/or their agents rented Goldberg's HCUs, as well as all charges, including room rental and hotel services incurred by such guests for which they failed to pay.

90. The Trump Defendants made the statements and omissions to Goldberg, as set forth in ¶¶ 14-36, 88-89 of this Count, with the intent that Goldberg would rely on them in deciding to purchase her Trump Tower HCUs, and/or to fraudulently induce Goldberg to purchase those units and Goldberg did so rely on them in deciding to purchase her HCUs.

91. As a result of the Trump Defendants' false statements, false promises, material misstatements, misrepresentations and/or omissions, Goldberg has been damaged through, among other things, the loss of her deposit monies, the interest on such monies, the value of her HCUs, the

-24-

loss of monies and benefits she was to derive from the purchase of her HCUs, unlimited use of her HCUs without impingement of her ability to earn rental income through the Trump Defendants' HCU Rental Reservation Program, rental income from her HCUs when she is not using them and access to the Trump Tower Health Club when she is not occupying her HCUs.

92.     The Trump Defendants' false, misleading, deceptive and/or misrepresentative statements to Goldberg, as well as their concealment, suppression and/or omission of material facts from Goldberg, as set forth in this Count, constituted unfair or deceptive practices under § 2 of the Consumer Fraud Act which entitles Goldberg to, among other things, rescind the Goldberg Purchase Agreements, compensatory and punitive damages, reasonable attorney's fees and costs.

WHEREFORE, Goldberg respectfully requests this Court to enter an order:

a.      enjoining the closing on her HCUs;

b.      allowing Goldberg to rescind the Goldberg Purchase Agreements before the closing on her HCUs;

c.      directing the Trump Defendants to tender to Goldberg all of the deposit monies paid to them under the Goldberg Purchase Agreements, a sum of $516,487.40, along with any interest due her under either or both of those Agreements, plus judgment interest as allowed by law on all such deposited monies, and any other monetary damages available under applicable law;

d.      awarding Goldberg punitive damages in an amount in excess of $500,000.00; and

e.      awarding Goldberg reasonable attorney's fees and costs, as specifically allowed under the Consumer Fraud Act.

## FEDERAL INTERSTATE LAND SALES FULL DISCLOSURE ACT CLAIM
## COUNT III

1-92.   Plaintiff Goldberg hereby incorporates and re-alleges ¶¶ 1-92 of Count II of this Complaint as ¶¶ 1-92 of this Count III.

93. The Trump Defendants' statements to Goldberg, as described in ¶¶ 14-49 of this Count, were all made, directly or indirectly with respect to the sale of particular Trump Tower HCUs to Goldberg.

94. The Trump Defendants' statements, as described in ¶¶ 14-49 of this Count, to Goldberg with respect to their sale of Trump Tower HCUs to Goldberg, were all directly or indirectly made:

a. to obtain money from Goldberg by means of an untrue statement and/or statements of material facts, and/or omissions of material facts; and/or

b. to engage in a transaction practice or course of business which operated as a fraud or deceit upon Goldberg in violation of § 1703 of the Interstate Land Sales Act.

95. As a result of the Trump Defendants' false statements, false promises, material misstatements, misrepresentations and/or omissions, Goldberg has been damaged through, among other things, the loss of her deposit monies, the interest on such monies, the value of her HCUs, the loss of monies and benefits she was to derive from the purchase of her HCUs, including but not limited to, her proportionate share of the revenue and commissions from the Trump Tower Meeting/Function Rooms and Ballrooms, unlimited use of her HCUs without impingement of her ability to earn rental income through the Trump Defendants' HCU Rental Reservation Program, rental income from her HCUs when she is not using them and access to the Trump Tower Health Club when she is not occupying her HCUs.

WHEREFORE, Plaintiff Goldberg, respectfully requests this Court enter an order, pursuant to §§ 1703 and 1709 of the Interstate Land Sales Act:

a. enjoining the closing on her HCUs;

b. allowing Goldberg to rescind the Goldberg Purchase Agreements;

-26-

c.   awarding Goldberg compensatory damages including, but not limited to, the return of her $516,487.40 in deposit monies tendered to the Trump Defendants under either or both of these Agreements, plus interest due her on such monies under either or both of these Agreements, and any other monetary damages available under applicable law; and

d.   reasonable attorney's fees and costs, including the cost of independent appraisers fees, if required, in the prosecution of this claim as specifically provided for under this Act.

