IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| JACQUELINE GOLDBERG, | ) | |
| | ) | |
| Plaintiff/Counterdefendant, | ) | |
| | ) | |
| v. | ) | Case No. 09 cv 6455 |
| | ) | |
| 401 NORTH WABASH VENTURE LLC and | ) | Judge Amy J. St. Eve |
| TRUMP CHICAGO MANAGING MEMBER | ) | |
| LLC, | ) | |
| | ) | |
| Defendants/Counterclaimants. | ) | |

**DEFENDANTS/COUNTERCLAIMANTS'
STATEMENT OF UNDISPUTED FACTS IN
SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT**

Stephen Novack
John F. Shonkwiler
Rebekah H. Parker
NOVACK AND MACEY LLP
100 North Riverside Plaza
Chicago, IL 60606
(312) 419-6900
Doc. #464590

Defendants/Counterclaimants 401 North Wabash Venture LLC ("Wabash") and Trump Chicago Managing Member LLC ("TCMM") (together, "Defendants"), by and through their attorneys, pursuant to Rule 56 of the Federal Rules of Civil Procedure and Local Rule 56.1, submit this statement of material facts as to which there is no genuine issue and that entitle Defendants to judgment as a matter of law on all counts of the Amended Complaint and the Counterclaim.

Citations herein to "Ex. __" refer by number to the Exhibits in Defendants' Appendix of Exhibits in Support of Their Motion for Summary Judgment filed herewith ("Appendix"). The parties have stipulated that all exhibits that are not specifically objected to on authenticity grounds shall be deemed authentic for summary judgment purposes.

**I.     Parties**

1. Wabash is a Delaware limited liability company and the developer of the Trump International Hotel and Tower, 401 North Wabash, Chicago, Illinois ("Trump Tower"). Wabash's sole member is 401 Mezz Venture LLC ("Mezz"). Mezz is a limited liability company with its members comprised of three limited liability companies: Trump Chicago Managing Member LLC; Trump Chicago Member LLC; and TIHT Chicago Member Acquisition LLC. The sole member of each of these three limited liability companies is Donald Trump, a citizen of the State of New York. (Ex. 1, Declaration of Andrew Weiss ("Weiss Decl.") ¶2.)

2. TCMM is a Delaware limited liability company, the sole member of which is Donald Trump, a citizen of the State of New York. (Ex. 1, Weiss Decl. ¶17.)

3. Jacqueline Goldberg ("Plaintiff") is a resident of Evanston, Cook County, Illinois. (Ex. 2, Deposition of Jacqueline Goldberg dated July 21, 2011 ("1st Goldberg Dep.") at 7-8.)[1] Plaintiff is a certified public accountant, certified financial planner and experienced real estate investor who has invested over $10 million in cash in various rental properties. (Id. at 10-11; Ex. 3, Deposition of Jacqueline Goldberg dated October 25, 2011 ("2nd Goldberg Dep.") at 53-55, 60-62.)

## II.     The Purchase Agreements

4. Plaintiff entered into two Purchase Agreements with Wabash to purchase two hotel condominium units ("HCUs") in Trump Tower: the first, dated on or about August 2, 2006, to purchase unit 2238 for $1,239,500; and the second, dated on or about August 8, 2006, to purchase unit 2240 for $971,687. (Exs. 4, 5, Purchase Agreements; Ex. 6, Declaration of Sara Martens ("Martens Decl.) ¶3; Amended Complaint ("AC") ¶¶36-37.)

5. Plaintiff deposited $516,487.40 toward the purchases of the HCUs pursuant to Paragraph 1(b) of the Purchase Agreements. (Ex. 6, Martens Decl. ¶4; AC ¶58.)

6. As of August 2006, the HCUs had not yet been built, and the Purchase Agreements expressly authorized Wabash to amend the hotel condominium Property Report in "its sole and absolute discretion." (Ex. 1, Weiss Decl. ¶16; Exs. 4, 5, Purchase Agreements ¶4(a).)

7. The Purchase Agreements also expressly warranted that Plaintiff acquired the HCUs "for personal use" and that no "representations, undertakings, or promises, whether oral or implied or otherwise" were made to her other than what was provided for therein. (Exs. 4, 5, Purchase Agreements ¶¶9, 18.)

---

[1] Rather than burdening the record with entire deposition transcripts, the Appendix includes only those excerpts of depositions that support the material facts referenced.

8. Plaintiff was never told that buying the HCUs was a good investment or that she would profit. (Ex. 2, 1st Goldberg Dep. at 82-83, 167-68.)

