**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| JACQUELINE GOLDBERG, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 09 C 6455 |
| | ) | |
| 401 NORTH WABASH VENTURE LLC and | ) | |
| TRUMP CHICAGO MANAGING | ) | |
| MEMBER LLC, | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION AND ORDER**

AMY J. ST. EVE, District Court Judge:

This action arises out of a dispute over the sale of two hotel condominium units in the

Trump International Hotel and Tower in Chicago, Illinois. The Plaintiff, Jacqueline Goldberg,

alleges that the Defendants – 401 North Wabash Venture LLC and Trump Chicago Managing

Member LLC – "lured her into signing" agreements to purchase two units by

"misrepresent[ing]" that the units included ownership of certain "Trump-branded luxury hotel

property and business operations [that] would generate over $5 million in revenue; an ownership

interest [that Defendants] stripped unilaterally from [unit] buyers and reclaimed for themselves

right before the hotel opened." (R. 138, Pl.'s Resp. at 1.)

In her Amended Complaint, Ms. Goldberg asserts claims under the Illinois Condominium

Property Act, the Illinois Consumer Fraud and Deceptive Business Practices Act, and the Federal

Interstate Land Sales Full Disclosure Act against both Defendants, and a single claim for breach

of contract against Defendant 401 North Wabash Venture LLC. Defendant 401 North Wabash

1

Venture LLC in turn asserts two counterclaims for breach of contract against Ms. Goldberg.

Before the Court is Defendants' motion for summary judgment on all of these claims. For the reasons explained below, the motion is granted in part, and denied in part.

## BACKGROUND

### I.     The Parties

Plaintiff Jacqueline Goldberg, a citizen of Illinois, "is a certified public accountant, certified financial planner and experienced real estate investor who has invested over $10 million in cash in various rental properties." (R. 115 & 133, Stmnt. of Undisputed Facts[1] ¶ 3.) In 2006, Plaintiff entered into agreements with Defendant 401 North Wabash Venture LLC ("Wabash LLC") to purchase two hotel condominium units – or HCUs – in the Trump International Hotel and Tower in Chicago, Illinois ("Trump Tower"). (Id. ¶ 4.) There are "approximately 339 HCUs within Trump Tower," fifty-five percent of which have been sold since 2003. (R. 133 & 162, Stmnt. of Add'l Undisputed Facts[2] ¶ 78.)

Defendant Wabash LLC, a limited liability company, is the developer of the Trump Tower. (R. 115 & 133, Stmnt. of Undisputed Facts ¶ 1.) Non-party 401 Mezz Venture LLC is the sole member of Defendant Wabash LLC. (Id.) 401 Mezz Venture LLC "is a limited liability company with its members comprised of three [other] limited liability companies: [Defendant]

---

[1]Citations to "Stmnt. of Undisputed Facts" refer collectively to Defendants' Local Rule 56.1 Statement of Facts (R. 115) and Plaintiff's Response to Defendant's Local Rule 56.1 Statement of Facts (R. 133). For purposes of clarity, the Court will use this citation reference where the fact preceding the citation is undisputed.

[2]Citations to "Stmnt. of Add'l Undisputed Facts" refer collectively to Plaintiff's Local Rule 56.1 Statement of Additional Facts (R. 133) and Defendants' Response to Plaintiff's Local Rule 56.1 Statement of Additional Facts (R. 162). For purposes of clarity, the Court will use this citation reference where the fact preceding the citation is undisputed

Trump Chicago Managing Member LLC; Trump Chicago Member LLC; and TIHT Chicago

Member Acquisition LLC." (*Id.*)  "The sole member of each of these three limited liability

companies is Donald Trump, a citizen of [] New York." (*Id.*)  All of these entities are affiliated

with the Trump Organization, which is the "umbrella organization" for Mr. Trump's "real estate

developments and other corporate affiliates." (R. 133 & 162, Stmnt. of Add'l Undisputed Facts

¶¶ 1-3 (internal quotation marks omitted).)  The Trump Organization, through its affiliates,

"directly develops, builds and manages residential, hotel and commercial real estate projects, and

separately licenses its brand name to projects built by other developers." (*Id* ¶ 3.)

## II.     The Condominium Form of Ownership

"A condominium is an interest in real estate created by statute that gives each owner an

interest in an individual unit as well as an undivided interest in common elements.

Administration and operation of the condominium are vested in the condominium association,

which is comprised of all unit owners." *Bd. of Directors of 175 E. Del. Pl. Homeowners Ass'n v.

Hinojosa*, 287 Ill. App. 3d 886, 889, 223 Ill. Dec. 222, 679 N.E.2d 407 (Ill. App. Ct. 1997)

("Condominiums are creatures of statute"); *see also Seaphus v. Lilly*, 691 F. Supp. 127, 134

(N.D. Ill. 1988); (R. 158-1, Expert Report of Mr. Robert Levin ("Levin Report") at 7 ("A

condominium is a form of real estate ownership [that] provides owners with an undivided

percentage interest in portions of the condominium property held in common with other owners,

and an exclusive interest in an area within the condominium property.").)  In Illinois, the

operative statute is the Illinois Condominium Property Act (the "Illinois Condo Act").  *See* 765

ILCS 605/1 *et seq.*

Under the Illinois Condo Act, "[a] condominium comes into being by the recording of a declaration[, which] is prepared and recorded by either the developer or association." *Hinojosa*, 287 Ill. App. 3d at 889 (citing 765 ILCS 605/2(a) (defining the declaration as the "instrument by which the property is submitted to the provisions of [the] Act")). The "primary function" of the declaration "is to provide a constitution for the condominium. . . . The declaration contains the property's legal description, defines the units and *common elements*, provides the percentage of ownership interests, establishes the rights and obligations of owners, and contains restrictions on the use of the property." *Hinojosa*, 287 Ill. App. 3d at 889 (emphasis added); *see also Wolinsky v. Kadison*, 114 Ill. App. 3d 527, 70 Ill. Dec. 277, 449 N.E.2d 151 (Ill. App. Ct. 1983) ("When a controversy arises as to the rights of a unit owner in a condominium, we must examine any relevant provisions in the condominium enabling statute, consider the declaration, and study the bylaws and attempt to reconcile the three.").

In addition to the Illinois Condo Act, the Chicago Municipal Code governs condominium developments in Chicago. Under the Municipal Code, a condominium developer must prepare and record a "property report" that contains certain required disclosures. *See* Chi., Ill., Mun. Code ch. 13-72-020. As a general matter, the property report must contain "information [that] establishes the condominium association as a legal entity, defines the condominium units and common elements which are being established and offered for sale, provides information regarding the operation of the condominium interests, and includes a statement of the projected finances of the condominium." (R. 158-1, Levin Report at 8.)

As relevant to the present case, some condominium developments are "situated in luxury hotels or vacation properties." (*Id.* at 3.) Condominiums of this type

4

are usually built, operated and managed by established hotel operators. Hotel condominium unit owners usually either use the unit for their own purposes, or rent it out as any other hotel room on the property. The rental of a hotel condominium unit generates revenue for the owner of the hotel condominium unit. Hotel condominium units are usually marketed, rented and managed through a rental program established and administered by the hotel operator and approved by the board. In such cases, the hotel operator manages the rentals of hotel condominium units pursuant to the terms of a rental agreement it executes with the owners who participate in the rental program.

(*Id.* at 13 (internal paragraph breaks omitted).) Just like in other types of condominium developments, HCU owners would obtain sole ownership of their specific unit, and also joint ownership – as a tenant in common with other HCU owners – of the "common elements" of the condominium. (*Id.* at 7.)

## III.    Trump Tower Chicago

### A.    The Development

Trump Tower is a ninety-two story mixed-use building located at 401 North Wabash Avenue in Chicago, Illinois. (R. 48, Am. Compl. & R. 84, Am. Ans. ¶¶ 7-8.) An affiliate of the Trump Organization developed the Trump Tower "rather than license its name" to an unaffiliated developer. (R. 133 & 162, Stmnt. of Add'l Undisputed Facts ¶ 11.) The Trump developer began construction of Trump Tower in or around 2005 and completed the construction in or around 2009. The building "consists of private residences, hotel condominium units, a health club, spa, meeting rooms, ballrooms, a public parking garage, a parking garage for the private condominium residents, retail space, restaurants, and various other areas including a concierge desk, reception area, and lobby." (R. 48, Am. Compl. & R. 84, Am. Ans. ¶ 8.) The hotel condominium units – or HCUs – "were not registered as securities." (R. 133 & 162, Stmnt. of Add'l Undisputed Facts ¶ 26.)

5

In 1997, prior to the development of Trump Tower, "an affiliate of the Trump Organization opened a hotel condominium property in New York City" referred to as the "Trump Tower NYC." (*Id.* ¶ 9.) Trump Tower NYC "has a meeting room and a small health club," which are common elements that the HCU condominium association owns and operates, and which generate revenue for the association. (*Id.* ¶ 10.) The building has a rental program that permits HCU owners to rent out their units to hotel guests and earn income. (*Id.* ¶ 71.) The "rental program, among other things: (a) provides for the allocation of rental opportunities among HCU owners by, among other ways, permitting the HCU owners to stay in the unit without affecting the propriety or allocation of the rental opportunities provided through the rental project; and (b) does not charge HCU owners a percentage fee for the rental of HCUs through the rental project." (*Id.*)

The parties agree that "certain information regarding the operation of Trump Tower NYC was used as a model by the individuals who were responsible for planning the hotel condominium at Trump Tower Chicago, including information regarding (a) the rental program; (b) the operating budget; and (c) the identification of common elements." (*Id.* ¶ 13; *see also* R. 133-2, Reiss Dep. at 111 ("very much our model").)

B.      **401 North Wabash Avenue Condominium & Property Reports**

The hotel condominium units in the Trump Tower are part of the 401 North Wabash Avenue Condominium (the "Condominium"). Defendant Wabash LLC created the Condominium by preparing, among other things, a condominium declaration (the "Condominium Declaration"), pursuant to the Illinois Condo Act, 765 ILCS 605/4(g); and a condominium property report (the "Property Report"), pursuant to the Chicago Municipal Code.

*See* Chi., Ill., Mun. Code ch. 13-72-020. The Property Report contained certain disclosures required by law, and included as attachments the Condominium Declaration and an estimated budget (the "Estimated Operating Budget"), among other documents. (*See* Prop. Rep.[3] & Exs. A-L.)

The Property Report took effect on or about September 24, 2003. (R. 115 & 133, Stmnt. of Undisputed Facts ¶ 10.) Defendant Wabash LLC subsequently amended the Property Report four times: on or about February 25, 2004 ("First Amendment"); on or about August 18, 2004 ("Second Amendment"); on or about January 10, 2005 ("Third Amendment"); and on or about October 1, 2007 ("Fourth Amendment"). (*Id.*)

**IV.    Plaintiff's Purchase of Two HCUs in Trump Tower**

**A.    Purchase Agreements**

In August of 2006, Plaintiff entered into two agreements with Defendant Wabash LLC to purchase two HCUs – Units 2238 and 2240 – in the Trump Tower. (*Id.* ¶ 4.) At that time, "the HCUs had not yet been built." (*Id.* ¶ 6.) The first agreement, dated August 2, 2006, related to Unit 2238 and had a total purchase price of $1,239,500.00. (*Id.* ¶ 4.) The second agreement, dated August 8, 2006, related to Unit 2240 and had a total purchase price of $971,687.00. (*Id.*) Each purchase agreement contained materially identical provisions, and the Court will refer to the agreements collectively as the "Purchase Agreements."[4]

---

[3]Citations to "Prop. Rep." refer to the Property Report, filed at docket # 116-3.

