**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| JACQUELINE GOLDBERG, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No. 09 C 6455 |
| | ) |
| 401 NORTH WABASH VENTURE LLC and | ) |
| TRUMP CHICAGO MANAGING | ) |
| MEMBER LLC, | ) |
| | ) |
| Defendants. | ) |

**MEMORANDUM OPINION AND ORDER**

AMY J. ST. EVE, District Court Judge:

Before the Court is Defendants' motion *in limine* No. 3, in which Defendants move to bar Plaintiff from mentioning that Defendants have invoked the attorney-client privilege and from arguing that the jury may draw any negative inference therefrom. (R. 213, Defs.' MILs.) For the following reasons, the Court grants the motion.

**LEGAL STANDARD**

Although the Federal Rules of Evidence do not explicitly authorize *in limine* rulings, the practice has developed pursuant to the district court's inherent authority to manage the course of trials. *Luce v. United States*, 469 U.S. 38, 41 n.4 (1984). *In limine* rulings avoid delay and allow the parties the opportunity to prepare themselves and witnesses for the introduction or exclusion of the applicable evidence. *See Wilson v. Williams*, 182 F.3d 562, 566 (7th Cir. 1999); *United States v. Connelly*, 874 F.2d 412, 416 (7th Cir. 1989). Trial courts have broad discretion in ruling on evidentiary issues before trial. *See Christmas v. City of Chi.*, 682 F.3d 632, 640 (7th Cir. 2012). Moreover, regardless of the Court's initial ruling on a motion *in limine*, the Court may alter its ruling during the course of trial. *See Farfaras v. Citizens Bank & Trust of Chicago*,

433 F.3d 558, 565 (7th Cir. 2006). The Court will only grant a motion *in limine* when the evidence is clearly inadmissible for any purpose. *See Jonasson v. Lutheran Child & Family Servs.*, 115 F.3d 436, 440 (7th Cir. 1997); *Betts v. City of Chicago, Illinois*, 784 F. Supp. 2d 1020, 1023 (N.D. Ill. 2011).

## ANALYSIS

At the heart of Defendants' motion is the sanctity of the attorney-client privilege. The privilege is "essential to the proper functioning of our adversary system of justice;" it "promote[s] full and frank consultation between a client and legal advisor by removing the fear of compelled disclosure of information." *Ctr. Partners, Ltd. v. Growth Head GP, LLC*, 981 N.E.2d 345, 355 (Ill. 2012) (internal quotations omitted). This protection is fundamental, and "its derogation is not to be undertaken lightly." *United State v. Davis*, 1 F.3d 606, 611 (7th Cir. 1993). Defendants seek an order precluding "Plaintiff at trial from mentioning that Defendants have invoked the attorney-client privilege with respect to privileged communications with counsel, or arguing that the jury can draw any adverse inference therefrom." (Defs.' MILs. at 1). Additionally, Defendants ask the Court to enter an order "bar[ring] Plaintiff from seeking to elicit further assertions of such privilege at trial." (R. 264, Defs.' Resp. at 6.) In their response to Plaintiff's sur-reply, Defendants also request that the Court "quash the subpoenas served on Trump's outside lawyers and bar Plaintiff from telling the jury that she 'subpoenaed' those lawyers, but they did not show up to testify." (*Id.*) According to Plaintiff, "the fact that . . . [Defendants] asserted a legal privilege to keep from disclosing information about their use of HCU-specialist lawyers for the project . . . bears directly on the central issue the jury must decide: whether the Trump Defendants concealed their development plans, misrepresented

2

information, and offer only pre-textual reasons to suggest otherwise." (R. 236, Pl.'s Resp. at 2) (internal quotations omitted.)

As a preliminary matter, the issue of what Defendants' lawyers *actually* told them with regard to their development plans at the inception of the project will not be before the jury. Indeed, Defendants have consistently asserted the attorney-client privilege over these communications.[1] Plaintiff does not currently dispute, and has never disputed, that the *contents* of these communications are not subject to disclosure—she has not challenged the application of the attorney-client privilege to these communications nor has she alleged waiver. Rather, Plaintiff seeks to inform the jury only of the *fact* that Defendants communicated with attorneys and that Defendants have invoked the attorney-client privilege to protect these communications from disclosure. (Pl.'s Resp. at 10.) Notably, Defendants have conceded that they do not intend to elicit evidence or make arguments regarding their consultation with or retention of lawyers, and do not plan to assert an advice of counsel defense.[2]

---

[1] Defendants have invoked the attorney-client privilege throughout this litigation to protect the contents of the communications with their attorneys about the Trump International Hotel and Tower (Trump Tower). (Defs.' MILs at 1.) Under Illinois law the contents of these communications, absent waiver, are protected from disclosure. *See Ctr. Partners, Ltd. v. Growth Head GP, LLC*, 981 N.E.2d 345, 355 (Ill. 2012) ("Where legal advice of any kind is sought from a lawyer in his or her capacity as a lawyer, the communications relating to that purpose, made in confidence by the client, are protected from disclosure by the client or lawyer, unless the protection is waived.").

