**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| JACQUELINE GOLDBERG, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 09 C 6455 |
| | ) | |
| 401 NORTH WABASH VENTURE LLC and | ) | |
| TRUMP CHICAGO MANAGING | ) | |
| MEMBER LLC, | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION AND ORDER**

AMY J. ST. EVE, District Court Judge:

Plaintiff Jacqueline Goldberg ("Ms. Goldberg") filed a five-count Amended Complaint against Defendants 401 North Wabash Venture LLC and Trump Chicago Managing Member, LLC (collectively, "Defendants" or "Trump Defendants"). (R. 48, Amend. Compl.) In her Amended Complaint, Ms. Goldberg alleged the following: violation of the Illinois Condominium Act, 765 ILCS 605/1 *et seq.* (Count I); violation of the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/1 *et seq.* (Count II); violation of the Federal Interstate Land Sales Full Disclosure Act, 15 U.S.C. §§ 1701 *et. seq.* (Count III); violation of the Illinois Securities Law (Count IV); and breach of contract (Count V). (R. 48.) On October 16, 2012, the Court granted summary judgment in favor of Defendants on Count IV. (R. 170.) The Court granted Defendants' motions to strike Ms. Goldberg's jury demand as to Count I and Count V. (R. 201; R. 298.) The Court, therefore, presided over a jury trial on Counts II and III from May 13, 2013 through May 22, 2013. On May 23, 2013, the jury returned a verdict in favor of Defendants on both Count II and Count III. The Court now addresses Counts I and V based

1

upon the evidence presented during the trial.  For the following reasons, the Court finds in favor

of Defendants on both Counts I and V.

## BACKGROUND

In August of 2006, Ms. Goldberg entered into two agreements with Defendant 401 North

Wabash Venture LLC to purchase two hotel condominium units ("HCUs") – Units 2238 and

2240 – in the Trump International Hotel & Tower Chicago ("Trump Tower").  At that time,

Defendants had not yet built the Trump Tower HCUs.  The first agreement, dated August 2,

2006, related to Unit 2238 and had a total purchase price of $1,239,500.00.  The second

agreement, dated August 8, 2006, related to Unit 2240 and had a total purchase price of

$971,687.00.  Each purchase agreement contained materially identical provisions, and the Court

will refer to the agreements collectively as the "Purchase Agreements."

At the time Ms. Goldberg signed her Purchase Agreements, she received certain

documents related to the HCUs, including the Property Report, which included the Declaration,[1]

and amendments to the Property Report.  The Declaration contained a definition of the Common

Elements – the areas and facilities in which the HCU owners would share an interest.  When Ms.

Goldberg signed her Purchase Agreements in August 2006, the definition of Common Elements

included ballrooms, meeting rooms, function rooms and laundry facilities.  Based on this

---

[1] Under the Illinois Condominium Act, "[a] condominium comes into being by the recording of a declaration[, which] is prepared and recorded by either the developer or association." *Bd. of Dirs. of 175 E. Delaware Pl. Homeowners Ass'n v. Hinojosa*, 287 Ill. App. 3d 886, 889, 223 Ill. Dec. 222, 679 N.E.2d 407 (Ill. App. Ct. 1997) (citing 765 ILCS 605/2(a) (defining the declaration as the "instrument by which the property is submitted to the provisions of [the] Act")).  The "primary function" of the declaration "is to provide a constitution for the condominium. . . . The declaration contains the property's legal description, defines the units and *common elements*, provides the percentage of ownership interests, establishes the rights and obligations of owners, and contains restrictions on the use of the property." *Hinojosa*, 287 Ill. App. 3d at 889 (emphasis added); *see also Wolinsky v. Kadison*, 114 Ill. App. 3d 527, 70 Ill. Dec. 277, 449 N.E.2d 151 (Ill. App. Ct. 1983).  For further discussion of the types of documents at issue in this case, see the Court's summary judgment ruling.  (R. 170.)

definition of Common Elements, Ms. Goldberg would own a certain percentage – determined by the relative size of her HCUs – of those facilities.

The definition of Common Elements changed when Defendants issued the Fourth Amendment to the Property Report in October 2007, before Ms. Goldberg closed on the HCUs but after she had paid $516,457.40 in earnest money deposits. Specifically, in the Fourth Amendment Defendants removed the ballrooms, meeting rooms, and function rooms from the Common Elements. Sometime in 2009, Ms. Goldberg decided not to close on her HCUs, allegedly based on the removal of these facilities from the Common Elements. Ms. Goldberg bases her claims on a theory that, in August of 2006 when she signed her Purchase Agreements, Defendants knew that they ultimately would remove these facilities from the Common Elements, yet included them in the Common Elements temporarily to induce her to sign her Purchase Agreements. Notably, the Purchase Agreements included a provision – Section 4(a) – which gave Defendants the "the right, in [their] sole and absolute discretion, to modify" the Property Report, Declaration, and other documents relating to the HCUs. (Defs.' Exs. 539 & 540, Pls.' Ex. 60(A) & 60(B), Purchase Agreements at § 4(a).)

The jury trial lasted approximately one and a half weeks. During the trial, each party admitted numerous exhibits, including the Purchase Agreements, the Property Report, and the First, Second, Third, and Fourth Amendments to the Property Report. Additionally, the following witnesses testified:

- **Charles Reiss** – former Executive Vice President for Development for the Trump Organization

- **Donald Trump, Sr.** – Chairman and President of the Trump Organization

- **Robert Shearer** – a real estate agent representing the Trump Organization in selling HCUs in the Trump Tower

- **Andrew Weiss** (via deposition designations) – Executive Vice President of Construction for the Trump Organization

- **James Petrus** – Chief Operating Officer of the Trump Organization's hotel collection

- **Jill Cremer** – former Vice President of Development for the Trump Organization

- **Robert Levin** – Ms. Goldberg's expert

- **Jacqueline Goldberg** – the Plaintiff

- **Terry Vogue** – Ms. Goldberg's real estate broker

- **Robert Brenton Howie** – Defendants' expert

The Court carefully evaluated the demeanor and credibility of each witness who testified during the trial, including body language, tone of voice, facial expressions, mannerisms, and other indicative factors.

## ANALYSIS

### I.  Illinois Condominium Act (Count I)

Ms. Goldberg alleges that the Defendants violated Section 22 of the Illinois Condominium Act by "fail[ing] to make full disclosure of the information contained in the October 2007 Property Reports and the Declaration of Condominium before Goldberg executed the Purchase Agreements."  (Amend. Compl. ¶ 79.)

Under Section 22 of the Illinois Condominium Act ("Condo Act"):

In relation to the initial sale or offering for sale of any condominium unit, the seller must make full disclosure of, and provide copies to the prospective buyer of, the following information relative to the condominium project:

(a) the Declaration;

(b) the Bylaws of the association;

(c) a projected operating budget for the condominium unit to be sold to the prospective buyer, including full details concerning the estimated monthly payments for the condominium unit, estimated monthly charges for maintenance or management of the condominium property, and monthly charges for the use of recreational facilities; and

(d) a floor plan of the apartment to be purchased by the prospective buyer and the street address of the unit, if any, and if the unit has no unique street address, the street address of the project.

765 ILCS 605/22.  This disclosure requirement seeks "to prevent prospective purchasers from buying a unit without being fully informed and satisfied with the financial stability of the condominium as well as the management and rules and regulations which affect the unit.'" *Mikulecky v. Bart*, 355 Ill. App. 3d 1006, 1012, 292 Ill. Dec. 10, 825 N.E.2d 266 (Ill. App. Ct. 2004) (quoting *Nikolopulos v. Balourdos*, 245 Ill. App. 3d 71, 77, 185 Ill. Dec. 278, 614 N.E.2d 412 (Ill. App. Ct. 1993)).  "Failure on the part of the seller to make full disclosure as required by [the Condo Act] shall entitle the buyer to rescind the contract for sale at any time before the closing of the contract and to receive a refund of all deposit moneys paid with interest thereon at the rate then in effect for interest on judgments."  765 ILCS 605/22.

