**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| JACQUELINE GOLDBERG, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 09 C 6455 |
| | ) | |
| 401 NORTH WABASH VENTURE LLC and | ) | |
| TRUMP CHICAGO MANAGING | ) | |
| MEMBER LLC, | ) | |
| | ) | |
| Defendants. | ) | |

**<u>MEMORANDUM OPINION AND ORDER</u>**

AMY J. ST. EVE, District Court Judge:

On May 23, 2013, following an approximately two week trial, the jury returned a verdict

in favor of Defendants 401 North Wabash Venture L.L.C. and Trump Chicago Managing

Member, L.L.C. ("Defendants") on Plaintiff Jacqueline Goldberg's Illinois Consumer Fraud and

Deceptive Practices Act claim ("ICFA") and the Land Sales Full Disclosure Act claim ("Land

Sales Act"). (R. 365.) On May 31, 2013, the Court issued an Opinion finding in favor of

Defendants on Ms. Goldberg's claim for violation of the Illinois Condominium Act and her claim

for breach of contract (the "Trial Opinion"). (R. 368, Opinion.) The Court entered judgment in

favor of Defendants on all four claims on May 31, 2013. (R. 369.) Before the Court is Ms.

Goldberg's motion for a new trial on all claims pursuant to Federal Rule of Civil Procedure

("Rule") 59. (R. 374, Mot., R. 375, Mem.) For the following reasons, the Court denies Ms.

Goldberg's motion.

## BACKGROUND

The allegations in this case stem from two purchase agreements Ms. Goldberg entered into, in August of 2006, with Defendant 401 North Wabash Venture LLC to purchase two hotel condominium units ("HCUs") – Units 2238 and 2240 – in the Trump International Hotel & Tower Chicago ("Trump Tower"). Each purchase agreement contained materially identical provisions, and the Court will refer to the agreements collectively as the "Purchase Agreements." Prior to signing these Purchase Agreements, Defendants provided Ms. Goldberg with certain documents related to the HCUs, including the Property Report, which included the Declaration, and amendments to the Property Report. According to these documents, Mrs. Goldberg would own a certain percentage of the Common Elements. These documents defined the Common Elements as including ballrooms, meeting rooms, function rooms, and laundry facilities.

In October 2007, after Ms. Goldberg had paid $516,457.40 in earnest money deposits, but before she closed on her HCUs, Defendants issued a Fourth Amendment to the Property Report which changed the definition of Common Elements by removing the ballrooms, meeting rooms, and function rooms. Notably, the Purchase Agreements included a provision – Section 4(a) – which gave Defendants the "the right, in [their] sole and absolute discretion, to modify" the Property Report, Declaration, and other documents relating to the HCUs.[1] (Defs.' Exs. 539 & 540, Pls.' Ex. 60(A) & 60(B), Purchase Agreements at § 4(a).)

---

[1] Section 4(a) of the Purchase Agreements provided, in relevant part:

> The Condominium Declaration, By-Laws, Budget, Floor Plans and such other documents required by Chapter 13-72 of the Municipal Code of Chicago and Section 22 of the [Illinois Condo Act], as amended from time to time, are collectively called the "Condominium Documents." Purchaser acknowledges that Purchaser has had the opportunity to review the Condominium Documents. *Seller reserves the right, in its sole and absolute discretion, to modify the Condominium Documents*, together with the Articles of Incorporation of the Association and the Statement of Record required by the Interstate Land Sales Full Disclosure Act (the "HUD Report"), provided that Seller shall notify Purchaser or obtain the Purchaser's approval of any changes in the

Sometime in 2009, Ms. Goldberg decided not to close on her HCUs, allegedly based on the removal of these facilities from the Common Elements. Ms. Goldberg then filed suit against Defendants. In her Amended Complaint, Ms. Goldberg alleged the following: violation of the Illinois Condominium Act, 765 ILCS 605/1 *et seq.* (Count I); violation of the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/1 *et seq.* (Count II); violation of the Federal Interstate Land Sales Full Disclosure Act, 15 U.S.C. §§ 1701 *et. seq.* (Count III); violation of the Illinois Securities Law (Count IV); and breach of contract (Count V). (R. 48.) The trial included testimony by ten witnesses and numerous exhibits. The jury decided Counts II and III, and the Court addressed Counts I and IV. On May 31, 2013, the Court entered judgment in favor of Defendants on all counts.

As noted in the Court's Trial Opinion, the "Court carefully evaluated the demeanor and credibility of each witness who testified during the trial, including body language, tone of voice, facial expressions, mannerisms, and other indicative factors." (Opinion at 4.) Notably, the Court drafted more than a hundred pages ruling on the parties' motions *in limine*, jury instruction issues, and other motions regarding trial issues, in addition to the 38-page Trial Opinion. (*See, e.g.,* 239, 249, 250, 251, 252, 256, 257, 258, 261, 273, 280, 281, 290, 292, 295, 296, 297, 298, 301, 313, 314, 315, 316, 317, 320, 323, 325, 352, 360, 363, 368.) The Court incorporates these prior rulings by reference in this Opinion.

---

Condominium Documents, the HUD Report and any such other documents, as the case may be, when and if such notice or approval is required by law. Purchaser agrees, from and after closing, to comply with the provisions of and perform all obligations imposed on Purchaser as a unit owner by the Act, the Condominium Declaration and the By Laws.

(Defs.' Exs. 539 & 540, Pls.' Ex. 60(A) & 60(B), Purchase Agreements at § 4(a) (emphasis added).)

**LEGAL STANDARD**

Ms. Goldberg faces a heavy burden under Rule 59(a) of establishing the need for a new trial. *See Marcus & Millichap Inv. Servs. of Chicago, Inc. v. Sekulovski*, 639 F.3d 301, 313–14 (7th Cir. 2011) (stating that "movants bear a particularly heavy burden because a court will set aside a verdict as contrary to the manifest weight of the evidence only if no rational jury could have rendered the verdict.") (citing *Lewis v. City of Chicago,* 590 F.3d 427, 444 (7th Cir. 2009)). "A court may only order a new trial if the jury's verdict is against the manifest weight of the evidence, or if for other reasons the trial was not fair to the moving party." *Willis v. Lepine,* 687 F.3d 826, 836 (7th Cir. 2012) (quotations omitted). "A new trial should be granted, however, only when the record shows that the jury's verdict resulted in a miscarriage of justice or where the verdict, on the record, cries out to be overturned or shocks our conscience." *Whitehead v. Bond,* 680 F.3d 919, 927-28 (7th Cir. 2012) (quotation omitted).

Seventh Circuit precedent instructs that courts are to view the evidence in the light most favorable to the non-moving party on a Rule 59(a) motion. *See, e.g., Wipf v. Kowalski*, 519 F.3d 380, 384 (7th Cir. 2008) (citing *Kapelanski v. Johnson*, 390 F.3d 525, 530 (7th Cir. 2004)); *Carter v. Chicago Police Officers*, 165 F.3d 1071, 1079 (7th Cir. 1998) (citing *M.T. Bonk Co. v. Milton Bradley Co.*, 945 F.2d 1404, 1407 (7th Cir.1991)). There was some disagreement on this issue among the district courts following the Seventh Circuit's decision in *Mejia v. Cook County, Ill.*, 650 F.3d 631, 633 (7th Cir. 2011). *See Allstate Ins. Co. v. St. Anthony's Spine & Joint Inst., P.C.,* No. 06–cv–7010, 2012 WL 669044, at *2 (N.D. Ill. Feb. 29. 2012) (collecting cases). In *Whitehead*, however, the Seventh Circuit clarified its opinion in *Mejia* by rejecting the plaintiff's argument, which relied on *Meija*, "that the district court applied the wrong standard to her motion

4

for new trial by looking at the case in the light most favorable to the defendants instead of making

an independent, neutral decision based on the credibility of the witnesses and evidence."

*Whitehead*, 680 F.3d at 928. The Seventh Circuit explained that the plaintiff's "reading of *Mejia*,

which places the judge in the role of a 13th juror, is misguided." *Id*. In addition, the Seventh

Circuit noted that "the district court must properly exercise its discretion in weighing the evidence

to determine if it's against the manifest weight of evidence." *Id.* The Seventh Circuit further

explained that "[s]ince the credibility of witnesses is peculiarly for the jury, it is an invasion of the

jury's province to grant a new trial merely because the evidence was sharply in conflict." (*Id*.)

(citation omitted). Indeed, "a certain deference to the jury's conclusions is appropriate." *Galvan*

*v. Norberg*, 678 F.3d 581, 588-89 (7th Cir. 2012).

## ANALYSIS

Ms. Goldberg's motion for a new trial lists a litany of errors which she believes occurred

during the trial, in the Court's motion *in limine* rulings, in other pre-trial rulings made by the

Court, and as far back as the Court's summary judgment ruling in October of 2012 – more than a

year and a half before trial. As explained below, many of these arguments are effectively

untimely motions for reconsideration which fail to cite any basis for the Court to reconsider its

previous reasoned decisions, and do not establish any error warranting a new trial. Furthermore,

Plaintiff has failed to articulate any factual or legal reason why the jury's verdict was against the

manifest weight of the evidence. Ms. Goldberg – without pointing to any specific error in the

Court's reasoning – also challenges the Court's verdict, which required conclusions and findings

which overlapped with the issues the jury decided. The heavy burden Ms. Goldberg faces under

Rule 59(a), therefore, seems particularly heavy here where the Court has already reviewed the

evidence presented to the jury and reached conclusions consistent with the jury's verdict.  Ms.

Goldberg's motion also, troublingly, is almost entirely devoid of citations to the record, leaving

her motion instead riddled with unsupported accusations about the Court's and Defendants'

conduct and statements throughout the trial.  As a result, for the reasons articulated below, despite

extensive briefing,[2] Ms. Goldberg has failed to establish that no rational fact-finder could have

reached the overlapping verdicts which the Court and the jury reached.

## I.  Neither the Jury's Verdict Nor the Court's Verdict Were Against the Manifest Weight of the Evidence

### A.  The Jury's Verdict

The jury returned a verdict in favor of Defendants on the ICFA claim and the Land Sales

Act claim.  To prevail on the ICFA claim, Ms. Goldberg needed to prove, among other things, by

a preponderance of the evidence, that "Defendants knew and failed to disclose and/or

misrepresented information about the hotel condominium before [she] signed the Purchase

Agreements."  (R. 366, Jury Instruc. at 29.)  To prevail on her Land Sales Act claim, Ms.

Goldberg needed to establish, by a preponderance of the evidence, one or both of the following:

1)      That the Property Report which Defendants provided to Plaintiff when she signed the Purchase Agreements contained an untrue statement of material fact or omitted to state a material fact; or

2)      That Defendants employed a scheme to defraud Plaintiff into signing the Purchase Agreements.

(*Id*. at 34.)  The Court instructed the jury that a fact or deception was "material" if a buyer would

have acted differently knowing the information, or if it concerned the type of information upon

which a buyer would be expected to rely in making a decision whether to purchase.  (*Id*. at 29,

34.)  According to Ms. Goldberg, "[n]o rational jury could based on the evidence presented at trial

---

[2] The Court permitted Ms. Goldberg to file both a memorandum in support of her motion and her reply brief in excess of the usual page limitations, which resulted in nearly eighty pages of briefing by Ms. Goldberg.  (R. 373, 388.)

enter a verdict against Ms. Goldberg on either of these claims." (Mem. at 3.) The Court disagrees.

### 1. The Laundry Facilities Evidence

Ms. Goldberg contends that there was "undisputed evidence at Trial that the Trump Defendants misrepresented and failed to disclose information to Ms. Goldberg about the hotel condominium with respect to the Laundry Facilities." (Mem. at 3.) This argument fails for three reasons.

