1

```
 1              IN THE UNITED STATES DISTRICT COURT
                NORTHERN DISTRICT OF ILLINOIS
 2                     EASTERN DIVISION

 3   JACQUELINE GOLDBERG,            ) Docket No. 09 C 6455
                                     )
 4                    Plaintiff,     )
                                     )
 5              vs.                  )
                                     )
 6   401 NORTH WABASH VENTURE, LLC,  )
     a Delaware Limited Liability    )
 7   Company, et al.,                ) Chicago, Illinois
                                     ) May 13, 2013
 8                    Defendants.)   2:00 o'clock p.m.

 9                          VOLUME ONE
                   EXCERPT OF TRIAL PROCEEDINGS
10        BEFORE THE HONORABLE AMY J. ST. EVE, AND A JURY

11   APPEARANCES:

12   For the Plaintiff:      KULWIN, MASCIOPINTO & KULWIN, LLP
                             BY:  MR. SHELLY B. KULWIN
13                                MR. JEFFREY R. KULWIN
                             161 North Clark Street
14                           Suite 2500
                             Chicago, Illinois  60601
15
     For the Defendants:     NOVACK AND MACEY, LLP
16                           BY:  MR. STEPHEN NOVACK
                                  MR. JOHN F. SHONKWILER
17                           100 N. Riverside Plaza,Suite 1500
                             Chicago, Illinois  60606
18
     Also Present:           MS. ALEXIS ROBINSON
19                           MS. CHRISTINA KIM

20   Court Reporter:         MR. JOSEPH RICKHOFF
                             MS. MARY M. HACKER
21                           Official Court Reporter
                             219 S. Dearborn St., Suite 1232
22                           Chicago, Illinois  60604
                             (312) 435-5562
23            * * * * * * * * * * * * * * * * * *

24                  PROCEEDINGS RECORDED BY
                    MECHANICAL STENOGRAPHY
25            TRANSCRIPT PRODUCED BY COMPUTER
```

S. Kulwin - opening

2

```
 1                    *    *    *    *    *    *    *    *
 2           THE COURT:  Okay.  Mr. Kulwin, go ahead.
 3           MR. S. KULWIN:  May it please the Court, Counsel,
 4   ladies and gentlemen of the jury.
 5           (Brief pause.)
 6           MR. S. KULWIN:  May it please the Court, Counsel,
 7   this time for sure, ladies and gentlemen of the jury.
 8           In the late 1990s Donald Trump, world famous New York
 9   real estate developer and hotel operator, decided to come to
10   Chicago and not just for a visit.  Mr. Trump decided to build
11   the biggest, most spectacular building of his career on the
12   banks of the Chicago River in the heart of downtown Chicago.
13           It would be over 90 stories high.  It would be the
14   tallest building in the world.  It would include residential
15   condominiums, a luxury health club and spa, massive meeting
16   rooms, laundry facilities, valet parking and 350,000 square
17   feet of office space, an amount equal to roughly 15 floors of
18   this building.
19           In addition to all of that, it would include a luxury
20   hotel with 174 hotel condominium units, hotel rooms that he
21   would offer for sale to individuals who could then rent them
22   through the Trump organization.  It was going to be the
23   biggest project he had ever done and would surpass anything he
24   had ever done before.
25           The projected cost was $840 million, and of course it
```

1  would be named the Trump International Hotel and Tower.  And

2  Mr. Trump's name, photographic image and reputation and, in

3  particular, his commitment to be personally involved in every

4  aspect of this project, would lead all of the efforts to sell

5  the residential and hotel condominium units in the building.

6       And so, in 2003, after years of detailed planning and

7  sales promotion, the Trump organization began to offer those

8  condominiums for sale in the Trump International Hotel and

9  Tower, pictured right here on the left.  The dark side is a

10 graphic drawing.  This is how the building actually appears

11 today in person.

12      Enter Jackie Goldberg, then an 80-year-old mother of

13 four, who had been investing in real estate condominiums for

14 about ten years.  She liked them as investments.  You could

15 hold them for many years and sooner or later they would

16 appreciate.  In the meantime you could rent them and make a

17 good, reliable return on your investment by earning the

18 difference between the monthly rent and the expenses of owning

19 the property.

20      In 2003 Jackie owned several condominiums, including

21 some in the building right next-door to where Trump Tower was

22 going up.  After looking into it, she purchased a residential

23 condominium in Trump Tower as an investment with plans to rent

24 and hold, as she did with her other condos.  At that time the

25 Trump sales agents spoke with her about purchasing a hotel

S. Kulwin - opening

4

1    condominium but she wasn't interested.

2            About three years later, in 2006, after hearing more

3    and more about Donald Trump and his organization's new Chicago

4    project, she began to think that Trump Chicago could turn into

5    what is known as a destination hotel, a place that people went

6    just to stay, and not because they wanted or needed to come to

7    Chicago, making owning a hotel unit possibly a very good

8    investment, depending on the terms of the deal.

9            So in July 2006 Jackie went to the Trump sales

10   office, and when she got there she found out something she had

11   not known before.  Trump was now selling a percentage

12   ownership of the Trump Hotel itself with every hotel

13   condominium unit that was purchased.

14           A hotel condominium unit purchaser would receive a

15   percentage ownership in the hotel's grand and junior

16   ballrooms, the expansive meeting rooms, the executive lounge,

17   and the food and beverage operations of the entire hotel, over

18   30,000 square feet of prime real estate, the heart of the

19   brand new magnificent Trump International Hotel and Tower, a

20   real estate ownership that would be worth to the condominium

21   association alone millions of dollars.

22           And there was more.  The budgets that the hotel

23   condominium association Trump gave to Jackie show that Trump

24   was estimating that the hotel's food and beverage operation

25   would generate over $5 million that would be paid to the hotel

S. Kulwin - opening

5

condominium owners in the hotel's first year of operation,

revenues which after expenses would yield a significant and

material profit stream for the hotel condominium owners, a

profit as high as $1.2 million in the first year of operation.

Those budgets showed that Trump was also giving the

hotel condominium owners all of the revenue from the hotel's

parking facility, almost another million dollars, with almost

another $100,000 a year of profit in the first year of

operation.

But there was still more.  The hotel owners would --

hotel condominium owners would also own the hotel's laundry

facilities and the storage areas.

Trump also guaranteed that every hotel unit owner --

every hotel owner -- every hotel unit owner, I'm sorry, would

have an equal chance to have their unit rented by the hotel.

Trump was going to do it with a computerized rotation point

system.

Every time they rented their unit, a computer would

assign it a rotation point.  The unit with the least rotation

points would automatically be rented next, guaranteeing a fair

distribution since Trump had no discretion to favor anyone,

including their friends or business associates who owned hotel

condominiums in the hotel.

Trump also promoted the fact that under this system

an owner could stay in their room and not be assigned any

S. Kulwin - opening

6

1   rotation points.  Trump even encouraged buyers to do so,

2   giving them all of the advantages of owning their own

3   condominium, staying in it as frequently as they wanted,

4   without lessening their chances down the road to be able to

5   rent it through the reservation system.

6        And while you were required to pay a monthly fee for

7   a mandatory membership in the hotel's luxury health club,

8   something that Jackie really didn't think she would need, the

9   owners could use it whenever they wanted, not just when they

10   were staying at the hotel.  It was like you got a membership

11   in an exclusive luxury health club in downtown Chicago for

12   nothing when you bought your unit, something that no doubt

13   would make the unit more valuable if you ever wanted to sell

14   it down the line.

15        All of these factors went into Jackie's decision to

16   buy a Trump Hotel condominium, something she really wasn't

17   originally interested in.  But the deciding factor in her mind

18   was the ownership interest in the hotel facilities.

19        Not only did the revenue of those facilities provide

20   her something she didn't have in her other condominium

21   investments, another source of revenue to offset expenses of

22   owning the property; it provided an opportunity to own a piece

23   of the magnificent brand new Trump Hotel run by the world's

24   most successful hotel operator.

25        Based on, among other things, Mr. Trump's reputation

1    for success and wealth, which was heavily touted with

2    promotional material she was given, Jackie thought the profits

3    for those hotel operations could be very, very significant

4    over time and that the value of her ownership interest in the

5    hotel space she was purchasing with her hotel condominium

6    units, the ballrooms, the meeting rooms, the laundry

7    facilities, would also become more valuable as real estate in

8    the years ahead.

9         So in August 2006 Jackie agreed to buy two hotel

10   condominium units in Donald Trump's International Hotel and

11   Tower for a total price of over $2 million.

12        Between August 2006 and February 2008 she paid Trump

13   over a half a million dollars of that purchase price.  And

14   then almost two years later, after she agreed to buy the hotel

15   condominium units for over $2 million, and after she had paid

16   Trump over a half million dollars in deposits toward that

17   purchase, Trump totally changed the deal.

18        How exactly?  In August 2006, when Jackie bought the

19   hotel condominiums, Trump provided her with documents in which

20   Trump represented the following that Jackie would receive.

21        Judge, can you inquire to see if they can see that?

22        THE COURT:  Everybody see okay?

23        (Jurors indicating.)

24        THE COURT:  Okay.  Go ahead.

25        MR. S. KULWIN:  What was Jackie being told she would

1     get?  What were they representing to her?  They represented to

2     her that she would get two hotel condominium units, 2238 and

3     2240.  And she would get a percentage, a shared ownership with

4     other owners and control with the other owners of the hotel's

5     bulk facilities, the ballrooms, the meeting rooms, the

6     conference centers, the food and beverage operation, that she

7     would have a percentage ownership of the laundry facilities in

8     the hotel, that she would have a percentage ownership in the

9     storage areas, that there would be $6 million of gross revenue

10    coming from the hotel's facilities that would be paid into the

11    condominium association, that there would be a fair allocation

12    of hotel rental opportunities through the computerized point

13    system with no penalty for the owner's use, and that there

14    would be unrestricted use of the health club membership

15    regardless of whether you were staying in the hotel.

16          Two years later, after she had paid the deposits,

17    this is what they were telling her -- this is what they told

18    her:  Did she get her two hotel condominium units?  Yes, she

19    would.  What about her percentage shared ownership of the

20    control of the hotel -- and control of the hotel facilities,

21    her piece of the Trump Hotel, the ballrooms, the meeting

22    rooms, all those facilities?  What was she going to get now?

23    Nothing.  They took it away.

24          What about her shared ownership of the laundry

25    facilities?  What was she going to get now?  Nothing.  They

S. Kulwin - opening

9

1    took it away.

2           What about her percentage ownership in the storage

3    areas?  What was she going to get now?  Nothing.  They took it

4    away.

5           What about the $6 million in gross revenues that were

6    going to be paid to the condominium association?  What was she

7    going to get now?  A $500,000 food and beverage licensing fee.

8           As you will learn, Trump knew it was taking back a

9    substantial real estate ownership interest when it took back

10   all of these things, when it reneged on the deal.

11          But what -- it was what one of their executives

12   labeled the hotel condominium owners equity in the hotel.

13   That's what they were taking back.  Specifically the

14   30,000 square feet of real estate, the $6 million in gross

15   revenues and the rest.

16          The $500,000 licensing fee is the amount Trump agreed

17   to pay the condo association on a yearly basis to buy it back,

18   an amount not even equal to the first year's expected profits

19   from those facilities, let alone anywhere near the value of

20   the 30,000 square feet of space that they had agreed to sell

21   to the condo owners.

22          What about the fair allocation of the rooms?  Nope.

23   That changed, too.  That was no longer guaranteed at all.  And

24   now you received rotation points when you stayed in your room,

25   thus losing your chance -- your best chance for future

S. Kulwin - opening

10

1    rentals.

2            How about the unrestricted use of the health club, a

3    selling point down the road for Jackie, even if you weren't

4    staying in the hotel, the luxury health club membership?  What

5    about that?  No, that was changed, too.  Now you only got to

6    use the health club if you were in the hotel.

7            Ironically, Trump simultaneously added a penalty for

8    staying in your room and then told you you could only use the

9    health club if you did so.

10           Needless to say, Jackie was extremely upset when she

11   got the news.  She didn't think, using her words at the time,

12   in February 2008, quote, that Trump had any right to do that.

13   She felt cheated.  She also felt that these were not people

14   she wanted to do business with any longer.

15           But what she didn't know, and as the evidence will

16   show, was that Donald Trump never had any intention of selling

17   30,000 square feet of prime real estate which he owned in his

18   hotel or the profit-generating food and beverage operations to

19   her or anyone else in the first place.

20           Indeed, as Mr. Trump will tell you, he thought from

21   the very beginning of this project it would be a disaster to

22   sell part of his hotel to hotel condominium unit owners like

23   Jackie.  And he thought it would be very bad for the Trump

24   organization, the Trump brand and for him personally.

25           But as you will hear, he personally authorized

S. Kulwin - opening

11

1    offering to sell it anyways.  Why?  Because it would help sell

2    hotel condominium units and because, as the evidence will

3    show, Donald Trump planned on keeping that prime real estate

4    for himself and the food and beverage operations for the Trump

5    organization all along.  And that is exactly what he did.

6         After telling the hotel condominium buyers that they

7    were getting ownership of the 30,000 square feet of real

8    estate in a prime location in the Trump Hotel, Donald Trump

9    took ownership of all of that prime real estate for himself

10   personally and insured that the Trump organization would

11   always control the operations of it and that he would get the

12   profits from the hotel's food and beverage operations for

13   years to come.

14        One thing Mr. Trump didn't get ownership of was the

15   laundry facilities, because as you will hear, ladies and

16   gentlemen, there never were any plans for any laundry

17   facilities in the Trump International Hotel and Tower.  It was

18   just another one of the misrepresentations used to get people

19   to buy hotel condominium units.

20        As for Jackie, ultimately she told Trump she wanted

21   her money back.  Trump said no.  But Jackie Goldberg was not

22   prepared to be taken.  So here we are, about to hear Jackie

23   Goldberg's claims for consumer and land sales fraud against

24   these defendants, owned and operated by Donald Trump and the

25   Trump organization.

S. Kulwin - opening

12

1     Good afternoon, ladies and gentlemen.  My name is

2   Shelly Kulwin, as you know.  And I, along with my partner,

3   Jeff Kulwin, represent Jackie Goldberg in this matter.  Also

4   sitting with us at counsel table today is Michael Ko, our

5   technical assistant.

6     For the next few minutes I'm going to be telling

7   you -- briefly summarizing what we believe the evidence in

8   this case will show.

9     Ladies and gentlemen, we believe the evidence will

10   show as follows:  First, who are the parties in this

11   litigation?  Who is Jackie Goldberg?

12     Jackie is now 87 years old.  In 2006, when these

13   events began, she was 80.  She received her college degree in

14   1953 from Roosevelt University in Chicago.  After she got

15   married and raised her four children, she went back to

16   Roosevelt and received her Master's degree in accounting in

17   1979, when she was 53 years old.  She then opened up a

18   business as a certified financial planner.  Although it's much

19   smaller today, it is a business that she still operates on a

20   daily basis.

21     Meanwhile, her husband, a former engineering

22   professor at the University of Chicago, sold his business,

23   leaving the family with funds which needed to be managed and

24   invested.  Having little interest in finances, Jackie's

25   husband left that task to her.

