```
 1                    IN THE UNITED STATES DISTRICT COURT
                      NORTHERN DISTRICT OF ILLINOIS
 2                           EASTERN DIVISION

 3   JACQUELINE GOLDBERG,              ) Docket No. 09 C 6455
                                       )
 4                        Plaintiff,   )
                                       )
 5              vs.                    )
                                       )
 6   401 NORTH WABASH VENTURE, LLC,    )
     a Delaware Limited Liability      )
 7   Company, et al.,                  ) Chicago, Illinois
                                       ) May 14, 2013
 8                       Defendants.)  ) 9:00 o'clock a.m.

 9                            VOLUME TWO
                      TRANSCRIPT OF TRIAL PROCEEDINGS
10         BEFORE THE HONORABLE AMY J. ST. EVE, AND A JURY

11   APPEARANCES:

12   For the Plaintiff:        KULWIN, MASCIOPINTO & KULWIN, LLP
                               BY:  MR. SHELLY B. KULWIN
13                                  MR. JEFFREY R. KULWIN
                               161 North Clark Street, Suite 2500
14                             Chicago, Illinois  60601

15   For the Defendants:       NOVACK AND MACEY, LLP
                               BY:  MR. STEPHEN NOVACK
16                                  MR. JOHN F. SHONKWILER
                               100 N. Riverside Plaza, Suite 1500
17                             Chicago, Illinois  60606

18   Also Present:            MS. ALEXIS ROBINSON

19   Court Reporter:          MR. JOSEPH RICKHOFF
                              MS. NANCY C. LABELLA
20                            Official Court Reporter
                              219 S. Dearborn St., Suite 1222
21                            Chicago, Illinois  60604
                              (312) 435-6890
22
                     * * * * * * * * * * * * * * * * *
23
                         PROCEEDINGS RECORDED BY
24                        MECHANICAL STENOGRAPHY
                     TRANSCRIPT PRODUCED BY COMPUTER
25
```

```
 1              THE CLERK:  09 C 6455, Goldberg v. 401 North Wabash
 2   Venture.
 3              MR. S. KULWIN:  Good morning, your Honor.  Shelly
 4   Kulwin and Jeffrey Kulwin on behalf of the plaintiffs.
 5              THE COURT:  Good morning.
 6              MR. NOVACK:  Good morning, Judge.  Steve Novack and
 7   John Shonkwiler on behalf of the defendants.
 8              MR. SHONKWILER:  Good morning, your Honor.
 9              THE COURT:  Good morning.
10              We are here to continue trial.  Is Mr. Reiss here?
11              MR. SHONKWILER:  Yes, your Honor, he is.
12              THE COURT:  Okay.  Great.  We will get started with
13   him.  I do not know what jurors we are missing, but Danny will
14   be back soon to tell me.
15              I did receive plaintiff's motion for a curative
16   instruction regarding the opening statements.  I received
17   defendants' response this morning.  And here is my ruling:
18   Your motion for a curative instruction due to improper
19   comments made during defendants' opening statement is denied
20   in large part.
21              I am denying it in terms of requesting any kind of
22   curative instruction.  I do not believe either legally or
23   factually a curative instruction is necessary or appropriate.
24   I will remind the jurors this morning that opening statements
25   are not evidence and I will instruct them on the law, and what
```

1    I say on the law is what controls.

2         Second, the defendants' comments yesterday have not

3    opened the door generally to evidence of prior litigation, as

4    I previously ruled.  However, the comments yesterday have

5    opened the door to you questioning Ms. Goldberg about her

6    e-mail and what she was referring to.  And she may testify

7    that she was referring to other litigation referenced in that

8    Tribune article.

9         So your motion is denied in large part, granted in

10   part.

11        MR. S. KULWIN:  Judge, could we just submit for the

12   record the proposed curative instruction?

13        THE COURT:  Yes, you can hand it up to me.

14        MR. S. KULWIN:  And just file it?

15        THE COURT:  Just file it.  I do not think you

16   included that in your filing.

17        MR. S. KULWIN:  No, I just drafted it this morning.

18        THE COURT:  Okay.  If you want to file that, you may.

19   But I am not going to give that.  I do not think that is

20   necessary.

21        MR. S. KULWIN:  And just to put one final point on

22   it.  I won't belabor it anymore.  It's not just that it

23   misstates the evidence.  Mr. Novack made a specific point to

24   discredit me in front of the jury, to say I was hiding things

25   when he -- that there's no interpretation of this e-mail that

1   could in any way be viewed as what he's saying.  It's not

2   possible, Judge.  And to put that up there -- this whole

3   trial, every day now, they're going to be thinking, well, she

4   admitted it.  And we have to wait until we call her?  I have

5   to rearrange my evidence on that?  It is -- it is patently

6   unfair.  It's prejudicial.  I'm just saying it's wrong.

7          THE COURT:  I understand.  And I have read your

8   submission, and I respectfully disagree.  I will remind them

9   that they have not received any evidence yet.  I do not think

10  he attacked you.  I certainly did not take it that way.  And

11  my guess is in closing arguments, we are going to hear

12  Ms. Goldberg's view.  And Ms. Goldberg can now testify about

13  the fact that she was referring to other lawsuits.

14         MR. S. KULWIN:  And -- and the article -- the

15  newspaper article is going to be allowed to come into evidence

16  so that she can -- so it's not just her word?

17         THE COURT:  Well, I have not said that.  I will get

18  to that when you get to her.  But she can certainly refer to

19  it.

20         MR. NOVACK:  Judge, I had two things I wanted to

21  raise after reading the transcript from yesterday.

22         One is, when we asked your Honor for the --

23  permission to use Exhibit 522, that's the lawyer letter, in

24  our opening --

25         THE COURT:  Yes.

```
 1              MR. NOVACK:  -- you said that you were not going to
 2   let me do that and reserved judgment on foundation.  But you
 3   thought foundation could be an issue because the letter was
 4   unsigned.  And I just want to --
 5              THE COURT:  I said I was not sure and I would make
 6   that determination in the --
 7              MR. NOVACK:  No, I know that.
 8              THE COURT:  -- in the context of the testimony.
 9              MR. NOVACK:  I know that.  But I thought the
10   transcript said that you said that it was also unsigned.  I
11   just wanted to --
12              THE COURT:  It is unsigned.
13              MR. NOVACK:  It is not --
14              THE COURT:  The version you gave me was unsigned, and
15   I did say it was unsigned.
16              MR. NOVACK:  Judge, it's signed by Ms. DeAngelis,
17   Goldberg's lawyer.  That's the important thing because she was
18   sending the letter.  It's unsigned by Trump because it says
19   "agreed and accepted."  They wouldn't agree.  In fact, the
20   whole point of this is it is unsigned by Trump.  So it's not
21   an unsigned letter is the point.
22              And the final thing is you asked --
23              THE COURT:  I will still take it up in the context of
24   the witness.
25              MR. NOVACK:  No.  I understand.  I'm not asking you
```

1    for a ruling.  I just wanted to --

2              THE COURT:  What is your next question or issue?

3              MR. NOVACK:  My next question, your Honor, is that

4    yesterday morning you asked Mr. Kulwin to tell us by the end

5    of the court day who the order of his next witnesses are.  And

6    we e-mailed and we don't have that yet.

7              THE COURT:  And I did not ask you.

8              MR. S. KULWIN:  Right, Judge.  The problem has been

9    because every time we have come up with an order, it switches.

10   So what we were doing yesterday was trying to figure out who

11   we could fill in.

12             THE COURT:  So you have Mr. Reiss first.

13             MR. S. KULWIN:  Mr. Reiss.

14             THE COURT:  And then Mr. Trump.

15             MR. S. KULWIN:  And then Mr. Trump and then we have

16   Mr. Shearer.  And the person we wanted to put in there in

17   between, we weren't sure if they were available.

18             THE COURT:  Who is that?

19             MR. S. KULWIN:  That would be Ms. Vogue.

20             THE COURT:  Is she available?

21             MR. S. KULWIN:  We don't think so.  She's not

22   available tonight.  So that would probably take us to

23   Mr. Petrus.

24             THE COURT:  Okay.

25             MR. S. KULWIN:  And then we're just going to have to

1   kind of back and fill because of -- then we have Ms. Cremer.

2           THE COURT:  Right.  Who will be here on Thursday?

3           MR. S. KULWIN:  Thursday.

4           THE COURT:  My guess is that Mr. Reiss and Mr. Trump

5   and Mr. Shearer will take us into tomorrow and maybe close to

6   lunchtime tomorrow.

7           MR. S. KULWIN:  I would say that that's a decent

8   guess.

9           THE COURT:  Just based on what you have told me and

10  what I have seen and what I have seen so far.

11          MR. NOVACK:  Well, just for travel times, does that

12  mean Mr. Petrus might be called tomorrow?

13          THE COURT:  Yes.

14          MR. S. KULWIN:  Yes.

15          THE COURT:  And he should be here.  How long do you

16  anticipate Mr. Petrus' testimony, ballpark?

17          MR. S. KULWIN:  Checking.  Please hold.

18    (Brief pause.)

19          MR. S. KULWIN:  About an hour and a half or two.

20          THE COURT:  And who would be after Mr. Petrus if we

21  are not up to Ms. Cremer yet?

22          MR. S. KULWIN:  After -- we would be reading some of

23  Mr. Weiss after Mr. Petrus.

24          THE COURT:  All right.  We will talk at the end of

25  the day too and see where you are.

```
 1                I am going to take a quick break.  Our jury is all
 2      here.
 3                MR. S. KULWIN:  The list for this afternoon.
 4         (Tendered.)
 5                THE COURT:  Okay.  I will be right back, and we will
 6      bring in the jury.  If you would please bring Mr. Reiss in,
 7      and he can get up on the witness stand.
 8                Are you going to use --
 9                MR. S. KULWIN:  Yes, Judge.
10                THE COURT:  -- this?
11                I do not care if you use it.  I just do not want you
12      to block my view of the jury.
13                MR. S. KULWIN:  Right.
14                We gave you the list of exhibits.  Are those exhibits
15      now considered admitted?
16                THE COURT:  No.  You have not moved anything into
17      evidence.
18                MR. NOVACK:  Can we do that now?
19                MR. S. KULWIN:  Can we do that now?
20                THE COURT:  Sure.  I will be right back.
21         (Recess taken.)
22                THE COURT:  Mr. Reiss, you may come up, sir.
23                Do you want to move in those exhibits?
24                MR. S. KULWIN:  Yes, Judge.
25                THE COURT:  Whenever you're ready, Mr. Kulwin.
```

1          MR. S. KULWIN:  The plaintiff moves in Plaintiff's

2     Exhibit 1A, 1B, 2 through 4, 6 through 12, 21, 25A, 25B, 29,

3     33, 43, 45, 47, 48, 60A, 60B, 73.

4          Where's 75?

5     (Brief pause.)

6          MR. S. KULWIN:  62, 73, 79-2.

7          THE COURT:  I am sorry.  62, 73.  What was next?

8          MR. S. KULWIN:  79-2, 79-3, 80 and 81.

9          MR. SHONKWILER:  And those -- there's no objection

10    from the defendant to those plaintiff's exhibits.

11         THE COURT:  I will admit those plaintiff's exhibits.

12         MR. SHONKWILER:  And defendants move to have the

13    following defendants' exhibits admitted:  501 through 504, 506

14    through 512, 515 through 516 -- I'm sorry -- 515, 516, 518,

15    526, 527, 531, 533, 534, 535, 538, 539, 540, 558, 559, 563,

16    567, 573, 575, 576, 580, 583, 584, 586, 587, 588, 590, 591,

17    592, and 601 through 606.

18         And the one question, if we get to the end of trial,

19    your Honor, and we feel like there's a lot of paper that

20    really hasn't been used before the witnesses and hasn't been

21    discussed in testimony and we are interested in voluntarily

22    withdrawing some of our exhibits, will we have an opportunity

23    to do that?  We just don't want to overburden them with

24    information.

25         THE COURT:  Mr. Kulwin?

1     MR. S. KULWIN:  If they move them in, they move them

2  in, Judge.  That's my view.

3     THE COURT:  I agree.  They are in evidence.  I will

4  admit these, I assume without objection.  We can revisit at

5  the end.  They are in evidence.  I think the question is

6  should they go back if for some reason --

7     MR. SHONKWILER:  I think that's what I mean, yes.

8     MR. S. KULWIN:  One last consultation with Mr. --

9     THE COURT:  The jury is ready, so quickly, please.

10  (Brief pause.)

11     THE COURT:  Okay.  Bring in the jury, please, Danny.

12  (Jury in.)

13     THE COURT:  You may be seated.

14     Good morning, ladies and gentlemen.

15     Just a reminder, yesterday you heard the opening

16  statements from both attorneys.  Opening statements are not

17  evidence.  You are about to start hearing the evidence today,

18  and that is what we will do over the next few days and the

19  rest of this week certainly.

20     Also a reminder, as I told you in opening comments to

21  you when we began with the jury selection yesterday, at the

22  end of the case, I will instruct you on the law.  And those

23  instructions will contain the law that controls in this case.

24     Mr. Kulwin, your first witness.

25     MR. S. KULWIN:  Thank you, your Honor.  At this time

Reiss - direct

113

1    plaintiff calls Charles Reiss.

2              THE COURT:  Mr. Reiss, please raise your right hand,

3    sir.

4              CHARLES REISS, PLAINTIFF'S WITNESS, SWORN

5                        DIRECT EXAMINATION

6    BY MR. S. KULWIN:

7    Q.  Good morning, Mr. Reiss.

8    A.  Good morning.

9    Q.  Sir, could you state your name, please, spell it out, the

10   last.

11   A.  Charles Reiss, R-e-i-s-s, as in Sam.

12   Q.  And how old are you, sir?

13   A.  I'm 70.

14   Q.  Now, Mr. Reiss, you hold a bachelor's of arts in

15   architecture, correct?

16   A.  That's correct.

17   Q.  You received that from Cooper Union University in New

18   York?

19   A.  Yes.

20   Q.  You also have a master's degree in planning from New York

21   University?

22   A.  Yes.

23   Q.  You've been a private consultant in the real estate

24   business for the last eight years?

25   A.  Yes.

Reiss - direct

1   Q.  Following your master's degree, you worked for a private

2   consultant doing development plans for downtown New York City?

3   A.  No.  Doing development plans for small town -- small

4   cities in the eastern part of the United States.

5   Q.  Okay.  Following that, you worked for the chairman of a

6   non-profit public/private group advising the then-mayor of New

7   York City John Lindsay on urban design?

8   A.  That's correct, yes.

9   Q.  The chairman of that non-profit was William S. Paley?

10  A.  Yes, he was.

11  Q.  He was then the chairman of CBS?

12  A.  Chairman, president and owner of CBS.

13  Q.  And owner.  All right.  A very big guy?

14  A.  Yes.

15  Q.  And you were working with him?

16  A.  Yes.

17  Q.  You worked for New York City beginning in 1979, and you

18  became an assistant commissioner for housing?

19  A.  Yes, I did.

20  Q.  Later, for five years, you were the deputy commissioner of

21  New York City housing?

22  A.  Yes.

23  Q.  You then had your own consulting practice for eight years?

24  A.  Yes, I did.

25  Q.  Between 1990 and 1993, Mr. Trump became your client?

Reiss - direct

1  A.  That's correct.

2  Q.  At that time Mr. Trump was developing a very large

3  property on the west side of Manhattan, correct?

4  A.  Yes.

5  Q.  A large group of -- good government groups had sued him to

6  stop that development, true?

7  A.  That's correct.

8  Q.  They hired you to ensure that Mr. Trump would be more

9  respectful of the negotiated deal that the parties entered

10 into for him to build that building in a certain way, correct?

11 A.  That's correct.

12         MR. SHONKWILER:  Objection, relevance.

13         MR. S. KULWIN:  It goes to his background, Judge.

14         THE COURT:  Overruled.  The answer may stand.

15 BY MR. S. KULWIN:

16 Q.  Can I just hear the answer again?

17 A.  Yes.

18 Q.  Okay.  And it was that Mr. Trump would actually build the

19 building that parties agreed he would build without their

20 objections, right?

21 A.  I'm sorry.  I didn't hear.

22 Q.  The issue was that they wanted him to -- have Mr. Trump

23 actually build the building that he had agreed he would build

24 without objection?

25 A.  That's correct, yes.

                              Reiss - direct
                                                                    116

 1   Q.  One with more public space, less density and higher

 2   quality of design, true?

 3   A.  True, yes.

 4          MR. SHONKWILER:  Objection.  This is barred by a

 5   motion in limine regarding prior conduct and prior litigation.

 6          MR. S. KULWIN:  No, Judge.  No such motion was filed

 7   on this issue.

 8          THE COURT:  Overruled.

 9   BY MR. S. KULWIN:

10   Q.  Shortly after that, in 1993, you closed your private

11   consulting business and went to work for the Trump

12   organization?

13   A.  Yes, I did.

14   Q.  You worked for them from 1993 until the summer of 2004?

15   A.  That's correct.

16   Q.  At that time you left to become the chief operating

17   officer of the Sunshine Group, a luxury condo brokerage firm,

18   right?

19   A.  That's right.

20   Q.  You stayed there for a year, and then you opened up your

21   private consulting firm again, right?

22   A.  Yes.

23   Q.  Now, the private consulting firm you've been doing since

24   2005 includes preparing hotel condominium plans, right?

25   A.  Yes.

Reiss - direct

117

1   Q.  And that's what's referred to in Illinois as property

2   reports; is that right?

3   A.  That's correct.

4   Q.  And to prepare hotel condominium plans, you have to have a

5   certain amount of expertise in hotel condominiums to do that,

6   right?

7   A.  Yes.

8   Q.  And that type of hotel condominium planning would also

9   include mapping?  In other words, deciding what's going to be

10  in the common elements, what's not going to be in the common

11  elements, how the building is going to be divided up, right?

12  A.  That's right.

13  Q.  And it also would include preparing operating budgets for

14  the hotel portions of the proposed hotel condominium project,

15  right?

16  A.  Yes.

17  Q.  And the allocation systems associated with those budgets,

18  true?

19  A.  Yes.

20  Q.  Now, in some of these hotel condominium buildings, there's

21  both residential and hotel condominiums, correct?

22  A.  Yes.

23  Q.  And you'd work on allocating how the operating expenses of

24  the whole building would be split up, right?

25  A.  That's correct.

Reiss - direct

118

1   Q.  Between the hotel condos and the residential condos, true?

2   A.  That's correct.

3   Q.  Now, today, sir -- oh, and that would also obviously

4   involve -- be -- excuse me; it's early in the morning --

5   dealing with the hotel budget, right?  You have to deal with

6   that too?

7   A.  That's correct.  Just one other thing.  There may be other

8   condominium regimes in a building in addition to hotel and

9   residential, such as commercial or office.

10  Q.  Right.  And the commercial condominium is something where

11  there's commercial space in the building and that's sold as a

12  separate condominium to someone else, right?

13  A.  Or retained by the owner.

14  Q.  Or retained by the owner.  That happens all the time when

15  they divide up these buildings, right?

16  A.  Yes.

17  Q.  In other words, the owner goes in and says, okay, I'm

18  going to build this hotel condominium unit building; we're

19  going to have 47 residential or 100 residentials, 89 hotel

20  rooms or 200 hotel rooms, and then we're going to have

21  commercial space, right?

22  A.  Yes.

23  Q.  And I'm going to keep that commercial space for myself,

24  right?  They do that, true?

25  A.  That's correct.

Reiss - direct

119

1   Q.  And they try to make those decisions as they're -- as

2   they're building the project so they know how it's going to be

3   divided up because it all has to be disclosed on the property

4   report, right?

5   A.  That's correct.

6   Q.  Now, you're represented by Mr. Trump's attorneys here

7   today?

8   A.  Yes, I am.

9   Q.  You met with them to prepare for your testimony, true?

10  A.  Yes.

11  Q.  The legal services are being provided at Mr. Trump's

12  expense?

13  A.  Yes.

14  Q.  You own a hotel condominium in Trump Tower?

15  A.  Yes.

16  Q.  You bought that at a discounted price from what was being

17  offered to the general public, right?

18  A.  I bought it under -- if I can elaborate a little more?

19  Q.  Sure.  You bought it --

20  A.  I bought it under a program called friends and family.

21  Q.  Right.  And under the friends and family program, if you

22  bought it before the sales office opened, you got a 10 percent

23  discount, right?

24  A.  That's correct.

25  Q.  And I can't recall what your unit cost, but if I

Reiss - direct

1   understand it, if you were buying a million dollar property,

2   you'd get a hundred thousand dollar discount, right?

3   A.  That's my recollection.

4   Q.  Right.  Okay.  And you would have bought that -- because

5   you had to buy it before the sales office opened, you would

6   have had to buy it before 2003, right?

7   A.  I don't know the exact date we bought it.  But the sales

8   office opened in September of -- September 2003, so sometime

9   prior to that.

10  Q.  Right.  And at the time you bought it then, the ballrooms,

11  the meeting rooms, the revenue from those facilities, they

12  weren't in the common elements yet?  That didn't happen until

13  2004, correct?

14  A.  No, that's not correct.

15  Q.  Sir, isn't it true, sir, that the first amended property

16  report was the first time that ballrooms, function rooms and

17  hotel revenue was placed into the property report?

18  A.  In the initial -- in the initial plan, the plan that was

19  in place when the sales office opened and before the offices

20  were dropped, there was a smaller component of boardrooms and

21  meeting rooms.  It was much smaller, but it was in the

22  common -- it was in the common elements.

23  Q.  Perhaps you didn't hear my question.  My question was,

24  sir:  When you bought, there were no ballrooms, were there?

25  A.  There were no ballrooms, but there were meeting --

Reiss - direct

121

1    Q.  There were no --

2    A.  -- rooms.

3    Q.  No.  There were no expansive meeting rooms, were there?

4    A.  That's correct.

5    Q.  There was no $5 million of revenue from the ballroom and

6    other meeting room facilities in the hotel -- in the

7    condominium budget, was there?

8    A.  There was not.

9    Q.  There was not a million dollars of parking revenue in the

10   condominium budget, was there, when you bought?

11   A.  I don't really have any recollection about the parking.  I

12   can't --

13   Q.  If I --

14   A.  -- answer that.

15   Q.  If I represented to you that it isn't in the September '03

16   property report, would you accept that?

17   A.  I would accept it.

18   Q.  Okay.  And you bought that hotel condominium in

19   partnership with Mr. Flicker, Russell Flicker, correct?

20   A.  Yes, I did.

21   Q.  And there was another gentleman in it as well, right?

22   A.  Yes.

23   Q.  What's his name?

24   A.  Jay Neveloff.

25   Q.  And who is Mr. Neveloff?

Reiss - direct

1    A.  He's an -- he's an attorney in New York City.

2    Q.  And he works -- he represents Mr. Trump, right?

3    A.  Yes, on occasion.

4    Q.  Now, since you bought your unit before the sales office

5    opened and before the -- all the ballrooms and the $5 million

6    and things were in the common elements, you didn't base your

7    decision to buy it on the inclusion of those things in the

8    common elements; isn't that right?

9    A.  That's correct.

10   Q.  So if someone were to get up in court and stand in front

11   of this jury and say, oh, Charles Reiss bought a condo at

12   Trump Tower; and he would never buy a condo in Trump Tower

13   knowing that the common elements of ballrooms and hotel

14   facilities and things of that nature were going to be removed

15   because he'd be defrauding himself, that would be an

16   inaccurate statement, wouldn't it, because you bought when

17   they weren't in the building, true?

18        MR. SHONKWILER:  Your Honor, objection to

19   argumentative.

20        THE COURT:  Sustained.  And objection to form is

21   sustained as well.

22        MR. S. KULWIN:  Sure.

23   BY MR. S. KULWIN:

24   Q.  Sir, you -- when you bought that thing, it didn't have the

25   ballrooms and the $5 million, right?

Reiss - direct

1   A.  That's correct.

2   Q.  So you couldn't be defrauding yourself by buying that

3   thinking that, ooh, I think these ballrooms and things are

4   going to be in here, and then it turns out they weren't later,

5   right?  You couldn't do that because they weren't in there in

6   the first place, true?

7   A.  That's true.  If I understand your question, that's true.

8   Q.  Okay.  Now, by the way, you, like all of the condo

9   owners -- hotel condo owners at Trump Tower, received a letter

10   in 2008 about the change in the way the rotation point system

11   was going to work, right?

12   A.  I was not -- I am not the managing partner of the unit we

13   hold.  And the letter would have gone to either Mr. Flicker or

14   probably Mr. Neveloff.

15   Q.  But you remember talking about that letter, right, don't

16   you, with Mr. Flicker?

17   A.  I remember there was a change in the rotation point

18   system.

19   Q.  That's not my question.

20        You remember talking to Mr. Flicker and Mr. Neveloff

21   about that letter, don't you?

22   A.  Briefly --

23   Q.  Right.

24   A.  -- yes.

25   Q.  Right.  You were going to set up a conference call -- when

Reiss - direct

```
 1    the letter came out, you and Mr. Flicker and Mr. Neveloff were

 2    going to set up a conference call to discuss how you were

 3    going to vote on the matter, right?

 4    A.  I don't have any recollection of that.

 5    Q.  Okay.  Let me see if I can remind you.

 6            You gave a deposition in this case, right?

 7    A.  Yes.

 8    Q.  And you were under oath, right?

 9    A.  Yes.

10    Q.  There was a court reporter sitting in the courtroom, just

11    like this court reporter here, right?

12    A.  Yes.

13    Q.  Okay.  You had plenty of time to answer the questions,

14    true?

15    A.  Yes.

16    Q.  And you were able to make any changes you wanted to the

17    deposition after you read it if anything was inaccurate,

18    right?

19    A.  Yes.

20    Q.  Okay.  At page 225.  And here was the question:

21            Every question I've ever asked you has been other

22    than the conversations you've had with counsel.

23            Answer:  I was aware that there was -- I'm sorry.

24    Let me go back one.

25            Page 224, line 16.
```

Reiss - direct

1        Question:  Are you aware that the rental management

2    program that was first implemented at Trump Tower Chicago

3    penalized unit owners who stayed in their units by assigning

4    them an occupancy point?  Are you aware of that?

5            MR. SHONKWILER:  Your Honor, I'm sorry.  Counsel, I

6    don't see that on page 225.

7            MR. S. KULWIN:  224.

8            THE COURT:  224.

9            MR. S. KULWIN:  I changed it.

10   BY MR. S. KULWIN:

11   Q.  Then there was some banter between the lawyers.  And then

12   this was your answer:

13           I was aware that there was a change in how the

14   occupancy points were going to be calculated.  I was aware of

15   that because of communication.  My recollection is a

16   communication went from the management company to the unit

17   owners asking their opinion.  And there was -- Russ and Jay

18   attempted to set up a conference call to discuss it, and I saw

19   no reason to participate in it.  Whatever you guys want to do.

20   I don't have any intention of staying there.  It just doesn't

21   impact me.

22           Remember that answer?

23   A.  Yes.  That's why I didn't remember the conference call

24   because it didn't happen.

25   Q.  The question was, they had had an effort to set up that

1    conference call, right?

2    A.  Yes.

3    Q.  Right.  And you don't know if the conference call

4    happened, right?

5    A.  No.

6    Q.  And that was Mr. -- when you were talking about Russ and

7    Jay, you were talking about Russ Flicker and Jay Neveloff?

8    A.  Yes, I was.

9    Q.  So even these people who represented Mr. Trump and worked

10   for Mr. Trump, when they got this letter, they said, well,

11   let's have a conference call to discuss about how we're going

12   to vote on it, right?

13   A.  Yes.

14   Q.  That's what it says, true?

15   A.  Yes.

16   Q.  And to decide, well, is that fair?  Is that a fair deal,

17   right?  That's what the conference call was going to be about,

18   true?

19   A.  Yes.

20   Q.  Okay.  And -- and in addition, sir, you said to them, I

21   don't care; I'm never going to stay in the thing, right?

22   A.  Yes.

23   Q.  Because you don't stay in yours, right?

24   A.  Right.

25   Q.  And neither does Mr. Flicker or Mr. Neveloff to your

Reiss - direct

1   knowledge, true?

2   A.  To my knowledge, true.

3   Q.  But people who were buying these things with the notion

4   of, gee, I'm going to buy this, stay in it and rent it, people

5   like who lived in Chicago, that rotation point system could be

6   important to them, correct?

7          MR. SHONKWILER:  Objection, your Honor, foundation,

8   calls for speculation.

9          THE COURT:  Sustained.

10  BY MR. S. KULWIN:

11  Q.  You're aware of what -- you were there when the point

12  system was first issued, true, Mr. Reiss?

13  A.  I was there when the point system was first created.  It

14  was --

15  Q.  Right.

16  A.  It was actually created when Trump International's --

17  Chicago's predecessor was done at Columbus Circle in New York

18  City.

19  Q.  And it was put in the FAQ questions of Trump International

20  to show people that, look, you can have all the benefits of

21  owning a condo without having to worry about what's going to

22  happen with your rental opportunities.  That was the point;

23  stay as often as you like, true?  Wasn't that the point?

24  A.  That was the point when I was there, yes.

25  Q.  Right.  Okay.  And so I go back to my other question:  The

Reiss - direct

1  point was -- which didn't affect you because you never stayed

2  in your unit -- was to say, hey, gee, if you can buy this

3  thing, stay in it as much as you want and don't worry, it's

4  all the benefits of owning a condo, but it won't lessen your

5  chances to rent it down the road, right?

6  A.  That's the idea of not giving a rotation point when an

7  owner stays in the unit, that's correct.

8  Q.  And so in '07 when they changed it, even Mr. Neveloff and

9  Mr. -- now, again, let me lay the foundation for this.

10       Mr. Neveloff and Mr. Flicker, they weren't going to

11  stay in theirs either, right, to your knowledge, based on your

12  experience with them, true?

13  A.  Yes.

14  Q.  So the reason they were having a conference call about it

15  is they wanted to know amongst themselves and you how is this

16  change going to affect the value of our unit if we want to

17  sell it down the road to somebody who was going to stay there,

18  right?

19       MR. SHONKWILER:  Objection, calls for speculation.

20       THE COURT:  Sustained.

21  BY MR. S. KULWIN:

22  Q.  Were you aware of why they were having the conference

23  call, sir?

24  A.  As I testified in the deposition, I was totally

25  uninterested in it.  I didn't want anything to do with it.

Reiss - direct

1   And they wanted to have a conference call, and I said, you

2   guys decide.

3   Q.  But --

4   A.  I'm not concerned about it.

5   Q.  But the point was, they told you why they wanted to have a

6   conference call, didn't they?

7   A.  My recollection of this is there was a notice from the

8   management saying there was -- there was -- there was an idea

9   on the table to change the rotation point system; and there

10  was going to be a vote of unit owners.  And the unit owners

11  had to vote on it.  And I guess Jay called his two partners in

12  the deal, myself and Russell, and said should we vote on it

13  and how would you like to vote on it.  My answer to them was I

14  don't care; vote however you want.  That's all -- that's the

15  last I had to do with it.  I don't even know how the vote was

16  resolved.

17  Q.  Okay.  I do.  Here's my question --

18  A.  Well, I don't.

19  Q.  Okay.  Here's my question to you, sir, though:  They

20  wouldn't be even thinking about discussing it, given that they

21  never stayed in their units, except to discuss what's the

22  impact on our value of the unit if this changes, right?

23          MR. SHONKWILER:  Objection.

24  BY THE WITNESS:

25  A.  No.

                              Reiss - direct
                                                                    130

 1              THE COURT:  Sustained.

 2   BY THE WITNESS:

 3   A.  I don't --

 4              THE COURT:  Wait, sir.  There is an objection.

 5              Sustained.  It is calling for speculation.

 6              Sir, if there is an objection wait for me to rule,

 7   please.

 8              THE WITNESS:  Sorry.

 9   BY MR. S. KULWIN:

10   Q.  Now, in addition to the unit that you owned in Trump Tower

11   here, you also own or owned -- you can tell me -- three hotel

12   condominium units in the Trump development in Toronto,

13   correct?

14   A.  That's correct.

15   Q.  And you have partners in that, correct?

16              MR. SHONKWILER:  Objection, relevance, your Honor.

17              THE COURT:  Overruled.

18   BY MR. S. KULWIN:

19   Q.  You have partners in those units, don't you?

20   A.  Yes, I do.

21   Q.  And one of the partners is named Trump, correct?

22   A.  Donald Trump, Jr.

23   Q.  Right.  That's Donald Trump's son, right?

24   A.  Yes.

25   Q.  So fair to say -- and you still communicate with Donald

Reiss - direct

131

 1  Trump, Jr. regarding these units, right?

 2  A.  Occasionally, yes.

 3  Q.  You're basically partners with Donald Trump, Jr. in this

 4  business venture, true?

 5  A.  That's correct.

 6  Q.  And the value of those condominiums that you're partners

 7  with Mr. Trump in is what?

 8  A.  Right now?

 9  Q.  Purchase price.

10  A.  We have not -- we have not closed on those units.

11  Q.  Okay.  But what's the purchase price?

12  A.  I don't think -- I don't remember what we purchased them

13  for.

14  Q.  Well, would it be in excess of a million dollars?

15  A.  I seriously doubt it.  The market for hotel

16  condominiums --

17  Q.  Well --

18  A.  -- in Toronto is very bad.  That's one of the reasons we

19  haven't closed.

20  Q.  The question is -- oh.  So because you agreed to buy it

21  and the market went bad, now you're thinking of backing out?

22  A.  We're not bailing out.

23  Q.  My question --

24  A.  We just have not resolved the closing.

25  Q.  My question is:  The purchase price, sir -- not what it's

Reiss - direct

132

1  worth -- what did you and Mr. Trump, your partner, agree to

2  pay for those three units?

3  A.  I don't remember.  Probably around 600,000 or 700,000 for

4  the three units.  But I could be wildly off.  It was a long

5  time ago.

6  Q.  Okay.  Can't recall?

7  A.  No, I can't.

8  Q.  Okay.  Now, in addition, sir, you worked on the Trump

9  Tower project for a long time, right?

10  A.  In Chicago?

11  Q.  Uh-huh.

12  A.  Yes.

13  Q.  And you had an emotional attachment to the project, right?

14  A.  Yes, I did.

15  Q.  Now, turning to 2003 and 2004, you're -- I'm sorry.

16  Turning to 1993 when you first began, your title was assistant

17  vice president for development, correct?

18  A.  I believe that's correct.

19  Q.  Your final title before leaving was executive vice

20  president for development, true?

21  A.  That's my recollection, yes.

22  Q.  Your duties during this time period included land use

23  review, right?

24  A.  Correct.

25  Q.  And that involves determining what type of project can be

Reiss - direct

133

1  built at a particular location under particular zoning

2  ordinances, right?

3  A.  Correct.

4  Q.  During that time you were also involved in real estate and

5  business management of the Trump organization, true?

6  A.  Yes.

7  Q.  You were involved in marketing and sales for the Trump

8  organization, true?

9  A.  True, yes.

10  Q.  And marketing and sales means helping design and come up

11  with ideas for how we're going to sell condominium units and

12  residential units and hotel condominium units, true?

13  A.  True.

14  Q.  You were also involved in project planning, right?

15  A.  That's correct.

16  Q.  And that involved basically developing, like you talked --

17  like what you do now as a consultant; you develop how the

18  building is going to look, how it's going to be divided up,

19  things of that nature, right?

20  A.  In consultation with architects, in consultation with the

21  team principal, in consultation with the owners, in

22  consultation with the investors.

23  Q.  Right.

24  A.  It's very much a collaborative team concept.

25  Q.  And the owners are one of the collaborative team members,

Reiss - direct

134

 1    right?

 2    A.  Yes, they are.

 3    Q.  Because, after all, it's their project, right?

 4    A.  That's right.

 5    Q.  And they want to know what's going on because they're the

 6    ones who are putting down the big money, right?

 7            MR. SHONKWILER:  Objection, speculation.

 8            THE COURT:  Sustained.

 9    BY MR. S. KULWIN:

10    Q.  Based on the ones you're dealing with, sir?

11    A.  In my consultancy practice, I pay particular attention to

12    the ideas and satisfaction of the people who employ me.

13    Q.  Now, one of the things you were involved in is development

14    of the Trump organization's hotel condo project in New York,

15    right?

16    A.  Yes.

17    Q.  You were involved in it from the inception, true?

18    A.  Yes.

19    Q.  You were the managing director of that project from the

20    time it opened in 1997 until you left in 2004, right?

21    A.  Yes.

22    Q.  As managing director of the New York -- the Trump New York

23    hotel condominium unit, you were the liaison between the Trump

24    organization and the general manager of the building, right?

25    A.  I'm sorry.  Could you restate it?

Reiss - direct

135

1  Q.  As the managing director, you were the liaison between the

2  Trump organization and the general manager of the building,

3  right?

4  A.  Yes.

5  Q.  You served as the general manager's advisor on a number of

6  manners -- matters having to do with running the building,

7  right?

8  A.  Yes.

9  Q.  And you also worked on Trump Tower Chicago during that

10  time period of '98 to 2003 at the same time, right?

11  A.  That's correct.

12  Q.  During the entire time that you were doing all this work,

13  Mr. Reiss, you reported directly to Donald Trump; isn't that

14  right?

15  A.  Yes.

16  Q.  And you -- and that's Donald Trump, Sr., not Jr.?

17  A.  Yes.

18  Q.  And you supervised Jill Cremer, right?

19  A.  Yes.

20  Q.  And Russ Flicker?

21  A.  Yes.

22  Q.  And during those years, was Ms. Cremer's basic position

23  director of sales?

24  A.  Yes.

25  Q.  And Mr. Flicker's position was assistant vice president

Reiss - direct

136

1    for development, right?

2    A.   That's right.

3    Q.   During the time you were with the Trump organization, you

4    developed an expertise in hotel condominium unit development,

5    right?

6    A.   Yes, I believe so.

7    Q.   You gave presentations to other developers and attorneys

8    at conferences held on the pluses and minuses of hotel

9    condominium developments, right?

10            MR. SHONKWILER:  Objection, relevance, your Honor.

11   There's no content question.

12            THE COURT:  Sustained.  Clarify the time frame you

13   are talking about.

14   BY MR. S. KULWIN:

15   Q.   Do you remember giving conferences like that?

16            MR. SHONKWILER:  Same objection, your Honor.

17            THE COURT:  You may answer yes or no, sir.  And then

18   lay a foundation.

19   BY THE WITNESS:

20   A.   I do remember, yes.

21   BY MR. S. KULWIN:

22   Q.   When was that, sir?

23   A.   That was after I left the Trump organization.

24   Q.   In 2005?

25   A.   In 20005 when I was working for the Sunshine Group.  And

Reiss - direct

137

1     also, there were one or two conferences when I had my own

2     consultancy after that.

3     Q.  So in 2005 while Mr. Flicker was still at Trump, or early

4     on -- had he gone by then?  You're giving me a look.

5     A.  Russell left the Trump organization, I believe, in

6     December of 2004.

7     Q.  In any event, in 2005, you were giving presentations to

8     other developers and attorneys at conferences being held on

9     the pluses and minuses of hotel condominium development,

10    right?

11            MR. SHONKWILER:  Same objection, relevance.

12            MR. S. KULWIN:  Now it is relevant, Judge.

13            THE COURT:  Overruled.  You may answer.

14    BY THE WITNESS:

15    A.  Yes.

16    BY MR. S. KULWIN:

17    Q.  And that expertise that you were -- and these attorneys

18    and other developers, these were people in the hotel

19    condominium business, right?  That's why you were speaking to

20    them, true?

21    A.  They were -- they were people in the hotel condominium

22    business or people who wanted to be in the hotel --

23    Q.  Right.

24    A.  -- condominium business.

25    Q.  In fact, sir, you gave the opening presentation to

Reiss - direct

138

1   hundreds of attendees at that 2005 conference at an annual

2   presentation put on by James Butler's firm -- law firm in Los

3   Angeles, gathering all those type of people together, right?

4   A.  Yes.  It was in Palm Beach.

5   Q.  Palm Beach, California.  Right.  And the Butler law firm

6   was one of the leading law firms in the country involved in

7   hotel condominium development, right?

8   A.  That's correct.

9   Q.  And, by the way, one of the attendees who was coming to

10  hear you speak on your expertise at that conference was a man

11  named Brent Howie, wasn't he?

12          MR. SHONKWILER:  Objection, no foundation and

13  relevance.

14          THE COURT:  Sustained on foundation and form.

15  Rephrase it.

16          MR. S. KULWIN:  Sure.

17  BY MR. S. KULWIN:

18  Q.  Mr. Reiss, you've heard of Brent Howie, haven't you?

19  A.  No.

20  Q.  No?  Never met him?

21  A.  I may have met him.  I don't recall the name.

22  Q.  In any event, sir, this expertise that you -- that gave

23  you sufficient gravitas, sufficient credibility to give a

24  presentation to such an august group was the expertise in

25  hotel condo development that you developed between 1995 when

Reiss - direct

139

1   you started working on those projects for Trump until 2000- --

2   August of 2004 when you left, correct?

3   A.   That's -- must be why they chose me to speak, yes.

4   Q.   Right.   They didn't chose you -- they didn't choose you

5   because you were a dumbo and didn't know anything about the

6   business, right?

7        Right?

8   A.   Yes.

9   Q.   They wanted someone who knew -- who was an expert in the

10  field who could impart their knowledge, their wisdom, their

11  intelligence about these projects to others, right?

12       MR. SHONKWILER:   Objection, calls for speculation.

13       THE COURT:   Sustained.

14  BY MR. S. KULWIN:

15  Q.   You spoke to them about your knowledge, your expertise in

16  the hotel condominium development business from all that you

17  had learned between 1995 and 2005, correct?

18  A.   That's correct.

19  Q.   And when you were at Trump, you didn't hold back when you

20  were working on Trump Tower Chicago any of your expertise, did

21  you?

22  A.   Hold -- no.

23  Q.   No.   You used that same expertise and intelligence and

24  background that made you sufficiently competent to give this

25  lecture in 2005 in working on the Trump Tower Chicago project,

Reiss - direct

1   right?

2   A.  It's very much the foundation of my knowledge, correct.

3   Q.  Yeah.

4         Now, a condominium project is basically a building

5   with multiple units owned by individuals who all own the

6   common area of the building together, right?

7   A.  Yes.

8   Q.  These common areas can include anything that is not -- can

9   include anything that is not part of the individually owned

10   units, right?  Can?  Not must, but can?

11   A.  Yes.

12   Q.  And they're called common elements, right?

13   A.  Yes.

14   Q.  And the building is run by a condo board made up of unit

15   owners elected by other unit owners, true?

16   A.  Yes.

17   Q.  And in larger buildings, sir, is it your experience

18   that -- and by larger buildings, I mean like where there's a

19   hundred or more units -- is it your experience that generally

20   they hire a management company to run the building?

21   A.  Yes.

22   Q.  And the management company, among other things, manages

23   the common elements and deals with all the bills and expenses

24   relating to them and also is involved in collecting the common

25   assessment payments from the unit owners, right?

Reiss - direct

141

```
 1   A.   Yes.  The management company will often have backup
 2   systems that make it much more convenient to have a
 3   stand-alone organization.
 4   Q.   Okay.  Now, if the -- and the condo unit owners in a
 5   condominium building, they pay what are called monthly
 6   assessments, true?
 7   A.   Yes.
 8   Q.   And those assessments cover the costs, among other things,
 9   of operating the building, including paying the management
10   company, bills for maintenance for the common elements and
11   things of that nature, right?
12   A.   That's correct.
13   Q.   If those costs go up to run the building, then the common
14   assessments can go up to run -- for the unit owners, true?
15   A.   That's correct.
16   Q.   If, God forbid, something bad happens in the building,
17   they issue something called a special assessment, right?
18   A.   That's correct.
19   Q.   So if the roof fails or something like that, they'll send
20   a letter to all the owners, we need a few extra bucks to fix
21   this, true?
22   A.   That's right.
23   Q.   And, in fact, that's why condo boards usually have what's
24   called a reserve, right?
25   A.   That's right.  To the extent --
```

Reiss - direct

142

1  Q.  And --

2  A.  To the extent the reserve doesn't -- is not sufficient for

3  it, then you go to a special assessment.  But even if you do

4  go to reserve, you're going have to refill the reserve.  So

5  one way or another, it's the same money.

6  Q.  Either way you're going to have to have a special

7  assessment?

8  A.  Right.

9  Q.  Okay.  Now, if these costs of running the building go

10 down, then the assessments can go down, true?

11 A.  That's right.

12 Q.  And if there's an excess of the revenue over the expenses,

13 that can go into the reserve, right?

14 A.  Yes.

15 Q.  And the larger the reserve is, the less of a special

16 assessment that will be required if something bad happens to

17 the building, true?

18 A.  True.  But that would be a board decision what to do with

19 that --

20 Q.  Right.

21 A.  -- excess.

22 Q.  Right.

23 A.  Whether they wanted lower assessments or up their

24 reserves.

25 Q.  Right.  Either way.  But either way, it's good for the

Reiss - direct

143

```
 1   unit owners; lower the assessments, up the reserves?

 2   A.  Right.

 3   Q.  Now, in your experience, some people buy residential

 4   condos to live in, right?

 5   A.  Yes.

 6   Q.  Some of them in vacation spots or, you know, if it's

 7   something special, they might buy them as a second home,

 8   right?

 9   A.  Yes.

10   Q.  And they may rent them when they're not using them; that's

11   your experience, right?

12   A.  Where it's permissible.

13   Q.  Right.  And some people buy them as investments?

14   A.  Yes.

15   Q.  That's what you do?  You bought them as investments?

16   A.  Yes.

17   Q.  You can earn money on those investments by the difference

18   between what you rent the unit for and what it costs you to

19   own it, right?

20   A.  That's right.

21   Q.  And you can make a profit on such rentals if the rental

22   income exceeds the monthly assessments, the real estate taxes

23   and other costs associated with owning the unit, right?

24   A.  Debt service is an important --

25   Q.  I'm sorry?
```

Reiss - direct

144

```
 1   A.  Debt service is an important component of that.

 2   Q.  Debt service?  The mortgage?

 3   A.  Yes.

 4   Q.  Right.  But it's a part of it, just like the property

 5   taxes are --

 6   A.  That's right.

 7   Q.  -- and the monthly assessments, right?

 8   A.  Yes.

 9   Q.  And in some luxury buildings, the monthly assessment is

10   actually even higher than the debt service, depending on what

11   kind of loan you get --

12   A.  Yes.

13   Q.  -- right?

14           So if the assessment goes down, then, you know,

15   that's good, true?

16   A.  Yes.

17   Q.  Now, you can also -- oh, and, of course, any revenue

18   stream that can come into the condo association from a source

19   other than the common assessments is a good thing, right?

20   A.  Yes.

21   Q.  Because if they had a stream of income from some other

22   source, that too can be used to lower common assessments or

23   build a reserve and a special assessment won't be as needed or

24   as high if something wrong happens, right?

25   A.  That's right.  It's offsetting income.
```

1   Q.  Right.  And another thing that you can do with a condo is

2   you can hold it for appreciation and then make a profit on it

3   when you sell it if you hold it long enough, right?

4   A.  That's correct.

5   Q.  That's known as appreciation, true?

6   A.  Yes.

7   Q.  And that type of thing usually is a longer hold

8   proposition, right?  Usually?  Not always, but usually?

9   A.  In a booming market, it can be very quick.  But, yes.

10  Q.  Right.

11  A.  But sometimes you do very well in a very short period of

12  time.  Sometimes you don't.

13  Q.  And that's known as a flip?

14  A.  Uh-huh.

15  Q.  Right?

16  A.  Uh-huh.

17  Q.  You have to say yes.

18  A.  Yes.  I'm sorry.  Yes.

19  Q.  A flip is when you buy something once the market opens or

20  kind of at the bottom of it when it's first -- or when it's

21  first starting to get hot; and then suddenly things go up

22  really quick, you sell it, make a quick profit; that's known

23  as a flip, right?

24  A.  Yes.  Usually the common term is you flip the contract

25  before you close.  That's really the difference between the

Reiss - direct

1    two.

2    Q.  Yeah.  I was just going to ask you about that.

3          And you owned a unit in the New York condo as well,

4    right?  A hotel condo?

5    A.  I owned two units.

6    Q.  You owned two units in that one?

7    A.  Yes.

8    Q.  And you held on for quite a long time, right?  Seven

9    years?

10   A.  I owned one with someone else, which we actually couldn't

11   get along on how we were to use the unit, so we both decided

12   it was best to sell it.  And then I owned one where I stayed

13   in it a considerable amount of time for myself, and I probably

14   owned that about five or six years.

15   Q.  And then you sold it?

16   A.  And then I sold it.

17   Q.  Right.  Now, you and Mr. Trump, Jr. bought, was it three

18   residential condos in Trump Tower Chicago?

19   A.  I believe it was two.

20   Q.  Two.  Okay.  And you bought those before the sales office

21   opened as well and you got your 10 percent family and friends

22   discount, right?

23   A.  Yes.

24   Q.  And then a short time later, you flipped the contracts,

25   right?

Reiss - direct

147

1   A.  It wasn't a short time later.  I mean, it was --

2   Q.  Two years?

3   A.  It was probably maybe three years later.

4   Q.  Three years later you flipped the contracts, right?

5   A.  Right.

6   Q.  And you made a profit?

7   A.  A small profit.

8   Q.  And you took that profit and you invested in -- you took

9   your profit and invested in the hotel condo with Mr. Flicker

10  and Mr. Neveloff?

11  A.  That's correct.

12  Q.  Okay.  Now, anybody else -- for example, Ms. Goldberg, for

13  example, who also bought a residential condo in 2003 -- could

14  have, if they wanted to, done that same thing?  That wasn't

15  reserved to just someone who worked for Trump, right?

16  A.  I would have to know the nature of the contract and

17  whether it permitted a contract to be flipped prior to

18  closing.  Ours did.  I don't know.

19  Q.  But assuming that there was nothing in the contract that

20  precluded it --

21  A.  If it wasn't forbidden, then they could do it.

22  Q.  Right.  And they could -- and they might want to do that

23  unless they were a long-term hold-and-buy type investor?

24  A.  Uh-huh.

25  Q.  Yes?

Reiss - direct

1    A.  Yes.  But often contracts forbade it because it would

2    create a cannibalization in sales, so I --

3    Q.  Now, the common -- I'm sorry -- the condo owners are

4    required to join a condominium association, right?

5    A.  Yes.

6    Q.  And they elect a condo board, right?

7    A.  Yes.

8    Q.  And that gets back to, if it's a very large building, the

9    condo board ultimately selects a management company that they

10   want to hire to run the building, true?

11   A.  In the -- yes.

12   Q.  Okay.  And in -- that's not any different in a hotel

13   condominium, right?  There's a condominium association and

14   they elect a condo board as well, right?

15   A.  That's correct.

16   Q.  And the unit owners are charged monthly assessments and

17   they pay in just like in a residential condominium, right?

18   A.  That's correct.

19   Q.  And they're responsible for their individual unit's

20   maintenance and real estate taxes and utilities on their unit

21   generally, right?

22   A.  Right.  But there are additional charges in a -- it's more

23   complex in a --

24   Q.  Right.

25   A.  -- hotel condominium unit because there are charges each

Reiss - direct

1  time the room is --

2  Q.  Right.

3  A.  -- used.  There are charges for when the owner uses it.

4  There are charges when it's rented commercially.

5  Q.  Right.  But -- so basically, other than those things, it's

6  similar in terms of, I own a unit, I got to pay the real

7  estate taxes, the utilities, things of that nature and then I

8  got to pay use fees to the hotel?

9  A.  Right.

10  Q.  One of the big differences between a regular residential

11  condo and a hotel condo is that the hotel condo can be rented

12  on a daily basis?

13  A.  That's correct.

14  Q.  People generally don't rent their residential condos on a

15  day-to-day basis?

16  A.  They're typically not allowed either by the statute --

17  either by the rules governing the homeowners' association or

18  more typically by zoning.

19  Q.  Another difference between a hotel condo building and a

20  residential condo building is, there can be -- there not

21  always is, but there can be things like restaurants, health

22  clubs, function rooms, ballrooms, banquet rooms, right?

23          MR. SHONKWILER:  Objection, your Honor.  The

24  questioning has wandered away from the project to a general

25  area that I don't think is relevant.

Reiss - direct

150

 1          THE COURT:  What is your response?

 2          MR. S. KULWIN:  I laid it all out in opening

 3   statement, and he knows about this and I'm heading toward --

 4   and that's really the basis of his knowledge.

 5          THE COURT:  Overruled.  You may answer.

 6   BY THE WITNESS:

 7   A.  Can you restate?

 8   BY MR. S. KULWIN:

 9   Q.  Sure.  I understand that like in luxury condominiums that

10   aren't hotel condominiums, you may have a restaurant and you

11   may have a health club and things of that nature, right, in a

12   residential, a high-end luxury?

13   A.  Yes.

14   Q.  But in a hotel condo, luxury hotel condo, you may also --

15   you don't have to, but you may also have -- and it's

16   frequently done -- you may have function rooms, ballrooms,

17   banquet rooms, room service, large meeting/conference rooms,

18   right?

19   A.  Yes.  Those are uses that are associated with a hotel

20   function.

21   Q.  Right.

22   A.  And are there to support the -- one of their functions is

23   to support the ability to rent the rooms.

24   Q.  Right.  And when you say a function room, that means like

25   people have weddings there or reunions and things of that

Reiss - direct

1   nature, right?

2   A.  That's right.

3   Q.  And when you talk about a conference center or things like

4   that, you might want to have like a big company have their

5   annual meeting or something like that, correct?

6   A.  That's correct.

7   Q.  And all of those events and functions are supported by

8   what's called the food and beverage service, right?

9   A.  That's correct.

10  Q.  That's the part of it that -- that delivers the food and

11  things of that nature and the drinks that are consumed at

12  those kind of functions and conferences, right?

13  A.  That's correct.

14  Q.  And the food and beverage departments of hotels usually

15  include -- when it's called food and beverage, it includes the

16  food, the beverage, the rental of the rooms and things of that

17  nature, right?

18  A.  Correct.

19  Q.  Now, the unit owners in a hotel condominium can choose to

20  rent their rooms themselves, right?

21  A.  They --

22  Q.  They can?

23  A.  They can exercise that option.

24  Q.  But it would be a really bad idea, wouldn't it?

25          MR. SHONKWILER:  Objection, your Honor.  And, again,

Reiss - direct

 1    I'm not sure if we're talking about this project now or --

 2              THE COURT:  Sustained.

 3              MR. S. KULWIN:  I'm just going to his expertise,

 4    Judge.

 5              THE COURT:  You may rephrase.  Sustained.

 6    BY MR. S. KULWIN:

 7    Q.  In your expertise, sir, or in your experience, that's not

 8    an option that people choose generally because it doesn't work

 9    very well, right?

10    A.  Sometimes people will choose it.  It's their own choice.

11    In our hotel in New York City on Columbus Circle, there were a

12    few residents -- a few hotel condominium owners who used it.

13    That option exists because of the Securities and Exchange

14    Commission statute that says that we can't compel them to rent

15    their rooms using the management company.  So that option

16    always has to exist to be in conformance with the SEC.

17    Q.  It has --

18    A.  A few people will exercise it.  They quickly learn they're

19    better off not exercising it.

20    Q.  Right.  So the other option they have is to join the

21    rental program being run by the hotel?

22    A.  Yes.  They're given the option of signing, if my memory

23    works right, something called a rental management agreement.

24    Q.  Right.

25    A.  And that is basically a relationship with the management

Reiss - direct

153

1  company and says what the management company will do to rent

2  the room and what they will do to comply with the standards of

3  the management company.

4  Q.  Right.  And basically that rental program will lay out how

5  the allocation of the rental -- would you like some more

6  water?

7  A.  Yeah.  I'd love it.  I think this is empty.

8  Q.  I've got some.

9          MR. SHONKWILER:  Would this be easier?

10         THE COURT:  Whatever you want to do.

11         MR. S. KULWIN:  Whatever he wants to do.  That's

12  fine.

13    (Brief pause.)

14  BY MR. S. KULWIN:

15  Q.  Whenever you're ready, Mr. Reiss.

16  A.  I'm ready.

17  Q.  The beauty of it is, is that you put yourself in the

18  rental management agreement, you take advantage of the hotel's

19  marketing and advertising, their reservation system and things

20  of that nature and it makes it easier for you to rent your

21  room, right?

22  A.  That's right.

23  Q.  And you sign a rental management agreement that, among

24  other things, tells you how they're going to pick which rooms

25  to rent, right?

Reiss - direct

154

1    A.  That's right.

2    Q.  And at the Trump Hotel in Chicago when you were there, it

3    basically promoted, in both the marketing and elsewhere, that

4    it was a computerized rotation system, correct?

5    A.  That's correct.

6    Q.  And that -- by that what you meant was, look, your room

7    comes up -- Shelly Kulwin buys a room.  His room comes up.  It

8    has never been rented before, so he's got zero.  Charlie

9    Reiss' has three points.  Easy.  Shelly Kulwin's room gets

10   rented.  Charlie Reiss' doesn't.  Right?

11   A.  Yes.

12   Q.  You keep going and going and going.  We reach the top

13   again together.  Now you've still got three points.  I've only

14   got one.  Shelly Kulwin's room gets rented.  Right?

15   A.  That's right.

16   Q.  Finally I get to four points and now it's your turn; you

17   get to get rented.  Right?

18   A.  Right.  The theory is it created equitable distribution.

19   Q.  And it's done automatically without discretion?

20   A.  Right.

21   Q.  To be fair?

22   A.  That's correct.

23   Q.  Now, the hotel management company that's running that

24   program can be hired by the condo board to do it, right?

25   A.  Yes.

Reiss - direct

1   Q.  And they can be fired from doing it, right?

2   A.  Yes, at some point.  I'm not sure how that happens

3   exactly, but --

4   Q.  But it can be done?

5   A.  -- when the hotel opens, there's a contract in place.

6   That contract has a term.  I assume that upon expiration of

7   that term, the hotel management -- the homeowners -- the condo

8   unit association can reevaluate it.

9   Q.  Okay.  Now, in certain projects that the Trump

10  organization developed when they were building residential

11  condos, they would have commercial space on the ground floor;

12  that happens, right?

13  A.  Yes.  It's very common in New York.

14  Q.  Right.  In fact, Trump World on Second Avenue had such --

15  A.  It has a restaurant and a bar.

16  Q.  You took that -- you took the words right out of my mouth.

17  A.  Excuse me?

18  Q.  You took the words right out of my mouth.  You beat my

19  question.

20          Now, the commercial space in that building was

21  reserved as a special commercial condominium, right?

22  A.  Yes, it was.

23  Q.  And Mr. Trump owned that space, true?

24  A.  Yes, he did.

25  Q.  And he rented that space to a company that operated the

Reiss - direct

156

1  bar and restaurant, right?

2  A.  Yes.

3  Q.  And the Trump organization had to approve the design of

4  the bar and the restaurant, right?

5  A.  Yes, it did.

6  Q.  And the operational hours, right?

7  A.  They're -- when they lease it, they make whatever

8  statements they want to make in the lease --

9  Q.  Right.

10 A.  -- and my recollection is the bar had certain operational

11 issues.  The restaurant was hard to lease and took a number of

12 years.  I think it wasn't leased when I left even.  It was

13 leased a couple --

14 Q.  My point is --

15 A.  -- of years later.

16 Q.  My point is, sir:  Trump could set the terms of what it

17 looked like, what hours it operated and how it was designed;

18 it all had to be approved by Trump, right?

19 A.  He was the owner, yes.

20 Q.  Right.  And by being the owner of the space, he can ensure

21 that he could dictate how it would be run, correct?  That's

22 the beauty of owning something, right?

23 A.  Yes.

24 Q.  And he could also ensure whether it would be run properly,

25 correct?

Reiss - direct

157

1   A.  That's right.

2   Q.  And in your experience, it was important to the Trump

3   organization to be able to ensure that any entity occupying

4   any commercial space in the Trump building was of a certain

5   quality, right?

6   A.  That's right.

7   Q.  And reached -- you know, at least looked like it was

8   reaching a certain success level, right?

9   A.  That's right.

10  Q.  And if they failed to have that quality or live up to that

11  successful level, Trump could get rid of it, right,

12  ultimately?

13  A.  If the lease term permitted it, yes.

14  Q.  And they were able to get rid of it if they thought that

15  the person operating the commercial space that Trump owned

16  wasn't up to snuff, wasn't doing a good job; they could get

17  rid of it because they owned the property in which these

18  entities were operating, true?

19          MR. SHONKWILER:  Your Honor, objection, lack of

20  foundation.

21          THE COURT:  Sustained.

22  BY MR. S. KULWIN:

23  Q.  You're aware of that, sir?

24          MR. SHONKWILER:  Aware of what?

25          THE COURT:  Sustained.  Rephrase your question.

Reiss - direct

1           MR. S. KULWIN:  Sure.

2     BY MR. S. KULWIN:

3     Q.  When you were working in the Trump Hotel, you were aware

4     that Trump was very protective of its brand image, right?

5     A.  That's correct.  That was very --

6     Q.  They spent a lot of years trying to cultivate that image,

7     correct?

8     A.  That's correct.

9     Q.  They didn't want anybody running a commercial space or

10    anything at all in one of their hotels that could soil that

11    image, correct?

12    A.  That's correct.

13    Q.  And so one of the things they did if they -- if they owned

14    commercial space was -- that they were going to lease out was

15    to set certain bars of excellence so they could protect their

16    brand image, correct?

17    A.  That's correct.  I'm only saying they couldn't -- they

18    couldn't evict or terminate a lease by whim.  It had to be

19    within the lease terms.

20    Q.  That's when you go to the lawyers and they start fighting?

21    A.  Yes.

22    Q.  Okay.  Now, in a Trump Hotel, the ballrooms -- in the

23    Trump Hotel here in Chicago, the grand and junior ballrooms,

24    the meeting centers, things of that, they were a showplace

25    area for the hotel, right?

Reiss - direct

159

1    A.  Yes.  They were very special, right.

2    Q.  Right.  And they were very -- a very important part of the

3    hotel, right?

4    A.  When the opportunity came to create them, they became a

5    very important part of the hotel.

6    Q.  Right.  And --

7    A.  They weren't there initially.

8    Q.  Right.  And Mr. Trump would have wanted those things -- he

9    would have wanted to make sure that those things -- those

10   ballrooms, those meeting rooms, that conference center that

11   lie at the heart of his hotel, the showplace, if you will --

12   was run with a high level of excellence, correct?

13              MR. SHONKWILER:  Objection, calls for speculation.

14              THE COURT:  Sustained on form.  Rephrase it.

15   BY MR. S. KULWIN:

16   Q.  Mr. Reiss, you were aware of Mr. Trump's deep interest in

17   the Trump Tower Chicago project, correct?

18   A.  Yes, of course.

19   Q.  And you were aware of how important his brand was to him,

20   correct?

21   A.  The brand was very important to the success of the

22   building and its subsequent operation.

23   Q.  Right.  And you had discussions with Mr. Trump about

24   putting ballrooms and meeting rooms into the building, right?

25   A.  When the opportunity arose to find the extra floor area

Reiss - direct

160

1    for the ballroom, we discussed the design change that led to

2    it and he agreed it was a good idea and we went forward with

3    the design change.

4    Q.  We're going to get to those discussions shortly.  But you

5    discussed it with him, right?  That's what you just said,

6    right?

7    A.  I discussed that I thought it was a good idea to put a

8    ballroom in when the opportunity presented itself, that's

9    right.

10   Q.  My only question was, sir:  Based on your experience of

11   working with Mr. Trump and the importance of this project to

12   him, you were aware that making sure that this showroom in his

13   hotel would be run with excellence, correct?

14   A.  Yes.

15   Q.  Because if those ballrooms and meeting rooms and

16   conference centers and the food and beverage service that went

17   with it were run poorly, it would be bad for the hotel, right?

18   A.  It would be bad for the hotel and bad for the brand.  And

19   it was an assumption in everything we did at that time that we

20   would run it -- we would run whatever facilities were in a

21   building that had the brand name to the highest practical

22   standard we set.

23   Q.  If it was going to be Trump, it was going to be superior,

24   it was going to be excellent and Trump was going to make sure

25   of it, right?

Reiss - direct

1   A.  That was the brand we were trying to build, yes.

2   Q.  Now, prior to -- I'm sorry.  Did you say something?

3        Prior to developing any hotel condominium unit

4   building, the Trump -- let me back up here.

5        Prior to developing this project, the Chicago

6   project, the Trump organization had quite a bit of experience

7   in running hotels, right, before Trump Chicago?

8   A.  Well, we had run -- we had done Columbus Circle.

9   Q.  No, no, not hotel condos.  I'm saying prior to building

10  Trump Chicago -- that's my shorthand for it, okay?

11  A.  Okay.

12  Q.  The Trump organization had quite a bit of experience

13  running hotels?  Hotels?

14  A.  We had done New York City on Columbus Circle.  Donald

15  was --

16  Q.  Go ahead.  I'm listening.

17  A.  I was aware of that and worked on that.  I know

18  historically Donald briefly had an ownership in the Plaza

19  Hotel, but I didn't know -- I didn't work on that.  I don't

20  think I was working for the organization at the time.  And, of

21  course, Donald had an interest in Atlantic City.

22        MR. S. KULWIN:  If I may have one moment, Judge?

23        THE COURT:  You may.

24     (Brief pause.)

25        MR. S. KULWIN:  At this time, Judge, I want to put

Reiss - direct

162

1   up -- I want to admit -- let me lay the foundation.

2   BY MR. S. KULWIN:

3   Q.  Mr. Reiss, you're familiar with the brochures that Trump

4   issued for Trump Tower Chicago, correct?

5   A.  I remember it slightly, yes.

6   Q.  You had input in how they were --

7   A.  Yes.

8   Q.  Let me show you what we've marked as Plaintiff's

9   Exhibit 75.  Okay.

10              MR. S. KULWIN:  May I approach, Judge?

11              THE COURT:  You may.

12  BY MR. S. KULWIN:

13  Q.  Tell me when you're ready, sir.

14    (Brief pause.)

15  BY MR. S. KULWIN:

16  Q.  Have you seen these before, Mr. Reiss?

17  A.  I assume I have.  I must have, but I don't have a lot of

18  recollection.  It was a lot of years ago, but I wouldn't -- I

19  certainly should have seen them, yes.

20  Q.  Okay.  And these are part of the business records of the

21  Trump organization in connection with selling the Trump Hotel,

22  right?

23  A.  Uh-huh, yes.

24  Q.  Part of their business to keep such records, right?

25  A.  Are they what?

Reiss - direct

163

1 Q. Part of their business to keep records like that, right?

2 A. Yes. But I will say that in briefing -- in leafing

3 through this at the moment, a lot of these documents are after

4 I left.

5 Q. Okay. Okay.

6 A. I'd say most of them.

7 Q. Okay. Well, I'm going to show you one that I don't think

8 was.

9   MR. S. KULWIN: Judge, at this point I move in

10 Plaintiff's Exhibit 75.

11   THE COURT: Is there any objection?

12   MR. SHONKWILER: Two objections. The first page is a

13 letter that has not -- there's been no foundation laid for it.

14   The second objection is the witness has testified

15 that some of these materials were not -- didn't exist when he

16 was at the Trump organization.

17   THE COURT: What is your response to the cover

18 letter?

19   MR. S. KULWIN: We'll withdraw the cover letter,

20 Judge.

21   THE COURT: Okay.

22   MR. S. KULWIN: And on the other thing, if that's the

23 case, we'll ask for it to be moved in conditionally because

24 the next one coming up will know it.

25   THE COURT: I will grant your request to admit

Reiss - direct
164

 1  Exhibit 75 conditionally --

 2          MR. S. KULWIN:  Okay.

 3          THE COURT:  -- to link up with the next witness.

 4  BY MR. S. KULWIN:

 5  Q.  Sir, I'm going to hand you -- it's in there, but just to

 6  make it easier for you -- Exhibit 4433.

 7          Can you see that, Mr. Reiss?

 8  A.  Yes.

 9  Q.  Now --

10  A.  I sure can, yes.

11  Q.  Now, this lists the hotel and resorts or purports to list

12  the hotel and resorts that Mr. Trump said -- had -- their

13  organization was involved in at the time they were selling

14  Trump Tower, doesn't it?

15  A.  That's correct.

16  Q.  And there's, what --

17          THE COURT:  Mr. Kulwin, excuse me for a moment.  What

18  exhibit is this?  You said 4433.  That is not in evidence.

19          MR. S. KULWIN:  4433 is the Bates page.

20          THE COURT:  Okay.  What exhibit --

21          MR. S. KULWIN:  It's Exhibit 75.

22          THE COURT:  Exhibit 75?

23          MR. S. KULWIN:  I apologize, Judge.  It's Exhibit 75,

24  page 4433.

25          THE COURT:  Okay.  Go ahead.

Reiss - direct

1   BY MR. S. KULWIN:

2   Q.  And that lists Mar-a-Lago Club in Palm Beach, right?

3   A.  Yes, it does.

4   Q.  Okay.  Trump 29 in Palm Springs, right?

5   A.  Yes.

6   Q.  A number of other hotel casinos, right?

7   A.  Yes.

8   Q.  And it's all under hotels and resorts, right?

9   A.  That's right.

10  Q.  And then it shows golf clubs that -- two golf clubs that

11  he's building, right?

12  A.  You'll have to scroll up.

13  Q.  The latter three are in development.  But Trump

14  International Golf Club in Palm Beach and Trump National Golf

15  Club in New York, they're already up and running at this time,

16  right?  Correct?

17  A.  I believe Palm Beach is.  Bedford is.  I don't really know

18  a lot about the others.

19  Q.  And golf clubs generally have food and beverage services,

20  right?  Did you know if these did?

21  A.  I have no idea.

22  Q.  Okay.

23  A.  I've never played golf.

24  Q.  Really?

25  A.  No.

Reiss - direct

 1   Q.  Me neither.

 2        Okay.  Now, in addition, if you look at the top of

 3   that document -- if you go to the top of it, please.

 4        It tells the reader that the Trump organization has

 5   developed and continues to manage over 3,000 units in 13

 6   residential condominiums and rental properties, 2 million

 7   square feet of office space, 4,000 hotel rooms.

 8        Do you see that?

 9   A.  Yes.

10   Q.  And that was accurate, right?

11   A.  Excuse me?

12   Q.  That's accurate, wasn't it?

13   A.  I assume it's accurate.

14   Q.  Well, you more than assume; you know it's accurate, right,

15   because Trump wouldn't be issuing brochures that are false,

16   right?

17   A.  We -- yes.

18   Q.  You're smiling.  I mean, do you think it's puff?

19   A.  I don't think it's puff.  These happened a long time ago.

20   The hotels relate to all the gambling resorts, which were of a

21   different -- of a very different nature than Trump

22   International New York and Chicago.

23   Q.  But the point of what's being said here in something --

24   first, something similar just like this sheet was in the

25   brochures when you were there, right?

Reiss - direct

1   A.  Yes.

2   Q.  And the point of what they're trying to tell the buyer,

3   potential buyer, is we, Trump, have a lot of experience

4   running hotels, right?

5   A.  Yes.

6           MR. SHONKWILER:  Objection, your Honor, foundation.

7   The questioning is about a page that has not been established

8   as one that he is aware of.

9           THE COURT:  Sustained.  Lay a little more foundation.

10  BY MR. S. KULWIN:

11  Q.  Maybe I didn't hear you.  Didn't you say there was a sheet

12  just like this in the brochure when you were there?

13  A.  I assume there would have been a brochure sheet that

14  listed other properties that the Trump organization had

15  developed.

16  Q.  Right.  And the point of putting something in the brochure

17  like that is to tell the potential buyer, we, Trump, have a

18  lot of experience in the hotel business, correct?

19  A.  That's correct.

20  Q.  Right.  And you don't say anywhere in this list here, do

21  you -- Trump doesn't say anywhere in this list here, you know,

22  we have a lot of hotel experience, but it's really totally

23  different than what we're doing now, so, you know, not so

24  much?

25          MR. SHONKWILER:  Objection.

Reiss - direct

1    BY MR. S. KULWIN:

2    Q.  We're not so much?

3            MR. SHONKWILER:  Argumentative.

4            THE COURT:  Sustained.

5            MR. S. KULWIN:  Really?

6    BY MR. S. KULWIN:

7    Q.  You don't say anywhere in this brochure, sir, you know, we

8    have all this experience selling hotel -- you know, running

9    all these hotel rooms, but really it's a totally different

10   experience?

11           MR. SHONKWILER:  Your Honor, lack of foundation,

12   argumentative.  It could be in the first 20 pages for all we

13   know.

14           THE COURT:  Sustained on form.  Rephrase it.

15   BY MR. S. KULWIN:

16   Q.  Sir, anywhere in this brochure do you say -- does the

17   Trump organization say, the experience that we have in hotel

18   rooms is really different than what we're building here at

19   Trump Chicago?

20           MR. SHONKWILER:  Your Honor, objection, no

21   foundation.  This is one page.  It could be one of 20.

22           MR. S. KULWIN:  Judge --

23           THE COURT:  Overruled.  You may answer, sir.

24   BY MR. S. KULWIN:

25   Q.  Mr. Reiss --

                        Reiss - direct

 1            THE COURT:  If you can.

 2    BY THE WITNESS:

 3    A.  To my knowledge, we don't say that.

 4    BY MR. S. KULWIN:

 5    Q.  Right.  You don't say, for example, also in this same

 6    document, you know -- well, another thing you talk about here

 7    is the mixed-use properties.  There's four mixed-use

 8    properties, right?  It's right underneath.  See it?

 9    A.  That's correct.

10    Q.  Okay.  And you've got the Trump International Hotel and

11    Tower in Central Park West, right?

12    A.  Right.

13    Q.  Trump Grand Ocean Resort and Residences in Miami, Florida,

14    right?

15    A.  Right.

16    Q.  Trump Tower, right, in New York?

17    A.  That's correct.

18    Q.  And it's all under Trump International Hotel and Tower in

19    Chicago, opening in 2007, correct?

20    A.  Yes.

21    Q.  And when you were there, by the way, that's when they

22    thought the hotel would open, was 2007, correct?

23    A.  When I was there?

24    Q.  Yeah.

25    A.  Yeah, that was the projected date.

Reiss - direct

 1   Q.  Right.  Later on it got -- after you left, it got moved to

 2   2008, right?

 3   A.  I believe so, yes.

 4   Q.  Okay.  So now these three underneath the Trump Tower --

 5   well, let me ask this:  A mixed-use property is one that has,

 6   what?  Hotel condominiums and residential condominiums, right?

 7   A.  Yes, primarily.

 8   Q.  And so what you're telling the reader is -- you were

 9   there; this was your brochure here -- look, we've got a lot of

10   experience doing hotel condominium buildings?

11           MR. SHONKWILER:  Objection, your Honor.  The witness

12   didn't testify to that.

13           THE COURT:  Rephrase your question.

14   BY MR. S. KULWIN:

15   Q.  Mr. Reiss, let me break it down for you.

16           When you were there, the scheduled opening of Trump

17   Chicago was 2007, correct?

18   A.  Correct.

19   Q.  After you left, it changed to 2008, correct?

20   A.  Yes.

21   Q.  Okay.  So since we know that, we know that this is a

22   brochure that had to be issued while you were there, right?

23   A.  There were many brochures.  I mean, there's nothing

24   wrong -- there's nothing incorrect of the listing of mixed-use

25   properties.  But whether this was issued when I worked there

Reiss - direct

171

1    or not, I have no way of knowing.

2    Q.  Well, let me ask you this question:  If this specific one

3    wasn't, one just like it was?

4    A.  Right.

5    Q.  Okay.  Now, the purpose of Trump issuing this document,

6    with this thing here is, is to tell the reader, we have a lot

7    of experience running mixed-use properties, right?

8    A.  That's correct.

9    Q.  We're good at it; we know what we're doing, right?

10   A.  That's correct.

11   Q.  You don't say in there anywhere, you know, our executive

12   team that's working on Trump Tower Chicago right now in -- let

13   me rephrase.

14        In 2003, 2004, 2005, did you ever issue any marketing

15   material at all that told potential buyers, look, the

16   executive team that we have running Trump Tower Chicago, they

17   don't really know a lot about hotels?

18   A.  No, of course not, because it wouldn't be true.

19   Q.  It would be false, right?  That would be a false

20   statement, right?

21   A.  Yes.

22   Q.  You had a lot of experience.

23        Okay.  Now, we've discussed running condo projects.

24   At some point in the '90s, while you were with the Trump

25   organization, you were given the task of trying to figure out

Reiss - direct

172

 1   how to build a hotel and a residential condo together at the

 2   same time.  Do you remember that?

 3   A.  You're referring to New York?

 4   Q.  Yeah.

 5   A.  Yes.

 6   Q.  Okay.  The first project -- hotel condo project you worked

 7   on for the Trump organization was the Trump International New

 8   York, correct?

 9   A.  That's right.

10   Q.  The project started out as the development of a building

11   called the Paramount, right?

12   A.  That's right.

13   Q.  You and Mr. Trump, along with accountants and others, were

14   involved in doing a, quote, evaluation and investigation of

15   what could be developed on the Paramount site, true?

16   A.  That's true.

17   Q.  During that evaluation and investigation, Mr. Trump first

18   spoke to you about developing a hotel condominium project?

19   That was the first time, right?

20   A.  Yes.

21   Q.  You discussed with him at that time the hotel condominium

22   projects that have already gone up in Florida in the 1980s,

23   right?

24   A.  He discussed with me.  I wasn't aware of it.  Right.

25   Q.  That's what I was just going to ask you.

Reiss - direct

173

1      He was familiar with the theory behind the hotel

2   condominium, right?

3   A.   I think he was.   It had happened -- there was a flurry of

4   hotel condominiums that were built in -- my recollection, that

5   were built in Florida maybe 15 years prior to that.   There

6   were a lot of structural and legal problems with the way they

7   were done, and they didn't continue their operation.

8   Q.   We're going to get to that.

9   A.   But the concept of a hotel condominium certainly did

10  exist.

11  Q.   Well, let me see if I can restructure -- re-put together

12  the conversation as I think you recall it.

13      As you recall it, you went to Mr. Trump and told him,

14  look, we can't do a hotel in the Paramount, right?

15  A.   Can I -- no.

16  Q.   Okay.   When --

17  A.   Can I give a little more detail?

18  Q.   Wasn't there like an FAR issue?

19  A.   Yes.

20  Q.   Yes.   That's what I meant.   I mean, you could do it.   You

21  just couldn't do a good one because the zoning didn't allow

22  you to have the floors big enough or something like that?

23  A.   The zoning had a cap on the number of residential units --

24  Q.   Right.

25  A.   -- the floor area that was permissible.   And because it

Reiss - direct

174

1    was a rehab and the building existed, we had more floor area

2    than residential permitted.  So the issue at the time was what

3    are we going to do with the rest of it.  And it was a very

4    weak market at the time.

5    Q.  For residential condos?

6    A.  It was a very weak market for office space.  I'm sorry.

7    Q.  Okay.

8    A.  The area was not a very favorable area.  It has gone

9    through tremendous change since.  And so we were left kind of

10   with an option of a hotel.

11   Q.  And Mr. Trump said to you, we can combine a hotel with a

12   condominium?

13   A.  That's right.

14   Q.  And you said there's no precedent for that; do you

15   remember that?

16   A.  Well, I was unaware of one, yes.

17   Q.  And he said there was, referring down to these

18   developments down in Florida?

19   A.  Right.

20   Q.  Now, after that conversation when Mr. Trump clued you in

21   on hotel condos, you and others did a significant amount of

22   research into the history of the Florida hotel condominium

23   unit business, right?

24   A.  Yes, into -- more on a national sense.  It wasn't so

25   specific in Florida but, yes.

Reiss - direct

175

1   Q.  I was just going to say, you just didn't look at Florida?

2   A.  Yes.

3   Q.  You looked at developments all over the country?

4   A.  Right.

5   Q.  And that investigation happened a long time ago?  In 1995,

6   correct?

7   A.  Probably about then.

8   Q.  And at that time, you found out there had been many hotel

9   condo developments both in Florida and across the country,

10  right?

11  A.  I'm not so comfortable with the word "many."  There had

12  been a spurt of them.  I don't know --

13  Q.  Okay.

14  A.  -- how many.  We could --

15  Q.  You also gathered some anecdotal evidence about what

16  occurred at those projects, right?

17  A.  Yes.

18  Q.  And by that you mean, you spoke to developers and

19  professionals who had been involved in those projects and they

20  told you their personal experiences about what went right and

21  what went wrong, true?

22  A.  Right.  Yes.

23  Q.  And you might have even called down to speak to specific

24  professionals down in Florida about their experience; remember

25  that?

                          Reiss - direct
                                                                    176

 1   A.  I don't remember any specific calls.

 2   Q.  No.  I know.  But you might have done that?  I think

 3   that's what the question was.

 4   A.  It's possible.

 5   Q.  You looked at the research about such projects that was

 6   available to you, right?

 7   A.  Yes.

 8   Q.  Okay.  You had numerous conversations with --

 9           MR. S. KULWIN:  You know, Judge, at this point, could

10   I have a quick sidebar?  It deals with a motion in limine.

11           THE COURT:  Yes.

12     (Proceedings heard at sidebar:)

13           MR. S. KULWIN:  My question is, I'm about to ask him

14   about these investigations that he put together.  It's

15   important to lay the foundation for what an expert he is.  I'm

16   concerned -- I don't want to lead him to say they consulted

17   with attorneys.  I'm going to say consultants.

18           THE COURT:  Okay.  I assume he has been prepped for

19   that?

20           MR. SHONKWILER:  He has.

21           MR. S. KULWIN:  Thank you.

22           THE COURT:  Okay.

23     (Proceedings heard in open court:)

24   BY MR. S. KULWIN:

25   Q.  You also had -- we were talking about this investigation

Reiss - direct

177

1   you were doing into the hotel condo business.

2           You also had numerous conversations with Trump

3   consultants about how the hotels should function -- hotel

4   condominiums should function, right?

5   A.   Yes.

6   Q.   And you actually put a plan together and tested it out

7   through these conversations with these consultants, right?

8   A.   A plan?  I'm sorry.

9   Q.   You're sorry?

10  A.   I'm sorry.  I don't understand what you mean by plan.

11  Q.   Well, let me see if I can --

12          Let me see if I can refresh your recollection.

13  A.   Okay.

14          MR. S. KULWIN:  May I approach?

15          THE COURT:  You may approach.

16          MR. S. KULWIN:  This is deposition page 75, lines 6

17  to 13.

18          THE COURT:  Read it to yourself, sir.

19     (Brief pause.)

20  BY THE WITNESS:

21  A.   I think in the deposition, I was referring to a plan in

22  terms of, look, here's a workable model; let's test this out

23  and see if it conforms to statute, see if it conforms to the

24  operation of a hotel.  A plan in that sense.

25  BY MR. S. KULWIN:

Reiss - direct

178

1   Q.  Right.  But you put together a plan to go over with these

2   consultants, right?

3   A.  Yes.

4   Q.  And you also produced an informal research report with the

5   results of your investigation and your extensive review,

6   correct?

7   A.  Yes, I assume we did.  I want to stress the word informal.

8   I don't think there was -- it wasn't a formal due diligence

9   process or anything like that where a major report was made.

10  Q.  But let's not minimize it, sir.  You spent a lot of time

11  investigating the industry, right?

12  A.  Yes.

13  Q.  You spent a lot of time with these consultants running by,

14  you know, possibilities of how it could be done, right?

15  A.  Yes.

16  Q.  You brought your skill and expertise to it, right?

17  A.  Yes.

18  Q.  Which was -- you know, you were a very experienced real

19  estate guy at the time, right?

20  A.  Yes.

21  Q.  And when it was all done, you put together a written

22  document that could be looked at by, among others, Mr. Trump

23  if he wanted to, correct?

24  A.  Yes, as well as the owners of the building, which was the

25  General Electric Pension Trust.

Reiss - direct

1   Q.  Right.  So you had to make like a presentation to General

2   Electric Pension Trust and Mr. Trump saying this is what we

3   can do, this is how it will work, all of that; and it was all

4   in writing?

5   A.  That's right.  We made a few formal presentations to

6   General Electric because I believe the relationship was such

7   that we were primarily their development managers for the

8   building.

9   Q.  Okay.

10  A.  We being the Trump organization.

11  Q.  All right.  And you left that report, when you left Trump,

12  at Trump, correct?

13  A.  I assume I did, yes.

14  Q.  Now, the Trump Tower International in Chicago project

15  began its investigative steps in the late -- mid to late

16  1990s?

17  A.  Probably the late 1990s.  There was an attempt to acquire

18  the property from the Sun-Times.  That took a while to get

19  going.  And the eventual resolution was a partnership with the

20  Sun-Times.

21  Q.  In the development of the building?

22  A.  In the development of the building.  And that probably

23  happened 1998 --

24  Q.  And 1998 --

25  A.  -- approximately.

Reiss - direct

1   Q.  Well, 1998 is when Mr. Trump assigned you to work on the

2   project?

3   A.  Yes.

4   Q.  And by 2002, 2003, it was well into the developmental

5   stages, correct?

6   A.  Yes.  We had opened -- in September of 2003, we had opened

7   the sales office.  So we had a property report.  We had a

8   design.  And we could define our residential and condominium

9   units sufficiently to conform to statute in order to create a

10  sale.

11  Q.  Right.  Now, around that same time, between 2002 and 2004,

12  the Trump organization, including you, were working with

13  developers of the Sunny Isles Trump Sonesta hotel condo

14  development, correct?

15  A.  Yes.

16  Q.  The Trump organization, including you, was providing

17  advice to the developers of the hotel condominium building in

18  Sunny Isles, correct?

19  A.  Yes.  It was primarily a branding relationship where the

20  developer had approached us and wanted to use the Trump brand.

21  And the theory was, we would work with him and kind of use it

22  as a -- an initial -- as an initial way to create branding

23  standards.

24  Q.  And they came to the Trump organization; they wanted to

25  use the Trump brand of hotel condos and you lent them your

Reiss - direct

181

1    expertise on that area as well, correct?

2    A.  To the extent they listened.  They weren't a very --

3    Q.  Good listener?

4    A.  -- compliant partner.  They were also -- there were two

5    residential buildings in that complex and there was one hotel.

6    Q.  Hotel condo?

7    A.  It was a hotel condo, right.

8    Q.  Now --

9    A.  And we were not the managers.  I believe Sonesta was the

10   manager.

11   Q.  Right.  Now, the Sunny Isles hotel condo obviously was

12   going to include a full service hotel, right?

13   A.  Yes.

14   Q.  Meaning it would have doormen, lobby, food and beverage

15   services, meeting spaces, banquets, function rooms, correct?

16   A.  That's correct.

17   Q.  And Mr. Trump, as you just said, was licensing his name to

18   Sunny Isles, right?

19   A.  That's correct.

20   Q.  In other words, they pay him, they get to use the Trump

21   name?

22   A.  That's correct.

23   Q.  Even though they own it?

24   A.  That's correct.

25   Q.  And you would have been involved as part of the -- you and

Reiss - direct

182

1    others of the Trump organization would have been involved with

2    the owners, their consultants who were working on the project,

3    right?

4    A.  We had periodic meetings with them to monitor progress --

5    Q.  Right.

6    A.  -- and try and make them conform to --

7    Q.  Right.

8    A.  -- let's call it evolving brand standards.

9    Q.  Right.  Now, the Sunny Isles hotel condominium unit owners

10   weren't given an opportunity to buy an interest in the hotel

11   amenities, were they?

12   A.  I'm sorry.  I didn't hear.

13   Q.  The Sunny Isles hotel condominium unit owners weren't

14   given an opportunity to buy an interest in the hotel

15   facilities, were they?

16   A.  I don't remember the condo plan.  I didn't create that

17   condo plan.  When the Sunny Isles people approached the Trump

18   organization, the building was already designed, the condo

19   plan had been filed, the manager had been selected.  I don't

20   remember the -- any of the details with regard to that plan.

21   Q.  All right.  Going back to the '90s again, you ultimately

22   began working on developing the Trump International Hotel

23   condominium in New York in 1994, 1995, right?

24   A.  Yes, about that.

25   Q.  It opened in 1997, correct?

Reiss - direct

183

1  A.  1997, yes.

2  Q.  It had hotel condo units, right?

3  A.  Yes.

4  Q.  A lobby?

5  A.  A separate hotel lobby and a separate residential lobby.

6  Q.  Small meeting rooms?

7  A.  The meeting rooms were retrofitted later into the project.

8  Q.  But it had small meeting rooms ultimately?

9  A.  I'm only saying, it didn't have it initially.  We created

10 it shortly after it opened.

11 Q.  Right.  A small health club space?

12 A.  Yes.

13 Q.  In 2001 they added a small function room space?

14 A.  Yes, that's what I'm referring to, right.

15 Q.  It wasn't anywhere near the scale of the facilities in

16 Trump Chicago?

17 A.  It was nowhere near the scale of the -- of Trump Chicago,

18 for what eventually happened to Trump Chicago.

19 Q.  Right.

20 A.  The initial plan for Trump Chicago before the office space

21 was dropped probably was kind of similar, a little bigger than

22 Trump Chicago.  It was a bigger building.  But proportionately

23 it was probably the same.

24 Q.  The food and beverage for the restaurant and room service

25 is owned by a separate company unrelated to the Trump

Reiss - direct

184

1    organization in the New York situation, correct?

2    A.  We're talking about New York?

3    Q.  Yeah.

4    A.  The food and beverage, the -- my recollection is that the

5    space was retained by the developer, by the Trump

6    organization, and was leased out to a restaurant from the

7    outset, Jean-Georges, who is still there, I believe.

8    Q.  So Trump owned the food and beverage operation and he

9    leased it out?

10   A.  That's right.

11   Q.  And then he controlled -- because he owns it and he leases

12   it out, if he doesn't like what they're doing, he ultimately

13   can fire them --

14   A.  Yes.

15   Q.  -- at the end of the lease?

16   A.  Again, according -- based on what the lease says, correct.

17   Q.  Right.  Now, you bought -- you talked about how you bought

18   a unit in New York.  You also served on the condo board,

19   correct?

20   A.  I was president -- I believe I was president of the hotel

21   unit condo board.

22   Q.  Right.

23   A.  As well as managing director of the building.

24   Q.  So you had a lot of experience working with condo boards

25   in a hotel condo before Trump Tower Chicago went up?

Reiss - direct

185

1  A.  Yes, I did.

2  Q.  And you had experience working with them while they owned

3  the common elements of the function room, the meeting room,

4  the health club, things of that nature, correct?

5  A.  Yes, I did.

6  Q.  Now, with respect to your work on both Sunny Isles and

7  Trump Chicago, you reported to Mr. Trump about any issues that

8  would come up relating to those projects, correct?

9          MR. SHONKWILER:  Object to the form, compound.

10          THE COURT:  Sustained.  Rephrase it.

11          MR. S. KULWIN:  Sure.

12  BY MR. S. KULWIN:

13  Q.  With respect to the Sunny Isles project, you would report

14  to Mr. Trump about any issues that came up, correct?

15  A.  I would report -- to be accurate, I would report to

16  Mr. Trump on any issues where I thought I would need his

17  guidance, assistance or there was something that would be

18  particularly of interest to him.  All issues were not reported

19  to him.

20  Q.  Do you recall giving this deposition -- let me rephrase

21  that.

22          Did you answer this -- were you asked this question

23  and did you give this answer at your deposition, page 69,

24  Line 10:

25          And you would report to him -- meaning Mr. Trump --

Reiss - direct

186

1   about issues that would come up relating to those projects

2   that you were working on, correct?

3           Answer:  Yes.

4   A.  Yes.  I'm merely giving a little more detail on what "any

5   issues" means.

6   Q.  You didn't give that detail at your deposition though, did

7   you?

8   A.  Sorry.  I --

9   Q.  You didn't --

10  A.  It's not realistic to assume that everything that happened

11  I would talk to Mr. Trump about.

12  Q.  That's not my question.

13          MR. SHONKWILER:  Objection, your Honor.  This is not

14  impeaching testimony.

15          THE COURT:  Overruled.  That's a question for the

16  jury.  But please don't argue with the witness.

17          MR. S. KULWIN:  Sure.

18  BY MR. S. KULWIN:

19  Q.  Mr. Reiss, to be clear, when you got -- after you gave

20  this deposition, you had a chance to review it, correct?

21          Right?

22  A.  I had a chance to review it.

23  Q.  You could add anything you wanted to it, right?  You could

24  make corrections?

25  A.  Yes.

Reiss - direct

187

1   Q.  You didn't, when you looked at this question, say --

2   A.  Sir, I'm only saying --

3   Q.  May I --

4           MR. S. KULWIN:  Your Honor, may I finish?

5           THE COURT:  Let him finish the question, Mr. Reiss,

6   and then you can answer.

7           MR. S. KULWIN:  Thank you, your Honor.

8   BY MR. S. KULWIN:

9   Q.  You didn't add to this:  I did report to him when issues

10  came up, but it was only if I really thought it was important,

11  et cetera, et cetera, et cetera?  You didn't say that there,

12  did you?

13  A.  I didn't say it during the deposition.

14  Q.  Or make an amendment to the deposition, as was your right,

15  afterwards?

16  A.  I didn't say that.

17  Q.  All right.

18          Now, you did a lot of work on the Trump Chicago

19  project between 1998 and 2003, correct?

20  A.  Yes.

21  Q.  Mr. Trump intended it to be a hotel condominium --

22  A.  In 2004 --

23  Q.  2004.

24  A.  -- up until I left.

25  Q.  Right.  Mr. Trump intended it to be a hotel condominium

Reiss - direct

1   building from the outset, right?

2   A.  That's correct.

3   Q.  And he assigned you to work on that, right?

4   A.  That's correct.

5   Q.  And he assigned you to work on Sunny Isles, correct?

6   A.  That's correct.

7   Q.  You never said to Mr. Trump when he gave you either of

8   those assignments, you know, Donald, I'm not qualified to do

9   this, did you?

10  A.  No, of course not.

11  Q.  Because were you qualified to do it, right?

12  A.  I believed I was.

13  Q.  Now, with respect to the research you did on Trump Tower,

14  after you looked at it, after doing some initial research, you

15  presented to Mr. Trump how you thought the project should be

16  organized, right?

17  A.  That's right.

18  Q.  You explained you thought it should include residential

19  condo units, hotel condo units, commercial space and office

20  space, right?

21  A.  That's right.

22  Q.  By 1998 you already had access to all the research you had

23  done regarding the hotel condominium industry that you had

24  done in the early '90s up through 1998 regarding the New York

25  condo?

Reiss - direct

1  A.  And the year of operation.

2  Q.  Right.  And you also had a year of operation in New York,

3  right?

4         You also had names of people down in Florida that you

5  would work with who were in the hotel condo business that you

6  could consult with if you wanted to with them too, right?

7  A.  Could be.  I don't think that was a very valuable portion

8  by that time.  We -- at that point, we really were totally

9  reliant on the year of operation we had in New York.

10  Q.  One of the things you did on the projects here -- in both

11  these projects -- was you worked at the Trump organization on

12  preparing operating budgets for the hotel condo, correct?

13  A.  That's correct.

14  Q.  And you tried to make those budgets as accurate as

15  possible, correct?

16  A.  That's correct.

17  Q.  Because if the operating budgets were inaccurate, that

18  could cause severe business problems, like insufficient

19  revenue to operate the project, right?

20  A.  That's correct.

21  Q.  And with respect to Trump Chicago and New York, there

22  would be an operating budget for the residential condo portion

23  of the building and one for the hotel condo portion of the

24  building, true?

25  A.  That's true.

Reiss - direct

1  Q.  And one for operating the hotel as well?

2  A.  Right.

3  Q.  And each one had to be as accurate as possible, correct?

4  A.  Correct.

5  Q.  Now, with respect to the condo association operating

6  budget, one of the key elements, if not the key element, is

7  the amount of revenue that is going to be generated by the

8  hotel condo unit owners' payments of their monthly

9  assessments, right?  That's one of the key aspects of it?

10  A.  Assessments are a major component.

11  Q.  And if there are going to be other sources of revenue in

12  such a budget, they have to be accurate as well, right?

13  A.  That's correct.

14  Q.  And, of course, as mentioned a moment ago, if the condo

15  association was receiving other revenue over and above the

16  income from the condo assessments, that could have an impact

17  on the amount of assessments each owner has to pay, right?

18  A.  Yes.

19  Q.  Now, for -- in working on the operating budgets for Trump

20  Chicago, you used the expertise of the New York hotel

21  condominium staff to help you put it together, right?

22  A.  Yes.

23  Q.  In part.

24        Those were very professional people?

25  A.  Yes.  The -- I relied very heavily on the manager and the

Reiss - direct

1    controller of the -- of the hotel and building.

2    Q.  I'm going to ask you about him in a second.

3    A.  Okay.

4    Q.  You also used guidelines you obtained from other Chicago

5    condominium projects, right?

6    A.  Yes, to the extent they were available.

7    Q.  You also worked with Mr. Flicker to do research on the

8    concierge hotel operation to help create the most accurate

9    budgets you possibly could, right?

10   A.  What do you mean "the concierge"?

11   Q.  Take that out.

12   A.  Okay.

13   Q.  That was a misstatement.

14           You also worked with Mr. Flicker to do research on

15   the hotel operations to create the most accurate budgets you

16   could?

17   A.  Yes.

18   Q.  You gave Mr. Flicker advice on how to go about researching

19   hotels in Chicago so you could develop an accurate hotel

20   budget, correct?

21   A.  Yes.

22   Q.  You also looked at publicly available information about

23   the Chicago market for hotels and condos, correct?

24   A.  Yes.

25   Q.  For example, you looked at Smith Travel Research to look

Reiss - direct

1   at operational budget numbers for luxury hotels in Chicago,

2   right?

3   A.   That's correct.   That's a major source.   That's right.

4   Q.   And that's a source that gathers up not by name --

5   A.   By grouping.

6   Q.   Yeah, by grouping because like the Drake, the Peninsula,

7   the -- I don't know, Four Seasons, I can't remember all of

8   them -- they don't want -- they won't tell or allow their name

9   and their specific numbers to be published, right?

10  A.   Right.

11  Q.   Because that's a secret, right?

12  A.   Right.

13  Q.   But they will share, as long as it's part of a group, this

14  is how we're doing, and that creates a tremendous resource for

15  people in the hotel business?

16  A.   And that allowed us to -- yes.

17  Q.   And it allowed you to --

18  A.   To project as well as we could from that viewpoint of what

19  room rates would be, what occupancy would be and what other

20  factors were involved in income.

21  Q.   And what type of revenues you could expect from ballrooms,

22  meeting rooms and function rooms?

23  A.   That's correct.

24  Q.   And, again, just so we're clear, when you put in the

25  budget in the property reports that the, you know, commissions

Reiss - direct

1   for the ballrooms, meeting rooms, function rooms and things of

2   that nature was $5 million, it was an estimate, correct?

3   A.  It was an estimate, that's right.

4   Q.  You weren't guaranteeing $5 million, right?

5   A.  No.

6   Q.  But what you did do though is, you used your expertise and

7   all the expertise in the Trump organization, being in the

8   business for many, many years, to come up with the most

9   accurate projection you could, right?

10  A.  Yes.  It was a good faith estimate.

11  Q.  Absolutely.

12         Now, you mentioned this controller at the New York

13  hotel.  And I want to be clear.  You worked very closely with

14  him in developing the Trump Chicago budget, correct?

15  A.  Yes.

16  Q.  So it just isn't any ordinary controller though; he was a

17  professor?

18  A.  His name was Mike Levchuck.  And he was a professor of

19  hotel accountancy at, I think it was New York University.

20  Q.  New York University is a very well-known prestigious

21  university in New York City?

22  A.  In their business school, correct.

23  Q.  The business school is.  So the New York University

24  business school is a well-known prestigious school in New

25  York, correct?

Reiss - direct

194

1    A.  Yes.

2    Q.  And around the country too, to your knowledge?

3    A.  To my knowledge, yes.

4    Q.  And he's a professor there, right?

5    A.  He taught the course.  I don't know his level of --

6    Q.  But, in any event, his job as professor of hotel

7    accounting is to teach other people going into the hotel

8    business, look, this is how you put a hotel budget together,

9    this is what you can expect, these are issues, these are

10   details, here's how you do projections, et cetera, et cetera,

11   right?

12   A.  That's correct.

13   Q.  And he just doesn't make that stuff up off the top of his

14   head; it's based on his research, his expertise, his analysis

15   of a wealth of information that's available at the time to

16   him, correct?

17   A.  That's correct.

18   Q.  And he uses treatises in the field written by other

19   experts about hotel operations, condominium operations and a

20   combination of the two, correct?

21        MR. SHONKWILER:  Objection, your Honor.  This is

22   speculation.

23        THE COURT:  Sustained.

24   BY MR. S. KULWIN:

25   Q.  Were you aware that he used treatises and things of that

Reiss - direct

1   nature to come up with these points?

2   A.  He might have used --

3   Q.  All right.

4   A.  I'm sure he used all kinds of research.  But I think

5   mostly he used his knowledge through hotel accountancy of what

6   other companies -- what other hotels had spent to -- what

7   it -- the basic issue he's resolving is how much does it cost

8   to run a quality hotel.

9   Q.  Right.  And he had a lot of expertise in that area?

10  A.  He had a lot of expertise, but the operation itself by

11  that point had a lot of expertise because we had been running

12  a hotel for about a year, if not more.  And also that hotel

13  had achieved a very high rating from Mobil.

14  Q.  Right.

15  A.  So we were very confident that we had a good relationship

16  between the cost of running a hotel and achieving a certain

17  level of quality.

18  Q.  And those --

19  A.  Of course, that had to be translated to the Chicago area

20  so there had to be work having to do with different union

21  standards, with different various local practices.  To the

22  extent we were able to do that, I believe we did that.

23          THE COURT:  Mr. Kulwin, let me know when you are at a

24  good point for a break.

25          MR. S. KULWIN:  I'm at a good point now.

Reiss - direct

1     THE COURT:  Okay.  We will take our morning break.

2   (Jury out.)

3     THE COURT:  Mr. Kulwin, do you have a sense of how

4  much longer you will be on direct?

5     You may step down, sir.  Come back in about ten

6  minutes.

7     MR. S. KULWIN:  I do, Judge.

8     THE COURT:  Just ballpark.

9     MR. S. KULWIN:  Give me two seconds.

10   (Brief pause.)

11     MR. S. KULWIN:  I've been going for two hours?

12     THE COURT:  Yes.

13     MR. S. KULWIN:  I would say a little under two more.

14     THE COURT:  Okay.  We will pick up in ten minutes.

15   (Recess taken.)

16     MR. NOVACK:  I want to wait for Mr. Kulwin --

17     THE COURT:  Yes.

18     MR. NOVACK:  -- but I want to raise something before

19  the jury comes back in.

20     THE COURT:  Yes.

21     (Brief pause.)

22     THE COURT:  You had an issue?

23     MR. NOVACK:  Yes, Judge.

24     If it please the Court, we had thought that Mr. Trump

25  was going to be called shortly after lunch.  We knew it was

1    afternoon, but we kind of was planning on early afternoon.  It

2    doesn't look like that's going to happen now, if we continue

3    the present schedule.

4          I've just been advised that Mr. Trump is filming

5    tomorrow afternoon in New York the final episode of either

6    Celebrity or some Apprentice show.  He says they are -- I'm

7    told that he's got hundreds of people coming in from all over

8    the country and that he needs to leave here at noon tomorrow

9    to make that.  And he's available now.  He was going to be

10    available all afternoon and all morning.

11          But if Mr. Reiss' direct is going to go until 1:00

12    o'clock; and, then, there's going to be, obviously, a lunch

13    hour -- understandably, so -- and, then, a cross, that means

14    we're talking about 3:30, 4:00 o'clock at the earliest for

15    Mr. Trump.  And I'm just fearful that that won't allow him to

16    leave at noon.  And I'm wondering if there's a way that we

17    could do a little out of ordering here, to get that done.

18          THE COURT:  Well, I am a little frustrated that you

19    are just raising this with me now.

20          Mr. Kulwin --

21          MR. S. KULWIN:  No, Judge.

22          THE COURT:  -- how much longer do you think you are

23    going to be with this witness?

24          MR. S. KULWIN:  My best estimate is two hours, Judge.

25    And, to be honest with you, you know, he's known about this

Reiss - direct

198

1    for months.  This was supposed to be on his schedule.  We've

2    told them probably 30 times Tuesday or Wednesday.

3            Originally -- originally -- Ms. Cremer hadn't all of

4    a sudden found a kindergarten problem, he wasn't even going to

5    --

6            THE COURT:  That is not fair.

7            MR. S. KULWIN:  I don't mean found a kindergarten, he

8    had a -- I meant had a kindergarten problem.  I've got kids.

9    I know.

10           He would have been scheduled to start on Wednesday

11   morning and they knew that.  They're trying to order our

12   proof, Judge.

13           Quite frankly, that's what they're trying to do.

14           THE COURT:  Well, let us continue.

15           MR. NOVACK:  Cremer was always after Trump.

16           THE COURT:  Let us continue with Mr. Reiss and we

17   will see where we are.

18           Bring in the jury, please.

19           (Jury in.)

20           THE COURT:  You may be seated.

21           You may proceed.

22           MR. S. KULWIN:  Thank you, your Honor.

23   BY MR. S. KULWIN:

24   Q.  Mr. Reiss, when -- as a result of all of the work that we

25   just spoke about going into the Chicago project, you believed

Reiss - direct

199

1   that the Trump organization was in the best situation in the

2   United States to prepare a hotel budget for the Trump Chicago

3   project, correct?

4   A.  A hotel condominium budget, yes, I did.

5   Q.  Right.

6           Now, I want to show you Plaintiff's Exhibit 4,

7   Exhibit H.

8           Can you see it up there?

9   A.  Yes, I do.

10  Q.  You prepared this budget, correct?

11          This is from the original property report, September

12  of '03?

13  A.  It's from one of the --

14  Q.  2003.

15  A.  It's from one of the amendments.

16  Q.  Right.

17  A.  I don't know which one.

18  Q.  I'm sorry.

19          The second amended property report?

20  A.  The second amended.

21  Q.  You prepared this budget, right?

22  A.  I believe the second amendment came out after I had left.

23  Q.  Okay.

24  A.  But I'm sure I worked on it.

25  Q.  Okay.

Reiss - direct

200

1        And let's go to the first amendment.

2        MR. S. KULWIN:  No. 2, please, Exhibit H.

3   BY MR. S. KULWIN:

4   Q.  Let's stick with one that you worked on.  I had the wrong

5   exhibit.

6        MR. S. KULWIN:  Exhibit 2, Mike.  That's Exhibit H.

7        Thank you.

8   BY MR. S. KULWIN:

9   Q.  Now, this appears in the first amended property report.

10  Do you recall that?

11        THE COURT:  Mr. Kulwin, you have thrown out a couple

12  numbers now.  Can you please clarify for the record --

13        MR. S. KULWIN:  Sure.

14        THE COURT:  -- what exhibit is up?

15        MR. S. KULWIN:  I apologize, Judge.

16  BY MR. S. KULWIN:

17  Q.  Exhibit H is from Plaintiff's Exhibit 2 in evidence, the

18  February 25th, 2004 amended property report.

19        Does that ring a bell to you?

20  A.  Yes.

21  Q.  Do you want to see it to confirm it?

22  A.  No, I'm familiar with it.  I mean, I remember it.

23  Q.  Yeah.

24        Now, in here you have the $5,038,625, commissions and

25  other revenues, right?

Reiss - direct

201

1   A.  Correct.

2   Q.  And if you look at the footnote, it describes -- and we

3   can pull that up, maybe.

4         If you look at the footnote, it describes that this

5   is -- you're referring to the income from the ballrooms, the

6   meeting rooms, the F&B related to that, correct?

7   A.  Yes.

8   Q.  Okay.

9         Now, you were aware, were you not, from all of your

10  experience in 2003, that ballrooms, meeting rooms, food and

11  beverage operation revenues go up and down, right?

12  A.  Yes.

13  Q.  That they fluctuate, correct?

14  A.  Like all income, yes.

15  Q.  Right.

16        That wasn't some big hidden secret in the hotel

17  business, was it?

18  A.  No.

19  Q.  It was a well-known fact, right?

20  A.  Yes.

21  Q.  You could have years where commissions like this could be

22  as high as, I don't know, 20 percent higher, right?

23  A.  Yes.

24  Q.  Or 20 percent lower --

25  A.  Yes.

Reiss - direct

1    Q.  -- right?

2           It can go even -- and it can even get worse.  It can

3    go up as high as 50 percent higher and 50 percent lower -- or

4    depending on what's going on -- right?

5    A.  Income fluctuates.

6    Q.  Right.

7           And you were aware that there could be those kinds of

8    ups and downs in 2003, true?

9    A.  Yes.

10   Q.  Okay.

11   A.  Yes.

12   Q.  All right.

13          MR. S. KULWIN:  You can take that down, Mike.

14          Thank you.

15   BY MR. S. KULWIN:

16   Q.  All right.

17          Let's, if we could, switch to a slightly different

18   topic.  When the Chicago project began, you were involved in

19   researching brokerage firms to sell both the residential and

20   hotel condominium units, right?

21   A.  Yes.

22   Q.  And you also assigned Ms. Cremer and Mr. Flicker to help

23   you, right?

24   A.  Yes.

25   Q.  And the three of you traveled to Chicago on a regular

Reiss - direct

1    basis to review proposals from brokerage firms, to decide

2    which firm you were going to use?

3    A.   Yes.

4    Q.   Among the firms you interviewed were Koenig & Strey?

5    A.   That's correct.

6    Q.   Baird & Warner?

7    A.   Correct.

8    Q.   Prudential?

9    A.   Correct.

10   Q.   American Invsco?

11   A.   Correct.

12   Q.   And there may have been many others?

13   A.   Yeah, that may have -- well, we also interviewed

14   @properties, I remember.

15            There may have been one or two others, but they don't

16   come to mind.

17   Q.   And, to be thorough, you investigated these firms to

18   ensure that they could reflect the level of quality Mr. Trump

19   wanted to create, correct?

20   A.   Yes.

21   Q.   In fact, you visited one of Koenig & Strey's sales office

22   at the Palmolive Building here in Chicago as a secret shopper,

23   pretending to be a buyer, right?

24   A.   I did some shopping on my own, that's correct.

25   Q.   Okay.

Reiss - direct

204

1          Ultimately, you advised Mr. Trump that you were

2     recommending hiring Koenig & Strey, correct?

3     A.   That's right.

4     Q.   But it was Mr. Trump who made the ultimate decision to

5     hire them, correct?

6     A.   Yes.

7     Q.   And he did that after interviewing them, as well, correct?

8     A.   I think the actual procedure was I had -- we had -- gone

9     through the process in Chicago.  We felt they were the best of

10    the group we had interviewed.  I told Donald that.  And I

11    said, "Let's fly them out here and you can make the final

12    choice."

13         And he interviewed them.  I don't think he

14    interviewed any other firms.

15    Q.   Right.  That's my point.  I'm in complete agreement.

16    A.   Right.

17    Q.   My point is, is that you said, "Mr. Trump, we've winnowed

18    it down."

19    A.   Right.

20    Q.   "This is the one we're -- this is the horse that we're

21    betting on.  Let's fly them out to New York.  You can meet

22    with them and make the call"?

23    A.   Right.

24    Q.   And that's exactly what he did, right?

25    A.   Yes.

Reiss - direct

1          In all -- in all -- kind of things like that, it was

2    very important that even though I may have felt that if they

3    were the best choice, that Donald had to feel comfortable with

4    them, and we had to witness that the two firms could work

5    together -- the two principals.

6    Q.  I'm sorry?

7    A.  The two principals.

8    Q.  Okay.

9          Now, in addition to hiring a brokerage firm, the

10   Trump organization developed marketing material to help sell

11   the hotel condominiums, right?

12   A.  That's right.

13   Q.  To assist in that effort, you investigated the Chicago

14   marketplace, correct?

15   A.  With the assistance of K&S.

16   Q.  Right.

17         You did a number of shopping expeditions on your own,

18   for the purpose of learning the marketplace?

19   A.  Yes.

20         I actually did that pretty early.  I think I did that

21   really prior to the retention of K&S.

22   Q.  Okay.

23         But by "shopping expeditions," you mean, like, you'd

24   go over to the Peninsula or the Four Seasons or whomever you

25   were considering as potential --

Reiss - direct

1   A.  Yes.  I wanted to get a feel for what the actual market

2   was, not in terms of any reports, but what the prices were

3   really being -- what prices were really being -- offered, yes.

4   Q.  Not that I'm angry, I'm not.

5           MR. S. KULWIN:  Could you ask Mr. Reiss if he could

6   just kind of wait until the question's over?

7           THE COURT:  If you can wait --

8           THE WITNESS:  I apologize.

9           THE COURT:  -- it works better.

10          (Brief pause.)

11  BY MR. S. KULWIN:

12  Q.  Ultimately, the Trump organization provided information to

13  Koenig & Strey, to help it produce the marketing materials for

14  Trump Tower, correct?

15  A.  That's correct.

16  Q.  Specifically, you and Ms. Cremer provided that

17  information, right?

18  A.  Correct.

19  Q.  You told them the number of units that were going to be in

20  the building at that time?

21  A.  Correct.

22  Q.  The concept of the building -- that it would include

23  residential condos, hotel condominiums, commercial space,

24  office space and a hotel -- right?

25  A.  That's right.

1  Q.  Later on when it happened, you were the one that advised

2  him that there would be luxury function rooms and, you know,

3  ballrooms and things of that nature.  You would have been the

4  one to advise him of that, right?

5  A.  Yes.  I'm -- Jill was the primary -- primarily -- the

6  primary contact between me and them; but, sure.  We met with

7  them frequently.

8  Q.  You also gave them information about Mr. Trump, himself,

9  correct?

10  A.  Correct.

11  Q.  You showed them marketing brochures employed in Trump New

12  York for the hotel condominium?

13  A.  That's right.

14  Q.  And the Trump organization had to review and approve all

15  marketing materials used by Koenig & Strey, correct?

16  A.  Yes.

17  Q.  To the best of your knowledge, Koenig & Strey never used

18  any non-approved marketing materials for Trump Tower Chicago,

19  correct?

20  A.  That's right.

21  Q.  Part of the reason that Trump -- or the Trump organization

22  -- reviewed all of the marketing pieces before they were used

23  was to protect the Trump brand, correct?

24  A.  That's right.

25  Q.  And Trump did it to ensure consistency of the message that

Reiss - direct

1   was being given to prospective buyers, true?

2   A.  That's right.

3   Q.  And to be sure that prospective buyers were being given

4   accurate information about what the developer was offering for

5   sale, true?

6   A.  True.

7   Q.  With respect to the Trump Tower marketing, Mr. Trump would

8   have been very involved in the process, correct?

9   A.  He was involved in the process, but I don't think that he

10  actually -- as a matter of fact, I'm sure he didn't

11  actually -- approve every single marketing issue that went

12  out.

13  Q.  That's not my question, sir.

14  A.  Okay.

15  Q.  My question is:  He was very involved in the process?

16  A.  Yes.

17  Q.  And Mr. Trump would have run the whole process on deciding

18  how to market to buyers, very close to the vest.

19          Let me rephrase it?

20          He would have held the whole process of how to market

21  to buyers very close to the vest, right?

22  A.  I'm not sure I understand.

23  Q.  Well --

24          MR. SHONKWILER:  Your Honor, we object to the form of

25  the question.  Before Mr. Kulwin starts reading the dep

Reiss - direct

 1   transcript, we'd like him to rephrase.

 2          Vague.

 3          THE COURT:  He said he was not sure he understood.

 4   So --

 5          MR. S. KULWIN:  Okay.

 6          THE COURT:  -- if you are going to refresh his

 7   recollection, you may.  But there is nothing to impeach on, if

 8   that is where you are going.

 9   BY MR. S. KULWIN:

10   Q.  Let me see if I can -- see if I understand.

11          The marketing -- the Trump marketing, because they

12   generated it all themselves -- Mr. Trump liked all of that

13   held very close to the vest of the Trump organization?

14          MR. SHONKWILER:  The same objection.  Vague, your

15   Honor.

16   BY MR. S. KULWIN:

17   Q.  If you understand, sir.

18          Do you understand?

19          THE COURT:  Overruled.

20          You may answer, if you understand the question.

21   BY THE WITNESS:

22   A.  I don't under- -- I honestly don't understand the

23   question.  I would --

24   BY MR. S. KULWIN:

25   Q.  Okay.  Let me --

 1   A.  I would -- Jill worked -- may I answer in my terms or --

 2   Q.  No.  You don't understand the question.

 3   A.  Okay.

 4   Q.  I'm going to rephrase the question.  But, first, I'm going

 5   to see if I can refresh your recollection.

 6           MR. S. KULWIN:  Page 93 at Line 14.

 7           (Document tendered.)

 8           (Brief pause.)

 9   BY THE WITNESS:

10   A.  Okay.  That's what I said.

11   BY MR. S. KULWIN:

12   Q.  So, maybe you can explain to me.  When you say, "Donald

13   would have been very involved in the process, it would have

14   been run very close to the vest," you meant that Donald Trump

15   was very involved in the process, number one, right?

16   A.  Yes.

17   Q.  And when you say held "close to the vest," he kept his own

18   counsel, as they say.  He kept what he believed tightly within

19   himself and, then, told others what he thought?

20   A.  I mean, it's -- I have to agree.  But if -- I loosely used

21   the colloquialism in that deposition and I'm just not sure

22   what I would have meant at the time.

23   Q.  Now, the marketing information that you were providing to

24   Koenig & Strey, along with Mr. Trump, would have been turned

25   into brochures -- the ones that we talked about before?

Reiss - direct

1    A.   Correct.

2    Q.   Do you remember that?

3            And I want to go through just some of the pages of

4    that.

5            MR. S. KULWIN:  Plaintiff's Exhibit 75 in evidence,

6    Bates Stamp 4371.

7            Can we blow this up a little bit?

8    BY MR. S. KULWIN:

9    Q.   Now, we start with, in this one, this picture has Mr.

10   Trump sitting in a hotel lobby and he's talking about the

11   project, correct?

12   A.   I think that's his apartment.

13   Q.   His apartment.  Okay.

14           But one of the things that the purpose of this

15   brochure does is it's stressing his personal involvement in

16   the project, isn't it?

17   A.   Yes.

18           MR. S. KULWIN:  If we can go to 4379.

19   BY MR. S. KULWIN:

20   Q.   Here, it talks about all of the facilities that are

21   offered -- that are going to be offered -- on the project.

22           The project overview, right?

23   A.   Yes.

24   Q.   Okay.

25           2.6 million gross square feet, that's the actual

Reiss - direct

212

1  space that's in the building, right?

2  A.  That's right.

3  Q.  The height, 90 stories; the -- I'm going to skip the

4  residential condominiums.

5       The 286 five-star luxury condominium guest rooms,

6  right?

7       The health club, right?

8  A.  Right, it's here.

9  Q.  And it also talks about the grand and junior ballrooms

10 with the 30-foot ceilings, prefunction areas, outdoor tower,

11 right?

12 A.  Outdoor terrace.

13 Q.  Outdoor terrace.

14      Did I say "tower"?  I apologize.  Outdoor terrace,

15 correct, it promotes that?

16      It also promotes the conference center, 20,000 square

17 feet and the meeting rooms, the executive lounge with a lake

18 view.  It promotes all of those things, correct?

19 A.  Correct.

20 Q.  Before we get to another aspect of these -- this

21 brochure --

22      MR. S. KULWIN:  Just leave that up there for a

23 second.

24 BY MR. S. KULWIN:

25 Q.  Mr. Reiss, you would agree that there were -- at least

Reiss - direct

1    that there were -- a lot of different types of buyers, based

2    on your experience, that Trump was trying to appeal to on the

3    hotel condominium sales, right?

4    A.   Yes, buyers with different reasons to own a unit.

5    Q.   Some of the people you were appealing to wanted the

6    lifestyle -- the luxury of owning there.  They wanted to come

7    down there and use it and, then, rent it when they couldn't

8    use it.

9         That was one set of buyers you were appealing to,

10   true?

11   A.   Yes.

12   Q.   Another set of buyers you were appealing to were people

13   who were, you know, maybe had a home in the suburbs and they

14   wanted to use it for what -- and I've never understood this

15   term; I don't know how to say it; but, I think it's popular in

16   New York -- a pied-a-terre, right?

17   A.   Yes.

18   Q.   That's, like, French for -- French or Italian for -- like

19   a little apartment in the city, right?

20   A.   Yes.

21   Q.   And some people were very sophisticated and they were

22   looking at it not as an investment, from a securities point of

23   view -- I want you to put that aside -- they were looking at

24   it as an investment, like you looked at it as an investment

25   when you bought, correct?

Reiss - direct

214

1  A.  Yes.

2  Q.  And those more soph- -- the people looking at it as an

3  investment would be more sophisticated people who would be

4  analyzing it more as a deal, correct?

5  A.  Yes.

6  Q.  All right.

7          And, so, when the property report tells them that

8  they're getting the grand and junior ballrooms and the

9  ceilings and all that, as part of the deal that they're

10  buying, one of the things they want to do is they want to see,

11  "Well, what type of ballrooms are we getting here as part of

12  the deal?"

13          That's part -- I know that's not all of it, but

14  that's part -- of what this is appealing to; isn't that right?

15          MR. SHONKWILER:  Your Honor, objection.

16  Mischaracterizes the evidence.  Compound.

17          THE COURT:  Sustained on form.

18          MR. S. KULWIN:  Okay.  I will rephrase, Judge.

19  BY MR. S. KULWIN:

20  Q.  Let me break it down for you.

21          The people who are, like, more sophisticated, who are

22  buying as an investment, they're more likely to look at the

23  property report and see, "What are we getting here?  What's

24  part of our deal?"

25          You'd agree with that, right?

```
 1              MR. SHONKWILER:  Objection.  Calls for speculation.

 2              THE COURT:  Sustained.

 3              MR. S. KULWIN:  Then I'll rephrase it.

 4   BY MR. S. KULWIN:

 5   Q.  Sir, when you were trying to appeal to these certain

 6   sophisticated buyers, you understood that they would analyze

 7   it more in terms of a deal, correct?

 8   A.  Yes.  They would be looking at it for income.

 9              Although I do really have to add that under federal

10   statute, we were not allowed, nor did we, to discuss with any

11   potential buyer whether -- the amount of income they would

12   make or not make.

13   Q.  Right.  I understand that.

14   A.  Okay.  It was their decision to make.

15   Q.  All right.

16              That's for them to decide?

17   A.  Yes.

18   Q.  I understand that.

19              You didn't promise them, "You're going to make this

20   much money" or that much money.  You weren't allowed to

21   promise them that, right?

22   A.  Right.

23   Q.  Okay.

24              That's not my question, though.

25              We've agreed that a more sophisticated buyer was
```

Reiss - direct

1   going to analyze it more on the basis of a deal and they would

2   look at -- or you would think they would look at -- what the

3   whole deal is made up of, right?

4   A.  That's correct.

5   Q.  And one of the things at the time you were there -- the

6   deal included was -- an interest in the grand and junior

7   ballrooms and things of that nature, right?  That was part of

8   the common elements at one point?

9   A.  That's right.

10  Q.  Okay.

11        And when you put this in the brochure, of course,

12  you're helping those people -- or it's designed to say, "Look,

13  this is part of the deal.  This is what it's -- this is what

14  the deal is.  This is what you're going to look at," right?

15        MR. SHONKWILER:  Objection, your Honor.

16        THE COURT:  Sustained.

17  BY MR. S. KULWIN:

18  Q.  When you designed the brochure what you were trying to

19  tell those sophisticated buyers is, "Part of what you're

20  getting, here it is, grand and junior ballrooms"?

21        MR. SHONKWILER:  Objection, your Honor.  There's no

22  foundation for this.  It's --

23        THE COURT:  Overruled.

24        You may answer that question.

25  BY MR. S. KULWIN:

Reiss - direct

1    Q.   Sir?

2    A.   The brochure describes what's in the building.

3    Q.   Right.

4    A.   It doesn't necessarily imply there's an ownership of these

5    facilities.

6             For instance, retail and restaurant, sir, on this

7    brochure, as well.  And that at no time was that in common

8    ownership.

9             So, this is designed to be a description of the

10   building into which you are thinking about buying a

11   condominium unit.

12   Q.   And while you were there, an interest in the hotel that

13   specifically included the grand and junior ballrooms, correct?

14   A.   Yes.

15   Q.   Now --

16            MR. S. KULWIN:  If we could turn to 4387 -- Bates

17   4387 of Exhibit 75.

18            Is that 4387?  I'm looking for the FAQs.

19            May I have a moment, your Honor?

20            THE COURT:  You may.

21            (Brief pause.)

22            MR. S. KULWIN:  4383.

23            I apologize, Mike.  It's always the lawyer's fault,

24   never the tech guy.

25   BY MR. S. KULWIN:

Reiss - direct

218

1   Q.  And these are the frequently asked questions.  And you,

2   when you were there, participated in having these developed,

3   correct?

4   A.  That's correct.

5   Q.  Okay.

6           And one of the things that you specifically --

7           MR. S. KULWIN:  I'm not trying to read that one.  I'm

8   going to go over here.

9           Thank you, Mike.

10  BY MR. S. KULWIN:

11  Q.  One of the things that you specifically put in there was:

12  "How does an owner's stay in a personal guest room affect the

13  rental program," right?

14  A.  That's right.

15  Q.  And, then, the answer goes on, "When an owner or the

16  designated guest of an owner occupies their personal

17  guestroom, the reservation system does not assign any rotation

18  points for that night.  Therefore, you are encouraged to stay

19  in your personal guestroom," and it goes on.

20          Right?

21  A.  That's right.

22  Q.  Now, the Trump organization's intent in putting that in

23  there was to tell potential buyers, "Look, you can own a

24  condo, have all the benefits of staying in it whenever you

25  want it, and it won't harm your ability to get rental income

Reiss - direct

1    from that down the road," true?

2    A.   That's right.

3              MR. S. KULWIN:  Can you give me 4370?

4              And can you blow up and highlight -- one second.

5              (Brief pause.)

6              MR. S. KULWIN:  I'm having trouble finding it.

7    BY MR. S. KULWIN:

8    Q.   Let's --

9    A.   May I just add to the previous answer, just a short

10   sentence?

11   Q.   If you -- if you -- must.

12   A.   The theory was not only to help the owner who stayed, but,

13   also, to help the owners who didn't stay, because, in effect,

14   there were less hotel rooms to rent for a finite, the same

15   amount of occupancy.  So, we felt it benefitted everyone.

16   Q.   Right.  Okay.

17             MR. S. KULWIN:  In any event, let's skip to 4390, if

18   we could.  I think that's Mr. Trump.

19             No, that's not -- there it is.

20   BY MR. S. KULWIN:

21   Q.   One of the things that Mr. Trump likes to do is he likes

22   his likeness to be in the brochures, correct?

23   A.   Yes.

24   Q.   He thinks that's an effective way to communicate the

25   brand, right?

1    A.  Yes.  It's very much the brand name that relies on a

2    person.  That's right.

3    Q.  The brand name relies on people thinking Donald Trump's

4    here?

5    A.  That's right.

6    Q.  Donald Trump knows what he's doing, right?

7    A.  That's right.

8    Q.  Donald Trump is very successful, right?

9    A.  That's right.

10   Q.  Donald Trump is going to build this thing and he's just

11   not going to let some guys we've never heard of just, you

12   know, build it the way they want to.  He's going to make sure

13   it's a great thing, right?

14           MR. SHONKWILER:  Objection, your Honor.  Speculation.

15   Argumentative.

16           MR. S. KULWIN:  No, I'm talking about --

17           THE COURT:  Overruled.

18           MR. S. KULWIN:  I am sorry, Judge.

19           THE COURT:  You may answer, if you can.

20   BY MR. S. KULWIN:

21   Q.  That's the point?

22   A.  It's Donald Trump and his organization.

23   Q.  But there's no pictures of you up there?

24   A.  No, there's no pictures of me up there.

25   Q.  And there's no pictures of Mr. Flicker?

Reiss - direct

221

1  A.  No.

2  Q.  Jill Cremer?

3  A.  No, there isn't.

4  Q.  Jim Petrus, no?

5  A.  No.

6  Q.  Just Donald Trump?

7  A.  Yes, Donald Trump.

8  Q.  Now, at one point, the building was going to have a

9  certain type of spire at the very top of it.  Do you remember

10 that?

11 A.  When I was there, the original design had a spire, that's

12 right.

13 Q.  Okay.

14         And then it --

15 A.  At a very early point.

16 Q.  Right.

17         And then it was changed, right?

18 A.  (No response.)

19 Q.  You've got to say "Yes" or "No."  I'm sorry.

20 A.  Excuse me?

21 Q.  Then it was changed?

22 A.  Yes, it was --

23 Q.  Discussed?

24 A.  What I do remember is even while I was there, there were a

25 lot of technical issues having do with eccentricity of wind

Reiss - direct

1   load and the initial rendering.  And the technological

2   definition of how you'd accomplish it tended to go in

3   different directions.  But that's what I remember.

4   Q.  And, ultimately, the person who had to decide -- the

5   person who made the decision -- about whether the spire was

6   going to come or go was Mr. Trump, correct?

7   A.  I wasn't there when that was changed; but, ultimately,

8   that would have been his decision, sure.  It was a major

9   design and iconic issue.

10  Q.  Okay.

11          Now, another thing that you tried to do was you tried

12  to communicate that Trump -- the Trump brand -- adds value to

13  anything you're going to buy -- the hotel interest or the

14  units -- the Trump brand adds value.

15          Do you remember that being in the brochures?

16  A.  That was very important in all our sales, in New York as

17  well as in Chicago and --

18  Q.  Indeed --

19  A.  -- all other branding operations.

20  Q.  Indeed, I believe the quote was, "The Trump factor."

21          Remember that?

22  A.  Yes.

23  Q.  The Trump factor will add, based on -- not predicting the

24  future, but based on -- the past, would add 79 to 86 percent

25  value.  That's what the brochure said.

Reiss - direct

1          Do you recall that?

2  A.  I don't recall the -- the percentage.  There was a lot

3  of -- there were actually a lot of -- studies done in New York

4  about comparable buildings side by side, one with the Trump

5  name, one that isn't.

6          It seems like a high percentage to me, but there

7  definitely was a Trump factor.

8  Q.  Let me see if I can refresh your recollection.

9          MR. SHONKWILER:  Your Honor, we're going to object on

10 relevance grounds to this entire line of questioning and where

11 it's gone now.

12         THE COURT:  If you are continuing on with the line of

13 questioning about the New York facility --

14         MR. S. KULWIN:  No.

15         THE COURT:  Okay.

16         MR. S. KULWIN:  It's not about New York.

17         THE COURT:  I think you should move on.

18         MR. S. KULWIN:  I'm not asking about New York.

19         THE COURT:  We will hear what the question is.

20         You just said you were going to refresh his

21 recollection about a question regarding the New York facility.

22         So, if you are going to do that, I think you should

23 move on.

24         If you are going to come to Chicago, that is a

25 separate issue.

Reiss - direct

1          MR. S. KULWIN:  I am.

2          I apologize, Judge.  Maybe I misunderstood the

3    answer.

4    BY MR. S. KULWIN:

5    Q.  Sir, what I was asking you is in the brochures you used in

6    Chicago, you used the Trump factor, right?

7    A.  We used -- I don't recall offhand, but I'm not -- we

8    certainly would have used the Trump factor.  It was something

9    we did in New York, as well.

10   Q.  All right.

11         Now, sir, you're familiar with the term "property

12   report," correct?

13   A.  Yes.

14         (Brief pause.)

15         MR. S. KULWIN:  Sorry, Judge.

16   BY MR. S. KULWIN:

17   Q.  It's a document that is required for developers to give to

18   potential buyers.  And it's designed to give them as much

19   pertinent material with regard to the property that a buyer is

20   purchasing as possible, correct?

21   A.  That's correct.

22   Q.  One of the purposes of the property report, as you

23   understood it working at the Trump organization, was to have

24   the sellers define the common elements that are going to be

25   sold to the buyers of the individual condo units, right?

Reiss - direct

1   A.   That's one of the purposes.

2   Q.   And Trump's determination about what features of the hotel

3   it would include in the common elements it was selling, hotel

4   condominium unit owners was a marketing decision, correct?

5   A.   Yes.

6   Q.   The hotel features that Trump put into the property

7   reports -- a description of the common elements -- is what

8   Trump was selling to the hotel condominium buyers in Chicago,

9   correct?

10  A.   Correct.

11  Q.   And Trump chose to put the hotel features it put into the

12  common elements because you and Mr. Trump believed it was

13  something the Chicago condo market cared about, correct?

14           MR. SHONKWILER:  Objection, your Honor, to the use of

15  the word "Trump" without context.  It's vague and ambiguous.

16           THE COURT:  Sustained.

17           Rephrase.

18           MR. S. KULWIN:  Okay.  All right.

19  BY MR. S. KULWIN:

20  Q.   And the features -- the hotel features -- the Trump

21  organization put into the common elements were done because

22  you and Mr. Trump believed it was something the Chicago condo

23  market cared about, correct?

24  A.   Yes.

25  Q.   In fact, if it wasn't something the market cared about,

Reiss - direct

1   you were not going to put it into the common elements, true?

2   A.  For the most part, that's true.

3           There was also our own knowledge of what it takes to

4   run a good hotel.  And it may be that the market wasn't up to

5   date on what they should care about.

6           But I can't think of any specific issues that would

7   have violated that, right.

8   Q.  Right.

9           So, basically, when you and Mr. Trump decided -- when

10  the Trump organization decided -- to put the ballrooms, the

11  hotel facilities, all those things into the common elements,

12  it was something you believed that the market cared about in

13  Chicago, right?

14  A.  Yes.

15  Q.  And it's what -- and I think what you said was -- "It's

16  what we're selling," right?

17  A.  Right.

18  Q.  Thank you.

19  A.  Can I add to that somewhat -- the answer?

20          I gave my "Yes" or "No."

21  Q.  I'm not trying to pin you down.  I'm just --

22  A.  No, I know you are not.  But there is a little more to the

23  answer.  That's all.

24  Q.  Okay.

25  A.  That, initially, there was no large-scale ballroom.  The

Reiss - direct

1    ballroom came about because the excellent initial sales and

2    the lack of progress, in renting the office space, dropped the

3    office and we took advantage of that.  That's my only

4    clarification I want to make.

5    Q.  I know.  And that's fine, Mr. Reiss.  We're going to get

6    -- if you're patient, we're going to get -- to all of that.

7    A.  Okay.

8    Q.  We're going to get to everything.

9    A.  Okay.

10   Q.  And try to cover the waterfront here, as quickly as

11   possible.

12   A.  Okay.

13   Q.  Now, Trump wanted -- when they put that in the common

14   elements, the Trump organization wanted -- buyers to believe

15   that if they signed a contract to buy a hotel condominium

16   unit, they would also get an ownership interest in the hotel,

17   along with the rest of the buyers, right?  That was the point?

18          MR. SHONKWILER:  Objection.  Objection.

19   BY THE WITNESS:

20   A.  Yeah --

21          MR. SHONKWILER:  The witness can speak to his

22   knowledge and his recollection.  He is now being asked to

23   speak for the entire organization.

24          MR. S. KULWIN:  He is the organization, Judge.  He is

25   an agent.  He was running the Marketing Department.

Reiss - direct

1          THE COURT:  Overruled.

2          You may answer, sir, if you can.

3          THE WITNESS:  Please restate.

4          MR. S. KULWIN:  Joe, I hate to do this, but can I

5   just have that one back?

6          THE COURT:  You can read it back.

7          MR. S. KULWIN:  Thank you, your Honor.

8          I apologize.

9          (Record read.)

10  BY THE WITNESS:

11  A.  The project report said that was the ownership interest

12  and that we presented that to the owners, and that was the

13  basic document on which they relied -- they were supposed to

14  rely, anyway.

15  BY MR. S. KULWIN:

16  Q.  Okay.

17         And it also -- because we saw in the budget earlier,

18  it also -- told them, if they looked at the budget, that they

19  were going to be getting a percentage ownership of the revenue

20  that those facilities would generate.

21         I believe it first was $5 million, right?

22  A.  Yes.

23  Q.  Okay.

24         MR. S. KULWIN:  Judge --

25  BY THE WITNESS:

```
 1   A.  I don't believe it was a percentage.  They were -- they
 2   owned all of the net revenue.
 3            MR. S. KULWIN:  Your Honor, I apologize, it's not
 4   Mr. Reiss' fault, but I've been asked by the court reporter,
 5   can you just ask him to wait until the question is over?
 6            THE COURT:  Yes.
 7            THE WITNESS:  Okay.
 8            MR. S. KULWIN:  Because I am getting in trouble.
 9            THE COURT:  Please wait.
10            THE WITNESS:  I'm trying.
11            THE COURT:  Joe is taking down everything that is
12   being said.
13            THE WITNESS:  Okay.
14            THE COURT:  So, when two people talk at the same time
15   --
16            THE WITNESS:  I understand.  I'm sorry.
17            THE COURT:  You are talking when I talk now.  So, it
18   is very difficult for him.
19            THE WITNESS:  It's a habit.
20            MR. S. KULWIN:  I know you're from New York.
21            THE WITNESS:  Yes.
22            (Laughter.)
23            MR. S. KULWIN:  I'm like that, too.  I'm like that,
24   too.  I get it.  I get it.  Okay.
25   BY MR. S. KULWIN:
```

Reiss - direct

230

1   Q.  Now, prior to August of 2006, Mr. Reiss, and while -- in

2   part, while -- you were there, let's -- prior to October of

3   2006 -- August of 2006, Trump issued while you were there two

4   amended property reports, the first and the second, correct?

5   A.  Correct.

6   Q.  And you worked on the drafting of the first amendment

7   property report that came out in February of 2004, correct?

8   A.  That's correct.

9   Q.  And these documents -- and you were just about leaving,

10  but had probably worked on the second amendment when that came

11  out, in August of 2004, correct?

12  A.  That's correct.

13  Q.  Okay.

14          And when these new documents were generated, they

15  were distributed to potential buyers, correct?

16  A.  Yes.

17  Q.  Along with there were also the same glossy brochures we

18  were looking at before?

19  A.  Yes.

20  Q.  And Trump knew that the marketing materials had to be

21  consistent with what it was representing in the property

22  report, correct?

23  A.  Yes.

24  Q.  Now, if you can go to Section 3.1 of the February, 2004,

25  first amended property report, which would be Exhibit 2, in

```
 1   evidence.

 2             (Brief pause.)

 3   BY MR. S. KULWIN:

 4   Q.  And 3.1 says, "The common elements shall consist of all

 5   portions of the property, except the units, and including the

 6   limited common elements -- "

 7             MR. S. KULWIN:  Keep going.

 8   BY MR. S. KULWIN:

 9   Q.  And up here --

10             MR. S. KULWIN:  Can you just blow up -- yeah, there

11   you go.

12   BY MR. S. KULWIN:

13   Q.  " -- and it includes laundry facilities, lobby facilities,

14   meeting, function rooms and ballrooms, storage areas, the

15   executive lounge," and on and on.

16             MR. S. KULWIN:  Can you highlight the executive

17   lounge?

18             Thank you.

19   BY MR. S. KULWIN:

20   Q.  That's what was put in there, correct?

21   A.  Yes.  Yes.

22   Q.  And in the August, 2004, amendment, that didn't change,

23   did it; to your knowledge?

24   A.  To -- I -- to my knowledge, it didn't change, but I

25   wouldn't know one way or the other.
```

Reiss - direct

1   Q.  Okay.

2   A.  I wouldn't remember one way or the other.

3   Q.  Okay.

4        And we've already gone over in each of these property

5 reports there was an estimated budget.

6        MR. S. KULWIN:  Exhibit H, please?

7        Can I have Exhibit H?

8 BY MR. S. KULWIN:

9   Q.  While he is looking -- there it is.

10        Okay.  And this is the revenue right here

11 (indicating), just so we're clear, that's associated -- this

12 $5,038,000, that's what's associated -- with the ballrooms,

13 the meeting rooms, the function rooms, things of that nature,

14 correct?

15   A.  Correct.

16   Q.  Now, these ballrooms, meeting rooms, functional rooms,

17 center, all these things -- let me rephrase that.

18        The hotel -- the Trump International hotel, forget

19 about the residential condominiums -- consisted of the hotel

20 units, right -- the rooms?

21   A.  Yes.

22   Q.  Okay.

23        And those are owned by individuals?

24   A.  Yes.

25   Q.  It consisted of the lobby, right?

Reiss - direct

1  A.  Yes.

2  Q.  The health club, right?

3  A.  Yes.

4  Q.  Okay.

5      And there's some commercial space, stores and things

6  of that nature, right?

7  A.  Yeah, but the commercial -- the stores wouldn't have been

8  as part of a hotel condominium.

9  Q.  Right.

10  A.  My recollection is they were reserved --

11  Q.  Right.

12  A.  -- for the owner.  Okay.

13  Q.  Correct.  I'm not -- we're in agreement.

14      Okay.  And, then, the hotel, the big -- a big --

15  chunk of the hotel was the grand and junior ballrooms, the

16  conference centers, the meeting centers, things of that

17  nature, right?  It was a big chunk of the hotel?

18  A.  Yes.

19  Q.  So, in a real sense, when the Trump organ- -- the Trump

20  organization, by offering all of these features -- the ball

21  rooms, the meeting rooms, things of that nature -- in the

22  common elements in these property reports was telling

23  potential buyers, "Buy a hotel condominium and you're not just

24  buying a room at a hotel.  You're buying an interest in the

25  heart of the hotel," correct?

Reiss - direct

1   A.  Yes.  "You're buying a share of the common elements."

2   That's right.

3   Q.  An ownership interest in the elements that were displayed

4   beautifully in the brochures -- the junior ballrooms, the

5   grand ballrooms, things of that nature -- right?  Displayed

6   beautifully in the brochures?

7   A.  Yes.

8   Q.  And, really, an ownership interest, to a certain degree,

9   in the Trump brand, because they're going to be owning part of

10  the Trump hotel, right?

11  A.  Yes.

12  Q.  Now, these hotel features we talked about, they don't just

13  generate revenue, they generate a lot of expenses, too?

14  A.  Yes.

15  Q.  And the difference between the revenues that they generate

16  and the expenses, you know, that's the profit on them, right?

17  A.  Yes.

18  Q.  And under the two reports that we looked at, the condo

19  association would receive all the revenue from those

20  functions, right -- those facilities?

21  A.  Yes.

22  Q.  The condo association would pay the expenses for those

23  facilities?

24  A.  Correct.

25  Q.  And if there was a profit, they would keep it?

Reiss - direct

235

1   A.  Correct.

2   Q.  Which they could use to reduce monthly assessments or put

3   it in a special reserve, whatever, right?

4   A.  That's correct.

5   Q.  And that, in turn, could lower the cost of owning the

6   hotel condominium unit, if they used it to lower assessments,

7   right?

8   A.  That's right.

9   Q.  And increase the profit on renting the hotel condominium

10  unit?

11  A.  That's right.

12  Q.  Now, the revenue that was -- that you put in those budgets

13  for the meeting rooms, the function rooms and things of that

14  nature, it was -- a very conservative estimate, wasn't it?

15  A.  I can't characterize it ten years later.

16  Q.  Well --

17  A.  It was an estimate that I certainly believed in and --

18  Q.  Right.

19  A.  -- and the analysis, we did support it.

20  Q.  Two questions about that one.

21          Let me see if I can jog your memory.

22          The revenue that you had up there on the common

23  elements was based on a 65 percent occupancy.  Do you recall

24  that?

25  A.  Yes, I'm -- I'm -- familiar with the note, but that

1    doesn't mean it was conservative or liberal.  It was a

2    guess -- it was a -- it was a good estimate on what occupancy

3    might be.

4    Q.  Okay.

5            And that was based -- okay.  That was my mistake.

6            That was based, as you just said, on a lot of

7    detailed research that went into it, correct?

8    A.  Yes.

9    Q.  Based on all the information that you gathered, that we

10   talked about before, correct?

11   A.  Based on surveys that -- with Mike Levchuck, that we did

12   of the Chicago marketplace, that's right.

13   Q.  Mike's the professor --

14   A.  Yes.

15   Q.  -- of hotel accounting?

16   A.  Sorry.

17           Yes.

18           (Laughter.)

19   BY MR. S. KULWIN:

20   Q.  It's me.  No, it's really -- it's not you.  It's not about

21   you.  It's about me.

22           (Laughter.)

23   BY MR. S. KULWIN:

24   Q.  What I mean is Mike's the professor of the hotel

25   accounting, correct?

1    A.   Correct.

2    Q.   And this was also -- all these commissions were based on

3    an estimate of 33 percent occupancy of the ballrooms.  Do you

4    remember that?

5    A.   That's correct.

6    Q.   And the estimated rental rate for the meeting and function

7    rooms was $2,000 a day.  Do you recall?

8    A.   I think that was in the second amendment.  I think the

9    first amendment was a little less.

10   Q.   Okay.

11          And for the ballrooms, $5400 a day?

12   A.   Yeah.

13   Q.   As we mentioned before, just to be clear, these

14   estimates -- all of them -- took into account seasonal

15   fluctuations -- you know, bar mitzvah season, wedding season,

16   bad economy, good economy -- right?

17   A.   Yes.  And that's the purpose of occupancy.

18          Occupancy, basically, levels everything out over the

19   course of a 12-month period.

20   Q.   Right.

21          And, as you mentioned, these were more than just

22   Trump's best efforts.  You called around to other Chicago

23   hotels and got their revenue numbers for these types of

24   operations?

25   A.   To the extent they divulged them, we got those numbers,

Reiss - direct

238

1     that's right.

2     Q.  And, again, you mentioned Mr. -- Professor Mike -- I can't

3     recall his last name.

4     A.  Levchuck.

5     Q.  Okay.  I will just call him "Professor Mike."

6          You mentioned Professor Levchuck, and he was very

7     expert in doing just this kind of thing -- making these kinds

8     of projections -- right?

9     A.  Correct.

10    Q.  And he was very helpful in preparing that operating

11    budget, correct?

12    A.  Yes.

13    Q.  And, so, those numbers were -- revenues and expenses, were

14    -- what Trump reasonably thought the hotel would experience

15    with the condo association owning those elements, correct?

16    A.  Yes.

17          MR. SHONKWILER:  Objection, your Honor, just to the

18    use of the word "Trump," again.

19          THE COURT:  Sustained.

20          Do you want to clarify?

21          MR. S. KULWIN:  Yes.  Yes, ma'am.

22    BY MR. S. KULWIN:

23    Q.  Those numbers were -- those revenues and expenses were --

24    what the Trump organization reasonably thought the hotel would

25    experience with the condo association owning those elements,

Reiss - direct

1    correct?

2    A.  Yes.

3    Q.  Taking into account all fluctuations and revenues common

4    in the hotel business, as we just said?

5    A.  Yes.

6    Q.  Now, one of the things you knew at the time was -- as you

7    said before, was -- that Trump intended, even though they were

8    selling these units, to run those facilities, right?

9          MR. SHONKWILER:  Your Honor, I'm sorry, I don't want

10   to interrupt, but I think we need to be clear about when

11   "Trump" means the organization.

12         THE COURT:  Sustained.

13         Are you referring to the Trump organization or

14   Mr. Trump?

15         And if it is Mr. Trump, you are going to have to lay

16   a little more foundation.

17         MR. S. KULWIN:  Going forward, Judge, I am just going

18   to use "Mr. Trump."  And, otherwise, when I don't use "Mr.,"

19   it's the Trump organization.  Can I do that?

20         THE COURT:  Talk to your witness.  See if he

21   understands it like that.

22   BY MR. S. KULWIN:

23   Q.  Can do I that, Mr. Reiss?  Is that okay?

24         If I say, "Mr. Trump," I mean Donald Trump.  If I say

25   "Trump," I mean the Trump organization.

Reiss - direct

1           Are we good?

2    A.  I got it.

3    Q.  Got it.

4           So, one of the things the Trump organization decided

5    from the very beginning -- as we noted before -- was it was

6    going to run these ballroom facilities, once they were in the

7    common elements, right?

8    A.  Yes.

9    Q.  That was always the plan, right?

10   A.  That was the plan for even when the initial property

11   report was issued and the function rooms were much smaller.

12   Q.  All right.

13          And one of the things, though, that you also

14   understood was, then, is if the hotel condominium unit owners

15   owned all of these facilities, you were fully aware that while

16   you could negotiate a management contract with them,

17   ultimately, they could fire the Trump organization from

18   running them, correct?

19   A.  Yes.

20   Q.  Now, you had mentioned office space before.  You wanted me

21   to get to it.  I'm going to get to it.

22          When the tower was originally designed, it contained

23   office space to lease to businesses, right?

24   A.  That's right.

25   Q.  And between the time the building was originally designed,

1   until approximately the fall of 2003, it not only included

2   office space, but it also included the commercial space and

3   all the other things, right?

4   A.   That's right.

5   Q.   And the office space equalled 350,000 square feet,

6   correct?

7   A.   I -- I -- believe that was the last number.

8   Q.   Right.

9   A.   But I think that, over time, it started out with much

10  more.

11  Q.   It started out with even more and, then, it got --

12  A.   I believe so, yeah.

13  Q.   It started out with more and, then, it got reduced?

14  A.   Correct.

15  Q.   Okay.

16       So, it got down to 350,000 square feet?

17  A.   Correct.

18  Q.   Which is a lot of square feet?

19  A.   Yes.

20  Q.   And up until about the fall of 2003, the intent was to

21  rent it to, like, a large company or an accounting firm or a

22  law firm -- something like that -- who would serve as the

23  anchor tenant?

24  A.   Yes.

25  Q.   And an anchor tenant is someone who takes up the bulk of

Reiss - direct

1    the space; and, then, the little part it doesn't, you lease to

2    other people?

3    A.   Yes.

4    Q.   But between the time the building was designed and the

5    time the sales office opened in September of 2003, there was

6    discomfort within the Trump organization about whether it was

7    going to be able to rent this 350,000 square feet, right?

8    A.   Yes.

9    Q.   That became a growing concern at Trump, as it got closer

10   to 2003, right?

11   A.   Yes.

12   Q.   And the growing concern continued to grow bigger as time

13   went by and Trump was still unable to rent the 350,000 square

14   feet, correct?

15   A.   Um --

16          THE COURT:  Is there an objection?

17          MR. SHONKWILER:  We're objecting to the questioning

18   now on relevance grounds -- the entire line of questioning.

19          THE COURT:  What is your response?

20          MR. S. KULWIN:  I laid out in my opening statement,

21   Judge, that 350,000 square feet is what led to the addition of

22   the ballrooms, the meeting rooms, the things of that nature.

23          THE COURT:  Overruled.

24          You may answer, sir, if you can.

25   BY THE WITNESS:

Reiss - direct

1  A.  We -- we -- were becoming dis- -- uncomfortable about it,

2  because with a component that large, if it was not rented, it

3  would have been very difficult to acquire financing.

4        Shortly --

5  BY MR. S. KULWIN:

6  Q.  Before you go on -- before you go on --

7  A.  Okay.

8  Q.  -- wait for the question.

9  A.  Okay.

10 Q.  I promise you we'll get to everything.

11        Anything I don't get to, he will.  Okay?

12        All right.  So, that raises a good point.  To be

13 clear, Mr. Trump didn't plan on using $840 million of his own

14 money to build this thing, right?

15        The plan was to get financing?

16 A.  Yes.

17 Q.  And, in fact, the plan was to finance part of the

18 construction early on with the sales of condos -- the deposits

19 from the sales of condos -- right?

20 A.  Yes.

21 Q.  Okay.

22        And to borrow the rest from financial institutions,

23 right?

24 A.  Well, actually, that's not entirely accurate.  The sales

25 of the condominiums go -- a high percentage of them go -- to

Reiss - direct

1  the further construction loan.  They're never used for equity

2  or anything like that.

3  Q.  Okay.

4  A.  They don't work that way.

5      So -- but having contracts on the sale of the unit

6  makes it attractive for an institution giving a construction

7  loan.

8  Q.  Let me break that down, okay, for us people who don't get

9  it as much.

10      Okay.  So, what you're saying is the more contracts

11  they sold, the more secure a lender would be that, "Hey, these

12  things are going to get sold.  We can lend on this"?

13      The contracts, themselves, are like collateral?

14  A.  That's correct.

15  Q.  Okay.

16      But what you knew is -- as you just mentioned, is --

17  that even if we reached our goal of selling -- of getting --

18  50 percent of the units under contract, the finance community

19  would say, "What are you doing with the 350,000 square feet?"

20  A.  Correct.

21  Q.  And there would be, as you mentioned, a problem getting

22  the financing.

23      Now --

24      MR. SHONKWILER:  I object.  This has gone beyond what

25  counsel characterized the relevance of the testimony as being.

Reiss - direct

245

 1          THE COURT:  Overruled.

 2   BY MR. S. KULWIN:

 3   Q.  Now, even after the sales office opened, you still

 4   couldn't rent the space.  The issue became more of a growing

 5   concern, right?

 6   A.  Yes.

 7   Q.  And you guys didn't expect to be in this position, in

 8   September of 2003, on the office space, right?

 9   A.  No.  Obviously, we did not.

10   Q.  All right.

11          So, at some point, after the sales office opened in

12   September of 2003, you decided -- I mean, not --

13          MR. S. KULWIN:  Strike that.

14   BY MR. S. KULWIN:

15   Q.  -- it was decided that Trump should give up on trying to

16   lease the office space and eliminate it from the building.

17          That was the decision?

18   A.  We -- it -- it was the decision, yes.  We asked -- but

19   prior to making that decision, we asked -- the architect to do

20   an evaluation of what the building would look like without the

21   office component, and found that that -- that what they

22   produced for us was an extremely attractive option.

23   Q.  Okay.

24          Now, removing the office space from the building was

25   a very significant decision, correct?

Reiss - direct

1   A.  Correct.

2   Q.  You didn't have any authority to eliminate that office

3   space from Trump Tower, correct?

4   A.  Not on my own.  Certainly not.

5   Q.  You went to Mr. Trump to discuss it?

6   A.  Yes.

7   Q.  And it was Mr. Trump who made the decision -- that big

8   decision -- to eliminate the office space from the building,

9   correct?

10  A.  He agreed with my recommendation, correct.

11  Q.  But let's be clear.  You couldn't just tell the

12  architects, "Cut it out."  Only Mr. Trump could do that,

13  right?

14  A.  Yes.  He agreed with my recom- -- yes.

15  Q.  He was the ultimate authority?

16  A.  Yes.  In this case, he was.

17  Q.  At the time the Trump organization decided to eliminate

18  the office space, there were 174 hotel condominium units being

19  offered for sale, correct?

20  A.  That sounds right.

21  Q.  And, so, as part of the decision to eliminate the office

22  space, Trump decided to use part of the space to create more

23  hotel condominium units to sell?

24  A.  Yes.  But I think the major component of the expansion,

25  other than the banqueting rooms, was the residential.

Reiss - direct

247

1   Q.  Okay.

2          So, in addition to hotel -- you added a lot more

3   residential condominiums --

4   A.  Yeah.

5   Q.  -- you were going to sell?

6   A.  Okay.

7   Q.  You had a lot more residential condominiums that you had

8   to sell, right?

9   A.  Correct.

10  Q.  Okay.

11         And you had a number more hotel condominium units you

12  had to sell, right?

13  A.  Correct.

14  Q.  And, then, the rest of the space -- after you put all

15  those things out there -- was this new ballroom, junior

16  ballroom, expanded meeting center, things of that nature?

17  A.  Yes.

18         And, I believe, the health club facilities was

19  expanded, as well.

20  Q.  And, then, the executive lounge got bigger, too, I think?

21  A.  I don't recall exactly.

22  Q.  Now, adding all of these units to the building -- carving

23  up that office space and adding up all these units to the

24  building -- that was another big decision, right?

25  A.  Excuse me?

Reiss - direct

1    Q.  Adding all of these additional units to where the office

2    space used to be, and undertaking to try to sell them, that

3    was another big decision, wasn't it?

4    A.  Yes.

5    Q.  And Mr. Trump made that decision, as well?

6    A.  He -- yes, he -- followed my recommendation.

7    Q.  By the way, when you say he followed your recommendation,

8    Mr. Trump is a guy who wants the facts before he makes

9    decisions, isn't he?

10   A.  Yes.

11   Q.  I mean, he didn't get to be Donald Trump by just, like,

12   taking fliers.  He analyzes --

13            MR. SHONKWILER:  Objection, your Honor.

14            THE COURT:  Sustained.

15            MR. SHONKWILER:  It calls for speculation.

16            THE COURT:  Sustained.

17   BY MR. S. KULWIN:

18   Q.  Now, somewhere between the decision to add these

19   additional units and this office space occurred at some point

20   between September, 2003, when the decision to -- around when

21   the decision was to -- eliminate the office space, and

22   February of 2004, when those changes were revealed in the

23   first amended property report, correct?

24   A.  Correct.

25   Q.  And so I'm clear, during that same time period, a decision

Reiss - direct

1   was made to put the grand -- the new added grand -- and junior

2   ballrooms into the common elements, right?

3   A.  Right.

4   Q.  And to put the meeting rooms and functions into the common

5   elements, right?

6   A.  Right.

7   Q.  And to put the $5 million of revenue into the common

8   elements, correct?

9   A.  Correct.

10  Q.  And those, too, were big decisions, correct?

11  A.  Yes, they were.

12  Q.  And Mr. Trump made that decision, correct?

13  A.  Yes.

14  Q.  And it's fair to assume that you would have discussed with

15  Mr. Trump the amount of revenue and profits -- and whatever --

16  that could be generated by these ballrooms at that time,

17  correct?

18  A.  Yes, that conversation would have occurred.

19  Q.  Right.

20  A.  But, again, that was primarily a Trump organization

21  decision.  And, typically, issues having to do with

22  condominium allocations and how the detailed aspect of the

23  condominium plan was set up was, basically, my own.

24  Q.  Right.

25          It was all your own, but you didn't have the ultimate

Reiss - direct

1   authority to implement any of it.  You had to go to Donald

2   Trump, right?

3           You've already said that, correct?

4   A.  I just want to be clear.  When the building -- the

5   physical aspect of the building -- was changed so drastically,

6   yes, of course, we went to Donald Trump.

7           How that was carried through, in the relationship of

8   the different allocations and uses and cost estimates for the

9   assessments, was, basically, a let's say a -- a -- something

10  that happened because of the building -- because of the change

11  of the building.

12          And we had already established in the first -- the

13  initial -- project report, as well as in New York, that the

14  ballroom and meeting room functions were commonly owned.

15          So, I don't think that in the conversations I would

16  have had with Donald, that at the time would have been a very

17  significant aspect, because it was assumed that that's how we

18  would do it.  Because that's how we did it in New York and

19  that's how we did it in the initial project report for the

20  Chicago building.

21  Q.  Mr. Reiss, I want to be clear about one thing.  The adding

22  of the meeting rooms, the conference rooms, all of those

23  things and the 5 million of revenue, was a big decision,

24  correct?

25  A.  Correct.

Reiss - direct

251

1          MR. SHONKWILER:  Objection.

2          Sorry, your Honor.

3          Your Honor, it's ambiguous whether "adding" means to

4    the building or to the common elements or to the budget or the

5    --

6          MR. S. KULWIN:  I will keep going, Judge.

7          THE COURT:  Go ahead.  You may clarify.

8    BY MR. S. KULWIN:

9    Q.  And putting them into the common elements was a big

10   decision, as well, wasn't it?

11   A.  They were both important decisions.

12   Q.  And Mr. Trump, as you just said before, made both of them,

13   correct?

14          That's what you just said?

15   A.  If I said that, I'd like to re-characterize it.

16   Q.  So, he didn't make the decision?

17   A.  I didn't say he didn't make the decision.  I said one

18   decision followed the other.

19          The initial decision was to change the physical

20   description of the building.  In making that decision, the

21   elements of the budget and the allocation of the budgets had

22   to change.

23          We already established the principle that meeting

24   rooms, that function rooms were commonly owned.  I may have

25   discussed it with him.  I may not have discussed it with him.

Reiss - direct

252

 1   It was almost 11 years ago.  But I can tell you that that

 2   would have been an assumption, when the building was changed

 3   -- that Donald would have understood -- that, yeah, common

 4   area elements, such as ballroom and meeting rooms, do fall

 5   into the construct of shared amenities with the unit owners.

 6          All I'm saying is I'm not aware and I have no

 7   recollection of that particular aspect of the change being a

 8   major issue in my conversation with Donald.

 9   Q.  Two points on that, if I can deconstruct what you just

10   said.

11          What I'm asking you is -- I think what you're telling

12   me is -- he made the decision to eliminate the office space,

13   right?

14   A.  He agreed -- he agreed -- with my decision that it was the

15   correct thing to do.  I wouldn't have done that without him.

16   Q.  Right.

17          You wouldn't have added all the common -- the new

18   condo units -- without him, right?

19   A.  Correct.

20   Q.  Couldn't have added all the condo units without him,

21   right?

22   A.  Correct.

23   Q.  Couldn't have added the ballrooms, junior and grand,

24   without him, correct?

25   A.  Correct.

Reiss - direct

1   Q.  Didn't add the junior and grand ballrooms without him,

2   correct?

3          MR. SHONKWILER:  Objection.  The same ambiguity

4   objection, your Honor.

5          I don't know what we're talking about adding.  Are we

6   talking about adding --

7          MR. S. KULWIN:  I think it's awfully clear, Judge.

8          THE COURT:  Mr. Kulwin, do you want to make sure your

9   witness understands what you are asking?

10  BY MR. S. KULWIN:

11  Q.  You understand it, right?  I am talking about adding it to

12  the building, correct?

13  A.  I'm talking about adding in a physical sense -- the change

14  in the physical --

15  Q.  Right.

16  A.  -- sense.

17          The change in the physical design and square feet

18  allocated --

19  Q.  Right.

20  A.  -- to each function, yes.

21  Q.  That's what we're talking about?

22  A.  Yes.

23  Q.  You couldn't do that yourself, he did that, right?  He

24  made that decision, correct?

25  A.  Yes.

Reiss - direct

254

1   Q.  And what you're saying is -- if I understand it is -- he

2   knew when that decision was made that the natural occurrence

3   was, then, that the ballrooms and all of these things were now

4   going to be put in the common elements?

5            That's what you're saying, correct?

6            MR. SHONKWILER:  Objection.  Calls for speculation.

7            THE COURT:  Overruled.

8            You may answer, if you know, sir.

9   BY THE WITNESS:

10  A.  I don't know.

11  BY MR. S. KULWIN:

12  Q.  One way or the other, don't know?

13  A.  I -- you're asking me about a conversation that occurred

14  ten years ago, that I, obviously, have very little

15  recollection of.  It would have been assumed that --

16  Q.  By Mr. Trump?

17  A.  It was assumed by me that Donald understood that aspect.

18            It just wasn't part of the conversation.

19  Q.  Well --

20  A.  I can't -- I can't -- characterize what was in Donald's

21  mind ten years ago.

22  Q.  I know.  That's right.

23            You don't know what he was thinking?

24  A.  I would be dishonest if I did.

25  Q.  I wouldn't want you to be that.

Reiss - direct

1    You don't know what Mr. Trump was thinking at the

2  time he went along with that, do you?  Right?

3  A.  I only know that --

4  Q.  No, no.

5  A.  -- I went in there and I asked for approval for a plan I

6  developed.  And he liked it.

7  Q.  You don't know what Mr. Trump, himself, was thinking?

8    MR. SHONKWILER:  Objection.  Asked and answered and

9  argument.

10    THE COURT:  Overruled.

11  BY THE WITNESS:

12  A.  Of course not.

13  BY MR. S. KULWIN:

14  Q.  He objected.  You answered.  I didn't finish the question.

15    So, if I could --

16  A.  You did ask it.  You did.  You said I didn't know what

17  Donald was thinking.  And I said, "Of course not."

18    THE COURT:  Ask another question, if you need to.

19  BY MR. S. KULWIN:

20  Q.  You didn't know what Donald Trump was thinking about the

21  concept of adding these ballrooms, meeting rooms, et cetera,

22  and $5 million of revenue into the common elements at the time

23  he approved the decision, did you?

24  A.  No, I did not.

25  Q.  And he never shared with you what he was thinking,

Reiss - direct

256

1   correct?

2          You don't remember that?

3   A.  He went along with the plan to change the building.

4   Q.  Right.

5          But he never shared with you what he was thinking.

6   That's why you don't know, correct?

7   A.  I'll say, "Yes," again.

8   Q.  Okay.

9   A.  It was a conversation that happened ten years ago.

10  Q.  Now, Mr. Reiss, this ballroom -- this office space -- who

11  owned the office space before it was taken out of the

12  building?

13  A.  The office space was to be rented.  And it was owned by

14  the Trump organization -- by Donald.

15  Q.  Donald Trump owned it?

16  A.  The owner of the building.

17         Well, at the time it was also the Sun-Times.

18  Q.  Right.

19  A.  The Sun-Times was a 50 percent owner in that building, up

20  to the point that they had trouble.

21  Q.  Up until they had trouble?

22         And, then, they faded out?

23  A.  Yes, right.

24  Q.  They faded out into the sunset.

25         So, Mr. Trump owned that commercial space, correct --

Reiss - direct

257

```
 1    that office space, rather?
 2    A.  It's 50/50 with the Sun-Times.
 3    Q.  But he had the authority to do what he wanted with it?
 4    A.  Yes.
 5    Q.  Under the deal?
 6    A.  Well, it was a management structure of the deal.  He would
 7    have -- we did meet periodically with the Sun-Times and kept
 8    them informed where the building was going.
 9           As a matter of fact, the original sales office was in
10    the Sun-Times building, when it was still on-site.
11    Q.  Okay.
12           Here's my question:  Let's say he owned 50 percent of
13    it.  All right?  That would be 175,000 square feet, correct?
14           Right?
15    A.  Of the office space, yes.  Right.
16    Q.  And, ultimately, he ended up owning a hundred percent of
17    it, correct, because the Sun-Times got into trouble?
18    A.  The Trump organization bought out the Sun-Times' share.
19    Q.  Right.
20           And the Trump organization is owned by Mr. Trump,
21    right?
22    A.  Yes.
23    Q.  Okay.
24           So, the 30,000 square feet that Mr. Trump put into
25    the common elements in 2004 was space that he personally
```

Reiss - direct

258

```
 1    owned, that was going in, right?
 2         MR. SHONKWILER:  Objection to use of "Mr. Trump" and
 3    the Trump organization.
 4         MR. S. KULWIN:  Mr. Trump.
 5         THE COURT:  Overruled.
 6         You may answer that, if you can, if you know.
 7    BY THE WITNESS:
 8    A.  It's hard to say where one square foot transcribes
 9    another.  But it's an interesting concept, yes.
10    Q.  Oh.
11    A.  There was 350,000 feet, which at one point was owned a
12    hundred percent by Donald Trump.
13    Q.  Right.
14    A.  Part of it became commonly -- under the first amendment
15    became commonly -- owned, that's right.
16    Q.  Not just part of it, it was about 30,000 square feet,
17    right?
18    A.  I don't recall.  It sounds right.
19    Q.  Okay.
20         Now, sir, real estate generally, among professionals,
21    is valued on a square-foot basis, correct?
22    A.  Yes.
23    Q.  True, there's the location, which is always important --
24    location, location, location.  It's always very important,
25    right?
```

Reiss - direct

259

1   A.  Yes.

2   Q.  The square footage of Trump Tower was no different,

3   correct?  There was a valuation of -- on a per-square-foot

4   basis, true?

5   A.  Yes.

6   Q.  And you could kind of figure out what the valuation was,

7   to some degree, if you looked at the individual condominium

8   units, because if you took the price of what they were being

9   sold for and divided it by the square footage, you could come

10  up with a rough square foot valuation, correct?

11  A.  Yes.

12  Q.  And, of course, this 30,000 square feet that was being

13  given to the owners, it was in the heart of the hotel,

14  correct?

15  A.  Yeah.  I think the ballroom space is located at the base

16  of the hotel, right.

17  Q.  It's prime real estate in the hotel, correct?

18  A.  Yes.

19  Q.  So, if -- it would have a square foot value, like, higher

20  than, like, a closet in the parking garage, right?

21  A.  Yes.

22  Q.  Okay.

23       And the square foot value of the space on which the

24  ballrooms were located and other things was, roughly, about

25  $1400 a square foot, correct?

Reiss - direct

1   A.  I don't know how that number comes about.  And I don't

2   recall it.

3   Q.  Well, let me ask you this:  If I told you that I took the

4   value of Ms. Goldberg's unit and divided it by her square

5   footage and came up with that number, would that surprise you?

6   A.  If you took the value of --

7   Q.  The cost of what she paid for her units, and divided it by

8   the square footage, and came up with $1400 a square foot, does

9   that sound completely off the charts wrong?

10  A.  If that's -- that is -- the way you calculate a cost per

11  square foot, that's a high number.

12  Q.  Right.

13          Did you happen to know --

14  A.  But that doesn't mean that the purchase of one unit --

15  Q.  Right.

16  A.  -- transcribes to the entire building.  Everybody pays a

17  different amount based on their own belief in the contract and

18  the building --

19  Q.  But at the end of the day --

20  A.  -- and negotiation.

21          Sorry.

22  Q.  That was my fault.  That one was my fault.

23          At the end of the day, sir, there is a cognizable,

24  objective per square foot value for the ballroom space at the

25  Trump hotel, correct?

Reiss - direct

1   A.  Sure.  There's a replacement value and there's a belief

2   that it would generate so much income.  And you can transcribe

3   that into its value, less its cost.

4   Q.  And for a luxury hotel, like the Trump hotel, it had all

5   the finest finishes, didn't it?

6   A.  It's a very well-finished building, yes.

7   Q.  I mean, they use -- you know, they didn't use, you know,

8   laminate.  They used granite, right?

9   A.  I wasn't there when they did the interior design, but it's

10  certainly a very nice building.

11  Q.  It's very high end --

12  A.  Yes.

13  Q.  -- right?

14      And the higher end the building, the more expensive

15  the square foot value, correct?

16  A.  The more expensive the replacement value.

17  Q.  Right.

18  A.  You can easily make a mistake and put too much into it,

19  and the market doesn't sustain it.

20  Q.  Right.  Sure.

21  A.  It's two different concepts of value.

22  Q.  That's true.

23      Let's get down to the bottom line.  At the time in

24  2003, units were selling very well, right?

25  A.  Correct.

Reiss - direct

262

1   Q.  And the values -- Trump had an idea of what the value of

2   the space in the building was worth, right?

3   A.  Correct.

4   Q.  Okay.

5        And for a luxury hotel like that, isn't it fair to

6   say that the square foot value, at a minimum, would be a

7   thousand dollars a square foot, back then in 2003?

8   A.  I have to tell you I'm really uncomfortable quoting a

9   value without looking at the numbers.

10       You're talking about the ballroom component.  There

11  are different components in the building.  They each had

12  different values.

13       And, remember, the amount of square foot you could

14  put in each component was dictated not only by the market, but

15  the zoning allocation, as well.

16  Q.  Mr. Reiss, maybe I'm misstating the question.  All I'm

17  trying to get at was you don't dispute that that 30,000 square

18  feet in the heart of the Trump hotel was a very valuable piece

19  of real estate, do you?

20  A.  I don't dispute that at all.  I just don't feel

21  comfortable telling you with precision what that value was.

22  Q.  I'm not asking for precision.

23       But even if you use a thousand dollars a square foot,

24  that real estate would be worth $30 million, correct?

25       MR. SHONKWILER:  Objection, your Honor.  Asked and

Reiss - direct

1    answered.

2            THE COURT:  Sustained.

3            And you are asking him to speculate now.

4    BY MR. S. KULWIN:

5    Q.  Would you be comfortable if -- not right this second, and

6    I'll finish right after lunch, but would you be comfortable

7    calculating a square foot value based on an individual unit?

8    A.  Calculating the square foot value of the ballroom space?

9    Q.  Yeah, sure.

10   A.  Based on the individual units?

11   Q.  Yeah.

12   A.  No, I would not.  That's my -- I think that's my -- point

13   that --

14   Q.  You think it's --

15   A.  -- it's a different function, done for a different

16   purpose.

17   Q.  You think it would be worth less?

18   A.  Excuse me?

19   Q.  You think it would be worth less?

20   A.  I do think it would be worth less, yes.

21   Q.  Significantly less?

22   A.  I -- you're asking for, again, precision I can't give from

23   this seat ten years later.

24   Q.  In any event, though, sir -- Mr. Reiss -- you're aware,

25   Mr. Trump was aware, that he was giving away a very valuable

1    piece of real estate by putting in the common elements?

2              MR. SHONKWILER:  Objection, your Honor.  Calls for

3    speculation.

4              THE COURT:  Sustained.

5    BY MR. S. KULWIN:

6    Q.  Based on -- he was aware he was doing it, right?

7              That he was giving it away, right?

8              MR. SHONKWILER:  Objection.  The same speculation.

9              THE COURT:  Sustained.

10   BY MR. S. KULWIN:

11   Q.  He was aware that he was giving away the ballroom space,

12   the meeting room space and all that stuff that he owned, he

13   was giving it away to the owners, correct?

14             MR. SHONKWILER:  Objection.

15   BY MR. S. KULWIN:

16   Q.  He was aware of that?

17             MR. SHONKWILER:  Objection.  This calls for

18   speculation.

19             THE COURT:  Sustained.  Foundation.  Form.

20   BY MR. S. KULWIN:

21   Q.  Going back to where we were before, you already said that

22   he knew that he had approved the ballrooms being added and all

23   of those other things, right, Mr. Reiss?

24             MR. SHONKWILER:  Objection.

25   BY THE WITNESS:

1    A.  Yes.

2          MR. SHONKWILER:  Your Honor, asked and answered.

3          THE COURT:  Overruled.  He is trying to lay some

4    foundation.  Overruled.

5    BY MR. S. KULWIN:

6    Q.  That's correct, sir?

7    A.  Yes.

8    Q.  You already said that he was aware that he knew it was

9    going into the common elements, because that was the natural

10   consequence of things, correct?

11         MR. SHONKWILER:  Objection.  Mischaracterizes the

12   testimony.

13         THE COURT:  Overruled.

14         He may answer.

15   BY THE WITNESS:

16   A.  I'd like to answer.

17         You're predicating -- I'm sorry, you look -- you

18   looked -- amused by my answer, but I'm just trying --

19   BY MR. S. KULWIN:

20   Q.  I don't look --

21   A.  -- I'm just trying to be accurate.

22         THE COURT:  Wait.  Gentlemen, gentlemen, we are not

23   going to do that.

24         THE WITNESS:  I'm only trying to be accurate.

25         THE COURT:  Mr. Reiss, please do not talk when I am

Reiss - direct

266

1    talking.

2              There is a question pending.  We are not going to

3    argue with the lawyer.  Please answer the question, sir.

4    BY THE WITNESS:

5    A.  The value of the square feet in the ballroom evolved from

6    the inability to rent the square feet to a commercial usage.

7              So, to say that there was a great deal of value in

8    the office space that was now being transcribed into a

9    banqueting facility, is not exactly true.

10             That's all I wanted to say.

11   BY MR. S. KULWIN:

12   Q.  And all I wanted to say was, sir, you were aware -- you've

13   already said that you don't dispute it was still a

14   significantly valuable piece of real estate, correct?

15   A.  I've said that multiple times.

16   Q.  Okay.

17             And you're aware that Mr. Trump knew that that

18   valuable real estate was going into the common elements at the

19   time it occurred?

20             MR. SHONKWILER:  Objection, your Honor.

21   BY MR. S. KULWIN:

22   Q.  You said that, as well, true?

23             MR. SHONKWILER:  Misstates the evidence.

24             THE COURT:  Overruled.

25             You may answer that.

1    BY THE WITNESS:

2    A.  True.

3              THE COURT:  Let us break for lunch.

4              MR. S. KULWIN:  Thank you, Judge.

5              THE COURT:  We will pick up at 1:30.

6              MR. S. KULWIN:  Thank you, Judge.

7              (Jury out.)

8              THE COURT:  1:30.

9              MR. S. KULWIN:  Thank you, your Honor.

10             (Whereupon, a recess was taken at 12:22 o'clock p.m.,

11       until 1:30 p.m., of the same afternoon.)*    *    *    *    *.

12

13   We certify that the foregoing is a correct transcript from the
     record of proceedings in the above-entitled matter.

14

15
     /s/ Joseph Rickhoff                    May 14, 2013
16   Official Court Reporter

17   /s/ Nancy LaBella                      May 14, 2013
     Official Court Reporter
18

19

20

21

22

23

24

25

```
1                    IN THE UNITED STATES DISTRICT COURT
                        NORTHERN DISTRICT OF ILLINOIS
2                              EASTERN DIVISION

3    JACQUELINE GOLDBERG,              ) Docket No. 09 C 6455
                                       )
4                        Plaintiff,    )
                                       )
5               vs.                    )
                                       )
6    401 NORTH WABASH VENTURE, LLC,    )
     a Delaware Limited Liability      )
7    Company, et al.,                  ) Chicago, Illinois
                                       ) May 14, 2013
8                        Defendants.)   1:30 o'clock p.m.

9                    TRANSCRIPT OF TRIAL PROCEEDINGS
            BEFORE THE HONORABLE AMY J. ST. EVE, AND A JURY
10
     APPEARANCES:
11
     For the Plaintiff:          KULWIN, MASCIOPINTO & KULWIN, LLP
12                               BY:  MR. SHELLY B. KULWIN
                                      MR. JEFFREY R. KULWIN
13                               161 North Clark Street, Suite 2500
                                 Chicago, Illinois  60601
14
     For the Defendants:         NOVACK AND MACEY, LLP
15                               BY:  MR. STEPHEN NOVACK
                                      MR. JOHN F. SHONKWILER
16                               100 N. Riverside Plaza, Suite 1500
                                 Chicago, Illinois  60606
17
     Also Present:               MS. ALEXIS ROBINSON
18
     Court Reporter:             MR. JOSEPH RICKHOFF
19                               MS. MARY M. HACKER
                                 Official Court Reporter
20                               219 S. Dearborn St., Suite 1232
                                 Chicago, Illinois  60604
21                               (312) 435-5562

22              * * * * * * * * * * * * * * * * * *

23                      PROCEEDINGS RECORDED BY
                        MECHANICAL STENOGRAPHY
24              TRANSCRIPT PRODUCED BY COMPUTER

25
```

```
 1          (Proceedings out of the hearing of the jury:)

 2              THE COURT:  Mr. Novack, can you please remember to

 3    tell your witnesses not to take these elevators, because one

 4    of the jurors told Katie that Mr. Reiss was on the elevator

 5    with her.

 6              MR. NOVACK:  Under the rules I did not talk to him

 7    after the testimony, so --

 8              THE COURT:  Before they come in -- I realize he

 9    didn't know, but that's your responsibility.

10              MR. NOVACK:  I'll take the blame.

11              THE COURT:  As soon as we get that --

12              MR. NOVACK:  I think Mr. Shonkwiler is out there, but

13    the door is locked.

14              THE COURT:  Okay.

15              (Brief pause.)

16              THE COURT:  Mr. Kulwin, how much longer do you think

17    you have?

18              MR. S. KULWIN:  I think I'm only going to have a

19    half-hour.

20              THE COURT:  About a half-hour, okay.

21              Mr. Novack, did you hear that?  He has about a

22    half-hour left.

23              MR. NOVACK:  Thank you for telling us, Judge.

24              THE COURT:  Ready?

25              (No response.)
```

1          THE COURT:  Bring in the jury, please.

2          MR. S. KULWIN:  I'm sorry.  I was just sitting down

3   to rest my back, Judge.

4          THE COURT:  You don't have to stand until the jury

5   comes in.

6          MR. S. KULWIN:  Thanks, Judge.

7          THE COURT:  Mr. Novack, do you have a sense of how

8   long you'll be with this witness, now that you've heard most

9   of the direct?

10          MR. NOVACK:  I believe an hour or so.

11          THE COURT:  How long do you think you'll be with this

12   witness?

13          MR. SHONKWILER:  I hope an hour.  I hope so.

14          THE COURT:  Okay.

15          (Jury entered the courtroom.)

16          THE COURT:  You may be seated.

17          You may continue.

18          MR. S. KULWIN:  Thank you, your Honor.

19          CHARLES REISS, PLAINTIFF'S WITNESS, DULY SWORN

20                        DIRECT EXAMINATION

21   BY MR. S. KULWIN:

22   Q.  Mr. Reiss, when Trump decided to eliminate the office

23   space and add the Trump organization -- we've got that

24   understanding, right -- eliminate the office space and add the

25   new hotel and residential units, it filed an amended property

Reiss - direct

1   report, correct?

2   A.  Yes.

3   Q.  Based on your experience in the organization and in the

4   work you had done, you believed, while you were working at the

5   Trump organization, that the property report had to be amended

6   whenever there was a significant change made to the

7   description of the building, correct?

8   A.  Yes.

9   Q.  Or in the operational role of the building, correct?

10  A.  Yes.

11  Q.  Or if there was a budgeting issue that affected the

12  building, correct?

13  A.  Within certain limits -- within certain bounds, yes.

14  Q.  And changes in the physical description of the building

15  that would require an amendment, based on your understanding,

16  would be, for example, removal of the office space?  That

17  certainly would trigger an amendment, as you recall, correct?

18  A.  Yes.

19  Q.  Now, when Trump amended the report in February of '04

20  eliminating the office space, some of the HCU purchasers who

21  had already signed contracts but hadn't closed yet were told

22  that the floors on which their units had been located were now

23  going to be lower than originally planned?

24  A.  That's correct.

25  Q.  As a result of that, somebody might go down from like 37

Reiss - direct

1    to 26?

2    A.  That's correct.

3    Q.  And their views of the city would be changed as well as a

4    result?

5    A.  Correct.

6    Q.  And Trump at that time, because of that material change,

7    agreed -- offered to let them rescind their contracts, true?

8    A.  Yes.  A letter was sent out I believe in March --

9    Q.  Right.

10   A.  -- or in February, giving them until March, something like

11   that, that offer to --

12   Q.  Right.  And even though under the contract you had the

13   right to change the condominium documents, you still offered

14   them a right to rescind, correct?

15   A.  That's right.

16   Q.  Because you knew that under the terms of the contract,

17   even though you could change the condominium documents, you

18   just couldn't make any arbitrary and capricious change that

19   was beyond anybody's expectation, right?

20           MR. SHONKWILER:  Objection, your Honor.  It calls for

21   a legal conclusion.

22           THE COURT:  Sustained.

23   BY MR. S. KULWIN:

24   Q.  Based on your understanding at the time, what you

25   understood about it, it was your understanding that you could

Reiss - direct

1    make any type of arbitrary and capricious change?

2    A.  I don't think that's a yes or no.  Could I answer in

3    another way?

4    Q.  Sure.

5    A.  If there was a significant impact upon the -- the

6    rescission that was offered in February from a March deadline

7    was based on the physical change that occurred to those units.

8    I do recall the latter, and it specifically mentioned that the

9    hotel units now moved down in the stack to occupy the space,

10   for the most part, that was taken by the commercial space.

11   And that's pretty conventional in the field, that when your

12   view is affected, certainly by height, that rescission right

13   is to be offered.  And we did do that to -- my recollection is

14   all of the hotel units were offered that decision.

15   Q.  But my point is, you were doing that based on custom and

16   practice.  Under the contract you said you could make a

17   change, right?

18            MR. SHONKWILER:  Objection.  Calls for a legal

19   conclusion, argumentative.

20            THE COURT:  Sustained.

21            MR. S. KULWIN:  May I be heard at sidebar, Judge?

22            THE COURT:  Why don't you ask another question.  You

23   were calling for a legal conclusion.  That's what I sustained.

24   BY MR. S. KULWIN:

25   Q.  Your understanding was -- not what the contract actually

Reiss - direct

1  allowed.  Your understanding was, though, the contract let you

2  guys make changes to the condo documents, including lowering

3  the floors, correct, if things came up?

4  A.  I don't think so.  The contract specifies the unit, it

5  specifies the location of the unit in the building.  And,

6  therefore, if the unit is lowered, it doesn't have the same

7  physical location --

8  Q.  Doesn't it say that it's the description contained in the

9  condominium documents?  Isn't that what the description is,

10  sir?

11  A.  Both are relevant.  The -- that --

12  Q.  In any event --

13  A.  There's a deed in the contract that locates it in space.

14  Q.  In any event, sir, when you reached the conclusion to

15  lower those floors, that happened somewhere in the fall

16  of 2003, right?

17  A.  Somewhere after the initial opening of the sales center.

18  Q.  Right.

19  A.  That's right.

20  Q.  But the decision to tell people about it -- I mean, the

21  actual notification to people didn't occur until February

22  of 2004?

23  A.  I think the notification was coterminous with the release

24  of the second amendment -- of the first amendment.

25  Q.  February of 2004, months later?

Reiss - direct

275

1   A.   Yes, right.

2   Q.   Months later, correct?

3   A.   Correct.

4   Q.   Months later, correct?

5   A.   Correct.

6   Q.   And the decision as to when to tell people that their

7   floors were being lowered was a marketing, political decision

8   made at Trump, correct?

9   A.   I wouldn't characterize it as a political decision.  It

10  was an ethical, fair decision.

11  Q.   Page 158, Line 20, talking about the notification of

12  lowering the floors.  You were asked this question at your

13  deposition when you were sworn under oath, Mr. Reiss,

14  remember?

15        You gave that deposition in October of 2011, over --

16  almost two years ago, correct?

17  A.   Correct.

18  Q.   Weren't you asked this question:  (Reading:)

19    And when would the public have been notified?

20    Answer:  It's a marketing, political decision.  I can tell

21  you from the context of 2011 when I think the public should

22  have been notified, but I don't know when they were notified.

23        Isn't that what you said?

24  A.   You're reading it.  That's what I said.

25  Q.   And you knew what you meant by marketing, political

Reiss - direct

276

1  decision, right?  Right?

2  A.  Yes.

3  Q.  A marketing, political decision -- let's take it a step at

4  a time.

5         A marketing decision is, when should we tell people

6  so that it will least affect our ability to market the units.

7  That's a marketing decision, correct?

8  A.  Yes.

9  Q.  And a political decision is, when should we tell people

10  that will least offend the people who have already bought.

11  That's the political decision, correct?

12  A.  I think there's much more involved with respect -- there

13  is much more involved in the characterization of that word.  I

14  use -- just like I used the colloquialism when we discussed it

15  this morning, deposition is a much more informal atmosphere

16  and I used the colloquialism.

17         The fact is, it's an ethical decision.  And politics

18  and ethics every once in awhile, of course, are not the same

19  definition.

20  Q.  Wait a second, Mr. Reiss.  Did you just say, if I

21  understood you correctly, that you were using more informal

22  conversation in your sworn deposition and that's --

23  A.  It was --

24  Q.  May I finish, please?

25  A.  It was a more --

1  Q.  May I finish, please?

2  A.  Well --

3          MR. S. KULWIN:  Your Honor, may I finish, please?

4          THE COURT:  Finish your question.

5          MR. S. KULWIN:  Thank you, your Honor.

6  BY MR. S. KULWIN:

7  Q.  Are you saying, sir, that when you were in a sworn

8  deposition that you were told was a court proceeding, you used

9  informal colloquial information, but now that you're in front

10 of this jury you're using more precise terms?  Is that your

11 testimony?

12 A.  I said it was a more informal atmosphere.

13 Q.  And the informalness of the atmosphere changes your

14 answer?

15 A.  The informalness of the atmosphere doesn't change my

16 answer.

17 Q.  The informalness of the atmosphere makes you feel less

18 compelled to explain yourself so that people know what you're

19 talking about?

20 A.  Sir, I sat in that deposition for over a day.

21 Q.  Yeah.

22 A.  I took time out from my work and my travel.  It was two

23 years ago.  I was unaware of the nature of the case and I gave

24 answers.  They are correct answers.  It was a political

25 decision and it was -- and it was -- and it was a technical

1    decision.

2            All I'm saying is I'm adding to that two years later,

3    after having to think about this process, that it was also an

4    ethical decision.

5    Q.  You took two -- you took time out of your busy schedule to

6    give that deposition two years ago and you sat there for eight

7    hours, right?

8    A.  Yes.

9    Q.  You sat there -- were you in New York or Chicago?

10   A.  Chicago.

11   Q.  Okay.  So you came all the way out here for that, right?

12   A.  Yes, I did.

13   Q.  But you also came all the way out here for this, right?

14   A.  I had to.

15   Q.  You didn't have to.  Your -- Mr. Trump's lawyers asked you

16   to.  You're not under subpoena, are you, sir?

17   A.  I'm not under subpoena, but it was always assumed that the

18   deposition was followed by a trial, if there was to be one.

19   Q.  You did it because Mr. Trump wanted you here?

20   A.  That's not true.

21   Q.  Okay.  And you're taking your busy time now to testify,

22   right?

23   A.  I believe --

24   Q.  Isn't that right?

25   A.  I believe -- I'm making a decision that this is the right

Reiss - direct

1    professional thing to do.

2    Q.  Okay, fine.  And let me tell you --

3    A.  I'm not sure what you're trying to characterize by my --

4    Q.  I'm not trying to characterize anything, sir.

5           At your deposition you had lawyers sitting next to

6    you, correct?

7    A.  Correct.

8    Q.  Mr. Shonkwiler -- was it Mr. Shonkwiler or Ms. Parker?

9    A.  It was Ms. Parker.

10   Q.  Ms. Parker and Mr. Shonkwiler and Mr. Novack's son was

11   there, correct?

12   A.  Ms. Parker was there.

13   Q.  Right.  And you could stop the deposition whenever you

14   wanted and say, you know, I need a break, right?

15   A.  And that happened frequently.

16   Q.  Okay.  And you could consult with Ms. Parker about, gee,

17   you know, I don't understand these questions, should I

18   elucidate on this question, is that right?  Could you do that,

19   sir?

20   A.  Yes.

21   Q.  And now, after consulting with -- after being prepared by

22   then Mr. Novak and Mr. Shonkwiler and Ms. Parker at their firm

23   last night, now all of a sudden today, in front of this jury,

24   it's, well, my answers are a little bit more formal here than

25   they were then?

Reiss - direct

1    A.  I was not --

2            MR. SHONKWILER:  Your Honor --

3            THE COURT:  Sir, there's an objection.

4            MR. SHONKWILER:  -- objection.

5            THE COURT:  Sustained.  Argumentative.

6            Mr. Kulwin.  I think it's time to move on.

7            MR. S. KULWIN:  Thank you, your Honor.

8    BY MR. S. KULWIN:

9    Q.  Now, you're familiar with the purchase contracts that were

10   used -- the standard purchase contracts that were used to sell

11   the Trump condos, correct?

12   A.  I'm reasonably familiar.  Again, it was ten years ago.

13   Q.  You signed one yourself, correct?

14   A.  Yes.  I signed and Russell signed.

15   Q.  And you're familiar that it had something called an

16   attorney approval attached to it, right?

17   A.  The Illinois statute requires a seven-day attorney review

18   period.

19   Q.  All right.  And just so we're clear -- I want to be

20   crystal clear about that.  What that means is that someone can

21   show it to their lawyer for seven days before -- and if their

22   lawyer doesn't like it, they can back out of the contract,

23   right?

24   A.  Correct.

25   Q.  It doesn't mean, it doesn't mean, that after that approval

Reiss - direct

1   time period is over and some change comes that they think was

2   inappropriate or unfair or material, that they can then go

3   back based on the attorney approval and get out of the

4   contract, right?

5           MR. SHONKWILER:  Objection, your Honor.

6   BY MR. S. KULWIN:

7   Q.  It does not mean that based on your understanding?

8           MR. SHONKWILER:  Objection, your Honor.  Foundation

9   and calls for a legal conclusion.

10          THE COURT:  Sustained.

11          Rephrase your question.

12  BY MR. S. KULWIN:

13  Q.  Based on your understanding of the contract that was given

14  out, Mr. Reiss, that attorney approval thing doesn't let you

15  back out of the contract for something that happens after the

16  seven days expires, correct?

17  A.  That's my understanding.  There's significant and long

18  case law on when a contract is voided.  I'm not an attorney.

19  Q.  Right.

20  A.  And I don't feel my answer is really an expert answer.

21  Q.  No.  I'm not asking for an expert answer.

22  A.  Well, you're asking for me to conclude.  I would not make

23  that conclusion on my own in the normal sense of things.

24  Q.  I'm asking your understanding of someone who was familiar

25  with the Trump contract, someone who signed the Trump contract

Reiss - direct

1    when he bought a unit.

2          I'm asking you, sir, was it your understanding that

3    because that seven-day approval thing was there, anything that

4    happened afterwards, after the seven days expired, that

5    someone could rescind the contract based on things that

6    happened after the seven days expired?  Was that your

7    understanding?

8    A.  No.  They can't.

9    Q.  Okay.

10    A.  It's hard after the seven days.

11    Q.  Right.  Okay.

12          And, of course, nothing about the contract, nothing

13    about the contract, allows the Trump organization to tell

14    people something that's untrue, make a misrepresentation and

15    lead them to believe that they're buying something that

16    they're not?  Trump can't do that, correct?

17    A.  Correct.  That's right.

18    Q.  Nothing in the contract let's them do that, correct?

19    A.  Correct.  That's why there's a reference to the property

20    report.

21     (Brief interruption.)

22    BY MR. S. KULWIN:

23    Q.  Earlier today, just to be brief, we talked about the Trump

24    factor, remember that?

25    A.  Yes.

Reiss - direct

283

1   Q.  Yeah.  And I said that one of the things that was being

2   pitched back then was that the Trump factor, based on studies,

3   buildings in which you invested went up from 79 to 86 percent.

4   You said that number seemed a little bit high.  Do you

5   remember that?

6   A.  Yes, I do.

7   Q.  Okay.  Let me show you part of the -- part of Exhibit 75.

8   This one doesn't have a Bates stamp.

9           MR. S. KULWIN:  I apologize, Judge.  But it's under

10  -- Mr. Shonkwiler, it's under Donald Trump, President and CEO,

11  that piece of paper.

12          MR. SHONKWILER:  I beg your pardon?

13          MR. S. KULWIN:  Under the sheet that says Donald J.

14  Trump, President and CEO.

15          THE COURT:  Why don't you show him, since you can't

16  refer to a Bates number?

17          MR. S. KULWIN:  Oh, sure.

18          (Brief pause.)

19  BY MR. S. KULWIN:

20  Q.  If you would look at that, sir, and see if it refreshes

21  your recollection.

22  A.  It doesn't refresh my recollection but it's there in

23  print, so obviously it was printed and sent out.

24          MR. S. KULWIN:  Judge, if I may have a moment?

25          THE COURT:  You may.

Reiss - direct

1          (Brief pause.)

2          MR. S. KULWIN:  Judge, with one last sidebar about a

3     question I would like to ask him, I'm done.

4          THE COURT:  Okay, we'll have a brief sidebar.

5       (Proceedings had at sidebar:)

6          MR. S. KULWIN:  Judge, this wasn't covered in any

7     motions in limine, but I know that the defense would object to

8     this.

9          One of the issues in this case is Mr. Trump, was he

10    honest in his marketing materials, was he honest in promoting

11    the building.  It's obviously an issue.

12         One of the things that he used to promote the

13    building was the first season of The Apprentice.  The winner

14    of The Apprentice was Bill Rancic.  Bill Rancic was trumpeted

15    as being the guy who was going to run Trump Tower.

16         Mr. Reiss remembers very little, but one thing he

17    remembers is his conversation with Donald Trump about that and

18    how it was blowing, it was false.  Bill Rancic didn't do

19    anything on the project and I want to bring that out through

20    Mr. Reiss.

21         THE COURT:  All right.  Bill Rancic didn't do

22    anything on the project?

23         MR. S. KULWIN:  And I want to bring that out through

24    Mr. Reiss.

25         THE COURT:  How is that relevant to the issue?

1       MR. S. KULWIN:  It shows that Mr. Trump was willing

2   to say things that were materially untrue to promote the

3   building.  And that's what was done.

4       MR. SHONKWILER:  Your Honor, this was in the

5   program -- part of the television program was,

6   congratulations, you won.  Now you're going to work on Trump

7   Tower.  That was a part of the program.  Nobody is

8   representing that that program is -- it's reality television.

9   We're not supposed to stand by -- that can't be used to

10  impeach his integrity as a human.  That's not right.

11      MR. S. KULWIN:  I disagree, Judge.  It's called

12  reality TV because it's reality TV.

13      And by the way, in every newspaper in this city it

14  was promoted that Mr. Rancic is running Trump Tower.  In fact,

15  he was living on my block and people would come by and say,

16  look, there's Bill Rancic.  Everybody thought Bill Rancic was

17  running this project.  And Mr. Trump made a big deal of

18  saying, yeah, the guy from Chicago won The Apprentice and he's

19  running Trump Tower.  It was all false.

20      THE COURT:  First of all, thank you for fronting it

21  rather than raising it.

22      MR. S. KULWIN:  Right, absolutely.

23      THE COURT:  I'm going to sustain the objection.  It's

24  too far afield.

25      MR. S. KULWIN:  All right.  I just wanted to -- can't

Reiss - cross

 1  blame me for trying.

 2          (Further proceedings in open court:)

 3          THE COURT:  Anything further, Mr. Kulwin?

 4          MR. S. KULWIN:  Ms. Goldberg says no, so I say no.

 5          THE COURT:  Cross-examination.

 6                     CROSS EXAMINATION

 7  BY MR. SHONKWILER:

 8  Q.  Good afternoon, Mr. Reiss.

 9  A.  Good afternoon.

10  Q.  Where do you live, sir?

11  A.  I live in Shushan, New York.

12  Q.  Are you married?

13  A.  Yes.

14  Q.  Do you have any children?

15  A.  Two children, 45 and 43.

16  Q.  Are you retired?

17  A.  I have an independent consulting practice.  I work about

18  three quarters of the time.

19  Q.  Mr. Reiss, you left the Trump organization in 2004, is

20  that correct?

21  A.  That's right, in the summer of 2004.

22  Q.  And why did you leave?

23  A.  I got a much better job at a higher pay and it was time to

24  move --

25  Q.  Did you --

Reiss - cross

1   A.  -- time to change.

2   Q.  I beg your pardon?

3   A.  And it was time to change jobs.

4   Q.  Did you part on happy terms with Mr. Trump?

5   A.  No, I didn't.

6   Q.  Are you here today of your own free will, Mr. Reiss?

7   A.  Yes, I am.

8   Q.  Is anyone paying you to testify?

9   A.  No, they're not.

10  Q.  You don't have any interest in the outcome of this case,

11  do you?

12  A.  No.

13  Q.  Any financial interest?

14  A.  None.

15  Q.  Any interest at all?

16  A.  No.

17  Q.  There's been a lot of discussion today, Mr. Reiss, and

18  yesterday, frankly, about property reports.  I'm not sure

19  you've seen one yet.

20          MR. SHONKWILER:  Your Honor, may I approach with an

21  exhibit?

22          THE COURT:  You may.

23  BY MR. SHONKWILER:

24  Q.  Careful, these are not stapled.

25  A.  Okay.

Reiss - cross

```
 1              THE COURT:  Can you just state for the record the
 2    exhibit numbers you've put before the witness, please?
 3              MR. SHONKWILER:  Yes.  For the record, and counsel,
 4    these are Plaintiff's Exhibits 1-B, 2 and 4.
 5    BY MR. SHONKWILER:
 6    Q.  Mr. Reiss, if you could just please take a look at the one
 7    on your right, Exhibit 1-B.  Tell me if you recognize that.
 8    A.  Yes.
 9    Q.  And what is it, please?
10    A.  It's the property report that we issued.  I believe it's
11    the first one that was issued -- yeah, September 24th, 2003.
12    This was issued along with the opening of the sales office.
13    Q.  For what building, please?
14    A.  For Trump International Hotel and Tower Chicago.
15    Q.  For Chicago.
16              And specifically, for which part of Trump
17    International Hotel and Tower Chicago?
18    A.  For -- oh, I see.  For the hotel condominium.  This is not
19    for the entire building.
20    Q.  Is there another property report for the residential
21    condominium at Trump Tower?
22    A.  Yes, there probably was -- there was, yes.
23    Q.  Okay.  And how many pages would you say are in that
24    document, approximately?
25    A.  100.
```

Reiss - cross

1   Q.  And tell us what that's comprised of?  Does it have

2   multiple components?

3   A.  Typically it will describe the building, it will describe

4   the services to the building, it will describe the philosophy,

5   it will describe the location, it will describe how the -- in

6   this case it's a hotel -- how the hotel will be run.  It will

7   list all of the units in the hotel, their percentage common

8   interest, that is, the amount of percentage they share in the

9   costs of running the building, and it will have a budget.

10  Q.  Does it also have a condominium declaration?

11  A.  Yes.

12  Q.  Do you recall just from memory what other pieces there are

13  or -- when I say components, I should have referred to them as

14  exhibits because -- tell me, does this document actually

15  itself have multiple exhibits?

16  A.  Yes, it does.

17  Q.  Do you remember from memory which exhibits each property

18  report has?

19  A.  I'm going to be a little shaky there.  I certainly

20  remember the exhibits having to do with the budget and having

21  to do with the -- and having to do with the listing of all the

22  units and their percentage common interest and their estimated

23  taxes and assessment payments on a monthly and yearly basis.

24  Q.  But there are several components, aren't there?

25  A.  Yes.

Reiss - cross

1    Q.  Some you don't even remember as you're sitting here,

2    right?

3    A.  I'm afraid I don't.

4    Q.  It's a complicated document with a lot of pieces to it, is

5    that correct?

6           MR. S. KULWIN:  Objection, your Honor.  This is an

7    adverse cross.  He's leading.

8           MR. SHONKWILER:  Limited to scope, your Honor, of

9    what was asked on direct.

10          THE COURT:  Overruled.

11   BY MR. SHONKWILER:

12   Q.  I --

13   A.  It's a very complicated document and it's put together by

14   multiple people.

15   Q.  Okay.  The document that's in front of you in the center

16   is Plaintiff's Exhibit 2.  Would you take a look at that and

17   please tell me if you recognize that and, if so, what it is?

18   A.  This is for the residential condominium.

19   Q.  I'm sorry?

20   A.  It's the property report for the residential condominium

21   at Trump International Hotel and Tower in Chicago issued on

22   the same day that the hotel condominium was issued.

23   Q.  I would like to show you the hotel condominium property

24   report.  And I apologize I'm using plaintiff's exhibits.  I'm

25   going to --

Reiss - cross

1        MR. S. KULWIN:  I object to that and -- that he's

2   referring that he's using plaintiff's exhibits as though we

3   did something wrong because he picked up the wrong document.

4   And I would ask that it be stricken.

5        THE COURT:  Rephrase your question.

6        MR. SHONKWILER:  I didn't mean to suggest any such

7   thing, your Honor.  I will use the defendants' exhibit so that

8   I'm more familiar with it.

9   BY MR. SHONKWILER:

10  Q.  I would like to show the witness, please, Defendants'

11  Exhibit 601, and if you could tell me please -- Mr. Reiss,

12  I'll take Plaintiff's Exhibit 2 from you.

13       Tell me, please, do you recognize this exhibit?

14  A.  This is the first amendment to the initial property report

15  for I believe the residential condominium issued on

16  February 25th, amending the initial report that was issued on

17  September 24th.

18  Q.  Well, I need to see that again then, please.  We'll start

19  with the second amendment and come back to the first

20  amendment.

21       The document on your left, if that's a residential

22  property report I will replace it.  Can you tell me whether

23  that is a residential property report or a hotel property

24  report?

25  A.  It says condominium and I believe that is how we defined

Reiss - cross

1    the residential.

2    Q.  Okay.

3            THE COURT:  Can you please read the exhibit number on

4    that for the record, sir?

5            THE WITNESS:  The exhibit number is 133-20.

6            THE COURT:  Is there an exhibit number on the bottom

7    right-hand corner?

8            THE WITNESS:  I'm sorry.  PX 4.

9            THE COURT:  Thank you.

10   BY MR. SHONKWILER:

11   Q.  We'll come back to those.

12           Mr. Reiss, tell me -- yes, put those down.  We will

13   show you the documents, the long awaited property report

14   documents.  And now I don't have them ready for you.  I

15   apologize.

16           Tell me, when you have a property report that is

17   amended, does the amendment replace the original property

18   report or does it supplement it?

19           MR. S. KULWIN:  Objection.  Calls for a legal

20   conclusion.

21           THE COURT:  Sustained.

22           Rephrase your question.

23   BY MR. SHONKWILER:

24   Q.  The question, Mr. Reiss, is:  Does an amendment to the

25   property report replace everything that was in the original?

Reiss - cross

 1          MR. S. KULWIN:  Same objection.

 2          THE COURT:  Sustained.

 3     BY MR. SHONKWILER:

 4     Q.  Mr. Reiss, do you have knowledge about whether an

 5     amendment to the property report supplements it or replaces

 6     it?

 7     A.  Yes, I have knowledge.

 8     Q.  And what is the answer to that?

 9     A.  I believe it supplements it.

10     Q.  Okay.  When a buyer comes in to buy a condominium and the

11     current amendment is the second amendment, is the buyer given

12     the original property report, the first amendment and the

13     second amendment?

14     A.  I believe so, yes.

15     Q.  And why is that?

16     A.  Because it's the -- it's the sum of all the property

17     reports that reflect the current status.

18     Q.  All right.  I'm going to come back to those, but I wanted

19     everyone to have an idea of what they look like.  And I

20     promise you we will get the hotel property reports in front of

21     you before we start asking you questions about them.

22          Mr. Kulwin asked you some questions about your work

23     history before you joined the Trump organization.  Do you

24     remember that?

25     A.  Yes, I do.

Reiss - cross

1    Q.  In the 25 years or so that you worked before you joined

2    the Trump organization, did you have any experience planning,

3    building or operating hotels or condominiums?

4           MR. S. KULWIN:  Objection to relevancy.  25 years

5    before?  I -- I withdraw it, Judge.

6           THE COURT:  Okay.

7           You may answer, sir.

8    BY THE WITNESS:

9    A.  I did not.

10   BY MR. SHONKWILER:

11   Q.  You were in the work force for about 25 years before

12   joining Trump, isn't that right?

13   A.  My first full-time job was in 1966 and I joined Donald in

14   '93.  So what is that?  That's about 27 years, in fact.

15   Q.  Okay.  And in that 27 years did you have any knowledge or

16   expertise in preparing operating budgets or property reports

17   for condominiums?

18   A.  I did not.

19   Q.  What were your chief areas of expertise when you joined

20   Trump in 2003?

21   A.  In --

22   Q.  I'm sorry.  Strike that.

23           In 1993.  Am I correct about that date, sir?

24   A.  I joined Donald as an employee in 1993.  As it was stated

25   earlier, I had a consulting business and Donald became a

1    client through the governmental groups in 1990.

2    Q.   And what were your chief areas of expertise when you

3    joined Trump?

4    A.   Entitlement, community relations, and affordable housing,

5    and government subsidy programs and tax programs, the latter

6    two having to do with housing.

7    Q.   When you joined Trump in 1993, did you do any land use

8    review work?

9    A.   Yes, I did.

10   Q.   And what does that mean for the jury, land use review?

11   A.   It's more properly called entitlement.  It really means

12   zoning, and how to get a property qualified under zoning or

13   how to work with the Department of City Planning to change the

14   zoning ordinance in order to conform a property.  Or, in the

15   third case, there are many clauses in the New York City zoning

16   ordinance where discretion is applied and -- where discretion

17   is required, and you go through a process to convince both the

18   City Planning Commission and the local community boards that

19   that discretion is appropriate.

20   Q.   Now, Mr. Reiss, when did you get your first experience

21   planning and running a hotel?

22   A.   With Trump International Hotel in New York City on

23   Columbus Circle.

24   Q.   Was that a hotel and residential condominium?

25   A.   Yes, it was.

Reiss - cross

1  Q.  Was this also the Trump organization's first time

2  developing a hotel condominium?

3  A.  To the best of my knowledge, yes.

4  Q.  Did the Trump organization construct that building in New

5  York from the ground up?

6  A.  No.  It was a rehab of an existing building called the

7  Gulf and Western or the Paramount building.

8  Q.  Okay.  And do you remember when the New York building that

9  contained the hotel condominium was completed and up and

10 running?

11 A.  It was opened in 2007 -- I'm sorry.  In 1997.

12 Q.  And you participated in the planning of that building?

13 A.  Yes, I did.

14 Q.  Did you learn some things through trial and error during

15 the process of planning that building?

16 A.  I learned a great deal, yes.

17 Q.  Do you remember any examples of things you learned through

18 trial and error?

19 A.  There were a number of tax programs that the city had that

20 people had not thought were applicable to the building, and I

21 discovered they were.  I kind of used them in very creative

22 ways.

23        I learned a great deal about how to prepare what was

24 a very intricate condominium plan, and I learned a great deal,

25 even more importantly, about the standards of running a good

Reiss - cross

1    hotel and what a good hotel was meant to be.

2    Q.  Did you prepare the property report for that building?

3    A.  I did prepare the property report but I had less authority

4    at that point in time because the New York statute is very

5    different, and there was a consultant specifically for that

6    who I worked with very closely in doing it.

7    Q.  Was your experience on the New York hotel the first time

8    you worked on a hotel condominium property report?

9    A.  Yes.

10   Q.  Did you help prepare operating budgets for the New York

11   hotel condominium?

12   A.  Yes, I did.

13   Q.  And was that also your first experience working on a

14   budget for a hotel condominium?

15   A.  Yes, it was.

16   Q.  Am I -- let me ask a few more questions about the New York

17   property.  And remind us again, when was that completed?

18   A.  It was opened in 2007 -- I'm sorry.  I keep making that

19   mistake.  In 1997.

20   Q.  In the hotel business what does banquet refer to?

21   A.  Banquet refers to food and beverage facilities that are

22   within the hotel and are typically associated with room rental

23   and have formal functions as opposed to a restaurant, which is

24   one customer at a time.

25   Q.  Am I correct, the New York hotel itself does not run a

Reiss - cross

1    food and beverage operation in the hotel?

2    A.  That's correct.

3    Q.  If people staying in the hotel in New York want room

4    service, how do they get it?

5    A.  They get it through the restaurant, Jean Georges.

6    Q.  Okay.  The restaurant is not a Trump restaurant, correct?

7    A.  It's not.

8    Q.  That's just a restauranteur who leases a space from you in

9    the building?

10   A.  That's right.

11   Q.  Okay.  How did you decide for New York what elements of

12   the project would be included in the common elements of the

13   condominium?

14   A.  A lot had to do with the layout of the building but, in

15   fact, there were very few common elements in the New York

16   property.  It was very much a condominium with -- a heavier

17   role of condominium than actually hotel.  And it was seen as a

18   rooms-only kind of hotel.

19        So while there was a recreation center, that

20   recreation center was available both to the residents in the

21   top of the building and the hotel.  In fact, that recreation

22   center opened -- occupied the space of an old movie theater.

23   But other than that, upon initial opening there were no other

24   commonly owned facilities.

25   Q.  What was your role in deciding what components of the New

Reiss - cross

1   York property would be common elements of the hotel

2   condominium?

3      (Discussion had off the record.)

4          THE COURT:  You may answer, sir.

5   BY THE WITNESS:

6   A.  Oh, I think my role was -- it was -- at the time, because

7   it was a relatively new thing, it was a collegial role that

8   many people played a part in.

9          But again, there really -- there wasn't any space for

10  any common elements, and Donald felt very strongly that there

11  shouldn't be, that this should really be just about selling

12  condominium properties and running a third of them as a hotel.

13  BY MR. SHONKWILER:

14  Q.  I'm sorry.  What was your role in deciding what the common

15  elements would be for that building?  What role did you play

16  in that decision, please?

17  A.  I -- looking back -- we're now talking 14, 15 years ago.

18  My role was -- I think I was primarily the planner of that

19  building and I worked with the architects to make the most

20  efficient layout.  And I -- I decided that at some point, with

21  other people's agreement, that at some point this was a

22  building that didn't need and didn't require any kind of

23  common facilities other than the restaurant and the gym.

24  Q.  Okay.  And did Donald Trump, Sr., participate in decisions

25  about which components of the property would be common

Reiss - cross

1    elements?

2    A.   In New York?

3    Q.   In New York.

4    A.   Yes.

5    Q.   What do you recall about that?

6    A.   There were -- there wasn't much to recall.  Having --

7            MR. S. KULWIN:  Judge, I'll object.  Lack of

8    foundation.  Can we get a who, when and where?

9            THE COURT:  Sustained.

10           MR. SHONKWILER:  Let's move on.

11   BY MR. SHONKWILER:

12   Q.   Mr. Reiss, I showed you earlier Defendants' Exhibit 601.

13   This is the first amendment.  I would like you to take another

14   look at it.

15           You testified previously you thought this was the

16   first amendment to the residential condominium?

17   A.   Yes, sir, I believe it is.  It's dated February 25th.

18   Q.   All right.  Could you take a look at the top of the second

19   page of that document and read there and tell me if you see a

20   reference that changes your mind?

21   A.   It says hotel condominium.  Yes.

22   Q.   Is this then the first amendment to the hotel condominium?

23   A.   Yes.  I was looking at the cover page which just says

24   condominium.  So, yes, this is the hotel condominium.

25   Q.   From a planning perspective -- I'm sorry.

Reiss - cross

1        Mr. Reiss, I want to talk about the Chicago building

2   now.  Let's move from New York to Chicago.

3   A.   Okay.

4   Q.   From a planning perspective how complex was the Chicago

5   Trump Tower project as compared to the New York project?

6   A.   Much more complex.

7   Q.   Okay.  In what sense, please?

8   A.   It was a bigger building, it was on a much more

9   complicated lot, it had very high parking requirements that

10  were difficult to submit.  Even -- when there was an office

11  building, there was essentially three major components to that

12  building when there was an office.  When the office was

13  replaced, as we've stated earlier, it was replaced with a

14  rather large banqueting facility with separate entrances.

15        So the -- what really defines a complicated building

16  is the amount of multi-use functions and entrances to that

17  building.  And Trump International Chicago had many of those.

18  Q.   Tell us what you mean by multi-use?

19  A.   It had a residential use, it had a hotel use, it had

20  retail use, and it had banqueting use which had separate

21  entrances, so I would define it as somewhat separate use.

22  Q.   Were there actually separate parcels to Trump Tower

23  Chicago?

24  A.   Yes.  Each condominium is its own parcel.

25  Q.   How about the commercial property as opposed to the hotel

Reiss - cross

1    condominium property?  Are they different parcels or are they

2    the same?

3    A.  They are different parcels.

4    Q.  And how many different parcels are there in Trump Tower

5    Chicago?

6    A.  Well, can I count?  There will be -- there will be

7    commercial, that's one; there will be residential; that's two;

8    there will be hotel, that's three; there's -- well, it's the

9    same owner.  There's probably restaurant, that's four; and the

10   health club I believe is owned by the building -- by both the

11   hotel and the residential condominium, so I'm not sure at this

12   point.  So there's about five.

13   Q.  Okay.  So the physical structure that is Trump Tower

14   actually is comprised of five separate parcels, is that

15   correct?

16   A.  I believe so, yes.

17   Q.  Does every part of the building, physical part of the

18   building, have to be put into one of those five parcels?

19   A.  Yes.

20   Q.  When you have a building with this many parcels, how do

21   you go about deciding -- let me start with some foundation.

22   Strike that, please.

23         Was it part of your responsibility for the Chicago

24   building to decide which parcel in the building a certain

25   component might go into?

Reiss - cross

1   A.  Yes, it was.

2   Q.  How do you go about making a decision like that when you

3   have so many different parcels?

4   A.  Well, certain of the decisions are obvious.  The hotel is

5   going to be in the hotel.  Where there is any kind of

6   ambiguity, like a health club, you make that decision, I

7   believe, based on what works best for the owners as well as

8   the sales effort.

9        So it's most -- the health club in Chicago I believe

10  is owned both by the -- both by the residential and the hotel

11  condominium associations.

12       I think the other component of the question is really

13  how do you go about allocating the costs of each budget item

14  amongst those -- amongst each one of those regimes.  Is that

15  --

16  Q.  Well, why don't you tell us that.  How do you go about

17  allocating the costs?

18  A.  Okay.  You consult with -- depending upon the nature of

19  the costs -- for instance, if it's utilities you'll consult

20  with the mechanical engineers for the building.  It gets down

21  to kind of crazy things, literally counting the light bulbs in

22  each component and making an estimation about how much wattage

23  they will draw over a given time.

24       When it has to do with maintenance of the facility,

25  if you have a -- somebody whose job responsibility is

1  cleaning, how much time will he spend in the hotel, how much

2  time will that fellow spend in the residential part and other

3  parts.  And while you make a lot of intuitive decisions,

4  basically that's based on square feet.

5          So each one of those components, each budgetary line

6  item, is looked at and you try and reach a fair allocation

7  system amongst each one of the components.

8          Obviously there's some personnel issue --

9     (Brief interruption.)

10          THE WITNESS:  I'm sorry.  I've got to turn that off.

11          THE COURT:  Can you please turn that off.

12          THE WITNESS:  I thought I did.  I'm sorry.

13          (Brief pause.)

14  BY THE WITNESS:

15  A.  (Continuing:)  There are some personnel who only work

16  within each one of the components, such as a maid.  But there

17  are other -- like the building-wide engineer who may work --

18  who may work in the entire building.  And, therefore, you have

19  to reach certain decisions as to how that allocation occurs.

20  BY MR. SHONKWILER:

21  Q.  You were asked during Mr. Kulwin's examination about

22  research that you did before you began work on the New York

23  building.  Do you recall that?

24  A.  On the New York building, yes.

25  Q.  And you were also asked about research you did before you

Reiss - cross

1  started on the Chicago building.  Do you remember that?

2  A.  Yes, I do.

3  Q.  The New York building was your first hotel condominium

4  experience and Chicago was your second, is that right?

5  A.  That's right.  I mean, Sunny Isles was in there but I

6  wasn't -- I didn't play a development role in Sunny Isles.

7  Q.  And Sunny Isles, you didn't write the property report?

8  A.  No, I did not.

9  Q.  And Sunny Isles, Trump was not the developer, is that

10  right?

11  A.  No, he was not.

12  Q.  Okay.  And in New York -- the research you did for the New

13  York project and the Chicago project you did because you had

14  to learn about hotel condominiums, isn't that right?

15  A.  That's right.

16  Q.  Isn't it right that it's a specialized area of development

17  that is different from other kinds of developments?

18  A.  It's highly specialized, yes.

19  Q.  And because of the expertise that you obtained from

20  working on those two projects, as Mr. Kulwin pointed out in

21  his examination, you were actually asked to speak at certain

22  events after you left Trump, is that right?

23  A.  That's correct.

24  Q.  Is it safe to say you learned a lot from those two

25  projects, the one in New York and the one in Chicago?

Reiss - cross

1    A.   Yes.  They were tremendous learning experiences.

2    Q.   Did the original plans for Chicago Trump Tower include a

3    hotel condominium?

4    A.   Yes.  I believe they always did.

5    Q.   I'm sorry?

6    A.   I believe they always did, yes.

7    Q.   Did they include a residential condominium?

8    A.   Yes.

9    Q.   I think you testified there was also office space

10   originally included?

11   A.   Yes, there was.

12   Q.   And some retail space?

13   A.   Yes.  In the very, very, very -- if I just could amend

14   that a little bit.

15        In the very, very, very beginning of the building, as

16   a concept, it was 100 percent office.  But that quickly went

17   away because it was just too much office space for Chicago to

18   absorb.

19   Q.   Now, please take a look at Exhibit 600.  It's on your

20   right.  It's the original property report.

21   A.   Yes.

22   Q.   Now, can you tell from the property report there when it

23   was issued, the date?

24   A.   The date is September 24th, 2003.

25   Q.   Okay.  Was the building constructed at that point?

Reiss - cross

1   A.   No.

2   Q.   What was on the lot where the building now sits --

3   A.   The old --

4   Q.   -- in 2003?

5   A.   The old Sun-Times building.

6   Q.   Okay.

7           THE COURT:  Mr. Shonkwiler, if you're going to ask

8   questions about Exhibit 600, it is not in evidence.  601

9   through 606, those were moved in, but not 600.

10          MR. SHONKWILER:  We would like to move it into

11  evidence, your Honor.

12          THE COURT:  Is there any objection?

13          MR. S. KULWIN:  If I could just see it.

14          (Brief pause.)

15          MR. S. KULWIN:  No objection.

16          THE COURT:  Okay.  I will admit Defendants' 600.

17          (Said exhibit was received into evidence.)

18  BY MR. SHONKWILER:

19  Q.   What role did you have in preparing the original property

20  report?

21  A.   For Chicago?

22  Q.   Yes.

23  A.   I believe I was in charge of its production and

24  coordinating all the consultants to prepare it.

25  Q.   Okay.  Who signed this document on behalf of the

Reiss - cross

1    developer?

2    A.  I did.

3    Q.  Can you find where you signed it, please?

4    A.  I don't have a clue.  I'm sure you don't want me to go

5    through all these pages.

6    Q.  Well, you are the author of the document.  I don't want to

7    make us sit here any longer than we have to, but I was hoping

8    you would be able to find that.  If not, I will help you out.

9           THE COURT:  If you know the page number, why don't

10   you direct him to it.

11          MR. SHONKWILER:  Sure, your Honor.

12   BY MR. SHONKWILER:

13   Q.  Mr. Reiss, do you see the numbers on the bottom right-hand

14   corner of the page that start with the letters SJ?  Just on

15   each page, do you see those numbers?

16   A.  Bottom right?

17   Q.  Yes.

18   A.  I don't.  Am I looking at the wrong exhibit?

19   Q.  Yes.  I'll take that back.

20   A.  Okay.  I do.

21          MR. SHONKWILER:  Sorry, your Honor.  Just one second,

22   please.

23          (Brief pause.)

24   BY MR. SHONKWILER:

25   Q.  Sorry we had to replace those for you.

Reiss - cross

```
 1            This is Defendants' Exhibit 600.  This is the
 2   original property report, and that is the document I would
 3   like you to look at now.
 4   A.  Okay.
 5   Q.  Okay.  Do you see the numbers on the bottom right?
 6   A.  Yes, I do.
 7   Q.  Okay.  Please turn to page SJ 37.
 8   A.  Yes.
 9   Q.  Okay.  Is that your signature there?
10   A.  Yes, it is.
11   Q.  And, sir, did you sign this on behalf of Trump Chicago
12   Managing Member for the developer?
13   A.  Yes, I did.
14   Q.  What other Trump employees worked on this property report
15   with you, Mr. Reiss?
16   A.  Russell Flicker would have been the main person assisting
17   me on it.
18   Q.  Did Russell Flicker work for you or under you?
19   A.  He worked for me, yes.
20   Q.  Who was the general contractor for construction for Trump
21   Tower once the construction began?
22            MR. S. KULWIN:  Objection to relevancy, Judge.
23            THE COURT:  I didn't hear you.
24            MR. S. KULWIN:  I'm sorry.  Objection to relevancy.
25            THE COURT:  Overruled.
```

```
 1              You may answer that, if you can, sir.  If you know.
 2   BY THE WITNESS:
 3   A.  The general contractor became Bovis.  They were
 4   technically a construction manager, not a general contractor.
 5   BY MR. SHONKWILER:
 6   Q.  Did you sometimes consult with them while you were still
 7   at the Trump organization?
 8   A.  Again, when I -- when I was here the building had not
 9   begun construction.  So there was preliminary construction
10   studies and we would have meetings with the architects at
11   which they attended.
12   Q.  You did have meetings with the architect?
13   A.  Yes.
14   Q.  Tell me, who was responsible at the Trump organization for
15   deciding what parts of the hotel -- what parts of the project,
16   rather, would be hotel common elements?
17   A.  I was.
18   Q.  Okay.  Were there other Trump employees who assisted you
19   with that?
20   A.  Russell and Jill were on my staff.  I also had a fellow
21   who worked on construction but he didn't have a great deal to
22   do with that.
23   Q.  Did Mr. Flicker work on the New York project, too?
24   A.  No, he did not.
25   Q.  Did Mr. Flicker have any experience with preparing
```

Reiss - cross

1  property reports when he came to work for Trump?

2  A.  No, he did not.

3  Q.  Did he have any experience working on hotels?

4  A.  Not to my knowledge.

5  Q.  How about hotel condominiums?

6  A.  Not to my knowledge.

7  Q.  How did you, with the help of anyone who assisted you, go

8  about deciding which parts of the property would be common

9  elements for the Chicago Trump Tower hotel condominium?

10  A.  For the most part it's rational decision-making using -- I

11  like to rely on as many mathematical formulas as possible in

12  order to have a record of how that allocation was made.  But

13  again, it's -- each component has its own criteria and its own

14  way to figure out that allocation.

15  Q.  Okay.  Look again, please, at the exhibit you have in your

16  hand, the original property report --

17  A.  Yep.

18  Q.  -- Defendants' 600.

19  A.  Yes.

20  Q.  Do you recall whether the original plans for the property

21  included plans for any meeting or ballroom facilities?

22  A.  The original property report had plans for a small

23  ballroom facility.

24  Q.  I'm sorry, a --

25  A.  A small function meeting room facility, not a ballroom

Reiss - cross

 1   facility.

 2   Q.  Does the property report include a description of those

 3   meeting -- or function room facilities?

 4   A.  I believe it does.  It would probably be in a note

 5   attached to the budget.

 6   Q.  Well, I would like to ask you to turn to the condominium

 7   declaration, which is one of the exhibits to that property

 8   report.  Is that correct?

 9   A.  Yes.

10   Q.  Okay.  Can you find the condominium declaration?  I think

11   you should look at page SJ 43.

12   A.  I have it.

13   Q.  Can you tell whether this is part of the condominium

14   declaration portion of the property report?

15   A.  It seems to be, yes.

16   Q.  Okay.  Do you recall that the declaration began with a

17   list of definitions?

18   A.  Yes.

19   Q.  Okay.  I'm showing you page SJ 43 up on the screen here.

20   A.  Right.

21   Q.  It says Definitions.  Is that the section of the

22   declaration that defines things?

23   A.  Yes.

24   Q.  And is it in this section of the property report where

25   things would be either defined as common elements or parts of

Reiss - cross

1   another parcel of the Trump Tower structure?

2   A.  Yes.

3   Q.  Okay.  Would you please turn to page -- two pages forward,

4   to SJ 45.  There's a paragraph there that's entitled Meeting

5   Rooms.  Do you see it?

6   A.  Yes.

7   Q.  Okay.  It says:  (Reading:)

8     Meeting Rooms.  The meeting and conference rooms and

9   ancillary facilities related thereto, located on either or

10  both of floors 13 and 14 of the property, comprising a portion

11  of the property and constituting a portion of the common

12  elements.

13          Do you see that?

14  A.  Yes.

15  Q.  Okay.  Do you remember what the word property, with a

16  capital P, means according to this document?

17  A.  Property would mean the condominium -- the hotel

18  condominium regime.

19  Q.  Okay.  It doesn't mean the whole building, correct?

20  A.  I don't think so, no.

21  Q.  It refers to one of the multiple parcels you referred to

22  earlier, right?

23  A.  That's right, because we were looking at the hotel

24  condominium property report.

25  Q.  Does this paragraph tell you whether these meeting rooms,

Reiss - cross

1   under the original property report, are part of the common

2   elements of the hotel condominium?

3   A.   It says -- yes, it says constituting a portion of the

4   hotel common -- of the common elements, yes.

5   Q.   So if you wanted to know whether these rooms were in the

6   common elements as opposed to one of the other four or five

7   parcels of the building, you would have to go to this page in

8   the property report, right?

9   A.   That's right.

10  Q.   Did you need to consult with Mr. Trump before you were

11  able to make a decision for this paragraph, as to whether you

12  could call these common elements or whether you had to put

13  them in another parcel?

14  A.   I did not.

15  Q.   Did you consult with Mr. Trump before you made that

16  decision?

17  A.   As to the location of the meeting rooms?

18  Q.   Which parcel they went into, i.e., the common elements --

19  A.   I did not.

20  Q.   -- versus another parcel?

21  A.   I did not.

22  Q.   Did Mr. Trump require you to get his approval for every

23  decision you made related to planning the project?

24  A.   He did not.

25  Q.   Did Mr. Trump ever approach you with his own ideas about

Reiss - cross

315

1  what should be included in the common elements of the hotel

2  condominium as opposed to other pieces of the property that

3  constitutes Trump Tower?

4  A.  I can't remember ever having such a conversation.

5  Q.  And was the same true for the planning of the New York

6  hotel condominium common elements?

7         In other words, do you ever recall Mr. Trump coming

8  up to you saying, I've got a great idea for the common

9  elements for this condominium?

10  A.  It was a very -- it was a very different building.  The --

11  there were so few common elements that the conversation

12  wouldn't have even happened other than the gym, which is

13  pretty standard in residential development in New York.  There

14  would have been no conversation.

15  Q.  And you don't recall any conversation --

16  A.  No.  The gym was a given, and the restaurant was

17  typically, in all of Donald's previous buildings, retained by

18  the developer, by the Trump organization.  I just followed the

19  formula.

20  Q.  Is it possible for you to consult with Mr. Trump on every

21  decision you make?

22  A.  Is it possible?

23  Q.  Yes.

24  A.  I don't think he would have welcomed it.  It certainly is

25  possible but I wouldn't have.

Reiss - cross

1   Q.  Was it your understanding that you were required to?

2   A.  No, it was not.

3   Q.  Was it your understanding that he would be happy if you

4   consulted with him on every decision?

5   A.  I think he would be very bothered by it.

6   Q.  Was Mr. Trump aware of all the work you contributed to

7   planning the New York hotel?

8   A.  I believe he was.  I hope he was.

9   Q.  Did you have an understanding, based on that experience,

10  as to whether Mr. Trump gave you latitude to make decisions

11  about planning the Chicago project?

12  A.  Yes, very much so.

13  Q.  Was it up to you to use your judgment on whether to bring

14  an issue to Mr. Trump for his approval?

15  A.  Yes, it was.

16  Q.  There was a lot of discussion earlier today about what

17  went into the building and what went into the common elements

18  and what you discussed with Mr. Trump and what you didn't.

19  Let's cover those one at a time and get straight what you

20  remember about each of those things.

21  A.  Do I need to refer to this thing --

22  Q.  No, sorry.  Please put it down.  And I -- would you like

23  me to take them?  Are they okay up there?

24  A.  They're fine.

25  Q.  All right.  If they fall, we'll have a heck of a time

Reiss - cross

 1    bringing them back together, won't we?

 2            First let's talk about the difference between adding

 3    something to the building and putting something in the common

 4    elements.  And if it helps to refer to those five parcels you

 5    referred to earlier, fine.  But please explain to the jury

 6    briefly what it means to add something to the building?

 7    A.  It means that the design -- if we're adding a physical

 8    component to the building, that would have to be designed, so

 9    we would have to go back to the architects and plan for that

10    design.

11            We would also have to check with the zoning.  And in

12    Chicago we -- there was a special authorization under zoning.

13    We had what's called a project permit for this.  So any change

14    in the building that was not in conformance with the zoning

15    granted project permit, we would have to go back and make that

16    change and -- either ask the city to amend it or get a ruling

17    that it was -- remained in conformance.

18    Q.  We're talking about a change to the physical structure of

19    what Trump Tower is, correct?

20    A.  That's right.

21    Q.  Are changes to the physical structure of the building

22    decisions that Mr. Trump was involved in?

23    A.  On a major scale he would have been.

24    Q.  So, for example, we talked about the addition of the

25    ballrooms to the building.  Is that a decision Mr. Trump was

Reiss - cross

1   involved in?

2   A.  I think the more accurate way to portray it is when the

3   decision was made not to have the commercial in the building,

4   that on my own I examined the implications of that and happily

5   went back to Donald and probably said, you know, this is what

6   we're doing, we can get a great ballroom out of this, it's the

7   best use, and he probably said great, go ahead.

8   Q.  And that was a big decision about the makeup of the

9   building physically, right?

10  A.  It was a big but obvious decision, I think.

11  Q.  Now, once a decision is made to add a facility to the

12  building, then those facilities must be identified as being

13  included in one of those five parcels, correct?

14  A.  That's correct.

15  Q.  Okay.  That latter process, deciding which particular

16  parcel particular components went into, was that a level of

17  detail that Mr. Trump ever got involved in, to your

18  recollection?

19  A.  Not to my recollection.

20  Q.  Do you ever remember having a discussion with Mr. Trump

21  about your suggestion as to whether a particular piece of the

22  property should go in one parcel versus another?

23  A.  No, I don't.

24  Q.  And when we talk about common elements in this trial, are

25  we talking about one of those five parcels?

Reiss - cross

1  A.  Yes.

2  Q.  We're talking about the hotel condominium parcel?

3  A.  Yes.

4  Q.  If something is included in the hotel condominium parcel,

5  it is a common element; that's what we mean when we say that

6  today?

7  A.  If it's owned by all of the unit owners, yes, it would be

8  common.

9  Q.  And everything that is in the common elements of the hotel

10  condominium is owned by the unit owners in --

11  A.  Right.

12  Q.  -- in proportion to their ownership of the building?

13  A.  Right.

14  Q.  So, for example, do you recall what percentage ownership a

15  single -- a one bedroom hotel condo unit would have of the

16  whole condo?

17  A.  I believe there are 174 hotel rooms.  I think that's the

18  number that's in my head.  So maybe like three quarters of a

19  percent would be the average interest of an average hotel

20  condo unit.

21  Q.  So a fraction of one percent?

22  A.  Yes.

23  Q.  And if there were more hotel condo units added, that

24  percentage would go down?

25  A.  It would go down, that's correct.

Reiss - cross

1   Q.  So when we talk about unit owners owning common elements,

2   we're talking about owning a fraction of one percent?

3   A.  That's right.  A very small amount, yes.

4   Q.  And we are also talking about shared ownership in common

5   with all other unit owners, correct?

6   A.  Yes, we are.

7   Q.  There's no unit owner that has an exclusive ownership

8   right to any portion of the common elements?

9   A.  No.  It wouldn't be a common element.

10          There's another definition called a limited common

11  element, which is typically a balcony where because it's

12  projecting off the face of the building, it has to be owned in

13  common.  However, only the unit owner can access it.  That's a

14  separate category of common element.

15  Q.  Let's talk about marketing, because I know you were

16  involved in that, too.

17          We've been shown black and white copies of what had

18  been referred to as brochures.  Can you please explain to the

19  jury what did those brochures look like back when you were

20  actually using them to help sell condos?

21  A.  They were colored, they were on nice stock.  As I recall,

22  one of the brochures had inserts which were staggered so you

23  could see them graphically, and each insert dealt with another

24  -- a different aspect of the building.  They were typically

25  given out at the sales center.

Reiss - cross

1    Q.   Is it your understanding that the law requires certain

2    things to be put into the property reports?

3    A.   Yes.

4    Q.   And the property report and the first amendment and the

5    second amendment are the documents sitting in front of you, is

6    that correct?

7    A.   Yes.

8    Q.   Okay.  The marketing materials -- now, when I say

9    marketing materials, I'm talking about the glossy brochures.

10   Those marketing materials never said anything about what was

11   in the common elements of the building, correct?

12   A.   No, they did not.

13   Q.   If you wanted to know what was in the common elements, you

14   had to look through that pile of paper in front of you, right?

15   A.   Yes.

16   Q.   The selling points that the Trump organization believed

17   were important, when you were there and when you were helping

18   make those decisions, those were in the glossy marketing

19   materials, correct?

20   A.   The selling points?

21   Q.   Correct.

22   A.   No, they were not.  They were in the property report.

23   Q.   If something was in the property report but not the glossy

24   brochures --

25            MR. S. KULWIN:  Judge --

Reiss - cross

```
 1  BY MR. SHONKWILER:
 2  Q.  -- why would that decision have been made?
 3            THE COURT:  Was there an objection?
 4            MR. S. KULWIN:  No, Judge.
 5            THE COURT:  Okay.
 6  BY THE WITNESS:
 7  A.  It would have been made because we either didn't think it
 8  was material or didn't -- it wasn't material in the sense that
 9  it would have a big marketing impact.
10  BY MR. SHONKWILER:
11  Q.  I guess --
12  A.  We are limited in the amount of pages and the amount of
13  data and the amount of information we can put in marketing
14  material.  By their nature they are short and precise and they
15  are designed to give a general overall impression of the
16  building but certainly not to give its details.
17  Q.  Understood.
18            And if you wanted to know details, on that level of
19  detail you had to go through the property report, right?
20  A.  Yes.  And as a matter of fact, when the property report is
21  given to an owner, it's part of the federal government
22  regulations that they sign a statement saying that they did
23  that.
24  Q.  And I think I understand your testimony now.  Let me make
25  sure.
```

Reiss - cross

1      When you were involved in deciding what would go into

2  the marketing materials, the glossy brochures that were given

3  to the potential unit owners, were there -- did you withhold

4  the most important selling points, in your mind, from the

5  glossy brochures?

6  A.  I don't think I did, no.

7  Q.  Was it your effort to include the most important selling

8  points in the marketing materials?

9  A.  What I judge to be -- what I judge to be most beneficial

10  to a sales program were in the marketing report, and what also

11  gave a very good conceptual feel of the building, yes.

12  Q.  And were the sales agents instructed to hand that stack of

13  paper to every person who walked into the building asking

14  about condominium --

15  A.  Yes, they were.

16  Q.  Every person who asked?

17  A.  Not every person who asked.  Every person who -- let's

18  see.  When -- every person who makes a bid on a unit is

19  required to get one of these statements.

20  Q.  Okay.  Let's talk about people who haven't put in a bid on

21  a unit.  Let's talk about people who walk in and inquire and

22  say they're interested in condominiums.  Would those people be

23  handed at the door a copy of the property report?

24  A.  No.

25  Q.  Okay.  And at the point when somebody says, okay, I'm

Reiss - cross

1  offering to purchase a unit, at that point would they be given

2  a property report?

3  A.  Yes.

4  Q.  Okay.  But not until then?

5  A.  No.  Not -- it's a precursor to signing the contract.

6  Q.  Okay.  Unless they asked for it?

7  A.  If they asked for it, I guess we would have given it to

8  them, but it had no legal bearing.

9  Q.  In your experience did people ever --

10  A.  I don't think we would have -- I -- I could be wrong here,

11  but I don't think we would have given out a property report

12  until a contract was issued.

13  Q.  Okay.

14  A.  Or under way.

15       MR. SHONKWILER:  Just give me one moment, please.

16       (Brief pause.)

17  BY MR. SHONKWILER:

18  Q.  From your experience, if Mr. Trump's likeness is being

19  used in marketing materials, does he like to approve the

20  materials before they are published?

21  A.  Yes.

22  Q.  Do you have to seek his approval for every decision you

23  make about what goes into marketing materials?

24  A.  No.

25  Q.  Was most of your work on the marketing materials done

Reiss - cross

1    without Mr. Trump's involvement?

2    A.   I think that's a fair statement.  He certainly saw some of

3    the material.  I made decisions when he should see it.  The

4    use of his image, I always cleared which photograph was

5    selected with him.

6    Q.   It was within your judgment to decide when you should go

7    to Mr. Trump?

8    A.   That's right.

9    Q.   If you could pick up, please, Exhibit 601.  I think it's

10   in the middle.  It's the first amendment to the hotel

11   condominium property report.  And I won't make you guess.  I

12   will tell you what page I'm looking at.

13   A.   Oh, I see what I did.  Okay.

14   Q.   What I'm looking for is Paragraph 3.1 of the declaration

15   because Mr. Kulwin asked you some questions about it.  Can you

16   tell me whether you can find that?

17   A.   I think a hint would help.

18           THE COURT:  Do you want to refer him to a specific

19   page number?

20           MR. SHONKWILER:  Yes, I will, as soon as I find it.

21   Regrettably, since this was not part of what I had planned on

22   asking about, I have to find it myself.

23           MR. S. KULWIN:  Your Honor, may I be heard at sidebar

24   for a second?

25           THE COURT:  Let's see if -- let's wait for the next

Reiss - cross

1    question and see if you still need to.

2    BY MR. SHONKWILER:

3    Q.  I found it.  Mr. Reiss, it's on page SJ 32.

4    A.  Yes?

5    Q.  Do you remember being shown this section of the

6    condominium declaration -- at the bottom, I'm sorry, 3.1 --

7    A.  Description of common elements?

8    Q.  Yes.  Do you see that?

9    A.  Yes, I do.

10   Q.  Let me read the first sentence to you and ask you if you

11   recall this.  It says:  (Reading:)

12     The common elements shall consist of all portions of the

13   property except the units.

14           Now, earlier I think you told me the capital P

15   property refers to the hotel condominium parcel of the

16   building, is that right?

17   A.  That's right.

18   Q.  (Reading:)

19     And including the limited common elements unless otherwise

20   expressly specified herein.

21           Do you have an understanding, sir, of what that

22   sentence of this paragraph means?

23   A.  It means basically within the property, as you said, with

24   a capital P, the common elements are the residual portions of

25   that property.

Reiss - cross

1   Q.  So is it correct that everything that's in the hotel

2   condominium piece of the building, and it's not a unit, is a

3   common element?

4   A.  And is not a limited -- is not a unit and is not a limited

5   common element.

6   Q.  Okay.  It says here, and including limited common

7   elements.  So are you --

8   A.  Well, okay.  I mean, it's a definition -- as I said

9   before, limited common element is technically common but it

10  only has access from an individual unit owner.

11  Q.  And read the next sentence with me, please, starting here:

12  (Reading:)

13    The common elements include, without limitation and if

14  applicable, any of the following items located at the

15  property.  And I want to stop right there.

16          Did you have an understanding as to what that meant?

17  A.  It means that any of the properties that follow that

18  statement may or may not be a common element.

19          MR. S. KULWIN:  Judge, I'm going to object to his

20  interpreting the document where it doesn't say may or may not

21  anywhere in it.

22          THE COURT:  What's your response?

23          MR. SHONKWILER:  Well, your Honor, I'm asking the

24  witness if he has an understanding of what this paragraph

25  means.  And if he does, based on being an author -- or one of

Reiss - cross

1  the authors of this document, he can answer --

2          THE COURT:  Overruled.

3          MR. S. KULWIN:  But what he's doing, Judge, he's not

4  asking what he thinks -- he's asking what the effect on the

5  reader is and he has no idea.

6          THE COURT:  I would agree with that but that's not

7  what the last question was.  Overruled.

8          THE WITNESS:  Did I answer it?

9          THE COURT:  Yes.

10         THE WITNESS:  Okay.

11  BY MR. SHONKWILER:

12  Q.  Okay.  Then after the word property there's a colon and a

13  long list of things that appears to take up the rest of the

14  paragraph, is that right?

15  A.  That's correct.

16  Q.  Okay.  Is it your understanding that this paragraph of the

17  declaration is a representation that everything that follows

18  is going to be in the building and is going to be in that one

19  parcel called the common elements?

20         MR. S. KULWIN:  Judge, at this point it's beyond

21  leading.  It's argumentative.

22         THE COURT:  Sustained on the last question.

23  BY MR. SHONKWILER:

24  Q.  Do you have an understanding of what this -- the rest of

25  this paragraph starting with the words "the common elements

Reiss - cross

329

1  includes," what it means?

2  A.  To me it means that anything that follows may be a common

3  element if it's included in the actual building.  It doesn't

4  necessarily mean it has to be.

5  Q.  Okay.  You can put that exhibit aside now, Mr. Reiss.  And

6  please pick up the first amendment.  I think that's the pile

7  in the middle.

8  A.  That's the one I just put down.

9  Q.  It's Defendants' Exhibit 601, and if you can identify the

10  first amendment to the property report.

11  A.  That would be this one?  (Indicating.)

12  Q.  Yes.

13  A.  The one I just -- yes, okay.

14  Q.  And did you also sign that document?

15  A.  Yes.

16  Q.  This time I will tell you the page is SJ 23.

17  A.  Yes.

18  Q.  And that's your signature?

19  A.  Yes, it is.

20  Q.  Okay.  Was your role in preparing this document similar to

21  your role in preparing the original condominium -- the

22  property report?

23  A.  Yes.

24  Q.  And do you recall why you had to amend the property report

25  in February of 2003?

Reiss - cross

1    A.  I'm sorry?  Could you say it again?

2    Q.  The question is, do you recall why you had to amend the

3    property report in February of 2003?

4    A.  Because of the physical change in the building that

5    occurred when the commercial aspect was dropped.

6    Q.  And was this amendment, the first amendment, also the one

7    that added ballrooms to the hotel?

8    A.  Yes, it was.

9         MR. SHONKWILER:  If you can just give me one second,

10    please.

11         (Brief pause.)

12    BY MR. SHONKWILER:

13    Q.  Can you turn to page SJ 28 of the first amendment?

14    A.  Yes, I have it.

15    Q.  And in front of this paragraph, at the bottom, called

16    meeting, function rooms and ballroom space?

17    A.  Yes.

18    Q.  Do you remember we looked at -- earlier at the original

19    property report's description of meeting rooms?

20    A.  Yes.

21    Q.  Okay.  Can you tell me what the bolding and underlining

22    and striking represents in this paragraph?

23    A.  The bolding and underlining means additions to the initial

24    property report and the striking means deletions.

25    Q.  So this shows the changes you made comparing the original

1   now to this first amendment?

2   A.   That's correct.

3   Q.   Okay.  And it says here:  (Reading:)

4      The meeting rooms and ballrooms and other space available

5   for meetings, events or functions and ancillary facilities

6   related thereto, located on either or both floors 16 and 17 of

7   the building, comprising a portion of the property and

8   constituting a portion of the common elements.

9           Do you see that?

10  A.   Yes, I do.

11  Q.   Does this paragraph tell you whether those facilities will

12  be common elements of the hotel condominium parcel of the

13  building?

14          MR. S. KULWIN:  Objection, Judge.

15          THE COURT:  Sustained.

16  BY MR. SHONKWILER:

17  Q.   Can you tell from this paragraph here whether the meeting,

18  function rooms and ballrooms are included, according to this

19  first amendment, in the common elements parcel of the

20  property?

21          MR. S. KULWIN:  Same objection, Judge.

22          THE COURT:  Sustained.

23  BY MR. SHONKWILER:

24  Q.   Mr. Reiss, I was too brief with this.  But you said your

25  involvement in the first amendment was similar to your work on

Reiss - cross

1   the original property report?

2   A.  Yes.

3   Q.  And did you help make decisions, for the first amendment

4   purposes, about what would go into the hotel condominium

5   common elements?

6   A.  Yes, I did.

7   Q.  Okay.  Did anyone else at the Trump organization help you

8   make those decisions?

9   A.  I would -- other than working with Russell, who worked for

10  me, no.

11  Q.  Russ Flicker?

12  A.  Yes.

13  Q.  Okay.  So it was up to you and Russ Flicker to decide what

14  would go into the common elements as opposed to one of the

15  other four parcels, correct?

16  A.  Yes.

17  Q.  And it was your decision -- was it your decision in the

18  first amendment to include the meeting, function rooms and

19  ballrooms in the common elements of the hotel condominium?

20  A.  Yes, it was.

21  Q.  And is that what it says here in this paragraph we're just

22  looking at?

23  A.  Yes, it does say that.

24  Q.  Okay.  And if you want to know whether these are in the

25  common elements of the project, of the building, you got to go

Reiss - cross

1  to this page of the declaration, is that right?

2  A.  Yes.

3  Q.  And, again, is this a decision that you were authorized to

4  make on your own?

5  A.  Yes.

6  Q.  Were you required to go to Mr. Trump in advance in order

7  to make it?

8  A.  I'm sorry.  Repeat the question.

9  Q.  Were you required to go to Mr. Trump in advance --

10  A.  I did not view it as a requirement, no.

11  Q.  At the time it was your understanding that decisions about

12  what would go in the common elements parcel as opposed to the

13  other four parcels of the building was your decision to make,

14  correct?

15  A.  That's right.

16  Q.  And it was within your discretion to decide to go to Mr.

17  Trump and ask him for approval?

18  A.  That's right.

19  Q.  And do you have any recollection at all of talking to Mr.

20  Trump about whether you recommended that these parcels we just

21  looked at -- I'm sorry, these facilities we just looked at,

22  the meeting and function room and ballroom facilities, should

23  go in the common elements of the hotel condominium as opposed

24  to one of the other four parcels in the first amendment?

25  A.  I can't recall ever having that discussion with Mr. Trump.

Reiss - cross

1   Q.  You have no recollection of any such discussion on --

2   A.  No, I don't believe it ever happened.

3   Q.  And would it have been out of the ordinary to have a

4   discussion with Mr. Trump about whether a facility in the

5   Trump Tower property should go into one parcel as opposed to

6   one of the four others?

7   A.  No, I don't think it would have been out of the ordinary.

8   As we've said earlier, there was a great deal of experience

9   coming into this phase with the running of Trump International

10  in New York.  I would believe that Donald -- I certainly

11  believed at the time that Donald trusted me to make that

12  decision.  I've been making decisions like that for the last

13  few years and I didn't see the necessity to consult with him

14  on it.  And frankly, if I had, he probably would have said,

15  why are you bothering me.

16  Q.  If you had asked him he would have said, why are you

17  bothering --

18          MR. S. KULWIN:  Objection to speculation.

19  BY THE WITNESS:

20  A.  Yes.

21          THE COURT:  Sustained.

22  BY MR. SHONKWILER:

23  Q.  I think we misunderstood each other.  Having heard your

24  answer, I'm certain you didn't hear my question.

25          The question was:  Would it have been out of the

Reiss - cross

1    ordinary for you to go seek Mr. Trump's approval before making

2    that type of common elements decision?

3    A.  It would have been out of the ordinary.

4    Q.  Thank you.

5         And when you talked before about whether Mr. Trump

6    approved your common elements decisions, were you referring to

7    the fact that you had authority, delegated by Mr. Trump, to

8    make those decisions?

9    A.  Yes.  There was no -- there was no formal document

10   delegating that authority, but I was comfortable that I had

11   that authority.  And I had no reason to believe I didn't and

12   never had any reason to believe I didn't.

13   Q.  It was always your understanding that that was your

14   decision to make?

15   A.  Yes, it was.

16   Q.  And within your discretion to decide and within your

17   judgment to decide whether --

18        MR. S. KULWIN:  Judge, I'm going to object.  It's

19   asked and answered at this point.

20        THE COURT:  Sustained.

21   BY MR. SHONKWILER:

22   Q.  I would like to ask you just a few questions about the

23   operating budget.  That's also a part of the property report

24   document, right?

25   A.  Yes, it is.

Reiss - cross

1   Q.  And maybe you'll find it before I do, but please flip to

2   the first page --

3           MR. S. KULWIN:  Judge, I'm going to be ask to be

4   heard on this, if I may, please.

5           THE COURT:  Just save the commentary, Mr. Shonkwiler,

6   and --

7           MR. S. KULWIN:  Yes, your Honor.

8           THE COURT:  -- ask your question.

9           I'm assuming that's what the objection is?

10          MR. S. KULWIN:  It is, Judge.

11  BY MR. SHONKWILER:

12  Q.  Mr. Reiss, it's page SJ 69 of the first amendment.

13  A.  I have it.

14  Q.  Were you responsible for preparing this projected

15  operating budget for the hotel condominium?

16  A.  Yes, I was.

17  Q.  And this first amendment was issued in 2004, correct?

18  A.  That's correct.

19  Q.  And at that time there was nothing but a Sun-Times

20  building on that parcel?

21  A.  The Sun-Times --

22          MR. S. KULWIN:  Judge, asked and answered.  He's

23  asked him this several times.  We've gone over this document

24  several times.  He's asking the same series of questions he's

25  asked him before.

Reiss - cross

```
 1           We will stipulate that the first amendment was done
 2    in February of '04.  We will stipulate that the building
 3    wasn't built yet.  We will stipulate that the common elements
 4    were in the property report.  Maybe we can move along.
 5           THE COURT:  Mr. Shonkwiler?
 6           MR. SHONKWILER:  Your Honor, we will move it along.
 7           THE COURT:  Okay.  Good idea.
 8    BY MR. SHONKWILER:
 9    Q.  Who helped you prepare this operating budget for the hotel
10    condominium?
11    A.  I worked with Russell and I worked with consultants in
12    Chicago.
13    Q.  And because the building did not exist at this time, are
14    these numbers --
15           MR. S. KULWIN:  Objection.  I move to strike that.
16           MR. SHONKWILER:  I'm trying to skip asking the same
17    --
18           MR. KULWIN:  He's arguing --
19           THE COURT:  Wait.  You both can't talk at the same
20    time.
21           MR. SHONKWILER:  Excuse me.
22           THE COURT:  Finish your objection.
23           MR. S. KULWIN:  He's arguing his case.  Let him ask
24    questions.
25           THE COURT:  What is your response?
```

Reiss - cross

1          MR. SHONKWILER:  I was just asked to stop asking the

2     question of whether it existed.  So I skipped the question and

3     said we have established that the building wasn't there.  It's

4     part of the question.

5          THE COURT:  Overruled on that question.

6          Finish your question.

7     BY MR. SHONKWILER:

8     Q.  The question, Mr. Reiss, is:  Are these estimates and

9     projections in this budget?

10    A.  Are these estimates and -- yes.

11    Q.  For a building that hasn't yet started operating, right?

12    A.  That's correct.

13    Q.  As opposed to numbers reflecting what had actually

14    happened in the past for something that existed?

15    A.  That's correct.

16    Q.  Okay.  Thank you.

17         THE COURT:  Mr. Shonkwiler, can you please put the

18    exhibit number of what you've been talking about on the

19    record?  You're referring to it by name and not exhibit

20    number.

21         MR. SHONKWILER:  Yes, your Honor.  Thank you.  It's

22    Defendants' Exhibit 601, first amendment.

23         THE COURT:  Thank you.

24         MR. SHONKWILER:  We're looking at page SJ 69.

25    BY MR. SHONKWILER:

Reiss - cross

339

1    Q.  Mr. Reiss, you were asked some questions about the

2    projected revenues.  They're at the top and they are called

3    income.  Do you see the top three lines here?

4    A.  I do.

5    Q.  Okay.  Let me put this up on the screen.

6            Is there a description somewhere in the property

7    report of the way that you reached those projected estimated

8    revenue figures?

9    A.  Yes.  There's the first footnote, footnote No. 1.

10   Q.  If you flip forward three pages -- three or four pages to

11   SJ 74, do you see something called Note 1?

12   A.  Yes.

13   Q.  Is that the page that describes how you estimated those

14   revenue numbers?

15   A.  Yes.

16   Q.  Okay.  Now, there are two projected numbers here:  One for

17   meeting room rental and one for commissions from spa services,

18   is that right?

19   A.  That's right.

20   Q.  Okay.  Let's start with the meeting room rentals first.

21           Was this a calculation that you and Mr. Flicker

22   performed with the help of your consultants?

23   A.  It was probably a calculation that I was mainly

24   responsible for with input from Mr. Levchuck, the controller

25   at New York, with help from Russell, whatever sources I could

Reiss - cross

1    use to try and make a reasonable estimate.

2    Q.  Did Mr. Trump ever help you prepare calculations for an

3    operating budget?

4    A.  No, he did not.

5    Q.  Did he help you prepare these calculations?

6    A.  No, he did not.

7    Q.  Did you have to get his approval in order to put your

8    estimates in the budget that was published in the property

9    report?

10    A.  No, I did not.

11    Q.  Okay.  Now, please look at the line under that,

12    commissions from spa services.

13    A.  Yes.

14    Q.  Do you know what that refers to?

15    A.  I believe it refers to the fact that if a -- if a hotel

16    occupant or a resident used a private health trainer, that

17    trainer would pay a percentage of his fee to the hotel for

18    using their facilities.  I believe that's what it refers to.

19    Q.  Okay.  Was the spa a common element of the first

20    amendment?

21    A.  Yes.

22    Q.  Now, do you recall whether the health club was removed

23    from the common elements at some point in the planning

24    process, Mr. Reiss?

25    A.  I don't -- I believe that in this amendment, the original

Reiss - cross

1  property report and the other one, the health club was part of

2  -- was a common element.  And it was given up to a manager,

3  and I believe there's a fee in the budget for a manager to run

4  it and that fee is charged to the unit owners.

5  Q.  Is it your recollection right now that you cannot remember

6  that it was removed from the common elements at any point in

7  time?

8  A.  No, I can't remember it being removed.

9  Q.  Okay.

10        MR. SHONKWILER:  Your Honor, could I have just a

11  moment to collect exhibits and papers here?

12        THE COURT:  Yes.

13        (Brief pause.)

14        THE COURT:  Are you finished?

15        MR. SHONKWILER:  Finished with the examination?

16        THE COURT:  Yes.

17        MR. SHONKWILER:  Not quite yet, your Honor.

18        THE COURT:  Okay.

19        MR. SHONKWILER:  But we will come back to the health

20  club if we have time for it.  I'm trying to expedite this.

21   (Brief pause.)

22        MR. SHONKWILER:  Your Honor, if we could take five

23  minutes, we might be able to cut substantially from this.

24  There's a portion I think was covered by plaintiff's counsel

25  sufficiently, and flipping through these pages may take a

Reiss - cross

 1    couple minutes.

 2            THE COURT:  We can take our afternoon break.  We'll

 3    take our afternoon break.

 4            MR. SHONKWILER:  Thank you.

 5            (Jury exited the courtroom.)

 6            THE COURT:  How much longer do you think you have?

 7            MR. SHONKWILER:  I really don't think much at all.

 8            THE COURT:  Okay.  Do you have much of a redirect?

 9            MR. S. KULWIN:  I do, Judge.

10            THE COURT:  Okay.

11            MR. S. KULWIN:  45 minutes maybe.

12            THE COURT:  I know our next witness is here and ready

13    to go.  Mr. Novack, I am -- you may step down, sir, if you

14    would like.

15            I'm denying your request with respect to continuing

16    the date of Mr. Trump's testimony.

17            MR. NOVACK:  I understand.  Thank you.

18            THE COURT:  I set this trial date back in November

19    knowing full well everybody had a busy schedule.  And when we

20    were here last Thursday the discussion took place that the

21    testimony might take place on Wednesday, might go into

22    Thursday.  And now at the last minute to raise it and say he's

23    not available really isn't fair to Mrs. Goldberg or the jury,

24    or the Court or the Court staff.

25            I have extra marshals that have been brought out to

Reiss - cross

1    try to keep everything in order.  They've had to pull people

2    from other places.  So out of fairness, I am denying your

3    request.  And I expect Mr. Trump will be here all day, if

4    necessary, tomorrow to testify.

5             MR. NOVACK:  Just so you know, this was new

6    information to me, but I appreciate that you've considered it.

7    Thank you very much.

8             THE COURT:  Ten minutes.

9             MR. S. KULWIN:  Thank you.

10            (Brief recess was taken.)

11            THE COURT:  Ready?

12            MR. SHONKWILER:  Ready, your Honor.

13            THE COURT:  Bring in the jury, please.

14            (Jury in.)

15            THE COURT:  You may be seated.

16            You may continue.

17            MR. SHONKWILER:  Thank you, your Honor.

18   BY MR. SHONKWILER:

19   Q.  Mr. Reiss, were you also involved in preparing the second

20   amendment to the hotel condominium property report?

21   A.  Yes.

22   Q.  Okay.

23            Was your involvement in preparing that amendment the

24   same, substantially, as it was for the prior property report

25   documents?

Reiss - cross

1   A.   Substantially.

2        I would expect that Mr. Flicker had more involvement

3   than he did in the first.  The last two or three months of my

4   term with Trump, I was -- I had, basically, changed my status

5   to a consultant to Donald, and I was working part-time.

6   Q.   Mr. Reiss, as of the day you left the Trump organization,

7   was it your understanding that the plan for the hotel

8   condominium was to include the meeting room and ballroom

9   facilities in the common elements?

10  A.   Yes, it was.

11  Q.   In all of the time that you worked there -- for the Trump

12  organization -- did anyone in the organization ever tell you

13  that they thought the meeting room and ballroom facilities

14  should be removed from the common elements?

15  A.   No.

16  Q.   In all the time that you worked at the Trump organization,

17  did you have any reason to believe that anybody associated

18  with the Trump organization was even considering removing the

19  meeting and ballroom facilities from the common elements?

20  A.   No, I did not.

21  Q.   When you made the decision to include the meeting and

22  ballroom facilities in the common elements, did you do that

23  because you thought that decision -- all things considered --

24  served the best interests of the developer, the unit owners

25  and the association?

Reiss - cross

1   A.  Yes, I did.

2   Q.  When you made that decision, did you consider that there

3   might be risks to the developer and the unit owners if you

4   included those facilities in the common elements?

5   A.  Risks, in terms of that it may not meet the income

6   projections?

7   Q.  Well, for example, is it correct that if the hotel meeting

8   room and ballroom facilities were to operate at a net loss for

9   a particular time period --

10  A.  Right.

11  Q.  -- that that would financially harm the association if

12  they owned those --

13  A.  Yes.

14  Q.  -- common elements?

15  A.  Yes.

16  Q.  Okay.

17       Was that a risk that you considered when you made the

18  decision that it was in the best interests of everyone to

19  include them as common elements?

20  A.  Yes.

21  Q.  Okay.

22       And did you also consider the risk -- the possible

23  risk -- that the association could make some poor decisions

24  and interfere with the hotel manager's ability to manage those

25  facilities?

Reiss - cross

1  A.  Yes.  I was aware of that risk, but didn't feel --

2  Q.  Despite -- go ahead, please.

3  A.  I was aware that this is a risk and others might think

4  it's a risk, but I thought that it would not happen in this

5  instance.

6  Q.  And why is it that after considering those risks, you

7  believed this was in the best interests of everyone?

8  A.  I believed it was a very prudent decision that the

9  economic projections were -- were -- good.  I believed that

10  having a ballroom facility like this was a necessary accessory

11  to running a high-quality hotel and would significantly help

12  in the bookings.  And I believed that the hotel -- the

13  homeowners -- the hotel homeowners association -- would not

14  act in the best interests -- in the best -- would not -- would

15  continue to act in the best interests of the ballroom

16  management because, in fact, a well-run ballroom means a

17  well-run hotel.  And if the ballroom is not well run, you

18  would see an impact -- a declination -- of the occupancy rate

19  in the hotel.

20        So, I was very confident that a well-run board, with

21  proper education, would know that the owning of the banqueting

22  facility in common and running it -- and would run it in such

23  a manner that it was fully supportive of the hotel, occupancy

24  and the roommates, themselves.

25  Q.  Do you still believe that today?

Reiss - cross/redirect

1   A.  I do.

2   Q.  Do you still believe today that the decision you made to

3   include those facilities in the common elements was the right

4   one?

5   A.  I do.

6   Q.  And if you had to make it, again, would you make the same

7   decision?

8   A.  Given the facts I had at the time, I certainly would.

9   Q.  I see.

10          You are a unit owner of a hotel condominium?

11  A.  I am.

12  Q.  Do you feel that you were harmed by any of the changes

13  that were made to the fourth amendment -- in the fourth

14  amendment to the property report?

15  A.  No, I do not.

16          MR. SHONKWILER:  Your Honor, I have nothing further.

17          THE COURT:  Redirect, Mr. Kulwin?

18          MR. S. KULWIN:  Could Mr. Shonkwiler take those

19  exhibits back?

20          THE WITNESS:  Please.

21          THE COURT:  Do you want to grab your exhibits,

22  please?

23          (Documents tendered.)

24                      REDIRECT EXAMINATION

25  BY MR. S. KULWIN:

Reiss - redirect

 1   Q.  Let's start from the beginning, Mr. Reiss.

 2           You said that you left on bad terms with Mr. Trump;

 3   is that right?

 4   A.  Yes.

 5   Q.  What really happened was, was that he let you work

 6   part-time as a consultant and then you took a job -- you left

 7   him and took a job -- for a lot more money, right?

 8   A.  Yes, I did.  That's right.

 9   Q.  And the fact of the matter is, after you were at that job

10   for a year, it didn't work out, correct?

11   A.  Less than a year.

12   Q.  Yeah.

13           And you feel very remorseful about the way you

14   treated Mr. Trump, don't you?

15   A.  I feel that I could have acted more professionally.

16           When I began negotiations with the new firm, I had to

17   sign a document saying that I would not discuss the

18   negotiations with anyone.  And the only time I could -- I

19   could -- I could -- divulge them to Mr. Trump was after I had

20   signed a contract with the new company.

21           I don't think you'll find that statement in the

22   deposition.  I didn't recall it when you inter- -- when your

23   firm interviewed me.

24   Q.  Sir, what I'm asking you is when you left, you had

25   remorse?  You regretted the way you dealt with it, correct?

```
 1              Isn't that what you said?
 2    A.  If I used the word "remorse" in the deposition, then I
 3    used the word "remorse."  I -- I -- do feel at this juncture
 4    -- and it's been a significant aspect of my own professional
 5    life -- that I could have handled that leaving a little
 6    better.
 7    Q.  Right.
 8    A.  As well as the subsequent communications with Mr. Trump.
 9    Q.  You regret the way you dealt with him?
10    A.  Excuse me?
11    Q.  You regret the way you dealt with him?
12    A.  I don't -- I regret the way I dealt with it.  I was
13    constrained by the contract I had signed by the new company,
14    but I certainly don't regret leaving.
15    Q.  No, I understand that.
16              But my point, is real simple -- then I'm going to
17    move on -- is you feel badly at the way you treated Mr.
18    Trump --
19              MR. SHONKWILER:  Objection.  Asked and answered.
20    BY MR. S. KULWIN:
21    Q.  -- and that's --
22              THE COURT:  Sustained.
23    BY MR. S. KULWIN:
24    Q.  You regret the way you handled that transaction with Mr.
25    Trump?
```

 1          MR. SHONKWILER:  Objection.  Asked and answered, your

 2   Honor.

 3          THE COURT:  Sustained.

 4   BY MR. S. KULWIN:

 5   Q.  Now, in addition, despite "leaving on bad terms with him,"

 6   that didn't stop you from continuing to be partners with his

 7   son in three condos, did it?

 8   A.  No, it didn't.  I already --

 9   Q.  And it doesn't stop you from talking to his son on a

10   regular basis about those condos, correct?

11          That doesn't stop you from doing that, either, does

12   it?

13   A.  No.

14   Q.  And it doesn't stop him from paying for your legal fees in

15   connection with your participation in this case?

16          He didn't say, "No, I'm not going to pay for that,"

17   did he, right?

18   A.  My legal fees?

19   Q.  Yeah, for --

20   A.  Yes.  Okay.

21   Q.  These folks don't work for nothing, do they?

22   A.  Yes.

23   Q.  All right.

24          They do?

25   A.  I said, "Yes," I agree with your question.

Reiss - redirect

1    Q.  So, it didn't stop you from that, either.

2           Now, I just want to get something real quick out of

3    the way early on.

4           You were handed, like, a ton of documents by Mr.

5    Shonkwiler.

6           First of all, the property reports that were given to

7    the people who were interested, they came in nice bound

8    folders, correct, with three rings and a plastic cover?

9    A.  I know they were bound.  I don't remember the nature of it

10   being -- of how they were bound.

11   Q.  I'm sorry, my fault.

12          They weren't just a bunch of loose papers flying all

13   over; they were in bound books, correct?

14   A.  That's correct.

15   Q.  All right.

16          Now, let's see how --

17          MR. S. KULWIN:  May I?

18          THE COURT:  You may.

19   BY MR. S. KULWIN:

20   Q.  You know what this is (indicating), Mr. Reiss.  This isn't

21   confusing to you, is it?

22          (Document tendered.)

23   BY THE WITNESS:

24   A.  It's a property report.

25   BY MR. S. KULWIN:

Reiss - redirect

1    Q.  And it's very clear to you which property report it is,

2    isn't it?

3    A.  It's the first amendment, dated February 25th.

4    Q.  And that's the first amendment to the hotel condominium

5    report.

6            That's easy enough, isn't it?

7    A.  Yes.

8    Q.  Okay.

9            Now, it has a section called, "Common Elements,"

10   right?

11   A.  Yes.

12   Q.  3 -- Article 3, right?

13   A.  3.1, yes.

14   Q.  It's not hard to find that for you, is it?

15   A.  I don't understand the -- your -- question.

16           It's not hard to find because you've tabbed it.

17   Q.  Right.  I've tabbed it for you.

18           Let me ask you a question, sir.  If you were thinking

19   about buying a unit and they told you, "Hey, in the common

20   elements, you get all these things -- ballrooms and things of

21   that nature -- " do you think it would be really difficult for

22   to you find that in there?

23   A.  No, not if you're interested in buying it.  You have an

24   obligation to find it.

25   Q.  Right.  It would be easy to find, right?  You take a

Reiss - redirect

353

 1  couple minutes, sit down, look through it, there it is, right?

 2  A.  It's easy for some people.  It's not easy for other

 3  people.  I --

 4  Q.  How about --

 5  A.  -- can't answer that.

 6  Q.  My fault.

 7       How about easy for a sophisticated buyer who has a

 8  Master's Degree in Accounting?  How about easy for them?  What

 9  do you think?

10  A.  Okay.  Yes.

11  Q.  Yeah.

12       And if that same woman who invests in real estate,

13  who has a Master's in Accounting, but wanted to find the

14  budget that included the $5 million of revenue, do you think

15  they could find that without floating around with all sorts of

16  papers?  Do you think they could find it -- Exhibit H?

17       MR. SHONKWILER:  Objection, your Honor.  Speculation.

18       THE COURT:  Sustained.

19  BY MR. S. KULWIN:

20  Q.  Sir, you're what, 70?

21  A.  Excuse me?

22  Q.  You're 70, right?

23  A.  Yes.

24  Q.  Can you find Exhibit H in that document real quick?

25  A.  Does that have something do with my age?

Reiss - redirect

```
 1   Q.  It does, actually.

 2   A.  I found it.  It's tabbed.

 3   Q.  Right.

 4   A.  So, I wasn't really appropriately tested.

 5           (Laughter.)

 6   BY MR. S. KULWIN:

 7   Q.  All right.

 8           Well, here.  Let me take the tab out.  Okay?  I'll

 9   give you a different one.

10           You weren't appropriately tested.  Okay.

11           THE COURT:  Mr. Kulwin --

12           MR. S. KULWIN:  Sorry, Judge.

13           THE COURT:  -- I --

14           MR. S. KULWIN:  I apologize.

15           THE COURT:  Think about your next line of questioning

16   and what your purpose is here.

17           MR. S. KULWIN:  Yes, ma'am.

18           (Document tendered.)

19   BY MR. S. KULWIN:

20   Q.  Here's another one (indicating).  Here's January 10th.

21           See if you can find the Exhibit H, the estimated

22   budget.

23   A.  It's right here (indicating).

24   Q.  Good.  Not too difficult, was it?

25           No tab that time, was there?
```

Reiss - redirect

```
 1   A.   (No response.)

 2   Q.   Was there a tab?

 3   A.   There was no tab.

 4   Q.   Now, let me ask you.  Here's a brochure from Trump

 5   international.  Can you tell me -- can you find what type

 6   of --

 7            (Document tendered.)

 8   BY MR. S. KULWIN:

 9   Q.   -- stainless steel they're using in the kitchens?

10            MR. SHONKWILER:  Objection, your Honor.  This is

11   argumentative and irrelevant.

12            MR. S. KULWIN:  No, it's highly relevant, Judge.

13            THE COURT:  Can you identify that by exhibit number,

14   please?

15            MR. S. KULWIN:  Sure.  That's the actual version of

16   Plaintiff's Exhibit 75.

17            THE COURT:  Okay.

18            MR. SHONKWILER:  Also objecting as beyond the scope

19   of my examination.

20            THE COURT:  Overruled.

21            You may answer this, if you can, sir.

22   BY THE WITNESS:

23   A.   You want me to find the stainless steel used in the

24   kitchen --

25   BY MR. S. KULWIN:
```

1   Q.  Yeah, what --

2   A.  -- in this brochure?

3   Q.  Yeah.  Just tell me where it is.

4   A.  I don't think you're going to find it.

5   Q.  How about the -- really?  You can't find it anywhere in

6  there?

7   A.  I don't --

8   Q.  Well, let me ask this question.  Where would you start

9  looking if you wanted to know what the kitchen was like?

10  A.  You'd look in "Hotel" and "Residences," depending upon

11  what you wanted to buy.

12  Q.  Okay.

13        Well, let's say you wanted to buy in a hotel.

14  A.  Okay.

15        You'd pull out the tab.

16  Q.  Right.

17  A.  And you'd look.

18  Q.  Right.

19  A.  And you'd see what's listed.

20  Q.  Okay.

21        Not too difficult, is it?

22  A.  No.

23  Q.  Is that difficult?  Okay.

24        Now, let me ask you this question --

25        MR. S. KULWIN:  If I may have one moment?

Reiss - redirect

357

```
 1              THE COURT:  You may.

 2              (Brief pause.)

 3              MR. S. KULWIN:  Up here, Judge?  Would that be good?

 4              THE COURT:  As long as the witness can see it and you

 5    do not block the jury's view of the witness.

 6              MR. S. KULWIN:  That's not going to be good.

 7              How about here?

 8              Can you see okay, Judge?

 9              THE COURT:  Now I can.

10    BY MR. S. KULWIN:

11    Q.  Mr. Reiss, can you see it?

12    A.  So far.

13    Q.  I'm displaying a demonstrative exhibit.

14              Do you recognize the picture in here, Mr. Reiss?

15    A.  Yes.

16              THE COURT:  Can you identify it, please, by exhibit

17    number?

18              MR. S. KULWIN:  It was part of the Demonstrative

19    Exhibit Group 1, which was used in the PowerPoint.

20              THE COURT:  Okay.

21    BY MR. S. KULWIN:

22    Q.  Now, if I heard your examination correctly -- the

23    cross-examination -- you worked a lot on making sure this

24    building got built, right -- early early on, the development

25    of it, true?
```

1   A.  I worked a lot on seeing the design was a buildable

2   design.  I was gone by the time it began construction

3   drawings.

4   Q.  Let me ask you a question, sir.  You were asked some

5   questions whether you learned by trial and error on the job.

6   Do you remember that by Mr. Shonkwiler?

7   A.  I don't think he used that term.

8   Q.  Really?

9        You're not trying to tell the jury that this

10  unbelievably stunning building got done by a bunch of

11  knuckleheads who didn't know what they were doing, are you?

12        MR. SHONKWILER:  Objection, your Honor.

13  BY THE WITNESS:

14  A.  When did I say that?

15        THE COURT:  Sustained on form.

16  BY MR. S. KULWIN:

17  Q.  You're not trying to tell the jury that a bunch of people

18  who were unprofessional or incompetent got this building

19  built, right?

20  A.  Of course not.  When did I say that?

21  Q.  Okay.

22        And are you telling -- you're not implying to this

23  jury in any way, shape or form that you and Mr. Flicker and

24  Ms. Cremer had no idea what they were doing when you were

25  putting together the property reports, right?

1    You're not saying that, are you?

2   A.  Of course not.

3   Q.  And the experience that you got in the Trump organization

4   from 1993 to 2003, that's ten years of experience; isn't that

5   right?

6   A.  Yes.

7   Q.  Ten years of investigating hotel condominiums, design --

8   developing with consultants a property report for New York,

9   investigating this, working with consultants in Chicago for

10  years developing a property report for this, correct?

11  A.  Yes.

12  Q.  Years and years of experience, correct?

13  A.  It's not years and years, but it's close to a decade, yes.

14  Q.  All right.  Close to a decade.  That's years and years.

15    Let me ask you this, sir:  In addition to that -- in

16  addition to that -- by 2005, you testified this morning that

17  you were already an expert in the field.  They were asking you

18  to give presentations, right?

19  A.  Yes.

20  Q.  You didn't learn something astonishing between, like, June

21  of 2004, and January of 2005, to suddenly turn you from

22  someone who didn't know what they were doing into an expert,

23  did you?

24    You were an expert by 2004, weren't you?

25  A.  I believe I was.

Reiss - redirect

1   Q.  Right.

2           And you didn't ever -- and these guys that asked you

3   to give a presentation to a bunch of lawyers and developers at

4   a hotel condominium conference didn't say to you, "Gee, we

5   listened to your presentation in January of '05.  Are you sure

6   you're an expert?"

7           They appreciated what you had to say, right?

8           MR. SHONKWILER:  Objection.  Relevance, your Honor.

9   Asked and answered.

10          THE COURT:  Sustained.

11  BY THE WITNESS:

12  A.  I hope to --

13          THE COURT:  I sustained it, sir.

14          THE WITNESS:  Okay.  Sorry.

15  BY MR. S. KULWIN:

16  Q.  And, sir, at no time -- you were asked some questions at

17  the very end there whether or not you still thought it was a

18  good idea to include those things in the common elements.  Do

19  you remember that?

20  A.  Yes.

21  Q.  Okay.

22          Just so we get it straight, sir, you worked with

23  consultants here in Chicago about looking at what should be in

24  the common elements, correct?

25          You did, didn't you?

1  A.  Yes.

2  Q.  Okay.

3        And these people were paid professionals, right?

4  A.  Yes.

5  Q.  Okay.

6        And, in addition to that, sir, earlier this morning

7  we talked about all the research that you did, correct?

8  A.  We did.

9  Q.  And that Smith Research Guide that you looked at, that

10 talked about all sorts of the revenues that come from F&B,

11 that's a respected document in the business, isn't it?

12 A.  Yes.

13 Q.  You didn't just willy nilly say, "Oh, I think I'll just

14 throw these things in the budget," right?

15        You worked at it, you looked at it, you used your

16 expertise and experience, correct?

17 A.  Yes.

18 Q.  Based on ten years in the business, right?

19        MR. SHONKWILER:  Your Honor, asked and answered.

20 Objection.

21        THE COURT:  Sustained.

22 BY MR. S. KULWIN:

23 Q.  Now, let me ask a question, sir.  Donald Trump, he's an

24 expert in the hotel business, isn't he?

25 A.  Yes.

1   Q.  He's run food and beverage operations all over this

2   country, hasn't he?

3   A.  He -- after I -- well, yes.

4   Q.  Yes.

5   A.  I mean, he owned -- when I was there, he was the owner of

6   the Atlantic city operation.

7   Q.  Right.

8   A.  And, as I said, he had briefly owned the Plaza.

9   Q.  Mr. --

10  A.  I don't think he had any other hotels at that point.

11  Q.  You know who Andrew Weiss is, right?

12  A.  Yes.

13  Q.  Mr. Weiss -- let me ask you this.  Tell me if you agree

14  with this statement.

15          "I don't need to tell Donald Trump about the

16  profitability of an F&B operation.  He makes those judgments

17  on himself.  He knows a lot more about it than anybody else."

18          MR. SHONKWILER:  Objection.

19  BY MR. J. KULWIN:

20  Q.  Agree or disagree?

21          MR. SHONKWILER:  Objection, your Honor.  Beyond the

22  scope.

23          THE COURT:  Sustained.

24          And improper to ask him to comment on somebody else's

25  words.

Reiss - redirect

1  BY MR. S. KULWIN:

2  Q.  Sir, is it true that Mr. Trump knows a lot about F&B and

3  can analyze profitability on his own?

4  A.  Donald has a very good intuitive sense of all aspects of

5  business.

6  Q.  Okay.

7  A.  It doesn't mean he's going to hit it on the head when he

8  makes an estimate of a food and beverage operation to occur

9  six years in the future.

10  Q.  Nobody can hit anything on the head, but you do your best

11  to make the -- to make an estimate; isn't that right?

12  A.  I believe I did, yes.

13  Q.  And are you telling me -- when you were making the

14  projections back in 2003, the hotel business had a certain ebb

15  and flow, right?

16  A.  Yes.

17  Q.  Nothing really changed between 2003 and 2007 in the hotel

18  business, did it, that you're aware of?

19  A.  Not that I'm aware of.

20  Q.  Right.

21  A.  But, I -- again, I -- was not there after 2005.  Things

22  may have happened in the design of the building.  But, fine.

23  I don't -- I am not aware of any changes of significance that

24  would have altered my projections.

25  Q.  Right.

Reiss - redirect

1       It wasn't like -- it wasn't like -- 9/11 or the

2  dot-com crash or anything like that, that suddenly gutted the

3  hotel business, that would have taken your carefully-put-

4  together estimates, that you put together with a professor

5  from New York University, and turned it into mush, right?

6       Nothing that you're aware of, true?

7  A.  There's nothing I'm aware of.

8  Q.  And you were asked some questions about whether Mr.

9  Flicker had any prior experience in the hotel business, right?

10       Do you remember that?

11  A.  Yes, I was.

12  Q.  Mr. Flicker was a lawyer at one of the largest law firms

13  in New York City before he came to Trump, right?

14  A.  Yes.

15  Q.  He had a law degree from, what?  Columbia University,

16  right?

17  A.  I think it was Duke.

18  Q.  Duke, one of the best law schools in the country, correct?

19  A.  Yes.

20  Q.  This guy was hardly some knucklehead, was he?  He was a

21  smart guy?

22  A.  Yes.

23  Q.  And you, of course, worked with him and trained him in the

24  hotel business that you had learned about for the prior ten

25  years, right?

1    A.   Yes.

2    Q.   And you're a smart guy?

3    A.   Thank you.

4    Q.   You're welcome.

5         (Laughter.)

6    BY MR. S. KULWIN:

7    Q.   I agree with you.

8         Now, when you were talking about common elements in

9    New York, you were asked some questions about whether -- you

10   call him "Donald," right?  I'll call him "Mr. Trump" --

11   whether Mr. Trump was involved in any decisions about common

12   elements.  I want to make sure I heard you correctly.

13        Didn't you say this -- because I think I wrote it

14   down right -- "Donald felt very strongly that there shouldn't

15   be any common elements in New York City"?

16        Did I hear your testimony correctly?

17   A.   Yes, I did say that.

18   Q.   All right.

19        Okay.  Again, if Donald felt very strongly about it,

20   he must have been discussing it with you, right?

21   A.   The only way for me to answer that question is to tell you

22   that that -- to reiterate to you that that -- building was

23   very different.

24   Q.   Not my --

25   A.   Because it was -- hold on.

Reiss - redirect

366

1        Because it was a renovation and because we were

2   interested in selling condominiums, and we had yet to form the

3   concept of a management company, common elements were not an

4   issue in the income aspect of that building.

5   Q.  That's not my question.  Not even close.

6        My question is:  For you to know that Donald Trump

7   felt very strongly about what was and was not going to be

8   common elements in New York, you had to be discussing the

9   common elements with him, correct?

10  A.  Again, the building on Columbus Circle was owned by the

11  General Electric Pension Trust, and there were numerous

12  meetings with all parties involved in ownership.

13  Q.  That, again --

14  A.  But certainly that was -- we did not want to devote space

15  to common interests.  It was not felt it was necessary for

16  that hotel at that location.  It was a different building at a

17  different point in time.

18  Q.  Sir --

19  A.  But, yes, I was aware that he did not want meeting rooms

20  of significant size in that building.

21  Q.  Sir, fascinating.  The question is real simple.

22       For you to know that Donald felt very strongly about

23  not having common elements in the building, you had to have

24  discussions with him about it; true or false?

25       MR. SHONKWILER:  Objection.  Asked and answered.

Reiss - redirect

1          MR. S. KULWIN:  It has not been answered yet, Judge.

2          THE COURT:  Overruled.

3          Answer, if you can, sir.

4   BY THE WITNESS:

5   A.  Yes.

6   BY MR. S. KULWIN:

7   Q.  And if you're having conversations with him about it, it's

8   because he's interested in it, correct?

9   A.  He was very interested in the Columbus Circle building.

10  Q.  Yeah.

11          So, he was very interested in the Columbus Circle

12  building and the common elements, but he really couldn't care

13  less about the common elements in his premiere building of his

14  life in Chicago, correct?

15  A.  Not correct.

16  Q.  Right.

17          He wasn't -- oh, so, was he or wasn't he interested

18  in the common elements in Chicago?

19  A.  He was interested in the building.  But, by that time, as

20  I've stated, it had pretty much devolved into -- it was a

21  different building at a different point in time, with

22  different criteria, and I knew the difference in those

23  buildings and I knew what the appropriate decision to make

24  was.  And I didn't need and didn't have consultation with him.

25  Q.  Interesting -- all interesting -- sir.

Reiss - redirect

1        My question to you is very simple.  He was interested

2  in the common elements in New York -- the smaller building --

3  but he had no interest in talking to you about the common

4  elements about his premiere building in Chicago?

5        Is that my understanding correct -- is it correct?

6  A.  Yes, it's correct.

7  Q.  Okay.

8        Now, you went through a series of answers about how

9  you didn't have to consult with Donald Trump; he delegated

10  things to you; you could do things on your own.

11        Do you remember all those questions?

12  A.  Yes.

13  Q.  Okay.

14        Sir, isn't it true that on Trump Tower Chicago, you

15  had ultimate authority to do absolutely nothing?

16        Isn't that true, sir?

17  A.  I don't know how to answer that question.  There was no

18  formal delegation of authority one way or another.

19        Of course, Donald was the principal; and, of course,

20  Donald could intercede in anything I did.

21  Q.  Going back to your sworn deposition -- court proceeding --

22  October 14th, 2011, with your lawyer sitting next to you, Page

23  197, Line 17.

24        Question:  "And you didn't have the ultimate

25  authority to remove the health club from the common elements,

Reiss - redirect

1   correct, sir?"

2        Answer:  "I didn't have the ultimate authority to do

3   anything."

4   A.  I didn't have the ultimate authority to do anything.  I

5   didn't say anything differently then.

6   Q.  You didn't?  Okay.

7        So, you didn't have the ultimate authority to do

8   anything, but you could take 30,000 square feet and put it in

9   the common elements, because Donald didn't care, right?

10  A.  Donald had -- Donald believed, at that point in time,

11  after numerous years of running the Columbus Circle building

12  and having me as Managing Director of that building, that I

13  was capable of making those decisions.

14       The two buildings were done at different points in

15  time in my own career, as well as Donald's career.  You're

16  talking about six years, seven years of difference.

17       Yes, Donald had ultimate authority, but I made those

18  decisions and he chose not to intervene.

19  Q.  I'm just -- I'm baffled.  How do you know --

20  A.  Sorry.

21  Q.  Well, wait.

22       How do you know, if you have ultimate authority to --

23  you don't have ultimate authority to do anything -- how do you

24  know, "Well, is this one of the ones I have ultimate

25  authority, no ultimate authority on, or is this one of the

```
 1   ones I have ultimate authority on?"

 2          How do you know?  What did you have, like a Ouija

 3   Board?

 4          MR. SHONKWILER:  Objection, your Honor.

 5   Argumentative.

 6          THE COURT:  Sustained.  And form.

 7   BY MR. S. KULWIN:

 8   Q.  How do you know if it's true; do you just guess?

 9          MR. SHONKWILER:  Objection.  Argumentative.

10          THE WITNESS:  I'd like to answer.

11          THE COURT:  Sustained on form.

12   BY MR. S. KULWIN:

13   Q.  You were asked some question about what percentage the

14   ownership interest would yield in the common -- in the

15   ballrooms, the facilities, the income -- do you remember those

16   questions?

17   A.  Yes.

18   Q.  And you said maybe it was, like, three quarters of a

19   percent, half a percent.  Do you remember that?

20   A.  Yes.

21   Q.  It was a sufficient enough percent that you put it in the

22   common elements and you thought, as you testified this

23   morning, that it was what the market wanted, correct?

24   A.  Are you talking in terms of the revenue from the

25   banqueting?
```

Reiss - redirect

1  Q.  No, I'm talking about the percentage ownership.  That's

2  what you were asked about.

3  A.  Percentage ownership is a requirement to be put in the

4  property report.

5  Q.  Not my question, sir.

6         You were asked what the percentage of the ownership

7  of the common elements -- the ballrooms, all those

8  facilities -- right?

9         Do you remember that question?

10 A.  Uh-huh.

11 Q.  And you said, "I don't know, about half a percent, three

12 quarters of a percent per unit."

13        Do you remember that?

14 A.  An average basis.

15 Q.  An average basis, okay.

16        But that percentage interest that was being offered

17 to the HCU buyers, it was put there -- it was put in the

18 common elements -- because you believed it would help sell

19 condominiums.

20        That's why you put it there in the first place,

21 right?

22 A.  You're talking -- I'm sorry, but you're talking -- about

23 the revenue, not -- the percentage of common interest for each

24 unit is -- is -- preordained almost.

25        I don't understand the relevance of the question.

Reiss - redirect

1        I did think --

2   Q.  Let me --

3   A.  I did think that the revenue from the operation was

4   beneficial to the operation of the hotel and its unit owners,

5   yes.

6   Q.  You thought that the half-percent interest that they were

7   selling -- half percent to three-quarters percent interest

8   that they were selling -- to every condominium unit owner

9   buyer was sufficiently attractive in the revenue and in the

10  actual ownership of the property, to attract a certain class

11  of buyer who was interested in investing in the hotel, to

12  make -- to help them decide to buy a unit.  That's why those

13  facilities were put in the common elements; isn't that what

14  you testified to this morning?

15  A.  If that's what I testified this morning, I didn't

16  understand the question.

17       The percentage common interest from each unit owner

18  varied wildly.  I gave an average.  Some of them are much

19  smaller than a quarter of a point or three quarters of a

20  point.  Some of them are larger.

21       I just don't understand the point.

22       I acknowledge willingly, happily that that revenue is

23  important to the average -- to the unit owner.  But I don't

24  understand the relevance of the percentage common interest.

25  That's all.  I just don't get it.

1   Q.   Perhaps you don't understand the question, sir.

2   A.   That's very likely.

3   Q.   Okay.

4        Well, my question is very simple.  When you were

5   asked by Mr. Shonkwiler, "What's the percentage of common

6   elements then," maybe it's me who doesn't understand, you

7   weren't trying to imply to the jury that the fact that the --

8   each unit owner only got a percentage, like a half percent of

9   the revenue or the ownership of the things was some trivial

10  thing that wasn't important?  You weren't implying that, were

11  you?

12  A.   No, of course not.

13  Q.   Okay.  I just want to make sure.

14       And just so we're clear -- never mind.

15       Now, if I heard you also correctly, every time you

16  were going to use a picture of Mr. Trump in a brochure, he had

17  to see the picture, right?

18  A.   Yes, I would show him which pictures we're going to use.

19  Q.   You couldn't even make a decision about -- you didn't even

20  have the authority to make a decision about -- what picture of

21  Donald Trump went into the brochure, correct?

22       You didn't have that authority?

23  A.   The two have no parallel.  Donald choosing his own image

24  was very important to Donald.  Even if it was the most

25  technical and obscure of documents, which he would have

1    absolutely no interest or no concern or never have any impact

2    in his life, I knew that Donald was concerned about his image

3    and I would always consult with him which picture is used.

4          I think anybody, no matter what position they occupy

5    in the organization, would want to know what picture is being

6    used of him.

7          My wife is an author.  They consult her on the squib

8    in back of the book what picture they put in, even though she

9    has nothing to do with the design of the cover.

10   Q.  I'm going to ask you about your wife, then.

11         When they consult with her about the photo on the

12   book, do they consult her if they decide to chop out 300 pages

13   in the middle of it?

14   A.  She is an author.  They don't consult or they can't --

15         MR. SHONKWILER:  Objection.  Argumentative.

16         THE COURT:  Sustained on the objection.

17   BY MR. S. KULWIN:

18   Q.  Let me ask you this question, sir:  When they -- so, you

19   are telling me Donald Trump pays attention to such detail

20   about his photo, but can't be bothered whether or not you're

21   putting 30,000 -- let me finish, please -- 30,000 square feet

22   that he owns into the common elements being given to the

23   owners?  He can't be bothered with that detail?

24         MR. SHONKWILER:  Objection, your Honor.  This is

25   asked and answered, and argumentative.

Reiss - redirect

375

```
 1              THE COURT:  Sustained on both bases.
 2   BY MR. S. KULWIN:
 3   Q.  Now, you were asked a bunch of questions about whether
 4   these determinations you were making about the common elements
 5   somehow -- whether they happened before or after the building
 6   was built.  Do you remember that?
 7   A.  I'm sorry, repeat it.
 8   Q.  You were asked a series of questions by Mr. Shonkwiler
 9   dealing with do the -- did your -- decisions or your
10   conclusions or your investigations about what was going to be
11   in the common elements, and what the revenue from the budget
12   was going to be, did it take place before the building was
13   built.
14              Do you remember those questions?
15   A.  Yes.
16              MR. SHONKWILER:  Objection to form.  Compound.
17              THE COURT:  Overruled.
18   BY THE WITNESS:
19   A.  Yes.
20   BY MR. S. KULWIN:
21   Q.  I am sorry?
22   A.  Yes.
23   Q.  Okay.
24              And you answered, "No, no, at that time it was just
25   the empty lot."
```

Reiss - redirect

1       Do you remember that?

2  A.  I said that the Sun-Times was still on the building -- on

3  the site -- and hadn't been demolished yet.

4  Q.  Let me ask you:  Did somehow the fact that it was not

5  being built yet have anything at all -- I mean, that they

6  hadn't actually put the shovels in the ground -- did that have

7  any impact at all whatsoever about the calculations you were

8  doing about what an F&B operation could do in Chicago?

9  A.  The relevance of having the building built is --

10 Q.  No, no.

11 A.  I'm answering the question.

12 Q.  Oh.

13 A.  The relevance of having the building built is it helps see

14 the space.  You can only determine or imagine a space so much

15 through architectural drawings, particularly in those days

16 before there was the quality of computer-generated renderings.

17       But, other than that, the answer to the question is

18 "No," it shouldn't.

19 Q.  All right.

20       Because you could go over to the Peninsula or the

21 Four Seasons or the Drake, check out their ballrooms, meeting

22 rooms, all those things, compare it to the revenue information

23 you have about F&B operations from those kinds of operations

24 in Chicago; you could do that first, right?

25 A.  Yes.

1  Q.  And, then, you could compare that to what you firmly

2  believed that ballrooms and the meeting rooms would look like

3  in this building, once it was built, correct?

4  A.  Correct.

5  Q.  And, of course, the building was designed the way it

6  appears in this picture.  And it pretty much went up -- it

7  ended up -- looking that way, didn't it?

8  A.  Yes, it did.

9  Q.  Right.

10      And the ballrooms -- the 30,000 square feet of

11  ballrooms that you were touting in the brochures -- you ended

12  up with about 30,000 square feet of ballrooms, meeting rooms

13  and things of that nature; isn't that true?

14  A.  I don't know what happened to the plans afterwards, but it

15  looks like it did, yes.

16  Q.  Yeah.

17      And, of course, you knew -- you absolutely knew; you

18  had no doubt in your mind -- that those ballrooms, meeting

19  rooms, function rooms -- they would be built with class all

20  the way, correct?

21  A.  Yes.

22      MR. SHONKWILER:  Your Honor, this is only marginally

23  relevant and it's been covered, I think.  And, so, I'm

24  objecting.  This has all been asked and answered.

25      MR. S. KULWIN:  It goes right to -- it's in response

```
 1    to him.  It responds directly to what they were talking about,

 2    Judge.

 3            THE COURT:  Overruled.

 4    BY MR. S. KULWIN:

 5    Q.  The answer was?

 6    A.  The answer was, "Yes."

 7    Q.  Okay.

 8            You were asked some questions whether or not

 9    Mr. Trump ever sharped a pencil and sat down with you and

10    started figuring out the budget, and all those things, and you

11    said, "Of course not," right?

12            MR. NOVACK:  Objection, your Honor.  He was not asked

13    that.

14            THE COURT:  Sustained.

15    BY MR. S. KULWIN:

16    Q.  Were you asked some questions about whether or not Mr.

17    Trump helped you prepare the budget?

18    A.  I believe I was.

19    Q.  Yeah.  That's what I thought.

20            And you said, "Of course, he didn't," right?

21            Do you remember that?

22    A.  Yes.

23    Q.  Because he didn't, did he?

24    A.  No, he didn't.

25    Q.  No, of course not.
```

1        But he was fully aware that when all of the figuring

2   was done, there was $5 million of revenue that had been put

3   into the hotel condo budget from the F&B operations.

4            He knew that, didn't he?

5            MR. SHONKWILER:  Objection.  It calls for

6   speculation.

7            THE COURT:  Sustained.

8            MR. SHONKWILER:  And com- --

9   BY MR. S. KULWIN:

10  Q.  Based on your conversations with him, sir, he knew that,

11  didn't he?

12  A.  I can't answer that.  I don't think he did.

13  Q.  Really?

14           So, when he --

15           MR. SHONKWILER:  Objection, Judge.

16           THE COURT:  Sustained.

17           MR. SHONKWILER:  Argumentative.

18           THE COURT:  Sustained.

19           MR. S. KULWIN:  I haven't said anything.

20           THE COURT:  The commentary --

21           MR. S. KULWIN:  I apologize.

22           THE COURT:  -- is what I'm sustaining.

23           MR. S. KULWIN:  I apologize.

24  BY MR. S. KULWIN:

25  Q.  So, it's your testimony that Donald Trump literally never

Reiss - redirect

1    knew that there was the ballrooms and the meeting rooms, and

2    all those things had a projected revenue stream of $5 million

3    and it was all going to somebody else other than him, you

4    think he didn't know?

5         MR. SHONKWILER:  Objection, your Honor.  It calls for

6    speculation.  Asked and answered.

7    BY MR. S. KULWIN:

8    Q.  Based on your conversations with him.

9         THE COURT:  Rephrase that question.

10   BY MR. S. KULWIN:

11   Q.  Based on all of your dealings with him, between 2004 and

12   when you left in 2005, are you telling us that Donald Trump

13   had no clue that there was a $5 million revenue stream in the

14   first year emanating from property that he used to own, now

15   going to the hotel condo board?

16        MR. SHONKWILER:  Objection.

17   BY MR. S. KULWIN:

18   Q.  He didn't know?

19        MR. NOVACK:  Asked and answered.

20        THE COURT:  Sustained on form.

21        MR. S. KULWIN:  Okay.  I'll try, again, Judge.

22   BY MR. S. KULWIN:

23   Q.  Is it your testimony, sir, that Donald Trump had no idea

24   $5 million of revenue from these facilities was now flowing to

25   the condo board, instead of him, after the amendment?

Reiss - redirect

1    A.  It was --

2            MR. NOVACK:  Objection.  Speculation.

3            THE COURT:  Sustained.

4            You are asking him to testify to what Mr. Trump knew

5    or did not know.

6            MR. S. KULWIN:  But he has --

7            THE COURT:  But you need to rephrase your question.

8            MR. S. KULWIN:  I will, Judge.  I will.

9            THE COURT:  The way you broadly asked it, that is

10   unfair and asking him to speculate.

11   BY MR. S. KULWIN:

12   Q.  Mr. Reiss, you met with Mr. Trump while you were working

13   on the first amendment, correct?

14   A.  Well, yes.

15   Q.  Okay.

16           We've already gone over -- just to save time -- that

17   you discussed with him the moving of the office space, the

18   adding of the ballrooms, all those things, right?

19           We already talked about that this morning, right?

20   A.  We did.

21   Q.  Right.

22           And my question is:  Based on those conversations --

23   okay -- and while you were there, any conversations you had

24   with him, do you know whether Mr. Trump was aware that $5

25   million of revenue was now flowing to the condo board -- the

Reiss - redirect

1  condo owners -- instead of him?

2  A.  As I -- as I -- testified, I developed the criteria for

3  that revenue.  I put it in the condo plan.  It was not

4  something he was involved with.

5        If, at some point after that, there was a -- there

6  was a -- conversation in which he said, "So, how did that

7  revenue go?"

8        And I mentioned $5 million, that might have occurred.

9        It might not have occurred.  I really don't know and

10  I have no recollection.  It was not important.

11  Q.  Not important?

12  A.  Not important to him.

13  Q.  Okay.

14        You were asked some questions about whether you were

15  aware of the risks of putting those facilities, with the

16  budget fluctuations, into the common elements, right?

17        You were asked those questions.  Do you remember

18  that?

19  A.  I was.

20  Q.  I'm sorry?

21  A.  Yes.

22  Q.  And would you say that Mr. Trump knew as much in 2003

23  about the F&B operations in a hotel as you did?

24  A.  He probably knew more.

25  Q.  All right.

```
 1            So, if you were aware of the risks of putting that in
 2   in 2003, he certainly was aware of the risks, right?
 3            MR. SHONKWILER:  Objection.  It calls for
 4   speculation.
 5            THE COURT:  Sustained.
 6   BY MR. S. KULWIN:
 7   Q.  Well, based on your knowledge of what he knew, he would be
 8   equally aware of the risks, right?
 9            MR. SHONKWILER:  Objection.  It calls for
10   speculation.
11            MR. S. KULWIN:  Based on what he knows, Judge.
12            THE COURT:  Overruled.
13            If you can answer that, you may.
14   BY THE WITNESS:
15   A.  The preparation of a budget calls for an answer to a
16   question.  That question is:  What do you think is going to be
17   the revenue from the food and beverage from the point in time
18   you make that estimation.
19            It is -- it doesn't say:  What is the percentage of
20   probability that you are going to get that -- that revenue
21   projection?
22            It doesn't call for you to speculate on the future
23   economic conditions.  It says:  At the point in time you make
24   a number, you put it down and you give some reasonable
25   criteria for how you made that number.  That's how the number
```

 1    was made.

 2    Q.  Am I -- that's not my question, though.

 3          My question is --- you testified that you were aware

 4    of the risks.  You've just testified that Mr. Trump probably

 5    knew about more about F&B than you.  My question to you is:

 6    In working with him and knowing his knowledge of the business,

 7    based on what you know, he would have been aware of those same

 8    risks in 2003, correct?

 9    A.  Any -- yes, any -- business has risks.

10    Q.  And he also would have been aware of whether a condo board

11    was suited to run that or not, based on your dealings with

12    him, to the same extent that you were, if not more, right?

13          MR. SHONKWILER:  Objection.  It calls for

14    speculation.

15    BY MR. S. KULWIN:

16    Q.  Based on --

17          THE COURT:  Sustained.

18    BY MR. S. KULWIN:

19    Q.  Based on your dealings with Mr. Trump, your conversations

20    with him, your work with him, would he know about the risks of

21    letting a condo board run it, as much as you did?

22    A.  I don't think you could make that statement.  Donald had

23    never run or been responsible for or developed a hotel

24    condominium in which there was banqueting facilities.

25          So, no, I wouldn't agree with that.

Reiss - redirect

385

1   Q.  Wouldn't agree.

2        So, if I got it right, then, Donald Trump at that

3   time -- in 2003 -- really didn't know, in your view, what

4   those risks would be, right?

5        MR. SHONKWILER:  Objection.  It calls for speculation

6   from a witness who is available and physically here.

7        THE COURT:  Overruled.  Overruled.

8   BY THE WITNESS:

9   A.  Please restate.

10  BY MR. S. KULWIN:

11  Q.  Based on what you knew, Donald Trump wasn't aware in 2003

12  of the risks of a condo board owning a food and beverage

13  operation?

14       MR. SHONKWILER:  Objection.  Asked and answered.

15       MR. S. KULWIN:  I just rephrased it.

16       THE COURT:  Overruled.

17       If you know, you may answer.

18  BY MR. S. KULWIN:

19  Q.  If you know.

20  A.  I -- I -- really respectfully believe I answered it.

21       He had not run a building in the same format, in the

22  same given conditions.

23  Q.  I just want to be sure.

24       All these questions that you were asked about your

25  experience building a hotel condo -- do you remember that, you

Reiss - redirect

1   were asked how this was only the second one you ever worked

2   on.  Do you remember that --

3   A.  Yes.

4   Q.  -- Mr. Shonkwiler --

5   A.  Yes.

6   Q.  And he brought out that Mr. Flicker had never worked on

7   one, right?

8   A.  Right.

9   Q.  A hotel condo?

10  A.  Yes.

11  Q.  Ms. Cremer, either -- she had never worked on one?

12  A.  Jill came to work for me after we had finished Columbus

13  Circle.  So, yes.

14  Q.  Mr. Trump really hadn't worked on one, other than New

15  York, right?

16  A.  Yes.

17          MR. S. KULWIN:  Can we have -- can we turn on the

18  screen, please?

19          Can we have Plaintiff's Exhibit  75, please?

20          And you know which Bates number, right, Mike?

21          There you go, Bates 4433.

22  BY MR. S. KULWIN:

23  Q.  You've got a brochure there.  Can you pull out -- I know

24  it's on the screen, but I just want to make sure.

25          (Brief pause.)

1           MR. S. KULWIN:  Let's look at this one.

2           And, first, can you give me the long view, Mike?

3    BY MR. S. KULWIN:

4    Q.  Now, as you said this morning, it talks -- in the

5    brochure's that's being given to people who are thinking about

6    buying -- it lists the Trump International projects, right?

7    A.  Yes.

8    Q.  And it says -- it talks about how he's managed 4,000 hotel

9    rooms and 500,000 square feet of gaming, and 400,000 square

10   feet of retail space, right?

11   A.  Yes.

12          MR. SHONKWILER:  Your Honor, I'm objecting.  There

13   has been no foundation for the date of this document at all;

14   and, also, no foundation that this witness has ever seen this

15   document.

16          MR. S. KULWIN:  Except that he saw it this morning,

17   Judge, testified he remembered it and went over it.

18          MR. SHONKWILER:  No, he did not, your Honor.

19          THE COURT:  Overruled.

20          But ask another question and I --

21          MR. S. KULWIN:  All right.

22          THE COURT:  -- think you are starting to go outside

23   of the --

24          MR. S. KULWIN:  Okay.

25          THE COURT:  -- recross or the cross bounds, Mr.

1    Kulwin.

2             MR. S. KULWIN:  I'll stick with --

3             THE COURT:  We are not going back over what we did

4    this morning.

5    BY MR. S. KULWIN:

6    Q.  I just want to be crystal clear, Mr. Reiss.

7             Does it say anywhere in this list -- or in any of the

8    brochures that Trump handed out, that you were familiar with,

9    in any of the market material anywhere, that, "We're building

10   this, but our staff -- our executive staff -- that's running

11   this, really doesn't have a whole heck of a lot of

12   experience"?

13            MR. SHONKWILER:  Objection.  Asked and answered.

14            MR. S. KULWIN:  Not this one, Judge.

15            THE COURT:  Overruled.

16            You may answer that, if you can.

17   BY THE WITNESS:

18   A.  It doesn't make a statement like that because it's not

19   true.

20   BY MR. S. KULWIN:

21   Q.  All right.

22            Now, you were asked some questions about whether

23   amendments replace or supplement.  I just want to be sure the

24   amendments that are sitting in front of you -- 2004 and

25   2005 -- regardless of anything that the one in 2003 said, make

Reiss - redirect

1    it crystal clear that the common elements that are being

2    offered and sold to hotel condominium users include the

3    meeting rooms, the function rooms, the ballrooms and things of

4    that nature?

5              That's true, correct?

6    A.  That's true, correct.

7    Q.  And the last one -- the budget in the January of '05, that

8    has the 5 million and the 994,000 of parking -- that's the

9    last effective one, correct?

10   A.  I don't recall seeing parking.

11   Q.  The parking --

12   A.  Was that the third -- the second -- amendment?

13   Q.  The third.  It's in the third one.  I'm sorry.

14   A.  Oh, I wouldn't know anything about it.

15   Q.  But whatever it is, the last one that the buyer gets is

16   the one that's in effect when they're buying, correct?

17   A.  Yes.

18              I believe the legal term is "amended and restated."

19   Q.  Sure.

20   A.  That's when they include all the previous --

21   Q.  Okay.

22   A.  -- or just amendment would include the amendments, I

23   believe.

24   Q.  And you were asked some questions -- I want to take this

25   back -- where you were saying it may or may not --

Reiss - redirect

1      MR. S. KULWIN:  Can we have Plaintiff's Exhibit  7

2  up?

3      I'm sorry, Exhibit, I believe it's, 2.  And, in

4  particular, Page 34 of the document, Mike.

5      There you go.

6      Can you go to the next page?

7  BY MR. S. KULWIN:

8  Q.  You were asked some questions about the common elements

9  include, without limitation and, if applicable, all of these

10  things, right?

11  A.  Yes, I was.

12  Q.  And you said that it was your understanding that it may or

13  may not mean that all of these things are part of the common

14  elements?

15      Is that your testimony?

16  A.  I believe the term, "if applicable," means that it's more

17  a definitional paragraph than anything else.

18      But you're in a very -- you're in a legal situation

19  and I'm not an attorney, but that's the way I read it.

20  Q.  As an -- did you read it that way as an attorney, as an

21  employee of the Trump organization or as a human being?

22  A.  As a human being, somebody that can read, yes.

23  Q.  Somebody who can read.  Okay.

24      So, somewhere in here, "without limitation" --

25  without limitation, somehow -- this is, where it says, "The

Reiss - redirect

1    common elements include, without limitation, if applicable,"

2    somehow you read that it says, to you, "may or may not"?

3    A.  That's how I read it.

4    Q.  Okay.

5            And, of course, what it means is, doesn't it, is that

6    if it's in the building, it's a common element?

7    A.  If those facilities are in the building, they would be a

8    common element.

9    Q.  Right.

10            And there are ballrooms in the building?

11    A.  That's right.

12    Q.  And function rooms, right?

13    A.  Yes.

14    Q.  All right.

15            And, so, if those -- the executive lounge, all those

16    things -- they're in the building.  If they're in the

17    building, they are common elements, that's what this is

18    saying?

19    A.  Yes.  I've said that countless times.

20    Q.  Okay.

21            And of course you were asked a series of questions

22    about whether you knew there was any plan not to disclose

23    anything.

24            Do you remember those questions?

25    A.  (No response.)

Reiss - redirect

1   Q.  Right?

2   A.  A plan not to disclose anything?

3   Q.  Not to -- I'm sorry.

4       You were asked some questions about whether there was

5   some kind of -- whether there was ever any plan or statement

6   by anybody at the Trump organization not to give these common

7   elements that were listed, right?

8   A.  To withhold -- to withhold -- them from the property

9   report?

10  Q.  Maybe it's a bad question.

11      If I understood the question that was given to you,

12  you were asked that when you were there, to your knowledge,

13  did anybody at Trump ever say to you that, "We're not going to

14  actually deliver those common elements"?

15  A.  No one ever said that.

16  Q.  That was your answer, correct?

17  A.  Yes.

18  Q.  All right.

19      But earlier today you conceded that you didn't know

20  what Mr. Trump was thinking about what was going to happen

21  with the common elements, correct?

22      You said that, didn't you?

23  A.  I conceded it in the context of I don't know what's in Mr.

24  Trump's mind.

25  Q.  Right.

Reiss - redirect

1    And you were also asked about whether you signed this

2  document -- the second amended report.

3    Whether you signed the second amended report -- the

4  first amended report -- right?

5  A.  Yes.

6  Q.  You signed it, right?

7  A.  Yes.

8  Q.  And when you signed it, you were affirming that it was

9  true and accurate, right?

10 A.  Yes.

11 Q.  All right.

12    It actually says, "The undersigned affirms that the

13 first amendment to the property is true, complete and

14 correct," signed, "Charles P. Reiss," right?

15 A.  Right.

16 Q.  If it turns out that there was a false statement in here,

17 then you would have signed a false document, correct?

18 A.  If it turned out that there was a false statement in

19 there, then I signed a document without being aware there was

20 a false statement in there.

21 Q.  Yeah.

22 A.  I didn't do it deliberately, if there is.

23    You're obviously -- found one.

24 Q.  No.  Maybe I have and maybe I haven't.

25 A.  Oh, I guess I'll find out.

Reiss - redirect

394

```
 1  Q.  I guess you will.
 2  A.  Okay.
 3  Q.  Let me ask you.  Did you know Andrew Weiss?
 4  A.  Yes.
 5  Q.  Did Mr. Weiss tell you that there were never any plans in
 6  the building to have any laundry facilities?
 7          MR. SHONKWILER:  Objection.  Hearsay.  Beyond the
 8  scope.
 9          MR. S. KULWIN:  It goes to whether -- it goes to
10  whether -- he knows there's a false statement, Judge.
11          THE COURT:  You are not offering it for the truth of
12  the matter?
13          MR. S. KULWIN:  Not yet, no.
14  BY THE WITNESS:
15  A.  Did Andrew --
16          THE COURT:  Wait, sir, one second.
17          Ladies and gentlemen, the testimony you are about to
18  hear is not being offered for the truth of what was said, but,
19  instead, is being offered to show whether or not this witness
20  heard those words.
21  BY MR. S. KULWIN:
22  Q.  Did he ever tell you that?
23  A.  Say it, again.
24  Q.  That there were -- that the architectural plans of the
25  building had no plans for laundry facilities?
```

Reiss - redirect

1    A.  I don't recall having any kind of conversation like that

2    with Andrew.

3    Q.  Were you aware there was there were no laundry facilities

4    in the building, sir -- planned for the building?

5    A.  I really don't remember.

6    Q.  So, it's possible that you were aware that there were no

7    plans for the laundry facility; isn't that possible?

8           MR. SHONKWILER:  Objection as to form.

9           THE COURT:  Sustained.

10   BY MR. S. KULWIN:

11   Q.  You don't remember one way or the other?

12   A.  I don't.

13   Q.  Okay.

14          But you certainly signed a document that says, "We're

15   giving you laundry facilities in the common elements"?

16   A.  I thought we established that I --

17          MR. SHONKWILER:  Objection.

18   BY THE WITNESS:

19   A.  -- read that document differently; that if there were

20   laundry facilities, they would be in the common interest.

21          I thought that's what we just went over?

22   Q.  So what you are saying is they'll be in the common

23   elements if they're in the building?

24          MR. SHONKWILER:  Objection, your Honor.  Asked and

25   answered.

1          THE COURT:  Sustained.

2          Mr. Kulwin, how much longer do you think you have?

3          MR. S. KULWIN:  Two minutes.

4          THE COURT:  Two minutes?

5          MR. S. KULWIN:  Two or three minutes, Judge.

6          THE COURT:  Okay.

7          MR. S. KULWIN:  I'm moving.

8          If I may have a moment, Judge?

9          THE COURT:  You may.

10         (Brief pause.)

11         MR. S. KULWIN:  I don't have two minutes, Judge.  I

12    have no minutes.

13         THE COURT:  Recross?

14         MR. SHONKWILER:  Very briefly, your Honor.

15                    RECROSS EXAMINATION

16    BY MR. SHONKWILER:

17    Q.  Mr. Reiss, do I understand you correctly that when you

18    said Mr. Trump felt strongly about not including common

19    elements in the New York property, what you were referring to

20    is the fact that he felt strongly about not including ballroom

21    facilities or significant meeting or function room facilities

22    in the building?

23         MR. S. KULWIN:  Objection.  Argumentative and asked

24    and answered.

25         THE COURT:  Overruled.

1           You may answer, if you can.

2    BY THE WITNESS:

3    A.  That's right.

4    BY MR. SHONKWILER:

5    Q.  And, again, decisions about what goes into a building are

6    different than decisions about which pieces of the building go

7    into which parcels; is that correct?

8    A.  That's right.

9           MR. SHONKWILER:  Nothing further.

10          THE COURT:  Thank you, Mr. Reiss.  You may step down,

11   sir.

12          THE DEFENDANT:  Thank you.

13          (Witness excused.)

14          THE COURT:  Please call your next witness, Mr.

15   Kulwin.

16          MR. S. KULWIN:  Donald Trump.

17          (Brief pause.)

18          THE COURT:  Please come forward, Mr. Trump.

19          Mr. Novack, do you want to bring your client some new

20   water?

21          MR. NOVACK:  Yes, your Honor.

22          MR. S. KULWIN:  Judge, should we take the camera out?

23          THE COURT:  Can you take it down?

24          MR. S. KULWIN:  I mean, we're going to be using it

25   during the examination.

Trump - direct

```
 1              THE COURT:  That is fine.

 2              MR. S. KULWIN:  Okay.

 3               DONALD TRUMP, PLAINTIFF'S WITNESS, SWORN

 4              THE COURT:  Go ahead, Mr. Kulwin.

 5              MR. S. KULWIN:  Thank you, your Honor.

 6                       DIRECT EXAMINATION

 7  BY MR. S. KULWIN:

 8  Q.  Sir, can you state your fame and spell your last name for

 9  the record?

10  A.  Yes.  Donald John Trump, T-r-u-m-p.

11  Q.  And how old are you?

12  A.  Excuse me?

13  Q.  How old are you?

14  A.  66.

15  Q.  And you reside in New York City?

16  A.  Yes, I do.

17  Q.  Now, you're Chairman and President of the Trump

18  organization; is that correct?

19  A.  Correct.

20  Q.  And you founded that organization 23 years ago in 1980?

21  A.  Well, in the -- probably in the -- mid '70s, would be more

22  accurate.  But, yes, around that time.

23  Q.  And prior to that time, you were in the real estate

24  business with your family, correct?

25  A.  Yes, that's right.
```

Trump - direct

1  Q.  You've been in the real estate business for over 40 years,

2  correct?

3  A.  Approximately, yes.

4  Q.  In 2003, the Trump organization began selling condominiums

5  and hotel condominiums in the Trump Hotel Tower --

6  International Hotel and Tower -- right?

7  A.  I believe that was the date.  I'm not exactly sure, but I

8  think so, yes.

9  Q.  And at the time that you were offering that -- those units

10  -- for sale, you had built and developed many properties,

11  correct?

12  A.  Correct.

13  Q.  During that time, you had developed and managed over 3,000

14  residential condominium and rental properties?

15  A.  Yes.  Probably even more than that.

16  Q.  Two million square feet of office space?

17  A.  Yes, a lot.

18  Q.  4,000 hotel rooms?

19  A.  I don't know the exact number, but it sounds about right.

20  Q.  Okay.

21        500,000 square feet of gaming space?

22  A.  Yes.

23  Q.  400,000 square feet of retail space?

24  A.  Yeah.

25  Q.  Two golf clubs?

Trump - direct

1    A.  At the time of '03?

2    Q.  2003, yeah.

3    A.  Probably around two or three, yes.

4    Q.  And you had also developed three mixed-use properties:

5    The Trump International Hotel Tower in New York, the Trump

6    Grande Ocean Resort and Residence in Florida and Trump Tower

7    in New York City, right?

8    A.  Well, the one in Florida was not developed by me.  I

9    wasn't the developer of the Trump Grande.  That was done by

10   the Dezer Organization.

11   Q.  You licensed --

12   A.  We licensed the name, yes.

13   Q.  Okay.

14        On your brochure, however, it's listed as one of the

15   projects that you did?

16   A.  Well, we were involved with it, absolutely.

17   Q.  You were also -- you also developed and were operating

18   five residential properties in 2003, with a sixth one to be

19   scheduled, correct?

20   A.  Excuse me, again?

21   Q.  Sure.

22   A.  You said six month new?

23   Q.  No.

24        You had also developed and were operating, as of

25   2003, in New York City five residential properties, with a

Trump - direct

1    sixth one scheduled to open in 2004.

2            Does that sound correct?

3    A.  It sounds like, I think, at least that number, yes.

4    Q.  Okay.

5            And you were developing and you had developed and

6    were operating eight hotels and resorts total throughout the

7    United States at that time, correct?

8    A.  It could be about that, yes.

9    Q.  Now, the Trump hotel Chicago was the most significant and

10   important project you had going in 2003, correct?

11   A.  It was a very -- and continues to be a very -- important

12   project for me, yes.

13   Q.  In 2003, it was the most significant, though, correct?

14   A.  Well, I had other very significant developments, but I

15   would say that this was a very significant.  It was one of the

16   tallest buildings in the world.  We wanted to do a really

17   great job.  And I think we did that.

18   Q.  It had 2.4 million square feet of space?

19   A.  Yes.

20   Q.  300 residential condos, 175 luxury condos to begin with,

21   right?

22   A.  Yes.

23   Q.  Okay.

24   A.  Approximately.

25   Q.  And numerous amenities were going to be in it, right?

Trump - direct

1    A.  Yes.

2    Q.  And you were going to -- with this building, you were

3    going to -- surpass anything you had ever done before, right?

4    A.  Well, I've built some great buildings.  I mean, I've

5    gotten tremendous reviews architecturally and I've built some

6    great buildings.  But this certainly has gotten great

7    architectural reviews.  It's gotten great reviews from the

8    various magazines.  Travel and Leisure said the best hotel in

9    North America.

10        We've certainly done a good job with this one.  But

11   I've gotten a lot of good reviews on a lot of projects I've

12   done.  And this was a very important and is a very important

13   project for me.

14        MR. S. KULWIN:  TX 75, 4416, I believe.

15   BY MR. S. KULWIN:

16   Q.  Do you recognize the picture there, sir?

17   A.  Yes.

18   Q.  That's you?

19   A.  Yes.

20   Q.  And when you write something and sign your name to it in

21   your brochure, you mean it, right?

22   A.  I -- I -- I mean, this was possibly written by people that

23   are in the organization, because I can't write, obviously,

24   like, I don't think anybody does.  It's advertising copy.

25        But I read it and, yes, it means something to me.

Trump - direct

403

1    Q.  You don't sign it without reading it, do you?

2    A.  I -- I -- would generally read it.  Sometimes -- I mean,

3    I'm signing literally thousands of checks a week.  It's very,

4    very hard.

5           But, generally speaking, I would -- something like

6    that, I would -- read, yes.

7    Q.  You personally sign all the checks for the Trump

8    organization?

9    A.  I do.  I sign all of the checks.

10   Q.  Right.

11   A.  It's a very large task.

12   Q.  Right.

13          You pay a lot of attention to detail?

14   A.  I do, yes.

15   Q.  And in this, it says -- and you knew that this was going

16   out to potential buyers, right -- this brochure?

17   A.  Yes.

18          THE COURT:  Mr. Kulwin, just for the record, is that

19   Plaintiff's Exhibit  75 that you are discussing?

20          MR. S. KULWIN:  It is.  It is Bates 004416, Judge.

21          THE COURT:  Thank you.

22          MR. S. KULWIN:  I apologize.

23   BY MR. S. KULWIN:

24   Q.  And you said, "With every building I've ever built, I have

25   undertaken a personal challenge to surpass anything I've done

                            Trump - direct
                                                                    404

 1    before."
 2            So, when you were building this one, you were going
 3    to try to surpass everything you had done before?
 4    A.  Well, I think that's true.
 5            Generally speaking, I would say that is true.
 6    Q.  Okay.
 7    A.  This is the largest.  I think it's probably the most
 8    spectacular of the buildings that I've built.
 9    Q.  All right.
10            As a result of all the experience we've just talked
11    about, you became extremely knowledgeable about the
12    development and operations of condominium buildings, right?
13    A.  Well, I know about condominium buildings.
14    Q.  Well, you grew up --
15    A.  I know about the many norms of buildings.
16            Yes, certainly, I know a lot about condominium
17    buildings.
18    Q.  You know -- you're like one of the experts.  You've done
19    tons of them, right?
20    A.  Well, I have great people, too.  I -- because, obviously,
21    all of the things that you just mentioned, I can't do it all
22    myself.  I have to rely on people.
23    Q.  I understand you rely on people, Mr. Trump, but the
24    question is:  You were involved on a lot -- all of these
25    projects -- from the ground up, weren't you?

Trump - direct

 1  A.  Well, in some form I was.

 2  Q.  Right.

 3  A.  But I have a great staff of people --

 4  Q.  I know.  A great staff of people.

 5  A.  -- that do it.  You could never do this by yourself.

 6  Q.  We are going to talk about your great staff in a moment.

 7  A.  Okay.  Fine.

 8  Q.  Here's what I'm asking:  As a result of all of your

 9  experience, sir, you learned how to build condominium

10  buildings from the ground up, didn't you?

11  A.  Yes, sure.  All buildings, not just condominium buildings.

12  Q.  I'm sorry?

13  A.  I've been building all my life.  I've been building

14  buildings all my life.  So, I know how to build buildings.

15  Q.  Right.

16       You certainly knew a lot more than Russ Flicker, who

17  was in his 30s when he first came to work for you, right?

18  A.  A very capable person.

19  Q.  Right.

20       But you knew more than him, right?

21  A.  I don't know.  He was a trained lawyer, highly -- he

22  certainly knew more about the law than I did.  I mean, he was

23  a lawyer.  He came out of a very top law firm.

24  Q.  Okay.

25  A.  And, likewise -- well, you know -- other people that

Trump - direct

1    worked for me.

2    Q.  Did Charlie Reiss know more about building condominium

3    buildings than you?

4    A.  Well, I think he knows about as much.  He's very good at

5    what he does.  He's, you know, very, very professional.

6    Q.  And you learned how to market and sell condominium

7    buildings after doing it for years and years.

8            You became expert at it, right?

9    A.  Well, I found that selling the building is the primary

10   thing is build a great building, because you can't fool

11   people.  And I think -- you know, we -- as an example on this

12   building in Chicago -- we've had tremendous architectural

13   reviews, as you know.  We've gotten tremendous reviews,

14   generally.

15           We've gotten -- in all instances, we've gotten --

16   fabulous hotel reviews from Travel and Leisure, from Forbes,

17   from the American Academy of Hospitality.  They gave us five

18   stars, the highest reward.

19           So, I find that the best form of selling is to build

20   something great.  And it sells much easier.

21   Q.  Mr. Trump, it's interesting.  It's not a commercial.  The

22   question is this:  You knew -- you learned how to market and

23   sell buildings from doing it a number of times, including in

24   the way you built it, right?

25           Is that true?

Trump - direct

1    A.  Well, I've done it, like other people.  You did it.  And

2    you do learn over the years, certainly.  You probably, in

3    theory, do it better now than I would have done it 30 years

4    ago.  But you do learn.

5    Q.  But in 2003, sir --

6              THE COURT:  Mr. Kulwin, please let him finish his

7    answer.

8              Were you done?

9              THE WITNESS:  Thank you.

10             I was.  Thank you.

11             THE COURT:  Okay.

12   BY MR. S. KULWIN:

13   Q.  By 2003, sir, you knew -- you were excellent at promoting

14   sales for a building, weren't you?

15             MR. NOVACK:  Objection, your Honor.  Asked and

16   answered.

17             THE COURT:  Overruled.

18             You may answer, if you can.

19   BY THE WITNESS:

20   A.  I don't want to be braggadocios.  I mean, I'm

21   professional.  I build great buildings and they sell.  And,

22   you know, I'm very proud of the fact that we build great

23   buildings.

24             MR. S. KULWIN:  I'm going to move to strike the

25   answer, Judge.  I'm asking him "Yes" or "No" questions.

Trump - direct

```
 1            THE COURT:  Overruled.

 2   BY MR. S. KULWIN:

 3   Q.  My point, Mr. Trump, is, is that by 2003, you had a lot of

 4   experience in marketing for sale condos, in your experience in

 5   the real estate business; isn't that true?

 6   A.  Condominiums?  Mostly residential condominiums.

 7   Q.  But condominiums, right?

 8   A.  Well, mostly residential.  I mean, most of the

 9   condominiums that I built were residential.  They weren't

10   hotel condominiums.

11   Q.  All right.  We're going to get to that.

12            And you just said, if I understand it correctly, that

13   really the best way to sell them is to build a great building,

14   right?

15   A.  I always find that building a great building helps

16   certainly with the selling --

17   Q.  But you --

18   A.  -- especially when -- especially when -- markets go bad.

19   Having a building that's a better building, a higher quality

20   building, perhaps in a better location, certainly helps.

21   Q.  But you still market them even if you build a great

22   building.  You still have brochures.  You still have

23   promotions.  You still have offers.  You still do all those

24   things?

25   A.  Sure.  You have to market, sure.
```

Trump - direct

1   Q.  And you also learned how to manage these residential

2   buildings and how to operate them successfully, once you were

3   done building them, correct?

4   A.  Yes.  Operation is very important, absolutely.

5   Q.  And that was true -- all those things were true -- in 2003

6   of the hotel business, as well, right?

7   A.  I don't know what you mean.  Are you talking about

8   generally speaking or in my case?

9   Q.  You, in 2003.

10  A.  I don't know what that question means.

11  Q.  In 2003, you were expert at running and operating hotels?

12  A.  Yes, I think we were very good at running hotels, yes.

13  Q.  And hotels --

14  A.  And we continue to be.

15  Q.  And hotels include food and beverage operations, correct?

16  A.  It's true.

17  Q.  And food and beverage operations include ballrooms,

18  meeting rooms, function rooms, and all the food and food

19  service and drinks that are served within them, correct?

20  A.  Well, in some cases.  But I hadn't done that because the

21  only other condominium hotel that I built was at number 1

22  Central Park West at Trump International, and that doesn't

23  have ballrooms and doesn't have food and beverage.  So, it's

24  rented to Jean-Georges, a great restauranteur, and he does the

25  food and beverage.

Trump - direct

1   Q.  Mr. Trump, I didn't tell you ask you about hotel

2   condominiums.  I asked you about hotels.

3   A.  Hotels?  Yes, I would say I'm an expert at hotels.

4   Q.  Right, hotels.

5         By 2003, you were an expert at hotels and running

6   food and beverage operations, which include ballrooms, banquet

7   rooms and the like, right?

8   A.  We were running hotels, yes.

9   Q.  And you -- just so I'm clear and you -- were very expert

10  at it by 2000- --

11        MR. NOVACK:  Judge, I am going to object.  Asked and

12  answered.

13        THE COURT:  Sustained.

14  BY MR. S. KULWIN:

15  Q.  Okay.

16        And now, sir -- so, you're expert in hotels and

17  you're expert at residential condos, right?

18        And a hotel condo takes a hotel and puts it together

19  with a residential condo, right?  That's what it does.

20        Is that what it does?

21  A.  Well, no.

22  Q.  It doesn't?  Okay.

23  A.  It's not a residential condo.  It's a hotel condo.

24  Q.  It takes --

25  A.  You have -- in the case that you're talking about, we have

Trump - direct

1   a residential condo on top, we have hotels in the middle/

2   bottom; and, then, we have food and beverage.

3   Q.  My point, though, is, sir, you knew how to run a

4   residential condominium?

5   A.  Yes.

6   Q.  And there is a residential condominium at Trump

7   International Hotel and Tower, right?

8   A.  And everyone's very happy.

9        MR. S. KULWIN:  Your Honor, I'm going to move to

10  strike it and ask him to answer the question.

11       THE COURT:  I will strike the last portion and the

12  jury should disregard it.

13  BY MR. S. KULWIN:

14  Q.  And, sir, in addition to that, you also have a hotel at

15  the Trump International Hotel, which you're also -- you were

16  expert by 2003 on how to run a hotel, right?

17  A.  We are running that hotel.

18  Q.  And you were an expert by 2003 on how to run hotels,

19  correct?

20  A.  We are very professional, yes.

21  Q.  Now, it's fair to say, sir, that by the time -- by 2003 --

22       MR. S. KULWIN:  Well, I'll withdraw that question.

23  BY MR. S. KULWIN:

24  Q.  Now, also by 2003, you had considerable experience in

25  hotel condominiums, didn't you?  By 2003?

Trump - direct

1  A.  Well, I don't -- I don't -- think you can say that.

2        Hotel condominiums were the -- one I built, which was

3  very successful, was Trump International Hotel and Tower at

4  number 1 Central Park West in New York.  It was a tremendous

5  success.

6        But, outside of that, other than maybe some licensing

7  deals or something, I wasn't really involved in running hotel

8  condominiums.  Hotel condominiums were few and far between,

9  and have become not a very favored source of investment for

10 people over the years.  That's happened over the last five or

11 six or seven or ten years, because it just hasn't been.

12       So, there haven't been that many of them.

13       My primary one was at number 1 Central Park West.

14 Q.  Mr. Trump, by 2000 -- in the early 1990's, you were

15 already following the hotel condominium trends, weren't you?

16 A.  We were --

17 Q.  Were you following the hotel condominium trends in the

18 early 1990s?

19 A.  I don't know what you mean by "following it."

20 Q.  Were you aware that hotel condominiums were being

21 developed in Florida and other places?

22 A.  I wasn't watching much.  I mean, the primary one that --

23 Q.  Were you aware?

24 A.  Yes.  They were being developed.  Not too many of them,

25 but they were being developed.

Trump - direct

413

1   Q.  Now, at that point in time -- in the early '90s -- General

2   Electric was a mortgagee in possession and they requested --

3   on a building and they requested -- a proposal from you on

4   what to do with the building.

5           Do you recall that in the early '90s?

6   A.  Are you talking about in New York?

7   Q.  In New York.

8   A.  At 1 Central Park West?

9   Q.  Yes, right.

10  A.  That's right.

11  Q.  Right.

12  A.  General Electric.

13  Q.  And at that time, you were more in the residential condo

14  business than in the hotel business -- in the early '90s?

15  A.  That is correct.

16  Q.  And -- but you couldn't build a residential condo there --

17  I mean, you could build it, but you couldn't build the one you

18  wanted.  Do you remember that?

19  A.  No.

20  Q.  Due to FAR -- F-A-R -- ratings.

21          You don't remember that?

22  A.  Well, I remember exactly that, but I built exactly what I

23  wanted.  But I also --

24  Q.  You had a discussion, sir, with Mr. Reiss about what to

25  build there, didn't you?

Trump - direct

1   A.   It could be.   I mean, you're talking about many, many

2   years ago.   But it could very well be.

3   Q.   After the -- during that discussion, you proposed to him,

4   "Why don't we make it a hotel condominium?"

5        It was your proposal, right?

6   A.   You are talking about 1 Central Park, again?

7   Q.   Yeah.   That was your idea?

8   A.   I was certainly -- let me see.

9        Yeah, I mean, this is a long time ago you're talking

10  about.

11       Yeah, I was in favor of a residential building with a

12  -- either a -- hotel or an office building on the bottom; and,

13  ultimately, we decided on a hotel.

14  Q.   And when you talked to Mr. Reiss about that, he had never

15  heard of a hotel condominium.   Do you remember that?

16  A.   No, but it's possible that he would say that.

17       But, no, I don't remember that.

18  Q.   Now, following the discussions with Mr. Reiss about that,

19  your organization started doing an extensive investigation

20  into the hotel condominium business, right?

21  A.   I don't know.   I mean, maybe.   I don't really know.   This

22  site was very unique.   It was a phenomenal piece of property

23  and a phenomenal location and my partner was General Electric,

24  which was a great partner, and continues to be a great

25  partner.

Trump - direct

```
 1   Q.  That's not my question, though.  It's interesting, but
 2   it's not my question.
 3           My question, sir, is:  People in your organization,
 4   in part because you had to present something to General
 5   Electric, started doing an extensive investigation into the
 6   hotel condominium business?
 7   A.  Well, that's possible.  I don't remember it, but certainly
 8   it would be possible.
 9   Q.  And they actually wrote up the results of their
10   investigation, correct?
11   A.  I don't know.
12           Again, it's very possible, but I don't know.
13   Q.  Well, let me ask you a question.  When you -- you attended
14   meetings with General Electric about what was going to be
15   developed there, didn't you?
16   A.  That's right.  That's right.
17   Q.  You have to let me finish.
18           You attended meetings there about -- with General
19   Electric and their representatives about -- what you wanted to
20   develop there, right?
21   A.  That's true.
22   Q.  And you didn't go into those meetings without any facts,
23   did you?
24   A.  Well, you're asking me many years ago about, you know,
25   whether or not we developed the report.
```

Trump - direct

416

1    I would say probably we did, but I just don't

2 remember that.

3 Q.  But my bigger question is:  You would have had the facts.

4 You would have gotten the facts before you went to such a

5 presentation, right?

6 A.  Generally speaking, that's true.

7 Q.  And you would have wanted to know what had gone wrong with

8 hotel condominiums and what had worked, before you went ahead

9 and proposed to General Electric -- of all things -- "This is

10 what we're going do with your property"?

11    You'd want to know what worked, right?

12 A.  Well, at the time, this was -- and from what I hear, this

13 was -- really one of the very, very first hotel condominiums.

14 And it's also one of the ones that really worked well because

15 of its location, and I think because we did a great job of

16 construction.

17    So, I don't know that I had a lot to look at because

18 very few hotel -- hotels were being built, but very few hotel

19 condominiums were being built when I built Trump International

20 Hotel and Tower in New York.

21 Q.  Okay.

22    My point, Mr. Trump, is before you went to the

23 meeting with General Electric, you would have wanted to have

24 all the facts that you could gather about the hotel

25 condominium business, before you proposed to General Electric,

Trump - direct

1   "This is what we're going do with your building"?

2           Do you understand that question?

3   A.  I do, but it's --

4           MR. NOVACK:  Your Honor, I understand it, because I

5   just heard it.  It's asked and answered.

6           MR. S. KULWIN:  I couldn't find the answer, Judge.

7           THE COURT:  Overruled.

8           You may answer, if you can.

9           THE WITNESS:  Sure.

10          Thank you, your Honor.

11  BY THE WITNESS:

12  A.  The fact is that was primarily a residential building.

13          The reason -- the only reason -- we ended up doing

14  the hotel section --

15          MR. S. KULWIN:  I'm going to move to strike, Judge.

16  He is not answering the question.  He is giving a speech.

17          The question is very simple, your Honor.  When he

18  went -- he wouldn't go into General Electric and make a

19  presentation about a hotel condominium without the facts.

20          THE COURT:  If you are seeking a "Yes" or "No"

21  answer, you can ask the witness for that, if he can provide

22  one.

23          MR. S. KULWIN:  Okay, fine.

24  BY MR. S. KULWIN:

25  Q.  Mr. Trump, I'm seeking a "Yes" or "No" answer.  Okay?

Trump - direct

418

1    You wouldn't go to General Electric, of all places,

2  and give them a proposal on what to do with their site without

3  having the key facts about what you were proposing; is that

4  right?  "Yes" or "No"?

5  A.  Well, I would say, "Yes."

6  Q.  Okay.

7  A.  But, again, it was primarily a residential building.  It

8  was not primarily -- a very small component of that building

9  was the hotel.  It was mostly a residential building.

10  Q.  Well --

11  A.  And the residential is what they wanted to hear about,

12  much more so, because --

13  Q.  Well, let me ask --

14  A.  -- because there was very little track record for a

15  condominium --

16    MR. S. KULWIN:  Judge, I am going to move to strike

17  these answers.  He is not answering the question.  He is

18  giving speeches.

19    THE COURT:  I will strike the last portion and the

20  jury should disregard it.

21    MR. S. KULWIN:  Thank you.

22    THE COURT:  Ask your next questions, please.

23  BY MR. S. KULWIN:

24  Q.  Sir, when you developed that hotel in New York, you worked

25  with expert consultants, right?

Trump - direct

419

1    A.  Yes.

2    Q.  Now, ultimately after the investigation was complete and

3    done and all the facts were gathered and you talked to General

4    Electric, you made the decision about what type of building to

5    put there, correct?

6            That was your decision?

7    A.  No.  I would say General Electric made -- they were the

8    primary owners, they really made the decision.

9    Q.  They had to approve it, but you made the decision what to

10   recommend to them, correct?

11   A.  I recommended something to them.

12           MR. NOVACK:  Objection.  He is arguing.  He got his

13   answer, didn't like it and he is arguing.

14           MR. S. KULWIN:  Oh, no, I'm not, I am asking a

15   different question.

16           THE COURT:  Overruled.

17           MR. S. KULWIN:  Thank you, your Honor.

18   BY MR. S. KULWIN:

19   Q.  I will say it, again.

20           You were the one who made the decision about what to

21   recommend to General Electric, correct?

22   A.  Well, it is true, but my first recommendation to them was

23   not a hotel condominium, but was an office building with

24   apartments on top.

25           We ended up doing a residential building with an

Trump - direct

1   hotel on the bottom instead of office.

2   Q.  And you were the one who made the second recommendation to

3   them, correct?

4   A.  I made the second recommendation.

5   Q.  That was your decision, too, right?

6   A.  Not my decision.  It was my recommendation.

7   Q.  Right.

8          But you were the one who decided to make the

9   recommendation to General Electric.  That was your call?

10  A.  I made the recommendation, that's true, based on my

11  consultants' knowledge.  But I made the recommendation.

12  Q.  And that's what -- as you've now told us several times --

13  turned into the Trump International Hotel and tower in New

14  York, correct?

15  A.  That is correct, yes.

16  Q.  And that opened in 1997, right?

17  A.  I believe so, yes.

18  Q.  And from 1997 to 2003, you and Mr. Reiss and others in

19  your organization had six years of experience of running a

20  hotel condominium, right?

21  A.  Well, we had that experience.  It was a much different

22  building than what we have in Chicago, much smaller, doesn't

23  have a ballroom, doesn't have food and beverage because we

24  lease that out to a restauranteur.  We don't run the food and

25  beverage.  So --

Trump - direct

421

```
 1   Q.  So, during that --
 2   A.  -- it's a very -- I mean, it's a much smaller operation.
 3           MR. S. KULWIN:  Again, I'm going to move to strike
 4   all of this, Judge.  It's filibustering and it's not answering
 5   the question.  I move to strike it.
 6           MR. NOVACK:  I object to that motion.  He asked the
 7   question.  He can get the answer.
 8           THE COURT:  Overruled.
 9   BY MR. S. KULWIN:
10   Q.  The question is:  You had six years of experience --
11   between 1997 and 2003 -- running the hotel condominium
12   building in New York?
13           Is that "Yes" or "No," Mr. Trump?
14   A.  Yes.
15   Q.  Oh, good.
16           And, also, during that same time period, you had --
17   your organization was advising a developer down in Florida
18   about how to do -- what to do -- with a hotel condominium
19   project, right?
20   A.  Again, most --
21   Q.  Is that right?
22   A.  No, it's not right.
23   Q.  It's not right?  It's not right?
24   A.  It was mostly --
25   Q.  If it's not right, Mr. Trump, it's not right.
```

Trump - direct

```
 1    A.   It was -- okay.

 2    Q.   That's good.

 3    A.   Okay.  Fine.

 4    Q.   You know Sunny Isles --

 5    A.   Yes.

 6    Q.   -- that's in Florida?

 7    A.   Yes.

 8    Q.   It's a hotel condominium project?

 9    A.   No, it's a condominium, with a small hotel component.

10    Q.   It's a hotel condominium project?

11    A.   It's a -- it's primarily a -- massive residential

12    condominium, with a small hotel component.

13    Q.   So, you know the details of it?

14    A.   I know -- not too well.  There's a very capable developer

15    that developed that named Dezer -- the Dezer Organization --

16    and they are very capable people.  And they pretty much made

17    up their own minds as to what they wanted to build.

18          And we don't manage that building.

19    Q.   You license it?

20    A.   We license it, yes.

21    Q.   All right.

22          And they pay you to use the Trump name?

23    A.   In that case, yes.

24    Q.   All right.

25          And -- but if they're using your name, you ensure
```

Trump - direct

1   that they follow certain guidelines, correct?

2   A.  Yes.  We watch the -- we watch that it's of a high

3   quality, yes.

4   Q.  And how it's operated -- how it's operated?

5           You make sure that they operate it in a certain way,

6   right?

7   A.  We want it operated very well, as with all our buildings.

8   It's important.

9   Q.  And the fact of the matter is, sir, you won't license your

10  name unless the people buying the license agree to allow you

11  to dictate things like how it's operated, how it looks, what's

12  the decor like -- things of that nature -- right?

13  A.  Well, we --

14  Q.  Is that true?  Is that true?

15          "Yes" or "No," sir, is that true?

16  A.  I can't give you a "Yes" or "No" answer.

17          MR. NOVACK:  Objection.

18          MR. S. KULWIN:  I am asking --

19          MR. NOVACK:  He is constantly interrupting him like

20  that.

21          THE COURT:  You cannot all talk at the same time

22  because Joe cannot take it down.

23          MR. S. KULWIN:  I understand.

24          THE COURT:  If he cannot answer a question in "Yes"

25  or "No," he is entitled to give more than that.  And he just

Trump - direct

1  said he cannot give you a "Yes" or "No."

2          MR. S. KULWIN:  Okay, if he says he can't give me a

3  "Yes" or "No."

4  BY MR. S. KULWIN:

5  Q.  Mr. Trump, the question is simple, okay?  You require them

6  to live up to certain standards and decor and things of that

7  nature or you won't agree to license them?

8          Do I understand that right, "Yes" or "No"?

9  A.  Well, I can't, again, give you -- I can say that we do

10 require them; but, when we don't have ownership, we can't

11 guarantee that that's going to be the case.

12         As an example, in Sunny Isles, there have been

13 cases -- times -- when we wanted to withdraw from it unless

14 they changed.

15         Now, they did change.  But if they didn't change, it

16 would not have been a good situation.

17         So, without the ownership, you can't really dictate

18 how somebody's going to manage a property.

19 Q.  Exactly.

20         For you to be sure that your brand is protected, the

21 best way to protect it is to own the facilities yourself?

22 A.  Well, ownership is a very good thing, if you can do that,

23 yes.

24 Q.  That is the --

25 A.  Absolutely.

Trump - direct

```
 1   Q.  -- the best way that you knew, even in 2003, to protect
 2   your brand, correct?  Ownership?
 3   A.  Ownership is good, because we can keep the building in
 4   good shape.  And that's important for the unit owners.  It's
 5   important even for the residential units.  So, ownership is
 6   certainly an asset.
 7   Q.  Right.
 8          And you knew that in 2003, right?
 9   A.  Relative to, what?  I mean, I don't understand the
10   content.
11   Q.  You knew it was a fact relative, like you know --
12   A.  Ownership is certainly better than having a management
13   contract.
14   Q.  Because you can get fired if you have a management --
15   A.  Yeah.  I mean, it's better for the building.  It's better
16   for the building.
17   Q.  We will get to the building in a second.
18   A.  Not necessarily better for me.  It's better for the
19   building, to protect the reputation of the building.
20   Q.  Sir, we will get to the building in a second.
21   A.  All right.
22   Q.  But it's, also, it's best for you?
23   A.  I am more interested in the building in this case -- and,
24   in all cases, the individual building -- because if we don't
25   own it, they could go out and get a fast food franchise to run
```

Trump - direct

426

```
 1    a ballroom and destroy a great building.  And, frankly,

 2    because the owner can do that.  They can fire the manager.

 3    They can get rid of the manager.  And they can get Burger King

 4    to run the ballroom very easily, and it's not a good situation

 5    for the building.

 6            And, by the way, it would have a huge negative impact

 7    on the value of the apartment site.

 8    Q.  Right.

 9            And you would never, ever take the risk with this --

10    what you were going to build to surpass anything you had ever

11    done before, you weren't ever going to risk -- Burger King

12    running your ballroom, were you?

13    A.  I don't think anybody --

14            MR. NOVACK:  Objection, unless we have a timeframe

15    for when he is asking.

16            MR. S. KULWIN:  In 2003.

17            THE COURT:  Wait.  Let him finish, please.

18            Sustained.

19            Rephrase your question with a timeframe.

20    BY MR. S. KULWIN:

21    Q.  You weren't ever, as of 2003, ever going to take a risk

22    that Burger King was going to be running your ballrooms, were

23    you?

24    A.  I certainly wouldn't want Burger King running my ballroom.

25    Q.  You weren't going to take the risk --
```

1   A.  Or the ballroom for other people.  Nobody would want it.

2   Q.  You weren't going to take the risk in 2003 of giving up

3   the ownership and letting a bunch of hotel condo owners decide

4   who is going to run those ballrooms.

5           You knew that in 2003?

6   A.  No, I didn't know that in 2003.

7   Q.  You didn't?

8   A.  No, I didn't.

9   Q.  We will get back to that, Mr. Trump.

10  A.  Okay.  All right.

11          THE COURT:  Mr. Kulwin --

12          MR. S. KULWIN:  I'm sorry.

13          THE COURT:  -- you are cutting off the witness.

14          MR. S. KULWIN:  I apologize.

15  BY MR. S. KULWIN:

16  Q.  If you licensed your name, sir, and it is run poorly by

17  one of your licensees, that will damage your brand, correct?

18  A.  Well, we would generally terminate and it would damage the

19  building.

20          The building will be damaged more so than the brand

21  because the brand we can leave.  But the building we can't

22  leave.  And if they get a licensee that does a very poor job,

23  we may be gone from the building, but the people that bought a

24  unit -- bought units -- in the building will be very

25  substantially hurt.

Trump - direct

1  Q.  That's not the question.

2        The question is this:  When you licensed your name,

3  you sign a contract, right?  Right?  You do --

4  A.  Yes.

5  Q.  -- sign a contract?

6  A.  Yeah, sure.

7  Q.  And when -- part of the contract is they have to do

8  certain things to make sure that your brand is protected?

9  They have to run it a certain way.

10        We've covered that, right?

11  A.  Correct.

12  Q.  Okay.

13        And if they start running the hotel down, doing a

14  poor job, before you can get to the legalities of leaving the

15  licensing agreement, people coming to that hotel are going to

16  walk into that Trump hotel that you've licensed your name in

17  -- that's being running poorly -- and go, "Yuk, this is bad,"

18  right?  That would be --

19  A.  Bad for the building.

20  Q.  And bad for Trump because people --

21  A.  Well --

22  Q.  -- would walk into this Trump hotel that was being run

23  poorly and go, "I thought that Trump meant excellence and

24  superiority.  This place is being run like a dump."

25        That would be bad for you, wouldn't it?

```
 1              MR. NOVACK:  I object to the form of that question.

 2              THE COURT:  Sustained on form.

 3    BY MR. S. KULWIN:

 4    Q.   That would be --

 5              THE COURT:  Sir, I sustained it.

 6              THE WITNESS:  Yes.

 7    BY MR. S. KULWIN:

 8    Q.   Mr. Trump, it's a real simple question.  If a licensee --

 9    I know that you think it's bad for the building.  We'll get to

10    that, I promise.  But if a licensee is running a building

11    poorly and they're doing a bad job, and the public comes in

12    and sees a hotel that's in disarray or badly run, and it's got

13    the Trump name on it, that's bad for the Trump brand, isn't

14    it?

15    A.   It's bad for everything, but it's particularly bad for

16    that individual building.  And it's bad for the people that

17    own units in that building, because their units would be worth

18    half -- it would be worth a tremendous amount less -- if that

19    event took place.

20    Q.   I understand that you keep talking about the building,

21    Mr. Trump.  My question is:  You say it would be bad for

22    everything.  It's real simple.  It would also be bad for your

23    brand, wouldn't it?

24    A.   Again --

25              MR. NOVACK:  Judge, he's asked that and he answered
```

Trump - direct

1    it.

2              MR. S. KULWIN:  No.

3              THE COURT:  Overruled.

4    BY MR. S. KULWIN:

5    Q.  Mr. Trump --

6    A.  I think -- excuse me.

7              Did you ask the question?

8    Q.  I did.

9    A.  Do you want to ask it, again?

10   Q.  Sure.

11   A.  Good.

12   Q.  It would be bad for your brand, wouldn't it?

13   A.  Primarily bad for the building.

14   Q.  You're not --

15   A.  Because the brand is all over.

16             You don't understand, the brand is all over -- on

17   many, many, many buildings.

18   Q.  All right.

19   A.  This would be bad for the building.  It would be bad for

20   the unit owners of the building.  It would be bad for me, as a

21   unit owner, because I own units.  It would be bad for the

22   building, beyond anything else.

23   Q.  Mr. Trump, it's real simple.  So, you're saying -- if I

24   understand it right, you're saying -- that even if a licensee

25   ran one of your hotels poorly, the public came to it, it was

Trump - direct

1   in disarray, it looked terrible, that really wouldn't affect

2   your brand because you have so many great hotels, nobody would

3   care?  Is that what your testimony is?

4   A.  No, I'm not.  I'm saying it wouldn't be good for anybody.

5   In particular, it would be bad for the building.

6   Q.  You keep saying that and I'm going to ask it one last

7   time.  All I'm asking you is -- I don't care if it's bad for

8   the building; we will get to the building -- it would be bad

9   for your brand?

10  A.  Nothing that's bad is good for a brand.

11  Q.  Okay.

12  A.  So, whether it's my brand or any other brand, nothing

13  that's bad is good for a brand.

14          But, in particular --

15  Q.  And if it's --

16  A.  -- it would be bad for the building.

17  Q.  And if it's bad for the brand, the brand can get devalued,

18  right?

19  A.  Well, my units can get devalued by a lot more.

20  Q.  And the brand could also get devalued?

21  A.  I don't know if one building would do it.  I'm not sure.

22  But --

23  Q.  Isn't that why you so jealously guard all of the

24  requirements of what licensees are supposed to do before you

25  agree to license it?

Trump - direct

1   A.  I want people to run good operations, yes.

2   Q.  Right.

3        Not only because you want a good building, but you

4   don't want people schlocking up your brand?

5   A.  Well, I want a great building, not a good building.  And I

6   also want a good brand.

7   Q.  Right.

8        And if the brand goes bad or starts to deteriorate

9   because you're not -- your organization isn't -- taking enough

10  care in managing who uses it, it would also devalue your name

11  because your name is the brand?

12  A.  Well, maybe; but, primarily, it's what I said.

13  Q.  Maybe, Mr. Trump?  Really?

14        MR. NOVACK:  Objection.  He's arguing.

15        THE COURT:  Sustained.

16  BY MR. S. KULWIN:

17  Q.  Mr. Trump, if you walked into this Sonesta Sunny Isles

18  Trump hotel and there was rusty water and crummy food and all

19  that, you don't think that that would devalue your name?  You

20  wouldn't be furious with that?

21  A.  Well, I'd take the brand off the building.

22  Q.  You'd be furious?

23  A.  No, I would take the brand off the building, if they

24  didn't fix it.

25  Q.  Sir, you're the ultimate authority at the Trump

Trump - direct

1  organization, aren't you?

2  A.  Ultimate authority, but I have many, many people that make

3  decisions.  I have thousands of people that work for me.  I'm

4  doing jobs all over the world.  And I have many, many people

5  that make decisions.

6  Q.  Thousands and thousands.  But on Trump Tower Chicago, you

7  had a cadre of four or five people, right?

8  A.  I had a group of, yeah, probably five people.

9  Q.  All right.

10  A.  Four people.

11  Q.  And you, among that four or five people, were the ultimate

12  authority, correct?

13  A.  Yes, I would say "Yes."

14  Q.  No decision of any major significance on that project

15  could be made without your approval?

16  A.  No, I don't think that's right.

17        As an example, I built the building and it came --

18  I'm very proud of the fact that it came -- even in the worst

19  years that we've had in this country since 1929, we got it

20  built.  Everyone else is laying fallow all over Chicago.  We

21  built the building.

22  Q.  Well --

23  A.  Well, it's true.  We built the building.  It got done.

24  It's magnificent.  And I had a group of people do it.

25        I didn't negotiate every contract.  I didn't

Trump - direct

434

1    negotiate -- we built it on time and on budget, which was not

2    easy to do.  But I didn't negotiate those contracts.  I had a

3    group of experts that work for me, that are extremely good at

4    it, and they built the building and they signed the contracts.

5    And they negotiated the contracts.  I didn't do that.

6    Q.  I wasn't suggesting you negotiate every contract.

7            When you say you built the building and got it done

8    when other companies were -- other projects were -- lying

9    fallow, you were able to get a $640 million loan in 2005 that

10   enabled you to get the building built?

11   A.  That's true.  That's because I have a good reputation.

12   Q.  Yeah.  You had the money.  That's why you got the building

13   built, right?

14   A.  A lot of people --

15           MR. NOVACK:  Objection.  He's arguing, again.

16   BY THE WITNESS:

17   A.  -- didn't get the money.

18           MR. S. KULWIN:  No, I'm not.

19           THE COURT:  Sustained.

20   BY MR. S. KULWIN:

21   Q.  Now, it was your idea to build Trump Tower, correct?

22   A.  Well, actually, it was -- you're talking Trump Tower in

23   Chicago?

24   Q.  Yep.

25   A.  Actually, it was probably the idea of the Sun-Times,

Trump - direct
435

1  because they owned the site.

2  Q.  I see.

3         The Sun-Times came up with the idea?

4  A.  They came up with the idea, yes.

5  Q.  So, basically, it was --

6  A.  They owned the site.

7  Q.  So, basically, it was the Chicago Sun-Times woke up one

8  day and said, "We're going to build a giant tower on our

9  site," right?

10        MR. NOVACK:  I'm going to object, Judge.  He asked

11 that and it's been answered.

12        THE COURT:  Sustained on form.

13        MR. S. KULWIN:  All right.

14 BY MR. S. KULWIN:

15 Q.  Sir, let me rephrase -- let me restate -- it.  I want to

16 be clear.

17        Is it your testimony that it wasn't -- you weren't

18 the one who came up with the idea to do the Trump Tower

19 Chicago project?

20 A.  The earliest phase, if you are asking me about --

21 Q.  No, I'm asking you very simply.  Was it your idea to build

22 this project -- the Trump Tower project -- in Chicago?

23 A.  Well, certainly I was a piece of it, but it was really the

24 Sun-Times that wanted to build it.  They owned the site and

25 they wanted a great building and they approached me.  I didn't

Trump - direct

436

1   approach them.  They approached me.

2   Q.  Okay.

3        Do you remember giving a deposition in this case,

4   sir?

5   A.  Yes.

6   Q.  Now, let me clarify something about that deposition.

7        That was in your offices, right?

8   A.  Yes, it was.  I think so.

9   Q.  It was in the conference room underneath your personal

10  office, right?

11  A.  Yes.

12  Q.  Okay.

13        In New York City at Trump Tower, right?

14  A.  That's right.

15  Q.  And Mr. Novack, your attorney, was present for the whole

16  thing, right?

17  A.  Correct.

18  Q.  And you were sworn under oath to tell the truth, right?

19  A.  Correct.

20  Q.  Now, it only went an hour-and-a-half.

21        You recall that, right?

22  A.  No.  But it -- whatever it was.

23  Q.  Okay.

24        But that wasn't because I imposed some hour-and-a-

25  half limit on you, right?

```
 1              MR. NOVACK:  Objection, your Honor.

 2              THE COURT:  Sustained.

 3              MR. S. KULWIN:  No, Judge, I'm going to ask to be

 4    heard then, please.  I would like a sidebar.

 5              THE COURT:  Sustained.

 6              Let us keep going and we will talk about this --

 7              MR. S. KULWIN:  Thank you, Judge.

 8              THE COURT:  -- after court today.

 9    BY MR. S. KULWIN:

10    Q.  In any event, sir, do you remember this question and this

11    answer?

12              MR. S. KULWIN:  Mike, Page 21, Line 12.

13              Page 21, Line 12.

14              (Whereupon, said tape was played in open court.)

15    BY MR. S. KULWIN:

16    Q.  Do you remember that?

17    A.  Well, the project.  But I was approached by the Sun-Times

18    because they owned the land.

19    Q.  Let me ask you, sir:  When you -- after you were done with

20    your deposition, you got a chance to read it if you wanted,

21    right?

22    A.  Yes.

23    Q.  And you could make changes or amendments to it, right?

24              MR. NOVACK:  Objection, your Honor.

25    BY THE WITNESS:
```

Trump - direct

438

1   A.  Perhaps.

2            MR. NOVACK:  That isn't a correct statement of the

3   law.

4   BY MR. S. KULWIN:

5   Q.  You could --

6            MR. S. KULWIN:  He could change it, he could

7   supplement it if it wasn't accurate.

8            THE COURT:  Sustained.

9            You have to rephrase that to fall within the law.

10  BY MR. S. KULWIN:

11  Q.  If there was something inaccurate, you could fix it?

12           MR. NOVACK:  Objection, again.  It's not describing

13  accurately.

14           THE COURT:  You may answer, sir, if you know.

15  BY THE WITNESS:

16  A.  The very earliest --

17  BY MR. S. KULWIN:

18  Q.  Mr. Trump, the question is:  If there was a mistake in

19  your deposition, that you saw it when you read it, you had the

20  opportunity to correct it?

21  A.  Well, I didn't read it.  I gave the deposition, but I

22  didn't read it.

23  Q.  I see.

24           You didn't want to read your sworn statement under

25  oath before you came here, right?

Trump - direct

439

1              You never read it?

2    A.  I looked it -- I didn't read it.  I have many, many things

3    to do.  I assumed that the reporter did a good job, but I

4    didn't read it.

5              Perhaps my lawyer read it.  But I had no problem with

6    signing it.

7    Q.  Okay.

8              Let me ask you this question, Mr. Trump:  There

9    wasn't any confusion in your mind about what the question was.

10   You were the one that came up with the idea that it would be a

11   great idea to do this project.

12             You weren't confused by that question, were you,

13   Mr. Trump?

14   A.  No, I wasn't at all.

15   Q.  Okay.

16             And you said nothing -- zero -- about the Sun-Times,

17   in response to that question --

18   A.  Well, you --

19   Q.  -- is that right?

20   A.  -- you just asked a very basic question.  And I said in a

21   very, I think, a little bit nebulous way, because I didn't

22   know if you were referring to the prior -- to the concept of

23   the deal.  But the Sun-Times approached me about doing a

24   building on the site.

25             Once I got involved, it was my concept and my idea.

Trump - direct

1   But the Sun-Times was the one, because they owned the real

2   estate, about doing a building on the site.

3           But the idea, itself, of doing that building, was

4   mine.

5   BY MR. S. KULWIN:

6   Q.  Sir, you're the one who actually selected the site for

7   Trump Tower.  You, personally.  It wasn't the Sun-Times coming

8   to you.  You personally selected the site, didn't you?

9   A.  The --

10  Q.  Didn't you?  Did you select the site?

11  A.  I loved it.  I've always loved the site.  But the

12  Sun-Times --

13          MR. NOVACK:  Objection.

14          THE COURT:  Mr. Trump, there is an objection.

15          MR. NOVACK:  I was objecting with the argumentative

16  nature of the interruptions.

17          THE COURT:  Sustained.

18          Rephrase your question.

19  BY MR. S. KULWIN:

20  Q.  Did you select the site for this building?

21  A.  Again, many years ago, I believe that the Sun-Times called

22  me about the potential of doing a job on the site.

23          After that call was made, I became very enamored with

24  the site and with doing it.  And I made most of those, you

25  know, decisions.

Trump - direct
441

```
 1          But the Sun-Times -- the first I knew about it was
 2  when I heard it was available, and the Sun-Times called me.
 3          MR. S. KULWIN:  Page 21, Line 10.
 4          Page 21, Line 10.
 5          (Whereupon, said tape was played in open court.)
 6  BY THE WITNESS:
 7  A.    That's true.  They called me about the site.
 8  BY MR. S. KULWIN:
 9  Q.  Wait, wait.  There's no question pending.
10  A.  Well, I have agreed to that.
11  Q.  There's no question pending.
12  A.  Okay.
13  Q.  Okay?
14          You understood that question, right?
15  A.  Yeah.
16  Q.  You understood these words:  "You selected the site."
17          You understood that, right?
18  A.  Well, I did select the site.
19  Q.  No, no, that's not the question.
20  A.  They presented it to me and I selected the site.
21  Q.  That's not the question.  That's not the question.
22          The question was:  Did you understand, when I asked
23  you the question:  "You selected the site?"
24          Did you understand that question at your deposition?
25  A.  That depends on what point you're talking about.
```

Trump - direct

442

```
 1           MR. NOVACK:  Judge, in that --

 2    BY THE WITNESS:

 3    A.  I first -- I first -- heard about --

 4           THE COURT:  Mr. Trump --

 5           THE WITNESS:  Yes, ma'am?

 6           THE COURT:  -- there is an objection by your lawyer.

 7    If your lawyer objects --

 8           THE WITNESS:  Okay.

 9           THE COURT:  -- let me rule on it.

10           THE WITNESS:  Thank you.

11           MR. NOVACK:  I am going to ask --

12           THE COURT:  Go ahead.

13           MR. NOVACK:  I am going to ask for the opportunity to

14    read in another portion of his deposition --

15           MR. S. KULWIN:  No.

16           MR. NOVACK:  -- for completeness, because the context

17    of these questions makes it clear that he's being asked at the

18    deposition about, within the Trump organization, who is making

19    those decisions.

20           THE COURT:  Let me see.

21           MR. S. KULWIN:  That's completely false, Judge.

22           THE COURT:  He is pointing to Page 20, starting at

23    Line 15.

24           Let me read this.  One moment.

25           (Brief pause.)
```

Trump - direct

443

1          THE COURT:  Overruled.

2          You may redirect or cross on that, if you would like.

3          MR. NOVACK:  Thank you.

4    BY MR. S. KULWIN:

5    Q.  Mr. Trump, my question is:  Did you understand, when I

6    asked you the question:  "You selected the site?"  Did you

7    understand that question at your deposition?

8    A.  Well, if you are not accepting my answer, then perhaps I

9    didn't understand.

10          The first time I knew about it was when the Sun-Times

11   said something to us about the availability of the site.

12          After that, I did, in fact, select the site.  I liked

13   the site.  I had other opportunities, but I selected that

14   site.

15   Q.  You selected the architect?

16   A.  That's true.

17   Q.  You hired the brokerage firm?

18   A.  I think so, yes.

19   Q.  In fact, you personally interviewed the lead broker, Tere

20   Proctor, before you hired the brokerage firm?

21   A.  That's true.

22   Q.  You personally discussed with her what some of the key

23   selling points for the building would be?

24   A.  Probably.

25   Q.  And it was those key selling points and your discussion

Trump - direct

444

1  with Ms. Proctor which were distilled into ideas that were

2  placed into the marketing brochures distributed to potential

3  buyers, correct?

4  A.  That, I don't know, but it's possible certainly.

5  Q.  Are you saying it's possible or you don't know or --

6  A.  I don't know, but it's possible, maybe even probable.

7  Q.  Let me see if I can --

8  A.  As ideas.

9  Q.  Let me see if I can help you.  Let me just see if I can

10  refresh your recollection.

11          MR. S. KULWIN:  Approach, Judge?

12          THE COURT:  You may approach.

13  BY MR. S. KULWIN:

14  Q.  Let's see if this refreshes your recollection --

15  A.  Okay.

16  Q.  -- Mr. Trump.

17          THE COURT:  For the record, what page?

18          MR. S. KULWIN:  Page 18, Line 17, through the end

19  where there's some objections, it's reread; and, then, the

20  answer ends up at Line 13.

21          THE COURT:  Read it to yourself, please, Mr. Trump.

22          THE WITNESS:  Yes.

23          All of it?

24          MR. S. KULWIN:  Yes, please.

25          THE COURT:  What he just pointed out.

Trump - direct

445

```
 1            THE WITNESS:  Or just the one line?

 2            MR. S. KULWIN:  You want me to point it out to you,

 3    again, Mr. Trump?

 4            THE WITNESS:  Which one is it?  Starts at Line 24?

 5    BY MR. KULWIN:

 6    Q.  It starts here (indicating) --

 7    A.  Okay.

 8    Q.  -- with "right," and then goes all the way down here and

 9    it ends up right there (indicating).  Tell me if that

10    refreshes your recollection.

11            (Brief pause.)

12    BY THE WITNESS:

13    A.  Yes, it's a correct answer.

14    BY MR. S. KULWIN:

15    Q.  All right.

16            And, of course, it was your decision to place your

17    photo in all the marketing materials, right?

18    A.  Probably not.  It was probably an advertising agency to do

19    it.

20    Q.  Really?

21    A.  But I would have no objection with it.

22    Q.  It was --

23    A.  It could have been -- it wasn't my decision.  People do

24    it.  People that work for me do it.  And I don't think I said

25    "Yes" or "No."  I think they just do it.
```

Trump - direct

446

1   Q.  Mr. Trump, isn't it true that you want your likeness in

2   all of the advertisements here?

3   A.  That I, what?

4   Q.  That you want your picture and likeness in all the

5   advertisements.

6   A.  No, that's not true at all.

7   Q.  Isn't it true that you literally have to see every

8   photograph that's going to be used of you for final approval

9   in every marketing brochure?

10  A.  I would say no, that's not.  We have standard photos, but

11  I don't look at specifics, no.  That is not true.

12  Q.  Okay.

13          Now, at one point there was some controversy about

14  the spire that was going to be at the top of the building?

15  A.  Yes.

16  Q.  You were the one who ultimately decided whether to keep

17  the original spire or not, correct?

18  A.  Well, actually it was Mayor Daley.  He really wanted to

19  see it built.  Mayor Daley wanted it.

20          MR. S. KULWIN:  Give me PX-75, Page 4392.

21          THE COURT:  Is this still Plaintiff's Exhibit 75?

22          MR. S. KULWIN:  Yes.

23          THE COURT:  -- Mr. Kulwin?

24  BY MR. S. KULWIN:

25  Q.  Do you see that up there, Mr. Trump?

Trump - direct

1   A.  Yes, I do.

2   Q.  PX-76?

3   A.  Yes.

4   Q.  This is part of your brochure, right?

5   A.  Okay.

6   Q.  You don't say untrue things in your brochure; you say --

7   A.  No, I don't.

8   Q.  I'm sorry.  You've got to let me finish.

9           You don't say untrue things in your brochure; you say

10  true things, correct?

11  A.  Yes, that's true.  I certainly try.

12  Q.  Okay.

13          "After weeks -- " I'm reading from the top:  "After

14  weeks of speculation concerning a taller spire for the top of

15  the Trump International, the decision was made to keep the

16  original height of 1361 feet.  Mr. Trump ultimately decided

17  that he preferred the original design, stating, 'We have

18  created one of the most magnificent buildings anywhere in the

19  world, and I do not want to do anything to tamper with it or

20  its tremendous success.  The building height will be 92

21  stories with a very beautiful spire."

22          Those were your words, right?

23  A.  Yes.

24          MR. NOVACK:  Your Honor, I'm going to make the

25  objection that this is just plain and simple irrelevant to

Trump - direct

1   this case.

2          THE COURT:  The answer can stand.

3          Overruled.

4          MR. S. KULWIN:  Thank you.

5   BY MR. S. KULWIN:

6   Q.  And, of course, you were the one who arranged the $640

7   million loan?

8   A.  That's probably true.  I mean, again, I have terrific --

9   Q.  The point --

10  A.  -- people, but yes.

11         THE COURT:  Let him finish.

12         MR. S. KULWIN:  I'm sorry.

13  BY THE WITNESS:

14  A.  I have people that do that.  I didn't arrange it.  I have

15  people.  In fact, there was a broker involved that did the

16  actual loan.

17         But it was my reputation that was able to get that

18  loan when other people in Chicago were unable to get their

19  financing.  And you see that all over the city with vacant

20  sites.

21  Q.  Yeah.  Yes.

22         The point, though, is, sir, you're personally and

23  directly involved in everything that your name represents,

24  aren't you?

25  A.  Well, I'm involved; but, I have other people that are very

Trump - direct

449

```
 1   good, and they work with me.

 2   Q.  You're not personally and directly involved?

 3           MR. NOVACK:  Objection.  He did not say that.  It's a

 4   misstatement of what he just said.

 5           THE COURT:  Sustained.

 6   BY MR. S. KULWIN:

 7   Q.  Mr. Trump, can I have my deposition back?  Actually, it's

 8   your deposition.

 9   A.  Okay.

10   Q.  My copy.

11           (Document tendered.)

12   BY MR. S. KULWIN:

13   Q.  I want to be clear because there was an objection.  I just

14   want to be sure, okay?  You are personally and directly

15   involved in everything your name represents; is that true?

16           MR. NOVACK:  That's the exact question he just asked.

17   He got an answer.

18           MR. S. KULWIN:  He didn't answer it, Judge.

19           MR. NOVACK:  And he shouldn't be allowed to now ask

20   it, again.

21           THE COURT:  Sustained.

22           That is the question that he answered.

23           MR. S. KULWIN:  Okay.

24   BY MR. S. KULWIN:

25   Q.  Do you remember this question and answer, then, at your
```

1    deposition?

2            MR. S. KULWIN:  Page 20.

3            MR. NOVACK:  Judge, there's nothing to go to a

4    deposition over.

5            MR. S. KULWIN:  He didn't --

6            THE COURT:  Let me see the deposition transcript.

7            You know what?  Let us end for the day, ladies and

8    gentlemen.  It is about five to 5:00.

9            We will pick up tomorrow morning.  Just a few

10   reminders before you go.  First of all, tomorrow morning we

11   will pick up at 9:15.  Remember tonight, please do not do any

12   kind of independent research on the case.  I anticipate there

13   will be some media coverage about the case.  Please do not

14   read any, watch any, listen to any.

15           Have a great evening.  I will see you tomorrow

16   morning at 9:15.

17           (Jury out.)

18           THE COURT:  You may step down, sir.

19           THE WITNESS:  Thank you.

20           THE COURT:  Please be back here tomorrow morning a

21   little bit after 9:00.

22           THE WITNESS:  Okay.  Thank you.

23           MR. S. KULWIN:  Are we done?

24           THE COURT:  We are done with the jury.

25           I know there was at least one issue for me.

```
 1              What possibly is the relevance of the time limit on

 2    Mr. Trump's deposition, that I imposed?

 3              MR. S. KULWIN:  I know.  Here's why.

 4              If you remember, Judge, in the opening statement,

 5    Mr. Novack tried to explain why Mr. Trump's answers that we

 6    just saw in the video during my opening statement were not

 7    really accurate because he said, "You know, it's only an

 8    hour-and-a-half deposition."

 9              MR. NOVACK:  No, I didn't say that at all.

10              MR. S. KULWIN:  That's exactly what he said, and I've

11    got the -- may I finish, please?

12              THE COURT:  Wait, wait.

13              I know it is the end of the day.

14              MR. S. KULWIN:  Yes.

15              THE COURT:  And I know we have been here since 9:00

16    o'clock this morning.

17              MR. S. KULWIN:  I know.  8:00.

18              THE COURT:  Me, before that.

19              MR. NOVACK:  That was my bad.

20              THE COURT:  So, let us take a deep breath.  We are

21    not going to start this.  I will give you whatever time you

22    need to address issues.  So, you do not need to talk over each

23    other.

24              MR. S. KULWIN:  You're right.

25              THE COURT:  I do remember the opening.
```

452

1          I am sustaining the objection.

2          I imposed the order.  I imposed the time limit.  It

3    is not relevant.

4          You can question him about his deposition.  You can

5    ask him if he had enough time to answer questions.  But the

6    fact that I imposed a time limit -- you have brought out that

7    there was an hour-and-a-half, but why is completely

8    irrelevant.

9          MR. S. KULWIN:  But here is -- I know I'm not going

10   to win this argument, but let me --

11         THE COURT:  You just lost.  So, if you want to say

12   something for the record, go ahead.

13         MR. S. KULWIN:  Let me just say it for the record.

14         THE COURT:  I have ruled.  It is completely

15   irrelevant that I imposed it.  You asked why there was a

16   limit.  It is irrelevant.

17         MR. S. KULWIN:  It's relevant, Judge, because

18   Mr. Novack brought it up in his opening statement as though I

19   -- I -- imposed the limit, as though I didn't give him a

20   chance to answer the questions and that's why he came up with

21   these crazy answers that the jury saw during the opening

22   statement.

23         THE COURT:  I certainly did not get that impression

24   from opening.

25         If you want to ask Mr. Trump if he had enough time to

1    answer the questions during his deposition, I think that will

2    address the --

3              MR. NOVACK:  He already asked that question, and he

4    got an answer.

5              MR. S. KULWIN:  I don't recall that.

6              MR. NOVACK:  Judge, what I said was --

7              THE COURT:  I have ruled.  I am sustaining.

8              MR. NOVACK:  If I've won, I'm stopping.

9              THE COURT:  You won.  Stop --

10             MR. NOVACK:  I won.

11             THE COURT:  -- while you are ahead.

12             MR. NOVACK:  Judge, I want to raise something,

13   please -- two things.

14             THE COURT:  Yes.

15             MR. NOVACK:  One is we still need to know --

16             THE COURT:  One second.

17             Were you done, Mr. Kulwin?

18             MR. S. KULWIN:  I lost.  I'm done.

19             THE COURT:  Okay.  Go ahead.

20             That has never stopped you before.

21             (Laughter.)

22             MR. S. KULWIN:  You can't blame me for trying.

23             THE COURT:  Go ahead.

24             MR. NOVACK:  During Mr. Reiss' testimony, Mr. Kulwin

25   asked him a question about what I'll just call prior conduct

1   that you limined out.  He asked him about didn't he do

2   something that was different than what he promised; wasn't

3   there proceedings about that.  And I want to make sure that

4   the ground rules are that he's not going to do that, again.

5          MR. S. KULWIN:  I'm not.

6          MR. NOVACK:  He was going into what we called these

7   prior bad acts.  And you've ruled on that.

8          THE COURT:  I certainly have ruled on it, and I made

9   clear both sides should be apprised and fully up to speed on

10  my rulings.  But I did not get the sense that Mr. Kulwin was

11  trying to walk over the line with that.

12         MR. S. KULWIN:  Thank you, your Honor.

13         THE COURT:  But you should be fully apprised of my

14  rulings.

15         MR. S. KULWIN:  I am, Judge.

16         MR. NOVACK:  Then the final thing, Judge, is you

17  indicated, I think, this morning that we should get the rest

18  of the order of these witnesses.

19         THE COURT:  Yes.  Thank you for reminding me.

20         My guess is, especially if we continue at this rate

21  -- and, Mr. Novack, you might want to talk to your client

22  about listening to questions and answering precisely the

23  question that is posed, especially if he is trying to get out

24  of here tomorrow.  That might expedite things.  But my guess

25  is Mr. Trump is going to be on the stand at least all morning.

```
 1              MR. S. KULWIN:  Absolutely, Judge.
 2              THE COURT:  Possibly beyond.  But certainly at least
 3    all morning.
 4              Who is up after Mr. Trump?
 5              Mr. Shearer?
 6              MR. S. KULWIN:  Mr. Shearer.
 7              THE COURT:  And, then, who?
 8              MR. S. KULWIN:  We're going to read Mr. Weiss, the
 9    parts that we were going to read.
10              THE COURT:  That will not take too long.
11              MR. S. KULWIN:  No.
12              And, then, Mr. Petrus.
13              THE COURT:  And, then, Mr. Petrus.
14              MR. S. KULWIN:  Wait.  I'm getting a correction,
15    Judge.
16              THE COURT:  Cremer will not be on until Thursday.
17              MR. S. KULWIN:  Thursday.
18              Tomorrow.
19              So, Mr. Petrus will be the next witness.
20              MR. S. KULWIN:  And, then, Mr. Cremer.
21              THE COURT:  Okay.
22              Ms. Cremer, right?
23              MR. S. KULWIN:  Right.  Ms. Cremer.  Right.
24              THE COURT:  So, tomorrow I think Mr. Trump,
25    Mr. Shearer, Mr. Weiss' deposition excerpts and Mr. Petrus.
```

456

1    That should be more than we need for tomorrow.

2            So, Mr. Petrus is flying in.  He certainly does not

3    have to be available until after lunchtime.

4            MR. NOVACK:  After lunch?

5            THE COURT:  Yes.

6            MR. NOVACK:  And can we know who is coming after

7    Ms. Cremer --

8            THE COURT:  Send --

9            MR. NOVACK:  -- so we can plan?

10           THE COURT:  Who is up on Thursday after Ms. Cremer?

11   So, if they have witnesses flying in, we can make sure they

12   are here.

13           MR. S. KULWIN:  I think we might have run out of

14   witnesses flying in, Judge.  I have to ask my expert.

15           (Brief pause.)

16           MR. S. KULWIN:  It's either going to be Ms.

17   Manolo -- there isn't going to be anybody else flying in from

18   New York.  There is nobody else left in New York.  We've

19   emptied out New York.

20           THE COURT:  Send Mr. Novack an e-mail tonight with

21   who else is in order after Ms. Cremer for Thursday.

22           MR. S. KULWIN:  No problem, Judge.

23           THE COURT:  Also, for Friday, if you recall, we have

24   one juror who had the issue that at 9:15 he had a ten-minute

25   meeting about switching his hours with his current job, and he

1   was very anxious and he wanted to be there.  I am going to ask

2   Katie tomorrow to check with him and just confirm that that

3   meeting is still on and find out how long he thinks it will

4   take to get here.  If that means we start on Friday morning at

5   10:00, I am willing to do that to accommodate him.

6           MR. S. KULWIN:  Okay, Judge.

7           THE COURT:  We are also looking into our other juror

8   who had the juvenile court issue on Monday.  Katie has some

9   general information from her, but I will let you know when I

10  find out more.

11          MR. S. KULWIN:  And, Judge, tomorrow at the end of

12  the day, can Mr. Novack give us his list?

13          THE COURT:  Yes.  I told you we would talk about

14  that.  We will see where we are and how much longer you think

15  the trial will last.

16          MR. S. KULWIN:  I think the trial is -- despite

17  everything, Judge, I still think we're going to end a week

18  from tomorrow.

19          THE COURT:  Okay.

20          MR. S. KULWIN:  I'm the eternal optimist.

21          THE COURT:  I like that.  We will see.

22          MR. S. KULWIN:  Thank you.

23          THE COURT:  Is there anything else for the Court this

24  evening?

25          MR. S. KULWIN:  No, your Honor.

458

```
 1          THE COURT:  Please be here at 9:00 o'clock tomorrow
 2  morning in case there is anything you need me to address.
 3          I hope that you are not going to continue this filing
 4  motions every night.  If you do file something tonight, if you
 5  would please make sure you e-mail it to Katie so she can get
 6  it to me.  If you file it after midnight, it does not show up
 7  on my morning report.
 8          MR. S. KULWIN:  I have to get my money's worth,
 9  Judge.
10          THE COURT:  If you are going to do it, I just need to
11  make sure, if you want me to rule on it, that I have it.  So,
12  e-mail it to Katie so she can get it to me.
13          MR. S. KULWIN:  We have nothing that we're planning.
14          MR. NOVACK:  We have no plans, and we didn't last
15  night either, Judge.
16          MR. S. KULWIN:  We did.
17          THE COURT:  Have a good evening, and I will --
18          MR. J. KULWIN:  One quick thing.
19          THE COURT:  Mr. Kulwin.
20          MR. J. KULWIN:  I know you do your status hearings in
21  the morning at 8:30.  Just to make sure we can set up on time,
22  do you mind if we set up our boxes during your status?
23          THE COURT:  You can come a little earlier and do it.
24  I am not sure how lengthy my statuses -- you should have time,
25  but if I were you, I would get here about 8:15 and do it.
```

459

1         MR. J. KULWIN:  Certainly.  Thank you.

2         THE COURT:  I will see you tomorrow morning at 9:00.

3         (Whereupon, an adjournment was taken at 5:00 o'clock

4     p.m., until 9:00 o'clock a.m., the following day, May 15,

5     2013.)

6                 *       *       *       *       *

7

8  We certify that the foregoing is a correct transcript from the
   record of proceedings in the above-entitled matter.
9

10
   /s/ Joseph Rickhoff                    May 14, 2013
11 Official Court Reporter

12 /s/ Mary Hacker                        May 14, 2013
   Official Court Reporter
13

14

15

16

17

18

19

20

21

22

23

24

25