1          IN THE UNITED STATES DISTRICT COURT
              NORTHERN DISTRICT OF ILLINOIS
2                    EASTERN DIVISION

3   JACQUELINE GOLDBERG,          ) Docket No. 09 C 6455
                                  )
4                    Plaintiff,   )
                                  )
5            vs.                  )
                                  )
6   401 NORTH WABASH VENTURE, LLC, )
    a Delaware Limited Liability  )
7   Company, et al.,              ) Chicago, Illinois
                                  ) May 15, 2013
8                  Defendants.)     9:00 o'clock a.m.

9                     VOLUME THREE
            TRANSCRIPT OF TRIAL PROCEEDINGS
10     BEFORE THE HONORABLE AMY J. ST. EVE, AND A JURY

11  APPEARANCES:

12  For the Plaintiff:        KULWIN, MASCIOPINTO & KULWIN, LLP
                              BY:  MR. SHELLY B. KULWIN
13                                 MR. JEFFREY R. KULWIN
                              161 North Clark Street, Suite 2500
14                            Chicago, Illinois  60601

15  For the Defendants:       NOVACK AND MACEY, LLP
                              BY:  MR. STEPHEN NOVACK
16                                 MR. JOHN F. SHONKWILER
                              100 N. Riverside Plaza, Suite 1500
17                            Chicago, Illinois  60606

18  Also Present:             MS. ALEXIS ROBINSON

19  Court Reporter:           MR. JOSEPH RICKHOFF
                              Official Court Reporter
20                            219 S. Dearborn St., Suite 1232
                              Chicago, Illinois  60604
21                            (312) 435-5562

22            * * * * * * * * * * * * * * * * * *

23                  PROCEEDINGS RECORDED BY
                  MECHANICAL STENOGRAPHY
24            TRANSCRIPT PRODUCED BY COMPUTER

25

461

1          THE CLERK:  09 C 6455, Goldberg vs. 401 North Wabash

2    Venture.

3          MR. S. KULWIN:  Good morning, your Honor, Shelly and

4    Jeff Kulwin on behalf of the plaintiff.

5          THE COURT:  Good morning.

6          MR. NOVACK:  Good morning, Judge, Steve Novack and

7    John Shonkwiler for the defendants.

8          MR. SHONKWILER:  Good morning, your Honor.

9          THE COURT:  Good morning.

10          We are continuing with trial this morning.

11          Are there any issues for the Court?

12          MR. S. KULWIN:  There is going to be, Judge.

13          I am going to be going into with Mr. Trump the issue

14    of profitability.  In particular, I want to -- you will recall

15    that his defense is -- part of his defense is -- that he

16    learned for the first time in August of '06, or sometime in

17    the summer of '06 -- or not sometime, I don't think he knows,

18    but '06 apparently -- that much to his surprise, the budgets

19    for the ballrooms, meeting rooms and things like that were

20    extremely volatile and he had to take them away to protect the

21    HCU owners.

22          I am going to show him an agenda that has him in a

23    meeting in August of 2006, in which he's presented with

24    projections that Mr. Petrus put together from the hotel

25    sourcing industry, that shows that the competition -- the

1    Peninsula, the Drake, places of those -- were actually

2    making -- made in 2005 three-and-a-half million dollars on the

3    F&B operations.

4         THE COURT:  This shows -- this agenda you are going

5    to show -- shows that other hotels made that amount?

6         MR. S. KULWIN:  It shows that Mr. Petrus, to

7    ascertain what they could expect at Trump, hired a company --

8    just like Mr. Reiss testified about, Smith Associates, this is

9    comparable to that, this is what they specialize in -- they

10   did a benchmark of all the hotels in Chicago and came up with

11   those numbers.  And he communicated that to Mr. Trump at the

12   time.  That's the inference.

13        The research is dated right before the meeting, the

14   meeting takes place on August 4th of 2006, Mr. Trump is an

15   attendee and it goes to show what he knew at the time that he

16   claims he's actually being told, "This is really volatile; it

17   can go up and down; you can lose a lot of money," et cetera.

18        That's what -- and I'm also going to show him an

19   internal projection that Mr. -- one of the internal

20   projections, but this is the only one that I can

21   necessarily -- that I want to go into with him, because the

22   others are too detailed and I want to do that with Mr. Petrus;

23   we will talk about that when Mr. Petrus comes up -- that shows

24   a rough estimate is three-and-a-half million dollars -- I

25   mean, two -- three-and-a-half million dollars for Trump,

1    because they do a better job.

2              Further --

3              THE COURT:  Was that at the same time?

4              MR. S. KULWIN:  The same time.

5              THE COURT:  The summer of 2006?

6              MR. S. KULWIN:  Correct.

7              THE COURT:  Okay.

8              MR. S. KULWIN:  And it also shows, Judge, that

9    Mr. Trump, I anticipate, is going to testify that while food

10   and beverage is an important thing, it's a small percentage of

11   the overall hotel revenues.

12             What these projections show is that, in the benchmark

13   hotels, such revenues make up to 35 percent of the gross; and,

14   at the Trump, the projection was 28 percent.

15             It's directly -- directly -- relevant to rebut his

16   defense, to show his intent.

17             And there's no hearsay involved because it's not --

18   you know, it goes to his state of mind.

19             And it's a business record of theirs, by the way,

20   Bates stamped by them.

21             THE COURT:  Mr. Novack?

22             MR. NOVACK:  Thank you, your Honor.

23             I have really three things that I think are relevant

24   to this and put the invalidity to it.

25             Number one, you're not going to hear him -- as far as

464

```
 1    I know, you're not going to hear him -- say that the first
 2    time he heard about volatility was sometime in '06 or '07.  He
 3    is going to say the first time he heard about some things was
 4    that time, but not -- you are not going to hear him say he
 5    didn't know there could be volatility or ups and downs in
 6    profitability.
 7            Second, Mr. Trump was not at the August 6th meeting.
 8    That is --
 9            MR. SHONKWILER:  August 4th.
10            MR. NOVACK:  The August 4th meeting.
11            You are going to hear testimony that that's Donald
12    Trump, Jr., not Donald Trump, Sr.  So, that's out of it.
13            And, then -- and the reason we have objected to this
14    and objected to the summary exhibits is because this brings
15    into the case this specter of lost profits, which the Court
16    has ruled is not in the case.  They're not going to be able to
17    ask the jury for damages for lost profits.  And this will be a
18    source of confusion to the jury when they're making their
19    decision.
20            They're going to say, "Well, it's lost profits."
21            THE COURT:  What about Mr. Kulwin's argument that
22    part of your defense is going to be, because of the volatility
23    at this point, that is one factor that went into the decision-
24    making of taking these common elements away from the HCU
25    buyers?
```

```
 1              MR. NOVACK:  It did.  But Mr. Trump -- and Mr. Petrus

 2    made that decision.  You'll hear that.

 3              Mr. Trump doesn't claim that -- assuming that that is

 4    a part of the decision-making -- that he didn't know it back

 5    earlier.  So, there's no reason to put lost profits -- I'm

 6    sorry, profitability numbers -- at an August 6th date.

 7              THE COURT:  I am going to have to hear his testimony.

 8              If he was not at that meeting, you are going to have

 9    to establish that he saw these numbers, if it was Donald

10    Trump, Jr., at the meeting.  I do not -- unless he saw this

11    agenda or is familiar with this agenda, I do not --

12              MR. S. KULWIN:  I think whether it was -- I'm sorry.

13    I apologize.

14              THE COURT:  That is not something you are going to

15    have a foundation to use with this witness.

16              And as for the volatility, I am just going to have to

17    hear his testimony when he -- if he thought that was a factor

18    in decision making, when he -- thought that.  And I will have

19    to make these decisions based on the testimony.

20              MR. S. KULWIN:  If I may, first of all, the issue of

21    whether it's Donald Trump, Sr., or Donald Trump, Jr.,

22    is going -- the jury is going to have to decide.  He may very

23    well deny that it's him.

24              THE COURT:  Well, you have to have a good faith

25    basis --
```

466

```
 1            MR. S. KULWIN:  I do have a good faith basis.  The
 2   good -- I apologize.
 3            THE COURT:  It is first thing in the morning.  Let us
 4   not start out this way.
 5            MS. S. KULWIN:  I know.
 6            THE COURT:  What is your good faith basis for
 7   believing he was there?  Has somebody else put him there?
 8            MR. S. KULWIN:  I will say this:  First of all,
 9   Donald Trump, Jr., wasn't identified as a person with any
10   relevant knowledge.
11            If it was Donald Trump, Jr., why didn't they identify
12   him as a person with relevant knowledge?
13            THE COURT:  What is your good faith basis for
14   believing that Donald Trump, Sr., was the one there?
15            MR. S. KULWIN:  It says, "D. Trump."  It doesn't say,
16   "D. Trump, Jr.," which is how it usually says, number one.
17            Number two, all the testimony is -- Mr. Petrus says,
18   "Oh, I -- you know, I -- told Mr. Trump about this."
19            Mr. Weiss said -- you heard it.
20            THE COURT:  Well, that is separate than believing he
21   was there.
22            I am going to have to hear his testimony and make a
23   decision then.
24            MR. S. KULWIN:  And one last point, Judge?
25            THE COURT:  Yes.
```

1          MR. S. KULWIN:  As you've noted, corporate knowledge

2     for one is corporate knowledge to everyone.  And, so, even if

3     he didn't personally get the news, the corporation knew.

4     Okay?  And it's the corporation that is saying it was

5     volatility and things that have nature.

6          THE COURT:  And that might be argument and that might

7     be a reason to use this with another witness.  Maybe Mr.

8     Petrus.  But that does not mean you can use it with Mr. Trump.

9          MR. S. KULWIN:  Okay.

10          Then, I am also going to go into something else with

11     Mr. Trump, which is the -- something he absolutely knows

12     about, which is the -- budgets from the two property reports.

13          He clearly knows --

14          THE COURT:  What is the relevance of those?  I know

15     you had a whole other lawsuit that you represented the

16     plaintiff, dealing with the budgets that was before a

17     different judge and the change in the budgets.

18          What is the relevance of those budgets to this

19     lawsuit?

20          MR. S. KULWIN:  Well, I have to say that I am not

21     doing a very good job.

22          Here's the relevance, Judge.  The relevance is this:

23     Part of what the buyers are getting -- what Ms. Goldberg is

24     going to testify to, what I brought out with Mr. Reiss, what I

25     talked about in opening statement -- is that they're getting

468

1    the $5 million.  Okay?

2         Now, what the defense is going to say is, "So, what?

3    It's all eaten up by the expenses for the food and beverage

4    operations.  Therefore, 5 million means nothing because it

5    really is a zero."  Okay?

6         What we can show is that, if you look at the 2005

7    budget and you take the gross revenue -- okay -- and then you

8    look at the 2007 budget and take the gross revenue, and then

9    you look at how the expenses change between the two, you can

10   see the exact effect of taking out the food and beverage

11   operations on the gross revenue and the exact effect of taking

12   out the expenses -- the food and beverage expenses -- on the

13   gross revenue, which leaves you with the profit that they were

14   anticipating.

15        And while Mr. Novack is going to jump up and down and

16   say, "Oh, he doesn't have it right; that's not how you do it;

17   it's more complicated than that," that's non-germane.  I don't

18   have to call a hotel accountant.  It's not misleading.  It's

19   what --

20             THE COURT:  I do not need to hear that part.

21             MR. S. KULWIN:  Okay.

22             THE COURT:  My question was:  What is the relevance

23   of this to your case?

24             MR. S. KULWIN:  The relevance is it shows that -- it

25   shows, number one, that -- it's a material thing.  They are

1    getting something material when they give him the 5 million.

2    It's just another thing that's material, which they are going

3    to say it's not.  They are going to say it's zero.

4          We are going to say, "No way.  It's a million-three,

5    just based on a comparison of those two things."

6          And Trump clearly has to know about it because he

7    knew it was in both budgets.

8          THE COURT:  Mr. Novack?

9          MR. NOVACK:  Judge, one quick thing on the prior

10   thing that I was going to try to get in before we switched

11   gears.  Even if volatility is an issue, the fact that there

12   were projections at one point that showed profitability, that

13   doesn't mean that the volatility still doesn't exist.

14         It's because of volatility you have to estimate at a

15   particular time; but, then, at another time, it could be the

16   volatility.

17         On the --

18         THE COURT:  That sounds like argument, but --

19         MR. NOVACK:  Okay.

20         THE COURT:  -- go ahead, rather than --

21         MR. NOVACK:  Quickly.  But I may not get a chance to

22   say it when the jury's here.

23         On the second issue --

24         THE COURT:  The budgets.

25         MR. NOVACK:  The budgets.

1          -- the big mistake here is that they say, ipso facto,

2   that if the ballrooms were taken out and after that the

3   expenses went from a hundred to fifty -- just funny numbers --

4   that means fifty must have come out because the ballrooms and

5   meeting rooms came out.

6          The testimony is going to show that there were other

7   expenses that were changed, the estimates changed on a whole

8   slug of expenses unrelated to those rooms.  You can't just

9   make that subtraction.

10          In fact, to allow them to make that subtraction is

11   going to mislead the jury.

12          THE COURT:  Okay.

13          I have to hear his testimony.

14          MR. NOVACK:  Okay.

15          THE COURT:  And I will make that decision.

16          I have one brief other matter and, then, we will get

17   started.

18          Is Mr. Trump here?

19          MR. NOVACK:  He is.

20          THE COURT:  Okay.  Let me handle the marshal matter

21   and, then, you can bring him in.

22          MR. S. KULWIN:  Do I have time to step down the hall,

23   Judge?

24          THE COURT:  I would go now.

25          MR. S. KULWIN:  Yes.

471

1           (Whereupon, the Court gave its attention other

2      matters, after which the following further proceedings were

3      had in open court, to wit:)

4           MR. NOVACK:  Judge, I had one agenda item we didn't

5      get to before the criminal case.

6           THE COURT:  Okay.  Let us do it briefly.  It is 9:15,

7      but Mr. Kulwin is not here.

8           MR. NOVACK:  Let's start it now.

9           (Laughter.)

10          THE COURT:  Is it something that needs to be

11     addressed before the jury?

12          MR. NOVACK:  Yes, because I don't want to say this.

13          THE COURT:  Today, before this morning?

14          MR. NOVACK:  Yes.  It has to do with Mr. Trump.

15          (Brief pause.)

16          MR. J. KULWIN:  He is coming down the hall right now,

17     your Honor.

18          THE COURT:  Okay.

19          (Brief pause.)

20          THE COURT:  Yes, what is your issue?

21          MR. NOVACK:  Your Honor, very quickly, I had to make,

22     I don't know how many, asked-and-answered objections

23     yesterday.  And I don't want that jury to think I'm trying to

24     hide testimony from Mr. Trump.  I would ask you to direct

25     Mr. --

1          (Brief interruption.)

2          MR. NOVACK:  -- Kulwin, because I think he is trying

3     to --

4          THE COURT:  Whoever is ringing -- everybody, please

5     make sure your phones are off because the Court Security

6     Officer will remove you from the courtroom if it rings during

7     the course of trial.

8          I am sorry.

9          MR. NOVACK:  By my lengths, it looks like Mr. Kulwin

10    wants to keep this going with Mr. Trump the on the stand.  And

11    I ask you to direct him to use his best efforts not to repeat

12    questions, so that I don't have to keep doing that, which I

13    will, of course.

14         THE COURT:  I am hoping that today this morning when

15    testimony goes there will be maybe a little less bantering and

16    questions posed and answers given.

17         So, if I need to, I will interject and certainly rule

18    on objections.

19         I know you did not feel -- your response is going to

20    be you did not think you were getting the answers.  So, let us

21    try to move this along.

22         I would suggest you do that for the jury's sake, if

23    nothing else.

24         MR. NOVACK:  Thank you, Judge.

25         MR. S. KULWIN:  I would just like to respond briefly,

1  Judge.

2          THE COURT:  No.  I know what you are going to say.  I

3  want to get the jury here.

4          Mr. Trump, would you come forward, please, sir.

5          MR. S. KULWIN:  Could you --

6          THE COURT:  Would you go get the jury?

7          MR. S. KULWIN:  -- please instruct Mr. Trump to

8  answer the questions, not give speeches, not interrupt me, and

9  I won't have to keep asking the same questions, which is all

10  he does, which is all he did yesterday.

11          THE COURT:  Well, the record from yesterday will

12  speak for itself, but I am hoping that we can move things

13  along this morning.

14          MR. S. KULWIN:  And I will assure the Court, I am not

15  enamored with being with Mr. Trump.

16          (Jury in.)

17          THE COURT:  You may be seated.

18          Good morning, ladies and gentlemen.

19          We are continuing this morning with Mr. Trump's

20  testimony.

21          When we broke yesterday, we were in the middle of his

22  direct examination.

23          Mr. Trump, sir, you are still under oath.

24          Mr. Kulwin, you may proceed.

25          MR. S. KULWIN:  Thank you, your Honor.

Trump - direct

1      DONALD TRUMP, PLAINTIFF'S WITNESS, PREVIOUSLY SWORN

2              DIRECT EXAMINATION - Resumed

3  BY MR. S. KULWIN:

4  Q.  Mr. Trump, originally the Trump Tower was supposed to

5  include 350,000 square feet of office space, correct?

6  A.  Well, it's not called "Trump Tower."  It's --

7  Q.  It's called "International Hotel and Tower"?

8  A.  Yes.

9  Q.  Okay.

10         And just for purposes of shorthand, to save time, can

11  we call it Trump --

12  A.  That's okay.  Sure.

13  Q.  I'm sorry?

14         Mr. Trump, could you wait until I finish the

15  question?  Thank you.

16         For purposes of these proceedings, can we just call

17  it "Trump Tower Chicago"?

18  A.  Yes.

19  Q.  Thanks.

20         Okay.  So, is the answer, yes, 3450,000 square feet?

21  A.  I believe that was the number, yes.

22  Q.  Okay.

23         And that made up, what, approximately 14 percent of

24  the building?

25  A.  Probably.

Trump - direct

```
 1   Q.  And your plan was to get an anchor tenant for that space,

 2   correct?

 3   A.  Well, not necessarily an anchor, a number of tenants or

 4   just see how it was.

 5          But the office market in Chicago was very bad.  So,

 6   we decided to go away from that plan and substitute it with

 7   hotel units.

 8   Q.  Sir, the question was:  The plan was to get an anchor

 9   tenant?  Is that a "Yes" or a "No"?

10   A.  I don't know about an anchor tenant.  A number of tenants

11   or an anchor tenant, yes.

12   Q.  Okay.

13          And an anchor tenant is someone who takes up the

14   majority of the space, like a law firm, corporate

15   headquarters, things of that nature --

16   A.  That's correct.

17   Q.  -- correct?

18          Mr. Trump, you have to let me finish the question.

19   A.  I thought you were finished.

20   Q.  I wasn't.

21   A.  Oh, sorry.

22   Q.  I mean, it's an apology.

23          THE COURT:  Just ask your next question.

24   BY THE WITNESS:

25   A.  I thought you were finished.
```

Trump - direct

476

1    BY MR. S. KULWIN:

2    Q.  We are in Chicago.  It goes a little slower.

3          MR. NOVACK:  Your Honor --

4          THE COURT:  Sustained.

5          Mr. Kulwin?

6          MR. S. KULWIN:  Yes, sir -- yes, ma'am.  Okay.

7    BY MR. S. KULWIN:

8    Q.  Now --

9          THE COURT:  Wait, wait.  I am not done.

10         (Laughter.)

11         MR. S. KULWIN:  Okay.

12         THE COURT:  We are not going to do that.  Please do

13   not argue with him.  Ask your question.

14         Mr. Trump, please listen to the question and answer

15   the question that is posed.

16         It will go much smoother and we will all be done this

17   morning a little bit faster if we play by the rules.

18         And save the commentary.  You know that is not

19   appropriate.

20         MR. S. KULWIN:  All right.

21         Thank you, your Honor.

22   BY MR. S. KULWIN:

23   Q.  Now, yesterday we talked a little bit about the finances

24   of the building, the loans you were getting.

25         Do you recall that?

Trump - direct

477

1    A.  Yes.

2    Q.  Going back to that for a second, one of the things that

3    you had to do to secure financing was sell a number of

4    condominium units and get contracts on them before you went

5    into the market, correct -- for financing?

6    A.  I don't remember in this particular case.  In some

7    condominiums you do; and, in some, you don't.

8           I've had financing where I haven't even, you know,

9    conceived of what we're doing and I've had financing where

10   we've sold a percentage of units.

11          I don't remember exactly.  It could be I had my

12   financing quite early, I got my financing at a very propitious

13   time, the market was good, the market had not yet crashed;

14   but, I don't know -- I'm not sure I can give you that answer.

15          I could find out, but I'm not sure that I had to have

16   certain numbers of units.

17          So, it is possible, however, and I believe -- I

18   believe -- that I got my financing after I sold a number of

19   units -- residential units -- and, I think, to a much lesser

20   extent, the hotel units.

21   Q.  Interesting.

22          Mr. Trump, the question is --

23          MR. NOVACK:  Objection, your Honor.  I don't think he

24   should be commenting on the testimony.

25          THE COURT:  I agree.

```
 1          Sustained.
 2   BY MR. S. KULWIN:
 3   Q.  Well, Mr. Trump, that's not the question.  The question is
 4   simple.  Was one of the things you needed -- you either
 5   remember or you don't.  Was one of the things you needed to
 6   get your financing was to sell a certain number -- get a
 7   number of contracts -- on the condos?
 8          Do you remember?
 9   A.  Not specifically --
10          MR. NOVACK:  Asked and answered.
11   BY THE WITNESS:
12   A.  -- on this --
13          THE COURT:  Sir, there is an objection.
14          MR. NOVACK:  He said you can say you don't remember.
15   He said he doesn't remember exactly, but -- he gave a whole
16   explanation.
17          THE COURT:  Overruled.
18          You may answer that question, if you can.
19   BY THE WITNESS:
20   A.  It's possible -- and, maybe, probable -- but I don't
21   remember specifically on this job because we do many types of
22   financings on different jobs.
23   BY MR. S. KULWIN:
24   Q.  This, of course, in 2003, was the biggest one you had ever
25   done?
```

Trump - direct

479

1   A.  Yes.

2   Q.  Now, in addition, another aspect of getting the financing

3   was getting an anchor tenant because even if you sold a

4   certain number of units, the financing institutions would say

5   to you, "What are you doing with the 350,000 square feet,"

6   right?

7   A.  Do you mean by that this is prior to the hotel concept?

8   Q.  Yeah.

9           No, prior to -- no, I mean, by that, prior to -- you

10  abandoning the office space and putting hotel condos in there,

11  yes.

12  A.  Well, if I had a hotel condo, I wouldn't need an anchor

13  tenant because it's a hotel condo.

14  Q.  Perhaps you're not understanding.

15          Here's the question:  When the building was first

16  conceived, you had office space, residential condos, hotel

17  condos, right?

18  A.  I don't believe so.  I believe we had office condos and we

19  had residential condos.

20          Now, maybe we had some hotels in there, but I thought

21  we had office and, like, one of the jobs I have in New York.

22  But we had many iterations of this job.  We started as office

23  and residential.  We had office and hotel rooms.  We've had

24  many iterations.  I don't exactly know which one you're

25  referring to.

Trump - direct

480

```
 1              But until we came up with a final plan -- which
 2    ultimately is the plan that got built -- we had had a lot of
 3    different concepts that ultimately ended up in what we built.
 4              It depends on which timeframe you're talking about.
 5    Q.  Between 19- -- well, in 2003, August, the plan was to have
 6    residential condos, hotel condos and 350,000 square feet of
 7    office space, true?
 8    A.  Well, there was a plan like that.  I don't know that it --
 9    specifically, the date, because we had other plans, also.
10    Q.  Okay.
11              MR. S. KULWIN:  Can I have a moment, Judge?
12              THE COURT:  Yes.
13              (Brief pause.)
14    BY MR. S. KULWIN:
15    Q.  Referring to Plaintiff's Exhibit 75, No. 4435.
16              MR. S. KULWIN:  Can you put that up, Mike?
17    BY MR. S. KULWIN:
18    Q.  While he is doing that, Mr. Trump, brochures that you were
19    issuing shortly before you put the condo units up for sale
20    would have been as accurate as possible as of September of
21    2003, correct?
22    A.  Probably so, yes.
23    Q.  And if you look at this brochure, it charts out what's
24    supposed to be in the building.
25              Do you see that?
```

Trump - direct

481

 1  A.  Yes.  That was one of our plans, yes.

 2  Q.  Right.

 3          And you see that it's got nine floors dedicated for

 4  office space?

 5  A.  That's correct.

 6  Q.  Okay.

 7  A.  That was one of the plans.

 8  Q.  Okay.

 9          And that particular plan was the plan that was in

10  effect in September of '03?

11  A.  Well, I don't see a date on this piece of paper; but, at

12  some point, we were thinking about going that route, yes.

13          MR. S. KULWIN:  May I have a moment, Judge?

14          THE COURT:  You may.

15          (Brief pause.)

16  BY MR. S. KULWIN:

17  Q.  In any event, sir -- by the way, Mr. Reiss would have been

18  very familiar with what the plans for the building were

19  immediately before the issuance of the September property

20  report, correct?

21  A.  I would think so, yes.

22  Q.  Okay.

23          In any event, sir, ultimately you did fail to get an

24  anchor tenant; isn't that right?

25  A.  Well, probably you would say the market was bad, the

Trump - direct

1   hotel -- the office market in Chicago at the time was very,

2   very bad.  We looked for tenants.  I don't know about anchor

3   tenants, but we looked for tenants and anchor tenants --

4   whoever.  The market was really terrible and we decided to

5   replace that space with hotel rooms.

6   Q.  Okay.

7           And just to refresh your recollection, if we could --

8           MR. S. KULWIN:  Can we get, Mike, Exhibit 1-B, Page

9   2?  It's, like, four or five pages in.

10          Is that it?  Okay.

11          And can you call out the bottom paragraph, please --

12  the last one.

13  BY MR. S. KULWIN:

14  Q.  Do you see that up there, Mr. Trump?  It's right by your

15  screen there.

16          Now, this is the property report from September 23,

17  2003.

18          Do you want to see it or will you accept my

19  representations in that regard?

20  A.  No, I'll accept.

21  Q.  Okay.

22          And, so, as of September, 2003, you were planning on

23  putting in 351,500 square feet of office space, correct?

24  A.  Well, it says, "Will likely include."  That means it was

25  subject to change, which we had an absolute legal right to do.

Trump - direct

483

 1   We had a right to change -- a legal right to change.

 2          This was -- it said, right before you mentioned the

 3   words, but it said, "The building will likely include."

 4   That's because we were still formulating the building.

 5   Q.  Mr. Trump, I'm not arguing whether you could change the

 6   office space or not change the office space.  I'm simply

 7   asking you:  At that point in time, you put it in there

 8   because that was the plan.  That's what you thought --

 9   A.  At that point in time --

10   Q.  -- it would --

11   A.  -- yes.

12   Q.  Mr. Trump, can you please let me finish the question?

13   Okay?

14          Thank you.

15          MR. NOVACK:  Your Honor, I would like Mr. Kulwin, if

16   he wants something said to the witness, to ask you to say it.

17          THE COURT:  Well, it is his examination.  Overruled

18   on that particular one.

19          MR. NOVACK:  Thank you, Judge.

20   BY MR. S. KULWIN:

21   Q.  Mr. Trump, I'm just saying, when you issued this property

22   report, the plan was to have 351,500 square feet of office

23   space.

24          It was in the diagram that we just looked at and it's

25   in the property report.

Trump - direct

484

1       Are you saying that wasn't the plan?

2   A.   As it says in the agreement -- contract -- the likely plan

3   was exactly that.  The likely plan.

4   Q.   Right.

5       And it was only going to become unlikely if you

6   couldn't rent the space?

7   A.   Or for whatever reason.  Yeah, we had the right to change.

8   We had the right to change.  We had a contractual right to

9   change.

10       So, if we -- in that case, that was the plan as of

11   that specific day.

12       Ultimately, we decided to put a hotel where the

13   office building was.

14       MR. S. KULWIN:  Judge, I'm going to move to strike

15   Mr. Trump's answer and I'm going to ask to be heard at sidebar

16   for a moment.

17       THE COURT:  I am going to deny your request for a

18   sidebar.

19       I will strike the last portion as non-responsive and

20   the jury should disregard it.

21   BY MR. S. KULWIN:

22   Q.   Once again, sir, the question is very simple.  Okay?  At

23   the time you did the September 23rd property report, your

24   likely plan -- what you thought you were going to do, barring

25   something unusual happening -- was you were going to have

Trump - direct

485

1   350,000 square feet of office space, yes?

2   A.  Yes.

3   Q.  Now, in October of 2003, you had a meeting with Charlie

4   Reiss about that very topic, right?

5   A.  I don't remember the date, but I did at some point have a

6   meeting, yes.

7   Q.  And it was -- well, it was -- certainly before you decided

8   to put in the ballrooms -- the grand and junior ballrooms --

9   and the expanded conference rooms?  It was before that?

10  A.  I would imagine, yes.

11  Q.  And Mr. Reiss at that point told you, "We don't have an

12  anchor tenant for the 350,000 square feet," right?

13  A.  I don't know if he said that, but it's possible.

14          I knew what the office market was in Chicago, so it's

15  very possible.

16  Q.  So, he didn't really have to tell you.  You already knew

17  this market, "I'm following it.  I mean, I'm Don Trump, I know

18  what's going on.  You don't have to tell me that, Charlie"?

19  A.  Well, I could see that the market was bad and it was

20  unlikely that you would get that kind of a tenant.

21          The IBM building was a hundred percent vacant right

22  alongside of us -- or pretty much vacant.  It was a big office

23  building, a nice building and it was vacant.  So, you know,

24  many of the other buildings were vacant or partially vacant.

25          So, I understood the Chicago market well enough to

Trump - direct

486

1    know that it wasn't that likely we would get a tenant.

2    Q.  And, so, that presented you with a certain financing

3    problem, didn't it?

4    A.  No, I don't -- I mean, we were going to -- we could change

5    the use and we could change to something else, I guess.

6           I mean, you know, would it be a financing problem?

7    Yeah, I would say financing an office building in Chicago at

8    that time would have been very tough, yes.

9    Q.  My question, though, is:  You now had a 350,000 space gap

10   -- a hole -- in the middle of your building and you had to

11   figure out a way to come up with something new, that would

12   satisfy the financing institutions that you wanted to get

13   financing from, correct?

14   A.  Well, I would say, yeah --

15   Q.  Is that correct?

16   A.  -- if it's a -- if it's a -- more popular use than an

17   office space, yes, that would be true.

18   Q.  Okay.

19          Now, in addition, you knew that if you couldn't get

20   the financing, if you couldn't replace this office space with

21   something that would satisfy the financiers, you had a couple

22   of choices, one of which is you'd have to finance it yourself,

23   right?

24   A.  Well, I could finance it myself or just wait till the

25   market gets better.

Trump - direct

487

1   Q.  You could do that, but one of the --

2   A.  Excuse me, I could just hold the land and wait till the

3   market gets better.

4   Q.  So, then, you had two choices.  One, you could finance it

5   yourself; or, two, you could abandon your plans to do the

6   project temporarily and just wait?

7   A.  That's absolutely correct.

8   Q.  That wasn't something, though, that you wanted to do,

9   correct, in 2003?

10  A.  In retrospect, it wouldn't have been a bad thing, I'll

11  tell you.  But --

12          MR. S. KULWIN:  Judge, I move to strike the answer

13  and ask Mr. Trump to answer the question.

14          THE COURT:  I will strike the answer.  The jury

15  should disregard it.

16          Ask your question, again.

17  BY MR. S. KULWIN:

18  Q.  And, by the way, since you did blurt that out, so you are

19  saying you wish you had never built Trump Tower?

20  A.  Well, it depends --

21          MR. NOVACK:  I object.

22          THE COURT:  Sustained.

23          If you ask me to strike it, you cannot follow up on

24  it.

25          (Laughter.)

Trump - direct

488

1              THE COURT:  Sustained.

2              Ask your next question, please.

3    BY MR. S. KULWIN:

4    Q.  Now, even after you obtained the financing -- and it took

5    you a couple years after that to obtain the financing, didn't

6    it?

7    A.  It took us a while to come up with plans and

8    specifications because when you go and get financing for a

9    project, we hired Skidmore from Chicago -- a great firm -- a

10   great architectural firm -- and it takes a long time to get

11   the plans and specifications.

12             You can't get financing on a building based on a

13   drawing or based on a schematic.  You need what's called

14   detailed plans and specifications, because they're putting

15   money into a building.  They need to know what they're putting

16   money in.

17             So, it took us a -- quite a long time to have the

18   architectural drawings to a point where you could get

19   financing.

20             MR. S. KULWIN:  I move to strike it, Judge.  He is

21   not answering the question.

22             THE COURT:  Overruled.

23   BY MR. S. KULWIN:

24   Q.  Mr. Trump, did it take you a couple of years after that to

25   get financing -- permanent financing?  Did it?

Trump - direct

489

1   A.  Well, I just explained.  We had to get drawings done

2   before I could do --

3   Q.  Did it?

4   A.  I don't know when the financing was done.  I mean, you

5   could --

6   Q.  Okay.

7   A.  -- find out very easily, but --

8   Q.  Isn't it true, sir --

9   A.  -- whatever the period of time --

10  Q.  -- that the financing wasn't obtained until 2005?

11  A.  I don't know.  I mean, whatever the date is, it is.  I

12  don't know what difference it makes.

13  Q.  Really?  You don't remember that?

14          MR. NOVACK:  Objection.

15  BY THE WITNESS:

16  A.  No, I don't remember the date.

17          THE COURT:  Sustained.  Argumentative.

18          Mr. Trump, if there is an objection, sir, please let

19  me rule.

20          THE WITNESS:  Sure.

21  BY MR. S. KULWIN:

22  Q.  Okay.  I want to be clear.

23          Do you remember when you got it?

24  A.  Of course not.

25  Q.  Of course not.

Trump - direct

1      MR. S. KULWIN:  Can we have PX 75, Bates 4375?

2      No, this one (indicating).

3      If I could have a moment?

4      THE COURT:  You may.

5      (Brief pause.)

6  BY MR. S. KULWIN:

7  Q.  And if you look at this brochure, it tells you, of course,

8  that you got the financing in the first quarter of 2005.

9      Does that ring a bell to you?

10  A.  I -- I -- don't know.  I mean, that's what it says here,

11  yes.  I just don't know when it was.

12  Q.  Well, you --

13  A.  It says that.

14  Q.  You don't doubt the truth and veracity of your own

15  brochure, do you?

16  A.  No.  But, you know, like, I just don't know.  You're

17  asking me about when it was.

18      I see a brochure, but I don't -- I cannot give you a

19  date.

20  Q.  Okay.

21      So, you're not comfortable relying on this brochure

22  that says you got it in the first --

23  A.  No, I think I'd be comfortable with --

24  Q.  Mr. Trump, may I finish the question?

25      You're not confident in your own brochure that says

Trump - direct

491

1   you got the office space in the first quarter of 2005?  You're

2   not confident in its veracity?

3   A.  Well, I haven't seen this brochure.  I don't remember this

4   brochure.  It's a long time ago.

5         But I would assume that if it's in there, that's

6   probably about the time that we got it.

7   Q.  Aren't you comfortable with the idea that all of your

8   brochures were factually accurate?

9   A.  Yes, I'm comfortable with that, yes.

10   Q.  Now, going back to the meeting with Mr. Reiss, after he

11   told you that, you decided to eliminate the office space,

12   right?

13   A.  Well, it was a decision made between the executives and

14   myself, yes.

15   Q.  Really?

16   A.  I was one of the parties and I was the ultimate party,

17   because I was the owner/developer.  But it was based upon, you

18   know, expertise of people, including Mr. Reiss.

19   Q.  Who made the ultimate decision, Mr. Trump?

20   A.  I did.

21   Q.  You've got to let me finish.

22         Who made the ultimate decision, Mr. Trump?

23   A.  I thought you did finish.

24         I did.

25         MR. S. KULWIN:  I would move to strike that.

Trump - direct

492

1          THE COURT:  Please answer the question, Mr. Trump.

2     BY THE WITNESS:

3     A.  I did.

4     BY MR. S. KULWIN:

5     Q.  And that was an important decision, wasn't it?

6     A.  You're saying the decision to do the financing or the

7     decision to replace the office space with hotels?

8          I don't know what you're referring to.

9     Q.  The decision to eliminate the office space from the

10    building.

11    A.  Well, it was a decision, yeah.  It was a decision.

12         It was important?  You know, it's another way of

13    doing the building.

14    Q.  Was it an important decision to change, after you've

15    issued the first property report and started marketing the

16    building, to take 350,000 square feet -- approximately, 15

17    percent of the building -- and decide, "We're going to abandon

18    that plan and change it to something else"?

19         Was that --

20    A.  Yes.  Conceptually, yes.

21    Q.  Conceptually, it was an important decision?

22    A.  Yes, that's true.

23    Q.  Okay.

24         Now, once you decided to abandon the 350,000 square

25    feet of space as office space, you had to decide what to do

```
 1   with it, correct?

 2   A.  That's correct.

 3   Q.  And Mr. Reiss recommended to you that the space, in part,

 4   be turned into grand and junior ballrooms, expanded meeting

 5   rooms, and the like, correct?

 6   A.  Well, you're using the word "grand."  It's not grand.

 7   It's a ballroom with a column in the middle of it.  It's not a

 8   grand -- it's not a space -- you know, you make it sound like

 9   it's the -- it's a relatively small ballroom.  It's got some

10   meeting rooms.

11           It's not a big deal, like you say.  The bigger deal

12   was to decide to go to the 350,000 feet of mini-hotel rooms.

13   That was by far and away the bigger and more important deal.

14           You make it sound like it's Versailles.  It's not

15   Versailles.  Versailles doesn't have columns in the middle of

16   it.

17   Q.  Let me show you a color version, part of Plaintiff's

18   Exhibit 75.

19           Do you recognize this, Mr. Trump?

20           (Document tendered.)

21   BY MR. S. KULWIN:

22   Q.  Does this look familiar to you?

23   A.  I mean, I've seen it.  It's a brochure.

24           MR. NOVACK:  Could I know what he is showing him,

25   please?
```

Trump - direct
494

```
 1              MR. S. KULWIN:  This is part of Exhibit 75.

 2              THE COURT:  Plaintiff's Exhibit 75, the color

 3     version, he said.

 4              MR. S. KULWIN:  The color version.

 5     BY THE WITNESS:

 6     A.  I mean --

 7              MR. NOVACK:  Well, Judge, there's about 50 pages of

 8     75.

 9              MR. S. KULWIN:  I don't have the Bates on this,

10     Mr. Novack.  I went over it with Mr. Shonkwiler yesterday.

11     BY MR. S. KULWIN:

12     Q.  Okay.  You've seen this before --

13     A.  Yes.

14     Q.  -- right, Mr. Trump?

15     A.  Yes, I have.

16     Q.  And, again, these things were handed out to people

17     thinking about buying your units, right?

18     A.  I believe so, yes.

19     Q.  And you wanted them to know the truth, right?

20     A.  Absolutely.

21     Q.  Okay.

22              So, let me tell you -- let me ask you -- how do you

23     describe the ballrooms in this, sir?

24              Can you read it for us out loud?

25     A.  Where does it say about ballrooms?  The features?  Where?
```

Trump - direct

495

1    Q.  Right here (indicating).

2    A.  "Conference center and amenities, including a grand

3    ballroom and a junior ballroom, prefunction area."

4         It's a -- I mean, it's a -- very standard statement.

5    Q.  You described it as a "grand ballroom."  Now, you're

6    saying, "Nah, not really"?

7    A.  It's a -- we call it the grand ballroom.  That's what we

8    call it.  But it is a ballroom that's rather small and it's

9    got a column in the middle of it.  The column is a very tough

10   thing to get around.

11   Q.  I see.

12        So, basically, your marketing people over at the

13   Trump Tower, when they're trying to book weddings and

14   functions and things of that nature, and people call up and

15   they say, "Really, I want to have a wedding here.  How's the

16   grand ballroom?"  You instruct them to say, "You know, it's

17   kind of small."

18   A.  No.

19   Q.  "It's not very good."

20   A.  No.

21   Q.  "It's got a big column in the middle"?

22   A.  But when they see it, they do notice there's a column in

23   the middle of it.

24   Q.  Can you answer my question?  Is that what you direct your

25   marketing people to tell them?

Trump - direct

496

1   A.  No.  We bring people over.  We show it to them.  We -- it

2   certainly is a beautiful room.  It's not a very big room, but

3   it's a beautiful room.  And it's -- you know, we try and make

4   it as nice as we can make it.

5   Q.  Yeah.

6           And, then, when you were marketing it to people who

7   wanted to buy HCUs, why didn't you tell your marketing people,

8   "I don't like this word 'grand,' it's not really grand, it's

9   just okay.  And it's got a big column in the middle of it"?

10          Let me finish.

11          Why don't you tell them that?  Why don't you tell

12  them the truth?

13  A.  Because every ballroom --

14          MR. NOVACK:  Objection.

15          THE COURT:  Sustained.

16          MR. NOVACK:  Relevance.

17          THE COURT:  Sustained on relevance.

18  BY THE WITNESS:

19  A.  Well, we do --

20          THE COURT:  I sustained it, sir.

21          THE WITNESS:  I'm sorry.

22          THE COURT:  Please do not answer.

23          THE WITNESS:  Okay.

24          MR. S. KULWIN:  On form, Judge?

25          THE COURT:  On form and on relevance, the way you

1     asked it.

2              MR. S. KULWIN:  Okay.

3     BY MR. S. KULWIN:

4     Q.  Mr. Trump, was there a reason why, when you issued the

5     marketing materials to people who were looking at buying in

6     this facility -- this grand ho- -- this tremendous hotel, you

7     didn't instruct them to say, "Look, you're over-hyping the

8     grand ballroom.  It's really not so grand"?

9              MR. NOVACK:  Judge, I object on relevance.  There's

10    no issue --

11             MR. S. KULWIN:  It's highly relevant, Judge.

12             MR. NOVACK:  -- as to whether the descriptions of the

13    ballroom and marketing materials were accurate, inaccurate or

14    anything.

15             THE COURT:  Sustained on form.

16             MR. S. KULWIN:  Okay.

17    BY MR. S. KULWIN:

18    Q.  Sir, when the marketing materials were issued, what was

19    the reason for telling people to put in "grand ballrooms"

20    instead of "not grand"?

21             MR. NOVACK:  Objection.

22             THE COURT:  Overruled.

23             You may answer that, Mr. Trump.

24    BY THE WITNESS:

25    A.  Almost every ballroom in every building is called the

Trump - direct

498

 1   "grand ballroom."  That's a space that's referred to as the

 2   ballroom.

 3          And if you look at other hotels throughout the

 4   country, the main ballroom is usually called "grand ballroom."

 5   That's what they call it, "the grand ballroom."  And this is

 6   throughout virtually every building.  I mean, almost every

 7   building you go into has a grand ballroom.  And it's really

 8   become a term.

 9          And, by the way, our room is very nice.  It has a

10   problem that it's not a square room or it's not a rectangular

11   room.  It's rounded.  And it's -- and it's -- got a column.

12   And the column is, you know, a problem.

13   Q.  But it's certainly a room that, at least according to what

14   we heard in opening statement, was anticipated to be -- you

15   know, generate a hundred thousand dollars of revenue for each

16   event.  Fair?

17   A.  Opening statement?

18   Q.  Mr. Novack's opening statement, your lawyer.

19   A.  Oh, I don't -- I really don't -- know.  I wasn't here for

20   his opening statement.

21          I can tell you that --

22   Q.  Can you tell me this?

23   A.  Yes.

24   Q.  Can you tell me if a hundred thousand dollar rental fee

25   was something likely for that grand ballroom?

Trump - direct

1   A.  I don't know.  You'd have to ask the manager of the room.

2   Q.  You don't know.  Okay.

3   A.  I don't know.

4   Q.  All right.

5   A.  I mean, I don't know.

6   Q.  In any event, sir --

7   A.  I can tell you this:  The rent that I pay --

8   Q.  There's no question pending.

9   A.  -- is, is --

10  Q.  There's no question pending.

11          MR. S. KULWIN:  Judge, will you tell him there's no

12  question pending?

13          THE COURT:  There is no question pending, Mr. Trump.

14          THE WITNESS:  Too bad.

15          THE COURT:  Ask your next question.

16  BY MR. S. KULWIN:

17  Q.  I'm sorry?

18  A.  I said "too bad" because I was going to give you an answer

19  that, I think, would have been responsive to what you just

20  said.

21  Q.  I will ask you another question.  Don't worry.

22  A.  Okay.  Fine.

23          THE COURT:  Mr. Kulwin, Mr. Trump, my guess is --

24          THE WITNESS:  I know.

25          THE COURT:  -- that there are other places you would

Trump - direct

1    rather be than sitting here.

2              THE WITNESS:  Okay.

3              THE COURT:  And, Mr. Kulwin, my guess is that you

4    would like to move this case along.

5              MR. S. KULWIN:  I would, Judge.

6              THE COURT:  At this rate, we are still going to be

7    here tomorrow morning.

8              So, can you please listen to the question posed?

9              THE WITNESS:  Okay.  Yes.

10             THE COURT:  Ask your questions appropriately.

11             And please answer the question.

12             MR. S. KULWIN:  I am, Judge.

13             Thank you.

14             THE COURT:  Mr. Kulwin, that is exactly what I mean.

15             (Laughter.)

16             THE COURT:  I am not looking for commentary back.

17   Just ask your question, please.

18   BY MR. S. KULWIN:

19   Q.  Mr. Trump, in addition to deciding what you were going to

20   do with the space, you had to decide whether it would be grand

21   or junior ballrooms; and, then, you had to decide what you

22   were going to do the with rest of the space, as well, right?

23   A.  Yes.

24   Q.  And the rest of the space you decided to carve up into

25   additional residential and hotel condos, correct?

Trump - direct

1    A.   Residential -- yeah, that's right.

2    Q.   I believe you added 25 or 26 hotel condos, from 174 to

3    200?

4    A.   I think that's right, yes.

5    Q.   And you went up from, I think, 320 to 470 residential

6    condos, correct?

7    A.   I believe that's correct; yes, sir.

8    Q.   Now, you're familiar with the term, of course, "common

9    elements," correct, sir?

10   A.   Yes.

11   Q.   And you know that common elements are everything that's

12   not in the unit, that is described and included in the common

13   elements, right?

14   A.   Correct.

15   Q.   And common elements are something that are owned by the

16   condo owners, along with their units?

17   A.   Correct.

18   Q.   And you were aware that in the property reports that were

19   issued, after you decided to eliminate the office space to

20   people like Ms. Goldberg, that it included an ownership

21   interest in the ballroom, the meeting rooms that were now

22   planned for the hotel?

23        You knew that, right?

24   A.   Yes, I did.

25   Q.   And you knew that the budgets in those property reports

Trump - direct

502

1   also included $5 million of anticipated revenue that was going

2   to be generated from those rooms in the hotel condo budget,

3   right?

4   A.   But no income.

5   Q.   Sir, did you know that the $5 million revenue was in

6   there?

7   A.   That's -- that's -- gross business.

8          When you describe -- well, you'd have to define

9   "revenue."

10         But revenue is gross.

11  Q.   Sir --

12  A.   At the end there was --

13  Q.   Sir --

14  A.   -- no revenue.  There was no -- there was no -- income.

15  Q.   Sir, did you know that it was $5 million?

16  A.   I didn't know the number.  I just knew that when it was

17  all subtracted, there was nothing left.  But I did not know

18  the number of 5 million.

19  Q.   Does this (indicating) refresh your recollection that the

20  number was $5,053,000 that was put in the income?

21  A.   Give me that --

22         THE COURT:  Mr. Kulwin, can you just identify for the

23  record what you have just put up?

24         MR. S. KULWIN:  Exhibit H from Plaintiff's Exhibit 7.

25         THE COURT:  You may answer.

Trump - direct

503

1   BY THE WITNESS:

2   A.  No, I don't know that I've ever seen it.

3          I mean, I've heard the number of about $5 million,

4   but I don't know that I have ever seen this particular

5   estimate.

6   Q.  But you knew that 5 million was in there?

7   A.  I think I heard the number somewhere; yes, sir.

8          MR. NOVACK:  Well, I'm going to object unless he can

9   put a timeframe on when he knew that.  Just to say he knew it,

10  he probably knows it today.

11         MR. S. KULWIN:  Judge, can you ask Mr. Novack not to

12  make arguments?

13         THE COURT:  I will sustain the objection.

14         Lay a little more foundation.

15  BY MR. S. KULWIN:

16  Q.  Sir, you knew that at the time that you knew that the

17  common elements went in -- which you just said you did -- you

18  knew, sir, that it also included the projected revenue?

19         MR. NOVACK:  Objection.  He never laid a foundation

20  or a timeframe as to when he knew --

21         THE COURT:  Sustained.

22         MR. NOVACK:  -- if the common elements were in.

23         THE COURT:  Sustained.

24         MR. S. KULWIN:  Well, that's not in.

25         Go ahead.

Trump - direct
504

 1              THE COURT:  Sustained.

 2              MR. S. KULWIN:  Okay.

 3              If I may have a second, Judge?

 4              (Brief pause.)

 5    BY MR. S. KULWIN:

 6    Q.  Okay.  First things first, addressing this.

 7              I want to be clear.  You knew that the budget

 8    reports -- I mean, the property reports -- we just talked

 9    about immediately after the ballrooms and things and that were

10    added, those things were included in the common elements?  You

11    knew that?

12              MR. NOVACK:  Objection unless we have a timeframe,

13    again.

14              MR. S. KULWIN:  I just said.

15              THE COURT:  Overruled.

16              You may answer, if you can, Mr. Trump.

17    BY MR. S. KULWIN:

18    Q.  Right?

19    A.  Yes, I did.

20    Q.  Okay.  Good.

21              And you also knew, sir, that the -- that those --

22    same reports that came out right after you added these

23    elements also included the revenues that were anticipated from

24    those ballrooms and facilities?

25              You knew that, too, didn't you?

Trump - direct

1   A.  I'm just not aware of it.

2           Mr. Reiss might have been aware of it, somebody else

3   might have been aware of it.  I'm not aware of it.

4           And, again, the word "revenue" is a very misleading

5   word because that's --

6           MR. S. KULWIN:  Judge, I'm going to ask him -- ask

7   you -- to ask him to stop.  And strike that answer.

8           THE COURT:  I will strike the last part.

9           The jury should disregard it.

10          Ask your next question, please.

11  BY MR. S. KULWIN:

12  Q.  Sir, you remember this -- did you make this -- sorry.

13          You gave a deposition in the case.  We talked about

14  that yesterday.  You were under oath, right?

15  A.  Yes, I am.

16          MR. S. KULWIN:  Can we have Page 27, Line 7.

17          (Whereupon, said video was played in open court.)

18  BY MR. S. KULWIN:

19  Q.  That was your answer, wasn't it?

20  A.  It's -- I think it's fine.  I mean --

21          MR. S. KULWIN:  Judge --

22          THE WITNESS:  Am I allowed to --

23  BY MR. S. KULWIN:

24  Q.  Mr. Trump, there's no other question pending.

25  A.  All right.

Trump - direct

506

1   Q.  Now, the decision to sell the hotel facilities, and the

2   revenue generated by them to the hotel purchasers, first came

3   prior to the issuance of the first amended property report,

4   right?

5   A.  I -- I -- believe so, yes.

6   Q.  Okay.

7           And that occurred in February of 2004, right?

8   A.  I -- I'm not sure of the date, but early on.  Very early

9   on.

10  Q.  Let me show you Plaintiff's Exhibit 2 and see if this

11  refreshes your recollection.

12          Right there, Mr. Trump (indicating).

13  A.  Yes, that would be fine.

14  Q.  And someone had to make the decision of whether or not

15  once you decide to add these ballrooms, these meeting rooms,

16  the revenue with them into the hotel, someone had to make the

17  decision of whether or not they would be included in the

18  common elements, correct?

19  A.  Yes.

20  Q.  And you were the one at that time who -- in February of

21  '04 or right before who -- approved the decision to include

22  the common -- in the common elements, the ballrooms, the

23  meeting rooms, the function rooms and the revenue that's

24  associated with it?

25  A.  It was not a very big deal.  And I think that Charlie

Trump - direct

507

1    Reiss and his staff, when they came up with the idea for the

2    hotel, they included that.

3              But I don't remember having been really quizzed on

4    the specifics of adding the ballroom one way or the other.  It

5    was not a very big decision.

6              I mean, it became an important decision later because

7    the ballroom was going to lose a fortune -- a lot of money.

8              MR. S. KULWIN:  Judge, I'm going to move to strike

9    the entire answer.  He didn't answer anywhere close.

10             THE COURT:  I am going to strike the last sentence

11   and the jury should disregard it.

12             Ask your next question, please.

13   BY MR. S. KULWIN:

14   Q.  Sir, you were the one who had to approve the decision --

15   didn't you -- to include those common elements in it?

16             Did you or didn't you?

17   A.  It was --

18   Q.  Did you or didn't you?

19   A.  I would have approved it, but I don't even remember it

20   because, frankly, it wasn't a big deal at the time.  It became

21   a big deal later.

22   Q.  Sir --

23             MR. S. KULWIN:  Judge, I going to move to strike

24   that, too.  He is not answering the question.

25             THE COURT:  That did respond to the question.

Trump - direct

1          Overruled.

2    BY MR. S. KULWIN:

3    Q.  I'm not asking you whether you now say it's not a big

4    deal, sir.  We'll get to that.  It's a real simple question:

5    Did you approve it?

6          Did you approve it?

7    A.  I approved the concept of a hotel.  I don't remember

8    specifically the ballroom and things being mentioned as part

9    of that.

10         But I approved the concept of a hotel, yes.

11   Q.  Going back to your deposition under oath, sir.

12         MR. S. KULWIN:  Can we have it at Page 84, 18 to 25,

13   and 1 to 5, the next page.

14         (Whereupon, said video was played in open court.)

15   BY MR. S. KULWIN:

16   Q.  Sir, you had --

17   A.  That's correct.

18   Q.  -- to approve it?

19   A.  That's a correct statement, yes.

20   Q.  Okay.

21   A.  I mean, ultimately I had to --

22   Q.  Sir, there's no question pending.  Sir, there's no

23   question pending.

24   A.  Well, no, but I --

25   Q.  Mr. Novack's going to have the chance to ask you all the

Trump - direct

509

```
 1    questions he wants.  There is no question pending.

 2           Thank you.

 3           Now, during the development stages of the project,

 4    you entrusted certain executives to advise you about what was

 5    being designated in the common elements, true?

 6    A.  Yes.

 7    Q.  And you had discussions with your executives about which

 8    areas Trump Tower would be deemed to be included as designated

 9    as common elements, true?

10    A.  The larger -- you mean, like the residential units, the

11    hotel units, et cetera?

12    Q.  You had conversations with your executives, who were in

13    the development stages when you were building the hotel, about

14    the designation of the items that were going to be included in

15    the common elements --

16    A.  I don't --

17    Q.  -- is that true?

18    A.  I don't remember, but it's possible, certainly.

19    Q.  Let me see if I can refresh your recollection.

20           Sir, you gave -- you signed -- sworn interrogatories

21    in this case; isn't that correct?

22    A.  I guess so, yes.

23    Q.  Well, let me see.  Showing you, "Donald J. Trump, Sr.'s

24    Objections and Responses to Plaintiff's Interrogatories."

25           Is this your signature on it, sir?
```

1                    (Document tendered.)

2    BY THE WITNESS:

3    A.  Yes.

4    BY MR. S. KULWIN:

5    Q.  And can you read what's above it, please, out loud?

6    A.  I --

7                    THE COURT:  Wait, wait.

8                    Are you refreshing his recollection?

9                    MR. S. KULWIN:  Yes.

10                   THE COURT:  Okay.

11                   He does not need to read it out loud, then.

12   BY MR. S. KULWIN:

13   Q.  Can you read that, sir?

14                   THE COURT:  Do not read it out loud.

15   BY MR. S. KULWIN:

16   Q.  Not out loud.

17   A.  Yes.

18   Q.  And, in it, you swore under penalty of perjury that the

19   statements you made in this are true, correct?

20   A.  That's correct, yes.

21   Q.  And didn't you say there, "Trump responds that while Trump

22   Tower -- "

23                   THE COURT:  Mr. Kulwin, if you are seeking to refresh

24   his recollection, that is not the proper way.  You have to let

25   him read it and see if it refreshes his recollection.

```
 1              MR. S. KULWIN:  Yes, your Honor.
 2   BY THE WITNESS:
 3   A.  From where?
 4   BY MR. S. KULWIN:
 5   Q.  Right there (indicating).
 6   A.  And how far?
 7   Q.  Here (indicating).
 8   A.  In yellow.
 9          (Brief pause.)
10   BY THE WITNESS:
11   A.  Yes, but this is referring --
12   BY MR. S. KULWIN:
13   Q.  Let me ask you a question.
14   A.  -- this is referring to, I think, 2007.
15   Q.  Well --
16   A.  Isn't that referring to 2007?
17   Q.  Well, sir, let me read it to you.
18   A.  Okay.  Go ahead.
19   Q.  Okay?
20   A.  Good.
21   Q.  All right.
22          It says here, "During the development stages, he,"
23   meaning you, "had various brief informal status discussions
24   with employees to stay apprised regarding development of the
25   project, including the designation of portions of the project
```

Trump - direct

512

1    as common elements."

2            Isn't that what you said?

3    A.  I thought it was referring -- and maybe that's what I --

4    what I -- you know, have to say, I thought it was referring to

5    2007 -- the 2007 time period.

6            But, as I said before, I mean, I discussed aspects of

7    the job -- many aspects of the job -- and I said probably I

8    did discuss these things with my people.  I just don't

9    remember when.

10           It would be something that would be pretty obviously

11   discussed; but, you know, I just don't remember when.

12   Q.  Okay.

13           Sir, isn't it true that you had discussions with Jill

14   Cremer, Andrew Weiss, Charlie Reiss and Russ Flicker, while

15   they were employed at Trump, about their evaluation of whether

16   or not the ballrooms, the meeting rooms -- all those things --

17   the revenue, should be included in the common elements?

18   A.  I don't remember it, but it's certainly very possible.

19   Q.  You don't remember, but it's possible?

20   A.  It's possible, sure.  It's -- you know, it's -- another

21   element of the job.

22           MR. S. KULWIN:  Can we get Page 36, Line 12, through

23   Page 37.

24           (Whereupon, said video was played in open court.)

25           MR. S. KULWIN:  Pause it for one second, Mike.

Trump - direct

 1           Can you pause for one second.

 2           Just because the sound was a little low, Judge, can I

 3    read that out loud?

 4           THE COURT:  You may.

 5    BY MR. S. KULWIN:

 6    Q.  "(Record read back as follows:)

 7           "You would have discussed with them their ongoing

 8    evaluations whether to keep the meeting room functions, which

 9    included the F&B operations and the common elements, or

10    whether Trump, itself -- or whether Trump, itself -- should

11    retain -- retain those for itself?"

12           Question:  "You can answer."

13           And I'll just read it from there.  Your answer was:

14    "I would imagine that would have been discussed, yes."

15           MR. NOVACK:  Judge, I object.

16    BY THE WITNESS:

17    A.  Well, I just said it's very possible.

18           THE COURT:  Mr. Trump, there is an objection.

19           MR. NOVACK:  I objected at the deposition to that

20    question as being compound.

21           MR. S. KULWIN:  Judge, I would -- I don't know what

22    the relevance of his objection was at that time, but --

23           THE COURT:  Well, it was compound, was the question

24    -- was the objection?

25           MR. NOVACK:  That's correct.

Trump - direct

1            THE COURT:  Was it rephrased?

2            MR. NOVACK:  No, it was just --

3            MR. S. KULWIN:  He didn't object, again.

4            MR. NOVACK:  The court reporter just read it back.

5            THE COURT:  I do not have the transcript before me.

6   If you want to show it to me?

7            MR. NOVACK:  May I hand it up?

8            THE COURT:  Yes.

9            MR. S. KULWIN:  If I may have a moment, Judge.

10           (Document tendered to the Court.)

11           (Brief pause.)

12           THE COURT:  Sustained.

13       I will strike, ladies and gentlemen, what you have

14  just viewed on the video and you should disregard it.

15           MR. S. KULWIN:  Can I re-ask it, Judge, now that I'm

16  here?

17       I mean, can I --

18           THE COURT:  You may ask another question.

19           MR. S. KULWIN:  Right.

20           THE COURT:  I would suggest you do not ask a compound

21  question or there will be an objection, but you may ask

22  another question.

23           MR. S. KULWIN:  I will break it down.

24  BY MR. S. KULWIN:

25  Q.  Sir, you would have discussed with those executives --

1   Flicker, Reiss, Cremer, Weiss -- whether Trump was going to

2   retain the common elements, such as the food and beverage

3   operations, the ballrooms and things of that nature, rather

4   than retain it for itself, rather than leave it to the common

5   elements, during those meetings you just talked about?

6           MR. NOVACK:  Objection, your Honor, to form.

7           THE COURT:  Sustained on form.

8   BY MR. S. KULWIN:

9   Q.  You would have discussed with Mr. Flicker, Ms. Cremer,

10  Mr. Weiss, Mr. Reiss, whether Trump was going to retain those

11  common elements for itself at that time, correct?

12  A.  Well, as I said, it's very possible.

13  Q.  Do you recall?

14  A.  I mean, I can't remember specifically, but it's very

15  possible.

16  Q.  Okay.  Good.

17          And in those discussions --

18          MR. S. KULWIN:  Let me have a second, Judge.

19          (Brief pause.)

20  BY MR. S. KULWIN:

21  Q.  And you would have, in those discussions with Mr. Reiss,

22  Flicker, Cremer, Weiss, during that time period -- 2002, 2003,

23  2004, that period -- you would have made the decision whether

24  to keep those hotel facilities in the common elements or

25  not --

Trump - direct

516

 1          MR. NOVACK:  Objection, your Honor.

 2   BY MR. S. KULWIN:

 3   Q.  -- right?

 4          MR. NOVACK:  He should ask him did he, not would he

 5   have.

 6          THE COURT:  Sustained.

 7   BY MR. S. KULWIN:

 8   Q.  You made that decision, didn't you?

 9   A.  Well, a decision was made and I went along with it.

10   Q.  Did you make that decision whether to retain them or keep

11   them in the common elements?

12   A.  Well, that was the decision that was made.  So, I guess

13   you could say, yes.

14   Q.  So, you made that decision, right?

15   A.  At the time, yes.

16   Q.  And, to be clear, any discussion that you would have had

17   with Mr. Reiss on that topic would have occurred prior to

18   August of 2004, because Mr. Reiss left Trump in 2004, in

19   August, right?

20   A.  I don't remember -- say it, again, the question.

21   Q.  Any kind of discussions that you would have had with

22   Mr. Reiss about, "What are we doing with the common elements?

23   Are they going in -- the ballrooms, facilities and revenue

24   going to the common elements or are we keeping them for

25   ourselves?"  Anything like that -- any conversation with

Trump - direct

1   Mr. Reiss like that -- would have had to occur before August,

2   2004?

3   A.  I would think so, yes.

4   Q.  And anything -- any kind of conversation with Mr. Flicker

5   on that topic would have had to occur before January of '05,

6   because that's when he left?

7   A.  I think that's right, yes.

8   Q.  And after January of '05, you didn't replace either

9   Mr. Flicker or Mr. Reiss during the rest of 2005; isn't that

10  correct?

11  A.  Did I replace them?  We had Mr. Weisselberg.  We had other

12  executives working on the job.

13          I didn't specifically replace them, no.

14  Q.  And so that during that time period -- and, then, you

15  hired Jim Petrus in June of '06, as the opening of the hotel

16  got closer, correct?

17  A.  That is correct.

18  Q.  And between that January of '05 and June of '06, the main

19  person -- the person with the most authority in charge of the

20  development of the Trump hotel -- not in the construction

21  side, was you?

22  A.  Well, I would say maybe Mr. Weisselberg.

23          I mean, it would ultimately be me, in terms of my

24  decisions, but maybe Mr. Weisselberg was -- was -- quite

25  involved, because I had numbers of executives.

Trump - direct

1          Mr. Andy Weiss was very involved with the hotel, as

2    you know.

3          So, I have other executives, yes.

4    Q.  Andy Weiss was largely involved with the construction

5    areas?

6    A.  Mostly involved with construction, yes.

7    Q.  So, basically, on the marketing and sales side, you were

8    the main authority until -- on the hotel side until --

9    Mr. Petrus was hired in June of '06?

10   A.  No.  I had people in Chicago that were working on --

11   Q.  In New York?

12   A.  In New York?  Mr. Weisselberg.

13         And I was also involved, certainly.

14   Q.  Mr., who?

15   A.  Weisselberg -- Mr. Weisselberg, the Chief Financial

16   Officer, was very much involved.

17   Q.  He is the Chief Financial Officer, but he wasn't in charge

18   of marketing and sales and things of that nature, he was the

19   numbers guy?

20   A.  No, but he might have -- you know, he might have -- seen

21   that.

22         I would say that the people in Chicago, for the most

23   part, really ran that, in terms of the marketing.

24   Q.  In 2005?

25   A.  Yeah, after -- after -- Mr. Flicker left, yes.

Trump - direct

519

```
 1   Q.  And who was that in Chicago?
 2   A.  We had some executives in Chicago.  I don't know.  I'd
 3   have to get their names for you.
 4   Q.  Who?
 5   A.  I'd have to get their names.  I would be able to get them,
 6   but I would have to find them.
 7   Q.  Well, let me give you a list of who the Trump organization
 8   identified as people with relevant knowledge --
 9   A.  Okay.
10   Q.  -- about these events --
11   A.  Okay.
12   Q.  -- and see if you see -- this is what the Trump
13   organization told us these are the people with relevant
14   knowledge --
15           (Document tendered.)
16   BY MR. S. KULWIN:
17   Q.  -- about what happened here.  And see if you see any
18   executives on there like what you're talking about.
19   A.  Well, Mr. Flicker, yes.
20   Q.  No, no, you don't need to --
21   A.  Yes.  Ms. --
22   Q.  Mr. Trump?
23   A.  -- Manolo.
24           Yes?
25   Q.  You don't need to read it?
```

Trump - direct

1   A.   Oh.

2   Q.   The question is -- the question that's pending is --

3   Mr. Trump, the question that's pending --

4   A.   Yes?

5   Q.   -- is:  After Mr. Flicker and Mr. Reiss left in 2005, I

6   asked you, "You were the main guy running the show until

7   Petrus was hired?"

8         And you said, "There may have been other executives

9   in Chicago, and I can't remember their names."

10        Okay?  Are you with me --

11  A.   Yes.

12  Q.   -- so far?

13  A.   Yes, I am.

14  Q.   Okay.

15        So, now I've given you the list of executives that

16  your organization identified as people with relevant knowledge

17  about this case.  And I'm asking you:  Is there anybody on

18  that list -- look it over, anybody on that list -- that you're

19  referring to.

20  A.   Well, I would say mostly my son, Don Trump, Jr., was

21  involved; and, also, Eric Trump was involved, for the most

22  part.  And, then, I would be, you know, ultimately the person.

23        But my sons were involved in this job, specifically

24  after they left.

25  Q.   Eric Trump is not on the list, right?

Trump - direct

1    A.  He's not, but he could be.

2    Q.  Now, sir, it's true that -- with respect to the meetings

3    and discussions that you had with Mr. Flicker, Ms. Cremer and

4    Mr. Reiss and Mr. Weiss in 2004 and 2005 about this subject,

5    there are no memos of any of those meetings, are there?

6    A.  I don't know.

7    Q.  There are no notes --

8    A.  I don't have any.

9    Q.  -- of any of those meetings, are there?

10   A.  I don't know.  Anything we'd have, I would assume, you

11   would have been able to find.

12   Q.  There are no e-mails setting up any of those meetings, are

13   there?

14   A.  I don't know.

15   Q.  Okay.

16          There is nothing in writing whatsoever from the Trump

17   organization, who is building this almost billion-dollar

18   project, prior to January, 2005, prior to September of 2005,

19   that discusses in any way -- prior to August of 2005 that

20   discusses in any way -- or records any discussions that you

21   and your executives had about this topic; isn't that correct?

22          MR. NOVACK:  Objection to the form of that question.

23          MR. S. KULWIN:  I will rephrase it.

24          THE COURT:  Sustained.

25          MR. S. KULWIN:  I will rephrase it.

Trump - direct

1    BY MR. S. KULWIN:

2    Q.  There's nothing in writing, sir, at all, between September

3    of 2003 and June of 2006, that records in writing anywhere any

4    of the meetings that you had with Ms. Cremer, Mr. Reiss,

5    Mr. Weiss or Mr. Flicker about this topic; isn't that true?

6    A.  Well, I don't know.  I mean, I can tell you we get things

7    done.  We don't write it about it, we get it done.

8          So, I don't know if there's any big written

9    statements, but I don't write notes of meetings.  I remember

10   as much as I can about meetings, but I don't write notes of

11   meetings.  And I can't speak for the other people.

12   Q.  Well, you travel a lot, right?

13   A.  No, not that much.

14   Q.  You're not out of the office much?

15   A.  Not that much, no.

16   Q.  Okay.

17         And -- so, you don't have to go all over the country

18   supervising your 2500 employees?

19   A.  No.  I -- I -- I travel, but I don't -- I would say I

20   don't -- travel very much.

21   Q.  You have a lot of things going on, though, right?

22   A.  I do.

23   Q.  A lot of different appointments you have to be at?

24   A.  That's right.

25   Q.  A lot of information you're bringing in?

Trump - direct

1    A.   That's right.

2    Q.   So -- so -- your executives, when they want to tell you

3    about things, get you ready for a meeting they're going to

4    have, wouldn't they write something down saying, "Mr. Trump,

5    we're meeting on this.  Here it is"?  Anything?

6    A.   Not -- you know, not -- usually.

7         I mean, Andy Weiss has been with me a long time.  You

8    perhaps can ask him that question.  We don't -- you know, they

9    don't give me briefings in writing.  I sit at a meeting.  They

10   tell me what's going on and we take it from there.

11   Q.   And --

12   A.   I don't write -- I don't write -- things down.

13   Q.   And not one piece of paper even -- even -- setting up a

14   meeting, letting everybody know that there's going to be a

15   meeting?  Nothing?

16   A.   Well, anything I have, you have.

17   Q.   Okay.

18   A.   That's all I can tell you.

19        I mean, you know, I don't know.  But I'm not very

20   formal in that way.  I don't write notes to myself.  I don't

21   do things like that.

22        And, you know, again, anything I have, you have.

23   Q.   Okay.

24        And if I represent to you that we don't have anything

25   like that -- there are no memos, notes, memoranda of any kind

Trump - direct

524

```
 1   during that time period, '03 to '06 -- June of '06 --

 2   reflecting any meetings whatsoever -- any explanation for

 3   that, other than you just don't do that?

 4   A.  It sounds --

 5          MR. NOVACK:  Judge, I'm going to object to the form

 6   of the question.  And this has now been asked and answered

 7   two, three, four times.

 8          THE COURT:  Sustained on form.

 9          MR. S. KULWIN:  I'll move on, Judge.

10   BY MR. S. KULWIN:

11   Q.  Now, Mr. Trump, you would never include something in one

12   of your developments that you thought would harm it, correct

13   -- intentionally?

14   A.  No, I wouldn't.

15   Q.  And you would never include something in one of your

16   developments that you thought would harm the value of the

17   hotel condominiums you were selling, correct?

18   A.  No, I wouldn't.

19   Q.  Or the value of the hotel you were building?

20          You wouldn't do that, either?

21   A.  No, I wouldn't.

22   Q.  And you certainly wouldn't include something in one of

23   your developments that you thought would hurt your brand,

24   correct?

25   A.  That's correct.
```

Trump - direct

1  Q.  Because, as we spoke before, damage to the brand would not

2  be a good thing for the building or for you, correct?

3  A.  That's correct.

4  Q.  And -- but you knew, when you initially included -- when

5  you initially allowed the ballrooms, the meeting rooms, the

6  F&B operations to be sold to the hotel condominium unit

7  owners, you knew -- that that meant that they would own those

8  facilities, correct?

9  A.  Well, as I told you, I don't specifically remember that

10 aspect of it.  But that would be it.

11          I mean, it was in the plan originally.  We had rights

12 to amend the plan.  We had rights to totally redo that.   In

13 writing, we had the right to redo that at any time we wanted.

14          MR. S. KULWIN:  Judge, I am going to move to strike.

15 BY THE WITNESS:

16 A.  Well, that's the fact.

17          MR. S. KULWIN:  I move to strike.

18 BY THE WITNESS:

19 A.  But it was certainly the plan.

20          THE COURT:  Mr. Trump --

21          MR. S. KULWIN:  I move to strike it.  He is not

22 answering the question.

23          THE COURT:  Mr. Novack?

24          MR. NOVACK:  I object to the motion to strike.

25          THE COURT:  Overruled.

Trump - direct

```
 1            MR. S. KULWIN:  Who is overruled, him or me?

 2            THE COURT:  I have overruled your objection.

 3            MR. S. KULWIN:  Sorry.  I wasn't sure.

 4            THE COURT:  So, why do you not rephrase the question.

 5            MR. S. KULWIN:  Yes.  Yes, your Honor.

 6   BY MR. S. KULWIN:

 7   Q.  You knew -- you know that when you give owners common

 8   elements, that they own it, right?

 9   A.  Yes, but we have the right to amend --

10   Q.  Sir --

11   A.  -- in the contract.

12   Q.  Sir --

13            MR. S. KULWIN:  Judge, I move to strike.

14            THE COURT:  I will strike it.

15            The jury should disregard it.

16   BY MR. S. KULWIN:

17   Q.  Sir, you knew that when you give owners common elements,

18   they own it, correct?

19            Did you know that?

20            THE WITNESS:  Am I allowed to give the same answer,

21   your Honor?

22            THE COURT:  You may answer the question.

23   BY THE WITNESS:

24   A.  Yes.

25            I mean, the answer is "Yes."
```

Trump - direct

1    BY MR. S. KULWIN:

2    Q.  You knew it.  All right.

3        And you also knew, when you approved the ballrooms,

4    the facilities, the meeting rooms, the conference rooms, the

5    dollars that went into it, that by putting them in the common

6    elements, you knew that that meant that the hotel condo owners

7    would now, under that plan, own those facilities?

8        MR. NOVACK:  I object to the form of that question.

9        THE COURT:  Sustained on form.

10   BY MR. S. KULWIN:

11   Q.  You knew, sir, when you put the hotel facilities -- the

12   ballrooms, the meeting rooms, the function rooms -- by putting

13   them in the common elements, you knew that the owners would

14   own it at that point, correct?

15   A.  Yes.  And I am, by far, the biggest owner.  And I did know

16   that.

17       MR. S. KULWIN:  Judge, I move to strike that part of

18   it, too.

19       THE COURT:  Overruled.

20       Ask your next question, please.

21   BY MR. S. KULWIN:

22   Q.  And you also knew, back in '04, that when you did that,

23   they would also own the revenues?

24       They would get the revenues, as well -- the revenues?

25   A.  They would, subject to my leaving the plan the way it was.

Trump - direct

528

 1    A.   They would, subject to my leaving the plan the way it was.

 2    And I had the right to change the plan.

 3           MR. S. KULWIN:   Move to strike, Judge, again.

 4           THE COURT:   Overruled.

 5    BY MR. S. KULWIN:

 6    Q.   And you were aware that a condo board that was ultimately

 7    elected to run the hotel condo association would be charged

 8    with managing the hotel elements?

 9           You knew that, right?

10    A.   Yes.

11    Q.   Or hire a management company to do it, right?

12    A.   Well, yes.

13    Q.   And during your discussions with Ms. Cremer and Mr. Reiss

14    and Mr. Flicker, you would have discussed with them the condo

15    board's suitability to run the though hotel's food and

16    beverage operations, right?

17           MR. NOVACK:   Judge, I object to that question as --

18    it's compound and --

19           THE COURT:   Sustained.

20           And part of the problem is you are asking, "You would

21    have done" things, as opposed to "Did you do it."

22           MR. S. KULWIN:   Okay.

23    BY MR. S. KULWIN:

24    Q.   During your discussions, you discussed with Ms. Reiss --

25    Mr. Reiss, Mr. Flicker, Mr. Weiss, Ms. Cremer -- you discussed

Trump - direct

529

```
 1  with them the condo board's suitability to run the hotel's

 2  food and beverage, correct?

 3          MR. NOVACK:  Objection.  It's compound and there's no

 4  foundation as to which discussions he is now talking about.

 5          THE COURT:  Answer the question "Yes" or "No," sir,

 6  if you can.

 7          And, then, you can follow up with specifics.

 8          THE WITNESS:  I can only say, your Honor, it's

 9  possible.  I mean, I just don't remember what I discussed with

10  them so many years ago.  But it's possible I did.

11  BY MR. S. KULWIN:

12  Q.  When you say "it's possible," do you mean it sounds like

13  something that would have been discussed?

14  A.  No.  I say it's possible that I did.

15  Q.  Question --

16          MR. S. KULWIN:  I mean, Page 38, Line 14.

17  BY MR. S. KULWIN:

18  Q.  Your deposition, again, sir.

19          MR. NOVACK:  Line, what?

20          MR. S. KULWIN:  14.

21          (Whereupon, said video was played in open court.)

22  BY MR. S. KULWIN:

23  Q.  Right?

24  A.  The same answer, I think.

25  Q.  And at the time you believed that letting condo boards run
```

Trump - direct

1   these type of ballrooms and meeting rooms and F&B operations

2   could ruin the hotel operations easily, correct?

3   A.  Well, if the board put in the wrong people, it could have

4   a huge negative impact on the building and the units and the

5   ballrooms and everything else.  Certainly, that is correct.

6   Q.  And, in fact, you had seen that happen many times at hotel

7   condo projects, quote -- using your words -- "went to hell as

8   a result of letting the condo purchasers and condo boards own

9   and manage the hotel food and beverage facilities," right?

10              MR. NOVACK:  Objection.  It's without a timeframe as

11  to when he is saying that.

12              MR. S. KULWIN:  I am laying the foundation, Judge,

13  first, just to find out if he knows it.

14              THE COURT:  Then rephrase, if that is what you are

15  trying to do.

16              MR. S. KULWIN:  Okay.

17  BY MR. S. KULWIN:

18  Q.  You knew, sir -- you had seen it, based on your own

19  knowledge, you knew -- that hotel condo projects, in your

20  opinion, went to hell as a result of letting the condo

21  purchasers and condo boards own and manage the hotel F&B

22  facilities?

23              MR. NOVACK:  I am objecting on lack of a timeframe.

24              THE COURT:  Sustained, because time is important.

25              What year are you talking about?

Trump - direct

531

```
 1              MR. S. KULWIN:  I was going to do that next, Judge.
 2              First, I have to find out if he knew it.  If he never
 3    knew it, then I will seek the time.
 4              THE COURT:  Sustained.  Sustained.
 5              Give him a timeframe, to see if he knew it at what
 6    point in time.
 7    BY MR. S. KULWIN:
 8    Q.  Prior to the time that you developed Trump Tower in 2003,
 9    you knew and you had seen many times hotel condo projects that
10    "went to hell," your words, as a result of letting the condo
11    purchasers and condo boards own and manage the hotel
12    facilities, correct?
13    A.  Well, certainly.  I mean, everybody knows that condo
14    boards, that things happen for good and for bad with condo
15    boards.  So, you know, I can refer more to the residential
16    world than I can to the hotel world.
17              But certainly condo boards have been known to make
18    bad decisions.  I mean, that's no secret.  That's on the front
19    page of every newspaper.
20    Q.  That's not my question.
21              My question, sir, is:  Prior to the time that you
22    built Trump Tower, you were aware that -- and you had seen
23    many times that -- condo projects, hotel condo projects went
24    to hell as a result of letting the condo purchasers and condo
25    boards manage the hotel F&B facilities?
```

Trump - direct

1   A.   I just don't think it's anything I thought of at the time.

2   Q.   That's not my question, sir.

3        Did you know it or not?

4   A.   I don't know.

5   Q.   Okay.

6   A.   I mean, I -- there was so few hotel projects, I --

7   Q.   Going into your deposition, sir --

8   A.   -- just don't know.  It's just not -- it wouldn't have

9   been --

10  Q.   There's no question --

11       THE COURT:  Mr. Kulwin -- Mr. Kulwin -- you both

12  cannot talk at the same time.  He was finishing his answer.

13  BY THE WITNESS:

14  A.   But certainly, again, it would be possible.

15       I mean, it would be certainly possible.  But I just

16  don't -- it's not something that was much on my mind.

17  Q.   Going to your deposition, sir --

18       MR. NOVACK:  Judge, can we have a sidebar before he

19  puts that on the screen?

20       THE COURT:  Yes.

21       (Proceedings had at sidebar:)

22       MR. NOVACK:  I know that he is going to put up on the

23  screen a question and answer about what he was talking about,

24  that he is going to say, "I've seen it many times before -- "

25  I'm sorry -- "That I have seen many times where it could go to

Trump - direct

533

1    hell," just as a shorthand.  I don't have the page and line.

2            Those questions were asked at a deposition in 2012.

3    He did not put a timeframe, like I made him do here, at the

4    time.  And he asked that question open-ended.

5            The answer was, when he is sitting there then, "Yeah,

6    I've seen it many times."  But he didn't ask a --

7            MR. S. KULWIN:  I followed up with a -- I am sorry.

8    My fault.

9            I followed up with the very next question:  "And you

10   had seen that before you had ever developed Trump hotel?"

11           MR. NOVACK:  Where is that?

12           MR. S. KULWIN:  It's the next question.

13           THE COURT:  Do you have a page?

14           MR. S. KULWIN:  Yes, sir.

15           THE COURT:  Do you know the page?

16           MR. J. KULWIN:  I can go get it.

17           (Brief pause.)

18           THE COURT:  He is getting it.  That is okay.

19           What page and line?

20           MR. S. KULWIN:  It's right there (indicating), Judge,

21   46 --

22           THE COURT:  Page 46?

23           MR. S. KULWIN:  -- Line 22.

24           I mean, Page 45, 22 to 25; 46, Line 1.

25           THE COURT:  What is his answer?

Trump - direct

534

```
 1              MR. NOVACK:  "It's possible."

 2              THE COURT:  "It's possible."

 3              MR. NOVACK:  "Anything is possible."

 4              MR. S. KULWIN:  That's enough.

 5              THE COURT:  But that is consistent with what he just

 6   said.

 7              MR. S. KULWIN:  No, it isn't, Judge.

 8              THE COURT:  Because he just said, "It's possible."

 9              MR. S. KULWIN:  He didn't say, "It's just possible."

10   That's not what he said.  He is said, "I don't think so.  I

11   didn't know that."  That's what he said.

12              I will ask him, again.

13              THE COURT:  Then you can ask him, again, because he

14   said, "It's possible."

15              MR. NOVACK:  Could you look back to see that

16   testimony?

17              THE COURT:  Yes.

18              (Brief pause.)

19              THE COURT:  He did say, "It's possible."  So, it is

20   not impeaching.

21              Just a reminder, too, if you are playing the

22   testimony, I am assuming you are impeaching, not refreshing

23   recollection.  And it really does have to be impeaching.

24              The last one was not impeaching, either.  So, he

25   said, "It's possible."
```

Trump - direct

535

1              He said, "It's possible" in the deposition

2        transcript.  That is not impeaching.

3              MR. S. KULWIN:  Wait, wait.  Did Joe just say he

4        said, "It's possible"?

5              THE COURT:  Yes, he did.  It was his last answer.

6              That is my recollection, as well.

7              MR. S. KULWIN:  Can I follow up on that, because I

8        didn't hear that?  And I'm not clear.

9              THE COURT:  You can ask another question, but not one

10       that has been asked and answered.

11             (Proceedings had in open court:)

12             THE COURT:  Go ahead.

13       BY MR. S. KULWIN:

14       Q.  So, stir, even before you developed Trump Tower, you

15       believed in a having a condo board run the F&B facilities and

16       things of that nature could be disastrous -- a catastrophe --

17       correct?

18       A.  Well, I think as a general statement -- I mean, you know,

19       much has been written about condo boards.  And I think people

20       feel they can run things well and they can run things poorly,

21       like everything else.

22       Q.  I'm not asking you that, sir.  I'm asking if you, before

23       you developed Trump Tower, believed that allowing a condo

24       board to run F&B facilities would be a disaster for the

25       building?

Trump - direct

536

```
 1   A.  I don't think I ever thought of it before I built the
 2   building.
 3   Q.  You didn't believe that before?
 4   A.  I don't know.
 5          MR. NOVACK:  Objection.
 6   BY THE WITNESS:
 7   A.  I'm not sure that it's a question of believe or -- I'm not
 8   even sure.  I just don't know that I gave it much thought.
 9   BY MR. S. KULWIN:
10   Q.  You weren't -- you allowed the condo board to take
11   ownership of the F&B operations for the Trump Tower
12   International Hotel and all the management of the ballrooms,
13   and it didn't even occur to you, "You know, this could be a
14   bad idea"?
15          MR. NOVACK:  Objection, your Honor.  That's compound.
16   He is mixing owning and managing.
17          THE COURT:  Sustained.
18          And sustained on form.
19   BY MR. S. KULWIN:
20   Q.  You didn't think that allowing the condo board, knowing
21   that they would own the building -- that they would have the
22   ability to hire managers to run the building and all those
23   facilities -- it didn't occur to you at all that this would be
24   a really bad idea?
25          MR. NOVACK:  Objection to form.
```

Trump - direct

```
 1              THE COURT:  Sustained on form.
 2    BY MR. S. KULWIN:
 3    Q.  You didn't think, sir, when you were building this tower
 4    beforehand, knowing as you did the problems that could be
 5    caused, you didn't think that letting the condo board own the
 6    F&B operations was a really bad idea?  You didn't think that?
 7    A.  I just don't remember having thought about it at the time.
 8    Q.  It didn't --
 9    A.  We had many other things that we were thinking about, in
10    terms of this job and in terms of many other jobs.  I just
11    don't think I thought about it at the time very much.
12    Q.  So, you gave no thought -- no thought at all -- to
13    allowing the condo board to own the F&B operations of the
14    Trump International Hotel and Tower?  Is that what you're
15    telling us?
16    A.  Well --
17    Q.  Is that what you're telling us?
18              MR. NOVACK:  Objection.
19    BY THE WITNESS:
20    A.  -- no.  What I am telling you is that decision --
21              THE COURT:  Wait, Mr. Trump.
22              Is there an objection?
23              MR. NOVACK:  Asked and answered, yes.
24              THE COURT:  Sustained.
25    BY MR. S. KULWIN:
```

Trump - direct

538

1   Q.  You didn't give any thought, sir, to the idea that it

2   could be bad for the building to allow them to actually own

3   those facilities?

4            MR. NOVACK:  Objection.  Asked and answered.

5            THE COURT:  Overruled.

6            You may answer, if you can.

7   BY THE WITNESS:

8   A.  My executives made that decision.  It was not something I

9   gave, that I remember, any thought to at the time.

10  BY MR. S. KULWIN:

11  Q.  No.  No, sir.

12           Earlier you testified you approved that decision?

13  A.  I approved, but it's not something -- as I told you --

14  that I gave thought -- the specific question that you are

15  asking, it's not something that I gave -- that I can remember

16  giving thought to.

17  Q.  That's my question.  I just want to be clear.

18           When you approved giving 30,000 square feet in the

19  heart of your hotel to the condo board for -- I mean, to the

20  condo association to own it, you didn't give that any thought;

21  is that your answer?

22  A.  I don't remember giving it thought.  My executives made a

23  decision at -- initially speaking.  They put it into the unit

24  owners, of which I'm the largest, by the way.

25           MR. S. KULWIN:  Judge, move to strike that.

Trump - direct

539

```
 1   BY THE WITNESS:
 2   A.  Well, I am the largest, by far.
 3           THE COURT:  It can stand.
 4   BY THE WITNESS:
 5   A.  So, they made that decision.  And I didn't -- you know, I
 6   don't remember.  It's possible I thought about it, but I don't
 7   remember having thought about it.
 8   BY MR. S. KULWIN:
 9   Q.  Okay.
10           And, sir, you've mentioned -- you've tried very hard
11   to get into it -- that you're the largest unit owner at Trump
12   Tower, right?
13   A.  That's true.
14   Q.  Okay.
15           But in 2003, you in no way anticipated being the
16   largest hotel condominium unit owner at Trump Tower, did you?
17   A.  I had no way of knowing.  I had no way of knowing how the
18   hotel rooms would sell.  I really had no way of knowing.  I
19   had no way of knowing what the market would be.
20           I mean, it was a -- it's a -- long-term project.  And
21   I had no way of knowing what my position ultimately would be
22   with respect to unit ownership.
23   Q.  The plan, sir, was to sell all of them, wasn't it?
24   A.  Well, to sell them and I --
25   Q.  Was that the plan?
```

Trump - direct

540

1   A.  -- I have the right to keep some and I've chosen to do

2   that.  But the plan was to sell.  And I -- you know, at some

3   point, with many of my jobs, I'll sell units and I'll keep a

4   lot of units.

5   Q.  Sir, wasn't the plan to sell a majority of the hotel

6   condominium units?  Wasn't that the plan?

7   A.  I would say that when you do these jobs, you have to be

8   very flexible, because you don't know what the market's going

9   to be.  You don't know what's going to go with the world.  Is

10  there going to be war?  Is there going to be -- lots of other

11  things that happened.  In this case, a catastrophe happened.

12  It was called --

13          MR. S. KULWIN:  Judge --

14  BY THE WITNESS:

15  A.  -- a depression.

16          MR. J. KULWIN:  Judge, move to strike.  We are

17  getting into a speech.

18          THE COURT:  I will strike that.

19          The jury should disregard it.

20  BY THE WITNESS:

21  A.  But whenever I build a condominium, I always -- I plan to

22  sell units, but I always -- keep units, also.

23  BY MR. S. KULWIN:

24  Q.  Sir, the question is:  Are you now telling us that all of

25  this marketing -- things that you put out, all of the

Trump - direct

1    brochures, the press -- let me break it back.

2            Sir, when you first built Trump Tower, you showed up

3    in Chicago.  You had a shovel.  You made a big deal of it,

4    didn't you?

5    A.  Sure.  I was very proud of it.

6    Q.  And you spent years -- years -- from the time you decided

7    do it, telling everybody in the world what a great hotel this

8    is, correct?

9    A.  Absolutely.

10   Q.  And you spent years and lots of money developing a

11   marketing and sales campaign to sell --

12   A.  Sure.

13   Q.  -- hotel condominium units; isn't that correct?

14   A.  Sure, but that doesn't mean I am going to sell all of

15   them.

16   Q.  Sir, so now you're telling us -- now that you're being

17   sued you're telling us, now that your organization's being

18   sued -- "That wasn't the plan.  I really didn't want to sell

19   any.  I was going to keep most for myself"?

20   A.  I didn't say that.

21   Q.  Was that your testimony?

22   A.  I didn't say that.

23           MR. NOVACK:  Objection.

24           THE COURT:  Sustained.  Argumentative.

25           MR. S. KULWIN:  Okay.

Trump - direct

542

```
 1   BY MR. S. KULWIN:
 2   Q.  So, now, let me ask you this question:  You didn't know
 3   that you weren't going to sell all those units in 2003, did
 4   you?
 5   A.  I had no idea if I was going to sell all of them or none
 6   of them.
 7          It is a very risky business -- the building of
 8   condominium.  So, it's possible I would have sold a lot of
 9   them.  It's possible I would have sold none of them.
10   Q.  And if you --
11   A.  I had no idea of knowing.
12   Q.  And if you had sold a lot of them, sir -- okay, if you had
13   sold a lot of them -- then the condo unit owners would own the
14   facilities and they would have the benefits of it, correct?
15   A.  As of that time, yes.  As of that time.
16   Q.  And if they controlled it and owned it, they could hire
17   the managers who ran it, correct?
18   A.  Well, the only thing is when that decision was made, which
19   is in '07, I owned 187 units.
20   Q.  Sir --
21   A.  I owned 187.  I owned more than half of the building.
22          I mean, she had a default on two units.  She
23   defaulted on two units.
24          MR. S. KULWIN:  Judge, I am going to move to strike
25   --
```

Trump - direct

543

 1   BY THE WITNESS:

 2   A.  And I owned 187 units.

 3           MR. S. KULWIN:  -- and I demand a sidebar right now,

 4   Judge.  I want a sidebar.  I want an instruction.

 5           THE COURT:  Mr. Kulwin --

 6           MR. S. KULWIN:  I'm sorry.  Okay.

 7           THE COURT:  -- I am going to strike Mr. Trump's

 8   answer.

 9           The jury should disregard it.

10           We are not having another sidebar.

11           Mr. Trump, if you could please listen to Mr. Kulwin's

12   question --

13           THE WITNESS:  Yes, your Honor.

14           THE COURT:  -- and answer just his question.

15           Then Mr. Novack will have the opportunity to ask

16   questions of you.

17           But this will go much faster if you answer --

18           THE WITNESS:  Okay.

19           THE COURT:  -- just the question that is posed.

20           There is no question pending.

21           THE WITNESS:  Okay.

22           Yes, your Honor.

23           THE COURT:  Ask another question, please.

24   BY MR. S. KULWIN:

25   Q.  Mr. Trump, the reality of it is in 2004, when you made the

Trump - direct

1   decision to put the condos -- the ballrooms, the meeting

2   rooms, the revenue -- into the common elements, you didn't

3   plan on owning all of the hotel condominium units.  You

4   planned on selling them; isn't that right?

5          MR. NOVACK:  Judge, I'm going to object to the form.

6   I don't think that he needs to raise his voice the way he is

7   doing.

8          THE COURT:  Well, I am sustaining because that has

9   been asked and answered.

10         Let us move on.

11  BY MR. S. KULWIN:

12  Q.  And you in that time period -- in 2004, when the decision

13  was made, sir, not 2007 -- when you decided to put them in,

14  not take them out -- okay -- your goal, your effort,

15  everything you were trying do was to sell as many units as you

16  could?

17         MR. NOVACK:  Objection.  Asked and answered.

18         THE COURT:  Sustained.

19  BY MR. S. KULWIN:

20  Q.  And, sir, you're right.  By 2007, when you actually took

21  them out, you did own most of the units, didn't you?

22  A.  That's right.

23         So, obviously, the ballroom didn't help.

24  Q.  Sir --

25         MR. S. KULWIN:  Move to strike it.

Trump - direct

545

 1          THE COURT:  I will strike the last portion of the

 2    answer.

 3    BY MR. S. KULWIN:

 4    Q.  So, sir, in 2007, when you did decide to do it, you did

 5    own most of the units, correct?

 6          Is that correct?

 7    A.  I owned, I believe, 187 units.

 8    Q.  Right.

 9    A.  So, I owned a little more than half.

10    Q.  Right.

11          You had to rent all of them, didn't you?

12    A.  I, what?

13    Q.  You had to rent them, didn't you?

14    A.  No.  It was operated as a hotel.

15    Q.  Right.

16          You had to rent through the hotel.  You had to rent

17    them?

18    A.  No, it is not called "rent."

19    Q.  Oh, really?

20    A.  It's called -- we operate them through a hotel.

21    Q.  Right.

22          So, what do you --

23    A.  It's not called "rent."

24    Q.  It's not called "rent"?

25    A.  We operate the hotel.  It's operated through the hotel.

Trump - direct

546

1    Q.   Through a reservation system?

2    A.   We don't rent on a long-term basis, we operated a hotel.

3    Q.   Through a reservation system?

4    A.   Yes, that's correct.

5    Q.   Right.

6             And when you first started this project and you were

7    planning on selling all the hotel units, the reservation

8    system was done by computer?

9    A.   I didn't say I was planning on selling all of the hotel

10   units.

11   Q.   Sir, when you started this -- oh, I know, let's go back to

12   that.

13   A.   I didn't say I was planning on selling all.  I could sell

14   a lot.  I don't sell all.  In many buildings, I keep units.

15            And I didn't say -- I am a very proud of this

16   building.  I'm very honored to own a lot of units in this

17   building.  And -- I know you have shrugged your eyes, but I am

18   very honored to own units in this building.  And I didn't say

19   -- and I never said -- that I was going to go sell all of the

20   units.  I kept units.

21   Q.   Mr. Trump, let me ask you.  Is there one memo -- written

22   document, letter, anything at all -- that documents your

23   assertion now that you had no plan to sell all the units,

24   anything in writing whatsoever?

25   A.   Just me.  It's just me.

Trump - direct

547

1  Q.  Just you?

2  A.  If I sold a number of units, that's great.  And if I kept

3  them, that's great, too.  It's a great -- as far as I'm

4  concerned, I view it as a good investment.

5  Q.  So, what we have --

6  A.  I view it as a good investment.

7  Q.  So, what we have to rely on, sir, of this alleged plan to

8  keep many units, is your word --

9          MR. NOVACK:  Objection.  Argumentative.

10  BY MR. S. KULWIN:

11  Q.  -- correct?

12          THE COURT:  Sustained.  Argumentative.

13  BY MR. S. KULWIN:

14  Q.  Now, sir, let's get back to this.

15          In '07, you owned a bunch of the units, right?

16  A.  That's right.

17  Q.  Okay.

18          And you had to put them out for -- I don't know what

19  you called it, if it's not rent, for -- offering to the public

20  to come stay at your hotel?

21  A.  They became hotel rooms.

22  Q.  They became hotel rooms?

23  A.  And they are right now hotel rooms.

24  Q.  They are hotel rooms.

25          And the hotel rooms --

Trump - direct

548

1   A.  And the hotel is doing very well.

2           MR. S. KULWIN:  Judge, I'm going to move to strike.

3           THE COURT:  I will strike the last comment.

4           The jury should disregard it.

5   BY MR. S. KULWIN:

6   Q.  And the hotel reservation system is how the rooms are

7   decided to be rented; is that correct, sir?

8   A.  That's right.

9   Q.  And at the beginning, when you were putting things out, it

10  was all done by a computerized system, correct?

11  A.  I really don't know.  You'd have to ask the hotel people.

12  I don't know.

13  Q.  Well, let's go back to this one, Mr. Trump.

14          Remember this, sir?  I think you can see it in the

15  brochure live and in color, right here (indicating).

16          (Document tendered.)

17  BY MR. S. KULWIN:

18  Q.  PX 75?

19  A.  Which one?

20  Q.  PX 75.

21          Not that one (indicating).

22          THE COURT:  Do you want to direct him to a particular

23  page?

24          MR. S. KULWIN:  Yes.

25          Yes, your Honor, if I can just find it here.  I'm

Trump - direct

549

```
 1   having trouble reading.  Hold on.

 2           Can I have that back for a second, Mr. Trump?

 3           Thank you.

 4           (Document tendered.)

 5   BY MR. S. KULWIN:

 6   Q.  This one, Mr. Trump (indicating), right here.

 7   A.  Yeah.

 8   Q.  Does that refresh your recollection?

 9           (Document tendered.)

10           (Brief pause.)

11   BY THE WITNESS:

12   A.  I mean, again, I just -- I don't know exactly what they do

13   and how they rent out the rooms.  I'm not -- you know, I'm not

14   -- running the hotel.

15   Q.  Let me just --

16   A.  You'd had have to ask the people that run the hotel.

17   Q.  Let me just ask you a question.

18           This says that it's going to be run by a computerized

19   rotation point system, correct?

20   A.  Right.  Yeah, that's right.

21   Q.  And it says that through this program guest rooms will be

22   fairly reserved throughout the hotel, right?

23           Is that correct?

24   A.  Yes.

25   Q.  Okay.
```

Trump - direct

1      And that's how it was pitched to the people buying

2 condos at the Trump International Tower and Hotel -- hotel

3 condos?

4      That's how it was pitched to them, wasn't it?

5 A.  I really don't know.  It's possible.  And it's possible

6 that's the way they do it.  You'd have to ask the managers of

7 the hotel.

8 Q.  Weren't you involved in the marketing, sir?

9 A.  I'm not involved -- I have a manager who is an excellent

10 manager, who runs the hotel.  He runs this program.

11      I don't know what he does, but I can tell you that

12 the people are extremely happy, that have their units.

13      MR. S. KULWIN:  Judge, I'm going to move to strike

14 it, again.

15      THE COURT:  I will strike it.

16      Please listen to the question, Mr. Trump.

17      MR. S. KULWIN:  You know, Judge, I believe that a

18 door has now been opened and I want to go into it now.

19      THE COURT:  No.

20      Ask your next question, please.

21 BY MR. S. KULWIN:

22 Q.  And, sir, the fact of the matter is, is that when the

23 actual rental management association agreement came out, it

24 changed.  That system was no longer totally in play, was it?

25 A.  I don't know.  I mean, I --

Trump - direct

551

1   Q.  Let me see --

2   A.  -- I don't know.  And the reason I don't know is because

3   maybe that system is upgraded.  Because computers and

4   everything get very upgraded over the years, having to do with

5   hotels.

6          A system that was good five years ago is not a good

7   system today.  They get upgraded.

8   Q.  Really?

9   A.  That's why I'm saying you can ask the manager of the

10  hotel, if you'd like.

11  Q.  Is it your testimony that you think that computers got

12  worse over the last five years?

13  A.  No, I think they got better.

14  Q.  Right.

15  A.  And they upgrade systems.

16  Q.  Right.

17         And my question is, though, sir, isn't it true that

18  the rental management system in 2007, when you changed -- when

19  you owned all -- many -- of the rooms, changed to the -- from

20  the computer point system -- automatic, no discretion -- to

21  Trump has discretion to allocate them the way they want?

22  A.  No, but I still do own many of the units.

23  Q.  Sir, is that --

24  A.  Excuse me.  You said when I owned many units.

25         Well, I still own many units.  And I'm very proud to

Trump - direct

552

1   own many units.

2   Q.  Sir, in 2004, when you were pitching it, in 2003, and you

3   were planning on selling all the units, you had a

4   computerized --

5   A.  I --

6   Q.  Let me finish, please.

7   A.  -- I wasn't planning on --

8   Q.  Let me finish.

9   A.  But I wasn't -- I have told you --

10          THE COURT:  Counsel and, Mr. Trump --

11          THE WITNESS:  But he said I was planning on selling

12   those units.  I wasn't.

13          THE COURT:  Mr. Trump, I have not asked you a

14   question, sir.

15          THE WITNESS:  Okay.

16          THE COURT:  It is quarter to 11:00.  You have been

17   dancing around and boxing with each other for the last 45

18   minutes.  This is not a boxing ring.

19          THE WITNESS:  Okay.

20          THE COURT:  Mr. Trump, things would go much smoother

21   if you just listen to the question of Mr. Kulwin and answered

22   his question.

23          THE WITNESS:  Okay.

24          THE COURT:  Mr. Kulwin, things would go much smoother

25   if you stopped asking compound questions --

```
 1            MR. S. KULWIN:  Yes.  Yes, your Honor.

 2            THE COURT:  -- where there are multiple answers to

 3    it.

 4            MR. S. KULWIN:  Yes, your Honor.

 5            THE COURT:  Let us take our morning break.

 6            I am going to give you gentlemen time to catch your

 7    breath and, hopefully, we will pick up and move smoother.

 8            (Jury out.)

 9            THE COURT:  Mr. Kulwin --

10            MR. S. KULWIN:  Yes, your Honor.

11            THE COURT:  -- before you go and, Mr. Trump, I know

12    you two like sparring with each other, but we are going to be

13    here tomorrow.

14            And I know you would like to get out of here,

15    Mr. Trump.  I know you have better places to be.

16            I do not take that personally, but I know you have

17    better places to be.

18            You have got to stop it.  Do you think the jury likes

19    this?

20            If you think they like this, I can assure you they do

21    not.  You are wasting their time.

22            Please, listen to the questions that are asked.

23            Mr. Kulwin, you have got to control yourself, too.

24    You are rolling your eyes.  I would suggest you do not tell me

25    that you demand a sidebar.  That is not proper and you know
```

Trump - direct

554

 1    that.

 2              I do not want to call you out on it in front of jury,

 3    but I will.

 4              MR. S. KULWIN:  Okay.

 5              THE COURT:  So, let us get control of ourselves.

 6    Take the next ten minutes.  Take a deep breath.  And when you

 7    come back, I hope we can get this back on track.

 8              MR. S. KULWIN:  Your Honor, when we do --

 9              THE COURT:  I do not want to hear anything right now.

10              MR. S. KULWIN:  I would just like --

11              THE COURT:  I do not want to hear anything.  I will

12    be back at five till.

13              (Brief recess.)

14              THE COURT:  Are you ready, Mr. Kulwin?

15              MR. S. KULWIN:  Unless you'll let me be heard, Judge,

16    for a moment, I'm ready.

17              THE COURT:  No.  I want to move on.

18              MR. S. KULWIN:  Okay.  I'm ready.

19              THE COURT:  Line up the jury, please.

20              Mr. Novack, where is your client?

21              MR. NOVACK:  Pardon?

22              THE COURT:  Where is your client?

23              There he is.

24              (Jury in.)

25              THE COURT:  You may be seated.

Trump - direct

1          Mr. Kulwin, you may proceed.

2          MR. S. KULWIN:  Thank you, your Honor.

3    BY MR. S. KULWIN:

4    Q.  Mr. Trump, I think when we left we were talking about how,

5    as of 2007, you owned a lot of units in the hotel.

6          Do you remember that?

7    A.  Yes, that's right.

8    Q.  And we also showed up on the board how, in 2003 and 2004,

9    when you were selling the units, you had a computerized system

10   -- you were selling the idea of a computerized system, no

11   discretion -- do remember that -- for rental?

12   A.  Yes, I do.

13   Q.  And, of course, at the end -- in October or November of

14   2007, of course -- you had sent out the rental management

15   agreement for people to sign if they wanted to participate in

16   the program.

17          You're aware of that, right?

18   A.  I know something was sent out.

19          I don't run the program.  I have managers that run

20   the program.

21   Q.  But you, as the owner of many of the hotel rooms, would

22   have a very strong interest in how that was going to be run,

23   right?

24   A.  You know, I want to treat everybody fairly.

25          Frankly, I don't -- I just don't -- know.  I know

Trump - direct

556

```
 1   that they -- they do it on a basis that people are really

 2   happy in the building.  What can I tell you?

 3          MR. S. KULWIN:  Judge, I would move to strike the

 4   "people are really happy," again.

 5          THE COURT:  I will strike it.

 6          And the jury should disregard it.

 7          MS. S. KULWIN:  Okay.

 8   BY MR. S. KULWIN:

 9   Q.  And the fact of the matter is that what happened was -- as

10   you're aware, I imagine, you can tell me -- is that when it

11   came time to open up the hotel, they overrode this

12   computerized system and gave the hotel manager complete

13   discretion on how to allocate rooms; isn't that right?

14   A.  I don't know.

15   Q.  Let me see if I can refresh your recollection.

16          MR. S. KULWIN:  No, let me see --

17          (Brief pause.)

18   BY MR. S. KULWIN:

19   Q.  This is in --  let me show you something that's in --

20   evidence, Plaintiff's Exhibit  45.

21          MR. S. KULWIN:  Can we have Page 7 up?

22   BY MR. S. KULWIN:

23   Q.  And if you look here (indicating), this is --

24          MR. S. KULWIN:  Can you highlight this part?

25          Go to the next page.
```

Trump - direct

1    BY MR. S. KULWIN:

2    Q.   It says here, "Hotel manager shall make reasonable efforts

3    to equitably allocate unit reservations and occupancy among

4    the participating units, based on such factors as the hotel

5    manager deems appropriate in the hotel -- "  " -- in hotel

6    manager's sole -- "

7            MR. S. KULWIN:  Mike, the next page, please.

8            And blow up the top -- the other top.

9    BY MR. S. KULWIN:

10   Q.   " -- sole discretion."

11           Okay?

12   A.   Yes.

13   Q.   All right.

14           So, now, in 2007, when you now own all of the -- so

15   many hotel rooms, now it's gone from an equitable automatic

16   computerized system to whatever the hotel manager wants to do

17   -- or it gives him that right -- right?

18   A.   Well, it's a standard in the industry.  And I believe this

19   was approved by all the people in the building.

20   Q.   Actually, sir, now that you brought that up, isn't it true

21   that there was a lot of outrage about this and they had a

22   vote?

23   A.   Well, they always have a vote.  I don't think there was

24   outrage.

25   Q.   And isn't it true that they voted to not let you do that

Trump - direct

558

 1   and to go back to the computerized point system?

 2   A.  I don't know.  I really don't know.  I -- I -- don't know

 3   anything about it.

 4   Q.  All right.

 5          Now, before you said that you -- now, before -- a

 6   moment ago, you said that, you know, you had a plan.  You

 7   thought, "Well, you know, I could keep a lot of the rooms."

 8          And I asked you, "Wasn't the plan to sell all of

 9   them?"

10          And wasn't the plan to sell all of them?

11   A.  Whatever happens, happens.  I mean, it's been like that

12   with many buildings.  I sometimes keep units.  I sometimes

13   sell them.  It depends on market conditions.  It depends on my

14   own personal position.  It depends on many things.

15   Q.  My question is:  In 2003, 2004, wasn't your plan -- intent

16   -- to sell all of the units?

17          MR. NOVACK:  Objection.  That's been asked and

18   answered many times.

19          MR. S. KULWIN:  But I'm not --

20          THE COURT:  We did cover that earlier.

21          MR. S. KULWIN:  I'm just not sure, Judge.

22          THE COURT:  We did.

23          Sustained.

24          MR. S. KULWIN:  Can I just get this foundation

25   question in, so I can remember for myself?

Trump - direct

559

```
 1              THE COURT:  Mr. Novack?

 2              MR. NOVACK:  Well, I would object to that.

 3              THE COURT:  Sustained.

 4              We have been through that for probably about 20

 5   minutes.

 6              MR. S. KULWIN:  Okay.

 7   BY MR. S. KULWIN:

 8   Q.  Well, sir, when you issued your brochures, though, you

 9   certainly told everybody that your plan was to sell all the

10   units, right?

11   A.  I don't think so.  I don't think I used the word "all."

12   Q.  Okay.

13   A.  Did I use the word "all"?

14   Q.  You were offering them all for sale, right?

15   A.  Yeah, but that's not -- you know, that also means that I

16   can keep some.  And, you know, I, essentially, buy them

17   myself.

18   Q.  Now, you had experience -- extensive experience -- prior

19   to Trump Tower, running the hotel in New York City -- the

20   hotel condo, right?

21   A.  Yes.

22   Q.  And, so, your organization -- you and your organization --

23   were well aware, from the inception of the planning of Trump

24   Tower, whether a hotel condominium board was well-suited to

25   operate F&B operations, correct?
```

Trump - direct

560

1    A.  I can't understand you.  Say it, again.

2    Q.  Sure.

3         So, you and your organization were well-versed from

4    the inception of the planning of the Trump project in Chicago,

5    whether a hotel condominium board was well-suited to operate

6    an F&B operation and meeting rooms and function rooms in a

7    hotel, right?

8         MR. NOVACK:  Objection, Judge.  This has been asked

9    and answered, as well.

10        MR. S. KULWIN:  No, this is based on his experience

11   in New York, Judge.

12        THE COURT:  Overruled.

13        You may answer, if you can, Mr. Trump.

14   BY THE WITNESS:

15   A.  Yes.  I mean, I've dealt with hotel condominium boards

16   before.

17   BY MR. S. KULWIN:

18   Q.  And, of course, when the decision was to put in the hotel

19   facilities into the common elements, it was done to help sell

20   hotel condominiums, right?

21   A.  Well, I didn't know about ownership, but I knew that we

22   would always be renting it.

23        And I think Charlie Reiss really made the decision as

24   to -- I didn't -- the reason I said I didn't give it a lot of

25   thought, because I assumed we would always be managing it or

Trump - direct

1   we would be managing the building.

2          You're going back to 2003 now -- 2003.

3          So, I didn't focus on ownership.  I don't think I

4   knew about ownership.  I did know that we would be managing

5   the building.

6   Q.  But -- hold on.  Back up.

7          You knew about ownership, because you knew they were

8   in the common elements.  You testified about that earlier?

9   A.  I don't -- well, I don't -- know if I testified about that

10  earlier.

11         I mean, what I do know is that I expected to be

12  managing the building.  I don't know that ownership was

13  something I thought of with respect to this relatively minor

14  aspect of the job.

15  Q.  Sir, are you now -- I am confused here now.

16         Are you now saying you didn't know that it was in the

17  common elements and that they owned it?

18  A.  No.  I'm saying this:  I'm saying that I always

19  anticipated -- I never focused on ownership because I always

20  anticipated -- that we'd be managing the building.  And if we

21  managed the building, it would have less of a problem, until

22  around 2007 when Mr. Petrus approached me and talked to me

23  about -- because he is a great hotel man and talked to me

24  about -- the fact that you have to protect the building, and

25  you have to protect the unit owners from very bad things

Trump - direct

1    happening with the public space.

2           And the bad things happening would be that the board

3    could rent that space out -- could fire Trump and rent that

4    space out -- to people that would not run it properly.

5    Q.  Right.

6    A.  And that was Mr. Petrus in 2007.

7    Q.  So, you're telling us that the very first time you

8    understood that if the hotel condominium unit owners owned the

9    common elements, including the ballrooms and the F&B, the very

10   first time you realized that Trump could be fired by them was

11   when Jim Petrus came and told you that?

12          Is that your testimony?

13   A.  He made a very strong case for it.

14   Q.  Is that your testimony?

15   A.  I would say, yes, that was -- that was -- the time -- that

16   was primarily the time -- that I was most concerned with it.

17   He was very, very strong on the fact that if we were ever

18   terminated, it could be very bad for us, for -- it could be

19   very bad for the building, for the unit owners.

20          It could be very bad --

21   Q.  But you knew --

22   A.  -- depending on who they put in -- if they put in the

23   wrong people.

24   Q.  But you knew, long before Mr. Petrus came to work,

25   before -- from the inception of Trump Tower, before you even

 1    started development, you knew that condo boards could do that

 2    very thing.

 3              You've testified to that just a moment ago?

 4    A.  Well --

 5              MR. NOVACK:  Objection.  That was not his testimony.

 6              THE COURT:  Sustained.

 7              MR. S. KULWIN:  Judge, he's now --

 8              THE COURT:  Ask another question, please.

 9    BY MR. S. KULWIN:

10    Q.  Sir, you are now saying that the first time you realized

11    that was when Petrus told you in '06; is that right?

12    A.  In '07.

13    Q.  '07?

14    A.  That was when it made the big impression on me.

15              He was very strong on it.  He --

16    Q.  Sir --

17    A.  He's a very high -- I assume he is going to be testifying,

18    but he's a very excellent hotel man.  And he felt very

19    strongly that the ownership, which is not something I focused

20    on because I felt that if we ran it, it would be fine, because

21    we were going to manage it.  He felt that the ownership was

22    very important for the unit owners and for everything

23    involved.

24    Q.  Two points on that one, sir.

25    A.  Go ahead.

Trump - direct

1   Q.  You say Mr. Petrus is this great hotel guy.  Let me ask

2   you, aren't you one of the best hotel guys in the country?

3   A.  Well, I'm doing many, many jobs all over the world.

4   Q.  Sir, can you --

5   A.  Excuse me.

6           This is one important job, but this is one.  I'm

7   doing many jobs.  I'm doing Doral Country Club in Miami.

8   Q.  Sir --

9   A.  I'm doing the old Post Office site on Pennsylvania Avenue

10  in Washington.

11  Q.  Sir --

12  A.  I'm doing many, many jobs.

13  Q.  Sir, that's not the point.

14          The point is, aren't you one of the leading hotel

15  guys in the country?

16  A.  Yes.

17  Q.  Weren't you one of the leading hotel guys in 2006?

18  A.  2007.

19  Q.  And 2007.

20  A.  Well, 2000- -- yes, in both.

21  Q.  Thank you.

22          And isn't it true, sir, that you were one of the

23  leading experts on F&B and things of that nature back then?

24  A.  Well, I know something about it, certainly.

25  Q.  Are you telling me that Jim Petrus, a guy who's just been

Trump - direct

565

1    working for hotels for a bunch of years, knew more about F&B

2    operations and running hotels than you?

3    A.  Well, he actually does know more because he runs them.  I

4    don't specifically run them.  I build them and I hire people

5    to run them.

6    Q.  Sir --

7    A.  He actually runs them.

8    Q.  Sir, are you telling me that Jim Petrus knew more than

9    you?

10   A.  Well, he is a manager who runs hotels.  I don't run

11   hotels.

12   Q.  It's a simple question.

13   A.  I build them and I hire people, like Jim Petrus, to run

14   them.

15   Q.  It's a simple question.

16          Are you telling me that Jim Petrus knows more about

17   running a hotel than Donald Trump, the world famous hotelier?

18   A.  Absolutely, he does.

19   Q.  Okay.

20          Now, when you put out all of your bro- -- and, by the

21   way, Mr. Petrus, does he have any hotels named after him?

22   A.  He gets a lot of money for --

23          MR. NOVACK:  Objection.

24   BY THE WITNESS:

25   A.  -- running lots of hotels.

Trump - direct

566

```
 1           THE COURT:  Sustained.  Argumentative.
 2   BY MR. S. KULWIN:
 3   Q.  Well, are you aware of if whether he has any hotels --
 4           MR. NOVACK:  Objection.
 5   BY THE WITNESS:
 6   A.  No, he doesn't.
 7           THE COURT:  Sustained.
 8           It is still argumentative.
 9   BY MR. S. KULWIN:
10   Q.  And let me ask you this question, sir:  When you issued
11   all of these brochures -- do you still have the brochure, Mr.
12   Trump?
13   A.  Yes, I do.
14   Q.  Can I have it?
15           (Document tendered.)
16   BY MR. S. KULWIN:
17   Q.  I am just wondering, when you were trying to sell people
18   on buying hotel condominiums in your building, did you put in
19   here anywhere, "I don't really know a lot about how to do
20   this"?
21   A.  No.
22   Q.  Okay.
23   A.  And I do know -- you asked me whether or not Mr. Petrus
24   knew more about the management of a hotel than me.
25   Q.  Did you --
```

 1    A.  And I said, "Yes."

 2    Q.  Did you put in here anywhere that, "The organization I

 3    have, my executives, really aren't really very good at running

 4    hotels; don't know a lot about it"?

 5           Did you put anything like that?

 6    A.  I didn't say that.

 7    Q.  No.

 8           And --

 9    A.  I didn't say that to you.  I said, actually, just the

10    opposite.

11    Q.  Sir, there's no question pending.

12    A.  I said just the opposite.

13           MR. S. KULWIN:  Judge, there's no question pending.

14           THE COURT:  There is no question pending, Mr. Trump.

15    BY MR. S. KULWIN:

16    Q.  Sir -- and when you issued your brochures to people,

17    didn't you say -- and I just want to make sure I got it

18    right -- didn't you say that --

19           (Brief pause.)

20           MR. S. KULWIN:  May I have a moment, Judge?

21           THE COURT:  You may.

22           (Brief pause.)

23    BY MR. S. KULWIN:

24    Q.  And didn't you say, when you were issuing all these

25    brochures, that you would have personal and direct involvement

1    in running the whole project and doing it?

2    A.  I don't know.  But I do.

3    Q.  You do?  Okay.

4    A.  Otherwise, it wouldn't have been built on budget, on cost.

5    Q.  Right.

6         And didn't you --

7    A.  And on schedule.

8    Q.  We're not asking about that, Mr. Trump.

9         And didn't you say in these -- in trying to sell

10   these things -- "The Trump organization -- " this is before

11   Mr. Petrus ever worked for it -- "has developed and continues

12   to manage over 3,000 units and residential condominium rental

13   properties and two million square feet of office space," and

14   here's the key one, "4,000 hotel rooms"?

15   A.  Yes.

16   Q.  Yeah.

17        And in the hotels that you were running at the time,

18   they all had F&B operations, right?

19   A.  But I don't run them myself.  I hire people, like Mr.

20   Petrus, to run them.

21   Q.  But Mr. Trump --

22   A.  I don't run them myself.

23   Q.  -- for the last time -- for the last time, I hope -- let's

24   be clear.  You knew, prior to the inception of the Trump

25   hotel, that condo boards:  A, could be a disaster for the

Trump - direct

569

 1   building, right?

 2   A.  It's not something I gave tremendous thought to.

 3   Q.  I'm not asking you that.  I'm --

 4   A.  Sure, they can be good.  They can be bad.

 5           You can be good.  You can be bad.  I mean, it

 6   depends --

 7   Q.  Did you know it?

 8   A.  It depends on what -- that they can be bad?  Yes.  I, also

 9   -- can they be good?  They can be good.  They can be bad --

10   Q.  But when you were --

11   A.  -- like with -- like with -- everything.

12           MR. S. KULWIN:  If I may have a second, Judge?

13           THE COURT:  You may.

14           (Brief pause.)

15   BY MR. S. KULWIN:

16   Q.  But, sir, you didn't think about anything about -- you

17   never thought back before, when you were doing this, that they

18   could be good?  You never thought that?

19   A.  I thought that we would manage the hotel.  I always

20   assumed we were going to manage the hotel.

21           I never focused on owning the common units.  I always

22   assumed we would manage the ballroom, et cetera.  So, it

23   didn't really dawn on me until around 2007, when Mr. Petrus,

24   who is a leading hotel person, who comes on board, he told me

25   that, "You really -- " that there are huge liabilities for not

Trump - direct

1    owning the ballroom.

2              That was the time that we started focusing on that.

3              But that was the story, I mean, in a nutshell.

4    Q.  Mr. Trump -- Mr. Trump -- before Jim Petrus ever shows up

5    on the scene, you believed that condo boards could be a

6    disaster for the building?

7    A.  I was always --

8              MR. NOVACK:  Objection.  Asked and answered.

9    BY THE WITNESS:

10   A.  -- going to manage the hotel.

11             THE COURT:  Mr. Trump -- Mr. Trump -- there is an

12   objection.

13             Sustained.  It has been asked and answered.  We spent

14   quite a bit of time --

15             THE WITNESS:  Okay.

16             THE COURT:  -- on this before the break.

17   BY MR. S. KULWIN:

18   Q.  And --

19             THE COURT:  Mr. Kulwin?

20             MR. S. KULWIN:  Yes?

21             THE COURT:  Please do not interrupt.

22             MR. S. KULWIN:  I apologize, Judge.  I apologize.

23   BY MR. S. KULWIN:

24   Q.  And at the time you always assumed you were going to

25   manage it, but you always were aware that they could fire you?

1   A.  But I didn't think of that.  I always assumed that we

2   would be managing the hotel.  And it wasn't until 2007, that

3   this topic came up with Mr. Petrus, and that's why you have no

4   evidence whatsoever.

5           MR. S. KULWIN:  Judge, I'm going to object.

6           THE COURT:  I will strike that statement.

7           And the jury should disregard it.

8           MR. NOVACK:  Just for clarification, is that after he

9   started with the --

10          THE COURT:  Talking the about the evidence, yes.

11  BY MR. S. KULWIN:

12  Q.  And, of course, at the same time that you say Mr. Petrus'

13  suddenly was so persuasive to you -- that this was something

14  you had to own -- that was the same time that you realized

15  that you still owned about 174 hotel condominium units, right?

16  A.  That's right.  I'm not going to do anything to hurt

17  myself.

18  Q.  And at that --

19  A.  I mean, as to what you -- excuse me, what you -- just to

20  finish -- what you're asking me to do is hurt myself.

21  Q.  No.

22  A.  Again --

23  Q.  No.

24  A.  -- she has two defaulted units.

25          MR. S. KULWIN:  Judge, I am --

Trump - direct

1    BY THE WITNESS:

2    A.   -- and I have many units.

3            THE COURT:  Mr. Trump -- Mr. Trump -- and Mr. Kulwin,

4    hold on.

5            Ask your next question.

6            MR. S. KULWIN:  May I ask you to strike his last

7    statement, Judge?

8            THE COURT:  I will strike the last portion.

9            The jury should disregard it.

10   BY MR. S. KULWIN:

11   Q.   And, Mr. Trump, at that point in time, holding as you were

12   hundreds of -- over a 150 -- hotel units that you had hoped to

13   sell, now, all of a sudden, you're taking the ballrooms and

14   all of those things out of common elements and putting them

15   into the commercial space, right?

16   A.   Actually, it's just the opposite.  I owned a large number

17   of units.  Those units do not have the common -- the ballroom

18   and, you know, the various elements that you mentioned.  And

19   I'm actually -- if I go by your theory, I'm -- the one that

20   gets hurt.

21           As I said, I offered -- I own many units.  She could

22   own two.  And this has nothing do with the ballroom.  This has

23   to do with the fact that she doesn't -- she wants to get

24   her --

25           MR. S. KULWIN:  Judge --

Trump - direct

573

1    BY THE WITNESS:

2    A.  -- half-a-million-dollars back.

3           MR. S. KULWIN:  Judge, I am going to ask you to

4    strike it.

5    BY THE WITNESS:

6    A.  It has nothing to do with the ballroom.

7           THE COURT:  I am going to strike the last portion.

8           The jury should disregard it.

9           Mr. Trump, you have a very capable lawyer here who

10   will make a closing argument to the jury when this is done.

11          THE WITNESS:  Okay.

12          THE COURT:  So, please just answer the question, sir.

13          THE WITNESS:  Okay.

14   BY MR. S. KULWIN:

15   Q.  And, sir, if I understand your testimony, what you're

16   saying is, is that, "Gosh, I own all these units.

17   Transferring out of the common elements is hurting myself,"

18   right?

19   A.  Well, you could make that case, certainly.

20   Q.  Could you?  Okay.

21          Well, let me ask you, sir, where did all of that

22   space get transferred to when it left the common elements?

23   A.  I don't know what you mean.  Do you mean to -- to -- the

24   sponsor?

25          Are you referring to the sponsor?

Trump - direct

1    Q.  I'm asking you this.

2    A.  Yeah, it goes to the sponsor.

3    Q.  All right.

4         Well, let me ask you this:  Wasn't it converted into

5    commercial space?

6    A.  But if I was going to hurt my- -- excuse me -- if I was

7    going to --

8         MR. S. KULWIN:  Judge, would you ask Mr. Trump --

9    BY THE WITNESS:

10   A.  Well, I'd like to finish the -- I'd like to finish the

11   answer.

12        THE COURT:  Yes.

13        You answered the question.

14        THE WITNESS:  Okay.

15   BY MR. S. KULWIN:

16   Q.  Mr. Trump, doesn't it go into -- go into -- the commercial

17   space?

18   A.  It goes into commercial space.

19   Q.  And who owned that?

20   A.  I owned it.

21   Q.  Right.

22   A.  But if I was going to hurt --

23   Q.  Sir --

24        MR. S. KULWIN:  Judge?

25   BY THE WITNESS:

Trump - direct

1   A.  If I was going to hurt --

2          THE COURT:  Mr. Trump, you have answered the

3   question.  He asked you who owned it.

4          THE WITNESS:  Okay.

5   BY MR. S. KULWIN:

6   Q.  So, at the end of the day, you ended up owning all these

7   units; but, when you took the common -- the hotel facilities

8   and the ballrooms and things of that nature out of the common

9   elements, yeah, you no longer owned it as a unit owner, you

10  owned it better.  You owned all of it yourself?

11  A.  And you know, what?  I lost a fortune owning the ballroom.

12          MR. S. KULWIN:  Judge, I move to strike it.

13          THE COURT:  I will strike it.

14          The jury should disregard it.

15  BY MR. S. KULWIN:

16  Q.  Now, in the event that the Trump -- in the event that the

17  common facilities -- I mean, I'm sorry, the hotel facilities,

18  the ballrooms, things of that nature -- were owned by the

19  condo board -- run by the condo board, owned by the

20  condominium association -- just listen to the question now --

21  they could fire the Trump organization, correct?

22  A.  They would be able to.

23  Q.  Yeah.

24  A.  They would be able to or at least have a very good chance

25  of doing that, which is one of the problems that we had.

1  Q.  And if that occurred, that would be -- I know you're going

2  to say "very bad for the building," but let's put that aside,

3  that would be -- very bad for the Trump organization?

4  A.  And, potentially, very bad for the building.

5  Q.  But, also, for the Trump organization?

6  A.  Yes, I would say that's true.

7  Q.  And because it would be very bad for the Trump

8  organization, logically, you would never put the condo board

9  in a position to do that -- to have that ability -- right?

10  A.  Well, I guess that's what Mr. Petrus' point was, brought

11  up in 2007.  That was the point.

12         It would be also very bad for the association -- for

13  the hotel unit owners -- because the ballroom has lost so much

14  money --

15         MR. S. KULWIN:  Judge, I move to strike.

16  BY THE WITNESS:

17  A.  -- that they're recovering costs would be through the

18  roof.

19         THE COURT:  I will strike the last portion as non-

20  responsive.

21         And the jury should disregard it.

22  BY MR. S. KULWIN:

23  Q.  And putting aside what Mr. Petrus said -- I want to be

24  clear, it wasn't -- you said you didn't think about it, but

25  also knew that they could fire you back even before Mr. Petrus

Trump - direct

1      arrived?

2              MR. NOVACK:  Objection.  Asked and answered.

3              THE COURT:  Sustained.

4      BY MR. S. KULWIN:

5      Q.  And -- now, sir, you were aware, from the inception of the

6      Trump project -- Chicago -- you were are absolutely aware of

7      whether it would be profitable for the Trump organization

8      itself to operate the food and beverage and meeting and

9      function rooms, rather than selling it as the common elements?

10             You were aware of that, right?

11             MR. NOVACK:  Objection.  No foundation.

12             And I'm going to object to relevance, based on what

13     we argued and what we talked about earlier.

14             THE COURT:  Sustained on form.

15             You need to rephrase that.

16     BY MR. S. KULWIN:

17     Q.  At the time from the inception -- at the time from the

18     inception, from the beginning of the project, 2001, 2002,

19     2003 -- you were absolutely aware of whether it would be

20     profitable for the Trump organization, itself, to operate the

21     F&B and function room operations as common elements --

22             MR. NOVACK:  I'm going to object on --

23     BY MR. S. KULWIN:

24     Q.  -- rather than selling it as common elements?

25             MR. NOVACK:  I just want to make my record of a

 1    relevance objection.

 2            THE COURT:  Overruled.

 3            You may answer that, if you can.

 4    BY THE WITNESS:

 5    A.  I wasn't aware.  I didn't know what would happen.

 6            I can tell you that over the last -- since -- you

 7    know, we're paying $500,000 a year.

 8            MR. S. KULWIN:  Judge, I'm going to move to strike

 9    anything about afterwards.

10            MR. NOVACK:  Well, Judge --

11            THE COURT:  The last sentence I am going to strike.

12            And the jury should disregard it.

13            MR. S. KULWIN:  In all the stress, I didn't hear the

14    answer.  Can I have it back, again, please?

15            THE COURT:  Joe, would you read the answer back,

16    please, up through the second sentence.

17            (Record read.)

18            THE COURT:  Thank you.

19    BY MR. S. KULWIN:

20    Q.  You were certainly aware --

21            MR. S. KULWIN:  I'm sorry.  Wait.

22            (Brief pause.)

23    BY MR. S. KULWIN:

24    Q.  In your deposition, sir, Line 11, Page 30, didn't you say

25    this?

Trump - direct

579

1    A.   What?

2            MR. S. KULWIN:   Page 30, Line 1.

3            (Whereupon, said video started to be played in open

4      court.)

5            THE COURT:   Can you stop, please?

6            MR. NOVACK:   Judge, before this is read, I'm afraid

7    we are going to need --

8            THE COURT:   Okay.

9            (Proceedings had at sidebar:)

10           THE COURT:   Go ahead.

11           MR. NOVACK:   Judge, I object to the part of this that

12   he's going to try to play on the grounds that it lacks --

13   lacked -- foundation at the time and I made that objection in

14   a timely manner.

15           MR. S. KULWIN:   "You were aware from the inception of

16   the project -- "

17           THE COURT:   Hold on.

18           MR. S. KULWIN:   Okay.

19           (Brief pause.)

20           THE COURT:   Let me go back here.

21           (Brief pause.)

22           THE COURT:   Overruled.

23           MR. S. KULWIN:   Thank you, Judge.

24           MR. NOVACK:   And I object on the grounds it's not

25   impeaching.

 1              Mr. Trump just said, "I didn't know.  We didn't know

 2      how it was going to come out."

 3              And his answer is that he was aware of that one way

 4      or the other.

 5              MR. S. KULWIN:  I just asked him whether he was aware

 6      of the profitability.

 7              "You were aware whether it was profitable or not."

 8      That was the question.

 9              THE COURT:  It is a question for the jury.

10              MR. S. KULWIN:  Right.

11              THE COURT:  Do you have an extra copy?

12              MR. S. KULWIN:  Yes.

13              THE COURT:  Thank you.

14              (Proceedings had in open court:)

15      BY MR. S. KULWIN:

16      Q.  Didn't you say this in your deposition, Mr. Trump?

17              (Whereupon, said video was played in open court.)

18      BY MR. S. KULWIN:

19      Q.  Now -- and you would have known at the time, from the work

20      that Mr. Reiss was doing -- the research Mr. Reiss was doing,

21      also from the inception of the project -- whether or not the

22      conclusion had been that they would be profitable?

23              You would have known that, too, correct?

24      A.  Well, first of all, I stand by what I said in my

25      deposition.  And -- because it's correct -- and, you know, I

Trump - direct

581

1   have -- I have a basic understanding of what would happen with

2   the ballroom.

3          I personally thought it would lose money from the

4   inception.  You know, the number you were giving is a gross

5   number.  You forgot to deduct things called expenses.

6          I personally thought it would lose money; and,

7   unfortunately, it's lost a lot more money than I thought.

8          MR. S. KULWIN:  Judge, move to strike.

9          THE COURT:  Overruled.  He was answering the

10  question.

11  BY THE WITNESS:

12  A.  So, the ballroom has lost a lot more money than I -- and

13  that was my feeling, when you asked me about the ballroom.  I

14  thought it would lose money.

15         I didn't know it was going to lose as much as it has

16  lost.  So, it would have been actually a net negative to the

17  unit owners had that stayed in.

18  BY MR. S. KULWIN:

19  Q.  Did you say -- first of all, did you say -- anywhere in

20  the property report that when you put the $5 million in

21  there -- did you put anywhere in there that said, "This is

22  really a loser"?

23  A.  No, the 5 million is a gross number.

24  Q.  Did you ever say that?

25  A.  No, I didn't have to.  The 5 million is a --

Trump - direct

1   Q.  You have answered.

2   A.  -- gross revenue number.

3   Q.  There's no question pending.

4   A.  It has nothing to do with that.

5         MR. NOVACK:  I think the witness should be allowed to

6  complete the answer.

7         THE COURT:  The answer can stand.

8         Let us ask your next question.

9  BY MR. S. KULWIN:

10  Q.  Now, at the time -- and you ended up owning these food and

11  beverage operations, right?

12  A.  In 2007 --

13  Q.  Right.

14  A.  -- after whatever the day.

15  Q.  And not only did you end up owning them, you agreed to pay

16  a half million dollars a year in perpetuity for the privilege

17  of doing it; is that correct?

18  A.  Even worse.

19  Q.  Is that correct?

20  A.  Even worse.  Adjust --

21  Q.  Is that correct?

22  A.  Adjusted for inflation.

23         MR. S. KULWIN:  Judge --

24  BY THE WITNESS:

25  A.  Well, you're not giving the other -- the correct number.

Trump - direct

1          THE COURT:  Mr. Trump --

2          THE WITNESS:  He's not giving me the correct number.

3          THE COURT:  Can you answer that question in a "Yes"

4     or "No," sir?  If --

5          THE WITNESS:  Well, I'd have to say "No" because he's

6     giving me the wrong number.

7          THE COURT:  Okay.

8          The answer is "No."

9     BY MR. S. KULWIN:

10    Q.  Mr. Trump --

11    A.  It was more than that.

12    Q.  Sir, in the budget, you agreed to pay $500,000 a year for

13    the privilege of operating the F&B; is that correct?  Is that

14    correct?

15    A.  It is wrong.

16    Q.  You're saying the number is too low; you paid more?

17    A.  No.  I'm saying you didn't -- not only did I agree to pay

18    $500,000 a year, which is the maximum anyone --

19         MR. S. KULWIN:  Judge --

20    BY THE WITNESS:

21    A.  -- could come up with, but I agreed to adjust it every

22    year for inflation.

23    BY MR. S. KULWIN:

24    Q.  Oh, for inflation?

25    A.  So, it goes up every year.

Trump - direct

584

1   Q.   Inflation.

2        So, let me get it straight.  Donald Trump decided to

3   buy the F&B operation in his own hotel, which he thought was

4   going to be horribly unprofitable, for half a million dollars

5   a year for eternity, even though he thought it was a complete

6   financial loser?  Do I understand you?

7   A.   Well, I didn't think it would be and, hopefully, sometime

8   into the future it will be fine; but, frankly, the units that

9   I own -- which is approximately 50 percent of the building --

10  benefit very greatly from the fact that I'm paying $500,000 a

11  year, adjusted for inflation upward.

12  Q.   Sir --

13  A.   Only upward, not downward.

14  Q.   Sir, sir, did you just say now that in 2007, you didn't

15  think it was going to lose money?

16  A.   I didn't know, but I felt it would lose.

17  Q.   So, you thought --

18  A.   These facilities don't make a lot of money, if you look

19  throughout hotel standards.  They do not make a lot of money.

20  And when you look at a facility like this, I never expected it

21  would make a lot of money.

22  Q.   Okay.

23  A.   One of the reasons we had to do it is because the

24  association needed certainty.  The association can't lose a

25  million dollars one year and then make a hundred thousand and

1    then lose two.  There's no certainty.

2         The association -- which, by the way, totally agreed

3    with this -- they needed --

4         MR. S. KULWIN:  Judge, I'm --

5    BY THE WITNESS:

6    A.  -- certainty.

7         MR. S. KULWIN:  -- going to object to that.  He's got

8    no evidence of that.  He's giving a speech.  He's making a

9    closing argument.  I'd ask you to strike it.

10        THE COURT:  I am going to strike the last part, and

11   the jury should disregard it.

12        MR. S. KULWIN:  And, at this point, Judge -- we

13   talked about something earlier this morning.  I'd like to be

14   heard on that.

15        THE COURT:  Let us move on, Mr. Kulwin.

16        MR. S. KULWIN:  That's my next line of questioning,

17   Judge, on those projections.

18        THE COURT:  Is this your last line of questioning?

19        MR. S. KULWIN:  No, it's not.  It's almost -- it's

20   getting close, but this is the point that is relevant right

21   now.

22        THE COURT:  We can have a quick sidebar.

23        (Proceedings had at sidebar:)

24        MR. S. KULWIN:  There it is, Judge.  I told you he

25   was going to do it, and he did it.  He's trying to tell this

Trump - direct

586

1   jury that he thought at the time this was going to be a major

2   loser; they were going to lose tons of money; he was doing it

3   for their benefit, when in point of fact it's just false.

4          He knew -- the organization knew -- that the

5   projections were two-and-a-half million dollars to

6   three-and-a-half million dollars, and maybe more.  And he's

7   done.

8          Sorry.

9          MR. NOVACK:  The issue is whether this witness has a

10  foundation for him to have known those numbers that Mr. Petrus

11  did and present it to a meeting he wasn't at.  That was the

12  whole point of the argument, and there's nothing here that's

13  laid a foundation for that.

14         THE COURT:  If you can lay the foundation with this

15  witness about the projections --

16         MR. S. KULWIN:  But, Judge, here's the problem.

17  Okay?  It's like I'm getting cut into pieces.  They're an

18  organization.  Okay?  The organization knows it.  If he

19  doesn't know it, then fine.  Then he looks --

20         THE COURT:  I am saying you can ask him, but if he

21  says "No," then --

22         MR. S. KULWIN:  I can ask him --

23         THE COURT:  -- you are not going to go into the

24  document or the details, if he does not know.

25         What we talked about this morning was this particular

1  meeting, which I have not heard you ask him any question

2  about, "Were you at an August 4th, August 6th meeting?"

3          MR. S. KULWIN:  And he says "I don't remember."

4          THE COURT:  Then I do not know if you have anything

5  to refresh his recollection with.  You will have to ask him.

6          MR. NOVACK:  On that point, Judge --

7          MR. S. KULWIN:  May I --

8          MR. NOVACK:  -- Mr. Kulwin --

9          MR. S. KULWIN:  May I --

10         THE COURT:  No.  Let him.

11         MR. NOVACK:  -- said we didn't disclose Donald Trump,

12 Jr.  He just said Donald Trump, Jr., was disclosed on our

13 disclosures as people with information.

14         MR. S. KULWIN:  My question, Judge, is:  Are you

15 saying that I can ask him, "Were you aware that in -- at this

16 time in summer of 2006," blah-blah-blah-blah-blah?  I can ask

17 him that?

18         THE COURT:  Well, it depends what the blah-blah-

19 blah-blah-blah is.  I cannot --

20         MR. S. KULWIN:  Was he aware that they were

21 projecting those kind of profits?

22         THE COURT:  You may ask him that and see what he

23 says.

24         MR. NOVACK:  Well, wait.  If he gets the numbers into

25 his question -- if he gets the numbers in his question, the

1    harm is done.

2          THE COURT:  No, not necessarily.

3          Why don't you start with if he was aware of

4    projections at that time, and let us see where he is.  And,

5    then -- and see if he was aware at that point of the

6    projections before you start talking about specific numbers.

7          But make sure -- your questions are so open ended,

8    which is part of the reason you are running into problems with

9    this witness.  I know he is going beyond, but you are giving

10   him wiggle room with --

11         MR. S. KULWIN:  Judge --

12         THE COURT:  I am just giving you guidance to try to

13   move this along.  If you would like, I can go back and read

14   some of them to you.

15         MR. S. KULWIN:  No, no.

16         THE COURT:  But your questions are very, very open

17   ended.  And Mr. Trump is obviously an intelligent person.  He

18   sees some wiggle room and he takes it and runs.

19         My suggestion to you, also, not just to move this

20   along, but to get in -- to try to get in -- what you are

21   attempting to is to be very specific about what time period

22   you are talking about and exactly projections of what.

23         MR. S. KULWIN:  Toward that end, Judge, I will say

24   I'm not -- we can talk about it at the break, but he was

25   supposed to be advised of motions in limine.  And he has

Trump - direct

1    repeatedly, repeatedly --

2            THE COURT:  This is a separate issue.  You do not get

3    the point, Mr. Kulwin.  I am trying to help you here.

4            MR. S. KULWIN:  I do get the point, Judge.  And I

5    take your advice very seriously.  I hear what you are saying,

6    and I am going to try my best to do it.

7            THE COURT:  Then implement it.

8            (Proceedings had in open court:)

9    BY MR. S. KULWIN:

10   Q.  Mr. Trump, so, if I understand it, Mr. Petrus came to you

11   and he made this convincing argument to you about why the

12   condo board and condo association shouldn't own these

13   elements; is that right?

14   A.  Why the condo association should?  Do you mean why the

15   sponsor should?

16   Q.  Why the condo association should not.

17   A.  Oh, should not.  I'm sorry.  I thought you said "should."

18   Q.  Is that right?

19   A.  Yes, that's true.

20   Q.  Okay.

21           And, sir, at the time, you were aware, weren't you,

22   that Mr. Petrus was doing a lot of research in the area; isn't

23   that correct?

24   A.  I didn't know, but it's very possible that he did, yes.

25   Q.  You don't know whether he did?

Trump - direct

1  A.  No, I don't know.  But it's very possible that he did.

2  I'm not disputing it.

3  Q.  And when he made this case to you, one of the things he

4  told you was about the profitability of these operations,

5  didn't he?

6  A.  I don't remember him discussing profitability at all,

7  other than to say that he needed it out.  We had no --

8  Q.  Other than to say, what?  I'm sorry?

9  A.  That he felt it should be, for certainty -- also for the

10  association, but for certainty -- that he thought it should

11  definitely be out.  I mean, you'll have to ask him what he

12  thought, but that's what he told me.  He thought it was very

13  important.

14  Q.  He felt what was very important?

15  A.  He felt the ownership was very important because of all

16  the reasons we've discussed for two days.

17  Q.  And you're telling me that in all those discussions -- I

18  want to be clear -- Mr. Petrus never said to you, "Look, I've

19  been doing all this research.  I've been gathering all this

20  information about the budget.  This is what I've come up

21  with"?  He never talked to you about that?

22       MR. NOVACK:  Object to the form, Judge.

23       THE COURT:  Sustained.

24  BY MR. S. KULWIN:

25  Q.  Did he ever -- isn't it true he discussed with you, sir,

1  during all of these -- after he was there, didn't he discuss

2  with you, "Mr. Trump, here's the basis for my rationale.  I've

3  been doing work about this.  I've looked into it."

4  A.  I think he did, yes.

5  Q.  And when he said to you, "I looked into it" -- I think he

6  did -- he showed you his work," didn't he?

7  A.  No, I don't remember him showing me any work, no.

8  Q.  He talked to you about what the results were?

9  A.  He talked to me about it.  He thought it would be okay.

10  Nothing spectacular.  He thought it would be okay.

11  Unfortunately, what happened was the market --

12       MR. S. KULWIN:  Judge --

13  BY MR. S. KULWIN:

14  Q.  Mr. Trump --

15  A.  -- tanked --

16  Q.  Mr. Trump --

17  A.  -- and it hasn't been okay.

18       MR. S. KULWIN:  Judge, move to strike.

19       THE COURT:  I will strike the from "unfortunately"

20  on, and the jury should disregard it.

21       MR. S. KULWIN:  May I have leave to proceed now,

22  Judge?

23       THE COURT:  You have not laid the foundation that we

24  talked about.

25  BY MR. S. KULWIN:

Trump - direct

1    Q.  Did I hear you correctly, sir, that when he talked to you,

2    he talked to you about he thought it would be good, but not

3    great, right?  Is that what you said?

4            MR. NOVACK:  Objection.

5    BY THE WITNESS:

6    A.  Well, he --

7            MR. NOVACK:  Asked and answered.

8            THE COURT:  Over- --

9            MR. NOVACK:  He's already answered.

10           THE COURT:  Overruled.

11   BY THE WITNESS:

12   A.  I said most importantly, he thought it was very

13   important -- the ownership -- so that somebody else cannot

14   come in there because the board would -- and he was, in

15   particular, worried about the wrong person being the manager.

16   BY MR. S. KULWIN:

17   Q.  But my question is --

18   A.  And he talked about that.

19   Q.  My question is:  I heard you say "I thought."  He thought

20   it would be good, not great?

21   A.  I thought -- you know, again, you're talking about many

22   years ago.  I thought -- my impression was -- that he thought

23   it would be okay.  I mean --

24   Q.  And --

25   A.  Not --

Trump - direct

593

1   Q.  When you mean okay --

2   A.  It wasn't the greatest, but he thought it would be okay.

3   Q.  And when you mean "okay," what you were talking about is

4   the food and beverage operations?

5   A.  The food and beverage operation.  Thought it would be

6   okay.

7           MR. S. KULWIN:  Now, Judge?

8           THE COURT:  Overruled.

9           MR. S. KULWIN:  I'm overruled?

10          THE COURT:  You have not -- you are not there.

11  BY MR. S. KULWIN:

12  Q.  And when he said it would be okay, he told you the basis

13  for his thinking it would be okay?

14  A.  That, I don't remember.

15  Q.  One way or the other?

16          Maybe I can refresh your recollection.

17          (Brief pause.)

18  BY MR. S. KULWIN:

19  Q.  Let me show you what's been marked as part of Plaintiff's

20  Exhibit 125, Bates numbers 3237 through 3268.

21          THE COURT:  Mr. Kulwin, just a reminder, this is not

22  in evidence.

23          MR. S. KULWIN:  I know.

24          THE COURT:  So, you should not read it.

25          MR. S. KULWIN:  I'm not going to.

Trump - direct

 1           MR. SHONKWILER:  What page, counsel?

 2           MR. S. KULWIN:  3237.

 3   BY MR. S. KULWIN:

 4   Q.  Take a look, Mr. Trump.  Does this refresh your

 5   recollection at all --

 6           (Document tendered.)

 7   BY MR. S. KULWIN:

 8   Q.  -- about what Mr. Petrus talked to you about when he was

 9   talking to you about those operations?

10           THE COURT:  Read it to yourself, please, sir.

11           THE WITNESS:  Yes.

12   BY THE WITNESS:

13   A.  It doesn't, your Honor.  I don't believe I've ever seen

14   this.  I don't --

15           MR. S. KULWIN:  He hasn't even looked at it, Judge.

16           THE WITNESS:  I have looked at it.  I don't -- I

17   don't even know what it is.

18   BY MR. S. KULWIN:

19   Q.  Sir, did you attend any meetings at the Trump organization

20   about the budgets in '06?

21   A.  Not that I remember, no.

22   Q.  Can't recall that either?

23   A.  No.

24   Q.  Did you ever meet with Mr. Petrus about it --

25   A.  About, what?

Trump - direct

1   Q.  -- in August of '06?

2   A.  About, what?

3   Q.  About the budget and things of that nature.

4         Can't remember that either, right?

5   A.  I would say that he would have met maybe with Ivanka Trump

6   or with Don Trump or with Eric Trump.  I don't remember having

7   met with him at all about the budget.

8   Q.  In any event, you said that Mr. Petrus made this very

9   strong case for you, right?  He came to you and talked to you;

10  is that right?

11  A.  Well, he had a strong case for ownership because of the

12  negatives of not owning --

13  Q.  Sir --

14  A.  -- for the building.

15  Q.  -- isn't it -- and that's what led you to approve removing

16  the facilities, correct?  His pitch to you?

17  A.  Well, he felt -- I mean, you --

18  Q.  No, no.

19  A.  You'll be asking him.

20  Q.  Listen to the question.

21  A.  He felt -- he felt --

22  Q.  Listen to the question.

23  A.  Go ahead.

24  Q.  That was -- not what he said to you.  You've said that

25  several times.

Trump - direct

596

1         The question is:  That pitch to you -- Mr. Petrus'

2    pitch to you -- in that meeting with you led you to approve

3    removal of the hotel facilities from the common elements,

4    right?

5    A.   What --

6    Q.   Is that right?

7    A.   -- Mr. Petrus told me at the meeting, whatever it may have

8    been, I said, "Okay.  Let's do it.  I don't care."

9    Q.   Sir, isn't it true that you don't remember any meetings

10   with Mr. Petrus or anyone else about this topic?  Isn't that

11   true?

12   A.   No.  Mr. Petrus is the one that told me about the

13   ownership of the elements.

14   Q.   It's a simple question, sir.  Isn't it true that you don't

15   remember any meetings with Mr. Petrus about this topic?

16   A.   No, that's not --

17   Q.   Isn't that true?

18   A.   That's not correct.

19   Q.   Okay.

20        Isn't it also true, sir, that you don't remember how

21   many meetings you had with Mr. Petrus, right?

22   A.   I would say it didn't take many.  I think it was one or

23   two probably.

24   Q.   So, isn't it also true, sir, that you don't remember what

25   employees participated in any meetings you had with anybody

Trump - direct

1  about removing these elements?  Isn't that also true?

2  A.  Well, that may be so.  I mean, I'm not sure who was in the

3  room with me.  There could have been other people.

4  Q.  And you don't remember when they occurred or who was

5  present; isn't that right?

6  A.  Well, it's many years ago, but I know it was sometime

7  during '07.

8  Q.  So, let's go back to be clear.  You don't remember

9  Mr. Petrus -- you say you do remember Mr. Petrus and the

10  meetings, right?

11  A.  That's right.

12  Q.  Did you sign sworn interrogatories in this case?

13  A.  Yes, I did.

14  Q.  And did you sign them on October 19th, 2011?

15  A.  Yes.

16  Q.  And didn't you say in those signed sworn interrogatories,

17  "Trump -- " "Mr. Trump says while Trump Tower's in the

18  development stages -- "

19          THE COURT:  Slow down, please.

20          MR. S. KULWIN:  Yes.

21  BY MR. S. KULWIN:

22  Q.  " -- he had various brief, informal status discussions

23  with employees to stay generally apprised regarding the

24  development of the project, including the designation of

25  portions of the project as common elements.  And he ultimately

Trump - direct

598

1   agreed with the decision to remove the function rooms from the

2   common elements of the hotel condominium.  Mr. Trump does not

3   recall how many times those discussions regarding common

4   elements occurred -- "

5   A.  It's true.

6   Q.  " -- their dates or any other details about the

7   discussions, and he does not recall which employees

8   participated."

9   A.  Well, that's true, other than I know -- I mean, you know,

10  this took place a long time ago.  Mr. Petrus spoke to me about

11  -- a while ago, when this whole thing came up, and he said it

12  was him sometime long after that.  And I vaguely remember that

13  meeting.

14  Q.  Hold it, sir.

15          In 2011, you swore under oath you had no idea who

16  said it, right?

17  A.  No.  After --

18          MR. NOVACK:  Objection.  That's not --

19  BY THE WITNESS:

20  A.  I'm not saying that.

21          THE COURT:  Sustained.  Sustained.

22  BY THE WITNESS:

23  A.  I'm saying af- --

24          THE COURT:  Mr. Trump, I sustained it.

25          THE WITNESS:  Okay.

Trump - direct

1  BY MR. S. KULWIN:

2  Q.  Sir, in 2011, when you signed these sworn interrogatories,

3  you aver that you did not recall which employees told you

4  about this --

5  A.  But --

6          MR. NOVACK:  That's not --

7  BY THE WITNESS:

8  A.  -- since then --

9          MR. NOVACK:  Objection.

10          THE COURT:  Wait, Mr. Trump.  There is an objection.

11          MR. NOVACK:  What he's reading, he does not recall

12  all the employees who participated.

13          MR. S. KULWIN:  This doesn't --

14          MR. NOVACK:  That's different than who said it.

15          MR. S. KULWIN:  That's absolutely wrong, Judge.

16          THE COURT:  Sustained.

17          MR. S. KULWIN:  Judge, that's absolutely wrong.  He

18  says --

19          THE COURT:  Mr. Kulwin, I sustained it.

20          MR. S. KULWIN:  I'll read it --

21          THE COURT:  If you want to read it --

22          MR. S. KULWIN:  I will.

23          THE COURT:  -- verbatim there -- but you have already

24  done that.  So, you are going to get an "asked and answered"

25  objection, and I am going to sustain it.

Trump - direct

600

1   BY MR. S. KULWIN:

2   Q.  And after you -- so, what you're saying is, sir, in

3   October of 2011, when you signed sworn interrogatories saying

4   that you didn't recall which employees told you about any of

5   this --

6           MR. NOVACK:  Objection.

7   BY MR. S. KULWIN:

8   Q.  -- since the --

9           MR. S. KULWIN:  That's what he says here, Judge.

10          Can I go on?

11          THE COURT:  What is your objection?

12          MR. NOVACK:  The objection is it's the same misquote.

13          THE COURT:  Sustained.

14          MR. NOVACK:  It doesn't say --

15          THE COURT:  Sustained.

16          MR. S. KULWIN:  Judge, could I lay the foundation for

17  the quote, again, please, so I can get the next question in?

18          THE COURT:  Ask your question.  We will see if there

19  is an objection.

20  BY MR. S. KULWIN:

21  Q.  Sir, in the interrogatories, you say you don't recall how

22  many times the discussions occurred regarding the common

23  elements, their dates or any other details about the

24  discussion, correct?

25  A.  Well, that's what I said just now, other than I --

Trump - direct

601

1   Q.  Hold it.

2   A.  -- know through conversations since then --

3   Q.  Sir --

4   A.  -- that I did speak to Mr. Petrus.

5           MR. S. KULWIN:  Move to strike that, Judge.  I'm

6   asking him first this.

7           THE COURT:  I will strike the last portion.

8   BY MR. S. KULWIN:

9   Q.  In --

10          THE COURT:  The jury should disregard it.

11  BY MR. S. KULWIN:

12  Q.  In your interrogatories, in 2011, under oath, you said you

13  didn't remember any of the details of the discussions?

14  A.  I don't think that's what it says.

15  Q.  Really?

16  A.  I don't think so.

17  Q.  Take a look.

18          (Document tendered.)

19  BY THE WITNESS:

20  A.  It says that I had meetings generally apprised regarding

21  the development -- that I had meetings where I was generally

22  apprised of the development.  So, that doesn't say I don't

23  remember anything.

24  BY MR. S. KULWIN:

25  Q.  It says, "And I don't remember any other details about the

Trump - direct

602

1    discussion" --

2    A.  Right.  That's -- sure.  But that's different from what

3    you're saying.

4    Q.  I see.

5         And in addition, sir, you say, "I do not recall which

6    employees -- " which, not all of; which employees " --

7    participated, correct?  October of '11.

8         First just answer that.  Is that correct?

9    A.  That is correct.

10   Q.  Okay.

11        Now, what you're saying is that since October of '11,

12   Mr. Petrus came to you and reminded you, right?  Is that

13   right?

14   A.  Yeah.  He came to me sometime after that because I was

15   curious as to that whole thing, and he absolutely refreshed my

16   recollection.

17        MR. S. KULWIN:  Move to strike all of that, Judge.

18   BY MR. S. KULWIN:

19   Q.  I'm just asking you, isn't it true that you're now saying

20   that Mr. Petrus -- after you swore under oath that you didn't

21   remember which employees, that Mr. Petrus -- reminded you?

22   A.  No, he --

23   Q.  Is that correct?

24   A.  He came to me and we talked, and he refreshed my

25   recollection that it was him.  And I do --

Trump - direct

603

1    Q.  And that was --

2    A.  And I do remember it.

3    Q.  And that was in 2011?

4    A.  That was after the deposition.

5    Q.  Yeah.  It was after -- it was after you signed your sworn

6    interrogatories?

7    A.  No, it was after the deposition.  Yes.

8    Q.  He came to you after you gave your deposition or after you

9    signed the interrogatories?

10   A.  I would say probably after, because I think I signed it

11   fairly quickly after.  You'd have to show me the dates.

12   Q.  October, 2011, was when you signed.

13   A.  Sometime after -- was the signing?

14   Q.  You signed it -- it was not -- you signed it on October

15   19th, 2000- --

16   A.  It would have been after I signed, yes.

17   Q.  Signed this, but before your deposition?

18   A.  No, after I signed the deposition.

19   Q.  You never signed --

20   A.  You said I signed the interrogatories --

21   Q.  Right.

22   A.  -- right?

23   Q.  So --

24   A.  Right.

25   Q.  -- you signed it?

Trump - direct

604

```
 1  A.  Right.
 2          What is the date of the signing?
 3  Q.  October 19th, 2011.
 4  A.  Sometime after that, I spoke with Mr. Petrus -- and you
 5  will speak to him, also -- and that was what happened.  And it
 6  --
 7  Q.  And it was before --
 8  A.  -- very much refreshed my recollection.  It was him --
 9  Q.  And that was before --
10  A.  -- who brought this up.
11  Q.  And it was before you gave your deposition, correct?
12  A.  I thought it was the same thing.  I thought I was --
13          THE WITNESS:  Your Honor, I thought I was signing the
14  deposition.
15          THE COURT:  I am not sure he understands --
16          THE WITNESS:  I do not know what he is talking about.
17          THE COURT:  -- the distinction.
18          MR. S. KULWIN:  Okay.
19  BY MR. S. KULWIN:
20  Q.  Here are your interrogatory answers.
21  A.  Okay.
22  Q.  They're dated October 19th, 2011.
23  A.  Okay.
24          (Document tendered.)
25  BY MR. S. KULWIN:
```

Trump - direct

605

1   Q.  You do understand that, right?

2   A.  Yes.

3   Q.  Okay.

4          Your deposition took place after that.  You know

5   that, correct?

6   A.  Yes.

7   Q.  And you know the difference -- you've been in depositions

8   before.  You know the difference between a deposition and a

9   signed interrogatory --

10  A.  Yeah.

11  Q.  -- correct?

12  A.  Yes.

13  Q.  Is that right?

14  A.  Yes.

15  Q.  And you knew that your deposition wasn't given till --

16  check for the record here real quick --

17          THE COURT:  April 18th of 2012.

18  BY MR. S. KULWIN:

19  Q.  -- April 18th of 2012 --

20  A.  I would have seen him -- yes, I would have seen him after

21  that.

22  Q.  After, what?

23  A.  After my last -- I assume the deposition came last.

24  Q.  It did.

25  A.  Okay.

Trump - direct

1       After the deposition.

2  Q.  And in your deposition -- you agree that you said in your

3  deposition -- isn't that correct, that it was true you didn't

4  remember any of the details -- let me finish -- any of the

5  details or who told you; isn't that right?

6  A.  It says here --

7  Q.  No, no, not there.

8  A.  Okay.

9  Q.  In your deposition.

10  A.  Well, I'd have to read the deposition.

11  Q.  We'll get it for you.  I'll play it for you.

12       THE COURT:  Are you attempting to refresh his

13  recollection or what are you doing, Mr. Kulwin?

14       MR. S. KULWIN:  I will just take a quick look, Judge,

15  if I may.

16       THE COURT:  You may, but before you play anything,

17  answer that question, please.

18       (Brief pause.)

19       MR. S. KULWIN:  I was going to play it, Judge.

20       THE COURT:  What page are you at?

21       MR. S. KULWIN:  Page 79, Line 7.

22       THE COURT:  The only way you can play it is if it is

23  impeaching.  That is consistent with what he said.

24  BY MR. S. KULWIN:

25  Q.  Mr. Trump, before your deposition, you didn't -- you're

Trump - direct

```
 1  saying that Mr. Petrus came to you after your --
 2  A.  I --
 3  Q.  -- deposition?
 4  A.  I don't know when he came to me.  I just know he came to
 5  me.
 6  Q.  So --
 7  A.  I don't know when.  I don't know if it's before or after
 8  the deposition, but he came to me.
 9  Q.  In your deposition, though, you testified that you didn't
10  remember any of the details.  You just assumed that's what
11  Mr. Petrus told you; isn't that correct?
12  A.  I don't know.  I mean, I don't remember the deposition.
13  I'd have to read it.
14  Q.  Okay.  Let me show it to you.
15          (Document tendered.)
16  BY MR. S. KULWIN:
17  Q.  Right here (indicating).
18          THE COURT:  To yourself, please.
19          MR. NOVACK:  Judge, I'm asking --
20          THE WITNESS:  Where is it?
21          MR. NOVACK:  -- that Mr. Kulwin be required to show
22  Mr. Trump -- if he's showing this for recollection refreshed,
23  that he show him -- Page 63, Line 23 --
24          THE WITNESS:  He's showing Page 79.
25          MR. NOVACK:  -- to 64 --
```

Trump - direct

```
 1              THE COURT:  One second.

 2              MR. NOVACK:  63, Line 23, to Line 4 on the next page,

 3   64.  Actually, he might, for context, your Honor, start at

 4   Page -- at Line 2 on Page 62.

 5              (Brief pause.)

 6              THE COURT:  Yes.  He can read both of those, as well.

 7              MR. S. KULWIN:  You want to read those, too.  Fine.

 8              THE COURT:  Page 63, Line 2 --

 9              THE WITNESS:  Line 2.

10              THE COURT:  -- through Page 64, Line 7; and, then,

11   the Page 79, where Mr. Kulwin was referring to.

12   BY THE WITNESS:

13   A.  Well, this is --

14              MR. S. KULWIN:  Wait.  Just read it to --

15              THE COURT:  Read it to yourself.

16              MR. S. KULWIN:  -- yourself, Mr. Trump.

17   BY THE WITNESS:

18   A.  That's correct.

19              MR. S. KULWIN:  64, what, Judge?

20              THE COURT:  Page 63, Line 2, through Page 64, Line 7.

21              (Brief pause.)

22   BY THE WITNESS:

23   A.  Yes, that's fine.

24   BY MR. S. KULWIN:

25   Q.  Okay.
```

1           And now read all of this, from Page 78, Line 11,

2    through Page 17 of Page 79.

3               (Brief pause.)

4           THE WITNESS:  Well, am I allowed to respond to

5    this --

6           THE COURT:  Let him ask a question.

7           THE WITNESS:  Yeah.

8           THE COURT:  There is no question yet.

9    BY MR. S. KULWIN:

10   Q.  Does it refresh your recollection, sir, that at the time

11   of your deposition, you didn't remember Mr. Petrus saying

12   anything to you, you just assumed that's what he would say?

13   A.  Well --

14   Q.  Is that true?

15   A.  No, because the previous said that -- the previous line

16   that the Judge asked us to look at said -- that Mr. Petrus and

17   Mr. Weiss were there.

18          MR. S. KULWIN:  Judge, he's reading from the dep.

19   BY THE WITNESS:

20   A.  Now you're asking me another, and this is referring to the

21   $500,000.  And that's what I think you're referring to here --

22          MR. S. KULWIN:  May I --

23   BY THE WITNESS:

24   A.  -- the $500,000.

25          MR. S. KULWIN:  May I play the 78, please, Judge?

Trump - direct

610

```
 1              THE COURT:  No.  You have not laid the foundation for

 2  it.

 3  BY MR. S. KULWIN:

 4  Q.  Sir, I want to --

 5  A.  You're referring -- you're referring to the --

 6              THE COURT:  Mr. Trump --

 7  BY THE WITNESS:

 8  A.  -- $500,000.

 9              THE COURT:  Mr. Trump, there is no question.  There

10  is no question.

11              MR. S. KULWIN:  Judge, can you look at Page 77, Line

12  6 through 17.

13              Can I play that?

14              I'm sorry.

15              (Brief pause.)

16              MR. S. KULWIN:  May I play that?

17              THE COURT:  No.

18              You can ask him a question.  You have not laid a

19  foundation yet.

20  BY MR. S. KULWIN:

21  Q.  Mr. Trump, isn't it true that you didn't know who

22  recommended that the elements be removed and gave you all the

23  reasons why they thought it would be removed?  Isn't that

24  true?

25  A.  I think that I -- as I told you before and sort of says in
```

Trump - direct

```
 1   that --
 2   Q.  Isn't that true --
 3   A.  -- in that document --
 4   Q.  -- Mr. Trump?
 5   A.  No, it's not because of my -- my --
 6          MR. S. KULWIN:  Judge, may I now play it?
 7   BY THE WITNESS:
 8   A.  My --
 9          THE COURT:  Mr. Trump --
10   BY THE WITNESS:
11   A.  -- recollection is --
12          THE COURT:  Mr. Trump.
13          THE WITNESS:  Yes.
14          THE COURT:  Wait, please.
15          THE WITNESS:  Okay.
16          THE COURT:  Let us have a sidebar.
17          (Proceedings had at sidebar:)
18          THE COURT:  Mr. Kulwin, I am not sure what you are
19   doing here.  You are asking him all sorts of questions about
20   prior testimony.  He is here to ask him the questions today.
21   You can use prior testimony to refresh or to impeach.  And now
22   you are arguing with him about his prior testimony.  You can
23   save all those arguments for the jury at the end.  I am not
24   sure what you are trying to do.
25          MR. S. KULWIN:  May I explain?
```

Trump - direct

612

1          THE COURT:  Please.

2          MR. S. KULWIN:  Okay.

3          Mr. Trump has volunteered a number of times that

4     Mr. Petrus made this strong case to him.

5          THE COURT:  I got it.

6          MR. S. KULWIN:  I've impeached him with his

7     interrogatories that in October of 2011, he said he had no

8     idea.  So, then, he said, "Well, Mr. Petrus came to me

9     afterwards and reminded me."

10          I said, "When?"

11          He said, "I don't remember.  It could be before the

12     deposition or after the deposition."

13          I then said, "In 2012, didn't you say that you didn't

14     know who did it?"  I just asked him that just now.

15          And he said, "I did know who."

16          THE COURT:  Well, you were asking him questions about

17     when Mr. Petrus came to him to refresh his recollection.  He

18     initially said he thought it was after the deposition, but

19     then he said he was not sure.  I think the next question is,

20     "Now that you have seen this portion of your deposition, is

21     your recollection refreshed as to when Mr. Petrus came to

22     you?"

23          MR. S. KULWIN:  And he if he says "No," can't I then

24     say, "Isn't true, sir, at the time of your deposition, you

25     didn't know who told you?" --

Trump - direct

```
 1            THE COURT:  You can --

 2            MR. S. KULWIN:  -- and then --

 3            MR. NOVACK:  If I may.

 4            MR. S. KULWIN:  -- impeach him if he says "No"?

 5  Okay?

 6            MR. NOVACK:  I would object to that because what he

 7  said at his deposition in a different place, you can't just

 8  pick out one thing.

 9            MR. S. KULWIN:  But that's --

10            MR. NOVACK:  He said Mr. Petrus in --

11            THE COURT:  You are reading from Page 63.  You are

12  going too fast.  Joe could not hear you.

13            MR. NOVACK:  Witness said, "Mr. Petrus, in

14  particular, is the head of the hotel company.  And he, I

15  remember, felt very strongly that the volatility of the

16  situation the other way would be, you know, potentially

17  catastrophic for the hotel and the operation of the hotel and

18  the operation of the building itself."

19            THE COURT:  Here is the problem --

20            MR. S. KULWIN:  Judge, that's --

21            THE COURT:  Wait.

22            You have to be very specific in your question about,

23  "Does this refresh your recollection as to when Mr. Petrus

24  told you -- " what?

25            MR. S. KULWIN:  Right.
```

Trump - direct

614

1              THE COURT:  Not just "told you."

2              MR. S. KULWIN:  Judge, Mr. Novack is reading from his

3       direct examination.

4              THE COURT:  No, he is not.

5              MR. S. KULWIN:  Yes, he is.  That's his --

6              THE COURT:  He is reading it from his --

7              MR. S. KULWIN:  No, that's his.  That's his

8       examination.

9              THE COURT:  This is Donald Trump's --

10             MR. S. KULWIN:  I know.  That was him questioning

11      just now.

12             MR. NOVACK:  But that doesn't matter.

13             MR. S. KULWIN:  It does matter.

14             THE COURT:  Stop.

15             If you are trying to mislead -- it is unfair --

16             MR. S. KULWIN:  I'm not.

17             THE COURT:  Listen.

18             It is unfair of you to say to him and try to impeach

19      him with something if he says something different in another

20      portion of his deposition without giving him the opportunity.

21             I would suggest to you that you go back to him and

22      ask him the question I just told you to, if this refreshes his

23      recollection as to when Mr. Petrus conveyed this information

24      to him; and, if not, you can ask your next question and I will

25      hear if there is an objection.

Trump - direct

615

```
 1              MR. S. KULWIN:  Your Honor --

 2              THE COURT:  I would also suggest to you, Mr. Kulwin,

 3    that you have now spent about 25 minutes on this area of

 4    questioning.

 5              MR. S. KULWIN:  It's a critical --

 6              THE COURT:  Watch this jury.  You are losing this

 7    jury.

 8              MR. S. KULWIN:  I know.  It is a critical issue,

 9    Judge.  Look, what happened was --

10              THE COURT:  I have given you my recommendation.

11              (Proceedings had in open court:)

12    BY MR. S. KULWIN:

13    Q.  Mr. Trump --

14    A.  Yes.

15    Q.  -- if you look at Page 77 --

16    A.  Okay.

17    Q.  -- does it refresh your recollection that you didn't know

18    at the time of your deposition who told you that it would be a

19    disastrous idea to have -- who told you -- who recommended to

20    you that the elements be removed from the -- that the hotel

21    facilities be removed from the common elements?

22    A.  Well, this says it was --

23    Q.  No, no.  Don't --

24    A.  -- Mr. --

25    Q.  -- read it, sir.
```

 1   A.  Well, I'm --

 2   Q.  Read it to yourself.

 3   A.  I'm just saying what it says.

 4   Q.  Read it to yourself.

 5       Does that refresh your recollection if you look at

 6   your answer?

 7   A.  Not really, because I --

 8   Q.  Okay.  That's enough, Mr. Trump.

 9   A.  Okay.

10       MR. S. KULWIN:  Now, Judge, I will ask another

11   question.

12   BY MR. S. KULWIN:

13   Q.  Sir, isn't it true at the time of your deposition, you

14   didn't know who recommended that the elements be removed and

15   gave you all the reasons why they thought it should be

16   removed?  At the time of your deposition, you didn't know?

17   A.  As I said, at the time of my deposition.  But I found out

18   later, when Jim Petrus came to see me.

19   Q.  Okay.

20       So, after your interrogatory answers, after your

21   deposition, that's when Mr. Petrus came to see you?

22   A.  At a later -- at a later date, absolutely.

23   Q.  All right.

24   A.  Yes.

25   Q.  Are you aware, sir, that in January of 2005, that your

Trump - direct

617

1   organization added the parking revenue to the common elements?

2   A.  I don't remember specifically when.  I think at some point

3   that took place, yes.

4   Q.  Yes.

5        And isn't it true, sir, that right on the face of the

6   hotel budget, it showed a hundred-thousand-dollar profit --

7   A.  That, I don't know.

8   Q.  -- for the parking facilities?

9   A.  I don't know.

10       MR. S. KULWIN:  Can we have Exhibit H in evidence on

11  Plaintiff's Exhibit 7.

12  BY MR. S. KULWIN:

13  Q.  Now, you see here the $994,650 for parking revenue, sir?

14  A.  Yes.

15  Q.  And the parking facility was going to be run by a parking

16  management company, right?

17  A.  That's right.

18  Q.  And they would charge a fee, correct?

19  A.  I believe that's right.  I'm not that familiar with it.

20  Q.  But that was what you envisioned, true?

21       MR. NOVACK:  Judge, I'm going to object because when

22  Mr. Trump was asked about this before, he said that he had

23  never seen this document.

24       MR. S. KULWIN:  No, but I can still ask him about it,

25  Judge.  He is the organization.

Trump - direct

618

```
 1              THE COURT:  Overruled.
 2              Let us see if he can answer the last question.
 3              MR. S. KULWIN:  Okay.
 4   BY MR. S. KULWIN:
 5   Q.  That was your envisionment, right?  A parking company
 6   would run it?
 7   A.  I don't know too much about it.  I really don't.
 8   Q.  You go back down, though, when a parking company --
 9              MR. S. KULWIN:  One more time.  One more page.
10   BY MR. S. KULWIN:
11   Q.  Now, if you look here -- if you see here, sir, the parking
12   management fee, the expense is $903,832, correct?
13   A.  Yes.
14              Is this a -- is this a budget?  This is a budget,
15   right?
16   Q.  Yeah.
17   A.  This is a budget?
18   Q.  Yeah.
19   A.  Yeah.
20              So, I just don't know what it means because --
21   Q.  Okay.
22   A.  -- those aren't -- those aren't the numbers.
23   Q.  Okay.
24              You don't think those are the real numbers?
25   A.  I don't think so, no.  This is a budget.  This isn't --
```

1   these aren't real numbers, I don't think.

2   Q.   So --

3   A.   What does it say on the top?

4   Q.   So, when you issued the property report with Exhibit H to

5   potential buyers, like Ms. Goldberg, who were looking at it --

6   so, if she looked and she saw parking 994, expense for parking

7   903, she'd be basing it on false numbers?

8   A.   Well, Mrs. Goldberg had the right to --

9   Q.   No, no, I'm not asking what she had the right to.  I'm

10  asking --

11  A.   Well --

12  Q.   -- would she be basing her conclusion on false numbers?

13  A.   Before she signed her documents, she --

14  Q.   Sir --

15  A.   -- asked us to terminate the clause whereby we had the

16  right to rescind.

17  Q.   Sir, sir --

18  A.   Her lawyer wrote us a letter.  We said "No."  And, then,

19  she said --

20          MR. S. KULWIN:  I move to strike it, Judge.

21  BY THE WITNESS:

22  A.   -- "I'll will buy it, anyway."

23          MR. S. KULWIN:  I move to strike it, Judge.

24          THE COURT:  It can stand.

25          And you are asking him about what was in somebody

Trump - direct

1    else's head.

2              MR. S. KULWIN:  No, I'm --

3              THE COURT:  Rephrase your question.

4    BY MR. S. KULWIN:

5    Q.  Sir, when Ms. Goldberg looked at something -- forget about

6    Ms. Goldberg.

7              Anybody looking at that, sir, are you telling me that

8    if they looked at it and saw the 944 and the 904 numbers we

9    were just talking about, to the best of your knowledge, those

10   numbers were inaccurate?

11   A.  I'm just --

12             MR. NOVACK:  Judge --

13   BY THE WITNESS:

14   A.  I just don't know the --

15             MR. NOVACK:  -- I'm going to object to that.

16             THE COURT:  There is an objection.

17             MR. NOVACK:  He did not say they were inaccurate.  He

18   said they weren't real because they were projections versus

19   actual.

20             THE COURT:  Sustained.

21             You are asking him to --

22   BY MR. S. KULWIN:

23   Q.  And when --

24             THE COURT:  -- speculate.

25   BY MR. S. KULWIN:

Trump - direct

621

1  Q.  And when you give projections, Mr. Trump, in the property

2  report, they have to be as true and accurate as you can make

3  them at the time; isn't that correct?

4  A.  Absolutely, but nobody knew the world was going to

5  collapse.

6        MR. S. KULWIN:  Judge, I move to strike that.

7        THE COURT:  I will strike the last sentence, and the

8  jury should disregard it.

9  BY MR. S. KULWIN:

10 Q.  And, quite frankly, sir, when you make any projections,

11 you don't know the world's going to collapse, right?

12 A.  That's true.

13 Q.  And at the time that these projections were being made,

14 they were being made by the Trump organization, correct?

15 A.  I assume so.  I don't -- I didn't see that, but --

16 Q.  And --

17 A.  -- I assume so.

18 Q.  And, Mr. Trump, the Trump organization, I mean, who better

19 to know how to make projections about hotel revenues and

20 expenses in 2005 than the Trump organization?

21 A.  Who knew what was going to happen.

22 Q.  Sir, I'm not asking you about who knew.

23 A.  Okay.

24 Q.  I'm talking about -- there wasn't any crash in 2006, was

25 there?

Trump - direct

1   A.  Well, 2007 and '8 there was.

2   Q.  There wasn't any crash in 2006, was there?

3   A.  It was the beginning.

4   Q.  Okay.

5        Do you have any documentation like that, sir?

6   A.  No.

7   Q.  In fact, in October of 2007, the stock market peaked,

8  didn't it?

9   A.  Yeah.  It was --

10  Q.  Yeah.

11  A.  -- slightly after that.

12  Q.  Yeah.  Slightly after that.

13       And, so, sir, in 2006, those projections was Trump's

14  best estimate of what was going to happen, correct?

15  A.  Well, I would assume so.  I don't know who did the

16  estimates.

17  Q.  You don't know?

18  A.  I don't know.

19  Q.  Okay.

20  A.  I didn't do the estimates.

21  Q.  Okay.

22       And you would agree, sir, that a hundred thousand

23  dollars a year towards the condo budget would be a -- have a

24  positive impact, correct?

25  A.  It's a very small number relative to what we're talking

Trump - direct

623

1   about.

2   Q.   So --

3   A.   A hundred thousand dollars.

4   Q.   -- $500,000 a year would have a positive impact?

5   A.   Yes.

6   Q.   Okay.

7   A.   500 --

8   Q.   Not a hundred thousand?

9   A.   Well, 500,000 plus the fact that it lost --

10  Q.   Sir --

11  A.   -- over a million dollars would have --

12  Q.   Sir --

13  A.   -- a very positive impact.  The ballroom lost over a

14  million dollars.

15          MR. S. KULWIN:  Move to strike.

16  BY THE WITNESS:

17  A.   So, that would have a very positive impact.

18          MR. S. KULWIN:  Move to strike all of it, Judge.  Not

19  responsive.

20          MR. NOVACK:  He asked that question.

21          THE COURT:  You -- overruled.

22  BY MR. S. KULWIN:

23  Q.   Sir, $500,000 would have a positive impact; is that right?

24  A.   Well, it's not --

25  Q.   What do you mean --

1    A.  It's 500,000 plus the fact that they didn't lose over a

2    million dollars.  So, that would be a million-five or a

3    million-six.  That would have a huge positive impact.

4    Q.  Sir, we didn't know they were going to lose a million-five

5    or million-six --

6    A.  It could have lost.

7    Q.  May I finish?

8    A.  It could have lost -- yes, go ahead.

9    Q.  You didn't know they were going to lose a million-five and

10   a million-six.  You thought the opposite was going to happen.

11   A.  We didn't know -- look, I didn't know.  I was never a big

12   fan of owning F&B because I know F&B, generally speaking, is

13   not a great thing to own from the standpoint purely of a

14   bottom line.  I had no idea it was going to lose as much money

15   as it has.  And, frankly, the unit owners are very lucky that

16   they made that deal.

17             MR. S. KULWIN:  Judge, I move to strike all of that.

18             THE COURT:  I will strike the portion about they were

19   lucky.

20   BY MR. S. KULWIN:

21   Q.  And the fact of the matter is, sir, you're looking back in

22   hindsight.  At the time, in 2006, 2007, when this decision was

23   being made, you were extremely bullish on hotels, weren't you?

24   A.  The whole world was.

25   Q.  Were you?  I don't care about the whole world.

Trump - direct

1   A.  I think.  I guess.

2   Q.  You.

3   A.  I mean, I think so.

4   Q.  You were bullish?

5   A.  Probably.

6   Q.  Right.

7           And you were building one in Las Vegas, right?

8   A.  Right.

9   Q.  And one in Hawaii, right?

10  A.  Right.

11  Q.  And they all had F&B operations, right?

12  A.  That's true.

13  Q.  And, so, at the time in 2006, okay, you were aware of

14  whether they would be profitable not here in Chicago, right?

15  You said that already?

16  A.  Well, excuse me, they were very different operations,

17  though --

18  Q.  And the bottom --

19  A.  -- when you mention the other --

20  Q.  The bottom line of it is, sir -- and the bottom line of it

21  is, sir -- is that your people certainly knew -- Mr. Petrus

22  certainly knew -- whether or not those F&B operations in 2006

23  were going to be profitable or not, based on what he could

24  gather from the market at the time; isn't that true?

25  A.  I don't -- I told you --

```
 1              MR. NOVACK:  Objection.

 2              THE COURT:  There is an objection.

 3   BY THE WITNESS:

 4   A.  -- I don't remember that.

 5              THE COURT:  Mr. Trump, there is an objection.

 6              MR. NOVACK:  Calls for speculation by the witness.

 7              THE COURT:  Sustained.

 8              Mr. Kulwin, do you have a sense of how much longer

 9   you have?

10              MR. S. KULWIN:  Yes, Judge.

11              THE COURT:  How much?

12              MR. S. KULWIN:  If I can have one second, Judge?

13              THE COURT:  Yes.

14              (Brief pause.)

15              THE COURT:  I am trying to see if we can finish

16   direct before --

17              MR. S. KULWIN:  Sure.

18              THE COURT:  -- we break for lunch.

19              (Brief pause.)

20   BY MR. S. KULWIN:

21   Q.  Now, with respect --

22              MR. S. KULWIN:  I'm sorry, Judge, I forgot.

23              We're going to break at 12:30, Judge?

24              THE COURT:  Well, that is what I am trying to get a

25   sense of:  How much longer?
```

Trump - direct
627

```
 1            I will go until at least 12:30.  If you tell me you
 2   will be done by 12:35, I will go to 12:35.
 3            MR. S. KULWIN:  It would depend on how you -- on
 4   something we talked about this morning.  So, if --
 5            THE COURT:  Okay.
 6            So, go ahead.  Ask your next question.
 7            You are not there yet.
 8   BY MR. S. KULWIN:
 9   Q.  Sir, with respect to the conversations that you say
10   Mr. Petrus reminded you of sometime after 2012, there's no
11   written notes that he gave you about that, correct?
12   A.  Not that I know -- not that I remember.
13   Q.  There's nothing scheduling a meeting with you, correct?
14   A.  I don't -- I don't know.  I don't think so.  Normally --
15   Q.  He never --
16   A.  -- he'd -- he'd call the office and just come in.
17   Q.  He never provided you with any summaries -- any summary or
18   memorandum -- that set out his explanations?
19   A.  Well, sometimes when people do that --
20            MR. S. KULWIN:  Judge --
21   BY MR. S. KULWIN:
22   Q.  Mr. Trump, it's a --
23   A.  I mean --
24   Q.  -- simple question.
25   A.  -- I don't remember.  A lot of times I just throw things
```

Trump - direct

628

1   away.

2   Q.  Mr. Trump, it's a simple question.  He never provided you

3   with any written summaries or anything laying out the basis

4   for his conclusion; is that right?

5   A.  I don't know.  I don't remember.  It's possible he did,

6   but I don't have it.

7   Q.  So, if it's possible, it would have been produced in

8   discovery in this case, to your knowledge?

9   A.  That would be true.

10  Q.  Okay.

11  A.  If I had it, it would have been produced.

12  Q.  All right.

13       And there's no -- to your knowledge, you don't recall

14  seeing anything like that, do you?

15  A.  I don't remember seeing it, no.

16  Q.  Okay.

17       And there's no meeting memorandums of any -- now,

18  supposedly, did Mr. Petrus also remind you after 2012 that the

19  executives got together and talked --

20  A.  No, he --

21  Q.  -- about all this?

22  A.  He just said he came to my -- he just said he came to my

23  office.  Because I asked him about that.

24  Q.  So, you asked him about it?

25  A.  Yes.

Trump - direct

629

1   Q.  Did he tell you, no, there wasn't any meetings like that?

2   A.  No, after the deposition.

3   Q.  Right.  No, that's what I'm talking about.

4       After the deposition, did he remind you that there

5   were other meetings with other executives before he came to

6   see you?

7   A.  No.  It wasn't -- I mean, honestly, it wasn't a big deal.

8   Q.  Did he remind you?

9   A.  No.  No.

10  Q.  And, so, he didn't happen to show you, for example, this

11  from 125, Bates 3236?

12      He didn't show you anything like this --

13      (Document tendered.)

14  BY MR. S. KULWIN:

15  Q.  -- when he came to remind you after 2012 about this

16  conversation?

17      MR. NOVACK:  Judge, we're trying to find that

18  document to see if it's the same one he already showed him.

19      THE COURT:  And what document is that?  Plaintiff's

20  --

21      MR. S. KULWIN:  It's different, Judge.  It's

22  Plaintiff's 125, Bates 003236.  It's also a defense exhibit.

23      THE COURT:  That document is not in evidence yet.  So

24  --

25      MR. S. KULWIN:  I know.  I'm just refreshing his

Trump - direct

630

 1    recollection.

 2            THE COURT:  Please do not interrupt me.

 3            It is not in evidence.  So, do not read from it.

 4    BY MR. S. KULWIN:

 5    Q.  Does this refresh your recollection at all, Mr. Trump?

 6            (Document tendered.)

 7    BY THE WITNESS:

 8    A.  No, it doesn't.

 9    BY MR. S. KULWIN:

10    Q.  Okay.

11            In any event, when he came to remind you that he had

12    had this conversation with you after April, 2012, did he say,

13    "By the way, here are some documents that we went over

14    together"?  Anything like that?

15    A.  No.  No.

16    Q.  Did he show you anything when he came to see you after

17    your deposition that indicated anything in writing that he

18    based this conclusion about why letting the condo association

19    owning the com- -- those common elements would be bad?  Did he

20    show you anything in writing about that?

21            MR. NOVACK:  Judge, I'm going to object.  Asked and

22    answered about these writings.

23            MR. S. KULWIN:  This is after the dep.

24            THE COURT:  Overruled.

25    BY MR. S. KULWIN:

Trump - direct

1   Q.  Mr. Trump?

2   A.  No, he didn't.

3   Q.  As we established, we believe the condo board would hire

4   Trump to run the F&B facilities.  It's common, isn't it, for

5   hotel owners of F&B facilities to hire management companies,

6   right?

7   A.  It -- it happens, yes.

8   Q.  Right.

9           In fact, they hire management companies to run entire

10  hotels, right?

11  A.  Yes, that happens.

12  Q.  Right.

13          So, for example, many Hyatt hotels really aren't

14  owned by Hyatt; they just manage them, right?

15  A.  That's true.

16  Q.  And many Starwood hotels really aren't owned by Starwood;

17  they just manage them?

18  A.  That's true.

19  Q.  And the owners really just rely on the management company

20  to make sure everything runs smoothly, right?

21  A.  No.  Some people do it themselves.  They don't hire

22  outside companies.

23  Q.  Right.  I know.

24          But I'm saying the ones in those situations.

25  A.  Yeah.

Trump - direct

632

```
 1   Q.  Okay.
 2           And just like those developers, a condo association
 3   could have hired a management company -- in this case, your
 4   management company -- to run the F&B facilities --
 5   A.  That is --
 6   Q.  -- correct?
 7   A.  -- correct.  That's correct.
 8   Q.  And they could have even hired a consultant in the hotel
 9   business to deal with you folks to make sure you were doing it
10   the right way, correct?
11   A.  Correct.
12   Q.  Okay.
13           And there's a number of hotels that are run that way
14   that operate very successfully; isn't that true?
15   A.  I don't know.  I mean, I assume so, yes.
16   Q.  Okay.
17           Now, when you finally made the decision to remove the
18   hotel facilities from the common elements, you also made the
19   decision to pay this F&B fee -- 500,000, plus inflation -- to
20   the condo board, right?
21   A.  Yes.
22   Q.  Condo association--
23   A.  Yes.
24   Q.  -- right?
25   A.  That's right.
```

Trump - direct

633

1   Q.  And you did that because you knew you were taking away an

2   equity interest in the hotel that had been given to them?

3   A.  Well, it was a form of payment for something, that's

4   right.  And it gave stability to the board because they'd get

5   that money every year --

6   Q.  Right.

7   A.  -- as opposed to going up and down like a yo-yo.

8   Q.  My question is, sir:  You gave them -- you made that

9   payment -- it was for a payment -- for the equity interest in

10  the hotel that they had received originally?

11  A.  Well, I think you could say that, yes, partially at least.

12  Q.  And you took that, if I understand it, because, as you

13  keep saying, it was to protect them from the fluctuations and

14  the volatility, right?

15  A.  There would be massive fluctuations.

16  Q.  Right, right, right.

17  A.  Bigger than we had ever thought.

18  Q.  But when these things were sold back in '03 -- I mean, in

19  '04, '05, '06 -- to people like Mrs. Goldberg, you didn't make

20  any representations of any kind, or guarantees, that they

21  would make money, did you?

22  A.  Well --

23  Q.  Did you make any?

24  A.  -- we had --

25  Q.  Mr. Trump, did you make any representations to the people

Trump - direct

634

1   who bought in, like Mrs. Goldberg, and got these facilities,

2   did you make any representations to them that those facilities

3   would make money?

4   A.   I don't know.  I mean, I really don't know.

5   Q.   And you certainly didn't make any guarantees that they

6   would make money.  That would be ridiculous.

7   A.   I don't know.  I don't think so.

8   Q.   Right.  Okay.

9          And when you sold them their hotel condominium units,

10  you didn't guarantee the amount of rental income you would get

11  from them, would you?

12  A.   You're talking about prior to the $500,000 a year?

13  Q.   Guaranteed rental income, sir.  It has nothing to do with

14  the 500,000.

15  A.   You mean, the -- you're talking about the rest of them?

16  Q.   The rental income in the hotel condominium units.

17  A.   I don't think so.  I wouldn't be the one to answer that

18  question.  I just don't know.

19  Q.   You wouldn't guarantee they were going to make a certain

20  amount of money on their -- renting their -- hotel --

21  A.   I don't --

22  Q.   -- units?

23  A.   I don't -- no, I wouldn't.  I don't think I would.

24  Q.   And you didn't make any guarantee that their units would

25  appreciate in value, either, did you?

Trump - direct

1   A.  No.

2   Q.  Okay.

3        You told them what you were selling in 2004 and 2005,

4   which was the hotel units, interest in the hotel; and, you

5   said, "Here it is.  You look it over.  It's your decision.

6   You decide whether you want to invest," right?  All up to

7   them; is that right?

8   A.  Not really.

9   Q.  You told them in the -- somewhere that there were risks or

10  things that they weren't aware of?

11  A.  Absolutely.

12       I have a clause in the contract that allows me to

13  change that deal.  And --

14  Q.  But, Mr. Trump --

15  A.  -- we exercised the right.  We have a clause --

16  Q.  Mr. Trump --

17  A.  -- a very well-written clause, and a very specific

18  clause -- that allows us to do exactly what we did.

19  Q.  Mr. Trump --

20  A.  Mrs. Goldberg knew that --

21  Q.  Stop.

22       MR. S. KULWIN:  Judge, I'm --

23  BY THE WITNESS:

24  A.  -- and her lawyer --

25       THE COURT:  I will strike -- Mr. Trump, you have

Trump - direct

636

1    answered.

2           I will strike from what Mrs. Goldberg knew on.

3           MR. S. KULWIN:  Thank you.

4    BY MR. S. KULWIN:

5    Q.  Mr. Trump, listen to the question.  The question isn't

6    whether you -- whether some contractual term may have given

7    you a right or may not have given you a right.

8    A.  Well, that means something.

9    Q.  We'll argue about that later.

10          There's nothing in the contract that allows you to

11   promise something that's something that you're not going to

12   give them, right?  You can't do that, right?

13   A.  We had the right to amend.

14   Q.  Can you do that?  Can you promise --

15          MR. NOVACK:  Objection.

16          MR. S. KULWIN:  He's not answering, Judge.

17          THE COURT:  Sustained.  Sustained --

18   BY MR. S. KULWIN:

19   Q.  Does the --

20          THE COURT:  -- on form.

21   BY MR. S. KULWIN:

22   Q.  -- contract allow you to promise to give them something

23   that you know you're not going to give them?

24          MR. NOVACK:  Objection.

25          THE COURT:  Sustained.

1           You are asking for a legal conclusion.

2    BY THE WITNESS:

3    A.  I never knew that --

4           THE COURT:  I sustained it, sir.

5           MR. S. KULWIN:  Judge --

6           THE COURT:  You can rephrase it.

7    BY MR. S. KULWIN:

8    Q.  Mr. Trump, there's nothing in the contract that you're

9    aware of that allows you to promise to give common elements to

10   people when you know at the time you're signing the contract

11   you're not going to give it to them.

12          MR. NOVACK:  Objection.

13   BY MR. S. KULWIN:

14   Q.  You're not allowed to do that.

15          MR. NOVACK:  Objection.

16          THE COURT:  What is your objection?

17          MR. NOVACK:  It's asking him to interpret that

18   contract --

19          MR. S. KULWIN:  No.

20          MR. NOVACK:  -- and reach a conclusion.

21          THE COURT:  Sustained.

22          You can ask him his understanding of certain things.

23   BY MR. S. KULWIN:

24   Q.  Sir, based on your understanding, you're not allowed to

25   knowingly in your mind say, "We're never going to give these

Trump - direct

1   common elements to the people," and then because the contract

2   lets us change the common elements, that you can go ahead,

3   sell it to them as though you are going to give it to them

4   when you know you're not, based on your understanding?

5   A.  I never said that.

6           MR. NOVACK:  Objection to form.

7   BY MR. S. KULWIN:

8   Q.  Okay.

9           So --

10          THE COURT:  Sustained on form.

11          MR. S. KULWIN:  I'll try, again.

12  BY MR. S. KULWIN:

13  Q.  Sir, there's nothing, based on your understanding, in the

14  contract that allows you -- based on your understanding -- to

15  basically tell people, "You're going to get the common

16  elements that are described and -- " but when you know you're

17  not going to give it to them, based on your understanding?

18  A.  I never thought about it, and I never did it until 2007.

19  You're asking me about early, when --

20  Q.  And --

21  A.  -- we sold the units.

22  Q.  And, sir --

23  A.  That only came about in 2007.

24  Q.  And, sir, the bottom line of it is, despite that provision

25  that you keep talking about, there's nothing in your -- any of

Trump - direct

639

1  your -- materials that tell people that -- you know, that give

2  them advice on whether or not to make the investment, right?

3          MR. NOVACK:  I'm going to object, Judge.  It's the

4  same -- there's nothing in any of these materials.  No matter

5  what he finishes that sentence -- that question -- with,

6  there's no foundation without showing him --

7          THE COURT:  That is very broad.

8          Sustained.

9          "Any of these materials."  I am not sure what you are

10  talking about.

11 BY MR. S. KULWIN:

12 Q.  There's nothing in the property report, sir, that gives

13 them any advice about whether they should buy a unit and these

14 facilities.  There's nothing like that, right?  Is there?

15 A.  Well, there's a -- I don't know if it's in the property

16 report or the contract.

17 Q.  Let's stop.

18 A.  But we --

19 Q.  Let's just talk about the property report.

20 A.  I don't know about the property report.

21 Q.  Okay.

22 A.  I know in the contract we have the right to amend.

23 Q.  There's nothing in the -- I'm not talking about the

24 contract, sir.

25 A.  Well, you should be.

Trump - direct

640

```
 1    Q.  There's nothing in the brochure, sir, that tells people
 2    looking into these facilities that they -- that advises them
 3    whether or not it's a good investment or a bad investment,
 4    right?  In the brochures?
 5    A.  I don't know.  That, I don't know.
 6    Q.  And while you say that the contract provides this
 7    provision that you keep talking about, that provision doesn't
 8    say anything like -- and I'll show it to you if you want.
 9    There's nothing in that provision that says, look, you know,
10    there's risks in this investment; maybe you shouldn't do this.
11    There's nothing like that, is there?
12              MR. NOVACK:  Objection.  He's asking for the witness'
13    interpretation.
14              THE COURT:  And sustained on form.
15    BY MR. S. KULWIN:
16    Q.  Sir, is there anything in the contract that says this is a
17    risky investment; you should consider it?  Is there?
18    A.  Only that we're allowed to amend.
19    Q.  All right.
20              Now --
21    A.  And we had the right --
22    Q.  Now --
23    A.  -- absolute right --
24    Q.  Stop.
25    A.  -- to amend.
```

Trump - direct

641

```
 1              MR. S. KULWIN:  Judge, I'd ask you to strike it.
 2              THE COURT:  It can stand.
 3              Ask your next question, please.
 4    BY MR. S. KULWIN:
 5    Q.  Now -- so, it was up to Mrs. Goldberg to decide, when she
 6    got all these materials, whether or not she wanted to buy a
 7    hotel condominium unit based on the information provided,
 8    right?
 9    A.  And she negotiated --
10    Q.  Sir --
11    A.  -- with us.
12    Q.  -- right?  Is that right?
13    A.  She negot- --
14    Q.  Is that right?
15    A.  She negotiated --
16    Q.  I'm not asking you about that.
17    A.  But she wanted that --
18              MR. S. KULWIN:  Judge --
19    BY THE WITNESS:
20    A.  -- clause out.
21              MR. S. KULWIN:  -- can you ask him -- will you please
22    ask him to answer the question.
23              THE COURT:  Did you understand the question, or do
24    you want it repeated?
25              THE WITNESS:  I'm trying to answer it properly, your
```

Trump - direct

642

1    Honor.

2    BY THE WITNESS:

3    A.  You can't just say "Yes" or "No."  I mean, Mrs. Goldberg

4    was a very unusual case.  She wanted the clause taken out.

5             MR. S. KULWIN:  Judge, Judge --

6    BY THE WITNESS:

7    A.  We refused to take it out.

8             MR. S. KULWIN:  Judge, Judge --

9             THE COURT:  I am going to --

10   BY THE WITNESS:

11   A.  And, then, she bought the units anyway, and then --

12            MR. S. KULWIN:  Judge --

13   BY THE WITNESS:

14   A.  -- she sued me.

15            MR. S. KULWIN:  Judge --

16            THE COURT:  I am going to strike it.

17   BY THE WITNESS:

18   A.  It's unbelievable.

19            MR. S. KULWIN:  I move to strike.

20            THE COURT:  I am going to strike it.

21            Why don't you rephrase your question on form basis.

22   BY MR. S. KULWIN:

23   Q.  Sir, when you sold the units to Mrs. Goldberg -- right?

24   Okay? -- it was up to her, based on all the materials you gave

25   her, to decide whether it was a good investment to buy these

Trump - direct

1  units and these hotel facility interests that you were

2  offering to sell her; isn't that true?

3        That's a "Yes" or a "No," sir.  If you can't --

4  A.  There was no such thing as a "Yes" or "No."

5  Q.  If you can't answer it "Yes" or "No," please tell me.

6  A.  I cannot answer it "Yes" or "No."

7  Q.  Okay.

8        Now, when you decided to build Trump Tower, you took

9  a risk, right?

10  A.  Yes.

11  Q.  And you took a risk to make money, right?  That was your

12  hope?

13  A.  And to build a great building in a great site, which I

14  always wanted to do in Chicago.

15  Q.  Was it truly altruistic, Mr. Trump?  You had no interest

16  in making --

17  A.  Somewhat.

18  Q.  Was it --

19  A.  Somewhat.

20  Q.  Sir, you didn't have any interest in making money?

21  A.  I didn't have to build a building of that magnitude, of

22  that beauty.  I could have saved a lot of money by building a

23  much --

24  Q.  Sir --

25  A.  -- cheaper building.

Trump - direct

644

```
 1  Q.  Sir --
 2  A.  It was altruistic, yes.
 3  Q.  Totally altruistic?  Did you want to make money?
 4  A.  No, I -- I would have preferred, but --
 5  Q.  And --
 6  A.  -- I didn't have to go to the level that I did to build --
 7  Q.  If --
 8  A.  -- a landmark building.
 9  Q.  If, sir, while you were building the building you got
10  halfway up and the banks or -- well -- your partner at the
11  time, the Sun-Times, would have said to you, "You know,
12  Mr. Trump, we've looked this over.  It's too risky for you.
13  We're going to take it back from you, and we'll pay you a
14  license fee."
15          Back then.  Not now in hindsight; back then.
16          "We'll pay you a licensing fee.  We'll take it back."
17          You would have told them, "You're nuts," right?
18  A.  Well, it sort of happened.
19          MR. NOVACK:  Objection --
20          THE COURT:  Sustained on form.
21  BY MR. S. KULWIN:
22  Q.  You would have taken -- you wanted to take the risk.  You
23  wanted to be allowed to take the risks.  You wanted to take
24  the chance to make money.  That's what you do, isn't it?
25  A.  It sort of happened because the same time --
```

Trump - direct

1   Q.  Is that what you do, sir?

2   A.  Well, you were --

3   Q.  I'm not asking you --

4   A.  -- asking me about --

5   Q.  -- about what happened.

6   A.  -- the Sun-Times.

7           THE COURT:  Wait, wait, wait.

8           MR. S. KULWIN:  I'm not asking him about that.

9           THE COURT:  Mr. Kulwin.

10          MR. S. KULWIN:  Yes.

11          THE COURT:  You cannot talk at the same time as

12  Mr. Trump.

13          And, Mr. Trump, you cannot talk at the same time as

14  Mr. Kulwin.

15          Why don't you ask your question, again.

16          MR. S. KULWIN:  Sure.

17  BY MR. S. KULWIN:

18  Q.  You take risks; you make investments to make money, right?

19  A.  Yes, but I do --

20  Q.  Is that true?

21  A.  I do it for other reasons, too, believe it or not.  But I

22  do it also to make money.  But I do it for other reasons.

23  Q.  And when you're buying a piece of real estate, you know,

24  for investment, investments have risk; correct?

25  A.  That's true.

Trump - direct

646

1          MR. NOVACK:  Judge, I'm going to object to this.

2     These questions are now irrelevant.

3          MR. S. KULWIN:  No.

4          THE COURT:  They have been asked and answered,

5     though.

6          MR. NOVACK:  And that.

7          THE COURT:  Do you think you are going to --

8          MR. S. KULWIN:  Yes.  I'm going to be finished with

9     everything but that one issue by 12:35.

10         THE COURT:  Okay.

11         Because we will stop at 12:35, one way or the other.

12         MR. S. KULWIN:  Okay.  All right.

13         THE COURT:  Wait one second.

14         (Brief pause.)

15         THE COURT:  Go ahead.

16    BY MR. S. KULWIN:

17    Q.  And it's certainly self-evident, isn't it, sir, that

18    investing in a hotel operation is risky?

19    A.  Yes, certainly it is.

20         MR. NOVACK:  Objection.  I object on the grounds of

21    asked and answered, that he's already answered, again.

22    BY MR. S. KULWIN:

23    Q.  And you don't believe -- I mean, that's part of the

24    capitalist system that you believe in, right?  Me, too.

25         Right?  Risk?

Trump - direct

1          MR. NOVACK:  Objection.

2          THE COURT:  Sustained.

3          MR. S. KULWIN:  I'm laying the foundation, Judge.

4          I'm sorry.

5          THE COURT:  You want him to answer whether or not you

6   believe in the capitalist system?

7          Sustained.

8          MR. S. KULWIN:  I just want to make sure he did.

9          (Laughter.)

10          MR. S. KULWIN:  I just wanted to make sure he did.

11   Okay.

12          THE COURT:  Sustained.

13   BY MR. S. KULWIN:

14   Q.  And you certainly, Mr. Trump, don't believe that there's

15   some group or organization that should protect people from

16   making investments if they're told all the information.

17   That's their right, correct?

18          MR. NOVACK:  Objection, Judge.

19          THE COURT:  Sustained on relevance.

20   BY MR. S. KULWIN:

21   Q.  Sir, what you say you were doing is basically the HCU

22   buyers who bought into this building decided to take a risk by

23   buying the units and the interest in the hotel; and, according

24   to you, you suddenly decided in 2007 -- if that's when you say

25   it happened -- that you decided it was too risky for them and

Trump - direct

```
 1   you were going to take it away, right?

 2              MR. NOVACK:  Objection, your Honor.

 3              THE COURT:  Sustained.

 4              MR. NOVACK:  Closing argument.

 5              THE COURT:  Sustained on form and argumentative.

 6   BY MR. S. KULWIN:

 7   Q.  All right, Mr. Trump.  When you --

 8              MR. S. KULWIN:  And this is my last point besides

 9   that other issue, Judge.

10   BY MR. S. KULWIN:

11   Q.  Finally, Mr. Trump, you make a lot of real estate deals;

12   right?

13   A.  Yes.

14   Q.  That's your business.

15              MR. NOVACK:  I couldn't hear that question.

16              THE COURT:  You make a lot of real estate deals.

17   That's your business, right?

18   BY THE WITNESS:

19   A.  Yes.

20   BY MR. S. KULWIN:

21   Q.  Well, when you make a deal and someone decides --

22              MR. S. KULWIN:  And if I can have one second, Judge.

23              (Brief pause.)

24   BY MR. S. KULWIN:

25   Q.  When you buy a piece of real estate and you make a deal to
```

Trump - direct

1  buy it and you say, "This is how much I'm going to pay -- "

2  you say, "This is what I'm going to pay" -- that's what

3  happens, right?

4            MR. NOVACK:  Objection.

5            THE COURT:  Sustained on form.

6  BY MR. S. KULWIN:

7  Q.  Sir, when you make a deal, is it your understanding that

8  even when you make a deal, deals change?

9            MR. NOVACK:  I'm going to object, Judge.  I don't see

10  the relevance.

11            THE COURT:  Overruled.

12            You may answer, if you can.

13  BY THE WITNESS:

14  A.  Well, when I make a deal, I usually don't have a clause in

15  a contract that allows --

16  BY MR. S. KULWIN:

17  Q.  Sir --

18            MR. S. KULWIN:  Judge --

19  BY THE WITNESS:

20  A.  -- me to amend it.

21            MR. S. KULWIN:  -- move to strike it.

22            THE COURT:  Overruled.

23            MR. S. KULWIN:  If I may have a moment, Judge?

24            THE COURT:  You may.

25            MR. S. KULWIN:  Other than that other issue.

Trump - direct

650

1           THE COURT:  Okay.

2           (Brief pause.)

3           MR. S. KULWIN:  At this time, except for that one

4    issue, I will cease questioning.

5           THE COURT:  Okay.

6           We are going to take our lunch break, ladies and

7    gentlemen.

8           If you would please come back at 1:45.

9           (Jury out.)

10          THE COURT:  You may step down, sir.

11          THE WITNESS:  Thank you.

12          THE COURT:  Please be back about 1:40, if you would.

13          THE WITNESS:  Yes.

14          THE COURT:  Mr. Kulwin, I will take up your issue at

15   1:40.

16          MR. S. KULWIN:  Okay.

17          And, Judge, I misstated.  There's that issue, but

18   there is one other small thing I might go into that I don't

19   need a ruling on.

20          Thank you, Judge.

21          (Whereupon, a recess was taken at 12:30 o'clock a.m.,

22       until 1:40 o'clock p.m., of the same afternoon.)

23                    *    *    *    *    *

24

25

651

1    I certify that the foregoing is a correct transcript from the
     record of proceedings in the above-entitled matter.

2

3

     /s/ Joseph Rickhoff                          May 15, 2013
4    Official Court Reporter

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

652

```
 1                    IN THE UNITED STATES DISTRICT COURT
                        NORTHERN DISTRICT OF ILLINOIS
 2                            EASTERN DIVISION

 3    JACQUELINE GOLDBERG,              ) Docket No. 09 C 6455
                                        )
 4                        Plaintiff,    )
                                        )
 5                 vs.                  )
                                        )
 6    401 NORTH WABASH VENTURE, LLC,    )
      a Delaware Limited Liability      )
 7    Company, et al.,                  ) Chicago, Illinois
                                        ) May 15, 2013
 8                        Defendants.)    1:40 o'clock p.m.

 9                    TRANSCRIPT OF TRIAL PROCEEDINGS
             BEFORE THE HONORABLE AMY J. ST. EVE, AND A JURY
10
      APPEARANCES:
11
      For the Plaintiff:        KULWIN, MASCIOPINTO & KULWIN, LLP
12                              BY:  MR. SHELLY B. KULWIN
                                     MR. JEFFREY R. KULWIN
13                              161 North Clark Street, Suite 2500
                                Chicago, Illinois  60601
14
      For the Defendants:       NOVACK AND MACEY, LLP
15                              BY:  MR. STEPHEN NOVACK
                                     MR. JOHN F. SHONKWILER
16                              100 N. Riverside Plaza, Suite 1500
                                Chicago, Illinois  60606
17
      Also Present:             MS. ALEXIS ROBINSON
18
      Court Reporter:           MARY M. HACKER
19                              NANCY C. LABELLA
                                Official Court Reporters
20                              219 S. Dearborn St.
                                Chicago, Illinois  60604
21                              (312) 435-5564
                                (312) 435-6890
22

23                * * * * * * * * * * * * * * * * * *

24                        PROCEEDINGS RECORDED BY
                          MECHANICAL STENOGRAPHY
25                    TRANSCRIPT PRODUCED BY COMPUTER
```

1    (Proceedings out of the hearing of the jury:)

2         THE COURT:  Just one second -- go ahead.  You wanted

3    to raise an issue with me with respect to the use of the

4    budgets.

5         MR. S. KULWIN:  Okay.  I spent the lunch hour looking

6    at our notes of what Mr. Trump said.  I believe he's

7    repeatedly said, I don't remember, I don't remember, I don't

8    remember.

9         THE COURT:  About what?  Don't remember what?

10        MR. S. KULWIN:  He doesn't remember about -- he

11   doesn't remember the budgets that are in the property reports

12   and he -- I believe that's his testimony, I don't remember.

13        THE COURT:  I'm not sure you asked him about all the

14   budgets in the property report.  You asked him about Exhibit

15   H.

16        MR. S. KULWIN:  That is the budgets.

17        THE COURT:  That's not all of them, though.  That's

18   just -- that's right, Exhibit H to 75, and he said he didn't

19   remember seeing it.

20        MR. S. KULWIN:  I apologize.  I can lay the

21   foundation with him.  I think he's going to say that --

22   Exhibit H is the budget in each property report, and I can go

23   through that and ask him about each one.  I am -- can you ask

24   him to step out, Judge?

25        THE COURT:  Yes.  Mr. Trump, if you could step --

654

1           THE WITNESS:  Sure.

2           THE COURT:  -- outside.  I don't know -- John, how

3     busy is it back there?

4           COURT SECURITY OFFICER:  I got about 25 people out

5     there.

6           THE COURT:  Okay.  The jury is coming in this way.

7           THE WITNESS:  You want me out?

8           THE COURT:  Yes, please.

9           John, would you just -- I don't know who's out there.

10    Just step out with Mr. Trump, please.

11      (Mr. Trump exited the courtroom.)

12          MR. S. KULWIN:  I think he -- I am going to ask him

13    -- I can lay the foundation and say, do you remember seeing

14    any of these.  I assume he's going to say no.  If he does, I

15    assume you're going to rule that I can't then try to establish

16    what I want to establish with him, and then I have to do it

17    with somebody like Mr. Petrus.

18          THE COURT:  Well, I'm not sure how you would

19    establish it with him, so it's kind of hard for me to give you

20    a general ruling.  But if he continues to say, look, I don't

21    think I saw these, I don't remember seeing these, I don't have

22    any knowledge of this, then I do think you have to do it with

23    another witness.

24          MR. S. KULWIN:  Okay.  And that's fine, Judge.

25          THE COURT:  And Mr. Petrus is coming.

1          MR. S. KULWIN:  I know.  I'm on my feet barely down

2     there.

3          Okay.  So --

4          MR. NOVACK:  Does that mean he's not going to do

5     that, or do we have to go through that exercise?  He's already

6     shown him the budget in play at that time, he showed him the

7     August 4 meeting agenda.  It didn't refresh his recollection.

8          I just don't think there's been any foundation --

9          MR. S. KULWIN:  Those are different things but --

10         THE COURT:  They are different things.  He did say he

11    didn't see either one.  So I'm not sure -- well, that's a good

12    question.  Are you going to try to ask him again -- let's not

13    go back over, have you seen this.

14         MR. S. KULWIN:  I don't want to do that, Judge.

15         THE COURT:  Okay.

16         MR. S. KULWIN:  I just want to be clear that in your

17    mind he's already testified that he doesn't remember seeing

18    the budgets in any of the property reports.  If that's his

19    testimony, then I assume you're going to say I can't try to do

20    that profit analysis that are on those summary exhibits with

21    him.  I can try it with Mr. Petrus.

22         THE COURT:  I'm concerned with Mr. Trump because he's

23    on the stand now.  You cannot do it with him.

24         I'm not sure he has said he didn't see any of the

25    budgets in any of the property reports.  He did say he didn't

656

 1    -- he did not see Exhibit H.  If you're telling me that's in

 2    every one of the property reports, then I think you have it,

 3    but I don't think you've established that with him.

 4            But he did say, I didn't see this, I don't remember

 5    seeing this, I don't know if I ever saw this, referring to

 6    Exhibit H, which is a budget.  So I think that -- I'm not

 7    going to let you go back through that.

 8            MR. S. KULWIN:  Right.  And I think the only

 9    difference would be is if I asked him about '07, I imagine he

10    would say the same thing, but I would like to ask him about

11    '07.

12            THE COURT:  Is it the same document?

13            MR. S. KULWIN:  No.  It's a changed document.

14            THE COURT:  Okay.  You can ask him '07.

15            MR. S. KULWIN:  Okay.

16            THE COURT:  Again, it's not in evidence and without

17    showing it to the jury --

18            MR. S. KULWIN:  Right.  So '07 -- I apologize, Judge.

19            THE COURT:  -- you can ask him about '07.

20            MR. S. KULWIN:  '07 is in evidence, Judge.  It's part

21    of the property report that's in evidence.

22            THE COURT:  Okay.  You may ask him if he has seen it

23    or if he participated in creating it.  However you want to ask

24    it in an appropriate fashion, you may do that.

25            MR. S. KULWIN:  I will try my best.

1          THE COURT:  And then you had one other area.  What's

2     that?

3          MR. S. KULWIN:  I have two other minor issues.

4          The first issue is, I would like to ask him, or I

5     would like a stipulation or something, that the part --

6     defendants are allowed to supplement their interrogatories and

7     that they are obligated to do so, and he had the opportunity

8     to supplement his interrogatories or his deposition after

9     Mr. Petrus came to him and he never did so.

10         THE COURT:  The rules changed on that a little bit,

11    which is why I sustained the objection the other day, and

12    that's a legal matter.

13         I think you can ask him if he had -- if he reviewed

14    these or if he -- you can try to lay a foundation on the

15    interrogatories, if he ever asked to change them.  I think

16    that's fine.

17         MR. S. KULWIN:  Okay.  I'll do that.  I'll do that.

18         THE COURT:  But the rules did change a little.

19         MR. S. KULWIN:  I'll do that, Judge.

20         And then there's a third thing that Jeff is going to

21    talk about.  Mr. Kulwin Two is the prime --

22         THE COURT:  This is with respect to Mr. Trump --

23         MR. S. KULWIN:  It is.

24         THE COURT:  -- this third thing?  Okay.  Go ahead.

25         MR. J. KULWIN:  It addressed the issue of the good

658

```
 1   faith basis to believe that Mr. Trump was at the meeting on
 2   which --
 3            THE COURT:  Okay.
 4            MR. J. KULWIN:  -- the agenda.
 5            We were before you in 2011.  We filed a motion for
 6   leave to depose Mr. Trump.
 7            THE COURT:  Yes.
 8            MR. J. KULWIN:  And the defendants, as I recall,
 9   opposed that motion.
10            THE COURT:  They did?
11            MR. J. KULWIN:  They did.  And we argued it before
12   you, and as I recall -- and I have the transcript on my phone,
13   I can read it, but we argued that he was involved in making
14   these decisions and the defendants opposed the motion.
15            THE COURT:  And I granted it with leave to go into
16   particular areas, the marketing materials being one of them,
17   if I recall.
18            MR. J. KULWIN:  I apologize.  Not with respect to Mr.
19   Trump, Jr.  Your Honor sustained the objection and denied our
20   ability to depose Mr. Trump, Jr.  This was before --
21            THE COURT:  Okay.  All right.  Mr. Trump, Jr., okay.
22            MR. J. KULWIN:  Correct.  This was in September of
23   2011.  That would be our good faith basis to believe, going
24   into today, that Mr. Trump, Sr., was the individual who was
25   listed on the agenda of the August 2006 meeting.
```

659

```
 1           MR. S. KULWIN:  And just to supplement that one point
 2   --
 3           THE COURT:  Did you raise this agenda with me when
 4   you brought the motion?
 5           MR. J. KULWIN:  I didn't raise the agenda, but what
 6   we did raise at the time was the fact that other people,
 7   Mr. Flicker and Mr. -- I believe Ms. Cremer, put Mr. Trump,
 8   Jr., in the meetings where these things were discussed.
 9           MR. S. KULWIN:  And I believe what you said was that
10   you could ask Mr. Reiss about them.  And all we're seeking to
11   do, Judge, is the inference now left with the jury is that
12   Donald Trump, Jr., had all this information and somehow we
13   forgot to interview him --
14           THE COURT:  I don't think that inference has been
15   left.  I don't think that inference has been left at all.
16           MR. S. KULWIN:  I think it came up during the
17   testimony that he was on the list of people -- Mr. Trump
18   pointed out that he was on the list of people with relevant
19   knowledge on the question of who was at the meeting or who
20   knew certain information.  I can't remember off the top of my
21   head.  And the inference was, well, Don Trump, Jr., would know
22   about that.
23           And, you know, the inference is that Donald Trump,
24   Jr., is someone who has information and, you know, A, what
25   Jeff -- what Mr. Kulwin said is true, that we've now a good
```

1    faith basis to say it had to be Don, Sr., who was at the

2    meeting because they deposed him and saying Don, Jr., didn't

3    know anything.

4           MR. NOVACK:  May I?

5           THE COURT:  Yes.

6           MR. NOVACK:  If you'll recall, that motion was made

7    because they had exceeded the ten deponents.

8           THE COURT:  Yes.

9           MR. NOVACK:  And they asked for three or four people.

10   We objected to all of them.  Your Honor ended up saying,

11   denied, denied, denied, but you can take Senior for these

12   topics.  That's No. 1.

13          THE COURT:  And I granted as to Reiss, yes.  I didn't

14   say denied, denied.  I think I said granted, denied --

15          MR. NOVACK:  Granted --

16          THE COURT:  Granted, in part denied.  I'm looking at

17   it; it's docket entry number 94.

18          MR. NOVACK:  Secondly, what Mr. Trump said was,

19   Ivanka, Eric, Don, Jr., he said three of them, and there was

20   no linkage to this meeting or agenda because that subject

21   wasn't announced to the jury.  So there's no possible way

22   they're going to get that inference.

23          MR. S. KULWIN:  Well, the other aspect of it --

24          THE COURT:  And I assume, because I'm not going to

25   let you, you're not going to argue they could have called

1    Donald Trump, Jr., and asked him this?

2            MR. NOVACK:  No.

3            THE COURT:  You're not going argue that in closing?

4            MR. NOVACK:  No, your Honor.

5            THE COURT:  Okay.  You've already gone into with him,

6    to the extent you can, the August 6th meeting.  I've let you

7    do that to the extent you're entitled to.  What else?

8            (No response.)

9            THE COURT:  All right.

10           MR. NOVACK:  Thank you.

11           THE COURT:  Let's get Mr. Trump back in.

12           (Brief pause.)

13           THE COURT:  Mr. Novack, how long do you think your

14   examination of Mr. Trump will be?

15           MR. NOVACK:  15 minutes, maybe.

16      (Mr. Trump re-entered the courtroom.)

17           THE COURT:  Okay.  We'll get you out of here today.

18           THE WITNESS:  Thank you.

19           THE COURT:  Are you ready, Mr. Kulwin?

20           MR. S. KULWIN:  I am, your Honor.

21           THE COURT:  Okay.  Bring in the jury please, Danny.

22           COURT SECURITY OFFICER:  Yes, your Honor.

23           (Jury entered the courtroom.)

24           THE COURT:  You may be seated.

25           Mr. Kulwin, you may continue.

Trump - direct

662

1          MR. S. KULWIN:  Thank you very much, your Honor.

2      DONALD TRUMP, PLAINTIFF'S ADVERSE WITNESS, DULY SWORN

3              DIRECT EXAMINATION (resumed)

4  BY MR. S. KULWIN:

5  Q.  Just one last point, Mr. Trump.  Whenever you're ready.

6  A.  Yes?

7  Q.  You mentioned several times during your examination this

8  morning the clause in the contract that allowed you to make

9  changes to the common elements.  Do you remember that?

10 A.  Yes.

11 Q.  Okay.  And of course, you were very -- you were aware of

12 the existence of that clause in 2004, right?  Fair statement?

13 A.  I don't know when I became aware of it.  I know it

14 existed.

15 Q.  All right.  And you knew, if I --

16          MR. NOVACK:  Your Honor, I'm sorry.  I want to enter

17 an objection.  It seems to be going beyond the scope of what

18 --

19          THE COURT:  Yes.  I think you're going back over --

20          MR. S. KULWIN:  No.  I'm --

21          THE COURT:  -- some territory we've already covered.

22 I thought you were going to do a limited --

23          MR. S. KULWIN:  This is the limited point that I was

24 --

25          THE COURT:  All right.  Go ahead.  I'll give you a

Trump - cross
663

1    little more leeway.

2            MR. S. KULWIN:  I don't think I covered it, but if I

3    did I apologize, Judge.

4    BY MR. S. KULWIN:

5    Q.  And certainly, sir, your understanding of that was in

6    existence while you were working on this project?

7    A.  At some point I found out about it.  I don't know when.

8    Q.  You don't know when?

9    A.  No, I don't.

10            MR. S. KULWIN:  All right.  That's it.  I have

11   nothing else, Judge.

12            THE COURT:  Cross-examination, Mr. Novack?

13            MR. NOVACK:  Thank you, your Honor.

14                        CROSS EXAMINATION

15   BY MR. NOVACK:

16   Q.  Good afternoon, Mr. Trump.

17   A.  Good afternoon.

18   Q.  Good afternoon, everybody.

19            Mr. Trump, in your direct examination there were some

20   questions asked and you gave some testimony about the New York

21   hotel condominium that you had developed prior to Chicago?

22   A.  Yes.

23   Q.  Do you recall that?

24   A.  Yes, sir.

25   Q.  Now, were there large meeting rooms or any ballroom in

1    that New York hotel?

2    A.  No.

3    Q.  Was there any food and beverage operation that was being

4    run or operated by the condo association in that hotel

5    condominium?

6    A.  No, there's not.

7    Q.  So am I right, you never developed a hotel condominium

8    where the condominium association ran meeting -- large meeting

9    rooms, ballrooms, food and beverage?

10   A.  That's correct.

11   Q.  Okay.  Now, Mr. Kulwin asked you some questions about

12   whether you were an expert hotel operator.  Do you recall

13   that?

14   A.  Yes.

15   Q.  He did not ask you whether you were an expert hotel

16   condominium operator, did he?

17   A.  I don't believe so.

18   Q.  Okay.  In fact, when he asked you about those 4,000 rooms

19   that Trump was managing, do you recall that?

20   A.  Yes, I do.

21   Q.  Are all 4,000 of those rooms hotel condominium rooms?

22   A.  No, they're not.

23   Q.  The overwhelming majority are not, is that correct?

24   A.  That is correct, yes.

25   Q.  Okay.  And, in fact, again, the only hotel condominium

Trump - cross
665

1   that Trump had developed prior to the Chicago Trump Tower was

2   the New York hotel condominium?

3   A.   Correct.

4   Q.   And that was the one that did not have large meeting

5   rooms, ballrooms or food and beverage operations?

6          MR. S. KULWIN:   Objection.

7   BY THE WITNESS:

8   A.   That's correct.

9          MR. S. KULWIN:   Asked and answered, argumentative.

10          THE COURT:   Sustained on asked and answered.

11          MR. NOVACK:   Okay.

12   BY MR. NOVACK:

13   Q.   Now, Mr. Trump, I want to ask you some other questions.   I

14   want to get to the heart of this case.

15   A.   Okay.

16          MR. S. KULWIN:   I object to the "heart of the case"

17   and ask to strike it, please.

18          THE COURT:   I'll strike the introduction.

19          Ask your question, please.

20   BY MR. NOVACK:

21   Q.   And I want to do it over here as long as the court

22   reporter can hear me, because I would like you to look over

23   here.

24          MR. NOVACK:   Can the court reporter hear me?

25          THE COURT REPORTER:   Yes.

Trump - cross

666

BY MR. NOVACK:

1 BY MR. NOVACK:

2 Q.  Mr. Trump, under oath now, did you allow the meeting

3 rooms, ballrooms, related food and beverage and other

4 operations to be put into the common elements knowing that you

5 would later take them out?

6 A.  No, not at all.

7 Q.  Did you orchestrate a plan to have a ballroom --

8           MR. S. KULWIN:  Judge, I object to "a plan" based on

9 your motion in limine in ruling.

10           THE COURT:  Rephrase it, rephrase it.

11 BY MR. NOVACK:

12 Q.  Did you have an intent, sir, to have the ballrooms,

13 meeting rooms, function rooms and related revenues included in

14 the common elements with the intent that you would later take

15 them back?

16           MR. S. KULWIN:  Objection to the "intent," Judge,

17 again, based on the motion in limine.

18           THE COURT:  Overruled.  Overruled.

19 BY THE WITNESS:

20 A.  Absolutely not.

21 BY MR. NOVACK:

22 Q.  Was that ever your intent?

23 A.  No, it was not.

24 Q.  Did you ever instruct your people to do that?

25           MR. S. KULWIN:  Objection --

1   BY THE WITNESS:

2   A.  No -- no, I did not.

3   BY MR. NOVACK:

4   Q.  Now, at the time that Mrs. Goldberg signed her purchase

5   agreements -- and to remind you of that, uncontested -- it was

6   in August of 2006, okay?  So put yourself there.

7           At the time that she signed her purchase agreements

8   did you already know you were going to take back those meeting

9   rooms, ballrooms and related food and beverage operations?

10  A.  No.

11  Q.  When the decision to do that was made, did you ever try to

12  hide or hold back the decision to take back those items?

13  A.  Not at all.

14  Q.  Did you ever instruct anybody to do that?

15  A.  No, I didn't at all.

16          MR. NOVACK:  No further questions, Judge.

17          MR. S. KULWIN:  Just a couple.

18          THE COURT:  Redirect.

19                      REDIRECT EXAMINATION

20  BY MR. S. KULWIN:

21  Q.  Let's go back from the last point, Mr. Trump.

22          Your organization kept selling hotel condominiums

23  with the interest in the hotel facilities included in the

24  common elements in May of '07, correct?

25  A.  I don't know the date, but until the change was made, yes.

Trump - redirect

1   Q.  And that change -- that change -- when you say the change

2   was made, you mean from when the October amendment went out,

3   right?

4   A.  I guess that would be right, yes.

5   Q.  Right.

6           And so you -- your organization was selling those

7   units as though they came with these hotel facilities and the

8   food and beverage in June, July, August and September of '07,

9   right?

10  A.  I don't know what the dates are.  I just can't tell you

11  what the dates are, but we ultimately changed and we've had no

12  complaints.

13  Q.  Well, I -- no complaints, Mr. Trump?

14  A.  Well, we --

15  Q.  None?

16  A.  People are very happy in the building.

17  Q.  You had no complaints from anybody about this change --

18  A.  Well, I can tell you --

19  Q.  -- is that what you're saying?

20  A.  I don't know of complaints.  Now, maybe, if there's one or

21  two, I don't know, but I could certainly find out.  But I have

22  not heard of a complaint.

23          MR. S. KULWIN:  Your Honor, I would ask to be heard

24  before you're let go, okay?

25          If I can --

1          THE COURT:  Why don't you finish and then we'll have

2     a sidebar.

3          MR. S. KULWIN:  Okay.

4     BY MR. S. KULWIN:

5     Q.  Now -- wait one second.

6          (Brief pause.)

7     BY MR. S. KULWIN:

8     Q.  So would it come as a surprise to you -- just tell me --

9     if the executives in your organization understood that you had

10    approved the removal of all of these elements, that you had

11    approved it, in May of 2007?

12    A.  I don't know the dates.  I just can't -- I can't put

13    myself that far back in time to know whether it's May, June,

14    July.  I just can't do that.

15    Q.  And would it surprise you that even after your executives

16    at Trump organization have admitted to knowing that these

17    weren't going with the common elements any longer, they kept

18    selling them with them in May, June, July, August and

19    September of '07?

20          MR. NOVACK:  Judge, I object to the form of the

21    question, about whether this would have surprised him.

22          THE COURT:  Sustained.

23    BY MR. S. KULWIN:

24    Q.  Would you have found it troubling then if you knew that?

25          MR. NOVACK:  Same objection, your Honor.

Trump - redirect

670

```
 1              THE COURT:  Sustained.
 2   BY MR. S. KULWIN:
 3   Q.  Was that part of your policy at the Trump organization, to
 4   allow that to go on?
 5              MR. NOVACK:  Objection, your Honor.  First of all, it
 6   assumes a fact that's not in evidence about this decision that
 7   --
 8              THE COURT:  Sustained.  Rephrase it.
 9   BY MR. S. KULWIN:
10   Q.  Did you ever instruct your people -- well, let me rephrase
11   that.
12              Do you allow your executives -- did you allow your
13   executives to continue to offer these facilities as part of
14   the common elements after they were advised or knew that you
15   had already approved the removal?
16   A.  I just can't really respond to the question because I
17   don't know the exact time line.
18              I only instruct my executives to do a good job and a
19   fair job.  I don't -- but I can't tell you the time line.
20   Q.  Okay.  Now, you were asked a couple of questions about
21   whether you ever -- and you made a point to say -- under oath,
22   now, you said did you ever intentionally do this?  Do you
23   remember those questions Mr. --
24   A.  Yes.
25   Q.  Okay.  And, of course, your interrogatories were under
```

1    oath, right?

2    A.  Yes, sir.

3    Q.  Your deposition was under oath --

4    A.  Yes.

5    Q.  -- right?

6           And, of course, with respect to all of the things

7    that went on from 2003 to 2007, when you say you made the

8    decision relating to these common elements, there's not --

9    there's no memos indicating why you made the decision or when

10   it was made, correct?

11          MR. NOVACK:  Judge, I object, that that writing

12   business has been asked and answered and --

13          THE COURT:  Sustained.  And we are going beyond the

14   scope now.

15   BY MR. S. KULWIN:

16   Q.  And --

17          MR. S. KULWIN:  If I may have a moment, Judge?

18          THE COURT:  You may.

19          (Brief pause.)

20          MR. S. KULWIN:  May we be heard, Judge?

21          THE COURT:  Yes.

22     (Proceedings had at sidebar:)

23          THE COURT:  Go ahead.

24          MR. S. KULWIN:  Judge, he's opened the door.  I mean,

25   I didn't pull it out of him; he volunteered it, we've had no

1    complaints, no complaints, no complaints about this very

2    issue.  It's just not true and the jury --

3              THE COURT:  I'm not sure he specified it to this

4    issue, right.

5              MR. NOVACK:  But he also then later said, look, maybe

6    there were, I just don't know, one or two.  And that's all

7    there were, so --

8              THE COURT:  I am not going to let you go into that,

9    but I am going to strike the comment and tell the jury to

10   disregard it.

11             MR. S. KULWIN:  Thank you, your Honor.

12     (Further proceedings in open court:)

13             THE COURT:  Ladies and gentlemen, I'm going to strike

14   the testimony that was given a moment ago, that there were no

15   other complaints.  The jury should disregard that testimony.

16             Mr. Kulwin, anything further?

17             MR. S. KULWIN:  I am finished with Mr. Trump, Judge.

18             THE COURT:  Any recross, Mr. Novack?

19             MR. NOVACK:  No, your Honor.

20             THE COURT:  Thank you, Mr. Trump.  You may step down.

21             THE WITNESS:  Thank you very much.

22             THE COURT:  You're excused.

23             THE WITNESS:  Appreciate it.

24     (Witness excused.)

25             THE COURT:  Please call your next witness.

1          MR. S. KULWIN:  In a sense that would be me, Judge.

2    We're going to read Mr. Weiss now.  I'm going to take the

3    script --

4          THE COURT:  Okay.  Ladies and gentlemen, you are

5    about to hear some deposition testimony from a witness, Mr.

6    Weiss.  This testimony was taken prior to trial.

7          Mr. Kulwin is going to -- Mr. Kulwin standing at the

8    lectern is going to read the questions that were asked during

9    the deposition.  Mr. Kulwin sitting in witness stand is going

10   to read Mr. Weiss' answers that were given during the

11   deposition.

12         Mr. Weiss is not here to testify.  You should judge

13   this testimony, ladies and gentlemen, the same as if Mr. Weiss

14   were here on the witness stand and testifying.

15         Do you have a copy of it for me to follow along in

16   case there are any issues?

17         MR. J. KULWIN:  I don't have a marked copy.

18         MR. S. KULWIN:  I do.

19         THE COURT:  Do you have a marked copy that --

20         MR. SHONKWILER:  I have one.

21         THE COURT:  Why don't you read it, and if there -- I

22   assume you will object if there are issues, but you'll have to

23   give me your copy.

24         MR. SHONKWILER:  Right.

25         THE COURT:  Okay.

674

```
 1              MR. S. KULWIN:  Go slow, please.

 2              THE COURT:  So if you would just -- why don't you

 3    read a little bit of the cover page so we put this in context,

 4    the deposition of --

 5              MR. J. KULWIN:  Sure.

 6              THE COURT:  Yes, Mr. Novack?

 7              MR. NOVACK:  We actually need to address you on one,

 8    two or three line matters, but I think it should be before we

 9    start.

10              THE COURT:  Okay.  Bring the deposition.

11       (Proceedings had at sidebar:)

12              THE COURT:  What page?

13              MR. SHONKWILER:  Here's the issue --

14              THE COURT:  Give me a page.

15              MR. SHONKWILER:  Page 130, lines 7 to 15 was

16    designated by plaintiff.

17              THE COURT:  Is this something I ruled on already?

18              MR. S. KULWIN:  Yes.

19              MR. SHONKWILER:  We objected on the same relevance

20    grounds to testimony about the construction budget, and the

21    testimony began on 114 and went all the way through I think

22    134, and they were all granted.  It was our own mistake; we

23    didn't object to this.

24              And our concern now is not only that it's irrelevant

25    for the same reasons as the other testimony, but without the
```

675

1    surrounding testimony it is confusing and it -- it begins by,

2    I didn't recall what, if anything, he said to you in response

3    to your raising the issue.  Without context it just doesn't

4    make sense.

5           MR. NOVACK:  It was part of the same package, the

6    same ground.  We just left out those lines.  We just -- but I

7    -- not to try to be presumptuous, but I think as you did grant

8    our objection to all the others, you would have done the same.

9           MR. S. KULWIN:  My interpretation of what you did is

10   because all of the questions -- a lot of those questions were

11   on one part of the budget.  Later on it came down to just the

12   -- you wanted to limit it to just the issue of --

13          THE COURT:  This wasn't objected to, so I --

14          MR. S. KULWIN:  I thought they did object.

15          MR. NOVACK:  No.

16          MR. SHONKWILER:  It was our oversight.

17          THE COURT:  You should have objected.  I don't like

18   doing things twice.  It's a little unfair to bring it up now,

19   to the Court as well as to Mr. Kulwin.

20          Let me read it for a moment -- you've got all this in

21   color.  Is the blue coming in?

22          MR. S. KULWIN:  Blue is out, right?

23          MR. J. KULWIN:  Yellow is ours.

24          MR. S. KULWIN:  Yellow is ours.

25          THE COURT:  Is blue coming in?

676

```
 1                MR. J. KULWIN:  Blue is --

 2                THE COURT:  Are you reading blue?

 3                MR. J. KULWIN:  I believe we were going to read blue.

 4    It was their counter-designations.

 5                MR. SHONKWILER:  I don't see any such

 6    counter-designations on mine in blue, on Page 129, at all.

 7                THE COURT:  Are you reading the blue?  It doesn't

 8    look to me like -- it looks like that's what I sustained.

 9                MR. SHONKWILER:  Why don't you check Page 124 to see

10    if your counter-designation is in a different color.

11                MR. NOVACK:  We're orange, they're yellow --

12                MR. S. KULWIN:  Do you have your orange?  We'll use

13    your orange.  Blue is out, orange is --

14                MR. NOVACK:  In between all the outs is -- it's an

15    outliner that just shouldn't be there.

16                THE COURT:  So blue is not coming in?

17                MR. S. KULWIN:  Blue is out, orange is in, although

18    you should use Mr. Shonkwiler's.  There was an error in our

19    office.  I apologize.

20                MR. NOVACK:  Did you show the Judge the part that we

21    think should come out as well?

22                (Brief pause.)

23                MR. SHONKWILER:  It pertains to the operating budget.

24                THE COURT:  Okay.  Mr. Kulwin, I am going to,

25    consistent with my other ruling, sustain the objection and not
```

```
 1   let those lines 8 to 15 come in.  For one, it's not going to
 2   make any sense given everything else that's out.
 3             MR. S. KULWIN:  Okay.
 4             THE COURT:  Make sure you're working off the right
 5   transcript.
 6             (Further proceedings in open court:)
 7             THE COURT:  Mr. Kulwin, can you come back to this
 8   maybe later on?
 9             MR. S. KULWIN:  No, because -- I apologize, Judge.
10   There's an issue now about what's in and what's out.
11             Could we have one moment?  I apologize.  Oh, did you
12   mean come back to the Weiss --
13             THE COURT:  Yes.  Why don't you call a witness --
14             (Discussion had off the record.)
15             THE COURT:  Please call your next witness.
16             MR. J. KULWIN:  Judge, we'll call Robert Shearer, who
17   I believe is out in the hall.
18             THE COURT:  Okay.  Mr. Shearer, please come forward,
19   sir.
20             MR. SHEARER:  Thank you.
21    ROBERT FREDERICK SHEARER II, PLAINTIFF'S WITNESS,    DULY
22   SWORN
23             THE COURT:  Go ahead.  You may proceed.
24                           DIRECT EXAMINATION
25   BY MR. J. KULWIN:
```

Shearer - direct

678

1   Q.  Could you please state and spell your name for the record?

2   A.  Robert Frederick Shearer II, S-H-E-A-R-E-R.

3   Q.  Mr. Shearer, how old are you, sir?

4   A.  59.

5   Q.  Mr. Shearer, you were one of the real estate agents

6   representing the Trump organization in selling hotel condos,

7   is that correct?

8   A.  Correct.

9   Q.  And how long have you been a licensed real estate broker?

10  A.  How long have I been a licensed real estate broker?

11  Q.  Yes.

12  A.  Early 1990.

13  Q.  And throughout your career as a real estate agent, have

14  you represented both buyers and sellers?

15  A.  Yes, I have.

16  Q.  Okay.  And have you represented buyers and sellers in an

17  equal proportion?

18  A.  I would say that's a fair accounting, yes.

19  Q.  And could you please tell us, where do you work now?

20  A.  Baird & Warner Gold Coast office in Chicago.

21  Q.  And since you began working at Baird & Warner, have you

22  ever brought any of your clients to Trump Tower to look at

23  condos that were being offered for sale?

24  A.  Yes, I have.

25  Q.  And would it be fair to say that you would like an

Shearer - direct

679

1    opportunity to work on another Trump project in the future?

2    A.  Yes.

3    Q.  I would like to turn your attention to the time that you

4    were working at Trump Tower Chicago.  Could you please tell

5    us, when were you hired to join the sales team at Trump Tower?

6    A.  September 2003.

7    Q.  And who did you represent in your role as a member of the

8    Trump Tower sales team?

9    A.  I'm not certain I understand your question.

10   Q.  Sure.  Let me ask a better question.

11        You were representing the Trump organization as the

12   sellers of those condominiums at Trump Tower, correct?

13        MR. SHONKWILER:  Objection, leading.

14        THE COURT:  Sustained on leading.

15   BY MR. J. KULWIN:

16   Q.  Did you represent the organization that was selling the

17   condos at Trump Tower or did you represent the individuals who

18   were buying the condos at Trump Tower?

19   A.  Well, I was an agent for Koenig & Strey.

20   Q.  And with respect to Trump Tower back when you were on the

21   sales team, were you representing the sellers or the buyers?

22   A.  I'm sorry, could you repeat the question?

23   Q.  Sure.

24        When you were working on the sales team at Trump

25   Tower, were you representing the sellers or the buyers?

Shearer - direct

680

1    A.   Sellers.

2    Q.   Okay.  And prior to joining the Trump Tower sales team,

3    had you ever worked on the sales staff for a large new

4    condominium building?

5    A.   No.

6    Q.   And when you were on the sales staff, you were selling

7    both residential condos and hotel condos?

8    A.   Correct.

9    Q.   Okay.  And prior to joining the sales team had you ever

10   sold hotel condos before?

11   A.   No.

12   Q.   Prior to the time when you actually started selling the

13   condominiums at Trump Tower, did you receive some training

14   about the property that you were going to sell?

15   A.   No.

16          MR. J. KULWIN:  One moment, Judge.

17          (Brief pause.)

18   BY MR. J. KULWIN:

19   Q.   When you joined the Trump Tower sales team but before you

20   actually started selling the condos, did you receive some sort

21   of an overview about what the project would entail?

22   A.   I don't remember.

23   Q.   Okay.  Let me see if I can try and refresh your

24   recollection.

25          Take a look at that, please.

Shearer - direct

681

1   A.  Yes.

2   Q.  Okay.  Sir, is your recollection refreshed with respect to

3   whether or not you received some -- an overview of the project

4   before you started selling the units?

5   A.  Yes.

6   Q.  Okay.  And did you receive some sort of overview about the

7   project before you actually started selling the units?

8   A.  I believe there were some marketing materials provided to

9   us.

10  Q.  And did you ever meet with any members of the Trump

11  organization to provide you with an overview of the project

12  that you were going to sell?

13  A.  Not to my knowledge.

14  Q.  Okay.  Let me see if I can refresh your recollection

15  again.

16     (Brief pause.)

17  BY THE WITNESS:

18  A.  Okay.  Thank you.

19  BY MR. J. KULWIN:

20  Q.  Sir, is your recollection refreshed as to whether or not

21  --

22  A.  Yes.

23  Q.  -- you met with any members of the Trump organization who

24  provided you with some information about the project you were

25  going to sell?

Shearer - direct

682

1   A.  I did.

2   Q.  Okay.  And do you remember who that person was?

3   A.  Jill Cremer.

4   Q.  And do you recall what role did Ms. Cremer play at the

5   Trump organization?

6   A.  I don't remember at this point.

7   Q.  And during the time you worked on the sales staff at Trump

8   Tower, did any of your duties and responsibilities include

9   preparing the marketing materials that were used to sell the

10  hotel condos?

11  A.  No.

12  Q.  And did you receive the marketing materials that you used

13  to help sell the hotel condos from the Trump organization?

14  A.  No.

15  Q.  Do you know where you received the marketing materials

16  from?

17  A.  I believe they came from Koenig & Strey.

18          MR. SHONKWILER:  Excuse me.  I beg your pardon.  I

19  would just like to ask the witness to speak up a little bit.

20          THE COURT:  Could you scoot up a little bit closer to

21  the microphone?

22          THE WITNESS:  Sure.  I didn't even see that.  Sure.

23          THE COURT:  Thank you.  I know it's a small space.

24          THE WITNESS:  There we go.

25          THE COURT:  Thank you.

Shearer - direct

683

```
 1          THE WITNESS:  Sure.  Is that better?
 2   BY MR. J. KULWIN:
 3   Q.  And, Mr. Shearer, Koenig & Strey was, to your knowledge,
 4   retained by Trump Tower to help sell the hotel condos and the
 5   residential condos of the building?
 6   A.  Yes.
 7   Q.  And would it be fair to say that your duties and
 8   responsibilities did not include modifying any of the
 9   marketing materials that you received?
10   A.  Correct.
11   Q.  During the time that you worked on the sales staff at
12   Trump Tower did you also receive property reports?
13   A.  Yes.
14   Q.  And did any of your duties and responsibilities on the
15   sales staff include drafting or modifying the property reports
16   that were prepared for Trump Tower?
17   A.  No.
18   Q.  Do you recall anyone ever telling you, Mr. Shearer, that
19   you could not use the information in the marketing materials
20   that you received in trying to sell the Trump Tower hotel
21   condos?
22   A.  I don't remember.
23   Q.  Do you recall anyone ever telling you, Mr. Shearer, that
24   you could not use any of the information in the property
25   reports that you were provided in trying to sell the Trump
```

1    Tower condominiums?

2    A.  I don't remember.

3    Q.  Were you ever told, Mr. Shearer, that you could not

4    promote information in the property reports and the marketing

5    materials as tools to try and sell the Trump Tower condos?

6    A.  Could you please repeat that?

7    Q.  Sure.

8            Were you ever told that you could not use the

9    marketing materials or the information in the property reports

10   to try and sell the condominiums?

11   A.  I don't remember.

12   Q.  Did you ever compare the marketing materials to the

13   property reports to see --

14   A.  No.

15   Q.  -- if the information was the same?

16   A.  No.

17   Q.  And did you ever -- you never questioned whether or not

18   the information that was in the marketing materials was

19   consistent with the information that was in the property

20   reports, correct?

21   A.  Correct.

22   Q.  I'm sorry?

23   A.  I did not.

24   Q.  Okay.  And during the time that you were selling the Trump

25   Tower condos, were you ever provided with any documents that

Shearer - direct

685

1   told you that you could not discuss the common elements that

2   were being sold with the hotel?

3   A.   No.

4   Q.   Would it be fair to say, Mr. Shearer, that you tried to

5   sell as many condominiums as you could, correct?

6           MR. SHONKWILER:  Objection, leading.

7           THE COURT:  Sustained.

8   BY MR. J. KULWIN:

9   Q.   Would it be fair to say, Mr. Shearer, you tried to sell as

10  many units as possible?

11  A.   Yes.

12  Q.   And how were you paid while you were working on the sales

13  staff for Trump Tower?

14  A.   We were on a salary.

15  Q.   And did you also receive a commission?

16  A.   Yes.

17  Q.   And that would be a commission on each unit that was sold,

18  correct?

19  A.   Correct.

20  Q.   Now, I would like to turn your attention to Ms. Goldberg.

21  Do you recall selling any Trump Tower condos to Ms. Goldberg?

22  A.   Yes.

23  Q.   Did you sell her a residential condominium?

24  A.   Yes.

25  Q.   How many condominiums did you sell to Ms. Goldberg?

Shearer - direct

686

1   A.   Residential?   One.

2   Q.   Okay.   And did you sell Ms. Goldberg any other

3   condominiums?

4   A.   Yes.

5   Q.   How many others besides the residential?

6   A.   I believe two.

7   Q.   Do you recall at what point in time you sold Ms. Goldberg

8   the residential condominium?

9   A.   At the beginning, to the best of my knowledge, of the

10   project.

11   Q.   And do you recall when the project first started?

12   A.   September of 2003.

13   Q.   Okay.   And after you had sold Ms. Goldberg the residential

14   condo, what do you recall about meeting with her next with

15   respect to any other condos that she was interested in buying?

16   A.   I truly don't remember another meeting.

17   Q.   Would it be fair to say, Mr. Shearer, that you made many

18   sales presentations during the time that you worked at Trump

19   Tower?

20   A.   Yes.

21   Q.   And how long did you work at Trump Tower?

22   A.   Better part of six years.

23   Q.   And over that six-year period would it be fair to say that

24   you don't remember specifically what you said to any specific

25   buyer that you were meeting with to try and sell condominiums?

Shearer - direct

687

1   A.  Yes.

2   Q.  Okay.  And would it be fair to say, sir, that you relied

3   on the information that you had with respect to the marketing

4   materials and in the property reports during the sales

5   presentations that you would make?

6           MR. SHONKWILER:  Objection, leading.

7   BY THE WITNESS:

8   A.  I --

9           THE COURT:  Sustained.

10          THE WITNESS:  Can I answer it?

11          THE COURT:  No, you don't answer it, sir.

12  BY MR. J. KULWIN:

13  Q.  Did you rely on the information in the marketing materials

14  for your sales presentations?

15  A.  I relied on the marketing materials provided by Koenig &

16  Strey.

17  Q.  And Koenig & Strey was hired by the Trump organization to

18  work at Trump Tower, correct?

19          MR. SHONKWILER:  Objection, leading.

20          THE COURT:  Sustained.  Rephrase it.

21  BY MR. J. KULWIN:

22  Q.  Was Koenig & Strey hired by the Trump organization to sell

23  condominiums at Trump Tower?

24  A.  I believe that is true.

25  Q.  Okay.  And did --

Shearer - direct

```
 1                (Discussion had off the record.)

 2   BY MR. J. KULWIN:

 3   Q.  And did you rely on the property reports in making the

 4   sales presentations that you made when you met with

 5   prospective buyers?

 6   A.  No.

 7   Q.  Did you read the property reports before you made your

 8   sales presentations?

 9   A.  Yes.

10   Q.  In fact, did you have to certify that you had read the

11   property reports before you made your sales presentations?

12   A.  Yes.

13           MR. J. KULWIN:  May I approach, Judge?

14           THE COURT:  You may.

15   BY MR. J. KULWIN:

16   Q.  Showing you what's been marked as Plaintiff's Exhibit 73.

17           MR. NOVACK:  Could you repeat the number, please?

18           THE COURT:  73.

19           MR. NOVACK:  Thank you.

20   BY MR. J. KULWIN:

21   Q.  Is that your signature, sir, on Exhibit 73?

22   A.  Yes.

23   Q.  And can you just please read to the jury what it says

24   right above your signature?

25   A.  (Reading:)  I certify that I have made no representations
```

Shearer - direct

689

1   to the person/persons receiving this property report which are

2   contrary to the information contained in the property report.

3   Q.  Okay.  So would you agree that you would have had to have

4   read the property reports in order to make the certification

5   that's reflected on Exhibit 73?

6           MR. SHONKWILER:  Objection, leading.

7           THE COURT:  Sustained.  Rephrase it.

8           MR. J. KULWIN:  Sure.

9   BY MR. J. KULWIN:

10  Q.  Would it be fair to say that you would have had to have

11  read the property reports before you could make the

12  certification that's reflected on Exhibit 73?

13          MR. SHONKWILER:  Same objection, and object to the

14  form.

15          THE COURT:  Sustained.  It's a leading question.

16  BY MR. J. KULWIN:

17  Q.  Would you have been able to have made the certification

18  that we just looked at in Exhibit 73 if you had not read the

19  property reports?

20  A.  No.

21  Q.  Okay.  Now, are you aware that in October of 2007 there

22  was a fourth amendment to the property report that was issued

23  for the hotel condominiums?

24  A.  I really don't remember that.

25  Q.  And, sir, you don't -- do you know whether or not there

Shearer - direct

690

1    was a fourth amendment to the property report that was issued

2    in October of 2007?

3    A.   No.

4    Q.   You don't know?

5            MR. SHONKWILER:  Objection.  Asked and answered.

6            THE COURT:  The last answer can stand.

7            MR. SHONKWILER:  Also, your Honor, I'm still having

8    trouble hearing.  I apologize.  I don't want to interrupt but

9    I can't hear.

10           THE WITNESS:  I'll lean closer.

11           THE COURT:  Keep your voice up or move -- you're good

12   now.

13           THE WITNESS:  Okay.

14           Can you hear me now?  Okay.

15           MR. J. KULWIN:  If I may just have one minute, Judge?

16           THE COURT:  You may.

17           (Brief pause.)

18           MR. J. KULWIN:  We have nothing further for

19   Mr. Shearer.

20           THE COURT:  Cross-examination.

21                        CROSS EXAMINATION

22   BY MR. SHONKWILER:

23   Q.   Good afternoon, Mr. Shearer.

24   A.   Good afternoon.

25   Q.   You got your real estate broker's license in the 1990s, is

Shearer - cross

691

1   that right?

2   A.  Correct.

3   Q.  Do you remember what year?

4   A.  I do not.

5   Q.  Between the year in the '90s, when you got your license,

6   and when you went to work for Koenig & Strey in 2003, were you

7   a real estate broker that entire time?

8   A.  Yes, I was.

9   Q.  Were you selling residential properties in the city?

10  A.  Yes, I was.

11  Q.  Condominiums?

12  A.  Primarily.

13  Q.  Okay.  And when you went to work at Koenig & Strey, you

14  were chosen to be one of three Koenig & Strey brokers to be

15  assigned to a special project at Trump Tower, is that right?

16  A.  That is correct.

17  Q.  Do you remember the names of the other brokers who were on

18  that team with you?

19  A.  I do.

20  Q.  Could you tell us, please?

21  A.  Tere Proctor and Ms. Kiyoko Binosi.

22  Q.  Now, you were the exclusive -- the team of three that you

23  just named were the exclusive brokers at that time for Trump

24  Tower, correct?

25  A.  That is correct.

Shearer - cross

1   Q.  But you were employees of Koenig & Strey, right?

2   A.  That is correct.

3   Q.  And you personally were never employed by the Trump

4   organization, right?

5   A.  That is correct.

6   Q.  And exclusive meaning if people wanted to buy condos at

7   Trump Tower, they came to your sales office, correct?

8   A.  That is correct.

9   Q.  Also exclusive in the sense that you at that time were not

10  selling properties in other buildings?

11  A.  That is correct.

12  Q.  Now, you mentioned you were on salary with a commission.

13  Do you recall that?

14  A.  Yes.

15  Q.  What was your salary?

16  A.  135,000 per year.

17  Q.  135,000?

18  A.  Yes.

19  Q.  What was the commission rate on your sales?

20  A.  One quarter of one percent.

21  Q.  One quarter of one percent, meaning of what?

22  A.  Well, actually there was a $50,000 draw against

23  commissions.  So one quarter of one percent would go toward

24  that $50,000 draw and against sales closed, or condos that

25  were to be closed.

Shearer - cross

693

1  Q.  Okay.  So the one quarter of one percent is one quarter

2  and one percent of the purchase price of a unit that you sell?

3  A.  Correct.

4  Q.  Okay.  And the $50,000 draw you just described -- tell me

5  if I'm understanding this right -- does that mean the first

6  $50,000 worth of commissions that you earn in a year was paid

7  in advance to you?

8  A.  Correct.

9  Q.  Is that right?

10 A.  Yes.

11 Q.  So part of the $135,000 that you received was a $50,000

12 advance payment on any -- on any commissions you might earn

13 that year?

14        MR. J. KULWIN:  Objection, Judge.  Asked and

15 answered.

16        THE COURT:  What's your response?

17        MR. SHONKWILER:  I'm not so sure, Judge, that I

18 understand, yet I want to make sure it's clear and I --

19        THE COURT:  Overruled.

20        You may answer if you can.

21 BY THE WITNESS:

22 A.  Could you repeat the question, please?

23 BY MR. SHONKWILER:

24 Q.  Part of the $135,000 salary you received was a $50,000

25 draw, is that correct?

Shearer - cross

694

1   A.  Correct.

2   Q.  And that $50,000 was an advance paid towards your first

3   $50,000 of commissions for the year?

4   A.  Correct.

5   Q.  So if you sold enough property to make $50,000 of

6   commission in a year, you would be at 135,000 for the year at

7   that time, and continued sales beyond that then would give you

8   more income for the year, is that correct?

9   A.  Correct.

10  Q.  Were you paid bonuses?

11  A.  No.

12  Q.  And the compensation structure you just explained, is that

13  typical, in your experience, in the real estate business?

14  A.  Yes, very.

15  Q.  I know you've testified you don't remember any of the

16  exact words that you said to Ms. Goldberg, but do you remember

17  who Ms. Goldberg is?

18  A.  Yes.

19  Q.  Do you recognize her here in the courtroom?

20  A.  I do.

21  Q.  Okay.  And what do you recall -- I want to start with the

22  first meeting.  Do you recall you met with Ms. Goldberg to

23  sell her a residential condominium in the building?

24  A.  Yes.

25  Q.  Do you remember where the meeting was?

1    A.   It was at the Sun-Times, and we had a makeshift sales

2    center built at the Sun-Times location, which now is the

3    company, you know, where Trump is located -- Trump

4    International Hotel, 401 North Wabash.

5    Q.   How did Ms. Goldberg strike you at that meeting?

6    A.   Very savvy, very decisive, was looking for a residence

7    for, I believe, she and her husband.

8    Q.   What about your impression of her made you decide she was

9    savvy and sophisticated -- or decisive?

10   A.   Well, it was more about looking at floor plans with views,

11   basically what do you have to offer, how much is it and what

12   are the monthly assessments.  It was like -- very -- very cut

13   and dry, actually.

14   Q.   Was she alone at that meeting?

15   A.   I believe she was with her husband and a realtor.

16   Q.   The realtor was whom, do you know?

17   A.   Terry Vogue, I'm pretty sure.

18   Q.   Is there anything else about the impression that Ms.

19   Goldberg made on you at that first meeting that you haven't

20   told us?

21   A.   No.

22   Q.   Now, at that first meeting Ms. Vogue and Ms. Goldberg

23   looked at floor plans and identified what they wanted and

24   asked you questions about the units they were interested in.

25   Do you recall that?

1          MR. J. KULWIN:  Objection, Judge.  Relevance as to

2    first meeting.  This is a residential condo.

3          THE COURT:  What's the relevance?

4          MR. SHONKWILER:  Well, there were two meetings so it

5    will be very short, but the relevance is that the information

6    that the buyers were interested in was of a particular variety

7    and uniquely different from some of the other --

8          THE COURT:  Overruled.

9          You may answer if you can, sir.

10   BY THE WITNESS:

11   A.  I do remember -- my impression was that they had reviewed

12   the floor plate, which indicates what units are available per

13   floor, and that they were kind of narrowing in at that

14   meeting.  It was -- you know, there must have been some

15   preliminary reviewing of the options available.

16         THE COURT:  Mr. Kulwin?  There's an objection.

17         MR. J. KULWIN:  Objection.  Move to strike on

18   speculation grounds, Judge.

19         THE COURT:  Lay a little more foundation or I will

20   strike it, because he was talking about his impression.

21   BY MR. SHONKWILER:

22   Q.  I do want only your impressions, and if you are -- if

23   you're testifying beyond your impressions to something you

24   were told, please just clarify and make sure you explain it

25   that way so that we know what you're talking about.

Shearer - cross

1        I'll ask this question again.  Do you recall that Ms.

2  Goldberg and Ms. Vogue were looking for particular information

3  when they came to your office that first time?

4  A.  Yes.

5  Q.  Was it your impression that they came in having done some

6  research already about certain units?

7        MR. J. KULWIN:  Objection.  Grounds, Judge?

8        THE COURT:  Sustained.

9        If he's going to give an impression, you have to lay

10  a basis for a foundation to give such an impression.  That's

11  the objection.

12  BY MR. SHONKWILER:

13  Q.  Do you recall what kind of information they asked you for,

14  Mr. Shearer?

15  A.  Pricing, floor plans, monthly assessments.

16  Q.  By monthly assessments you're referring to what?

17  A.  Attached to the particular units that they were looking at

18  on the floor plan.

19  Q.  And are monthly assessments the monthly -- the estimated

20  monthly costs that the owner of that unit would pay?

21  A.  Correct.

22  Q.  Did they ask you for any other information?

23        MR. J. KULWIN:  Objection, Judge.  We need some

24  clarification that this was still on the residential condos.

25        THE COURT:  Sustained.

1   BY MR. SHONKWILER:

2   Q.  We're talking only about your first meeting where there

3   was a residential condominium purchased?

4   A.  Correct, yes, at the Sun-Times, correct.

5   Q.  Do you remember the question?

6   A.  Could you repeat it, please?

7   Q.  I'll ask another one.  Do you remember whether there was

8   any other information that they asked you for at that first

9   meeting?

10   A.  I do not.

11   Q.  And was there anything about the question -- the questions

12   they asked and the information they sought that led you to

13   believe that they were prepared for that meeting?

14        MR. J. KULWIN:  Objection.  Calls for speculation,

15   Judge.

16        THE COURT:  Sustained.

17        MR. SHONKWILER:  We'll move on to the next meeting,

18   your Honor.

19   BY MR. SHONKWILER:

20   Q.  Mr. Shearer, you had a second meeting with Ms. Goldberg,

21   correct?

22   A.  Yes.

23   Q.  Do you remember how long that was after the first?

24   A.  I do not remember.

25   Q.  Do you recall getting a call from Terry Vogue saying Ms.

Shearer - cross

1    Goldberg was looking into hotel condominiums at Trump Tower?

2    A.  I don't recall.

3    Q.  Do you recall that you did meet with Ms. Goldberg and

4    Ms. Vogue at some point to discuss the purchase of a hotel

5    condominium?

6    A.  Yes.

7    Q.  Okay.  Do you remember approximately how long your meeting

8    with Ms. Goldberg and Ms. Vogue lasted?

9    A.  All of 30 minutes to an hour.

10   Q.  At that meeting, much like the first, Ms. Goldberg made

11   very specific requests for information, right?

12   A.  Yes.

13        MR. J. KULWIN:  Objection.  Move to strike, Judge,

14   speculation, and just like the first.

15        THE COURT:  Overruled.

16   BY MR. SHONKWILER:

17   Q.  In particular, she wanted to see floor plans and views for

18   particular units, right?

19   A.  Yes.

20   Q.  And then she wanted to know the price of the units, right?

21   A.  Yes.

22   Q.  She also wanted to know the monthly estimated costs for

23   the units she was considering, right?

24   A.  Yes.

25   Q.  Do you have to make a sales pitch -- I beg your pardon.

Shearer - cross

1    Strike that.

2            Do you recall that you made a sales pitch to Ms.

3    Goldberg in that second meeting about hotel condominiums?

4    A.  I did not make a sales pitch in that meeting.

5    Q.  Why not?

6    A.  She knew exactly what she wanted.

7    Q.  Can you elaborate?

8    A.  I --

9            MR. J. KULWIN:  Objection.  Move it strike the last

10   answer, Judge, on speculation grounds.

11           THE COURT:  What's your response?

12           MR. SHONKWILER:  The witness' impression was that she

13   knew what she wanted.  I can ask him what that's based on,

14   asking him to elaborate.

15           THE COURT:  Overruled.

16           You're free to redirect on that.

17   BY MR. SHONKWILER:

18   Q.  What was the basis for your feeling that Ms. Goldberg knew

19   exactly what she wanted?

20   A.  She wanted to review floor plans, what was available, how

21   much do these units cost and what are the monthly expenses.

22   Q.  Your recollection is that at that meeting you were just

23   answering questions from Ms. Goldberg and Ms. Vogue and giving

24   the information they requested, right?

25   A.  Correct.

Shearer - cross

1  Q.  And what information -- apart from what you've already

2  said, was there information that they asked you for at that

3  meeting?

4        MR. J. KULWIN:  Objection.  Asked and answered.

5        THE COURT:  Overruled.

6        He said apart from what you've already said.  He's

7  looking for something else.

8  BY THE WITNESS:

9  A.  I'm sorry, could you repeat the question?

10 BY MR. SHONKWILER:

11 Q.  Let me ask a new one.  Do you recall that it was important

12 to Ms. Vogue at that meeting to get the projected monthly

13 expenses for each unit she was considering purchasing?

14 A.  Yes.

15        THE COURT:  To Ms. Vogue?

16        MR. SHONKWILER:  Ms. Goldberg.

17        THE COURT:  I think you need to rephrase.  You said

18 Ms. Vogue.  Rephrase your question.

19 BY MR. SHONKWILER:

20 Q.  Do you recall that it was important to Ms. Goldberg to get

21 the list of projected monthly expenses for each unit she was

22 considering buying?

23 A.  Yes.

24 Q.  Do you recall Ms. Goldberg ever asking you for information

25 about the common elements of the hotel condominium?

Shearer - cross

```
 1   A.  I don't remember.

 2   Q.  Did she ever ask you questions about whether there would

 3   be revenues to the unit owners from the common elements?

 4   A.  I don't remember that.

 5   Q.  You don't remember her asking anything like that?

 6   A.  Correct.

 7            MR. J. KULWIN:  Objection, argumentative.

 8            THE COURT:  Overruled.

 9   BY MR. SHONKWILER:

10   Q.  Do you recall her asking you questions about amenities,

11   like the health spa or the club?

12   A.  No.

13   Q.  Now, Mr. Shearer, in all the years that you were selling

14   Trump Tower condominiums, you had sales brochures to work

15   with, didn't you?

16   A.  Yes.

17   Q.  And you gave those sales brochures to potentially

18   interested buyers?

19   A.  Yes.

20   Q.  And did you use the information in those sales brochures

21   to sell the properties to potential interested buyers?

22   A.  Yes.

23   Q.  Now, you had some buyers come into your office knowing

24   exactly what they wanted, right?

25   A.  Yes, I did.
```

1   Q.  In fact, how you would characterize the sales at Trump

2   Tower in 2003 when you started your job?

3          MR. J. KULWIN:  Objection, relevance.  How would he

4   characterize?

5          THE COURT:  Sustained on form.  Rephrase that.

6   BY MR. SHONKWILER:

7   Q.  Well, were they -- were the units selling well in 2003?

8          MR. J. KULWIN:  Objection.  Lack of foundation,

9   Judge.

10         THE COURT:  Overruled.

11         You may answer if you can.

12         MR. J. KULWIN:  When, Judge?

13         MR. SHONKWILER:  2003.

14         MR. J. KULWIN:  Objection.  Relevancy on 2003, Judge.

15         THE COURT:  What's the relevancy of that year?

16         MR. SHONKWILER:  Why don't we move on to another

17   question, and if we think there's some foundation for that

18   we'll come back to it.

19         THE COURT:  Okay.

20   BY MR. SHONKWILER:

21   Q.  How long was this second -- did you answer this question

22   already:  How long was your second meeting with Ms. Goldberg?

23         MR. J. KULWIN:  Objection.  Asked and answered.

24         MR. SHONKWILER:  I don't remember if it was.

25         THE COURT:  Overruled.

 1             You may answer.

 2    BY THE WITNESS:

 3    A.  I don't remember.

 4    BY MR. SHONKWILER:

 5    Q.  Do you remember if Ms. Goldberg bought a condo at that

 6    meeting?

 7    A.  At the second meeting?

 8    Q.  Yes.

 9    A.  I just don't remember which meeting it was.

10    Q.  Do you recall during the years you were selling condos

11    that there were buyers who walked right into your sales office

12    and bought condos at Trump without you ever even giving them a

13    sales pitch?

14             MR. J. KULWIN:  Objection.  Relevance, Judge?

15             THE COURT:  Overruled.

16             You may answer if you can.

17             MR. J. KULWIN:  Other buyers, Judge?

18             THE COURT:  Overruled.

19             You may answer if you can, sir.

20    BY THE WITNESS:

21    A.  Could you repeat it?

22    BY MR. SHONKWILER:

23    Q.  Do you recall that there were buyers that walked into your

24    sales office and bought condos at Trump without you ever even

25    giving them a sales pitch?

Shearer - cross

1    A.  Yes.

2    Q.  Was Ms. Goldberg one of those buyers?

3    A.  Yes.

4    Q.  When you did give a sales pitch, though, to a buyer, did

5    you talk to buyers about what was in the common elements of

6    the hotel condominium?

7          MR. J. KULWIN:  Objection as to foundation, when,

8    relevance.

9          THE COURT:  Sustained.

10   BY MR. SHONKWILER:

11   Q.  Did you ever -- isn't that --

12         MR. SHONKWILER:  Can we ask ever and narrow it from

13   there, Judge?

14         THE COURT:  Ask the question.  We'll see if there's

15   an objection.

16         MR. SHONKWILER:  That's true.

17   BY MR. SHONKWILER:

18   Q.  Mr. Shearer, you worked at Trump -- in the sales office at

19   Trump Tower for -- strike that.

20         You worked in the sales office that Koenig & Strey

21   ran on behalf of Trump for six years, correct?

22   A.  Yes.

23   Q.  Did you develop a sales pitch and some patterns and habits

24   for how you sold units to potential buyers?

25   A.  Yes.

Shearer - cross

1  Q.  And did that sales pitch involve pitching the items that

2  were in the brochures to the buyers?

3  A.  Yes.

4  Q.  Did you rely heavily and extensively on the brochures for

5  your sales pitch?

6          MR. J. KULWIN:  Objection, argumentative.

7          THE COURT:  Sustained on form.  Rephrase it.

8  BY MR. SHONKWILER:

9  Q.  Did you rely primarily on the brochures and the

10  information that was in the brochures when you had to give

11  your sales pitches?

12  A.  Yes.

13  Q.  When you gave your sales pitches did you rely on

14  information that was in the property report but that was not

15  in the sales brochures?

16          MR. J. KULWIN:  Objection.  Asked and answered.

17          THE COURT:  Overruled.

18          You may answer if you can.

19  BY THE WITNESS:

20  A.  No.

21  BY MR. SHONKWILER:

22  Q.  Did you rely on information -- strike that.

23          Did you use information from the operating budget of

24  the property report when you made sales pitches to buyers?

25  A.  No.

Shearer - cross

1   Q.  Am I correct that you don't even recall one way or another

2   whether meeting rooms, function rooms or ballrooms were

3   identified in the property report documents as common elements

4   of the hotel condominium?

5   A.  Correct.

6           MR. J. KULWIN:  Objection, argumentative.

7           THE COURT:  Overruled.

8           MR. SHONKWILER:  Just two more questions,

9   Mr. Shearer.

10  BY MR. SHONKWILER:

11  Q.  Was it ever your understanding that there would be laundry

12  facilities in the hotel condominium that would generate

13  revenue for unit owners?

14  A.  I do not remember that.

15  Q.  Did you ever tell any buyer, to the best of your

16  recollection, in all your years at Trump Tower sales center,

17  that there would be laundry facilities in the building that

18  would generate income and would be paid to the unit owners?

19  A.  No.

20          MR. SHONKWILER:  Thank you, your Honor.

21          THE COURT:  Redirect, Mr. Kulwin.

22                  REDIRECT EXAMINATION

23  BY MR. J. KULWIN:

24  Q.  Mr. Shearer, Mr. Shonkwiler asked you questions for about

25  15, 20 minutes or so; would you say that that's fair?

Shearer - redirect

1   A.  I didn't really look at the time.

2   Q.  And your meeting with Ms. Goldberg, if I heard you

3   correctly, that was about between a half-hour and an hour?

4   A.  I -- the first meeting?  I'm sorry?

5   Q.  Second -- I'm sorry.  I apologize.  The second meeting

6   that you had with her with respect to the hotel condominiums?

7   A.  I believe so.

8   Q.  And if I heard you correctly, one of the things you

9   discussed with Ms. Goldberg were the assessments that she was

10  going to have to pay on the hotel condos, is that correct?

11  A.  Yes.

12  Q.  And at the time that you met with Ms. Goldberg, did you

13  have an understanding that the assessments reflected the

14  amount of revenue and expenses that could be expected to the

15  hotel condominium?

16  A.  No, I don't remember that.

17  Q.  I showed you that certification, Exhibit 73, where you had

18  to certify that you didn't make any statements that were

19  contrary to the property report.  Do you remember that?

20  A.  Yes.

21  Q.  And if I remember correctly, you had to read the property

22  report in order to make that certification.  You said that,

23  too, right?

24  A.  Yes.

25  Q.  And are you aware if the budget is in the property report?

Shearer - redirect

709

1    A.  I don't remember.

2    Q.  I'm going to see if I can refresh your recollection.

3    (Indicating.)

4    A.  Yes.

5    Q.  Okay.

6    A.  Thanks.

7    Q.  Sure.

8         So at the time you met with Ms. Goldberg, didn't you

9    understand that the income that was coming to the hotel

10   condominium association would be used to offset expenses?

11   A.  Based on what I just read.

12   Q.  Yes?

13   A.  Yes.

14   Q.  Okay.  And the revenue that would be coming into the hotel

15   condominium association, that would be the revenue that would

16   be coming from the ballrooms and the meeting rooms and

17   function rooms at the hotel, correct?

18         MR. SHONKWILER:  Objection, leading.

19         THE COURT:  Sustained.

20   BY MR. J. KULWIN:

21   Q.  Let me see if I can show you Exhibit H --

22         MR. SHONKWILER:  Exhibit what, Judge?

23         MR. J. KULWIN:  7.

24   BY MR. J. KULWIN:

25   Q.  I think you have it in front of you there, Mr. Shearer.

Shearer - redirect

710

1    A.  Yes, I do.

2    Q.  Do you recognize Exhibit 7?

3    A.  I'm sorry?

4    Q.  I'm sorry.  Do you recognize Exhibit H from --

5            THE COURT:  This is Exhibit H to Plaintiff's 75.

6            MR. J. KULWIN:  Yes, Judge.  Thank you.  I apologize.

7            MR. S. KULWIN:  7, your Honor.

8            THE COURT:  Plaintiff's 7, okay.

9    BY THE WITNESS:

10   A.  Can you please repeat the question?  I kind of lost sight

11   of it here.

12   BY MR. J. KULWIN:

13   Q.  Sure.

14          Do you recognize what's on the screen, which comes

15   from Plaintiff's Exhibit 7 and is Exhibit H to the property

16   report?

17   A.  I don't remember this.

18   Q.  Okay.  At the time you would have met with Ms. Goldberg

19   you would have recognized that document, correct?

20           MR. SHONKWILER:  Objection, leading.

21           THE COURT:  Sustained.  Ask another question.

22           MR. J. KULWIN:  Sure.

23   BY MR. J. KULWIN:

24   Q.  In certifying that you had read the property report before

25   meeting with Ms. Goldberg, would it be fair to say that you

```
 1   would have also read the budgets that were included with the

 2   property report?

 3              MR. SHONKWILER:  Objection, leading.

 4              THE COURT:  Sustained.

 5   BY MR. J. KULWIN:

 6   Q.  Did you read the budgets that went along with the property

 7   reports for the hotel condominiums?

 8   A.  I don't remember.  I just don't remember.

 9   Q.  At the time you made the certification you believed that

10   that was accurate, right?

11   A.  Yes.

12   Q.  And in order to explain to Ms. Goldberg the assessments,

13   you had to make sure that you weren't telling her anything

14   that was contrary to what was in the property report, right?

15              MR. SHONKWILER:  Objection, leading.

16              THE COURT:  Sustained.

17   BY MR. J. KULWIN:

18   Q.  Mr. Shearer, would it be fair to say that you would have

19   to know what was in the budget in order to know what the

20   assessments would be for the individual units?

21              MR. SHONKWILER:  Objection, leading.

22              THE COURT:  Mr. Kulwin, that's leading.  Sustained.

23              MR. J. KULWIN:  Okay.  Nothing further from this --

24              MR. S. KULWIN:  One second.

25              MR. J. KULWIN:  I'm sorry.
```

Shearer - redirect

1          (Discussion had off the record.)

2          MR. J. KULWIN:  One minute, Judge, please.

3          (Brief pause.)

4          THE COURT:  The witness is asking for water.  Mr.

5    Kulwin, if you could provide water, please.

6    BY MR. J. KULWIN:

7    Q.  Mr. Shearer, there's a significant portion of the meeting

8    that you had with Ms. Goldberg that you can't recall as we sit

9    here today, is that right?

10         MR. SHONKWILER:  Objection, leading.

11         THE COURT:  Sustained.

12   BY MR. J. KULWIN:

13   Q.  Mr. Shearer, can you remember everything that you spoke

14   about with Ms. Goldberg during that second meeting where the

15   two of you discussed the hotel condominium units?

16   A.  No.

17   Q.  And the meeting was about between 30 minutes and an hour,

18   is that right?

19   A.  To the best of my recollection, yes.

20   Q.  And did you provide Ms. Goldberg at that second meeting

21   with copies of the property reports?

22   A.  I don't remember.

23   Q.  Okay.

24   A.  I don't remember.

25   Q.  Let me see if I can refresh your recollection.

Shearer - redirect

1  A.  Okay.  Thanks.

2         MR. SHONKWILER:  Excuse me.  Counsel, could I just --

3  would you show me what you're showing the witness?

4         MR. J. KULWIN:  I can --

5         MR. SHONKWILER:  Can you tell me what you're showing

6  him?

7         THE COURT:  State for the record what you're using to

8  refresh his recollection.

9         MR. J. KULWIN:  Sure.  I'm going to show him his

10 deposition.

11        THE COURT:  Okay.  The page number?

12        MR. J. KULWIN:  Sure.  Page 84.

13        THE COURT:  Line, please?

14        MR. J. KULWIN:  Lines 3 to 4.

15        THE COURT:  Okay.  Thank you.

16        Read it to yourself, please, Mr. Shearer.

17        THE WITNESS:  Okay.

18        (Brief pause.)

19        THE WITNESS:  Okay.

20 BY MR. J. KULWIN:

21 Q.  Mr. Shearer, is your memory refreshed with respect to when

22 you provided -- or if you provided Ms. Goldberg a copy of the

23 property reports at that second meeting?

24 A.  Yes.

25 Q.  Did you provide her a copy of the property reports at that

1    second meeting?

2    A.  No.

3    Q.  When did you provide buyers with copies of the property

4    reports?

5    A.  Upon request or at the conclusion of writing the contract.

6    Q.  And was there a rule that was used in the sales staff as

7    to what would have to happen before a potential buyer could

8    get a copy of a property report?

9    A.  They would have to sign a receipt.

10            MR. J. KULWIN:  One more moment, please, Judge.

11            (Brief pause.)

12            MR. J. KULWIN:  I'm sorry, Judge, one more second.

13            (Brief pause.)

14   BY MR. J. KULWIN:

15   Q.  And, Mr. Shearer, is it -- there's about 40 to 45 minutes

16   of the meeting that you had with Ms. Goldberg that you can't

17   remember, is that accurate?

18   A.  Yes.

19            MR. J. KULWIN:  Nothing further, Judge.

20            THE COURT:  Recross?

21            MR. SHONKWILER:  We have nothing further.

22            THE COURT:  Thank you, Mr. Shearer.  You may step

23   down, sir.  You're excused.

24     (Witness excused.)

25            THE COURT:  Please call your next witness.

Weiss - deposition

1        MR. S. KULWIN:  Yes, your Honor.  I think we're going

2   to read the designations now, Judge.  I think we've

3   straightened it all out.

4        THE COURT:  All right.  You may.

5        Ladies and gentlemen, as I told you a few moments

6   ago, now Mr. Kulwin is going to come back and read testimony

7   from Mr. Weiss' deposition.  Again, you should judge this

8   testimony and evaluate this testimony as if Mr. Weiss was here

9   testifying.

10       Whenever you're ready.

11       MR. J. KULWIN:  This is the deposition of Andrew

12  Weiss, called by the plaintiff for examination pursuant to the

13  Rules of Civil Procedure on the 20th day of July, 2011.

14  Appearing at the deposition is myself, Jeff Kulwin, on behalf

15  of the plaintiff, and Mr. Shonkwiler on behalf of the

16  defendants.

17    ANDREW WEISS, TESTIFIED THROUGH HIS DEPOSITION, DULY SWORN

18                      EXAMINATION

19  BY MR. J. KULWIN:

20  Q.  (Reading:)  Good afternoon, Mr. Weiss.

21  BY MR. S. KULWIN:

22  A.  (Reading:)  Good morning.

23  Q.  Good morning, Mr. Weiss.

24       My name is Jeff Kulwin and I represent the plaintiff

25  in the Goldberg versus 401 North Wabash lawsuit.

Weiss - deposition

716

1          Are you represented by counsel here today?

2     A.  Yes, I am.

3     Q.  Are you taking any medications that could interfere with

4     your ability to understand the questions that I ask or impair

5     your ability to provide full and complete answers to those

6     questions?

7     A.  No.

8     Q.  Is there any other reason you could think of that would

9     interfere with your ability to understand or answer the

10    questions that you're asked today?

11    A.  No.

12    Q.  Mr. Weiss, can you give me your address, please?

13    A.  41 Edgewood Road, Hartsdale, New York.

14    Q.  And what is your educational background?

15    A.  I have a bachelor of science degree in civil engineering.

16    I have a master's of business administration degree.

17    Q.  And where did you get your BS?

18    A.  At Columbia University.

19    Q.  And your MBA?

20    A.  At New York University.

21    Q.  Can you briefly tell me your employment history prior to

22    joining the Trump organization?

23    A.  I worked for -- my initial job out of school was for a

24    company called W.J. Barney Construction.  I worked for them

25    for about two years.  I was an assistant superintendent on a

Weiss - deposition

717

1   construction project.  Then I worked for HRH Construction

2   Company after that for approximately six years, and I had

3   various positions there, project manager, various levels, and

4   then I went to the Trump organization and I've been there

5   since 1981.

6   Q.  How old are you, sir?

7   A.  59.

8   Q.  Okay.  Prior to today's deposition have you had any

9   conversations or meetings regarding the lawsuit that Ms.

10  Goldberg filed against the defendants in this case?

11  A.  I had some meetings and discussions with my attorney.

12  Q.  I don't want you to tell me what you or your attorney

13  talked about.  I just want to find out when did you have those

14  meetings?

15  A.  Yesterday.

16  Q.  And how long did you meet yesterday?

17  A.  About two hours.

18  Q.  Starting in 1981, can you please tell me all of the

19  positions that you held at the Trump organization leading up

20  to your current position, which I believe is executive vice

21  president of construction?

22  A.  I started out as a vice president in charge of

23  construction, development and construction, and I worked on a

24  series of development and construction projects over the years

25  as the owner's representative overseeing these various

Weiss - deposition

718

1   development and construction projects.

2   Q.  And that is your position today, is that correct?

3   A.  Well, I'm executive vice president now, so I moved up.

4   Q.  When were you made the executive vice president of

5   construction?

6   A.  I believe it was 1989.

7   Q.  It's my understanding that you did some work on the Trump

8   International Hotel and Tower here in Chicago, is that

9   correct?

10  A.  Yes.

11  Q.  I'm just going to call that Trump Tower Chicago.  Is that

12  okay?

13  A.  That's fine.

14  Q.  Other than Trump Tower Chicago, have you worked on any

15  other Trump condominium, hotel condominium construction

16  projects?

17  A.  Yes, I have.

18  Q.  Can you tell me which ones, please?

19  A.  I worked on the Las Vegas project.  I worked on Trump

20  International Hotel in New York and I worked on pretty much

21  all of the other condo projects that the Trump organization

22  has developed over the years.

23  Q.  Approximately how many would you say there have been since

24  you started?

25  A.  I would say somewhere around 12 to 15 buildings.

Weiss - deposition

1  Q.  Other than working on those projects, do you do any other

2  work for the Trump organization?

3  A.  I work on all kinds of project related matters in the

4  office.  I provide support to the operation of many of the

5  buildings that we operate that are completed.  I sit on some

6  condominium boards as the sponsor's representative.

7  Q.  Okay.  When you say that you support -- provide support

8  for some of the other buildings that have been completed, what

9  do you mean by that?

10  A.  Well, we were operating, we manage all the -- pretty much

11  all the buildings that we develop.  So we have a management

12  organization in the office and I offer them technical support

13  when they have issues, when they have alterations or

14  construction projects or major repair projects or things of

15  that nature.

16  Q.  Okay.  Other than what you've already told me, could you

17  explain what are the duties and responsibilities of the

18  executive vice president of construction?

19  A.  Well, I oversee the development, the design, construction

20  of the developments that we undertake starting with the start

21  of development of a concept and a program to hiring and

22  commissioning architects, engineers and other design

23  professionals and then seeing the process of design through to

24  its completion, then transitioning into construction and

25  overseeing the construction process to its completion and then

Weiss - deposition

1 the transition from construction to operations.

2 Q.  How would you describe Trump Tower Chicago?

3 A.  It is a multi-use building, high-rise building, that is

4 comprised of a hotel condominium section, a residential

5 condominium section and a commercial section.

6 Q.  And what are hotel condominium units?

7 A.  They are hotel rooms and suites that are sold to

8 individuals and are owned by them and operated by them in a

9 transient hotel manner.

10 Q.  Okay.  And how do they differ from traditional condominium

11 units?

12 A.  Traditional condominium units are generally used as

13 residences.  They don't have the hotel services and they

14 generally don't permit transient occupancy.

15 Q.  And there is a board for the residential units and a board

16 for the hotel condominium units?

17 A.  That's correct.

18 Q.  When did you first start working on Trump Tower Chicago?

19    MR. S. KULWIN:  Hold on a second.  Page, please?

20 What page is that?

21    MR. J. KULWIN:  23.

22    MR. S. KULWIN:  Sorry.  Go ahead.

23 BY MR. J. KULWIN:

24 Q.  (Reading:)  When did you first start working on Trump

25 Tower Chicago?

Weiss - deposition

721

1    BY MR. S. KULWIN:

2    A.  (Reading:)  Well, I worked on it on two occasions.  There

3    was an interruption in between.  I worked on it very early in

4    the pre-development, between 1999 and 2001, and then became

5    involved in it in 2004.

6    Q.  And if I understand you correctly, you were involved from

7    2004 until --

8    A.  From 2004 on.

9    Q.  Okay.  And what kind of work did you do on Trump Tower

10   between 1999 and 2001?

11   A.  We were doing preliminary feasibility studies and

12   analysis.  We were looking at various options on how to

13   develop a project, whether to develop the property, whether to

14   get involved or not.  We were interviewing architects, doing

15   market studies to see what would be the appropriate

16   development for the property.

17   Q.  And what was the state of those studies and analyses in

18   2001 at the time that you left to go do some other work?

19   A.  Well, we had developed some preliminary schemes, which

20   were actually a much bigger and taller building that was

21   primarily office building with residences, with residential

22   condominiums on top, but that plan, which was going to be the

23   world's tallest building at the time, came unwound on

24   September 11, 2001.

25   Q.  Is that when you moved on to another project?

Weiss - deposition

1   A.  Shortly after that.  At that point we moved back to square

2   one and started looking at various alternatives, and I became

3   busy on another project in New York and I had some associates

4   who were working -- who were continuing to work on the Chicago

5   project.

6   Q.  Who were those associates?

7   A.  Charles Reiss, Russell Flicker and Michi, M-I-C-H-I,

8   Koeppel, K-O-E-P-P-E-L.

9   Q.  Are all of those individuals below you on the

10  organizational chart?

11  A.  Well, Charlie and Russell did not report to me.  They were

12  -- I'm not sure what their titles were but they were not

13  reporting to me.  Michi Koeppel was reporting to me at the

14  time.

15  Q.  And in 2001, while you were still working on the Trump

16  Tower Chicago, who did you report to?

17  A.  Mr. Trump, Donald Trump, Sr. -- I mean Donald, Sr.

18  Q.  At the time you left in 2001 had plans begun to develop

19  Trump Tower into a residential and hotel condominium unit

20  building?

21  A.  Not yet.  I think that came later.  The project was still

22  going through entitlements.

23  Q.  Did you say entitlements?

24  A.  Entitlements, the zoning approvals, and that process

25  wasn't completed until -- I'm not sure.  Probably late --

Weiss - deposition

1    probably late 2002, maybe early 2003.

2    Q.   What was the first hotel condominium unit building that

3    you worked on for the Trump organization?

4    A.   Trump International Hotel and Tower in New York.

5    Q.   Between 2001 and 2004, when you resumed working primarily

6    on Trump Tower Chicago, did you have any involvement in the

7    development of the Chicago building?

8    A.   No, not -- I was not active in the development.  I may

9    have heard about it in the office and gotten some reports how

10   things were going but not -- certainly not active on a

11   day-to-day basis.

12   Q.   Okay.  Did Mr. Trump, Sr., assign you to go back to work

13   to the Chicago building?

14   A.   Yes.

15   Q.   What was your understanding of the reason why you were

16   assigned to go back to work to -- on the Chicago building?

17   A.   Well, the building was going into design development and

18   thereafter final design, so it was becoming a real

19   construction project at that point and it required a lot more

20   time and experience to handle the project.  And I had also

21   finished working on Trump Park Avenue at the time, so my time

22   became more available.

23   Q.   If I understand your testimony correctly, please let me

24   know if I got it wrong, is it correct that you had no role or

25   responsibility in any areas relating to the sales or marketing

Weiss - deposition

1   of any of the hotel condominium units in Trump Tower?

2   A.  That is correct.

3   Q.  Is it also correct that you had no role or responsibility

4   in any area relating to the Trump Tower hotel condominium unit

5   rental agreements?

6   A.  I had no formal responsibility.  I may have seen the

7   documents.  I may have even commented on them, I don't

8   remember, but it certainly wasn't my primary focus.

9   Q.  You had mentioned marketing --

10       MR. S. KULWIN:  Page, please?  I'm sorry.

11       MR. J. KULWIN:  I apologize.  40.

12   BY MR. J. KULWIN:

13   Q.  (Reading:)  You had mentioned marketing brochures and

14   things like that.  I've seen the sales packet and the

15   frequently asked question documents.  You know what I'm

16   referring to?

17   BY MR. S. KULWIN:

18   A.  (Reading:)  Yes.

19   Q.  Okay.  Did you have any role or responsibility in

20   preparing any of those?

21   A.  No.

22   Q.  Okay.  What was your understanding as to how those sales

23   packets and frequently asked question documents were

24   distributed to potential purchasers of the Trump Tower hotel

25   condominium units?

Weiss - deposition

```
 1   A.  I don't know.
 2          MR. J. KULWIN:  91.
 3   BY MR. J.  KULWIN:
 4   Q.  (Reading:)  Okay.  And what is your understanding of what
 5   laundry facilities means?
 6   BY MR. S. KULWIN:
 7   A.  (Reading:)  It's really not clear.  It could mean any one
 8   of many different things, such as coin-operated --
 9          MR. SHONKWILER:  I beg your pardon, Counsel.  What
10   page are you on?
11          MR. S. KULWIN:  91.  This is your designation,
12   Line 5.
13          MR. J. KULWIN:  Start over?
14          MR. SHONKWILER:  Thank you.
15          MR. S. KULWIN:  Please.
16   BY MR. J. KULWIN:
17   Q.  (Reading:)  Okay.  And what is your understanding of what
18   laundry facilities means?
19   BY MR. S. KULWIN:
20   A.  (Reading:)  It's really not clear.  It could mean any one
21   of many different things, such as coin-operated washer/dryers
22   in the basement or it could be a commercial laundry setup,
23   where they do laundry for people who come in off the street.
24   It could be anything.
25   Q.  Now, at some point in 2004 --
```

Weiss - deposition

1          MR. SHONKWILER:  Sorry, Counsel, I don't see where

2   you are.

3          MR. J. KULWIN:  92.

4          MR. S. KULWIN:  The next page.

5          MR. SHONKWILER:  Your Honor, I don't believe that

6   part has been designated.

7          MR. S. KULWIN:  Yes.

8          THE COURT:  Mr. Kulwin, why don't you show Mr.

9   Shonkwiler and see if you can resolve it.

10          (Brief pause.)

11          MR. S. KULWIN:  Can the witness have some water?

12          THE COURT:  Can you figure it out?

13          MR. NOVACK:  Would this be maybe a time to have the

14   afternoon break and then we can check on it?

15          THE COURT:  Were you able to figure it out, the --

16          MR. J. KULWIN:  We're having a small problem with

17   just a couple of pages that we think are necessary.

18          THE COURT:  Okay.  Let's take our afternoon break.

19          (Jury exited the courtroom.)

20          THE COURT:  Do you need my assistance or do you think

21   you can figure it out?

22          MR. NOVACK:  I don't think so, Judge.  Hopefully not.

23          THE COURT:  Okay.  We'll pick up about twenty after.

24          MR. NOVACK:  Twenty after.

25   (Brief recess was taken.)

Weiss - deposition

1    (Jury in.)

2              THE COURT:  You may be seated.

3              You may continue reading Mr. Weiss' deposition.

4              MR. J. KULWIN:  Thank you, your Honor.

5    BY MR. J. KULWIN:

6    Q.  Now, at some point in 2004, do you recall any meetings or

7    conversations that you had relating to whether to include the

8    laundry facilities in the Trump Tower Chicago building?

9    BY MR. S. KULWIN:

10   A.  I believe there was some conversations.

11   Q.  Okay.  Who do you recall having conversations with

12   regarding that subject?

13   A.  I believe we were consulting with our operations people in

14   New York.

15   Q.  And who would have been the operations people in New York

16   that you would have been consulting with?

17   A.  Well, the general manager was Tom Downing; and there were

18   various people working for him.  I'm not sure who.

19   Q.  Okay.  And how long has Mr. Downing been with the Trump

20   organization?

21   A.  He had been at Trump International since its opening,

22   which was in 1997.

23   Q.  And if I heard you correctly, Mr. Downing's role with

24   respect to the Trump Tower here in Chicago was just to consult

25   with respect to operations?

Weiss - deposition

1   A.  Correct.

2   Q.  Do you know when he began that role?

3   A.  No, I -- I don't know.

4   Q.  Okay.  So what do you recall about your conversations with

5   operations relating to the laundry facilities?

6   A.  I don't recall any specific conversations personally.

7   Q.  Do you recall any general conversations?

8   A.  I recall there was some discussions and it was determined

9   that it was not appropriate to have commercial laundry

10  facilities in a place like Chicago where there was a developed

11  infrastructure for laundry services by outside service

12  providers.  And that infrastructure was more efficient and

13  functional than trying to operate a laundry facility in-house.

14  Q.  Okay.  Let me show you this, which is Plaintiff's

15  Exhibit 6 in evidence.

16        MR. S. KULWIN:  I think I'm going to need -- okay.  I

17  can read it.  I can read it.  Go ahead.  I got it.  What am I

18  doing?  I'm reading from the transcript.

19  BY MR. J. KULWIN:

20  Q.  Mr. Weiss, you've been handed Exhibit 6, which is Bates

21  stamped DEFS 3115 to 3116.  It looks like it's an e-mail chain

22  that begins on October 25th at -- 2004, and ends later that

23  same day, relating to the laundry facilities at Trump Tower

24  Chicago.  Do you recognize that as such?

25  BY MR. S. KULWIN:

Weiss - deposition

729

1  A.  Yes.

2  Q.  Do you recall receiving this particular e-mail?

3  A.  I don't specifically recall it.

4  Q.  In the middle of the first page, in an e-mail from

5  Mr. Downing to Mr. Flicker, Mr. Downing says, quote, Hi, Russ,

6  operating the laundry is an absolute nightmare and should be

7  avoided at all costs, end quote.  Do you see that?

8  A.  Yes.

9  Q.  He says, quote, I have quite a bit of experience in this

10  area.  And even with the current room count, we should plan on

11  using an outside contractor, end quote.

12      Does that refresh your recollection regarding any

13  particular discussions you had with Mr. Downing or Mr. Flicker

14  about laundry?

15  A.  I didn't have --

16  Q.  I'm sorry.  About laundry facilities in Trump Tower

17  Chicago?

18  A.  I don't recall having or participating in conversations

19  with either of these gentlemen, but I can understand that I

20  got a copy of this e-mail and I agree with it.

21  Q.  And -- right.  Your response to Mr. Flicker's e-mail to

22  you letting you know that there is going to be no laundry

23  inside of the hotel is, you said, great, correct?

24  A.  Correct.

25  Q.  And why did you think that that was great?

Weiss - deposition

1    A.   Because I remember we had done quite a bit of feasibility

2    work on possibly putting a laundry facility into the building

3    in New York when we were doing that.  And after doing a lot of

4    research on the subject, we came to the conclusion that it

5    just did not pay to do it.  It was likely to be a financial

6    net loser to the building.  You could have an outside service

7    do the laundry for less cost than it would cost you to operate

8    the laundry, so leave it to the professionals.

9    Q.   Okay.  Do you recall anybody consulting with you about

10   that issue prior to the issuance of the first property report

11   for Trump Tower Chicago?

12   A.   No.

13   Q.   When was the first time that you became aware that Trump

14   Tower Chicago had included among the common elements laundry

15   facilities for the hotel condominium unit owners?

16   A.   There were no plans for a laundry facility in the

17   documents, in the design of the building documents.

18   Q.   You never saw any design documents relating to laundry

19   facilities for Trump Tower Chicago, correct?

20   A.   Correct.

21   Q.   Do you recall any discussions that you had with anybody at

22   the Trump organization relating to whether or not changes

23   needed to be made to a future property report relating to

24   laundry facilities?

25   A.   No.

Weiss - deposition

731

1  Q.  Okay.  Did you discuss with Mr. Flicker, Mr. Downing or

2  anybody involved in the Trump Tower Chicago project how, if at

3  all, the decision not to operate laundry inside the building

4  would impact future property reports or people who had already

5  purchased units, hotel condominium units, inside of the

6  building?

7  A.  Again, when I got involved in the project, the design

8  documents did not show a commercial laundry; and they never

9  did.

10  Q.  Okay.

11  A.  This memo confirms that there were discussions about it,

12  and this appears to be a rather short discussion about it; and

13  it was not implemented.

14  Q.  Now, you had mentioned to me earlier today that the

15  construction started in early 2006; is that right?

16  A.  2005.

17  Q.  2005.  Okay.  And I -- just so I can bracket this, when

18  was the construction of the building complete?

19  A.  2009.

20  Q.  Is that when people first started to move in and start

21  renting?

22  A.  People started moving in in January of 2008.

23  Q.  Okay.

24  A.  The building was opened in phases.

25  Q.  Do you recall any meetings or discussions that you had

Weiss - deposition

1   prior to the preparation of the January 2005 property report

2   in which you discussed whether or not to advise purchasers or

3   potential purchasers that a decision had been made to remove

4   the laundry facilities from the building?

5   A.  No, we never had any discussions about that.

6   Q.  Did you personally ever discuss with anyone that you

7   believed it was appropriate to include in the January 2005

8   property report the fact that a decision had been made not to

9   have laundry facilities in the building?

10  A.  I never had -- I never had that conversation with anybody.

11          MR. J. KULWIN:  218?

12          MR. S. KULWIN:  Yes.

13  BY MR. J. KULWIN:

14  Q.  Do you recall having any conversations or discussions with

15  Mr. Trump, Sr. in which you discussed with him that the Trump

16  Tower in Chicago had decided to transfer the complexity and

17  the risks of the operation of the food and beverage, function

18  and meeting rooms to the Trump organization or an affiliate of

19  the Trump organization because Trump was better able to absorb

20  the losses that might result?  Do you recall having that

21  discussion with him?

22  A.  I don't recall using those particular words, but I can

23  tell you we had conversations about the subject.

24  Q.  Do you recall any specific conversations you had about the

25  subject with Mr. Trump, Sr. about this topic?

Weiss - deposition

733

1    A.  I can't recall specific conversations.

2    Q.  Do you recall telling Mr. Trump that you thought it would

3    be profitable for the Trump organization to run the food and

4    beverage and meeting and function room portions of the Trump

5    Hotel Chicago?

6    A.  Well, I wasn't telling him whether it would or would not

7    be profitable.  I think he has made his own judgment about

8    that.

9    Q.  Okay.  Were you present for any conversations in which

10   Mr. Petrus talked to Mr. Trump, Sr. and told him that he had

11   concluded that it was better for the Trump organization to run

12   the food, beverage, meeting and function rooms as opposed to

13   the condominium association?

14   A.  No.

15   Q.  Well, when you discussed it with Mr. Trump, Sr., didn't he

16   ask you whether or not this would be a good deal for the Trump

17   organization or not?

18   A.  I think he made up his own mind about that.

19   Q.  Okay.  And what factors did he use to make up his mind, if

20   you know?

21   A.  I don't know.

22   Q.  And just to make sure I asked and just to be clear, do you

23   recall discussing with Mr. Trump, Sr. the fact that the

24   decision to have the Trump organization run the food, beverage

25   and meeting and function rooms could result in absorbing

Petrus - direct

734

1    losses from that operation?

2    A.  Mr. Trump runs a lot of food and beverage operations at

3    numerous different properties, so he knows probably a lot more

4    than I do about what it takes to run a food and beverage

5    operation.  I didn't have to tell him what I thought on the

6    subject.

7    Q.  Okay.  And he had run food and beverage operations prior

8    to 2003, right?

9    A.  Yes.

10           MR. J. KULWIN:  That is all.

11           THE COURT:  Okay.

12           Please call your next witness.

13           MR. S. KULWIN:  Can I have one second to get

14   organized?

15           THE COURT:  You may.  Who is your next witness?  If

16   you want him or her to start coming in.

17           MR. S. KULWIN:  Jim Petrus.

18           THE COURT:  Okay.

19     (Brief pause.)

20           THE COURT:  Mr. Petrus, please come forward, sir.

21           Please raise your right hand, sir.

22        JAMES KEITH PETRUS, PLAINTIFF'S WITNESS, SWORN

23                       DIRECT EXAMINATION

24   BY MR. S. KULWIN:

25   Q.  Sir, can you state your name and spell your last name for

Petrus - direct

1  the record.

2  A.  James Keith Petrus.

3  Q.  How old are you?

4  A.  59.

5  Q.  And where do you reside?

6  A.  New Canaan, Connecticut.

7  Q.  Now, you're currently employed by the Trump organization;

8  is that right?

9  A.  Yes, I am.

10  Q.  And you're the chief executive of the Trump Hotel

11  collection?

12  A.  Chief operating officer of the Trump Hotel collection.

13  Q.  And you work in its New York City headquarters at Trump

14  Tower?

15  A.  Yes, I do.

16  Q.  And you've been employed there since 2006?

17  A.  That's correct.

18  Q.  You're represented here today by Trump's attorneys?

19  A.  I am.

20  Q.  They represented you at your sworn deposition in this case

21  as well?

22  A.  Yes, they did.

23  Q.  You met with them in preparation for your testimony at

24  that deposition, correct?

25  A.  I did.

Petrus - direct

1  Q.  You met with them again in preparation for your testimony

2  here, correct?

3  A.  That's correct.

4  Q.  Your job -- in your job, you report to the entire Trump

5  family; is that correct?

6  A.  That is accurate.

7  Q.  I'm sorry?

8  A.  Yes.

9  Q.  Including Mr. Trump, Sr.?

10  A.  That is correct.

11  Q.  And Mr. Trump, of course, hired you?

12  A.  Yes.

13  Q.  Now, you've worked in the hotel business since

14  approximately 1975, correct?

15  A.  Yes.

16  Q.  You were employed with the Hyatt Hotel group for a number

17  of years?

18  A.  That is correct.

19  Q.  And with the Starwood organization for a number of years?

20  A.  Yes, sir.

21  Q.  And you did a lot of work in food and beverage, correct?

22  A.  That is correct.

23  Q.  Now, if I understand it, you never were involved in the

24  actual building or development of a hotel; is that correct?

25  A.  The actual building or development of a hotel or this

 1   hotel?

 2   Q.  A hotel.

 3   A.  I have been involved in the building and development of a

 4   hotel.

 5   Q.  Which hotel was that?

 6   A.  Going back to Starwood days, building and development of

 7   Westin La Cantera, Westin Riverwalk, Westin Stonebriar.

 8   Q.  Okay.

 9   A.  And back in my Hyatt days, building and development of

10   Grand Hyatt Wailea.

11   Q.  Okay.  That's out in Hawaii, right?

12   A.  That's correct.

13   Q.  And when was the latest one that you did, that you were

14   involved in?

15   A.  Probably the latest one would be Westin La Cantera, sir.

16   Q.  And when was that?

17   A.  That was in 1999.

18   Q.  1999.  Okay.

19         And were you involved in anything -- did you ever --

20   you were never involved in anything about writing a property

21   report like they're done in Illinois in those hotels, correct?

22   A.  That is correct.

23   Q.  Now, with respect to work that you did with hotel

24   condominiums -- let me just be clear about something.  If I

25   understand you correctly, the hotels you all worked in prior

Petrus - direct

738

1   to getting to Trump were your normal hotels?  They had hotel

2   rooms, right?

3   A.  Correct.

4   Q.  They had a reservation lobby, right?  Is that true?

5   A.  A reservation lobby meaning what?

6   Q.  You know, you walk in; I would like room 473.

7   A.  A front desk.

8   Q.  Yeah, a front desk.

9   A.  Yes, sir.

10  Q.  Some of them had ballrooms, right?

11  A.  Expensive, correct.

12  Q.  Banquet rooms?

13  A.  Yes, sir.

14          THE COURT:  I'm sorry.  Can you, sir, be careful with

15  the microphone.  They are very sensitive.  And maybe move your

16  hands off.

17          THE WITNESS:  All right.

18          THE COURT:  Thank you.

19          Go ahead.

20          Do you want the last question and --

21  BY THE WITNESS:

22  A.  Meeting space.

23          THE COURT:  -- answer read back?

24          MR. S. KULWIN:  No, no.  I've got it.

25          THE COURT:  Okay.

1    BY MR. S. KULWIN:

2    Q.  I'm sorry?

3    A.  Meeting space was your last question.

4    Q.  Actually, no.  But if it was, I'm moving on to something.

5            In addition, sir, these food and beverage -- these

6    are -- you've heard of the term -- you obviously have heard of

7    the term food and beverage operations, right?

8    A.  Yes, I have.

9    Q.  And in hotels, food and beverage operation includes all of

10   the food and beverages that are served in a hotel and the

11   rooms in which they're served, right?

12   A.  That's correct.

13   Q.  And when hotels put together budgets, they have -- if you

14   know -- they have line item for food and beverage services,

15   correct, that include potential revenues for food and beverage

16   sales, right?

17   A.  Correct.

18   Q.  And it would also include rental fees for the banquet

19   rooms, the ballrooms, meeting rooms and things of that nature

20   where that food is served, correct?

21   A.  Yes.

22   Q.  Okay.  Now, with respect to the Trump Hotel here in

23   Chicago, okay, the hotel itself has ballrooms, right?

24   A.  Correct.

25   Q.  It has banquet rooms, right?

Petrus - direct

1   A.  Ballrooms, banquet rooms, meeting rooms, yes.

2   Q.  It has -- and they're all included in the food and

3   beverage service, right?

4   A.  Correct.

5   Q.  And it has beverages that are served, food that is served

6   at all the functions that are held at those things, correct?

7   A.  Yes.

8   Q.  And it has hotel rooms, right?

9   A.  Yes, sir.

10  Q.  And for all intents and purposes, the hotel at the Trump

11  Hotel -- at the Trump International Hotel and Tower, for all

12  intents and purposes, is run like a hotel, right?

13  A.  Correct.

14  Q.  You ran -- I mean, I understand that every hotel is a

15  little bit different, right?  A little bit?

16  A.  To some degree.

17  Q.  But to a great degree, especially when you're working at

18  like a brand oriented, like you did, at Hyatt and Starwood,

19  from hotel to hotel, there are basic common features, right?

20  A.  I guess it all depends on what you -- what you consider to

21  be common features.  But if you're talking about general

22  amenities, such as restaurants, meeting space, guest rooms,

23  one could say yes.

24  Q.  Okay.  Well, let's go to luxury hotels.  You're familiar

25  with those obviously.  When you worked at Starwood, there were

Petrus - direct

```
 1   luxury hotels and not such luxury hotels, right?

 2   A.  Correct.

 3   Q.  Same with Hyatt, luxury hotels, not such luxury hotels,

 4   right?

 5   A.  Correct.

 6   Q.  Let's stick with luxury hotels, okay?  Got it?

 7   A.  Yes, sir.

 8   Q.  And, by the way, at a lot of the hotels that you worked

 9   at, for Starwood and Hyatt, they were just -- Starwood and

10   Hyatt were just managing the hotels, correct?

11   A.  No.  They're -- in the portfolio, they were both owned

12   properties and managed properties.

13   Q.  I understand that there were both.  But you heard -- I

14   think you -- actually I learned it from you, I think -- the

15   phrase asset light?  You used that phrase before, correct?

16   A.  It's a term that's developed in the industry.

17   Q.  Right.  And asset light means when a hotel company, like

18   Hyatt or Starwood, decides, for whatever reason, that it's

19   more profitable to do hotel management services rather than

20   actually owning the asset of the hotel, right, to a certain

21   degree?

22   A.  Well, that would depend on what era you're talking about.

23   Q.  Any era.

24   A.  No, that's not an accurate statement.

25   Q.  Okay.  Let me try this on for size.  Let's just put it
```

Petrus - direct

1   like this:  It was true in your experience at both Hyatt and

2   Starwood that some of the hotels you worked at, they didn't

3   own the hotel, true?

4   A.  Correct.

5   Q.  And all that they were doing was managing the hotel, true?

6   A.  Correct.

7   Q.  And they were managing it for the owner of the hotel,

8   true?

9   A.  Correct.

10  Q.  And they would collect all the revenues that were

11  generated by the hotel, true?

12  A.  Correct.

13  Q.  And then they would pay all the expenses out of those

14  revenues, true?

15  A.  Yes.

16  Q.  Including their management fee, true?

17  A.  Yes.

18  Q.  And if there are like withholding taxes and payroll taxes,

19  they would pay it all?  They would take care of everything out

20  of the revenue, right?

21  A.  Correct.

22  Q.  And whatever was left over, the profit, was paid to the

23  owner, true?

24  A.  Correct.

25  Q.  And they did that in a number of situations for those

Petrus - direct

743

1   owners very successfully, right?

2   A.  Absolutely.

3   Q.  And, of course, if the owner wanted to -- got dissatisfied

4   with them for any reason, once the management contract was up,

5   they could let them go, right?

6   A.  That was an option.

7   Q.  Right.  That was the beauty of ownership, right?  If we

8   don't like what you're doing, we'll let you go, true?

9   A.  That was an option.

10  Q.  Right.  And another option would be -- another option

11  would be if the -- if the owner just thought you might be

12  doing a great job, but I don't like your fee structure, I'm

13  going to shop it somewhere else; they had that option too,

14  right?

15  A.  Correct.

16          MR. SHONKWILER:  Objection.  Your Honor, I've lost

17  all context of whether we're talking about every hotel in

18  Mr. Petrus' experience or a particular one or --

19          THE COURT:  Mr. Kulwin?

20          MR. S. KULWIN:  I think he understands we're focusing

21  on the ones that are just managed.

22          THE COURT:  Did you understand that?

23          THE WITNESS:  Yes.

24          THE COURT:  Okay.  Overruled.

25          MR. S. KULWIN:  Thank you.

Petrus - direct

744

1      And now, unfortunately, because it's late in the day,

2  could I possibly have the last question and answer back?

3      THE COURT:  Yes.

4   (Record read.)

5  BY MR. S. KULWIN:

6  Q.  And, now, going back to how hotels are set up -- and we're

7  talking about luxury hotels now; I want to focus in on

8  luxury -- the Trump International Hotel and Tower here in

9  Chicago is a luxury -- the hotel part is a luxury hotel,

10  correct?

11  A.  Absolutely.

12  Q.  And just like other luxury hotels, it has a food and

13  beverage service, right?

14  A.  Correct.

15  Q.  And just like other luxury hotels, it has its ballrooms

16  and its meeting rooms and things of that nature, right?

17  A.  Correct.

18  Q.  And like other luxury hotels, it has all sorts of

19  amenities like spas -- I haven't been there -- pools, whatever

20  it is, right?  It has all those things?

21  A.  Yes, sir.

22  Q.  And your experience -- almost 98 percent of your

23  experience when you came to Trump Towers was in the hotel

24  business, correct?  Is that fair?

25  A.  Meaning what?

Petrus - direct

1    Q.  Meaning you worked for companies that ran hotels,

2    including luxury hotels?

3    A.  Versus?

4    Q.  Versus running residential condominiums.

5    A.  I had experience in that area as well.

6    Q.  Going back how far?

7    A.  Back to Starwood.

8    Q.  Okay.  How far back?

9    A.  Five months before my arrival at --

10   Q.  And you're talking about the one down in Tampa?

11   A.  That was a -- that was a condo hotel.

12   Q.  A condo hotel?

13   A.  Right.

14   Q.  But in your 25-plus years of experience, I think, or

15   30-years plus experience -- years of experience before you got

16   to Trump, wouldn't you agree that the majority of your time,

17   if not almost over 90 percent, was in the pure hotel business?

18   A.  I'm not sure of that percent.

19   Q.  Well, when you were at -- let's just try it out.

20        I'll go through it.  You were the director of food

21   and beverage at the Colonial Williamsburg when you first got

22   out of college, right?

23   A.  Correct.

24   Q.  Then you were the assistant food and beverage director at

25   the Hyatt, right?

Petrus - direct

1   A.  Yes, sir.

2   Q.  Neither of those involved condominiums, right?

3   A.  Not at that time, right.

4   Q.  You were the hotel F and B operations -- oops.

5           You served as an F and B director for Hyatt at its

6   hotel in Nashville and in San Francisco for part of your

7   career?

8   A.  Correct.

9   Q.  Those were hotels, right?

10  A.  Yes, sir.

11  Q.  Okay.  You also supervised other Hyatt hotels in the

12  region that included Nashville, right?

13  A.  Correct.

14  Q.  Those were all hotels, right?

15  A.  Yes, sir.

16  Q.  You went on to become a general manager of various Hyatt

17  hotels in Arizona and Hawaii, right?

18  A.  Yes, sir.

19  Q.  Those were all hotels, right?

20  A.  Yes, sir.

21  Q.  When you moved to Starwood, you basically were doing a

22  similar thing, supervising hotels in the southern California

23  and Arizona region, right?

24  A.  Yes, sir.

25  Q.  Those were all hotels, right?

Petrus - direct

747

1   A.  That's correct.

2   Q.  Then for a long time, you were supervising -- I don't

3   know -- 20 to 30 hotels for Starwood in the United States,

4   right?

5   A.  That's correct.

6   Q.  Those were all hotels, correct?

7   A.  Yes, sir.

8   Q.  And out of all of that experience, if I've got it right,

9   you ran -- you ran one hotel in a hotel condominium -- that

10  was in a hotel condominium in Florida starting in 1998, true?

11  A.  I was involved -- directly involved in the Westin

12  Innisbrook in 1998, that's correct.

13  Q.  Right.  That's the one, right?

14  A.  Well, I think where -- you're taking this a little bit out

15  of context.

16  Q.  Before we get to that, is that the one that you started

17  working at in 1998?

18  A.  Westin Innisbrook was 1998, that's correct, yes.

19  Q.  And is that in Tampa?

20  A.  That is in Tampa, yes.

21  Q.  All I'm trying to get at, sir, is, from 1975 to 1998, your

22  experience was hotels, that's all, fair?

23  A.  Not exactly.  And what you're missing is during my time

24  with Starwood, Starwood was involved in mixed-use

25  applications, both hotel and residential.  And as part of the

Petrus - direct

748

1   organization and part of my involvement in that organization,

2   I was also involved in those discussions that involved

3   mixed-use opportunities.

4   Q.  But those mixed-use opportunities, you say, other than

5   Tampa, weren't hotel condominiums, true?  Is that true?

6   A.  No, that is not true.

7   Q.  How many other -- can you name me actually hotel

8   condominiums other than Tampa that you were involved in

9   between 1975 and 1998?

10  A.  On a mixed-use basis or condo hotel?

11  Q.  Hotel condominiums like the Trump Hotel.

12  A.  Yes.  On a hotel condominium basis, active properties that

13  were operational, there weren't any above and beyond that.

14  Q.  Okay.  That's what -- that's all I wanted to know.

15  A.  Yes.

16  Q.  Okay.  Good.

17  A.  Mixed-use, there were several.

18  Q.  Okay.  But other than the one in Tampa, that's it for

19  hotel condominiums, right?

20  A.  Yes, sir.

21  Q.  Okay.  Good.

22          Now, when you were brought to Trump, the thing that

23  you were hired to do was to become the CEO of the hotel

24  collection, right?

25  A.  No, sir.

Petrus - direct

749

1  Q.  That's your current job, isn't it?

2  A.  No, sir.

3  Q.  COO?

4  A.  Yes, sir.

5  Q.  I'm sorry.

6  A.  Thank you.

7  Q.  Mea culpa.

8          So you were brought to Trump to be the COO of the

9  Trump Hotel collection, right?

10  A.  Correct.

11  Q.  And the hotel collection included, as the name implies, a

12  bunch of hotels, right?

13  A.  Correct.

14  Q.  And those were the same kind of -- and you had a lot of

15  experience operating hotels, right?

16  A.  Correct.

17  Q.  Okay.  Now, before you came to the Trump organization -- I

18  know this is a stupid question, but I'll ask -- you had heard

19  of Donald Trump, right?

20  A.  Yes, sir.

21  Q.  He was a well-known person in the hotel industry, true?

22  A.  He was a well-known business person.

23  Q.  Well-known business person.  And at the time, between 1998

24  and 2003, for example, he was licensing his name to hotels,

25  right, if you know?

Petrus - direct

1   A.  Between 1998 through 2003?

2   Q.  Between 1998 between 2003 -- 2004, he was licensing his

3   name to hotels, true?  If you know.  If you don't know, you

4   don't know.

5   A.  I am not certain of that.

6   Q.  Okay.  So let's see here.  This document was produced --

7   this is in evidence from Exhibit 75 from the brochure of the

8   Trump International Hotel and Tower.  And as you can see here,

9   sir, it has a listing that Mr. Trump's organization is running

10  the Mar-a-Lago Club in Palm Beach, right?

11  A.  I see that, yes, sir.

12  Q.  And is that a hotel or a licensing deal?

13  A.  The Mar-a-Lago Club is a club.

14  Q.  But is it a -- is he licensing his name or is he running

15  it?

16  A.  I could not say.

17  Q.  Okay.  Trump 29, that's a Trump Hotel, right?

18  A.  I'm not certain what Trump 29 is.

19  Q.  Okay.  There's the Atlantic City hotels, right?  And

20  casinos, right?

21  A.  That is a hotel.

22  Q.  Well, there's three of them?

23  A.  Yes.

24  Q.  Okay.  There's the Trump Hotel casino in Indiana, right?

25  A.  That's what it states there.

Petrus - direct

1   Q.  Yeah.  And he's also running the Trump casino hotel in

2   Kansas City, right?

3   A.  Again, that's -- if it says Trump casino, what it is is a

4   Trump casino.

5   Q.  With a hotel in it?

6   A.  I'm not certain of that, sir.

7   Q.  You've never been to one of the Trump casinos where they

8   have the casinos on the floor and hotel rooms up above?

9   A.  I have not.

10  Q.  Oh.  Are you familiar that that's how they work?

11  A.  Yes, sir.

12  Q.  Because kind of like Vegas, Las Vegas, the hotels are

13  casinos; but the casino, you know, is on the bottom floor and

14  there's all these rooms above it that are up top, right?

15          MR. SHONKWILER:  Objection to the form.

16          THE COURT:  Sustained.

17  BY MR. S. KULWIN:

18  Q.  Okay.  Like in Las Vegas, there's hotels, right?  You know

19  that, right?

20  A.  Yes, sir.

21  Q.  And a lot of the hotels are called casinos, right?

22  A.  Yes, sir.

23  Q.  And in addition, in 2003, he was running two golf clubs,

24  right, according to this?

25          MR. SHONKWILER:  Your Honor, I just object if there's

Petrus - direct

1    any reference to the document.  We have not established any

2    date to the document.  The question without reference to the

3    document was okay.

4            THE COURT:  Sustained.  Rephrase it.

5            MR. S. KULWIN:  This is already in evidence, your

6    Honor, identified as having been distributed.

7            THE COURT:  Rephrase your question, please.

8    BY MR. S. KULWIN:

9    Q.  In any event, sir, at the time he's marketing the Trump

10    Hotel, another thing he's saying is, I've got the Trump

11    International Golf Club and the Trump National Golf Club,

12    right?

13    A.  I'm not sure what the chronology is or the year that

14    you're referencing, sir.

15    Q.  All right.  In 2006 when you arrived, there was the Trump

16    International Hotel and Tower in New York, right?

17    A.  Yes, sir.

18    Q.  The Trump Grande Ocean Resort Residences in Miami, right?

19    A.  I'm not aware of that.

20    Q.  So this is not accurate?

21    A.  I could not say that.

22    Q.  Okay.  How about Trump Tower, that's a mixed-use property

23    in New York?  Aware of that?

24    A.  Trump Tower that is referenced here is a -- it's --

25    Q.  Is it an office building?  What is it?

Petrus - direct

753

1   A.  It's an office building and residence and retail.

2   Q.  Okay.  Now, let's get to hotel casinos if we can.  Hotels

3   that have casinos in them have food and beverage operations,

4   correct, to your knowledge?

5   A.  Many do.

6   Q.  In other words, when you go to a hotel that has a casino

7   in it, they have -- like luxury hotels, they have ballrooms

8   where you could have functions, right?

9         MR. SHONKWILER:  Your Honor, I'm going to object on

10  relevance grounds to the continued general questioning without

11  reference to this building or any particular building.

12        MR. S. KULWIN:  I can respond to the relevance if

13  you'd like.  The relevance is, is he a hotel guy?  Is Trump a

14  hotel guy?  That's what I'm trying to establish through

15  Mr. Petrus, given Mr. Trump's testimony earlier and the

16  defense theory in this case.

17        THE COURT:  You are talking about casinos.  I will

18  give you a little leeway, but I think you need to rein it back

19  in.

20        MR. S. KULWIN:  Okay.  I'll frame it tighter.

21  BY MR. S. KULWIN:

22   Q.  To operate a hotel, whether there's a casino in it or not,

23  if it's a hotel -- it's a luxury hotel -- it needs a food and

24  beverage operation, doesn't it?  If it's a hotel?

25   A.  If it's a luxury hotel or if it's a hotel?

Petrus - direct

1   Q.  A luxury hotel, it needs a food and beverage operation,

2   right?

3   A.  I don't think there's any steadfast rule.

4   Q.  Have you ever been to a luxury hotel that didn't have food

5   and beverage, with a casino or without a casino?

6   A.  I'm not sure where -- what your question is though.

7   Q.  My question is:  Have you ever been to a luxury hotel with

8   or without a casino?

9   A.  Personally?

10  Q.  Yes, personally.  Or in your business experience?

11  A.  Yes.

12  Q.  More importantly, in your business experience, have you

13  ever been to any luxury hotels with or without a casino where

14  you couldn't get food?

15          MR. SHONKWILER:  Objection, your Honor, relevance.

16          THE COURT:  Overruled.  You may answer that if you

17  can.

18  BY MR. S. KULWIN:

19  Q.  Mr. Petrus --

20  A.  No, sir.

21  Q.  Is it -- I apologize.

22  A.  Petrus is okay.

23  Q.  "Pe-trus."  I'm sorry.  I've been calling you "Pet-rus"

24  for years.

25          Now, sir, when you first began with Trump in

Petrus - direct

1    June 2006, you were provided access to documents, information

2    and computer files that had been done on Trump Tower Chicago

3    prior to your employment there, correct?

4    A.  That is accurate, yes, sir.

5    Q.  I'm sorry?

6    A.  That is correct.

7    Q.  And they were provided to you in an organized fashion,

8    correct?

9    A.  Yes, sir.

10   Q.  And you don't recall how far back the materials you were

11   provided went, correct?

12   A.  I am not aware.

13   Q.  In other words, they may have gone back as far as 2003?

14   You can't recall, true?

15   A.  I'm not certain of the exact dates.

16   Q.  You can't recall if they would have gone back that far?

17   They may have, right?

18   A.  Possibly.

19   Q.  All right.  Included in the materials that you were

20   provided were the condo documents for the Trump International

21   Hotel that had been issued prior to your arrival, right?

22   A.  Yes, sir.

23   Q.  Now, included in those property reports was something

24   called estimated operating budget, right?

25   A.  Yes, sir.

Petrus - direct

756

1   Q.  And this operating budget includes estimates for the

2   revenues that the condo association will receive, correct?

3   A.  Yes, sir.

4   Q.  And the expenses that it will incur in operating those

5   common elements, right?

6   A.  Yes, sir.

7   Q.  And so, for example, the revenue might show common

8   assessments, how much money is being paid in, right?

9   A.  Could be.

10  Q.  And you know what a common assessment is, right?

11  A.  Yes, sir.

12  Q.  It's a monthly charge paid by the unit owners, true?

13  A.  Yes, sir.

14  Q.  And it might include revenue from any other source that

15  the condo association might be getting revenues from, true?

16  A.  Yes, sir.

17  Q.  And the budgets that you looked at when you first arrived

18  showed that the common elements -- I mean the income for the

19  hotel operating -- the hotel condo association operating

20  budget was getting a large influx of revenue from the food and

21  beverage operations of the hotel, true?

22  A.  From a section of the food and beverage operations of the

23  hotel.

24  Q.  From the ballrooms, the meeting rooms, the function rooms,

25  the spas, right?

```
 1   A.  From the areas -- the meeting space and the ballroom

 2   areas, yes, sir.

 3   Q.  And there were a couple of ballrooms and there were a

 4   number of meeting rooms, right?

 5   A.  Yes, sir.

 6   Q.  And, in addition, it showed that they were getting almost

 7   a million dollars in revenue from the parking facility, true?

 8   A.  I don't recall exactly, but --

 9   Q.  Probably?

10   A.  Could be.

11   Q.  Yeah.  Okay.  Now, at some point when you got there, you

12   started working on an operating budget -- a new operating

13   budget for the hotel condominium association, correct?

14   A.  An updated budget.

15   Q.  Updated.  And in doing that, you went through a process to

16   update what you had in the 2005 operating budget based on your

17   current knowledge, current thinking and current market

18   conditions, right?

19   A.  Yes, sir, that's correct.

20   Q.  And in that regard, you did an exhaustive, comprehensive

21   review of all the line items related to this 2005 estimate --

22   I'm sorry.  Let me bring that back.  Let me show you

23   something.

24        MR. S. KULWIN:  Can we have Exhibit 7 -- I mean --

25   yeah, Plaintiff's Exhibit 7, Exhibit --
```

Petrus - direct

758

```
 1              THE COURT:  Did you say Exhibit 7, Exhibit H?  You
 2    faded.
 3              MR. S. KULWIN:  Plaintiff's Exhibit 7, Exhibit H.
 4              THE COURT:  Okay.
 5    BY MR. S. KULWIN:
 6    Q.  And in -- I'll represent to you, sir, that this is the
 7    operating budget from the 2005 property report that was in
 8    effect at the time you arrived at Trump Hotel in 2006.
 9              Do you recall seeing this?
10    A.  I recall seeing this, that is correct.
11    Q.  And you're familiar with it, right?
12    A.  I'm familiar with the exhibit.
13    Q.  Right.  Exhibit H?
14    A.  That's correct.
15    Q.  And by that you mean, you're familiar with Exhibit H; but
16    you might not necessarily recall being familiar with the
17    entire property report itself, right?
18    A.  I'm familiar with having access to it.
19    Q.  Right.  But the document that you remember looking at when
20    you arrived is this, correct?
21    A.  It was one of the documents.
22    Q.  Do you remember any other specific ones in the property
23    reports that you recall looking at?
24    A.  There were so many that it's hard to sort through all of
25    them.
```

Petrus - direct

759

1   Q.  Right.  But this one you specifically recall?

2   A.  I remember the Exhibit H --

3   Q.  Yeah.

4   A.  -- document.

5   Q.  In any event, when you got there to, you know, do this

6   updating, you did an exhaustive, comprehensive review of all

7   the line items related to this budget, true?

8   A.  That is correct.

9   Q.  And you did it, according to you, to make sure it

10  reflected the current market conditions, right?

11  A.  That is correct.

12  Q.  You didn't want to go back and redo what Mr. Reiss and

13  Mr. Flicker had done developing their operating budget like

14  this one, correct?

15  A.  That is correct.

16  Q.  But instead you took what you knew at the current time

17  when you were developing a new operating budget to ensure that

18  it was a reflection of the current market conditions based on

19  all the information you had available to you at the time,

20  right?

21  A.  Based on my knowledge, based on industry trends and based

22  on conditions at that point in time, yes, sir.

23  Q.  But after looking at the 2005 budget -- I just want to be

24  sure --

25              THE COURT:  Do you need water?

Petrus - direct

1    THE WITNESS:  No, I'm good.  Thank you though.

2  BY MR. S. KULWIN:

3  Q.  But after looking at the 2005 budget, you didn't

4  communicate to anybody at the Trump organization that you

5  thought the budget was inaccurate, right?

6  A.  Well, there was a -- there was a process that we went

7  through to review each of the line items.  And it was an

8  exhaustive and comprehensive process to look at all of the

9  line items.

10  Q.  Right.  But you didn't tell anybody in the Trump

11  organization that the budget overall was inaccurate, correct?

12  You didn't use the word "inaccurate" in any way, did you?

13  A.  What I had said --

14  Q.  I'm sorry.  I apologize.  I don't want to interrupt you,

15  but my question is:  When you were talking to the Trump

16  organization about this budget, you never used the word "it's

17  inaccurate," correct?

18    MR. SHONKWILER:  Objection, your Honor, to vague and

19  object to form.  The question is too general.

20    THE COURT:  Sustained.  Clarify exactly when you are

21  talking about.

22    MR. S. KULWIN:  Okay.

23  BY MR. S. KULWIN:

24  Q.  We've already established that you looked through this

25  entire budget, right?  Line by line exhaustively, correct?

Petrus - direct

1    A.   That's correct, yes, sir.

2    Q.   After you were done with that review, your line by line

3    exhaustive review of this 2005 budget for the hotel

4    condominium association, you did not report back to the Trump

5    organization, people in it that you were reporting to,

6    Mr. Trump and others, that the budget as stated was

7    inaccurate?

8    A.   I don't --

9              MR. SHONKWILER:   Object to form, compound.

10             THE COURT:   Sustained.   Rephrase.

11   BY MR. S. KULWIN:

12   Q.   Skipping the part about you went through the whole thing

13   line by line, okay, you didn't tell anybody after you got done

14   reviewing it that this -- you didn't use the word -- you

15   didn't describe this budget after you got done reviewing it to

16   anybody in the Trump organization using the phrase "it's

17   inaccurate," did you?

18   A.   No.   I don't think the word accurate was used.

19   Q.   Inaccurate?

20   A.   Inaccurate.

21   Q.   That's what I thought.

22   A.   Uh-huh.

23   Q.   Okay.

24             Now, this budget was done somewhere in the area of

25   2004 and 2005 because it's in the 2005 property report; you

Petrus - direct

762

```
 1  knew that, right?
 2  A.  I wasn't sure of the time period.
 3  Q.  You didn't know one way or the other?
 4  A.  I did not.
 5  Q.  But, of course, you got all the documents, as we talked
 6  about before, organized for you; you could have looked and
 7  checked, right?
 8  A.  Possibly.
 9  Q.  Well, I'm getting the impression you're relatively
10  thorough, so I imagine you would have, right?
11          MR. SHONKWILER:  Objection, your Honor.  I'm sorry.
12  I'm having trouble hearing Mr. Kulwin now too.
13          MR. S. KULWIN:  Me?
14          MR. SHONKWILER:  If you could speak a little slower
15  and -- I didn't hear the last question or, frankly, the last
16  two.
17          MR. S. KULWIN:  Is he asking me to talk louder?
18          THE COURT:  The question was:  Well, I'm getting the
19  impression you're relatively thorough, so I imagine you would
20  have, right?
21          You may answer, sir --
22  BY THE WITNESS:
23  A.  Yes.
24          THE COURT:  -- if you can.
25  BY THE WITNESS:
```

Petrus - direct

1   A.  I don't believe I looked for the specific date that the

2   document was produced.

3   BY MR. S. KULWIN:

4   Q.  In any event, you started -- you say you started working

5   on a new one to be sure that the 2005 budget reflected market

6   conditions that may have changed between 2005 and 2006,

7   correct?

8   A.  Somewhere in that time period.

9   Q.  But that -- just so I'm clear, that's what you were doing?

10  You wanted to make sure that the market conditions hadn't

11  changed since this came out in January of 2005 and when you

12  started working on a new one in June of 2006, right?

13  A.  But more than just market conditions.

14  Q.  Okay.  Because if the market conditions had changed for

15  the worse, okay, or the trends had changed for the worse, as

16  you say, then the operating budget would also have to be

17  changed to take into account if there are worsening market

18  conditions or trends, right?

19  A.  Well, again, this was more than just looking at market

20  conditions.  It was also based on the knowledge that I had

21  about the operational elements of the hotel.

22          MR. S. KULWIN:  If I may have a moment, Judge.

23     (Brief pause.)

24  BY MR. S. KULWIN:

25  Q.  But what I want to be clear about, sir -- I want to make

Petrus - direct

764

1   sure I got it -- your analysis was to take what you knew at

2   the current time and make sure that going forward it was a

3   reflection of thinking, market conditions were ripe and

4   information we had available to us, true?

5           MR. SHONKWILER:  Objection, asked and answered.

6           MR. S. KULWIN:  This is a little different, Judge.

7           THE COURT:  Sustained.  You asked that.

8   BY MR. S. KULWIN:

9   Q.  So is what I just -- is -- if they're right that I've

10  asked that already, it doesn't include, you know, anything

11  else other than market conditions, does it?

12  A.  No.  I believe what I just said was that the modifications

13  that were made to the budget were based on market conditions.

14  Q.  Okay.

15  A.  But also, and most importantly, was my knowledge of the

16  operational elements of the hotel that were gleaned from my

17  30-plus years of experience coming into the responsibility

18  that I had.

19  Q.  And, sir, if -- the fact of the matter though is --

20  putting aside your 30-plus years in the operational aspects of

21  the hotel -- the fact of the matter is that market conditions

22  for the hotel business between 2005 and 2007 were pretty

23  spectacular?

24  A.  I think you're overlooking the fact that --

25  Q.  No.  I apologize.  Could you answer my question?  They

 1   were pretty spectacular, weren't they?

 2   A.  No.  But I think you're taking it out of context because

 3   the point that I just made was that my operating experience,

 4   tied to the specific elements of how the building should

 5   operate were significant.

 6   Q.  We'll get to that aspect of it, Mr. Petrus.  But as I

 7   recall it -- and I've been told -- and rightfully so I'm sure

 8   because the judge said you've already been asked this -- one

 9   of the key things you were looking at was, I'm going to update

10   it for current market conditions.  And my question to you is:

11   The market conditions between 2005 and 2007 for hotels was

12   excellent?

13           MR. SHONKWILER:  Objection, relevance, the time frame

14   and the issue.

15           MR. S. KULWIN:  It's highly relevant.

16   BY THE WITNESS:

17   A.  In my --

18           THE COURT:  Hold on, sir.  There is an objection.

19           Clarify your time frame.

20   BY MR. S. KULWIN:

21   Q.  Between 2005 and 2007.

22           THE COURT:  You may answer if you can.

23   BY THE WITNESS:

24   A.  Yes.  My comment is that there are market conditions,

25   right, but there are also operating elements, general

Petrus - direct

766

1   operating elements.  And for you to say that the market

2   conditions in all areas, right, were superior from a

3   three-year period of time, that's not a statement that I could

4   agree with.

5   BY MR. S. KULWIN:

6   Q.  Well, I'm not talking about a three-year period of time.

7   I'm talking about -- let me focus in then.  Let me back it up.

8           The market conditions from January of 2005 until you

9   started working on the budget that you were trying to update

10  from January 2005, which was in June of 2006, the market

11  conditions for the hotel industry were superior; isn't that

12  true?

13  A.  Market conditions under what element though specifically?

14  Q.  Throughout the country, in Chicago, in Hawaii, in Las

15  Vegas, in a number of places.

16  A.  But specific to what area, sir?

17  Q.  Specific to hotels.

18  A.  Specific to what areas though?

19  Q.  Hotels.

20  A.  But what area of the hotel?

21          MR. SHONKWILER:  Objection, your Honor, asked and

22  answered.

23  BY MR. S. KULWIN:

24  Q.  Staying at food and beverage.

25          THE COURT:  Overruled.

Petrus - direct

1    BY THE WITNESS:

2    A.  I can't agree with that statement.  I think it's too

3    broad, sir.

4    BY MR. S. KULWIN:

5    Q.  Okay.  That's too broad.

6            Well, let me ask you:  Do you think that -- certainly

7    the Trump organization was bullish on hotels in that time

8    period, wasn't it?

9    A.  Over what period of time?

10   Q.  '05, '06, going into '07.

11   A.  I couldn't say what existed prior to my arrival.

12   Q.  Well, they were developing a hotel in Las Vegas when you

13   arrived, true?

14   A.  I -- yes.

15   Q.  Okay.  They were developing a hotel in Hawaii when you

16   arrived, true?

17   A.  Yes.

18   Q.  They were developing a hotel in Chicago when you arrived,

19   true?

20   A.  Yes.

21   Q.  That's three -- and the hotels that they were developing,

22   these are not like little small Best Westerns; these are big

23   hotels, true?

24   A.  Yes.

25   Q.  In fact, this is a really big one, true?

Petrus - direct

1    A.   92 stories.

2    Q.   Yeah.  And Mr. Trump was also in the planning station for

3    a hotel up in Toronto, true?

4    A.   I don't recall the time period.

5    Q.   Let me see if I can refresh your recollection on the time

6    period.

7            Okay.  Well, did he go into development, do you

8    recall, in Toronto in 2008 or 2009 or 2010 or 2011?

9    A.   When did the -- when you say go into development, are you

10   saying when did the first shovel go into the ground?

11   Q.   No.  When did they first commit to doing a project?

12   A.   I'm not exactly certain.

13   Q.   Okay.  Well, I don't know -- when I use the word

14   "development," what do you mean?

15   A.   Well, the problem with the word "development" is that

16   there's a lot of different interpretations.

17   Q.   Well, let me see if I can refresh your recollection about

18   whether or not you were aware that Mr. Trump was in

19   development in Panama and Toronto between 2007 and 2011.

20           Page 46, line 16, why don't you take a look at that.

21   And that would be, sir, right here.

22   A.   You know, I don't recall the exact dates.

23   Q.   But you understood when you were asked this what the word

24   development meant, right?  Because you didn't say I don't know

25   what you mean, did you?

Petrus - direct

769

1  A.  That's what that states.

2  Q.  Right.  And that is what it states, right?

3  A.  Yes, sir.

4  Q.  Okay.

5  A.  Yes, sir.

6  Q.  And I forgot where I left off, but in addition to Toronto,

7  he was also in development in Panama, right?  That's four and

8  five, true?

9       MR. SHONKWILER:  Objection, your Honor.  If we can

10  have a time frame.

11  BY MR. S. KULWIN:

12  Q.  In that same period, 2006 -- we'll even go to 2011 -- he

13  was in development, right?

14       MR. SHONKWILER:  Objection.  What time period?  I

15  still don't -- I don't get it.

16       THE COURT:  Overruled.  You may answer if you can,

17  sir.

18  BY THE WITNESS:

19  A.  Within the 2006 to 2011 time period, specifically for

20  Panama?

21  BY MR. S. KULWIN:

22  Q.  Yeah.

23  A.  That seems accurate.

24  Q.  And he was also in development for another one, another

25  hotel in New York during that same time period, true?

Petrus - direct

```
 1   A.  From the 2006 to 2011 time period?

 2   Q.  Yes.

 3   A.  That's correct.

 4   Q.  Okay.  And you are very aware, sir, aren't you, that big

 5   events can and have dramatically changed market conditions for

 6   hotels and the hotel condominium business in the years well

 7   before Mr. Trump began developing the Trump Hotel here in

 8   Chicago, right?

 9   A.  Meaning exactly what though?

10   Q.  Meaning a big event could drastically affect the hotel

11   business or the hotel condo business and the market conditions

12   for them?  You're aware of that, right?

13   A.  Specifically what are you --

14   Q.  Let's just start with that.  Are you aware of any big

15   event -- is it, in your mind, as a person who has been in the

16   hotel business for a long time, that a big event -- let's not

17   specify which one -- but an event on the world scene, in the

18   country, something, could have a big impact on the hotel

19   business, the hotel condo business?

20            MR. SHONKWILER:  Object to form, your Honor.

21            THE COURT:  Sustained on form.

22   BY THE WITNESS:

23   A.  In --

24            THE COURT:  I sustained it, sir.  He has to ask

25   another question.
```

Petrus - direct

1   BY MR. S. KULWIN:

2   Q.  You're familiar with the fact, sir, that major events in

3   the world can have an adverse effect on the hotel business and

4   the hotel condo business, correct?

5   A.  Absolutely.

6   Q.  And you're also aware that before Mr. Trump began

7   developing this hotel here in Chicago, there were two such

8   events, correct?

9   A.  Over what period of time?

10  Q.  From 2000 to 2002.

11  A.  Yes, sir.

12  Q.  In 2000 there was what was called -- what was known as the

13  dot com bust, right?

14  A.  Yes, sir.

15  Q.  And the dot com bust was the economy was very heated,

16  there was a lot of traveling going on, a lot of people using

17  hotels, a lot of wealth going around based on perceived stock

18  wealth in companies that ended with dot com, right?

19  A.  Yes, sir.

20  Q.  And when that bubble crashed, that had a very adverse

21  effect on the hotel business, true, in 2000?

22  A.  Yes, it did.

23  Q.  And then -- but this operating budget, the one we just had

24  up, the one in 2005, that was five years after the dot com

25  bust obviously, right?

Petrus - direct

772

1    A.  Yes, sir.

2    Q.  And then the other major event that happened before

3    Mr. Trump started doing the Trump Hotel in Chicago was 9/11,

4    right?

5    A.  Yes, sir.

6    Q.  And that had a very adverse effect on the hotel business,

7    correct?

8    A.  Yes, sir.

9    Q.  But following 9/11, you're not aware of any big events

10   like the dot com or 9/11, any major events, singular events,

11   that had an adverse effect on the hotel business prior to

12   2007, are you?  Putting those two aside.

13   A.  Nothing of the same significance, no.

14   Q.  Indeed, in October of 2007 when Trump released its new

15   hotel operating budget in which it removed the hotel

16   facilities and took the common elements back for commercial

17   space, the stock market had peaked, right?

18   A.  Yes, sir.

19   Q.  Now, one thing that was occurring between the time you

20   arrived in June 2006 -- let me rephrase that.  I apologize.

21        One thing that was occurring when you arrived in 2006

22   was the Trump Hotel was getting close to opening here in

23   Chicago, right?

24   A.  Closer to opening.

25   Q.  Yeah.  Closer to opening?

Petrus - direct

1   A.  Fair statement.

2   Q.  Yeah.  By the way, just to emphasize that point we went

3   back to, we were talking about all the development that

4   Mr. Trump was doing in hotels; that's in part why he hired you

5   because now he wanted a COO just of the hotels?  That's what

6   your title is, right?  Hotel collection, right?

7   A.  Yes, sir.

8   Q.  Okay.  And as the hotel was getting closer to opening, the

9   Trump organization -- tell me if you are part of that in this

10  regard -- knew it had to file the final condominium documents,

11  right?

12          MR. SHONKWILER:  Objection to the form of the Trump

13  organization knew.

14          THE COURT:  Sustained.

15          MR. S. KULWIN:  Okay.

16  BY MR. S. KULWIN:

17  Q.  I'll just put it to you then.  You knew -- well, when you

18  were interviewed for the job, Mr. Trump interviewed you,

19  right?

20  A.  That's correct.

21  Q.  And he hired you, right?

22  A.  That's correct.

23  Q.  And during the interview, you spoke, right?

24  A.  Yes, sir.

25  Q.  And, of course, one of the things you talked about was the

Petrus - direct

774

1   Trump Chicago, right?

2   A.  I don't believe so.

3   Q.  Never came up?

4   A.  I don't believe so.

5   Q.  Oh, okay.  Ultimately though when you first arrived --

6   when you first arrived, you started getting into the project,

7   right?  The Trump Chicago project?

8   A.  One of the projects.

9   Q.  Yeah.  And you learned, did you not, that as the hotel was

10  getting closer to opening, the final condominium documents

11  would have to be filed before it opened, right?  Were you

12  aware of that?

13  A.  Yes, sir.

14  Q.  Okay.  And the final condominium documents include the

15  final property report, true?

16  A.  Yes, sir.

17  Q.  And the final declaration of condominium, true?

18  A.  Yes, sir.

19  Q.  And you knew that once those things are filed, that says,

20  this is it, this is what the hotel looks like, this is what is

21  in it, this is what's -- let me break it down.

22          That's a general overview.  This is the final

23  product, right?  You knew that?

24          MR. SHONKWILER:  Objection to form.

25          THE COURT:  Sustained on form.  Rephrase it.

Petrus - direct

1          MR. S. KULWIN:  Sure.  No problem.

2    BY MR. S. KULWIN:

3    Q.  When you -- when I say you knew the final condo documents,

4    the property report, the condo dec, one of the things it does

5    when you file those final things is it says, this is the final

6    product, this is what we build, right?

7          MR. SHONKWILER:  Objection, calls for legal

8    conclusion, lacks foundation.

9          THE COURT:  Overruled.  You may answer if you can,

10   sir.

11   BY THE WITNESS:

12   A.  When you say this is the final product, meaning -- meaning

13   exactly what?

14   BY MR. S. KULWIN:

15   Q.  Fair question.

16          One of the things that it defines finally is, this is

17   how many residential units we have, right?

18   A.  Yes.

19   Q.  Another thing it defines finally is, this is how many

20   hotel condominium units we have, right?

21   A.  Yes.

22   Q.  Another thing it defines is, this is how much commercial

23   space we have, right?

24   A.  Yes.

25   Q.  And another thing it defines is, this is what the common

Petrus - direct

776

1   elements are, correct?

2   A.  Yes, sir.

3   Q.  And once those final documents are filed stating that this

4   is it, that's what it has to be, right?

5   A.  Yes, sir.

6   Q.  Now, the operating budget that you ultimately produced for

7   the final property report that was filed before the hotel

8   opened reflected the removal of the ballrooms, the meeting

9   rooms, the function rooms and all the revenue associated with

10  it from the hotel condo association common elements and

11  budget, right?

12          MR. SHONKWILER:  Object to form.

13          THE COURT:  Sustained.  Rephrase it.

14          MR. S. KULWIN:  Sure.

15  BY MR. S. KULWIN:

16  Q.  The -- you prepared the final operating budget for the

17  hotel condominium association that went into the final

18  property report and condo declaration, right?

19  A.  I was --

20          MR. NOVACK:  I can't hear over here.

21          MR. S. KULWIN:  It is rare when someone --

22          THE COURT:  I did not think I would ever have to tell

23  you this, but keep your voice up, please, Mr. Kulwin.

24          MR. S. KULWIN:  That's my problem, Judge.  It's

25  either too loud or too soft.  I have that issue.  I apologize.

 1  And it is late.

 2  BY MR. S. KULWIN:

 3  Q.  You prepared the operating budget, sir, for the final

 4  property report that was going to be filed on the Trump Hotel,

 5  correct?

 6          MR. SHONKWILER:  Objection, your Honor.  I think

 7  counsel is mischaracterizing the evidence by calling a

 8  particular report final.

 9          THE COURT:  Overruled.  You may answer if you can or

10  clarify if you need to.

11  BY THE WITNESS:

12  A.  Sure.  I was involved --

13  BY MR. S. KULWIN:

14  Q.  Yeah.

15  A.  -- in preparing the amendment to the budget.

16  Q.  That would be the fourth amendment, right?

17  A.  That's correct.

18  Q.  And that's the last one that was filed before the hotel

19  opened, right?

20  A.  Yes, sir.

21  Q.  And the last one -- the final one has to be, as you said,

22  before it opened.

23          Now -- and I apologize if you've already answered

24  this; I'm sure someone will tell me -- that budget that you

25  prepared took out the ballrooms, the meeting rooms from the

Petrus - direct

1   common elements, right?  I mean that property report.

2   A.  Took out the elements that I thought, based on my

3   knowledge --

4   Q.  No, no.  Hold on.

5   A.  Let me finish.

6   Q.  No, let me finish.  I'm just asking you:  That report --

7   that last report took out from the common elements the

8   ballrooms, the meeting rooms, the function rooms, those

9   things; is that correct?

10  A.  It took out those specific words and replaced it with

11  something else.

12  Q.  We'll get to what it replaced.

13  A.  Okay.

14  Q.  And then it also took out of --

15          MR. S. KULWIN:  Can I have Exhibit H again, please.

16  BY MR. S. KULWIN:

17  Q.  It also took out the $5 million of meeting rooms,

18  ballrooms, rentals and spa commissions, right?

19  A.  That's correct.

20  Q.  And it also took out the parking revenue, correct?

21  A.  That's correct.

22  Q.  And at the time that it did that, the common charges were

23  4,755,633, correct?

24  A.  Yes, sir.

25          MR. S. KULWIN:  Can I have 25B, Exhibit H.  In

Petrus - direct

1    evidence, Plaintiff's Exhibit 25B, Exhibit H.

2         Can you blow up the top, please.

3    BY MR. S. KULWIN:

4    Q.   And this is what it looks like now in the final one, the

5    assessments are now 5,636,605, right?

6    A.   Yes, sir.

7    Q.   And then there's this 500,000 F and B, right?

8    A.   That's correct.

9         MR. S. KULWIN:   Okay.   You can take that down.

10   BY MR. S. KULWIN:

11   Q.   Now, with respect to the research that you did as to the

12   market conditions that you did back then, you don't have any

13   memos or written analysis of those market conditions?   Or do

14   you?

15   A.   Written memos of the market conditions of Chicago?

16   Q.   Yes.   You have those, right?   You did something like that,

17   correct?

18   A.   Relative to what specific areas?

19   Q.   The luxury hotel market in Chicago.   You did something

20   like that, right?

21   A.   Well, I think you're -- I think you're taking me down a

22   path that I'm not going to agree to because when we talk about

23   market conditions, we're -- it could be market conditions

24   relative to something specific like utility costs.

25   Q.   Let me --

1  A.  And let me finish my statement.

2  Q.  Oh, go ahead.

3  A.  Utility costs today are going to be different than they

4  are tomorrow.

5  Q.  Well --

6  A.  And that applies to a lot of things.  So when you talk

7  about just market conditions in general, that might mean one

8  thing.  But when you talk about line item expenses, moment to

9  moment, there are fluctuations.

10  Q.  There are always fluctuations, correct?

11  A.  Thank you.

12  Q.  And the fact of the matter --

13  A.  That's my point.

14  Q.  And the fact of the matter is that the operating budget in

15  2005 that Mr. Reiss prepared took into account those

16  fluctuations, didn't it?

17  A.  It may not have.

18  Q.  Do you know?

19  A.  I'm not certain of that.

20  Q.  Do you have any reason to believe that Mr. Reiss didn't

21  know what he was doing?

22  A.  I'm not stating that.

23        MR. SHONKWILER:  Objection, your Honor, calls for

24  speculation.

25        THE COURT:  Sustained and argumentative.

Petrus - direct

1    BY MR. S. KULWIN:

2    Q.   Okay.  Were you aware that Mr. Reiss was working with a

3    professor of hotel accounting when he put that budget

4    together?

5    A.   I'm not aware of that statement.

6    Q.   Right.  Now, meanwhile, let's focus in.  The first thing I

7    want to know is, did you ever write a memorandum, you, to

8    anybody in the organization that details your views that the

9    current market conditions in 2007 and the operational features

10   of the Trump Hotel necessitated the removal of the ballrooms,

11   the spa, you know, the laundry facilities, all those things

12   from the common elements into the commercial areas?  Did you

13   ever write a memo like that?

14   A.   Specifically write a memo?  I don't recall doing that.

15   Q.   Did you ever write an e-mail to anyone in the Trump

16   organization laying out your analysis or justifying your

17   conclusion that the market conditions in 2006, 2007, along

18   with the operational features of the Trump Tower in Chicago,

19   necessitated the removal of the ballrooms and things of that

20   nature from the common elements into the commercial areas?

21   Did you write anything like that?

22        MR. SHONKWILER:  Objection, your Honor, on two

23   grounds.  One, it misstates the evidence.  But it goes far

24   beyond the bounds of what would have been discovery in this

25   case.

Petrus - direct

1        THE COURT:  Sustained on form.  Rephrase it.

2   BY MR. S. KULWIN:

3   Q.  Sir, did you write in 2006 or 2007, prior to October

4   of 2007, any e-mails setting forth your rationale and backup

5   and data that the market conditions, hotel market conditions,

6   and the operational features of the Trump Chicago project

7   necessitated the removal of the ballrooms, the meeting rooms

8   and things of that nature from the common elements?  Did you

9   ever write an e-mail like that?

10  A.  I don't recall writing any specific e-mail --

11  Q.  Okay.

12  A.  -- because this was an iterative process that involved

13  many discussions about all of the line expenses and revenues.

14  Q.  Okay.  And do you have -- and to your knowledge do --

15  let's start with you.  Do you have any notes of any kind of

16  those iterative discussions that led you to the conclusion

17  that the market conditions, combined with the operative

18  features of the Trump Chicago project, necessitated the

19  removal of the ballrooms and all those facilities from the

20  common elements into the commercial space owned by Mr. Trump?

21  Anything like that in your notes?

22        MR. SHONKWILER:  Objection, misstates the evidence,

23  your Honor.

24        THE COURT:  Overruled.  You may answer if you can,

25  sir.

Petrus - direct

1   BY THE WITNESS:

2   A.  I don't believe that there's an e-mail, but --

3   BY MR. S. KULWIN:

4   Q.  No.  This one is notes.

5   A.  Or notes.

6   Q.  Okay.

7   A.  But -- but the knowledge that I had about the profit level

8   of the banquet and meeting space and the burden that would be

9   placed on unit owners far outweighed anything else because it

10  is common knowledge that in -- over a period of time, the food

11  and beverage areas of a hotel can be a financial drain on the

12  person that manages and owns that area.

13  Q.  And, in fact, sir, you obtained -- you commissioned an

14  independent review of the revenues and expenses of the luxury

15  hotels in the area, in Chicago, in around in -- for the year

16  2005 to analyze that very issue; isn't that right?

17  A.  I don't recall that.

18  Q.  Really?  Let me see if I can refresh your recollection.

19          MR. S. KULWIN:  May I have a moment, Judge?

20          THE COURT:  You may.

21    (Brief pause.)

22          MR. S. KULWIN:  I apologize, Judge.  I had it and I

23  misplaced it.  If I could just have a second to find it.

24    (Brief pause.)

25          THE COURT:  To save time, do you want to move on and

Petrus - direct

1    come back to this issue tomorrow morning?

2              MR. S. KULWIN:  Yes, Judge, I will.

3              THE COURT:  Okay.

4              MR. S. KULWIN:  I apologize for that.

5    BY MR. S. KULWIN:

6    Q.  We'll get back to that in a moment.  I can -- I want to

7    find that for you.  Okay?

8    A.  Yes, sir.

9    Q.  Now, again, you talked about -- you just talked about the

10   concept that you said it could be a drain and it would be

11   financially difficult and all of those things, correct, for

12   the food and beverage operations?  Common knowledge?

13             MR. SHONKWILER:  Objection to form.

14             THE COURT:  Overruled.  You may answer if you can,

15   sir.

16   BY THE WITNESS:

17   A.  What I know is this, is that the food and beverage areas

18   of a hotel are oftentimes a financial drain on the person that

19   either owns or manages or both of those areas.  And what we

20   were looking at was a budget that did not reflect that.  So

21   the modification was made to lessen that burden, right, on the

22   unit owners, of which Donald Trump happened to be a large

23   portion of the owners.

24             MR. S. KULWIN:  May I approach, Judge?

25             THE COURT:  You may.

1   BY MR. S. KULWIN:

2   Q.  Let's -- and, by the way, back in 2004 when Mr. Trump

3   agreed to put the common -- the laundry facilities, the hotel,

4   the ballrooms, all those things into the common elements, he

5   didn't -- did he tell you he knew he was going to own all

6   those things four years later?

7   A.  He never made any comment to me about that.

8           MR. SHONKWILER:  Your Honor -- counsel, can you just

9   tell me what you're showing the witness, please?

10          MR. S. KULWIN:  I mentioned it before.  3237, part of

11  125, to 3244.

12          MR. SHONKWILER:  Of what exhibit?

13          THE COURT:  What exhibit number?

14          MR. S. KULWIN:  125.

15          THE COURT:  Plaintiff's 125.

16          MR. S. KULWIN:  3237 to 3244.

17          THE COURT:  And 125, just a reminder, is not in

18  evidence.

19  BY MR. S. KULWIN:

20  Q.  Before I show it to you, sir, I want to be clear that you

21  started in June of 2006, right?

22  A.  That's correct.

23  Q.  So the most relevant market conditions that you would want

24  to look at is -- if you could get it -- is the end results for

25  2005?  That would be one of the best things?  How did

 1   everybody do by the end of 2005; that would be one of the best

 2   things to look at?

 3   A.  Seems logical.

 4   Q.  Let me show you this exhibit, sir, which we obtained from

 5   the Trump organization and ask you:  Ever seen it?

 6   A.  I have seen this.

 7   Q.  Yeah.  And that's something -- that's one of the documents

 8   that you reviewed when you were doing your analysis, correct?

 9   A.  It may have been, yes.

10   Q.  Okay.  May I have it back, please?

11   A.  Let me just take one look here.

12   Q.  Sure.

13     (Brief pause.)

14   BY THE WITNESS:

15   A.  Okay.

16   BY MR. S. KULWIN:

17   Q.  Okay.

18          MR. S. KULWIN:  Judge, at this point we would move

19   into evidence this portion of 125.

20          THE COURT:  Is there any objection?

21          MR. SHONKWILER:  We don't think there's sufficient

22   foundation, your Honor.  The witness said he recalled seeing

23   it.

24          THE COURT:  Lay a little more foundation.

25   BY MR. S. KULWIN:

1    Q.  You saw it at the Trump organization, correct?

2    A.  Yes, sir.

3    Q.  It was in their business records, correct?

4    A.  Yes, sir.

5    Q.  Part of Trump's business is to keep records like this,

6    right?

7    A.  That's correct.

8    Q.  Okay.  You saw it at or near the -- like you said, at or

9    near the time you started working there in 2006, right?

10   Correct?  Or sometime shortly thereafter, right?

11   A.  Yes, sir.

12           MR. S. KULWIN:  That's my foundation, Judge.

13           THE COURT:  Move it again.  We will see if there is

14   an objection.

15           MR. S. KULWIN:  I move it in.

16           THE COURT:  Is there any objection?

17           MR. SHONKWILER:  Our objection is that it has not

18   been established who prepared it or when or for what purpose.

19           THE COURT:  Overruled.  There is sufficient basis to

20   admit it.

21           MR. S. KULWIN:  Thank you, your Honor.

22           Judge, this is going to be a somewhat lengthy

23   exhibit.  And I will admit, I need a little time if I want to

24   make it tight.  Is it possible that we could break now?

25           THE COURT:  I think --

1          MR. S. KULWIN:  Please.

2          THE COURT:  I think we all had a long enough day, so

3    we will break now.

4          Ladies and gentlemen, we will pick up tomorrow

5    morning at 9:15.

6          Again, just a couple of reminders.  My guess is there

7    will be some media coverage on this case.  You do not need to

8    read that.  You have been here in the front seat the whole

9    day.  So I am just reminding you, please do not read, watch,

10   listen to, do any independent research, watch any of the media

11   coverage regarding this case.  It is important that you decide

12   this case just based on the evidence presented here.  And,

13   again, you have the front row seat.  You certainly know what

14   that is.

15         Please do not communicate with anybody about this

16   case, either on the phone, through your e-mail, on your

17   Facebook, any other way.

18         Have a great evening.  I will see you tomorrow

19   morning at 9:15.

20     (Jury out.)

21         THE COURT:  Mr. Petrus, you may step down, sir.

22   Please be back here tomorrow morning a little bit after 9:00.

23         MR. S. KULWIN:  I express my heartfelt thanks for

24   allowing me to do that, Judge.

25         THE COURT:  Quick question, a couple of quick

1  questions.  How much longer do you think you will be with

2  Mr. Petrus on direct examination?

3          MR. S. KULWIN:  I have a significant amount of time.

4  An hour and a half to two.

5          THE COURT:  Okay.  So my guess is he will take up

6  probably all of the morning with your examination; is that

7  fair?

8          MR. SHONKWILER:  You're asking me?

9          THE COURT:  Yes.

10         MR. SHONKWILER:  An hour and a half or two from

11  9:30 --

12         THE COURT:  9:15, which would take us, with the

13  break, to at least 11:30.  My guess is you will have

14  45 minutes to an hour?

15         MR. SHONKWILER:  Likely to lunch, yes.

16         THE COURT:  Okay.  Who is up after Mr. Petrus?

17         MR. S. KULWIN:  Ms. Cremer.

18         THE COURT:  Okay.  And then who?

19         MR. S. KULWIN:  I believe we're still debating

20  whether we're going to call Ms. Manolo, but if we do, she's

21  next.  And then after that would be Mr. Levin, our expert.

22         THE COURT:  Okay.  And then I do not know if that

23  will take us through the day.  How long is your direct of

24  Mr. Levin?

25         MR. S. KULWIN:  I'll have to ask Mr. Kulwin.  He

1   drafted it.

2           THE COURT:  Mr. Kulwin, how long?

3           MR. J. KULWIN:  About an hour, hour and a half.

4           THE COURT:  Give me one more just in case.

5           MR. S. KULWIN:  A just in case is a tossup.  It's

6   either Ms. Vogue or Ms. Goldberg because we don't know --

7   Ms. Vogue's schedule keeps changing on us.

8           THE COURT:  Okay.  Is Ms. Goldberg going to be your

9   last witness in an ideal world or --

10          MR. S. KULWIN:  In a perfect world, she will be our

11  last witness that we have control to bring in.  Then

12  there's --

13          THE COURT:  Their expert.

14          MR. S. KULWIN:  Their expert and we're on the fence

15  about Ms. Proctor, who we may call her or not.  We don't know.

16  We're still talking.

17          THE COURT:  Okay.

18          MR. NOVACK:  May I ask one question?

19          THE COURT:  You may.

20          MR. NOVACK:  That is, how long they anticipate direct

21  of Mrs. Goldberg would be.

22          MR. S. KULWIN:  I haven't talked to her about the

23  case much, but I would say an hour and a half or so.

24          MR. NOVACK:  What I'm trying to do is see if I need

25  to prepare a cross for her tomorrow.  It doesn't sound like

1  it.

2          THE COURT:  We are not going to get to her tomorrow

3  for cross, even if she is put on.

4          MR. NOVACK:  Can I bank on that so I don't stay up

5  too late tonight?

6          THE COURT:  If Mr. Kulwin calls the witnesses that he

7  has identified, and I know you have to finish with Petrus.  I

8  know you want to call Cremer and you want to call Levin, your

9  expert.  Yes, you can bank on that.  I cannot imagine that we

10  will get through all of the direct of Ms. Goldberg.

11          MR. S. KULWIN:  There is this question, Judge:  It's

12  possible, depending on when we start on Friday, that we'll be

13  ending and there will be no witnesses left for us that we're

14  able to call but our case won't be over.

15          THE COURT:  Okay.

16          MR. S. KULWIN:  Just so you know.

17          THE COURT:  We will talk about that tomorrow and see

18  how far you get and where we are, and then I will ask you when

19  your expert is coming in.

20          Just so you know, on Friday, the juror who had --

21  Mr. ████████, who had the issue that he wanted to go to his job

22  for the 9:15 meeting with respect to his hours, Katie talked

23  to him and he said he talked to his union rep and he doesn't

24  need to go.  And I had her go back and say that I was willing

25  to start at 10:00 if he wanted to do it.  I know he was

1  concerned about that during voir dire selection, and I would

2  honor his request to go there.  She went back and said that

3  and said his response was, You would wait until 10:00 for me?

4  To which she said yes, and he said that's not necessary; thank

5  you.

6          So I think what I am going to do on Friday -- and we

7  will see where we are tomorrow -- is start at 9:00, if the

8  jurors can come, and end by 4:00.

9          MR. S. KULWIN:  All right.  With the caveat being we

10  might end a lot earlier than 4:00.

11          THE COURT:  And then we will talk tomorrow and see

12  who Mr. Novack is going to call first and if their expert is

13  going to be here.

14          MR. S. KULWIN:  Toward that end, your Honor, you

15  asked the defense to give us their order of witnesses.

16          THE COURT:  Yes.

17          MR. S. KULWIN:  And we'd like to know what that is.

18          MR. NOVACK:  And we're going to do that tonight.

19          THE COURT:  Send them an e-mail tonight and let them

20  know.

21          You should be here at 9:00 tomorrow.

22          Is there anything else for me?

23          MR. S. KULWIN:  No.

24          THE COURT:  All right.  I will see you tomorrow

25  morning.  9:00 o'clock, please.

793

1          MR. S. KULWIN:  Thank you, Judge.

2          MR. NOVACK:  Thank you.

3          THE COURT:  Thank you.

4     (Trial adjourned until May 16, 2013, at 9:00 a.m.)

5                    *    *    *    *    *

6

7    We certify that the foregoing is a correct transcript from the
     record of proceedings in the above-entitled matter.

8

9
     /s/ Mary M. Hacker                    May 15, 2013
10   Official Court Reporter

11   /s/ Nancy C. LaBella                  May 15, 2013
     Official Court Reporter
12

13

14

15

16

17

18

19

20

21

22

23

24

25