794

```
 1                  IN THE UNITED STATES DISTRICT COURT
                       NORTHERN DISTRICT OF ILLINOIS
 2                           EASTERN DIVISION

 3    JACQUELINE GOLDBERG,           ) Docket No. 09 C 6455
                                     )
 4                      Plaintiff,   )
                                     )
 5              vs.                  )
                                     )
 6    401 NORTH WABASH VENTURE, LLC, )
      a Delaware Limited Liability   )
 7    Company, et al.,               ) Chicago, Illinois
                                     ) May 16, 2013
 8                    Defendants.)      9:12 o'clock a.m.

 9                             VOLUME FOUR
                      TRANSCRIPT OF TRIAL PROCEEDINGS
10          BEFORE THE HONORABLE AMY J. ST. EVE, AND A JURY

11    APPEARANCES:

12    For the Plaintiff:        KULWIN, MASCIOPINTO & KULWIN, LLP
                                BY:  MR. SHELLY B. KULWIN
13                                   MR. JEFFREY R. KULWIN
                                161 North Clark Street, Suite 2500
14                              Chicago, Illinois  60601

15    For the Defendants:       NOVACK AND MACEY, LLP
                                BY:  MR. STEPHEN NOVACK
16                                   MR. JOHN F. SHONKWILER
                                100 N. Riverside Plaza, Suite 1500
17                              Chicago, Illinois  60606

18    Also Present:             MS. ALEXIS ROBINSON

19    Court Reporter:           MR. JOSEPH RICKHOFF
                                Official Court Reporter
20                              219 S. Dearborn St., Suite 1232
                                Chicago, Illinois  60604
21                              (312) 435-5562

22              *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *

23                        PROCEEDINGS RECORDED BY
                          MECHANICAL STENOGRAPHY
24                 TRANSCRIPT PRODUCED BY COMPUTER

25
```

1          THE CLERK:  09 C 6455, Goldberg vs. 401 North Wabash

2     Venture.

3          MR. S. KULWIN:  Good morning, your Honor, Shelly

4     Kulwin and Jeff Kulwin on behalf of the plaintiff, Ms.

5     Goldberg.

6          THE COURT:  Good morning.

7          MR. NOVACK:  Good morning, Judge, Steve Novack and

8     John Shonkwiler on behalf of the defendants.

9          THE COURT:  Good morning.

10         We are here to continue the trial.

11         Our jury is here.

12         Are there any issues that I have to take up before we

13    begin?

14         MR. NOVACK:  Judge, I have one; and, that is, that

15    over the last couple of days, both in Mr. Reiss' testimony and

16    Mr. Petrus' testimony, Mr. Kulwin asked them about any

17    significant events, in terms of market conditions, crashes.

18         They mentioned 9/11.  They mentioned another one.

19    And, then, they inquired as to whether anything like that was

20    going on through 2007.

21         And I think that that should permit us to get into

22    that issue now, notwithstanding a previous limine order.  And

23    we would like to get into that issue with several upcoming

24    witnesses, including Mr. Petrus today.

25         THE COURT:  You can certainly follow up with

```
 1   Mr. Petrus, based on the statements that he made.  And you
 2   could certainly on cross with him.
 3            We will take up the other witnesses later today.
 4            MR. NOVACK:  Thank you.
 5            THE COURT:  But certainly with Mr. Petrus.
 6            MR. S. KULWIN:  We have one minor issue --
 7            THE COURT:  Yes.
 8            MR. S. KULWIN:  -- Judge.
 9            When we designated Mr. Weiss, we inadvertently left
10   out one designation.  We sent this to counsel.  It's an
11   admissible statement, in our view.
12            THE COURT:  Is there an objection to it?
13            MR. NOVACK:  Judge, we don't know.  We got it about
14   11:00 last night and haven't yet looked at it.
15            MR. S. KULWIN:  Okay.
16            THE COURT:  Okay.
17            Then let us wait.  We will take that up later today.
18            MR. NOVACK:  Okay.
19            THE COURT:  The jury is here, so I would like to --
20            MR. NOVACK:  I don't know that we'll have our answer
21   today.  We may have to give it to you tomorrow morning.
22            THE COURT:  I just do not want to waste time this
23   morning while the jury is here.  So, I am fine.  Tomorrow
24   morning is fine.
25            MR. S. KULWIN:  That's fine, Judge.
```

1          THE COURT:  Is Mr. Petrus here?

2          MR. SHONKWILER:  Yes.

3          MR. S. KULWIN:  I saw him outside.

4          THE COURT:  Okay.

5          If you would bring him in, please.

6          And, Danny, line up the jury, please.

7          (Brief pause.)

8          MR. S. KULWIN:  I'm just trying to figure out where I

9    can put the flip chart, without getting in your way and where

10   the jury can see it.

11         THE COURT:  Usually over there (indicating).

12         MR. S. KULWIN:  Okay.

13         After the jury comes in, we will put it over there.

14         THE COURT:  Okay.

15         (Jury in.)

16         THE COURT:  You may be seated.

17         You may be seated, as well.

18         THE WITNESS:  Thank you.

19         Good morning, ladies and gentlemen.

20         We are continuing today with the presentation of

21   evidence.

22         When we broke yesterday, Mr. Petrus was on direct

23   examination.  We will continue with his examination this

24   morning.

25         Mr. Petrus, you are still under oath, sir.

Petrus - direct

798

1         And, Mr. Kulwin, you may proceed.

2         MR. S. KULWIN:  Thank you very much, your Honor.

3    JAMES KEITH PETRUS, PLAINTIFF'S WITNESS, PREVIOUSLY SWORN

4         DIRECT EXAMINATION - Resumed

5  BY MR. S. KULWIN:

6  Q.  Mr. Petrus, yesterday when we spoke, I believe -- and

7  correct me if I am wrong -- you testified that one of the

8  things you did was consult industry trends in reaching

9  decisions about whether the F&B operation should remain in the

10  common elements or be returned to the commercial space owned

11  by Mr. Trump.

12         Did I hear it correctly?

13  A.  That's correct.

14  Q.  Okay.

15         Now, in your experience in the hotel business, you

16  became familiar with a number of sources which hotel personnel

17  could consult about such industry trends when making decisions

18  and determinations as to how a particular hotel is going to

19  operate, correct?

20  A.  That is correct.

21  Q.  And you would consult these trend sources to make the best

22  choices you could for whatever hotel you were working for,

23  correct?

24  A.  The sources would be one of the options that would be

25  available, that is correct.

Petrus - direct

```
 1   Q.  Right.
 2            And that would include making decisions and
 3   determinations about potential or prospective revenues and
 4   expenses -- things of that nature -- you'd consult those?
 5   A.  That's correct.
 6   Q.  Okay.
 7            And there were people at all of the hotels at which
 8   you worked at that, on a day-to-day basis, regularly followed
 9   those industry trends, true?
10   A.  One would assume -- when you say "regular," one would
11   assume -- that that would be the case.
12   Q.  Well, more than assume.
13            Let me just make sure I've got it.
14            Was your -- I'm sorry, I must have misheard.
15            Was your issue that it was regularly or just that you
16   knew they followed it, you didn't know it was daily basis?  Is
17   that what you're saying?
18   A.  I would not know if it was a daily basis, a monthly basis,
19   a yearly basis.  But I think if your question is, is it an
20   assumption that people would follow trends of some sort, I
21   think logically the answer would be yes.
22   Q.  And they did it at the hotels you worked at?
23   A.  Again, the same answer.  Logically, yes.
24   Q.  Well, when I'm talking about industry trends, is that the
25   same as consumer behavior trends?
```

Petrus - direct

800

1  A.  Not --

2  Q.  Is that part of it?

3  A.  -- necessarily.

4  Q.  Okay.

5        So, was it -- you consulted those industry trends

6  while you were at Starwood, correct?

7  A.  I would use resources that were available to me,

8  absolutely.

9  Q.  Okay.

10        And you also did it while you worked at Hyatt,

11  correct?

12  A.  I would use resources, that is correct.

13  Q.  And monitoring such industry trends are an important

14  function for anyone -- that anyone in the hotel business needs

15  to perform in making decisions about a particular hotel is

16  going to operate, true?

17  A.  I think a good operator would be -- a savvy operator would

18  be -- privy to as much information as possible.

19  Q.  Right.

20        And you found that the Trump organization had people

21  following these very and market conditions on a day-to-day

22  basis when you arrived, right?

23  A.  I could not say that -- when I arrived -- no.

24  Q.  I'm just curious because -- let me see if I can show you

25  your deposition and see if this -- I don't want to accuse you

Petrus - direct

801

```
 1    of making an inconsistent statement if you haven't.
 2                So, let me show you this and see if I've got it
 3    wrong.
 4                MR. S. KULWIN:  May I?
 5                MR. SHONKWILER:  Counsel, could I know what page you
 6    are referring to, please?
 7                MR. S. KULWIN:  Sure.
 8                42, Line 1 to 10.
 9                (Document tendered.)
10    BY THE WITNESS:
11    A.  Yes, sir.
12                I think the difference here is that what you are
13    asking, when I arrived, was this applicable?  When I'm - what
14    I'm responding to is when I arrived, I'm not sure if -- when I
15    arrived, is that on the first second of me walking in the door
16    or is it -- is this a general thought or question about do
17    people follow industry trends?
18                To me, there's a difference in how that question is
19    phrased.  And what I'm trying to respond to here is --
20    Q.  You mean here?
21    A.  Here, right.
22                What I'm saying here is accurate because this is a
23    general statement.  What you had asked me, quite honestly, was
24    when I arrived.  I'm not sure.  And the moment that I arrived,
25    I can't tell you honestly --
```

Petrus - direct

1    Q.  Right.

2    A.  -- that I was privy to what people were following, from a

3    trend standpoint.

4    Q.  Right.

5    A.  That's my point.

6    Q.  Right.

7            And I understand your point.

8            MR. SHONKWILER:  Your Honor, so that the record is

9    clear, can we strike the last testimony that was without a

10   question, I believe, and have counsel ask the question and,

11   then, get an answer?

12           Because I don't see anything in here that's

13   inconsistent.  And I'm not sure what the witness and Mr.

14   Kulwin are talking about right now.

15           THE COURT:  He was attempting, I believe, to refresh

16   his recollection, to see if there was something different.

17   And he has said no.  There was a question pending.

18           Overruled.

19           MR. S. KULWIN:  Thank you, your Honor.

20   BY MR. S. KULWIN:

21   Q.  So, just to be clear, what you're saying is -- I just want

22   to be clear -- Trump was absolutely following market

23   conditions.  You're just not sure it occurred to you as soon

24   as you walked in the door the day you arrived, correct?

25           MR. SHONKWILER:  Objection to the form, "Trump."

Petrus - direct

 1              THE COURT:  Sustained.

 2              MR. S. KULWIN:  Is that -- it's the Trump.

 3      BY MR. S. KULWIN:

 4      Q.  The Trump organization was absolutely following these

 5      market conditions.  You're just not sure you noticed it the

 6      day you arrived.  You can't say that, correct?

 7      A.  I can't say that.

 8              And, also, I mean, just as a point of clarification,

 9      when you say "the Trump organization," does that mean all 200

10      people that worked in the Trump organization or does that mean

11      the manager of Trump International, the one hotel in Central

12      Park?

13              I'm trying to get a feel for what your specific

14      question is.

15      Q.  Well, I guess, the first of all is I was told there was,

16      like, 2500 people who worked for the Trump organization.  I

17      was focusing on whose ever job it was in the business at

18      Trump.

19              My understanding of your answer is -- I just want to

20      be clear is -- there were people at the Trump organization

21      that you saw and found who were following the market

22      conditions, just like the market trends -- rather, industry

23      trends -- just like you followed them when you worked a

24      Starwood and Hyatt.  That's my first premise.

25              And I believe you said, "Yes," but you just didn't

Petrus - direct

804

 1    know whether you noticed that the day you arrived?

 2    A.  Yes, I -- I -- can't say that on the day that I arrived,

 3    that I knew exactly what people were tracking, as it relates

 4    to market trends or consumer trends.  I couldn't speak

 5    factually and honestly about that.

 6    Q.  Right.

 7         But you do concede that the Trump organization -- you

 8    ultimately learned that they were following those industry

 9    trends?

10         MR. SHONKWILER:  Objection as to timeframe.

11         THE COURT:  Sustained.

12    BY MR. S. KULWIN:

13    Q.  After you arrived.

14    A.  On a broad --

15         MR. SHONKWILER:  The same objection.  There are two

16    timeframes:  When he learned and when they were following.

17         THE COURT:  Overruled.

18         You may answer that, if you understand it, Mr.

19    Petrus.

20         THE WITNESS:  Yes.  Thank you.

21    BY THE WITNESS:

22    A.  From a -- on a broad-based standpoint, I think it would be

23    safe to assume that over a course of time, that people

24    followed general industry trends.

25    Q.  At Trump?

Petrus - direct

805

 1   A.  People that were directly involved in the hotel at

 2   Trump -- directly involved in the hotel at Trump -- yes.

 3   Q.  Now, on August 4th, 2006, you attended a meeting with a

 4   number of people from the Trump organization, correct?

 5   A.  That's correct.

 6   Q.  And I want to put up now in evidence Defense Exhibit 579.

 7           THE COURT:  Did you say "579"?

 8           MR. S. KULWIN:  Yes, ma'am.

 9           THE COURT:  That is not in evidence.

10           MR. S. KULWIN:  Oh.

11           THE COURT:  It was not moved in.

12           MR. SHONKWILER:  You can move it in.

13           MR. S. KULWIN:  We'll move it in, Judge.

14           THE COURT:  Okay.

15           I will admit it.

16           MR. SHONKWILER:  No objection.

17           (Defendant's Exhibit No. 579 was received in

18       evidence.)

19   BY MR. S. KULWIN:

20   Q.  Can you see that, Mr. Petrus?

21   A.  Petrus.

22           Yes.

23   Q.  And this is a agenda for that meeting, correct?

24   A.  That is correct.

25   Q.  And you're there and so is Mr. -- which Trump is that?

Petrus - direct

806

1   A.   That's, Jr.

2   Q.   Okay.

3        And there's Mr. Weiss and there's some other people

4   there, right?

5   A.   Yes, sir.

6   Q.   Mr. Downing is from the New York hotel, correct --

7   A.   That's correct --

8   Q.   Hotel Trump?

9   A.   -- yes.

10  Q.   And Ms. Cremer is the salesperson for Trump International,

11  among other things?

12  A.   Ms. Cremer worked for Andy Weiss, yes.

13  Q.   Okay.

14       And if you look at the agenda, the first thing on the

15  agenda is, "Discuss documents, resources," and you have, "PKF

16  Info."  Do you see that?

17  A.   Yes, sir.

18  Q.   Yesterday I showed you what's now in evidence as

19  Plaintiff's Exhibit 125, Bates Nos. 3237 through 3244.

20            MR. S. KULWIN:  Do we have an extra copy of this?

21            You know, we'll put it up here (indicating).

22            THE WITNESS:  Can I use that (indicating)?

23            THE COURT:  I am sorry?

24            THE WITNESS:  Can I use that (indicating)?

25            THE COURT:  Is that the correct document?

Petrus - direct

807

```
 1              He has asked for the hard copy.  There is a document
 2    up here.  I am not sure if it is the correct document that you
 3    are referring, though.
 4              MR. S. KULWIN:  May you -- if you pass -- there's a
 5    document up there?
 6              THE COURT:  There is.
 7              MS. S. KULWIN:  Let's see.
 8              THE COURT:  I do not know --
 9              (Document tendered.)
10              MR. S. KULWIN:  Yes.  I've got a copy.  Let me just
11    make sure.
12              I don't want him to use anything that's not in
13    evidence, though.  There's just the pages that are in
14    evidence.
15    BY MR. S. KULWIN:
16    Q.  It's going to be up on the screen; but, if you want, I
17    will leave you the hard copy.
18    A.  Great.  Thank you.
19              (Document tendered.)
20    BY MR. S. KULWIN:
21    Q.  Now -- and, by the way, at this meeting there's a, "M.
22    Levchuck."  Do you see that?
23    A.  I don't see it.
24              Yes.
25    Q.  Okay.
```

Petrus - direct

1        And that's Mike Levchuck, the professor from NYU?

2   A.  Michael Levchuck is the controller at Trump International

3   New York.

4   Q.  And you're aware that he teaches hotel accounting at NYU

5   Business School?

6   A.  He teaches a class, yes.

7   Q.  Okay.

8        Now, on the top of this document it says -- 125, it

9   says -- "Benchmarker Income Statement PKF Hospitality

10  Research," correct?

11  A.  Yes, sir.

12  Q.  And Hospitality Research PKF -- is it PKF or PKJ?

13        PKF.

14        And PKF Hospitality Research is a company you can go

15  to, to get information about hotel markets and competition,

16  correct?

17  A.  Correct.

18  Q.  What they do is they gather information from various

19  hotels, they aggregate that information and, then, other

20  people who are in the hotel business can access it, even

21  though they don't know the exact hotel it's coming from,

22  correct?

23  A.  Correct.

24  Q.  And when it says, "Benchmarker Income Statement," what

25  they're saying is, is they've gone and looked at, for you --

1    for Trump -- the various hotels -- comparable hotels, that's

2    why they call them "benchmarks" -- that's comparable, to the

3    best they can, to the Trump International hotel, correct?

4    A.  Not exactly.

5           The way it actually works is that you preselect the

6    hotels that you want to compare your property to and --

7    Q.  And you did that?

8    A.  And I -- we did that.  That's correct.

9    Q.  And you would have wanted to compare it to comparable

10   hotels -- luxury hotels -- correct?

11   A.  That's correct.

12   Q.  And the luxury hotels I'm aware of in Chicago -- albeit, I

13   have a limited exposure -- is in places like the Peninsula,

14   the Drake, the Ritz Carlton, the Four Seasons -- places like

15   that?

16   A.  I think that would be a representative -- not exactly the

17   set, but I think I understand your point.  And the idea is

18   that you're comparing yourself to as close to a competitive

19   set as possible.

20   Q.  And those are the type of hotels -- they're luxury, high-

21   end, five star hotels -- right?

22   A.  Luxury hotels.

23   Q.  Okay.

24          Now, the date on this document is August 3rd, 2006,

25   correct?

Petrus - direct

810

 1   A.   That's correct.

 2   Q.   The day before the meeting, right?

 3   A.   That's correct.

 4   Q.   Now, if you look in the first column up here (indicating),

 5   it says, "Year End 2005," correct?

 6   A.   Yes, sir.

 7   Q.   And that's reflecting that these are the numbers that

 8   Benchmark PKF gathered for the benchmark hotels for the year

 9   ending 2005, correct?

10   A.   That's correct.

11   Q.   And, then, it lists -- and under that column, it lists --

12   the revenues for various items, correct?

13   A.   Correct.

14   Q.   And those represent the average revenues, in the various

15   items that are listed, for the year 2005, that these benchmark

16   hotels earned, true?

17   A.   Yes, sir.

18   Q.   Okay.

19        So, what I want to do is -- and I'm going to

20   apologize in advance for my handwriting, which is very bad,

21   but I'll write slow -- is put some of these numbers up on the

22   chart, so that we can do some figuring.

23        MR. S. KULWIN:  And, your Honor, if you could ask the

24   jury if they can see it?

25        THE COURT:  Can everybody see that okay?

```
 1              (Jurors nodding.)

 2              MR. S. KULWIN:  Mr. Petrus, can you maybe --

 3              THE WITNESS:  Yes.

 4              MR. S. KULWIN:  -- lean forward.

 5              THE WITNESS:  I'm good.

 6              MR. S. KULWIN:  Okay.

 7   BY MR. S. KULWIN:

 8   Q.  Now, if you look on the second entry, it says under,

 9   "Revenue," it says, "Food," correct?

10   A.  Correct.

11   Q.  And that says -- for revenues for food it says --

12   11,708,893, correct?

13   A.  Yes, sir.

14   Q.  And for beverage -- food and beverage -- for "beverage" --

15   I have to apologize for my handwriting -- it says 3,675,457,

16   correct?

17   A.  That's correct.

18   Q.  And I have a calculator, if you want one.  I did it in

19   advance for you.

20              The total is -- a drum roll, please -- 15,384,350,

21   right, for those two numbers items, correct?

22   A.  That's correct.

23   Q.  Okay.

24              Now, if you look in the next column over here

25   (indicating), it says, "Ratio to Revenues."
```

Petrus - direct

812

1          Do you see that here (indicating), this column

2   (indicating)?

3   A.  Yes, sir.

4   Q.  And what it's telling you, is that of a hundred percent of

5   the money the hotel -- these hotels -- take in, on average,

6   food makes up 27-and-a-half percent, on average, right?

7   A.  27 -- out of the total revenue stream, that's correct.

8   Q.  Right.

9          And beverage makes up 8.6 percent, correct?

10  A.  Yes, sir.

11  Q.  So, the total revenues that these average hotels take in

12  is 42,568,381 for the average year, right?

13  A.  Yes, sir.

14  Q.  Okay.

15         And, of that, approximately a third -- 36 percent --

16  comes from food and beverage, as listed there, correct?

17  A.  That's correct.

18  Q.  Okay.

19         Now, if you go down for -- to the next column -- I

20  mean, down below, rather --

21         MR. S. KULWIN:  Let's highlight these two.

22  BY MR. S. KULWIN:

23  Q.  -- these are "Departmental Costs and Expenses," right?

24  That's the expense associated with the revenue for those

25  particular items, true?

Petrus - direct

813

1   A.  For the food and beverage.

2   Q.  Right, right.

3           And, so, here we have two items highlighted here

4   (indicating)?

5           MR. S. KULWIN:  Can you highlight those, Mike?

6           All right.  Thanks.

7   BY MR. S. KULWIN:

8   Q.  And, so, the expense for food is 10,918,421 -- for food,

9   sorry; and, for beverage, it's 1,917,580.  For a total of

10  12,836,000 -- let's just call it and make it even --

11  12,836,000, right?

12          Is that correct?

13  A.  Yes, sir.

14          MR. S. KULWIN:  Jeff, can you help me for one second?

15          Hold this up for a second, please.

16          MR. J. KULWIN:  15,384,350.

17          MR. S. KULWIN:  And these for expense?

18          MR. J. KULWIN:  12,836,000.

19          MR. S. KULWIN:  Okay.  Now you can flip it.

20          Thank you.  Thanks very much, Jeff.

21  BY MR. S. KULWIN:

22  Q.  Now, the difference between revenue and expense is

23  something called income, correct?

24  A.  Yes, sir.

25  Q.  And it's also known in some areas as profit, true?

Petrus - direct

814

```
 1   A.   That's correct.

 2   Q.   And the average profit -- I'm sorry -- yeah, the average

 3   profit -- they we were showing these benchmark hotels earning

 4   on food and beverage at the year-end 2005 equals 2,548,369,

 5   right?

 6   A.   Yes, sir.

 7            MR. S. KULWIN:  If I could have one second, Judge?

 8            THE COURT:  You may.

 9            (Brief pause.)

10            MR. S. KULWIN:  I apologize, Judge.  I just want to

11   make sure I got one thing right.

12            THE COURT:  Okay.

13            (Brief pause.)

14   BY MR. S. KULWIN:

15   Q.   Now, in addition, these -- this particular food and

16   beverage amounts -- include restaurant revenues, as well,

17   correct?

18   A.   That would be one of the additional inclusions.

19   Q.   Right.  Okay.

20            And it doesn't break out, necessarily, costs for --

21   it doesn't seem to allocate in this document, that I can see,

22   costs directly related to, you know, banquet rooms and things

23   of that nature, conference rooms versus restaurants.

24            It does not break that out specifically, correct, in

25   this document?
```

1   A.   No.

2   Q.   In the document?

3   A.   No, it does not.

4   Q.   Okay.  All right.

5   A.   And in the document -- if I can just add to that -- that

6   included in the food revenue stream and included in the

7   beverage revenue stream, there is restaurant, there is room

8   service, there's mini bar.  All of this is bundled into the

9   total.

10  Q.   I understand.

11  A.   So, this document -- just for clarity -- is a

12  representative of not banquets --

13  Q.   Alone?

14  A.   -- meetings, right?

15  Q.   Right.

16  A.   Right.

17          This is a representation of with in the industry is

18  known as the "food and beverage division."

19  Q.   Right.

20          And --

21  A.   And this is really an apples and oranges --

22  Q.   Well, Mr. Petrus, now you're --

23  A.   -- exercise.

24  Q.   -- excuse me, now you're kind of giving a speech.  We'll

25  get to -- your lawyer can examine you.

Petrus - direct

816

1    A.  Right.

2    Q.  So, now, what I'm saying, though, is it doesn't break out

3    specifically expenses related to just banquets and things of

4    that nature; but, it certainly shows that, overall -- on these

5    overall food and beverage things -- that they're making a

6    healthy profit, correct, on the overall -- including

7    everything, mini bar, room service, all those things -- true?

8    That's what it shows?

9            MR. SHONKWILER:  Objection.  Relevance, your Honor.

10           MR. S. KULWIN:  I'll connect it up.

11   BY THE WITNESS:

12   A.  I appreciate --

13           THE COURT:  There is an objection, sir.

14           I am going to sustain that on form.

15           Rephrase that.

16           MR. S. KULWIN:  Thank you, your Honor.

17   BY MR. S. KULWIN:

18   Q.  It shows that, on all of the food and beverage things that

19   you just identified, a healthy two-and-a-half million dollar

20   profit, true?

21           MR. SHONKWILER:  The same objection, your Honor.

22           THE COURT:  Overruled.

23           You may answer, if you can.

24   BY MR. S. KULWIN:

25   Q.  Is that true?

Petrus - direct

1  A.  I think -- and this is a question that, quite honestly, we

2  clarify on a regular basis, because what this is a

3  representation of is the operating department.  This is not a

4  representation of the business, right -- of running the entire

5  food and beverage department.

6         And let me just finish my statement before you go on.

7  Q.  Well, I was going to ask you a question --

8  A.  Thank you.

9  Q.  -- about that?

10  A.  Let me finish, though.

11         The actual business would have to also include the

12  items that are categorized under -- in your reference here

13  that you're looking at -- called "Undistributed Expenses,"

14  because those are overhead expenses of running the food and

15  beverage area.

16         So, you can go on.

17  Q.  Okay.

18         Now, sir, putting aside the undistributed expenses --

19  which also aren't allocated, okay -- the -- again, going back,

20  we have this profit and a hotel -- an owner of food and

21  beverage facilities, which include room service and all the

22  other things, can hire a hotel manager, correct, to operate

23  it?  True?

24  A.  (No response.)

25  Q.  Is that right?

Petrus - direct

818

1   A.   The owner -- yes, that's correct.

2   Q.   And the average fees for a hotel management company is,

3   what, two percent base of the revenue, plus incentives?

4   A.   Fees are really driven on geographic locations.

5   Q.   Well, here in Chicago.

6   A.   Actually north of that amount.

7   Q.   How much north?

8   A.   It's -- it's -- north of that amount.

9   Q.   But not much?

10  A.   A couple percent.

11  Q.   Well, let me show you something and see if I can refresh

12  your recollection.

13          This is -- you worked at Hyatt, right?

14  A.   That's correct.

15  Q.   And here's a management agreement for the Grand Hyatt of

16  Macau.  Okay?

17          (Document tendered.)

18  BY MR. S. KULWIN:

19  Q.   Just look at it.  If it refreshes your recollection, it

20  does.  If it doesn't, it doesn't.

21          Don't read it out loud, though.

22          THE COURT:  Can you please identify what you just

23  handed him, by exhibit number, for the record?

24          MR. S. KULWIN:  It's -- I don't have an exhibit

25  number, Judge.  It is just -- I am just -- using it to

Petrus - direct

819

 1    refresh.

 2              How about Plaintiff's Exhibit Q?

 3              THE COURT:  Thank you.

 4              MR. SHONKWILER:  Objection, your Honor.  There's no

 5    evidence that this is what counsel represents it to be.

 6              THE COURT:  Overruled.

 7              He can see if it refreshes his recollection.

 8    BY MR. S. KULWIN:

 9    Q.  Does it help you at all, sir?

10    A.  I'm not sure what it would refresh my memory of.

11    Q.  About management fees for hotels.

12    A.  Well, I think what you're doing is you're taking one

13    location --

14    Q.  Don't -- don't read it out loud.

15              Okay -- yeah, go ahead.

16    A.  No, but where this is one hotel out of a portfolio of --

17    today, Hyatt has 200 hotels.

18              Is it possible that this could be a representation of

19    that?  Possibly.

20    Q.  Okay.

21    A.  But is this -- is this -- a fair representation of what

22    the industry norm is?  It is not.

23    Q.  So, what you're saying is industry norm is what, four

24    percent?

25    A.  It's -- it's -- higher than two.

Petrus - direct

820

```
 1    Q.  Okay.

 2          But it's not 20 percent?

 3    A.  Well, management fees are driven on what's called "base

 4    and incentives."

 5    Q.  Right.

 6    A.  Right.

 7    Q.  That's what it points out, right?

 8    A.  Right.

 9          But it's not that, as the average.

10    Q.  The incentive is only based on -- you get incentives out

11    of the profits -- if there's profits.  The base is based on

12    the gross revenue?

13    A.  That's correct.

14    Q.  Okay.

15          So, if there's no profits, you don't get anything

16    above that, correct?

17    A.  Logically.

18    Q.  Right.

19          And these hotel management fees are designed -- you

20    know, they incentivize the management company to get profits

21    because the more profits there are, the more money they make,

22    right?  Right?

23    A.  Absolutely.

24    Q.  And management companies would tend not to want to sign

25    deals where a big chunk of their revenue -- their payment,
```

Petrus - direct

821

```
 1   their commission -- comes from profits of something that going

 2   in they know is a giant loser.

 3              A fair statement?

 4   A.  That would make good business sense.

 5   Q.  Right.

 6   A.  Right.

 7   Q.  And, of course, we know that the hotel condominium

 8   association could hire -- actually, under the deal that was

 9   offered in 2005, it was anticipated would hire -- the Trump

10   hotel to be the management company for the food and beverage

11   operations at the hotel they were going to own, right?

12              That was the plan?

13   A.  I'm not certain exactly what the plan was in 2005.

14   Q.  But they could do it then?

15   A.  That would be one of the options.

16   Q.  Right.

17              They could also hire the Ritz or the Drake or they

18   could hire --

19   A.  It wouldn't make logical sense that with one brand name on

20   the building, you'd bring in someone else.  But --

21   Q.  But they could?

22   A.  -- someone could do that.

23   Q.  Right.

24              In fact, if they were making a profit on it every

25   year, and they didn't like the fees that Trump was charging
```

Petrus - direct

1    them, at some point after the term of the original contract

2    came up, they could just say, "You know, what?  We've been

3    talking to Starwood and they're offering us a better deal.

4    So, sorry, Trump, you're out.  They're in," right?

5            MR. SHONKWILER:  Objection to form, your Honor.

6            Asked and answered.

7            THE COURT:  Sustained on form.

8            MR. S. KULWIN:  Okay.

9    BY MR. S. KULWIN:

10   Q.  So, sir, if you can break this down, assume that the

11   owners were making a profit and they didn't like the fees that

12   Trump was charging them.  They could fire Trump and bring in

13   Starwood, correct?

14           MR. SHONKWILER:  The same objection, your Honor.

15           THE COURT:  Sustained on form.

16   BY MR. S. KULWIN:

17   Q.  Let me make it more basic.

18           The condo association could fire Trump and hire

19   somebody else if they wanted to, right?

20           MR. SHONKWILER:  The same objection.

21           THE COURT:  Overruled.

22           You may answer, if you can, sir.

23   BY THE WITNESS:

24   A.  Would that be a possibility?

25   BY MR. S. KULWIN:

Petrus - direct

823

1   Q.  Sure.

2   A.  On a broad-based scenario?

3   Q.  Sure.

4   A.  If they -- if that was within the condominium declaration?

5   Q.  Yeah.

6   A.  They would have that prerogative.

7   Q.  Okay.

8        Now -- and if they were using Trump just as a

9   management company, and there were profits emanating from

10  these operations, the hotel condo association would retain

11  those profits after payment of the management fee, right?

12        MR. SHONKWILER:  Objection to form.

13        THE COURT:  Overruled.

14        You may answer, if you can.

15  BY THE WITNESS:

16  A.  If they were the owner --

17  BY MR. S. KULWIN:

18  Q.  Yeah.

19  A.  -- of the space --

20  Q.  Uh-huh.

21  A.  -- right?

22  Q.  Uh-huh.

23  A.  And they hired a management company to work on just a

24  management basis, in that hypothetical situation --

25  Q.  Uh-huh.

Petrus - direct

824

```
 1   A.   -- they would take on all of the risk --
 2   Q.   Uh-huh.
 3   A.   -- right?
 4   Q.   Uh-huh.
 5   A.   -- all of the risk --
 6   Q.   Uh-huh.
 7   A.   -- all of the risk and any profits that were reaped.
 8   Q.   Right.
 9        Not only would they take on all of the risk and
10   profits they reap, they would take on the ownership of the
11   real estate in the hotel, right?
12   A.   That's the way that the condo declaration at that time was
13   written.
14   Q.   Right.
15        And in the condo declaration here -- the Trump hotel
16   condo declaration -- that is how it was written, correct?
17   A.   I'm not certain what the scenario was in the amendment
18   three.
19   Q.   Let me see if I can refresh your recollection.
20        I'm going to show you amendment one, which was -- in
21   terms of the description of the common elements, was not
22   changed until 2007, and I'll turn your attention to --
23        MR. S. KULWIN:  3.1, Mike.  That would be Page 8 of
24   the document.
25   BY MR. S. KULWIN:
```

Petrus - direct

825

1   Q.  See if this --

2           MR. S. KULWIN:  This is in evidence, your Honor.

3           THE COURT:  What is the exhibit number, please, for

4   the record?

5           MR. S. KULWIN:  2.

6           THE COURT:  Plaintiff's 2.

7   BY MR. S. KULWIN:

8   Q.  And if you look down here (indicating), the common

9   elements, and you can see here that the executive lounge, the

10  function rooms and the ballrooms, storage areas -- there's a

11  laundry facilities in there, as well -- are part -- they own

12  that?

13          (Document tendered.)

14  BY THE WITNESS:

15  A.  Okay.

16          In this -- in this -- hypothetical example, yes.

17  Q.  It's not hypothetical, this is how it is.

18  A.  Yes.  In this example, yes.

19  Q.  Okay.  Thank you.

20  A.  Can we just --

21  Q.  Okay.  Feel free.

22  A.  Yeah.

23  Q.  Okay?

24  A.  This was one --

25          MR. SHONKWILER:  Objection, your Honor.  Is there a

Petrus - direct

826

 1    question pending?

 2             MR. S. KULWIN:  He is holding the exhibit and asking

 3    me a question.

 4             THE WITNESS:  I'm just -- I'm looking at the

 5    document.

 6             THE COURT:  The witness asked to look at the

 7    document.

 8             MR. SHONKWILER:  Okay.

 9             (Brief pause.)

10    BY THE WITNESS:

11    A.  Okay.

12    BY MR. S. KULWIN:

13    Q.  Okay.

14    A.  Thank you.

15    Q.  You're welcome.

16             Thank you.

17    A.  Thank you.

18    Q.  Now, I'm going to leave that here (indicating) for a

19    second.  If it falls, I will pick it up.

20             Okay.  Now -- and another thing that the hotel

21    condominium association was free to do, if they wanted, was

22    hire a hotel condominium consultant.

23             You've heard of those, correct?

24    A.  (No response.)

25    Q.  You've heard of those?

Petrus - direct

827

1   A.  I think there were -- there were -- probably a few out

2   there.

3   Q.  Right.

4   A.  Maybe a few out there at the time.

5   Q.  All right.

6        Now, after the hotel -- after the Trump organization

7   transferred the food and beverage elements, ballrooms, et

8   cetera, out of the common elements into the commercial area

9   that Mr. Trump owned, Mr. Trump had to hire a management

10  company -- well, he didn't have to, but he did -- he hired a

11  management company to run it for him, didn't he?

12  A.  That's correct.

13  Q.  And the organization that he hired was the Trump

14  organization, correct?

15  A.  A division of the Trump organization.

16  Q.  Right.

17       And let me show you Plaintiff's Exhibit 33.

18       MR. S. KULWIN:  And, Mike, if you could put up the

19  Page 27.

20       Not Page 27, I apologize.

21       Page 62, Bates 2729.

22  BY MR. S. KULWIN:

23  Q.  I keep forgetting you have a screen.  I'm sorry,

24  Mr. Petrus.

25  A.  That's okay.

Petrus - direct

828

1   Q.  Okay.

2          That indicates Mr. Trump, who is the president of 401

3   North Wabash, is hiring Trump International Hotels Management

4   Company, which he also owns, because that's his signature, as

5   well, right?

6   A.  That is correct.

7   Q.  And he's hiring them to run the rental -- he's hiring them

8   to run the whole thing, right?  Correct?

9   A.  He's -- he's -- we are operating the building, as would be

10  the case in other hotels that, you know, compete in the PKF

11  report --

12  Q.  Right.

13  A.  -- as you've shared.

14  Q.  Okay.

15         And he pays Mr. Trump one pocket, pays Mr. Trump's

16  the other pocket a base fee of close to $700,000 a month to

17  run the whole thing; and, out of that, they have to pay

18  expenses and all the rest, correct?

19         MR. SHONKWILER:  Objection to form.

20         THE COURT:  Sustained.

21         MR. J. KULWIN:  Okay.

22  BY THE WITNESS:

23  A.  I --

24         THE COURT:  I sustained.

25         MR. S. KULWIN:  It was sustained.

Petrus - direct

829

 1  BY MR. S. KULWIN:

 2  Q.  And under the terms of this, Mr. Trump pays Mr. Trump --

 3  Mr. Trump's one organization pays his other organization a

 4  base management fee of $678,000 a month, correct?

 5  A.  No, sir.

 6  Q.  Okay.

 7          If you can look --

 8          MR. S. KULWIN:  Mike, can you bring up Section 9.1?

 9  Maybe I've misread it.

10          It's Bates 2694, I apologize.

11          And can you highlight "Management Fees and Payments

12  to Operator or Owner," and highlight the 678.

13  BY MR. S. KULWIN:

14  Q.  Okay.  I'm not saying that's net.  I'm just saying a base

15  management fee to start before expenses is that amount?

16  Wrong?

17  A.  No.  I think your comment was, "Trump is paid $678,000 a

18  month."

19          This $678,000, just for clarity, is for a year.

20  Q.  Okay.

21  A.  You know, there's a difference between --

22  Q.  I see.  You're right.

23  A.  -- a month and a year.

24  Q.  You are absolutely right.  I apologize.  You're absolutely

25  right.

Petrus - direct

1        And, so, that's 678 -- I apologize.  That was my

2   mistake and I apologize for that.  I meant to say a year.

3        And what's that, in terms of estimated revenues, on a

4   percentage basis; do you know?

5   A.  If you took --

6   Q.  I mean, if I took 10 million, it would be, like, about --

7   A.  -- you know, $40 million.  What is 678,000 --

8   Q.  Divided by 40?

9   A.  -- divided by $40 million?

10   Q.  That would be, roughly, about .024 percent?

11   A.  Thank you.

12   Q.  Every once in a while, I get them right.

13        Okay.  Now, as a result of owning the space now,

14   Mr. Trump also has the right to control how it's run, correct,

15   as the owner, right -- the food and beverage stuff?

16   A.  All in a consistent fashion, as a luxury hotel --

17   Q.  Right.

18   A.  -- comparable to other luxury hotels that are in the

19   marketplace.

20   Q.  Right.

21        He also has the option, if things get bad, to not run

22   it as such a luxury hotel.  He has that option, correct?

23   A.  He's required to run the hotel according to the operating

24   standards that are applicable to the entire portfolio that

25   every other owner is required to maintain.

Petrus - direct

1    Q.  Right.

2            But since --

3    A.  That is correct.

4    Q.  But since he owns the hotel space and the management

5    company, he could always lower those standards and change the

6    management agreement to comply with what he wants, correct?

7            He could do that?  There's nothing to prevent him?

8    A.  In the realm of possibilities?

9    Q.  I'm not asking about possibilities.  I'm asking did he

10   have the ability to do that?  Because as we've all learned, no

11   one can see the future.

12           MR. SHONKWILER:  Objection.  There's no timeframe for

13   the question, Judge.

14           THE COURT:  Do you want to clarify the timeframe,

15   Mr. Kulwin?

16           MR. S. KULWIN:  Yes, your Honor, I would be more than

17   happy to.

18   BY MR. S. KULWIN:

19   Q.  Going forward from the time he did this, should things go

20   badly for him five years down the road, ten years down the

21   road, Mr. Trump, because he owns both units, would have the

22   flexibility to, if he had to, lower the level of the quality

23   of those operations, if he had to?

24   A.  I'm not sure if it's as simple as how this is being framed

25   up, because, number one, Donald Trump, himself, isn't the

Petrus - direct

832

1    person that's directing or dictating the standards.  He's

2    hired me to do that.

3           And what is applicable to this luxury hotel in

4    Chicago, quite honestly, is applicable to all of the

5    properties.

6           So, if the -- what I'm hearing is that could he, on a

7    whim decide --

8    Q.  Not on a whim.

9    A.  Well --

10   Q.  I didn't say on a whim.  I said should he be required to,

11   based on economic conditions.

12   A.  Could he, based on economic conditions in one city, change

13   the operating standard?  The answer on that is "No."

14   Q.  No.

15          Well, first of all, you say he couldn't do it because

16   he's hired you to run it.

17          He can fire you, right?

18   A.  I would think that would be the case.

19   Q.  Yeah.

20          If he came to you and said, "I want you to run it

21   this way, because economically this is how we need it to run

22   -- "

23   A.  Right.

24   Q.  -- and you say, "Well, no, that violates the standards,"

25   he could says, "Well, there's the door," right?

Petrus - direct

833

```
 1   A.  My point, though -- my point that I'm trying to make,

 2   though -- is that as this is a brand, it's not a singular

 3   hotel asset that we are concerned with.  It is -- it's -- the

 4   standard of the brand.

 5           So, what's applicable to one happens to be applicable

 6   to the balance of the hotels, as well.

 7   Q.  I fully understand that, Mr. Petrus.

 8           My last point on that is, though, if he is suffering

 9   economic duress down the road five years, ten years, he might

10   have to do that throughout.  The brand might just have to be

11   deteriorated to meet -- he'd have the ability to do that?

12   That's all I'm asking.

13           MR. SHONKWILER:  Objection to form.

14           THE COURT:  Sustained on form.

15   BY MR. S. KULWIN:

16   Q.  He would have the ability, should he need to --

17           MR. SHONKWILER:  Objection to form.

18           THE COURT:  Rephrase it.

19   BY MR. S. KULWIN:

20   Q.  Mr. Trump could, should he need to --

21           MR. SHONKWILER:  Objection.

22           THE COURT:  Overruled.

23           You may answer, if you can.

24           MR. S. KULWIN:  I've got to finish.

25           (Laughter.)
```

Petrus - direct

834

```
 1              MR. S. KULWIN:  Sorry, Judge.

 2              Okay.  Should he need to --

 3    BY THE WITNESS:

 4    A.  Go ahead and finish your -- finish your -- statement.

 5    BY MR. S. KULWIN:

 6    Q.  No, no.  The Judge understands it, Mr. Shonkwiler

 7    understands it, but you must --

 8              THE COURT:  If you understand it.

 9              MR. S. KULWIN:  If you understand it.

10    BY THE WITNESS:

11    A.  If the question is if the economic factors that impacted

12    the world, right, required us, in a competitive fashion,

13    right, in order to compete also with other luxury brands --

14    which is also, quite honestly, taken into consideration -- to

15    modify and alter and tweak the standards, in order to compete,

16    he would have the ability to do that.  That's correct.

17    BY MR. S. KULWIN:

18    Q.  I will try it a different way.

19              Forget about the world.  Everybody else in the world

20    is doing fine.  Let's say Mr. Trump, for his own reasons,

21    isn't.

22              Do you understand?  So, Mr. Trump.  Do you understand

23    that part?

24    A.  Mr. Trump, personally?

25    Q.  Mr. Trump --
```

Petrus - direct

835

1          MR. SHONKWILER:  Your Honor, I'm going to object as

2   soon as this question is over, but it ended shorthand.  So, I

3   will object now to form.

4          MR. S. KULWIN:  I am trying to break it down, Judge,

5   to lay a foundation.

6          THE COURT:  Overruled.

7          You may answer, if you can.

8   BY MR. S. KULWIN:

9   Q.  Mr. Petrus, stick with me.

10         First, do you understand?  I mean, forget about --

11  I'm not talking about world events.  I'm saying if he suffered

12  some type of economic misfortune.  Got that part so far?

13  A.  Yes, sir.

14  Q.  Okay.

15         He would have the ability, if he needed to, to make

16  adjustments in the level of the standard not just in the Trump

17  International in Chicago, but throughout his brand -- but, in

18  particular, here.

19         I'm not saying he is going to.  I'm saying he'd have

20  that ability, correct?

21         MR. SHONKWILER:  The same objection.

22         THE COURT:  Sustained on form.

23  BY MR. S. KULWIN:

24  Q.  Would he have that ability to do that, Mr. Petrus?

25         MR. SHONKWILER:  The same objection.  It's the same

Petrus - direct

1  question that was just shortened.

2          THE COURT:  Yes.

3          Sustained.

4  BY MR. S. KULWIN:

5  Q.  Could Mr. Trump, as the owner, if he was under financial

6  duress, change the level of quality because he owns both

7  operations?  That's all.

8          MR. SHONKWILER:  The same objection.

9          THE COURT:  Overruled.

10          You may answer, if you can, Mr. Petrus.

11  BY MR. S. KULWIN:

12  Q.  Could he?

13  A.  I'm not sure if -- and I don't want the question to be

14  taken out of context.  It's not as simple as Donald Trump.

15          Because of the vested interest that he has in other

16  operations, that this is something that because he's -- he's

17  -- personally had financial hardship, that he has the ability

18  to alter the standards that are applicable across the brand.

19  Q.  And, so, then, I guess it would also be true, conversely,

20  that if the hotel condo owners owned all those things, it

21  wouldn't be very simple for them to suddenly downgrade all of

22  the facilities and put Burger King in, for example?

23  A.  Absolutely.

24          That's a very good example, by the way.

25  Q.  The other thing that happened here -- let me go to a

Petrus - direct

1    different topic now.

2            You were one of the people responsible for drafting a

3    new estimated operating budget for the hotel condominium

4    association for the 2007 amendment, correct?

5    A.  That's correct.

6    Q.  And to do that, you made changes in both income and

7    expenses, correct?

8    A.  That's correct.

9    Q.  Specifically, you took out the income that removed the

10   hotel facilities -- that the hotel facilities generated -- to

11   reflect that the condo association would not be getting that

12   income any longer, correct?

13   A.  Can you restate that question, again?

14   Q.  Sure.

15           You took out the income that the removed hotel

16   facilities -- the ballrooms, the meeting rooms, the function

17   rooms -- generated to reflect that the condo association would

18   no longer be getting that, correct?

19   A.  I modified it.

20   Q.  Well, you took it out.  We'll get to the 500,000 in a

21   second.

22           You took it out, right?

23   A.  Yes, sir.

24   Q.  Okay.

25           And you also removed the expenses involved in running

Petrus - direct

838

 1   these removed hotel facilities, correct?

 2   A.  That's correct.

 3   Q.  All right.

 4        If we could start with Plaintiff's Exhibit 7, Exhibit

 5   H.

 6        All right.  Now, the income -- the income -- that is

 7   listed in the 2005 operating budget with the condo association

 8   includes meeting and ballroom rentals, spa commissions, et

 9   cetera, 5,053,625, correct?

10   A.  That's what's stated; yes, sir.

11   Q.  Right.

12        And, then, there's valet parking of 994,650, correct?

13   A.  Yes, sir.

14   Q.  All right.

15        And there's some other miscellaneous, 15,000, right?

16        And, then, the rest is common charges, true?

17   A.  That's correct.

18   Q.  All right.

19        Now, you removed all these for '07?

20        MR. S. KULWIN:  Can we go to '07, Exhibit H?

21   BY MR. S. KULWIN:

22   Q.  Now, we're going to get to this F&B license in a second,

23   but all of the Commissions for all the ballrooms, the meeting

24   rooms and things of that nature, have been removed, right?

25   A.  That's correct.

Petrus - direct

839

1          MR. S. KULWIN:  Judge, before I put this

2    demonstrative exhibit up -- and this is for demonstrative

3    purposes only; I'm now going to do the comparison -- I've put

4    it on a chart of the income that was in the '05, that we just

5    talked about and what's in the '07.

6          Do you want to see it?  They have a copy.

7          THE COURT:  I have seen it before.

8          Is there an objection to using it as a demonstrative,

9     Mr. Shonkwiler, or, Mr. Novack?

10          MR. NOVACK:  You mean, not as a summary exhibit?

11          THE COURT:  Oh, correct.  As a demonstrative only.

12          MR. NOVACK:  Not as a summary exhibit?

13          THE COURT:  I cannot hear you, Mr. Novack.

14          As a demonstrative, not a summary.

15          MR. NOVACK:  But the document is entitled, "Summary

16    Exhibit" with a number.

17          THE COURT:  Okay.

18          Why do you not take off the title and you may -- it

19    sounds like there is no objection to you using it as a

20    demonstrative.

21          MR. S. KULWIN:  Okay.

22    BY MR. S. KULWIN:

23    Q.  So, when we're looking at the income from the hotel

24    facilities, you've got -- in the 2005 report, there was

25    $6,048,275, correct?

Petrus - direct

1   A.  Can you go back to the 2005 report?

2   Q.  Sure.

3           MR. S. KULWIN:  Can you go back to the 2005 report,

4   Mike?  Take this off.

5           Sorry, Judge.

6           Go ahead, Mike, and blow up that part.

7   BY MR. S. KULWIN:

8   Q.  I'll represent to you that I had added it up and that's

9   the number.

10  A.  Okay.

11  Q.  You can check it.  I have a calculator.

12  A.  Okay.

13          So, the number that you're reflecting on the other

14  document here is the aggregate of the three lines?

15  Q.  Right.

16  A.  Right, okay.

17  Q.  And you took all that income out for 2007, correct?

18  A.  That's correct.

19  Q.  Okay.

20          And, now, the other thing that you did was -- if we

21  look, let's go to the 2005 report.

22          MR. S. KULWIN:  And if you could go to Exhibit H;

23  and, if you could go all the way to the bottom -- all the way

24  to the bottom -- and it would be on the next page.

25          And here (indicating) at the bottom, highlight this.

Petrus - direct

841

1        Got it?  This one here, 10,818,908.

2        There you go.

3   BY MR. S. KULWIN:

4   Q.  And what you did, as we've talked about before, is you

5   took all the expenses out -- that's what you said --

6   relating -- the expenses that you took out relating to these

7   facilities came out of that bottom line, correct -- the 10

8   million, 818 -- right?  That's where you -- you took it out?

9   A.  Well, when you say "all of the expenses," it wasn't all of

10  the expenses.

11       I think if you scroll down through this -- can you go

12  through this?

13  Q.  We are going to get to that in a second, Mr. Petrus --

14  A.  If you'd just -- let me just --

15  Q.  -- but what you said was -- excuse me -- excuse me -- what

16  you said was that you removed the expenses involving running

17  these hotel facilities, as well, from the 2005.  And you said

18  "Yes," correct?

19  A.  Well, I think --

20  Q.  Is that what you said?

21  A.  I think --

22       MR. SHONKWILER:  Your Honor, objection.

23       THE COURT:  Sustained.

24  BY MR. S. KULWIN:

25  Q.  Do you remember giving a deposition, sir?

Petrus - direct

842

1    A.  Yes.

2    Q.  Okay.

3    A.  My point is, if you go through the expenses -- and can we

4    go through the document here?

5    Q.  No.  I don't want to do that yet.  Okay?

6         I want to know -- you answered the question before --

7    and correct me if I'm wrong.  You said that you took all of

8    the expenses -- you said you took the expenses, "involved in

9    running these removed hotel facilities out of the 2005."

10        Those were your words.  I didn't make that up.

11   A.  Yes.

12   Q.  Is that correct?

13   A.  You took the direct expenses out of the budget, that's

14   correct.

15   Q.  Okay.  Good.  All right.

16        MR. SHONKWILER:  Objection, your Honor.  There's

17   nothing inconsistent with that and what the witness is trying

18   to say.  He --

19        MR. S. KULWIN:  I disagree, Judge.

20        THE COURT:  Well, he is not trying to impeach him

21   with anything at the moment.

22        MR. SHONKWILER:  I'll wait until it comes.

23        THE WITNESS:  My --

24        THE COURT:  Sir, there is no question.

25        The last answer can stand.

Petrus - direct

843

```
 1                MR. S. KULWIN:  Thank you, your Honor.

 2                THE COURT:  Ask your next question, please.

 3                MR. S. KULWIN:  Thank you, your Honor.

 4   BY MR. S. KULWIN:

 5   Q.  Okay.

 6                So, now -- where is my little pink sheet here?

 7                (Brief pause.)

 8                MR. NOVACK:  Judge, I am going to object to him using

 9   2, even as a demonstrative, because 2 has qualifying language

10   that the witness has not testified to.

11                He's trying to say that all the difference relates to

12   expenses.

13                MR. S. KULWIN:  Judge, I prefer that he not make this

14   argument in front of the jury, if I could.

15                THE COURT:  If you --

16                MR. NOVACK:  Well, we can go to the side.

17                THE COURT:  If you are seeking to use No. 2 as a

18   demonstrative, you need to lay a foundation with this witness.

19                MR. S. KULWIN:  I just did, Judge.

20                I mean, I can do it, again.

21                THE COURT:  Obviously, you did not because I just

22   asked you.  You have not even shown him that.

23                You need to lay the foundation with him as a

24   demonstrative and confirm with him that it would be useful in

25   his testimony, before you can use it as a demonstrative.
```

Petrus - direct

844

1  BY MR. S. KULWIN:

2  Q.  Well, sir, that's what the -- the exercise we just went

3  through.

4          A moment ago you said that you took the 6 million --

5  you said -- here it is.  I got it.

6          MR. S. KULWIN:  I've got it, Judge.  Now, I figured

7  it out.

8          Go back to Exhibit H, please, of PX 7 at the bottom.

9  BY MR. S. KULWIN:

10 Q.  The number there is 10,818,908, correct, for total

11 expenses for the hotel condominium association as of 2005; is

12 that right, sir?

13 A.  Yes, sir.

14 Q.  Okay.

15         MR. S. KULWIN:  Now, can we go to the same exhibit

16 for 2007, at the bottom.

17         MR. SHONKWILER:  What exhibit is this, counsel?

18         MR. S. KULWIN:  Hold on.  Let me see if I can get it.

19         (Brief pause.)

20         MR. S. KULWIN:  Plaintiff's Exhibit B.

21 BY MR. S. KULWIN:

22 Q.  Now, this are the total expenses for 2007, after you

23 modified it; is that correct?

24 A.  The reduction from 10 million to 6 million?

25 Q.  6 million -- now the expenses are 6,136,605?

Petrus - direct

845

1   A.  Yes, sir.  I was responsible for reducing the expenses

2   from 10 million to 6 million --

3   Q.  Okay.

4   A.  -- for all of the unit owners, that's correct.

5   Q.  Let's be specific.

6           It was 10,818,908 --

7   A.  That's correct.

8   Q.  -- to 6,136,605?

9   A.  Yes.

10          I was responsible for reducing the expenses, based on

11  the estimates at the time --

12  Q.  Right.

13  A.  -- from $10.8 million to $6.1 million.

14  Q.  That --

15  A.  That was the estimate that was provided at the time.  That

16  is correct.

17  Q.  That's correct.  Okay.

18          And, now, I've lost my chart.

19          MR. S. KULWIN:  If I may have a moment, Judge?

20          THE COURT:  You may.

21          (Brief pause.)

22          MR. S. KULWIN:  Jeff, I'm looking for No. 2, please.

23          (Brief pause.)

24          MR. S. KULWIN:  Now, Judge, I believe I've laid the

25  foundation.  I've got both.  I just want to show him the two

Petrus - direct

1  numbers together.  That's all.  It's a summary of those two

2  numbers.

3          THE COURT:  You have not even shown him the exhibit

4  yet.

5  BY MR. S. KULWIN:

6  Q.  Sir, these accurately reflect the two numbers -- one for

7  expenses, one from the 2005 property report, one from the 2007

8  property report --

9          (Document tendered.)

10          MR. NOVACK:  Judge, I'm going to object to this.

11          MR. S. KULWIN:  Judge, is Mr. Novack defending the

12  witness or Mr. Shonkwiler or are they both allowed to object?

13          MR. SHONKWILER:  Either one of us, if you prefer.

14          MR. NOVACK:  He would like to object to the summary

15  exhibits, if possible.

16          THE COURT REPORTER:  Mr. Novack, I cannot hear you.

17          THE COURT:  He said he would like to object to the

18  summary exhibits, if possible.

19          Only one person should be defending the deposition.

20          So, Mr. Shonkwiler, go ahead.

21          The testimony, I am sorry, not the deposition.

22          MR. SHONKWILER:  The objection to this proposed

23  demonstrative that has not to the numbered, it has just been

24  given, but to the parenthetical description of what the

25  numbers mean, which has not been established.  There is no

Petrus - direct

 1    foundation.

 2            MR. S. KULWIN:  I will strike that out for now,

 3    Judge.  I will strike that out for now.

 4            THE COURT:  Is there any objection to the use of it,

 5    with that part stricken out, and the summary title at the top

 6    removed?

 7            MR. SHONKWILER:  We don't think there's any relevance

 8    without the part that's proposed to be stricken.  That's our

 9    objection to it.

10            THE COURT:  Okay.

11            Lay your foundation without the parenthetical there;

12    and, then, see if he can lay the proper foundation for it.

13            And, then, you may ask to use it, again, and we will

14    see if there is an objection.

15    BY MR. S. KULWIN:

16    Q.  Sir, does that accurately reflect the two numbers of the

17    expenses -- one for the 2005 report and one for the 2007

18    report -- for expenses?

19    A.  Yes.

20    Q.  Just the numbers.

21    A.  Yes.

22            I -- I --

23    Q.  Those are the numbers?

24    A.  I was -- I had to reduce the expenses, right at that time,

25    from the estimated $10.8 million to $6.1 million because that

Petrus - direct

848

 1    was --

 2              MR. S. KULWIN:  Judge --

 3    BY THE WITNESS:

 4    A.  -- the assessment that I had at that time that.

 5              THE COURT REPORTER:  I could not hear you.

 6    BY THE WITNESS:

 7    Q.  That was the assessment that I had at the time, that it

 8    was appropriate to properly reflect the estimates, to reduce

 9    the expenses from 10.8 to $6.1 million for all -- for the

10    benefit of all --

11              MR. S. KULWIN:  Judge --

12    BY THE WITNESS:

13    A.  -- of the unit owners.

14              MR. S. KULWIN:  -- I'm moving to strike that part.  I

15    was just asking him if those are the numbers.

16              THE COURT:  Overruled.

17    BY MR. S. KULWIN:

18    Q.  And, sir, what you did when you took that out -- those

19    expenses -- is you adjusted the expenses, okay?

20              What you did is -- when you adjusted the expenses,

21    what you say -- what that means is, when you say you adjusted

22    the revenue and adjusted the expenses -- is you revised the

23    condominium operating budget to remove the revenue from the

24    rental of the banquet rooms and you removed the expenses

25    involved in running those rooms; is that correct -- and the

Petrus - direct

849

1    meeting rooms; is that correct?

2    A.  I think it was a little bit -- it was more inclusive than

3    just those items.

4            In the modification, it --

5    Q.  Okay, sir.

6            MR. S. KULWIN:  Judge --

7            MR. SHONKWILER:  He is interrupting the witness, your

8    Honor.

9            THE WITNESS:  Can I --

10           MR. S. KULWIN:  -- I am going to ask him to stop?

11           THE COURT:  Wait, wait, wait.

12           THE WITNESS:  Can I just finish?

13           THE COURT:  No.

14           THE WITNESS:  Can I just finish?  I am not --

15           THE COURT:  One second, please.

16           He was not done with his answer.  You asked him.  And

17   if that is what he did, you have to give him a chance to

18   explain.  That was not a "Yes" or "No" type question.

19           You may finish your response, Mr. Petrus.

20           THE WITNESS:  I apologize.  I'm not a fast talker.

21   BY THE WITNESS:

22   A.  What I did was I went back and I evaluated every line

23   item.  And, in the process, there are items that were

24   embedded.  It wasn't like these are expenses that are solely

25   for meeting room rental, and these are expenses for operating

Petrus - direct

1    the front drive.  They were all -- they were together.

2         But I was charged with coming up with a budget that

3    was an accurate reflection at that point in time of the

4    estimated expenses.

5         So, the answer is all of the expenses in the process,

6    in an iterative fashion, with lots of thought, were modified.

7    BY MR. S. KULWIN:

8    Q.  Sir, you gave a deposition in this case; is that correct?

9    A.  That is correct.

10   Q.  And you were under oath at the time; is that right?

11   A.  That is correct.

12   Q.  And the date of it was August 23rd, 2011; is that right?

13   A.  It seems correct.

14   Q.  You were represented by counsel here at the time, correct?

15   A.  That is correct.

16   Q.  Were you asked this question and did you give this answer?

17        MR. SHONKWILER:  Can I have the page?

18        MR. S. KULWIN:  Line 24, Page 159.

19        MR. SHONKWILER:  I'm sorry.  Hold on.

20        MR. S. KULWIN:  Line 24, Page 159.

21   BY MR. S. KULWIN:

22   Q.  "And when you say you took out the revenue and adjusted

23   the expenses, am I correct that what you mean is you revised

24   the condominium operating budget to remove the revenue from

25   the rental of the banquet rooms, and you removed the expenses

Petrus - direct

851

 1   involved in running those items; is that correct -- the

 2   meeting rooms?"

 3           Question:  "The meeting rooms?"

 4           Answer:  "And the banquet rooms."

 5           "And the banquet rooms?"

 6           Answer:  "And the catering rooms.

 7           "Right.  You took out the revenue and you also

 8   removed the expenses from the operating budget; is that

 9   correct?

10           "That's right."

11           Isn't that what you said?

12           MR. SHONKWILER:  Objection, your Honor.  It's not

13   impeaching.

14           THE COURT:  Overruled.

15           The jury can decide that.

16   BY MR. S. KULWIN:

17   Q.  Is that what you said, sir?

18   A.  The reality --

19   Q.  No, no.  Is that what you said, sir?

20   A.  If that's what was said in the deposition, that is what I

21   said.

22   Q.  Okay.

23   A.  My point -- my point --

24   Q.  Now --

25           MR. S. KULWIN:  Judge, may I --

Petrus - direct

1           THE COURT:  There is no other question pending.

2           Counsel can come back to it.

3   BY MR. S. KULWIN:

4   Q.  Mr. Petrus, when you talk about all this line-by-line work

5   that you say you did now, okay, there's no memo of any type of

6   analysis that you wrote at that point, is there?

7   A.  A specific memo to --

8   Q.  Yeah, a memo.

9   A.  -- the work process?

10  Q.  Yeah, that actually details out what you did, other

11  than -- other than -- that simple calculation we just went

12  over.  Is there any memo?

13  A.  There aren't specific memos.

14  Q.  Is there any notes of that meeting on August 4th -- that

15  we just talked about -- when you're talking about all these

16  issues -- any notes of that meeting that you're aware of?

17  A.  I'm not aware of any specific meeting notes, no.

18  Q.  All right.

19           Are you aware of any e-mails from you to anybody else

20  at or near -- and when I mean "near," within 30 days, one way

21  or the other, okay -- documenting what you said to anybody at

22  that August 4th meeting about all of those issues?

23  A.  I don't -- I'm not -- I don't recall anything.

24  Q.  Is there any e-mail at all after the meeting -- within 30

25  or 45 days -- saying, "Let me explain more clearly what all

Petrus - direct

853

```
 1    this means?"
 2              Anything like that at all in writing within 30 days
 3    of the meeting?
 4    A.  A paper trail?
 5    Q.  Yeah.  Is there a paper trail of any of it?
 6    A.  I don't recall.
 7    Q.  Have you seen any that you recall?
 8    A.  I don't recall.
 9    Q.  Okay.
10              MR. S. KULWIN:  Now, I would ask the Court now if I
11    may show the summary now -- the demonstrative exhibit -- based
12    on that testimony and the impeachment.
13              THE COURT:  You may show him the two numbers without
14    the parenthetical.
15              MR. SHONKWILER:  Around the title, too, your Honor.
16              THE COURT:  And the title.  I said that earlier.
17              MR. SHONKWILER:  Thank you.
18              THE COURT:  It is not a summary exhibit.
19              MR. S. KULWIN:  No, not as a summary exhibit, but I
20    was -- but I would like to show it, based on his testimony --
21              THE COURT:  I just said you could, without the
22    parenthetical or without the title of "Summary Exhibit,"
23    because it is not a summary.
24              MR. S. KULWIN:  Right, without the title as a
25    summary.  I understand that part.
```

Petrus - direct

854

1          It's the parenthetical I would like to ask leave for

2     because that testimony I just read establishes that's what he

3     did.

4               THE COURT:  No, you may not.

5               I am sustaining the objection to that.

6               MR. S. KULWIN:  I think I misplaced it, again.

7               I think you have it up there, Mr. Petrus.

8               (Brief pause.)

9     BY MR. S. KULWIN:

10    Q.  So, before you -- whenever you hit the 2005 report, before

11    you -- modified it, the total expenses for the condo

12    association was $10,818,908; is that correct?

13    A.  That is correct.

14    Q.  And after you were done, it was 6,136,605; isn't that

15    correct?

16    A.  Yes, sir.

17    Q.  And the net difference between those two numbers is a

18    reduction of expenses of 4,682,303; is that correct?

19    A.  Yes, sir.

20              MR. S. KULWIN:  Judge, where I want to go from here

21    is going to require, if I may have one, a sidebar.

22              Do you want to take break?

23              THE COURT:  Let us take a brief sidebar.

24              (Proceedings had at sidebar:)

25              MR. S. KULWIN:  What I want to do now, Judge, is I

Petrus - direct

855

1    want to compare the income removed to the expenses removed and

2    show the difference.  And, then, I'll show the F&B fees that

3    he put in.  Okay?

4            THE COURT:  You are handing me what is called

5    "Summary Exhibit 3."

6            MR. S. KULWIN:  You can call it "Demonstrative," if

7    you want.

8            MR. NOVACK:  Here's the situation.

9            Can I speak if we are not in front of the jury?

10           THE COURT:  You may speak over here, not in front of

11   the jury.

12           MR. NOVACK:  Here's the problem.  None of that

13   testimony asked him -- none of that testimony asked him --

14   either in the deposition or here, "Was that the only change

15   you made?"

16           Because the answer to that is, "Absolutely not."

17           He made a number of changes, other than just the

18   items that were removed from the common elements.  And they're

19   trying to say that, "Aha, every change must have been that,

20   and that's how they proved this profit."

21           This number is not right.  This concept is not right.

22   This witness has never, ever said that they're right.

23           In fact, he said a little bit earlier today he took

24   into account a whole bunch of things not related to it.

25           THE COURT:  Right.

Petrus - direct

856

1        Let me just tell you, in order to use this -- as with

2   any demonstrative exhibit -- you cannot just pick and pull

3   numbers from a document and say, "Aha, here."

4        You have got to lay the proper foundation with your

5   witness that this is what you are purporting it is and that it

6   is something that will be helpful to his testimony.

7        If you want to show it to him and see if he will

8   agree that these -- as to these numbers -- you can try to do

9   that.  But you have not laid a foundation yet for it.

10       You cannot just pull something out, that does not

11  have a foundation, and put it up in front of the jury and,

12  then, try to get the witness to testify about it without a

13  foundation.

14       MR. S. KULWIN:  May I respond?

15       THE COURT:  You may, but I am telling you, you have

16  not laid a foundation for this particular demonstrative

17  exhibit.

18       MR. S. KULWIN:  May I respond?

19       THE COURT:  I said, "Yes."

20       MR. S. KULWIN:  Thank you, your Honor.

21       I've laid the foundation.  I've laid that he removed

22  this from the income.  I've relayed that he --

23       THE COURT:  Please do not raise your voice with me.

24       MR. S. KULWIN:  I'm not trying to, Judge.

25       THE COURT:  You are.  I am telling you.  So, please

Petrus - direct

857

1      do not.

2            Go ahead.

3            MR. S. KULWIN:  I laid the foundation that he removed

4      the income.  I laid the foundation that he removed the

5      expense.  He's testified under oath in a deposition, which

6      he's now said, "Yes, this is what I said."

7            Specifically --

8            THE COURT:  I heard what you said.

9            MR. S. KULWIN:  Okay.

10           THE COURT:  I am just telling you, you have not laid

11     the foundation yet.

12           You can show him this document and see if he will

13     agree that those numbers are right.

14           MR. S. KULWIN:  But if he disagrees, Judge, that goes

15     to weight, not admissibility.

16           THE COURT:  Not for a demonstrative.  A demonstrative

17     is supposed to assist him in his testimony.

18           MR. S. KULWIN:  It's supposed to assist the jury in

19     understanding his testimony.

20           THE COURT:  That is two things -- a part -- you are

21     absolutely right.  But if they are not correct numbers -- you

22     can argue something like this and show it in closing argument;

23     but, if you do not lay the proper foundation with the witness,

24     it is just that.  It is argument.  And I am telling you, you

25     are not there yet.

Petrus - direct

858

1          Sustained.

2              (Proceedings had in open court:)

3              MR. S. KULWIN:  May I have one moment, Judge?

4              THE COURT:  You may.

5              (Brief pause.)

6   BY MR. S. KULWIN:

7   Q.  Now, Mr. Petrus, we've gone through this and I've read you

8   your testimony.  After you made --

9   A.  Just one second.  Let me just turn this off.  Okay?

10             I apologize.

11             (Brief pause.)

12  BY THE WITNESS:

13  A.  Go ahead.  I'm sorry.

14  BY MR. S. KULWIN:

15  Q.  After you made these two adjustments -- expense and

16  revenue -- the difference between the revenue that you took

17  out and the expenses that you took out, between '05 and '07,

18  was 1,365,972; is that correct?

19  A.  If that's the -- if that's the -- calculation.

20  Q.  Okay.

21             So, at least based on the condo budgets from '05 to

22  '07, after all the revenue was drained out from these

23  facilities and per your deposition -- I'll rephrase it.

24             Based on the numbers, after you took out all of the

25  revenue -- okay -- from the facilities -- okay -- the amount

Petrus - direct

859

1    removed was 6 million -- we went over it -- -048, 275.

2          You agreed with that number, correct?  We talked

3    about that.

4          And after you took out all the expenses -- as you

5    said in your deposition -- involved in running the hotel

6    facilities, which was 4,682,303, the difference of the amount

7    of net income to the condo association, after those

8    adjustments between '05 and '07, was 1,365,972, right?

9          MR. SHONKWILER:  Objection to form.

10         THE COURT:  Overruled.

11         You may answer, if you can.

12   BY MR. S. KULWIN:

13   Q.  Is that correct?

14   A.  You know, it's hard for me to sit up here, quite honestly,

15   and agree to -- if you would like me to go up there and do the

16   calculation --

17   Q.  Oh, sure.

18   A.  -- you know, I can then agree to you.

19   Q.  Not a problem.  That's a fair --

20         THE COURT:  If you have the numbers on the proposed

21   demonstrative, it might be just as easy for him, because you

22   have to lay a foundation with him, anyway.

23         MR. S. KULWIN:  Okay.

24         THE COURT:  It might be just as easy for you to show

25   him that document.

Petrus - direct

860

1   BY MR. S. KULWIN:

2   Q.  Let me show you --

3        THE COURT:  And, if not, Mr. Petrus, you can

4   certainly say so, if you would rather have them written out.

5   BY MR. S. KULWIN:

6   Q.  Let me show you --

7        THE WITNESS:  That is fine, by the way.

8        THE COURT:  Thank you.

9        THE WITNESS:  Yeah.

10   BY MR. S. KULWIN:

11   Q.  Let me show you Demonstrative Exhibit 3.  These are the

12   numbers we went over.

13        Does that help?

14   A.  So, the income removed in --

15   Q.  First --

16   A.  -- 4 --

17   Q.  -- if you don't want to -- first, you've got to just tell

18   us whether it helps.

19        THE COURT:  Well, I think you have to clarify "help,"

20   what --

21        THE WITNESS:  Yeah.  I'm not --

22   BY MR. S. KULWIN:

23   Q.  Does that help you do the calculation I just asked you?

24   A.  Yeah, I'm just -- I'm trying to go through your process

25   here, to make sure that I know what --

Petrus - direct

1   Q.  Okay.

2   A.  So, the 6-million-48, that's the total income --

3           MR. SHONKWILER:  Counsel -- sorry, your Honor, until

4   there's a question pending, could we ask the witness to --

5   instead of thinking out loud, to think to himself; and, then,

6   answer a question?

7           THE COURT:  Well, I think he is trying to answer the

8   question of if this helps; and, in order to answer that, he is

9   trying to figure out what is in there.

10          MR. SHONKWILER:  Okay.

11          THE COURT:  Is that accurate, Mr. Petrus?

12          THE WITNESS:  Yes, that's correct.

13          Thank you.

14  BY MR. S. KULWIN:

15  Q.  Line 1, the 6,048,275 -- let me see if I can shorten it.

16          That's the number that you took out from the 2005

17  condo budget, for the income related to the ballrooms, the

18  meeting rooms, the -- all those facilities, the F&B -- right?

19  We agreed on that?

20  A.  Yes, sir.

21  Q.  And, then, I read you your deposition and you said that --

22  in your dep, you said that -- the 4,682,303 represented two

23  things:  First, it's the difference between the total expenses

24  in 2005 that the condo association had to pay, and the total

25  after you adjusted it in 2006.  That's the first thing.

Petrus - direct

862

1              That's correct?

2    A.  The total expenses.

3    Q.  The total expenses?

4    A.  The total expenses, including everything.

5    Q.  Including everything.

6    A.  Right.

7    Q.  That's all I'm saying.

8    A.  Right.

9    Q.  And, so, now what I'm asking you -- forget about the

10   description, I'll take all of that out -- the difference now

11   between what the condo board originally was getting for income

12   and paying in expense in 2005, and what they're paying now in

13   2007?

14              The difference is they're less 1,365,972?  They're

15   getting that much less?

16   A.  Right.

17   Q.  Is that right?

18              MR. NOVACK:  Objection to form, your Honor.

19              MR. S. KULWIN:  I'm just trying to help him explain.

20              THE COURT:  Sustained on form.

21              MR. S. KULWIN:  Okay.

22   BY MR. S. KULWIN:

23   Q.  You took out 6,048,275 in income between '05 and '07.

24              We agree on that, right?

25   A.  Yes, sir.

Petrus - direct

863

1    Q.  You took out expenses between '05 and '07 of 4,682,303.

2            We agree on that, right?

3    A.  That's correct.

4    Q.  The difference -- the net difference -- for the condo

5    association after those adjustments is they got less revenue

6    after expenses of $1,365,972; is that correct?

7    A.  Based on the estimate that was done by the people that

8    preceded me?

9    Q.  Right.

10   A.  Right.

11           And the estimate that I had completed in 2007 --

12   Q.  Right.  I'll accept that.

13   A.  -- right?  Right?

14   Q.  Is that right?

15   A.  Based on those estimates --

16   Q.  Yeah.

17   A.  -- at that time, the difference is -- in your calculation

18   here -- the 1.365 number, that is correct.

19   Q.  Okay.

20           And, then, you asked about the 500,000.

21           Ultimately in '07, when you took all of that out, you

22   added back to the income for the condo association the

23   $500,000 fee, right -- food and beverage licensing fee, true?

24   A.  That's correct.

25   Q.  So, the net income -- the net loss of income, profit, if

Petrus - direct

864

1   you will, the difference between income and expenses -- for

2   the condo between 2005 and 2007, is 865,972; is that correct?

3   A.  Yes, based on the estimates --

4   Q.  Estimate --

5   A.  -- that were made in --

6   Q.  In '05?

7   A.  -- in '05 --

8   Q.  Versus --

9   A.  -- versus '07, that is correct.

10          MR. S. KULWIN:  Can I show it now with the

11  adjustments of the titles?

12          THE COURT:  You may use it as a demonstrative only,

13  with the adjustment of the titles.

14          MR. S. KULWIN:  Okay.

15          MR. SHONKWILER:  For the record, your Honor, there is

16  an objection that there's no foundation still that every

17  dollar of difference that has just been testified about is

18  attributable to only a single factor.

19          And we think that that's what it suggests in the

20  demonstrative.

21          THE COURT:  Well, that is not what the witness

22  testified to.  So, I think you are right about that, but that

23  is not what the witness testified to.

24          MR. SHONKWILER:  Okay.

25          Our concern is that's what the demonstrative text

Petrus - direct

865

1    shows.

2          THE COURT:  Well, the text is coming out of the

3    demonstrative.

4          MR. SHONKWILER:  Ah, thank you, your Honor.

5          MR. S. KULWIN:  Before I put this up and for fear of

6    doing anything wrong, can I just show you the -- show them the

7    -- one word?

8          THE COURT:  Show it to the other side first.  And,

9    then, if you need me --

10         (Brief pause.)

11         MR. S. KULWIN:  They want one more foundational

12   question, Judge.

13         THE COURT:  Okay.

14   BY MR. S. KULWIN:

15   Q.  Mr. Pet- --

16         THE COURT:  Petrus.

17   BY THE WITNESS:

18   A.  Petrus.

19   BY MR. S. KULWIN:

20   Q.  Mr. Petrus, I apologize.

21   A.  That's okay.

22   Q.  Mr. Petrus, I just want to be clear that when you look at

23   these numbers -- this bottom line number -- for all intents

24   and purposes means that the condo association, the difference

25   between the revenues and the income -- I mean, the revenues

Petrus - direct

1    and the expense -- they lose a profit based on -- I admit I

2    understand you're saying based on -- the original estimate in

3    '05 and estimate you did in '07 of 865,972; is that right?

4    A.   Based, again -- yes, based -- on the estimates that were

5    done in '05, for total expenses --

6    Q.   Right.

7    A.   -- right?

8           And based on the estimate that was done in 2007 for

9    total expenses.

10   Q.   Okay.

11          So, let's take a look at them.

12          THE COURT:  And, for the record, you are putting

13   Demonstrative No. 3 --

14          MR. S. KULWIN:  3.

15          THE COURT:  -- on the overhead.

16          MR. S. KULWIN:  Right.

17   BY MR. S. KULWIN:

18   Q.   We've kind of --

19          MR. S. KULWIN:  Thank you very much, your Honor.

20   BY MR. S. KULWIN:

21   Q.   We've kind of already gone all through it, again, but I

22   just want to show -- and I apologize for my messy stickies,

23   because I'm not -- I mean, I flunked construction in

24   kindergarten -- so there you have it.  Okay?  There's the

25   income removed, based on the estimates done in '05 by Mr. --

Petrus - direct

867

1   and you know that's done by Mr. Reiss and Mr. Flicker, right?

2   A.  I don't know that.

3   Q.  And the removal of the expenses from '05, based on

4   those -- that work done by the prior Trump executives; and,

5   then, there's the difference (indicating); and, then, there's

6   (indicating) that F&B that you added in; and, there's your net

7   (indicating), correct?

8           That's what it adds up to be, right?

9   A.  (No response.)

10  Q.  Okay.

11          Now --

12          THE COURT:  Are you moving to a different topic?

13          MR. S. KULWIN:  Oh, I think so, Judge.

14          Do you want to take break?

15          THE COURT:  Let us take a morning break.

16          MR. S. KULWIN:  Thank you, your Honor.

17          (Jury out.)

18          THE COURT:  You may step down, sir.  Be back in about

19  ten minutes.

20          Is that an exhibit?

21          THE WITNESS:  Yes.

22          THE COURT:  Just leave it up there, if you would,

23  please.

24          THE WITNESS:  Thank you.

25          THE COURT:  If you do not mind, I am going to mention

Petrus - direct

868

 1   something to the jury at the break -- or have Katie mention it

 2   to them -- about starting at 9:00 tomorrow and ending at 4:00.

 3              Is that okay?

 4              MR. S. KULWIN:  Great.

 5              THE COURT:  I can do it in court, but it is probably

 6   easier to get reactions.

 7              MR. NOVACK:  The one thing about tomorrow afternoon

 8   is, depending on how fast this goes, there may be a gap in

 9   witnesses.

10              THE COURT:  Okay.

11              We will talk about that later.  If I let them out

12   before 4:00, nobody is going to complain.  So --

13              MR. S. KULWIN:  Oh, no.

14              THE COURT:  -- are you okay if I --

15              MR. NOVACK:  That's okay.

16              MR. S. KULWIN:  That's great.

17              MR. SHONKWILER:  We're just suggesting it could be

18   earlier.

19              THE COURT:  As I said, I do not think anybody will

20   complain.  I just want to make sure getting here at 9:00 is

21   not a problem for them.

22              MR. S. KULWIN:  Okay.

23              Thanks, Judge.

24              What time back?

25              THE COURT:  Five till.

Petrus - direct

```
 1              (Brief recess.)

 2              THE COURT:  The jury is fine with starting at 9:00

 3    tomorrow.

 4              Will you bring Mr. Petrus back in, please?

 5              And, Danny, bring in the jury.

 6              THE COURT:  Mr. Kulwin, how much longer do you think

 7    you have on direct?

 8              MR. S. KULWIN:  I was just telling Mr. Novack, I

 9    don't -- I don't -- I think maybe 45 minutes, I think.  Maybe

10    faster.

11              (Jury in.)

12              THE COURT:  You may be seated.

13              Whenever you are ready, Mr. Kulwin.

14              MR. S. KULWIN:  Thank you very much, your Honor.

15    BY MR. S. KULWIN:

16    Q.  Now, going back to Plaintiff's Exhibit 7 --

17              MR. S. KULWIN:  Exhibit H, again, Mike.

18    BY MR. S. KULWIN:

19    Q.  -- there's a line for the common charges.  Do you see

20    that, Mr. Petrus?

21    A.  Yes, sir.

22    Q.  And without belaboring the point -- because we heard all

23    about it -- the common charges are the monthly assessments

24    that the unit owners pay to pay expenses for the common

25    elements, correct?
```

Petrus - direct

870

1   A.  That is correct.

2   Q.  Okay.

3           And, so, there it is (indicating).

4           And this is for 2005 -- this is the effective amount

5   for January, 2005.

6           MR. S. KULWIN:  Can we go to 25-B, Exhibit H,

7   October, 2007?

8           And can you highlight that.

9   BY MR. S. KULWIN:

10  Q.  And, now, this is the one that you did, correct?

11  A.  That is correct; yes, sir.

12  Q.  And now the common charges are 5,636,605; is that correct?

13  A.  That is correct.

14  Q.  And just --

15          MR. S. KULWIN:  And, Judge, I've cleared this with

16  counsel.  They said it's okay with them if I put this up.

17          THE COURT:  And what is "this"?

18          MR. S. KULWIN:  This is a demonstrative exhibit that

19  just shows those numbers.

20          THE COURT:  Demonstrative No. 4?

21          MR. S. KULWIN:  It's actually -- okay, let's call it

22  4.

23          THE COURT:  I do not care.  I just want to make --

24          MR. S. KULWIN:  It was 7.

25          THE COURT:  -- sure the record is clear.

Petrus - direct

871

```
 1              All right.  Demonstrative No. 7, you may show to the

 2  witness.

 3              MR. S. KULWIN:  And the jury, if that's okay?

 4              THE COURT:  And the jury, yes.

 5              MR. S. KULWIN:  I just wanted to be sure.

 6              Okay.  I've got all my stickies covering this stuff

 7  that they don't want me to show.

 8  BY MR. S. KULWIN:

 9  Q.  Okay.

10              Now, we've got it up there and, so, what this

11  reflects is, is that in 2005, the common charges -- when the

12  hotel revenues and expenses and everything were in the budget

13  for the hotel condominium, the common charges -- were

14  4,755,633, right, Mr. Petrus?

15  A.  The common charges for 2000- -- that's correct, yes, sir.

16  Q.  And, then, for 2007, they went up to 5,636,605, correct?

17  A.  That is correct.

18  Q.  And, so, the difference -- the increase in the common

19  charges -- was $880,972; is that correct?

20  A.  Yes, sir.

21  Q.  And we can go back to the last chart.

22              That pretty much reflects almost exactly the amount

23  of lost profit as a result of your adjustments of removing

24  certain income, which was all the facilities income, ballrooms

25  and things like that, and other expenses, correct, in that
```

Petrus - direct

1   chart?

2   A.  I'm not sure if the word "profit" is appropriate in this

3   case because what this is, is it's the difference between

4   income and expenses.  And the -- the -- budget is not set up

5   on a profit basis.

6   Q.  I understand that that -- that's, like, a term we're using

7   here.

8           But, in any event, the two numbers are almost

9   identical -- within a few thousand dollars -- correct?

10  A.  Within a few thousand, yes, that's correct, sir.

11          Yes, sir.

12  Q.  And if you go back, now, to -- it's almost, like, a

13  $15,000 difference.  Okay?

14          And if you go back to Exhibit H -- oh, never mind.

15          MR. S. KULWIN:  Strike that.

16  BY MR. S. KULWIN"

17  Q.  So, there you have it.  Okay.

18          Now, let's move on to another topic.

19          In light of the prior property reports that Trump had

20  issued before you got there, the Trump organization believed

21  that they were obligated to provide the hotel condominium unit

22  owners something in return for the hotel facilities that Mr.

23  Trump was now getting for himself, correct?

24  A.  I can't say that that's a fact, if it preceded me.

25  Q.  No, no, no, no.  I'm sorry.  A bad question.

Petrus - direct

873

1          In light of the fact that the hotel facilities and

2    the associated revenue was being removed in the October, '07

3    amendment, the Trump organization believed they were obligated

4    to provide the hotel condominium unit owners something in

5    return for the stuff that Mr. Trump was now getting, correct?

6          MR. SHONKWILER:  Judge, i object to the extent it

7    calls for his knowledge of the entire organization.

8          MR. S. KULWIN:  Well --

9          THE COURT:  Sustained.

10          MR. S. KULWIN:  Okay.

11   BY MR. S. KULWIN:

12   Q.  The same question:  Your understanding was that that was

13   the Trump organization's view, correct?

14   A.  I think -- and, again, this was my thought process at the

15   time is that I realized that there were swings in revenue,

16   there were going to be swings in expenses, and there -- there

17   -- was some volatility in that.

18          And, as I went back and looked at it, one of the

19   thought processes was:  Do you put that burden, particular in

20   initial years, on unit owners?  Because if the profitability

21   wasn't there, would it be a smarter move for the unit

22   owners -- a safer move for the unit owners -- to give them

23   something that was predictable and static and something that

24   was established as a definite income stream that one could

25   count on.

1        I mean, that was really the thought process that was

2   incorporated.

3   Q.  Mr. Petrus, but it wasn't my question.

4        My question was:  In return -- I'm not asking you --

5   I didn't ask for your rationale.  We're going to get to your

6   rationale.

7        Because you were taking away these revenues and

8   ownership of this real estate, you understood that the Trump

9   organization felt obligated to give something to the hotel

10  condo owners for it; isn't that true?

11  A.  Well, I'm not sure if the word "obligated" -- because this

12  is monies that would come from Trump on an ongoing basis,

13  regardless of revenues or profits.  That was a commitment that

14  was being made.

15       I'm not sure if the word "obligated," but it was

16  something that we felt was appropriate, considering the

17  circumstance.

18  Q.  Going back to your deposition at Page 196, did you -- were

19  these questions asked and did you -- give these answers, Line

20  12.

21       "Why did you want to maintain at least a $200,000

22  fee?"

23       Answer:  "We thought there was an obligation that we

24  had to provide the Trump condo common area participants some

25  form of participation in an item that was originally shared --

Petrus - direct

875

 1            "Why was that?

 2            " -- without giving them the risk and burden.

 3            "Why was that important?

 4            "I think it was just a logical business decision.

 5            "But why do you think that was a logical business

 6    decision?

 7            "It's common sense.

 8            "But I'm not in the hotel industry.  So, I don't

 9    understand.  Explain to me why you thought it was significant

10    to maintain at least a $200,000 fee?"

11            Answer:  "Because we thought we were obligated to

12    provide them with some form of equity in something that was

13    originally shared, albeit very complicated to understand, and

14    very complicated also to operate."

15    A.  Yeah, I think I'm elaborating on more detail, just to make

16    sure that you understood the thought process.

17    Q.  Well, I'll get to your thought process.  I just want to be

18    sure I understand it.  You felt obligated.

19            That's what you say here, isn't it?

20    A.  At that time, yes, that's correct.

21    Q.  Okay.

22            And when you say "at that time," you mean 2007?

23    A.  I'm saying when I did the deposition.

24    Q.  Oh, so now we're here.  Somehow it's --

25    A.  No, I'm elaborating.  I'm giving you a little bit more

Petrus - direct

1   detail, so that you understand the rationale behind it --

2   Q.  Actually --

3   A.  -- to your term.

4   Q.  Actually, don't you recall you gave that same kind of

5   detail at your deposition?  I'm just asking you about

6   obligated.  And you agreed you believed that you were

7   obligated to give them some form of equity, right?

8   A.  And I'm explaining the reasoning behind it.

9   Q.  But --

10  A.  It might be more than what you're asking for, I guess.  I

11  appreciate that comment.

12  Q.  I don't want to beat it into the ground.  Just so the

13  record is clear --

14  A.  Right.

15  Q.  -- you felt obligated -- your perception was, your

16  understanding was that the Trump organization felt obligated

17  to give them some form of equity?

18  A.  Something.

19  Q.  Some form of --

20  A.  Something that was static predictable, not volatile, that

21  we could -- that we could -- deliver to the unit owners, that

22  wasn't based on market conditions, that would be prevailing at

23  the time.  That's --

24  Q.  Your words --

25  A.  -- that's correct.

Petrus - direct

1   Q.  Your words, sir, "obligated equity."  That's what it was,

2   correct?

3           MR. SHONKWILER:  Objection.  Asked and answered.

4           THE COURT:  Sustained.

5   BY MR. S. KULWIN:

6   Q.  And by "obligated equity," sir, you mean the normal term

7   in real estate -- what equity means -- correct?

8           MR. SHONKWILER:  Your Honor, I'm just objecting that

9   this launched from the question that was just objected to and

10  that your Honor sustained.

11          THE COURT:  It is a separate question, though.

12          MR. SHONKWILER:  Okay.

13          THE COURT:  Are you asking --

14          MR. SHONKWILER:  Counsel used the same words that --

15          THE COURT:  Are you asking him today what his

16  understanding of that term is?

17          MR. S. KULWIN:  Yes.

18          THE COURT:  Okay.

19          Rephrase it, then.  That is not how you asked it.

20          MR. S. KULWIN:  Thank you, your Honor.

21  BY MR. S. KULWIN:

22  Q.  You understand the term "equity," right?

23  A.  Yes, sir.

24  Q.  In real estate, it's used to represent ownership, correct?

25  That's what "equity" means, right?

 1   A.  That's correct.

 2   Q.  In real estate, it usually means an ownership interest in

 3   property, correct -- in real estate?

 4   A.  That's correct.

 5   Q.  So, for example, if you buy a house and you have a

 6   $200,000 mortgage, and your house is worth $300,000, the

 7   equity is a hundred thousand dollars, correct?

 8   A.  Absolutely; yes, sir.

 9   Q.  And in a business sense, what "equity" usually means is

10   some form of ownership of an income stream, usually in the

11   form of stock, right?

12          That's your understanding; isn't that true?

13   A.  Or an asset.

14   Q.  Or an asset.

15   A.  Right.

16   Q.  So, for example, if you have a business and you own a

17   physical thing, like, land, the equity may also be the income

18   stream that flows therefrom.

19          That's another form of equity, correct?

20   A.  That's correct.

21   Q.  Okay.

22          And at some point in 2006 or 2007, you started

23   working on -- you and your staff started working on -- how

24   much the organization was going to pay hotel condominium

25   owners for this equity, correct?

Petrus - direct

879

1   A.  Correct.

2   Q.  And, also, how it would reflect these changes and pay this

3   equity in the fourth amendment, correct?

4        That's another thing you were working on?

5   A.  Or some form of that.

6   Q.  Right.

7        And you also were working on what impact this change

8   would have on the hotel condominium's budget.

9        You were working on that, too?

10  A.  On the total budget, that's correct.

11  Q.  Now, originally, as noted in that question from your

12  deposition, the -- one of the -- first numbers that came out

13  was $200,000 a year, correct?

14  A.  I think there were many different iterations of that --

15  Q.  Right.  Well --

16  A.  -- of which 200,000 was one of them.

17  Q.  Okay.

18       Well, the only two that we have -- that we've seen --

19  is 200 and the 500.  Were there some others?

20  A.  I think there were a lot of different elements that were

21  evaluated.

22  Q.  We'll get to that in a second.

23       But in terms of the numbers that popped up in the

24  documents, the first number was 200,000.

25       I can show it to you, but does that ring a bell to

Petrus - direct

1   you?

2   A.   That was one of the considerations; yes, sir.

3   Q.   And, then, later on, the final number that was reached was

4   $500,000?

5   A.   That's correct.

6   Q.   Now, you're not aware of any documents that detail any

7   analysis the Trump organization did to come to the $200,000

8   number, are you?

9   A.   Well, there were -- there were -- elements that were taken

10  into consideration.

11  Q.   No, I know that.

12  A.   When you look at meeting room rental, public rental, there

13  are elements that were -- that were -- reviewed in the

14  process; yes, sir.

15  Q.   I understand that there were elements that were reviewed;

16  but, there's no memo or document that we can look at that

17  says, "Trump looked at these elements, did this analysis,

18  weighed pros and cons, came to $200,000"?

19         There's nothing like that, correct?

20  A.   Well, probably to a certain degree there may have been.   I

21  mean, if you -- the PKF report that you have --

22  Q.   Yeah, I have that.

23  A.   Do you have that?

24         Can you bring that up?

25  Q.   Sure.

Petrus - direct

881

```
 1              But before I show this to you for a second, that's
 2   not my question.  I'm not asking you what you used.  I'm
 3   asking you are there any Trump-generated documents that they
 4   wrote -- you, your staff, anybody in the organization -- that
 5   summarizes all the considerations, from any source; and, then,
 6   you can follow it along -- a paper trail, as you used -- to
 7   see how you reached 200,000?
 8              Any document that Trump wrote.
 9   A.  I think probably --
10              MR. SHONKWILER:  Objection to form; and, also, to the
11   ambiguity with "Trump."
12              THE COURT:  Sustained.
13   BY MR. S. KULWIN:
14   Q.  The same question, that the Trump organization wrote.
15   A.  From an analysis standpoint?
16   Q.  Yes.
17   A.  I think the only thing that we did was we looked at
18   industry trends.
19              So, if I could go back and --
20   Q.  We'll get back to that --
21   A.  Okay.
22   Q.  -- about how you reached it.
23   A.  Okay.
24   Q.  But I'm asking now, rather than have you do it here and
25   you explain it to me for the first time, what I want to know
```

Petrus - direct

 1   is:  Are there any contemporaneous documents from back then,

 2   in '07, that the Trump organization prepared, that we could

 3   look at, that shows, "Here are our factors, here are our

 4   conclusions, here is our number:  200,000"?

 5          Anything like that at all?

 6   A.  Yeah, I think the only thing that I had at the time were

 7   industry trends and my 30-plus years of experience dealing

 8   with banquet, meeting room rentals and what trends were, what

 9   is customary and what the risk factors were.

10   Q.  I apologize, Mr. Petrus, perhaps it's me.  I don't want to

11   waste time and bore the jury.  I just want to get the answer.

12          I'm not looking for your rationale.  I'm just asking

13   you:  Is there any document that the Trump organization wrote,

14   prepared -- a paper trail, as you've mentioned -- that we can

15   look at, that was contemporaneously made, that says, "Here are

16   our factors.  Here are the considerations.  This is how we got

17   to 200,000"?

18          There's nothing like that, is there, that you're

19   aware of, written by the Trump organization?

20   A.  I think the only -- the only -- thing that would fall

21   under the category would be analysis.

22          So -- and I think the document that you originally

23   were referencing probably could be used as a basis.

24   Q.  Okay.

25          But that wasn't written by the Trump organization.

1    A.  That was written by an independent third-party

2    organization that is credible --

3    Q.  Right.

4    A.  -- Pannell Kerr Foster -- write -- that are authorities in

5    this matter, that don't have any type of bias one way or the

6    other --

7    Q.  Right.

8    A.  -- but just present facts.

9    Q.  Right.

10         But Mr. Petrus, quite frankly, there's nothing in

11   that document that narratively says anything at all about,

12   "Yes, and we take this and go from Page 1 to Page 2 to Page

13   3," and it ends up at $200,000.

14         There's nothing like that in that document, is there?

15   A.  No, but I think --

16   Q.  That's all I want to know.

17         Is there?  Is there?

18   A.  There's a common-sense element that --

19   Q.  No, no, I'm asking you.

20   A.  -- with people taking --

21         MR. SHONKWILER:  Your Honor, has to got to let him

22   answer the question.

23         MR. S. KULWIN:  Judge, I'm moving to strike the

24   answer.

25         MR. SHONKWILER:  We haven't --

Petrus - direct

884

1          MR. S. KULWIN:  I'm asking is there in it.

2          THE COURT:  Well, I think he is trying to explain

3     what he interprets that way.  So, let us hear the answer

4     first.

5          You may finish, sir.

6          THE WITNESS:  Thank you.

7     BY THE WITNESS:

8     A.  What was done was that I took information that was

9     available to me -- to your point earlier -- from luxury hotels

10    that were competitive.

11         There's a trend here.  This was not done in a willy

12    nilly fashion.  This was taking definitive information and,

13    also, your experience of the big-picture trend, and trying to

14    correlate that to a building that was being developed -- not

15    yet opened but being developed -- that would be a fair

16    estimate of what one would expect to yield out of this space.

17         MR. S. KULWIN:  I want to move to strike the answer,

18    Judge.  I asked him if there were any documents that the Trump

19    organization --

20         THE COURT:  I will strike that part.

21         And the jury should disregard it.

22    BY MR. S. KULWIN:

23    Q.  Mr. Petrus, it's a simple question.  Is there any

24    contemporaneous document from 2007 written by you, your staff,

25    anyone at the Trump organization, that shows us the logic,

Petrus - direct

885

1   step by step or in any fashion of how you reached the

2   $200,000?

3   A.  No, sir.

4   Q.  Okay.

5           And, similarly, there's no similar document that

6   shows how you got from the 200,000 to the 500,000; isn't that

7   correct?

8   A.  That's correct.

9   Q.  And Trump has no analysis of any kind that valuated the

10  property that was being lost -- the actual physical real

11  estate that was being lost -- by the condo association by this

12  change?

13          You don't have any analysis like that is

14  contemporaneous with 2007; is that correct?

15  A.  Again --

16  Q.  No, the question is:  Analysis written by the Trump

17  organization in 2007.

18  A.  No.

19  Q.  Any analysis?

20  A.  No, but one would take the information that was available

21  to them and make decisions based on data and the facts.

22  Q.  And the amount of space that was being lost by the condo

23  association was approximately -- as a result of this transfer

24  was approximately -- 30,000 square feet, correct?

25          That's all the ballrooms, the meeting rooms, the

Petrus - direct

886

 1    conference rooms, that went from the common elements to

 2    Mr. Trump's commercial ownership, correct?

 3    A.  Approximately.

 4    Q.  Yeah.

 5         And at the time -- at the time -- that it happened,

 6    the Trump organization was selling a 600-and -- excuse me.

 7         MR. S. KULWIN:  May I have one moment, Judge?

 8         THE COURT:  You may.

 9         (Brief pause.)

10    BY MR. S. KULWIN:

11    Q.  At the time, it was selling a 604 split -- four foot -- at

12    the time that this happened, like, in 2006, for example --

13    well, let me ask you this.  I'm going to lay a foundation.

14         Between 2006 and 2007, you are not aware of any

15    decrease in the prices of the hotel condos at Trump Tower, are

16    you -- decreases by Trump in lowering the price?

17    A.  I can't say that I'm not privy to the pricing formulation.

18    Q.  But at the time that this was done -- this transfer was

19    done -- Trump was selling a 604-square-foot condo -- 604

20    square feet -- for $971,000.

21         You're aware of that, right?

22    A.  If that's what you're stating.

23    Q.  Okay.

24         And they were selling a 972-square-foot condo for, I

25    believe it was, over a million dollars, right?

Petrus - direct

1     That's what it was, right?

2  A.  (No response.)

3  Q.  Okay.

4     And you can -- actually, it was for 1,149,500, was

5  what a 900-square-foot condo cost at that time, correct?

6  A.  (No response.)

7  Q.  And, so, I can give you a calculator, if you want; but,

8  that would equate -- at the Trump Tower in around 2007 -- of a

9  per square-foot value of, roughly, $1500 a square foot, fair?

10 A.  If that's the calculation.

11 Q.  Okay.

12     And the Trump organization did nothing --

13     MR. S. KULWIN:  Strike that.  I believe he answered

14   that.  I apologize.

15 BY MR. S. KULWIN:

16 Q.  And certainly when this change was made in what you say

17 was to -- let me get this straight.

18     This change was made, you say, because the Trump

19 organization wanted to protect the hotel condominium unit

20 owners from the risks of running the F&B facilities -- the

21 risks of the volatility -- right?

22 A.  Specifically, the areas that were referenced here are

23 banquet and meeting spaces, I think.

24 Q.  Right.

25 A.  Isn't that accurate?

Petrus - direct

888

 1    Q.  Banquets, meetings, conference rooms --

 2    A.  Different --

 3    Q.  -- food and beverage -- you have to let me finish.

 4    A.  Different things.

 5    Q.  You have to let me finish.  I'm sorry.

 6         You have food and beverage, all those things?

 7    A.  Right.

 8         I think we want to be careful here because when you

 9    start talking about food and beverage in general -- right --

10    it bundles areas that aren't part of this discussion.

11    Q.  I understand.

12         But we're talking about the food and beverage aspect

13    that includes the banquets, the meetings, the conference

14    rooms, the function rooms -- all those things?

15         MR. SHONKWILER:  Objection.  Vague.

16         MR. S. KULWIN:  That's --

17         THE COURT:  If you understood the question, you may

18    answer.

19         THE WITNESS:  No.

20    BY THE WITNESS:

21    A.  Could you just restate the question one more time, please?

22    BY MR. S. KULWIN:

23    Q.  Sure.

24         My understanding was, based on your testimony and

25    Mr. Trump's, that the 500,000 that you decided -- that the

Petrus - direct

889

1  Trump organization supposedly decided -- to take away the

2  hotel condo unit association's ownership of the ballrooms, the

3  function rooms, the banquet rooms, the meeting rooms and all

4  the associated revenue that went with it, to protect it from

5  the volatility of the ups and downs of that income.

6          Is that my understanding?

7  A.  That is correct.

8  Q.  Okay.

9          Now, no one went to any of the hotel and condominium

10 owners, who had already purchased these things, and asked them

11 whether they wanted to be so protected, correct?

12         No one went to any of them, right?

13 A.  I'm not aware of that.

14 Q.  And no one went to them and asked them whether it was even

15 something they wanted, correct -- to your knowledge?

16 A.  I'm not aware of that.  I think this was done on --

17 Q.  Internally?

18 A.  -- basic common sense.

19 Q.  And there were no conversations within the Trump

20 organization to the effect that, "Removing these common

21 elements is totally inconsistent with what we've been

22 promising buyers for the last four years," correct?

23         No conversations like that; is that true?

24 A.  Again, the premise here --

25 Q.  No, Mr. Petrus, the question is very specifically, there

Petrus - direct

1    were no -- listen to the question, please.

2            There were no conversations within the Trump

3    organization to the effect that, "Removing these common

4    elements is totally inconsistent with what we have been

5    promising buyers for the last four years"?

6            That's the question.

7    A.   I don't think I can answer that as a "Yes" or "No."

8    Q.   Really?

9            Let me see if I can refresh your recollection of that

10   one.

11           MR. S. KULWIN:  Page 195, Line 14.

12   BY MR. S. KULWIN:

13   Q.   Let's see if it refreshes your recollection.

14           If not, I will ask you -- right there (indicating)?

15           MR. SHONKWILER:  Your Honor, there was an objection,

16   argumentative and vague, to the question that the witness is

17   reading now at his deposition.

18           THE COURT:  He is using it to refresh his

19   recollection.

20   BY THE WITNESS:

21   A.   Yeah, I don't think that the question that you're asking

22   me is exactly what's on here, to be honest with you.

23   BY MR. S. KULWIN:

24   Q.   Well, let me ask you that one.

25           I will.  That's fine.

Petrus - direct

1          Do you recall any conversations in which it was

2    discussed that, "We had promised common elements -- ownership

3    of the meeting rooms, function rooms and ballrooms -- and that

4    now the property report -- a new one -- is taking away all

5    that ownership"?

6          Were there any discussions like that and, "It's

7    inconsistent with what we've promised previously"?

8          That's a terrible question.  Let me say that, again.

9          An awful question.

10         Was there any discussion within the Trump

11   organization --

12   A.  Can you just read what's on there; and, then, this way,

13   I'm responding.  Because if this is about what was in the

14   deposition, why don't you just read what's there?

15   Q.  I'm going to rephrase the question and clarify.

16   A.  But, then, I'm -- in my mind I'm -- trying to decide if

17   that's exactly what you stated.

18   Q.  Don't worry about that.

19         My question is real simple.  Were there any

20   discussions at the Trump organization to the effect that, "We

21   were promising them for the last four years we're giving them

22   all this ownership and this revenue and now we're doing

23   something completely inconsistent"?

24         Do you recall any such discussions like that?

25   A.  I don't recall.

Petrus - direct

892

1  Q.  Okay.

2        But you're organization certainly knew that there

3  were purchasers who had been told they were going to get an

4  ownership interest in these facilities, with this $5 million

5  of revenue, that were not going to be happy with losing

6  this --

7        MR. SHONKWILER:  Judge --

8  BY MR. S. KULWIN:

9  Q.  -- correct?

10        MR. SHONKWILER:  -- I think we need a sidebar to

11  discuss this issue that has just been raised.

12        THE COURT:  I am going to sustain a form objection.

13        Rephrase it; and, then, if we need a sidebar, we can

14  go to sidebar.

15  BY MR. S. KULWIN:

16  Q.  The Trump organization was aware that certain owners --

17  some owners -- would be upset with these changes, correct?

18        MR. SHONKWILER:  Objection to the form.

19        THE COURT:  Sustained --

20        MR. SHONKWILER:  And I didn't hear --

21        THE COURT:  -- in light of a prior in limine ruling.

22        MR. S. KULWIN:  I have to confer with Jeff for a

23  second, if that's okay?

24        THE COURT:  Okay.

25        (Brief pause.)

Petrus - direct

893

1          MR. S. KULWIN:  I'm going to try it a different way.

2          MR. NOVACK:  Judge, is it possible to have a very

3    brief sidebar?

4          THE COURT:  Yes.

5          (Proceedings had at sidebar:)

6          THE COURT:  I sustained the last objection because I

7    have kept out prior litigation.

8          MR. S. KULWIN:  This isn't about litigation.

9          THE COURT:  Well, that is certainly -- the question

10   was --

11         MR. S. KULWIN:  Okay.

12         THE COURT:  -- posed, that you put him in a position

13   of saying either "No" or the prior litigation which was

14   brought, that I made very clear.

15         I am not sure what you are getting at.

16         MR. S. KULWIN:  Okay.

17         That was a poorly-phrased question.

18         THE COURT:  What are you getting at?

19         MR. S. KULWIN:  I'm getting that they had complaints

20   in '07, prior to any litigation.  It's not related.

21         In fact, this was the exhibit I was going to show

22   him, PX 17.

23         THE COURT:  Let me see it.

24         (Document tendered.)

25         MR. S. KULWIN:  Sure.

Petrus - direct

894

1          And, then, there's an attachment.

2          MR. SHONKWILER:  I think that also is barred --

3    whether there were complaints.

4          Everything on here, your Honor, refers to this

5    e-mail, which is hearsay, first of all.  But, I also think

6    your Honor barred in limine one way or another except for the

7    unit -- the individual unit -- owners, why owners --

8          THE COURT REPORTER:  I am sorry, I cannot hear you.

9          THE COURT:  I do not think it was raised.  I think it

10   was only raised in the context of friends and family

11   litigation, and other litigation.

12         There is also this -- I am just talking about this --

13   he was on here.

14         MR. S. KULWIN:  I'm sorry, Judge, I can't --

15         MR. SHONKWILER:  The issue --

16         THE COURT:  Let me read it just real quickly.

17         (Brief pause.)

18         THE COURT:  Okay.  So, go ahead.  I have read it.

19         MR. SHONKWILER:  I recall that there was a limine

20   order barring testimony that people were satisfied or

21   unsatisfied, one way or another, except for the witnesses who

22   will be testifying that they actually own units and testifying

23   about whether they were disappointed by the changes.

24         MR. S. KULWIN:  No.

25         THE COURT:  I believe the prior limine was limited to

Petrus - direct

1    the issue that was brought before me -- which was the prior

2    litigation.  I do not remember a general -- I certainly said

3    that the unit owners could testify, but I do not remember a

4    limine more broad than that.

5           I could give you a chance to look and see.

6           And, then, was there another objection about this

7    particular -- or the relevance of this?

8           MR. NOVACK:  It's a different subject, but it's

9    arising out of this line of questioning; and, that is, this:

10   In the opening, Mr. Kulwin many times said that, "You'll see

11   that the Trump organization broke their promise, reneged on

12   the deal, didn't deliver what they said," blah, blah.

13          I think they're going to argue that that would be

14   okay, but I was going to ask you for a jury instruction that

15   as a matter of law, because you have held that as a matter of

16   law, they did not promise any particular common element.

17          THE COURT:  Okay.  Let us get back to --

18          MR. NOVACK:  But --

19          THE COURT:  -- the jury instructions later.

20          MR. NOVACK:  But I now -- no, I'm asking for that

21   instruction to be given now.

22          THE COURT:  I am not going to give that right now,

23   but we can take it up, if it is appropriate to give at a later

24   time.

25          MR. SHONKWILER:  There was one more objection that is

Petrus - direct

896

1    that there is hearsay in this e-mail.  This gentleman says, "I

2    received something."  It's an objective fact that, you know,

3    is false and disputed and it's hearsay.

4              MR. S. KULWIN:  It is going to state of mind, Judge.

5              MR. SHONKWILER:  That part of it isn't --

6              THE COURT:  Which we would get around -- well, that

7    would get around -- the hearsay.

8              What is the hotel rental program highlights?

9              MR. S. KULWIN:  The hotel rental -- that's the thing

10   we've been showing on the board.

11             THE COURT:  How does that --

12             MR. S. KULWIN:  It's Exhibit 75.

13             THE COURT:  Okay.  Okay.

14             MR. SHONKWILER:  I can --

15             MR. NOVACK:  Before we leave this issue, if they are

16   allowed to say that somebody was complaining, we should be

17   allowed to say that a-hundred-and-some people closed without

18   complaining.

19             THE COURT:  Right.

20             So, you would open -- certainly open -- up that door.

21             MR. S. KULWIN:  Well, wait a second, Judge.

22             MR. NOVACK:  We'd be happy to do that.

23             THE COURT:  At the 2007 time period.

24             MR. S. KULWIN:  No, no.

25             It wouldn't be opening up that door, Judge, because

Petrus - direct

897

 1    this is just going to show not that people were complaining,

 2    but that they knew that this was a possibility, that they --

 3    he is not complaining yet.  He is asking questions.  And if

 4    you look at --

 5            THE COURT:  Finish your train of thought.

 6            This is being shown to -- this is being used to show

 7    that they knew the possibility --

 8            MR. S. KULWIN:  Yes, the possibility.  And that if

 9    did this, this was going to be problematical for them and they

10    were aware of it.

11            And that's important in our case because that goes to

12    show, "You know, what?  We've got to do something here.  This

13    is a problem."

14            MR. SHONKWILER:  One final short thing.  Every e-mail

15    string relates to this first one, which this is the part this

16    gentleman says he received a letter signed by Mr. Trump and it

17    goes on to describe it.  That is disputed and it's an

18    objective statement of a fact that's not state of mind.  It is

19    hearsay.

20            MR. S. KULWIN:  I don't care if that part comes out.

21            THE COURT:  Okay.

22            So, let us take that part out.

23            MR. S. KULWIN:  Okay.

24            MR. SHONKWILER:  I'm just concerned the rest of the

25    string makes no sense without this gentleman's, you know,

Petrus - direct

1    in --

2              THE COURT:  I think you can say, "We have received a

3    letter --

4              MR. S. KULWIN:  Sure.

5              THE COURT:  -- and take out the, "signed by

6    Mr. Trump," since that is what is --

7              MR. S. KULWIN:  That's not a problem, Judge.

8              MR. SHONKWILER:  That part is also just false.  There

9    was no letter.  That's disputed.  This whole paragraph --

10             MR. S. KULWIN:  We're not suffering that for the

11   truth of the matter asserted.  We're offering it to go to the

12   state of mind.  There's an attached e-mail on --

13             THE COURT:  It can come in for state of mind.

14             Take out the reference to Mr. Trump.

15             MR. S. KULWIN:  Okay.

16             Thanks, Judge.

17             (Proceedings had in open court:)

18             MR. S. KULWIN:  Judge, I want to be a thousand

19   percent sure about something.  Can I just ask one question

20   over here.

21             THE COURT:  Why do you not show it --

22             MR. S. KULWIN:  It's not about this.  It's about

23   something that you said.  And I just want to be a hundred

24   percent sure.  I apologize.

25             (Proceedings had at sidebar:)

1      MR. S. KULWIN:  I just want to be a thousand percent

2  sure that we are not opening the door to 175 people closed by

3  showing this.

4      THE COURT:  I have to hear your questions.  I am not

5  sure.

6      You may be.  I have to hear your questions and his

7  answers to that.

8      It is a risk you take.

9      (Proceedings had in open court:)

10  BY MR. S. KULWIN:

11  Q.  Now, sir, on May --

12      (Brief pause.)

13  BY MR. S. KULWIN:

14  Q.  On May 1st, you wrote an e-mail -- May 1st, 2007, I

15  apologize, you wrote an e-mail -- about the impact the

16  proposed change of moving these things out of the condo

17  budget, into the commercial property that Mr. Trump owned,

18  that it would have on the revenue expenses at Trump Tower.

19      Do you recall that?

20  A.  You might have to refresh my memory on that.

21  Q.  I'm sorry?

22  A.  You might have to refresh my memory on the specific

23  document.

24  Q.  Okay.

25      MR. S. KULWIN:  Can we put up PX-11 in evidence,

Petrus - direct

1   please?  And just the first page for right now.

2          THE COURT:  Yes, that is in evidence and you may show

3   it.

4          MR. S. KULWIN:  Thank you, your Honor.

5          I'm sorry for not asking.  I apologize.  I was pretty

6   sure it was in evidence.

7   BY MR. S. KULWIN:

8   Q.  I'm showing you now what is Plaintiff's 11.  It's marked

9   as Plaintiff's Exhibit 11.  It's a memo from you to Jill

10  Cremer, Andrew Weiss, Donald Trump, Jr., Ivanka Trump, Tom

11  O'Callaghan, Mickael Damelincourt --

12         Am I pronouncing that right?

13  A.  Close enough.

14         MR. S. KULWIN:  I will give you the spelling later,

15  Joe.

16  BY MR. S. KULWIN:

17  Q.  It's, basically -- and it's subject:  "Updated Files,

18  Hotel Operations," et cetera.

19         Do you see that?

20  A.  Yes.

21  Q.  And you wrote this memo, correct -- this e-mail, correct?

22  A.  Yes, sir.

23  Q.  And it's attached to a whole bunch of backup documents,

24  correct?

25  A.  (No response.)

Petrus - direct

1    Q.  Right?

2    A.  I don't see that here, but --

3    Q.  Oh, I'm sorry.  You're right.  You don't see it there.  My

4    fault.  I'm not sure.  You tell me.

5              (Document tendered.)

6              (Brief pause.)

7    BY THE WITNESS:

8    A.  Yes, sir.  Uh-huh.  Yep.

9    BY MR. S. KULWIN:

10   Q.  Okay.

11        And you say, "Attached are the revised documents for

12   the fourth amendment.  Please let us know if you need any

13   additional information.  We have adjusted the banquet fee that

14   was originally estimated to be an expense to Trump of

15   approximately $5 million to an FB fee of 500,000.

16        "Despite this change, due to the overall reduction of

17   operating costs, the unit owners cam per unit is still less

18   than the amount in the third amendment.  We think this is a

19   positive and powerful story to tell," right?

20        Those are your words, right?

21   A.  Yes, sir.

22   Q.  All right.  Let's just break this down a little bit.

23        First of all, you say, "We have adjusted the banquet

24   fee that was originally estimated to be an expense to Trump of

25   $5 million."

Petrus - direct

1          You're referring to --

2          MR. S. KULWIN:  And if we can get Exhibit H up for a

3   second, from the third amended property report.

4          There you go.

5   BY MR. S. KULWIN:

6   Q.  -- you're referring in that e-mail to this number

7   (indicating)?

8          MR. S. KULWIN:  Can you highlight that, Mike?

9          Thank you.

10  BY MR. S. KULWIN:

11  Q.  You're referring to that number, correct (indicating)?

12  A.  That's correct.

13         MR. S. KULWIN:  And can you go to Exhibit H on 2007?

14  BY MR. S. KULWIN:

15  Q.  And you're saying that, "We've adjust- -- originally

16  estimated an expense to Trump to a food and beverage fee of

17  $500,000."

18         And you see that up there, correct?  That's what

19  you're referring to there, right?

20  A.  That's correct.

21  Q.  Okay.

22         And you say, "Despite the change," basically, the

23  common charges aren't going to change that much, right?

24  A.  That's correct.

25  Q.  And we've already looked at what it changed.  And it

Petrus - direct

903

1    changes about eight or nine hundred thousand dollars, right --

2    give or take?

3    A.   In the hypothetical.

4    Q.   Yeah.  Okay.

5         And, then, you say, "We think this is a positive and

6    powerful story to tell," right?

7    A.   (No response.)

8    Q.   Okay.

9         To whom?

10   A.   To whomever is reading this memo.

11   Q.   So, it was a positive and powerful story to tell to the

12   people within the Trump organization?

13   A.   That's correct.

14   Q.   Right.

15        Because you wanted to show what a good job you've

16   done, right?

17   A.   Well, we've done a very good job at making sure that the

18   estimates were reflective of that time.

19   Q.   Okay.  All right.

20        So, it wasn't a positive or powerful story to tell to

21   the buyers who had bought thinking they were getting the $5

22   million in revenue -- it wasn't a powerful and positive story

23   to tell to them -- right?

24   A.   No, that's not an accurate statement.

25   Q.   Okay.

Petrus - direct

1       Well, when Trump does -- in your experience, working

2   there, the Trump organization does -- something good for

3   potential customers or current customers, they promote it,

4   right?

5       That's their kind of modus operandi, true?

6   A.   Right.

7   Q.   And Mr. Trump, as we all know -- I think it's a fair

8   statement -- is he's particularly adept at that type of

9   promotion, correct?

10  A.   If you say so.

11  Q.   I'm sorry?

12  A.   If you say so.

13  Q.   Do you say so?

14  A.   Well, I'll let you be the judge of that.

15  Q.   Okay.

16      And promoting something that's a positive story to

17  tell for potential buyers would create a good marketing buzz,

18  right?

19      "Look at the great thing we just did.  Look at this

20  great benefit.  Buy some units," right?

21      That would help, right?  True?

22  A.   It would make logical sense; yes, sir.

23  Q.   Okay.

24      But the Trump organization did literally nothing to

25  tell anyone, outside of itself, this positive powerful story,

Petrus - direct

1    did it?

2    A.  Over what period of time?

3    Q.  Well, between the time you decided to do it on May -- that

4    you say you decided to do it, or from the time that the Trump

5    organization officially in writing did it -- May 1st, as of

6    this memo, 2007 -- until October 7 and thereafter?

7    A.  I don't recall what transpired between that memo and

8    October.

9    Q.  Okay.

10         Are you aware of any letter, announcement, mailing,

11   promotional event -- anything at all -- that promoted this

12   powerful story from May of 2007 to, I don't know, 2009, 2010,

13   whatever?  Anything at all -- aware of anything?

14   A.  I think we communicated, as we had a responsibility, the

15   information that was accurate.

16   Q.  And --

17   A.  I think accurate and representative of the time is a good

18   story.

19   Q.  And what you mean by that is you just put it in the fourth

20   amended report, right?

21   A.  Well, I think there was a communication that went out to

22   the owners announcing the information that was in the fourth

23   amendment.

24   Q.  Really?

25   A.  I think you just showed me -- I think you just showed us

Petrus - direct

 1   -- some of the information.

 2   Q.  Really?

 3           Was there any letter, outside of the fourth

 4   amendment, that proceeded or went with it, that told the

 5   owners, "Look inside.  There's a change.  It's really good for

 6   you"?

 7           Aware of anything like that?

 8   A.  I think the -- I think there's a process that's attached

 9   to communicating amendments.  And I think we followed that, as

10   is required.

11   Q.  Right.

12           So --

13   A.  I actually think we -- we -- followed it to a T.

14   Q.  That, then -- what you're saying -- is the way you

15   communicated this powerful story, is you sent them the fourth

16   amended property report?

17   A.  I'm not exactly sure the exact -- the precise --

18   communication.  But we did exactly what we were required to do

19   in updating the amendment.

20   Q.  But that's not my question.

21           My question was:  Are you aware of any document --

22   besides the actual fourth amendment that includes the

23   change -- that was sent to any current buyer at the time or

24   that -- or any potential buyer -- promoting this powerful

25   story that you wanted -- that you thought should be told?

```
 1              MR. SHONKWILER:  Objection.

 2              MR. S. KULWIN:  That's a simple question.

 3              MR. SHONKWILER:  Objection.

 4   BY THE WITNESS:

 5   A.  Yes.

 6              MR. SHONKWILER:  Asked and answered.

 7              THE COURT:  Overruled.

 8              You may answer if you can, sir.

 9   BY THE WITNESS:

10   A.  Again, I think the powerful story was for us internally,

11   knowing that expenses that were good estimates during that

12   period of time.  And I think the communication people -- and,

13   again, I'm going to use the word "think," because I was not

14   there, but I think the process that was engaged in all of the

15   amendments was consistent.  This wasn't something that was

16   done off scheme.

17              So, between amendment one and two, two and three,

18   three and four, I think the process of communicating and

19   disseminating the estimates at that time, I think that was all

20   done in a very consistent fashion.  There wasn't anything out

21   of the norm.

22   Q.  Mr. Petrus, that's an interesting speech, but that's not

23   my question.

24              MR. SHONKWILER:  Objection, your Honor, to the

25   commentary.
```

Petrus - direct

```
 1              THE COURT:  Sustained.
 2   BY MR. S. KULWIN:
 3   Q.  My question is:  Sir, from the time this decision was made
 4   internally, according to you on May 1st, 2007, until the
 5   time -- until 2008, 2009 or to the present -- did the Trump
 6   organization -- forget about consistency; I'm asking you, did
 7   the Trump organization -- write a letter, issue a press
 8   release, write a memo, send an e-mail, anything to promote --
 9   promote -- this powerful story?
10              That's the only question.
11              MR. SHONKWILER:  Objection to form and to relevance.
12   BY THE WITNESS:
13   A.  I think --
14              THE COURT:  Sustained on form.
15              Rephrase it.
16   BY MR. S. KULWIN:
17   Q.  Did the Trump organization issue anything, other than the
18   fourth amendment, in writing to buyers or potential buyers
19   telling this powerful story at any time, other than the fourth
20   amendment?
21              It's a simple question, sir:  "Yes" or "No"?
22   A.  I think there -- I think the answer is stated in the
23   information that's shared.  And if you look at the detail --
24   Q.  Mr. --
25   A.  -- it's --let me --
```

1              MR. S. KULWIN:  Judge, I move to strike it.

2     BY THE WITNESS:

3     A.  -- let me --

4              THE COURT:  Let me hear his answer.

5     BY THE WITNESS:

6     A.  Let me finish my statement.

7              If you look at the detail of what's disclosed, any

8     sensible buyer -- any unit owner that was investing this type

9     of money -- that picked up the document and read the detail of

10    the information that was shared in a forthright fashion,

11    there's no ambiguity here.  This is plain and simple.  These

12    are facts.  And this is information that was shared all above

13    board to all unit owners.

14             It doesn't take a lot of time and a lot of effort to

15    understand the information that was shared in that document.

16             MR. S. KULWIN:  I move to strike it, Judge.

17             THE COURT:  I am going to deny that.  I think you

18    need to follow up on --

19             MR. S. KULWIN:  Fine.

20             THE COURT:  -- the statement.

21    BY MR. S. KULWIN:

22    Q.  So, all above board, right?  All crystal clear, right?

23             That's what you're saying?

24    A.  If you read the --

25    Q.  Is that what you're saying?

Petrus - direct

910

1   A.  If you read the document and you read the detail of the

2   document --

3   Q.  Mr. Petrus --

4   A.  -- it's as good as the information that you are reading.

5   Q.  Mr. Petrus, you wrote an e-mail saying it was a powerful

6   story to tell, right?

7            Did you write that e-mail?

8            MR. SHONKWILER:  Asked and answered, Judge.

9            THE COURT:  Sustained.

10  BY MR. S. KULWIN:

11  Q.  And, sir -- okay, listen to my question, if you will.

12           And we're going to get to everything else you said.

13           My question, very simply, is -- let's start with a

14  letter.

15           Did the Trump organization send a letter with the

16  fourth amended report that said, "Big change.  Good news.

17  Take a look"?

18           Anything like that:  "Yes" or "No"?

19  A.  The facts are in --

20  Q.   "Yes" or "No," sir?

21           MR. SHONKWILER:  Objection.

22  BY THE WITNESS:

23  A.  This is not a "Yes" or "No" question.

24           THE COURT:  Wait, wait, wait.  There is an objection,

25  Mr. Petrus.

Petrus - direct

911

```
 1            MR. SHONKWILER:  Objection.  I am objecting that
 2    counsel is yelling at the witness.
 3            THE COURT:  I am going to sustain the form.
 4            Rephrase that question.
 5    BY MR. S. KULWIN:
 6    Q.  Did the Trump organization send a letter to the buyers --
 7    the prior buyers or to their sales agents, to anyone -- with
 8    the fourth amendment saying, "There's a major change.  It's
 9    good news.  Take a look"?
10            Did they?  Did they?  A letter?
11    A.  I don't believe, with all respect to you, that this is not
12    just a simple "Yes" or "No," because if you're looking --
13    Q.  Fine.
14    A.  -- if you're looking --
15    Q.  Let me ask a different question.
16    A.  Let me just finish here for just a second.
17    Q.  No.
18            MR. S. KULWIN:  Judge, I would ask --
19            THE COURT:  Let him finish.  You are trying --
20    BY THE WITNESS:
21    A.  If you are looking for --
22            THE COURT:  Wait, Mr. Petrus.
23            THE WITNESS:  Yes.  I'm sorry.
24            THE COURT:  You are asking him a question that he has
25    just said he cannot answer "Yes" or "No."
```

Petrus - direct

1            MR. S. KULWIN:  Fine.  I will ask a different

2    question.

3            THE COURT:  But let him finish that.

4            You may finish.

5            THE WITNESS:  Thank you very much.  I appreciate it.

6    BY THE WITNESS:

7    A.  I think the format that was followed was consistent with

8    how the information was communicated in the other amendments.

9            So, as revenues and expenses were updated in the

10   other amendments, the communication vehicle of -- that went

11   out to all unit owners, in a consistent fashion, was the same

12   format that was used between all of the amendments.

13           So, there wasn't anything that was done as something

14   that was malicious or --

15           MR. S. KULWIN:  Oh, Judge --

16   BY THE WITNESS:

17   A.  -- or --

18           MR. S. KULWIN:  -- I ask that you please ask him to

19   stop.

20           THE COURT:  I will strike the statement with respect

21   to maliciousness.

22           MR. S. KULWIN:  I move to strike the entire answer.

23   It's not even close to what I asked him.

24           THE WITNESS:  But the --

25           THE COURT:  I am going to deny that request.

Petrus - direct

913

1          I think your answer is done.

2          Ask another question.

3     BY MR. S. KULWIN:

4     Q.  On the first amendment, are you aware of anybody in the

5     internal -- in the Trump organization writing a memo saying,

6     "Wow, here's the first amendment.  We have a powerful story to

7     tell"?

8          Are you aware of that?

9     A.  (No response.)

10    Q.  Are you aware of that?

11    A.  I am not, but --

12    Q.  How about the second amendment?

13    A.  -- but the --

14    Q.  Wait.  Now I get to ask the question.

15         Are you aware of that with the second amendment --

16    writing anything about powerful stories to tell?

17         Are you aware of that?

18    A.  I'm not aware of that.

19    Q.  How about the third amendment?  Are you aware of any

20    internal e-mail from any executive saying, "This amendment

21    includes a powerful story to tell"?

22         Are you aware of it?

23    A.  I am not aware of that.

24    Q.  Okay.

25         Now, with the fourth amendment -- your powerful story

Petrus - direct

914

 1    to tell, sir -- now is the question.  Here it is.  Real

 2    simple.  Just tell me whether you can answer "Yes" or "No."

 3              Here's a "Yes" or "No" question.  Just tell me

 4    whether you can answer "Yes" or "No."

 5              THE COURT:  Mr. Kulwin --

 6              MR. SHONKWILER:  Objection to the commentary.

 7              THE COURT:  -- can you just slow down a little bit?

 8    BY MR. S. KULWIN:

 9    Q.  Sir, did the Trump organization write a letter or an

10    e-mail or a memo of any kind telling anybody, "We have a

11    powerful story to tell in the fourth amendment"?

12              Can you answer that "Yes" or "No"?  Can you answer

13    that "Yes" or "No"?

14    A.  This is -- I don't think it's a --

15    Q.  Can you answer it "Yes" or "No"?

16              THE COURT:  He is trying to tell you.

17    BY THE WITNESS:

18    A.  I don't think that this is a "Yes" or "No" answer.

19    BY MR. S. KULWIN:

20    Q.  Okay.  Good.

21    A.  Because --

22    Q.  Then I will ask a different question.

23    A.  -- the -- can I finish my statement?

24              MR. S. KULWIN:  Judge, I asked him to stop.

25              THE COURT:  No, that is good.  You cannot answer

```
 1   "Yes" or "No."

 2            Ask your next question.

 3            THE WITNESS:  Okay.

 4            THE COURT:  Mr. Kulwin --

 5            MR. S. KULWIN:  All right.  I will take a deep

 6   breath, Judge.  I'm sorry.

 7            THE COURT:  Thank you.

 8            MR. S. KULWIN:  You are welcome.  I apologize.

 9   BY MR. S. KULWIN:

10   Q.  Now, sir, you didn't work for the Trump organization when

11   the decision was made to include these facilities -- is that

12   correct -- in the common elements?

13   A.  That is correct; yes, sir.

14   Q.  And you have no idea what, if anything, Mr. Trump and Mr.

15   Reiss discussed about that; is that correct?

16   A.  That is correct.

17   Q.  And, in fact, you don't even know -- and you don't know --

18   what Mr. Trump was thinking about at the time, back in 2004;

19   isn't that correct?

20   A.  I cannot make that assumption.

21   Q.  Right.

22            Now, you say that you were discussing these things --

23   these removal of the facilities -- only after you got there in

24   '06.  That's when you started discussing with Trump people

25   about removing the facilities, right?
```

Petrus - direct

916

1    A.  That's correct.

2    Q.  Okay.

3         But the mere fact that you folks were discussing it

4    in 2006 doesn't mean in any way, shape or form, that a

5    decision hadn't been made long before you got there to never

6    deliver them; isn't that true?

7         MR. SHONKWILER:  Objection.  Calls for speculation.

8         THE COURT:  Sustained.

9    BY MR. S. KULWIN:

10   Q.  Let's put it this way:  You were also discussing with the

11   Trump organization principals at that time the decision to

12   remove the laundry facilities from the common elements; isn't

13   that right?

14   A.  I think there were discussions about laundry facilities,

15   if there were laundry facilities.

16   Q.  I think the question is:  You were discussing the removal

17   of the laundry facilities from the common elements?

18        MR. SHONKWILER:  Asked and answered.

19        THE COURT:  Overruled.

20        You may answer, if you can, sir.

21   BY THE WITNESS:

22   A.  I believe the answer is still the same, that there was a

23   discussion about laundry facilities, if laundry facilities

24   were applicable.

25   BY MR. S. KULWIN:

Petrus - direct

917

1   Q.  Sir, isn't it true that you can remember a discussion

2   about the laundry facilities, but you can't remember anything

3   else specifically about it?  Isn't that true?

4   A.  I don't remember the details, quite honestly.  I mean,

5   there's --

6   Q.  So, you don't know whether there was any discussion about

7   if laundry facilities were applicable.  All you remember is

8   there was a discussion, correct?

9   A.  I don't remember the details surrounding the laundry

10  facilities.

11  Q.  Including the details you just popped out with, about "if

12  applicable"?

13          You don't remember that being discussed, either,

14  right?

15  A.  No, no.  I just -- I said that there was a discussion

16  about laundry facilities --

17  Q.  Right?

18  A.  Right.

19          But I don't remember the detail around it.

20  Q.  Okay.

21          Now, at the time this was being discussed supposedly,

22  you were aware, were you not, that the laundry facilities had

23  never been part of the plan; is that right?

24          MR. SHONKWILER:  I object to the form.  This is

25  ambiguous.

Petrus - direct

918

```
 1              THE COURT:  Overruled.
 2   BY THE WITNESS:
 3   A.  I'm not sure if --
 4              THE COURT:  He may answer, if he understands.
 5   BY THE WITNESS:
 6   A.  I'm not sure if my recall, quite honestly, was that I knew
 7   whether or not at some point the laundry facility was in or
 8   out.  I can't say factually that I knew that.
 9   BY MR. S. KULWIN:
10   Q.  Really?
11              I thought that you knew that the defendants in this
12   case never had any plans for Trump Tower that included
13   commercial laundry facilities or any other such facilities to
14   handle wholesale laundry service for the property?
15   A.  I don't recall the detail around it, to be honest with
16   you.
17   Q.  Did you sign an affidavit in this case?
18   A.  I may have.
19   Q.  And was it dated April 25th, 2012?
20   A.  If you have that in front of you.
21   Q.  And did you declare under penalty of perjury under the
22   laws of the United States of America that it was true and
23   correct?
24   A.  What was the actual statement?
25   Q.  First, can you answer this:  Did you do that?
```

1  A.  Well, if you have that in your hand, then, obviously, I

2  did.

3  Q.  Okay.

4  A.  Yeah.

5  Q.  Did you make this statement:  To my knowledge Wabash,"

6  meaning the defendants here -- the Trump organization?

7  A.  Right.

8  Q.  " -- never had any plans for Trump Tower that included

9  commercial laundry facilities or any other such facilities to

10 handle wholesale laundry service for the property"?

11 A.  If that was the statement, then that's accurate.

12 Q.  Now, with respect to any discussions about removing all of

13 this stuff -- and if I've asked this already, I am sure I'll

14 be reminded, and I apologize if I have -- the actual

15 discussions about removing the facilities and all that, there

16 are no memos of those discussions; is that correct?

17         MR. SHONKWILER:  Objection to "facilities and all

18 that."

19         MR. S. KULWIN:  Okay.

20         THE COURT:  Sustained.

21 BY MR. S. KULWIN:

22 Q.  The actual discussions in which you participated in the

23 summer of 2006 and thereafter, that you say you participated

24 in about the decision to remove the laundry -- the ballrooms,

25 the banquet rooms, the conference rooms, the meeting rooms,

Petrus - direct

1    the $5 million of revenue associated with it -- there are no

2    written memos about any of those meetings, are there?

3              MR. SHONKWILER:  Your Honor, objection.  It

4    mischaracterizes evidence.

5              THE COURT:  Sustained on form.

6              Rephrase it.

7    BY MR. S. KULWIN:

8    Q.  Mr. Petrus, you were in discussions, if I understand it,

9    with others at the Trump organization about removing from the

10   common elements the banquet rooms, the meeting rooms, the

11   function rooms, the ballrooms and all the associated revenue;

12   is that true?

13   A.  That was an ongoing basis; that's correct, sir.

14   Q.  All during '06 and '07, right?

15   A.  For a long duration of time.

16   Q.  There are no memos of any of those discussions, are there?

17   A.  I think there were several verbal conversations that took

18   place with people within the organization.

19   Q.  There are no written memos of any of those conversations,

20   correct?

21   A.  Again, as I just stated, these were verbal conversations.

22   Q.  Is that another way of saying, "No, there are no written

23   memos"?

24   A.  If that's the way you interpret it.

25   Q.  Sure.

1    And there are no notes of any of those meetings; is

2    that correct --

3    A.  Um --

4    Q.  -- that you're aware of?

5    A.  Not that I'm aware of.

6    Q.  And there are no e-mails, other than the one we've just

7    seen -- this May 1, 2007, one -- documenting any of those

8    discussions; isn't that correct?

9    A.  That's correct.

10   Q.  Now, when you wrote this e-mail on May 1 of '07 -- okay --

11   this was now the plan, correct?

12          THE COURT:  Can you identify for the record, please

13   --

14          MR. S. KULWIN:  Sure.  I'm sorry, Judge.

15          THE COURT:  -- when you say, "This e-mail"?

16          Is that a letter?

17          MR. S. KULWIN:  Plaintiff's Exhibit 11.

18   BY MR. S. KULWIN:

19   Q.  This was now the plan Trump was proceeding on?

20   A.  When you say "the plan," what do you mean by that?

21   Q.  To add the $500,000 to F&B fee and remove the common

22   facilities?

23   A.  I think this was -- and, again, I apologize if I wasn't

24   clear earlier on this -- this was a process that took place.

25   Q.  Oh, I understand that.  My question is --

1  A.  There was -- no, but let me finish.

2  Q.  Let me ask you another question.

3  A.  Let me --

4  Q.  I can shorten it some.

5       My question is:  By May of 2007, everyone knew in the

6  Trump organization -- that's on this list (indicating) -- that

7  Trump was going forward with the $500,000 F&B fee?

8  A.  I don't think, being perfectly candid about this, that

9  this was a locked and baked at that time.

10 Q.  I'm sorry, wasn't a, what?

11 A.  It wasn't locked and it wasn't baked.  This was not --

12 Q.  Wasn't locked and baked?

13 A.  This was not a fait accompli, that this was solidified in

14 its final form in May.

15 Q.  Well, let me ask you this question.  That's interesting.

16      You say here in this e-mail, "We have" --  "Attached

17 are the revised documents for the fourth amendment."  Okay?

18      And, then, you say, "We have adjusted the banquet fee

19 that was originally estimated to be an expense," right?

20      "We have done it," right?

21      "Have," like it's done?

22 A.  No, no.

23 Q.  No?

24 A.  But --

25 Q.  Okay.  Let me show you another one.

Petrus - direct

923

```
 1              Let me show you what's marked as PX-12 in evidence.

 2              Now, by May 11th -- okay -- you were already drafting

 3    budgets for the fourth amendment that showed --

 4              MR. S. KULWIN:  One second, Judge, please?

 5              THE COURT:  Yes.

 6              (Brief pause.)

 7    BY MR. S. KULWIN:

 8    Q.  -- a $500,000 F&B fee replacing the common elements -- the

 9    $5 million from the common elements, right?

10              That's on May 11th, right?

11    A.  If you have that in your hand there.

12    Q.  Well, let me show it to you.  It's Plaintiff's Exhibit

13    12?

14              MR. S. KULWIN:  Mike, can you put up May -- can you

15    go to Page 3 -- I'm sorry, 3271.  My apologies.

16              MR. SHONKWILER:  Is this exhibit in evidence, your

17    Honor?

18              MR. S. KULWIN:  12 -- yes, Exhibit 12 -- is in

19    evidence.

20              THE COURT:  It is.

21    BY MR. S. KULWIN:

22    Q.  Do you see that up there, sir?

23    A.  Yes, sir.

24    Q.  And there it is.  There is the $500,000 F&B license,

25    right?
```

```
 1   A.  (No response.)

 2   Q.  It's right there?

 3   A.  Right.

 4   Q.  Okay.

 5           Now --

 6   A.  Can I just stop you for a second?

 7   Q.  No.  Mr. Petrus --

 8           MR. S. KULWIN:  Judge, could you instruct Mr. Petrus

 9   that Mr. Shonkwiler will have the opportunity to ask him

10   questions?

11           THE COURT:  Well, I think he knows that, but I am not

12   sure if he does not understand your question or --

13           MR. S. KULWIN:  I don't have a question yet.

14           THE COURT:  Okay.

15           Then ask another question.

16           And if you do not understand it, you can certainly

17   let him know.

18           THE WITNESS:  Thank you.

19           MR. S. KULWIN:  Can we have the first page, please?

20   BY MR. S. KULWIN:

21   Q.  The date on this is May 11th, 2007, correct?

22   A.  That's correct; yes, sir.

23   Q.  And the handwriting -- do you recognize the handwriting?

24   A.  The handwriting on the top?

25   Q.  Yeah.
```

1   A.  Do I recognize it?

2   Q.  Yeah.

3   A.  I don't recognize it.

4   Q.  But it says, "Fourth Amendment Budget," right?

5          Isn't that right?

6   A.  That's what it says; yes, sir.

7   Q.  And if you look at the bottom of the e-mail --

8          MR. S. KULWIN:  Go down to the bottom of the e-mail,

9   please.

10  BY MR. S. KULWIN:

11  Q.  You know who Andrew Weiss is, right?

12  A.  That's correct.

13  Q.  He was coordinating working with all of you on putting

14  together the fourth amendment, correct?

15  A.  That's correct.

16  Q.  And he writes at the bottom -- and he's got all these

17  comments --

18          MR. S. KULWIN:  Let's go back to the top.

19          I'm sorry, Mike.

20  BY MR. S. KULWIN:

21  Q.  He's got comments about everything:  Controller expense,

22  public area cleaning, et cetera, et cetera, et cetera.

23          He's got a comment to the hotel budget notes, about

24  the AC system -- all these little detailed comments.

25          Relatively minor things, correct?

Petrus - direct

1    A.  I'm not sure if you'd say that they were minor, but these

2    are -- this is a laundry list of comments that were made on

3    May 11th; yes, sir.

4    Q.  Right.

5            And, then, he says at the bottom, "That is all my

6    comments.  We are almost there," correct?

7    A.  That's what it says.

8    Q.  And he's saying, "We're almost finished."

9            What he's saying to you is, "We're almost finished

10   drafting the fourth amendment as we're going forward."

11           That's what he's saying there, isn't he?

12           MR. SHONKWILER:  Objection.  Calls for speculation.

13           THE COURT:  Overruled.

14           You may answer, based on your understanding, if you

15   can.

16   BY THE WITNESS:

17   A.  Well, I guess when you're asking the question "we're

18   almost there," what you're insinuating is that, is that in 30

19   seconds, 30 days, 30 months or 30 years?  And I'm not sure.

20   BY MR. S. KULWIN:

21   Q.  Okay.

22           Now, you did some of your own projections or your --

23   well, let me rephrase it.

24           Your staff, under your supervision -- if I understand

25   it correctly -- did some of your own projections about moving

1   forward, revenues and expenses of the food and beverage

2   operations; isn't that right?

3   A.  Did many different versions.

4   Q.  Okay.

5           And let me show you Plaintiff's Exhibit 13, not in

6   evidence, and I want to ask you whether these are some of the

7   versions that you did.

8           (Document tendered.)

9   BY THE WITNESS:

10  A.  Yes, they are.

11  BY MR. S. KULWIN:

12  Q.  Okay.

13          MR. S. KULWIN:  Judge, at this time we would move in

14  Plaintiff's Exhibit 13.

15          THE COURT:  I think you need --

16          MR. S. KULWIN:  More foundation?

17          THE COURT:  -- to lay a little more foundation --

18          MR. S. KULWIN:  Sure.

19          THE COURT:  -- about time period, et cetera.

20          MR. S. KULWIN:  Sure.

21          MR. SHONKWILER:  Judge, we also have a relevance

22  objection to this document that we discussed previously with

23  the Court.

24          THE COURT:  Okay.

25          Let us hear a little more foundation.

Petrus - direct

1   BY MR. S. KULWIN:

2   Q.  And, sir, these are -- were made in the ordinary course of

3   Trump organization's business, correct?

4   A.  "In the ordinary course" meaning --

5   Q.  Part of its regular business.

6   A.  Yes, of analysis, looking at things, evaluating.

7   Q.  Yeah.

8   A.  Yes, sir.

9   Q.  And the records, themselves, were maintained as part of

10  its business, correct?

11  A.  This was a document that was retained; yes, sir.

12  Q.  Right.

13      And the information that's on there was put on there

14  at or near the time you had the information, correct -- that

15  you received it or came up with it -- true?

16  A.  I'm not exactly sure.  This says --

17  Q.  No, no, not the actual date.  Listen to the question.

18      The information that you put on there was put on

19  there at or near the time you prepared the documents, right?

20      I know it's confusing, but it's a legal thing.

21  A.  Yeah, I'm not sure what -- what -- the documents are that

22  you're referring to.

23  Q.  The ones -- the projections -- that are in there.

24  A.  Yes.  This projection that is -- that says -- "12-17"?

25  Q.  Yeah.

Petrus - direct

929

```
 1              I'm just asking you:  Was the -- is the --
 2    information that's on the document placed there at or near the
 3    time you received the information?
 4    A.  I'm not certain of that.
 5    Q.  Okay.
 6              Was it just lying around somewhere and then you put
 7    it on there?
 8    A.  You know --
 9              MR. SHONKWILER:  Objection.  Argumentative.
10              THE COURT:  Sustained.
11    BY MR. S. KULWIN:
12    Q.  Well, let's put it this way:  Is it part of the company's
13    business to maintain these records?
14    A.  Part of the company's policy is to do analysis and to
15    retain information, absolutely.
16    Q.  And in 2000- -- is it safe to say that the information
17    that appears on these documents was put on there somewhere in
18    either 2006 or 2007?
19              A fair statement?
20    A.  Or 2008.
21    Q.  Well, the reason I ask, if you look -- before you say
22    2008 -- doesn't it include a projection for 2008?
23    A.  It does.
24    Q.  Okay.
25              MR. S. KULWIN:  Judge, I think that that's a
```

Petrus - direct

930

 1    sufficient foundation.

 2            MR. SHONKWILER:  Your Honor, this is not a budget for

 3    the hotel condominium.  It's a cash flow projection for years

 4    that are not at issue in this case -- beginning in 2008 and

 5    going forward -- relating to the hotel, not the hotel

 6    condominiums.

 7            THE COURT:  I think you need to clarify what exactly

 8    this pertains to:  The food and beverage in the hotel itself

 9    or in the hotel condominium.

10            MR. S. KULWIN:  I think there might be a

11    misapprehension, but I will.

12    BY MR. S. KULWIN:

13    Q.  Sir, this is a Cash Flow Income Statement For the hotel,

14    correct, that you're preparing here?

15            The first page there, 3282 -- is it 3282?

16    A.  That's correct.

17    Q.  Okay.

18            Is that the right number, "3282"?

19    A.  It's "3286."

20    Q.  3286?

21    A.  Right.

22    Q.  And included in that cash flow analysis for the hotel is

23    an analysis of food and beverage, revenue and expenses, as

24    well as parking facilities in there, correct?

25    A.  Yes.

Petrus - direct

1    Q.  And it projects out for 2008, 2009 and 2010; is that

2    correct?

3    A.  That is correct.

4            MR. S. KULWIN:  Judge, I would move it in.

5            MR. SHONKWILER:  The same objection.  The projections

6    that are irrelevant for various reasons.  But the time that it

7    is being projected is 2008 to 2010.

8            THE COURT:  Let us have a brief sidebar with the

9    document.

10           If I could borrow that document, sir?

11           THE WITNESS:  Yes.  Thank you.

12           (Document tendered.)

13           (Proceedings had at sidebar:)

14           THE COURT:  Okay.  I am hearing two different

15   objections.  And I do not have a good enough understanding of

16   where you are going with this.

17           So, tell me what your objections are, please.

18           MR. SHONKWILER:  Our objections are the limine order

19   about -- well, there are no damages claims.  We've established

20   that based on the theory that the plaintiff would close and

21   that there would be --

22           MR. S. KULWIN:  I am sorry, I'm having trouble

23   hearing him.

24           MR. SHONKWILER:  There are no damages claims to which

25   these could possibly be relevant, first of all.

 1              And I think their argument --

 2              THE COURT:  That is true.

 3              MR. S. KULWIN:  And we are not offering it for that

 4    purpose.

 5              MR. SHONKWILER:  And your argument, I think, is these

 6    show a state of mind in the sense that they show what people

 7    at the Trump organization were projecting at a certain time

 8    period.  But it has not been established for what year, unless

 9    I missed something.

10              MR. S. KULWIN:  I'm going to be able to establish --

11              MR. SHONKWILER:  I'm sorry, what year this document

12    was prepared in.  And it's dated 12-17 without a year.

13              MR. S. KULWIN:  First of all --

14              MR. SHONKWILER:  And, third, the numbers that are

15    being projected are numbers for the operation of the hotel.

16    And there's been no connection whether these affect the budget

17    for the --

18              THE COURT:  Let us start with the last objection.

19              How is this related to the hotel condominium units?

20              MR. S. KULWIN:  Okay, because, Judge, you see the

21    highlighted part --

22              THE COURT:  Yes.

23              MR. S. KULWIN:  -- food and beverage -- that's what's

24    moving from the hotel condominium association's budget.

25    That's the thing that's moving from the budget to Trump -- the

Petrus - direct

933

1    thing.

2          These are projections for that thing going forward.

3          THE COURT:  Well, I am not sure he said that.

4          MR. S. KULWIN:  Well, yeah.

5          MR. SHONKWILER:  And he won't say it.  It's not true.

6          THE COURT:  I did not hear that he said that this

7    food and beverage projection on Plaintiff's Exhibit 13 is a

8    projection based on what is moving out of the HCU units.

9          MR. S. KULWIN:  It includes what's moving out of the

10   HCU units.

11         And if you look at this number right here

12   (indicating), Judge -- wait.

13         Can I borrow it for a second because I don't want to

14   lean over you.

15         You see this number right here (indicating) -- the

16   994,650?

17         I am sorry, Judge.

18         THE COURT:  For parking?  Yes.

19         MR. S. KULWIN:  That's the exact number that's on the

20   hotel condo budget -- the very precise number.

21         What they're doing with this document is they are

22   looking at their overall projection that they think, "How are

23   we going to do on this -- on these facilities -- on all of the

24   facilities, including the F&B?"

25         And this --

Petrus - direct

```
 1          THE COURT:  If they are moved out of the hotel

 2    condominium unit?  Because that is the only way it is

 3    relevant.

 4          MR. S. KULWIN:  Yes.

 5          THE COURT:  And I have not heard him say that.

 6          Certainly, with respect to the food and beverage.  I

 7    think you are going to have to lay a little more foundation to

 8    establish relevancy that this projection is based on what they

 9    anticipate pulling out of the HCUs.

10          MR. S. KULWIN:  Go ahead, Jeff.

11          MR. J. KULWIN:  There was nothing left for the HCUs

12    for food and beverage.  That was it.

13          MR. NOVACK:  Yeah, but there's more in the food and

14    beverage than was moved out.

15          MR. S. KULWIN:  But that goes to weight.

16          MR. NOVACK:  This has got in room service, mini bar.

17    That never was --

18          MR. S. KULWIN:  That goes to weight, not --

19          MR. SHONKWILER:  Sorry.

20          THE COURT:  Okay.

21          MR. SHONKWILER; there's four people talking.

22          THE COURT:  Go ahead.

23          MR. SHONKWILER:  Okay.  There is no evidence that the

24    food and beverage dollars and expenses, dollar for dollar, a

25    hundred percent, were ever in any budget prepared for this
```

Petrus - direct

1    building.  No evidence.

2         MR. S. KULWIN:  But, Judge --

3         THE COURT:  I think you need to lay a little more

4    foundation that --

5         MR. S. KULWIN:  It includes it?

6         THE COURT:  -- that Plaintiff's Exhibit 13 includes

7    numbers pulled out from what was anticipated in the HCUs.

8         I have not heard that.

9         MR. S. KULWIN:  Okay.

10        THE COURT:  I understand, Mr. Novack, your point and

11   Mr. Shonkwiler's point that it may include more.  And you are

12   free to cross on that.  But I have not heard that it includes

13   what they anticipated being in the condo units.

14        MR. S. KULWIN:  Okay.  That's fair, Judge.

15        MR. NOVACK:  Excuse me.

16        I hope I'm not overstepping, but if it does include

17   more, then the numbers don't mean a thing.  Because if there's

18   -- if this 50 percent never was in before, then the hundred

19   percent number is irrelevant.

20        MR. SHONKWILER:  To state of mind, which is the

21   issue.

22        THE COURT:  Well, that is an argument for the jury.

23        I understand your argument.  It might very well be

24   true.  But to the extent they include the HCUs -- I agree, if

25   it is a very small amount overall, that you have a much bigger

Petrus - direct

1     hill arguing that with the jury.

2            But I still have not heard any connection.

3            MR. S. KULWIN:  Sure.

4            And when I'm done with this, Judge, I'm done -- I'm

5     pretty sure.

6            (Proceedings had in open court:)

7            MR. S. KULWIN:  Sorry, I misspoke.  I might have one

8     other or two other small points, but let's do this first.

9     BY MR. S. KULWIN:

10    Q.  Sir, we've already established that this is a cash flow

11    for the hotel operations looking forward.

12           Within those numbers that appear on that document are

13    amounts that would have been generated by the banquet rooms,

14    the meeting rooms, the function rooms and the related food and

15    beverage for those rooms?

16           Are those included in those amounts?

17    A.  One --

18           THE COURT:  I am sorry, I think you need to rephrase

19    that, to make sure the witness understands that you are

20    talking about banquet rooms, meeting rooms, from the HCUs --

21           MR. S. KULWIN:  Right.

22           THE COURT:  -- as opposed to otherwise.

23           MR. S. KULWIN:  Okay.

24           I don't -- I don't -- think there are any, but I

25    will.

1    BY MR. S. KULWIN:

2    Q.  Sir, let me lay some foundation.

3           In the Trump hotel, there were banquet rooms, meeting

4    rooms, function rooms, executive lounge and revenue that those

5    facilities generated, correct, in the Trump hotel?

6    A.  That would be included, yes.

7    Q.  Right.

8           And this document that you are doing this analysis on

9    includes those potential revenues, correct?

10   A.  Possibly, yes.

11   Q.  What's not accurate?

12   A.  Well, this is -- this, again, is -- an estimate.  And I'm

13   looking at this and here's an example.

14          Let me just finish my statement.

15          It has on here "Restaurant Lease."

16          I'm sorry to belabor you with this.

17   Q.  No, no.  My back --

18   A.  And it's part of the food and beverage operation.

19          We ended up not doing a restaurant lease.  So, this

20   is something that was evolving over time.  And this is a

21   snapshot of a scenario.

22   Q.  I understand.

23   A.  And it is nothing more than that.

24   Q.  I understand that, Mr. Petrus.

25          But my question is -- what's important and

1    significant here -- is -- all I'm asking is put aside that

2    it's a projection.  Got it.  Put aside it's a snapshot.  Got

3    it.  Put aside it's not written in stone.  Got it.

4            The question is:  Do those projections include the

5    revenue that was going to be generated by the banquet rooms,

6    the meeting rooms, the function rooms, the executive lounge

7    that was formally in the common elements?  That's the

8    question.

9    A.  And the answer on that is that the revenues here that are

10   under "banquets" -- all right -- would include all revenues.

11           Now, who owns it --

12   Q.  I'm sorry?

13   A.  Who owns it --

14   Q.  No, that's not --

15   A.  -- who manages it, that's a whole separate conversation.

16   Q.  We are not talking about that.

17   A.  Thank you.

18           MR. S. KULWIN:  Am I okay now, Judge, to move it in?

19           THE COURT:  Yes, you can move it in.

20           MR. S. KULWIN:  I will move it.

21           Thank you, Judge.

22           THE COURT:  And I will admit it.

23           (Plaintiff's Exhibit No. 13 received in evidence.)

24   BY MR. S. KULWIN:

25   Q.  Now, let's talk about the timing and, the date of this.

Petrus - direct

939

```
 1          MR. S. KULWIN:  And I want to move this (indicating)
 2   temporarily.
 3          Now, if you could put up, Mike, Plaintiff's Exhibit
 4   13, 3286.
 5          Maybe you could blow up the very top of it -- way up
 6   at the top -- where it says, "Cash Flow Projection 12-17"?
 7          Do you see that?  The very top, yeah.  Can you blow
 8   that up a little bit?
 9          Can you get it any bigger?
10          There you go.  Okay.
11   BY MR. S. KULWIN:
12   Q.  Now, it says, "12-17."
13          We can read, can't we, that's December 17th, correct?
14   A.  Yes, sir.  Right.
15   Q.  The issue is what year is it, right?  That's the issue
16   because it doesn't have a year on it, correct?
17   A.  Right.
18   Q.  Okay.
19          It's projecting for 2008, 2009 and 2010.
20          So, we at least know, in all likelihood, that it's,
21   at the latest 2008, but it could be -- and the earliest it
22   could be -- is 2006, because you didn't get there until June
23   of 2006, right?
24          MR. SHONKWILER:  Object to form.
25          THE COURT:  Sustained on form.
```

Petrus - direct

940

1           MR. SHONKWILER:  And "in all likelihood."

2    BY MR. S. KULWIN:

3    Q.  Can we agree this document, it's -- the earliest iteration

4    -- the earliest it could have been prepared -- is December of

5    2006, because you weren't even there until June of '06, right?

6    A.  That's a safe assumption; yes, sir.

7    Q.  Okay.

8           And the latest that it could be, really, would be

9    December of 2007 because there's no point in doing a

10   projection for 2008 on December 17th, 2008, correct?

11   A.  Not to be argumentative, but it is possible that this

12   could be actuals for 2008 and projections for 2009 and '10, or

13   it could be 2008 actuals, 2009 actuals and projections for --

14   I'm not sure by looking at --

15   Q.  Well, it doesn't --

16   A.  -- the document, as it's stated -- and it's my fault.  I

17   don't recall exactly the year that this was produced.

18   Q.  I understand.

19          But it really couldn't be actuals, though, because it

20   says "Cash Flow Projection" --

21   A.  Yeah, but --

22   Q.  Let me finish.  Projections.

23          -- and nowhere does it say "actual."  So, these are

24   projections, right?

25   A.  It's -- it's not -- it's not -- bulletproof.

Petrus - direct

1   Q.  Nothing -- I mean, in the greater scheme of things,

2   anything can happen in the world.  The sun could fall out of

3   sky tomorrow.

4   A.  Yeah.

5   Q.  But, basically, my question is that given that the

6   document is dated "Cash Flow Projection," it's a pretty 99

7   percent safe bet that you are not doing cash flow projections

8   for 2008 on December 17th, 2008?

9   A.  No.  And I'm not trying to be difficult with you on this.

10  But I also can't tell you that -- there could have been a flaw

11  where maybe 2008 was actual and it's missing the -- I

12  understand what you are trying to say here, but I'm not going

13  to agree to it because in looking at the document, in all

14  honesty, I can't tell you "Yes" or "No."

15  Q.  Okay.

16  A.  That's all.

17  Q.  Try this on for size, sir.  I know in all honesty you

18  can't tell me "Yes" or "No," but try this on for size.

19          The word "projection" means looking forward, right?

20  A.  Uh-huh.

21  Q.  Is that a "Yes"?

22  A.  Yes, sir.

23  Q.  Okay.

24  A.  Yes, sir.

25  Q.  And the Trump organization -- I mean, they got some pretty

Petrus - direct

942

1   sharp people over there, don't they?

2          Is that "Yes"?

3   A.  I would hope that would be a "Yes."

4   Q.  Yeah.

5          And the people working -- and you're a pretty sharp

6   guy, right?

7   A.  I guess it all depends on who you speak with.

8   Q.  Well, you're a sharp guy?

9   A.  I would have to say so.

10  Q.  And you're the COO of a Trump Hotel Collection?

11  A.  Yes, sir.

12  Q.  You can't get there by being a knucklehead.  You are a

13  sharp?

14  A.  Right.  Okay.

15         MR. SHONKWILER:  Sorry, I can't hear the question.

16         MR. S. KULWIN:  He answered.

17         THE COURT:  Why do you not repeat it?

18         MR. S. KULWIN:  Okay.

19  BY MR. S. KULWIN:

20  Q.  You can't get there by being a knucklehead.  You are a

21  pretty sharp guy?

22         MR. SHONKWILER:  Objection.

23         THE COURT:  Sustained.

24  BY MR. S. KULWIN:

25  Q.  You can get there by being a knucklehead?

Petrus - direct

943

1              (Laughter.)

2    BY THE WITNESS:

3    A.   Whatever.

4    BY MR. KULWIN:

5    Q.   Whatever.  Here we go.  I'm sorry.

6    A.   Okay.

7    Q.   But, in any event -- in any event -- the people you had

8    working under you, you made sure were pretty sharp people,

9    too, right?

10   A.   Yes, sir.

11   Q.   And careful?

12   A.   Yes, sir.

13   Q.   And accurate?

14   A.   Yes, sir.

15   Q.   Okay.

16              So, when they write "projection," they mean

17   projection -- 99 percent sure?

18   A.   Yes.  And --

19   Q.   I'm just asking you 99 percent.  When they write

20   "projection," don't they mean projection?

21   A.   That one would assume that; yes, sir.

22              THE COURT REPORTER:  I am sorry?

23              THE WITNESS:  "That one would assume that; yes, sir,"

24   was my comment.

25   BY MR. S. KULWIN:

1    Q.  And, again, not going all the way back, it wouldn't make

2    any sense to do a projection for 2008 on December 17th of

3    2008?  Would you agree with that?

4            MR. SHONKWILER:  Asked and answered.

5            THE COURT:  Sustained.

6    BY MR. S. KULWIN:

7    Q.  You can't answer now.  Not allowed to answer.

8            THE COURT:  I sustained.

9            So, ask another question, please.

10           THE WITNESS:  Go ahead.

11   BY MR. S. KULWIN:

12   Q.  Now, sir, so let's go on.

13           So, let's try to see if we can narrow it even

14   further.

15           These documents, you were doing the amendments for --

16   you were doing the drafts of the fourth amended complaint --

17   the fourth amended property report -- in 2006 and 2007,

18   correct?

19   A.  This was a work in progress.

20   Q.  But it had to be finished before October, 2007, right?

21   That's when it got filed.

22   A.  Is that when they filed it?

23   Q.  Yeah.

24   A.  Okay.

25   Q.  And if you look here (indicating), these documents are

1    attached to a draft of the fourth amended property report,

2    correct?

3    A.  Is this a draft?

4          MR. SHONKWILER:  Sorry?

5          THE COURT:  "Is this a draft" was the question.

6    BY MR. S. KULWIN:

7    Q.  You have to answer me.

8          Do you think it's a draft?  It's got handwriting all

9    over it.

10   A.  It's got -- again, I think what this states is that this

11   is a -- this is in May, right?  This is a work in progress

12   because there's markups on a document.

13   Q.  Okay.

14   A.  I mean --

15         MR. SHONKWILER:  I don't know what document the

16   witness is referring to.

17         What exhibit is this?

18         THE WITNESS:  This is 3308.

19         MR. S. KULWIN:  All of it's in.  I moved it in.  It's

20   in.  That's what he's referring to.

21         MR. NOVACK:  Judge, could you wait one second?

22         THE COURT:  Yes.

23         (Brief pause.)

24         MR. S. KULWIN:  If you'd like, Judge, I can go to a

25   different topic; and, then, over the break they can look at it

Petrus - direct

946

1    all they want and come back, because --

2              THE COURT:  I thought this was your last topic,

3    because that is what you said.

4              MR. S. KULWIN:  I know.  I kind of amended that.  I'm

5    sorry if you didn't hear it.  I had a couple of other minor

6    points I wanted to go over.

7              Do you want to do that, Judge?

8              THE COURT:  Just one moment.  Let us see.

9              (Brief pause.)

10             THE COURT:  Is there an objection?

11             MR. NOVACK:  We think there was a question -- we're

12   having trouble hearing from over there.  We think there was a

13   question about whether one document was attached to an e-mail

14   that was another exhibit.  And we don't know what exhibits

15   they are referring to.  But we don't see anything like that in

16   our --

17             MR. S. KULWIN:  No, there wasn't any question like

18   that.

19             Judge, I can clarify it for him, if you want?

20             THE COURT:  Are you asking what Plaintiff's 13 is

21   comprised of?  And you thought it was just the projections?

22             MR. NOVACK:  Yes, your Honor.  He --

23             THE COURT:  Okay.  Let us break for lunch.

24             We will pick up at 20 to 2:00, please.  So, 1:40.

25             (Jury out.)

1          THE COURT:  You may step down, sir.

2          THE WITNESS:  Thank you.

3          THE COURT:  Here is Plaintiff's 13 that I have up

4    here.  Take a look at it and come back a little before 20

5    till; and, if you cannot resolve it --

6          MR. S. KULWIN:  Okay.

7          THE COURT:  -- I will.

8          (Whereupon, an adjournment was taken at 12:28 o'clock

9     until 1:40 o'clock p.m., of the same afternoon.)

10                    *   *   *   *   *

11   I certify that the foregoing is a correct transcript from the
     record of proceedings in the above-entitled matter.
12

13
     /s/ Joseph Rickhoff                    May 16, 2013
14   Official Court Reporter

15

16

17

18

19

20

21

22

23

24

25

```
 1                  IN THE UNITED STATES DISTRICT COURT
                       NORTHERN DISTRICT OF ILLINOIS
 2                            EASTERN DIVISION

 3   JACQUELINE GOLDBERG,              )  Docket No. 09 C 6455
                                       )
 4                       Plaintiff,    )
                                       )
 5             vs.                     )
                                       )
 6   401 NORTH WABASH VENTURE, LLC,    )
     a Delaware Limited Liability      )
 7   Company, et al.,                  )  Chicago, Illinois
                                       )  May 16, 2013
 8                       Defendants.)     1:40 o'clock p.m.

 9                  TRANSCRIPT OF TRIAL PROCEEDINGS
            BEFORE THE HONORABLE AMY J. ST. EVE, AND A JURY
10
     APPEARANCES:
11
     For the Plaintiff:         KULWIN, MASCIOPINTO & KULWIN, LLP
12                              BY:  MR. SHELLY B. KULWIN
                                     MR. JEFFREY R. KULWIN
13                              161 North Clark Street, Suite 2500
                                Chicago, Illinois  60601
14
     For the Defendants:        NOVACK AND MACEY, LLP
15                              BY:  MR. STEPHEN NOVACK
                                     MR. JOHN F. SHONKWILER
16                              100 N. Riverside Plaza, Suite 1500
                                Chicago, Illinois  60606
17
     Also Present:             MS. ALEXIS ROBINSON
18
     Court Reporter:           Nancy C. LaBella
19                             Mary M. Hacker
                               Official Court Reporters
20                             219 S. Dearborn St.
                               Chicago, Illinois  60604
21                             (312) 435-6890
                               (312) 435-5564
22

23            *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *

24                     PROCEEDINGS RECORDED BY
                       MECHANICAL STENOGRAPHY
25                 TRANSCRIPT PRODUCED BY COMPUTER
```

1    (Proceedings out of the hearing of the jury:)

2         THE COURT:  So you could not work out Plaintiff's 13?

3         MR. S. KULWIN:  I don't know, Judge.  They took it

4    and they said they didn't --

5         THE COURT:  What is the issue?

6         MR. NOVACK:  Judge, the issue is that -- it sort of

7    starts from this -- when Mr. Kulwin approaches the witness and

8    stands next to him like that, we don't know what is being

9    looked at.  We can't hear what's being discussed.

10        What we thought we heard was that the witness had

11   before him PX 12, which was the May 1 -- May 11, '07, e-mail

12   from Andy Weiss, and PX 13, which was that group of financial

13   projections, that we thought we heard the witness say or

14   Mr. Kulwin ask -- it was hard to tell -- that the two were

15   attached together.  And somebody said, oh, then that must be X

16   because they're attached.

17        MR. S. KULWIN:  Hold on.  Can we ask Mr. Petrus to

18   step out?

19        THE COURT:  Mr. Petrus, would you mind just stepping

20   outside the door, please, sir.

21        Thank you.

22   (Witness temporarily excused.)

23        THE COURT:  So is the question, what is Plaintiff's

24   Exhibit 13 beyond those two projection pages?

25        MR. S. KULWIN:  I think that's the question.

1          THE COURT:  Okay.  I thought Plaintiff's 13 was just

2   those two projection pages, based on the examination.

3          MR. S. KULWIN:  That's fine.  I thought he identified

4   all of them.  I don't really care.

5          THE COURT:  I believe he only identified the first

6   two, and you only asked him about the first two pages.  Those

7   first two pages are admitted.  If you want to go further, you

8   are going to have to lay more of a foundation.

9          MR. S. KULWIN:  Okay.  It's fine, Judge.  I thought

10  he said it, but I apologize.

11         MR. NOVACK:  But my additional point was that it

12  sounded like he was saying or being asked to confirm that

13  Exhibit 13, at least those two pages, were attached somehow to

14  PX 12.  And they were separate documents.

15         THE COURT:  I did not get that.  What I got was he

16  was being asked about additional documents behind the first

17  two pages and that those were not identified as part of

18  Plaintiff's 13.  But why don't you clarify -- when he comes

19  back in -- with him that Plaintiff's 13 consists of those two

20  pages.

21         MR. S. KULWIN:  That's fine.

22         MR. NOVACK:  And also I thought there was a reference

23  to May of '07, which didn't make sense to me since this

24  document was a December document.  But I thought the witness

25  said or Mr. Kulwin said -- and I can't tell who it was --

951

1    something about May of '07.

2           THE COURT:  You can clear that up on cross if you

3    want.  I do not recall that being an issue.  But the two

4    pages, if you would, clear that up.

5           MR. NOVACK:  But could we have some guidance as to

6    how to avoid this from happening in the future so that we know

7    what's being handed back and forth?

8           THE COURT:  If you do not know -- all of these

9    exhibits should have been exchanged in advance.  If you do not

10   know something, just ask, and just say what exactly is being

11   handed.

12          MR. S. KULWIN:  That's my confusion, Judge.  These

13   were all --

14          MR. NOVACK:  No.  We have the exhibits.  But we

15   couldn't tell if he was doing 12 or 13.  He had both of them

16   in front of him.

17          THE COURT:  Okay.  Plaintiff's 12 was already in

18   evidence, and he did ask questions about that.  Plaintiff's 13

19   I understood to be just those two pages.  You did not lay a

20   foundation for anything else, so clarify that.

21          MR. S. KULWIN:  Not a problem, Judge.

22          THE COURT:  Would you ask Mr. Petrus to come back,

23   please, and would you bring in the jury, please.

24          Mr. Kulwin, do you want this exhibit back or do you

25   want me to give it to Mr. Petrus?

Petrus - direct

1          MR. S. KULWIN:  For purposes -- so he can clarify it,

2     would you mind giving it to Mr. Petrus so that the jury is not

3     confused either.

4       (Jury in.)

5               THE COURT:  You may be seated.

6               Mr. Kulwin, go ahead, please.

7          MR. S. KULWIN:  Thank you very much.

8       JAMES KEITH PETRUS, PLAINTIFF'S WITNESS, PREVIOUSLY SWORN

9                    DIRECT EXAMINATION (Resumed)

10    BY MR. S. KULWIN:

11    Q.  Mr. Petrus, I want to be clear.  PX 13 -- I have given you

12    a folder.  It's the first two pages that you identified as

13    pages that you recognize; is that correct?

14    A.  Let me take a look.

15          The first two pages?

16    Q.  Well, why don't you just tell us what pages you know that

17    your people prepared, you or your people.

18      (Brief pause.)

19    BY THE WITNESS:

20    A.  I apologize for the delay.  I'm just --

21      (Brief pause.)

22    BY THE WITNESS:

23    A.  Yes, I think this set of documents here, Exhibit PX 13,

24    these are documents that were shared with me at some point in

25    time.

Petrus - direct

1   BY MR. S. KULWIN:

2   Q.  Okay.  So they were all prepared by your staff or part of

3   the documents that are there?

4   A.  Not necessarily my staff.  There were other people that

5   were involved.  But these were pieces of information that

6   flowed through the organization at some point.

7               MR. S. KULWIN:  Does that clarify it, Judge?

8               THE COURT:  Is there any objection based on that?

9               MR. SHONKWILER:  Only two.  The first being, I want

10  to preserve for the record that we objected on relevance

11  grounds to the first two pages.  And I appreciate --

12              THE COURT:  That's already been addressed at sidebar.

13              MR. SHONKWILER:  -- your Honor overruled that.

14              The second is, to the extent this is being admitted

15  as separate documents in a group exhibit, we don't object.

16  But there's no foundation that the documents have any

17  relationship to one another or were ever attached to the

18  original.

19              THE COURT:  But that is argument.  It is admitted.

20              MR. S. KULWIN:  Thanks.

21  BY MR. S. KULWIN:

22  Q.  I don't want to spend a tremendous amount of time -- can

23  you just give me 32 -- can I borrow this?

24  A.  Sure.

25              MR. S. KULWIN:  Can you give me 3286, Mike, and can

Petrus - direct

954

1   you blow up --

2              THE COURT:  Is this part of Plaintiff's 13?

3              MR. S. KULWIN:  I apologize.  Yes, this is part of

4   Plaintiff's 13, defendant's Bates Stamp 3286.

5              And can you blow up here where it says food and

6   beverage and put some highlighting there.

7              There you go.  Can you blow up the middle section.

8   There you go.

9              Just make it a little bit bigger from here up.

10  BY MR. S. KULWIN:

11  Q.  Okay.  Now, sir, under food and beverage, you've got

12  listed banquets, room service, lounge and mini bar, right?

13  A.  That's correct.

14  Q.  The bulk of it -- the bulk of this revenue is the

15  banquets, correct?

16  A.  In this scenario, yes, it is.

17  Q.  Yes.  And the banquets would include the rooms that we've

18  been talking about, banquet rooms, meeting rooms, function

19  rooms and the related revenue thereto, correct?

20  A.  Including all of the food and beverage revenues that are

21  generated out of those rooms.

22  Q.  Right.

23  A.  Right.  Not necessarily the commissions.

24  Q.  Right.  It includes all that, right.  Okay.

25              Now, for 2008, at least this projection says it's

Petrus - direct

1   projected at six and a half million dollars, correct?

2   A.  That's correct, yes, sir.

3   Q.  And the overall food service is projected at --

4          MR. S. KULWIN:  Maybe you can highlight that bottom

5   number, Mike, where it says totals -- it's a little not so

6   great but --

7   BY MR. S. KULWIN:

8   Q.  And that on my hard copy -- and I'm more than happy to

9   show it to you -- is 8,761,051.  Can you read that?

10  A.  I can, yes, sir.

11  Q.  And is that accurate?

12  A.  Well, that's the estimate.

13  Q.  Right.  The estimate?

14  A.  Of those areas.  And in this scenario, it excludes the

15  restaurants.

16  Q.  Right.  Excluding restaurants.  And then you move on to

17  the next year, '09.

18         MR. S. KULWIN:  If you can highlight '09, Mike, both

19  numbers, the top and the bottom.

20  BY MR. S. KULWIN:

21  Q.  And you projected for banquets 7,475,000 and total for the

22  food and beverage 10,532,000, right?

23  A.  That's correct, yes, sir.

24  Q.  And then for '10, you're projecting 8,222,500; and total

25  for the food and beverage all told, 11,953,610, correct?

Petrus - direct

956

1    A.  That's what's indicated, yes, sir.

2    Q.  And there is no restaurants in this scenario, correct?

3    A.  In this scenario, there aren't restaurants included.

4    Q.  So if I may -- I think what I'm going to do is I just want

5    to write these numbers up here, real quick.

6            Do you have a pen, Mr. Petrus?

7    A.  I think you have a red pen right there.

8    Q.  Thank you.

9            MR. S. KULWIN:  Your Honor, can you inquire if the

10   jury can see everything?

11           THE COURT:  Can everybody see that okay?

12           No.  You need to turn it a little bit more.

13           There you go.

14           MR. S. KULWIN:  Better?

15           THE COURT:  Can you see it now?

16   BY THE WITNESS:

17   A.  I'm good.

18   BY MR. S. KULWIN:

19   Q.  You're good?

20   A.  Yes.

21   Q.  Okay.  Everybody is good.

22           So what we have is -- so what we have is -- and I'm

23   just going with the total for right now, not just the

24   banquets.  What we have is for the F and B -- I'm sorry.

25           What we've got here is '08, '09 and '10.  And we've

Petrus - direct

 1    got the projection, the F and B revenue is 8,761,051.  That's

 2    a bit tight.  For '09, you've got it at 10,532,310.

 3    10,532,310.  And then for '10, 2010, you've got the revenue

 4    for the food and beverage 11,953,610.  Correct?

 5            That's what is projected in this scenario, not

 6    including any restaurants but including banquet facilities?

 7    That's what it says on here, correct?

 8    A.  No, the banquets is included in that number.

 9    Q.  Yeah, right, banquets is included in there?

10    A.  That's correct.

11    Q.  And within these numbers for '08 -- and I'll write it down

12    in a different color.

13            MR. S. KULWIN:  Can you give me a blue?

14    BY MR. S. KULWIN:

15    Q.  Just to denote so -- I don't want to be confusing --

16    banquets -- no.

17            Banquets only, you've got 6.5 million -- 6.5 million

18    for '08; 7.475 million for '09; and 8.22.5 million for '10.

19    Okay.

20            MR. S. KULWIN:  Now, let's go to the expenses if we

21    can, Mike.

22            If we go down below.

23            Can you highlight food and beverage.

24            All the way across, please.

25    BY MR. S. KULWIN:

Petrus - direct

```
 1   Q.  And in fairness -- because I think I know what you're
 2   going to say, Mr. Petrus -- I understand -- first of all, this
 3   is the core -- core -- food and beverage expense, correct?
 4   Core.  You know what I mean by core?  Associated with the
 5   revenues.  This doesn't include undistributed other costs?
 6   A.  That's correct.
 7   Q.  This is the core?
 8   A.  This is the estimated --
 9   Q.  Right.  The estimated core?
10   A.  Right.
11   Q.  And if you compare the estimated core to the estimated
12   revenues, you're going to get the estimated gross profit
13   before other expenses, correct?
14   A.  Before undistributed expenses.
15   Q.  Before undistributed expenses?
16   A.  Right.
17   Q.  Okay.  So let's work with that for a second if we could.
18   And what you have here is -- and the expenses aren't broken
19   out between banquets and mini bar and all those other things;
20   but the bulk of the revenue is -- and I would imagine the bulk
21   of the expense is basically the banquets, in this scenario
22   with these projections at that time, fair statement?
23           MR. SHONKWILER:  Objection to form.
24           THE COURT:  Overruled.  You may answer if you can.
25   BY THE WITNESS:
```

1   A.  That would be an assumption.

2   BY MR. S. KULWIN:

3   Q.  Okay.

4           So what you have for '08 is 8,147,778 for F and B

5   expense; and for the next year, '09, 9,163,110.  Okay.  Right?

6   And then for the last year, 9,801,960.  Right?  And so then

7   you have your estimated gross profit, estimated, not including

8   restaurants, understanding it doesn't include undistributed

9   expenses, the number would be --

10          MR. S. KULWIN:  If I could have one minute, Judge?

11          THE COURT:  You may.

12    (Brief pause.)

13  BY MR. S. KULWIN:

14  Q.  I guess I'm going to have to do it the hard way.  I

15  apologize.  I'll bring my handy calculator out here.

16          So you have an estimated gross here of 8,761,051.

17  That's the revenue.  And then estimated gross expenses of

18  8,147,778, roughly -- I'm going to -- approximately 613,000,

19  give or take a few?

20          MR. SHONKWILER:  Your Honor, we object that the

21  estimated gross profit term is argumentative and not supported

22  by the testimony or the document.

23          THE COURT:  What is your response?

24          MR. S. KULWIN:  Mr. Petrus just testified that's what

25  it was.

Petrus - direct

960

 1          THE COURT:  Overruled.

 2  BY MR. S. KULWIN:

 3  Q.  Then '09, you have -- you have 10,532,310, minus the

 4  estimated core expenses of 9,163,110.  So you've got your

 5  projected gross profits of 1,369,200.  And then the third

 6  year, for 2010, you have 11,953,610, minus 9,801,960, equaling

 7  2,151,650.  You accept the math?

 8  A.  Those are the addition and subtraction.

 9  Q.  Okay.  Now, real quick, if the condo association owned

10  this food and beverage -- and, by the way -- and if the condo

11  association owned this food and beverage and were making a

12  profit, these -- they would have to pay a management fee,

13  correct?

14          MR. SHONKWILER:  Objection, your Honor.

15          THE COURT:  Sustained on form to "this food and

16  beverage."

17  BY MR. S. KULWIN:

18  Q.  If the condo board owned the food and beverage facilities

19  that we're talking about in this case -- do you know what I'm

20  referring to, the banquets, et cetera?  Okay?

21  A.  Yes, sir.

22  Q.  You're with me?

23  A.  Yes, sir.

24  Q.  They wouldn't automatically even get this estimated gross

25  profit because they would have to pay a management fee?

Petrus - direct

```
 1              MR. SHONKWILER:  Objection, your Honor.  There is no
 2   evidence to support the hypothetical about ownership of food
 3   and beverage or banquet operations or facilities.
 4              MR. S. KULWIN:  That's the whole point of the case.
 5              THE COURT:  Overruled.
 6              MR. SHONKWILER:  No.
 7              THE COURT:  You may answer if you can, Mr. Petrus.
 8   BY THE WITNESS:
 9   A.  Well, if the condo association owned this area and was not
10   operating it on their own --
11   BY MR. S. KULWIN:
12   Q.  Right.
13   A.  -- and went to an outside source --
14   Q.  Trump?
15   A.  Whomever.
16   Q.  Right.
17   A.  They would pay a fee for that.
18   Q.  And that would get deducted off of these profits, correct?
19   A.  That would be correct.
20   Q.  And that fee would cover -- you know, the management
21   company doesn't make a hundred percent profit on that fee,
22   right?
23   A.  Well, to the management company, the fee goes to the
24   organization.  And then what the organization does and how
25   they compensate myself and the others that are part of the
```

1  structure --

2  Q.  Right.

3  A.  -- that's their responsibility.

4  Q.  Right.  They pay some of the, you know, administrative

5  expenses and all those things -- wait, wait -- for the people

6  running these areas, true?

7  A.  No.

8  Q.  Okay.

9  A.  That is not accurate.

10 Q.  Okay.  So you're saying that a portion of the

11 undistributed core expenses that are listed below would also

12 come out of here, correct?

13 A.  That's correct.

14 Q.  Okay.  But you can't break out, using this number -- using

15 these numbers, which would apply or which would not apply?  At

16 least you don't do it on here?

17 A.  Quite honestly, just as is the case with the CAM budget --

18 because I think we're confusing the CAM budget, the common

19 area maintenance budget, because -- and I think this is an

20 important point, is that we're commingling two different

21 concepts here.  Right.  This is an operating income statement

22 budget, totally different than the CAM budget that we spent a

23 lot of time on.

24 Q.  No, I understand that.

25 A.  And in a CAM budget, you also cannot take expenses that

1    are strictly associated with the banquet/meeting space and the

2    commissions and in a pure and simple fashion extract out those

3    expenses that are a hundred percent related to that.  This

4    exercise, by the way, is a hundred percent separate and apart

5    from that discussion.

6    Q.  Sir --

7    A.  So, I mean, it's a bit confusing --

8    Q.  Sir --

9    A.  -- I think to these folks --

10   Q.  Sir, please don't lecture.

11          MR. S. KULWIN:  And I move to strike.

12          MR. SHONKWILER:  Your Honor, please, the witness was

13   still testifying.

14          MR. S. KULWIN:  He's not.  He's lecturing to the

15   jury, Judge.

16          THE COURT:  Overruled.  You may continue your answer.

17   If you --

18          THE WITNESS:  I won't lecture anybody.

19          THE COURT:  One second, please.

20          I told you about this yesterday.  When you ask very

21   broad questions, sometimes you get broad answers.  And he is

22   entitled to answer it.

23          You may finish your answer, sir.

24   BY THE WITNESS:

25   A.  As I was saying, I think we're confusing the issue here

Petrus - direct

964

 1    because we're talking about two different sets of financial

 2    statements that are not related.  And this is extremely

 3    important for everyone to understand, is that this is an

 4    income statement, a whole different conversation from a condo

 5    association CAM budget.  The two are not related.  And I think

 6    this is extremely important because we spent a lot of time on

 7    this.  And what we're doing here is that we're trying to

 8    commingle the two together or trying to figure out how one is

 9    feathered into the other.  It doesn't work that way.

10    BY MR. S. KULWIN:

11    Q.  Are you finished?

12    A.  Thank you.

13    Q.  You're welcome.  Okay.  I listened to all of that.

14         Let me ask you, sir -- let's cut right to it.  You're

15    talking about mixing and matching and apples and oranges.  Let

16    me see if I can break it down for you.  In the condo CAM

17    budget that you're talking about, 2005, it included banquet

18    revenues and things of that nature, true?  Did it?

19    A.  No.

20    Q.  It didn't.  Okay.

21         MR. S. KULWIN:  Put it up, please.

22    BY MR. S. KULWIN:

23    Q.  Sir --

24         THE COURT:  Can you clarify for the record what you

25    have just put up?

                                  Petrus - direct

 1              MR. S. KULWIN:  Plaintiff's Exhibit 7, Exhibit H.

 2              THE COURT:  Thank you.

 3    BY MR. S. KULWIN:

 4    Q.  Sir, this is the budget for the condo association,

 5    correct?

 6    A.  That is correct.

 7    Q.  And this says meeting, ballroom rentals, spa commissions,

 8    correct?

 9    A.  That is correct.

10    Q.  Is that correct?

11    A.  That is correct.

12    Q.  And this income, this income right here, is generated by

13    the banquet rooms that are listed right here where it says

14    six-five, seven-four, eight-two; is that correct?  Just stay

15    with me on that one.  Is that correct?

16    A.  There's --

17    Q.  Is that correct?  If you can't answer it yes or no, tell

18    me.

19    A.  I can't answer it yes or no because --

20    Q.  Okay.

21    A.  -- I think there's a level of detail here --

22    Q.  No.  No.  I asked --

23    A.  -- from --

24              MR. S. KULWIN:  Judge, please, I asked him if he can

25    answer yes or no.  He said he couldn't.  Would you please ask

1    him to just answer the questions?

2            THE COURT:  The answer of no, he can't answer it yes

3    or no can stand.  You can ask your next question.

4    BY MR. S. KULWIN:

5    Q.  Now, sir, when this says banquets in the income statement,

6    okay, it's referring to the Trump Hotel, right?

7    A.  That is correct, yes, sir.

8    Q.  And the banquet rooms in the Trump Hotel include the

9    banquet rooms, the meeting rooms, the function rooms, all

10   those rooms where you could have events and get food and

11   beverages?

12           MR. SHONKWILER:  Objection, your Honor.  There's no

13   evidence that there's any room called a banquet room anywhere

14   in Trump Tower.

15           MR. S. KULWIN:  Judge, I'm going to ask --

16           THE COURT:  Overruled.  The witness can answer that.

17           MR. SHONKWILER:  I ask to strike the speaking

18   objections as well, Judge.

19           THE COURT:  Overruled.

20   BY MR. S. KULWIN:

21   Q.  Is that correct, sir?  Is that correct?  In the Trump

22   Hotel, there are rooms, meeting rooms, function rooms, banquet

23   rooms, things of that nature, that are encompassed in the

24   hotel, right?  Is that right?

25   A.  Yes.

Petrus - direct

1    Q.  And when the Trump organization --

2            MR. S. KULWIN:  Keep it up, please.

3    BY MR. S. KULWIN:

4    Q.  -- was saying that in the common elements, they're going

5    to own the meeting rooms, the function rooms, the executive

6    lounge and things of that nature, they were referring to what

7    you're referring to in the banquet rooms; were they not?

8            MR. SHONKWILER:  Objection, your Honor.

9            THE COURT:  Sustained on form.

10   BY MR. S. KULWIN:

11   Q.  When the Trump organization put in meeting and ballroom

12   rentals and spa commissions -- first of all, that includes

13   food and beverage from those entities, correct?

14   A.  I believe, sir, that what that includes is the rental of

15   the space --

16   Q.  And --

17   A.  -- and a commission.

18   Q.  Right.

19   A.  A commission, not the gross revenues that you have

20   indicated here.

21   Q.  A commission --

22   A.  A commission on the revenues that are produced.  There's a

23   very --

24   Q.  Okay.

25   A.  There's a fine line difference --

Petrus - direct

968

1  Q.  So there's --

2  A.  -- between the revenue that you're -- indicated on the

3  income statement and a commission that is produced on those

4  revenues.

5  Q.  Okay.  And --

6  A.  You understand that, correct?

7  Q.  I do understand it.

8  A.  Okay.

9  Q.  So what we're talking about though is, whether you call it

10  commissions or gross revenues -- hold it a second; wait for

11  the question -- that money is coming as a result of events at

12  those places; is that true?

13  A.  That is correct.

14  Q.  Okay.  That's all I wanted to establish.

15       And if these monies -- if each of these monies where

16  it says here F and B revenue, banquets that you're projecting

17  here and here and here are going up, then --

18       MR. S. KULWIN:  Please leave it up, Mike, and please

19  blow it up, please.

20  BY MR. S. KULWIN:

21  Q.  -- then those commissions would also go up?

22  A.  Logically.

23  Q.  There you go.

24       Okay.  I'm done with the numbers.

25       All right.  Now, sir --

Petrus - direct

969

1          MR. S. KULWIN:  A couple other points, Judge, and

2     I'll be done.

3     BY MR. S. KULWIN:

4     Q.  Sir, earlier this morning we talked briefly about when it

5     was a done deal, the 500,000, and you said it was an evolving

6     process.  Ultimately in October of 2007, when they issued the

7     final report, that was definitely a done deal, correct?

8     A.  That was the submission of the --

9     Q.  Right.

10    A.  -- fourth amendment, that is correct.

11    Q.  Right.  Now, attached to this property report, of course,

12    is the backup of the budget that's Exhibit H, correct?

13    A.  That is correct.

14    Q.  Okay.  And, sir --

15         MR. S. KULWIN:  Mike, can we have -- it's Plaintiff's

16    Exhibit 25B, please.  Okay.

17         And if you can go all the way down to the bottom.

18         Oh, I'm sorry, page 4731.

19         First -- go back one page, 4730, and blow this up,

20    please.  I'm sorry.

21    BY MR. S. KULWIN:

22    Q.  This is -- this is the budget now, the income and expense

23    budget, for the condo association for the fourth amended

24    report that was issued in October of 2007; is that right?

25    A.  Correct.

Petrus - direct

1  Q.  And if you go to the very next page, the top of the very

2  next page, you see some backup of other aspects of the budget,

3  correct?

4  A.  That's correct.

5  Q.  And if you go all the way down to the bottom of the

6  page --

7          MR. S. KULWIN:  The very bottom of the page, Mike.

8          There you go.  Can you blow this up, Mike, and can

9  you color it.

10         Highlight, please.

11  BY MR. S. KULWIN:

12  Q.  What's the date there, sir?

13  A.  That's June 4th, 2007.

14  Q.  All right.

15         MR. S. KULWIN:  You can take that down.

16  BY MR. S. KULWIN:

17  Q.  Now, last point for me for now, sir, is this:  Before you

18  made a very big effort -- well, I shouldn't characterize it.

19  I'll withdraw that.

20         This morning you talked about how each amended report

21  you did the -- the Trump organization did the exact same

22  thing; first, second, third, fourth, always consistent, right?

23  A.  What I said is the people that disseminate that

24  information did it in the appropriate consistent fashion.

25  Q.  Right.  But I want to be clear.  Is it your testimony that

Petrus - direct

1  each time what they did to reflect every change was send out

2  the report and let people look at it for themselves; is that

3  your testimony?

4  A.  Yes, sir.

5  Q.  And you know that from looking at it and researching it

6  and you're aware of it, right?

7  A.  I'm aware of the -- the -- the details surrounding

8  amendment four.  And the people that were responsible for four

9  were also -- or sending out the information were also

10 responsible for the other amendments.

11 Q.  So that's not really accurate?  Mr. Reiss and Mr. Flicker

12 were gone by four.

13 A.  No.  I'm saying --

14 Q.  Oh.  The consultants?

15 A.  The consultants, that's correct.

16 Q.  But the fact of the matter is, sir, when the first

17 amendment came out -- the first amendment is when they first

18 put -- when they took out the health club and changed the

19 floors; you remember that?

20 A.  I wasn't there.

21 Q.  The fact of the matter is, they actually sent out a letter

22 describing a big change, didn't they?

23 A.  I'm not aware of that.

24 Q.  Okay.  Well, let me show you what we'll mark as -- and

25 this is part of -- this is an attachment to 113.

Petrus - direct

972

 1              MR. SHONKWILER:  I'm sorry?  Say it again.

 2              MR. S. KULWIN:  Plaintiff's Exhibit 113, which is not

 3    in evidence.  And I'm not going to have him read it.  I'm just

 4    refreshing his recollection with it or seeing if it refreshes.

 5    BY MR. S. KULWIN:

 6    Q.  Sir, I'm showing you a letter here dated February 27,

 7    2004, Trump International Hotel, the transmittal letter.  Do

 8    you see that?

 9              MR. SHONKWILER:  Your Honor, I object to him

10    refreshing his recollection with a document that was generated

11    years before he joined the Trump organization.

12              THE COURT:  Well, we will see if it refreshes his

13    recollection.  It may not.

14    BY THE WITNESS:

15    A.  I'm not aware of this document.

16    BY MR. S. KULWIN:

17    Q.  So no one shared with you -- may I have that back?

18    A.  Yes.

19    Q.  No one shared with you that when the first amendment came

20    out, the unit owners --

21              MR. SHONKWILER:  Your Honor, I object.  The exhibit

22    is not in evidence and Mr. Kulwin is now summarizing it.

23              MR. S. KULWIN:  No.

24              MR. SHONKWILER:  I think so.

25              THE COURT:  It sounded like it.

1          Rephrase your question.

2    BY MR. S. KULWIN:

3    Q.  I'm asking him whether anyone advised him with the first

4    amendment that the Trump organization sent out a letter

5    describing changes in the first amendment.  Did anyone tell

6    you that?

7    A.  I'm not aware of any of that type of detail.  It preceded

8    me joining the organization.

9          What I do know is that the property report

10   information that was sent out, when you look back through the

11   documents, they all are done in a consistent fashion, with a

12   level of detail that outlines whatever type of narrative may

13   have been in the front.

14   Q.  And -- but what you're saying is you have no idea

15   whether -- on the first amendment when the major changes were

16   made -- whether or not they sent out a letter accompanying it;

17   is that correct?

18   A.  Well --

19   Q.  Is that correct?

20   A.  I don't -- I don't have that information.

21   Q.  Okay.  That's all I wanted to know.

22   A.  Uh-huh.

23   Q.  I'm sorry.  Mr. Kulwin just showed me something that's

24   very important, to me anyway.

25          I want to show you, sir, Plaintiff's Exhibit 2.

Petrus - direct

974

```
 1              MR. S. KULWIN:  I'm going to give him the hard copy,

 2   but put it up.

 3   BY MR. S. KULWIN:

 4   Q.  This is the first amendment to the property report.  Okay.

 5   You've seen this before, correct?  Because you just said that

 6   you know they were all sent out consistently?

 7     (Brief pause.)

 8   BY THE WITNESS:

 9   A.  I'm looking for something specific.

10   BY MR. S. KULWIN:

11   Q.  Can I help you?  The common elements?

12   A.  The meeting space.

13   Q.  It's easy to find.  3.1.

14   A.  I've got it here.

15   Q.  No, that's not it.

16   A.  Yes, this is a definition of it.

17   Q.  No.  That's not where it's defined.  It's defined in 3.1.

18   It's over here.  I got it out for you.

19   A.  Good.

20   Q.  Oh, no, this talks about something else.

21              MR. SHONKWILER:  Counsel, can you please tell me what

22   page you're showing the witness?

23   BY THE WITNESS:

24   A.  This is 4.13.

25              MR. SHONKWILER:  Of what?  I'm sorry.
```

Petrus - cross

```
 1              THE COURT:  Plaintiff's Exhibit 2.
 2  BY MR. S. KULWIN:
 3  Q.  Plaintiff's Exhibit 2, 4.13.
 4  A.  And what this states is --
 5              THE COURT:  What is the question, Mr. Kulwin?
 6              MR. S. KULWIN:  My only question that is pending is,
 7  is this the first amendment.  That's my only question I wanted
 8  to know.
 9              THE COURT:  If you know.
10  BY MR. S. KULWIN:
11  Q.  If you know.
12  A.  This appears to be the first amendment, that's correct.
13  Q.  Okay.  Thank you.
14  A.  Yes.
15  Q.  Okay.
16              MR. S. KULWIN:  I don't have any other questions,
17  Judge.  I mean, I'm done with the witness.
18              THE COURT:  Cross-examination.
19                        CROSS-EXAMINATION
20  BY MR. SHONKWILER:
21  Q.  Good afternoon, Mr. Petrus.
22  A.  Good afternoon.
23  Q.  There was some discussion about a CAM budget.  Do you
24  remember using that term?
25  A.  I do.
```

Petrus - cross

1  Q.  And a CAM budget -- and Mr. Kulwin was using it too.  I

2  guess you can only tell me what you meant.  You were referring

3  to the hotel condominium operating budget; is that right?

4  A.  That is accurate.

5  Q.  And here's from --

6        Mr. Petrus, this is from Defendant's Exhibit 603,

7  which is the third amendment of the property report.  That was

8  the current amendment when you joined the Trump organization?

9  A.  That appears to be it, yes, sir.

10  Q.  And this is the first page from the operating budget from

11  the third amendment.

12        MR. S. KULWIN:  Judge, I would object to leading on

13  the basis of when you have adverse direct, you lead; but when

14  you have adverse cross, you don't under the rules.

15        THE COURT:  That is not true under the rules.

16  Overruled.  As long as it is cross-examination, it is

17  cross-examination.

18  BY MR. SHONKWILER:

19  Q.  So, Mr. Petrus, we've been looking at these throughout the

20  case and referring to them as the estimated operating budget

21  for the hotel condominium; and that's, in fact, what they're

22  entitled here, right?

23  A.  Estimated operating --

24  Q.  Estimated?

25  A.  That's correct, sir.

1   Q.  But this is also what you were calling a CAM budget,

2   right?

3   A.  That's correct.

4   Q.  And the reason you call it a CAM budget is because CAM is

5   an acronym for common area --

6   A.  Maintenance.

7   Q.  Maintenance?

8   A.  Yes.

9   Q.  Okay.  And is the reason you call this a CAM budget

10  because this budget shows the common charges for the

11  association, among other things?

12  A.  That is correct, sir.

13  Q.  And is the exercise of generating this budget one in which

14  you begin with expenses and, after you've estimated the

15  expenses, work backward to determine what the ultimate common

16  charges are for the unit owners?

17  A.  That is correct, sir.

18  Q.  That's why generally you refer to it as a CAM budget?

19  A.  That is correct.

20  Q.  And the bottom line, when we refer to common charges, that

21  means that's the amount that will be charged to the entire

22  condominium association, and each unit owner will pay a

23  percentage of that total amount, correct?

24  A.  Precisely.

25  Q.  And it's paid typically in monthly amounts?

Petrus - cross

1   A.   Yes, sir.

2   Q.   To the association?

3   A.   To the association.

4   Q.   By each unit owner?

5   A.   Yes, sir.

6   Q.   And that's why it's considered income or revenue to the

7   condominium association?

8   A.   Yes, sir.

9   Q.   And it's a big source of revenue because every condominium

10   association has expenses that it has to pay to run the

11   condominium, right?

12   A.   That is accurate.

13   Q.   You explained -- or you began to explain that this number

14   here, $5,053,625, consists of rental revenue and commissions

15   from the F and B operator; is that correct?

16   A.   That is correct, sir.

17   Q.   I'm going to show you note one to this very same operating

18   budget.  And note one is the part of the budget that explains

19   how that number was calculated, right?

20   A.   Yes, sir.

21   Q.   It explains, in any event, the assumptions that went into

22   putting together the number we just looked at, 5,053,625,

23   right?

24   A.   Yes.

25   Q.   And what it shows here is that that number consists of two

Petrus - cross

1  things, meeting room rental of 5,038,625 and commissions from

2  spa services of 15,000, right?

3  A.  That is accurate.

4  Q.  And then if you keep reading below, the first sentence

5  explains the assumptions that went into the rental revenue

6  projections.  I'm going to start reading here.  It is

7  projected that -- is this legible?  Not really.

8       Better?

9  A.  Thank you.

10  Q.  It is projected that the demand for meeting room space

11  will approximate 65 percent occupancy at an average daily rate

12  of $1,500.  The demand for ballrooms is projected to be

13  33 percent at an average daily rate of $11,150.

14       I'm going to stop right there for now.

15       That amount -- those sentences describe the amount

16  that is projected for revenue from renting the rooms, right?

17  A.  That is accurate.

18  Q.  Not from food or beverage, right?

19  A.  That is accurate.

20  Q.  The next sentence says, An additional 857,500 in annual

21  gross revenues is projected for commissions received from the

22  food service operator.

23       And what does commissions there refer to?

24  A.  Commissions would be a percent of the revenue stream that

25  would ultimately, it appears, in this estimated budget, that

Petrus - cross

1    it resulted in $857,000 in annual gross revenue.

2    Q.  For the association?

3    A.  For the association.

4    Q.  And that number, which is described as a commission, is a

5    percentage, as you said, of the food and beverage revenues

6    that are earned by the food and beverage operator, correct?

7    A.  For these specific areas.

8    Q.  For these specific areas?

9    A.  Very --

10            MR. S. KULWIN:  Judge, I'll object.

11   BY THE WITNESS:

12   A.  Very important --

13            THE COURT:  There is an objection.  What is the

14   objection?

15            MR. S. KULWIN:  The repeating of the answer.  I move

16   to strike.

17            THE COURT:  Sustained.  Unless you need it to ask

18   your next question, you should not be repeating the witness'

19   answer.

20            MR. SHONKWILER:  Okay.

21   BY MR. SHONKWILER:

22   Q.  The question, Mr. Petrus, is -- well, let's step back.

23   A.  Yes, sir.

24   Q.  We'll go through it a step at a time.

25            The first step is the commission means a percentage

1  of the overall food and beverage revenue that pertains to the

2  hotel condominium areas, correct?

3  A.  Yes, sir.

4  Q.  Okay.  So this number -- these numbers we were looking at

5  over here are revenues earned from the operation of the food

6  and beverage in the entire hotel, right?

7  A.  That is correct.

8  Q.  So a portion of these amounts -- and, again, these are

9  projections and estimates -- but a portion of these relates to

10 food and beverage that is served in the rooms that, according

11 to the third amendment, were going to be in the common element

12 of the hotel condominium, right?

13        Do you want me to repeat that?

14 A.  Yes, please repeat that.

15 Q.  A portion of that number would refer to food and beverage

16 that were served in the ballrooms and the meeting rooms that

17 was a part of the hotel condominium common elements under the

18 third amendment?

19 A.  That is accurate.

20 Q.  But not all of it?

21 A.  But not all of it.

22 Q.  And then of that portion that we're talking about that

23 relates to food and beverage that is served in the meeting

24 rooms and ballrooms, the revenue that is accounted for here

25 that would go to the association is not the gross revenue but

Petrus - cross

982

1  a percentage of that revenue, right?

2  A.  Absolutely.

3  Q.  That's what the commission means?

4  A.  That is accurate.

5  Q.  And the way that works is because -- because if these

6  ballrooms and meeting rooms are common elements and,

7  therefore, owned by the condominium association under this

8  assumption, the food and beverage operator would essentially

9  pay the condominium association a percentage of the revenue

10  for the right to serve in those rooms, more or less; is that

11  right?

12  A.  That is accurate.

13  Q.  And that's a small percentage, in fact, of the gross

14  revenues, right?

15  A.  Most likely it would be very small.

16  Q.  How small in your experience -- in your 38 years of food

17  and beverage experience -- is that commission typically paid?

18  A.  It would vary.  But if you looked at this as a leased

19  operation, it could be 5 percent, 6 percent, somewhere in that

20  area.

21  Q.  And if there was a 5 or 6 percent commission on revenues,

22  that means that whatever percentage -- let's look -- let's use

23  these numbers.

24      Let's say it was an $8 million number.  Okay.  Some

25  piece of that, some fraction of that, we don't know exactly

Petrus - cross

983

1    what, would be revenue associated with the ballrooms, meeting

2    rooms and other hotel common elements?

3    A.   That's correct.

4    Q.   And of that piece, 5 percent would be paid, if it was a 5

5    percent commission agreement, to the condominium association?

6    A.   That is accurate.

7    Q.   That's the amount that's in this budget that relates to

8    food and beverage, right?  And I mean this budget here.

9           MR. S. KULWIN:  I'm going to object.  It misstates

10   the evidence of $5,053,000.  He's misleading the jury.

11          MR. SHONKWILER:  He just went through for 20 minutes

12   and explained exactly how that number was calculated.

13          THE COURT:  Overruled.

14   BY MR. SHONKWILER:

15   Q.   We can go slowly and go through it again, Mr. Petrus.

16          THE COURT:  You do not need to go through it again.

17   BY MR. SHONKWILER:

18   Q.   So, Mr. Petrus, even under the third amendment, the one

19   that was in place before you were hired, the only amount that

20   was ever projected to go to the condominium association as

21   revenue that related in any way to food and beverage services

22   was a small percentage of whatever the overall food and

23   beverage revenue for the hotel would be, correct?

24   A.   That's how it was outlined, that's correct, sir.

25   Q.   And what you have been talking about with Mr. Kulwin, the

Petrus - cross

984

1    numbers written up here and on the exhibit that he showed them

2    to you from, that was Plaintiff's Exhibit 13, what those

3    numbers are is the food and beverage revenues for the whole

4    hotel, correct?

5    A.   This is the gross revenue.

6    Q.   For the hotel?

7    A.   For the hotel.  As opposed to a commission on those

8    revenues.

9    Q.   Okay.  Thank you.  I think we are clear enough on that.

10         All right.  The last thing on this, I believe, unless

11   we come back to it on our recross, Mr. Kulwin did some math

12   and I want to do a couple of basic calculations.  But if there

13   was a 5 percent commission even on $8 million, what is 5

14   percent of $8 million?  Am I right it's about 400,000?

15   A.   If you took 5 percent of $8 million, 400,000, that's

16   correct.

17   Q.   Okay.  You were asked yesterday, Mr. Petrus, about your

18   experience working in the hotel industry before you came to

19   Trump.  Do you recall that?

20   A.   I do.

21   Q.   I just want to hit a couple more points.

22         You had about 29 years of experience in the industry

23   before you went to Trump?

24   A.   I had approximately 29 years of experience before I went

25   to Trump.

Petrus - cross

1    Q.  And in those 29 years, you managed over 30 hotels; would

2    you say that's right?

3    A.  Between 30 to 35, sir.

4    Q.  Many of them were big luxury hotels?

5    A.  Doing in excess of $120 million each.

6    Q.  For those of us who have never managed a hotel, can you

7    please explain what a hotel manager does, briefly?

8    A.  Establishes the strategy for the actual operation, manages

9    all of the employees, manages all of the expenses, manages the

10   budget, and manages both owner relations and employee

11   relations and guest relations.

12   Q.  Is the manager of the hotel essentially responsible for

13   oversight of everything that happens in the day-to-day

14   operation of the hotel?

15   A.  Absolutely.

16   Q.  Now, you can't even read or understand a budget for a

17   hotel without knowing what each line of that budget refers to

18   and how those numbers are calculated; is that right?

19   A.  Critically important to the success of the operation.

20   Q.  And for --

21   A.  Yes, sir.

22   Q.  -- each of these 30-plus hotels you managed, you had to

23   understand enough about every element of the hotel's operation

24   to generate and review the budgets for those hotels, correct?

25   A.  Absolutely.

Petrus - cross

1    Q.   And your 29 years of hotel experience before you joined

2    Trump also included about ten years of experience as a food

3    and beverage director, correct?

4    A.   That is correct, sir.

5    Q.   For multiple different companies, right?

6    A.   Different organizations.

7    Q.   Your title at Trump is chief operating officer of the

8    Trump Hotel collection?

9    A.   Yes, sir.

10   Q.   Before you joined Trump, there was no such position; is

11   that correct?

12   A.   That is correct.

13   Q.   It was created for you, as far as you know; is that right?

14   A.   That's one way of looking at it, yes, sir.

15   Q.   How many Trump Hotel condominiums are currently open and

16   running?

17   A.   Eight.

18   Q.   When you arrived at Trump, there was just one hotel

19   condominium open and running; is that right?

20   A.   That's correct.

21   Q.   The one in New York?

22   A.   That is correct.

23   Q.   And there were several others at that point that were

24   either in the planning or development stages?

25   A.   Yes, sir.

Petrus - cross

1  Q.  And your job was to help build and establish a hotel

2  collection for the Trump organization, right?

3  A.  That is correct, sir.

4  Q.  The collection was not there when you arrived in June of

5  2006?

6  A.  That is correct.

7  Q.  What was the status of Trump Tower Chicago -- strike that.

8       Describe at what point the project was at when you

9  came to Trump in June 2006.

10  A.  And I'm going to do a little bit of guesswork here, but I

11  believe the building was perhaps -- out of the 92 stories, we

12  were at maybe the first or second floor, somewhere in that

13  range; and I can't nail it specifically.

14  Q.  And when you were asked -- how soon was it after you

15  started working at Trump that you were asked to begin helping

16  with the Chicago project?

17  A.  I'm going based on my memory here, but I want to say that

18  as this was one of our major projects, I commenced work on it

19  relatively quickly, starting with securing the ideal candidate

20  to become the VP and managing director.

21  Q.  Was your work on the Chicago project limited to the hotel

22  condominium parcel of the building?

23  A.  No, it was not.  It really encompassed all aspects.  It

24  was the residential element, it was the retail element, it was

25  the parking, commercial, food and beverage area.  It was the

1    entire project in its entirety.

2    Q.   And these different parts of the building you're referring

3    to are actually different properties legally speaking; isn't

4    that correct?

5    A.   Yes, sir, that is accurate.

6    Q.   There's a different property report for the hotel

7    condominium and another one for the residential condominium?

8    A.   That is accurate.

9    Q.   And then the commercial component is also a different

10   piece of the property -- I'm sorry -- of the overall building?

11   A.   Correct.

12   Q.   Okay.  And you worked on -- to some degree or another --

13   on all of those pieces?

14   A.   Yes, I did.

15   Q.   Let's talk about the budget.  And now we're talking about

16   the CAM budget again.  I'm going to keep calling it the

17   estimated operating budget for the condominium association.

18        As you explained today, one of your tasks was to

19   review the estimated operating budget for the hotel

20   condominium, correct?

21   A.   Accurate, yes, sir.

22   Q.   And am I correct that you performed a comprehensive

23   line-by-line review of the budget that was in place when you

24   were hired?

25   A.   Many times.

Petrus - cross

1    Q.  Many times over?

2    A.  Many times over.

3    Q.  Did you generate dozens of different drafts of this

4    document as you worked at Trump?

5    A.  Yeah.  This was -- again, I think I mentioned this.  This

6    was a work-in-progress that involved a lot of detail on every

7    line item because as the building was being developed, we were

8    getting greater definition around the amount of glass that

9    would have to be cleaned, the type of stone that would have to

10   be cared for, the thousand and one little details that were

11   coming to life as the building was coming out of the ground.

12   Q.  Now, in your new position with Trump, one of your

13   responsibilities was to take complete ownership of that

14   budget; is that correct?

15   A.  I was the owner, that is correct.

16   Q.  When that hotel opened, you personally had to stand by

17   every estimate that was in the budget?

18   A.  My neck was, as they say, on the line.

19   Q.  And that was your job and nobody else's, right?

20   A.  It was my responsibility.

21   Q.  And you had a staff helping you?

22   A.  And I had a team of people that I could also rely on for

23   information and resources to complete the exercise, that is

24   accurate.

25   Q.  And by the time that hotel opened, you had to be able to

Petrus - cross

1    say that you had thoroughly reviewed every line and that you

2    believed the projections and estimates were reasonable and

3    accurate based on the information you had available to you,

4    correct?

5              MR. S. KULWIN:  Just object to asked and answered.

6              THE COURT:  Overruled.  You may answer if you can,

7    sir.

8    BY THE WITNESS:

9    A.   To the best of my ability, I looked at every line item to

10   assure that it represented what I thought was the accurate

11   assessment and estimation for that line expense.

12   BY MR. SHONKWILER:

13   Q.   Can you tell us approximately how long it took for you to

14   go through the budget from the day you started reviewing it to

15   the day where you said, okay, I'm happy with this, this can go

16   in the fourth amendment?

17   A.   I'm guessing here.  This is an estimate.  But I think that

18   this process took in total six to nine months.

19   Q.   Six to nine?

20   A.   Yes, sir.

21   Q.   Okay.  Not 69, but six to nine?

22   A.   I'm sorry.  Six to nine.

23   Q.   Okay.  I want to talk now -- let's take it a piece at a

24   time and I want to get your best recollection about these

25   numbers that you looked at when you came to Trump and whether

Petrus - cross

1    you decided they needed to be amended and, if so, what you

2    remember about that decision.

3          Okay.  This is the third amendment budget.  This is

4    the one that was in place when you came to Trump.  It's

5    Defendants' Exhibit 603, Exhibit H.

6          The first category of expenses here are called

7    payroll; is that right?

8    A.  That is accurate, sir.

9    Q.  Okay.  If you take each of these line items, all the way

10   down to here, and add them up, it's what is referred to here

11   as total payroll, right?

12   A.  $6.1 million, that's right.

13   Q.  That 6.1 million is the sum of all these numbers in the

14   payroll above it, right?

15   A.  Yes, sir.

16   Q.  Now, I'm showing you the budget from the fourth amendment,

17   Defendants' Exhibit 604.  It's awfully small.

18         Okay.  Now, here's the payroll expense breakdown

19   after you did your comprehensive review, correct?

20   A.  That is accurate, sir.

21   Q.  What we can see just from the total alone is that payroll

22   has been reduced by nearly $4 million; is that right?

23   A.  That is accurate, yes, sir.

24   Q.  Now, do you recall what it was -- let's start with any of

25   these numbers -- let's start with front desk.  Do you remember

Petrus - cross

1  what it was about the estimate you received in the third

2  amendment -- here's the third amendment, front desk estimate,

3  482,000.  Here's your number, 272,000 -- okay -- and $424.  Do

4  you remember what it was that caused you to believe that this

5  number -- this estimate -- needed to be moved downward to be

6  accurate and reasonable?

7  A.  Well, what transpired was that I took each of these line

8  items -- and this is about granularity and drilling down to a

9  point where you can say how many people will be required to

10 perform the function to ultimately have a luxury hotel

11 experience and what is the wage that's associated with that.

12        And what I did was I went to all of the resources.  I

13 went to the union.  I went to the competing hotels to get wage

14 surveys.  So that ultimately I was marrying the requirement of

15 staffing with hourly wages and then, plus, estimating the

16 benefits that would be associated with those individuals.

17        And this became my estimate as to what I thought was

18 going to be required in order to run this property as a

19 successful luxury hotel that would compete at the very top end

20 of the marketplace.

21 Q.  Okay.

22 A.  And I did that, sir, for each of these items.  And, again,

23 it's about granular information that would lead you ultimately

24 to the end number, the end result here that's indicated for

25 each of these items.  And then I compared it to the -- the

Petrus - cross

1    backup for amendment number three, and I made adjustments as I

2    thought were appropriate based on the information that I had

3    available to me.

4    Q.  Thank you.

5         I want to jump around a little bit because I want to

6    talk about utilities.  And here's -- I'll tell you why I want

7    to talk about utilities now.

8         MR. S. KULWIN:  Judge, I'll object to him telling him

9    why he wants to talk about utilities.

10        THE COURT:  Sustained.

11   BY MR. SHONKWILER:

12   Q.  Mr. Petrus, let's look at your utilities expenses in the

13   operating budget.  This is, again, the third amendment

14   operating budget, the one that was in place when you came to

15   work at Trump.  The utilities are set out here.

16   Electricity --

17     (Brief pause.)

18   BY MR. SHONKWILER:

19   Q.  Here under utility, it says electricity, common area

20   usage, including HVAC, $850,000.  There's also a water and

21   sewer estimate.  And the total under the third amendment was

22   896,436.  Do you see that?

23   A.  Yes, sir.

24   Q.  Okay.  After you revised -- here's the product, fourth

25   amendment.  Here the utilities overall have gone up.  The

Petrus - cross

994

1    number is $1,023,508, I believe; is that right?

2    A.   That's correct, sir.

3    Q.   And I see a line item here for telephone and a line item

4    for gas.  Those line items weren't in the third amendment.  Do

5    you remember whether those were items that you added?

6    A.   Those were items that I added.  Again, some of these

7    items -- some of these line expenses went up, some of them

8    went down.  This was not an exercise of where we could

9    increase budgets.  We wanted to make sure that this was

10   spot-on as it relates to this point in time.

11          We also, as the building -- and if you're asking

12   about utilities specifically, as we began to develop the

13   building and understood the envelope of the structure and all

14   of the systems that were being weaved into the building, we

15   were able to go to outside consultants, reap the benefit of

16   their information to help us define what kilowatt hours were

17   going to be, what oil was, what gas was going to be, what

18   telephone connections were going to be.  All of this helped us

19   to make better decisions relative to what should be in the

20   fourth amendment budget.

21          MR. S. KULWIN:  Judge, I'm going to object on

22   relevancy.  He's now testified that some went up and some went

23   down.  And it has nothing to do with banquet rooms.

24          THE COURT:  Overruled.

25   BY MR. SHONKWILER:

1   Q.  That's a good segue.

2          This has nothing to do with banquet rooms, does it?

3   A.  That is correct, sir.

4   Q.  Some of these went up, some went down, some had to do with

5   banquet room addition or subtraction and some had to do with

6   other factors?

7   A.  This was about making sure that the budget was an accurate

8   estimate at this given time.

9   Q.  So when plaintiff's counsel showed you some numbers this

10  morning, it was addition and subtraction and it showed the

11  difference between the third amendment and the fourth

12  amendment expenses and the third amendment and fourth

13  amendment income and there were some subtraction -- just let

14  me get the question out -- and the product of all that was

15  some number, I think 4.8 million, that was attributed to --

16  well, I don't know what it was attributed to.

17         My question is:  That 4.8 million was the final

18  product of a lot of expenses that moved up and down for

19  various different reasons; is that correct?

20  A.  Absolutely.

21  Q.  And some of those reasons having nothing to do whatsoever

22  with the common elements and what they were?

23  A.  Absolutely.

24  Q.  Can you -- strike that.

25    (Brief pause.)

1          MR. SHONKWILER:  Just give me one moment, your Honor,

2    please.

3      (Brief pause.)

4    BY MR. SHONKWILER:

5    Q.  All right.  Mr. Petrus, there are many lines in this

6    budget.  I'm certain that none of us want to go through each

7    and every one, least of all you, so we won't.

8          MR. S. KULWIN:  Judge --

9          THE COURT:  Sustained on the commentary.

10   BY MR. SHONKWILER:

11   Q.  I want to go through a couple.

12         This was the third amendment.  Again, this is what

13   was in place when you joined.  Let's look at the front desk

14   payroll.  Do you recall -- and I'm just asking for your memory

15   now some years later.  Do you recall to what extent, if any,

16   your adjustment downward of that expense from 482,400 to

17   272,424 -- do you recall to what extent, if any, that had to

18   do with the change in the common elements that removed the

19   ballrooms and meeting rooms?

20   A.  It had no correlation to meeting space, commissions, et

21   cetera.

22   Q.  There were some lines in this budget that -- where the

23   expenses and revenues from the meeting space and ballroom

24   space did impact; is that right?

25   A.  That is accurate, sir.

1    Q.  This particular one, you'll recall, it didn't; is that

2    right?

3    A.  That is accurate.

4    Q.  I also note that the expense estimated for repairs and

5    maintenance, flowers -- and this is the third amendment, the

6    one that was in place when you came to work for Trump --

7    $25,000.

8            After your revisions -- I know it's in here.

9    A.  It's up there.

10   Q.  After your revisions, repair and maintenance of flowers is

11   estimated to be 177,500; is that correct?

12   A.  That is correct, sir.

13   Q.  Okay.  Now, the removal of certain facilities from the

14   common elements didn't cause the flower budget to go up, did

15   it?

16   A.  Not at all, sir.

17   Q.  Do you recall what it was that caused you to increase the

18   estimate 700 percent for the flowers?

19   A.  I believe, sir, that it's the same scenario where when you

20   drill down on granular details that are required to operate

21   this building in a luxury-type fashion, right, and you have

22   more defined information about specifics, you're able to come

23   up with a budget that is a better representation of what at

24   that time we thought the actual would end up being.

25   Q.  One final item I want to show you is the payroll estimate

Petrus - cross

998

1   for engineering, which is, under the third amendment,

2   1,470,964.

3           After your revisions, payroll, engineering, 300

4   and -- is it 68 or 88?

5   A.  388.

6   Q.  388,250.

7           Was that reduction in the estimate of over 1.1 -- or

8   approximately $1.1 million attributable solely to the removal

9   from common elements of ballrooms and meeting rooms?

10  A.  No, sir.

11  Q.  Do you recall whether it was in any part due to that?

12    (Brief pause.)

13          THE COURT:  He hasn't answered.

14  BY MR. SHONKWILER:

15  Q.  Do you recall --

16          MR. SHONKWILER:  I'll withdraw the question.

17    (Brief pause.)

18          THE WITNESS:  I shouldn't answer the question?

19          THE COURT:  He withdrew the question, so you do not

20  need to answer.

21          MR. SHONKWILER:  I withdrew the question.  Thank you.

22          THE WITNESS:  I'm sorry.

23    (Brief pause.)

24  BY MR. SHONKWILER:

25  Q.  I'll wrap up this subject by looking back at what I --

1          MR. SHONKWILER:  Correct me if I'm wrong, Mr. Kulwin.

2     I believe this is Summary Exhibit 3.

3          MR. S. KULWIN:  You have --

4          MR. SHONKWILER:  Demonstrative, not summary.

5     Demonstrative Exhibit 3.

6          MR. S. KULWIN:  You've got the number covered up, so

7     I don't know; but I'll take your word for it.

8          MR. SHONKWILER:  Okay.  It says 3.  If they're still

9     numbered the same way, it's 3.

10    BY MR. SHONKWILER:

11    Q.  Now, sir, do you recall that in Mr. Kulwin's examination,

12    this number here, $4,682,303, was the difference between the

13    total expenses estimated in the fourth amendment, which were

14    about 6.1 million, as compared to the total expenses from the

15    third amendment, which were about 10.8 million?

16    A.  That is the difference, sir.

17    Q.  Okay.  Is that difference between those two amendments --

18    and their overall estimated expense differences -- is that

19    difference due solely to the removal from the common elements

20    of ballrooms and meeting rooms?

21    A.  It is not.

22    Q.  And so this next line below it -- this next line below

23    it -- which is only the difference between this number and

24    this number, correct?  Is that line due solely to the removal

25    of common elements from the third amendment as compared to the

Petrus - cross

1000

1  fourth amendment?

2  A.  It would not be.

3  Q.  Now, there was -- in the third amendment budget, the

4  budget that was in place when you joined Trump, there were --

5  the revenues we just looked at -- were estimated revenues from

6  rentals and commissions related to the ballroom and meeting

7  room facilities.  Do you recall that number?

8  A.  Yes, sir.

9  Q.  It was about $5 million?

10  A.  Yes, sir.

11  Q.  Okay.  And there also would be expenses associated with

12  owning those facilities, correct?

13  A.  Yes, sir.

14  Q.  The $5 million number we looked at was a revenue number,

15  correct?

16  A.  Yes, sir.

17  Q.  And against that revenue number, there would be some

18  expenses to running those facilities, right?

19  A.  Yes, sir.

20  Q.  If the expenses associated with running those particular

21  facilities were less than the revenues in a given year, that

22  would result in a net profit of some amount that would go to

23  the condominium association if they owned those, correct?

24  A.  That is accurate.

25  Q.  And that net revenue or profit from those facilities for

Petrus - cross

1   that year would help reduce the amount of common charges that

2   would be assessed to the unit owners?  Is that how it works?

3   A.  That would be the hypothetical example, yes, sir.

4   Q.  And that's illustrated -- this is the third amendment --

5   well, I'm jumping ahead.  Let me hit one more point first.

6           If, on the other hand, in that given year -- we're

7   talking about the expenses associated with owning those

8   facilities -- exceeded the revenues associated with owning

9   those facilities, that would result in a net loss for that

10  year to the association?

11  A.  It would result in a loss, that's correct, sir.

12  Q.  If they were common elements, correct?

13  A.  If they were common elements.

14  Q.  And that net loss then would have what affect on the

15  common charges assessed to the unit owners?

16  A.  You would end up paying more CAM.

17  Q.  There would be higher common charges for the year?

18  A.  Higher common charges per unit owner, that's correct.

19  Q.  As of -- strike that.

20          Let's talk now about the actual events that led to

21  the decision to remove those common elements from the hotel

22  condominium.  And I'm going to refer to them as the meeting

23  and ballroom facilities just to have some regularity in our

24  definitions.  By that I mean the common elements that were

25  moved out of the hotel condominium by the fourth amendment.

Petrus - cross

1   Okay?

2   A.  Yes, sir.

3   Q.  Okay.  The meeting and ballroom facilities were common

4   elements under the third amendment; were removed under the

5   fourth, correct?

6   A.  Yes, sir.

7   Q.  Where are those meeting and ballroom facilities located

8   physically in the property?

9   A.  They're located on the 16th and the 17th floor of the

10  property.

11  Q.  Were they constructed yet when you started working at

12  Trump?

13  A.  They were not.

14  Q.  Were you involved in that change that moved those

15  facilities -- -- strike that.  I can word that better.

16          Were you involved in making the decision that

17  resulted in the movement of those facilities from the hotel

18  condominium common elements to the commercial property?

19  A.  Yes, sir.

20  Q.  Was that change first -- did that change first come about

21  at your suggestion?

22  A.  Yes, sir.

23  Q.  Why did you suggest making that change?

24  A.  I think I clearly realized the risk and the potential

25  burden that would be on each of the unit owners if they

Petrus - cross

1003

1  absorbed the actual expenses, all of the expenses, that were

2  associated with that area.

3          And as a result of that, I went back and I looked at

4  the analysis that had been done and the assumptions that were

5  done at one time earlier in the stage of the -- of the

6  project.  And I thought that the appropriate thing to do was

7  to make a modification to the budget that would give the unit

8  owners greater protection in the event that -- any type of

9  fluctuations in revenues and expenses tied to that area.  It's

10  about as simple as that.

11  Q.  Were there other factors you recall going into your

12  decision?

13  A.  There was information that was available to me about

14  trends.  And we referenced a PKF report that also gave us some

15  definitive information about what other luxury properties were

16  yielding from a meeting room rental perspective and also from

17  total revenues.

18          So all of this -- all of this information, plus my --

19  just my years of experience dealing with this and knowing the

20  volatility made me say that we're doing something that's

21  prudent by adjusting all of the line expenses to make sure

22  that they're accurate and also taking out a risk factor for

23  unit owners.

24  Q.  Do you remember Mr. Kulwin asking you at some point about

25  whether -- if the common elements, the ballroom and meeting

Petrus - cross

1004

1   room facilities, were common elements of the hotel

2   condominium, if the hotel condominium association could

3   potentially terminate the Trump affiliate that was managing

4   the hotel condo elements?

5   A.  Yes, sir.

6   Q.  Do you remember that discussion?

7   A.  Yes, sir.

8   Q.  There was reference to a Burger King somewhere in there;

9   do you remember that?

10  A.  I do remember that.

11  Q.  I just want to be clear.  It -- that is something that

12  could have happened had those been common elements, correct?

13  A.  Something crazy like that probably could happen.

14  Q.  Even short of that, is it possible for the owner -- even

15  in a facility that's managed by a Trump affiliate on a

16  day-to-day basis, is it possible that the owner can still make

17  some decisions that are important to the proper functioning of

18  the ballroom and meeting room facility?

19  A.  Just so that I'm clear on your question, when you say

20  owner, are you saying unit owner?

21  Q.  No.  I'm sorry.

22          Let's -- let's say that under the third amendment

23  these are still common elements; they're still owned by the

24  hotel condominium --

25  A.  Yes, sir.

Petrus - cross

1005

1   Q.  -- as common elements.

2          The association under that scenario would have a

3   contract with the Trump affiliate that was managing the hotel

4   condominium, correct?

5   A.  Yes, sir.

6   Q.  And under that contract, depending on the terms of it,

7   that association could potentially terminate the hotel

8   manager; in this case it was a Trump affiliate, right?

9   A.  That's correct.

10  Q.  Are there other decisions, short of terminating the

11  manager, that the condominium association could make that

12  could affect the manager's ability to run those facilities?

13  A.  Absolutely.

14  Q.  Like what, for example?

15  A.  Just input into operations.  They could have -- there

16  could be parameters that could be set up that could restrict

17  business.  There are things that could have a negative impact

18  on the overall success of the operation.

19  Q.  Now, I believe you testified and -- that it was never the

20  plan to have these ballroom and meeting room facilities, even

21  if they had been common elements, managed on a day-to-day

22  basis solely by the condominium association, right?

23  A.  That's correct.

24  Q.  It was always the plan that they would be managed by a

25  Trump affiliate manager?

Petrus - cross

1    A.   That's correct.

2    Q.   And that's the situation in all of your hotel

3    condominiums, right?

4    A.   That is accurate.

5    Q.   Okay.  But, nevertheless, there is a contract -- and I'm

6    going to show it because it was one of the exhibits Mr. Kulwin

7    showed you.  It's Plaintiff's Exhibit 33.

8         This is just the first page of the document.  Do you

9    remember being shown this?

10   A.   Yes, sir.

11   Q.   Okay.  And this is the management agreement between the

12   Trump affiliate that manages the hotel condominium and the

13   hotel condominium, right?

14   A.   Yes, sir.

15   Q.   Now, if you look at this contract, Mr. Kulwin pointed out

16   that Donald Trump signed it on behalf of each party.  And

17   that's because the parties to it are 401 North Wabash Venture

18   LLC -- that's the developer of Trump Tower, correct?

19   A.   Yes, sir.

20   Q.   As of October 10th, 2007, the developer owned still the

21   hotel condominium parcel, right?

22   A.   That's correct.

23   Q.   Because there had been no closings of any units, right?

24   A.   That is correct.

25   Q.   There was no condominium association?

Petrus - cross

1   A.  Accurate.

2   Q.  That came about later?

3   A.  That is accurate.

4   Q.  In like 2008 or --

5   A.  Yes, sir.

6   Q.  Okay.  Until then this contract had to be between the

7   then-owner of the condominium, the developer, and the manager,

8   Trump International Hotels Management; is that correct?

9   A.  That is absolutely correct.

10  Q.  And this name I just read, that is the name of the

11  manager, right, Trump International --

12  A.  That is the name of our organization.

13  Q.  Okay.  After the condominium did get up and running, this

14  contract was assigned by the developer over to the condominium

15  association, correct?

16  A.  That is correct.

17  Q.  So this contract now, the one that governs the

18  relationship between the Trump manager and the condominium

19  association, is now a contract, in fact, between the

20  condominium association and the Trump manager?

21  A.  That is correct, sir.

22  Q.  It's this contract that ultimately tells you your answer

23  to what sorts of rights the condominium association may have

24  to approve certain budgets or make certain decisions that

25  could affect the operations of these facilities if they were

Petrus - cross

1   owned by the hotel condominium, right?

2   A.  This establishes the parameters, that is correct.

3   Q.  Was any part of the decision -- back up.  Strike it.

4           Was any part of the consideration that went into your

5   original suggestion to remove these ballroom and meeting room

6   facilities out of the common elements related to the

7   prospective influence the condominium association could have

8   over the ultimate operation of these facilities if they were

9   common elements, to the best of your recollection?

10  A.  No, sir.

11  Q.  Do you remember whether you had any concern that if these

12  remained in the common elements -- that is, the meeting and

13  ballroom facilities -- that, for example, the budget could be

14  limited or cut in a way that would interfere with the proper

15  operations of those facilities?

16  A.  I did have that thought cross my mind, yes, sir.

17  Q.  Is that a thought that crossed your mind later or one that

18  originally led to a suggestion, if you recall?

19  A.  I don't recall exactly the timing on it.

20  Q.  Do you remember whether that factor ultimately played any

21  role in the decision that was made?

22  A.  I don't believe so.

23  Q.  Do you remember -- other than the factors you've testified

24  about already, do you remember any factors that were discussed

25  then that ultimately led to the decision to move the ballroom

Petrus - cross

1009

1     and meeting facilities out of the common elements of the hotel

2     condominium?

3     A.  I do not.

4     Q.  One more point about this contract before we move off.

5              Give me a second, please.

6              This contract pertains to the management of the hotel

7     condominium parcel of Trump Tower, correct?

8     A.  This document here?

9     Q.  Yes.

10    A.  Slide that down a second.

11    Q.  I'm going to read it to you in case you don't remember.

12    Tell me if this refreshes your recollection or helps you

13    answer the question.  This is the first page of the document.

14    A.  Right.

15    Q.  Also included in the building but not part of the

16    condominium and not subject -- not the subject of this

17    agreement are, a residential condominium?

18    A.  That is correct.

19    Q.  And then it goes down to, two, commercial property?

20    A.  That is correct.

21    Q.  And it goes on and on.  Here it does say -- incidentally

22    because this is when the fourth amendment came out -- that the

23    commercial property by the time you signed this document was

24    comprised of, among other things, parking garage, retail

25    space, health club and spa, meeting and function rooms,

Petrus - cross

1010

 1    ballrooms, et cetera.  Okay.  So this contract pertains only

 2    to the manager's management of the hotel condominium parcel of

 3    the property, right?

 4    A.  That is correct.

 5    Q.  This contract has nothing to do with the various other

 6    pieces that comprise the entire building?

 7    A.  That is accurate.

 8    Q.  Those are managed subject to a different contract, right?

 9    A.  A different agreement.

10    Q.  Right.

11         MR. SHONKWILER:  Can I have a minute to collect my

12    notes?

13         THE COURT:  You may.

14         MR. SHONKWILER:  Thank you.

15      (Brief pause.)

16    BY MR. SHONKWILER:

17    Q.  Mr. Petrus, do you remember the exact date when you first

18    suggested moving the meeting and ballroom facilities out of

19    the common elements?

20    A.  I do not recall the exact date.

21    Q.  Can you pinpoint the exact date when you and the others

22    working with you on the fourth amendment decided to move those

23    facilities out of the common elements?

24         MR. S. KULWIN:  Objection, Judge.  He stated he

25    doesn't remember.  It calls for speculation.

Petrus - cross

1011

1      MR. SHONKWILER:  One was suggested and one was

2  decided, your Honor.

3      THE COURT:  Overruled.  You may answer if you can.

4  BY THE WITNESS:

5  A.  I don't recall the exact date, no, sir.

6  BY MR. SHONKWILER:

7  Q.  And the date of the suggestion initially and the date of

8  the ultimate decision were different dates; do you recall that

9  at least?

10  A.  I don't recall the specific dates.

11  Q.  But you recall that they were different times?

12  A.  Absolutely.

13  Q.  Okay.  And do you recall approximately the amount of time

14  that passed between the date in which you originally suggested

15  this and the day in which it was ultimately decided and

16  approved?

17  A.  This -- let me just go back here.

18      Again, this was probably a nine-month process.

19      MR. SHONKWILER:  Your Honor, Exhibit 578 was one that

20  was discussed.  Is that in evidence?

21      THE COURT:  578 is not in evidence.

22      MR. SHONKWILER:  Not?

23    (Brief pause.)

24      MR. S. KULWIN:  No objection.

25      THE COURT:  I didn't hear you.

Petrus - cross

1012

1    MR. S. KULWIN:  I'm sorry, Judge.  No objection.

2    THE COURT:  No objection.  Okay.  I will admit

3    Defendants' Exhibit 578.

4    Before you start on that document, let's take our

5    afternoon break.

6    (Jury out.)

7    MR. NOVACK:  Judge, may I?

8    THE COURT:  One second first.

9    Do you have a sense of how much longer you have,

10   roughly?

11   MR. SHONKWILER:  It would be easier after I go

12   through these notes to be accurate about it.  But if -- I'll

13   probably be able to do it in 30 to 45.

14   THE COURT:  You may step down, sir.

15   Yes?

16   MR. NOVACK:  I have a question or I want to pass on

17   some information.  As you know, Jill Cremer is the next

18   witness, who does not work for the Trump organization.  She

19   came as an accommodation, and the accommodation being

20   Mr. Kulwin's case.  Today was the day for her testimony.  She

21   has just sent me a message that if she can't get on today, she

22   will not come back tomorrow.  She will not testify in the

23   case.  And I'm wondering if there's a way we can put her on

24   out of order so we don't lose her testimony.

25   MR. S. KULWIN:  I'll put her on right after the

1   break.

2           THE COURT:  How long do you think her direct will be?

3           MR. S. KULWIN:  30 minutes.  25, 30 minutes.

4           THE COURT:  Okay.  We will interrupt and put her on.

5           MR. NOVACK:  Thank you very much.

6           (Recess taken.)

7           (Proceedings out of the hearing of the jury:)

8           THE COURT:  Do you want to bring Ms. Cremer in?  Is

9   it Cremer or Cremer?

10          MR. NOVACK:  Cremer, I believe.  I met her for the

11  first time here out in the hall.  I believe it's Cremer.

12          (Brief pause.)

13          THE COURT:  Okay.  Bring in the jury please, Danny.

14          COURT SECURITY OFFICER:  Yes, Judge.

15          (Jury entered the courtroom.)

16          THE COURT:  You may be seated.

17          Ladies and gentlemen, in order to accommodate a

18  witness schedule, we're going to take a witness out of order

19  and come back and finish Mr. Petrus afterwards.

20          Your next witness, Mr. Kulwin?

21          MR. S. KULWIN:  Thank you, your Honor.  We call Jill

22  Cremer.

23          THE COURT:  Ma'am, would you please raise your right

24  hand.

25             JILL CREMER, PLAINTIFF'S WITNESS, DULY SWORN

Cremer - direct

1014

1                  DIRECT EXAMINATION

2    BY MR. S. KULWIN:

3    Q.  Good afternoon, Ms. Cremer.

4    A.  Good afternoon.

5    Q.  Ma'am, could you state your name and spell your last name

6    for the record?

7    A.  Jill Cremer, C-R-E-M-E-R.

8    Q.  Where do you reside, Ms. Cremer?

9    A.  New York City.

10   Q.  And are you currently employed?

11   A.  Yes, I am.

12   Q.  And can you tell the ladies and gentlemen of the jury

13   where that would be?

14   A.  I am employed by the Port Authority of New York and New

15   Jersey and I work on the World Trade Center project.

16   Q.  I'm sorry, I didn't hear the last part?

17   A.  I work on the World Trade Center development.

18   Q.  Okay.  Were you ever employed by the Trump organization?

19   A.  Yes, I was.

20   Q.  And when was that?

21   A.  I started in June of 1998 and I resigned in early 2008.

22   Q.  And why did you leave?

23   A.  I had twins.

24   Q.  Okay.  Congratulations, a long time ago.

25           Now, what was your position at the Trump organization

Cremer - direct

1  between 1998 and 2003?

2  A.  I was initially a project manager and then was promoted to

3  a vice president of development.

4  Q.  Okay.  And is that the position you remained in until you

5  left?

6  A.  Excuse me?

7  Q.  Is that the position you remained in until you left?

8  A.  Yes, it was.

9  Q.  What were some of the things that you oversaw in that

10  regard?

11  A.  I managed our land use review process and our sales and

12  marketing developments as well.

13  Q.  With respect to the marketing matters, did you have any

14  involvement in managing the outside agencies?

15  A.  Yes, I did.

16  Q.  And did you also work with Trump consultants concerning

17  condominium document development?

18  A.  Yes, I did.

19  Q.  Now, while you were developing the condominium documents

20  with the consultants, would you simultaneously formulate the

21  marketing campaign?

22  A.  Yes, I did.

23  Q.  Would you also have been involved in how on the Trump

24  Tower Chicago -- I'll call it Trump Chicago just for

25  convenience because there's a lot of names.

Cremer - direct

1016

```
 1              On the Trump Chicago project would you have been
 2   involved in coming up with ideas on how to market and sell the
 3   hotel condominiums?  Would you have been a part of that
 4   process?
 5   A.  I was part of the process.
 6   Q.  Right.  And that would also include what would be
 7   highlighted in the brochures, correct?
 8   A.  Yes.
 9   Q.  Now, while you were at Trump did you also work on other
10   projects besides Trump Chicago?
11   A.  Yes, I did.
12   Q.  And can you tell us about some of those?
13   A.  I worked on other projects in New York.
14   Q.  Which ones would those be?
15   A.  40 Wall Street, General Motors building --
16   Q.  Is the General Motors building the Trump International
17   Tower hotel in New York?
18   A.  No, it is not.
19   Q.  Okay.  Which one is that, the General Motors building?
20   A.  It's an office tower on Fifth Avenue.
21   Q.  All right.  I'm sorry.  Go on.
22   A.  I worked on Trump Place at Riverside South as well as
23   other projects in Florida.
24   Q.  Okay.  And what were the projects in Florida?
25   A.  There was a Trump Hotel in Sunny Isles.  I don't recall
```

Cremer - direct

1017

1    the name.

2    Q.  Was that a hotel condo?

3    A.  I believe it was.

4    Q.  Okay.  Go on.

5    A.  There was a Trump Hotel in Fort Lauderdale.

6    Q.  Okay.  And your work on the one in Sunny Isles, that would

7    have been between 2002 and 2008, to the best you can recall?

8    A.  Most likely, yes.

9    Q.  Okay.  Now, who was your direct supervisor when you worked

10   at the Trump Tower -- I mean, at the -- I'm losing my Trumps

11   -- at the Trump organization?

12   A.  Initially it was Charlie Reiss until he resigned, and then

13   I worked for Andy Weiss.

14   Q.  Did you work with Russ Flicker?

15   A.  Yes.

16   Q.  But you never reported to him, correct?

17   A.  Never.

18   Q.  Okay.  Can you recall approximately when you started

19   working on Trump Chicago?

20   A.  Approximately 2003.

21   Q.  Okay.  Now, I just want to ask you a couple questions

22   about your work with Mr. Reiss, if I could.  Is that okay?

23   A.  Yes.

24   Q.  Thank you, ma'am.

25           With respect to your work with Mr. Reiss, you were

Cremer - direct

1018

 1   aware that he worked on the operating budgets for Trump

 2   Chicago, the hotel condo operating budgets, correct?

 3   A.  Yes.

 4   Q.  Okay.  And fair to say he was a detailed oriented person,

 5   Mr. Reiss?

 6   A.  At times, yes.

 7   Q.  Okay.  Now, when you first began working on Trump Tower

 8   Chicago, you were working with Koenig & Strey to develop the

 9   marketing materials for Trump Tower Chicago?

10   A.  Yes.

11   Q.  And at the same time as you were doing that, you were also

12   developing the property reports, both residential and hotel

13   condo, working with the consultants for Trump Chicago,

14   correct?

15   A.  Yes.

16   Q.  Okay.  Now, I mentioned Koenig & Strey.  And Koenig &

17   Strey, they were the brokerage firm that Trump ultimately

18   hired to be the exclusive broker for Trump Chicago?

19   A.  Yes.

20   Q.  And you were involved in searching for a number of

21   brokerage firms, correct?

22   A.  Yes.

23   Q.  That wasn't done just randomly; you put a lot of effort

24   into that, correct?

25   A.  Yes.

Cremer - direct

1  Q.  And you worked in that regard with Mr. Reiss and

2  Mr. Flicker?

3  A.  Yes.

4  Q.  And all of you put a lot of work and effort and detail

5  oriented work in trying to choose the right one, true?

6  A.  Yes.

7  Q.  And if I understand, the commission -- they were paid on a

8  commission basis, correct?

9  A.  Yes.

10  Q.  And when they sold a unit they received a commission,

11  correct?

12  A.  Yes.

13  Q.  And they would get -- correct me if I'm wrong.  I may be.

14  They would get one-third when the customer signed an

15  agreement, right?

16  A.  I believe so.

17  Q.  Yeah.  And then another third several months later, and

18  the last third at closing, is that right?

19  A.  That's what I recall.

20  Q.  Thanks, ma'am.

21         Now, during the time that you worked with Mr. Reiss

22  and others on Trump Chicago, you folks -- fair to say you

23  pretty much closely supervised what Koenig & Strey was doing

24  out here, fair?

25  A.  Yes.

Cremer - direct

1    Q.  You had meetings in Chicago every other week with the lead

2    broker, correct?

3    A.  Yes.

4    Q.  Her name was Tere Proctor?

5    A.  Yes.

6    Q.  She led the sales team?

7    A.  Yes.

8    Q.  And at first, when you first started meeting with her, all

9    of you folks, it was about the design of the brochures and

10   things of that nature?

11   A.  Yes.

12   Q.  And then after those meetings you kind of -- after you got

13   that kind of in place, you started working on, you know, the

14   design and placements of the advertisements in various

15   publications?

16   A.  Yes.

17   Q.  And you also worked with them to plan what are called

18   special broker events, true?

19   A.  Yes.

20   Q.  And why don't you explain -- you probably know more than I

21   do.  Can you explain for the ladies and gentlemen what a

22   special broker event is?

23   A.  A broker event would be a reception of some sort.  It

24   could be a breakfast, it could be a lunch or a cocktail

25   reception in the evening in which we would present information

Cremer - direct

1021

 1    about the project.

 2    Q.   Okay.  By the way, ma'am, do you need any water up there?

 3    Do you have water?

 4    A.   That would be nice, actually.

 5    Q.   Okay.

 6            (Brief pause.)

 7    BY MR. S. KULWIN:

 8    Q.   Whenever you're ready, ma'am.

 9    A.   Okay.

10    Q.   And the Trump organization, in particular you and Mr.

11    Reiss, provided the information to Koenig & Strey for the

12    development of the marketing material, correct?

13    A.   Yes.

14    Q.   And that information included information about the type

15    of units, the amenities, the design of the building, the floor

16    plans, et cetera, true?

17    A.   Yes.

18    Q.   Also included photos of Mr. Trump?

19    A.   Yes.

20    Q.   Mr. Trump's preference was that his image be a part of the

21    marketing, correct?

22    A.   Yes.

23    Q.   And that was done to convey his personal involvement in

24    the project, right?

25    A.   Yes.

Cremer - direct

1    Q.  Because he's a very well known public figure, right?

2    A.  Yes.

3    Q.  Really?  Okay.

4          And his name and his identity kind of projected this

5    luxury brand, right?

6    A.  Yes.

7    Q.  Now, you provided information to Koenig & Strey,

8    obviously, that the Trump organization and you, in particular,

9    thought would be helpful in their efforts to sell the project,

10   right?

11   A.  Yes.

12   Q.  Now, I went over this a little bit generally but I want to

13   focus on Trump Chicago.

14          With respect to the property reports for Trump

15   Chicago, your role was to collect information and provide it

16   to the consultants that was supposed to go into the reports,

17   right?

18   A.  Yes.

19   Q.  And both you and Mr. Reiss would collect that information,

20   true?

21   A.  Yes.

22   Q.  And with respect to floor plans, you would collect

23   information from the architects about square footage and

24   things, right?

25   A.  Yes.

Cremer - direct

1   Q.  And you would collect from the finance team at Trump

2   information about the operating budgets, right?

3   A.  Yes.

4   Q.  And, by the way, there was a fellow that you also worked

5   with on that issue who was in New York who -- the controller

6   for the New York condo -- hotel condo.  Do you remember him,

7   Mr. Levchuck?

8   A.  Yes.

9   Q.  And he was a specialist in hotel accounting, right?

10  A.  I can't say that he was a specialist but --

11  Q.  You don't know --

12  A.  -- I worked with him on those matters.

13  Q.  Okay.  And you and Mr. Reiss and Mr. Flicker as well

14  reviewed the property reports to verify that the information

15  that was in it, like the number of units, correct spelling,

16  all that stuff, was accurate, correct?

17  A.  Yes.

18  Q.  And to the best of your knowledge, Koenig & Strey did not

19  use any marketing material or advertising material that was

20  not provided by Trump in selling the hotel condos at Trump

21  Chicago, correct, to the best of your knowledge?

22  A.  To the best of my knowledge, they did not.

23  Q.  And they didn't sell any units, to the best of your

24  knowledge, in any manner contrary to what Trump told them to

25  do, true?

Cremer - direct

1    A.  True.

2    Q.  From your work at Trump you know what the purpose of a

3    property report is, correct?

4    A.  Yes, I do.

5    Q.  And the purpose -- correct me if I'm wrong -- your

6    understanding, is to disclose specific information about the

7    property regarding that property, right?

8    A.  Yes.

9    Q.  And one of the components of the property report is to

10   identify and to define common elements, as you understand it,

11   correct?

12   A.  Yes.

13   Q.  And you understand, of course, that a common element is

14   property that is owned jointly by all the condominium unit

15   owners in the building, right?

16   A.  Yes.

17   Q.  And you're familiar with the operating budgets that are in

18   property reports, correct?

19   A.  I was familiar with them, yes.

20   Q.  And the purpose of those in Trump Chicago, in particular,

21   was to show the buyer what the common charges and assessments

22   would be based on, right?

23   A.  Yes.

24   Q.  And also to show them what the revenue that's going to be

25   coming into the condo association is going to be, right?

Cremer - direct

1025

1   A.  If there is revenue, yes.

2   Q.  Yeah.  It would be listed, right?

3   A.  (Nodding head.)

4   Q.  You have to say yes or no.  I'm sorry.

5   A.  Yes.

6   Q.  And also to show expenses, right?

7   A.  Yes.

8   Q.  Now, from working on the project you were aware that Trump

9   amended the property report, correct?

10  A.  Yes.

11  Q.  And based on your work at Trump, you were aware that a

12  property report was required to be amended when there was

13  significant changes that were going to be implemented,

14  correct?

15  A.  Correct.

16         MR. SHONKWILER:  Objection.  Calls for a legal

17  conclusion.

18         MR. S. KULWIN:  It was based on her understanding,

19  Judge.

20         THE COURT:  Rephrase that to make that clear.

21         MR. S. KULWIN:  Okay.

22  BY MR. S. KULWIN:

23  Q.  Same question based on your -- based on your understanding

24  and your work at Trump, you understood that an amendment to

25  the property report was required when there were significant

Cremer - direct

1026

1   changes that had to be made to the property, correct?

2           MR. SHONKWILER:  Same objection.

3           THE COURT:  Overruled.

4           You may answer, if you can.

5   BY THE WITNESS:

6   A.  Yes, I believe so.

7   BY MR. S. KULWIN:

8   Q.  Okay.  And the consultants ultimately decided whether

9   there was going to be an amendment, correct, the consultants

10  that Trump worked with?

11  A.  Yes.

12  Q.  But you were part of a team of people at Trump in deciding

13  whether you were -- that Trump was making a sufficiently

14  significant change, to give that to the consultants to

15  consider, right?

16  A.  Yes.

17  Q.  And significant changes can be -- based on your

18  understanding, can be the number of units sold, right, number

19  of units being sold?

20  A.  Yes.

21  Q.  The types of finishes or fixtures that -- if they are

22  significant, yes?

23  A.  Yes.

24  Q.  And the reason that -- if the unit numbers change it's

25  significant -- the amount of the units, because if the amount

Cremer - direct

1    of units that are being sold changes, each individual unit's

2    ownership interest in the overall building changes as well,

3    correct?

4    A.  I believe so, yes.

5    Q.  And that's something that's important to disclose, how

6    much percentage you own, right?

7    A.  Yes.

8    Q.  With respect to Trump Chicago, you had no role in

9    identifying which common elements would be sold to the hotel

10   condominium unit buyers, correct?

11   A.  No, I did not.

12   Q.  Before I get to that, let me just show you something,

13   okay?

14          I want to hand you what has been provisionally

15   admitted into evidence as Plaintiff's 75 and 76, and they are

16   Trump Chicago brochures, ma'am.  And I'll tell you why I'm

17   showing you -- there you go.

18          Ma'am, you were the only consistent employee -- and I

19   don't mean consistent -- you know what I mean.  I'm sure you

20   were consistent, but you were the only employee at the Trump

21   organization who worked from the time the first amendment

22   report was issued until the time the fourth amendment report

23   was issued, correct?

24   A.  I believe so.

25   Q.  And you were also -- as a result, you were the only one

Cremer - direct

1  there when all of the marketing materials during that time

2  period, 2003 and 2007, came out, correct?

3  A.  Correct.

4  Q.  So you were familiar with all of them, both before Mr.

5  Reiss left and after Mr. Reiss left, right?

6  A.  Yes.

7  Q.  And in that regard can you review Plaintiff's 75 and 76

8  and tell the ladies and gentlemen and -- tell us and the

9  ladies and gentlemen of the jury whether the pages included in

10  there -- and I realize they are black and white -- are pages

11  from those brochures?

12          And I know it's going to take a minute and I know you

13  have to go, but if you could just look through them.  And

14  those little numbers at the bottom, those are Bates numbers to

15  indicate that they came from Trump.

16          (Brief pause.)

17  BY MR. S. KULWIN:

18  Q.  Ma'am?  It is?

19  A.  I'm sorry, what's the question?

20  Q.  Are those all pages from Trump brochures, to the best of

21  your knowledge?

22  A.  With the exception of the cover letter --

23  Q.  Right, with the exception of the cover letter.

24  A.  -- the sales broker and copies of articles from

25  publications.

Cremer - direct

1029

1   Q.  Okay.

2   A.  Yes.

3   Q.  Except for that.  Okay.

4   A.  Yes.

5   Q.  And with respect to the articles from publications, did

6   Trump also, through Koenig & Strey, use reprints of such

7   articles as part of its marketing, to the best of your

8   knowledge?

9   A.  I'm actually not -- I actually don't recall what the sales

10   team --

11   Q.  You don't know?

12   A.  -- included in their packages to buyers.

13   Q.  But they wouldn't have included any such republications of

14   articles if -- without Trump's permission because Trump had to

15   approve everything they gave out, right?

16         MR. SHONKWILER:  Calls for speculation, your Honor.

17         THE COURT:  Sustained.  Lay a foundation that she'll

18   know that.

19   BY MR. S. KULWIN:

20   Q.  Well, we talked about earlier how you carefully monitored

21   all the work that Koenig & Strey did, you and Mr. Reiss and

22   others, right?

23   A.  In most cases we did.

24   Q.  Okay.

25   A.  But on an hourly by hourly daily basis --

Cremer - direct

1030

1  Q.  I understand.

2  A.  -- we were not present.

3  Q.  I understand.

4       But to the best of your knowledge, Koenig & Strey

5  wasn't supposed to issue anything that wasn't authorized by

6  Trump, correct, to the best of your knowledge?

7  A.  Correct.

8  Q.  And to the best of your knowledge, you or Mr. Reiss or

9  somebody in the Trump organization reviewed everything that

10 was being handed out, correct, to the best of your knowledge,

11 right?

12       MR. SHONKWILER:  Your Honor, objection.  Lacks

13 foundation.

14       THE COURT:  Overruled.

15       You may answer if you can.  If you know.

16 BY MR. S. KULWIN:

17 Q.  To the best of your knowledge, ma'am?

18 A.  As I had said, we were not involved with the daily

19 operations and interactions with buyers.

20 Q.  I understand that.

21 A.  But in general we were involved with oversight.

22 Q.  And the articles that you mentioned that are included with

23 those brochures are articles promoting Trump, correct?

24 A.  Correct.

25 Q.  Okay.  All right.  Putting aside the articles -- I think

Cremer - direct

1031

1 everything else is stuff that you recognize as being part of

2 the Trump --

3          MR. SHONKWILER:  I'm sorry, I can't hear counsel.

4          THE COURT:  Putting aside the articles.  Finish your

5 question, please.

6 BY MR. S. KULWIN:

7 Q.  -- are part of the Trump brochures that were being

8 distributed, correct?

9 A.  Yes.

10          MR. S. KULWIN:  Judge, with the exception of the

11 articles, which we'll put in through Ms. Goldberg, we'll now

12 move those parts of 75 and 76 into evidence.

13          THE COURT:  Is there any objection?

14          MR. SHONKWILER:  Your Honor, I thought 75, except for

15 the first page, was already in.

16          THE COURT:  I think it is.

17          MR. S. KULWIN:  It's only in -- it was in

18 conditionally, Judge.

19          THE COURT:  Is there any objection?

20          MR. SHONKWILER:  One second, please.  I'm sorry.

21          (Brief pause.)

22          MR. SHONKWILER:  No, we have no objection, your

23 Honor.

24          THE COURT:  Okay.  I will admit them both.

25          (Said exhibits were received into evidence.)

1  BY MR. S. KULWIN:

2  Q.  Ma'am, perhaps you could, just for simplicity, put --

3          MR. S. KULWIN:  May I approach, Judge?

4          THE COURT:  You may.

5  BY MR. S. KULWIN:

6  Q.  -- put stickies, Ms. Cremer, on just the articles that you

7  think were -- by the way, before I get to that, this cover

8  letter that you're talking about, were you aware that Koenig &

9  Strey was sending cover letters like this to the -- with

10 brochures?

11 A.  I actually don't recall.

12 Q.  One way or the other?

13 A.  But it is common business practice to include a cover

14 letter in a package to someone.

15 Q.  Okay.

16 A.  So I'm not surprised.

17 Q.  Okay.  Not surprised but not sure.

18          Okay.  We'll take the cover letter out.  And why

19 don't you just -- and I've got a whole stack of these for you.

20 Just tag a couple of articles that are --

21          (Brief pause.)

22 BY MR. S. KULWIN:

23 Q.  Okay?

24 A.  Uh-huh.

25 Q.  Thank you, ma'am.

Cremer - direct

1      All right.  Now, you -- let's go back to the topic

2  and start.  While you didn't have any role in identifying the

3  common elements, you participated in meetings with Charlie

4  Reiss and Russ Flicker about -- as well as consultants about

5  what would be included and what would not be included,

6  correct?

7  A.  Yes.

8  Q.  And you can't recall those meetings specifically, true?

9  A.  No, I cannot.

10  Q.  And you cannot recall specifically what occurred in any of

11  those meetings, true?

12  A.  No, I cannot.

13  Q.  But you've got a business practice of taking and

14  maintaining notes about what was discussed at Trump

15  organization meetings in which -- which would be included --

16  about -- start over.

17      You had a business practice generally, let's just

18  say, of taking notes and maintaining notes about what was

19  discussed at meetings at the Trump organization, fair

20  statement?

21  A.  Yes.

22  Q.  Including the meetings I just referenced, discussing the

23  common elements, correct?

24  A.  Yes.

25  Q.  And when you left Trump in 2008, you left your notes

Cremer - direct

1   there, correct?

2   A.  Yes.

3   Q.  Now, you recall that originally the project had office

4   space in it?  Do you remember that?

5   A.  Yes, I recall that.

6   Q.  And at some point Mr. Trump, working with Mr. Reiss,

7   decided to eliminate that space.  You recall that as well,

8   correct?

9   A.  It was actually Mr. Reiss consulting with Mr. Trump.

10  Q.  Right.  And Mr. Trump approved it?

11  A.  Yes.

12  Q.  Okay.  And due to the elimination of the office space,

13  some hotel condominium units were moved down, lowered to

14  floors, right?

15  A.  Yes.

16  Q.  Now, you had no role in any of the decisions made at Trump

17  as to what would be included in the common elements once the

18  office space was eliminated, correct?

19           MR. SHONKWILER:  Objection to form.

20           THE COURT:  Sustained on form.

21  BY MR. S. KULWIN:

22  Q.  Okay.  Did you have any role in determining what were in

23  the common elements once the office space was eliminated?

24  A.  No, I did not.

25  Q.  But there were meetings about that as well, correct?  I'll

 1    rephrase, because you look like -- puzzled.  Okay.

 2            But there were meetings at Trump about the decision

 3    of what to include in the common elements after the office

 4    space was eliminated as well, correct?

 5    A.  There --

 6    Q.  Right?

 7    A.  There may have been.  I don't specifically recall the

 8    meetings.

 9            MR. S. KULWIN:  Hold on one second.

10            (Brief pause.)

11    BY MR. S. KULWIN:

12    Q.  Okay.  And you attended some of those meetings, to the

13    best you can recall?

14            MR. SHONKWILER:  I'm sorry.  Objection to "those

15    meetings."

16            MR. S. KULWIN:  The ones I just asked about.

17            MR. SHONKWILER:  Your Honor, the last answer, I

18    believe, was she didn't recall any.

19            THE COURT:  Correct.

20            MR. S. KULWIN:  All right.

21            THE COURT:  Sustained.

22    BY MR. S. KULWIN:

23    Q.  All right.  Let me see if I can refresh your recollection

24    then.  I'm going to use my little handy thing here.

25            Page 146, if you could just read --

Cremer - direct

1036

```
 1              THE COURT:  Let the witness know 146 of what.

 2              MR. S. KULWIN:  Her deposition.

 3              THE COURT:  I know.  Let her know.

 4   BY MR. S. KULWIN:

 5   Q.  Page 146 -- this is of your deposition.

 6   A.  Uh-huh.

 7   Q.  I just want you to look at this and maybe it refreshes

 8   your recollection.

 9              THE COURT:  Read it to yourself, please.

10   BY MR. S. KULWIN:

11   Q.  Yes.  Start here, Line 15.

12              MR. SHONKWILER:  I'm sorry.  What page, Counsel?

13              MR. S. KULWIN:  145.

14              MR. SHONKWILER:  145?  What line?

15              MR. S. KULWIN:  15.

16              (Brief pause.)

17              MR. SHONKWILER:  Your Honor, having read this I don't

18   think it relates to the last question that was asked.

19              MR. S. KULWIN:  Judge --

20              THE COURT:  Wait.  Let's see if it refreshes the

21   witness' recollection first.  If it doesn't, then --

22              MR. S. KULWIN:  Okay.

23              THE COURT:  -- we'll move on.

24   BY MR. S. KULWIN:

25   Q.  Does that refresh your recollection at all whether there
```

Cremer - direct

1037

1    may have been meetings with people at the Trump organization

2    and the consultants about the decision of what should be in

3    the common elements after the office space was eliminated?

4          MR. SHONKWILER:  Your Honor, I just want to object to

5    the timeframe.  "After the office space" could be from then

6    until now or it --

7          THE COURT:  Overruled.  Let's see if it refreshes her

8    recollection, then we can getting the timing.

9          MR. S. KULWIN:  Just for the witness' benefit, can we

10   just have the question read back, please?

11         THE COURT:  Would you like the question read back?

12         THE WITNESS:  Yeah.

13         THE COURT:  Mary, would you read it back, please?

14         (Record read.)

15   BY THE WITNESS:

16   A.  Yes, but --

17   BY MR. S. KULWIN:

18   Q.  Okay.  That's it.  Good.

19         And to the extent there was meetings, you would have

20   attended some of those meetings, correct?

21   A.  Some, but not all.

22   Q.  And again, you would have used your standard practice of

23   taking notes at such meetings, true?  That's your standard

24   practice?

25   A.  Yes.

Cremer - direct

1038

1    Q.  And you would have left them all at the Trump

2    organization?

3    A.  Yes.

4    Q.  Now, the Trump brochures -- I'm sorry.

5            After the office space was dropped and the -- and

6    then there were new things added to the project, right,

7    ballrooms, meeting rooms, function rooms, bigger ones, right?

8    A.  Yes.

9    Q.  Okay.  And as a result of that there was an amendment to

10   the property report.  You recall that, right?

11   A.  Yes.

12   Q.  Okay.  But Trump also, I believe -- let me just check and

13   see if I've got it right.

14           MR. S. KULWIN:  If I may have one second, Judge?

15           THE COURT:  You may.

16           MR. S. KULWIN:  Thank you, your Honor.

17           (Brief pause.)

18   BY MR. S. KULWIN:

19   Q.  Trump also made changes to the advertising and marketing

20   material that Koenig & Strey was using to reflect the changes

21   that were in the new amended property report, right?

22           MR. SHONKWILER:  Object to form.  In particular, the

23   reference to Trump.

24           THE COURT:  Sustained.  Rephrase it.

25   BY MR. S. KULWIN:

Cremer - direct

1039

1     Q.  In addition to amending the property report, the Trump

2     organization also changed advertising and marketing material

3     that Koenig & Strey was using to reflect those changes to the

4     property report, right?

5               MR. SHONKWILER:  I object.  Vague to those changes,

6     and to which amendment?  I'm sorry, your Honor.

7               THE COURT:  Overruled.

8               You may answer if you can.

9     BY MR. S. KULWIN:

10    Q.  Do you understand?

11              Do you want her to read the question again?

12              MR. S. KULWIN:  I'm sorry.  Ma'am, could you -- Ms.

13    Court Reporter --

14              THE COURT:  Mary, would you please read it?

15              MR. S. KULWIN:  Mary, thank you.

16              (Record read.)

17    BY MR. S. KULWIN:

18    Q.  Do you understand the question?

19    A.  Yes, but the Trump organization didn't actually change the

20    advertising.  We directed Koenig & Strey --

21    Q.  Right.

22    A.  -- to --

23    Q.  Okay.  And you directed them to change -- okay, good.

24              Now, one of the things that was included in the

25    marketing material that was distributed to potential buyers

Cremer - direct

1040

 1   was the description not just of the hotel condominium -- I

 2   have a lot of trouble with that word -- hotel condominium

 3   units that were for sale but the hotel itself, right?

 4   A.  Yes.

 5   Q.  Do you still have those two exhibits up there?

 6   A.  Yes.

 7   Q.  Okay.  And I believe -- you know, if I could come up -- I

 8   don't want -- to save time, if I could look --

 9            (Brief pause.)

10            MR. S. KULWIN:  Thank you.

11   BY MR. S. KULWIN:

12   Q.  Just to make it easier for you, I wanted to put a sticky

13   so you didn't have to search around.  There you go, ma'am.

14   And I'm going to direct you there in a second.  Okay.

15            Now, one of the things that was included in the

16   market material -- I'm sorry.

17            Turning your attention specifically to the hotel

18   program, on Page 4382 of Plaintiff's Exhibit 75 it reads

19   whether an owner occupies the unit or places it for rent.  Do

20   you see that?

21   A.  Yes.

22   Q.  Could you read that part out loud, please?

23   A.  (Reading:)  Whether an owner occupies the unit or places

24   it for rent, the hotel will manage and maintain all guest

25   rooms, providing the highest level of service in the most

Cremer - direct

1    exclusive surrounding.

2    Q.   Is there a section referencing award-winning service?

3    A.   (Reading:)  Trump International Hotel will have an

4    intimate and private ambiance with all the comforts of home,

5    award-winning Trump service coupled with world class design,

6    guaranteeing an absolutely luxurious lifestyle.

7    Q.   Does it also talk about numerous awards in the hospitality

8    industry?

9    A.   It refers to award-winning Trump service.

10   Q.   Okay.  Can I borrow that for a second?  Thank you.

11        And the award-winning Trump service refers to the

12   numerous awards in the hospitality industry that Trump's hotel

13   condominium building in New York has won, right?

14   A.   That is what I recall.

15   Q.   Okay.  And that marketing language, award-winning service,

16   was aimed at people who were considering buying a -- who were

17   considering buying an interest in the Trump Hotel Chicago, not

18   to people who were just looking to rent a room, correct?  That

19   was the point of that, right?

20   A.   Yes.

21   Q.   Okay.  And indeed, the language was specifically designed

22   to appeal to a group of buyers who thought buying an interest

23   in the Trump Hotel was valuable, correct?

24   A.   I -- I cannot qualify whether they would buy it because

25   they thought it was valuable.

```
1          MR. SHONKWILER:  Your Honor, I'm sorry, could we hear
2    that question back again?
3          MR. S. KULWIN:  I'll read it back again.  I don't
4    have a problem.  Whatever the preference is, Judge.
5          THE COURT:  Do you want -- is it because you didn't
6    hear it or --
7          MR. SHONKWILER:  Didn't hear it, right.
8          THE COURT:  The question was:  (Reading:)
9     Okay.  And indeed, the language was specifically designed to
10   appeal to a group of buyers who thought buying an interest in
11   the Trump Hotel was valuable, correct?
12          And the answer was:
13    I cannot qualify whether they would buy it because they
14   thought it was valuable.
15          MR. S. KULWIN:  Can I hear the answer back?  I'm
16   sorry, Judge, I didn't hear it.  I apologize.
17          THE COURT:  (Reading:)
18    I cannot qualify whether they would buy it because they
19   thought it was valuable.
20          MR. S. KULWIN:  Okay.
21   BY MR. S. KULWIN:
22   Q.  Maybe it was the question.  I'm not asking whether you can
23   qualify it whether they thought it was valuable.  I'm saying,
24   that language that we just talked about was designed to appeal
25   to a group of buyers who thought buying an interest in the
```

Cremer - direct

1043

1   Trump Hotel was valuable.  Is that your recollection of it, or

2   you can't recall?

3   A.  I actually don't recall.

4   Q.  Okay.  Let me see if I can help you out there.

5           Why don't you look at Page 161 -- 161, Counsel,

6   Line 21 through 162, Line 4.

7           This is from your deposition.  You remember your

8   deposition?

9   A.  Uh-huh.

10  Q.  Just that question and answer.  I know it's been a little

11  while.  Maybe you can just read that and see if it refreshes

12  your recollection.

13  A.  Which line?

14  Q.  21 to 4.

15          (Brief pause.)

16          MR. SHONKWILER:  Judge, before we start another line

17  of questions, I just want to note that Mr. Kulwin has been

18  going about 35 minutes and I want to make sure we have time to

19  finish Ms. Cremer.

20          THE COURT:  Right.  How much longer do you think you

21  have, Mr. Kulwin?

22          MR. S. KULWIN:  Not much.  Maybe ten -- I'll move --

23          THE COURT:  Okay.  Finish it in ten minutes, if you

24  can.

25          MR. S. KULWIN:  I'll absolutely try, Judge.

Cremer - direct

1    BY MR. S. KULWIN:

2    Q.  Ms. Cremer, is that what you said?

3    A.  Yes.

4    Q.  Okay.  Thank you, ma'am.  I'm going to start to cut some

5    questions out here because I know you got to go.

6           Now, one of the things that Trump marketed when you

7    were -- while you were there was that the owner could stay in

8    the room as much as they want without any negative impact on

9    their ability to rent in the rental program, correct?

10   A.  Rephrase the question.

11   Q.  How about if I restate it for you.  I'm talking fast

12   because I want you to go.

13          Something that was also marketed by Trump in selling

14   the hotel condos was that the owner could stay in their room

15   as much as they wanted without any negative impact on their

16   ability to rent their room in the rental program.  That was

17   one of the things you marketed, correct?

18   A.  Yes.

19   Q.  And they also marketed, sensitive to that securities

20   issue -- and put that aside for a second -- that HCU owners --

21   by HCU I mean hotel condominium unit owners -- could earn more

22   revenue from renting their units and the associated costs,

23   correct?

24   A.  We did not report any information about earning revenue.

25   Q.  Maybe I read it wrong.  I might have that one wrong.  I

Cremer - direct

1045

1    do -- oh, that's in one of those articles.  I apologize.

2         Another thing that was marketed was the -- to the

3    potential buyers was the fair allocation of rental

4    opportunities, correct?

5    A.  Yes.

6    Q.  Specifically that Trump, as managers of the rental

7    program, would fairly allocate the room rentals, correct?

8    A.  Yes, I recall.

9    Q.  And, in fact, they marketed that they were going to use a

10   computerized rotation point system, true?

11   A.  That's what I recall.

12   Q.  Now, there came a point in time in 2006, 2007, when the

13   Trump executives in New York were discussing the removal of

14   the common elements that had been assigned, right?  Removal of

15   certain parts of the hotel elements that were being removed

16   and put out of the common elements?

17        Do you know what I'm talking about?  Ballrooms,

18   meeting rooms, things of that nature?

19   A.  I don't recall the timing that the --

20   Q.  You're absolutely right, you don't recall that.  But you

21   remember there was a point in time when that was being

22   discussed, correct?

23   A.  The issue was being considered.

24   Q.  Yeah.  And you attended a bunch of meetings about the

25   removal of those common elements, correct?

Cremer - direct

1046

 1    A.   I attended some meetings but I don't recall the specific

 2    meetings.

 3    Q.   Right.  Multiple meetings, as I understand, correct?

 4    A.   I don't recall if there were multiple meetings.

 5    Q.   Okay.  And at those meetings, to the best of your

 6    knowledge, no one ever discussed that people who had already

 7    purchased hotel condominium units with those common elements

 8    included and the $5 million of revenues that went with it,

 9    were going to be upset or distressed about the change, is that

10    right?

11    A.   I'm sorry --

12    Q.   You never discussed that?

13    A.   Can you restate that?

14    Q.   Sure.

15         At those meetings we just talked about, no one at

16    Trump ever discussed that people who had already agreed to

17    purchase hotel condominium units with those common elements,

18    would be upset or distressed about the removal of them?  That

19    wasn't discussed, was it?

20    A.   Not in the meetings that I attended.

21    Q.   Okay.  Now, I want to show you what's been marked as

22    Plaintiff's Exhibit 13 in evidence.  For purposes of speed,

23    why don't you just look at the first couple of pages, okay?

24         Just tell me when you're ready, Ms. Cremer.

25         (Brief pause.)

Cremer - direct

1  BY MR. S. KULWIN:

2  Q.  Okay?

3        At the meetings you attended you don't recall ever

4  seeing projections like this, correct?

5  A.  No, I do not.

6  Q.  At one point Mr. Petrus wrote an e-mail on May 1st talking

7  about -- maybe you recall; I can show it to you if you want --

8  talking about the change in the common elements and it was a

9  powerful story to tell?

10       Do you remember that e-mail?

11  A.  No, I don't remember the specific e-mail.

12  Q.  Let me see if I can show it to you real quick.  You can

13  tell me if you remember it one way or the other.

14       (Brief pause.)

15  BY MR. S. KULWIN:

16  Q.  Do you remember it?

17  A.  I actually don't remember the e-mail, but it was addressed

18  to me --

19  Q.  That happens.

20  A.  -- six years ago.

21  Q.  All right.  You just eliminated five of my questions, so

22  we'll move on from there.

23       MR. S. KULWIN:  If I may have one moment, Judge?

24       THE COURT:  You may.

25       (Brief pause.)

Cremer - cross

1048

```
 1          MR. S. KULWIN:  At this point, your Honor, subject to
 2   whatever happens, I have no further questions.
 3          THE COURT:  Cross-examination.
 4          MR. SHONKWILER:  Thank you, your Honor.  Just one
 5   moment, please.
 6          (Brief pause.)
 7                       CROSS EXAMINATION
 8   BY MR. SHONKWILER:
 9   Q.  Good afternoon, Ms. Cremer.
10   A.  Good afternoon.
11   Q.  Now, you were employed by the Trump organization when the
12   original property report came out for the Trump Tower Chicago?
13   A.  Yes, I was.
14   Q.  And you were also employed, I think as Mr. Kulwin covered,
15   when the first amendment, second amendment, third amendment
16   and fourth amendment came out, right?
17   A.  Yes, I was.
18   Q.  And I think Mr. Kulwin also covered this, but to be sure,
19   you were not the person who made the decisions at any point in
20   that time as to whether certain facilities in the building
21   should be common elements of the hotel condominium or not,
22   right?
23   A.  That is correct.
24   Q.  But you were present at meetings, both at the time that
25   the initial decision was made to include those -- the ballroom
```

Cremer - cross

1049

1    and the meeting room facilities in the common elements of the

2    hotel condominium, and also you were present for some meetings

3    later in which the decision was made to move those same

4    facilities out of the common elements, is that right?

5    A.  Some meetings but not all.

6    Q.  And the decision to initially include the ballroom and

7    meeting room facilities in the common elements of the hotel

8    condominium was made by Charlie Reiss, is that right?

9    A.  Yes, it was.

10   Q.  Do you remember if Russ Flicker also had some involvement

11   in that decision?

12   A.  Yes.

13   Q.  Okay.  The decision ultimately to remove them came much

14   later, is that correct?

15   A.  Correct.

16   Q.  And at the time that the decision was made to initially

17   include the ballroom and meeting room facilities in the common

18   elements of the hotel condominium, to the best of your

19   knowledge, based on all the meetings you were present for,

20   that decision represented the real plans of the Trump

21   organization at that point in time for the project, right?

22          MR. S. KULWIN:  Objection, Judge.  It calls for

23   speculation and lack of foundation.

24          THE COURT:  Sustained on foundation.

25   BY MR. SHONKWILER:

Cremer - cross

1050

1   Q.  You don't have any reason to believe, Ms. Cremer, that the

2   plans made by Mr. Reiss and Mr. Flicker to include those

3   elements in the common elements -- those facilities in the

4   common elements -- strike that.

5           Ms. Cremer, during the years you were there the Trump

6   organization changed its plans in terms of whether the

7   facilities for the meeting rooms and the ballrooms would be in

8   the common elements, is that correct?

9   A.  Correct.

10  Q.  Okay.  Do you have any reason to believe that anyone

11  affiliated with the Trump organization tried to fool potential

12  buyers of hotel condominiums by making false statements about

13  their plans for the project?

14          MR. S. KULWIN:  Objection, Judge.  Calls for

15  speculation, lack of foundation.

16          THE COURT:  Sustained on the "do you have any reason

17  to believe" part.  Rephrase it.

18  BY MR. SHONKWILER:

19  Q.  Based on everything you know, Ms. Cremer, from every

20  meeting you ever participated in and were present for, do you

21  have any reason to believe that anyone affiliated with the

22  Trump organization tried to fool potential buyers by making

23  false statements about their plans for the project?

24          MR. S. KULWIN:  Judge, I'm going to object.  Lack of

25  foundation and lack that she remembers anything at any of the

1    meetings and argumentative.

2         MR. SHONKWILER:  Well, Judge --

3         THE COURT:  Overruled.

4         You may answer that if you can --

5    BY THE WITNESS:

6    A.  No.

7         THE COURT:  -- based on your knowledge.

8    BY MR. SHONKWILER:

9    Q.  Okay.  In fact, you have reason to believe that the plans

10   at all points -- the points in time --

11        MR. S. KULWIN:  Objection.  Argumentative, calls for

12   speculation.

13        THE COURT:  Let him finish.

14   BY MR. SHONKWILER:

15   Q.  In fact, do you have reason to believe that the plans

16   stated in the property reports were true statements about the

17   Trump organization's plans for the property?

18   A.  Absolutely.

19        MR. S. KULWIN:  Objection.

20        THE COURT:  Sustained.  You can ask her based on her

21   experience if that's what she observed or --

22        MR. SHONKWILER:  Sure.

23        THE COURT:  -- if there were -- the way you phrased

24   it is --

25   BY MR. SHONKWILER:

Cremer - cross

1  Q.  Based on your experience and your knowledge, based on your

2  presence at all the meetings at which the subject was

3  discussed, do you have any reason to believe that the plans

4  for the project as represented in the property reports were

5  true statements?

6  A.  Absolutely.

7  Q.  And what is that belief based on?

8  A.  It was based on the facts at the time.

9  Q.  And Mr. Reiss made a decision to include those elements as

10  common elements of the hotel condominium -- that decision --

11  well, strike it.  I'm going to get an objection.  I will

12  strike it and start over.

13       Were you ever asked to keep any plans for the project

14  secret from the public?

15       MR. S. KULWIN:  Judge, I'm going to object based on

16  the motion in limine.  We don't have the proof of plans.

17       THE COURT:  Sustained on form.  Rephrase it.

18       MR. SHONKWILER:  I would like to strike the comment

19  from plaintiff's counsel as well.

20       THE COURT:  I'll strike that and the jury should

21  disregard it.

22       Rephrase your question.

23  BY MR. SHONKWILER:

24  Q.  Based on -- well, were you ever asked at any point in time

25  when you worked at the Trump organization to keep any plans

1   for the building secret from the public?

2           MR. S. KULWIN:  Same objection, Judge.

3   BY THE WITNESS:

4   A.  I was never asked.

5           MR. S. KULWIN:  It's argumentative.

6           THE COURT:  Overruled.

7   BY MR. SHONKWILER:

8   Q.  I'm sorry, Ms. Cremer?

9   A.  I was never asked that.

10  Q.  You were involved in creating marketing material -- in

11  creating marketing materials for the project, correct?

12  A.  Correct.

13  Q.  You worked with Koenig & Strey and gave them instructions

14  on what to put in the marketing materials?

15  A.  Yes.

16  Q.  And sometimes -- and approved marketing materials

17  ultimately before they were issued?

18  A.  Yes.

19  Q.  Okay.  Who were the other Trump employees who assisted you

20  with that responsibility?

21  A.  Initially it was Charlie Reiss.

22  Q.  Okay.  And you did review all sales materials before they

23  were used, is that correct?

24  A.  Correct.

25  Q.  And you did approve all sales materials, is that correct?

Cremer - cross

1   A.   Correct.

2   Q.   And it was part of your job in that regard to make sure

3   that the marketing materials always currently and accurately

4   reflected your plans for the property?

5   A.   Correct.

6   Q.   And, to your knowledge, were they always current and

7   accurate?

8   A.   Yes.

9   Q.   To your knowledge, were there ever any false statements or

10  misrepresentations in the marketing materials?

11  A.   No.

12  Q.   Would you have ever approved of piece of marketing for the

13  project that you knew contained false information about plans

14  for the property?

15  A.   No, I would not.

16  Q.   And the same question about the rental management program:

17  At the time that the marketing materials were released

18  representing the Trump organization's plans for the rental

19  management program, were those marketing materials truthful

20  about the plans?

21  A.   Yes, they were.

22  Q.   At all points in time, is that true?

23  A.   Yes.

24  Q.   Would you have ever approved a piece of marketing material

25  if it contained a false statement about the Trump

Cremer - cross

1    organization's plans for the rental program?

2    A.  No, I would not.

3    Q.  And you were never told or asked to say anything false in

4    the marketing materials, right?

5    A.  No, I was not.

6    Q.  And you were asked about notes that you took at one point

7    in time while you were working for Trump.  There was nothing

8    in any of the notes you ever took that alluded to any secret

9    plan or misrepresentation in the materials that were issued to

10   the public --

11          MR. S. KULWIN:  I'm going to object, Judge, on the

12   secret plan which is directly against the motion in limine,

13   No. 1.  And No. 2 --

14          MR. SHONKWILER:  Your Honor --

15          MR. S. KULWIN:  Do you mind if I finish, please?

16          And No. 2, I'm objecting it's argumentative.  She

17   doesn't remember what happened to the notes or in the meeting.

18          THE COURT:  I'm sustaining on form.

19          MR. NOVACK:  Judge, can we have a short sidebar on

20   this?

21          THE COURT:  If you have an objection, please don't

22   make it --

23          MR. NOVACK:  No, but --

24          THE COURT:  -- speaking.

25          I would like to avoid -- given that we have time

1   constraints with the witness and I'm not keeping the jury past

2   5:00, I would like to avoid a sidebar now, if we can.  I'll

3   hear you after court, though.

4           MR. NOVACK:  Thank you.

5   BY MR. SHONKWILER:

6   Q.  A few quick questions.

7           Ms. Cremer, you never took any notes inconsistent

8   with the recollection that you've testified about today --

9           MR. S. KULWIN:  Judge --

10  BY MR. SHONKWILER:

11  Q.  -- is that correct?

12          MR. S. KULWIN:  Objection.  Calls for speculation.

13  She doesn't --

14          MR. SHONKWILER:  These are her notes, your Honor.

15          THE COURT:  Sustained because she previously said she

16  didn't remember what was in there.  So you have to lay a

17  better foundation.

18          If she doesn't remember what's in there, she's not

19  going to be able to remember if anything is inconsistent with

20  today.

21  BY MR. SHONKWILER:

22  Q.  When you took about notes about meetings, did you take

23  notes to reflect what actually occurred in those meetings?

24  A.  Yes, I did.

25  Q.  And do you have any -- was it ever your practice to take

1    notes about things that did not accurately reflect what

2    occurred in the meetings that you were taking notes for?

3    A.  No, I would not.

4    Q.  You have testified today based on your personal

5    recollection from some of the meetings you attended about the

6    Trump organization's plans for the property, right?

7    A.  Correct.

8    Q.  And you've also testified about your personal recollection

9    from those meetings about whether Trump's plans for the

10   property were accurately stated in the property reports,

11   correct?

12   A.  Correct.

13   Q.  Was there any -- did you ever take a meeting note that was

14   inconsistent with your memory of what occurred in those

15   meetings?

16           MR. S. KULWIN:  Judge, I'm going to object.  She

17   testified she doesn't remember anything that happened at the

18   meetings.  How can she answer that question?

19           THE COURT:  Overruled.

20           MR. S. KULWIN:  There's no foundation.

21           THE COURT:  Overruled.

22           You may answer if you can.

23           THE WITNESS:  I'm sorry.  Could you restate it?

24   BY MR. SHONKWILER:

25   Q.  Did you ever take any --

Cremer - cross

1058

1    MR. SHONKWILER:  Can we just read it back?

2    THE COURT:  Mary, would you read it back, please?

3    (Record read.)

4    BY THE WITNESS:

5    A.  To the best of my knowledge, no.

6    BY MR. SHONKWILER:

7    Q.  You're aware, aren't you, that the marketing materials

8    that were issued for the building mentioned meeting rooms and

9    ballrooms at some point?

10   A.  Yes.

11   Q.  You're also aware, aren't you, that those marketing

12   materials did not say that the meetings and ballrooms were

13   common elements or not, is that correct?

14   A.  That is correct.

15   Q.  Okay.  And the reason that the marketing materials didn't

16   discuss whether meeting rooms and ballrooms were common

17   elements is because that was not regarded by the Trump

18   organization people who worked on the marketing materials as a

19   selling point to be highlighted?

20   MR. S. KULWIN:  Objection, foundation.

21   THE COURT:  What was your objection?

22   MR. S. KULWIN:  Lack of foundation.

23   THE COURT:  Sustained.

24   You can ask her about her own beliefs, but I don't

25   think you've laid the foundation to go as broad as you did.

1    MR. SHONKWILER:  Okay.

2  BY MR. SHONKWILER:

3  Q.  Is it your understanding, your personal understanding --

4  well, let me back up.

5      You were part of the process whereby Koenig & Strey

6  was advised by the Trump organization as to what should go in

7  the marketing materials, right?

8  A.  Yes.

9  Q.  And you participated in meetings with those people where

10  you discussed just that topic?

11  A.  Yes.

12  Q.  And when you saw draft marketing materials that were given

13  to you for your approval, you reviewed them?

14  A.  Yes.

15  Q.  And that entire process that you personally were involved

16  in included, among other things, making decisions about what

17  should go in those materials, right?

18  A.  Yes.

19  Q.  And that decision was based in large part upon what you

20  all thought was important -- an important selling point to

21  push to the public to sell these units, correct?

22  A.  Yes.

23  Q.  And do you recall that the reason why the marketing

24  materials never said whether ballrooms or meeting rooms were

25  in the common elements was because it was not regarded to be

Cremer - cross

1    an important selling point?

2           MR. S. KULWIN:  Objection.  Lack of foundation,

3    Judge.

4           THE COURT:  Overruled.

5           MR. S. KULWIN:  She doesn't remember the meetings.

6           THE COURT:  You may answer to the extent you can.

7    BY THE WITNESS:

8    A.  I actually don't recall why we did not note the ownership

9    structure of those elements.

10   BY MR. SHONKWILER:

11   Q.  No recollection?

12   A.  I don't recall why.

13   Q.  Sunny Isles was brought up briefly.  Do you remember

14   talking about the Sunny Isles project?

15   A.  Yes.

16   Q.  I guess Sunny Isles -- the Trump organization did not

17   develop Sunny Isles, correct?

18   A.  No, we did not.

19   Q.  Trump did not build that either, right?

20   A.  No, we did not.

21   Q.  It doesn't own it, right?

22   A.  No.

23   Q.  It has a license deal with the owner, is that correct?

24   A.  Yes.

25   Q.  And there are six buildings at Sunny Isles; five are

Cremer - redirect

1061

1  residential and one is a hotel condo.  Do you recall that?

2  A.  I only recall three initially.

3          MR. SHONKWILER:  Okay.  Give me one minute, your

4  Honor.

5          THE COURT:  Okay.

6          (Brief pause.)

7  BY MR. SHONKWILER:

8  Q.  Ms. Cremer, one last question about the marketing

9  materials.

10          It is true, isn't it, that the practice of the Trump

11  organization, as long as you were there, was to highlight the

12  best selling points for the property in the marketing

13  brochures, correct?

14          MR. S. KULWIN:  Objection.  Asked and answered and

15  argumentative.

16          THE COURT:  Sustained.  It was asked and answered.

17          MR. SHONKWILER:  Okay.  Thank you, your Honor.

18          THE COURT:  Redirect?

19          MR. S. KULWIN:  Just a couple quick ones.

20                      REDIRECT EXAMINATION

21  BY MR. S. KULWIN:

22  Q.  Ms. Cremer, you were asked a number of questions about

23  what you would or wouldn't put in your notes.  Do you remember

24  those questions?

25  A.  Yes.

Cremer - redirect

1062

```
 1  Q.  One of the things that would be helpful to you as to what
 2  was in those notes in those meetings you attended would be for
 3  you to look at those notes, right?  That would have been very
 4  helpful, right?
 5          MR. SHONKWILER:  Objection, argumentative,
 6  irrelevant.
 7          THE COURT:  Sustained on form.
 8  BY MR. S. KULWIN:
 9  Q.  You would know what happened at the meetings if you could
10  look at the notes, right?
11          MR. SHONKWILER:  Objection to "could look at the
12  notes."  It's argumentative.  There's no foundation that
13  Ms. Cremer can't look at the notes or couldn't at any point in
14  time.
15          THE COURT:  Overruled.
16          You may answer, if you can.  If you can answer that.
17  BY THE WITNESS:
18  A.  If I could look at notes it would be helpful.
19  BY MR. S. KULWIN:
20  Q.  And no one in the Trump organization showed you those
21  notes, right?
22  A.  That I took or --
23  Q.  Yeah, that you took.
24          No one showed you those notes before you came here
25  today, did they?
```

1    A.  No.

2    Q.  And, by the way, Mr. Shonkwiler and Mr. Novack and their

3    firm represent you -- represented you at your deposition,

4    right?

5    A.  Yes.

6    Q.  And they are representing you here today, right?

7    A.  Yes.

8    Q.  Okay.  Now, you were asked some questions about whether

9    you would ever intentionally let anything go out in either the

10   amended property reports or the marketing materials, and you

11   said candidly, no, correct?

12   A.  Correct.

13   Q.  But you could have let things go out that were false

14   without knowing, correct?

15   A.  I suppose it's possible but --

16   Q.  Well, let me give you an example --

17           MR. SHONKWILER:  Excuse me, your Honor.  I think the

18   witness was still testifying.

19           MR. S. KULWIN:  I'm sorry.

20           THE COURT:  Did you finish your answer, ma'am?

21           THE WITNESS:  Yes.

22           MR. S. KULWIN:  I'm just trying to move it along.

23   BY MR. S. KULWIN:

24   Q.  Let me show you Page 9 from Plaintiff's Exhibit 2, which

25   is the February 25th amended property report.  You were

Cremer - redirect

1    involved in that, correct?

2    A.  Yes.

3    Q.  And there's a description of the common elements here.

4    And it says here that there will be laundry facilities.  Do

5    you see that?

6    A.  Yes.

7    Q.  Okay.  And the fact of the matter is that you were never

8    aware of any laundry facilities in the building, is that

9    right?

10   A.  That's correct.

11   Q.  Okay.  Now, another thing is, you were asked some

12   questions about whether all the marketing materials and the

13   property reports were truthful and accurate to the best of

14   your knowledge.  Do you remember those questions?

15   A.  Yes.

16   Q.  You never sat down with Donald Trump, Sr., in a one-on-one

17   conversation or any conversation and said, Mr. Trump, how do

18   you feel about this, correct?

19   A.  No, I did not.

20   Q.  He never shared his personal feelings about any of those

21   things, did he?

22   A.  No.

23         MR. S. KULWIN:  No further questions, Judge.

24         THE COURT:  Recross?

25         MR. SHONKWILER:  One moment, your Honor.

1      (Brief pause.)

2           THE COURT:  Any recross, Mr. Shonkwiler?

3           MR. SHONKWILER:  Very brief, your Honor.

4                 RECROSS EXAMINATION

5  BY MR. SHONKWILER:

6  Q.  Ms. Cremer, do you even know whether the Trump

7  organization retains notes after employees leave the

8  organization?

9  A.  No, I do not.

10 Q.  Okay.  And you don't need to see your notes to know that

11 you didn't take notes that were false -- falsely represented

12 the meetings that you were taking them in, correct?

13          MR. S. KULWIN:  Objection.  Argumentative, calls for

14 speculation without her being able to look at the notes.

15          THE COURT:  Overruled.

16 BY THE WITNESS:

17 A.  Correct.

18          MR. SHONKWILER:  That's it.  Your Honor, I think we

19 have nothing further.

20          THE COURT:  Thank you, Ms. Cremer.  You may step

21 down, ma'am.

22   (Witness excused.)

23          THE COURT:  Let's bring Mr. Petrus back for about 15

24 more minutes and then we'll end for the day.  It would be nice

25 if we could finish his direct before the day is over.

Petrus - cross

1066

```
 1              So bring Mr. Petrus back in, please.

 2              MR. S. KULWIN:  We're off direct.  I'm sorry.

 3              THE COURT:  Are you done?

 4              MR. S. KULWIN:  No.  They're still crossing him.

 5              MR. SHONKWILER:  We were still on --

 6              THE COURT:  Okay.  How much longer do you think you

 7   have on cross of Mr. Petrus?

 8              MR. SHONKWILER:  More than 15 minutes.

 9              THE COURT:  Okay.  Let's go for about 15 more minutes

10   and then we'll finish early today.

11              If anybody needs to stand up and stretch, go right

12   ahead.

13              (Brief pause.)

14      JAMES KEITH PETRUS, PLAINTIFF'S WITNESS, PREVIOUSLY SWORN

15              THE COURT:  You're still under oath, Mr. Petrus.

16              THE WITNESS:  Yes.

17              THE COURT:  You may continue.  Go ahead, Mr.

18   Shonkwiler.

19                     CROSS EXAMINATION (resumed)

20   BY MR. SHONKWILER:

21   Q.  Ending where we left off -- here it is.

22   A.  Okay.

23              MR. SHONKWILER:  Exhibit 578 was admitted with no

24   objection, is that correct, Counsel?  No objection to 578?

25              MR. S. KULWIN:  It's in already.
```

Petrus - cross

1          MR. SHONKWILER:  I don't know if we moved it into

2    evidence or not.

3          THE COURT:  You did and I admitted it without

4    objection.

5    BY MR. SHONKWILER:

6    Q.  Mr. Petrus, you mentioned earlier today that you prepared

7    many, many drafts of the budget that you revised between the

8    time that it was published in the third amendment and the time

9    you ultimately published and revised it in the fourth

10   amendment, correct?

11   A.  That's correct.

12   Q.  And that revision process took place over a sequence of

13   about six to nine months leading up to the fourth amendment's

14   issuance, correct?

15   A.  Approximately.

16   Q.  Okay.  And this document I'm showing on the screen is one

17   of the drafts you prepared during the course of your making

18   revisions to the third amendment budget?

19   A.  That is correct, yes, sir.

20   Q.  Now, I'll put back up the third amendment budget and show

21   you the comparison between these two.

22          First, just look at the income line items with me.

23   In the third amendment there are four of them and the total

24   here is 10,818,908, and apart from the common charges, the

25   items are for the meeting ballroom rentals and spa

Petrus - cross

1068

1    commissions, valet parking and other.

2            Now I'm showing your revised draft that we looked at

3    here.  We see those four lines.  The top line, common charges,

4    is different from the third amendment, correct?

5    A.  That's correct.

6    Q.  So this shows that as of the time you made this particular

7    draft revision, the common charges were -- was a number that

8    had been affected by some of your draft revisions, correct?

9    A.  One of many of the changes.

10   Q.  And these next three numbers, though, are exactly the same

11   as they were in the third amendment, correct?

12   A.  At that particular time, yes, sir.

13   Q.  And the time that we're talking about here is dated right

14   at the top, August 3rd, 2006, right?

15   A.  That's correct.

16   Q.  And you created this, right, and that note reflects that

17   this was your revision of the budget as of August 3rd, 2006?

18   A.  That's correct.

19   Q.  And as of this date none of these revenue items, meeting

20   and ballroom rentals and spa commissions, valet parking or

21   other, had been changed, right?

22   A.  Correct.

23   Q.  However, if you look at the expenses -- now, this is the

24   third amendment again.  And let's just take a look at the

25   first four:  Front desk, front service, housekeeping and

Petrus - cross

1069

1    telephone.  This is the third amendment.

2           Now, here is your August 3rd, 2006 revision.  Those

3    four numbers are different, right?

4    A.  Yes, sir.

5    Q.  And I don't know if your memory is this good, but I'll

6    represent to you that each one of them is smaller, is that

7    correct?

8    A.  That's correct.

9    Q.  Now, your reason for reducing some of these estimated

10   expenses, as you testified earlier, were related to a number

11   of factors.  And specifically, the front desk number we looked

12   at was totally unrelated to anything having to do with common

13   elements, is that correct?

14   A.  Correct.

15   Q.  Okay.  Now -- and then just compare one more set.  Let's

16   look at utilities.  This is the third amendment.

17          Utilities in the third amendment includes these two

18   items and here's the total.  Now, here are the estimated

19   utility expenses in your August 3rd, 2006 draft amendment and

20   those numbers are the same, correct?

21   A.  That's correct.

22   Q.  Okay.  I want to look at one more category here at the

23   bottom.  This is the third amendment, repairs and maintenance

24   expenses.  Let's just look at the first four:  30,000, 7,500,

25   10,000, 4,000.

Petrus - cross

1   And looking at your August 3rd, 2006 draft, those

2   four numbers are exactly the same.  And I will represent to

3   you that all of these numbers for utilities and repair and

4   maintenance are, in fact, absolutely the same as they were in

5   the third amendment, to save time, frankly.

6       But is it your recollection that at this point in

7   time you had begun to revise the payroll estimated expenses in

8   the budget?

9   A.  That process had begun at that time, that's correct.

10  Q.  And your line by line review had gotten through the

11  payroll expenses, at least part of -- part of your review but

12  had not touched yet on these other areas, utilities or repair

13  and maintenance?

14  A.  That is correct.

15  Q.  And it also had not touched on any of the projected income

16  for the meeting or ballroom rentals, valet parking or others,

17  correct?

18  A.  Not as of that date.

19  Q.  And this revised draft of the budget reflects that as of

20  that date, August 3rd, 2006, you had not even begun to

21  consider the issue of whether the common elements would

22  change, is that correct?

23  A.  That is accurate.

24  Q.  And this is Defendants' Exhibit 579.  Mr. Petrus, this is

25  an agenda you prepared for a budget review meeting, correct?

Petrus - cross

1    A.   That is accurate, yes, sir.

2    Q.   And that budget review meeting took place on August 4th,

3    2006, right?

4    A.   That is correct.

5    Q.   The day after the date of the draft revised budget we just

6    looked at, right?

7    A.   Yes, sir.

8    Q.   And is it your recollection that this draft revised budget

9    was prepared to discuss at this budget review meeting?

10   A.   That's correct.

11   Q.   And nothing on the agenda for that meeting pertained to

12   common elements of the property, right?

13   A.   That is correct.

14   Q.   There is no line item, no budget item in this agenda, to

15   discuss whether any changes should be made to the common

16   elements of the property?

17   A.   Not at this time.

18   Q.   And that's consistent with your recollection that that

19   issue wasn't even on the table at this time?

20   A.   Not at this time.

21   Q.   You had not yet suggested it to anyone?

22   A.   That's correct.

23   Q.   Okay.  Do you recall being shown this draft -- August 3rd,

24   2006 draft -- I'm sorry.  Strike that, your Honor.

25            Mr. Petrus, you were shown several documents at your

 1   deposition in this case, is that right?

 2   A.  Yes, sir.

 3   Q.  And you were asked various questions about those

 4   documents?

 5   A.  Yes, sir.

 6          MR. S. KULWIN:  Judge, I object on relevancy, what he

 7   was asked at his deposition, unless it's related to something

 8   that he's trying to refresh his recollection on.

 9          THE COURT:  Why are you asking him about what he was

10   asked about at his deposition?  It's one thing to ask about

11   his testimony here in court, but you're asking him about an

12   out-of-court statement.

13          MR. SHONKWILER:  I think it's best reserved for

14   redirect, if it comes up.

15          THE COURT:  Okay.  You have just a few minutes left

16   for the day.

17   BY MR. SHONKWILER:

18   Q.  Now, Mr. Petrus, we've been talking about changes to the

19   budget and changes to the make-up of the common elements, and

20   there's a relationship between those two issues.  They

21   overlap.  I understand that.  But try to keep separate right

22   now -- I want to put the budget aside --

23          MR. S. KULWIN:  Judge, I'm going to object to all

24   this lead-up.  If he could just ask questions --

25          THE COURT:  Well, I think he's trying it assist the

Petrus - cross

1073

1   witness so he knows where he's going.  Overruled.

2   BY MR. SHONKWILER:

3   Q.  All right.  Now I want you to put aside all the questions

4   I asked about the budget changes and think only about now the

5   issue of what components should go in the common elements.

6           Am I correct that you firmly believed that the

7   meeting rooms and ballrooms should be taken out of the common

8   elements of the hotel condominium?

9   A.  That's correct.

10  Q.  And you came up with that idea to do so on your own,

11  correct?

12  A.  That's correct.

13          MR. S. KULWIN:  Objection.  Asked and answered,

14  Judge, twice.

15          THE COURT:  Sustained.  I think we went through this

16  earlier.

17          MR. SHONKWILER:  Some of it, your Honor.  Maybe that

18  question -- that's part of the sequence of questions that we

19  did not go through.

20          THE COURT:  I'm pretty sure you asked that question,

21  and it's 4:45.  So I'm going to let the jury go today.

22          Ladies and gentlemen, just a couple reminders.  We're

23  going to pick up at 9:00 tomorrow morning, and I promise I

24  will let you out by 4:00 if not earlier.

25          Please don't discuss the case, don't communicate

1074

```
 1    about the case, don't let anybody communicate with you about
 2    the case, don't read any media coverage or listen to or watch
 3    any.  I'll see you tomorrow morning.  Have a great evening.
 4              (Jury exited the courtroom.)
 5              THE COURT:  Mr. Petrus, you may step down.
 6              We're starting at 9:00 instead of 9:15 tomorrow, so
 7    if you could make sure that you're here by ten til, that would
 8    be great.
 9              THE WITNESS:  Thank you.
10         (Witness temporarily excused.)
11              THE COURT:  So tomorrow we'll finish with Mr. Petrus,
12    and then are you calling your expert next?
13              MR. S. KULWIN:  Yes.
14              THE COURT:  He'll be first up after Petrus?
15              MR. S. KULWIN:  Right.
16              THE COURT:  What about Manalo?  Are you calling
17    Manalo?
18              MR. S. KULWIN:  If we do, she's going to be so short
19    you won't -- you'll blink and she'll be gone.  We just want to
20    talk about it one more time tonight, Judge.
21              MR. NOVACK:  She needs to know whether to come,
22    that's --
23              MR. S. KULWIN:  We'll send you something tonight.
24    She's in Chicago.
25              THE COURT:  But she does need to know for planning
```

1    purposes, so --

2              MR. S. KULWIN:  I know.

3              THE COURT:  -- let Mr. Novak know by 6:30 p.m.

4    tonight, please.

5              MR. S. KULWIN:  Okay.

6              THE COURT:  And then your expert, how long again do

7    you think your direct of your expert will be?

8              MR. S. KULWIN:  45 minutes to 65, 75 minutes,

9    somewhere around there.

10             THE COURT:  Let me just remind you that I have

11   several rulings with respect to your expert.  I do fully

12   expect him to know what he should and shouldn't go into.  So

13   --

14             MR. S. KULWIN:  It's going -- we've carefully crafted

15   that one, Judge.

16             THE COURT:  Good.  He needs to know, too, so he

17   doesn't -- regardless of what your question is, so he doesn't

18   say something that he shouldn't.

19             MR. S. KULWIN:  He's not going to say anything about

20   buyers, Judge.

21             THE COURT:  Just -- you're on notice.

22             MR. S. KULWIN:  Okay.

23             THE COURT:  And then Vogue?  Are you going to call

24   Vogue?

25             MR. S. KULWIN:  That's our anticipation, Judge, but

1076

1    we anticipate putting Ms. Goldberg on before.

2            THE COURT:  Okay.  My guess is that we will not get

3    through all of those witnesses tomorrow.

4            MR. S. KULWIN:  I don't think so.

5            MR. NOVACK:  I'm sorry.  May I address Mr. Kulwin?

6            THE COURT:  Yes.

7            MR. NOVACK:  Can I ask him a question?

8            THE COURT:  Yes.

9            MR. NOVACK:  Did you say Vogue?  I didn't hear you.

10           THE COURT:  I said Vogue, and he said if they put her

11   on, it will be -- they plan to put on Ms. Goldberg first.

12           Is she somebody you need to know, Mr. Novack?  Is she

13   --

14           MR. NOVACK:  Who is that?

15           THE COURT:  Ms. Vogue?  Do you need to know to

16   apprise her to be here?

17           MR. NOVACK:  No.  We don't control her.

18           THE COURT:  Okay.  And then, Mr. Novack, did you let

19   Mr. Kulwin know who your first witness will be?

20           MR. NOVACK:  We did.

21           MR. S. KULWIN:  Not exactly.

22           THE COURT:  Can you tell me, please?  Who will your

23   first witness be?  I don't think we'll get to that person

24   tomorrow, but we will likely --

25           MR. NOVACK:  We --

1    THE COURT:  -- on Monday.

2    MR. NOVACK:  Monday is when we told them.  It will be

3  Mr. Howie and we're bringing him first so that, at Mr.

4  Kulwin's request, he can actually be in their case before they

5  rest.

6    THE COURT:  Great.  Okay.

7    MR. S. KULWIN:  The question we had for them, Judge,

8  is -- and I don't care if they don't tell us until tomorrow,

9  but we would really like to know tomorrow.  They have also

10  identified two other witnesses and --

11    THE COURT:  I'm asking.  Hold on.

12    MR. S. KULWIN:  Okay.  I'm sorry.

13    THE COURT:  Who is after Mr. Howie, and how long do

14  you think your direct of Mr. Howie will be?

15    MR. NOVACK:  I'm actually going to be on cross now.

16    THE COURT:  But your -- are you going to recall him

17  or are you just going to --

18    MR. NOVACK:  No.  We will only have him up here once.

19    THE COURT:  Okay.  I misunderstood it.  You're going

20  to let him call him and you'll just, on your cross, ask him

21  everything you were going to.  Okay.  How long do you think

22  that will take, ballpark?  An hour, two hours, three hours?

23    MR. NOVACK:  I would say an hour and 15 minutes to an

24  hour-and-a-half, something like that.

25    THE COURT:  Okay.

1078

1     MR. S. KULWIN:  Just for clarification, Judge, maybe

2  Mr. Novack -- it's up to him, but I doubt what we're going to

3  go into with Mr. Howie is going to allow him leeway to just

4  cross the entire time.  Just so --

5     THE COURT:  Right.  And 611, if a witness is called

6  as an adverse witness, it gives the Court complete discretion

7  on whether or not cross-examination can be conducted through

8  leading questions.  And the extent here, given the length this

9  has taken and some delays, I am permitting cross-examination

10 of adverse witnesses through leading questions because I don't

11 think it's taking anything away from the jury and it is moving

12 this case along.

13     I agree with you, though, on Mr. Howie.  To the

14 extent you're going to elicit his additional opinions beyond

15 the scope of what Mr. Kulwin elicits, that you will have to do

16 it in a non-leading fashion.  You may lead him on what I think

17 is going to be a narrow area, but the rest of it you do have

18 to do it in a direct question -- non-leading question fashion.

19     MR. NOVACK:  I'll do that.

20     THE COURT:  So after Mr. Howie, then?

21     MR. NOVACK:  Russell Flicker.

22     THE COURT:  And ballpark on direct, length?

23     MR. SHONKWILER:  It keeps changing with what comes

24 into the case.  How about -- I guess -- well, 30 minutes to an

25 hour.

1    THE COURT:  Perfect.  Okay.  And then after

2  Mr. Flicker?

3    MR. NOVACK:  Andy Weiss.

4    THE COURT:  How long do you anticipate his direct to

5  be?

6    MR. SHONKWILER:  Same.  And it's likely to be on the

7  lower end, about 30 minutes to an hour.

8    THE COURT:  After Mr. Weiss who?

9    MR. NOVACK:  And then after Mr. Weiss I'm not sure if

10  we're going to need anybody else.

11    THE COURT:  Okay.

12    MR. NOVACK:  And we may not call Flicker or Weiss.  I

13  told them -- we'll see how the case ends.  If -- but there's

14  also the possibility that if some witness we haven't heard yet

15  brings up something new, we have to bring back somebody who

16  has already testified.  I don't want to do that, particularly

17  --

18    THE COURT:  You're not going to bring Mr. Trump back,

19  are you?

20    MR. NOVACK:  But I'm just saying, in this awkward

21  situation where all the witnesses are in the other case, we

22  can't tell you that in advance.

23    THE COURT:  Okay.  The --

24    MR. NOVACK:  And I guess --

25    THE COURT:  After tomorrow I will expect you to give

1080

1    us more certainty.  I understand that we need Mr. Petrus to

2    finish, and you need to hear what Ms. Goldberg has to say, but

3    after tomorrow -- tomorrow is Friday.  At the end of the day I

4    will expect more certainty from you for planning purposes.

5    And certainly if you think you're calling Mr. Trump back, I

6    need to know that to let the appropriate court personnel know.

7            MR. NOVACK:  I think that's between slim and none,

8    leaning toward beyond none.

9            THE COURT:  For many reasons that would be my

10   expectation as well.

11           MR. NOVACK:  I'm sorry.  Sara Martens was on our list

12   and she's a maybe still.

13           THE COURT:  Okay.  So tomorrow I will expect a little

14   more certainty.

15           So this could even go to the jury by Tuesday.  We

16   still have to have another jury instruction conference.  You

17   have the right to a rebuttal case, I know that, if that comes

18   up.  We're almost done with jury instructions, and thank you

19   for re-filing those.

20           We'll have one more conference.  I'm working on

21   verdict forms.  I'll give you some draft verdict forms to look

22   at.  So it could go on Tuesday, we'll see, to the jury.

23           MR. S. KULWIN:  Right.  If we went on Tuesday, would

24   you expect that we would have this jury conference Monday

25   afternoon?

```
 1              THE COURT:  Yes.

 2              MR. S. KULWIN:  Okay, because --

 3              THE COURT:  Because if they only call Mr. Howie --

 4              MR. S. KULWIN:  We could have all day.

 5              THE COURT:  Yes.

 6              MR. S. KULWIN:  Because we have a couple of

 7   instructions, new instructions, that we're going to be

 8   submitting.

 9              THE COURT:  Well, you need to get those in.

10              MR. S. KULWIN:  We are.

11              THE COURT:  Well, I haven't seen them yet.  If you're

12   going to submit new instructions, I would like those

13   preferably when I come in tomorrow.

14              MR. S. KULWIN:  Well, I don't know if we can do that,

15   but I think that they're old instructions that weren't

16   relevant that have now become relevant that we're going to ask

17   you to reconsider, probably.  We'll have them to you --

18              THE COURT:  Let's do it by noon tomorrow so that I

19   have them to work with.

20              MR. S. KULWIN:  Okay.

21              All right.  What else?

22              MR. NOVACK:  I have a couple things.

23              The first one is this business that Mr. Kulwin has a

24   couple times objected by saying you can't talk about plans,

25   motion in limine.  Judge, you've never made a motion in limine
```

1082

 1  ruling that's preventing us from saying that we deny that we

 2  had a secret plan.

 3       THE COURT:  That came off -- that did not come off

 4  well because you left an impression that I said you can't talk

 5  about secret plans.

 6       MR. SHONKWILER:  And that they can't prove our case

 7  pursuant to secret plans.

 8       THE COURT:  I think -- I will remind the jury in the

 9  morning that lawyers' comments are not evidence and just that.

10  But you do have to be careful of how in front of the jury you

11  make your objections.  If you give me a little hint, I

12  generally know what you're talking about.  If I don't, I'll

13  bring you to sidebar.

14       MR. NOVACK:  We're trying to disprove a negative.

15  We're accused of having a different intent, understanding,

16  plan, whatever it is, that was inconsistent with what we told

17  the public.  And one of the ways we want to say we didn't --

18  we say we didn't have any plans, we didn't have any intent, we

19  didn't have any meetings because that's the way you do it.

20  Otherwise the jury is going to say, well, that's the way they

21  could have done it, that's the way they could have done it.

22  And Mr. Kulwin is trying to handcuff our defense by alluding

23  to a non-existent motion in limine.

24       MR. S. KULWIN:  Well, that's -- I'll --

25       MR. NOVACK:  There is no motion in limine that you

1083

```
 1   have ruled on, that I'm aware of, that would preclude us from
 2   saying to the jury, we did not have a secret plan to do
 3   something different than what we told them.  That's basically
 4   saying, we weren't going to do anything different than what we
 5   told them.  We weren't lying.
 6            THE COURT:  And I sustained at least one of the
 7   objections on form grounds, not on any motion in limine.
 8            But please don't make those comments in front of the
 9   jury any more.
10            MR. S. KULWIN:  Judge, if I might say one thing and
11   I'll be brief.
12            It's not a question of them saying we didn't have a
13   secret plan.  What their questioning attempts to do and what
14   Mr. Novack, in my view, argued contrary to the jury
15   instructions in his opening statement, among other things, is
16   that they are not going to be able to prove any secret plan.
17            And the jury instructions clearly say you don't have
18   to prove a plan.  He's been riding that horse for months now
19   and you've told him on several occasions you don't have to
20   prove a plan.
21            We don't have to prove intent.  We just have to prove
22   that there's a false statement in the property report and one
23   person, based on your ruling, in the corporation knew it was
24   false.  And if everybody else in the corporation thought it
25   was absolutely true, we still win.
```

1    And he keeps talking about, there's got to be a plan,

2   there's got to be this conspiracy.  And that's why I'm

3   objecting, because the way they're framing their questions is

4   designed to give the jury the impression that without a secret

5   plan the plaintiff loses, and that's just not true.

6        THE COURT:  I don't think that's accurate, and I will

7   instruct the jury on the law accurately.

8        MR. S. KULWIN:  Thank you.

9        MR. NOVACK:  Judge, the second thing I wanted to

10  raise is on a number of occasions there are questions and

11  arguments made that implied that we have destroyed documents

12  or not complied with discovery requests.  The time to have

13  raised those issues was during the discovery process.  They

14  never once raised that.

15       We produced every document we had.  If we didn't

16  produce a document, it wasn't because we put it under our

17  cuff; it was because it didn't exist.  And it's improper and

18  inappropriate for this line of questioning to imply that when

19  they had a chance to do that and didn't do it.  And the reason

20  they didn't do it is because it would have gotten them

21  nowhere.

22       But to say this to a witness, and you wrote notes,

23  and then they're going to say to the jury, you didn't see

24  those notes.  Well, there's a perfectly innocent explanation.

25  If, in fact, she had notes and she left them, they could have

1  been destroyed in the ordinary course of business, they could

2  have been misplaced by accident, any number of things.  But

3  the impression that they're trying to give is that we

4  deep-sixed it.

5       THE COURT:  You are suggesting a spoilation issue,

6  which you've never raised with me.  And there -- and a couple

7  times you did say, we asked for things and they didn't give it

8  to us.  So that's not appropriate commentary in front of the

9  jury.

10      MR. S. KULWIN:  Judge, we're arguing, and we've

11  argued from the beginning --

12      THE COURT:  I'm sorry, one second.

13      Ms. Goldberg, you can go if you want.  You're welcome

14  to stay if you want, but you look like you would like to go

15  out.  You're more than welcome to if you would like.

16      MR. S. KULWIN:  Judge, the fact that they produced no

17  documents, no memos, no writings, we argued extensively in

18  summary judgment and we argued it in our opening statement.

19  We're not accusing anybody who are lawyers in this case, nor

20  did we imply, that Mr. Novack or Mr. Shonkwiler or anybody

21  from Novack & Macey deep-sixed anything.

22      What we're arguing, which we're entitled to argue, is

23  it is beyond credulity to believe that an organization that

24  Mr. Novack wants to argue is so large, that Mr. Trump is so

25  busy that he can't even remember what happened, and that Mr.

1  Petrus, who is the most detailed witness I think I've ever --

2  deliberate witness I've ever seen just about, and nobody

3  writes anything down.

4          And Mr. Trump even in one of his many mispronuncietos

5  (sic) said, we don't write things down, we get things done.

6          THE COURT:  And I think that's fair to bring out that

7  they don't write things down.

8          MR. S. KULWIN:  That's all I want to do, Judge.

9          THE COURT:  It was carried a little far in the last

10  one, suggesting that there was an intentional destruction of

11  documents, which again is a spoilation issue.  That I think

12  you carried a little bit far.

13          MR. S. KULWIN:  I apologize for that, Judge.  But I

14  will point out, if I may, that Mr. Shonkwiler's questioning

15  was such that he was implying that there are notes, they

16  exist, and somehow we didn't ask for them and she wrote it all

17  down and it's all our fault we're making something up.

18          THE COURT:  Last word on this, Mr. Novack?

19          MR. NOVACK:  Judge, to say that there's nothing in

20  writing when they know there was a meeting, doesn't mean there

21  wasn't a meeting.  He even said to her, and there were

22  meetings --

23          THE COURT:  Right.

24          MR. NOVACK:  -- but no writings.

25          So the only inference that a jury can get from that

 1     is not that that means there never was a meeting; it must mean

 2     there was a document and it's been destroyed.

 3              So I would ask you to issue a very neutral cautionary

 4     -- I don't know what you would call it --

 5              THE COURT:  You're going to have to file something on

 6     that if you -- supporting --

 7              MR. NOVACK:  It would just say, ladies and gentlemen,

 8     there's no issue in this case on either side of any form of

 9     spoilation of documents or destruction of documents.  They

10     don't have to know who has asked for it, who didn't --

11              MR. S. KULWIN:  Absolutely not, Judge.

12              THE COURT:  You're going to have to file something on

13     that if you want me to give that.

14              What else?  It's 5:00 o'clock.  You should be here by

15     8:45 tomorrow morning.

16              MR. S. KULWIN:  We have one minor point, Judge.

17              I understand you gave them until today to decide on

18     Mr. Weiss, but I just want to know if they're not going to let

19     us read that, we're going to call Mr. Weiss.  And if they are

20     thinking about not calling Mr. Weiss, since he's from New

21     York, I just want to give him notice.

22              THE COURT:  If they're not going to let you --

23              MR. S. KULWIN:  We have a small little snippet that

24     we inadvertently forgot to designate.

25              THE COURT:  You were going to talk about that.  Talk

1088

1    about that tonight.  You didn't address that this morning.

2    I'm not going to make you call him in for a small little

3    snippet, I will tell you that now.

4            MR. S. KULWIN:  Thanks, Judge.

5            THE COURT:  So tomorrow morning, 8:45.

6            MR. NOVACK:  Thank you, Judge.

7            MR. SHONKWILER:  See you then.

8            MR. S. KULWIN:  Thanks, Judge.

9            MR. NOVACK:  Thank you.

10     (Triad adjourned until May 17, 2013, 8:45 a.m.)

11                        *    *    *    *    *

12

13   We certify that the foregoing is a correct transcript from the
     record of proceedings in the above-entitled matter.

14

15
     _/s/ Nancy C. LaBella_____              _May 16, 2013_
16   Official Court Reporter

17
     _/s/ Mary S. Hacker_____               _May 16, 2013_
18   Official Court Reporter

19

20

21

22

23

24

25