## ILLINOIS SECURITIES ACT CLAIMS
## COUNT IV

1-95.   Plaintiff, Goldberg, hereby incorporates and re-alleges ¶¶ 1-95 of Count III of this Complaint as ¶¶ 1-95 of this Count IV.

96.   The Trump Tower is a business enterprise, operated by the Trump Defendants, designed to, among other things, yield revenue from the operation of the Trump International Hotel, and all of its related operations, including its Meeting/Function Rooms, Ballrooms, restaurants, the HCU Rental Reservation Program and the Trump Tower Health Club and Spa ("Trump Tower Enterprise").

97.   The Trump Defendants are "issuers" under § 2.2 of the Illinois Securities Act.

98.   The Trump Defendants' offer to sell the HCUs to Goldberg is an "offer" under § 2.5a of the Illinois Securities Act.

99.   The Trump Defendants' HCU sales to Goldberg is a "sale" under § 2.5 of the Illinois Securities Act.

100.   Each HCU sold and/or offered by the Trump Defendants is a "security" under § 2.1 of the Illinois Securities Act for various reasons, including the following:

a.   the value of the HCUs are all dependent upon the success or failure of the Trump Tower Enterprise, in that, among other things, the HCU would lose appreciable value

-27-

if the Trump Tower Enterprise failed to successfully operate the Trump Tower and related services, including its Health Club and Spa, room service, restaurant and its other hotel service operations;

b.    the Trump Defendants' sales promotional material and/or oral representations, as well as statements made in the aforementioned Property Reports, all gave rise to a reasonable understanding that HCU purchasers, including Goldberg, would obtain a valuable benefit, over and above any monies paid for their HCUs, strictly as a result of the operations of the Trump Tower Enterprise, including but not limited to the following:

    (1)    HCU ownership would lead to a stream of income from renting the HCU through the Hotel Rental Reservation Program operated exclusively by the Trump Defendants that also was part of their association with a "worldwide reservation system" over and above all costs and/or expenses associated with such HCU ownership;

    (2)    the HCU would appreciate in value 79% to 86% more than condominium units in comparable properties as a result of "The Trump Factor," *i.e.* the Trump Organization, construction, management and operations of properties such as Trump Tower;

    (3)    an HCU's rental revenue stream would be greatly enhanced by "award winning Trump service," and the operation of the Trump Tower by the Trump Defendants in a manner consistent with a hotel containing "five star amenities and the services of a luxurious hotel";

    (4)    the HCU Condominium Association would earn a stream of income of between four and five million dollars ($4,000,000.00 - $5,000,000.00) per year, that would inure directly to the benefit of HCU purchasers, including Goldberg, from their share of the rental fees and commissions earned by the Trump Defendants from the rental of the Trump Tower's Meeting/Function Rooms and/or Ballrooms; and

c.    HCU purchasers, including Goldberg, did not receive and did not intend to receive the right to exercise any practical or actual control over the managerial decisions of the Trump Tower Enterprise; and/or any power to influence the utilization of the capital invested in the Trump Tower; while all of the economic benefits obtained from purchasing an HCU would instead result exclusively from the managerial efforts of others, including the Trump Defendants and/or their agents.

101.    By failing to register the HCUs as securities with the Illinois Secretary of State, the

-28-

Trump Defendants violated § 5 of the Illinois Securities Act.

102.    By failing to deliver to Goldberg a prospectus that met the requirements of the Illinois Securities Act, the Trump Defendants violated § 5 of the Illinois Securities Act.

103.    By failing to register themselves or their sales agents as issuers of securities, dealers or salespersons with the Illinois Secretary of State, the Trump Defendants violated of § 8 of the Illinois Securities Act.

104.    By failing to file any application, report or document required to be filed with the Secretary of State, the Trump Defendants violated § 5 *et seq.*, of the Illinois Securities Law.

105.    The sale of an HCU as a security to Goldberg does not fall under any exemption under either § 3 or § 4 of the Illinois Securities Act.

106.    The Trump Defendants' sale, attempt to sell and/or offer for sale of HCUs, including the HCUs to Goldberg, violated the provisions of the Illinois Securities Act, and therefore Goldberg, under § 13 of the Illinois Securities Act, may recover the full amount paid for her HCUs and 10% interest from the date of payment, costs and reasonable attorney's fees, less the amount of income received on the security.