9. Rather than rely upon any projections or assurances from Wabash or its brokers, Plaintiff did her own analysis and formed her own opinion about the HCUs. (Id. at 79-82.)

### III. The 2005 Property Report

10. The original Property Report ("Original Property Report") for the hotel condominium was effective as of September 24, 2003. By August 2006, when Plaintiff signed the Purchase Agreements, there had been three amendments to the Original Property Report: the First Amendment, which was effective February 25, 2004; the Second Amendment, which was effective August 18, 2004; and the Third Amendment, which was effective January 10, 2005. ((Ex. 7, Original Property Report at SJ000001$^2$; Ex. 8, First Amendment at SJ000001; Ex. 9, Second Amendment at SJ000001; Ex. 10, Third Amendment at SJ000001; Ex. 11, Declaration of Charles Reiss ("Reiss Decl.") ¶¶5-7 (The Original Property Report, First Amendment and Second Amendment only); Ex. 12, Declaration of Jill Cremer ("Cremer Decl.") ¶¶5-8; Ex. 13, Declaration of Russell Flicker ("Flicker Decl.) ¶¶5-8.)

11. Prior to signing the Purchase Agreements, Plaintiff received copies of the Original Property Report and the First, Second and Third Amendments (collectively, the Original Property Report and these three amendments will be referred to herein as the "2005 Property Report"). (Ex. 2, 1st Goldberg Dep. at 182-83; AC ¶59; Exs. 4, 5 Purchase Agreements ¶4(a).)

12. To the extent required by law, Wabash issued two versions of the Property Report and Amendments -- one that was compliant with federal law (the "HUD Version") and one that was compliant with state and local law (the "Illinois Version") (Ex. 1, Weiss Decl. ¶12.) Thus,

---

$^2$ For the Court's convenience, Defendants have added page numbers to certain lengthy documents contained in the Appendix with the prefix "SJ."

3

although Wabash had issued only four iterations of the Property Report as of August 2006 (i.e., the original Property Report and the First, Second and Third Amendments thereto), Plaintiff alleges that she actually received six separate Property Report documents consisting of four Illinois Versions and two HUD Versions. (AC ¶¶ 21-35, 59.)[3]

13. As stated in the Declarations of Charles Reiss, Russell Flicker and Jill Cremer, the disclosures in the Original Property Report and the First, Second and Third Amendments, contained the most current information then available, and accurately represented Wabash's plans for the Trump Tower as of the date those documents were issued. (Ex. 11, Reiss Decl. ¶¶5-7 (The Original Property Report, First Amendment and Second Amendment only); Ex. 13, Flicker Decl. ¶¶5-8; Ex. 12, Cremer Decl. ¶¶5-8.)

14. The Original Property Report did not include function rooms, ballrooms or a restaurant. (Ex. 1, Weiss Decl. ¶12; Compare Ex. 7, Original Property Report at SJ000047, SJ000050 with Ex. 8, First Amendment at SJ000030, SJ000030.) Those were added by the First Amendment, which made the function rooms and ballrooms hotel common elements, but continued to exclude the restaurant from the common elements. (Ex. 1, Weiss Decl. ¶12; Ex. 8, First Amendment at SJ000027, SJ 000029-30, SJ 000033.)

15. The health club, which the Original Property Report included in the common elements, was removed from the common elements by the First Amendment. (Ex. 1, Weiss Decl. ¶12; Ex. 8, First Amendment at SJ000033.)

16. The total number of HCUs and their location in the building also changed significantly after the Original Property Report. (Ex. 1, Weiss Decl. ¶12; Compare Ex. 7,

---

[3] Except where expressly stated otherwise, all references and citations to Property Report documents in Defendants' summary judgment filings -- i.e., including this Statement of Facts, the Defendants' Appendix of exhibits, the various Declarations filed in support hereof and Defendants' memorandum of law filed herewith -- are to the Illinois Versions.

Original Property Report at SJ000116-20 with Ex. 8, First Amendment at SJ000052-57.) In fact, the HCUs that Plaintiff agreed to purchase did not exist in the original plans. (Ex. 1, Weiss Decl. ¶12; Ex. 7, Original Property Report at SJ000116-20.)

17. The twenty-second floor, where Units 2238 and 2240 are located, was originally part of a ten-floor commercial space that was eliminated by amendment. (Ex. 1, Weiss Decl. ¶12; Ex. 7, Original Property Report at SJ000045; Ex. 8, First Amendment at SJ000029.)