[4]The Purchase Agreements are filed as exhibits to docket # 116. (R. 116, Ex. 4 (Unit 2238) and Ex. 5 (Unit 2240).)

In Section 2(a) of the Purchase Agreements, Plaintiff agreed to purchase from Defendant

Wabash LLC, and Defendant Wabash LLC agreed to convey to Plaintiff, the following:

> (a)     Unit No. [2238/2240] ("Purchased Unit") in the [Condominium];
>
> (b)     the undivided percentage interest attributable to such unit as a tenant-in-common in the Common Elements (as defined in the [Illinois Condo Act]) of the Condominium;
>
> (c)     the Personal Property[5]; and
>
> (d)     the FF&E[6].

(Purchase Agreements § 2(a); *see also* R. 48, Am. Compl. & R. 84, Am. Ans. ¶ 11; R. 133 &

162, Stmnt. of Add'l Undisputed Facts ¶ 27.)  Section 4(a) of the Purchase Agreements provided

in relevant part:

> Prior to closing, Seller will cause the [Condominium Declaration] to be recorded . . . . Purchaser acknowledges that Seller delivered to Purchaser prior to Purchaser's execution of this Purchase Agreement a copy of:
>
> > (1)     the Condominium Declaration which includes a copy of the By-Laws of the Association ("By-Laws");
> > (2)     the proposed first year's budget for the Association ("Budget");
> > (3)     the Floor Plan of the Purchase Unit;
> > (4)     the [P]roperty [R]eport . . . required by Chapter 13-72 of the Municipal Code of Chicago; and
> > (5)     all other items required by Section 22 of the [Illinois Condo Act].
>
> The Condominium Declaration, By-Laws, Budget, Floor Plans and such other documents required by Chapter 13-72 of the Municipal Code of Chicago and Section 22 of the [Illinois Condo Act], as amended from time to time, are collectively called the "Condominium Documents."  Purchaser acknowledges that

---

[5]The Purchase Agreements defined the "Personal Property" as "appliances," "finishes" and the "FF&E" described in attached schedules.  (Purchase Agreements § 2(a).)

[6]The Purchase Agreements defined the "FF&E" as "all furniture, fixtures, window treatments and all other furnishings, decor and accents," including "towels, lines, dishes, glassware, utensils, cookware" and other items, for the Purchased Unit.  (*Id.* § 2(c).)

Purchaser has had the opportunity to review the Condominium Documents. **Seller reserves the right, in its sole and absolute discretion, to modify the Condominium Documents**, together with the Articles of Incorporation of the Association and the Statement of Record required by the Interstate Land Sales Full Disclosure Act (the "HUD Report"), provided that Seller shall notify Purchaser or obtain the Purchaser's approval of any changes in the Condominium Documents, the HUD Report and any such other documents, as the case may be, when and if such notice or approval is required by law.  Purchaser agrees, from and after closing, to comply with the provisions of and perform all obligations imposed on Purchaser as a unit owner by the Act, the Condominium Declaration and the By Laws.

(Purchase Agreements § 4(a) (emphasis added).)  In various payments beginning in August of 2006, Plaintiff deposited a total of "$516,487.40 toward the purchases of the HCU's pursuant to Paragraph 1(b) of the Purchase Agreements."  (R. 115 & 133, Stmnt. of Undisputed Facts ¶ 5.)

### B. Documents and Other Materials that Defendants Provided to Plaintiff <u>Before</u> She Executed the Purchase Agreements

"Plaintiff testified that she met with three different real estate brokers for the Trump Defendants . . . . "  (R. 133 & 162, Stmnt. of Add'l Undisputed Facts ¶ 46.)  An affiliate of the Trump Organization "identified and retained the services of the Chicago real estate brokerage firm Koenig & Stray ('K&S') to handle Trump Tower Chicago sales and assist with the marketing materials to promote and sell the HCUs."  (*Id.* ¶ 22.)  The Trump affiliate "met with K&S and provided the information to use in those marketing materials," and also "explained to K&S the property which was offered for sale and dictated the sales practices which K&S was required to use."  (*Id.* ¶¶ 22-23.)  Prior to the execution of the Purchase Agreements, K&S or Defendants provided Plaintiff with certain materials and other information discussed below.  (R. 48, Am. Compl. & R. 84, Am. Ans. ¶¶ 15-16, 19.)

### 1. Marketing Materials

"[A]ffiliates of the Trump Organization and K&S used sales packets and other marketing materials [("Marketing Materials")] to promote Trump Tower Chicago HCUs. . . . [An affiliate of the] Trump Organization approved the Marketing Materials used for Trump Tower Chicago." (R. 133 & 162, Stmnt. of Add'l Undisputed Facts ¶ 40.) Mr. Charles Reiss, Mr. Russell Flicker and Ms. Jill Cremer "were responsible for reviewing and approving all marketing materials for Trump Tower." (R. 115 & 133, Stmnt. of Undisputed Facts ¶ 34.)

"The Marketing Materials, among other things, described numerous luxury features and amenities of the Trump Tower Chicago hotel including":

> (1)     "a 60,000 square foot Health Club and Spa";
> (2)     "Meeting Rooms featuring state of the art telecommunications systems";
> (3)     "Grand and Junior Ballrooms with 30' ceilings";
> (4)     "an 'Executive Lounge with terrace'"; and
> (5)     "20,000 square feet of multi-function space."

(R. 133 & 162, Stmnt. of Add'l Undisputed Facts ¶ 40.) The Marketing Materials used Mr. Trump's "image and likeness in order to convey his involvement in the project." (*Id.* ¶ 7.) The materials also promoted "the Trump brand as established, famous, and successful." (*Id.* ¶ 45.)

Some of the Marketing Materials related to a rental program that would be available to HCU owners. (*Id.* ¶¶ 41-43.) According to these materials, HCU owners could "occupy the unit 'as much or as little as desirable' and have it rented as a hotel room in the Trump International Hotel 'when not occupied.'" (*Id.* ¶ 42.) The program would "provide for the fair allocation of rental opportunities . . . and permit owners to occupy their units without adversely impacting the priority and allocation of rental opportunities[.]" (*Id.* ¶ 43.) The Marketing Materials included the following question and answer:

**When can owners use their hotel guestroom?** The hotel program is highly flexible with no minimum or maximum stays required. You may use your personal guestroom as many nights as you wish or not at all. . . .

**How is the hotel rental program managed?** The hotel rental program will be managed through a specialized computer reservation system that assigns 'rotation points' to guestrooms as they are occupied. The hotel rooms with the least number of rotation points are the next to be rented in the system. Through this program, guestrooms will be fairly reserved throughout the hotel.

**When does an owner's stay in a personal guestroom affect the hotel program?** When an owner, or the designated guest of an owner, occupies their personal guestroom, the reservation system does not assign any points for that night. Therefore, you are encouraged to stay in your personal guestroom since the reservation system will make up for the 'vacancy' of the room after your departure.

(*Id.*) Additionally, Defendants represented to Plaintiff that:

At no additional cost beyond the monthly assessment, each HCU owner would have a membership with the Trump Tower's health club, which the owner could use at any time.

Each HCU owner would own a percentage of the common elements, including meeting/function rooms, laundry facilities, storage areas, and ballrooms. The Condominium Association would receive a share of revenues, estimated to be roughly $5 million per year, generated from the meeting rooms and ballrooms.

When HCU owners rented their units, they would be entitled to receive the gross revenue from the rental, which consisted of the rental rate, less a per-use fee, HCU monthly costs, credit-card fees, and travel-agent fees.

(R. 48, Am. Compl. ¶¶ 20, 28-29, 32, 36.)

### 2.    Property Reports

Prior to entering into the Purchase Agreements, Plaintiff received a copy of the original Property Report, together with copies of the First, Second, and Third Amendments. Each amendment "included a revised operating budget," among other modifications. (R. 115 & 133, Stmnt. of Undisputed Facts ¶ 18.) Mr. Charles Reiss executed the Property Report, as well as the First and Second Amendments, in his capacity as senior vice president of Defendant Trump

Chicago Managing Member LLC. (R. 133 & 162, Stmnt. of Add'l Undisputed Facts ¶ 38.) Mr.

Reiss resigned his employment in 2004, and Mr. Russell Flicker signed the Third Amendment in

his capacity as senior vice president of Defendant Trump Chicago Managing Member LLC, on

behalf of Defendant Wabash LLC. (*Id.*; Third Amend.[7] at 1.)

### a. Property Report

Defendant Wabash LLC prepared and issued the Property Report in September of 2003.

(R. 115 & 133, Stmnt. of Undisputed Facts ¶ 10; R. 133 & 162, Stmnt. of Add'l Undisputed

Facts ¶ 28.) The Property Report contained the Declaration of Condominium that defined the

"common elements" as those portions of the property defined in Section 3.1 of the Declaration.

(Prop. Rep. at 13-14 & Ex. A, Decl.) Section 3.1 of the Declaration in turn provided in part as

follows:

> The Common Elements shall consist of all portions of the property, except the
> Units, . . . unless otherwise expressly specified herein. The Common Elements
> include, without limitation and if applicable, any of the following items located at
> the Property: the walls, roofs, hallways . . . housekeeping closets on each floor of
> the Condominium containing Units, *laundry facilities*, lobby facilities, *the Health
> Club, the Meeting Rooms, Storage Areas, mail boxes*, if any, cable television
> system (whether leased or owned), if any, fire escapes . . . and all other portions
> of the Property except the individual Units. . . .

(*Id.*) The Property Report further stated that each owner "shall be a member of the Health Club

for so long as such Unit Owner owns a Unit, and, as such, both the Unit Owner and their

respective Occupants . . . shall have the right to use the basic Health Club amenities . . . without

any supplemental charge[.]" (*Id.* at 16-17.) The Property Report stated that a hotel management

company would administer a hotel reservation program that would seek to promote "fair

---

[7]Citations to "Third Amend." refer to the Third Amendment to the Property Report, filed
at docket # 117-1.

allocation" of rental opportunities" by assigning reservations "on a rotating basis" among HCUs.

(*Id.* at 11; *see also* R. 133 & 162, Stmnt. of Add'l Undisputed Facts ¶ 30.)

The Estimated Operating Budget in the Property Report projected in part as follows:

| | |
|---|---|
| Common Charges | $7,162,462 |
| Commissions & Other Rentals | $65,000[8] |
| Other | $15,000[9] |
| Total Income | $7,242,462 |
| Total Expenses | $7,242,462 |
| Net Income | $0 |

(Prop. Rep., Ex. H at 1; *see also* R. 133 & 162, Stmnt. of Add'l Undisputed Facts ¶ 31.) The

Property Report contained the following cautionary language:

> **NO REPRESENTATIONS ARE MADE WITH RESPECT TO EXPECTED OR PROJECTED RENTAL INCOME. THERE IS NO ASSURANCE THAT THE HOTEL UNITS WILL BE ABLE TO BE RENTED AT ANY PARTICULAR RATE OR FOR ANY PARTICULAR PERIOD OF TIME AND THE RATES AND TOTAL INCOME FROM EACH UNIT WILL BE AFFECTED BY, AMONG OTHER THINGS, COMPETITION FROM OTHER LUXURY HOTELS, GUEST PREFERENCES, ECONOMIC CONDITIONS, DESIRABILITY OF LOCATION, SIZE OF UNITS, FREQUENCY OF OWNER OCCUPANCY AND MANY OTHER FACTORS.**

(R. 115 & 133, Stmnt. of Undisputed Facts ¶ 20 (bold and caps in original).)

### b. First Amendment

On or about February 25, 2004, Defendant Wabash LLC prepared and publicly issued the

First Amendment. (*See* First Amend.[10] at 1; R. 115 & 133, Stmnt. of Undisputed Facts ¶ 10; R.