[2] Specifically, Defendants have conceded: (1) Defendants will provide no testimony or evidence at trial about the substance of Defendants' privileged communications with counsel (Defs.' MILs. at 2; Defs.' Reply at 4); (2) Defendants will not call their attorneys to testify (Defs.' Reply at 4); (3) Defendants will not elicit any testimony of reliance on their attorneys' review of documents or advice (*Id.*); (4) Defendants will not put on evidence that they retained or consulted with any lawyers, including specialist lawyers, concerning the Trump Tower (*Id.*); (5) Defendants will not call Mr. Howie or any other witness to discuss best industry practices related to hiring specialist lawyers (*Id.*); (6) Defendants will not make relevant at trial their relationship with or communications with their attorneys (*Id.*). The Court will hold Defendants to these concessions at trial.

According to Plaintiff the fact that Defendants met with their attorneys combined with other evidence of general industry practices leads to the inference that Defendants acted fraudulently—that is, that Defendants' attorneys advised Defendants on their development plans from inception, Defendants thereafter decided to exclude the revenue-producing facilities from the hotel's common elements, and Defendants nonetheless fraudulently continued to include these revenue-producing facilities in the official marketing materials. (*Id.* at 9–10.) In other words, because Defendants have asserted the attorney-client privilege over the contents of their communications with lawyers, and not asserted an "advice of counsel" defense, Plaintiff wants to create an inference that is essentially the reverse of the advice of counsel defense. She wants to argue that industry practice dictates that "specialist" HCU lawyers would have advised Defendants from the start of the project to maintain control of the revenue-producing facilities of the hotel and not to include them in the common elements. She further wants the jury to infer that Defendants proceeded against the advice of counsel by initially including these facilities in the common elements and then removing them after Plaintiff signed her Purchase Agreements. As explained below, however, this inference is unfounded and highly speculative. Such speculation cannot serve as the basis for the purported relevancy of this evidence. *See People v. Wheeler*, 871 N.E.2d 728, 750 (Ill. 2007) ("Evidence [that] is . . . too speculative to shed light on the fact to be found . . . should be excluded."); *People v. Enis*, 564 N.E.2d 1155, 1161–62 (Ill. 1990) ("[A] trial court may reject offered evidence on the grounds of irrelevancy if it has little probative value due to its . . . speculative nature.").[3]

---

[3] The Court applies Illinois state law to substantive issues of privilege when sitting in diversity, because "in a civil case, state law governs privilege regarding a claim or defense for which state law supplies the rule of decision." Fed. R. Evid. 501.

Indeed, although the Court specifically gave Plaintiff an opportunity to explain the relevance of any meeting Defendants may have had with counsel (R. 250), Plaintiff has failed to provide a logical evidentiary link between the fact that Defendants consulted with attorneys and the alleged fraudulent intent of Defendants. To date, Plaintiff has proffered as the basis for her inference both evidence that Defendants might introduce and evidence she intends to introduce herself. As discussed below, there is no relevant basis to elicit evidence or make argument regarding Defendants' consultation with or retention of lawyers.[4]

## I. Defendants' Evidence

Plaintiff's initial theory about the relevancy of Defendants' communications with their lawyers is that Defendants might introduce evidence about these communications in their own defense. According to Plaintiff, "Trump employees are expected to testify at trial that significant meetings about [the Property Report and Amendments] occurred in the presence of the HCU-specialist lawyers the Trump Defendants hired." (Pl.'s Resp. at 9.) Plaintiff contends that if the jury is not informed during trial that Defendants have invoked the attorney-client privilege with regard to the substance of these communications, "the Trump Defendants will then be able to use the privilege improperly as both a shield to protect information from disclosure, and as a sword by leading the jury to draw the unwarranted inferences from the erroneous belief that the mere presence of HCU-specialist lawyers on the project ensures lawful conduct." (*Id.* at 11.)