The Condo Act only requires a seller to provide "information . . . which is available at the time."  765 ILCS 605/22.  "[I]f this information is not available at the time the contract for sale is executed, then the contract is voidable at the option of the buyer up until five days after the last item of required information is furnished to the prospective buyer, or until the closing of the sale, whichever is earlier."  *Borys v. Josada Builders, Inc.*, 110 Ill. App. 3d 29, 30-31, 65 Ill. Dec. 749, 441 N.E.2d 1263 (Ill. App. Ct. 1982).  Here, Ms. Goldberg received the Fourth Amendment to the Property Report in October of 2007.  Under the Condo Act, if the information was "not available" to Defendants for disclosure in August of 2006 when she signed her Purchase

5

Agreements, she could have voided the contract within five days of receiving the Fourth

Amendment.  765 ILCS 605/22.  She, however, did not attempt to exercise this right.  Rather,

she and Defendants reached an agreement on approximately June 3, 2009 not to proceed with the

closings on her HCUs.  (Amend. Compl. ¶ 74; Trial Tr. at 1549 lns. 15-25.)  Ms. Goldberg,

therefore, only prevails on her Condo Act claim if she has proven, by a preponderance of the

evidence, that certain required information was available to Defendants before she signed her

Purchase Agreements in August 2006 and yet Defendants did not disclose it at that time.

Significantly, Ms. Goldberg does not allege, and has not proven, that Defendants failed to

provide her with the specific documents which the Condo Act requires a seller to disclose – the

Declaration, the Bylaws, a projected operating budget, or a floor plan of the units she planned to

purchased.  765 ILCS 605/22.  Indeed, in entering into the Purchase Agreements, Plaintiff

"acknowledge[d] that Seller delivered to [her] prior to [her] execution of this Purchase

Agreement a copy of . . . all other items required by Section 22 of the [Condo] Act. . . . [She]

acknowledges that [she] has had the opportunity to review [them]."  (Purchase Agreements at §

4(a).)  Instead, she argues that Defendants violated the Act by failing to make a "full disclosure

of the information contained in the October 2007 Property Reports," known as the Fourth

Amendment.  (Amend. Compl. ¶ 79.)  The Condo Act, however, does not reach this type of

conduct.

The Condo Act does not require the documents and information provided to a purchaser

to be final.  Rather, the Condo Act anticipates that a seller may change and amend the

Declaration and other documents.  The Condo Act's definition of "Declaration," for example,

specifically states that the term includes amendments to the Declaration that occur from time to

time.  765 ILCS 605/2(a) (defining Declaration as "the instrument by which the property is

6

submitted to the provisions of this Act, as hereinafter provided, and such declaration as from time to time amended"). The Condo Act also sets forth how amendments to declarations and bylaws become effective. 765 ILCS 605/17. Section 22 also only requires a "projected" operating budget containing "estimated" monthly payments and charges. 765 ILCS 605/22. Moreover, Section 22 itself contemplates that changes will be made to the documents a seller must disclose. Indeed, rather than forbidding changes, Section 22 sets forth requirements for how a seller may make changes which "would materially affect the rights of the buyer or the value of the unit." 765 ILCS 605/22. Specifically, Section 22 requires that the seller "obtain[] the approval of at least 75% of the buyers then owning interest in the condominium" before making a material change. *Id*. Ms. Goldberg's allegations here are not that Defendants failed to obtain sufficient approval to amend the Property Report and Declaration.[1] Rather, she claims that, at the time she signed her Purchase Agreements in August 2006, Defendants knew that they planned to remove certain facilities from the Common Elements, and, therefore, did not make the full disclosures required by Section 22 by stating otherwise.

The language of Section 22, however, does not reach the fraudulent-type conduct which Ms. Goldberg alleges. First, Section 22 requires "full disclosure" and does not include any conventional fraud language such as conceal, omit, or misrepresent. Second, Section 22 specifically identifies the "information" which a seller must disclose by listing four documents:

(a) the Declaration;

(b) the Bylaws of the association;

---

[1] In Ms. Goldberg's initial complaint, she attempted to assert a claim under the Condo Act based on Defendants' alleged failure to obtain approval from 75% of the HCU owners before amending the Property Report. The Court, however, dismissed this claim in part because "there is no statutory remedy for failing to obtain approval for the amendment from 75% of the HCU owners." *Goldberg v. 401 North Wabash Venture LLC*, No. 09 C 6455, 2010 WL 1655089, at *6 (N.D. Ill. Apr. 22, 2010). Ms. Goldberg dropped these allegations in her Amended Complaint.

(c) a projected operating budget for the condominium unit to be sold to the prospective buyer, including full details concerning the estimated monthly payments for the condominium unit, estimated monthly charges for maintenance or management of the condominium property, and monthly charges for the use of recreational facilities; and

(d) a floor plan of the apartment to be purchased by the prospective buyer and the street address of the unit, if any, and if the unit has no unique street address, the street address of the project.

765 ILCS 605/22. Section 22 does not state what a seller must include in these documents.

Section 4 of the Condo Act, however, explicitly states what the Declaration must contain. 765 ILCS 605/4. There is no indication from the plain language of the Condo Act – in Section 4, Section 22, or elsewhere – that the Declaration must alert the purchaser of whether the representations contained within it are final or if the seller contemplates any particular changes. Rather, as discussed above, the Condo Act anticipates that the Declaration may be amended and the budgets are merely estimates. Section 22, therefore, seems to require that sellers provide certain documents to a purchaser in time for her to make an informed decision and to provide the purchaser with a remedy if the seller fails to produce these documents. *See, e.g., Mikulecky v. Bart*, 355 Ill. App. 3d 1006, 1011, 292 Ill. Dec. 10, 825 N.E.2d 266 (Ill. App. Ct. 2004) (stating that "Section 22 was designed to alleviate [certain] practices by requiring . . . the seller *provide certain descriptive documents* relative to the condominium"). The Court will not broadly interpret Section 22 as targeting the type of disclosure failures and misrepresentations which Ms. Goldberg alleges, relating to representations in the Declaration which Defendants allegedly planned to change, when there is no support in the language of the statute for such an interpretation. Indeed, other laws, such as the Illinois Consumer Fraud Act (815 ILCS 505/2), the Interstate Land Sales Full Disclosure Act (15 U.S.C. 1701 *et seq.*), and the tort of negligent

misrepresentation specifically target misrepresentations made to purchasers or other consumers. Ms. Goldberg's Condo Act claim, therefore, fails as a matter of law.

Even assuming that Section 22's "full disclosure" requirement prohibits a seller from disclosing information that it plans to subsequently change, as discussed below in Section 2(C)(3), Ms. Goldberg did not sufficiently adduce evidence at trial to prove, by a preponderance of the evidence, that Defendants knew in August 2006 that they would ultimately make the changes to the Common Elements reflected in the Fourth Amendment. The Court, therefore, finds in favor of Defendants on Count I.

## II. Breach of Contract (Count V)

In Count V, Ms. Goldberg alleges that Defendant 401 North Wabash Venture LLC[2] breached the Purchase Agreements by failing to deliver her HCUs in the manner described in the version of the Property Report existing at the time she signed the Purchase Agreements. Specifically, she alleges that the Fourth Amendment to the Property Report, which Defendants issued over a year after she signed her Purchase Agreements, stripped her of a percentage ownership in the building's meeting/function rooms, ballrooms, storage areas and laundry facilities, and a full health club membership. The Court will address whether Defendants (1) breached the terms of the contract and/or (2) breached an implied covenant of good faith and fair dealing.

---

[2] Ms. Goldberg asserts her breach of contract claim only against 401 North Wabash because Trump Chicago Managing Member LLC was not a party to the Purchase Agreements. The parties agreed, however, that for purposes of this case, there is no distinction between the two Defendants. For ease and consistency, the Court will therefore continue to refer to the Defendants collectively when analyzing the breach of contract claim.

### A. Legal Standard

Under Illinois law, a breach of contract claim requires the plaintiff to prove the following elements by a preponderance of the evidence: "'(1) the existence of a valid and enforceable contract; (2) substantial performance by the plaintiff; (3) a breach by the defendant; and (4) resultant damages.'" *Reger Dev., LLC v. Nat'l City Bank*, 592 F.3d 759, 764 (7th Cir. 2010) (quoting *W.W. Vincent & Co. v. First Colony Life Ins. Co.*, 351 Ill. App. 3d 752, 286 Ill. Dec. 734, 814 N.E.2d 960, 967 (Ill. App. Ct. 2004)); *see also Wigod v. Wells Fargo Bank, N.A.*, 673 F.3d 547, 560 (7th Cir. 2012) (citing *Assoc. Benefit Serv. v. Caremark RX, Inc.*, 493 F.3d 841, 849 (7th Cir. 2007); *MC Baldwin Fin. Co. v. DiMaggio, Rosario & Veraja, LLC*, 364 Ill. App. 3d 6, 30, 300 Ill. Dec. 601, 845 N.E.2d 22, 30 (Ill. App. Ct. 2006)). Courts "do not look at any one contract provision in isolation; instead [they] read the document as a whole." *Reger Dev.*, 592 F.3d at 764 (citing *Martindell v. Lake Shore Nat'l Bank*, 15 Ill.2d 272, 154 N.E.2d 683, 689 (Ill. 1958)).