First, the Court previously concluded that Ms. Goldberg did not show, by a preponderance of the evidence, that Defendants never planned to include laundry facilities of any kind. (Opinion at 38 n.7.) The Court drew this conclusion after a thorough review of the evidence and, therefore, does not agree that the jury's conclusion regarding the laundry facilities was against the manifest weight of the evidence. Notably, Ms. Goldberg asserts that the evidence regarding the laundry facility is "undisputed," in part because it was not disputed at summary judgment. (R. 389, Reply at 2.) As the Court noted in a previous opinion, however, "admissions made for purposes of summary judgment would not bind Defendants at trial." (R. 256 at 7) (citing *CIVIX–DDI, LLC v. Hotels.com*, L.P., No. 05 C 6869, 2012 WL 6591684, at *9 (N.D. Ill. Dec. 18, 2012); Fed. R. Civ. P. 56(g).) The only evidence from the trial Ms. Goldberg cites to support her contention is the deposition testimony of Trump Organization employee Andrew Weiss, which did not create "undisputed" evidence of the Trump Organization's plans regarding laundry facilities. Ms. Goldberg also makes a conclusory statement about how internal emails "show conclusively that Defendants knew there would be no [l]aundry [f]acilities within the hotel condominium common elements." (Mem. at 4.) She also vaguely references – without citation to the record or specific

testimony – that Charles Reiss and Jill Cremer also offered "undisputed" testimony to support her argument. (*Id.*) The Court will neither scour the record for testimony supporting Ms. Goldberg's argument, nor accept her conclusions in place of analysis. *See Cracco v. Vitran Exp., Inc.,* 559 F.3d 625, 632 (7th Cir. 2009).

Second, even if Ms. Goldberg's contention is correct – that the evidence did show that Defendants never planned to include laundry facilities – Ms. Goldberg has cited no evidence that Defendants ever *misrepresented* any information regarding the laundry facilities. At most, Section 3.1 of the Declaration, contained in the original Property Report issued in September of 2003, stated that the Common Elements would include various items, including laundry facilities, "if applicable." (Pl.'s Ex. 1B, Property Report, Ex. A, Declaration at 8.) Charles Reiss testified that this paragraph meant that anything included in the list would be in the Common Elements if it was included in the actual building, yet the inclusion of an item on the list did not mean that it would necessarily be part of the building. (Trial Tr. at 328 ln. 24 – 329 ln. 4.)

Ms. Goldberg, once again, misguidedly cites to the Court's summary judgment opinion – and in fact misstates the Court's ruling – stating the Court previously rejected this argument regarding the "if applicable" language. At summary judgment the Court merely determined that a genuine issue of material fact existed on this issue. Further, the Court stated that this argument regarding the laundry facilities raised an issue of weight for the jury. (R. 170 at 30.) It did not "reject" this argument, as Ms. Goldberg contends. The Court cannot reweigh the evidence now because Ms. Goldberg is unhappy with how the jury weighed this issue at trial.

Finally, Ms. Goldberg also fails to cite any evidence proving, by a preponderance of evidence, that any statements about laundry facilities – assuming they were misstatements – were "material," as required to prevail under the ICFA or the Land Sales Act.  Indeed, Ms. Goldberg attempts to shift the burden to Defendants by arguing that they did not put forth sufficient evidence to show that the laundry facilities were not material.  (Reply at 5.)  Furthermore, Ms. Goldberg's reliance on her own testimony to establish the materiality of the laundry facilities is misplaced.  Contrary to Ms. Goldberg's argument that, on the stand, "[she] pointed the Trump Defendants directly to the pages [in the HCU marketing materials] promoting ownership of the Laundry Facilities sold to HCU buyers," the hotel condominium marking materials never mentioned any laundry facilities.  (Mem. at 4; Pls' Ex. 75.)  Instead, dry cleaning and laundry services were listed as amenities as part of the residential properties, not the hotel condominiums. (*See* Pls.' Ex. 75 at DEFS 004380, DEFS 004431.)  Ms. Goldberg's case pertained only to the hotel condominium units.

### 2.    Consumer Fraud Evidence

Ms. Goldberg argues that "the only reasonable conclusion the jury could draw from the evidence was that the Trump Defendants knew at the time they offered to sell to buyers the revenue producing facilities of the hotel that they would never, in fact, deliver that ownership interest to buyers."  (Mem. at 4.)  Although this argument relates to the propriety of the jury's verdict, the Court previously analyzed the evidence regarding Defendants' knowledge in its ruling on Ms. Goldberg's breach of contract claim.  After reviewing the evidence, and citing to testimony from Donald Trump, Sr., Jill Cremer, Charles Reiss, and Jim Petrus, the Court concluded that the evidence "does not support Ms. Goldberg's allegations that Defendants knew, prior to August 2006, that they would remove the revenue-producing facilities from the Common

Elements at a later date." (Opinion at 34-37.) Ms. Goldberg offers no reason why this conclusion is against the manifest weight of the evidence but, instead, restates the arguments she made at trial, hoping the Court will re-weigh the evidence in her favor. Indeed, Ms. Goldberg merely cites testimony regarding how significant the Trump Tower project was for Mr. Trump and how it was important to him to protect his "luxury" brand. (Mem. at 5.) The testimony she cites does not demonstrate that the jury – or the Court – made a manifest error by not drawing the inferences from this evidence that Ms. Goldberg would have hoped. Instead, as explained in detail in the Trial Opinion, the evidence did not show any long-standing plan to remove the revenue-producing facilities from the Common Elements. (*See, e.g.,* Opinion at 34-37.)

### 3.    Pretext Evidence

Ms. Goldberg offers a misguided argument that the evidence showed that Defendants offered a "false excuse" about why they removed certain facilities from the Common Elements "as a pretext to hide the fact that they misrepresented and/or failed to disclose information regarding the hotel condominium." (Mem. at 6.) This argument attempts to shift the burden to Defendants to prove some type of justification for their actions. Furthermore, the Court, after its careful evaluation of the evidence, previously concluded that Defendants' explanation was "reasonable and credible." (Opinion at 24-33.) Ms. Goldberg offers no evidence to directly undercut that conclusion, but, again, merely hopes that the Court will re-weigh the evidence to reach a conclusion contrary to that which the jury – and Court previously– reached. This argument, therefore, fails to establish that the jury's verdict was against the manifest weight of the evidence.

Additionally, Ms. Goldberg simultaneously offers the contradictory argument that the reasons why Defendants removed certain facilities from the common elements "is legally

immaterial in defense of statutory consumer fraud claims brought under the Fraud Act and the Land Sales Act." (Mem. at 8.) Not only does this argument undercut her "pretext argument," but it misstates the Court's previous ruling. Specifically, Ms. Goldberg contends that the Court previously ruled that the ICFA and the Land Sales Act do not contain a knowledge requirement, citing to the Court's ruling on May 1, 2013. (*Id.* (citing R. 297).) In that May 1st ruling, the Court explained that a plaintiff could prevail on an ICFA claim by proving an innocent or negligent misrepresentation, which would not require knowledge. (R. 297 at 1.) The Court further explained, however, that for "an omission or concealment to be actionable, Defendants need to know of the fact at the time they concealed it." *Id.* at 2. Moreover, the Court later ruled that innocent misrepresentation was not a legally tenable theory here based on the misrepresentations alleged in this case. (R. 313.) As a result, the Court instructed the jury that, to prevail on her ICFA claim, Ms. Goldberg needed to prove that "Defendants knew and failed to disclosed and/or misrepresented information." (Jury Instruct. at 29.) Ms. Goldberg's arguments regarding Defendants' explanations for their conduct are, therefore, misguided.

### B. The Court's Verdict

On May 31, 2013, the Court issued its 38-page Trial Opinion – filled with citations to testimony and exhibits – finding in favor of Defendants on Ms. Goldberg's Illinois Condominium Act ("Condo Act") and breach of contract claims. Ms. Goldberg argues that the Court's verdict on these two claims "was legally erroneous and against the manifest weight of the evidence presented at trial." (Mem. at 9.) Ms. Goldberg, however, has not offered any authority to undermine the Court's legal conclusion. Once again, she merely offers the same arguments which the Court previously rejected in its Trial Opinion.

### 1. The Condo Act Claim

Ms. Goldberg alleged that Defendants violated Section 22 of the Condo Act by failing to make full disclosure of information in the Property Reports and Declaration before she executed her Purchase Agreements. The Court concluded that Ms. Goldberg's Condo Act claim failed for two reasons: (1) her claim failed as a matter of law (the "Legal Condo Verdict"), and (2) Ms. Goldberg did not sufficiently adduce evidence at trial to prove, by a preponderance of the evidence, that Defendants knew in August 2006 that they would ultimately make the changes to the Common Elements reflected in the Fourth Amendment ("Evidentiary Condo Verdict"). (Opinion at 9.)

Although Ms. Goldberg argues that the Court erred by concluding that her claims failed as a matter of law because the Condo Act does not reach the type of conduct which Ms. Goldberg alleged, she offers no legal basis for her position. Instead, she repeatedly argues that the Court's interpretation of the Condo Act would defeat the purpose of the Act, yet provides no citation for or explanation of that purported purpose. (Mem. at 10.) Confusingly, she also states that the Court's interpretation directly contradicts Illinois cases interpreting the ICFA – not the Condo Act. (*Id*.) Ms. Goldberg, therefore, has not demonstrated that the Court's Legal Condo Verdict was legally erroneous.

Regarding the Court's Evidentiary Condo Verdict, Ms. Goldberg merely refers to the arguments she made to undercut the jury's verdict. The Court need not address the shortcomings of these arguments again here.

### 2. Breach of Contract

In her complaint, Ms. Goldberg alleged that Defendants breached the Purchase Agreements by failing to deliver her HCUs in the manner described in the version of the Property

Report existing at the time she signed the Purchase Agreements. Based on the evidence presented at trial, the Court concluded that Defendants did not breach the terms of the Purchase Agreements or the implied covenant of good faith and fair dealing. (Opinion at 9-37.)

Ms. Goldberg argues that the Court's verdict is legally erroneous and against the manifest weight of the evidence for the same reasons she argues that the jury verdict is improper. (Mem. at 10.) As discussed above, and for the reasons further detailed in the Trial Opinion, and incorporated here by reference, the evidence supported a finding in favor of Defendants on the breach of contract claim.

Ms. Goldberg's sole additional argument, based on testimony from Mr. Reiss, is inapposite and unconvincing. (Mem. at 11.) Specifically, Ms. Goldberg cites to testimony where Mr. Reiss stated that Defendants sent a letter notifying purchasers of certain changes made in the First Amendment to the Property Report – such as changing what floor their unit would be on – and gave them an opportunity to rescind their agreement. (*Id*. (citing Trial Tr. at 271-75).) Ms. Goldberg claims that this testimony proves that the changes to the revenue-producing facilities at issue were contrary to her reasonable expectations, and, therefore, breached the implied covenant of good faith and fair dealing. This testimony, however, (1) does not establish what type of notice Defendants gave to Ms. Goldberg; (2) does not establish whether Ms. Goldberg ever knew that Defendants sent this letter to other purchasers in the past; and (3) does not undercut the Court's reasoned conclusion that the changes were not contrary to the expectations of Ms. Goldberg, who was a sophisticated purchaser aware of Defendants' contractual authority to make changes without notice to her. Ms. Goldberg, therefore, has not met her heavy burden of establishing that the Court's verdict was against the manifest weight of the evidence.