S. Kulwin - opening

13

1        And so in addition to running her financial planning

2 business, Jackie began managing her family's investments and

3 the charitable trust that she and her husband had set up with

4 part of those funds. And that is also something else that she

5 still does to this day.

6        In the early 1990s, as a side hobby, so to speak, in

7 addition to everything else she was doing, Jackie began

8 investing in real estate, including in individual

9 condominiums. As I mentioned a moment ago, she liked the

10 return she earned and how it fell in line with her general

11 long-term buy and hold investment philosophy.

12        Now let's turn to the defendants. The defendants in

13 this case are 401 North Wabash, LLC and Trump Chicago Managing

14 Member, LLC. The LLC stands for limited liability

15 corporation. For purposes of this case they are one and the

16 same.

17        What are they? 401 North Wabash is the address of

18 Trump Tower. Mr. Trump formed that company with others to

19 build Trump Tower. Mr. Trump formed Trump Chicago to manage

20 401. But all of it was owned and operated by Mr. Trump and

21 the Trump organization.

22        So let's look at that -- and the key people you'll be

23 hearing about in this case all work for the Trump

24 organization, including Mr. Trump. So let's briefly look at

25 the Trump organization during the relevant time period.

S. Kulwin - opening

14

1          First and foremost, of course, is Mr. Trump himself.

2     As you can see, Mr. Trump is a highly experienced hotel

3     condominium developer and real estate professional.  He was

4     also -- he had developed numerous hotels, golf resorts,

5     residential condominium and hotel condominium buildings by

6     2003.  He formed the Trump organization in 1980.  He's been in

7     the real estate business for 40 years.  He's the chairman and

8     CEO of the Trump organization and, of course, he's the

9     developer of Trump Tower Chicago.

10          But of particular significance in this is that by

11    2003 he was also, according to all of his executives, every

12    one of them, the ultimate authority at the Trump organization.

13    And per his executives, he had personal and direct involvement

14    in every major aspect of the Trump project in Chicago.

15          Now let's go to the people who work under Mr. Trump

16    at the Trump organization on the Trump Tower Chicago project.

17          You should know, and the evidence will show, there

18    are only a small handful of executives who implemented Mr.

19    Trump's main decisions on this project that are relevant to

20    this case, and all of them were located with Mr. Trump in

21    Trump's small executive suite atop Trump Tower in New York

22    City.

23          As you can see, Mr. Trump is the CEO and President of

24    the Trump organization.  Off to the side are his children, who

25    -- it's unclear to me, but I do not believe they have formal

S. Kulwin - opening

1    titles, but they did do some work for the organization on this

2    project.

3          Below that you see is Charles Reiss.  He worked for

4    Mr. Trump on many of his developments from 1993 to

5    August 2004.  Mr. Reiss helped Mr. Trump develop his first

6    hotel condominium building in New York, which opened in 1997,

7    and was not only a highly skilled real estate expert but

8    highly knowledgeable in the hotel condominium development

9    business.

10          Ms. Cremer is there, Jill Cremer, and Mr. Flicker.

11    Russ Flicker essentially worked under Mr. Reiss until Mr.

12    Flicker transitioned into Mr. Reiss' job a few months before

13    Mr. Reiss left the Trump organization.

14          Mr. Reiss, Mr. Flicker and Ms. Cremer were all deeply

15    involved in the sales and marketing of Trump Tower and

16    production of the marketing materials and condominium

17    documents given to potential hotel condominium buyers by

18    Jackie Goldberg.

19          Andrew Weiss, pictured on the right, who also worked

20    for Mr. Trump for a long time and still does, almost is

21    exclusively involved in construction issues dealing with Trump

22    Tower, like dealing with the general contractors, and did not

23    even work on the Trump Tower project between 2001 to 2004.

24          For a very, very short period of time, approximately

25    six months, not even, five months maybe, after Mr. Reiss left,

S. Kulwin - opening

16

1    the Trump organization chart of executives working on Trump

2    Tower looked like this.  That's appearing in front of you.

3         But when Mr. Flicker left in January of 2005, Mr.

4    Trump did not replace him until June of 2006, as the hotel got

5    closer to opening.  He ran things himself.

6         At that time, in June 2006, Mr. Trump hired another

7    executive named James Petrus, or Petrus, to begin to assemble

8    an organization to open and run the hotel as well as to help

9    him run his other hotels, or what they call in the Trump

10   organization the hotel and collection.

11        Now, while all of these executives played roles in

12   the development of Trump Tower, the evidence will be crystal

13   clear on one thing:  No Trump executive had authority to make

14   any important or significant decision that's involved in this

15   case regarding Trump Tower without Mr. Trump's personal

16   authorization and approval.  He was the sole and ultimate

17   authority on everything Trump.

18        And so, as I mentioned earlier, it was Mr. Trump's

19   decision to offer to sell those hotel facilities and food and

20   beverage operations to the hotel condominium buyers in 2003,

21   and it was Mr. Trump's decision to renege on that deal four

22   years later, after purchases had been made and deposits had

23   been given to Trump, no one else's.

24        Okay.  Now, you know who the case is now, who the

25   parties are.  Before I get into the details of what happened

S. Kulwin - opening

17

1    it's important that you understand some basic aspect of the

2    residential real estate business, some of which some of you

3    may already know, but let's just go over it.

4         To begin with, the question is, what is a hotel

5    condominium?  The best way to understand it, in my view, is to

6    compare it to other forms of real estate.

7         Let's start with a typical single family home.  When

8    you buy a single family home you own all the property, the

9    house, the yard, the garage, all of it, and you are

10    responsible to pay all of the expenses, including the

11    utilities and, most unfortunately, the property taxes.

12         As the name implies, it is generally the purchase of

13    the home, not as an investment property or rental property.

14    Normally you buy it through a builder or for resale, from

15    someone who has lived there, after reviewing what's called a

16    listing sheet, that tells you things like the price, the real

17    estate taxes and what school district you're going to be in.

18         Another form of real estate is the condominium.  They

19    come in different forms, but here are some examples.

20         You have a four-flat here.  A four-flat condominium

21    building has four apartments in it; an eight-flat condominium

22    building has eight units; a high-rise may have up to 200

23    condominium apartments in it.  They all share common features.

24         Each apartment is sold separately as an individual

25    condominium unit.  And in addition to ownership of your unit,

S. Kulwin - opening

18

1    you get a percentage of what is called the common elements.

2         What are common elements?  Common elements are

3    literally everything on the property that is not an individual

4    unit.  In this four-flat, for example, it would be the

5    hallways, the roof, the trees, the yard.  In this high-rise it

6    would include all of that and if there was a parking garage,

7    perhaps.

8         What percentage of the common elements do you own?

9    Well, in the four-flat there's four apartments; you would own

10   25 percent of the common elements if each unit was the same

11   size.  In the high-rise, a much smaller percentage.  But

12   together all the owners would own all of them.

13        Now, developers who build and sell condominiums can

14   and do sometimes reserve parts of the building for themselves

15   to keep.  So when they offer the condominium for sale they

16   will describe the common elements and specifically state what

17   is in and what is not in.

18        Critically on this point you will hear testimony from

19   experts in the residential and hotel condominium fields who

20   will tell you that developers like Mr. Trump focus very

21   intently at the beginning of a project on the decision of what

22   is and is not going to be in the common elements.

23        They will also tell you that in all their years

24   experience, over 30 years of experience each of them has, that

25   they have never, ever seen a developer offer to sell certain

S. Kulwin - opening

1    aspects of a building as common elements and then take back

2    those common elements after they began selling the

3    condominiums with the common elements in them.  Never.

4          What does that mean here?  The evidence will show

5    that Donald Trump would have focused very intently on what was

6    being included in the common elements at the time Trump -- at

7    Trump Tower before he made any decision about what would be

8    included in them.

9          What it also means, as the evidence will show, is

10   that Trump's call-back of the common elements after, after

11   Jackie Goldberg had agreed to purchase her HC units and those

12   common elements, was so totally contrary to the custom and

13   practice of the industry, that she could have never ever

14   envisioned it occurring when she agreed to buy her units in

15   the first place with those facilities and revenue included as

16   part of the deal in the common elements.

17         Common elements are a key part of this case, and I'll

18   be discussing them in more detail shortly.

19         Now, other factors of residential condominium units

20   are, just like the home, you are responsible for those

21   property taxes and the utilities and the maintenance of your

22   own unit.  But you must also pay your share of the expenses

23   for the common elements we just spoke of.

24         What expenses?  Well, you have your utilities for the

25   common elements, the hallways, the storage areas, things of

S. Kulwin - opening

20

1   that nature, the heat, the electricity.  You have -- the

2   hallways and the lobbies are to be cleaned and maintained,

3   garbage disposal, landscaping, window washing, a variety of

4   things that go with running a building that's not in each

5   separate apartment.

6       What is your share of the common expenses for the

7   common elements?  It's equal to your percentage ownership of

8   the common elements.  If the monthly expenses for the common

9   elements equals a thousand dollars, for example, in this

10  four-flat, and all the apartments are the same size, your

11  share would be $250.  Those are called -- and this is an

12  important concept -- common charges, or common assessments.

13      Who collects this money and pays the bills?  Everyone

14  who owns a condominium must join something called the

15  condominium association, which is literally made up only of

16  the building units' owners.  They then elect a condominium

17  board from among the owners to take care of all those tasks I

18  just told you about.

19      But another very important thing that the condominium

20  board does is it looks out for the best interests of the

21  condominium owners in dealing with all outside contractors and

22  in dealing with all the common elements that they own.  Their

23  interest is one with the common unit -- the hotel -- the

24  condominium unit owners themselves.

25      Now, some condominium buildings have amenities in

S. Kulwin - opening

21

1    their common elements that may generate revenue for the

2    condominium association.

3            For example, smaller buildings, they might own some

4    laundry facilities, or they might have a storefront that they

5    rent, or they might get revenue from vending machines that

6    they own.  That revenue is paid to the condominium association

7    and used to pay the building's common expenses.  And, of

8    course, every net dollar after expenses, the profit from such

9    revenue that they get, lowers the common assessment the unit

10   owners must pay for the common element expenses.

11           Another feature about residential condominiums that

12   are unlike houses is that people generally buy them not just

13   to live in but also as investments to rent and to own.  So

14   they will buy a unit, they will rent it out and try to make a

15   profit or a return on their investment on the difference

16   between the rent they are charging and the expenses of owning

17   the unit.

18           In addition, many people hold on to them for long

19   periods of time and make a profit on the difference between

20   what they paid and what they sell it for years later, as real

21   estate, despite it going up and down, over the long trend

22   appreciates and makes money.

23           A couple of other key points.  You cannot sell a

24   condominium in the State of Illinois without first giving a

25   buyer, a potential buyer, certain condominium disclosure

S. Kulwin - opening

22

1    documents to review before they buy it.  I'll tell you more

2    about those in a moment because they also play an important

3    role in this case.

4         Now, another thing you should know is that with

5    respect to larger condominium buildings, like those featured

6    here, okay, the condominium association -- on the bottom -- --

7    condominium associations almost always, if not always, hire

8    management companies to run the building, to send out the

9    bills, to collect the common assessments, to collect the

10   revenue from the common elements and all the rest, and they

11   get a management fee for that.  And it is done all the time.

12   And that management fee is part -- becomes part of the common

13   expenses for the condo association.

14        In fact, ladies and gentlemen, in this trial you will

15   meet a man by the name of Robert Levin, plaintiff's expert on

16   the condominium industry.  He owned and operated one of the

17   largest residential condominium and apartment building

18   management companies in the City of Chicago for over 30 years.

19   And he will be explaining in detail certain facts that are

20   important here as well as the customs and practice of that

21   industry and their significance to this case.

22        Now, another fork of the residential condominium is

23   the luxury residential condominium.  These are virtually the

24   same in all respects as your typical residential condominium I

25   just described, but they usually have more special amenities,

S. Kulwin - opening

23

1  like a pool, a spa, a concierge, which is the guy I guess in

2  the front who gets you the baseball tickets and things of that

3  nature, hotel -- play tickets.

4      In addition, luxury residential condominiums often

5  include commercial space for things like a hairstylist or

6  clothing boutiques or to house any of the special amenities I

7  just described.

8      The revenue from that space is paid to whoever owns

9  it.  If the developer reserves that space for himself, he gets

10  it.  If he sold it to a third party, they get it.  If it is

11  included in the common elements, again, if it is included in

12  the common elements, it is not called commercial space, and

13  all of the revenue is paid to the condominium association who

14  can use it for, among other things, reducing the common

15  assessments.

16      Now, let's talk about a hotel condominium.  Let me

17  lay the groundwork for you.

18      A hotel condominium is like a mix between a luxury

19  hotel and a luxury residential condominium.  Think of it like

20  if you bred a Labrador and a standard poodle, you get a

21  Labradoodle, which I heard is a good dog.

22      The first thing is that hotel condominium units share

23  all of the same purchase and ownership features as other

24  residential condominiums.  You own your own unit and a

25  percentage of the common elements.  You're responsible for

 1    your own unit's expenses.  You must pay the common

 2    assessments.  You join a condominium association.  There is a

 3    condominium board.  You cannot sell hotel condominiums without

 4    giving the condominium disclosure documents.  And they, too,

 5    are usually bought as second homes and as investments.

 6            But they also have other features.  First and

 7    foremost, owners rent them to the general public on a daily

 8    basis, just like a hotel room.

 9            Second, while they have the same amenities as luxury

10    condominiums, they frequently also include meeting rooms,

11    ballrooms, like those pictured here, and those -- and those

12    are places where you can have a wedding or other -- like

13    reunions as well as business conferences.

14            How do owners rent their units if they are a hotel?

15    The owner has two choices.  They can try to rent it themselves

16    by advertising on the internet or in the newspaper, or they

17    can -- the more logical thing is they can join the rental

18    program that allows their rooms to be rented through the hotel

19    and takes advantage of the hotel's own advertising and

20    marketing.

21            Who runs the rental program?  Normally the

22    condominium board will hire an experienced hotel management

23    company to run not only the rental program but the hotel

24    condominium association's budget as well, including doing

25    things like issuing bills for the common assessments and

S. Kulwin - opening

25

1    paying those common element expenses.

2           In this case there is no dispute that both hotel

3    buyers like Jackie and the Trump organization envisioned that

4    the Trump organization would run the hotel condominium program

5    and manage the condominiums' budget.

6           In fact, as I noted before, that was part of why

7    Jackie Goldberg bought her hotel condominium units and the

8    interest in the hotel facilities.  Who better to go into the

9    hotel business with than Donald Trump, she thought.

10          Another aspect of hotel condominiums is that they

11   have a lot of space within the building that generates

12   revenue.

13          First and foremost are the food and beverage

14   operations, which includes all of the fees from renting the

15   ballrooms, the conference centers and the functions, and it

16   also includes payment for all the food and beverage that are

17   served in those rooms and throughout the hotel.

18          Then there's rent from people who lease commercial

19   spaces.  The hotel -- and that's not in every hotel

20   condominium, but there are.

21          The hotel management company collects all those

22   revenues, and after paying all the expenses of those

23   operations, pays the profit to whomever owns those spaces.

24   This, of course, is going to be another important part of this

25   case, for as I told you before, Trump sold these very

S. Kulwin - opening

26

1    facilities that you see here, and the food and beverage

2    operations that go with them, to the hotel condominium buyers.