107.    On September 2, 2009, Goldberg gave written notice to the Trump Defendants of her decision to pursue remedies set forth in § 13 of the Illinois Securities Act. *A copy of that notice is attached hereto as Exhibit N.*

WHEREFORE, Goldberg respectfully requests this Court to enter an order:

a.    enjoining the closing on her HCUs;

b.    allowing Goldberg to rescind the Goldberg Purchase Agreements prior to closing;

c.    awarding Goldberg compensatory damages including, but not limited to, the

-29-

$516,487.40 in deposit monies she tendered to the Trump Defendants plus reasonable interest, including the 10% statutory interest allowed under the Illinois Securities Act; and

d.     reasonable costs and attorney's fees as specifically required under the Illinois Securities Act.

## BREACH OF CONTRACT (RESCISSION)
## COUNT V

### (Against 401 North Wabash Only)

1-107. Plaintiff, Goldberg, hereby incorporates and re-alleges ¶¶ 1-107 of Count IV of this Complaint as ¶¶ 1-107 of this Count V.

108.     Under § 2(a) of both of the Goldberg Purchase Agreements, 401 North Wabash agreed to convey to Goldberg, *inter alia*, the "undivided percentage interest attributable to such unit as a tenant-in-common in the Common Elements" (Goldberg Common Elements).

109.     Section 4 of the Goldberg Purchase Agreements states that the "Condominium Declaration, By-Laws, Budget, Floor Plans, and such other documents . . . are collectively called the "Condominium Documents." Section 4 further states that "Seller shall . . . obtain the Purchaser's approval of any changes in the Condominium Documents . . . when and if such . . . approval is required by law."

110.     Section 22 of the Illinois Condominium Property Act requires that 401 North Wabash obtain approval from seventy-five percent (75%) of the buyers then owning an interest in Trump Tower HCUs (the buyers) of any material changes to the Trump Tower Declaration of Condominium, By-Laws, projected operating budget and other documents.

111.     401 North Wabash did not obtain approval from seventy-five percent (75%) of the

buyers for any of the material changes to the Trump Tower Declaration of Condominium, By-Laws, projected operating budget and other related documents.

112.    401 North Wabash is not conveying the Goldberg Common Elements it agreed to convey at the time it entered into the Goldberg Purchase Agreements.

113.    401 North Wabash thus breached the Goldberg Purchase Agreements.

WHEREFORE, Plaintiff Goldberg respectfully requests this Court to enter an order:

a.      enjoining the closing on her HCUs;

b.      allowing Goldberg to rescind the Goldberg Purchase Agreements;

c.      awarding Goldberg compensatory damages including, but not limited to, the return of her $ 516,487.40 in deposit monies tendered to 401 North Wabash under the Goldberg Purchase Agreements, including any interest due Goldberg under the Goldberg Purchase Agreements, and any other monetary damages available under applicable law; and

d.      awarding Goldberg reasonable attorney's fees and costs.

## COUNT VI

### (Constructive Trust Claim)

1-113.    Plaintiff hereby incorporate and re-alleges ¶¶ 1-113 of this Complaint as ¶¶ 1-113 of this Count VI against Deutsche Bank and the Trump Defendants.

114.    As a result of the Trump Defendants' violations of the Illinois Condominium Act, the Illinois Consumer Fraud and Deceptive Practices Act, the Federal Interstate Land Sales Full Disclosure Act, the Illinois Securities Act, in the specific manner alleged in Counts I-IV of this Complaint, as well as their breaches of the Plaintiff's Purchase Agreements, as described in the manner set forth in Count V of this Complaint, Plaintiff was induced to, and did, deposit monies toward the purchase of her HCUs (including her F, F & E funds) in interest bearing accounts at

-31-

Deutsche Bank and is now owed such monies plus interest on such monies under the Purchase Agreements as a result of the Trump Defendants' aforementioned statutory breaches and breaches of contract ("Deposit Monies").

115. Accordingly, Plaintiff is entitled to, among other things, a return of all of her Deposit Monies, plus interest, which consist of $538,572.04.

116. All of the Deposit Monies placed with Deutsche Bank as a result of the Trump Defendants' wrongful conduct described in ¶ 114 of this Count are subject to a constructive trust.

117. The Trump Defendants have made written representations in the aforementioned Property Reports that such monies are being held in an escrow account to which they have access, is "largely controlled" by them, is not a traditional "independent escrow account" and, as a result, *inter alia*, is not protected from loss to the Trump Defendants if, among other things, they fail to perform certain obligations owed to the Plaintiff under the Purchase Agreements or there is a "dispute" that arises under the HCU Purchase Agreements.