18. Each of the First, Second and Third Amendments to the Property Report included a revised operating budget. (Ex. 1, Weiss Decl. ¶13; Ex. 7, Original Property Report at SJ000128-36; Ex. 8, First Amendment at SJ000068-78; Ex. 9, Second Amendment at SJ000023-33; Ex. 10, Third Amendment at SJ000029-38.)

19. The "$5,000,000" projected revenue figure upon which Plaintiff relies was a financial projection included in the "Estimated Operating Budget," which was Exhibit H to the Property Reports. (E.g., Ex. 10, Third Amendment at SJ000030; Ex. 2, 1st Goldberg Dep. at 187.)

20. The 2005 Property Report stated, among other things, that:

> **NO REPRESENTATIONS ARE MADE WITH RESPECT TO EXPECTED OR PROJECTED RENTAL INCOME. THERE IS NO ASSURANCE THAT THE HOTEL UNITS WILL BE ABLE TO BE RENTED AT ANY PARTICULAR RATE OR FOR ANY PARTICULAR PERIOD OF TIME AND THE RATES AND TOTAL INCOME FROM EACH UNIT WILL BE AFFECTED BY, AMONG OTHER THINGS, COMPETITION FROM OTHER LUXURY HOTELS, GUEST PREFERENCES, ECONOMIC CONDITIONS, DESIRABILITY OF LOCATION, SIZE OF UNITS, FREQUENCY OF OWNER OCCUPANCY AND MANY OTHER FACTORS.**

(Ex. 7, Original Property Report at SJ000015 (This provision of the Original Property Report was not amended by the First Amendment, Second Amendment, or Third Amendment).)

5

21. The 2005 Property Report also states that "the future value of any land is uncertain and dependent upon many factors." (E.g., Ex. 14, HUD Version First Amendment at SJ000004.)

**IV.     The 2007 Property Report**

22. On or about October 1, 2007, Wabash issued the Illinois version of the Fourth Amendment to the Property Report. (The 2005 Property Report as amended by the Fourth Amendment is referred to herein as the "2007 Property Report.") (Ex. 1, Weiss Decl. ¶6; Ex. 15, Fourth Amendment; AC ¶62.) The Fourth Amendment was effective as of October 1, 2007. (Ex. 1, Weiss Decl. ¶6, Ex. 15, Fourth Amendment at SJ000001.)

23. Plaintiff alleges that she received a copy of the Fourth Amendment in November 2007. (AC ¶67.)

24. The Fourth Amendment removed the meeting/function rooms and ballrooms from the common elements and, consistent therewith, amended the Estimated Operating Budget to reflect significant reductions in both the budgeted income and expenses associated therewith. (Ex. 1, Weiss Decl. ¶14; Ex. 10, Third Amendment at SJ000030; Ex. 15, Fourth Amendment at SJ000081.) The Fourth Amendment budget also reflected Wabash's plan to pay the association a $500,000 annual fee to maintain the projected net revenue, which is shown in the second line of the budget as a "license fee." (Ex. 1, Weiss Decl. ¶14; Ex. 10, Third Amendment at SJ000030; Ex. 15, Fourth Amendment at SJ000081.) The net result of these amendments to the Estimated Operating Budget was that both income and expenses were reduced by about four million dollars, and, accordingly, the estimated monthly assessments for Plaintiff's units changed by only about five percent. (Ex. 1, Weiss Decl. ¶15; Ex. 10, Third Amendment at SJ000030; Ex. 15, Fourth Amendment at SJ000081.)

25. In the Fourth Amendment, the estimated monthly assessments for Plaintiff's HCUs (shown on Exhibit F to the Property Reports) totaled $4,551, which put them at their second lowest point ever. They were lower than they had been in either the First Amendment ($5,832) or the Second Amendment ($5,566). Those estimated monthly assessments were at their lowest point ever under the Third Amendment ($4,002). (Ex. 1, Weiss Decl. ¶15; Ex. 8, First Amendment at SJ000065-66; Ex. 9, Second Amendment at SJ000020-21; Ex. 10, Third Amendment at SJ000023; Ex. 15, Fourth Amendment at SJ000074.)

26. The Fourth Amendment was recorded and issued to unit owners as soon as it was completed and approved by outside legal counsel. (Ex. 16, Declaration of Jim Petrus ("Petrus Decl.") ¶5; Ex. 1, Weiss Decl. ¶9; Ex. 12, Cremer Decl. ¶10.)