---

[8]Of this figure, $50,000 represents income from "Meeting Room Rental" and $15,000 represents "Commissions from Spa Services." (Prop. Rep., Ex. H at 5.)

[9]"Other Income" includes "bank interest and late fees from owners." (*Id.*)

[10]Citations to "First Amend." refer to the First Amendment to the Property Report, filed at docket # 116-7.

133 & 162, Stmnt. of Add'l Undisputed Facts ¶ 32.) The amendment modified the description of

the "common elements" by (1) expanding "Meeting Rooms" to "Meeting/Function Rooms"; (2)

adding "Ballrooms"; (3) adding "the executive lounge"[11]; and (4) removing "the Health Club."

(R. 115 & 133, Stmnt. of Undisputed Facts ¶¶ 14-15.) The First Amendment did not otherwise

modify the statements in the Property Report regarding Health Club membership and the rental

program.

The Estimated Operating Budget in the First Amendment projected in part as follows:

| | |
|---|---|
| Common Charges | $3,286,012 |
| Commissions & Other Rentals | $5,038,625[12] |
| Other | $15,000[13] |
| Total Income | $8,339,637 |
| Total Expenses | $8,339,637 |
| Net Income | $0 |

(First Amend., Ex. H; *see also* R. 133 & 162, Stmnt. of Add'l Undisputed Facts ¶ 34.) Under the

First Amendment, the "estimated monthly assessments for Plaintiff's HCU's" totaled $5,832.

(R. 115 & 133, Stmnt. of Undisputed Facts ¶ 25.)

---

[11]The First Amendment stated in a later section that "the developer currently intends to construct an executive lounge on either the sixteenth (16th) or seventeenth (17th) floor of the Building as part of the Common Elements on the Building." (First Amend., Ex. A, Decl. ¶ 4.14 (providing additional detail).)

[12]Of this figure,$5,038,625 represents income from room rental; $628,500 represents "commissions [] for food service operations" related to the room rentals; and $150,000 represents commissions from room service operations. (*Id.*, Ex. H.)

[13]This includes "bank interest and late fees from owners." (*Id.*, Ex. H.)

### c.  Second Amendment

On or about August 18, 2004, Defendant Wabash LLC prepared and issued the Second

Amendment.  (*See* Sec. Amend.[14] at 1.)  This document "contained no amendments to the

Declaration of Condominium" in the First Amendment.  (R. 133 & 162, Stmnt. of Add'l

Undisputed Facts ¶ 35.)  The Estimated Operating Budget in the Second Amendment projected

in part as follows:

| | |
|---|---|
| Common Charges | $3,830,120 |
| Meeting & Ballroom Rentals, and Spa Commissions | $4,649,500[15] |
| Other | $15,000[16] |
| Total Income | $8,494,620 |
| Total Expenses | $8,494,620 |
| Net Income | $0 |

(*Id.* ¶ 36 & Sec. Amend., Ex. H.)  Under the Second Amendment, the "estimated monthly

assessments for Plaintiff's HCU's" totaled $5,566.  (R. 115 & 133, Stmnt. of Undisputed Facts ¶

25.)

### d.  Third Amendment

On or about January 10, 2005, Defendant Wabash LLC prepared and issued the Third

Amendment.  (R. 133 & 162, Stmnt. of Add'l Undisputed Facts ¶ 35.)  This document

"contained no amendments to the Declaration of Condominium set forth in" the First

Amendment.  (*Id.*)  The Estimated Operating Budget in the Third Amendment projected in part

---

[14]Citations to "Sec. Amend." refer to the Second Amendment to the Property Report, filed at docket # 116-9.

[15]Of this figure, $4,634,500 represents income from room rental; $857,000 represents "commissions [] for food service operations" related to the room rentals; and $150,000 represents commissions from room service operations.  (Sec. Amend., Ex. H.)

[16]This figure represents "Commissions from Spa Services."  (*Id.*)

as follows:

| | |
|---|---|
| Common Charges | $4,755,633 |
| Meeting & Ballroom Rentals, and Spa Commissions | $5,053,625[17] |
| Valet Parking | $994,650 |
| Other | $15,000 |
| Total Income | $10,818,908 |
| Total Expenses | $10,818,908 |
| Net Income | $0 |

(Third Amend., Ex. H; *see also* R. 133 & 162, Stmnt. of Add'l Undisputed Facts ¶ 37.) Under

the Third Amendment, the "estimated monthly assessments for Plaintiff's HCU's . . . totaled

$4,002." (R. 115 & 133, Stmnt. of Undisputed Facts ¶ 25.)

### C. Documents and Other Materials that Defendants Provided to Plaintiff <u>After</u> the Parties Executed the Purchase Agreements, But Before Closing

#### 1. Hotel Condominium Rental Management Agreement

In or around September of 2007, Defendant Wabash LLC issued a "Hotel Condominium

Rental Management Agreement for Trump Tower" or "Rental Agreement." (*Id.* ¶ 30.) Under

the Rental Agreement, "any net revenue from the rental of each HCU is paid directly to the

owner of that particular HCU; there has never been any pooling of revenues." (*Id.* ¶ 31.) The

terms of the Rental Agreement differed from the terms that the Marketing Materials had

described. Specifically, under the Rental Agreement: (1) the "extent of the HCU owners use of

their units would adversely affect that unit's ability to be rented in the program"; and (2) HCU

owners would incur new fees and charges, including a 3% administration fee; a $6/night

reservation fee; and a $30/night marketing fee. (*See* R. 133 & 162, Stmnt. of Add'l Undisputed

---

[17]Of this figure, $15,000 represents income from "Spa Commissions"; $857,000
represents income from "commissions for food service operations" related to the room rentals;
and $150,000 represents commissions from room service operations. (Third Amend., Ex. H.)

Facts ¶ 55.)  Prior to the Rental Agreement, Mr. Charles Reiss and Mr. Russell Flicker were "responsible for determining how the anticipated . . . rental program was going to operate."  (R. 115 & 133, Stmnt. of Undisputed Facts ¶ 34.)

### 2.    Fourth Amendment

Defendant Wabash LLC prepared and issued the Fourth Amendment to the Property Report on or about October 1, 2007 (*see* Fourth Amend.[18] at 1; R. 115 & 133, Stmnt. of Undisputed Facts ¶ 22), which was about "two months before [Trump Tower] was set to open and closings were to begin on the sold condominium units."  (R. 133 & 162, Stmnt. of Add'l Undisputed Facts ¶ 52.)  Plaintiff received a copy of the amendment "[i]n November of 2007." (R. 115 & 133, Stmnt. of Undisputed Facts ¶ 23.)

The Fourth Amendment "contained certain changes to the information contained in the previous versions of the Property Reports" that Plaintiff had received prior to executing the Purchase Agreements.  (R. 133 & 162, Stmnt. of Add'l Undisputed Facts ¶ 52.)  As relevant to this case, the Fourth Amendment changed (1) membership policies for the Health Club; (2) the description of the common elements; and (3) the projected operating budget.

First, the Fourth Amendment modified the description of common elements by (1) removing "concierge area"; (2) removing "laundry facilities"; (3) removing "Meeting/Function Rooms and Ballrooms"; (4) removing "Storage Areas"; (5) removing "the executive lounge"; (6) removing "mail boxes, if any," and (7) adding "telephone systems."  (Fourth Amend., Ex. A, Decl. at 9.)  Now, the "Meeting/Function Rooms and Ballrooms are located within the

_____

[18]Citations to "Fourth Amend." refer to the Fourth Amendment to the Property Report, filed at docket # 117-3.

17

Commercial Property," rather than the Common Elements, and as such, the revenue from these functions goes to the developer. (*Id.* at 4.) Mr. Trump gave final approval for these changes. (R. 133 & 162, Stmnt. of Add'l Undisputed Facts ¶ 53.)

Second, the Fourth Amendment modified membership terms with respect to the Health Club. Under the amended report:

> Each Unit Owner . . . , without paying a basic membership fee, shall be a member of the Heath Club for so long as such Unit Owner owns *and occupies* a Unit, and as such, the Unit Owner *or* their respective Occupants . . . shall have the right to use the basic Health Club amenities . . . .

(Fourth Amend, Ex. A, Decl. at 25.) The addition of the italicized language stripped HCU owners of their complementary membership to the Health Club when the owner was not occupying her HCU.

Third, the Estimated Operating Budget now projected in part as follows:

| | |
|---|---|
| Common Charges | $5,636,605 |
| F&B License | $500,000[19] |
| Total Income | $6,136,605 |
| Subtotal Expenses | $6,079,456 |
| Contingency | $57,149 |
| Grand Total Expenses | $6,136,605 |

(*Id.*, Ex. H.) Under the Fourth Amendment, the "estimated monthly assessments for Plaintiff's HCU's . . . totaled $4,551." (R. 115 & 133, Stmnt. of Undisputed Facts ¶ 25.)

### D. Dispute Between the Parties

Defendant Wabash LLC "sent Plaintiff notice that the closings under the two Purchase Agreements were scheduled for June 26, 2009." (*Id.* ¶ 36.) Plaintiff "refused to close" and

---

[19]This figure is projected "commissions received for the food service operator." (Fourth Amend, Ex. H.)

threatened to seek to "enjoin the closing." (*Id.*)  The parties discussed a potential settlement, but their efforts were "unsuccessful." (*Id.*)  In two letters dated November 12, 2009, Defendant Wabash LLC notified Plaintiff "that she was in default under both Purchase Agreements for failure to close, but that she could remedy the defaults by contacting Wabash [LLC] to schedule closings to occur no later than December 7, 2009." (*Id.* ¶¶ 36-37.)  Plaintiff did not remedy the alleged default under either Purchase Agreement. (*Id.* ¶ 37.)  Defendant Wabash LLC then "sent Plaintiff two letters dated January 4, 2010, notifying her that the Purchase Agreements were terminated because of her defaults and failures to cure." (*Id.* ¶ 38.)

## V.    Procedural History

On September 10, 2009, Plaintiff filed a lawsuit in the Circuit Court of Cook County, Illinois against Wabash LLC, Trump Chicago Managing Member LLC, and Deutsche Bank Trust Company Americas ("Deutsche Bank").  Defendants removed the action to this Court on the basis of diversity jurisdiction.  *See* 28 U.S.C. §§ 1332, 1441, 1446.  In this federal proceeding, the Court dismissed Deutsche Bank as a Defendant and additionally dismissed certain claims against the other parties. (R. 33, 36, 37.)  On June 4, 2010, Plaintiff filed an Amended Complaint against Defendants Wabash LLC and Trump Chicago Managing Member LLC. (R. 48.)  On June 30, 2010, as amended on June 26, 2011, Defendants filed an Answer and Affirmative Defenses. (R. 54, 84.)  Additionally, Defendant Wabash LLC has asserted two counterclaims against Plaintiff (R. 54), which Plaintiff has answered. (R. 56.)

On April 26, 2012, Defendants moved for summary judgment on each of the claims and counterclaims. (R. 111, Defs.' Mot.; R. 119, Defs.' Mem.)  The motion is now fully briefed. (R. 138, Pl.'s Resp.; R. 166, Defs.' Reply.)

19

## SUMMARY JUDGMENT STANDARD

Rule 56 provides that a "party may move for summary judgment, identifying each claim or defense—or the part of each claim or defense—on which summary judgment is sought." Fed. R. Civ. P. 56(a). Under the Rule, summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Id.*; *see also Parent v. Home Depot U.S.A., Inc.*, — F.3d —, 2012 WL 4329332, at *2 (7th Cir. Sept. 24, 2012). A genuine dispute as to any material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 2510, 91 L. Ed. 2d 202 (1986); *see also* Fed. R. Civ. P. 56(c)(3) ("The court need consider only the cited materials, but it may consider other materials in the record.").