---

[4] In their response to motion *in limine* No. 11, Defendants argued that they may need to reference communications with lawyers to "refute the argument [that Defendants should have disclosed the Property Report changes several months earlier] by presenting evidence or arguing at trial that, 'in part, the reason why it took so long to disclose the Fourth Amended Property Report and information about the rental program was because the documents were being reviewed by legal counsel.'" (R. 235, Defs.' Resp. to MIL No. 11 at 14.) The Court will address this issue at the final pre-trial conference.

5

Plaintiff's contention is unfounded. Defendants explain that "[t]here has been *no* testimony or evidence in discovery about the substance of Defendants' privileged communications with their lawyers, and there will be no such testimony at trial." (R. 240, Defs.' Reply at 4.) They concede that they "*will not* call their attorneys to testify, and *will not* elicit any testimony of reliance on their attorneys' review of documents or advice." (*Id.*) Defendants "*will not* put on evidence that they had—or consulted with—'specialist' (or any other) lawyers concerning the project." (*Id.*) In short, Defendants will produce no evidence referencing the privileged communications with their attorneys, and will thereby provide neither an impetus nor a basis for Plaintiff's requested inference.

## II.     Plaintiff's Evidence

Plaintiff bases an alternative theory of relevancy on her own introduction of evidence that would tie these attorney communications to an inference of fraud. Plaintiff contends that "both expert witnesses are expected to testify that the industry custom and practice is that developers retain specialized lawyers to assist and provide advice for their luxury HCU development projects." (Pl.'s Resp. at 8.) Given this evidence, Plaintiff claims that the fact of Defendants' communications with attorneys is relevant because it supports an inference that Defendants knowingly and fraudulently failed to disclose to Plaintiff the changes to the common elements before she purchased her unit. (R. 253, Pl.'s Sur-reply at 1–2, 4.) Plaintiff reasons as follows: an expert witness gives an opinion that "sophisticated hotel condominium developers hire large real estate law firms . . . from the inception of their projects to advise them on the aforementioned 'mapping issue'" (*Id.* at 2);[5] Plaintiff then introduces evidence that Defendants met with

---

[5] "Mapping" is a process by which developers or attorneys decide what aspects of a development will be included in the common elements of a hotel condominium unit. (Pl.'s Sur-reply at 2–3.)

6

lawyers—"the *very type* of lawyers [the expert] states sophisticated HCU developers retain" (*Id.* at 3); and the jury may then infer that "these lawyers did in fact so advise the Trump Defendants on the mapping issue." (*Id.* at 3 n.3.) According to Plaintiff, this inference serves as circumstantial evidence of "fraudulent knowledge under [Plaintiff's] fraud claims." (*Id.* at 3)

Plaintiff's first premise—that sophisticated developers hire specialized firms to advise them on mapping—fails. In support of this first premise, Plaintiff contends that she will elicit testimony from the HCU-specialist lawyers retained by Defendants (*Id.* at 2), employees of Defendants (*Id.* at 5), Brent Howie, Defendants' expert witness (*Id.* at 2), and Robert Levin, Plaintiff's expert witness (*Id.* at 4). None of these sources will provide the requisite evidentiary link.

### A. Defendants' HCU-Specialist Lawyers

Plaintiff contends that she will "call the HCU-specialist lawyers retained by the Trump Defendants from both firms as witnesses at trial." (Pl.'s Sur-reply at 2.) Plaintiff will seek testimony from these lawyers that they have expertise in hotel condominium development, and that they were in fact retained by Defendants in connection with the Trump Tower. (*Id.*) In response, Defendants ask that the Court "quash the subpoenas served on Trump's outside lawyers and bar Plaintiff from telling the jury that she 'subpoenaed' those lawyers." (Defs.' Resp. at 6.) The Court grants Defendant's request to quash the subpoenas of Defendants' lawyers because she has not provided any legitimate basis for their testimony. *See Wollenburg v. Comtech Mfg. Co.,* 201 F.3d 973, 977 (7th Cir. 2000). Plaintiff may not inform the jury that she attempted to subpoena these lawyers, or any other witness.

First, there is no relevant testimony which these attorneys can provide over which Defendants would not assert attorney-client privilege. Indeed, the proposed testimony would

7

establish only the expertise of the lawyers in hotel condominium development and the fact that Defendants retained them. Such testimony would shed no light on whether and to what extent these lawyers advised the Defendants on what they should include in the Trump Tower's common elements. To the extent it did, this information would be protected by the attorney-client privilege and inadmissible.