### B. Alleged Breach of the Terms of the Contract

As a threshold matter, the contracts at issue here are two Purchase Agreements which Ms. Goldberg signed for two different HCUs. The two Purchase Agreements are substantively identical, though relate to different units. The Court, therefore, need not address each independently.

#### 1. The Terms of the Purchase Agreements

In Section 2(a) of the Purchase Agreements, Ms. Goldberg agreed to purchase from Defendants and Defendants agreed to convey to her, the following:

(a) Unit No. [2238/2240] ("Purchased Unit") in the [Condominium];

10

      (b)      the undivided percentage interest attributable to such unit as a tenant-in-common in the Common Elements (as defined in the [Illinois Condo Act]) of the Condominium;

      (c)      the Personal Property[2]; and

      (d)      the FF&E[3].

(Purchase Agreements at § 2(a).) Ms. Goldberg's breach of contract allegations relate to the conveyance of "the undivided interest . . . in the Common Elements."

The Common Elements are areas or facilities which the HCU owners own jointly – each owning a percentage corresponding with the relative size of their HCU. The Purchase Agreements obligated Defendants to convey "an undivided percentage interest" in these jointly-owned areas or facilities. The Purchase Agreements, however, did not include a definition of what areas or facilities comprised the Common Elements. Rather, the Purchase Agreements stated that the Condo Act defines the term "Common Elements." (Purchase Agreements at § 2(a).)

The Condo Act defines "Common Elements" as "all portions of the property except the units, including limited common elements unless otherwise specified." 765 ILCS 605/2(e). The Condo Act defines "property" as "all the land, property and space comprising the parcel, all improvements and structures erected, constructed or contained therein or thereon, including the building and all easements, rights and appurtenances belonging thereto, and all fixtures and equipment intended for the mutual use, benefit or enjoyment of the unit owners, submitted to the

---

[2] The Purchase Agreements defined the "Personal Property" as "appliances," "finishes" and the "FF&E" described in attached schedules. (Purchase Agreements at § 2(a).)

[3] The Purchase Agreements defined the "FF&E" as "all furniture, fixtures, window treatments and all other furnishings, decor and accents," including "towels, lines, dishes, glassware, utensils, cookware" and other items, for the Purchased Unit. (*Id.* at § 2(c).)

provisions of this Act." 765 ILCS 605/2(c). Property is "submitted to the provisions of this Act" by means of the Declaration. 765 ILCS 605/2(a).

The Property Report which Ms. Goldberg received before she signed her Purchase Agreements included the Declaration as an exhibit, pursuant to Section 22 of the Condo Act. The Declaration included the Bylaws as well as provisions outlining various features of the condominium, including the Common Elements. The definition of "Common Elements" contained in the Declaration was "All portions of the Property except the Units, more specifically described in Section 3.1 hereof." (Pl.'s Ex. 1B, Property Report, Ex. A, Declaration, at 8.) The Declaration defined "Property," in relevant part, as "All the land, property and space comprising the Parcel . . . The Property does not include any portions of the Residential Condominium Property, the Office Property the Retail Property, the Public Garage Property or any other portion of the Project which is not submitted to the Act pursuant to this Declaration or any amendment hereto." (*Id.* at 4.) As a result, the Common Elements, for Ms. Goldberg's purposes, related only to "land, property and space" contained in the Hotel Condominium parcel of the Trump Tower, not anything which Defendants assigned to the "Residential Condominium Property, the Office Property the Retail Property, the Public Garage Property or any other portion of" the building.[3] Per the definition of "Declaration", Section 3.1 of the Declaration described the contents of the Common Elements. As explained by former Trump executive Charles Reiss, who helped prepare the Property Report and some amendments to the Property Report, a purchaser would need to look to the Declaration to determine whether any particular

---

[3] Defendants divided the Trump Tower into multiple "parcels," which each contained different portions of the Tower. Unlike a traditional residential condominium where spaces constitute either the units or the common elements, Defendants had to specifically decide whether to allocate any particular area to the Hotel Condominium Parcel, the Hotel, the Residential Condominium or another parcel.

facility was in the Common Elements as opposed to another portion of the Property, like the

Residential Condominium or Hotel.  (Trial Tr. at 314 lns. 3-9.)

### 2. The Changes to the Common Elements Definition

In the original Property Report issued in September 2003, Section 3.1 of the Declaration

provided in part as follows:

> The Common Elements shall consist of all portions of the property, except the Units, . . . unless otherwise expressly specified herein.  The Common Elements include, without limitation and if applicable, any of the following items located at the Property: the walls, roofs, hallways . . . housekeeping closets on each floor of the Condominium containing Units, *laundry facilities*, lobby facilities, *the Health Club, the Meeting Rooms, Storage Areas, mail boxes*, if any, cable television system (whether leased or owned), if any, fire escapes . . . and all other portions of the Property except the individual Units. . . .

(Property Report, Ex. A, Declaration at 8.)  The Property Report further stated that each owner

"shall be a member of the Health Club for so long as such Unit Owner owns a Unit, and, as such,

both the Unit Owner and their respective Occupants . . . shall have the right to use the basic

Health Club amenities . . . without any supplemental charge[.]" (*Id*. at 22.)

On or about February 25, 2004, Defendants prepared and publicly issued the

First Amendment to the Property Report.  The amendment modified the description of the

"common elements" by (1) expanding "Meeting Rooms" to "Meeting/Function Rooms"; (2)

adding "Ballrooms"; (3) adding "the executive lounge"; and (4) removing "the Health Club."

(Pl.'s Ex. 2, First Amend. at 12-13.)  The First Amendment did not otherwise modify the

statements in the Property Report regarding Health Club membership.

On or about August 18, 2004, Defendants prepared and issued the Second

Amendment to the Property Report.  (Pl.'s Ex. 4 Sec. Amend.)  On or about January 10, 2005,

Defendants prepared and issued the Third Amendment.  (Pl.'s Ex. 7, Third Amend.)  This was

the last property report which Ms. Goldberg received before she signed her Purchase Agreements

13

in August 2006. There were no changes made to the definition of Common Elements in Section 3.1 of the Declaration in the Second or Third Amendments relevant to Ms. Goldberg's claims. There were also no changes made regarding the Health Club membership.

Defendants prepared and issued the Fourth Amendment to the Property Report on or about October 1, 2007. (Pl.'s Ex. 25B, Fourth Amend.) The Fourth Amendment changed (1) membership policies for the Health Club; (2) the description of the common elements; and (3) the projected operating budget.

First, the Fourth Amendment modified the description of common elements by (1) removing "concierge area"; (2) removing "laundry facilities"; (3) removing "Meeting/Function Rooms and Ballrooms"; (4) removing "Storage Areas"; (5) removing "the executive lounge"; (6) removing "mail boxes, if any," and (7) adding "telephone systems." (Fourth Amend., Ex. A, Decl. at 9.) Additionally, the Fourth Amendment stated that the "Meeting/Function Rooms and Ballrooms are located within the Commercial Property," rather than the Common Elements. (*Id*.)

Second, the Fourth Amendment modified membership terms with respect to the Health Club. Under the Fourth Amendment:

> Each Unit Owner . . . , without having to pay a basic membership fee, shall be a member of the Health Club for so long as such Unit Owner owns *and occupies* a Unit . . .

(Fourth Amend., Ex. A, Decl. at 25 (emphasis added).) The addition of the words "and occupies" meant that the HCU owners could no longer use the Health Club when they were not occupying their HCUs.