## II.     Defense Counsel's Remarks During Opening Statement and Closing Argument Do Not Warrant a New Trial

Ms. Goldberg contends that Defendants made "unfairly prejudicial arguments during opening statement and closing argument which deprived her of a fair trial." (R. 375, Mem. at 24.) Specifically, Ms. Goldberg challenges Defendants' remarks regarding Plaintiff's Exhibit 29 – an email written by Ms. Goldberg – and comments that allegedly "paint[ed] the provision in the Purchase Agreements and Property Reports as an absolute defense to the consumer protection claims." (*Id.* at 24-25.)

### A.     Plaintiff's Exhibit 29

Ms. Goldberg claims that she was prejudiced because Defendants, during opening statement and closing argument, suggested that Plaintiff's Exhibit 29 contained an admission that Ms. Goldberg did not believe she he had a legitimate legal case because the Trump Defendants had the right to make changes to the Property Report. (Mem. at 24 (citing Trial Tr. at 96, 2051).) Specifically, in opening statemen, Defendants quoted a line from Plaintiff's Exhibit 29 where Ms. Goldberg wrote: "It may be somewhere in the earlier documents that Trump had the right to revise. However, if so, I don't think there would be a court case." (Trial Tr. at 96 lns 14-16.) Defendants then stated, "Well, ladies and gentlemen, we've already seen the purchase agreement that she signed did allow Trump to make those changes. So, in Mrs. Goldberg's own words, she has no court case." (*Id.* lns. 17-20.) These comments do not warrant a new trial.

First, the Court repeatedly instructed the jury that opening statements and closing arguments are not evidence. In fact, to address Ms. Goldberg's concerns regarding Defendants' comments about Exhibit 29 during opening statement, the Court instructed the jury as follows, after opening statements, before the first witness testified as follows:

Opening statements are not evidence. You are about to start hearing the evidence today, and that is what we will do over the next few days and the rest of this week certainly. Also a reminder, as I told you in opening comments to you when we began with the jury selection yesterday, at the end of the case, I will instruct you on the law. And those instructions will contain the law that controls in this case.

(Trial Tr. at 112 lns. 15 – 23.) The Court presumes that the jury followed its instructions, and did not consider Defendants' opening statement to be evidence. *Sorich v. United States*., 709 F.3d 670, 678 (7th Cir. 2013); *see also Willis*, 687 F.3d at 834 (stating that instructions to the jury that statements by the attorneys are not evidence, which the court gave before and after closing arguments, remedies any harm that may have been caused by defense counsel's objections during argument).

Second, as Ms. Goldberg acknowledges, improper statements made during opening statement or closing argument "rarely rise to the level of reversible error." (Mem. at 24); *see, e.g., Banister v. Burton,* 636 F.3d 828, 834 (7th Cir. 2011) ("improper comments during closing argument rarely rise to the level of reversible error," especially "when the comment is merely a brief and unrepeated part of a lengthy argument" (internal quotation marks and citation omitted); *Schandelmeier–Bartels v. Chi. Park Dist*., 634 F.3d 372, 388 (7th Cir. 2011) ("We have stated repeatedly that improper comments during closing argument rarely amount to reversible error."). Here, Defendants' statements were isolated, brief, not-inflammatory, and merely presented their interpretation of an exhibit – which the Court later admitted into evidence – to support their theory of the case. Ms. Goldberg and her real estate agent had an opportunity to explain on the stand what Ms. Goldberg meant when she drafted Plaintiff's Exhibit 29 – namely that she was referring to an article in the Chicago Tribune regarding other HCU buyers. Defendants did not need to credit their testimony and were free to argue their alternative theory.

15

Third, the Court previously rejected the arguments which Ms. Goldberg asserts here.
Specifically, the Court refused to give a curative instruction which Ms. Goldberg sought after
opening statements and instead instructed the jury, before the first witness testified, that opening
statements are not evidence, as noted above. (R. 327); (Trial Tr. at 104.)  Here, Ms. Goldberg
merely restates the same arguments that she briefed when she originally sought the curative
instruction, without citing any error warranting the Court's reconsideration at this time.
Furthermore, the Court finds no prejudice in Defendants' comments regarding Plaintiff's Exhibit
29 necessitating a new trial.[3]

### B.      Provision 4(a) in the Purchase Agreements and Property Reports

Ms. Goldberg argues that Defendants inappropriately painted Section 4(a) of the Purchase
Agreements – which gave Defendants the right to make changes to the facilities contained in the
Common Elements – as an "absolute defense" to her claims.  The Court disagrees.

Notably, the Court addressed the propriety of arguments regarding Section 4(a) multiple
times before and during the trial.  The Court addressed this issue, for example, when it ruled on
Ms. Goldberg's motion *in limine* No. 16 (R. 273 at 4) and when it rejected Ms. Goldberg's
proposed jury instruction No. 20 regarding Section 4(a) (R. 352).  Indeed, in its ruling on Ms.
Goldberg's proposed jury instruction the Court specifically stated that "the parties may argue to
the jury the import of the provision allowing Defendants to make changes and whether it offers an
alternative explanation, other than fraud, for the changes Defendants made."  (R. 352 at 2.)  The
Court again addressed issues regarding Section 4(a) at the close of evidence, prior to closing
arguments.  (R. 360.)  In that ruling, the Court noted that neither party had ever asked the Court to

---

[3] The Court notes that, if any argument during the trial skirted the propriety line, it would have been Ms. Goldberg's
counsel's reference to the Trump Organization as the Mafia during his closing argument, which the Court struck, and
which prompted Defendants to move for a mistrial.[3]  (Trial Tr. at 2019 ln. 8 – 2020 ln. 6; 2045 lns. 2-6.)

interpret Section 4(a) – and the Court had never interpreted that provision. (*Id*. at 2.) The Court also noted that neither party had elicited evidence of the legal meaning of the provision during the trial. (*Id*. at 4.) The Court, therefore, declined to instruct the jury on the legal meaning of Section 4(a), in part because the jury did not need to understand the legal meaning of that provision because they were not deciding the breach of contract claim. (*Id.*) Rather, the Court, explained:

> This provision is relevant to Defendants' intent and to punitive damages. The provision is also relevant to materiality as Defendants may argue that the representations made by sales agents or in early amendments to the Property Report about what would be included in the Common Elements would not have affected a reasonable purchaser's decision because Defendants had the ability to change the definition of Common Elements.

(*Id*.)

The Court also repeatedly acknowledged that Section 4(a) was not an absolute defense to Ms. Goldberg's claims. (*See, e.g., id*. at 2 "'a reasonable jury could find that Defendant[s] breached an implied covenant of good faith and fair dealing by deliberately failing to disclose material information,' even though the Purchase Agreements contained a provision allowing Defendants to make changes." (quoting (R. 170, Sum. Jgmt. Op. at 50-51).) Indeed, the Court previously stated that "[a]lthough Defendants may not assert Section 4(a) as a defense to fraud, Defendants may argue that Section 4(a) offers an alternative explanation, other than fraud, for the changes Defendants made." (*Id*. at 4 (citing R. 352 at 2; R. 273 at 4-5).) Ms. Goldberg has not provided any citation or legal justification for her contention that these prior rulings regarding Section 4(a) were erroneous.

Moreover, Defendants did not make any improper arguments about Section 4(a). Their arguments were consistent with the Court's repeated rulings that Defendants could argue their theory of the case by highlighting the existence of Section 4(a). Ms. Goldberg does not cite any instance during the trial where Defendants argued that Section 4(a) was an absolute bar to Ms.

17

Goldberg's claims. Ms. Goldberg only cites one single sentence from Defendants' arguments, in which Defendants stated part of their theory of the case – "if Trump had the right to make changes, there can't be a lawsuit about making the changes." (Mem. at 24 (citing Trial Tr. 2050).) This quote refers to Defendants' interpretation of Plaintiffs' Exhibit 29, which, as discussed above, was not improper.

It also is worth noting that Ms. Goldberg's counsel – not Defendants – violated one of the Court's rulings regarding Section 4(a) in his closing argument by displaying this provision, and then telling the jury to read the provision in its entirety. (Trial Tr. at 1987 ln. 25 – 1988 ln. 24.) Just hours before Ms. Goldberg's counsels' closing argument, the Court ruled that he could not argue that Section 4(a) required Defendants to seek Ms. Goldberg's approval before any changes, based on language in Section 4(a) not applicable to Ms. Goldberg's pending claims.[4] (R. 360 at 4.) Despite this ruling, counsel proceeded to display the entire text of Section 4(a) for the jury in his closing argument, with the inapplicable language highlighted. The Court then sustained Defendants' objection to counsel reading this portion of Section 4(a). (Trial Tr. at 1988 lns. 11-17.) Notably, in response to Defendants' objection, Ms. Goldberg's counsel stated that – consistent with the Court's ruling – he was not going to argue about the meaning of that language. (*Id.* ln. 15.) He, however, immediately directed the jury to go back into the jury room and read the provision which the Court instructed him not to read. (*Id.* lns. 19-24.) The Court later informed Ms. Goldberg's counsel, that, by showing the jury the irrelevant portion of Section 4(a),

---

[4] Specifically, Section 4(a) included that clause that required Defendants to notify Ms. Goldberg or obtain her approval "of any changes in the Condominium Documents, the HUD Report and any such other documents, as the case may be, *when and if such notice or approval is required by law.*" (Purchase Agreements, §4(a) (emphasis added).) As the Court explained in its May 22nd ruling and its ruling on Defendants' motion to dismiss, however, Ms. Goldberg had not pursued any theory that a certain "law" required such notice or approval. (R. 360 at 4; R. 37 at 22.) In fact, in her original Complaint Ms. Goldberg had alleged that Section 22 of the Condo Act required such approval, yet the Court found that she failed to state a claim for breach under such a theory. (R. 37 at 22.) Ms. Goldberg did not include this theory in her Amended Complaint, and did not assert any other "law" which might trigger the notice requirements of Section 4(a).

he, at a minimum, "violated the spirit" of the Court's order, if not its exact wording. (*Id*. at 2042 lns. 23-25.) Based on counsel's improper conduct during his closing argument, the Court permitted Defendants to argue that the inapplicable language contained in Section 4(a) was not at issue in the case. (*Id*. at 2043 lns. 1-3.)

### III.    The Court Did Not Fail to Enforce Its Motion *in Limine* Rulings

Ms. Goldberg claims that the Court "took no action when Trump employee witnesses repeatedly violated [the Court's motion *in limine* rulings] in unsolicited statements made during their testimony." (Mem. at 30.) As a result, Ms. Goldberg contends she was prejudiced and deprived of a fair trial. (*Id*.) The Court disagrees.

#### A.    Other Buyers

The Court granted Ms. Goldberg's motions *in limine* Nos. 6 and 14 to bar evidence or argument regarding the reasons why other buyers closed on their HCUs in Trump Tower. (*See* R. 210, 246.) Ms. Goldberg claims that Mr. Trump and Mr. Petrus repeatedly violated these rulings. (Mem. at 31-32.) She fails, however, to cite even a single instance – even a single piece of testimony – where either did so. This failure is fatal to Ms. Goldberg's argument as the Court will not scour the record to find testimony to support her argument. *See Cracco,* 559 F.3d at 632.