3    Each one got a percentage every time they bought a hotel

4    condominium which, of course -- which meant that in addition

5    to owning a prime real estate -- this prime real estate, these

6    conference rooms and meeting rooms, the condominium

7    association would get the profits from these facilities which

8    they could use to lower the monthly assessments, among other

9    things.

10          But if the condominium association owned all of those

11   hotel facilities, how would they run it?  After all, what

12   would they know about running hotels' food and beverage

13   operations or laundry facilities or storage areas?

14          Well, as Ms. Goldberg even will tell you, that was of

15   no concern to her because the answer was obvious.  The

16   condominium association, through the board, would hire the

17   Trump organization to run it for them.  Again, that was part

18   of the allure of buying into the Trump Hotel in the first

19   place.

20          Who better to go into the hotel business with than

21   Donald Trump?  If you're going to make money in the hotel

22   business, you were going to make it with Donald Trump.

23          But there was one thing that the Trump condominium

24   board could do if, contrary to Ms. Goldberg's expectations,

25   Trump turned out to be a bad manager of those hotel facilities

S. Kulwin - opening

1     or if the condominium association felt that it was charging

2     fees that were excessive or wasn't treating the condominium

3     association fairly.

4            They could do this:  They could fire the Trump

5     organization as the hotel management company in the Trump

6     International Hotel.  And as you will hear, ladies and

7     gentlemen, this is just one of the reasons Mr. Trump never

8     intended to sell those facilities and revenues to Ms. Goldberg

9     or the Trump Hotel condominium association in the first place.

10    Donald Trump is not going to take a chance of being cut out of

11    his own hotel.

12           Indeed, later, after Mr. Trump refused to deliver

13    those facilities and the related revenue, the Trump

14    organization designated all of it as commercial property,

15    which was owned by Mr. Trump, not the condominium association.

16    And, of course, he hired the Trump organization as the hotel

17    property management company, ensuring that neither it nor he

18    could ever be fired as the Trump hotel's management company.

19           Earlier I spoke about documents -- documents

20    condominium and hotel developers must give to potential

21    buyers.  It is important for you to have a basic understanding

22    of them for this case.

23           When developers like Trump build and offer to sell

24    condominiums, hotel or otherwise, the law in Illinois requires

25    them to give potential buyers certain documents.  Meanwhile,

S. Kulwin - opening

1  the developer chooses to give other types of documents to

2  potential buyers as well.

3        The developer uses all of these documents to help it

4  sell condominiums.  And under the law, the developer must be

5  truthful in all of them.  They must tell the truth about what

6  they do say and they must not fail to disclose anything that

7  would be important or material to a potential buyer.

8        First, let's look at the documents developers choose

9  to give to the public.  They are known as sales or marketing

10  materials.  And, in fact, let's look at the ones that Trump

11  gave Jackie Goldberg in an effort to sell her a hotel

12  condominium.

13        You're going to be seeing pictures from the actual

14  Trump brochures that were handed out at the time.  This is one

15  of them.  That's Mr. Trump, in case you already didn't know.

16        The Trump marketing materials primarily featured Mr.

17  Trump, his vast experience, his tremendous success, his

18  organization and the numerous, numerous hotels, condominiums

19  and hotel condominium projects in which he had been involved

20  in up to then.

21        I believe one thing that was said was that he managed

22  something like 4,000 hotel rooms, 3,000 residential units,

23  five golf resorts, hotels, residential buildings, office

24  towers.

25        They also sold the Trump brand as being one of

S. Kulwin - opening

1  superior quality, excellence, success and the gateway to a

2  glamorous experience.  It was a brand name that Trump had

3  spent years cultivating.

4       These materials were designed to convince potential

5  buyers that Donald Trump knew what he was doing when it came

6  to building luxury hotel condominium properties like this one,

7  that he had been very successful at doing it, and that buying

8  into Trump Tower would be an exciting opportunity, a safe bet

9  and a good investment.

10       Now, the brochure also displays the hotel's

11  amenities, including the conference centers, which are seen

12  here, where business meetings could be held, and the grand and

13  junior ballrooms that could be used for weddings and other

14  functions.  This, of course, acted in part to show potential

15  buyers how appealing these common elements were and how well

16  received they would be and, in turn, how likely it was that

17  they would generate significant revenue.

18       Now, in addition to all of that, each Trump brochure

19  had something called a FAQ section, F-A-Q, frequently asked

20  questions, okay?  And what Trump would do in that situation

21  is, they would put together questions as though they were from

22  potential buyers about the projects, and then they would

23  develop answers that would tell them what Trump thought was

24  helpful information and which would also convince them to buy

25  a hotel condominium unit.

1          Here's one that was in there:  How does an owner's

2     stay in a personal guest room -- that means the unit you're

3     buying -- affect the rental program?  Answer:  When an owner

4     or the designated guest of an owner occupies their personal

5     guest room, their unit, the reservation system does not assign

6     any rotation points for that night.

7          Remember, every time you got a rotation point in the

8     reservation system, it lowered your chance to rent your room

9     down the road.

10          That little paragraph which is circled out there, it

11     goes on to say, therefore, you are encouraged to stay in your

12     personal guest room without having to worry about, is this

13     going to hurt me trying to rent it down the road through the

14     reservation system.

15          Another relevant question that was set out in the

16     FAQs described that computer rotation point system that

17     ensured a fair, impartial allocation of rental opportunities

18     for the hotel condominium unit owners.  It was all done by

19     computer, no discretion at all.  It had to be fair.

20          Now, we've talked about the documents that developers

21     can choose to give.  These are the documents that developers

22     have to give when they sell a hotel condominium unit.

23          A condominium developer, hotel or otherwise, must

24     give every potential buyer what is called a property report --

25     that's the one pictured on Page 1 -- before they sell them the

S. Kulwin - opening

1   condominium.  The purpose of this report is to disclose to the

2   potential buyer what they are and what they are not buying.

3          A property report must also contain the declaration

4   of the condominium followed by most the condo dec, which also

5   must include the developer's estimate of what the condo

6   association's revenues and expenses will be once they take

7   over portions of the building.  So you've got a property

8   report, in it will be the condo dec, in that will be the

9   budget.

10          While there is much information in these documents --

11   and you will see the ones that were given to Jackie -- the key

12   information contained in them is this.  These documents

13   describe in detail what makes up the common elements in which

14   the HC -- the hotel condominium unit purchasers receive an

15   ownership interest in addition to the condominium units they

16   were buying.

17          Here the property reports Trump gave Jackie clearly

18   stated, clearly stated right on it -- no dispute about that in

19   the case -- that the hotel's meeting rooms, ballrooms,

20   function rooms, storage areas and laundry facilities were all

21   in the common elements.  That will not be disputed in this

22   case.

23          Next, these reports that they give detail

24   descriptions of the property.  The ones given to Jackie

25   described, for example, the health club and the buyer's

1    unrestrictability to use it regardless of whether they were

2    staying in the hotel.  Another undisputed fact in this case.

3         Condo dec also included the condo budget.  Okay?  I'm

4    a little bit behind on these clips, I can see.  It also

5    includes the condo budget that was effected at the time she

6    decided to buy her units.  Okay?  And it includes the

7    estimated common charges that we talked about for the total

8    condo association.

9         Now, the one that was in effect, the latest one that

10   was in effect when Jackie Goldberg was deciding whether to buy

11   her units, had this budget in it.  And as you can see, there

12   is the meeting and ballroom rentals and spa commissions,

13   $5,053,625.  There's the parking revenue from the valet

14   parking, $994,650.  And there's the common charges, 4,755,633.

15   Those are estimated charges, estimated income for the year.

16   That's what Trump was telling Jackie Goldberg.  That's what

17   they represented to her.

18        Now, on the top -- I just talked about the common

19   charges the owners would pay.  It's considered income to the

20   condominium association because it's part of the revenue it is

21   anticipated that it will receive on a yearly basis from the

22   owner's payment of their monthly assessments.

23        Now, as you can see in this budget, the total

24   anticipated income for the first year is $10,818,908.  When

25   you see this actual document, it will show the expenses to be

S. Kulwin - opening

1   exactly $10,818,908 as well, a zero profit.  This is true of

2   every good condo budget, okay?

3          Why?  Because the common assessments, the amount the

4   owners are paid, are set at the total expenses the association

5   is going to have to pay to pay all of the expenses related to

6   the common elements less any income that the association

7   receives from other sources.  The common assessments fill the

8   gap between the mandatory expenses and any revenue they're

9   getting outside of the common assessments.

10         So here the condo association would start with the

11  fact, we have to come up with $10,818,908 to pay all the

12  potential expenses for the common elements.  Aha!  But we're

13  going to get close to $6 million in revenue from the meeting

14  rooms, the ballroom rentals, the spa commissions and the valet

15  parking, which leaves a gap of exactly $4.7 million.  So they

16  go, okay, that's what the common assessments are going to be.

17  Expenses less revenue equals common expenses -- common

18  assessments.

19         Now, as you can imagine, the higher the revenues are

20  from things like the meeting rooms, the ballrooms and the

21  valet parking, the smaller the gap that has to be made up by

22  the common assessments.  So as the revenues from those rooms

23  go up, the common assessments will go down.

24         Where is the profit, okay?  Where is the profit I'm

25  talking about that I mentioned before from these ballrooms and

S. Kulwin - opening

34

1    meeting rooms?  It's right in the budget.  It -- obviously the

2    entire $6 million isn't profit to the condo board.  They have

3    to pay the expenses associated with the meeting rooms, the

4    ballrooms, the commission -- they have to pay for the food and

5    the drinks, all of those things.

6         But the profit, which is the difference between what

7    those expenses are and the amount of revenue that they get

8    from it, that profit goes directly to pay off other expenses.

9    And for every dollar of profit they make off that revenue,

10   it's a dollar less of assessments that the condo owners have

11   to pay.

12        So based on what Trump told Jackie in 2006, before

13   she bought her units, it was crystal clear what she thought

14   she was getting as common elements.  She was getting a

15   percentage ownership of all of the meeting rooms, the

16   ballrooms, the spas and all of the revenue related to it, plus

17   the revenue from the parking facility.  That's what they told

18   her she was getting.  That was her interest in the hotel in

19   addition to the two units she was buying.

20        Why did Trump include those facilities and revenue in

21   the property report given to Jackie?  Why did they do that?

22   Why did they decide to include these valuable assets as common

23   elements?

24        Charles Reiss, who spoke directly with Donald Trump

25   -- remember Mr. Reiss was on the organizational chart, his

S. Kulwin - opening

 1   right-hand man during this time period -- he spoke directly

 2   with Donald Trump about the decision before Mr. Trump made it.

 3   And he said that Trump only put items in the common elements

 4   that, quote, his words, the market demanded.  In other words,

 5   Trump thought it would help sell hotel condominium units if

 6   people thought they were going to get these things.

 7          Jill Cremer, Mr. Reiss' assistant, who participated

 8   in meetings with Mr. Trump about the inclusion of these

 9   facilities in the common elements, she said they were placed

10   in the property reports to attract those buyers who found the

11   idea of buying an interest in the hotel attractive, an

12   interest in the hotel.  Not just the units.  An interest in

13   the hotel.  A perfect description of what Jackie Goldberg

14   thought in 2006.

15          Now, once Jackie agreed to buy these things, she had

16   to sign a purchase agreement.  The purchase agreements that

17   were used in the Trump project were all standard.  They set

18   out the purchase price, they named the specific unit, they had

19   a schedule of payments when you had to make your deposits,

20   because the building was being built while people were buying

21   them, so they put their deposits in over time, and then there

22   was a closing date when you paid the balance.

23          In Jackie's case she paid, over that two-year period,

24   over a half a million dollars.  Her closing date was in June

25   of '09.  She couldn't object to -- she could -- she had to pay

S. Kulwin - opening

36

1    up and finalize the deal by June of '09.

2          And as far as the common elements, it said you get

3    the common elements that are allowed by the law.  What are the

4    common elements allowed by law?  The ones that are in the

5    condominium documents we just described, the ones set out in

6    the property reports.

7          Now, another document is the rental management

8    agreement which sets out the terms to rent the hotel

9    condominium units, the allocations of rental opportunities,

10    the fees, the charges, the percentage of rent that the hotel

11    management company charges you to rent your room.  You know,

12    if you rent it for 1,500 or $2,000 per night, they get a piece

13    of that.

14          Okay.  This document was not given to Jackie nor was

15    it required to be.  It was not required to be given to her

16    until shortly before the hotel was scheduled to open in 2008.

17    It really wasn't even required to be given to her then unless

18    they wanted people to join the program.  But they did.

19          Now, as you recall, the marketing materials she had

20    been given in 2006 had already laid out the key features of

21    that rental program.

22          But the one that Trump sent to Jackie shortly before

23    the hotel opened took away those very things that I just

24    showed you in those marketing materials.

25          Rather than giving Trump no discretion to assign

S. Kulwin - opening

37

1  rooms, as it was going to have to do if it was being done by

2  the computer rotation point system alone, and as that FAQ

3  brochure had said, Trump now had complete discretion to

4  override that system as it deemed appropriate.

5          It also took away an owner's right to stay in their

6  unit without lessening their chances of having their unit

7  rented in the future.  Before, no points for staying in your

8  home; now there's -- for the hotel opening you get points for

9  staying in your room.

10         In other words, the brochures, the glossy marketing

11 brochures, said stay in your room as often as you want, enjoy

12 all the benefits of owning a condo without lessening your

13 chances for renting it.  Now the actual agreement that they

14 are making you sign right before you have to sign up for that

15 program says no.  If you stay in your room, it hurts your

16 chances for renting it.  It discourages you from staying in

17 your room.

18         Okay.  You've now had an overview of who the parties

19 are, what are some of the key documents and things of that

20 nature and kind of what happened in this case.  I want to go

21 through the detail.  It's not that much detail but there are

22 some few key points.

23         Your Honor, could you inquire just to make sure

24 everybody can see it?

25         THE COURT:  I'm pretty sure they can.  Can you see it

 1   okay?

 2              (Jurors indicating.)

 3              THE COURT:  Go ahead.

 4              MR. S. KULWIN:  This is a time line we've put

 5   together to help you follow some of the key events, okay?

 6              In the 1980s and early 1990s developers, especially

 7   in Florida, began building the first hotel condominiums.

 8   That's a picture there all the way -- where that little icon

 9   is.

10              In the 1990s Mr. Trump, whose business it was to

11   follow such trends, became aware of them and how they worked,

12   and it was a concept he would soon use on his own in New York

13   City.

14              In about 1993 and 1994 the Trump organization was

15   approached about making a proposal to build a residential

16   condo building in downtown New York.  After looking at it, Mr.

17   Reiss told Mr. Trump that for various reasons a residential

18   condo building could not work on that site.

19              In that discussion the idea of building a hotel in

20   that location came up.  At that point Mr. Trump told Mr.

21   Reiss, why not meld them together and build a hotel condo

22   building.  Mr. Reiss looked at him like he was from Mars

23   because he had never heard of such a thing.  But Mr. Trump

24   explained to him, oh, no, they're doing it down in Florida.

25   It can work.

1        Mr. Trump was following a trend and was fully aware

2    of that trend, and that's going to be an important moment.