118. Imposition of a constructive trust upon the Deposit Monies would preserve the conventional remedies available to Plaintiff to recover under her Illinois Condominium Act, Illinois Consumer Fraud and Deceptive Practices Act, Federal Interstate Land Sales Full Disclosure Act, Illinois Securities Act, and breach of contract claims.

119. Further, failure to impose a constructive trust on the Deposit Monies which were wrongfully placed with Deutsche Bank as a result of the Trump Defendants' wrongful conduct described in ¶ 114 of this Count, would result in the unjust enrichment of the Trump Defendants and/or Deutsche Bank in the event of a bankruptcy proceeding, foreclosure, or any other event that may result in the disbursement of the Deposit Monies to the Trump Defendants and/or third-parties

that rightfully belong to Plaintiff.

120.    In addition, given the Trump Defendants' admitted control over the Deposit Monies, failure to impose a constructive trust on those funds, will allow the Trump Defendants' unwarranted access to the Plaintiff's Deposit Monies during this litigation.

WHEREFORE, Plaintiff respectfully request this Court to enter an order imposing a constructive trust on the Deposit Monies described in ¶ 115 of this Count by either:

a.    Directing the Defendants to deposit the Deposit Monies with the Court or Clerk of the Court subject to further order of the Court and/or resolution of the present suit; or

b.    Directing the Defendants to transfer the Deposit Monies from the present escrow accounts at Deutsche Bank to an independent trust account unrelated to any of the parties under terms that are mutually agreed-upon by the parties; and

c.    Imposing a constructive trust upon all of the Deposit Monies and requiring turnover of such funds to Plaintiff.

Dated: September 10, 2009                        Respectfully submitted,


                                                 _____
                                                 Shelly B. Kulwin
                                                 One of Plaintiff's Attorneys

KULWIN, MASCIOPINTO & KULWIN, L.L.P.
161 North Clark Street, Suite 2500
Chicago, IL 60601
(312) 641-0300
Atty. No. 43136

-33-

Notice and Acknowledgment of Receipt of Summons and Complaint                    (3/01/07) CCG 0063

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS

JACQUELINE GOLDGERG

_____,
Plaintiff(s)

v.

401 NORTH WABASH VENTURE LLC, a Delaware Limited
Liability Company; TRUMP CHICAGO MANAGING MEMBER,
LLC, a Delaware Limited Liability Company; and DEUTSCHE
BANK TRUST COMPANY AMERICAS,                    Defendant(s)
a New York Banking Corporation

Case No. _____

Defendant(s) Amount Claimed: $ _____

## NOTICE AND ACKNOWLEDGMENT OF RECEIPT OF SUMMONS AND COMPLAINT

c/o Registered Agent Prentice-Hall Corp. System Inc,

To: 401 North Wabash Venture, LLC _____ Address: 33 N. LaSalle St. _____
(Name)

City: Chicago _____ State: Illinois _____ Zip: 60602 _____

The enclosed summons and complaint are served pursuant to section 2--213 of the Code of Civil Procedure.

You must complete the acknowledgment part of this form and return one copy of the completed form to the sender within
30 *days.

You must sign and date the acknowledgment. If you are served on behalf of a corporation, unincorporated association (including
a partnership), or other entity, you must indicate under your signature your relationship to that entity. If you are served on
behalf of another person and you are authorized to receive process, you must indicate under your signature your authority.

If you do not complete and return the form to the sender within 30 *days, you (or the party on whose behalf you are
being served) may be served a summons and complaint in any other manner permitted by law.

If you do complete and return this form, you (or the party on whose behalf you are being served) must answer the complaint
within 60 **days. If you fail to do so, judgment by default will be taken against you for the relief demanded in the
complaint.

I declare, under penalty of perjury, that this notice and acknowledgment of receipt of summons and complaint will have been
mailed on _____ September 10 , 2009 .

Dated: _____September 10 , 2009 _____        _____Mat A. Sow_____
                                                          Signature

## ACKNOWLEDGMENT OF RECEIPT OF SUMMONS AND COMPLAINT

I declare, under penalty of perjury, that I received a copy of the summons and of the complaint in the above captioned matter at:

(Please print or type)

Name: _____

Address: _____ City/State/Zip: _____

Relationship to Entity /Authority to Receive Service of Process:_____
(Not applicable if your are the named Defendant or Respondent.)

Dated: _____ , _____    _____
                                                                      Signature

*(To be completed by the person sending the notice.) Date for return of waiver must be at least 30 days from the date on which the
request is sent, or 60 days if the defendant is addressed outside the United States.

**(To be completed by the person sending the notice.) Date for answering complaint must be at least 60 days from the date on which the
request is sent, or 90 days if the defendant is addressed outside the United States.