27. As stated in the Declarations of Andrew Weiss, Jill Cremer and Jim Petrus, the disclosures in the Fourth Amendment, contained the most current information then available, and accurately represented Wabash's plans for the Trump Tower as of the date it was issued. (Ex. 1, Weiss Decl. ¶8; Ex. 12, Cremer Decl. ¶9; Ex. 16, Petrus Decl. ¶4.)

28. Prior to the commencement of work on the Fourth Amendment, Wabash never had any plans -- either then, or in the future -- to: (a) remove meeting/function rooms, ballrooms or storage areas from the common elements of the hotel condominium; (b) remove the budgeted income (or expenses) associated with the operation of meeting/function rooms or ballrooms from the estimated operating budget for the hotel condominium; or (c) change any of the terms of HCU owners' health club memberships or fee obligations. (Ex. 11, Reiss Decl. ¶9; Ex. 13, Flicker Decl. ¶10; Ex. 12, Cremer Decl. ¶11; Ex. 1, Weiss Decl. ¶10; Ex. 16, Petrus Decl. ¶6.) Further, Ms. Cremer, Mr. Weiss and Mr. Petrus -- who all worked on the Fourth Amendment -- all testified that, as of August 8, 2006 (the date that Plaintiff signed the second HCU Purchase

7

Agreement), Wabash had not decided to make the changes described in (a), (b) or (c) above. (Ex. 12, Cremer Decl. ¶11; Ex. 1, Weiss Decl. ¶10; Ex. 16, Petrus Decl. ¶6.)

29. Wabash's plans for the Trump Tower hotel condominium never included any laundry facilities. (Ex. 11, Reiss Decl. ¶10; Ex. 13, Flicker Decl. ¶11; Ex. 12, Cremer Decl. ¶12; Ex. 1, Weiss Decl. ¶11; Ex. 16, Petrus Decl. ¶7.)

## V. The HCU Rental Agreement

30. The Hotel Condominium Rental Management Agreement for Trump Tower (the "Rental Agreement") was completed in September 2007 and made available shortly thereafter to HCU purchasers who expressed interest in the program, including Plaintiff. (Ex. 16, Petrus Decl. ¶8.)

31. Under the Rental Agreement, any net revenue from the rental of each HCU is paid directly to the owner of that particular HCU; there has never been any "pooling" of revenues. (Ex. 16, Petrus Decl. ¶9; Exs. 17, 18, Rental Agreements at ¶4.5.)

32. Further, the Trump Tower HCU rental program allows owners to: (a) live in their unit full time; (b) live in it part-time or not at all; (c) participate in the HCU Rental Management program or participate in a rental program offered by entities not affiliated with Wabash; (d) rent their unit out themselves; or (e) allow their unit to lay dormant when unoccupied. (Ex. 16, Petrus Decl. ¶10; Exs. 17, 18, Rental Agreements.)

33. Although the Rental Agreement has been amended since it was issued in October 2007, the provisions concerning the matters summarized in Paragraphs 31 and 32 described herein have never changed. (Ex. 16, Petrus Decl. ¶11.)

## VI. The Marketing Materials

34. Before the Rental Agreement, Charles Reiss and Russell Flicker were responsible for determining how the anticipated Trump Tower HCU rental program was going to operate.

8

(Ex. 11, Reiss Decl. ¶13; Ex. 13, Flicker Decl. ¶14.) Mr. Reiss and Mr. Flicker, together with Jill Cremer, also were responsible for reviewing and approving all marketing materials for Trump Tower to ensure that they were accurate in all respects, including their descriptions of the anticipated rental program. (Ex. 11, Reiss Decl. ¶¶11-12; Ex. 13, Flicker Decl. ¶¶12-13; Ex. 12, Cremer Decl. ¶¶13-14.) Mr. Reiss, Mr. Flicker and Ms. Cremer all testified that the marketing materials were always kept accurate, and they were never aware of any false statements in the marketing materials. (Ex. 11, Reiss Decl. ¶13; Ex. 13, Flicker Decl. ¶14; Ex. 12, Cremer Decl. ¶14.) At no time during their involvement in the preparation of the marketing materials for Trump Tower were any of them aware of any undisclosed plans -- either then, or in the future -- to implement a HCU rental program that differed in any way from the anticipated program terms described in the marketing materials. (Ex. 11, Reiss Decl. ¶14; Ex. 13, Flicker Decl. ¶15; Ex. 12, Cremer Decl. ¶15.)