In deciding summary judgment motions, "facts must be viewed in the light most favorable to the nonmoving party only if there is a 'genuine' dispute as to those facts." *Scott v. Harris*, 550 U.S. 372, 380, 127 S. Ct. 1769, 167 L. Ed. 2d 686 (2007). The party seeking summary judgment has the initial burden of establishing that there is no genuine dispute as to any material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). After "a properly supported motion for summary judgment is made, the adverse party 'must set forth specific facts showing that there is a genuine issue for trial.'" *Anderson*, 477 U.S. at 255 (citation omitted). "[D]istrict courts presiding over summary judgment proceedings may not weigh conflicting evidence or make credibility determinations, both of which are the province of the jury." *Omnicare, Inc. v. UnitedHealth Grp., Inc.*, 629 F.3d 697, 704-05 (7th Cir. 2011) (internal citations omitted).

20

## ANALYSIS

Here, Defendants seek summary judgment on each of the five counts in the Amended Complaint, namely: violation of the Illinois Condo Act (Count I); violation of the Illinois Consumer Fraud and Deceptive Business Practices Act (Count II); violation of the Federal Interstate Land Sales Full Disclosure Act (Count III); violation of the Illinois Securities Law (Count IV); and breach of contract (Count V).[20] Defendant Wabash LLC additionally seeks summary judgment on its two counterclaims for breach of contract.

## I.     Summary Judgment on Counts I, II and III of the Amended Complaint

Plaintiff claims in Count I that Defendants violated the Illinois Condo Act, 765 ILCS 605/1 *et seq.*; in Count II that Defendants violated the Illinois Consumer Fraud and Deceptive Business Practices Act ("ICFA"), 815 ILCS 505/1 *et seq.*; and in Count III that Defendants violated the Federal Interstate Land Sales Full Disclosure Act ("Interstate Land Sales Act"), 15 U.S.C. §§ 1701 *et. seq.* Plaintiff's theory of liability for each of these counts is that Defendants "knew all along that they would <u>never</u> deliver the ownership of the hotel property and operations to HCU buyers," and therefore misrepresented, failed to disclose, omitted and/or concealed

---

[20]Defendant Trump Chicago Managing Member LLC additionally seeks summary judgment on all of the counts against it on the basis that it is not a proper party to this litigation. Defendant argues that it (1) "ceased to be" a member of Defendant Wabash LLC "long before Plaintiff signed the Purchase Agreements," "(2) is not a party to the purchase agreements; (3) never had any role in writing or issuing the Original Property Report or any Amendment thereto; and (4) never had any role in writing or issuing any marketing materials related to Trump Tower." (R. 119, Defs.' Mem. at 29; R. 166, Defs.' Reply at 38.) Although Defendant can make this argument at trial, the argument is not persuasive for purposes of summary judgment. As Plaintiff correctly observes in response, "[e]ach of the Property Reports provided to Plaintiff before she signed Purchase Agreements were executed by Fmr. VP Reiss and Fmr. VP Flicker in their capacity as Senior Vice-Presidents of TCMM, demonstrating that the TCMM entity is equally responsible for the misrepresentations here." (R. 138, Pl.'s Resp. at 36.)

material information in connection with the sale of the HCUs. (R. 138, Pl.'s Resp. at 2 (emphasis in original).)

More specifically, Plaintiff's claims under the Illinois Condo Act, the ICFA, and the Interstate Land Sales Act center around the following allegations:

Ownership of Common Elements. Defendants *represented* that "Goldberg would receive her proportionate share of the Trump Tower Common Elements that included Meeting/Function Rooms, Ballrooms, storage areas and laundry facilities" *but concealed* that Defendants "were going to remove the Hotel Meeting/Function Rooms, Ballrooms, storage areas and laundry facilities from the common elements . . . and convert them into commercial property" (R. 48, Am. Compl. ¶¶ 81(d), 82(d));

Estimated Operating Budget. Defendants *represented* that "the HCU Condominium Association would receive approximately five million dollars in commissions and rental fees generated by the Trump Tower Meeting/Function Rooms and Ballrooms" *but concealed* that Defendants "were going to keep all rental fees and commissions generated by the Trump Tower Meeting/Function Rooms and Ballrooms" (*id.* ¶¶ 81(e), 82(e));

The HCU Rental Program. Defendants *represented* that (1) Plaintiff would be "able to use her HCU as much as she wanted without adversely affecting her ability to rent it through the [rental program]"; (2) Defendants would promote the "fair allocation of rental opportunities [based on a rotation system]"); and (3) owners would "receive the gross revenue for daily rental," *but concealed* that Defendants "were going to require Goldberg to contractually agree, as a condition of her participation [in the rental program]" that: (1) "each use of her HCU would adversely affect her ability to rent her HCU" through the program; (2) she would pay "previously undisclosed daily charges"; (3) Defendants "have complete discretion" over the allocation of rental opportunities; and (4) she would pay "for all damages to her unit caused by guests . . . as well as all charges, including room rental and hotel services incurred by such guests for which they failed to pay" (*id.* ¶¶ 81(a)-(c) & 82(a)-(c), (g));

Health Club. Defendants *represented* that owners were "entitled . . . to use the Trump Tower Health Club at any time," *but concealed* that Defendants would only permit owners to use the Health Club when "actually occupying [the] unit" (*id.* ¶¶ 81(f), 82(f)).

## A. Legal Standards

Before turning to Defendants' arguments in support of summary judgment, the Court sets forth the elements of these claims.

### 1.     Count I – Illinois Condo Act

Section 22 of the Illinois Condo Act provides in relevant part that, "[i]n relation to the initial sale or offering for sale of any condominium unit, the seller must make full disclosure of, and provide copies to the prospective buyer of, the following information related to the condominium project:"

        (a)      the Declaration;

        (b)      the Bylaws of the association;

        (c)      a projected operating budget for the condominium unit to be sold to the prospective buyer, including full details concerning the estimated monthly payments for the condominium unit, estimated monthly charges for maintenance or management of the condominium property, and monthly charges for the use of recreational facilities; and

        (d)      a floor plan of the apartment to be purchased by the prospective buyer and the street address of the unit, if any, and if the unit has no unique street address, the street address of the project. . . .

765 ILCS 605/22; *see also Borys v. Josada Builders, Inc.*, 110 Ill. App. 3d 29, 30, 65 Ill. Dec. 749, 441 N.E.2d 1263 (Ill. App. Ct. 1982).  This disclosure requirement seeks "to prevent prospective purchasers from buying a unit without being fully informed and satisfied with the financial stability of the condominium as well as the management and rules and regulations which affect the unit.'"  *Mikulecky v. Bart*, 355 Ill. App. 3d 1006, 1012, 292 Ill. Dec. 10, 825 N.E.2d 266 (Ill. App. Ct. 2004) (quoting *Nikolopulos v. Balourdos*, 245 Ill. App. 3d 71, 77, 185 Ill. Dec. 278, 614 N.E.2d 412 (1993)).

As the Court previously explained, the requirement of full disclosure applies only to information "'which is available . . . before execution of the contract for sale.'"  *Goldberg v. 401 N. Wabash Venture LLC*, No. 09-CV-6455, 2010 WL 1655089, at *3 (N.D. Ill. Apr. 22, 2012) (quoting 765 ILCS 605/22) (emphasis added)).  "If a seller fails to make full disclosure as required by [Section 22], then the buyer is entitled to rescind the contract and receive a refund of

all deposit moneys paid plus interest." *Borys*, 110 Ill. App. 3d at 29.

### 2.     Count II – ICFA

The ICFA "'is a regulatory and remedial statute intended to protect consumers . . .

against fraud, unfair methods of competition, and other unfair and deceptive business

practices.'" *Windy City Metal Fabricators & Supply, Inc. v. CIT Tech. Fin. Servs., Inc.*, 536

F.3d 663, 668 (7th Cir. 2008) (quoting *Robinson v. Toyota Motor Credit Corp.*, 201 Ill.2d 403,

416, 266 Ill. Dec. 879, 775 N.E.2d 951 (2002)).  The act describes "unfair or deceptive acts or

practices" as including

> the use or employment of any deception, fraud, false pretense, false promise,
> misrepresentation or the concealment, suppression or omission of any material
> fact, with intent that others rely upon the concealment, suppression or omission of
> such material fact, . . . in the conduct of any trade or commerce . . . .

*Robinson*, 201 Ill.2d at 417 (quoting 815 ILCS 505/2); *see also Wigod v. Wells Fargo Bank,*

*N.A.*, 673 F.3d 547, 574 (7th Cir. 2012) ("The Act is liberally construed to effectuate its

purpose.") (internal quotation marks and citations omitted).

To prevail on a claim under the ICFA, the plaintiff must prove (1) an unfair or deceptive

act or practice by the defendant; (2) "the defendant's intent that the plaintiff rely" on the act or

practice; and (3) "the occurrence of" the act or practice "during a course of conduct involving

trade or commerce." *Robinson*, 201 Ill.2d at 417.

### 3.     Count III – Interstate Land Sales Act

The Interstate Land Sales Act sets up "specific disclosure regulations" and "contains a

general anti-fraud provision that makes it illegal to obtain money or property in connection with

a development by means of a material false statement or any omission of a material fact

necessary to make the statement made not misleading.'" *Sewell v. D'Alessandro & Woodyard,*

*Inc.*, 655 F. Supp. 2d 1228, 1255 (M.D. Fla. 2009) (quoting *Rice v. Branigar Org., Inc.*, 922 F.2d 788, 791 n.4 (11th Cir. 1991)); *see also* 15 U.S.C. § 1703.

### B.    Analysis

Here, the parties agree that the dispositive question, for purposes of Counts I, II, and III, is "whether there is evidence, viewed in the requisite light most favorable to Plaintiff, from which a reasonable jury could conclude that the Trump Defendants knew and failed to disclose when Plaintiff signed Purchase Agreements in 2006 that the ownership of the Trump-branded luxury hotel property and operations would not be provided when the HCUs were later delivered."  (R. 138, Pl.'s Resp. at 1; *see also* R. 166, Defs.' Reply at 2.)

In moving for summary judgment, Defendants point to the testimony of numerous current and former Trump executives and argue that "discovery has confirmed that all representations in the 2005 Property Report were true when made and accurately described Wabash's plans for Trump Tower."  (R. 119, Defs.' Mem. at 8-10 (citing  Stmnt of Undisputed Facts ¶¶ 13, 26-29).) Defendants further argue that Plaintiff "knew . . . that [changes] could happen" when she signed the Purchase Agreements, and that she lacks any evidence of fraud, non-disclosure, concealment, or other unlawful conduct that would subject Defendants to liability.  (R. 119, Defs.' Mem. at 10 (citing Defs.' Stmnt of Undisputed Facts ¶¶ 11, 14-15, 18).)

In response to the motion, Plaintiff proffers the following evidence, which the Court will discuss in detail below:  (1) the testimony of Mr. Trump about his experiences with and his views on condominium associations; (2) the testimony of Mr. Reiss and others about Mr. Trump's decision-making authority in the Trump Organization; (3) Defendants' promotion of "laundry facilities" when they never intended to include that function; (4) the expert opinions of

25

Mr. Robert Levin about industry custom and practice; and (5) the testimony of numerous current and former Trump employees who (a) were unable to testify about the timing of many significant events; and (b) offered what Plaintiff characterizes as incredible reasons for the changes effectuated by the Fourth Amendment.[21]

The Court has carefully reviewed the parties' briefs and independently reviewed the record in light of the parties' arguments. In considering the propriety of summary judgment, the Court will first review the nature of the evidence that Plaintiff proffers and then consider whether the proffered evidence, viewed in its entirety, is sufficient to defeat summary judgment.