Second, Plaintiff never disclosed these lawyers in her Rule 26(a) disclosures as individuals likely to have discoverable information and never challenged Defendants' assertion of attorney-client privilege over their communications with Defendants. (Defs.' Resp. at 5.) The Court will not allow Plaintiff to now attempt to elicit testimony to support some speculative reverse advice of counsel theory just weeks before trial. Moreover, some of the attorneys are more than 100 miles away and therefore outside of the Court's subpoena power. *See* Fed. R. Civ. P. 45(c)(3)(B)(iii). The Court, therefore, quashes the subpoenas which Plaintiff served on Defendants' outside lawyers.

**B.     Defendants' Employees**

Plaintiff also contends that she intends to elicit evidence from "Trump employees [who] testified directly that they consulted with HCU-specialist lawyers regarding the very issue of what should be included in the Common Elements." (Pl.'s Sur-reply at 4.) This description overstates the employees' testimony. Defendants' employees note that in their talks with lawyers from the DLA Piper law firm they had "discussions about all the different components and whether they were part of common elements or not," (R. 253-5, Flicker Dep. at 164), and that they "discussed the structure of the project, and what would and would not be offered as part of the common elements." (R. 253-6, Cremer Dep. at 120–21.) This testimony does not, however, support an inference that Defendants discussed the common elements with "HCU-

8

specialist lawyers," nor does it support an inference that these lawyers told Defendants what should or should not be included in the common elements. Rather, it shows simply that Defendants consulted with DLA Piper lawyers about the Property Report and Amendments, which included definitions of the common elements. As discussed above, Defendants have asserted and will continue to assert attorney-client privilege over the contents of communications with lawyers. Plaintiff, therefore, will be unable to elicit any testimony beyond the mere existence of those communications or discussions, which is not relevant.

### C.     Defense Expert Brent Howie

Plaintiff also intends to introduce testimony of Defendants' expert witness, Brent Howie, showing that "sophisticated real estate developers of hotel condominiums focus on what would be included in the Common Elements at the inception of the project in a process known as 'mapping,'" and that that "sophisticated hotel condominium developers hire large real estate law firms who have in-depth experience in hotel condominium development and/or HCU-specialist lawyers, from the inception of their projects to advise them on the aforementioned 'mapping issue.'" (Pl.'s Sur-reply at 2.)

The portion of Mr. Howie's testimony that Plaintiff cites, however, does not support that assertion. Much of Mr. Howie's cited testimony concerns *his own* experiences in mapping common elements during condominium development, and not that of industry practices. Indeed, the closest he comes to providing testimony that would support the generalized assertion Plaintiff seeks is the following interaction:

> **Mr. S. Kulwin**: [reading from the second paragraph of Mr. Howie's report] 'The practice of separating the essential hotel components in the commercial areas of the property from condominium owned areas is something that Provident began in the mid-'80s and adopted as a core philosophy of the company. It has since become a best practice among consultants, developers, lawyers and others who

9

>have industry knowledge and experience in the highly specialized hotel-condo development and management business.' Right?
>
>**Mr. Howie:** Yes.
>. . .
>**Mr. Howie**: What I'm saying here is the best practice amongst consultants, developers and lawyers who have industry knowledge and experience. So that assumes that they have industry knowledge and experience.

(R. 253-1, Howie Dep. at 230–31.) Mr. Howie's testimony and related opinion state that the mapping philosophy employed by his firm has become a best practice among those with "industry knowledge and experience in the highly specialized hotel-condo development and management business." (*Id.*) Mr. Howie does not opine as to whether it is a "best practice" of developers to consult with "HCU-specialist lawyers" or whether so-called "HCU-specialist lawyers" have a practice of always advising clients to retain control of revenue-producing elements. Furthermore, Mr. Howie's testimony does not establish that the particular law firms Defendants consulted with had this industry knowledge and experience; indeed, he expressly denies knowing whether Defendants' firms possessed this knowledge. (*Id.* at 234 (responding to the question of whether DLA Piper has such expertise with, "I don't know.") In fact, Defendants concede that neither Mr. Howie, not any other witness, will testify "that 'best practices' includes hiring and consulting 'HCU-specialist lawyers.'" (Def.'s Resp. at 4.) Mr. Howie's testimony, therefore, will not provide a link between the fact that Defendants consulted with attorneys and the inference that specialized hotel condominium unit lawyers advised Defendants one way or another from the inception of the project on what to include in the project's common elements.