14

### 3.     The Alleged Breach

According to Ms. Goldberg, Defendants breached the Purchase Agreements by changing Ms. Goldberg's ownership interest and Health Club Membership benefits via the Fourth Amendment after she signed her Purchase Agreement. Specifically, Ms. Goldberg argues that the changes indicated by the Fourth Amendment meant that Defendants would not convey to her the HCUs in the manner described by the Property Report and amendments that she received prior to signing her Purchase Agreements. This theory, however, ignores the fact that the Purchase Agreements do not specifically obligate Defendants to convey ownership interest in any particular areas or facilities of the building. As explained above, "Common Elements" was not a fixed term in the Purchase Agreements. Instead, the Purchase Agreements merely obligated Defendants to convey a percentage ownership of the "Common Elements," as defined in the Declaration. There is no evidence that Defendants were not fully prepared and willing to convey to Ms. Goldberg exactly what was described as constituting Common Elements in the Declaration contained in the Fourth Amendment. Ms. Goldberg, however, wanted Defendants to instead convey to her a percent ownership interest in the Common Elements as defined in the First Amendment to the Property Report.

This position is legally untenable, however, because nothing in the Purchase Agreements required Defendants to convey the property in the manner Ms. Goldberg wishes. To the contrary, the Purchase Agreements gave Defendants the authority and discretion to make changes to the Property Report and Declaration. Specifically, Section 4(a) of the Purchase Agreements provided, in relevant part:

> The Condominium Declaration, By-Laws, Budget, Floor Plans and such other documents required by Chapter 13-72 of the Municipal Code of Chicago and Section 22 of the [Illinois Condo Act], as amended from time to time, are

15

collectively called the "Condominium Documents." Purchaser acknowledges that Purchaser has had the opportunity to review the Condominium Documents. *Seller reserves the right, in its sole and absolute discretion, to modify the Condominium Documents*, together with the Articles of Incorporation of the Association and the Statement of Record required by the Interstate Land Sales Full Disclosure Act (the "HUD Report"), provided that Seller shall notify Purchaser or obtain the Purchaser's approval of any changes in the Condominium Documents, the HUD Report and any such other documents, as the case may be, when and if such notice or approval is required by law. Purchaser agrees, from and after closing, to comply with the provisions of and perform all obligations imposed on Purchaser as a unit owner by the Act, the Condominium Declaration and the By Laws.

(Purchase Agreements at § 4(a) (emphasis added).) The Purchase Agreements, therefore, gave Defendants "sole and absolute discretion" to modify the Common Elements definition and Health Club membership terms contained in the Declaration. (*Id.*) Additionally, Exhibit K to the First Amendment – Conceptual Description of Material Terms of Declaration of Covenants, Conditions, Restrictions and Easements for the 401 North Wabash Avenue Building – explicitly stated that the "Declaration is, and at all times shall remain, subject to change by the developer, and the material terms of the Declaration identified in this summary are likewise subject to change by the developer, from time to time." (Defs.' Ex. 601 at SJ000083.)

According to Section 4(a), Defendants did not need to notify Ms. Goldberg or obtain her approval before making any change to the Declaration unless "such notice or approval is required by law." (Purchase Agreements at § 4(a).) No law required Defendants to notify Ms. Goldberg or seek her approval for the changes at issue here. At most, the Condo Act required Defendants to seek approval of 75% of the HCUs owners before making any changes to the Declaration which "would materially affect the rights of the buyer or the value of the unit[4]." 765 ILCS 605/22. The Condo Act "does not, however, require a developer to obtain any particular

---

[4] The Seventh Circuit recently noted that it is unclear whether a private right of action exists under the Condominium Act "when a buyer alleges that the developer made a material change without 75% approval." *Burke v. 401 N. Wabash Venture, LLC*, 714 F.3d 501 (7th Cir. 2013).

purchaser's agreement before changing the [Declaration]." *Burke v. 401 N. Wabash Venture, LLC*, No. 08 C 5330, 2011 WL 2565896, at *4 (N.D. Ill. June 28, 2011) ("Because plaintiff has failed to point to a law that required defendant to obtain plaintiff's permission before making changes to the Property Report, plaintiff's breach of contract claims fail to state a claim").

Notably, Ms. Goldberg did not base her breach of contract claim on Defendants' failure to obtain approval from 75% of unit owners. Ms. Goldberg initially asserted such a theory in her initial Complaint, yet removed these allegations from her Amended Complaint. (R. 1-1, Compl. ¶¶ 110-111.) She also did not present evidence at trial establishing whether a vote did or did not occur. Rather, Ms. Goldberg attempted to prove that Defendants breached the Purchase Agreements by making changes, which she deemed material, from the Third Amendment to the Fourth Amendment. As discussed above, however, the Purchase Agreements did not promise to convey to Ms. Goldberg any specific property as Common Elements because Common Elements was a non-fixed term which Defendants could change based on the authority expressly delegated to them by Section 4(a) of the Purchase Agreements. Section 4(a) also gave Defendants the authority to change the Health Club membership rules contained in the Declaration.

The Court will not "alter, change or modify existing terms of a contract, or add new terms or conditions to which the parties do not appear to have assented." *Thompson v. Gordon* 241 Ill. 2d 428, 449, 349 Ill. Dec. 936, 948 N.E.2d 39 (Ill. 2011) (citing *Gallagher v. Lenart,* 367 Ill. App. 3d 293, 301, 305 Ill. Dec. 208, 854 N.E.2d 800 (Ill. 2006)). Because Defendants had no obligation to convey the property as described in the Third Amendment, or any prior property report, rather than the Fourth Amendment, and in fact had the authority to make changes to the Property Report without notice or approval, Ms. Goldberg has not proven that Defendants breached the express terms of the Purchase Agreements.

17

## C.        Alleged Breach of the Implied Covenant of Good Faith and Fair Dealing

"Every contract contains an implied covenant of good faith and fair dealing." *Northern Trust Co. v. VIII South Michigan Assocs.*, 276 Ill. App. 3d 355, 367, 212 Ill. Dec. 750, 657 N.E.2d 1095 (Ill. App. Ct. 1995). "In Illinois, courts have imputed an implied promise of good faith and fair dealing in real estate purchase agreements." *Burke v. 401 N. Wabash Venture, LLC*, 714 F.3d 501, 2013 WL 1442280 at *5 (7th Cir. 2013) (citing *Schwinder v. Austin Bank of Chi.*, 348 Ill. App. 3d 461, 475, 284 Ill. Dec. 58, 809 N.E.2d 180 (Ill. App. Ct. 2004)). The covenant of good faith and fair dealing "exists to ensure that parties vested with contractual discretion exercise that discretion reasonably, not arbitrarily, capriciously, or in a manner inconsistent with the reasonable expectations of the parties." *Vara v. Polatsek,* No. 1-11-2504, 2012 WL 6962887, at *8 (Ill. App. Ct. Oct. 5, 2012) (internal quotation omitted). Here, as discussed above, the Purchase Agreements gave Defendants "sole and absolute discretion" to make changes to the Property Report and Declaration. (Purchase Agreements at § 4(a).) Ms. Goldberg, therefore, prevails on her breach of contract claim if she has proven that Defendants made the changes at issue arbitrarily, capriciously, or in a manner inconsistent with the reasonable expectations of the parties. She has failed to prove her claim.

The fact that Defendants made even allegedly material or significant changes to the Common Elements does not in and of itself violate the implied covenant of good faith and fair dealing. Indeed, the Seventh Circuit has explained that:

> Good faith is a compact reference to an implied undertaking not to take opportunistic advantage in a way that could not have been contemplated at the time of drafting, and which therefore was not resolved explicitly by the parties. When the contract is silent, principles of good faith . . . fill the gap. They do not block use of terms that actually appear in the contract.

18

*F.D.I.C. v. Rayman,* 117 F.3d 994, 1000 (7th Cir. 1997) (quoting *Kham & Nate's Shoes No. 2, Inc. v. First Bank of Whiting*, 908 F.2d 1351, 1357 (7th Cir. 1990)); *see also Cromeens, Holloman, Sibert, Inc v. AB Volvo,* 349 F.3d 376, 395-96 (7th Cir. 2003) ("Illinois law holds that parties to a contract are entitled to enforce the terms to the letter and an implied covenant of good faith cannot overrule or modify the express terms of a contract.").  As discussed above, the terms of the Purchase Agreements allowed Defendants to make changes of any kind.  The Purchase Agreements did not include any limitations on the type of changes, gravity of the changes, or timing of the changes permitted.  *See, e.g., Cromeens,* 349 F.3d at 395-96 (finding no breach of the implied covenant when defendant terminated the contract without cause because the terms of the contract gave the party the right to terminate without cause upon sixty days' notice); *Heartland Bank and Trust Co. v. Goers*, No. 3-11-0030, 2012 WL 7005595, at *10 (Ill. App. Ct. Mar. 26, 2012) (finding that plaintiff's argument that the defendant bank broke its duty of good faith and fair dealing by terminating the line of credit without giving him prior notice failed because the "plain terms of the Note" stated that he had waived his right to be notified).  The covenant of good faith and fair dealing does not void Section 4(a)'s grant of discretion.