#### B.    Defendants' Breach of Contract Counterclaim

Ms. Goldberg argues that Mr. Trump "repeatedly violated" the Court's *in limine* ruling barring any evidence or argument regarding Defendants' breach of contract counterclaim, which Defendants voluntarily dismissed before trial. (Mem. at 31.) Once again, Ms. Goldberg fails to cite any testimony to support this assertion. Furthermore, she misguidedly argues that Mr. Trump violated the Court's ruling by stating that Ms. Goldberg "defaulted" on the Purchase Agreements. (*Id*.) Defendants' motion *in limine* No. 2 sought an order "barring Plaintiff at trial from

mentioning, inquiring about, adducing or presenting evidence concerning Wabash's Amended Counterclaim ("Counterclaim") or Fourth Affirmative Defense, or the dismissal thereof."  (R. 212.)  The motion, and corresponding ruling, did not address the issue of whether or not Ms. Goldberg "defaulted."  To the contrary, it was relevant and pertinent – to both Ms. Goldberg's and Defendants' theories of the case – that Ms. Goldberg did not close on her HCUs. Furthermore, Ms. Goldberg also fails to cite any portion of the record showing that she objected to this testimony during trial.

Ms. Goldberg also misguidedly argues in reply that "[t]he fact that the jury was not informed that the Trump Defendants sued Ms. Goldberg and then abandoned its [sic] claims right before trial had a substantial effect on the verdict and the jury's evaluation of the fraud evidence." (Reply at 30.)  Ms. Goldberg did not object to the dismissal of these claims.  Further, she offers no basis for why Defendants' legal strategy – on claims not before the jury – is relevant to her fraud claims.  Additionally, if the Court had allowed Ms. Goldberg to present evidence that Defendants brought – and then voluntarily dismissed – their breach of contract counterclaim, the jury would not have had the tools or information to do anything but speculate regarding why Defendants took these steps.  Ms. Goldberg offers no reason why the Court should have admitted evidence – assuming it was relevant to her claims – that would have necessitated speculative conclusions by the jury.  *See, e.g., U.S. v. Jones*, 713 F.3d 336, 340 (7th Cir. 2013) ("Although a jury may infer facts from other facts that are established by inference, each link in the chain of inferences must be sufficiently strong to avoid a lapse into speculation.").

### C.    The Purchase Agreements as Defense to Fraud Claims

Ms. Goldberg once again contends that Defendants improperly argued that certain provisions in the Purchase Agreements – namely Section 4(a) – provided an absolute defense to

Ms. Goldberg's claims.  (Mem. at 31.)  Not only does Ms. Goldberg fail to cite to any testimony or argument supporting her argument, but her assertion fails for the reasons discussed above in Section II(B).

### D.    No Advice of Counsel Defense

Next, Ms. Goldberg argues that the Court allowed Defendants to violate the *in limine* ruling barring Defendants from relying on an "advice of counsel defense" by permitting them to elicit testimony from Mr. Petrus that Defendants had consulted with the lenders' lawyers before issuing the Fourth Amendment to the Property Report.  (Mem. at 15.)  This testimony did not violate the Court's ruling.

As the Court stated during the trial, Ms. Goldberg opened the proverbial door to the testimony at issue.  Specifically, Ms. Goldberg elicited testimony from Mr. Petrus that there was a four month delay between when Defendants decided to make certain changes to the Property Report and when they disclosed those changes to the purchasers.  (Trial Tr. at 1114.)  Defendants then elicited testimony that the delay occurred, in part, because Defendants needed to have the proposed changes reviewed by the lawyers for their lenders before they notified purchasers.  (Trial Tr. at 1118.)  Notably, during the pre-trial conference, Ms. Goldberg's counsel informed the Court that he did not intend to go into the "delay" which occurred in issuing the Fourth Amended Property Report between May 2007 and October 2007.  (Pre-Trial Conf. Tr. 5/2/13 at 56 lns 7-9.)  The Court said that it would address whether Defendants could ask questions about lawyers relating to this delay if the issue arose.  The Court, therefore, merely let Defendants briefly walk through the door which Ms. Goldberg's counsel opened, despite his earlier claims that the door would remain shut.

Moreover, Mr. Petrus' testimony that the lender's attorneys needed to review the changes to the Property Report before Defendants issued the Fourth Amendment to the Property Report did not implicate the "advice of counsel" issues which Ms. Goldberg briefed *in limine*. Ms. Goldberg's motion *in limine* No. 11 expressed a fear that Defendants would be allowed to use the attorney-client privilege as a sword and a shield. Specifically, Ms. Goldberg feared that Defendants would elicit testimony that they had consulted with their lawyers when making changes to the Property Report – thus cloaking those changes in some legitimacy – while not revealing the content of those communications because they had asserted the attorney-client privilege over them during discovery. (R. 210, 246.) Indeed, Ms. Goldberg reiterated these concerns in her current motion. (Mem. at 32-33.) Defendants, however, could not assert the attorney-client privilege over communications with the lenders' – rather than their own – lawyers. The testimony Ms. Goldberg disputes, therefore, did not violate the Court's "no advice of counsel defense" ruling and did not create any of the consequences Ms. Goldberg feared regarding testimony about lawyers.

## IV. The Court Did Not Err In the "Mode of Witness Examinations"

Ms. Goldberg argues that the Court abused its discretion by:

(a) permitting the Trump Defendants to call their witnesses in Plaintiff's case-in-chief but use leading questions to examine them; and (b) failing to control Donald Trump during his testimony by directing him to answer questions and permitting him to provide answers which were nonresponsive to the questions presented; and (c) unduly limiting Ms. Goldberg's cross-examination of the key witnesses Donald Trump and Jim Petrus.

(Mem. at 36.) She also contends that the Court prejudiced her by refusing to allow her to use leading questions when examining realtors who sold units in Trump Tower. The Court addresses each argument in turn.

### A. Use of Leading Questions by Defendants

Ms. Goldberg's argument that Federal Rule of Evidence 611 "clearly" barred Defendants from asking "leading questions of their own current and former employees" misstates the law. Federal Rule of Evidence 611(c)(1) permits a party to ask leading questions on cross-examination. Fed. R. Evid. 611(c)(1). This rule does not "clearly" prohibit cross-examination of a non-hostile witness, as Ms. Goldberg contends. At most, as noted by Ms. Goldberg in her reply brief, the advisory committee notes state that a court may deny a party the ability to use leading questions on cross examination "when the cross-examination is cross-examination in form only and not in fact, as for example the 'cross-examination' of a party by his own counsel after being called by the opponent." (Reply at 34.) The decision whether to permit leading questions falls within the Court's discretion. Ms. Goldberg also fails to provide any legal citation requiring the Court to preclude Defendants from asking cross-examination of its employees – let alone its former employees who are not its current agents. She also does not cite to any instance where Defendants improperly asked a leading question outside the scope of Ms. Goldberg's direct examination – a limitation which Rule 611 does include. Furthermore, Ms. Goldberg fails to articulate how she suffered any prejudice from Defendants' leading questions. As such, her argument fails.

### B. Ms. Goldberg's Direct Questioning of Mr. Trump

During the May 2, 2013 pre-trial conference, the Court put both parties on notice that they needed to conduct themselves professionally during the course of the trial. Specifically, the Court had the following exchange with counsel:

> THE COURT: I know how talented both of you are. And I know that both of you have a lot of trial experience. But just so you are on notice -- based on my experience that sometimes when high-profile individuals come in the courtroom, lawyers do not always behave the way they should -- I fully expect that you will behave professionally and the

23

way you should. I will say no more. But I fully expect that and will let you know if you are not. So –

MR. S. KULWIN: I don't anticipate –

THE COURT: -- I will say no more.

MR. S. KULWIN: I don't anticipate examining Mr. Trump any differently than anybody else, and I'll examine him the way same way I did at his deposition.

MR. NOVACK: Judge, I would just say this –

MR. S. KULWIN: In terms of level of intensity.

THE COURT: Just keep it professional. I do not appreciate grandstanding when you are doing it for -- I do not appreciate grandstanding. So, I do not think I am going to have a problem with you; but, out of fairness, I am putting you on notice . . . But if there is an issue that rises to that level, I will bring it to your attention. If I bring it to your attention, you have brought it to a very high level.

(Trial Tr. at 30 ln. 7 – 31 ln. 1; 31 ln. 24 – 32 ln. 1.) Unfortunately, despite this warning, Ms.

Goldberg's counsel's conduct rose to such a level during the trial that the Court needed to address

him both outside the presence of the jury and in their presence.

Indeed, after hours of bickering in front of the jury between Ms. Goldberg's counsel, Mr.

Shelly Kulwin, and Mr. Trump, the Court admonished both of them about their behavior. *See,*

*e.g., In re Fosamax Prods. Liab. Litig.*, No. 06 Civ. 09455(JFK), 2010 WL 3955407, at *7

(S.D.N.Y. Oct. 4, 2010) ("experienced trial lawyers know that there are a multitude of proper

methods that can be used to control a difficult witness on cross-examination that are not offensive

and rude"). Specifically, the Court had the following exchange with Mr. Trump and Ms.

Goldberg's counsel:

THE COURT: It is quarter to 11:00. You have been dancing around and boxing with each other for the last 45 minutes. This is not a boxing ring.

THE WITNESS: Okay.

THE COURT: Mr. Trump, things would go much smoother if you just listen to the question of Mr. Kulwin and answered his question.

THE WITNESS: Okay.

THE COURT: Mr. Kulwin, things would go much smoother if you stopped asking compound questions –

MR. S. KULWIN: Yes. Yes, your Honor.

THE COURT: -- where there are multiple answers to it.

MR. S. KULWIN: Yes, your Honor.

THE COURT: Let us take our morning break. I am going to give you gentlemen time to catch your breath and, hopefully, we will pick up and move smoother.

(Jury out.)

THE COURT: Mr. Kulwin –

MR. S. KULWIN: Yes, your Honor.

THE COURT: -- before you go and, Mr. Trump, I know you two like sparring with each other, but we are going to be here tomorrow. And I know you would like to get out of here, Mr. Trump. I know you have better places to be. I do not take that personally, but I know you have better places to be. You have got to stop it. Do you think the jury likes this? If you think they like this, I can assure you they do not. You are wasting their time. Please, listen to the questions that are asked. Mr. Kulwin, you have got to control yourself, too. You are rolling your eyes. I would suggest you do not tell me that you demand a sidebar. That is not proper and you know that. I do not want to call you out on it in front of jury, but I will.

MR. S. KULWIN: Okay.

THE COURT: So, let us get control of ourselves. Take the next ten minutes. Take a deep breath. And when you come back, I hope we can get this back on track.

(Trial Tr. at 552 ln. 16 – 554 ln. 7.) Although the Court admonished Mr. Kulwin and Mr. Trump

to "maintain order in the courtroom" and "to impose silence, respect, and decorum," Ms.

Goldberg contends that the Court (1) improperly permitted "Donald Trump to repeatedly provide

unsolicited remarks which were non-responsive to the questions posed and in several instances

directly violated motion *in limine* rulings" (Mem. at 37); and (2) prejudiced Ms. Goldberg by admonishing her counsel and Mr. Trump differently (Reply at 35). *See, e.g., Lewis v. U.S.* 518 U.S. 322, 333, 116 S. Ct. 2163, 135 L. Ed. 2d 590 (1996) (citing *Codispoti v. Pennsylvania*, 418 U.S. 506, 513, 94 S. Ct. 2687, 41 L. Ed. 2d 912 (1974)); *Chambers v. NASCO, Inc*., 501 U.S. 32, 43, 111 S. Ct. 2123, 115 L. Ed. 2d 27 (1991); *see also U.S. v. Laraneta*, 700 F.3d 983, 985 (7th Cir. 2012). These arguments fail for the reasons discussed below.

First, Ms. Goldberg fails to cite to any specific testimony which Mr. Trump gave in violation of an *in limine* ruling. Rather, Ms. Goldberg only cites testimony which the Court struck, and, therefore, fails to provide even a single example of any instance where the Court permitted improper testimony before the jury. The Court also instructed the jury that it should not consider any evidence which it struck. (Jury Instruct. at 5.) The Court presumes that the jury followed its instruction. *Sorich,* 709 F.3d at 678.