3        After that the Trump organization, Mr. Reiss as well

4    as Mr. Trump, began an extensive investigation of the hotel

5    condo business, trying to find out, to use I believe Mr.

6    Reiss' words, everything that had gone right and everything

7    that had gone wrong in the hotel condo buildings that had been

8    put up to that point.

9        By the time that investigation ended the Trump

10   organization had a good handle on that type of development,

11   the hotel condo.  So they began building the first Trump

12   International Hotel and Tower, the one in New York City.  As

13   you can see, that building opened in 1997.

14       Before we go any further, that Trump Tower was

15   nothing like this one over here.  It was much smaller, it had

16   no ballrooms, it only had a small meeting room and it had no

17   laundry facilities.

18       You see, they had no laundry facilities because, as

19   you will hear from Andrew Weiss, one of the Trump executives

20   who worked on that project, by 1998 the Trump organization was

21   well aware that running a laundry facility in a hotel

22   condominium building was a net financial loser.

23       In other words, they knew -- the Trump organization

24   knew as of 1997 and 1998 that they would never be putting in a

25   laundry facility in any hotel condominium project that they

S. Kulwin - opening

40

1    were going to build thereafter.

2           Nevertheless, of course, as you've heard, they were

3    promising to put one in this hotel for all the potential

4    buyers.

5           Between 1998 and 2003 Mr. Trump and the Trump

6    organization continued to follow the developments and stay

7    involved in the hotel condominium business.  During that

8    five-year period Mr. Trump began investigating the idea of

9    building Trump Tower in Chicago.

10          As you will also hear, the Trump organization was

11    acting as a special advisor to a Florida developer who was

12    building three such hotel condominium buildings there.

13          You will also hear that Mr. Reiss, who was working

14    for the Trump hotel condo projects, became a recognized expert

15    in the field and gave a keynote address to a large gathering

16    of hotel condo consultants and attorneys.

17          In other words, by 2003 Trump was not only in the

18    hotel condo business, it was viewed as one of the leading

19    players in the field.

20          Why is this important in this case?  Because you will

21    hear from a consultant in the hotel condominium development

22    business who will tell you this:  By 2003 it was an article of

23    faith, a given, a well-accepted principle in the hotel

24    condominium field in 2003, that developers should not, not

25    sell revenue-generating food and beverage operations to a

S. Kulwin - opening

1    hotel condominium association, but instead should keep them

2    for themselves in order to retain control over these

3    operations.

4         As the evidence will show, this is something Mr.

5    Trump had to have known before he decided to sell those very

6    items to hotel condominium buyers in the Trump International

7    Tower in Chicago in 2003 and 2004.

8         Now, it's during this same time period, '98 to 2003,

9    that Mr. Trump, along with others, purchased the land for the

10   Trump Tower in Chicago on the site of the old Sun-Times

11   building, on the banks of the Chicago River, and formed 401

12   and Trump Tower Chicago building.

13        As the detailed planning for the project began, then

14   9-11 happened.  And as we all know, that changed a lot of

15   things for a lot of people.  And it also had a very bad effect

16   on the hotel business.  But it did not deter Mr. Trump.  He,

17   like most savvy real estate investors, played the long game

18   and was confident in his hotel condo development ability to

19   generate huge profits.

20        The only thing that changed as a result of 9-11 was

21   that Mr. Trump decided that he would no longer try to make it

22   the tallest building in the world.  Other than that, it was

23   full steam ahead.

24        Between 2001 and 2003 Trump did planning and

25   promotion for Trump Tower Chicago.  So by September of 2003

S. Kulwin - opening

42

1   they were ready to issue the first property report and began

2   selling condos at that time.  And that is exactly what

3   happened.  It was right about then that Jackie Goldberg looked

4   into and ultimately purchased a residential condo in Trump

5   Tower.  That purchase is not involved in this case.

6           Now, the first property report Trump issued stated

7   that the building would include 350,000 square feet of office

8   space, which Mr. Trump owned.  Mr. Trump's plan from the

9   beginning was for the project to find what was known as an

10  anchor tenant, a large company that would take up most of that

11  space and lease it from Mr. Trump.  And he would then, in

12  turn, make a profit.  It was going to be located right in the

13  middle of this building here, right around here, underneath

14  the residential condos.  Okay?  Right in the heart of the

15  building.  (Indicating.)

16          But in October of 2003, as you see over there, Mr.

17  Reiss came to Mr. Trump with a problem.  Right around here,

18  okay?  Right there.  (Indicating.)

19          He came to him with a problem.  Despite years of

20  trying, Trump could not find any company who wanted to be the

21  anchor tenant for the office space.

22          This left Mr. Trump with two problems.  One, he had a

23  gaping 350,000-square foot hole in his building -- in the

24  middle of his building, and two, he had a financing issue.

25  You see, Mr. Trump had no plan to use all of his own money to

1   build the Trump Tower.  His plan was to borrow at least

2   75 percent of it, or $640 million.  To get such financing he

3   needed an anchor tenant and he also needed to sell a certain

4   number of condos as security for the loan.

5          But also, as Mr. Reiss said, even if Trump was able

6   to sell 50 percent of the condos by the time they needed to go

7   into the financing market to get a loan, the bankers would

8   have asked them this question:  What about the 350,000 square

9   feet of empty space?  What are you doing with that?

10          Mr. Reiss thought they should drop the office space

11  and replace it with ballrooms, expanded meeting rooms and

12  conference room centers, as well as carve it up into

13  additional hotel condos to sell and residential condos.

14          But as Mr. Reiss will tell you, he didn't have

15  ultimate authority to do anything, so he went to Mr. Trump to

16  discuss the issue.  And sometime in November, December

17  of 2003, right over here, okay, November 2003, November,

18  December, Mr. Trump authorized the removal of the office

19  space.

20          Mr. Trump also authorized the adding of additional

21  titles to sell.  He also authorized the adding of the grand

22  and junior ballrooms, the expanded meeting rooms and the

23  conference centers.

24          As a result, the Trump organization was going to be

25  making major changes to the project after they had already

S. Kulwin - opening

44

1  issued a property report to give to potential buyers.  This

2  meant that Trump had to amend the property report.  And as you

3  will learn, if a developer makes a material or significant

4  change to a project, it must tell the people that have already

5  bought into it and to all future potential buyers, we've made

6  a material change.

7      Why?  Because, remember, the purpose of the property

8  report is to fully disclose the truth to the buyers of what

9  they are buying into so they can be fully informed about what

10  they're buying.

11      Now, at the same time, November, December of 2003,

12  Mr. Trump and Mr. Reiss also discuss the common elements of

13  the building.  Neither one remembers much about the

14  conversation, but one thing is clear:  Mr. Reiss had no

15  authority to change the common elements from how they were in

16  the first property report.  And Mr. Trump admits that it was

17  him who authorized the changes to be -- that were made to the

18  common elements about the time he approved eliminating the

19  office space.

20      So what was the change to the common elements that

21  Mr. Trump authorized?  Mr. Trump approved taking part of the

22  office space that had been commercial space that he owned and

23  which was now going to house the new ballrooms, the meeting

24  rooms, the expanded conference rooms, and place that space

25  into the common elements that would be owned by the hotel

1    condominium owners, approximately 30,000 square feet of prime

2    real estate which he previously owned in the heart of his

3    hotel, a real estate interest worth millions of dollars.

4          He also approved giving the revenue from the food and

5    beverage operations, which included those rooms, and

6    approximately 5 million of estimated revenues as we discussed

7    in the first year of the hotel.

8          Why did Mr. Trump agree and decide to give away so

9    much for literally nothing?  Well, according to Mr. Reiss and

10   Ms. Cremer, as I noted before, these changes were made to help

11   sell condominium units.  And, of course, after removing the

12   office space, Mr. Trump needed to sell more of those.

13         What will the evidence show showing Mr. Trump ever

14   actually intended to go through with that sale that he

15   authorized in late 2003?

16         Well, first of all, Mr. Trump will tell you that he

17   would never do anything that he believed would risk

18   endangering the success of any of his projects.  It is safe to

19   say that the evidence will show that Mr. Trump will also never

20   do anything that would be bad for him or for the Trump

21   organization.

22         So what did Mr. Trump think about the idea of letting

23   the condo association own the food and beverage operations at

24   the time he authorized it to be part of the common elements?

25   What did he think?  Let's watch.

S. Kulwin - opening

1          (Tape played.)

2          MR. S. KULWIN:  So there it is.  Mr. Trump says he

3    thinks it would be a disaster for the building if the hotel

4    condo owners owned the Trump Hotel food and beverage

5    operations he was selling them in 2003.  Critically, he also

6    says he had seen that hotel condo food and beverage operations

7    turn into a disaster, quote, many times before he ever made

8    the decision to sell them to the hotel condo owners here in

9    2003.

10         Now, as you saw, Mr. Trump was very focused on the

11   point that one of the worst things that could happen if the

12   condo association owned the food and beverage operation was

13   that they could fire the hotel manager.  You heard him say

14   that several times.

15         Who were these managers supposed to be at Trump Hotel

16   in Chicago?  Well, the Trump organization, that's who.  So Mr.

17   Trump was fully aware in 2003 and right here, right here, when

18   he agrees to do it, when he agrees to sell these units, these

19   hotel facilities and food and beverage operations to the unit

20   owners, he's fully aware of the risks.  He knows he's taking a

21   big risk, one that he had seen turn into, in his own words, a

22   catastrophe in other hotel condo projects many times before he

23   made that very deal, the risk that the Trump condo association

24   could literally fire the Trump organization from running the

25   Trump International Hotel Tower, and he would be cut out of

S. Kulwin - opening

1    running his own hotel, his premier development in the world at

2    that time.

3         Did Mr. Trump know what type of risk that would be

4    when he made the 2003 decision to sell these hotel facilities

5    to the condo association?  Let's watch again.

6       (Tape played.)

7         MR. S. KULWIN:  Okay.  Did Mr. Trump attempt to take

8    that risk?  Did Mr. Trump also intend to take the risk of

9    letting the hotel condo association ruin his reputation and

10   the brand name he had spent years cultivating by turning the

11   F&B operation, in his view, into a catastrophe?

12        And was Mr. Trump just going to give away

13   30,000 square feet of his own prime real estate in his own

14   Trump Tower Hotel at no extra charge to them but as part of

15   the price of the hotel condo units he was selling them in the

16   first place?

17        The evidence will show there's no way he was going to

18   do any of those things.  And, in fact, the evidence will show

19   that Mr. Trump eliminated all of those risks when he took all

20   of that property back for himself and hired the Trump

21   organization as the hotel management company shortly before

22   the hotel was to open.

23        And so it came to pass that Mr. Trump's specific

24   authorization of the F&B operations were included in the

25   common elements in the first amended property report in early

S. Kulwin - opening

48

1    2004.

2          In August 2004 Trump issued the second amended

3    property report, which changed nothing regarding any of the

4    things we are talking about here.

5          Now, both of those property reports specifically

6    stated that the building would include laundry facilities and

7    that those facilities would be included in the common

8    elements.  Yet the evidence will show that there were

9    literally no such facilities in the architectural plans for

10   the building.

11         In October 2004, right here, right there,

12   October 2004, internal Trump e-mails showed that to the extent

13   there was any doubt on that issue, those internal e-mails

14   revealed that Trump was never going to put laundry facilities

15   in the Trump Tower.

16         Now, in January 2005 Trump issued a third amended

17   report.  That report changed nothing about any of the common

18   elements we've discussed.  In fact, the only change of

19   significance to the case was that now Trump decided to add in

20   the parking revenue.

21         Do you see the $994,650?  He put that in in January

22   of '05, adding another benefit to hotel condominium owners for

23   purchasing a hotel condominium unit.

24         What about the laundry facilities?  Yep, they're

25   still listed as common elements even though Trump knew that

S. Kulwin - opening

1   was untrue.

2          In the first quarter of 2005 Mr. Trump received his

3   long term financing of $640 million to complete the building.

4   But at that point Trump was far from selling all of the hotel

5   condos in the building.  In fact, at that point he only sold

6   slightly more than half.

7          In July 2006, having become interested in the

8   possibility of buying a hotel condominium unit in Trump Tower,

9   Jackie Goldberg went to the Trump sales office to explore the

10  possibility.  As I mentioned before, she worried about the

11  possibility -- about the ability to buy an interest in the

12  hotel and the significant revenues it would generate.  It was

13  very exciting for her, very exciting, and it was a deciding

14  factor in her decision to do so.

15         Now, at this point let me tell you something about

16  the sales agents who were selling the hotel condominium units.

17         They worked for an independent brokerage company.

18  They were here in Chicago.  They were a highly experienced

19  team in selling luxury condominiums.  In fact, the firm and

20  its lead salesperson were personally hired by Donald Trump for

21  the job.  These agents earned substantial commissions on every

22  sale, so it was in their interest to promote every aspect of

23  what they called the sales program.

24         It was in the program.  We sold it, said the lead

25  broker.  And each salesperson was required to read the

S. Kulwin - opening

1  property report with the description of the common elements in

2  it to be sure that they said nothing to potential buyers about

3  the project that contradicted it.

4       They will also tell you that the description of the

5  common elements in that report was part of the program they

6  were selling, which makes sense.  Because if you're earning

7  commissions on sales and you can tell a potential buyer, look,

8  you get a piece of the action if you buy a unit, you're going

9  to do it.  And Jackie Goldberg will tell you that's exactly

10  what they told her.

11       So with her it worked.  She agreed to buy a unit on

12  August 2nd for about $1.2 million and a second unit about a

13  week later for under a million dollars.

14       Before she purchased either of them, Trump, as they

15  were required, gave her the property reports that had been

16  issued up to that point in addition to the marketing

17  brochures.  Jackie read them to the extent necessary to make

18  sure that, among other things, the common elements included

19  the hotel facilities and the $6 million revenues that you see

20  pictured right there.

21       Meanwhile, in October of 2006, despite obtaining this

22  loan, Mr. Trump was informed of another small problem.  There

23  was a $17 million shortfall in the development budget for the

24  project, and he was going to have to go into his own pocket

25  over the next couple of years to help fund that shortfall.  He

S. Kulwin - opening

1    did so between October 2006 and the completion of the project.

2           Now, shortly before Jackie bought her hotel

3    condominiums in August of '06, in June of '06 Mr. Trump, as I

4    told you before, hired Jim Petrus.  And he began to work in

5    June of '06, okay?  Mr. Petrus was a very experienced hotel

6    executive with a lot of expertise in operating hotels but none

7    in developing or marketing them.

8           Mr. Petrus decided to literally put together the team

9    to operate the Trump Hotel now that it was expected to open in

10   January of 2008.  So Mr. Petrus first started analyzing the

11   hotel budget.  According to him, he didn't know that --

12   anything Mr. Reiss or Mr. Flicker had done in the past to

13   create those exact same budgets, like the ones we see here.

14          But one of the things Mr. Petrus did do was repeat

15   something that Mr. Reiss had done back in '02:  A thorough

16   investigation of other luxury hotels with whom Mr. Trump would

17   have to compete in Chicago.  As part of this investigation

18   Mr. Petrus learned about how these hotels were doing in the

19   ballrooms and in the meeting rooms and in food service.  It

20   was a very positive picture.

21          Mr. Petrus also did his own projections for Trump and

22   what type of profits they would make on these food and

23   beverage operations.  Another positive picture.