**DOROTHY BROWN, CLERK OF THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS**

<u>Notice and Acknowledgment of Receipt of Summons and Complaint</u>                    (3/01/07) CCG 0063

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS

JACQUELINE GOLDBERG
_____ ,
                             **Plaintiff(s)**
           v.
401 NORTH WABASH VENTURE LLC, a Delaware Limited
Liability Company; TRUMP CHICAGO MANAGING MEMBER,
LLC, a Delaware Limited Liability Company; and DEUTSCHE ,
BANK TRUST COMPANY AMERICAS,     **Defendant(s)**
a New York Banking Corporation

Case No. _____

Defendant(s) Amount Claimed: $ _____

### NOTICE AND ACKNOWLEDGMENT OF RECEIPT OF SUMMONS AND COMPLAINT

                                   c/o Registered Agent Prentice-Hall Corp. System Inc,

To: 401 North Wabash Venture, LLC _____   Address: 33 N. LaSalle St. _____
               **(Name)**

City:   Chicago _____   State:  Illinois _____   Zip:  60602 _____

The enclosed summons and complaint are served pursuant to section 2--213 of the Code of Civil Procedure.

You must complete the acknowledgment part of this form and return one copy of the completed form to the sender within
   30    *days.

You must sign and date the acknowledgment. If you are served on behalf of a corporation, unincorporated association (including a partnership), or other entity, you must indicate under your signature your relationship to that entity. If you are served on behalf of another person and you are authorized to receive process, you must indicate under your signature your authority.

If you do not complete and return the form to the sender within   30   *days, you (or the party on whose behalf you are being served) may be served a summons and complaint in any other manner permitted by law.

If you do complete and return this form, you (or the party on whose behalf you are being served) must answer the complaint within   60   **days. If you fail to do so, judgment by default will be taken against you for the relief demanded in the complaint.

I declare, under penalty of perjury, that this notice and acknowledgment of receipt of summons and complaint will have been mailed on _____ September 10 _____ , _____ 2009 _____ .

Dated: _____September 10_____ , __2009__        _____
                                                    **Signature**

### ACKNOWLEDGMENT OF RECEIPT OF SUMMONS AND COMPLAINT

    I declare, under penalty of perjury, that I received a copy of the summons and of the complaint in the above captioned matter at:

(Please print or type)

Name: _____

Address: _____   City/State/Zip: _____

Relationship to Entity /Authority to Receive Service of Process: _____
(Not applicable if your are the named Defendant or Respondent.)

Dated: _____ , _____    _____
                                                       **Signature**

*(To be completed by the person sending the notice.) Date for return of waiver must be at least 30 days from the date on which the request is sent, or 60 days if the defendant is addressed outside the United States.

**(To be completed by the person sending the notice.) Date for answering complaint must be at least 60 days from the date on which the request is sent, or 90 days if the defendant is addressed outside the United States.

**DOROTHY BROWN, CLERK OF THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS**

2120 - Served     2121 - Served
2220 - Not Served     2221 - Not Served
2320 - Served By Mail     2321 - Served By Mail
2420 - Served By Publication     2421 - Served By Publication
SUMMONS     ALIAS - SUMMONS     (8/01/08) CCG N001

### IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT, _____ CHANCERY _____ DIVISION

No. _____ 09CH32851

JACQUELINE GOLDBERG,

(Name all parties)

v.

401 NORTH WABASH VENTURE LLC, a Delaware Limited
Liability Company; TRUMP CHICAGO MANAGING MEMBER,
LLC, a Delaware Limited Liability Company; and DEUTSCHE
BANK TRUST COMPANY AMERICAS,
a New York Banking Corporation

401 North Wabash Venture, LLC
c/o Registered Agent, Prentice-Hall
Corp. Systems Inc.
33 N. LaSalle Street
Chicago, IL 60602

**SUMMONS**

To each Defendant:

YOU ARE SUMMONED and required to file an answer to the complaint in this case, a copy of which is hereto attached, or otherwise file your appearance, and pay the required fee, in the Office of the Clerk of this Court at the following location:

☑ Richard J. Daley Center, 50 W. Washington, Room 802, Chicago, Illinois 60602

☐ District 2 - Skokie
5600 Old Orchard Rd.
Skokie, IL 60077

☐ District 3 - Rolling Meadows
2121 Euclid
Rolling Meadows, IL 60008

☐ District 4 - Maywood
1500 Maybrook Ave.
Maywood, IL 60153

☐ District 5 - Bridgeview
10220 S. 76th Ave.
Bridgeview, IL 60455

☐ District 6 - Markham
16501 S. Kedzie Pkwy.
Markham, IL 60426

☐ Child Support
28 North Clark St., Room 200
Chicago, Illinois 60602

You must file within 30 days after service of this Summons, not counting the day of service.
IF YOU FAIL TO DO SO, A JUDGMENT BY DEFAULT MAY BE ENTERED AGAINST YOU FOR THE RELIEF REQUESTED IN THE COMPLAINT.