35. The Trump Tower marketing materials that Plaintiff attached to the Complaint (the "Marketing Materials") and alleged that she relied on include the following statements regarding the hotel's various amenities:

- "What are the benefits of owning a Hotel Condominium? The hotel serves as a convenient in-town pied-a-terre for those seeking a second or even third home, but with the ability of having our hotel staff take care of your maintenance needs. An owner, family member or friend may occupy the hotel guestroom as much or as little as desirable throughout the year."

- Showcasing aspects of the amenities, fixtures, and finishes and stating that "[t]hese and so many other remarkable amenities are what make Trump International Tower & Hotel the preeminent address in Chicago . .. the address you deserve to call home."

- Accommodations "may be purchased for personal or corporate use and occupied as much or as little as desirable.

9

> When in residence, owners will have full access to the five star amenities and services of a luxurious hotel."

- The hotel "will have an intimate and private ambiance with all the comforts of home."

(Ex. 19, Marketing Materials at SJ000004, SJ000017, SJ000040; emphasis added.)

## VII. Plaintiff's Default

36. Wabash sent Plaintiff notice that the closings under the two Purchase Agreements were scheduled for June 26, 2009. (Ex. 6, Martens Decl. ¶5; Ex. 3, 2d Goldberg Dep. at 64-65; Gp. Ex. 22.) Plaintiff refused to close and threatened to file a lawsuit and motion to enjoin the closing. (Ex. 20, Declaration of Alan Garten ¶5; Ex. 21, Garten-Kulwin e-mail string.) At Plaintiff's request, Wabash agreed to temporarily suspend the closing while the parties discussed a potential settlement. (Id.) The settlement efforts were unsuccessful and Plaintiff filed this lawsuit in September 2009. (Id.)

37. Wabash sent Plaintiff notice by two letters dated November 12, 2009 that she was in default under both Purchase Agreements for failure to close, but that she could remedy the defaults by contacting Wabash to schedule closings to occur no later than December 7, 2009 (the "Cure Period"). (Ex. 6, Martens Decl. ¶6; Gp. Ex. 23) Plaintiff did not remedy the default under either of the Purchase Agreements within the Cure Period. (Ex. 6, Martens Decl. ¶7.)

38. Wabash sent Plaintiff two letters dated January 4, 2010, notifying her that the Purchase Agreements were terminated because of her defaults and failures to cure. (Ex. 6, Martens Decl. ¶8; Gp. Ex. 24.)

39. Wabash had the right to terminate the Purchase Agreements in the event of a breach by Plaintiff, and it did terminate after giving Plaintiff due notice of her breach and opportunity to cure. (Exs. 4, 5, Purchase Agreements ¶12(a).)

10

**VIII. This Action**

40. Plaintiff filed this action in the Circuit Court of Cook County, alleging six counts against Wabash, TCMM and Deutsche Bank Trust Company Americas ("Deutsche Bank"), and Defendants removed the action to this Court pursuant to 28 U.S.C. §1446 based on diversity jurisdiction. (Docket, CM/ECF No. 1.)

41. The Court dismissed various claims and dismissed Deutsche Bank as a party. (Docket, CM/ECF Nos. 33, 36, 37.)

42. Plaintiff filed a five-count Amended Complaint against Wabash and TCMM. (Docket, CM/ECF No. 48.)

43. Wabash and TCMM filed an answer and affirmative defenses, and Wabash filed a one-count Counterclaim against Plaintiff. (Docket, CM/ECF No. 54.)

44. Plaintiff filed an answer and affirmative defenses to the Counterclaim. (Docket, CM/ECF No. 56.)

45. With leave of Court, Wabash and TCMM amended their pleading to add another affirmative defense. (Docket, CM/ECF No. 84.)

**IX. TCMM**

46. TCMM: (a) has never been a member or manager of Wabash; (b) is not a party to the Purchase Agreements; (c) never had any role in writing or issuing the Original Property Report or any Amendment thereto; (d) never had any role in writing or issuing any marketing materials relating to Trump Tower; and (e) was not involved in any conduct alleged in this case. (Ex. 1, Weiss Decl. ¶17.)

Respectfully submitted,

401 NORTH WABASH VENTURE LLC
and TRUMP CHICAGO MANAGING
MEMBER LLC

By: /s/ Stephen Novack
        One of Their Attorneys

**CERTIFICATE OF SERVICE**

      Stephen Novack, an attorney, certifies that he caused copies of the foregoing to be served by electronically filing the document with the Clerk of Court using the ECF system this 26th day of April 2012.

                                                  /s/ Stephen Novack