### 1. Donald Trump's Personal Views on Condo Associations Owning and Operating Revenue-Generating Functions of his Properties

First, Plaintiff proffers the deposition testimony of Mr. Donald Trump, the sole owner and member of each Defendant corporation. Mr. Trump, a self-described "expert" on condominium developments, testified that based on his experience, he went into the Trump Tower project aware that "it can be very difficult" for a condominium board to manage function rooms, ballrooms, and food/beverage operations. (R. 133-7, Trump Dep. at 31.) Mr. Trump explained that, as a general matter, condominium associations "can change their mind," "fire

---

[21]Plaintiff proffers two additional pieces of evidence, neither of which appears to support her claims. First, Plaintiff proffers the testimony a Trump employee, Adora Manolo, who began working for Defendants in 2007. For a discussion of this testimony, see *infra* note 27 at page 29. Second, Plaintiff proffers the testimony of a sales broker, Ms. Tere Proctor. According to Plaintiff, Ms. Proctor's testimony revealed that in 2004, Mr. Reiss "leaked" to Ms. Proctor the "secret news" of a future change to the "plan that HCU buyers would own the hotel property and operations." But as Defendants correctly point out, Ms. Proctor's testimony unambiguously refers to the addition of hotel functions in 2004, not the removal of common elements years later. (R. 166, Defs.' Reply at 10-11.) Indeed, the proffered testimony, when read in the appropriate context, refers to a discussion pages earlier where the witness discussed changes in revenue projection as a result of *adding* the ballrooms to the common areas. (R. 133-12, Proctor Dep. at 96-110.)

managers," "do lots of different things to create tremendous turmoil," and "really ruin the operation very easily." (*Id.* at 44.) He further explained that if a condominium association fired a manager, "[i]t could become a disaster." (*Id.* at 45.) This "has happened before, many times, where condo boards are involved and they can't make a decision, they can't hire a manager, and the whole thing goes to hell." (*Id.* at 44-45.) This may affect not only the stability and profitability of the building, but also the Trump Organization. (*Id.* at 86.)

With regard to Trump Tower Chicago specifically, Mr. Trump testified that he was not personally involved in the initial decisions about common elements. (*Id.* at 48-51.) When asked, in light of his concerns about condominium associations, why the original Property Report allowed the condominium association to operate certain hotel functions, Mr. Trump testified, "I don't think it's something we thought of very much at the beginning. We started realizing it as we were building the building." (*Id.* at 45; *see also* at 29 (further testifying that the possibility of revenue fluctuations from operations was not "something we gave a lot of thought to at the very early stages").)

With regard to the Fourth Amendment, Mr. Trump testified: "Well, at some point, it was brought to my attention, it was brought to everyone's attention, that you need stability both in terms of a budget and in terms of management, and if the condo board was in this position, it could really lead to a disaster for the building." (*Id.*) Mr. Trump recalls that another person, likely Andy Weiss, recommended to him that Defendants make the changes contained in the Fourth Amendment. (*Id.* at 61.) Mr. Trump could not recall any specific details relating to the preparation or timing of the Fourth Amendment.

## 2.        Decision-Making Authority of Mr. Trump

Second, Plaintiff proffers the deposition testimony of Mr. Charles Reiss and others about

Mr. Trump's decision-making authority within the Trump Organization.  (*E.g.*, R. 138, Pl.'s

Resp. at 2.)  Mr. Reiss testified that Mr. Trump assigned him to work on the development of the

Trump Tower.  (R. 133-2, Reiss Dep. at 82-85.)  From the "outset" of the project in 1998, the

building was "intended to be an HCU building."  (*Id.* at 85-86.)  Mr. Reiss suggested to Mr.

Trump that the building "should be organized" as such, but "ultimately it was Mr. Trump's

decision."  (*Id.* at 86.)  Mr. Reiss made clear that "[u]ltimate authority in all cases was Mr.

Trump."  (*Id.* at 87.)  Indeed, Mr. Trump hired K&S as the firm to market and sell units in the

Trump Tower.  (*Id.* at 99-100.)  According to Mr. Reiss:

> The Trump organization was a very top down organization.  Donald, there was no
> way Donald could be involved in every decision.  There are some decisions I felt
> I needed to bring to him and there were some decisions I didn't feel I needed to
> bring to him. . . .

(*Id.* at 101.)

Mr. Reiss elsewhere suggested that he lacked authority to make decisions with respect to

the property.  In discussing an early modification to the building, for example, Mr. Reiss

testified:  "Just like all decisions, I discussed [removing office space in the building] with

Donald and we agreed that was the appropriate thing to do."  (*Id.* at 110-11; *see also id.* at 170-

71 (". . . I had no unilateral authority to do anything, but I had a great deal of latitude to make

decisions based on my previous work with Mr. Trump.").)  As to the Health Club, Mr. Reiss

testified to the following:

> QUESTION:   Who had the ultimate decision to remove the health club from the
>                        common elements?

28

ANSWER:    Like previous answers, the ultimate decision was Donald, but he
           would have – its not a major issue and he would have looked
           toward how staff recommended.

(*Id.* at 197.)

### 3.    "Pattern" of Conduct:  Laundry Facilities

Third, Plaintiff contends that Defendant "engaged in a pattern of failing to disclose and

misrepresenting information [about laundry facilities] in order to sell HCUs,"[22]  (R. 138, Pl.'s

Resp. at 14-15.)

It is undisputed that Defendants never had "plans" for Trump Tower to include "any

laundry facilities."  (R. 115 & 133, Stmnt. of Undisputed Facts ¶ 29.)  Yet Plaintiff testified that

Defendants promoted ownership of the "laundry facilities" as an income-generating function,

and the Property Report included "laundry facilities" in the description of the common elements

until the Fourth Amendment removed that function.  (Prop. Rep. at 14 ("The Common Elements

include, without limitation and if applicable, any of the following items located at the Property:

the walls, roods, hallways . . . laundry facilities, lobby facilities, the Health Club, the Meeting

Rooms, Storage Areas, mail boxes, if any cable television system . . . .").)  In fact, Mr. Reiss

"sent an email in October, 2004, stating that there would be "no laundry" in Trump Tower

---

[22]As additional evidence of this "pattern," Plaintiff states that Defendants concealed
aspects of the hotel rental program.  (R. 138, Pl.'s Resp. at 13-15.)  Plaintiff relies on the
testimony of Ms. Adora Manolo – who Defendants hired in 2007 – that she "was aware from the
inception of her term of employment that the Trump Tower rental program would be operating in
such manner that the extent of the use of units by owners would adversely impact the priority
and allocation of rental opportunities provided through the rental program."  (R. 133 & 162,
Stmnt. of Add'l Undisputed Facts ¶ 70.)  Viewing Ms. Manolo's testimony in the light most
favorable to Plaintiff, a reasonable jury could find only that Defendants had plans to modify the
hotel rental program in May of 2007.  But that is not helpful in resolving the issue before the
Court, namely whether there is sufficient evidence that Defendants had undisclosed plans in
August of 2006 when Plaintiff signed the Purchase Agreements.

Chicago, but nonetheless signed the Third Amendment in 2005 without removing "laundry facilities" from the description of the common elements.

Despite these undisputed facts, Defendants argue that there was no misrepresentation because: (1) "laundry facilities" is not a defined term like "Meeting Room" in any underlying document; (2) the description of common elements contained the words "if applicable," meaning that "including of the words 'laundry facilities' in that list reflected that, if anything generally matching that description was included in the 'Property,' it would be a common element"; and (3) Plaintiff's testimony is uncorroborated. (R. 166, Defs.' Reply at 11-13.) These arguments raise issues of weight for the jury.

Defendants' are correct that the Property Report included the phrase "if applicable," but so too did the Fourth Amendment to the Property Report that removed "laundry facilities." Additionally, although Defendants sometimes used the words "if any" following a specific common element, they did not do so with regard to "laundry facilities." Defendants did not remove the phrase "laundry facilities" until 2007, despite ample opportunity to do so, and despite Mr. Reiss' express statement in 2005 that Defendants were not including laundry facilities.

As to Plaintiff's testimony, Defendants dismiss it as "uncorroborated." The Seventh Circuit has made clear, however, that even "uncorroborated, self-serving testimony, if based on personal knowledge or firsthand experience, may prevent summary judgment against the non-moving party, as such testimony can be evidence of disputed material facts." *Marr v. Bank of Am., N .A.*, 662 F.3d 963, 968 (7th Cir. 2011) (internal citation omitted). *Cf. United States v. Stewart*, 107 Fed. App'x 667, 670 (7th Cir. 2004) (finding no error in district court's decision to credit uncorroborated testimony at sentencing) (citing *United States v. Cedano-Rojas*, 999 F.2d

1175, 1180 (7th Cir. 1993) ("The testimony of one witness, even one arguably biased against the defendant, is sufficient to support a finding of fact.")). Even if Plaintiff's testimony alone, without more, is insufficient to create a genuine issue of material fact, *see Bridgmen v. New Trier High Sch. Dist. No. 203*, 128 F.3d 1146, 1150 (7th Cir. 1997), it is sufficient to do so in concert with other evidence in the record viewed in the light most favorable to her. *See Coleman v. Donahoe*, 667 F.3d 835, 857 (7th Cir. 2012) ("Combined with the additional circumstances discussed above, [the plaintiff's] evidence is sufficient to defeat summary judgment[.]"). As discussed throughout this section, Plaintiff relies on much more than her own testimony to defeat summary judgment.

### 4.    Industry Practice and Custom

Fourth, Plaintiff proffers the expert report of Mr. Robert Levin, who opines that "established developers, like the Trump Defendants, make decisions about ownership of condominium property before any units are sold." (R. 138, Pl.'s Resp. at 14.) The Court previously explained, in a detailed order, that this type of opinion testimony is admissible. *See Goldberg v. 401 N. Wabash Venture LLC*, No. 09 C 6455, 2012 WL 368664, at *4-5 (N.D. Ill. Aug. 24, 2012). The jury could credit it, as discussed in greater detail below.

### 5.    Stated Reasons for the Changes & Inability to Testify to Specific Time-Frame

Finally, Plaintiff proffers testimony from numerous Trump witnesses to show that these witnesses almost uniformly (1) offered "non-credible explanations" for the reasons behind the changes in the Fourth Amendment (*e.g.*, the condominium association was ill-suited to own certain options even though this would have been known from the beginning ; need to prevent "gawking" at celebrities in the health club); and (2) were unable to remember or recall important

31

dates relating to the Fourth Amendment. (*Id.* at 15; *see also* R. 133 & 162, Stmnt. of Add'l Undisputed Facts ¶¶ 64-77.)

As to the latter, the Trump executives denied any implication of concealment or untimely disclosure, but they did not provide much more on the issue of timing:

<u>Mr. Donald Trump</u>

Plaintiff proffers the following testimony:[23]

COUNSEL:    . . . And you also knew from the inception of the project, based on that evaluation, that ongoing evaluation, that you might have to decide you know what, it doesn't work, the common elements being owned -- those common elements, the ballrooms, the meeting rooms, the F&B operations; that doesn't work with the condo board operating them; we have to decide maybe we should take that over.

TRUMP:    I don't know. I don't know if it was thought of at the beginning, but at a later date, it became more and more obvious.

COUNSEL:    And you don't know when that later date was?

TRUMP:    No, I don't.

*  *  *

COUNSEL:    Now, Mr. Kulwin asked you if you know -- remember when it was that your decision to take these rooms out was made. Is that still your answer?

TRUMP:    I don't know.

<u>Ms. Jill Cremer</u>

Ms. Cremer "was involved on behalf of Wabash in various aspects of the planning of Trump Tower beginning in 2002 until [she] left The Trump Organization in 2008." (R. 117-1.)

---

[23](R. 133 & 162, Stmnt. of Add'l Undisputed Facts ¶ 64 (citing R. 133-7, Trump Dep. at 70-71).)

During her deposition, Mr. Cremer testified as follows:[24]

COUNSEL:    Do you recall any meetings or discussions regarding the fourth amended property report?

CREMER:    Generally, yes, we had meetings and discussions regarding the fourth amendment.

COUNSEL:    Do you know when those meetings or discussions began?

CREMER:    No, I don't remember.

* * *

COUNSEL:    Do you recall any meetings or discussions regarding removing from the common elements the meeting, function and ballrooms?

CREMER    I don't specifically recall that.

COUNSEL:    Do you know that that occurred?

CREMER:    Yes, I do remember that that occurred.

COUNSEL:    Do you recall when you first started talking about that?

CREMER    No, I don't.

* * *

COUNSEL:    And so would it be fair to say that in the summer of 2006, at least by August 8th of 2006, you, Mr. Petrus and Andy Weiss were meeting to discuss various topics relating to Trump Hotel projects?

CREMER:    I honestly don't recall.

---

[24](*Id.* (citing R. 136-3, Cremer Dep. at 172-73, 213-15).)

<u>Mr. Andrew Weiss</u>

Mr. Weiss was "involved on behalf of Wabash in various aspects of the planning and

development for Trump Tower." (R. 116-1.) Mr. Weiss testified as follows:[25]

COUNSEL:    Did you attend meetings, conference calls, things of that nature, in which the identification or definition of what common elements would be sold to the Trump Tower hotel condominium unit buyers?

[objection omitted]

WEISS:    Are you referring to prior to the Fourth Amendment?

COUNSEL:    I'm referring to any time between 2004 when you rejoined the work on the Trump Tower - Chicago until the time that the Fourth Amendment was issued in sometime in October of '07.

WEISS:    I -- I don't recall. I attended a lot of meetings in that time frame.

COUNSEL:    Approximately, how many meetings between 2004 and 2007 would you say that you attended in which the identification or definition of common elements to be sold to the hotel condominium unit buyers was discussed?

[objection omitted]

WEISS:    I don't remember.

COUNSEL:    Do you remember any of them specifically?

WEISS:    No.

\* \* \*

WEISS:    I don't know when the final decision to remove the food and beverage operation from the common elements was made –

COUNSEL:    Was the decision made prior to [this] May 1st [2007] e-mail, if you know?

WEISS:    I don't know

---

[25](*Id.* (citing 136-1, Weiss Dep. at 47-48).)

<u>Mr. Jim Petrus</u>

Mr. Petrus "join[ed] the Trump Organization in 2006" and was "principally responsible for preparing the estimated operating budget that is Exhibit H to the Fourth Amendment to the Property Report." (R. 117-5.) Mr. Petrus testified as follows:[26]

| | |
|---|---|
| COUNSEL: | And I'm not trying to put words in your mouth. I'm just trying to understand. As you sit here today, you can't tell me with certainty when you first began work on the Trump Tower Chicago RMA, is that correct? |
| PETRUS: | That's correct. |
| COUNSEL: | And is your answer the same for when you started working on the Trump Tower Chicago hotel income statement? |
| PETRUS: | Can't recall that. |
| COUNSEL: | So the same answer. You can't pin down a particular point in time when you started working on it, correct? |
| PETRUS: | That's correct. |
| COUNSEL: | And same answer for when the discussions about an HCU owner's ability to use the health club? |
| PETRUS: | I don't recall, no. |
| COUNSEL: | Can't pin it down to a particular point in time, correct? |
| PETRUS: | Right. |
| COUNSEL: | And same with the discussions about what would or would not be included in the common elements? |
| PETRUS: | Well, I'm only going backwards now because if the date is October or November, 2 or whatever the final date was, obviously it was around that period of time logically speaking. |

[26](*Id.* (citing R. 136-8, Petrus Dep. at 92-93).)

35

COUNSEL:    Other than logically sort of putting it back together as you sit here today, can you pinpoint for me a particular point in time in which you first started having discussions with folks at the Trump organization about whether the meeting rooms, function rooms and ballrooms would or would not be included as part of the common elements?

PETRUS:    I remember conversations. I don't remember the dates if that's your question, yeah.

COUNSEL:    That's my question. So just to summarize your answer to make sure I've got it on the record, you remember talking about those issues; you don't remember at what point in time you first began to do so, is that correct?

PETRUS:    I can't rattle back the dates to you.

### Mr. Colm O'Callaghan

Mr. O'Callaghan began working for the Trump Organization in November of 2006 and, at the time of his deposition, served as the managing director of the Trump Tower. (R. 113-9.)

Plaintiff proffers the following testimony from Mr. O'Callaghan:[27]

COUNSEL:    Let's talk about the RMA and the rental agreement. You had told me before the lunch break that you were involved in discussions with legal counsel about formulating that document. Do you remember telling me that earlier today?

O'CALLAGHAN:    Yes.

COUNSEL:    I want you to put those lawyer meetings to the side, okay? Do you recall any meetings or discussions that you had in which you, your staff or people from the Trump organization were involved in which the operation of the rental program was discussed?

O'CALLAGHAN:    There were a number of meetings, yes.

COUNSEL:    Do you remember any of them specifically?

---

[27](*Id.* (citing R. 136-9, O'Callaghan Dep. at 125-26).)

| O'CALLAGHAN: | Not specifically. I mean, it was an issue that was discussed. |
| COUNSEL: | And it would be fair to say that you can't tell me when those meetings took place? |
| O'CALLAGHAN: | I can't say when. |

### 6. Analysis

Viewing the entire evidentiary record in the light most favorable to Plaintiff as the non-movant, and drawing "all reasonable factual inferences" in her favor, *see Mercatus Grp. LLC v. Lake Forest Hosp.,* 641 F.3d 834, 839-40 (7th Cir. 2011), a reasonable jury could find for Plaintiff on Counts I, II and III. Specifically, a reasonable jury could find that Defendants never intended to convey the HCUs in the manner described in the Property Report and Marketing Materials that Plaintiff received prior to August of 2006, and that Defendants therefore misrepresented and concealed material information.

The jury could reasonably infer that Mr. Trump, Defendants' principal who approved the Fourth Amendment to the Property Report, never intended to cede ownership of the hotel function areas at issue to HCU purchasers. Mr. Trump's testimony revealed his skeptical view of condominium associations. He discussed his knowledge of the "many times" that condominium associations have turned developments into a "disaster." According to Mr. Trump, condominium associations "can change their mind," "fire managers," "do lots of different things to create tremendous turmoil," and "really ruin the operation very easily," all of which can create tremendous financial and operational instability. Much of Mr. Trump's testimony, as Defendants point out, was in the abstract, but his general views, based on his knowledge and experience, including the development of the Trump Tower NYC, are

37

instructive.

Mr. Trump, an experienced real estate developer, had a great personal and financial interest in the project and was astutely aware of the development process. The development bears his name, and turmoil in condominium operations and finances, and the possibility that the condominium organization would "fire" the Trump Organization, "would be bad for the building." (R. 133-7, Trump Dep. at 85-86.) This possibly could also reflect poorly on Mr. Trump personally. Mr. Trump expressly stated:

COUNSEL: [You previously] said all sorts of bad things can happen if you let a condo board run it. [T]ey can get rid of you. They can decide not to use you and mess up the budget, and all these things. A lot of what you were saying was, sir, is that if you let the condo board run it, they can fire the Trump Organization from running the food and beverage.

TRUMP: I said if you let the condo board own it.

COUNSEL: Right. They can fire the Trump Organization, right?

TRUMP: They could ultimately fire the Trump Organization, which would be very bad for the building, but they could ultimately fire the Trump Organization.

COUNSEL: In your view it would be bad for the building.

TRUMP: Yes, that's my opinion.

COUNSEL: But, of course, they could also bring in a competitor, and it would look really bad for the Trump Organization if suddenly some other food-and-beverage company was running the food a beverage in the Trump Hotel. That wouldn't look too good, would it?

TRUMP: I think it would be bad for the building.

COUNSEL: But it would also be bad for you, wouldn't it?

TRUMP: No. I don't know.

| | | |
|---|---|---|
| COUNSEL: | Really, sir? | |
| TRUMP: | It would depend. | |
| COUNSEL: | Mr. Trump – | |
| TRUMP: | It would depend. | |
| COUNSEL: | Really?  Seriously?  Are you telling me that it wouldn't look bad if a condo board in the [Trump Tower] suddenly said, "We don't want the Trump Organization running food and beverage in this hotel.  They're doing a lousy job.  We're going to bring somebody else in."  That wouldn't be bad for your  organization? | |
| TRUMP: | We wouldn't be happy.  We wouldn't be.  [Objection omitted] | |

(*Id.* at 85-86.)

Mr. Trump and his executive team knew from the inception of the project that the common elements were an important marketing and selling point, and indeed Defendants touted the benefits of ownership of specific common elements (that they later stripped away) well before August of 2006.  Moreover, as Mr. Levin opines, it is industry practice and custom to define the common elements well in advance of construction.  *See United States v. O'Brien*, 119 F.3d 523, 533 (7th Cir. 1997) (relying in part on non-compliance with industry custom to affirm finding of intent); *Hill v. PS Ill. Trust*, 368 Ill. App. 3d 310, 320, 305 Ill. Dec. 755, 856 N.E.2d. 560 (Ill. App. Ct. 2006) (finding allegation that business practice "was contrary to well-establish industry practices" relevant to claim under the Consumer Fraud Act).

Mr. Trump testified that he approved the changes in the Fourth Amendment because "lots of things, lots of bad things could happen" if the condominium association owned the hotel function areas at issue.  (R. 133-7, Trump Dep. at 65.)  Despite his concerns regarding condominium associations, Mr. Trump explained that the pitfalls of ownership by the Condominium were "not something we thought of very much at the beginning" of this project

39

(and further testified that he was not personally involved in the early decisions about common elements). The jury could find to the contrary based on the evidence discussed above. (*E.g.*, R. 133-2, Reiss Dep. at 187.)

Individual Trump executives like Mr. Reiss may not have been aware of Mr. Trump's plans, but that does not matter because the buck stopped with Mr. Trump. He was the ultimate decision-maker and had the prerogative to share or not to share his plans for the development project.

Even if, as Defendants argue, "Plaintiff knew when she signed the Purchase Agreements that [modifications] could happen" in the future (R. 119, Defs.' Mem. at 9), this is of little moment because she claims fraud, deception, and non-disclosure *before and at the time* that she signed the Purchase Agreements. *See Burke v. 401 N. Wabash Venture, LLC*, No. 08 C 5330, 2011 WL 2565896, at *5 (N.D. Ill. June 28, 2011) (rejecting a similar argument on the basis that "nothing in the Agreement . . . allowed defendant knowingly to understand the budget in an attempt to attract buyers.").

Bolstering Plaintiff's theory of the case is the testimony of various Trump witnesses who could not recall important dates or time periods relating to the Fourth Amendment, and who offered what the jury could find are unsubstantiated reasons supporting the changes made in the Fourth Amendment. Although the "the prospect of challenging a witness' credibility is not alone enough to avoid summary judgment," *Dugan v. Smerwick Sewerage Co.*, 142 F.3d 398, 406 (7th Cir. 1998), Plaintiff's credibility arguments add context and support to the *other* evidence that Plaintiff proffers in support of her theory of the case. *Cf. Saif v. Holder*, 452 Fed. App'x 631, 632 (6th Cir. 2011) ("when combined with [the witness'] lack of credibility and documentary

40

evidence, these facts are more compelling"); *Marion County Coronor's Office v. E.E.O.C.*, 612

F.3d 924, 930 (7th Cir. 2010) ("[The defendant's] lack of credibility, combined with his stated

preference for employing African-Americans and his actions taken in furtherance of that goal,

was sufficient for the EEOC to find that [the plaintiff] was subjected to race discrimination.");

*Fry v. UAL Corp.*, 895 F. Supp. 1018, 1037 (N.D. Ill. 1995) (observing that although credibility

is insufficient to raise a genuine issue of material fact, the movant additionally relies on "other

evidence").

Moreover, Defendants rely extensively on the testimony of current and former Trump

executives in moving for summary judgment. This reliance squarely places the credibility of

these witnesses in issue. In light of the other evidence discussed above, the material issue of

when Defendants decided to make the changes effectuated in the Fourth Amendment may hinge

on the credibility of Defendants' witnesses. While these credibility issues may not be

affirmative proof in the abstract, viewing the evidence ni the light most favorable to Plaintiff,

given the other evidence in the record, this collective memory loss supports Plaintiff's theory of

the case.

Many of Defendants' attacks on Plaintiff's theory of the case are isolated attacks on

specific pieces of evidence. Although Plaintiff has not offered *direct* evidence to support her

claims, she has nonetheless met her burden by relying on numerous pieces of circumstantial

evidence that she strings together to provide a sufficient evidentiary foundation for her claims.

*See Cole v. Illinois*, 562 F.3d 812, 815 n. 2 (7th Cir. 2009) ("a number of observations each of

which supports a proposition only weakly can, when taken as a whole, provide strong support if

all point in the same direction: a number of weak proofs can add up to a strong proof") (citation

41

omitted).

###### C.      Defendants' Remaining Arguments as to Count II

Defendants offers three additional arguments as to Count Two.  None of them is persuasive for purposes of summary judgment.

###### 1.      Function Room Revenue Claim

First, Defendants argue that Plaintiff's "claim concerning function room revenue fails." (R. 119, Defs.' Mem. at 11-13.)  Defendants explain that to the extent Plaintiff alleges that Defendants' actions "depriv[ed] HCU owners of 'approximately five million dollars' in revenue,'" the claim fails because:  (1) the monetary figure was a merely an "estimate" or "projection" that cannot form the basis of a fraud claim; (2) Plaintiff "knew that the budget and her monthly assessments were subject to change"; and (3) the reduction in revenue was not material because there was also an equal reduction in expenses, meaning that the "net result was ultimately a wash for unit owners."  (*Id.*)

The Court rejects these arguments for purposes of summary judgment.  Although a projection itself may not be an actionable promise or representation, Plaintiff claims that Defendants knew, at the time, that the projection was false (because of the later changes in the Fourth Amendment) and therefore it was not a projection at all.  Similarly, as addressed above, Plaintiff's knowledge of the possibility of future changes does not extend to knowledge that Defendants would withhold or conceal information at the time of purchase.  Finally, Defendants' argument regarding materiality turns on questions of fact properly left to the jury under the circumstances of this case.  *See Loganberry Partners L.P. v. Alt. Ben. Sales, Inc.*, No. 95 C 7028, 1996 WL 296669, at *4 (N.D. Ill. May 31, 1996) (stating that "materiality of a fact [is], by

42

definition, [a] question[] of fact, in which 'all circumstances surrounding the transactions will be taken into consideration'") (quoting *Jeffrey M. Goldberg & Assoc., Ltd. v. Collins Tuttle & Co., Inc.*, 264 Ill. App. 3d 878, 885, 202 Ill. Dec. 367, 637 N.E.2d 1103 (Ill. App. Ct. 1994)).

### 2.     "Unfairness" Claim

Next, Defendants argue that Plaintiff's claim of "unfairness" under the ICFA fails as a matter of law.  (R. 119, Defs.' Mem. at 13-14.)  *See generally Saunders v. Mich. Ave. Nat'l Bank*, 278 Ill. App. 3d 307, 311, 214 Ill. Dec. 1036, 662 N.E.2d 602 (Ill. App. Ct. 1996) (discussing a claim of unfairness under the consumer fraud statute).  Defendants reason that, "as already explained [in connection with the previous claims], there is no evidence that any of the alleged statements that Plaintiff claims inducted her to buy HCUs were false at the time they were made." (R. 119, Defs.' Mem. at 13.)  Because Defendants rely on the same arguments that the Court rejected above, the motion for summary judgment on the "unfairness claim" is denied.

### D.     Conclusion

For all of these reasons, the Court denies Defendants' motion for summary judgment as to Counts I, II, and III.

## II.     Count IV – Illinois Securities Law

In Count IV, Plaintiff claims that Defendants violated the Illinois Securities Law in connection with its sale and marketing of her HCUs, which Plaintiff alleges to be "securities." (R. 48, Am. Compl. ¶¶ 75-86.)  To prevail on a claim under the Illinois Securities Law, Plaintiff must show that the transaction involved the sale of a "security" within the meaning of the statute. *See Boatmen's Bank of Benton v. Durham*, 203 Ill. App. 3d 921, 904, 148 Ill. Dec. 900, 561 N.E.2d 206 (Ill. App. Ct. 1990).  Defendants move for summary judgment on the primary basis

that "Plaintiff's HCUs are not 'securities.'"[28] (R. 119, Defs.' Mem. at 15.) Plaintiff responds

that the "HCUs are securities" under Illinois law because they are "investment contracts." (R.

138, Pl.'s Resp. at 23.)

### A. "Investment Contract"

The Illinois Securities Act, like its federal counterpart, defines "security" to include

"investment contract." 815 ILCS 5/2.1; *accord* 15 U.S.C. § 77b(1). Illinois courts look to

federal law to define "investment contract." *Ronnett v. Am. Breeding Herds, Inc.*, 124 Ill. App.

3d 842, 847, 80 Ill. Dec. 218 464 N.E.2d 1201 (Ill. App. Ct. 1984) (observing that "[t]he Federal

Securities Act of 1933 and the Securities Law are substantially similar; therefore, Illinois courts

have adopted the United States Supreme Court construction of 'investment contract'"). Under

federal law, as espoused by the United States Supreme Court in *S.E.C. v. W.J. Howey Co.*:

> an investment contract . . . means a contract, transaction or scheme whereby a
> person invests his money in a common enterprise and is led to expect profits
> solely from the efforts of the promoter or a third party, it being immaterial
> whether the shares in the enterprise are evidenced by formal certificates or by
> nominal interests in the physical assets employed in the enterprise.

328 U.S. 293, 299, 66 S. Ct. 1100, 90 L. Ed. 1244 (1946). In what has become known as the

"*Howey* test," three elements must be present for an instrument to be an investment contact: (1)

an investment of money; (2) a common enterprise; and (3) the expectation of profits to come

solely from the efforts of others. *See Rodeo v. Gillman*, 787 F.2d 1175, 1177 (7th Cir. 1986);

*Cogniplex, Inc. v. Ross*, No. 00 C 7463, 2001 WL 436210, at *9 (N.D. Ill. Apr. 27, 2001)

("Because Illinois' securities laws substantially track federal securities laws, Illinois courts have

---

[28]The parties do not discuss whether Plaintiff has standing to bring a securities law claim. The Court need not resolve that issue in light of this decision and expresses no view on the matter.

adopted the *Howey* test.").

**B.    Analysis**

The Court begins – and ends – with Defendants' argument that Plaintiff cannot establish the existence of a "common enterprise."  (R. 119, Defs.' Mem. at 16-21.)  As a general matter, there are two ways to show a "common enterprise": (1) "horizontal commonality" and (2) "vertical commonality."  *See S.E.C. v. Infinity Grp. Co.*, 212 F.3d 180, 188 n.8 (3d Cir. 2000). Horizontal commonality is the stricter of the two tests and exists where "multiple investors [] pool their investments and receive pro rata profits."  *Stenger v. R.H. Love Galleries, Inc.*, 741 F.2d 144, 146 (7th Cir. 1984).  Vertical commonality exists where the "fortunes of the investor are interwoven with and dependent upon the efforts and success of those seeking the investment."  *Id.* (internal quotation marks and citation omitted).  The Seventh Circuit "strictly" adheres to the horizontal test, *see id.*, but other circuits, like the Ninth, allow the plaintiff to show a common enterprise under either test.  *See, e.g.*, *Fed. Trade Comm'n v. Net. Servs. Dep't*, 617 F.3d 1127, 1142-43 (9th Cir. 2010).  In this case, which arises under the Court's diversity jurisdiction, the parties dispute the proper test for a common enterprise under Illinois law.  The Illinois Supreme Court does not appear to have spoken on the issue.

**1.    Horizontal Commonality**

Under the circumstances of this case, the Court concludes that Illinois courts would adhere exclusively to the test of horizontal commonality.  This is the approach that the Seventh Circuit adopted in a case directly on point.  In *Wals v. Fox Hill Dev. Corp.*, 24 F.3d 1016 (7th Cir. 1994) (Posner, J.), the Seventh Circuit considered whether a condominium time-sharing purchase and rental agreement was an "investment contract" within the meaning of the Federal

45

Securities Act of 1933. *See id.* at 1017. Under the agreement, the developer would "rent out temporarily unoccupied units as the agent of the owner," making the owner and developer "covertures in a profit-making activity." *Id.*

The court observed that this type of arrangement may be sufficient to establish vertical commonality under the law of some circuits, *see id.* at 1017-18, but not horizontal commonality, which requires "a pooling of interests not only between the developer [] and each individual 'investor,' but also among the 'investors' (the owners of the condominium, in this case)," *id.* at 1018. After surveying the available case law, the Seventh Circuit held that horizontal commonality "comports better" with the policies underlying the securities laws. *Id.* Although acknowledging the criticisms of horizontal commonality, the Seventh Circuit retorted that the securities laws seek to promote disclosure and this objective "makes sense only if the inventors are obtaining the same thing, namely an undivided share in the same pool of assets and profits." *Id.*

Turning to the record, the court held that the "unusual form of the rental agreement did not convert the sale of the home into an investment contract." *Id.* at 1019. The owners' investment "was in a specific" apartment, with a unique price and characteristics; essentially, each unit was a "different product." *Id.* Even if the rental agreements were similar between units, that was not enough to show commonality because that "approach would provide insufficient guidance to developers." *Id.* The court also reasoned:

> A share of stock, for example, is an undivided interest in an enterprise, entitling the owner to a pro rata share in the enterprise's profits. The owner of a condominium does not own an undivided share of the building complex in which his condominium is located. He owns his condominium, and if it is rented out for him by the developer he receives the particular rental on that unit rather than an undivided share of the total rentals of all the units that are rented out. The nature

of his interest thus is different from that of a shareholder in a corporation that owns rental property. This is true whether he owns the condominium all year round or owns a temporal slice of it.

*Id.* at 1018.

The *Wals* decision is almost directly on point, and although it arises under federal law, its reasoning is persuasive and applies with equal force to claims arising Illinois securities law. Indeed, the Illinois Securities Law is "substantially similar" to the federal securities laws and so Illinois courts interpret the statute with an eye towards federal law. *See, e.g., Shailja Gandhi Revocable Trust v. Sitara Cap. Mgmt., LLC*, No. 09 C 3141, 2012 WL 3580680, at *7 (N.D. Ill. Aug. 14, 2012) ("The Illinois Securities Law must be interpreted consistently with the federal laws on which it is based."); *Anderson v. Grand Bahama Dev. Co. Ltd.*, 67 Ill. App. 3d 687, 24 Ill. Dec. 114, 384 N.E.2d 981 (Ill. App. Ct. 1978) (relying on federal case law to determine whether an instrument was an investment contract under state and federal law). Even outside of the securities context, Illinois courts will not infrequently look to federal law, and specifically decisions from the Seventh Circuit, in considering analogous issues of state law.[29]

Although, as Plaintiff points out, two decisions of the Illinois Appellate Court, First District, allowed the plaintiff to proceed under either test – *Integrated Res. Servs., Inc. v. Ill. Sec'y of State, Sec. Dep't.*, 328 Ill. App. 3d 67, 262 Ill. Dec. 304, 765 N.E.2d 130 (Ill. App. Ct. 2002) and *Ronnett v. Am. Breeding Herds, Inc.*, 124 Ill. App. 3d 842, 80 Ill. Dec. 218, 464

---

[29]*See, e.g., Schroeder Muchie Laya Assoc., Ltd. v. 1000 W. Lofts, LLC*, 319 Ill. App. 3d 1089, 1094, 253 Ill. Dec. 846, 746 N.E.2d 294 (Ill. App. Ct. 2011) (standard of review in state court); *Berge v. Mader*, 2011 IL App. 103778, 354 Ill. Dec. 374, 379, 957 N.E.2d 968 (Ill. App. Ct. 2011) (judicial estoppel in state court); *W. Va. Laborers Pension Trust Fund v. Caspersen*, 357 Ill. App. 3d 673, 677-78, 293 Ill. Dec. 918, 829 N.E.2d 843 (Ill. App. Ct. 2005) (state long-arm statute); *Cannon v. William Chevrolet/Geo, Inc.*, 341 Ill. App. 3d 674, 688, 276 Ill. Dec. 593, 794 N.E.2d 843 (Ill. App. Ct. 2003) (attorney's fees).

N.E.2d 1201 (Ill. App. Ct. 1984) – those decisions have only limited persuasive and predictive value. *See Hill v. Int'l Harvester Co.*, 798 F.2d 256, 261 n.13 (7th Cir. 1986) (stating that "an intermediate appellate court decision is not binding evidence of state law in circumstances when it is not a good predictor of what the state's highest court would do in a similar case").

The older of the two cases, *Ronnett*, pre-dates the Seventh Circuit's decision in *Wals* and involved investment in "cattle breeding." After finding that there was no horizontal commonality, the court considered whether there was vertical commonality, which it answered in the affirmative. The court did not, however, analyze or explain its rationale for permitting a plaintiff to proceed under either test. Almost two decades later, the court in *Integrated Research Services* stated in boilerplate fashion that a plaintiff may establish "horizontal or vertical commonality." 328 Ill. App. 3d at 72. For this proposition, which the court applied to investments in foreign currency, the court relied exclusively on *Ronnett* without further explanation. *Id.* The court neither cited nor acknowledged the Seventh Circuit's intervening and well-reasoned decision in *Wals*.

## 2. The HCUs are Not Securities

Here, no reasonable jury could find that horizontal commonality exists. It is undisputed that "any net revenue from the rental of each HCU is paid directly to the owner of that particular HCU; there has never been any pooling of revenues." (R. 115 & 133, Stmnt. of Undisputed Facts ¶ 31.) *See S.E.C. v. Lauer,* 52 F.3d 667, 670 (7th Cir. 1995). Although the jury could find that, at least initially, Defendants represented that HCU purchasers would own a common interest in certain revenue-generating functions of the hotel, this is a far cry from being "a shareholder in a corporation that owns" rental or commercial property. *Cf. Wals*, 24 F.3d at

1018. The owner "does not own an undivided share of the building complex in which [her] condominium is located," *id.*, nor does the owner hold an interest in other units. She instead owns her specific unit and a common interest in certain enumerated common areas in a much larger building of which the HCU Condominium is only a part. (Prop. Rep. at 2 (noting that the Trump Tower additionally includes a residential condominium, a five-star luxury hotel, office and retail space, restaurant space, and garage property).) To the extent any common revenue was "pooled" – and Plaintiff does not even expressly make that argument – she has not shown that the revenue was anything more than an off-set of operational expenses, much less the fruits of an investment undertaking. (*Cf.* Prop. Rep., Ex. A, Decl. § 4.4 ("All income derived by the Association . . . shall be held and used for the benefit of the members").)

Ownership of common elements is true of every condominium development. The securities law "suggests that the term 'investment contract' has the limited purpose of identifying unconventional instruments that have the essential properties of a debt or equity security." *Wals*, 24 F.3d at 1018. Plaintiff makes no attempt to show how common ownership in this case is so extraordinary that it falls within the "ordinary concept of a security." *Johnson v. Nationwide Indus., Inc.*, 450 F. Supp. 948, 952-53 (N.D. Ill. 1978) (quoting *United Housing Found. v. Forman*, 421 U.S. 837, 95 S. Ct. 2051, 44 L. Ed. 2d 621 (1975)).

### 3.    Conclusion

The Court grants Defendants' motion for summary judgment as to Count IV.

## III.    Count V of the Amended Complaint and Counterclaims I and II

The Court now turns to the parties' breach of contract claims. In Count V, Plaintiff asserts a breach of contract claim against Defendant Wabash LLC. In Counterclaims I and II,

49

Defendant Wabash LLC asserts two breach of contract claims against Plaintiff arising out of the respective Purchase Agreements. Defendant moves for summary judgment on each of these three claims.

### A.  Legal Standard

Under Illinois law, a breach of contract claim requires the plaintiff to prove the following elements by a preponderance of the evidence: "'(1) the existence of a valid and enforceable contract; (2) substantial performance by the plaintiff; (3) a breach by the defendant; and (4) resultant damages.'" *Reger Dev., LLC v. Nat'l City Bank*, 592 F.3d 759, 764 (7th Cir. 2010) (quoting *W.W. Vincent & Co. v. First Colony Life Ins. Co.*, 351 Ill. App. 3d 752, 286 Ill. Dec. 734, 814 N.E.2d 960, 967 (2004)); *see also Wigod v. Wells Fargo Bank, N.A.*, 673 F.3d 547, 560 (7th Cir. 2012) (citing *Assoc. Benefit Serv. v. Caremark RX, Inc.*, 493 F.3d 841, 849 (7th Cir. 2007); *MC Baldwin Fin. Co. v. DiMaggio, Rosario & Veraja, LLC*, 364 Ill. App. 3d 6, 30, 300 Ill. Dec. 601, 845 N.E.2d 22, 30 (Ill. App. Ct. 2006)). Courts "do not look at any one contract provision in isolation; instead [they] read the document as a whole." *Reger Dev.*, 592 F.3d at 764 (citing *Martindell v. Lake Shore Nat'l Bank*, 15 Ill.2d 272, 154 N.E.2d 683, 689 (1958)).

### B.  Count V – Goldberg v. Wabash LLC

Plaintiff argues that Defendant breached its implied obligation of good faith regarding to Purchase Agreements by acting in a manner that was "arbitrary, capricious, and contrary to her reasonable expectations" as a party to the contract. (R. 138, Pl.'s Resp. at 34); *see also Bass v. SMG, Inc.*, 328 Ill. App. 3d 492, 262 Ill. Dec. 471, 765 N.E.2d 1079 (Ill. App. Ct. 2002) ("Illinois recognizes a 'covenant of good faith and fair dealing' in every contract as a matter of law, absent an express disavowal.") (quoting *Prudential Ins. Co. of Am. v. Van Matre*, 158 Ill.

App. 3d 298, 308, 110 Ill. Dec. 563, 511 N.E.2d 740, 746 (1987)).  The Seventh Circuit has

explained that:

> Good faith is a compact reference to an implied undertaking not to take
> opportunistic advantage in a way that could not have been contemplated at the
> time of drafting, and which therefore was not resolved explicitly by the parties.
> When the contract is silent, principles of good faith . . . fill the gap.  They do not
> block use of terms that actually appear in the contract.

*F.D.I.C. v. Rayman,* 117 F.3d 994, 1000 (7th Cir. 1997) (quoting *Kham & Nate's Shoes No. 2,*

*Inc. v. First Bank of Whiting*, 908 F.2d 1351, 1357 (7th Cir. 1990)).

Here, a reasonable  jury could find that Defendant breached an implied covenant of good

faith and fair dealing by deliberately failing to disclose material information, as described in

detail above.  Although Plaintiff agreed to permit Defendant to make changes in its "sole and

absolute discretion," she never agreed – and the jury could find that she never contemplated –

that Defendant would conceal, fail to disclose and/or misrepresent information material to the

Purchase Agreements.

Accordingly, Defendants' motion for summary judgment on Count V is denied.[30]

---

[30]Plaintiff pursues an alternative theory of breach, namely that Defendant failed to convey
ownership "as identified" in the pre-purchase Property Reports.  (*See* R. 138, Pl.'s Resp. at 34.)
That theory fails as a matter of law.  Defendants agreed to convey an "undivided interest . . . in
the Common Elements (as defined in the Illinois [Condo Act]). . . ."  (Purchase Agreements § 2.)
"Common Elements" means "all portions of the *property* except the units . . . unless otherwise
specified."  765 ILCS 605/2(e) (emphasis added).  "'Property means all of the land, property,
and space . . . submitted to the provisions of this Act" through the declaration. 765 ILCS
605/2(c).  Therefore, the Purchase Agreements entitled Plaintiff to a common interest in the
property, other than the units, as defined in the Declaration.  Although there is sufficient
evidence of fraud, concealment and non-disclosure, there is no evidence that Defendant refused
to convey to Plaintiff any interest identified in the applicable Condominium Declaration and
Property Report. *See Burke*, 2011 WL 2565896, at *4.

### C.     Counterclaims – Wabash LLC v. Goldberg

In its two counterclaims for breach of contract, Defendant Wabash LLC asserts that Plaintiff breached the Purchase Agreement for Unit 2238 (Counterclaim I) and the Purchase Agreement for Unit 2238 (Counterclaim II), by refusing to close.  (R. 54, 84, Counterclaim ¶¶ 1-33; *see also* R. 119, Defs.' Mem. at 29-31.)  In response to the counterclaims, Plaintiff has pleaded numerous affirmative defenses including fraud.  (R. 56, Ans. to Counterclaim at 10.)

In moving for summary judgment, Defendant reasons that the Purchase Agreements are valid and enforceable; Defendant performed its obligations thereunder; Plaintiff breached by failing to close; and Defendant suffered damages.  (R. 119, Defs.' Mem. at 29-31.)  Plaintiff does not dispute that Defendant can prove the elements of its breach of contract claim, but instead argues that genuine issues of material fact exist on her affirmative defense of fraud, thus precluding summary judgment.  (R. 138, Pl.'s Resp. at 36-37.)  The Court agrees, for all of the reasons discussed above with regard to Counts I, II, and III of the Amended Complaint.

### D.     Conclusion

The Court denies Defendant Wabash LLC's motion for summary judgment on Count V of the Amended Complaint, and denies Defendant's motion for summary judgment on both of its Counterclaims.

**CONCLUSION**

For all of the reasons explained above, Defendants' motion for summary judgment is

•        *denied* as to Counts I, II, III, and V of the Amended Complaint;

•        *granted* as to Counts IV of the Amended Complaint; and

•        *denied* as to Counts I and II of the Counterclaims.


**DATED:  October 16, 2012**


                                        **ENTERED**

                                        _____
                                        **AMY J. ST. EVE**
                                        **United States District Court Judge**