### D. Plaintiff's Expert Robert Levin

Plaintiff also claims that "[b]oth expert witnesses are expected to testify that the industry custom and practice is that developers retain specialized lawyers to assist and provide advice for their luxury HCU development projects." (Pl.'s Resp. at 8.) As discussed above, Mr. Howie will

10

offer no such opinion. Moreover, Plaintiff has not disclosed any such opinion which her expert, Robert Levin, will offer. Indeed, in its April 11, 2013 order the Court directed Plaintiff to "explicitly state what relevant opinions her expert, Mr. Levin, will offer regarding the industry custom and practice of retaining specialized lawyers and where Plaintiff disclosed this opinion previously." (R. 250.) In her sur-reply, however, Plaintiff did not cite to any such opinion from Mr. Levin's report, deposition, or testimony at the *Daubert* hearing. Rather, Plaintiff attempted to change course and argue that Mr. Levin's testimony will show that "sophisticated developers such as Trump focus directly on what they intend to include within the Common Elements in luxury condominium development from the inception of the development." (Pl.'s Sur-reply at 4 (citing R. 183, Levin Rpt. at 8).) At best, the portion of the report Plaintiff cites provides support for the premise that *developers* generally spend time focusing on common elements in drafting the Property Report. Such testimony does not relate to what any lawyer may have told Defendants and is irrelevant to the present motion.

## III.  Defendants' Defense

Plaintiff also argues that evidence of Defendants' consultations with lawyers is relevant and necessary to rebut Defendants' "defense to the fraud claims . . . that the Trump Defendants purportedly did not 'focus' on the issue of whether it was a good idea to allow hotel condominium unit (HCU) buyers to own the revenue producing facilities of the hotel as Common Elements until well after Ms. Goldberg signed Purchase Agreements." (Pl.'s Sur-reply at 1.) Defendants, however, have never asserted this defense and do not intend to rely on such a defense. Rather, Defendants plan to rebut Plaintiff's fraud claim by explaining that "two *different* sets of executives (one in and around 2004, and the other in and around 2007) made deliberate decisions concerning the plans for the property, including the common elements, but

11

those two sets of executives ultimately reached different conclusions about what was best." (Defs.' Resp. at 2.) Thus, the inference Plaintiff seeks—"that the notion the Trump Defendants did not 'focus' on this critical issue at the inception of the project is literally ludicrous"—is irrelevant. (Pl.'s Sur-reply at 2.)

Defendants in this case have invoked the privilege to protect communications with their attorneys. Plaintiff's attempt to circumvent the protections afforded by the attorney-client privilege is based on pure speculation and not grounded in evidence. Such speculation has no basis in the facts or evidence of this case; indeed, any inference that might arise would be akin to "soup . . . made by boiling the shadow of a pigeon that had starved to death." *Interlake Iron Corp. v. N.L.R.B.*, 131 F.2d 129 (7th Cir. 1942); *see also Piaskowski v. Bett,* 256 F.3d 687, 693 (7th Cir. 2001) ("Although a jury may infer facts from other facts that are established by inference, each link in the chain of inferences must be sufficiently strong to avoid a lapse into speculation."). Frail inferences of this type will be kept from the jury, for "[j]urors should not be allowed to dine upon such insubstantial fare." Deborah Stavile Bartel, *Drawing Negative Inferences Upon a Claim of the Attorney-Client Privilege*, 60 Brook. L. Rev. 1355, 1406 (1995).

12

**CONCLUSION**

For the foregoing reasons the Court grants Defendants' motion *in limine* No. 3. As a result, Plaintiff may not ask any question which she reasonably expects will cause Defendants to assert the attorney-client privilege. Furthermore, neither party may mention at trial that Defendants consulted with lawyers or previously invoked the attorney-client privilege during discovery.[6]

**DATED: April 29, 2013**

ENTERED

_____
**AMY J. ST. EVE**
**United States District Court Judge**

---

[6] As discussed above in footnote 3, at the final pre-trial conference, the Court will address the remaining issue of whether Defendants can refer to consultations with lawyers to "refute the argument [that Defendants should have disclosed the Property Report changes several months earlier] by presenting evidence or arguing at trial that, 'in part, the reason why it took so long to disclose the Fourth Amended Property Report and information about the rental program was because the documents were being reviewed by legal counsel.'" (Defs.' Resp. to MIL No. 11 at 14.) The Court may, therefore, carve out a limited exception to this ruling at that conference.