As explained in the Court's summary judgment opinion, "[a]lthough Plaintiff agreed to permit Defendant to make changes in its 'sole and absolute discretion,' she never agreed . . . that Defendant would conceal, fail to disclose and/or misrepresent information material to the Purchase Agreements." *Goldberg v. 401 North Wabash Venture LLC*, — F. Supp.2d —, No. 09 C 6455, 2012 WL 4932653, at *27 (N.D. Ill. Oct. 16, 2012).  Plaintiff, however, did not adduce sufficient evidence at trial to establish that Defendants abused their discretion by making changes beyond the reasonable expectations of the parties by intentionally concealing material information to induce Ms. Goldberg to sign the Purchase Agreements.

    **1.     Ms. Goldberg Was a Sophisticated Purchaser Aware of the Provision Giving Defendants the "Sole and Exclusive" Authority to Make Changes**

The evidence at trial showed that Ms. Goldberg was a sophisticated purchaser who was aware of Defendants' authority to make changes, including to the Common Elements. Ms. Goldberg was sharp and articulate throughout her testimony. Ms. Goldberg, although in her eighties at the time she signed her Purchase Agreements, was an active real estate investor. In addition to the HCUs in this case, she has purchased seven condominiums since 1995. (Trial Tr. at 1326 lns. 7-13.) In total, she has paid more than $11 million – in cash – for condominium properties. (Trial Tr. at 1450 ln. 19 – 1451 ln. 1.) She also has significant financial expertise, as she has a master's degree in accounting, is a certified public accountant, started her own financial planning business, and manages multiple charitable trusts. (*Id*. at 1323-25.) According to Ms. Goldberg, she has performed tax accounting and financial planning services for almost thirty years and has invested in real estate for approximately fifteen years. (*Id*. at 1448 lns. 11-17; 1449 at lns. 4-16.) In fact, Ms. Goldberg's real estate broker, Terry Vogue, testified that she left all of the number-crunching and analysis to Ms. Goldberg because of her specialized skill and interest. (*Id*. at 1692 lns. 15-25.) In addition to her significant personal experience, when purchasing her HCUs, Ms. Goldberg consulted with her real estate agent, Ms. Vogue, who had worked with Ms. Goldberg for over twenty years, and her lawyer, Judy DeAngelis, who had worked with Ms. Goldberg for over eleven years prior to assisting her with the Trump HCU deal. (*Id*. at 1683 lns. 10-11; 1486 ln. 10 - 1487 ln. 8.)

When Ms. Goldberg first received the relevant condominium documents in August 2006, she personally reviewed the original Property Report, the First Amendment, the Second Amendment and the Third Amendment. (Trial Tr. at 1340 lns. 10-21; 1342 ln. 19 – 1343 ln. 11.)

She testified that she looked at the differences in each version of the Property Report, noting that the Third Amendment would have been the most updated report. (*Id*.) Notably, her testimony indicated that she paid significant attention to these documents. Specifically, even seven years later, she could recall that the estimated budgets had decreased in the Second Amendment and then had risen again in the Third Amendment. (*Id*. at 1472 lns. 2-12.) She also noted that the version of the Property Report which her counsel showed her on the stand was missing certain aerial photographs of the building which she recalled being part of the materials. (*Id*. at 1345 lns. 2-22.)

Based on her review of the Property Report and First, Second, and Third Amendments, Ms. Goldberg would have seen that Defendants had already made changes to the Common Elements – adding some and removing others. In the First Amendment, for example, Defendants added ballrooms, function rooms, and meeting rooms to the Common Elements. (First Amend. at 9; *see also* Trial Tr. at 1483 lns. 3-9; 1485 lns. 2-25.) The First Amendment also revealed that Defendants removed the Health Club from the Common Elements. (*Id*.) Notably, Defendants indicated these changes in the First Amendment by denoting all additions in bold and underlined text and striking a line through all text which they had removed. As Mr. Petrus explained, there was no ambiguity in the amendments to the Property Reports, but rather "any sensible buyer – any unit owner that was investing in this type of money – that picked up the document and read the detail of the information that was shared in a forthright manner" would have understood the information without "a lot of time and a lot of effort." (Trial Tr. at 909 lns. 6-15.)

Not only would the Property Report and amendments have notified Ms. Goldberg that Defendants had previously made changes to the Common Elements, she was aware that Defendants had the authority to make any changes they desired. When Ms. Goldberg signed her

Purchase Agreements, she had a ten-day period during which she and her attorney could review

the Agreements and negotiate the terms of the Agreements with Defendants.  (Pl.'s Ex. 60A,

Purchase Agreement, Attorney Approval Rider at ECF 27; Pl.'s Ex. 60B, Attorney Approval

Rider at ECF 24.)  Ms. Goldberg had the absolute right to walk away from the deal at any point

before the close of that ten-day period, and receive her earnest money deposit back, if she and

Defendants could not mutually accept any term or modification in the Agreements.  During this

ten-day review period, Ms. Goldberg, through her lawyer, proposed twenty changes to the

Purchase Agreements.  (Defs.' Ex. 522.)  Ms. Goldberg specifically sought to change Section

4(a), which gave Defendants the "sole and exclusive" authority to make changes to the Property

Report and Declaration – which would include changes to the definition of Common Elements –

as well as other provisions.  (*Id.* ¶ 9.)  Specifically, Ms. Goldberg attempted to amend Section

4(a) to require Defendants to seek her approval to changes, thereby removing their "sole and

absolute" authority to make changes.  (*Id.*)

Defendants, as was their right, opted not to accept some of Ms. Goldberg's proposed

amendments, including her proposed amendments to Section 4(a).  Ms. Goldberg discussed her

disappointment and concern about Defendants' refusal to accept her amendments.  Ms. Vogue

testified that she told Ms. Goldberg that she did not have to close on the deal and could walk

away if she was not uncomfortable.  (Trial Tr. at 1717 ln. 18 – 1718 ln. 9.)  Ms. Goldberg did

not, however, opt to exercise her right to terminate the deal and receive her earnest money

deposits back.  Instead, she moved forward with the deal, accepting the risks associated with the

unfettered discretion which Section 4(a) provided Defendants.   According to Ms. Vogue,

however, Ms. Goldberg opted not to proceed with the purchase of a third HCU, after losing some

confidence in the Trump Defendants when she unsuccessfully tried to negotiate different terms for the Purchase Agreements. (*Id*. at 1722-23.)

Notably, Ms. Goldberg did not even seek to void the Purchase Agreements when she received or reviewed the Fourth Amendment, which contained the changes at issue. It was not until a year after discovering Defendants' alleged fraud that Ms. Goldberg informed Defendants that she sought to back out of the deal. Indeed, although the evidence did not show precisely when Ms. Goldberg reviewed the Fourth Amendment, which Defendants issued in October 2007, Ms. Goldberg was aware of the changes contained in the Fourth Amendment at least as early as February 14, 2008 because she had a discussion with Ms. Vogue about these changes, via email, on that date. (Defs.' Exs. 591 & 592 ; *see also* Trial Tr. 1417 lns. 9-25.) According to Ms. Goldberg, she knew in February of 2008 that she did not want to be in business with Defendants any longer. (Trial Tr. at 1549 lns. 4-12.) She did not seek to rescind the Purchase Agreements, however, until 2009. (Amend. Compl. ¶ 73; Trial Tr. at 1549 lns. 15-25.)

Ms. Goldberg's lack of urgency to revoke the Purchase Agreements after Defendants made the changes to the Common Elements undercuts her argument that the changes were such an outrageous surprise. Indeed, her decision ultimately not to follow through with the closing scheduled for June of 2009 may have been based on other factors, such as the volatility of the real estate market because of the recession. The implied covenant of good faith and fair dealing does not serve as an escape-hatch for parties who sign an agreement, which contains discretion and creates risk, when the deal does not turn out as expected. Even if Ms. Goldberg failed to sufficiently consider the full repercussions of signing a Purchase Agreement with a discretionary provision like Section 4(a), her failure does not establish a breach on the part of Defendants, particularly in light of Ms. Goldberg's sophistication, awareness of the provision, and awareness

23

that Defendants had made changes to the common elements since issuing the initial Property Report.  *See, e.g., Cromeens*, 349 F.3d at 376 (finding that the defendant "cannot be held to have breached the covenant of good faith and fair dealing for simply enforcing the contracts as written.").  Furthermore, Ms. Goldberg had the advice and representation of counsel during the process.

### 2. Defendants Offered a Reasonable and Credible Explanation for the Changes

Not only did Defendants have the sole and exclusive authority to make the changes at issue, they made the changes for understandable reasons.  When Ms. Goldberg signed her Purchase Agreements in August of 2006, Defendants had not yet built the Trump Tower.  In fact, Defendants did not complete Trump Tower until 2009.  The plan for the building, therefore, was a moving target at the time when Ms. Goldberg signed her Purchase Agreements.  Mr. Donald Trump testified that "until [they] came up with a final plan . . . [they] had a lot of different concepts that ultimately ended up in what [they] built."  (Trial Tr. at 480 lns. 1-4.)  In fact, even after Defendants made the changes at issue here by issuing the Fourth Amendment, they issued three additional amendments to the Property Report.  (*Id.* at 1131 ln. 19 – 1132 ln. 3.)

Moreover, the evidence did not show any plan to add the revenue-producing facilities to the Common Elements temporarily, only to remove them later.   Indeed, one set of executives – Charles Reiss and Russell Flicker – recommended the addition of these facilities to the Common Elements, and a different executive – James Petrus, who did not even work for the Trump Organization when that original decision was made, recommended the removal of the facilities.  As detailed below, Mr. Reiss and Mr. Petrus both testified credibly and took ownership for their decisions.  Each stated that he came up with the idea to remove/add the facilities and made a

24

recommendation to Donald Trump Sr., who authorized them to proceed rather than initiating the changes himself.

It is also credible that Defendants changed the plan for the building because they lacked experience at the time with hotel condominium developments, which are highly specialized types of developments, before developing Trump Tower. Defendants learned by trial-and-error as the Trump Tower project progressed and needed to make changes to the plans as they learned more about the potential risks and pitfalls associated with allocating certain facilities to HCU owners. The evidence, therefore, showed that Defendants made changes to the Common Elements as part of an evolving plan to develop, build, and own an expansive hotel condominium for the first time.

### a. Mr. Reiss Made a Reasonable Decision to Initially Put the Revenue-Producing Facilities in the Common Elements

The initial decision to add the ballrooms, meeting rooms, and function rooms to the Common Elements via the First Amendment resulted from a major change in the design of the building. Specifically, Mr. Reiss, a former Trump executive, and Mr. Trump testified that Defendants originally planned to include over 350,000 square feet of office space in the building. Defendants, however, struggled to rent the office space and, therefore, decided, based on a recommendation from Mr. Reiss, to turn that space into additional residential and hotel condominiums and ballrooms. (Trial Tr. at 242 lns. 4-8; 245 ln. 7 – 246 ln. 10; 247 at lns. 11-19.) According to both Mr. Trump and Mr. Reiss, it was Mr. Reiss' idea, along with Russell Flicker, to create a ballroom in the space instead, and to subsequently add the ballroom to the Common Elements for the hotel condominium. (*See, e.g., id.* at 226 ln. 9-14; 250 lns. 4-20; 3318 lns. 15-19; 332 lns. 13-20; 333 lns. 11-18; 606 ln. 20 – 607 ln. 5.) Mr. Trump was the ultimate

authority on the decision to eliminate the office space, which he agreed to do based on Mr.

Reiss' recommendation. (*See, e.g., id.* at 606 ln. 20 – 607 ln. 5; 245 ln. 23 – 246 ln. 10.) Mr.

Reiss, however, did not need to consult with Mr. Trump before including the ballroom, meeting

rooms, and function rooms in the Common Elements. (*Id.* at 314 ln. 10-14; 606 ln. 20 – 607 ln.

5.) Indeed, Mr. Reiss testified that he could not recall Mr. Trump ever discussing with him what

they should include in the Common Elements. (*Id.* at 314 ln. 25 – 315 ln. 4.) He informed Mr.

Trump of his decision to add these facilities to the Common Elements, nonetheless, even though

he did not need Mr. Trump's approval for this type of decision. (*Id.* at 501 ln. 18 – 502 ln. 7;

333 lns. 11-18.)

Mr. Reiss made his recommendation to Mr. Trump regarding the removal of the office

space and the addition of the ballroom, meeting rooms and function rooms to the Common

Elements based on his previous hotel experience and after having the architect evaluate what the

building would look like without the office component. (Trial Tr. at 245 ln 15 – 246 ln. 10.) Mr.

Reiss, however, only had limited experience working with hotel condominium issues. He

previously had worked on the Trump Tower in New York, which technically became a hotel

condominium, but which did not have the type of ballrooms, meeting rooms, function rooms, and

revenue-producing facilities present in the much larger Trump Tower Chicago. He had no other

prior experience with hotel condominium developments. Mr. Reiss stands by his decision to add

these facilities to the Common Elements, however, testifying that, based on the facts known to

him when he made the decision, he would make the same decision again today. (*Id.* at 347 lns.

2-8.)

Between the time Mr. Reiss added the revenue-producing facilities to the Common

Elements and Defendants issued the Fourth Amendment which removed them from the Common

26

Elements, Mr. Reiss left the Trump Organization to work for a competitor. When Mr. Reiss left the Trump Organization he was not on "happy terms with Mr. Trump." (*Id*. at 287 lns. 4-5.) Given this departure and the fact that Mr. Reiss currently does not work for the Trump Organization, Mr. Reiss had no motivation to fabricate his testimony to assist his former employer. Furthermore, his testimony was credible and consistent with the other evidence presented at trial.

### b. Mr. Petrus Reasonably Decided, Based on His Hotel Condominium Expertise, that Defendants Should Remove the Revenue-Producing Facilities from the Common Elements

Mr. Petrus, the Chief Operating Officer for the Trump Organization's hotel collection, testified regarding the reasons Defendants removed the revenue-producing facilities from the Common Elements with the Fourth Amendment in October 2007, and admitted that it was his idea to remove them. Notably, Mr. Petrus testified over three different days and was extremely credible. He patiently answered all of counsel's questions in a forthright manner, offering reasoned, thoughtful responses and explanations of difficult concepts – such as the differences between various budgets which Ms. Goldberg's lawyer repeatedly conflated and attempted to confuse.

Mr. Petrus explained that he felt that Defendants should remove the revenue-producing facilities from the Common Elements and replace them with a yearly fee which Defendants would pay to the unit owners. Mr. Petrus believed having a "static", "predictable" stream of income every year from a set payment would be a "safer" and "smarter" move for the HCU owners so that they would not have to risk a loss or cope with significant swings in revenue each year. (Trail Tr. at 873 ln. 12 – 875 ln. 2.) Mr. Petrus explained that he went back and looked at the assumptions that the executives previously had made during the earlier stages of the project

and determined that "the appropriate thing to do was to make a modification to the budget that would give the unit owners greater protection in the event that -- any type of fluctuations in revenues and expenses tied to that area." (*Id.* at 1003 lns. 7-10.)

Mr. Petrus consistently and credibly testified that it was his idea, which he developed on his own, to remove the revenue-producing facilities from the Common Elements. (*See, e.g.,* Trial Tr. at 1073 lns. 3-12; 1002 lns. 20-23.) He believed that it was important for the sake of the building, the Trump Organization, and the unit owners for Defendants to own the Common Elements. He explained that there is significant risk involved when a condominium association owns meeting rooms, ballrooms and function rooms because they may not run them properly. Mr. Petrus also explained that it could be possible, for example, for the condominium association, if the HCU owners owned the Common Elements, to allow "Burger King" to operate the ballroom, which would not be good for the Trump brand and would not help generate revenue for the HCU owners. (*Id.* at 1004 lns. 8-13.)

Notably, Mr. Trump repeatedly testified that, contrary to Ms. Goldberg's theory, he was not aware when he developed the Trump Tower in 2003 of the significant risk involved in relinquishing ownership of the ballrooms to the HCU owners. (Trial Tr. at 426 ln. 21 – 427 ln. 8; 531 lns. 8-19; 531 ln. 21 – 532 ln. 1; 535 lns. 22 – 536 ln. 8; 537 lns. 3-11; 538 lns. 1-9; 561 ln. 18 – 562 ln. 4; 569 ln. 15 – 570 ln. 2.) It was not until Mr. Petrus expressed his serious concerns about the condominium owners failing to run the facilities properly, including firing the Trump Organization as the operator, that Mr. Trump focused on this issue. (*Id*; 633 lns. 10-23.) Indeed, Mr. Petrus testified that Mr. Trump never told him what should or should not be included in the Common Elements. (*Id.* at 1144 lns. 9-13.) In fact, Mr. Petrus was not aware of anything mentioning the possibility of removing the meeting and ballroom facilities from the Common

28

Elements. (*Id*. at 1144 lns. 4-8.) He credibly and consistently took complete ownership over the idea to remove these facilities from the Common Elements.

Mr. Petrus also explained that neither Mr. Trump nor anyone else at the Trump Organization previously had decided to remove the revenue-producing facilities from the Common Elements, and that it took approximately nine months to obtain approval for his idea. (Trial Tr. at 1011 lns. 13-18; 991-993.) Mr. Petrus had personally reached the conclusion that Defendants should remove the ballroom and meeting room facilities from the Common Elements in May 2007. (*Id*. at 1107 lns. 2-9.) He recalled first broaching the idea with Mr. Trump in May. (*Id*. at 1108 lns. 1-11.) Defendants issued the Fourth Amendment in October 2007, after accepting Mr. Petrus' recommendation and concluding that Defendants would give the HCU owners $500,000 a year – adjusted each year for inflation – to replace the removed Common Elements. As discussed above, Defendants had the sole and exclusive authority to make changes to the Common Elements, and therefore did not need to compensate HCU owners for this change.

> **c.     Changes to the Building Plan and Facility Allocation Were Understandable and Not Arbitrary Because Defendants Lacked Expertise in Developing Hotel Condominiums**

When Defendants began developing Trump Tower, they lacked experience with hotel condominiums and therefore needed to alter their plan as development progressed. As explained by multiple witnesses, including Mr. Reiss and Defendants' expert Robert Brenton Howie, a hotel condominium is a "highly specialized" area of development that differs from other kinds of developments. (Trial Tr. at 306 lns. 16-18; 1842 lns. 6-12.) In fact, at the time that Defendants decided to build the Trump Tower – and even when Defendants opened the sales office in 2003 and when Ms. Goldberg signed her Purchase Agreements in 2006 – hotel condominiums were

still in their infancy as a type of development.  Mr. Reiss explained that there were a "flurry" of hotel condominiums built in Florida in the 1980s which ceased operating because of "a lot of structural and legal problems with the way they were done."  (*Id*. at 173 lns. 3-17.)  According to Mr. Trump, "[h]otel condominiums were few and far between, and have become not a very favored source of investment for people over the years."  (*Id*. at 412 lns. 1-10.)  He explained that it was not until the last five to ten years that developers have started investing in hotel condominium type properties.  (*Id*. at 412 lns. 10-13.)

When Mr. Trump first considered building a hotel condominium as part of Trump Towers he had Mr. Reiss research the hotel condominiums in existence at that time because the Trump Organization lacked institutional knowledge.  (Trial Tr. at 174-75.)  Before building Trump Tower, Defendants only had previously developed and built one other hotel condominium – the Trump International Hotel and Tower in New York City.  The New York City project differed significantly from the Trump Tower in Chicago, however, as it was much smaller and did not contain the expansive ballrooms and meeting rooms which the Trump Tower Chicago eventually included.  Indeed, Mr. Reiss testified that "there were very few common elements in the New York property.  It was very much a condominium with – a heavier role of condominium than actually hotel.  And it was seen as a rooms-only kind of hotel."  (*Id*. at 298 lns. 15-18.)   Mr. Reiss further explained that, until Trump Tower Chicago, Mr. Trump "had never run or been responsible for or developed a hotel condominium in which there was banqueting facilities."  (*Id*. at 371 lns. 19-25.)

One of the significant differences between a hotel condominium and a traditional condominium or hotel is that there are "three different stakeholders in a condominium hotel" – the condominium association, unit owners, and commercial components.  (Trial Tr. at 1838 ln.

30

21 – 1839 ln. 4.)  By comparison, in a residential condominium, a developer must only make one

determination – whether a certain area is part of the unit or not.  (*Id*. at 1862 ln. 23 – 1863 ln. 6.)

If a certain area or facility is not part of the unit, then it is part of the common elements by

default.  (*Id*.)  In a hotel condominium like Trump Tower, the developer must make specific

determinations regarding which stakeholder owns each particular facility or area.  As explained

further below, because Defendants lacked experience with hotel condominiums they were not

familiar with the challenges of deciding where to allocate various facilities.  They, therefore, did

not decide to remove the revenue-producing facilities from the Common Elements until Mr.

Petrus raised his concerns based on his experience with hotel condominium projects.

> **d.** **There Was No Evidence that Defendants Acted Outside the Bounds of the Customs and Practices Within the Hotel Condominium Industry**

Although Ms. Goldberg attempted to depict the changes Defendants made as highly

significant, alleging that they stripped away the features of HCU ownership which had the most

interest to her,[5] Ms. Goldberg failed to establish by a preponderance of evidence that Defendants

did anything outside the bounds of custom and practice.  Ms. Goldberg submitted Mr. Robert

Levin as an expert to testify about the industry customs and practices.  (Trial Tr. at 1274 lns. 2-

8.)  Mr. Levin, however, admitted that, while he has thirty years of experience working in the

residential condominium business, he has no experience with hotel condominiums.  (*Id*. at 1295

ln. 5 – 1296 ln. 2.)  He has no experience reviewing, analyzing, or drafting hotel condominium

documents and has never managed or assisted a developer with a hotel condominium.  (*Id*. at

1295 ln. 19 – 1297 ln. 3.)  In fact, he admitted that he was not an expert with respect to hotel

---

[5] Ms. Goldberg would have owned less than half a percent interest – with her interest from both her HCUs combined – in the Common Elements of Trump Tower.  (Trial Tr. at 1475 ln. 2-5.)

condominium documents. (*Id*. at 1299 lns. 10-12; 1305 lns. 17-20.) He also testified that he was only familiar with property reports for between 100 and 150 of the approximately 5,000 condominium buildings in Chicago, and had no familiarity with any hotel condominium's documents. (*Id*. at 1308 lns. 1-19.) He acknowledged that he had never reviewed property reports where revenue-producing facilities, like those at issue here, had been included in the common elements, or were part of the property. (*Id*. at 1300 ln. 23 – 1301 ln. 4; 1304 lns. 14-20.) He, therefore, could not offer any opinion regarding the propriety of a developer adding and removing facilities from the common elements, via amendments to the property reports. (*See, e.g., id*. at 1309 ln. 23 – 1311 ln. 18.)

By contrast, Defendants' expert, Mr. Howie, has worked with hotel condominium developers. Mr. Howie has experience helping hotel condominium developers "map" their property, meaning that he assists them in separating out which facilities of the hotel condominium will be part of the common elements. (Trial Tr. at 1818 lns. 20-25.) Mr. Howie testified that, although he has never seen a hotel condominium developer remove multiple facilities from the common elements, he works with the developers from the start of the development and therefore assists them in properly "mapping" the facilities from the project's inception. (*Id*. at 1824 ln. 17 – 1825 ln. 18; 1191 lns. 12-17.)

According to Mr. Howie, developers should not include ballrooms, function rooms, and meeting rooms in the common elements of a hotel condominium in part because those facilities predominately support the operations of the developer or affiliate operator and therefore that entity should maintain responsibility for the facility. (Trial Tr. at 1848 ln. 23 – 1850 ln. 2.) He also testified, based on his significant experience, that developers of other products, such as residential condominiums, are unaware of the issues related to mapping, including that they need

32

to make sure that the commercial components of a condominium hotel are not part of the common elements.  (*Id*. at 1850 ln. 18 – 1851 ln. 1; 1862 lns. 15-19.)  His experience and opinion, therefore, further support Defendants' credible explanation that they originally put these facilities in the Common Elements and removed them only at the recommendation of Mr. Petrus, who had more hotel condominium experience than Mr. Reiss or Mr. Trump.  In fact, Mr. Howie opined that even sophisticated developers would not be aware of the importance of mapping essential hotel facilities in the commercial areas of the building.  (*Id*. at 1858 ln. 14 – 1859 ln. 2; 1894 ln. 24 – 1895 ln. 2.)  Mr. Howie explained that he only learned the importance of "mapping," and of separating out the revenue-producing facilities from the common elements, over time, after seeing the complications and difficulties which can arise from these areas being common elements.  (*Id*. at 1857 ln. 16  – 1858 ln 5. )

Notably, even Ms. Goldberg's real estate agent told Ms. Goldberg, via email, that she thought it was a "valid point" that Defendants "wanted to have complete control of the decisions and the responsibility for the maintenance and management of those areas of the hotel and not leave the decisions or authority in the hands of the hotel board."  (Defs.' Ex. 592.)  She also told Ms. Goldberg that she could "understand [Mr. Trump] wanting to retain the ownership rights to ensure his standard and will would prevail."  (*Id*.)  Although Ms. Vogue attempted to downplay these statements on the stand by claiming that she was being sarcastic, there was no sarcasm present in the plain language of the email and her testimony appeared biased based on her long, close relationship with Ms. Goldberg.  (Trial Tr. at 1753 lns. 9-11.)

33

### 3. The Evidence Did Not Establish That Defendants Knew in August 2006 That They Would Eventually Make the Changes at Issue

There was no evidence that Defendants knew, in August 2006 when Ms. Goldberg signed her Purchase Agreements, that they ultimately would remove the ballroom, meeting rooms, and function rooms from the Common Elements. Additionally, not a single Trump employee or former employee testified to having any knowledge, either at the time that Ms. Goldberg signed her Purchase Agreements or later, that anyone at the Defendant corporations had added the facilities at issue to the Common Elements with the intent to remove them later. Indeed, Donald Trump, whom Ms. Goldberg attempted to depict as the ultimate authority at the Defendant corporations, specifically stated that he never had any such plan or intention. Mr. Trump testified that he did not allow the meeting rooms, ballrooms, related food and beverage and other operations to be put into the Common Elements knowing that he would later take them out. (Trial Tr. at 666 lns. 2-3.) Mr. Trump also testified that he did not include those facilities in the Common Elements intending to later take them back. (*Id*. at 666 lns. 12-23.) He further testified that he did not know, at the time Ms. Goldberg signed her Purchase Agreements, that he was going to take back the meeting rooms, ballrooms, and related food and beverage operations. (*Id*. at 667 lns. 7-10.)

Regardless of how "braggadocios"[6] Mr. Trump may or may not have been about the Trump Organization, four former and current Trump executives corroborated his testimony about the issues relevant to Ms. Goldberg's case. The other evidence in the case, as discussed above, also supports Mr. Trump's testimony. Specifically, Mr. Reiss, and Ms. Cremer, who no longer

---

[6] Mr. Trump testified that he "[did not] want to be braggadocios" but that he is "very proud of the fact that [they] build great buildings." (Trial Tr. at 407 lns. 20-23.)

34

work for Defendants and have no apparent ongoing loyalty to Defendants, and Mr. Petrus

testified credibly and consistently regarding the decisions to add the revenue-producing facilities

to the Common Elements and to remove them from the Common Elements.  As discussed above,

each of these witnesses substantiated Mr. Trump's testimony that Mr. Reiss and Mr. Flicker

initially decided to add the revenue-producing facilities to the common elements, and that Mr.

Petrus had the idea to remove them, which he did after obtaining Mr. Trump's approval.  None

of these witnesses were aware of any "bait and switch" plan, or any intent or plan in August

2006 to eventually remove the revenue-producing facilities from the Common Elements.

Mr. Reiss, for example, who left the Trump Organization on unfavorable terms (Trial Tr.

at 287 lns. 4-5), testified as follows:

Q.     Mr. Reiss, as of the day you left the Trump Organization,
       was it your understanding that the plan for the hotel
       condominium was to include the meeting room and ballroom
       facilities in the common elements?

A.     Yes, it was.

Q.     In all of the time that you worked there -- for the Trump
       organization -- did anyone in the organization ever tell you
       that they thought the meeting room and ballroom facilities
       should be removed from the common elements?

A.     No.

Q.      In all the time that you worked at the Trump Organization,
       did you have any reason to believe that anybody associated
       with the Trump Organization  was even considering removing the
       meeting and ballroom facilities from the common elements?

A.     No, I did not.

(*Id*. at 345 lns. 6-20.)

Ms. Cremer, who worked for Defendants when they issued the original Property Report

and the First, Second, Third and Fourth Amendments but who now works on the World Trade

Center development, stated the following:

> Q.     Based on everything you know, Ms. Cremer, from every
> meeting you ever participated in and were present for, do you
> have any reason to believe that anyone affiliated with the
> Trump Organization  tried to fool potential buyers by making
> false statements about their plans for the project?
>
> . . .
>
> A.     No.

(Trial Tr. at 1050 ln. 19 – 1051 ln. 6.)  She further testified as follows:

> Q.     Based on your experience and your knowledge, based on your
> presence at all the meetings at which the subject was
> discussed, do you have any reason to believe that the plans
> for the project as represented in the property reports were
> true statements?
>
> A.     Absolutely.
>
> Q.     And what is that belief based on?
>
> A.     It was based on the facts at the time.

(*Id*. at 1052 lns. 1-8.)  Based on their demeanor while testifying and their status as former

employees, neither Mr. Reiss or Ms. Cremer had any apparent bias or motive to fabricate.  To the

contrary, each testified consistently and credibly, even in the face of overly aggressive, repetitive

questioning.

Additionally, as discussed above, Mr. Petrus credibly testified that he was not aware of

any long-standing plan to remove the revenue-producing facilities from the Common Elements.

Rather, it was an idea he personally had in 2007 and which he recommended to Mr. Trump.  He

specifically testified as follows:

Q.    To your knowledge, before you suggested removing the meeting and ballroom facilities from the common elements, nobody else at the Trump Organization had even mentioned to you the possibility of that happening, right?

A.    That is correct.

Q.    Mr. Trump certainly never came to you with his own suggestions about what should or should not be in the hotel condominium common elements, right?

A.    Never.

(Trial Tr. at 1144 lns. 5-13.)

For Ms. Goldberg's theory to ring true, Mr. Trump, Ms. Cremer, Mr. Weiss, Mr. Reiss and Mr. Petrus all must have lied on the stand. For her theory to succeed, they must have lied about who made the decisions to add and remove the revenue-producing facilities, whether Mr. Trump directed them to add or remove the facilities, or whether they knew of anyone at the Trump Organization having knowledge, prior to 2007, that they would ultimately remove the facilities from the Common Elements. Alternatively, Ms. Goldberg's theory would require Mr. Trump to have lied about having a master plan, and to have kept all of his executives in the dark about his plan while convincing Mr. Reiss and Mr. Petrus to add/remove the facilities, somehow thinking it was their own idea rather than his. The Court finds both of these alternatives implausible, especially in light of the highly credible testimony given by the former and current Trump executives, particularly Mr. Petrus. The evidence, therefore, does not support Ms. Goldberg's allegations that Defendants knew, prior to August 2006, that they would remove the revenue-producing facilities from the Common Elements at a later date.[7]

---

[7] Although Ms. Goldberg does not fully articulate her theory regarding laundry facilities in her Amended Complaint, during trial she attempted to show that Defendants knowingly made misrepresentations in the initial Property Report and first three amendments by including "laundry facilities" in the Common Elements when there was never any

## CONCLUSION

For the foregoing reasons, the Court finds in favor of Defendants on Counts I and V.

**DATED:  May 31, 2013**

**ENTERED**

AMY J. ST. EVE
**United States District Court Judge**

---

plan for any laundry facility.   Section 3.1 of the Declaration stated that the Common Elements included "without limitation and if applicable, any of the following items . . .".  (Property Report, Ex. A, Declaration at 8.)  As Mr. Reiss explained, this paragraph meant that anything included in the list would be in the Common Elements if it was included in the actual building, but the paragraph does not mean that all items in the list would be part of the building.  (Trial Tr. at 328 ln. 24 – 329 ln. 4.)  Not only did Ms. Goldberg fail to show, by a preponderance of the evidence, that there was never any plan to include "laundry facilities" of any kind, but, if Trump Tower did not contain any laundry facilities then the Declaration did not require Defendants to convey any such facilities.  Ms. Goldberg's claims regarding laundry facilities, therefore, also fail.