Second, contrary to Ms. Goldberg's assertion that the Court prejudiced Ms. Goldberg by admonishing her counsel and Mr. Trump differently, the Court repeatedly admonished both Ms. Goldberg's counsel and Mr. Trump. Indeed, the Court had a "responsibility not to allow cross-examination to get out of hand, confuse the jury, and prolong the trial unnecessarily." *U.S. v. Holt*, 486 F.3d 997, 1002 (7th Cir. 2007) (citing *U.S. v. Dawson*, 434 F.3d 956, 958 (7th Cir. 2006)). Furthermore, while "judicial remarks during the course of a trial that are critical or disapproving of . . . counsel . . . ordinarily do not support a bias or partiality challenge," no unduly critical comments occurred at trial. *Liteky v. U.S.*, 510 U.S. 540, 555, 114 S. Ct. 1147, 127 L. Ed. 2d 474 (1994). Below are a few examples of the Court's even-handed attempts to move Mr. Trump's testimony forward:

THE COURT: We are not going to do that. Please do not argue with him. Ask your question. Mr. Trump, please listen to the question and answer the question that is posed.

26

It will go much smoother and we will all be done this morning a little bit faster if we play by the rules.  And save the commentary.  You know that is not appropriate.

MR. S. KULWIN: All right.

(Trial Tr. at 476 lns. 12-20.)

THE COURT: Mr. Kulwin, Mr. Trump, my guess is --

THE WITNESS: I know.

THE COURT: -- that there are other places you would rather be than sitting here.

THE WITNESS: Okay.

THE COURT: And, Mr. Kulwin, my guess is that you would like to move this case along.

MR. S. KULWIN: I would, Judge.

THE COURT: At this rate, we are still going to be here tomorrow morning.  So, can you please listen to the question posed?

THE WITNESS: Okay. Yes.

THE COURT: Ask your questions appropriately.  And please answer the question.

MR. S. KULWIN: I am, Judge.  Thank you.

THE COURT: Mr. Kulwin, that is exactly what I mean.

(Laughter.)

THE COURT: I am not looking for commentary back.  Just ask your question, please.

(Trial Tr. at 499 ln. 23 – 500 ln. 17.)

MR. S. KULWIN: -- and I demand a sidebar right now,  Judge. I want a sidebar. I want an instruction.

THE COURT: Mr. Kulwin --

MR. S. KULWIN: I'm sorry. Okay.

THE COURT: -- I am going to strike Mr. Trump's answer. The jury should disregard it. We are not having another sidebar. Mr. Trump, if you could please listen to Mr. Kulwin's question --

THE WITNESS: Yes, your Honor.

THE COURT: -- and answer just his question. Then Mr. Novack will have the opportunity to ask questions of you. But this will go much faster if you answer --

THE WITNESS: Okay.

THE COURT: -- just the question that is posed. There is no question pending.

THE WITNESS: Okay. Yes, your Honor.

THE COURT: Ask another question, please.

(Trial Tr. at 543 lns. 2-23.) Notably, the Court did not raise it's voice to Ms. Goldberg's counsel during any of these admonitions, even though he did not show the same respect to the Court, or to certain witnesses, particularly when he was demanding sidebars while simultaneously slamming his hand on the podium, as noted above.[5] Indeed, even Mr. Trump heeded the Court's admonishments and acted in a less contentious manner during the remainder of his testimony. Ms. Goldberg's counsel, however, required additional admonitions up to and including closing arguments.

Third, despite the accusations that the Court prejudiced Ms. Goldberg by improperly admonishing her counsel in the presence of the jury, Ms. Goldberg fails to cite any instance of such admonitions, let alone any improper admonitions. When the Court admonished Ms. Goldberg's counsel in the presence of the jury, it was to properly manage the proceedings and maintain order. *See, e.g., Chambers,* 501 U.S. at 43. A few examples of such instances are below:

---

[5] It should be noted that the transcript does not capture the loud and inappropriate tone that Mr. Kulwin used at times towards certain witnesses and the Court.

THE COURT: Mr. Kulwin --

MR. S. KULWIN: I'm sorry.

THE COURT: -- you are cutting off the witness.

MR. S. KULWIN: I apologize.

(Trial Tr. at 427 lns. 11-14.)

THE COURT: Let him finish.

MR. S. KULWIN: I'm sorry.

(Trial Tr. at 448 lns. 11-12.)

THE COURT: Mr. Kulwin -- Mr. Kulwin -- you both cannot talk at the same time. He was finishing his answer.

(Trial Tr. at 532 lns. 11-12.)

THE COURT: Mr. Kulwin?

MR. S. KULWIN: Yes?

THE COURT: Please do not interrupt.

MR. S. KULWIN: I apologize, Judge. I apologize.

(Trial Tr. at 570 lns 19-22 (interrupting the Court).)

THE COURT: Please do not interrupt me.

(Trial Tr. at 630 at ln. 2 (interrupting the Court).)

The Court also attempted to assist Ms. Goldberg's counsel by offering him suggestions – outside the presence of the jury – of how to rephrase his improper questions to elicit narrower responses more in-line with those he sought. At a sidebar, for example, the Court had the following exchange with Ms. Goldberg's counsel:

THE COURT: . . . But make sure -- your questions are so open ended, which is part of the reason you are running into problems with this witness. I know he is going beyond, but you are giving him wiggle room with --

MR. S. KULWIN: Judge --

THE COURT: I am just giving you guidance to try to move this along. If you would like, I can go back and read some of them to you.

MR. S. KULWIN: No, no.

THE COURT: But your questions are very, very open ended. And Mr. Trump is obviously an intelligent person. He sees some wiggle room and he takes it and runs. My suggestion to you, also, not just to move this along, but to get in -- to try to get in -- what you are attempting to is to be very specific about what time period you are talking about and exactly projections of what.

(Trial Tr. at 588 lns. 7-22.) Additionally, before the second day of Ms. Goldberg's examination

of Mr. Trump, the Court gave Ms. Goldberg's counsel the following advice, outside the presence

of the jury:

THE COURT: I am hoping that today this morning when testimony goes there will be maybe a little less bantering and questions posed and answers given. So, if I need to, I will interject and certainly rule on objections. I know you did not feel -- your response is going to be you did not think you were getting the answers. So, let us try to move this along. I would suggest you do that for the jury's sake, if nothing else.

(Trial Tr. at 472 lns. 14-23.) Indeed, Ms. Goldberg's argument fails to recognize that it was

counsel's clumsy questions which resulted in some of the witnesses' sometimes non-responsive

answers – or answers which were in fact responsive, but were not to counsel's liking. Examples

of some of counsel's problematic questions follow:

MR. S. KULWIN: I'm just -- I'm baffled. How do you know --

WITNESS: Sorry.

MR. S. KULWIN: Well, wait. How do you know, if you have ultimate authority to -- you don't have ultimate authority to do anything -- how do you know, "Well, is this one of the ones I have ultimate authority, no ultimate authority on, or is this one of the ones I have ultimate authority on?" How do you know? What did you have, like a Ouija Board?

MR. SHONKWILER: Objection, your Honor. Argumentative.

THE COURT: Sustained. And form.

(Trial Tr. 369 ln. 19 - 370 ln. 6.)

> MR. S. KULWIN: And the fact of the matter is, sir, you won't license your name unless the people buying the license agree to allow you to dictate things like how it's operated, how it looks, what's the decor like -- things of that nature -- right?
>
> WITNESS: Well, we --
>
> MR. S. KULWIN: Is that true?  Is that true?  "Yes" or "No," sir, is that true?
>
> WITNESS: I can't give you a "Yes" or "No" answer.

(Trial Tr. at 423 ln. 9 – 424 ln. 1.)

> MR. S. KULWIN: And you don't believe -- I mean, that's part of the capitalist system that you believe in, right?  Me, too.  Right?  Risk?
>
> MR. NOVACK: Objection.
>
> THE COURT: Sustained.
>
> MR. S. KULWIN: I'm laying the foundation, Judge.  I'm sorry.
>
> THE COURT: You want him to answer whether or not you believe in the capitalist system?  Sustained.

(Trial Tr. at 646 ln. 23 – 647 ln 8.)

Notably, Ms. Goldberg's counsel never asked for any curative instruction about any comment that the Court made or any testimony which Mr. Trump gave.  Furthermore, he even acknowledged during his closing argument that the jury may have noticed that he "can be a passionate person and somewhat zealous and possibly even aggressive and possibly even more aggressive" and that the jury may even think he is a "jerk."  (Trial Tr. at 2147 lns. 3-10.)  The Court's necessary admonishments to Ms. Goldberg's counsel certainly do not warrant a new trial.

### C.     Defendants' Cross-examination of Mr. Trump

Ms. Goldberg contends that she deserves a new trial because the Court prohibited her from fully cross-examining Mr. Trump regarding the length of his deposition. (Mem. at 37-38.) This argument fails.

On November 3, 2011, the Court granted Ms. Goldberg's motion to compel the deposition of Donald Trump, Sr. (R. 99.) Given the scope of the deposition, in part, the Court limited that deposition to 90 minutes. (*Id*.) During Defendants' opening statement at trial, they stated that "Mr. Trump's deposition was about an hour-and-a half long." (Trial Tr. at 82 lns. 17-18.) Defendants did not "minimize" any alleged admissions by Mr. Trump based on this comment. The Court imposed the time limit, and this discovery issue was irrelevant to Ms. Goldberg's claims. (Trial Tr. at 452 lns. 4-8.) Furthermore, the Court permitted Ms. Goldberg to question Mr. Trump "about his deposition," and permitted her to "ask [Mr. Trump] if he had enough time to answer questions" posed during his deposition. (*Id*. lns. 4-5.) The Court, therefore, did not impose any improper limitation on Ms. Goldberg's cross-examination of Mr. Trump by preventing her from asking an irrelevant question pertaining to a discovery issue.

### D.     Use of Non-Leading Questions to Examine Defendants' Former Real Estate Agents

In addition, Ms. Goldberg argues that the Court erred by not allowing her to use leading questions when examining Defendants' former real estate agents – Robert Shearer and Terry Proctor. (Mem. at 38.) The Court addressed this issue during the pre-trial conference on May 9, 2013. After hearing argument, the Court concluded that Mr. Shearer and Ms. Proctor were not adverse witnesses warranting leading questioning by Ms. Goldberg for at least the following reasons: (1) Mr. Shearer and Ms. Proctor did not work directly for the Trump Organization, but were merely listing agents for the Trump Tower via their employer, Koenig & Strey; (2) neither

32

Mr. Shearer nor Ms. Proctor had worked in that capacity for five or six years; and (3) they had no current financial interest in the building or the Trump Organization. (Trial Tr. at 29-32.) If their testimony at trial, however, established that they were adverse, Ms. Goldberg was free to renew her request. (*Id*. at 32 lns. 9-24.) Ms. Goldberg cites no testimony by either Mr. Shearer or Ms. Proctor, or additional evidence, indicating that the Court erred by precluding Ms. Goldberg from questioning them as adverse witnesses. She also provides no legal basis for her claim that portions of Robert Shearer's testimony was "incredible, providing another basis upon which the Court should have permitted Ms. Goldberg to use leading questions to examine him." (Mem. at 39.) She also does not contend that she moved, during trial, to classify these witnesses as hostile based on their responses. Ms. Goldberg's argument, therefore, fails.

## V. The Court Properly Instructed the Jury

Ms. Goldberg next argues that the Court should grant her a new trial because the Court improperly instructed the jury on the ICFA and Land Sales Act claims "and/or because the instructions provided to the jury were unfairly prejudicial and/or prevented the jury from fairly evaluating the evidence on the claims." (Mem. at 14.) "To prevail on a Rule 59(a) motion based on erroneous jury instructions, the movant must establish that (1) the instructions did not adequately state the law, and (2) the error was prejudicial because the instructions confused or misled the jury." *Fox ex rel. Fox v. Barnes*, No. 09 C 5453, 2013 WL 2111816, at *1 (N.D. Ill. May 15, 2013); *see also Javier v. City of Milwaukee,* 670 F.3d 823, 828 (7th Cir. 2012); *Marcus & Millichap Inv. Servs. of Chicago, Inc. v. Sekulovski*, 639 F.3d 301, 308 (7th Cir. 2011). Mrs. Goldberg has not met her burden.

Notably, Ms. Goldberg does not provide citations demonstrating that she preserved her objections to each of the jury instructions she now challenges. The Court also did not locate –

with the exception of the emotional distress damages instruction discussed below – any objection to these instructions during trial or after the Court finalized the instructions it read to the jury.  In fact, before the Court finalized the jury instructions, it asked both parties if they had any additional comments on the jury instructions, and Ms. Goldberg stated that she did not.  (Trial Tr. at 1665 lns. 10-13.)  It is unclear whether Ms. Goldberg needed to object to the instructions again after the Court made its rulings on these instructions to preserve her objections.  *See, e.g., U.S. v. Mims*, 92 F.3d 461, 465 (7th Cir. 1996) ("The court's refusal to give a tendered instruction does not automatically preserve an objection to the instruction actually given.").  Regarding this issue, the Seventh Circuit has stated:

> We have said that, so long as defense counsel alerts the court and the opposing party to the specific grounds for the objection in a timely fashion, then there is no utility in requiring defense counsel to object again after the court has made its final ruling.  But in the case of the court's refusal to give a proposed instruction, some of our cases have suggested that objections must be made *after* a ruling is made, or at least after the district court indicates how it intends to rule.  And counsel can simply object by stating that he or she objects and incorporates arguments previously made.  It would have been wise for White's counsel to have at least objected and incorporated his previous arguments by reference when the district court gave him an express opportunity to do so after it had made its ruling on the instructions.

*U.S. v. White*, 698 F.3d 1005, 1018-19 (7th Cir. 2012) (citations and quotations omitted); *see also Consumer Prods. Research & Design, Inc. v. Jensen*, 572 F.3d 436, 439 (7th Cir. 2009) (collecting cases where the Seventh Circuit "repeatedly rejected" the argument that "lodging an objection after the court denied the requested instruction would have been a futile act").  The Court need not resolve this issue because, even assuming that Ms. Goldberg sufficiently objected to these instructions at trial, she has not met her burden of showing that the instructions given did not adequately state the law and prejudiced her by confusing or misleading the jury.

### A.      No Instruction on "Unfair Practices"

As discussed below in Section VII(A)(2), the Court precluded Ms. Goldberg from

asserting an "unfair practices" theory of liability under the ICFA.  The Court, therefore, refused to

give an ICFA jury instruction that included "unfair practices."  For the reasons discussed in

Section VII(A)(2), the decision to prevent Ms. Goldberg from arguing "unfair practices" –

because it would have been prejudicial to Defendants, who had not been on notice of such a

theory – was not erroneous.

### B.      No "Contract Does Not Bar Fraud" Instruction

Ms. Goldberg also contends that the Court erred by refusing to instruct the jury on

"relevant legal principles regarding fraud claims between parties who executed a written contract,

and, specifically, that contract language provides no defense to consumer fraud claims."  (Mem. at

16.)  Notably, during the trial, Ms. Goldberg sought an instruction that "a contractual right to

make changes to the project is not a defense for failing to disclose, concealing, omitting and/or

misrepresenting material information."  (R. 337 at 2.)  The Court rejected this proposed

instruction, noting that it had previously addressed this issue when it ruled on Ms. Goldberg's

motion *in limine* on this same topic:

> Specifically, on April 19, 2013, the Court denied Plaintiff's motion *in limine* on this issue
> and ruled that Defendants' right to amend the Property Report "is relevant to Defendants'
> defense."  (R. 273 at 4.)  Plaintiff was, therefore, aware that Defendants would utilize this
> provision to mount their defense.  Plaintiff has not presented any new arguments or
> evidence.  The Court will not revisit this issue now and will not give Plaintiff's proposed
> instruction.

(R. 352 at 3.)  Ms. Goldberg once again fails to raise any new arguments or evidence to

demonstrate that the Court manifestly erred by refusing to give the jury this instruction.

Furthermore, as discussed in Section II(B) above, the Court – not the jury – decided Ms.

Goldberg's breach of contract claim.  The jury, therefore, did not need to understand the legal

import of various contractual provisions, but instead needed to evaluate the alleged misrepresentations or omissions which Defendants made to Ms. Goldberg. In fact, Ms. Goldberg reminded the jury during closing argument that the jury was not deciding any breach of contract claim. (Trial Tr. at 1981.) Ms. Goldberg also argued that the jury should not accept the Defendants' interpretation of Section 4(a) of the Purchase Agreements, and offered her own interpretation, consistent with her theory of the case. (*Id*. at 1982-1990.)

Moreover, Ms. Goldberg does not cite to any testimony elicited by Defendants, or argument made by Defendants, that Section 4(a) of Purchase Agreements was an absolute defense to fraud. She attempts to rectify this defect – which Defendants noted – by citing to certain pages of the trial transcript in her reply brief. (*See, e.g.,* Reply at 17.) The Court will not consider these tardy citations. *See, e.g., Wigod v. Wells Fargo Bank, N.A.,* 673 F.3d 547, 571 (7th Cir. 2012). Furthermore, even if the Court were to consider these citations, they do not show that Defendants improperly argued that Section 4(a) was an absolute defense to Ms. Goldberg's claims.

### C.   No Instruction on Innocent Misrepresentation and Pattern Instruction on Corporate Knowledge

Before trial, the Court held that Ms. Goldberg could not argue an innocent misrepresentation theory to prevail on her ICFA claim because, based on the concept of corporate knowledge, the Defendants, as corporations, could not have made any of the alleged misrepresentations innocently – without knowledge. (R. 313.) The Court stated, however, that Ms. Goldberg could argue that a particular Trump employee made a misrepresentation innocently, meaning that he or she personally lacked knowledge of its falsity. (*Id*.) During trial, the Court rejected Ms. Goldberg's additional proposed jury instruction regarding the interplay between corporate knowledge and innocent misrepresentations because the parties' agreed instruction on corporate knowledge sufficiently instructed the jury on the law, and Ms. Goldberg could "argue

her theory – and the application of the law to the facts of this case – to the jury." (R. 352 at 2.)
Specifically, using the agreed instruction, the Court instructed the jury that "[a] corporation
knows what its employees know about subjects that are within the scope of their duties and
responsibilities." (Jury Instruct. at 23.)

Ms. Goldberg offers no explanation as to why this agreed instruction did not sufficiently
apprise the jury of the relevant law. Instead, Ms. Goldberg misguidedly argues that the absence
of her proposed instructions "unfairly suggested" to the jury that Ms. Goldberg needed to prove
either (a) that Defendants had a "plan" to defraud her or (b) that Trump employees communicated
certain information to one another. (Mem. at 19-20.) The Court, however, instructed the jury on
the elements of Ms. Goldberg's claims – which included neither of the propositions that Ms.
Goldberg notes – and on the concept of corporate knowledge, as recited above. The jury
presumably followed the instructions and applied the relevant law. *Sorich,* 709 F.3d at 678. Ms.
Goldberg has not offered any reason to assume otherwise.

Ms. Goldberg also argues that the rejection of her proposed instructions Nos. 23-27
regarding the meaning of "knowledge" was "highly and unfairly prejudicial" to her. (Mem. at
19.) Ms. Goldberg does not articulate, however, how she suffered any prejudice by the refusal to
give these instructions. Furthermore, her argument is misguided because, as explained in a pre-
trial ruling, her proposed instructions Nos. 23-26 did not properly articulate the relevant law. The
Court stated, for example, that those instructions

> attempt[ed] to ease her burden of proof by allowing her to prove "reckless disregard of
> information" or "deliberate ignorance . . . however, these are not the knowledge
> requirements associated with the ICFA.

(R. 297 at 2.) Moreover, the parties' agreed instruction on corporate knowledge (recited above)
sufficiently addressed the issue. (*Id.*) Ms. Goldberg has not provided a reason to reconsider these

previous rulings and has not shown that the absence of these instructions improperly informed the jury of the relevant law.

### D.     No Curative Instruction

Ms. Goldberg argues that the Court erred by denying her motion seeking a curative instruction following what she believes were improper remarks by Defendants during their opening statement.  (Mem. at 20-21.)  Specifically, Ms. Goldberg sought an instruction to "correct" purported misrepresentations and inaccurate statements that Defendants made regarding Plaintiff's Exhibit 29, an email which Ms. Goldberg drafted.  (R. 327.)  As discussed in Section II(A) above, Defendants did not make any prejudicial remarks regarding Plaintiff's Exhibit 29, which was admitted into evidence.  Furthermore, the Court repeatedly instructed the jury that the lawyers' statements were not evidence.

### E.     The "No Destruction of Documents" Instruction

Based on questions Ms. Goldberg's counsel asked at trial, and certain testimony elicited, the Court instructed the jury regarding the absence of documents (the "Documents Instruction"), as follows:

> No party in this case contends that any other party destroyed or failed to produce documents as required.  Any absence of documents does not create an inference of any party's destruction or failure to produce documents.

(Jury Instruct. at 26.)  The Court explained the need to give this instruction in its May 20, 2013 Order granting Defendants' motion to give Defendants' Proposed Instruction No. 19, stating:

> Plaintiff may argue to the jury that the lack of documents relating to significant decisions or meetings, which witnesses claim occurred, undercuts those witnesses' credibility.  Her questioning, however, has gone too far and created a possible inference by the jury that Defendants either failed to disclose certain documents to her as part of this litigation or inappropriately destroyed documents.  Plaintiff never raised with the Court any issues of spoliation or other such failures to comply with discovery requirements.  Defendants' Proposed Instruction No. 19 helps cure any possible adverse inference regarding the absence of documents, and applies neutrally to each party.  It also does not preclude

>Plaintiff from making proper argument regarding the lack of written notes and other documents. Based on the potential unfair prejudice which Defendants may experience from Plaintiff's repeated questioning on this topic, the Court will give Defendants' Proposed Instruction No. 19.

(R. 352 at 1.) Ms. Goldberg was free to argue the import of Defendants' lack of notes or memoranda memorializing certain meetings or decisions.

Notably, Ms. Goldberg's counsel represented that all he sought to argue regarding documents was that "it is beyond credulity" to believe that an organization as large as the Trump Organization did not document its meetings, decisions, or conversations. (Trial Tr. at 1085 lns. 22-25.) As explained in the ruling, quoted above, the Court did not preclude this argument. In fact, Ms. Goldberg argued this theory to the jury, even inappropriately comparing the Trump Organization to the Mafia for allegedly not writing anything down. (*See, e.g.,* Trial Tr. at 2019-2020.) The Documents Instruction merely avoided an improper inference of spoliation or that Defendants had intentionally destroyed documents. It did not render "meaningless" the fact that Defendants lacked such documentation, particularly in light of Ms. Goldberg's argument. (Mem. at 22.)

## F. Emotional Distress Instruction

At the close of the evidence, the night before closing argument, Defendants filed multiple motions for judgment as a matter of law, including a motion for judgment on Ms. Goldberg's claim of emotional damages, or, alternatively to bar Ms. Goldberg from suggesting to the jury a specific award of emotional damages. (R. 357.) The Court informed Defendants that it would take their motions for judgment as a matter of law under advisement. Defendants also filed a conditional motion for an additional jury instruction regarding emotional damages. (R. 362.) The Court rejected Defendants' proposed instruction regarding emotional damages which read: "You are instructed not to consider whether Plaintiff sustained any emotional damages as a result of this

litigation." (R. 362-1.) Instead, the Court gave the following instruction on emotional distress damages:

> Plaintiff must prove demonstrable emotional distress in order to recover damages for emotional distress. She cannot establish emotional distress damages based simply on conclusory statements regarding emotional damages. Plaintiff cannot recover for any emotional damages caused by her decision to bring this litigation.

(Trial Tr. at 1971 lns. 5-15; R. 363.) The Court based this instruction on two Seventh Circuit cases, *Stevens v. Hous. Auth. of S. Bend, Indiana*, 663 F.3d 300, 308 (7th Cir. 2011) and *Biggs v. Vill. of Dupo*, 892 F.2d 1298, 1305 (7th Cir. 1990), as well as other cases cited in the May 22, 2013 Order. (*Id.*) Ms. Goldberg objected to this instruction. (Trial Tr. at 1973 ln. 22 – 1974 ln. 1.)

Ms. Goldberg offers no reason why this emotional damages instruction was improper or prejudicial, other than claiming it "unfairly narrows the damage claim to which Ms. Goldberg is entitled to present to the jury." (Mem. at 23.) Furthermore, because the jury concluded that Ms. Goldberg did not meet her burden of proof on either claim before it, the jury did not address the issue of damages. Ms. Goldberg's argument, therefore, fails.

## G.     No Case Specific Instructions

Ms. Goldberg argues – without legal citation or explanation – that the Court deprived her of a fair trial by failing to give "several jury instructions which related directly to the facts of this case," such as her proposed summary of the claims. (Mem. at 23-24.) The Court addressed its reasons for not giving each of these instructions in a written order or during the pre-trial conference. Ms. Goldberg provides no reason why these prior rulings were erroneous or prejudicial. Her undeveloped argument is waived. *See, e.g., U.S. v. Stafield*, 689 F.3d 705, 712 (7th Cir. 2012) ("Undeveloped arguments are considered waived.") (citing *Gross v. Town of*

*Cicero, Ill.*, 619 F.3d 697, 704 (7th Cir. 2010) ("[I]t is not this court's responsibility to research and construct the parties' arguments, and conclusory analysis will be construed as waiver.")).

## VI.     Ms. Goldberg's Attempts to Revisit the Court's Prior Rulings

The remainder of Ms. Goldberg's arguments effectively amount to untimely motions to reconsider the Court's previous rulings – dating back to the ruling on Defendants' motion for summary judgment.  Ms. Goldberg attempts to justify these arguments in her reply brief by stating that "district courts can always re-examine earlier rulings, particularly after a trial has been conducted on the merits."  (Reply at 14 (citing *Avitia v. Metro. Club of Chicago, Inc.,* 49 F.3d 1219, 1227 (7th Cir. 1995); *Nelson v. Lis*, No. 09 C 883, 2011 WL 4460492, at * 3 (N.D. Ill. Sept. 27, 2011)).  Neither of the cases Ms. Goldberg cites, however, stand for this proposition.  In *Nelson*, the district court considered whether it had adequately instructed the jury on the applicable law, and, in fact, granted a new trial based upon a flawed instruction.  2011 WL 4460492 at * 3.  The court did not address any motion *in limine* rulings, summary judgment decisions, or other pre-trial rulings.  In *Avitia*, the Seventh Circuit also considered whether the district court erroneously gave a particular jury instruction.  49 F.3d at 1227.  The Seventh Circuit also considered the "law of the case" doctrine because the district court judge did an improper "about face" on the issue of damages for nonpecuniary loss.  *Id.*  These cases, therefore, are inapposite to Ms. Goldberg's arguments addressed below.

Ms. Goldberg merely restates arguments previously rejected, and, therefore, has not met her heavy burden for establishing the need for a new trial.  Indeed, Ms. Goldberg does not explain why these rulings were erroneous, or whether, even if they were erroneous the error affects a substantial right of hers.  *Barber v. City of Chicago*, --- F.3d ----, No. 12–2562, 2013 WL 3957736, at *12 (7th Cir. Aug. 2, 2012) ("An evidentiary error warrants a new trial "only if the

error affects a substantial right of the party."); *see also Jordan v. Binns,* 712 F.3d 1123, 1137 (7th

Cir. 2013) ("to obtain a new trial they must demonstrate that there is a significant chance that at

least one of the errors affected their substantial rights, that is, that an error likely had a substantial

effect on the jury's verdict and the result was inconsistent with substantial justice"). A court may

grant a new trial only, after an examination of the error in light of the entire record, the court is

"unable to say with fair assurance that the error did not substantially sway the jury." (*Id.*) Ms.

Goldberg also has not even met the standard for reconsideration of the Court's prior rulings. *See*

*Broaddus v. Shields*, 665 F.3d 846, 860 (7th Cir. 2011) ("It is well established that a motion to

reconsider is only appropriate where a court has misunderstood a party, where the court has made

a decision outside the adversarial issues presented to the court by the parties, where the court has

made an error of apprehension (not of reasoning), where a significant change in the law has

occurred, or where significant new facts have been discovered").

### A.     The Court Did Not Err in Barring Claims at Trial

Ms. Goldberg contests the Court's prior rulings which prevented her from presenting three

of her claims to the jury: (1) the Illinois Securities Act Claim; (2) an "unfair practices" claim

under the ICFA; and (3) the breach of contract claim.

### 1.     The Illinois Securities Act Claim and Breach of Contract Claim

Ms. Goldberg did not present her Illinois Securities Act Claim (the "Securities Claim") to

the jury because the Court granted summary judgment for Defendants on that claim. (R. 169.)

Ms. Goldberg did not file a motion to reconsider that ruling, and Rule 59(a) is not the appropriate

mechanism for addressing a summary judgment ruling. *See, e.g., Schmude v. Sheahan*, No. 00 C

4580, 2004 WL 887376, at *3 (N.D. Ill. Apr. 23, 2004) (noting that a Rule 59(a) motion is

inappropriate for judgment on the pleadings, such as an adverse summary judgment ruling, which

should be addressed pursuant to Rule 59(e) or Rule 60(b)) (citations omitted); *see also In re Bauman*, 465 B.R. 495, 504 (Bkrtcy. N.D. Ill. 2012). Furthermore, Ms. Goldberg's argument that the Court's summary judgment ruling was an error affecting the propriety of the trial on other claims is misguided. Indeed, Ms. Goldberg merely argues that, by granting summary judgment on the Securities Claim, the Court precluded her from presenting evidence "which would have further supported the claims the Court permitted Ms. Goldberg to pursue at trial." (Mem. at 12.) Ms. Goldberg, therefore, is basically arguing that she would have prevailed on her claims if the jury would have heard evidence relevant to the Securities Claim, but not legally relevant to the claims she presented. This argument is misguided and improper. Ms. Goldberg makes this same argument regarding the breach of contract claim as well. Both arguments, therefore, fail. Furthermore, she has not identified any manifest error of law or fact to warrant reconsideration of the summary judgment ruling or that compromised any of her substantial rights.

## 2. The "Unfair Practices" Claim

Before trial, the Court sustained Defendants' objections to the jury instruction on an "unfair practices" theory of liability under the ICFA. (R. 295.) The Court recognized that, under the ICFA, a plaintiff can prevail by proving either unfair practices or deceptive acts. (*Id*. at 2.) *See e.g., Robinson v. Toyota Motor Credit Corp*., 201 Ill.2d 403, 417-18, 266 Ill. Dec. 879, 775 N.E.2d 951 (Ill. 2002) (describing the unfair practices encompassed by the ICFA). Because Ms. Goldberg had grounded all of her allegations, and her litigation position, in deceptive – rather than unfair – acts, such an instruction was not proper. (*Id*.) Defendants would have been prejudiced if Ms. Goldberg had pursued an unfair practices theory of liability at the eleventh hour. (*Id*.)

The Court also denied Ms. Goldberg's request for leave to file an amended complaint on the eve of trial to plead an unfair practices claim. According to Ms. Goldberg, she had a legal right to pursue an unfair practices claim at trial and also had the right to file an amended complaint. (Mem. at 12.) This contention, however, is incorrect. First, Ms. Goldberg had no absolute right, on the eve of trial, to file an amended complaint. Rather, Rule 15 allows a party to amend its complaint, by right, within 21 days after serving it. Fed. R. Civ. P. 15. Otherwise, a party must have consent of the other party or the court's permission. Second, the Court, in its discretion, concluded that the interests of justice did not require it to grant Ms. Goldberg leave to amend, on the eve of trial, in a case that had been pending for over three and a half years. Rather, because Ms. Goldberg had consistently, and unwaveringly, presented an ICFA claim based on deception rather than unfair practices, and Defendants had prepared their defense for years based on this theory, Ms. Goldberg's late request to amend was simply too late. Ms. Goldberg's reiteration here of the arguments she "explained in her pretrial filings on this issue" do not establish any error in either denying her request to present an unfair practices theory or denying her leave to file an amended complaint. (Mem. at 13.)

## B. The Court's Motion *in Limine* Rulings Were Not Erroneous

Ms. Goldberg next claims that the Court should grant her a new trial because it made "a number of significant legal and evidentiary errors [that] were highly and unfairly prejudicial to [her] and deprived her of a fair trial." (Mem. at 27.) Rather than provide the Court with any new evidence or articulate any way in which the rulings were legally incorrect, Ms. Goldberg merely rehashes arguments she previously made in support of five motions *in limine*, which the Court rejected. Ms. Goldberg fails to argue how these rulings constituted an error, much less an error having a substantial and injurious effect or influence on the jury's determination. *See, e.g.,*

*Wilson v. City of Chicago*, No. 07 CV 1682, 2013 WL 268468, at *5 (N.D. Ill. Jan. 24, 2013)

(refusing to grant a new trial based on a purportedly erroneous motion *in limine* ruling); *BP*

*Amoco Chemical Co. v. Flint Hills Resources, LLC*, 697 F. Supp. 2d 1001, 1037 (N.D. Ill. 2010)

(same).

### 1. Barring Evidence Regarding Defendants' Assertion of the Attorney-Client Privilege

Defendants moved *in limine* to bar Ms. Goldberg from eliciting evidence that Defendants

had asserted the attorney-client privilege. (R. 213.) The Court granted this motion after asking

the parties for additional briefing on certain issues relevant to that motion, (R. 289; *see also* R.

250), and also refused to give Ms. Goldberg's proposed jury instruction regarding attorney-client

privilege (R. 289). The Court issued a thirteen-page opinion granting Defendants' motion *in*

*limine*. (R. 290.) Ms. Goldberg has not pointed to any manifest error of fact or law undercutting

that ruling. Furthermore, she argues – without citation to the record – that Defendants

> improperly argued to the jury that the lack of reference to the revenue producing facilities of the hotel in the marketing materials proved they were immaterial when, in fact, the real reasons such information was included in the marketing materials was to avoid violating federal and state securities laws, meaning that the arguments made by the Trump Defendants on this point were factually untrue.

(Mem. at 27.) Notably, Ms. Goldberg does not claim that she objected to this testimony at trial

and sought, at that time, to introduce testimony regarding Defendants' consultations with lawyers.

Her argument also does not demonstrate that the evidence which the Court precluded would have

rebutted this allegedly "untrue" testimony as Defendants asserted the attorney-client privilege

before trial, and would have asserted that privilege at trial. Ms. Goldberg, therefore, would not

have been able to elicit any testimony regarding conversations Defendants had with their lawyers.

### 2.     Barring Evidence of Other Trump Tower Lawsuits

The Court granted Defendants' motion *in limine* seeking to bar references to other

lawsuits which arose from the Trump Tower project, specifically the "NKJ Litigation" and the

"Friends and Family" lawsuits." (R. 248.) Ms. Goldberg does not offer any reason why the

twelve-page ruling granting Defendants' motion was erroneous. (R. 249.) Instead, Ms. Goldberg

misguidedly argues that the Court should have allowed her to elicit such evidence after Trump

witnesses "opened the door . . . by providing unsolicited testimony that the buyers were all

'happy' and they received 'no complaints." (Mem. at 28.) Once again, Ms. Goldberg has failed

to provide even a single citation to the record, despite alleging that witnesses testified in a certain

manner. Notably, the Court struck testimony by Mr. Trump that other HCU owners had "no

complaints." (Trial Tr. at 672.) Indeed, the Court struck the testimony and immediately

instructed the jury to disregard the testimony "that there were no other complaints." (*Id*. lns. 13-

15.) Furthermore, the Court allowed Ms. Goldberg to offer some limited evidence about the

existence of another lawsuit similar to hers. (*See, e.g., id.* at 1422-23, 1426, 1430-31.) Ms.

Goldberg's argument, therefore, fails.

### 3.     Permitting Evidence Regarding the State of the Economy and Real Estate Market

In advance of trial, Ms. Goldberg moved *in limine* to exclude "evidence or argument that

"other HCU buyers and/or other real estate investors were trying to get out of closing on their

units in 2009 and thereafter because of the financial crisis in 2008 and thereafter." (R. 210.) The

Court granted her motion. (R. 301 at 8-9.) The Court held, however, that Defendants could

cross-examine Ms. Goldberg regarding her motives for not closing on her HCU, which could

implicate the economy and real estate market. (*Id*. at 9.) Ms. Goldberg confusingly argues that

the evidence at trial showed that the economy would have had no effect on Ms. Goldberg's

decision not to close as she paid for her HCUs by check and did not need to obtain financing. (Mem. at 28-29.)  Notably, Ms. Goldberg again does not cite to any evidence in the record to support her argument.  Her argument also fails to recognize that the state of the economy and real estate market may have been relevant to the value of Ms. Goldberg's HCU, her ability to rent her unit, or her ability to sell it in the future – each of which, based on common sense, which the jury was allowed to use – could have impacted her decision to ultimately pull out of the deal.

### 4. "Contract Does Not Bar Fraud" Argument

Ms. Goldberg again repeats her contention that the Court improperly allowed Defendants to argue that the terms of the Purchase Agreements "served as a complete defense" to fraud. (Mem. at 29.)  She again fails to offer a single citation of any such argument by Defendants.  For the reasons discussed above in Sections II(B) and V(B), this argument fails.

### 5. Permitting Evidence of Contract Negotiations

Ms. Goldberg moved *in limine* to bar evidence regarding "what transpired during the negotiations between the parties before the Purchase Agreements were executed by Plaintiff." (R. 210 at 36.)  The Court granted the motion in part without objection based on a concession by Defendants, and granted the remainder based on the analysis contained in its order.  (R. 273 at 5-6.)  Specifically, how Ms. Goldberg and Defendants negotiated the Purchase Agreements' terms was relevant to her sophistication, her understanding, and what was material to her decision to sign the Purchase Agreements.  (*Id.*)  Here, Ms. Goldberg restates – almost word for word – the argument that she made to support her unsuccessful motion *in limine.*  (Compare Mem. at 29-30 with R. 210 at 36.)  Here, she argues that "[t]his evidence is legally irrelevant and unfairly prejudicial because nothing which did or did not occur during the negotiations between the parties before the Purchase Agreements were finalized could exculpate the Trump Defendants from

engaging in deceptive, unfair or fraudulent conduct." (Mem. at 29-30.) This reiteration of her previous argument does not justify reconsideration of the prior ruling and does not establish any error. Furthermore, Ms. Goldberg fails to cite any examples where Defendants allegedly "used this evidence for not the reasons the Court allowed but for impermissible reasons." (Mem. at 30.) Ms. Goldberg, therefore, has not met her burden.

### C. Loss of Use of Funds Damages

Ms. Goldberg contends that the Court deprived her of a fair trial because it barred her from "presenting evidence and seeking as a component of her compensatory damages the 4-6% return she reasonable expected to obtain from the HCUs she had presented." (Mem. at 33.) Ms. Goldberg claims – without any legal citation – that she had a "legal right to present this aspect of her damage claim." (Mem. at 33.) The Court addressed her arguments in its May 13, 2013 Order and in open court on May 20, 2013. (R. 325; Trial Tr. at 1367-83.)

The May 13th Order precluded Ms. Goldberg from eliciting evidence about or seeking damages based on a "loss of use" theory, in part because she had not previously sought these damages and had not included them in her itemization of damages. (R. 325 at 4.) Further, it was unclear how Ms. Goldberg intended to prove that particular percentage return. (*Id*.) Indeed, Ms. Goldberg even conceded that she could not have received such a percentage return during the relevant time period. (*Id*.) She did not disclose an expert to testify on this issue. Instead, Ms. Goldberg intended to testify that she expected to receive such a return. Ms. Goldberg had not, however, produced any of the documents that contained the information she needed to lay a proper foundation for her expectations. (*Id.* at 5.) The Court, therefore, stated that Defendants could renew their motion at a time when the Court could assess whether Ms. Goldberg sufficiently established such damages. (*Id*. at 5.)

The Court addressed this issue again at sidebar during Ms. Goldberg's testimony because she stated that she had based her calculation on her tax returns.  (Trial Tr. at 1332-35.)  Ms. Goldberg contended that Defendants had sufficient notice of the basis for Ms. Goldberg's 4-6% calculation based on her deposition testimony.  The Court instructed Ms. Goldberg to provide the Court with specific excerpts from her deposition to support this claim.  (*Id*. at 1335.)  The Court heard further argument on this topic on May 20th and ruled that it had not, at that point, heard sufficient foundation for Ms. Goldberg to pursue loss of use damages.  (Trial Tr. at 1367-1383.) Here, Ms. Goldberg offers no reason why the Court's reasoning – on May 13th or May 20th – was unsound or erroneous.  Furthermore, Ms. Goldberg does not establish how, even if the Court erred, this error affected a substantial right because the jury found in favor of Defendants on both claims and, therefore, did not reach the question of damages.

### D. Permitting Expert Testimony

The Court denied Ms. Goldberg's *Daubert* motion to bar Defendants' expert, Brent Howie, from offering certain opinions.  (R. 255.)  The Court issued an eleven-page opinion explaining its reasons for denying this motion.  (R. 256.)  Ms. Goldberg, however, now attempts to rehash her arguments from that motion – that Mr. Howie used improper methodologies and had insufficient experience – without pointing to any manifest error justifying reconsideration of those arguments.  (Mem. at 33-34.)  This rehashing of prior arguments fails to satisfy Ms. Goldberg's burden.

### E. Admission of Defendants' Exhibit 522

During the trial, the Court admitted Defendants' Exhibit 522 ("Dx. 522") into evidence. Dx. 522 is an August 11th, 2006 letter from Ms. Goldberg's attorney, Judy DeAngelis, to Adam T. Berkhoff, an attorney representing Defendants.  In this letter, Ms. DeAngelis recommends

twenty modifications to the Purchase Agreements. Notably, Ms. DeAngelis sought to modify Section 4 to limit Defendants' ability to make changes to the Declaration, Property Report, and other condominium documents without Ms. Goldberg's approval.

After hearing argument on the admissibility of Dx. 522, the Court stated that it would admit the exhibit if Defendants could lay the proper foundation, namely that Ms. DeAngelis was Mr. Goldberg's agent. (Trial Tr. at 1383-96.) Defendants laid a sufficient foundation, and thus established that the exhibit was an admission by a party opponent under Federal Rule of Evidence 801(d)(2)(D). (*Id.* at 1497); *see e.g., U.S. v. Swan*, 486 F.3d 260, 265 (7th Cir. 2007); *U.S. v. Jung,* 473 F.3d 837, 841 (7th Cir. 2007) ("An attorney *may be* the agent of his client for purposes of Rule 801(d)(2)(D)."). Indeed, the letter even states that Ms. DeAngelis and her officer represent Ms. Goldberg with regard to her purchase of the HCUs. Here, Ms. Goldberg merely repeats the same, previously rejected, admissibility arguments.

Ms. Goldberg also argues that Dx. 522 was "legally and entirely immaterial to the issues to be decided at trial." (Mem. at 35.) Ms. Goldberg misguidedly bases this argument on the proposition that the terms of the Purchase Agreements did not provide a defense to fraud, and that the advice from Ms. DeAngelis would not have prevented what occurred here. (*Id.*) Dx. 522, however, was relevant to Ms. Goldberg's level of sophistication, what was material to her as a purchaser, and her awareness of the provision in the Purchase Agreements giving Defendants the ability to make changes, which related to whether Defendants deceived Ms. Goldberg. Ms. Goldberg, therefore, has not shown any error in admitting Dx. 522.

### F. Barring Plaintiff's Expert Testimony

Ms. Goldberg disputes (1) the prior rulings barring her expert, Robert Levin, from testifying on certain subjects (R. 160, 189), and (2) the ruling during trial barring Mr. Levin from

explaining what the meaning of Section 4(a) of the Purchase Agreements based on his knowledge of custom and practices in the industry.  (Mem. at 35.)  Because Ms. Goldberg once again offers no explanation of how the pre-trial rulings were erroneous, the Court will not reconsider them.  Notably, Mr. Levin's own testimony undercuts Ms. Goldberg's contention that the Court erred because he admitted that he is not an expert on hotel condominiums.  (Trial Tr. at 1299 lns. 10-12; 1305 lns. 17-20.)

Ms. Goldberg's argument that the Court's ruling during the trial was erroneous also fails, in part, because Ms. Goldberg does not cite to any portion of Mr. Levin's report, which she argues contained the bases for the excluded testimony.  (Mem. at 35.)  Furthermore, Ms. Goldberg had ample opportunity to demonstrate, at sidebar, where in Mr. Levin's report he disclosed an opinion regarding Section 4(a)'s "right to change."  (Trial Tr. at 1278 ln. 20 – 1280 ln. 1.)  Ms. Goldberg, however, could not find any support in Mr. Levin's report.  (*Id.*)  The Court, therefore, struck Mr. Levin's testimony.  (*Id.* at 1280 lns. 1-8.)  Ms. Goldberg has offered no reason why that decision was erroneous, or how, even if it was, it prejudiced her.

## VII.    Ms. Goldberg's Cumulative Effect Argument Fails

To prevail on her cumulative effect argument, Ms. Goldberg must show "(1) that multiple errors occurred at trial; and (2) those errors, in the context of the entire trial, were so severe as to have rendered [her] trial fundamentally unfair."  *Christmas v. City of Chicago*, 682 F.3d 632, 643 (7th Cir. 2012) (citing *United States v. Powell,* 652 F.3d 702, 706 (7th Cir. 2011)).  Because Ms. Goldberg has failed to demonstrate any error, as discussed above, her request is denied.  *See United States v. White,* 582 F.3d 787, 805 (7th Cir. 2009).

## CONCLUSION

For the foregoing reasons, the Court denies Ms. Goldberg's motion for a new trial.

**DATED:  August 23,  2013**

**ENTERED**

**AMY J. ST. EVE**
**United States District Court Judge**