24          At that point Mr. Petrus and Ms. Cremer and others

25   had meetings to discuss the hotel budget.  During these

1    meetings they also discussed the state of the common elements.

2            What was discussed in these meetings about what was

3    in the common elements?  Ms. Cremer took notes at the

4    meetings, as she had penned them, which she left to Trump in

5    2008, when she left the company.  But when we asked for those

6    notes in 2010, they said they no longer had them or they

7    didn't have any.

8            How about memos of what was discussed at any of these

9    meetings amongst the executives?  You know, you have a

10   meeting, there's a memo, about what happened to it.  In an

11   organization building a billion dollar project, any memos?  No

12   memos.

13           Any type of e-mails between the parties setting up

14   any of these meetings, reporting on what happened at any of

15   these meetings, discussing the decisions made at these

16   meetings, memos with dates on them, for example?  No.  No

17   e-mails, no memos, no notes, no nothing when it comes to what

18   was discussed about what was in the common elements in '06,

19   before they decided to take them back.

20           Now, according to the Trump executives, including Mr.

21   Trump -- well, not Mr. Trump.  According to the Trump

22   executives, it was Mr. Petrus who came up with the

23   recommendations for Mr. Trump to remove all these things that

24   you see down there from the common elements after Jackie

25   Goldberg had purchased her HCUs.  And it was Mr. Petrus,

S. Kulwin - opening

53

 1    according to them, that brought it to Mr. Trump.

 2            Now, pretty important meeting.  What was said between

 3    Mr. Petrus and Mr. Trump when they discussed whether or not

 4    these things were going to stay in the common elements?  No

 5    one remembers.

 6            Mr. Trump cannot even recall whethers he was at any

 7    such meeting, when it occurred, where it occurred, or if there

 8    was more than one.  He literally cannot recall one meeting

 9    that he discussed with any executive that worked for him about

10    this topic.  He says he knows they happened but he can't

11    remember who was there, what was said, where or when.

12            Are there any notes of such meetings?  No.  How about

13    a memorandum in this organization building a billion dollar

14    project summing up, discussing the removal of this major real

15    estate interest and this change?  Nope, nothing.

16            How about an e-mail setting up the meeting or

17    discussing what happened after the meeting?  Nope, no e-mails.

18    No notes, no meeting, no memorandums, no e-mails.  Nothing

19    about those meetings.

20            You will hear one telling exchange, though.  Andrew

21    Weiss recalled the meeting that he had with Mr. Trump about

22    that time to discuss the profitability of the food and

23    beverage operations and whether they should stay included in

24    the common elements.

25            When asked if he told Mr. Trump what he thought about

S. Kulwin - opening

54

1    the issue, Mr. Weiss said, Mr. Trump could make up his own

2    mind about that, quote, because he ran a lot of F&B operations

3    and he knew a lot more about it than me, and I certainly

4    didn't need to be telling Mr. Trump what I thought on that

5    subject.  Truer words were never said.  Donald Trump was an

6    expert on the F&B operations.  He didn't need anyone else

7    telling him how to analyze the deal.

8             Over the next eight to ten months Mr. Petrus worked

9    on the hotel budgets and tried to figure out what the heck to

10   give the hotel owners in return for what was being taken out

11   of the common elements.

12            First it was going to be $200,000 a year, then it was

13   going to be $500,000 a year.  How did the Trump organization

14   come to that number?  No one knows.  They have no documents,

15   none, showing any analysis that they did to figure out that

16   number.  There's no e-mails about it, no meetings about it,

17   nothing.  Nothing that records the discussions at all.  And,

18   of course, no notes.

19            But there is one document, this document.  In May

20   of 2007 Mr. Petrus sent an e-mail to all these other

21   executives we've been talking about.  Not Mr. Trump but

22   everybody else.  And what does it talk about?  It talks about

23   the windfall that Trump is going to make by making this

24   change.

25            What he says is, he tells them how the Trump

S. Kulwin - opening

55

1    organization -- he tells the Trump organization exactly how he

2    has converted a $5 million expense, this number right here, a

3    $5 million expense for the Trump organization -- and they call

4    it an expense because they're running these facilities and

5    they have to pay it to the condo association; it's their

6    expense, it comes out of their revenues that have to be paid

7    to the condo association -- how he converted that $5 million

8    into that $500,000 fee that they were now going to pay

9    instead.

10        Mr. Petrus was very excited about that and he ended

11   his e-mail with, this is a powerful story that we should be

12   telling.  A powerful story to whom?  It has to be within the

13   organization because it is a powerful story that they never

14   told to anyone who ever bought a hotel condominium unit up to

15   that point or to anybody who bought it afterwards.

16        Now, by May of 2007 everyone, everyone in the Trump

17   organization knew, if they hadn't known before, what Mr. Trump

18   had known from the beginning:  He was not selling the food and

19   beverage operations, which included the 30,000 square feet of

20   prime real estate in his hotel, to the condo association.

21        What will the evidence show Trump did to alert the

22   salespeople here in Chicago that the deal had changed, that to

23   stop telling people who may be buying, look, you're going to

24   get a piece of the action, you're going to get an interest in

25   the hotel, you're going to get the $5 million in revenue, the

S. Kulwin - opening

56

1   parking revenue, the laundry facilities, all those things,

2   you're going to be in partnership with Donald Trump, you're

3   going to own his hotel -- part of his hotel?  What do they

4   tell them about the fact that they knew that the deal had

5   changed and no one was going to get anything like that any

6   more?  The evidence will show this is what they told them:

7   Nothing.  They told them nothing.

8        So what did the agents do?  They kept selling as if

9   nothing had ever changed because they didn't know any better.

10  That's right.

11       The evidence will show that all the executives in the

12  Trump organization, including most importantly Mr. Trump, let

13  their sales staff continue to hand out property reports which

14  they knew were false because they included the F&B operations

15  and the 5 million in revenue, not to mention the laundry

16  facilities and the million dollars in parking revenue that was

17  also being eliminated.

18       How long did they do that for?  Well, the hotel was

19  going to open in January of '08.  And as you will learn, at

20  that point they had to finalize the condo declaration.  They

21  had to say once and for all what was in and what was out,

22  period.

23       How long did they keep telling people, you can buy

24  this and get a piece of the action?  They did it in May of

25  2007, they did it in June of 2007, they did it in July

S. Kulwin - opening

1  of 2007, they did it in August of 2007, and they did it in

2  September of 2007.  It wasn't until about two months before

3  the hotel was open that they finally gave people the news.

4          Now, when asked whether anyone within the Trump

5  organization raised the issue of whether this was wrong to do,

6  to keep telling people this, the answer from the Trump

7  executives was uniformly the same thing:  No one even brought

8  it up.

9          When asked if any of them, at any meetings that they

10  went to, if any of this was being discussed, said anything

11  like, you know, this is wrong, we shouldn't be doing this,

12  they all said no, no, I didn't.  And I don't remember anyone

13  else doing it either.

14          In October 2007 the fourth amended property report

15  which removed all of these operations of the related real

16  estate from the common elements, how did Trump go about doing

17  it?  When they issued this report how did they finally tell

18  people -- and they issued this report in October of '07 --

19  you're not getting any of these things?

20          They sent them a big, thick document.  And if you

21  look through it to where the common elements were, you would

22  see they were scratched out, lined through, like any one of us

23  would just take a pen and line through it.

24          There was no explanation.  There was nothing to alert

25  people who were getting this thing in the mail that there was

1    anything that significant that had changed.  Nothing.  And

2    there never was an explanation thereafter.

3           When Jackie received her fourth amended property

4    report, she can't even recall looking at it when it came in,

5    understandably so, given she wasn't expecting any changes or

6    would anybody expect any changes, let alone such large changes

7    like this being made, given that Trump sent her nothing

8    alerting her that there were changes coming or that changes

9    had been made.

10          In December Trump issued the rental management

11   agreement.  And as I said before, it changed the deal.  Now

12   you had points, now you were discouraged, all of those things.

13          One interesting thing about the rental management

14   agreement, it said if an owner wanted to join the rental

15   program, they had to agree that Trump was not bound by any

16   earlier promises they had made about the rental program when

17   they were selling the hotel condominium units.

18          In particular, the owner had to agree -- they used

19   these specific words -- the owner had to agree that Trump

20   would specifically not be held to any promises made in the FAQ

21   section of the brochures.  Trump was literally making the

22   owners, if they wanted to join the rental program, sign the

23   rental management agreement saying that they cannot hold Trump

24   liable for lying to them in the marketing brochures.

25          In February 2008 Jackie learned of these changes that

S. Kulwin - opening

1    Trump had made from -- she was -- she learned from a real

2    estate broker.  At first she couldn't believe it.

3           She wrote to her broker at that time, in February

4    of 2008 -- and I'll quote it -- quote, Trump had no right to

5    do that, and that she didn't think the document she had been

6    given by Trump gave him any right to do it.  And then she went

7    back to look at the fourth amended property report to see

8    exactly what Trump had done.

9           Ladies and gentlemen, Jackie Goldberg has been in

10   this lawsuit now for four years.  She's 87 years old.  It's

11   been, to say the least, a highly stressful and troublesome

12   event for her.

13          She's been the victim of a fraud.  She has been taken

14   for over a half a million dollars.  And as the evidence will

15   show, and as she will tell you as she sits here today, she

16   can't understand what is so complicated here.  These

17   defendants broke the deal.  They made a deal and then they

18   said, surprise, no deal.  And as she learned in this case, it

19   was a deal they never intended to honor.  She learned that

20   here in the course of this litigation.

21          So to her, as she will tell you, this is a simple

22   case.  And as the evidence will show, ladies and gentlemen,

23   there's a lot of paper here and there's going to be a number

24   of witnesses, but that is exactly what it is.  It is a simple

25   case.

```
 1              At the close of all the evidence, ladies and

 2    gentlemen, I'll get back here asking you for a verdict, a

 3    verdict on both of Jackie Goldberg's claims under the Illinois

 4    Consumer Fraud and Deceptive Practices Act and under the

 5    Interstate Land Sales Act.  At that time we will also be

 6    asking you for damages.

 7              Thank you very much for your attention.  I know it's

 8    hard to sit and listen.  I did the best I can to make it

 9    interesting.  We'll be seeing you during the trial.

10              Thank you.  Thank you very much.

11              THE COURT:  Ladies and gentlemen, we're going to take

12    our afternoon break.  We'll pick up in about ten minutes.

13      (Jury left the courtroom.)

14              THE COURT:  We'll pick up in ten minutes.  Mr. Novak,

15    do you think you're going to be able to finish --

16              MR. NOVACK:  Yes.

17              THE COURT:  -- before 5:00 o'clock?

18              MR. NOVACK:  I think it's going to -- is everyone

19    gone?

20              THE COURT:  Yes.

21              MR. NOVACK:  I think it's about 45 or so minutes.

22              THE COURT:  Okay.  We'll pick up at 4:00 o'clock.

23              MR. NOVACK:  Don't hold me exactly to that, but --

24              THE COURT:  Okay.

25      (Brief recess was taken.)
```

Novack - Opening Statement

61

 1              THE COURT:  Ready?

 2              MR. S. KULWIN:  Yes, your Honor.

 3              (Jury in.)

 4              THE COURT:  Ladies and gentlemen, you heard

 5    plaintiff's opening statement.  Now you have the opportunity

 6    to hear defendants' opening statement.  Just a reminder,

 7    statements by the lawyers are not evidence.

 8              Mr. Novack.

 9              MR. NOVACK:  Thank you, Judge.

10              OPENING STATEMENT ON BEHALF OF THE DEFENDANTS

11    BY MR. NOVACK:

12              Good afternoon, everyone.  Again, I'm Steve Novack.

13    I'm representing the defendants.

14              Helping me with the Elmo here is going to be my

15    secretary Kathy Zook.  She is going to help put some things up

16    on the screen.  You will have the choice of watching it on the

17    big screen or over here (indicating), whatever is more

18    comfortable.  The Judge told you you can move over there

19    (indicating) if it's easier.

20              And, as the Judge just said, she gave you an

21    important reminder.  She said this isn't evidence, what I say;

22    it wasn't evidence what Mr. Kulwin said.

23              But I'm glad I have the opportunity to talk to you

24    because a lot of what Mr. Kulwin said the evidence was going

25    to be, with all respect, I think you're going to find out it's

Novack - Opening Statement

62

1     not so.  And what this gives me an opportunity to do is to

2     talk to you about a lot of the evidence that Mr. Kulwin chose

3     not to mention.  You need to get a balanced picture of

4     everything.

5             And we all know now Mrs. Goldberg signed purchase

6     agreements to buy two hotel condominium units.  She put

7     earnest money in escrow for it.  But she didn't close on the

8     purchases.

9             So, why are we here?  Well, Mrs. Goldberg filed this

10    case.  And I'm going to disagree with Mrs. Goldberg's position

11    in the case, but I'm doing so -- and I hope you will

12    understand, and I hope, Ms. Goldberg, you understand -- I mean

13    you no disrespect.

14            But I'm going to tell you some things that just

15    aren't so -- things that you were just told that just aren't

16    so.

17            And she filed this case.  And she filed it to ask you

18    to award her an amount equal to her earnest money and/or give

19    her some other money on top of that, too.

20            Now, Mrs. Goldberg tries to justify all of this based

21    on the fact that in October of 2007, after she signed her

22    purchase agreements, the seller removed various items from

23    these common elements.

24            What are common elements?  You heard it briefly.  In

25    a condominium, common elements are everything other than the

1   units themselves.  In typical residential condominiums, that's

2   elevators, roofs, lobbies, walls, ceilings, hallways, and the

3   like.

4         And here the issue is about meeting rooms, ballrooms

5   that at one point were in the common elements and another

6   point were not.  And it's about revenues and expenses -- both,

7   revenues and expenses -- that at one point were in the

8   condominium association's budget and another point were not.

9         And it is true that the seller removed from the

10  common elements those items that used to be in the common

11  elements.  We're not going to fight that.  We might even have

12  some agreement on that.

13        But guess what?  Guess what?  Here's the punchline.

14  The evidence is going to show you -- not the evidence that

15  Mr. Kulwin told you about, but the evidence you'll see in this

16  case will show -- that Mrs. Goldberg agreed in writing that

17  the seller could do just that.  She agreed in writing that the

18  seller could take these elements out and remove these expenses

19  and revenues from the budget.

20        And the evidence on this point starts with just how

21  sophisticated and knowledgeable Mrs. Goldberg is.  Mr. Kulwin

22  put up a screen that had some bullet points about

23  Mrs. Goldberg's background, but not all of them.  Actually,

24  you're going to find out that she was and is a very, very

25  sophisticated and knowledgeable person and very, very active

Novack - Opening Statement

64

1    in real estate investment.

2           She's kind of what's called an entrepreneur and, in

3    this case, a professional one at that.  She's got a Master's

4    Degree in Accounting.  She's licensed by the State of Illinois

5    as a Certified Public Accountant, what we all know as a CPA.

6    She has a private accounting and tax practice and provides tax

7    services for individuals.

8           She's also a Certified Financial Planner, so she has

9    another set of letters by her name.  She's a CFP.  And she

10   provides financial planning services for others.

11          She owns a company.  A company.  Just like the

12   defendants in this case are companies, she owns a company

13   through which she provides her accounting, tax and financial

14   planning services.

15          For almost 30 years now, she's been using her

16   business savvy to invest in real estate.  In fact, over the

17   years, she's paid in over $11 million in cash to buy

18   investment properties.  And when I say "cash," I really mean

19   cash.  She never uses mortgages.  She pays cash on the barrel

20   head for her real properties.

21          And among the many properties she owns are a number

22   of apartment buildings.  And she's a landlord to many tenants.

23   And she also invests in luxury condominium units.  Not to live

24   in them, but to rent them to tenants.  And she's very

25   experienced with purchase agreements.  After all, she had to

Novack - Opening Statement

1    sign one for every one of those many properties that she

2    bought.

3            Now, in 2003, Mrs. Goldberg bought a residential

4    condominium in Trump Tower for a million-four; again, in cash,

5    no mortgage.  She bought it not to live there, but to rent to

6    a tenant.  In fact, at the time, Trump Tower had not even been

7    built yet.  It wasn't even expected to be built for another

8    five or six years.

9            In the meantime, after she signed her contract to

10   purchase, property values -- particularly, in luxury high-rise

11   buildings -- started to skyrocket.  And in only about three

12   years, before she even closed on her residential unit, it just

13   about doubled in value.  It increased by about a million to

14   million-and-a-half dollars.

15           And around that time, she decided to buy two hotel

16   units to add to that.  So, in August of 2006 -- and we're

17   still a couple years before the building is even done; this

18   building is a building in process -- she signs the two

19   purchase agreements, one for each unit.

20           Now, when she signed the first of those two

21   agreements on August 2nd of 2006, she was given a set of

22   documents.  It consisted of the building's original property

23   report and the three amendments that had already been issued

24   by the time she purchased.  It had already gone through three

25   changes before she even purchased.

1    The property report included what is known as a

2  condominium declaration.  You heard a little bit about it.

3  That's the document that actually established what is going to

4  be in or out of the common elements.  And the documents that

5  Mrs. Goldberg was given right at the time she purchased showed

6  that those common elements had changed between the original

7  property report and the time she signed her agreements.

8    So, this idea that they're complaining about the

9  change that occurred after she bought, well, she knew before

10 she bought that those changes had already -- that other

11 changes had already -- been made.

12   In fact, you'll see that in the first amendment --

13 which was issued in early 2004, years before Mrs. Goldberg

14 signed her agreement -- that amendment removed the health club

15 from the common elements.  Before that amendment, the health

16 club was in.  After that amendment, the health club is out.

17   And that same first amendment put into the common

18 elements, for the first time, the meeting rooms and ballrooms.

19 That's the subject of this case.  And it was put in -- you

20 heard Mr. Kulwin tell you that all we did when we took -- all

21 the seller did when it -- took out those common elements was

22 underline to show the change.  That's all it did when it put

23 those elements in in the first place.  No explanations.

24 That's the way things are done.

25   So, the documents that Mrs. Goldberg had when she

Novack - Opening Statement

1    signed up showed that items were being put into common

2    elements, being taken out of common elements.  She knew that

3    was going on.

4         Now, another very important thing you're going to

5    learn is that the two purchase agreements that Mrs. Goldberg

6    signed -- you didn't hear this when Mr. Kulwin was telling you

7    what was in the purchase agreement.  I'm going to put that up

8    in a second.

9         But those purchase agreements gave the seller the

10   express right to change the condominium documents, including

11   the property report, including the declaration, including the

12   common elements.  That's what the purchase agreement said.

13   The seller had the absolute right to change the common

14   elements.

15        And Mrs. Goldberg agreed to that.  Nobody forced her

16   to.  She's experienced.  She can read.  She made that

17   agreement.

18        Let me stop for a moment.  I do want to put up a

19   screen about that.  This is what you saw in the opening

20   statement by Mrs. Goldberg's counsel about the aspects of the

21   purchase agreements that he wanted you to focus on.  And

22   although he says in there that the agreement refers to condo

23   documents -- that's the last of those bullets on the right --

24   he did not tell you that the agreements allowed for these

25   changes.  But the evidence I just told you about is going to

1   show you exactly that.

2        Now, let me show you another of the documents -- of

3   the screens -- that Mr. Kulwin showed you a little bit ago.

4   And this is the page that has the word "representations" at

5   the top left and on the right "delivered," and the idea was to

6   show you the difference between the two.

7        And by that, Mr. Kulwin suggested to you that the

8   Trump organization -- the seller -- made representations as to

9   what was going to be in the sale here, what was going to be

10  delivered later.  But the evidence that I just told you about

11  -- that the seller had the right to make the changes -- that

12  tells you those aren't representations.  Those aren't

13  promises.  Those aren't guarantees.

14       You heard the word "guarantee" used in the opening.

15  There are no guarantees as to what was going to be in there.

16  He said that the seller reneged on the deal.  There was no

17  deal that said this is what the common elements are and they

18  will always remain as such.  On the contrary, the deal these

19  two parties entered into solemnly in writing said they can be

20  changed.

21       So, you will see that the purchase agreements gave

22  the seller the right to change the common elements and other

23  things.

24       Now, the purchase agreements that Mrs. Goldberg

25  signed gave her a very important right, too.  It wasn't a

1    one-sided contract.  She read it all.  She signed it.  But it

2    gave her rights.

3           And she was given a ten-day period after signing the

4    agreement to consult with her attorney, to review the property

5    report and all of its amendments, all those documents that you

6    heard about today.  She is given ten days to review them all

7    with her attorney and to look at the contract, as well, to see

8    if everything was acceptable to her and her lawyer; and, to

9    allow Mrs. Goldberg and her lawyer, if they chose to do it, to

10   try to negotiate different terms.

11          If they didn't like something, they could come back

12   and say, "I don't like that paragraph.  You know that

13   paragraph about change in the common elements, no, I don't

14   want to sign an agreement that has that in it."

15          Then the parties would negotiate, and either it would

16   be left in the contract or be taken out.

17          And if at the end of the period -- the end of that

18   ten-day period -- Mrs. Goldberg and her lawyer were

19   dissatisfied with the deal or dissatisfied with the contract

20   or dissatisfied with any of these things, she had the absolute

21   right to walk away from the deal.  Walk away from the deal.

22   No questions asked.

23          And let's look at the document that provided that.

24          Now, that's the whole document.  And that document is

25   called, "Attorney Approval Rider."  And it's an attachment to

Novack - Opening Statement

1    the purchase agreement Mrs. Goldberg signed.  The first

2    paragraph identifies which contract this rider belongs to,

3    mentions Mrs. Goldberg's name and unit number.

4         But the provision -- paragraph -- I want you to look

5    at is the second paragraph.  And I know it's hard to read, so

6    we just sort of blew this one up for you so you could see the

7    language double spaced.

8         I'm going to read it.  You can read along with me.

9    This is the right that Mrs. Goldberg was given.  It says as

10   follows:

11        "This purchase agreement is contingent upon approval

12   as to its form, other than dates and the purchase price, by

13   purchaser's attorney by 5:00 p.m. Chicago time on the 10th day

14   after the date of seller's acceptance of the purchase

15   agreement."

16        Seller's acceptance, you'll see in the contract, was

17   August the 3rd.  So, the 10th day would be August the 13th.

18        Then it goes on to say, "If written notice of

19   disapproval is received by seller from purchaser or

20   purchaser's attorney within such time period, then this

21   purchase agreement shall be deemed null and void and the

22   earnest money and any other amounts paid by purchaser to

23   seller shall be returned to purchaser.  If no written notice

24   of disapproval is received by seller within such time period,

25   then this contingency shall be deemed waived and this purchase

Novack - Opening Statement

71

1    agreement shall remain in full force and effect."

2         Now, being the sophisticated real estate investor

3    that she was and having repeatedly signed numerous other real

4    estate purchase agreements, Mrs. Goldberg took advantage of

5    that ten-day period.  She had her attorney -- her attorney's

6    name is Judy DeAngelis -- review the contract with her.  And

7    as a result of that, I believe the evidence will show you that

8    Mrs. Goldberg's lawyer asked for some 20 changes to be made in

9    that contract that she wanted to make.

10        Now, that event was not in Mr. Kulwin's timeline, but

11   it's important.  Very important.  And what I'm talking about

12   happened in that ten-day period, and you'll see that.

13        A number of the changes that were requested were to

14   prevent the seller from making changes.  Indeed, knowing that

15   the common elements had already been changed -- remember

16   health club out, meeting rooms in, other changes made -- and

17   knowing that that could happen, again -- because that's what

18   the contract said:  It could happen, again -- Mrs. Goldberg's

19   lawyer asked for a modification to prevent the seller from

20   changing the common elements.

21        Seller didn't agree to that.  Seller said "No."

22   Seller has a right to stick to the deal.  Didn't want to make

23   the change.  And this confirmed that, as was the case with

24   every other purchase agreement for those hotel condominium

25   units, the seller had the right to change the common elements.

Novack - Opening Statement

1    So, Mrs. Goldberg -- again, very sophisticated, very

2   experienced purchaser -- she had two choices.  She could back

3   out of the purchase agreements because she didn't like the

4   fact that the seller could change the common elements; and, if

5   she did that, she got her earnest money back, no questions

6   asked.  No harm, no foul.  She takes her money back, says,

7   "You know what, seller?  I'm not making a deal with you

8   because you're telling me you can change the common elements."

9   That was one alternative.

10    The other alternative was she could agree that the

11   seller had the right to make the alternatives -- make the

12   changes -- and stick with the purchase agreements.  And that

13   was her choice to make.  Nobody put a gun to her head to sign

14   this deal or stay with it.  No one could force her to stick to

15   it if she didn't want to.  And no one did.

16    But she chose on her own, voluntarily and with the

17   benefit of counsel, to stay with those purchase agreements.

18   That's how we get here.

19    But now, now that the seller did just what she said

20   the seller could do and change the common elements, she wants

21   you, ladies and gentlemen, to say it's okay for her to walk

22   away from the deal and get her earnest money back.  But that's

23   the same thing she tried to get the seller to do.  She tried

24   to get the seller to agree not to change the common elements

25   and give up the right to change it.

Novack - Opening Statement

1        And when he wouldn't -- when it wouldn't -- she could

2   have taken the earnest money back.  She didn't.  She wants

3   that second bite at the apple from this jury.

4        So, at the end of the case, when I come back, I'm

5   going to ask you to hold Mrs. Goldberg to the deal that she

6   and the seller agreed to in writing and not to give her

7   earnest money or anything else.

8        Now, to try to convince you to see her way, she asks

9   you to speculate with her.  She says -- she speculates --

10  remember Mr. Kulwin said she didn't know this.  When she got

11  those amendments, she didn't know what she's now claiming,

12  which is that this was always intended to be done.  So, she

13  now speculates with the theory that Trump never intended to

14  leave the meeting rooms, ballrooms and related revenues and

15  expenses in those common elements.

16       Now, her theory, the evidence is going to show you,

17  is based wholly -- wholly -- on this speculation.  And the

18  speculation is that Trump put those items into the common

19  elements to sell more units, secretly knowing that it would

20  later take them out after making the sales.  That's the

21  theory.

22       You will not hear a single witness testify that there

23  was any such plan.  And we don't have an obligation to prove

24  to you that there was no plan.  The Court has already told you

25  the burden of proof is on the party making the claim.

Novack - Opening Statement

74

1   Mrs. Goldberg must convince you that this secret plan existed.

2   We don't have to prove that it didn't.

3         But that's going to happen, because the evidence is

4   going to show that there was no such plan and no secret

5   intent.  Indeed, every witness that would know about that,

6   every witness that would know if there was such a plan or

7   every witness who is said to have had this secret intent, will

8   testify that there was no such plan, no secret intent.

9         You'll also see objective documents in writing.

10  Documents that were prepared at the time, not prepared for

11  this case, that prove that the subject of possibly removing

12  those items didn't even come up until after Mrs. Goldberg

13  signed her purchase agreements.  And you'll see those

14  documents will show you that no final decision on that was

15  made until sometime in mid-2007, over half a year after

16  Mrs. Goldberg signed.  Not done before she signed.  At least a

17  half a year afterwards.

18        And you'll also hear lots of testimony explaining the

19  logical and innocent way the subject ended up coming up and

20  the substantial financial analysis that was conducted before

21  the final decision was made.  Time doesn't allow me to go

22  through it all, but I want to give you a quick preview -- a

23  little summary, if you will -- what the evidence is going to

24  be.

25        And this all starts with two overarching facts that

1    you will learn throughout the course of the trial.  The first

2    is that in running the business of the Trump organization,

3    Donald Trump delegates most decisions, including very major

4    ones, to Trump organization executives.

5            Why is that?  Well, you'll see that Mr. Trump heads

6    up an organization of over 2500 employees worldwide; that he's

7    involved in many different projects at any given time.  It

8    would be impossible for him to be involved in the details of

9    each project or to make all decisions.  Many times he's

10   involved only if and when -- and I say if; only if and when --

11   executives come to him for input or approval.

12           And you'll see that when he does communicate with the

13   executives, it's in meetings or phone calls.  It's not in

14   e-mail.  It's not in memos.  It's not in letters.

15           Mr. Kulwin made a big point of telling you you're not

16   going to see a lot of documents.  Well, that's true.  This guy

17   just works that way.  He'll tell you.  Some people are

18   comfortable with written documents, some people aren't.  Some

19   people like the e-mail, some people don't.

20           The second overarching fact is that hotel

21   condominiums are very, very different than residential

22   condominiums.  With residential condominiums, there's usually

23   nothing to think about about common elements.  Why is that?

24   Because everything that's not part of the units goes into

25   those common elements.  All those things I told you about.

Novack - Opening Statement

76

1    Generally speaking, residential condominiums, they don't have

2    wedding rooms to market to the public.  It's not even an

3    issue.

4          But in a hotel condominium, like we're involved in

5    here, it's much more complicated, particularly with respect to

6    those parts of the hotel that are large, commercial-scale

7    features that are marketed to the public as a whole.  Sure, a

8    residential condominium building might have a little room that

9    the Board of Directors goes to sit and have their meeting, but

10   we're talking now about rooms that can rent out for hundreds

11   and hundreds of thousands of dollars at a time, feeding

12   hundreds of people who come for conventions, weddings, and the

13   like.

14         And you're going to hear from Mr. Brent Howie, who is

15   an expert witness that defendants retained to give testimony

16   to you during the trial.  He's a hotel condominium expert.

17   That's what he does.  And we expect him to explain that the

18   common elements are treated differently in hotel condominiums

19   than in residential condominiums.

20         But he's also going to say that developers, even

21   developers -- strike that.

22         He's going to tell you that hotel condominium

23   developers, even those who have tremendous experience in

24   developing residential condominiums, aren't aware of that.

25   They're not aware of those distinctions when they first get

1    into it.  That's one of the things he does for them.  He

2    points that out to them.

3         And you're also going to learn that although the

4    Trump organization had developed many, many residential

5    condominiums, it had developed only one hotel condominium

6    prior to the Chicago Trump Tower development; and, that was

7    the New York hotel condominium, which it just recently opened

8    and was quite different than Chicago.  You heard Mr. Kulwin

9    say it did not have banquet rooms and meeting rooms and food

10   and beverage.

11        So that although Trump was an experienced residential

12   condominium developer, he was not an experienced hotel

13   condominium developer.

14        Let's talk about some of the people.  The Trump

15   executive who was most responsible for the property report and

16   for structuring the common elements at the New York hotel

17   condominium, that was Charlie Reiss.  You've heard his name.

18   You're going to hear a lot about him.  He's going to be

19   probably the first witness in the case.

20        And like the entire Trump organization, Mr. Reiss had

21   absolutely no previous hotel condominium experience

22   whatsoever.  That was New York.

23        Now, you'll learn that the two executives most

24   responsible for these matters at Chicago Trump Tower were

25   Mr. Reiss, again, and Russell Flicker.  And you'll learn that

1    Mr. Flicker also had no experience with hotel condominiums

2    prior to his work at Chicago Trump Tower.

3            You'll also learn that the Chicago Trump Tower

4    development was very, very complicated.  Among other things,

5    it had a lot of commercial space and it had both a residential

6    condominium and a hotel condominium, same building.  It was

7    the largest and most complex building the Trump organization

8    had ever built.

9            Now, Mr. Reiss and Mr. Flicker tried to model the

10   Chicago hotel condominium based on New York, but, as I said

11   before, New York wasn't the same.  So, the New York hotel gave

12   Trump no experience whatsoever on what do you do with

13   ballrooms and meeting rooms and food and beverage.  This was

14   the first time -- Chicago was the first time -- the Trump

15   organization had to deal with those issues.

16           And you'll see that for reasons that Messrs. Reiss

17   and Flicker believe were appropriate, they -- they were the

18   ones that did it -- they decided in early 2004 to put the

19   meeting rooms and the ballrooms into the common elements in

20   Chicago and to give the revenues and expenses over to the

21   condominium association.

22           Now, this evidence, including the testimony you'll

23   hear from both Mr. Reiss and Mr. Flicker, will show you that

24   Donald Trump did not direct or even suggest that those items

25   be put into the common elements, nor did he direct or suggest

Novack - Opening Statement

1    that the revenues and expenses be put in the association

2    budget.  In fact, you're going to hear no one recalls Donald

3    Trump even being involved in those decisions in any way, shape

4    or form.

5           Now, Mr. Kulwin's timeline didn't show you this, but

6    this is a very key timing fact that I'm going to mention; and,

7    that is, that Mr. Reiss and Mr. Flicker -- remember, those are

8    the ones who made the decision to put these things in in the

9    first place.  Well, Mr. Reiss left the Trump organization in

10   2004.  Mr. Flicker left the Trump organization in 2005, long

11   before -- long before -- there was even any discussion, let

12   alone any decisions, about removing those elements from --

13   those items from the common elements.

14          So, the evidence will show you that Mrs. Goldberg's

15   theory that Trump put these items into the common elements

16   secretly intending to take them out crumbles as the two people

17   who decided to put them in in the first place weren't even

18   around when they were taken out.

19          So, let's move to the person that was around at that

20   time, and that's Jim Petrus.  And you're going to hear his

21   testimony, as well.  He was the Trump executive who first came

22   up with the idea of taking these items out of the common

23   elements.  And you will learn that in June of 2006 -- that's

24   only about two months, only about two months before

25   Mrs. Goldberg signed, and it's now over three years -- I'm

Novack - Opening Statement

1   sorry, over two-and-a-half years after these common elements

2   were put in -- that's when he was first hired by the Trump

3   organization.

4        And they put him into a position they never had

5   before, which was Director of Hotel Operations.  And unlike

6   Messrs. Reiss and Flicker before him, Mr. Petrus did have

7   specialized training and experience in hotels.  He even had

8   done a hotel condominium before coming to Trump.  So, Trump

9   finally had -- finally had -- a hotel condominium specialist.

10  Never had it before.

11       And you'll hear from Mr. Petrus.  He'll tell you that

12  he came up with the idea of removing the meeting rooms and

13  ballrooms.  He came up with the idea of taking the revenues

14  and expenses out.  He will tell you he thought of that on his

15  own, and that Donald Trump did not direct him to do that or

16  even suggest the idea to him.

17       And he'll tell you why he came up with this idea.

18  For two basic reasons.  First, he concluded that condominium

19  associations -- remember they're the ones responsible for

20  operating whatever's in the common elements.  He came to the

21  conclusion that they are poorly suited to run these complex

22  types of hotel operations.

23       And he also realized that even though there was a

24  management contract with Trump to actually do the physical

25  management of those areas, Mr. Petrus felt that there was a

Novack - Opening Statement

1    risk that the association could fire the manager or cut the

2    budget in such a way as to curtail the efficiency or

3    profitability of those operations.  And he concluded that all

4    of that was bad for everyone involved.  Bad for the seller --

5    it was bad for the Trump organization -- bad for the

6    association and bad for the unit owners.

7           And second, Mr. Petrus believed that the profits and

8    losses from these types of operations can fluctuate greatly.

9    And they can.  You'll hear that.  And if they did, that

10   changes the amount of assessments the unit owners have to pay

11   every month.  And the Trump organization believed that unit

12   owners wanted continuity, stability and consistency.  And that

13   was another reason that went into this.

14          As a result, Mr. Petrus determined that these items

15   should be removed, but only if there could be an agreement on

16   an amount of a fee for the Trump org- -- for the seller -- to

17   pay to the condominium association and a number that would

18   keep the assessments about where they were.  Not exact.  And,

19   by the way, all these numbers are estimates.  Estimates that

20   also Mrs. Goldberg knew could be changed.  But they wanted to

21   keep things just about where they were.

22          So, after coming up with this idea, and after first

23   vetting it and discussing it with other Trump executives,

24   Mr. Petrus presented the idea to Donald Trump.  And the

25   evidence will show that Mr. Trump approved that

Novack - Opening Statement

1    recommendation.  No question about it.

2         And the evidence will show that he did so because he

3    trusts his executives.  He trusted his executives Flicker and

4    Reiss to make the decisions about what was going to be in

5    those elements in the first place.  And he trusts Mr. Petrus

6    when he says they should come out.

7         And he also approved it because this was the first

8    time that anyone had ever told him that even if Trump was the

9    manager of these ballrooms and food and beverage operations,

10   the association could still fire Trump and severely -- or

11   severely -- curtail and interfere with the budget.  That's

12   something that Donald Trump -- no one told Donald Trump about

13   and that Donald Trump hadn't considered before this.

14        Now, you saw some testimony from Mr. Trump on the

15   screen where he talked about the ability of the association to

16   fire.  Let me tell you a little bit about those excerpts.

17   First of all, Mr. Trump's deposition was about an

18   hour-and-a-half long.  You saw about 30 seconds of it.

19        And the other thing that you'll learn through the

20   trial is that when Mr. Trump was asked those questions about

21   whether an association could fire, he was asked it in the

22   present tense.  Mr. Trump's deposition was April 18 of

23   2000- --

24        MR. S. KULWIN:  I'm going to object, Judge.  I'm

25   going to object to him making that statement.

Novack - Opening Statement

1          THE COURT:  Overruled.

2    BY MR. NOVACK:

3          Mr. Trump's deposition was taken April the 18th of

4    2012, about a year ago.  Years and years after the events in

5    question.  And he was asked questions about what could happen.

6    And Mr. Trump said, "Well, could be fired."  Well, by 2012, he

7    knew that because when Mr. Petrus came to him after Mrs.

8    Goldberg signed her purchase agreements, he told Mr. Trump

9    about that.

10          Now, let's get back to Mr. Petrus.  It is true that

11   all these years later, Mr. Petrus cannot recall exactly when

12   he first came up with this idea to remove these items.  And he

13   can't remember exactly when the decision was finally made to

14   do so.  But the objective evidence, ladies and gentlemen, will

15   show that the issue did not come up until sometime after

16   Mrs. Goldberg signed her purchase agreements and that the

17   decision to remove those items wasn't actually made until long

18   after she signed it.

19          And you will see written documents -- again, these

20   are documents prepared at the time, not prepared for this case

21   -- that will confirm all of this.  And I want to let you look

22   at a couple of those now.

23          And the first one is a document that we found that

24   was closest to the August 2nd, 2006, date on which

25   Mrs. Goldberg signed her first purchase agreement.  And what

1  this document shows -- this document is going to show you --

2  is that the Trump organization was still treating the meeting

3  rooms and ballrooms and all the revenue and expenses as part

4  of the common elements as of the date of this document, and

5  that no changes with respect to those items were being

6  considered.

7          MR. NOVACK:  Can you zoom in on the top part of that,

8  please.

9  BY MR. NOVACK:

10          So, what's the date of this document?  August 3,

11  2006, the day after -- the day after -- Mrs. Goldberg signed.

12  Remember Mrs. Goldberg's theory is that when she signed,

13  seller already had the secret intent and plan to take this

14  stuff out?  Well, here we are the day after she signed and

15  those numbers that you see at the top are the same numbers --

16  the identical numbers -- that Mr. Kulwin read to you today

17  that were in the third amendment, which was the document

18  Mrs. Goldberg saw before she signed.

19          The $6 million -- there's two figures:  $5 million

20  for the food and beverage, and there's 900,000 for the parking

21  valet.  There's your $6 million, still there after Mrs.

22  Goldberg signed.

23          And what else was going on here, ladies and

24  gentlemen, Mr. Petrus, he'll tell you.  He was working on this

25  document -- this is the budget for the association -- to try

Novack - Opening Statement

1  to update the estimates.  Remember, this is all estimates.

2  This is years still before the building's completed.  He's

3  working on the estimates, seeing if he can get some of the

4  expenses down, doing his best, making changes based on things

5  they learned.

6          And a number of these expense items are changed.

7  They're different.  He's working on this budget.  He's

8  changing the expenses from what they were before when

9  Mrs. Goldberg signed.  But the one thing that isn't changing:

10  Meeting and ballroom rentals, $5,053,625; valet parking,

11  994,650, exactly to the dollar.  The identical numbers as when

12  she signed.

13          So, at the time she signed, they weren't making any

14  changes.

15          Now, let's fast forward about nine months later.

16          MR. NOVACK:  If you could put that next one up,

17  please.

18  BY MR. NOVACK:

19          This is also an exhibit you will see during the

20  trial.  This is an e-mail dated April 27, 2007.  So, remember

21  Mrs. Goldberg signs in August.  So, we're nine months after

22  that.

23          And this is an e-mail from another Trump organization

24  employee, Michael Damelincourt.  And it's an e-mail to Jim

25  Petrus dated April 27, '07.  And it is saying that they need

1   to clarify and validate this fee that's being discussed at the

2   time that's going to be put in the budget to replace these

3   common elements, revenues and expenses.

4          And the key here --

5          MR. NOVACK:  Can you zoom in on that middle part.

6   BY MR. NOVACK:

7          You will see in there toward the middle, he says,

8   "Main area to clarify and validate are:"  Very first one,

9   F&B -- you'll learn that's food and beverage -- fee, $200,000.

10         Well, what does that tell us?  What will that show

11  you?  That the decision -- the decision for removal -- hadn't

12  yet been finalized because they hadn't yet come to the number.

13  And nobody knows if they're going to come to the number that

14  would be agreeable to replace it because now they're talking

15  about $200,000, and we all know that when the decision was

16  finally made and when it was put into that fourth amendment,

17  that number is $500,000.

18         So, we know that at the time Mrs. Goldberg signs,

19  there's no changes.  We know nine months later there's no

20  changes.  And when you first are going to find out that, yes,

21  it looks like the decision was made, mid-2007, a little bit

22  later than this April date; and, then, the fourth amendment

23  comes out.

24         Now, what is the evidence going to show you about

25  Donald Trump's involvement in the various common element

Novack - Opening Statement

1     decisions?  It's going to show that he does not generally get

2     involved in common element decisions.  He leaves it to

3     executives.  It's going to show that neither he nor any other

4     relevant witness recalls him being involved in the common

5     element decisions at the New York hotel.

6          It's going to show that he did not direct his

7     executives to put the meeting rooms, ballrooms or any other

8     items into the common elements in the Chicago Trump Tower.

9          The evidence will show that neither he nor any other

10    witness recalls him being involved at all in the common

11    element decisions at Trump Tower prior to hearing about

12    Mr. Petrus' idea to remove them.  And you'll learn that he

13    approved Mr. Petrus' idea to remove them in exchange for a

14    $500,000 annual fee every year from the seller.

15         Now, another thing you're going to learn about

16    Mr. Trump is he's a stand-up boss.  So that even though he and

17    his executives do not remember him expressly giving approval

18    to the initial inclusion of these items in the common

19    elements, he accepts the notion -- and you'll hear that

20    testimony -- that he ultimately approved that decision based

21    on the fact that he delegated it to his executives, not that

22    he approved it.  Not that he uttered the words "I approve it,"

23    but rather he told his executives, "You go do that.  Your

24    decisions."

25         And he doesn't then say, "Oh, those are my

Novack - Opening Statement

1    executives, not me." He stands behind their decision. But

2    the fact is, he didn't give his express approval.

3          And every relevant witness -- here, let me tell you

4    who I'm referring to. Every relevant witness: Charlie Reiss

5    and Russ Flicker, who haven't even been employed by Trump for

6    over eight years. They've been gone working for someone else

7    for eight years. Jill Cremer, who worked on the property

8    report in Chicago, she hasn't been with Trump for five years.

9    Jim Petrus and Andy Weiss, another executive who was involved

10   in relevant aspects at Chicago Trump Tower. And Donald Trump,

11   himself.

12         All of those witnesses are going to say to you under

13   oath there was no secret plan to remove the meeting rooms or

14   ballrooms from the common elements or to remove the revenues

15   and expenses from the budget. And each of them will say that

16   he or she didn't have any secret intent like that, either.

17   And you will not hear a contrary -- a single witness testify

18   to the contrary.

19         Now, here's something else you're going to hear.

20   Again, two of those witnesses who will say there was no secret

21   plan were Flicker and Reiss. They're the ones who made the

22   decision to put the stuff in there in the first place. Here's

23   the punchline: They personally bought hotel condominium units

24   at Trump Tower Chicago. They still own them.

25         So, the evidence is going to show you that if they

Novack - Opening Statement

1  were part of a secret plan or intent to remove those elements

2  later, then Mrs. Goldberg must be saying that they were trying

3  to dupe themselves.  And the same is true at the other end of

4  the so-called secret plan.

5        Another witness you'll hear from is Andy Weiss.  He's

6  one of the executives who participated in the decision to

7  remove these items.  But after those items were removed, after

8  they were taken away, Mr. Weiss bought a 50 percent share in

9  another person's contract to purchase a hotel condominium unit

10  at Chicago Trump Tower.

11        So, the evidence will show that if the removal of

12  those items was designed to hurt purchasers, which is the

13  claim you're hearing, Mrs. Goldberg must be saying that

14  Mr. Weiss made himself a victim.

15        And one more important thing here is that in October

16  of 2007 -- that's when the fourth amendment announced to

17  everybody that those items were removed, announced in the

18  property report -- Trump still had over 180 hotel condominium

19  units that hadn't yet been sold.  At an average of a million

20  dollars a unit, that's $180 million worth of property that he

21  was still wanting to sell that the seller hadn't sold and

22  wanted to sell.

23        So, the evidence will show that if Mrs. Goldberg's

24  theory is right and that this is something that hurts

25  purchasers when you take those common elements out, and if

1    she's right that makes it less attractive to purchasers, then

2    that would hurt sales, wouldn't it?  And that would mean that

3    Trump shot itself in the foot.  That's the speculative theory

4    that the plaintiff is asking you to believe.

5          Now, another thing that I believe the evidence will

6    show you is that regardless of Mrs. Goldberg's litigation

7    position today, this whole common element and budget removal

8    issue is not really material at the time.  It's a pretext.

9    It's a "make way" for this suit.  And the first point here

10    relates to the Trump Tower marketing materials.

11          You'll recall that Mr. Kulwin put up a number of

12    screens about the marketing materials.  There must have been

13    three or four of them, including one that I want to put up

14    right now.

15          Let's look at this one.  This is headed, "Materials

16    Given to Plaintiff," "Marketing Materials," and the second

17    bullet here says -- this is what Mr. Kulwin thought was really

18    important about the marketing materials:  They highlight

19    attractive features.  They highlight the attractive features.

20          Well, they do.  That's what marketing materials are

21    for.  If you've got something good in your product, you tell

22    people about it.  If it's something you want them to make

23    their decision on, you tell them about it.  You don't hide it.

24    The only place in all these documents where the common

25    elements indicated that they included the ballroom and meeting

1    room and these budgetary items was in the middle of this

2    property report that is hundreds and hundreds of pages long.

3              But guess what happened with the marketing materials,

4    which is where any seller would put his best foot forward?

5    There's not one word in those marketing materials that say

6    that the meeting rooms or the ballrooms were in the common

7    elements.  There's not one word in those written marketing

8    materials that says that there's going to be revenues and

9    expenses related to that in the condominium association

10   budget.  There is not one mention in those written marketing

11   materials about laundry facilities, let alone that the laundry

12   facilities were going to be revenue producing.

13             How material could that have been if it was being

14   hidden, if you will, out of these marketing materials?  Yes,

15   it was in the property reports.  And you will see how that

16   property report is put together, how many pages it is.

17             The second point is that although you hear about the

18   $6 million figure over and over and over again, understand

19   that's not a profit.  There's expenses that go with revenues.

20   And that revenue number was subject to those expenses that

21   could have been large enough to wipe out profits.

22             But the evidence is really going to show that

23   Mrs. Goldberg was not really concerned with the financial

24   aspects of the meeting rooms and the ballrooms in those

25   budgets.  One reason for that was that she knew, because the

1    budget told her so, that she was not going to get any

2    payments -- no checks were going to be sent to her -- because

3    of that $6 million or because of the leftover of the 6 million

4    after revenues.  She was not getting a check.  She was going

5    to have to pay money every single month after buying these

6    units.

7            So, consistent with that -- consistent with that --

8    she really didn't care that much about those -- that financial

9    stuff.  She made no financial analysis whatsoever as to

10   whether the operation of those meeting rooms and ballrooms and

11   food and beverage operations would be profitable.  She didn't

12   do anything about that.

13           But what she did do -- because her primary concern

14   was how much would her regular monthly payments be.  How much

15   would I have to pay out?  And she had three regular monthly

16   payments.  She had a monthly assessment; she had a monthly

17   fixed hotel expense payment; and, she had a real estate tax.

18   And she was very concerned about that.  No question about it.

19   She was concerned about that.  And she was concerned as to

20   whether she could rent her units each month for enough money

21   to cover those expenses.

22           So, she did an extensive investigation into that.

23   She had her broker investigate all the hotels in the area to

24   see what rates they were renting units at, what were their

25   occupancy rates.  She did a calculation to see how many days

Novack - Opening Statement

1  per month she had to rent her units in order to cover those

2  expenses.

3      And she found out she could easily cover it because

4  all she had to do was rent her units about ten days a month

5  and then she's covered.  Everything else is gravy for her.

6  That's money she would be getting from renting her unit.  Not

7  from operating ballrooms, but from renting her unit.  And

8  that's what she cared about.

9      And let's stop here for a second.  And you heard

10 Mr. Kulwin say Mrs. Goldberg, when she got that fourth

11 amendment and reviewed it, experienced a lot of distress.  She

12 was upset.  But you're going to see that as to the estimated

13 expenses -- which is, again, what she was most concerned

14 about:  A, she knew they were estimates anyway; they could

15 always change; but, the fourth amendment told her that

16 collectively for the two units, the change was -- the only

17 change in those expenses was -- to increase them from $5503

18 per month -- that's what she saw; that was the latest estimate

19 she saw before -- to $5578 a month.  $425 a month.

20     Now, that doesn't sound like a change that could

21 cause emotional distress to someone who had agreed to pay over

22 $2.2 million cash for these units.  That's an immaterial

23 amount.

24     And, anyway, the evidence will show that the specific

25 common elements couldn't have been so important to Mrs.

 1  Goldberg's decision to buy these units because remember,

 2  instead of walking away from the deal when she knew that those

 3  common elements could change, she stayed in the deal.  She

 4  stayed in the deal.

 5          THE COURT:  Mr. Novack, just so you know, it is five

 6  to 5:00.  I do want to end by 5:00 today.  If you are not

 7  done, we can pick up tomorrow.

 8          MR. NOVACK:  I want to say two very quick things,

 9  your Honor, if I may.  I think I can get it done by 5:00.

10          THE COURT:  Okay.

11  BY MR. NOVACK:

12          One is, how are you going to hear all this evidence?

13  Through witnesses.  Mrs. Goldberg, who has the burden of

14  proof, goes first.  She's going to call a number of witnesses

15  that we would otherwise call in our case.  If she does and if

16  the testimony comes in and everything that we were going to

17  bring out comes in in plaintiff's case, we won't call these

18  people back, again.

19          The second thing is that you're going to hear expert

20  witnesses.  Their expert has zero hotel condominium

21  experience, and we expect him to admit he's not an expert.

22  Our expert has vast experience in condominium hotels.

23          Final point before I end --

24          MR. NOVACK:  And I'd really like to finish this,

25  Judge, even if it goes over a minute or so.  It's important to

Novack - Opening Statement

1    me.

2            THE COURT:  I will give you a minute, but you can

3    finish it tomorrow morning if you cannot finish today.

4            MR. NOVACK:  I have about four minutes left?

5    BY MR. NOVACK:

6            To put this time in context, I want to put up another

7    of the screens Mr. Kulwin used this morning -- earlier today

8    in his opening.  This was his timeline.  And it's hard to see,

9    and he had the board up there.  But I will point you to what

10   we're talking about very quickly.

11           The very last item in there.  Mr. Kulwin's punchline,

12   if you will, said that when he --

13           MR. NOVACK:  Too much.  Go back a little bit more.

14   Okay.  Stop.

15   BY MR. NOVACK:

16           February 14, '08, it says when Mrs. Goldberg got the

17   fourth amendment, she sent the e-mail saying, "Trump has no

18   right to do that."  But the evidence is going to show you that

19   this wasn't the end of the e-mail.  You shouldn't cut that off

20   at that timeline.  Not the end by a longshot.

21           Here's the entire e-mail, ladies and gentlemen.  The

22   bottom of these two -- it's like an e-mail trail.  The bottom

23   e-mail is from Mrs. Goldberg to her broker Terry Vogue,

24   another witness you're probably going to hear from in the

25   case.  The top e-mail is where Mrs. Vogue forwards that e-mail

Novack - Opening Statement

96

1    to Trump -- to the seller.

2         And the bottom e-mail does say what Mr. Kulwin said:

3    "Trump has no right to revise them."  That's what she said.

4    She's talking about the fourth amendment.  She's read the

5    fourth amendment.  She's seen the common elements have come

6    out.  And she says he didn't have the right to revise that.

7         But later in that same e-mail, she qualifies that in

8    two very important ways, by saying two very important things

9    about those changes.  First, Mrs. Goldberg says that she asked

10   her attorney if the changes were okay and that she was told

11   they were okay.

12        Second, she says, quote -- I'm quoting this now -- I

13   don't know if you can see it.  It's pretty small.  Here's the

14   quote.  This is Mrs. Goldberg speaking:  "It may be somewhere

15   in the earlier documents that Trump had the right to revise.

16   However, if so, I don't think there would be a court case."

17        Well, ladies and gentlemen, we've already seen the

18   purchase agreement that she signed did allow Trump to make

19   those changes.  So, in Mrs. Goldberg's own words, she has no

20   court case.

21        And at the end of the case, ladies and gentlemen, at

22   the end of all the evidence, that's exactly the verdict that

23   I'm going to ask you to return in favor of the defendants.

24        Thank you for listening to me.  I hope you enjoy this

25   experience.  And I will look forward to talking to you, again,

1    at the end of the case.

2            THE COURT:  Thank you, Mr. Novack.

3            Ladies and gentlemen, we are done for the day.  We

4    will pick up tomorrow morning.  Please be here by 9:15.

5            Please remember do not discuss the case.  Do not do

6    any independent research.  Do not check the media.  Do not

7    follow any kind of news coverage on the story.

8            Have a great evening.  See you tomorrow morning.

9            (Jury out.)

10           THE COURT:  Mr. Reiss is up first thing tomorrow?

11           MR. S. KULWIN:  Yes, your Honor.

12           THE COURT:  And you anticipate his testimony will

13   be --

14           MR. S. KULWIN:  Couple hours.

15           THE COURT:  -- three hours on direct?

16           MR. S. KULWIN:  Three hours.  Maybe less.

17           THE COURT:  Okay.

18           And then --

19           MR. NOVACK:  We told Mr. Trump to be here around

20   10:30 or 11:00.  So, I want to make sure that's consistent

21   with Mr. Kulwin's schedule.

22           THE COURT:  I am guessing that is early.

23           MR. S. KULWIN:  That's early.

24           MR. NOVACK:  That's early.

25           THE COURT:  I am guessing that is early.

1          MR. NOVACK:  What time do you think he could --

2          THE COURT:  Well, wait, wait.

3          You said roughly three hours probably.

4          How long do you think your examination of Mr. Reiss

5     will be?

6          MR. NOVACK:  It will be about -- if Mr. Kulwin didn't

7     cover anything that we wanted to cover, it would be about an

8     hour-and-a-half, something like that.

9          MR. SHONKWILER:  Hour-and-a-half to two.  But he will

10    for sure --

11         MR. NOVACK:  Hour-and-a-half to two.  We anticipate

12    he'll say a lot.  So, say an hour, hour-and-a-half.

13         THE COURT:  I do not think Mr. Trump needs to be here

14    until after lunch.

15         MR. NOVACK:  Thank you.

16         THE COURT:  And you can tell him that.  And we will

17    see where we are.  But even if you finish early and we have to

18    take an earlier lunch, we can do that.  But I do not think you

19    will, based on my knowledge of the case and what you are

20    telling me.

21         Okay.  So, you should be here tomorrow morning,

22    please, by 9:00 o'clock.  If there is anything you need me to

23    take up at that time, I will take it up.  And you should be

24    ready to go.  Mr. Reiss should be here ready to go.  He will

25    be the first witness.  And I do expect that will take at least

1   the morning and probably spill over after lunch.

2           MR. NOVACK:  I'm assuming you would like him to wait

3   outside and be called once the jury is here and bring him in?

4           THE COURT:  You can bring in Mr. Reiss first, since

5   he is the first witness.

6           MR. NOVACK:  Okay.

7           THE COURT:  You can bring him in.  He can --

8           MR. NOVACK:  Should he sit up on the stand?

9           THE COURT:  Wait until I am done with my other

10  morning matters; but, yes, I will direct him.  He can come up

11  to the stand and wait for the jury.

12          MR. NOVACK:  Thank you.

13          MR. S. KULWIN:  I do have one thing, Judge.

14          THE COURT:  Yes.

15          MR. S. KULWIN:  And I going to ask you to reconsider

16  rather than take up time tomorrow morning.  You're familiar

17  with the issue.

18          We had as exhibits a number of other lawsuits pending

19  that you excluded as "other act" evidence.  Mr. Novack just

20  told the jury that the e-mail in which Ms. Goldberg says, "I

21  don't think there would be a court case," meant that she was

22  admitting that she wouldn't have a court case if it allowed

23  them to revise the documents.  That's exactly what he just

24  said.

25          He knows that when Ms. Goldberg was asked about that,

1    she was referring to court cases that were already pending

2    against Mr. Trump for breaching the deal.

3            I would ask you to reconsider letting us go into

4    those with her on the stand.  It's only fair, Judge.  He

5    opened the door.

6            THE COURT:  Do you want to respond?

7            MR. NOVACK:  She is saying that there's no court

8    case.  It doesn't matter what she's talking about.  There's no

9    court case against Trump if they had the right to revise.

10   That's the admission that's in that e-mail.  This is an

11   exhibit that they marked in evidence.  It's their exhibit.

12   And that doesn't open the door to anything.

13           MR. S. KULWIN:  If you --

14           THE COURT:  I will take it under advisement until

15   tomorrow morning.

16           MR. S. KULWIN:  Okay.

17           And can we -- we're going to look for her deposition

18   testimony on that --

19           THE COURT:  That is fine.

20           MR. S. KULWIN:  -- and send it to you.

21           THE COURT:  If you want me to look at it beforehand,

22   e-mail it to --

23           MR. S. KULWIN:  We will, Judge.

24           THE COURT:  -- somebody --

25           MR. NOVACK:  If I may say, it doesn't matter what she

1  says.  If that's the way she wants to -- you know, she wrote

2  these words.  We're just taking those words at their face

3  value.

4          MR. S. KULWIN:  No.  The words -- as you know, Judge,

5  the words say, "If that were true, I don't think there would

6  be a court case."  Okay?  "If that were true, I don't think

7  there would be a court case."

8          She knows there's a court case.  At a minimum, we're

9  allowed to rebut that.  We don't have to just eat that.

10          MR. NOVACK:  This was responsive --

11          MR. S. KULWIN:  If I may finish.

12          We don't just have to eat his interpretation,

13  especially if it's an interpretation that he knows is, in our

14  view, based on our her testimony, inaccurate.

15          MR. NOVACK:  This was all in response -- the door was

16  opened by Mr. Kulwin.  He said that earlier in that e-mail she

17  says that Trump had no right to do that.

18          MR. S. KULWIN:  Right.

19          MR. NOVACK:  And now she's saying but if he had --

20  but if the agreement let him do it, there wouldn't be a court

21  case.  So, he had no right to do it is there's a court case,

22  and -- but if there was an agreement that he could change it,

23  there's no court case.  It's all symmetrical.

24          MR. S. KULWIN:  No.

25          THE COURT:  I will see you tomorrow morning.

102

1          MR. S. KULWIN:  Thank you.

2          MR. NOVACK:  Thank you, Judge.

3          (Whereupon, an adjournment was taken at 5:05 o'clock

4     p.m., until 9:00 o'clock a.m., the following day, May 14,

5     2013.)

6                    *     *     *     *     *

7

8  We certify that the foregoing is a correct transcript from the
   record of proceedings in the above-entitled matter.
9

10
   /s/ Joseph Rickhoff                    May 13, 2013
11 Official Court Reporter

12 /s/ Mary Hacker                        May 13, 2013
   Official Court Reporter
13

14

15

16

17

18

19

20

21

22

23

24

25