To the officer:

This Summons must be returned by the officer or other person to whom it was given for service, with endorsement of service and fees, if any, immediately after service. If service cannot be made, this Summons shall be returned so endorsed. This Summons may not be served later than 30 days after its date.

Atty. No.: 43136
Name: Kulwin, Masciopinto & Kulwin, LLP
Atty. for: Plaintiff
Address: 161 N. Clark Street, Suite 2500
City/State/Zip: Chicago, IL 60601
Telephone: (312) 641-0300

WITNESS, Dorothy Brown SEP 10 2009

_____ Clerk of Court

Date of service: _____
(To be inserted by officer on copy left with defendant or other person)

Service by Facsimile Transmission will be accepted at: _____
(Area Code)    (Facsimile Telephone Number)

**DOROTHY BROWN, CLERK OF THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS**

| | |
|---|---|
| 2120 - Served | 2121 - Served |
| 2220 - Not Served | 2221 - Not Served |
| 2320 - Served By Mail | 2321 - Served By Mail |
| 2420 - Served By Publication | 2421 - Served By Publication |
| SUMMONS | ALIAS - SUMMONS |

(8/01/08) CCG N001

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
### COUNTY DEPARTMENT, _____CHANCERY_____ DIVISION

No. _____

09CH32851

09CH32

JACQUELINE GOLDGERG,
_____
(Name all parties)

v.

**401 NORTH WABASH VENTURE LLC, a Delaware Limited
Liability Company; TRUMP CHICAGO MANAGING MEMBER,
LLC, a Delaware Limited Liability Company; and DEUTSCHE
BANK TRUST COMPANY AMERICAS,
a New York Banking Corporation**

401 North Wabash Venture, LLC
c/o Registered Agent, Prentice-Hall
Corp. Systems Inc.
33 N. LaSalle Street
Chicago, IL 60602

### SUMMONS

**To each Defendant:**

YOU ARE SUMMONED and required to file an answer to the complaint in this case, a copy of which is hereto attached, or otherwise file your appearance, and pay the required fee, in the Office of the Clerk of this Court at the following location:

☑ Richard J. Daley Center, 50 W. Washington, Room _802_____, Chicago, Illinois 60602

☐ **District 2 - Skokie**
5600 Old Orchard Rd.
Skokie, IL 60077

☐ **District 3 - Rolling Meadows**
2121 Euclid
Rolling Meadows, IL 60008

☐ **District 4 - Maywood**
1500 Maybrook Ave.
Maywood, IL 60153

☐ **District 5 - Bridgeview**
10220 S. 76th Ave.
Bridgeview, IL 60455

☐ **District 6 - Markham**
16501 S. Kedzie Pkwy.
Markham, IL 60426

☐ **Child Support**
28 North Clark St., Room 200
Chicago, Illinois 60602

**You must file within 30 days after service of this Summons, not counting the day of service.**
**IF YOU FAIL TO DO SO, A JUDGMENT BY DEFAULT MAY BE ENTERED AGAINST YOU FOR THE RELIEF REQUESTED IN THE COMPLAINT.**

**To the officer:**

This Summons must be returned by the officer or other person to whom it was given for service, with endorsement of service and fees, if any, immediately after service. If service cannot be made, this Summons shall be returned so endorsed. This Summons may not be served later than 30 days after its date.

Atty. No.: _43136_____

Name: _Kulwin, Masciopinto & Kulwin, LLP_

Atty. for: _Plaintiff_

Address: _161 N. Clark Street, Suite 2500_

City/State/Zip: _Chicago, IL 60601_

Telephone: _(312) 641-0300_

WITNESS, _Dorothy Brown (seal)_

SEP 10 2009

_____
Clerk of Court

Date of service: _____
(To be inserted by officer on copy left with defendant
or other person)

Service by Facsimile Transmission will be accepted at: _____
(Area Code)   (Facsimile Telephone Number)

**DOROTHY BROWN, CLERK OF THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS**