1089

1        IN THE UNITED STATES DISTRICT COURT
              NORTHERN DISTRICT OF ILLINOIS
2                   EASTERN DIVISION

3   JACQUELINE GOLDBERG,           ) Docket No. 09 C 6455
                                   )
4                     Plaintiff,   )
                                   )
5              vs.                 )
                                   )
6   401 NORTH WABASH VENTURE, LLC, )
    a Delaware Limited Liability   )
7   Company, et al.,               ) Chicago, Illinois
                                   ) May 17, 2013
8                   Defendants.)    8:45 o'clock a.m.

9                     VOLUME FIVE
            TRANSCRIPT OF TRIAL PROCEEDINGS
10     BEFORE THE HONORABLE AMY J. ST. EVE, AND A JURY

11  APPEARANCES:

12  For the Plaintiff:        KULWIN, MASCIOPINTO & KULWIN, LLP
                              BY:  MR. SHELLY B. KULWIN
13                                 MR. JEFFREY R. KULWIN
                              161 North Clark Street, Suite 2500
14                            Chicago, Illinois  60601

15  For the Defendants:       NOVACK AND MACEY, LLP
                              BY:  MR. STEPHEN NOVACK
16                                 MR. JOHN F. SHONKWILER
                              100 N. Riverside Plaza, Suite 1500
17                            Chicago, Illinois  60606

18  Also Present:             MS. ALEXIS ROBINSON

19  Court Reporter:           MR. JOSEPH RICKHOFF
                              Official Court Reporter
20                            219 S. Dearborn St., Suite 1232
                              Chicago, Illinois  60604
21                            (312) 435-5562

22          * * * * * * * * * * * * * * * * *

23                  PROCEEDINGS RECORDED BY
                   MECHANICAL STENOGRAPHY
24          TRANSCRIPT PRODUCED BY COMPUTER

25

```
 1              THE CLERK:  09 c 6455, Goldberg v. 401 N. Wabash.

 2              MR. S. KULWIN:  Good morning, your Honor --

 3              THE COURT:  Good morning.

 4              MS. S. KULWIN:  -- Shelly Kulwin.

 5              And Jeffrey Kulwin will be arriving shortly for the

 6   plaintiff.

 7              Ms. Goldberg is not here this morning.  She is going

 8   to be late.  She wasn't well last night, but she will be here.

 9              THE COURT:  Okay.

10              So, you are okay starting without her?

11              MR. S. KULWIN:  Yes.

12              THE COURT:  Okay.

13              MR. NOVACK:  Good morning, Judge --

14              THE COURT:  Good morning.

15              MR. NOVACK:  -- Steve Novack and John Shonkwiler for

16   the defendants.

17              MR. SHONKWILER:  Good morning, your Honor.

18              THE COURT:  Were you able to resolve the issue on

19   Mr. Weiss' deposition?

20              MR. S. KULWIN:  Yes.

21              MR. NOVACK:  Yes.

22              THE COURT:  Okay.

23              And are you going to read it?

24              MR. S. KULWIN:  After Mr. Petrus.

25              THE COURT:  All right.
```

1    How much longer, Mr. Shonkwiler, do you think you

2    have with Mr. Petrus?

3         MR. SHONKWILER:  I think 30 minutes to an hour, and

4    probably on the lower end if it goes quickly --

5         THE COURT:  Okay.

6         MR. SHONKWILER:  -- without interruption.

7         THE COURT:  And I am sure you will have some

8    redirect?

9         MR. S. KULWIN:  I do have quite a bit of redirect.

10        THE COURT:  Quite a bit?

11        MR. S. KULWIN:  Quite a bit.

12        THE COURT:  Okay.  Let us see if we can condense

13   this --

14        MR. S. KULWIN:  I'm going to move --

15        THE COURT:  -- and move this along and get him out.

16        And, then, Mr. Levin is your next --

17        MR. S. KULWIN:  Correct.

18        THE COURT:  Okay.

19        MR. S. KULWIN:  And, then --

20        THE COURT:  Ms. Goldberg --

21        MR. S. KULWIN:  -- Ms. Goldberg.

22        THE COURT:  -- at some point?

23        MR. S. KULWIN:  Looking at it, the way things are

24   going, I would imagine we would probably start Ms. Goldberg

25   today.  I don't think we will finish her today.

1092

```
 1              THE COURT:  I cannot imagine we will.

 2              MR. S. KULWIN:  Yeah.

 3              THE COURT:  What about Manolo?  Are you going to call

 4    her?

 5              MR. S. KULWIN:  We are not calling her.

 6              THE COURT:  Okay.  You are not going to call her at

 7    all.

 8              And Vogue?

 9              MR. S. KULWIN:  We are calling her after Ms.

10    Goldberg.

11              THE COURT:  Okay.  So, she will be called next week.

12              So, it will be Vogue and Howie.

13              Do you have any other witnesses besides that?

14              MR. S. KULWIN:  Not in our case-in-chief.

15              THE COURT:  Okay.

16              I did receive your motion for two additional jury

17    instructions.  I have not had a chance to look at them yet,

18    other than --

19              MR. NOVACK:  I'm not pushing that.  That's for the

20    final pretrial conference --

21              THE COURT:  Thank you.

22              MR. NOVACK:  -- and however you want to handle final

23    instructions.  I did that because I thought you wanted it

24    today.

25              THE COURT:  I thought you wanted it given before the
```

1093

1    final -- I thought yesterday you said you wanted me to?

2            MR. NOVACK:  I thought.

3            THE COURT:  Which is why I said, "Get it on file."

4            But I will take this up -- and I think there is some

5    merit to your argument, but I will take it up -- after I have

6    had a chance to look more closely.

7            MR. S. KULWIN:  I don't think we've seen it yet,

8    Judge.

9            THE COURT:  It was just filed.

10           MR. S. KULWIN:  Oh, okay.

11           We are filing ours before noon today --

12           THE COURT:  Thank you.

13           MR. S. KULWIN:  -- for the pretrial conference.

14           We might be asking if it's okay -- just because we

15   just haven't had time -- to file, like, a two- or three-page

16   trial brief on Monday in support?

17           THE COURT:  I really -- if we are going to have a

18   jury instruction on Monday, I really -- want it to work with

19   over the weekend.

20           MR. S. KULWIN:  Can we do it at the end of --

21           THE COURT:  You can do it at the end of the day.

22           MR. S. KULWIN:  Like, in the evening, so you will

23   have it Saturday morning?

24           THE COURT:  Yes.

25           MR. S. KULWIN:  We will file something late today.

1094

1    THE COURT:  I already spent a tremendous amount of

2    time on these jury instructions, given your inability to agree

3    on most of them.

4    So, I do not want to make a snap decision at the last

5    minute.  I want time to look.

6    MR. S. KULWIN:  Fine.

7    THE COURT:  Yes?

8    MR. NOVACK:  Is the brief that counsel is saying

9    going to support the new instruction that he has filed?

10   THE COURT:  That is my understanding.

11   MR. S. KULWIN:  Yes.

12   MR. NOVACK:  Should we, then, file something quickly,

13   if we can?

14   THE COURT:  Let us see what it looks like.

15   If you feel you need to, yes.  Let us see what it

16   looks like.

17   MR. S. KULWIN:  Similarly, Judge, after we have a

18   chance to look at this, if we need to file a response?

19   THE COURT:  Yes.

20   MR. NOVACK:  May I ask one more question about

21   scheduling?

22   THE COURT:  Of course.

23   MR. NOVACK:  Is it clear we will not do closings on

24   Monday or is that open?

25   Like, what happens if we finish witnesses at noon or

1    1:00 or 2:00 or something?

2              THE COURT:  We still have to -- I cannot imagine we

3    are going to get to the point of closings on Monday.  Let us

4    see where we are maybe at noon today.  When we break for

5    lunch, you can ask me, again.

6              Unless you stand up and say you are not calling

7    anybody -- but, even then, we still have to go back through

8    the jury instructions.

9              MR. S. KULWIN:  I think --

10             THE COURT:  Ideally, if we think we are going to end

11   early on Monday, I would love to end just before lunch, so

12   they can just go home, rather than have them take an hour

13   lunch, come back for 20 minutes and, then, leave.  But we will

14   see where we are.

15             MR. S. KULWIN:  I think I'm --

16             THE COURT:  Did you understand?  You are giving me a

17   quizzical look, Mr. Novack.

18             MR. NOVACK:  You know, I have got to stop that

19   because I am not intending that it's quizzical.

20             THE COURT:  Okay.

21             MR. NOVACK:  But I was going to ask, I'm just going

22   to say that, for whatever it's worth, my preference would be

23   to do those closings first thing in a morning.  It just seems

24   to be better.

25             THE COURT:  The only way I would not be receptive to

1    that is if we end up bringing the jury back for an hour on

2    Wednesday.  I might say we will start with closings after

3    lunch.

4         But given what you have told me and based on my

5    observations of how questioning is going, I cannot imagine

6    that is a realistic scenario.

7         MR. S. KULWIN:  I would actually join --

8         THE COURT:  How is that for a lawyerly response?

9         (Laughter.)

10        MR. S. KULWIN:  Perfect.

11        I would actually join in Mr. Novack's motion -- or

12   preference.

13        THE COURT:  I do not mind if we end at lunchtime on

14   Monday and, then, pick up with closings on Tuesday.  I do not

15   mind that.  But I do not want to bring them down here for just

16   an hour and, then, say, "Go home and come back Tuesday."

17        So, let us see where we are at lunchtime.  I do not

18   think that will happen, but let us see where we are.

19        MR. S. KULWIN:  Very good, Judge.

20        Can I run down the hall real quick?

21        THE COURT:  Yes, run down the hall.

22        MR. SHONKWILER:  Your Honor, on the Weiss

23   designations can we just preface in some manner that explains

24   that this was meant to be read together with the other

25   designations --

1097

```
 1              THE COURT:  Yes.

 2              MR. SHONKWILER:  -- and it was inadvertently left

 3   out?

 4              THE COURT:  Yes.

 5              MR. SHONKWILER:  Thank you.

 6              THE COURT:  Would you bring in Mr. Petrus, please?

 7              And as soon as Mr. Kulwin is back, we will bring them

 8   in.

 9              (Brief recess.)

10              MR. S. KULWIN:  Do you want to say anything that

11   she's coming or they don't have to worry about that?

12              THE COURT:  Would you like me to?

13              MR. S. KULWIN:  I think so.

14              (Jury in.)

15              THE COURT:  You may be seated.

16              Good morning, ladies and gentlemen -- or should I say

17   "Good Friday Morning," ladies and gentlemen?

18              (Laughter.)

19              THE COURT:  We are continuing today with the

20   presentation of evidence and with Mr. Petrus' testimony.

21              Ms. Goldberg will be joining us later on this

22   morning.  You should not read anything into the fact that she

23   is not here at the moment, but she will be here later on.

24              Mr. Petrus, you are still under oath, sir.

25              Mr. Shonkwiler, you may continue.
```

Petrus - cross

1098

1    MR. SHONKWILER:  Thank you, your Honor.

2    JAMES KEITH PETRUS, PLAINTIFF'S WITNESS, PREVIOUSLY SWORN

3                CROSS-EXAMINATION - Resumed

4    MR. SHONKWILER:  I want to make sure I have this on

5  before I begin.

6        It looks like I have it, Judge.

7  BY MR. SHONKWILER:

8  Q.  Good morning, Mr. Petrus.

9  A.  Good morning.

10  Q.  Yesterday, Mr. Petrus, we talked about the management

11  agreement, the one between the Trump affiliate hotel manager

12  and the hotel condominium association.  Do you recall that?

13  A.  Yes, sir.

14  Q.  And, actually, I should have said between the Trump

15  manager and the hotel condominium owner because, as Mr. Kulwin

16  explained to you, it originally was between the developer --

17  the Trump developer -- and the Trump manager, correct?

18  A.  Yes, sir.

19  Q.  And, then --

20  A.  Then it assigned --

21  Q.  -- that later changed.

22        You were one of the people who helped write this

23  agreement; is that right?

24  A.  That is correct.

25  Q.  And you have worked with a lot of management agreements

Petrus - cross

1099

1    over your 38 years of experience, too; isn't that right?

2    A.  Yes, sir.

3    Q.  Each one of the 30-plus hotels you've managed has a

4    management agreement, correct?

5    A.  Yes, sir.

6    Q.  The owner and the manager have a contract that arranges

7    for the management of the hotel facilities, right?

8    A.  That is correct.

9    Q.  Now, not all management agreements are exactly alike, but

10   are there some typical terms that many of them have in common,

11   in your experience?

12   A.  That is correct, sir.

13   Q.  And is it also true that no matter how you write up one of

14   these management agreements, there's always some kind of

15   termination provision that governs the parties' rights to

16   terminate the contract under certain circumstances; is that

17   right?

18   A.  Typically, yes.

19   Q.  Now, is it often the case, in your experience, that in a

20   traditional hotel -- and by that, I mean, as opposed to a

21   condominium hotel, in a traditional hotel -- the owner and the

22   manager often are affiliated companies; is that true?

23   A.  Yes, sir.

24   Q.  And just as they were originally under this management

25   agreement before it was signed, correct?

Petrus - cross

1100

1   A.   Absolutely.

2   Q.   In your experience, when you have a management agreement

3   between two companies that are run by the same people, the

4   termination issue is not a concern, correct?

5   A.   That is correct.

6   Q.   Because nobody's going to terminate themselves or get into

7   a business dispute with themselves, right?

8   A.   Logically; yes, sir.

9   Q.   With this Trump hotel condo, it was a little different

10  because the agreement, which began between two affiliate

11  companies, later was assigned, so that that was no longer the

12  case.

13       Would you agree with that?

14  A.   Yes, sir.

15  Q.   And you knew this assignment was going to happen because

16  you helped prepare the agreement, right?

17  A.   That's correct.

18  Q.   And you also -- in fact, you knew before you prepared the

19  agreement because, based on your many other experiences in the

20  past, you're aware of how they worked, generally?

21  A.   That is correct.

22  Q.   Do you remember how long it took to draft this

23  agreement -- the management agreement -- for the hotel

24  condominium?

25  A.   This could have taken six months, nine months.

Petrus - cross

1   Q.  If, under this agreement, the association were to

2   terminate the Trump manager or otherwise interfere with the

3   manager's efforts to manage the hotel facilities, based on

4   your experience and everything you know about the Chicago

5   facilities, do you believe that that would potentially have a

6   bad effect on the hotel?

7   A.  Absolutely.

8   Q.  And if a hotel fails, Mr. Petrus, it's bad for everyone;

9   is that correct?

10  A.  Devastating.

11          MR. S. KULWIN:  Objection.  Calls for speculation.

12          THE COURT:  Sustained.

13  BY MR. SHONKWILER:

14  Q.  Mr. Petrus, you now have how many hotel condominiums in

15  the Trump collection?

16  A.  We now have -- operational, we have -- seven.

17  Q.  And is it true that when a hotel is successful and

18  generates a lot of revenue from a lot of traffic -- and by

19  "traffic," I mean people staying in the hotel rooms -- that

20  that generates more revenue for everyone, including the unit

21  owners?

22  A.  Absolutely.

23  Q.  Okay.

24          And, so, is it true in your experience that the

25  success of the hotel drives success for unit owners and the

Petrus - cross

1102

1   hotel developer and owner?

2   A.   Absolutely.

3   Q.   And the converse is also true.  If it does very poorly and

4   generates relatively little revenue, then any unit owner who

5   is participating in the rental program also would get less

6   revenue?

7   A.   It's an immediate ripple effect, that's correct.

8   Q.   And one way to alleviate the risk of the hotel manager

9   getting terminated from operating facilities under this

10  contract was to remove those from the common elements,

11  correct?

12  A.   Yes, sir.

13  Q.   Because if they're removed from the common elements,

14  they're no longer governed by this contract?

15  A.   It becomes very problematic.

16  Q.   And after the facilities were removed and put into the

17  commercial facilities, then they were subject to a contract

18  like this (indicating) that the Trump affiliate companies were

19  on both sides of, correct?

20  A.   We would have control, that's correct, sir.

21  Q.   And, so, there would be no similar termination issue?

22  A.   That's correct, sir.

23  Q.   Now, we left off yesterday evening talking about your

24  suggestion to change these common elements.  I want to ask, to

25  the best of your recollection, the first people that you

Petrus - cross

1103

1   discussed this idea with were Donald Trump, Jr., and possibly

2   Ivanka, too; is that correct?

3   A.  That is accurate.

4           MR. S. KULWIN:  Objection, Judge.  Lack of

5   foundation.

6           THE COURT:  Overruled.

7   BY MR. SHONKWILER:

8   Q.  And you also remember having some discussions about that

9   issue with Andy Weiss and Jill Cremer, right?

10  A.  That is correct.

11  Q.  Now, based on your initial discussions, you decided you

12  would not move those facilities from the --

13          MR. S. KULWIN:  Judge, I'm going to object, Judge.

14  He is asking for the content in getting around it.  There's no

15  foundation as to when this happened, who was present, where.

16          THE COURT:  He testified to this on direct, which is

17  why I overruled your prior.  If you are going to get in --

18  your prior objection.

19          If you are going to get in now to specific

20  discussions, you do need to lay a little more foundation.

21          Sustained.

22          MR. SHONKWILER:  Okay.

23  BY MR. SHONKWILER:

24  Q.  Now, early on in the decision-making process -- and the

25  decision I'm referring to is the decision as to whether to

Petrus - cross

1104

1   move these common elements out of the hotel condominium -- was

2   it important to you to determine whether you could balance the

3   hotel condominium budget such that the operating -- the

4   projected monthly expenses and common charges to unit owners

5   remained within the same range as they had been under the

6   prior projected budgets?

7   A.  My -- the intent there was to manage the budget line

8   expenses in an effective fashion -- right -- that represented

9   that point in time, and to take all of those elements into

10  consideration.

11  Q.  Did you decide -- I'm asking just for your recollection --

12  that you would only move those facilities from the common

13  elements if you could get to the end of your budget review and

14  revision process and determine that you could keep monthly

15  costs at a level that was consistent with what they had been

16  under prior projected budgets?

17  A.  That was the -- that was an -- objective.  That's correct.

18  Q.  So, in that sense, your work on the budget and this common

19  elements decision were closely tied, right?

20  A.  That's correct, sir.

21  Q.  I'm going to show you Exhibit 580.  This is Defendants'

22  Exhibit 580.  It's in evidence.

23          Mr. Petrus, this is an e-mail you received from

24  Mickael Damelincourt?

25  A.  Yes, sir.

Petrus - cross

1105

1    MR. S. KULWIN:  Judge, I'm going to -- oh, I'm sorry.

2    Never mind.

3    I withdraw that.  Sorry.

4    BY MR. SHONKWILER:

5    Q.  Dated April 27th, 2007, correct?

6    A.  Yes, sir.

7    Q.  Mr. Damelincourt was an accountant who worked for the

8    Trump organization and who helped you with the task of

9    revising the operating budget; is that right?

10   A.  That is accurate.

11   Q.  And in this e-mail, Mr. Damelincourt is sending you what

12   he calls "updated fourth amendment spreadsheets."

13   Do you see that here (indicating)?

14   A.  Yes, sir.

15   Q.  And he says, "Let's review when you get a chance," right?

16   Do you see that?

17   A.  Yes, sir.

18   Q.  And beneath that, he says, "Main area to clarify and

19   validate are," and, then, the first number below that is "F&B

20   Fee $200,000."

21   Do you recall that refers to the food and beverage

22   fee that was ultimately included in the budget as revenue to

23   the unit owners?

24   A.  "Ultimately" meaning in the fourth amendment?

25   Q.  Correct.

Petrus - cross

1106

```
 1   A.  Yes, sir.

 2   Q.  Okay.

 3           What Mr. Damelincourt was referring to here was --

 4           MR. S. KULWIN:  Objection as to what Mr. Damelincourt

 5   is referring to, Judge.

 6           THE COURT:  Sustained.

 7           Rephrase it.

 8   BY MR. SHONKWILER:

 9   Q.  Mr. Petrus, you and Mr. Damelincourt continued to work

10   with the budget projections after this e-mail and eventually

11   increased that food and beverage fee up to $500,000 a year,

12   right?

13   A.  That is correct.

14   Q.  So, do you recall from this e-mail that as of April 27th,

15   2007, you had not yet finished the exercise of reviewing and

16   balancing the new budget for the fourth amendment?

17   A.  Again, this was a work in progress over a period of time.

18   Q.  Okay.

19           And you'll recall in one of the exhibits Mr. Kulwin

20   showed you yesterday, in the fourth amendment ultimately this

21   fee was $500,000, right?

22   A.  Ultimately; yes, sir.

23   Q.  And is it your understanding that that number is

24   adjusted -- subject to adjustment -- every year upward for

25   inflation factors?
```

Petrus - cross

1107

1    A.  Yes, sir.  That is correct.

2    Q.  And you recall, don't you, that as of May, 2000,

3    internally, at least, you had reached a point where you were

4    comfortable with the decision to remove the ballroom and

5    meeting room facilities from the common elements of the hotel

6    condominium?

7    A.  I had reached that -- that -- conclusion that that was the

8    right course of action to take for budget reasons and, also,

9    for control reasons.

10   Q.  And do you recall that it was generally around that time

11   that you had discussions about this subject of the common

12   elements with Mr. Trump, Sr., in which you proposed --

13           MR. S. KULWIN:  Objection, Judge.  Object.  Lack of

14   foundation.  When, where, who was present.

15           MR. SHONKWILER:  Well, your Honor, we just

16   established the time period.  It's around May, 2007.  And the

17   question is:  Do you recall discussions?

18           MR. S. KULWIN:  No, because he is --

19           THE COURT:  Ask if he recalls discussions and get a

20   "Yes" or "No."

21           And, then, lay a little more foundation if he does

22   recall them, if you can specify the date.

23   BY MR. SHONKWILER:

24   Q.  Mr. Petrus, do you recall having conversations about this

25   subject with Mr. Trump, Sr.?

Petrus - cross

1108

1    A.  I remember going to Mr. Trump and explaining the

2    situation --

3           MR. S. KULWIN:  Judge, I object to him going into the

4    conversation without any foundation.

5           THE COURT:  Yes.  Sustained.

6           He said yes, so ask him if he recalls when and who

7    else was there and where.

8    BY MR. SHONKWILER:

9    Q.  Do you have any memory as to when that discussion

10   occurred?

11   A.  I think it was in the May timeframe.

12   Q.  And do you have any --

13   A.  And the --

14   Q.  Do you have any -- sorry.  Please --

15   A.  And the people that were in that room with me at the time,

16   I am not certain.  But I did have a conversation with him

17   because ultimately --

18          MR. S. KULWIN:  Judge, I'm going to object to him

19   going into this.  We still don't have where.

20          THE COURT:  See if you can lay a little more

21   foundation.

22          THE WITNESS:  Where?

23   BY MR. SHONKWILER:

24   Q.  Well, Mr. Petrus --

25   A.  This was in --

Petrus - cross

1109

1   Q.  -- explain, if you recall --

2   A.  Yes.

3   Q.  -- if you recall the location and if you recall the people

4   that were there.

5   A.  Yes.

6        It was in Mr. Trump's office.  And, typically, you've

7   got to go to him for a need like this, where we were basically

8   funding a half a million dollars out of his monies for budget

9   purposes.

10       And he and I had a conversation about this.

11  Q.  And you had to get Mr. Trump's approval in order to

12  implement a plan that required him to sign a check for

13  $500,000 every year, correct?

14  A.  Absolutely.

15  Q.  And, in your experience, to get Mr. Trump to write a check

16  for $500,000, you have to give a reason, don't you?

17  A.  I did.

18  Q.  When you recommended to him what you thought was right,

19  you gave him your best reasons, didn't you?

20  A.  I explained the situation to him, that's correct.

21  Q.  Now, you could tell us -- I think you've said you don't

22  recall exactly who was there or -- and I imagine you don't

23  recall exactly every word that was spoken, but are you

24  confident that you told Mr. Trump about the need for stability

25  in the operating budget?

Petrus - cross

1110

1  A.  I explained to him the risks factor for unit owners.  I

2  explained to him my thought process, I explained to him that

3  this was an ongoing responsibility that he would have in

4  perpetuity, and, yes, I mean, you know, he was a bit surprised

5  at what I was --

6          MR. S. KULWIN:  Judge, I'm going to -- never mind.

7  Go ahead.

8  BY THE WITNESS:

9  A.  -- at what I was saying.  But I think after I walked

10 through the thought process of my recommendations, although he

11 was surprised, he started to absorb what I was saying; and,

12 also, understood the -- I think, the -- downfall of having it

13 the way that it was --

14         MR. S. KULWIN:  Judge, I'm going to object.

15 BY THE WITNESS:

16 A.  -- and the risk that would be involved in that.

17         MR. S. KULWIN:  I am going to object to what he

18 understood.  I think he should be saying what was said.

19         THE COURT:  Sustained.

20         He can testify on his observations or things

21 Mr. Trump said to him, but --

22 BY MR. SHONKWILER:

23 Q.  Just your recollections, Mr. Petrus.

24 A.  That's my recollection.

25         And it took me -- it took us -- a while to go through

                         Petrus - cross
                                                            1111

 1   exactly the thought process; and, although he was surprised, I

 2   think he understood --

 3           MR. S. KULWIN:  Judge, the same objection.  Move to

 4   strike.  Ask that the witness be instructed to say who was

 5   said and what was said.

 6           THE COURT:  Well, he is not that confined.  But to

 7   the extent he is talking about what is in Mr. Trump's head, he

 8   cannot do that.

 9           MR. SHONKWILER:  Well, your Honor --

10           THE COURT:  Again, he can testify about his reactions

11   and his impressions --

12           THE WITNESS:  I'm --

13           THE COURT:  One second, sir.

14           THE WITNESS:  Yes.

15           THE COURT:  -- and what he saw.  But to start talking

16   about what is in Mr. Trump's head is too far.

17           If he is talking about what he understands -- he was

18   about to say what Mr. Trump understood.

19           MR. SHONKWILER:  All right.

20           THE COURT:  If you are going to get him to testify or

21   if you want him to testify to that, you need to lay a

22   foundation.

23           Is that something Mr. Trump said to him?

24   BY MR. SHONKWILER:

25   Q.  You can testify -- I think the Judge is saying -- to your

Petrus - cross

1112

1    perceptions --

2    A.  Yes.

3    Q.  -- and there's a line there.

4           (Brief pause.)

5           THE COURT:  One second.

6           He will ask you another question.

7           MR. SHONKWILER:  Let's start --

8           THE COURT:  Ask another question.

9           MR. SHONKWILER:  -- a new question.

10          THE COURT:  Good idea.

11   BY MR. SHONKWILER:

12   Q.  You also explained to Mr. Trump that if these amenities

13   were common elements, that he could be terminated as a

14   manager.  What you just explained to us is possible under this

15   agreement, after it's assigned to the association, correct?

16   A.  That is correct.

17   Q.  And, ultimately, Mr. Trump agreed with your

18   recommendation?

19   A.  Yes, he did.

20   Q.  Now, even after you discussed this with Mr. Trump and

21   internally completed your budget revision to your

22   satisfaction, the fourth amendment still could not be issued

23   until it went through an approval process, correct?

24          MR. S. KULWIN:  Judge, I'm going to object to this,

25   based on earlier discussions.

Petrus - cross

1           THE COURT:  Overruled.

2   BY MR. SHONKWILER:

3   Q.  As part of that --

4           MR. SHONKWILER:  Judge, did we get an answer?

5           THE COURT:  No.

6           MR. SHONKWILER:  Let me ask it, again.

7   BY MR. SHONKWILER:

8   Q.  Even after you discussed this with Mr. Trump and completed

9   your budget review to your satisfaction, the fourth amendment

10  still could not be issued until it went through an approval

11  process, right?

12  A.  That's correct.

13  Q.  And part of that approval process was that it had to be

14  reviewed by consultants?

15          MR. S. KULWIN:  Judge, I'm going to object.  This, I

16  think -- I believe -- at least that's what we have --

17          THE COURT:  Let us have a brief --

18          MR. S. KULWIN:  Thank you, Judge.

19          THE COURT:  -- sidebar.  I think he is doing exactly

20  what we discussed.

21          (Proceedings had at sidebar:)

22          THE COURT:  I am not sure what your objection is

23  because you brought up the time period on direct and I said

24  they could go into that time period, but they had to refer to

25  consultation with counselors, not lawyers.

Petrus - cross

1114

1    MR. S. KULWIN:  No, Judge.  What the ruling was, is

2  that if we made the argument that they purposely delayed the

3  issuance of the --

4    THE COURT:  No.

5    MR. S. KULWIN:  -- issuance of the fourth amendment.

6    THE COURT:  The ruling was if the time period -- you

7  are carrying it a little bit further.  You brought out that

8  four-month time period on direct.  And, so, now they have the

9  right to go into it on cross as to why.

10    I mean, I would not --

11    MR. SHONKWILER:  We won't.

12    THE COURT:  -- belabor this, but --

13    MR. SHONKWILER:  We won't refer to lawyers.  It was

14  to the lender and the lender's attorney.  And that's something

15  your Honor said that we absolutely could say.

16    MR. S. KULWIN:  That's --

17    MR. SHONKWILER:  We won't talk about our lawyers.

18    THE COURT:  No, I did not say lawyers.

19    MR. SHONKWILER:  The lenders.

20    THE COURT:  I do not think I said you could do the

21  lenders.

22    MR. NOVACK:  Oh, yeah.

23    MR. SHONKWILER:  Yes.

24    THE COURT:  The counselors.

25    MR. S. KULWIN:  The consultants.

Petrus - cross

1115

1    THE COURT:  The consultants.

2    MR. NOVACK:  I think what it was, as to our lawyers,

3  if they would be mentioned they had to be consultants, not

4  lawyers.  But the lenders -- I remember specifically you

5  agreed that there's no attorney-client privilege with lenders

6  and lenders' lawyers.  So, there's no reason to --

7    MR. S. KULWIN:  No.

8    MR. NOVACK:  -- not open the door.

9    THE COURT:  I did say there is no attorney-client

10  privilege with respect to them.

11    MR. S. KULWIN:  Right.

12    Judge, the deal was -- and we can go back and check,

13  but the deal was -- unless the plaintiff argued that they --

14    THE COURT:  It was not argued because you brought it

15  out in direct.  You opened the door.

16    There was testimony -- because I distinctly recall it

17  -- about the time period, and the four-month time period.

18    MR. S. KULWIN:  Your ruling was that you said we

19  could bring that up.  But what we couldn't do was we couldn't

20  say that they purposely -- this is exactly what your ruling

21  was:  We couldn't say that they purposely delayed the fourth

22  amendment.  And if they purposely delayed the fourth

23  amendment, then they were entitled to go into why it took so

24  long to issue the fourth amendment.

25    And I did not anywhere come close to that.

Petrus - cross

1      And what he's trying to do now is they're going to

2   try to argue -- which you specifically precluded them from

3   doing it -- that they had some -- it was the insider trading

4   argument that Mr. Novack wants to make, that they were

5   precluded somehow by law or custom from telling anybody.

6           THE COURT:  No --

7           MR. NOVACK:  That's not going to be said.

8           THE COURT:  -- they are not going to argue that.  I

9   am not going to let them argue that.

10          But you brought out this four-month delay.  They have

11  the right to respond to why it took four months to do that,

12  without going into their own lawyers.

13          MR. SHONKWILER:  I'm not --

14          MR. S. KULWIN:  The last point that I will make on

15  this, Judge -- and this was what your ruling was, because I

16  wouldn't have gone into it otherwise -- what you said was,

17  "You can go into that delay.  But if you make the point that

18  they purposely delayed the fourth amendment to gain an

19  advantage," which I didn't do, my four-month examination -- am

20  I talking too loud?

21          THE COURT:  No.

22          MR. S. KULWIN:  I can't tell.

23          THE COURT:  I will tell you.

24          MR. S. KULWIN:  I've got bad ears.

25          My four-month delay argument is they didn't issue any

Petrus - cross

1117

1  letters.  They didn't tell anybody, like their sales agent or

2  anything like that.  That's what my argument went to.

3          THE COURT:  So, why is it fair for you to bring out

4  before the jury that it took four months to get the fourth

5  amendment property report issued and not let them come back

6  with anything?

7          That was not my ruling.  I said you could not argue

8  further.  But you opened the door to why it took four months.

9          MR. S. KULWIN:  I didn't.  What I did was, Judge, I

10 said -- I didn't say why -- I never said to them, "Why did it

11 take four months?"

12         THE COURT:  You do not have to say it.  You opened up

13 the door by leaving the impression and getting out testimony

14 that it took four months.

15         MR. S. KULWIN:  No, I didn't.

16         THE COURT:  You did.

17         MR. S. KULWIN:  I never asked him.

18         THE COURT:  Overruled.

19         (Proceedings had in open court:)

20         THE COURT:  You may continue.

21 BY MR. SHONKWILER:

22 Q.  Mr. Petrus, we were talking about an approval process that

23 had to be completed before the fourth amendment could be

24 issued.  Do you recall that?

25 A.  Yes, sir.

Petrus - cross

1118

1     Q.  And, as part of that process, the fourth amendment had to

2     be approved by two different sets of lenders for the project,

3     right?

4     A.  That's correct.

5     Q.  There was the construction lender and, also, a mezzanine

6     lender?

7     A.  That's correct.

8     Q.  And each of the two lenders also had its own set of

9     attorneys --

10          MR. S. KULWIN:  Objection.

11    BY MR. SHONKWILER:

12    Q.  -- who had to approve it?

13          MR. S. KULWIN:  That's -- the same objection.

14          THE COURT:  Overruled.  That is a separate issue.

15    BY MR. SHONKWILER:

16    Q.  And each of the two lenders also had its own set of

17    attorneys, who had to approve it?

18          THE COURT:  You may answer, if you know.

19    BY THE WITNESS:

20    A.  That is correct.

21    BY MR. SHONKWILER:

22    Q.  Do you recall that that approval process took a number of

23    months to complete?

24    A.  I think it took several months.

25    Q.  Now, you were asked some questions yesterday by Mr. Kulwin

Petrus - cross

1119

1    about whether you saw or prepared particular documents back in

2    2006 or 2007.

3            Do you remember those questions?

4    A.  I do.

5            MR. SHONKWILER:  Your Honor, I want to show the

6    witness a document that's marked as Defendants' Exhibit 607,

7    that has been produced, but has not been admitted.

8            THE COURT:  Okay.  You may show it to him.

9            (Brief pause.)

10   BY MR. SHONKWILER:

11   Q.  Now, Mr. Petrus, you don't remember every document you've

12   seen or written over the past seven years, do you?

13   A.  Not -- no, I do not.

14   Q.  But did you prepare dozens of draft budgets and financial

15   projections for the Chicago hotel that you circulated within

16   your office?

17   A.  Absolutely.

18   Q.  And, in fact, you and your staff exchanged perhaps

19   hundreds of pages of such documents that reflected your

20   analysis of projected hotel expenses and revenues?

21   A.  Most likely, yes.

22   Q.  And you also sent and received e-mails from members of

23   your staff analyzing and commenting on those draft financial

24   documents, right?

25   A.  On a regular and ongoing basis.

Petrus - cross

1120

1    Q.  And many of those documents were gathered and provided --

2              MR. SHONKWILER:  Strike that.

3    BY MR. SHONKWILER:

4    Q.  I believe Mr. Kulwin also asked you whether you had ever

5    seen a single piece of paper referencing any meeting relating

6    to discussion of the decision about the common element

7    facilities in the hotel condominium.

8              MR. S. KULWIN:  Judge, objection.

9    BY MR. SHONKWILER:

10   Q.  Do you recall that question?

11             MR. S. KULWIN:  Objection.  Misstates the evidence.

12             THE COURT:  Overruled.

13             You may answer, if you recall such a question.

14   BY THE WITNESS:

15   A.  I recall the question.

16   BY MR. SHONKWILER:

17   Q.  Okay.

18             I'm showing you now a document that was produced in

19   discovery out of the defendants' files.  I'm asking you --

20   don't read it out loud, but I am asking -- if it refreshes

21   your recollection as to whether any documents like that

22   existed.

23             (Document tendered.)

24   BY THE WITNESS:

25   A.  It could very well be.

Petrus - cross

1121

 1    BY MR. SHONKWILER:

 2    Q.   Take your time and read through it, but not out loud,

 3    please.

 4              (Brief pause.)

 5    BY THE WITNESS:

 6    A.   Yes, sir.

 7    BY MR. SHONKWILER:

 8    Q.   Does this document refresh your recollection, first of

 9    all, as to whether there were any documents on that subject at

10    all?

11              The subject meaning discussion of the common elements

12    and whether there ought to be changes.

13    A.   Again, there were several conversations regarding this.

14    So, I think the answer here is "Yes," but it was -- that was

15    -- over a course of time.

16    Q.   And did this document refresh your recollection in any way

17    about the timing of those discussions?

18              Do you want to see the document, again?

19    A.   Yeah, let me just take a look at the --

20              (Document tendered.)

21    BY MR. SHONKWILER:

22    Q.   And don't read it, but just answer the question "Yes" or

23    "No," as to whether it refreshes your recollection.

24    A.   It refreshes my recollection that there were ongoing

25    conversations regarding the topic that we're discussing.  Yes,

Petrus - cross

1    sir.

2    Q.   And what do you remember, if anything, about the timing of

3    those discussions, in terms of when they occurred in the

4    calendar year?

5    A.   It was an ongoing process; and, you know, again, I think

6    I've stated that this was over perhaps a six-, nine-month --

7    perhaps even longer -- period of time that we had meetings,

8    conversations, regarding the budget, regarding updates,

9    regarding thought processes, regarding details surrounding the

10   budget.  But it was over an extended period of time.

11   Q.   And that period of time included, if you recall, early

12   '07?

13   A.   It did include early '07, yes, sir.

14   Q.   There was some discussion of laundry.  You were never

15   aware, were you, of any plans to include laundry facilities of

16   any kind in the Chicago Trump Tower?

17   A.   I was not aware of anything specific.

18   Q.   As far as you know, there never were any such plans,

19   right?

20   A.   I never was privy to a plan; yes, sir.

21   Q.   In fact, those decisions -- whatever decisions there may

22   have been -- would have been made before you came to work at

23   Trump, right?

24   A.   Yes, sir, that's correct.

25   Q.   Mr. Petrus, I am showing you a page from Defendants'

Petrus - cross

1123

1    Exhibit 603.

2          This is the third amendment -- the amendment that was

3    current when you came to work at Trump.

4          Do you recall that the property report has an Exhibit

5    F that refers to the initial sales price schedule, percentage

6    of ownership interests, estimated monthly assessments and

7    estimated real estate taxes?

8    A.  I am aware of that, yes, sir.

9    Q.  And every property report document for this hotel

10   condominium at Trump Tower had an Exhibit F of some version,

11   right?

12   A.  That is correct, sir, yes.

13   Q.  And I'm flipping forward a few pages in that same

14   document.  This is a page from Exhibit F.

15          Now, what this exhibit shows in the column on the

16   left is the unit number, and that refers to unit number of the

17   hotel unit, right?

18   A.  That is correct.

19   Q.  And the next column is the purchase price, correct?

20   A.  That is correct, yes, sir.

21   Q.  Unit 2238 was one of the units Ms. Goldberg was under

22   contract to buy, and that unit had a purchase price, as of --

23   well, let me back up.

24          MR. SHONKWILER:  Strike that.

25   BY MR. SHONKWILER:

Petrus - cross

1124

1    Q.  The date of the third amendment was January, 2005, right?

2    A.  Is that the date?

3    Q.  I'll represent to you that's the date on the document.

4    A.  Okay.

5    Q.  Ms. Goldberg's contract was signed after that date.

6         But is it your understanding of this "Purchase Price"

7    column, that if a unit has been sold, it's marked as sold.  If

8    it is on the market, it lists the price?

9    A.  That is my understanding.  That's correct, sir.

10   Q.  All right.

11        And the next column lists the percentage of common

12   ownership that is attributed to that unit, right?

13   A.  That is accurate, sir.  Yes, sir.

14   Q.  And that means the owner of this unit, 2238, would own

15   approximately one-third of one percent of the common

16   element -- the common elements -- of the hotel condominium?

17   A.  Correct.

18   Q.  It also means that the owner of this unit would share

19   about one-third of one percent of the common charges of

20   operating the condominium, right?

21   A.  Of the total common charges, that is correct, sir.

22   Q.  And the common charges -- and here's (indicating) the

23   first page of the operating budget from that same amendment.

24   That's Exhibit 603.

25        As you explained yesterday, the common charges are on

Petrus - cross

1125

1   this top line (indicating), right?

2   A.   That is correct.

3   Q.   Now, am I correct that if you take this common-charges

4   figure from the third amendment -- and that's an annual

5   figure, right?

6   A.   An annual figure, that is correct.  Yes, sir.

7   Q.   If you divide it by 12 -- for 12 months -- and you

8   multiply it times this number here (indicating), .3874

9   percent, you should get this number right here (indicating),

10  which is called the "Estimated Monthly Common Charge" for that

11  unit; is that right?

12  A.   That is accurate.

13  Q.   The next column over says, "Estimated Monthly Share of

14  Fixed Hotel Expenses," and this is also an estimated monthly

15  cost, on top of the common charges, that this unit owner of

16  2238 will be asked to pay every month; is that right?

17  A.   That is accurate, sir.

18  Q.   And, then, finally, on the right, there's estimated

19  monthly real estate taxes.  That's an estimate of the amount

20  of taxes that unit owner will be required to pay?

21  A.   Correct.

22  Q.   And if you add these three up, that's the best estimate --

23  according to the people who wrote this third amendment

24  document -- of what those monthly expenses would be?

25  A.   That was the estimate at the time.  That is correct, sir.

Petrus - cross

1126

1    Q.  And the other unit Ms. Goldberg was under contract for is

2    2240.  And this line (indicating) shows the same numbers for

3    2240, right?  The purchase price, the percentage unit owner-

4    -- the percentage ownership of the common -- well, the

5    percentage common ownership, right?

6    A.  Right.

7    Q.  The monthly common charges estimated, right?

8    A.  That's correct.

9    Q.  The fixed expenses and real estate, right?

10   A.  It's all outlined.  That's correct.

11   Q.  And all of those would be monthly expenses?

12   A.  That is correct.

13   Q.  Mr. Petrus, there was a pretty serious real estate market

14   crash in the United States that started in 2007 and continued,

15   at least, through 2012, wasn't there?

16           MR. S. KULWIN:  Judge, I'll object to 2012.  I'll

17   object to his lack of foundation.  He's not here as an expert.

18           THE COURT:  Sustained on the time period.

19           Rephrase your question.

20   BY MR. SHONKWILER:

21   Q.  Mr. Petrus, there was a real estate market crash in the

22   United States that began sometime around 2007.  Do you agree?

23   A.  Absolutely.

24           MR. S. KULWIN:  I will object unless we have a basis

25   for his knowledge of 2007.

Petrus - cross

1127

1        What's his basis?

2        There's no foundation.

3        THE COURT:  Sustained.

4        Lay a foundation as to how he can testify to that.

5   BY MR. SHONKWILER:

6   Q.  You've worked in the real estate business for many years,

7   right?

8   A.  Yes, sir.

9   Q.  You keep apprised of real estate market trends as part of

10  your work, correct?

11  A.  I do.

12  Q.  And you're always aware of market conditions, at least

13  since you've worked for Trump, right?

14  A.  That is correct.

15  Q.  And, particularly, with respect to any real estate markets

16  where the Trump organization has condominium buildings, right?

17  A.  Yes.

18  Q.  Okay.

19       Are you aware that there was a real estate market

20  crash in the United States -- and including in Chicago -- that

21  started in around 2007?

22       MR. S. KULWIN:  That's an insufficient foundation,

23  Judge.  He's generally aware in 2007?  When?  What's the basis

24  for his awareness?  There's nothing --

25       THE COURT:  Overruled.

Petrus - cross

1128

1    BY MR. SHONKWILER:

2    Q.  And you're aware that the values of luxury condominiums in

3    Chicago peaked around 2006 and precipitously declined

4    beginning sometime afterwards?

5             MR. S. KULWIN:  The same objection, Judge.  He has

6    absolutely no knowledge of it.  There's no foundation that

7    this man was involved in residential or hotel condominium

8    sales at all.

9             THE COURT:  Overruled.

10            He has testified to his basis.  That is a weight

11   issue for the jury.

12   BY MR. SHONKWILER:

13   Q.  For that matter, Mr. Petrus -- I am sorry, you have to

14   answer the question.

15   A.  Yes, I am aware of the crash in the real estate market.

16   Q.  Okay.

17            And all real estate in Chicago, to your knowledge,

18   was affected by the --

19            MR. SHONKWILER:  Strike that.

20   BY MR. SHONKWILER:

21   Q.  The market conditions we've just been discussing, have you

22   ever heard these referred to as the "bursting of the housing

23   bubble"?

24            MR. S. KULWIN:  Judge, I'm going to object as to

25   hearsay, lack of foundation.

Petrus - cross

1129

1    THE COURT:  Sustained.

2         You are going too far now.

3         And the housing bubble, he has no expertise in

4    housing, that you have established.

5    BY MR. SHONKWILER:

6    Q.  Mr. Petrus, you're also aware that the real estate market

7    crash that we're talking about now continued for many years,

8    correct?

9    A.  That is correct.

10   Q.  Now, Mr. Petrus, there are -- I think you testified there

11   are -- a couple hundred people employed by the Trump

12   organization in New York; is that right?

13   A.  At the corporate office, that is correct.

14   Q.  Now, worldwide, the Trump organization has thousands of

15   employees, correct?

16   A.  That is correct, sir.

17   Q.  The fourth amendment to the property report, as we've

18   discussed over the course of the week, was issued in around

19   October of 2007?

20   A.  That is correct, sir.

21   Q.  And that was shortly before the hotel condominium opened

22   in 2008, right?

23   A.  Yes, sir.

24   Q.  You were asked some questions by Mr. Kulwin about whether

25   that was the final amendment to the hotel condominium property

Petrus - cross

1130

1    report.

2         Do you recall those questions?

3    A.  I do recall those questions.

4    Q.  And it was the final amendment that was issued before the

5    hotel condominium opened, right?

6    A.  It was the final amendment before the actual physical

7    opening of the hotel, that's correct.

8    Q.  Okay.

9         But it was not the last amendment to the hotel

10   condominium property report, was it?

11   A.  It was not.

12   Q.  There had been three amendments since, right?

13        MR. S. KULWIN:  Judge, I'm going to object.  Lack of

14   foundation and failure to disclose.

15        We can talk at sidebar, if you'd like.

16        THE COURT:  Overruled on the second part.

17        Lay a little more foundation.

18   BY MR. SHONKWILER:

19   Q.  Mr. Petrus, you're the Chief Operating Officer of the

20   Trump Hotel Collection?

21   A.  Yes, sir.

22   Q.  And one of your responsibilities as Chief Operating

23   Officer of the Collection is to oversee all of the activities

24   at the hotels in the Collection, right?

25   A.  Yes, sir.

```
1   Q.  And one of those is the Chicago Trump Tower?

2   A.  That's correct, sir.

3   Q.  You were extensively involved in preparing the property

4   reports that were issued -- I'm sorry, the fourth amendment to

5   the property report that was issued -- in 2007, right?

6   A.  Yes, sir.

7   Q.  And you are also involved in every hotel amendment -- I'm

8   sorry, every property report amendment -- to the hotel

9   condominium property report that has been issued since, right?

10  A.  That is correct.

11          MR. S. KULWIN:  Judge, there's no foundation that

12  there have been any issued.  There are no documents like that

13  that we've ever seen.

14          MR. SHONKWILER:  Okay.  This question -- there were

15  several questions asked --

16          THE COURT:  I am going to sustain the form on that.

17          Rephrase your question.

18  BY MR. SHONKWILER:

19  Q.  Mr. Petrus, I think the question is:  And you also have

20  been involved in the preparation of the property reports for

21  the hotel condominiums in Trump Tower that followed the fourth

22  amendment, correct?

23  A.  That's correct.

24  Q.  Okay.

25          And there have been three of them, right?
```

Petrus - cross

1132

1   A.   That is accurate.

2   Q.   A fifth, sixth and seventh amendment, right?

3   A.   Yes, sir.

4   Q.   Now, you're familiar, Mr. Petrus, with the Hotel Rental

5   Program at Chicago Trump Tower?

6   A.   Yes, I am.

7   Q.   And that's a program that's available to owners of hotel

8   condominium units of the building, if they choose to

9   participate?

10  A.   That is correct.

11  Q.   Okay.

12       Owners can put their units in the Trump Hotel Rental

13  Program and, if they do, Trump will rent their hotel condo

14  unit just like any other room in the hotel, correct?

15  A.   Yes, sir.

16  Q.   Now, under the rental system that's in place, when

17  somebody stays in a unit owner's room, the unit owner gets a

18  share of the revenue earned from that stay, right?

19  A.   That is correct.

20  Q.   And there are periodic checks written for any net revenue

21  from the rentals to each unit owner, right?

22  A.   Yes, sir.

23  Q.   Now, in order to participate in that program, a unit owner

24  has to sign a contract called a rental management agreement?

25  A.   That is correct.

Petrus - cross

1133

1    Q.  You helped write the rental management agreement for the
2    Chicago Trump hotel, right?
3    A.  Yes.  Yes, I did.
4    Q.  What other Trump organization employees helped you to
5    prepare that?
6    A.  Colm O'Callaghan, Adoro Manolo, Mickael Damelincourt, they
7    were the -- probably the -- key players that were involved in
8    that process.
9    Q.  Do you recall when that rental management agreement was
10   first issued?
11   A.  I think it was probably the mid part of 2007.
12   Q.  And around the time that it was issued, was that the same
13   time that unit owners were first given an opportunity to sign
14   up for that program?
15   A.  Yes, sir.
16   Q.  Under the rental management agreement, there's a system
17   for allocating rentals fairly among unit owners who
18   participate, right?
19   A.  That's correct.
20   Q.  And under that agreement that was first issued in 2007, do
21   you recall that any night that the unit owner stayed in their
22   own hotel condo, that stay counted against them, in terms of
23   their priority for rental opportunities through the Trump
24   system?
25   A.  That is correct.

Petrus - cross

1134

1    Q.   Okay.

2          Now, you can operate a rental system so that the

3    owners' use of the unit does not impact the unit's priority

4    for rentals, correct?

5    A.   That is correct.

6    Q.   In fact, that's the way the system works at the New York

7    Trump hotel condominium, right?

8    A.   That is correct.

9    Q.   Now, when you were preparing the rental management

10   agreement, you considered both alternatives and, ultimately,

11   chose to use a system that did count the unit owner's

12   occupancy nights against the owner, for purposes of rental

13   priority, correct?

14   A.   That is correct.

15   Q.   And each of these two systems is arguably more favorable

16   to one group of owners and less favorable to another, right?

17   A.   That is accurate.

18   Q.   For example and, in particular, if you don't stay in your

19   own unit, you would like a system that counted owner occupancy

20   against the unit owner for rotation purposes, theoretically,

21   right?

22   A.   Logically.

23   Q.   Because you would get more rentals relative to other unit

24   owners?

25   A.   Correct.

Petrus - cross

1135

1  Q.  Okay.

2        On the other hand, a system that does not count owner

3  occupancy against the unit's rental priority is arguably more

4  favorable to the people who are staying in their units

5  frequently, right?

6  A.  Logically, yes.

7  Q.  Because they get to stay in their units and they also get

8  the same rental income as the other owners?

9  A.  Correct.

10  Q.  Now, later -- I mean, after the hotel in Chicago was up

11  and running -- you recall that you changed the rental system

12  in that respect, right?

13  A.  We did.

14  Q.  Now, the Chicago rental program works like the New York

15  program, in that unit owner occupancy does not count against

16  the unit, for rotation priority purposes, right?

17  A.  That is accurate.

18  Q.  And this was a change you made as a result of a vote of

19  the condominium owners?

20  A.  That is correct.

21  Q.  And when you took that vote, you had some unit owners who

22  voted on one side and some who voted on the other, correct?

23  A.  That is accurate.

24  Q.  There was a difference of opinion, right?

25  A.  It was not a hundred percent on either side.

Petrus - cross

1136

1  Q.  But the majority said they wanted a system that did not

2  count owner occupancy against rotation priority, right?

3  A.  That is correct, sir.

4  Q.  So, you changed it to make it that way?

5  A.  We -- we -- went ahead and we changed it.

6  Q.  And that's the system that's in place now?

7  A.  That is correct.

8  Q.  Now, another thing about the rental management agreement

9  is it gives the hotel manager the ultimate authority and

10  discretion to decide which rooms to rent and when and to whom,

11  correct?

12  A.  That is correct.

13  Q.  But the manager must exercise that discretion fairly and

14  equitably, right?

15  A.  Yes, through an automated system.

16  Q.  The manager, to your knowledge, does exercise that

17  discretion fairly and equitably, correct?

18        MR. S. KULWIN:  Judge, I am going to object to lack

19  of foundation.

20        THE COURT:  Sustained.

21  BY MR. SHONKWILER:

22  Q.  Mr. Petrus, are you familiar with the rental management

23  system as it operates in the Chicago hotel?

24  A.  Yes, I am.

25  Q.  And what responsibilities do you have for the oversight of

Petrus - cross

1    that system?

2    A.  I am the person responsible for it.

3    Q.  Okay.

4         And are you aware that the manager does exercise

5    discretion as to which rooms to rent to whom and when, fairly

6    and equitably?

7    A.  I am aware.

8    Q.  From your 38 years or so of experience managing hotels,

9    why is it necessary to give the hotel manager ultimate

10   discretion and control over which rooms are rented to whom and

11   when?

12   A.  It's important that the manager has the ability, number

13   one, to implement the system, because this is an automated

14   system that's in place through a software black box-type

15   program.

16        So, we have that control on that system, to make sure

17   that it is properly implemented; and, from time to time, there

18   may be an exception of a person that requests a specific room

19   or room type.  And in those isolated cases, the manager has to

20   have the ability to react to that.

21        But those are isolated exceptions.

22   Q.  So, for example -- and I don't run the system myself, so

23   correct me if I'm wrong -- but, for example, if somebody calls

24   and says, "I need a lakeview.  Do you have a lakeview?"  And

25   if you have one, Trump doesn't want to tell its prospective

Petrus - cross

1138

1  guests, "I can't give that one to you.  I'm sorry"?

2          MR. S. KULWIN:  Judge, I'm going to object.

3  Argumentative.  Form.

4          THE COURT:  Sustained on form.

5  BY MR. SHONKWILER:

6  Q.  Why don't you give us an example, Mr. Petrus --

7  A.  Yes.

8  Q.  -- of a situation where it would be -- let me get the

9  question out -- appropriate for the manager to exercise

10 discretion and override the system.

11 A.  You -- you -- have your wedding at Trump Chicago and that

12 night you stayed in Room 1401.  The following year, you and

13 your bride -- wife -- come back and you call Reservations and

14 say, "Gosh, I would love to come back to Trump Chicago.  And,

15 boy, wouldn't it be great if I could have Room 1401 as that

16 night's accommodation?"

17         We have the ability to go in -- into the system -- in

18 that isolated case to make sure that we are taking care of

19 customers' needs, customers' desires.  And we can then

20 re-route that one reservation to the specific request of the

21 customer.

22         And that is also outlined, by the way, in the rental

23 management agreement.

24 Q.  One more subject about the rental system.

25         Every time a unit is rented through the Trump rental

Petrus - cross

1139

1    program, the unit owner has to pay certain fees to the

2    manager, right?

3    A.  That is correct.

4    Q.  Now, those fees cover certain costs that are related to

5    the use of those rooms?

6    A.  That is correct.

7    Q.  And as part of the process of preparing the rental

8    management agreement, you helped decide what those fees would

9    be, right?

10   A.  Absolutely.

11   Q.  I'm showing you a document that's been admitted.  It is

12   Defendants' Exhibit 583.

13          THE COURT:  You may.

14   BY MR. SHONKWILER:

15   Q.  Mr. Petrus, this is an e-mail from you to Colm O'Callaghan

16   and Mickael Damelincourt -- you've copied yourself,

17   apparently -- dated April 18th, 2007?

18          Do you see that?

19   A.  Yes, sir.

20   Q.  Okay.

21          And the attachment to this is a form rental

22   management agreement for 401 North Wabash Avenue Hotel, right?

23   A.  That's correct.

24   Q.  And it also notes that it's a blackline.  Does that mean

25   that there were edits to that document that were being

Petrus - cross

1140

1  circulated?

2  A.  One would assume that; yes, sir.

3  Q.  The e-mail from you to Colm and Mickael Damelincourt says,

4  "Guys, can you be certain we maintain our notes on the rental

5  program fees that were proposed," right?

6  A.  That is correct.

7  Q.  And here they are:  Three percent admin, $30 per night

8  marketing, $6 reservation processing per night, applicable

9  GDS, TA commissions, et cetera.  Okay?

10         And does this refresh your recollection that there

11  was some discussion around this time -- April of 2007 -- about

12  what these fees would be?

13  A.  That is correct, sir.

14  Q.  In fact, this is something that you and Mr. O'Callaghan

15  and Mr. Damelincourt were deciding at that time, correct?

16  A.  Yes, sir.

17  Q.  Now, one thing you were deciding is which fees would be

18  charged, right?

19  A.  That is correct.

20  Q.  And you -- the other thing -- well, another thing -- you

21  were deciding is how much those fees would be, correct?

22  A.  Yes, sir.

23  Q.  And those decisions were made by you, Mr. O'Callaghan and

24  Mr. Damelincourt in 2007 as part of the process by which you

25  prepared the rental management agreement, correct?

Petrus - cross

1141

1   A.  Correct.

2   Q.  I see this e-mail refers to the fees as "proposed fees."

3           Do you recall that as of this date, the rental

4   program fees were still under consideration by you and your

5   group?

6   A.  I think one would assume that using the word "proposed,"

7   this was not solidified or finalized.

8   Q.  Now, Mr. Petrus, you don't own a unit in the Trump Tower

9   Chicago hotel condominium, do you?

10  A.  I do not.

11  Q.  You've never owned one?

12  A.  I have never owned one.

13  Q.  Now, you're aware that some Trump employees purchased

14  units in the hotel, though, correct?

15  A.  I am.

16  Q.  And those people bought those units because they wanted

17  them, right?

18  A.  That's --

19          MR. S. KULWIN:  Objection, Judge, as to --

20          THE COURT:  Sustained on foundation.  Sustained.

21  BY MR. SHONKWILER:

22  Q.  Mr. Petrus, as a Trump employee, you are not forced to buy

23  a unit, correct?

24  A.  I am not.

25  Q.  But you are allowed to buy one if you want, right?

Petrus - cross

1142

1    A.   That is correct.

2         MR. SHONKWILER:   I think just a few more questions,

3    your Honor, if I can have just one minute to make sure I'm not

4    forgetting something.

5         (Brief pause.)

6    BY MR. SHONKWILER:

7    Q.   Mr. Petrus, one of the documents that you were shown by

8    Mr. Kulwin, was this document that's Plaintiff's Exhibit 125.

9    And right now I'm looking at Page 3237.

10        Do you recall this?

11   A.   Yes, sir.

12   Q.   And this information from PKF Hospitality Research

13   includes some numbers that are estimates of food and beverage

14   revenue or expense for an entire hotel; is that correct?

15   A.   Yes, sir.

16   Q.   Now, you were also shown at some point Plaintiff's Exhibit

17   13.

18        And I'm looking now at Page 3286 of that exhibit.

19        Do you remember being shown this?

20   A.   I do; yes, sir.

21   Q.   And this document also shows some estimates and

22   projections of food and beverage revenue and expense from the

23   entire hotel, correct?

24   A.   That's correct.

25   Q.   But the operating budget for the Trump hotel condominium

Petrus - cross

1    never included all food and beverage revenues, correct?

2    A.  It did not.

3    Q.  Okay.

4          And, so, in that sense, you gave testimony yesterday

5    about apples and oranges that opposing counsel, I believe,

6    said, "You can discuss that with your attorney later."

7          Do you remember that?

8    A.  I do.

9    Q.  Okay.

10         And the apples and oranges that you had in mind when

11   you said that --

12         MR. S. KULWIN:  Well, Judge, can we find out what

13   Mr. Petrus had in mind when he said "apples and oranges"?

14         THE COURT:  Well, I think that is where Mr.

15   Shonkwiler is going.

16   BY MR. SHONKWILER:

17   Q.  Am I correct?

18   A.  Yes.

19   Q.  Am I correct, Mr. Petrus, that the apple you were talking

20   about was overall food and beverage revenue and expense for an

21   entire hotel, and the orange was the third amendment to the

22   property report that had commissions only?

23   A.  That was the apples and oranges comparison, and that is

24   correct.

25   Q.  The reason you call them apples and oranges is because

Petrus - cross

1144

1   they're very different, correct?

2   A.  Opposite ends of the spectrum.  And the two are not

3   related.

4   Q.  Mr. Petrus, just a few more questions.

5         To your knowledge, before you suggested removing the

6   meeting and ballroom facilities from the common elements,

7   nobody else at the Trump organization had even mentioned to

8   you the possibility of that happening, right?

9   A.  That is correct.

10   Q.  Mr. Trump certainly never came to you with his own

11   suggestions about what should or should not be in the hotel

12   condominium common elements, right?

13   A.  Never.

14         MR. SHONKWILER:  I don't have anything further, your

15   Honor.

16         THE COURT:  Redirect, Mr. Kulwin.

17         MR. S. KULWIN:  Thank you very much, your Honor.

18         While he is doing that, Judge, if I can just have a

19   second?

20         THE COURT:  You may.

21         (Brief pause.)

22         MR. NOVACK:  Your Honor, I wonder if I could ask that

23   that easel be moved unless and until they need it because --

24         THE COURT:  Yes, please, because it is blocking.

25         MR. NOVACK:  -- it blocks the view of the jury.

Petrus - redirect
1145

1       THE COURT:  Yes, I agree.

2       MR. S. KULWIN:  Put it down a little bit.

3       Put it down that way so the jury's not -- move it

4  towards the screen, please.

5       MR. J. KULWIN:  Sure.

6       MR. S. KULWIN:  There you go.

7       Thanks, Jeff.

8       (Brief pause.)

9                    REDIRECT EXAMINATION

10  BY MR. S. KULWIN:

11  Q.  Okay.  Let's see what we got here.

12      All right.  Good morning, Mr. Petrus.

13  A.  Good morning to you.

14  Q.  Sir, yesterday apparently I erred and I showed you

15  Plaintiff's Exhibit 33 and asked you whether it was the

16  management agreement between Trump -- Mr. Trump -- and the

17  Trump organization regarding his ownership of the ballrooms,

18  the meeting rooms, the function rooms.

19      Do you remember that?

20  A.  Yes, sir.

21  Q.  I erred in that regard, correct?  That wasn't the

22  management agreement, true?

23  A.  Yes, sir.

24  Q.  Right?

25      Okay.

Petrus - redirect

1146

1      But let's be clear, though.  There is a management

2  agreement between Mr. Trump and the Trump management company

3  to run the ballrooms, the meeting rooms and the function

4  rooms, true?

5      MR. SHONKWILER:  Objection.  The contract with

6  Mr. Trump?

7      THE COURT:  Sustained.

8      Rephrase it.

9      MR. S. KULWIN:  But that's who I'm asking -- I'm

10  asking -- him if that's it.

11      THE COURT:  Rephrase your question, please.

12  BY MR. S. KULWIN:

13  Q.  Mr. Trump, personally -- Donald Trump -- owns the

14  commercial space that has the ballrooms and things of that

15  nature.

16      You've testified to that already, right?

17  A.  Mr. Trump owns the commercial space, that's correct.

18  Q.  Right?

19  A.  Yes, sir.

20  Q.  And he, personally, has a management agreement with the

21  Trump organization to manage it, doesn't he?

22  A.  With a division of the Trump organization --

23  Q.  Right.

24  A.  -- to manage the entity.  That is correct.

25  Q.  Okay.

Petrus - redirect

1147

```
 1            So we're clear -- I just want to be clear about
 2    this -- Mr. Trump hired Trump to manage the ballrooms.  Just
 3    so we're clear.
 4            I gave you the wrong document, but there's no dispute
 5    that there is a document like that, correct -- a management
 6    agreement?
 7    A.  Yes, that is correct.
 8    Q.  And Mr. Trump goes into one pocket to pay that management
 9    fee into his other pocket, the management company that he
10    owns, right?  That's what he does?
11    A.  In essence, but that's also typical in the industry.
12    Q.  I'm not asking you about typical.  We'll get to typical in
13    a second.
14    A.  Okay.
15    Q.  All right?
16    A.  Right.
17    Q.  And what's the rate that he pays -- the management fee?
18    A.  For the commercial space?
19    Q.  Yeah, the percentage.
20    A.  It's a nominal amount.
21    Q.  What?
22    A.  Under five.
23    Q.  Under five, what?
24    A.  Under five percent.
25    Q.  How under?
```

Petrus - redirect
1148

1   A.  It's probably four.

2   Q.  Four percent.  Okay.

3       Of gross revenues?

4   A.  Of gross revenues, that's correct.

5   Q.  Any incentive?

6   A.  There's no incentive.

7   Q.  Okay.

8       So, he doesn't pay himself more if the profits get

9   better from running that space?

10  A.  I don't -- I don't -- believe so.

11  Q.  Okay.

12      And in the management agreement I showed you from

13  Hyatt yesterday, when I was trying to refresh your

14  recollection, there were such incentives, true?

15  A.  You know, I don't recall.

16      Are you talking about the Macau?

17  Q.  Yeah, that one.

18      Do you remember I went through and there was a two

19  percent base and, then, three percent, more, right?  True?

20  A.  Yes.

21      MR. SHONKWILER:  Objection, your Honor.  Beyond the

22  scope of redirect.

23      THE COURT:  Overruled.

24  BY THE WITNESS:

25  A.  Right.

Petrus - redirect

1149

1   BY MR. S. KULWIN:

2   Q.  So, that's the first thing I wanted to establish.  All

3   right.  I got that cleared up.

4           Now, I want to be clear about something else.

5           The first amendment to the property report that

6   described the common elements clearly said that the hotel --

7   you're not disputing that it said that the hotel --

8   condominium unit owners would own the ballrooms, the meeting

9   rooms, the function rooms, the executive lounge?  You're not

10  disputing that, are you?

11  A.  If that's what the report says?

12  Q.  Right.

13          Well, I just want to be clear on this.  Let's just be

14  clear.

15          (Brief pause.)

16  BY MR. S. KULWIN:

17  Q.  Let me show you Plaintiff's Exhibit 2, a description of

18  the common elements.

19          There you go.  Do you see this, a description of the

20  common elements right here (indicating)?

21  A.  Yeah.

22          May I take a look at it?

23  Q.  Sure.  Right here (indicating).  That's what I'm asking.

24  Okay?

25          MR. SHONKWILER:  Counsel, can we have an exhibit or a

Petrus - redirect
1150

1  page?

2          MR. S. KULWIN:  I said Exhibit 2 and it's Page 9

3  of --

4          MR. SHONKWILER:  The first amendment?

5          MR. S. KULWIN:  Indeed.

6  BY THE WITNESS:

7  A.  Yes, that's what this says -- this states.

8  BY MR. S. KULWIN:

9  Q.  They own the function rooms, the ballrooms, the executive

10 lounge.

11         There is no dispute about that, right, under this,

12 true?

13 A.  According to that, that is accurate.

14 Q.  And the third amendment didn't change that in any way,

15 right?

16 A.  That is correct.

17 Q.  Okay.

18         The January '05 one, right?

19 A.  That is accurate.

20 Q.  Okay.

21         So, now the hotel condominium unit owners -- the

22 hotel condominium unit owners, including Ms. Goldberg -- owned

23 the physical real estate under those common -- they own those

24 common elements of that space, right?

25 A.  At that time.

Petrus - redirect

1151

1     Q.  Right.

2           And after the October amendment of 2007 -- the fourth

3     one -- they no longer owned it, right?

4     A.  That's correct.

5     Q.  So, let's make sure we got that one down.

6           MR. SHONKWILER:  Counsel, can you put this where I

7     can see it?

8           MR. S. KULWIN:  I'm just -- do you need to see it,

9     Joe?

10          THE COURT:  No, it's for Mr. Shonkwiler to see it.

11          MR. S. KULWIN:  Can he just pull up a chair, Judge,

12    because I --

13          THE COURT:  I think it is going to be hard.

14          You can sit over there by Danny, if you would like.

15          MR. S. KULWIN:  Thank you, your Honor.

16          (Brief pause.)

17          MR. SHONKWILER:  Can we move this over here

18    (indicating)?

19          MR. S. KULWIN:  I thought he could pull up a chair,

20    Judge.  Is that okay?

21          MR. SHONKWILER:  No, I'd rather be able to sit with

22    my notes, your Honor.

23          THE COURT:  You have read it.  If you are going to do

24    more writing, then let us move it.  Otherwise, you have read

25    it, Mr. Shonkwiler.  It can stay where it is.

Petrus - redirect

1152

1     MR. S. KULWIN:  I'm going to do more writing.

2     MR. SHONKWILER:  I'll also, ask, your Honor, before

3  anything more is written, that we have an understanding of

4  what is going to be written, before the words actually appear

5  on the page.

6     THE COURT:  Well, let us hear what the question is

7  and see where we are going.

8     MR. S. KULWIN:  Put it right like this (indicating),

9  right there.

10    Now, can you see it, Mr. Shonkwiler?

11    MR. SHONKWILER:  Yes.

12    MR. S. KULWIN:  Judge, can you inquire about --

13    THE COURT:  I think they can all see it.

14    Can everybody see it okay?

15    (Jurors nodding.)

16    THE COURT:  All right.  Let us move on.

17    MR. S. KULWIN:  Thanks, Jeff.

18    Mike, can you put up Exhibit H to the third

19  amendment?

20    And can you highlight the top part there.

21  BY MR. S. KULWIN:

22  Q.  I want to be clear about something else, Mr. Petrus.  You

23  were asked a bunch of questions about this $867,000 and the

24  $150,000 and commissions in the third amendment.

25    Do you remember those questions that Mr. Shonkwiler

Petrus - redirect

1153

1    asked you?

2    A.  Yes, sir, I do.

3    Q.  Okay.

4         Let's be clear.  I want to be clear about something.

5    Under the third amendment, the Trump organization was telling

6    potential buyers that it was their estimate that $5,053,625

7    would flow into the condo association from the meeting and

8    ballroom rentals and spa commissions; is that right?

9         MR. SHONKWILER:  Objection.  Asked and answered.

10        THE COURT:  Overruled.

11        You may answer, if you can, sir.

12   BY THE WITNESS:

13   A.  That's what's outlined in Exhibit H.

14   BY MR. S. KULWIN:

15   Q.  Right.

16        The 867,100-and-whatever-dollars that Mr. Shonkwiler

17   was talking about in the footnote, is included within the $5

18   million; is it not?

19        Is that right?

20   A.  You know, I was not privy to the exact methodology of the

21   calculation.

22   Q.  Well, you just testified to it yesterday.

23   A.  No, but I -- I -- did not create these numbers.

24   Q.  So, when you were testifying about it yesterday, you

25   weren't sure that that's what it meant?

Petrus - redirect

1154

1  A.  No, no.  You asked me --

2  Q.  Okay.

3  A.  -- is that specific number included in the 553.

4        I did not create these.  So, I can't tell you that

5  the calculation -- and I'm not sure if you can, either --

6  Q.  I'm not --

7  A.  -- but I would like -- if you can show me what totals up

8  to 553, that will be the first time that I've seen it.

9  Q.  Sir, all I'm asking you is:  In the notes that Mr.

10  Shonkwiler was going over with you to this budget, it says --

11        MR. S. KULWIN:  Mike, can we have up Exhibit 2, the

12  first amendment, and the numbers -- there you go.  You're

13  great.

14  BY MR. S. KULWIN:

15  Q.  And it says on top, "Meeting room rental, 5-million-38.

16  Commission from spa services, 15,000.  There are three meeting

17  rooms, one board room, one ballroom, one function room," and

18  then it goes on.

19        "It's projected for the demand for the meeting room

20  space," and it talks about just a 65 percent occupancy, with

21  additional rates.  And, then, it says an additional 628,5 of

22  commissions received from the food service operator and

23  150,000 in annual gross revenue.

24        Are you telling me that you can't tell whether that

25  money is within the 5 million or in addition to?

Petrus - redirect

1155

1    A.  No.

2    Q.  It says, "in addition to"?

3    A.  Yes.  But what I'm saying is this, is that the 8 --

4    Q.  Before you tell me what you are saying, I'm just asking

5    you --

6    A.  Sure.

7    Q.  -- can you tell me whether you know that?

8    A.  I can't -- first off, I can't -- look at this and tell you

9    that all of these numbers add up to the 5-million-38.

10          Secondly, I can't determine by looking at this the

11    857.  That's commission of what number?  Can you tell me that?

12    Q.  Sir, you're not here to ask questions.  You're here to

13    answer questions.

14    A.  I understand that, but --

15    Q.  So, let me ask you this question.

16    A.  Okay.

17          THE COURT:  Mr. Kulwin --

18          MR. S. KULWIN:  Okay.  Sorry.

19          THE COURT:  Go back to the lectern, please.

20          Thank you.

21    BY MR. S. KULWIN:

22    Q.  Sir, let me ask you.  The question is, very simply, it

23    says, "Meeting Room Rental."

24          Do you know what "Meeting Room Rental" is?

25    A.  I do, yes, sir.

Petrus - redirect

1156

1   Q.  That's the rental of the ballrooms, the meeting rooms, the

2   function rooms, the executive lounge, correct?

3   A.  That is correct.

4   Q.  And, then, it says, "An additional 857,000 in gross

5   revenue is projected."

6          So, the natural reading of that, is it not, that

7   there's 5 million from the rentals and, then, even more

8   potential money from the sales -- from the commissions?  Isn't

9   that the natural reading of it?

10  A.  Um --

11  Q.  You don't know?

12  A.  I don't know that.

13  Q.  Okay.  Great.

14         But certainly under either scenario we're clear

15  that --

16         MR. S. KULWIN:  Go back to H, please.

17  BY MR. S. KULWIN:

18  Q.  -- that this 5 million is what is being told here in

19  January of '05, that the Trump organization, given their best

20  estimate at that time, is saying is going to flow into the

21  condo association, right?  That's what it says?

22  A.  That's what Exhibit H says.

23         MR. S. KULWIN:  And, now, Exhibit H of Exhibit 25-B.

24  BY MR. S. KULWIN:

25  Q.  And, now, it's down to 500,000, right?  And that's the F&B

Petrus - redirect

1    license, right?

2    A.   That's correct.

3    Q.   Okay.

4         So we're clear, before the fourth amendment,

5    5-million-053.  After amendment --

6         MR. SHONKWILER:  Your Honor, I object.  This is

7    getting argumentative already and he is not done with his

8    sentence yet.  This is a written -- this is a written --

9    closing argument to the jury.

10        MR. S. KULWIN:  No, Judge, I'm summarizing the

11   evidence.

12        THE COURT:  It is okay so far.

13        Ask your question.

14        You can object, again.

15        MR. S. KULWIN:  Okay.  All right.

16        THE COURT:  I do not think you asked a question on

17   that.

18        MR. S. KULWIN:  Okay.

19   BY MR. S. KULWIN:

20   Q.   And, so, before the fourth amendment, the condominium

21   association was getting 5,053,000 in gross revenue; and,

22   after, it says $500,000 in income, correct?

23        That's what it says, right?  Is that true?

24   A.   The estimate --

25   Q.   Yeah.

Petrus - redirect

1158

1   A.   -- in 2000- --

2   Q.   Five --

3   A.   Can I just finish my --

4   Q.   No.

5        MR. SHONKWILER:  Objection, your Honor.  He is not

6   letting the witness answer the question.

7        THE COURT:  Sustained.

8        MR. S. KULWIN:  I will withdraw the question.  I will

9   ask another question.

10  BY MR. S. KULWIN:

11  Q.   Before the fourth amendment, Exhibit H told the buyers

12  $5,530,000 of income -- that's what it said at the top,

13  income -- was coming into the condo association, correct?

14  That's what it said?

15  A.   That was the estimate at the time.

16  Q.   And, afterwards, in the "Income" section, the fourth

17  amendment in Exhibit H, it said $500,000?  That was the

18  license --

19  A.   And that was --

20  Q.   -- correct?

21  A.   And that was the estimate --

22  Q.   Is that correct, sir?

23       MR. SHONKWILER:  Your Honor, I object.  He is not

24  letting the witness answer.

25       THE COURT:  Please let him answer the question.

Petrus - redirect
1159

 1           You may answer, sir.

 2  BY THE WITNESS:

 3  A.  Yes --

 4  BY MR. S. KULWIN:

 5  Q.  Okay.

 6  A.  Yes, that was the estimate --

 7  Q.  Okay.

 8  A.  -- for the fourth amendment, is my answer.

 9  Q.  Thank you.

10           MR. SHONKWILER:  Your Honor, he is interrupting the

11  witness.

12           THE COURT:  Yes.

13           Mr. Kulwin, please let the witness answer.

14           MR. S. KULWIN:  Yes, ma'am.

15  BY MR. S. KULWIN:

16  Q.  Now, let's go to PX 13 for a second.

17           To be clear about that, the "food and beverage"

18  phrase -- "food and beverage" -- in the hotel industry is used

19  to define banquet rooms, meeting rooms, function rooms,

20  executive lounges, things of that nature, and all the food

21  that's served in those things.  That's one part of it,

22  correct?

23  A.  That is one part of it.

24  Q.  And another part of it --

25  A.  One part of it, that is correct.

Petrus - redirect

1   Q.  Another part of it is minibar, room service, right?

2   That's another part?

3   A.  That is another additional part.

4   Q.  And, then, where it applies, there may be a restaurant

5   that adds into it, as well, correct?

6   A.  A restaurant, lounge, bar --

7   Q.  I --

8   A.  -- nightclub.

9          MR. SHONKWILER:  Your Honor, please, I just would

10  like the witness to be able to finish his answer.

11         THE COURT:  Yes, please let him finish.

12  BY THE WITNESS:

13  A.  So, there's many different areas --

14  BY MR. S. KULWIN:

15  Q.  Well --

16  A.  -- in addition to what you stated --

17  Q.  Well --

18  A.  -- yes, that's correct.

19         THE COURT:  Mr. Kulwin.

20         MR. S. KULWIN:  I'm sorry, Judge.  I'm sorry.  I'm

21  just trying to move it along.  I apologize.

22  BY MR. S. KULWIN:

23  Q.  Sir, so we're clear, the elements in food and beverage are

24  the rental of the ballrooms, the meeting rooms, the function

25  rooms at the Trump Chicago.  Okay?  The executive lounge,

Petrus - redirect

1161

1    that's one thing that's part of food and beverage, correct?

2            MR. SHONKWILER:  Your Honor, I object to form.

3    Mischaracterizes evidence.

4            THE COURT:  Sustained on form.

5            Rephrase it, Mr. Kulwin.

6    BY MR. S. KULWIN:

7    Q.  One part of food and beverage is -- in the hotel, we will

8    start with that -- are the rental of the rooms where food is

9    served, meeting rooms, ballrooms, things of that nature, true?

10   A.  That is correct, sir.

11   Q.  Another part is the food that's served and the drinks that

12   are served in it, true?

13   A.  That is correct, sir, yes.

14   Q.  Another part is the minibars and the room service, true?

15   A.  It's one of the additional parts, that is correct.

16   Q.  And if there's a restaurant, that's another part -- if

17   there's a restaurant -- correct?

18   A.  Absolutely.

19   Q.  And if there is -- and a bar.

20           There could be a bar, as well, right?

21           MR. SHONKWILER:  Your Honor, asked and answered.

22           THE COURT:  Overruled.

23           You may answer, if you can.

24   BY MR. S. KULWIN:

25   Q.  Right?

Petrus - redirect

1162

1   A.  Yes, sir.

2   Q.  And all of that is encompassed in food and beverage, true?

3   A.  Yes, sir.

4   Q.  Okay.

5        MR. S. KULWIN:  Now, can we have PX-13, Page 3286?

6   BY MR. S. KULWIN:

7   Q.  Now, this is one of your projections for Trump Chicago

8   that you were doing after you arrived, correct?

9        This is what he talked about yesterday, true?

10  A.  That is one of the projections, that's correct.

11  Q.  Okay.

12       Now, here in first line --

13       MR. S. KULWIN:  Mike, I want you, if you could, to

14  blow up just the food and beverage four lines, if you could.

15       And if you could just highlight all the descriptions

16  and the numbers, so they're easy to see.  Can you do that?

17       While you are working on it, I will start

18  questioning.

19       Could you do it or, no?  Highlight the banquets --

20  the lines -- each one.

21       Thank you.  Okay.

22  BY MR. S. KULWIN:

23  Q.  Now, first, under food and beverage in your projection for

24  Trump Chicago are banquets, right?

25  A.  That's correct.

Petrus - redirect

1163

1   Q.  And that refers to the potential rental and food being

2   served in the banquet rooms, ballrooms, meeting rooms,

3   function rooms, correct?

4           That's your projection, rental and food?

5   A.  Well, it's -- it's -- actually rental, food, beverage and

6   ancillary revenues that would be included there --

7   Q.  Right.

8   A.  -- if you want to be accurate.

9   Q.  I do want to be accurate.

10  A.  Okay.

11  Q.  But it all comes from those things that are in those

12  rooms?

13  A.  That's correct.

14  Q.  Okay.

15          Then down here (indicating), the third one --

16          MR. S. KULWIN:  Can I have the third one, Mike?

17          Thank you.

18          And the number, please.

19  BY MR. S. KULWIN:

20  Q.  -- you have the lounge, right?

21  A.  Correct.

22  Q.  And that's what we just saw in the common elements in

23  2005, which were also owned by the unit owners?

24  A.  No, that -- that's a bar lounge, not an executive lounge.

25  Q.  In any event, sir, there it says 1. -- around 1.2 --

Petrus - redirect

1   million, correct?

2   A.  But, just to be clear, though, no, that --

3   Q.  It doesn't say 1.2 million?

4   A.  No.

5           But I think what you're referencing is a lounge.

6   This is -- this is -- a bar.

7   Q.  Okay.  All right.

8   A.  I mean, not the lounge, as you're stipulating.

9   Q.  Right.

10  A.  Just to be clear.

11  Q.  It doesn't say "bar," though?

12  A.  No.  But, since I drafted it, I know what it is.

13  Q.  Okay.  Good.

14  A.  And that wasn't the intent.

15  Q.  And, by the way, in the executive lounge, there's a bar,

16  as well, isn't there?

17  A.  There is not.

18  Q.  So, can you buy drinks there?

19  A.  Just as you could in any of the banquet areas.

20  Q.  Right.  Okay.

21          Now, then you have room service, which is 779; and,

22  minibar, 265, right?

23          That's what you got, right?

24  A.  285; but, yes.

25  Q.  Okay.  You're right.  Sorry.

Petrus - redirect

1165

1    MR. S. KULWIN:  Mike, go up just a little bit,

2  please -- or expand it a little bit.

3    No, down, I'm sorry.  I said "up," I meant "down."

4    There you go.

5    Can you expand the total for this whole thing?

6    There you go.

7  BY MR. S. KULWIN:

8  Q.  So, the total is 8 million -- for food and beverage --

9  8,761,005.  Roughly, $8.7 million, correct?

10  A.  That's the calculation; that's correct, sir.

11  Q.  And of the 8.7 million that you were projecting in this

12  particular scenario -- or estimating -- for the first year,

13  2008, 6.5 million was coming from the banquets; is that what

14  the projection says?

15  A.  That's what's indicated here, that is correct.

16  Q.  Okay.

17    And that's, roughly, give or take a few -- just a

18  second.

19    That's, roughly, 7 -- you're projecting at 75 -- in

20  this particular scenario; I understand it's one scenario --

21  you're projecting 75 percent of the food and beverage revenue

22  for the entire hotel is going to be coming from these banquet

23  rooms, correct?  That's what that says?

24  A.  In this particular scenario --

25  Q.  Right.

Petrus - redirect

1166

1    A.  -- yes, sir.

2    Q.  In this scenario.

3         And, then, of course, as we established yesterday,

4    you were projecting it was going to go up another about a

5    million dollars the next year; and, after that, another about

6    $800,000, right?

7         So that by 2010, you were looking at around $8.2

8    million from the banquets, correct?

9    A.  That is correct.

10   Q.  And the total that the banquets was then going to be -- of

11   the total revenue in 2010, for example, was going to be, if I

12   can do this quickly -- about 68, 70 percent of the total food

13   and beverage in 2010, right?

14   A.  That's correct.

15   Q.  Okay.

16        And, then, of course --

17        MR. S. KULWIN:  Can we go back to Exhibit H, Mike,

18   from the 2005?

19        Yes.

20   BY MR. S. KULWIN:

21   Q.  And, of course, on top of -- in the budget that was in the

22   2005 estimated budget for the condo association, that included

23   $994,000, give or take, of valet parking revenue that was

24   going to go into the condo association, correct?

25   A.  According to this report, that's correct.

Petrus - redirect

1167

1    Q.  Yes.

2           MR. S. KULWIN:  And if you can go back down, Mike, to

3    the expenses and find the parking management fee?

4           Keep going.  Keep going.  Keep going, please, a

5    little more.

6           The next page, please.

7           Sorry.  Checking, please hold.

8           There you go.  It's one, two, three from the bottom

9    in the Administrative Note 6.  Do you see it?

10          There you go.

11   BY MR. S. KULWIN:

12   Q.  And, of course, that was, again, a parking management fee

13   of about $903,000, correct?

14   A.  That's correct.

15   Q.  So, the net profit on that was about -- just based on this

16   -- a hundred thousand dollars, give or take, right?

17          MR. SHONKWILER:  Objection to lack of foundation,

18   your Honor.

19          THE COURT:  Overruled.

20          You may answer, if you can.

21   BY MR. S. KULWIN:

22   Q.  Mr. Petrus, correct?

23   A.  Well, if you subtracted the income from the property

24   management fee, one would assume -- right -- according to this

25   document estimate -- right -- at that time, that's what it

Petrus - redirect

1168

1   would be.

2   Q.   Okay.

3        And that, according to this budget, was going to be

4   flowing into the condo associations, right?

5   A.   That's correct.

6   Q.   And now -- okay.

7        Now, sir, in all of the projections -- and you

8   mentioned a couple of times that you had different scenarios,

9   and they're included -- you know, you saw them in Plaintiff's

10  Exhibit 13 yesterday.  Do you remember that -- that you ran

11  different scenarios?

12  A.   Yes, sir.

13  Q.   Correct me if I'm wrong, but in none of the scenarios that

14  you ran were you projecting banquet revenue going down and

15  food and beverage expenses for those things going above it.

16  There was no negative projections, was there?

17  A.   At that time that --

18  Q.   Right.

19  A.   -- the estimates were written --

20  Q.   Right.

21  A.   -- whatever was on that piece of paper was the thought

22  process --

23  Q.   Right.

24  A.   -- at that pinpoint in time.

25  Q.   Right.

Petrus - redirect

1169

1       And the point that I'm getting at is at that point in

2  time, based on -- and you were an expert in the hotel

3  business, as Mr. Shonkwiler has clearly laid out, for 30-plus

4  years -- based on all of the experience you had, all of the

5  things that you had looked at, everything that you knew, you

6  were projecting in 2006, 2007, that there would be a profit --

7  a gross profit -- spread between the banquets and the expenses

8  related to it every year going forward for the next three

9  years?

10       That's what the projections showed.  That was your

11  thinking at the time?

12       MR. SHONKWILER:  Objection to form.

13       THE COURT:  Sustained on form.

14       MR. S. KULWIN:  Okay.

15  BY MR. S. KULWIN:

16  Q.  Your thinking at the time -- in 2006 you were thinking --

17  you were trying to do your best estimate of banquet room

18  revenues, F&B revenues that were, you know, ultimately taken

19  by Mr. Trump, by your best estimate of what it would look like

20  in 2008, 2009, 2010.  That's the first thing, right?

21       MR. SHONKWILER:  Objection to form.  And

22  mischaracterizes the evidence.

23       THE COURT:  Sustained on form.

24       Rephrase it.

25  BY MR. S. KULWIN:

Petrus - redirect

1170

1    Q.  In 2006, 2007, you were working on these projections,

2    correct?

3            We talked about that, right?

4    A.  That's correct.

5            MR. SHONKWILER:  "These projections," your Honor?

6            I'm sorry, it's an important distinction.  We've

7    established between two sets of projections.  I have got to

8    know which ones we're talking about.

9            THE COURT:  Sustained.

10   BY MR. S. KULWIN:

11   Q.  Mr. Petrus, the ones that were in Plaintiff's Exhibit 16,

12   like the one I just showed you -- those projections -- those

13   were the ones you were working on --

14           MR. SHONKWILER:  I believe it's 13?

15           MR. S. KULWIN:  Plaintiff's 13.

16   BY MR. S. KULWIN:

17   Q.  -- right?

18           MR. SHONKWILER:  13?

19           MR. S. KULWIN:  13.  1-3.

20   BY MR. S. KULWIN:

21   Q.  Right?

22           THE COURT:  You may answer, if you can.

23   BY THE WITNESS:

24   A.  Can you bring it back --

25   BY MR. S. KULWIN:

Petrus - redirect
1171

1  Q.  Sure.

2  A.  So -- I'm not sure we're all on the same page here?

3  Q.  Oh, yeah, sure.

4          It's not up there, is it?

5  A.  (No response.)

6  Q.  Oh, I got it.  Here it is.  Sorry.

7          These (indicating)?

8          These were what you were working on in 2006 and 2007,

9  correct?

10          (Documents tendered.)

11  BY THE WITNESS:

12  A.  Yes, yes.  This is what we were working on.

13  BY MR. S. KULWIN:

14  Q.  Okay.

15  A.  And, no, this did not have -- have -- this was an

16  estimate, and it didn't reflect the crisis that occurred in

17  the hotel business that was devastating to these areas.

18  Q.  So, it did not -- it did not -- reflect it?

19  A.  It did not reflect the crisis that occurred in the hotel

20  industry.

21  Q.  Right.

22          Because in 2006 and 2007, you were using all of

23  your -- let me correct it.

24          But in 2006 and 2007, you were, as Mr. Shonkwiler was

25  keen to point out, a hotel expert, so to speak, for 30 years,

Petrus - redirect

1172

1    right?

2    A.  Absolutely.

3    Q.  One of the most knowledgeable people in the country, in

4    your view, right?

5    A.  Maybe the world.

6    Q.  In the world?  There you go.

7            No need to be modest.  Okay.

8            And you also looked at all sorts of outside sources,

9    right?

10   A.  That's right.

11   Q.  Like PKJ?

12   A.  PKF.

13   Q.  And you, using all of your skills and all of your

14   abilities, projecting in 2006 that the banquet rooms, the

15   meeting rooms, the function rooms were going to be higher and

16   higher revenue for three solid years with profits flowing

17   therefrom, right?

18   A.  Correct.

19   Q.  That's what your projections were?

20   A.  Correct.

21   Q.  Okay.

22           And that's what you were thinking about because

23   that's the only knowledge and information you had when you

24   were trying to develop the hotel condo budget, right?

25           That's what you were thinking?

Petrus - redirect

1    MR. SHONKWILER:  Objection, your Honor.  Lack of

2  foundation.  That document has not been dated with a year, to

3  my knowledge.

4    THE WITNESS:  Yeah.

5    THE COURT:  Overruled.

6    You may answer, if you can, Mr. Petrus.

7  BY THE WITNESS:

8  A.  My foundation for the numbers were based on my experience

9  that I had --

10  BY MR. S. KULWIN:

11  Q.  Right.

12  A.  Right.

13    -- and information that I had gathered --

14  Q.  Right.

15  A.  -- of which one report was what we had been referencing,

16  being the PKF report.

17  Q.  Right.

18  A.  Okay.

19  Q.  And there's no reports in any of your information that

20  documents any kind of impending crisis in the hotel business,

21  as of 2006 or September of 2007, right?

22    There's nothing in your files that we've seen like

23  that, right?

24  A.  There's -- no one would know that at the time, correct.

25  Q.  Right, right, exactly.  No one would know that at the

Petrus - redirect

1174

```
 1   time.
 2            And, in addition, you testified that the real estate
 3   crisis took place in 2007, based on your vast experience,
 4   right?  That's what you testified to?
 5   A.  That's correct.
 6   Q.  Okay.
 7            Well, first things first.  Let's get something
 8   straight.
 9            You've been an expert in the hotel business for 30
10   years, right?
11   A.  Yes, sir.
12   Q.  You're not an expert or -- you're not -- you're not even a
13   qualified -- you haven't been qualified as an expert here in
14   this case, as an expert in the hotel business, right?
15            MR. SHONKWILER:  Object to form.
16            THE COURT:  Sustained.
17            MR. S. KULWIN:  Okay.
18   BY MR. S. KULWIN:
19   Q.  You haven't been offered as an expert in this case?
20            MR. SHONKWILER:  The same objection.
21            THE COURT:  Sustained.
22   BY MR. S. KULWIN:
23   Q.  In any event, be that as it may, you're certainly not an
24   expert in the real estate industry, correct?
25   A.  You know, I'm not here to determine what I'm an expert in,
```

Petrus - redirect

1175

1    to be honest with you.

2    Q.  Well, I'm asking.

3          You've said that you know when the crash came.  I

4    want to know.  Were you -- did you have any level of expertise

5    in the area of real estate values in 2007?  Real estate

6    values.

7    A.  Was I -- I guess one of the questions would be what do you

8    determine as an expert in the real estate market?

9          I'm not sure what that is.

10   Q.  Yesterday -- I mean, just a -- to the same degree that you

11   were talking to Mr. Shonkwiler about this morning -- that you

12   followed it closely, that you were familiar with all the

13   values and the pricing and all that stuff.

14   A.  I --

15   Q.  You had that --

16   A.  I was --

17   Q.  -- information?

18   A.  I was privy to the trends that existed in our organization

19   and, also, the market trends in the real estate world, as

20   being part of the organization, yes.

21         If that qualifies you as an expert, I was well-versed

22   in that area.

23   Q.  Okay.

24         And, so, let me ask you, what documents that you

25   looked at relating to the so-called industry trends are in

Petrus - redirect

1176

1   your files, that have been produced here, that indicate that

2   there was a housing crisis in the fall of 2007?

3           MR. SHONKWILER:  Objection, your Honor.  There's no

4   foundation the witness knows what was produced in the

5   litigation.

6           THE COURT:  Sustained.

7   BY MR. S. KULWIN:

8   Q.  What documents did you have that indicated there was a

9   housing crisis in October of 2007?

10  A.  What documents are in a file or what are the pieces --

11  Q.  No, what documents are in the file?

12  A.  -- or what are the pieces of information that I had read

13  about?  That I was privy to?

14  Q.  Let's start with the documents in the file.

15          What documents are in your file?

16  A.  You know, there's -- the information isn't in a file.

17  Q.  Oh.  What is it?  Is it on the Internet?

18  A.  It could be in several different places, and the Internet

19  being one of them, quite honestly.

20  Q.  So, I just want to be clear.  You had information in

21  October --

22          MR. SHONKWILER:  Your Honor, we'd like a sidebar on

23  this issue.

24          THE COURT:  Yes.  Let us have one.

25          (Proceedings had at sidebar:)

Petrus - redirect

1177

1   MR. NOVACK:  Judge, I think we are getting right back

2   into that suggestion that we did something bad with documents,

3   and I think this would be a good time for that instruction

4   that I'm seeking.

5   MR. S. KULWIN:  He is not allowed to just off the top

6   of his head to say, "There's a crisis here and crisis there,

7   and I relied on it," without being able to be challenged on,

8   "What do you have?"

9   THE COURT:  You have to be careful with your

10  questions, though, when you are talking about "produced in

11  this litigation."

12  MR. S. KULWIN:  Okay.  I won't say "produced in the

13  litigation."

14  THE COURT:  That is suggesting that he has something

15  that he did not turn over.

16  I also think you have spent quite a bit of time now

17  on the real estate market, that you are going far down an area

18  that you should probably bring it back to the case before the

19  jury.

20  If you question that, watch the jury's faces.

21  MR. S. KULWIN:  I --

22  THE COURT:  I will leave that out there.  I will

23  leave you a little more latitude, but I think you are talking

24  about real estate, in general, and arguing with this witness

25  about whether he is an expert in the real estate industry.

Petrus - redirect

1178

1        Let us bring it back to hotels and hotel condominium

2   units.

3        MR. S. KULWIN:  Your Honor, Mr. Shonkwiler must have

4   spent 15 minutes with this guy talking about the real estate

5   crisis and the crash and how it motivated his thinking.  I

6   have to take it apart.

7        THE COURT:  In connection with his hotel experience.

8        I am just --

9        MR. S. KULWIN:  Thank you, Judge.

10       THE COURT:  I have not sustained an objection.

11       MR. S. KULWIN:  Thank you, your Honor.

12       THE COURT:  You might want to look at the jury's

13  faces, Mr. Kulwin.

14       MR. S. KULWIN:  Thank you, Judge.

15       (Proceedings had in open court:)

16  BY MR. S. KULWIN:

17  Q.  While Mr. Shonkwiler was examining you, sir -- I'm going

18  to skip that.

19       The last point on this one, sir -- the last point.

20  Just a couple of questions.

21       Are you saying that you were privy to information

22  that said that there was going to be a housing crisis market

23  crash in that area in October of 2007?

24  A.  That there was going to be an economic crisis that

25  occurred in September of 2008?

Petrus - redirect

1179

1  Q.  Yeah.

2  A.  That I was aware of it --

3  Q.  Right.

4  A.  -- in 2007?

5  Q.  Yeah.

6  A.  I don't believe that anyone could say that.

7  Q.  Okay.

8        And just so we're clear, the last question on this

9  point, Mr. Shonkwiler was saying -- maybe it was just a

10  misstatement, I don't know -- that there was a housing crisis

11  or a crash -- a real estate crash -- that you were aware of in

12  October of 2007.

13        You just said -- and I think we agree -- that

14  happened in September of 2008, correct?

15        MR. SHONKWILER:  Objection.  Mischaracterizes what

16  was asked or the answers to those questions.

17        THE COURT:  Sustained on form.

18  BY THE WITNESS:

19  A.  Yeah, I think we talked --

20        THE COURT:  I sustained it, sir.  I sustained it.

21        THE WITNESS:  Oh, I'm sorry.

22  BY MR. S. KULWIN:

23  Q.  So I'm clear, the real estate crisis that you talked to

24  Mr. Shonkwiler about -- the so-called crash that you talked

25  about -- as you just said, occurred in the fall of 2008, after

Petrus - redirect
1180

 1    Lehman Brothers went down; is that right?

 2    A.  Let's go -- let's go -- it's not a "Yes" or "No" answer,

 3    because I think what we're -- what we're -- confusing are real

 4    estate trends, in general, with the Lehman crisis that

 5    occurred on September 15th of 2015.

 6            Now --

 7    Q.  2008.

 8    A.  2008.

 9            Now, were there elements in the real estate market

10    that showed that there were elements in real estate that were

11    starting to flutter?  Absolutely.

12    Q.  And that's my question for you.

13    A.  And that -- does that qualify you as an expert?

14    Q.  No, that's not my question.  My question is:  Are you

15    telling us that you had information in the fall of 2007 that

16    showed that the bubble was going to burst in October of 2007?

17            Did you have anything like that?  Did you have

18    anything like that?

19    A.  No, sir, I did not.

20    Q.  Okay.

21            Now, you said you spent a lot of time adjusting

22    expenses on Exhibit H to the 2005 budget --

23            MR. S. KULWIN:  Mike --

24    BY MR. S. KULWIN:

25    Q.  -- right?

Petrus - redirect

1181

1    You went through this when you got there.  You spent

2  a lot of time adjusting, right?

3  A.  Yes, sir.

4  Q.  Okay.

5    But let's be clear about one thing.  Okay?  One of

6  the things that you did -- and I'm going to go through it step

7  by step -- one of the things that you did was you removed,

8  when you finally ended up with your final budget in '07, one

9  thing you did was remove all this income:  5053, 994, 15,000.

10  That went out, right?

11    MR. SHONKWILER:  Objection.  Asked and answered.

12    THE COURT:  Sustained.

13  BY MR. S. KULWIN:

14  Q.  Another thing that you did was you eliminated --

15    MR. S. KULWIN:  Go to the expenses, please.

16    Just move it up a little bit -- I mean, to the bottom

17  line -- all the way to the bottom.

18  BY MR. S. KULWIN:

19  Q.  You eliminated all the expenses from this bottom part of

20  the budget related to the ballrooms, the meeting rooms, the

21  function rooms, that were now not going to be owned by the

22  condominium association.

23    You did that, too, correct?

24  A.  No.  Again -- and I believe I stated this before -- but as

25  I went back and adjusted the expenses, there are items in here

Petrus - redirect

1182

1    that are bundled.

2           You cannot take that budget and say, "These are the

3    specific items that are solely associated with the banquet

4    area or the meeting space."

5           So, I think that's extremely important because in

6    readjusting the numbers and making them fair estimates for

7    that time, the adjustments were done on an aggregate basis,

8    not specific to just the banquet or meeting space areas.

9           MR. S. KULWIN:  Your Honor, I would move to strike

10   that.  I asked him:  "Is that correct?"  That is a "Yes" or

11   "No."

12          MR. SHONKWILER:  Your Honor, I think it was a

13   responsive answer to a question that's trying to narrow

14   testimony that's already been given.

15          THE COURT:  Overruled.

16          The answer may stand.

17   BY MR. S. KULWIN:

18   Q.  Sir, you gave a deposition in this case.  You were under

19   oath, right?

20   A.  That is correct, yes, sir.

21   Q.  That was on August 23rd, 2011, correct?

22   A.  That is correct.

23   Q.  Were you asked this question and did you give this answer?

24          THE COURT:  What page?

25          MR. SHONKWILER:  Your Honor, what page?

Petrus - redirect

1183

1     MR. S. KULWIN:  159, Line 19.

2     MR. SHONKWILER:  This has been asked and answered --

3  this portion from the dep transcript has been read to the

4  witness.

5     THE COURT:  Overruled.

6  BY MR. S. KULWIN:

7  Q.  Were you asked this question and did you give this answer:

8     "And you not only shifted the burden away from the

9  hotel condominium association -- " I'm sorry, wrong line.

10     Line 24 on 159, through Line 15 of 160.

11     "And when you say you took out the revenue and

12  adjusted the expenses, am I correct that what you mean is you

13  revised the condominium operating budget to remove the revenue

14  from the rental of the banquet rooms and you removed the

15  expenses involved in running those rooms; is that correct?"

16     Answer:  "The meeting rooms."

17     Question:  "The meeting rooms?"

18     Answer:  "And the banquet rooms."

19     Question:  "And the banquet rooms?"

20     Answer:  "And the catering rooms."

21     Did you give those answers to those questions almost

22  two years ago -- or 18 months ago -- sir?

23  A.  If that was the time.

24  Q.  And you were telling the truth at the time, correct?

25  A.  Yes.

Petrus - redirect

1184

1    Q.  Okay.  Thank you.

2    A.  Yes, sir.

3           THE COURT:  Mr. Kulwin, how much longer do you think

4    you have?

5           MR. S. KULWIN:  I have quite a bit, Judge.

6           THE COURT:  Let us take our morning break.

7           (Jury out.)

8           THE COURT:  You may step down, sir.

9           THE WITNESS:  Thank you.

10          THE COURT:  Please be back in about ten minutes.

11          Mr. Kulwin, just to address an issue we talked about

12   at sidebar, at the final pretrial conference on the issue of

13   the attorney-client in reference to attorneys being involved

14   in the four-month period between -- that it took for the

15   fourth amended property report to get out -- here is exactly

16   what I said to you, which is exactly what I said to you at

17   sidebar.  But, for purposes of the record, so it is crystal

18   clear, I said, "I do not want your client saying that there

19   was that four-month delay because Trump needed to consult with

20   lawyers.

21          "If a question comes up about the delay -- which

22   Mr. Kulwin may ask some questions that skirt around the

23   issue -- they can say that they had to talk to their

24   consultants.  I do not care if you use 'consultants.'  I just

25   do not want 'lawyers' coming out.

                         Petrus - redirect
                                                          1185

    1            "Or if the other companies -- the mortgage companies

    2    or others -- needed to talk to their lawyers, that is a

    3    separate issue.  That does not implicate the issues here."

    4            So, that is exactly what I told you at sidebar.

    5            I will see you in ten minutes.

    6            (Brief recess.)

    7            THE COURT:  Bring in the jury, please, Danny.

    8            (Jury in.)

    9            THE COURT:  You may be seated.

   10            Go ahead, Mr. Kulwin.

   11            MR. S. KULWIN:  Thank you very much, your Honor.

   12    BY MR. S. KULWIN:

   13    Q.  Now, Mr. Petrus, we were talking about the adjustments

   14    that you made.

   15            MR. S. KULWIN:  Mike, if you could put up Exhibit H

   16    from 2005 and Exhibit H from 2007, the amendments.

   17            Thank you.

   18    BY MR. S. KULWIN:

   19    Q.  On the right, Mr. Petrus, is the 2005; and, on the left,

   20    is -- on the right is 2007, on the left is 2005 -- because

   21    you're looking at it that way.

   22            So, let's just talk about some things for a second.

   23            What you said was some -- and correct me if I'm

   24    wrong, you said when you were doing this adjustment from 2005

   25    to 2007, some -- expenses went up and some expenses went down,

Petrus - redirect

1186

 1    right?

 2    A.   That's correct, yes, sir.

 3    Q.   And if I understand it -- I'm going to go through here --

 4    and correct me if I'm wrong -- I'm going to move this over.

 5              So, one line item of --

 6              MR. S. KULWIN:  May you inquire, Judge, of the jury?

 7              THE COURT:  Can everybody see it okay?

 8              (Jurors nodding.)

 9    BY MR. S. KULWIN:

10    Q.   One line item of expenses was payroll, right?

11    A.   Yes, sir.

12    Q.   Okay.

13              And in '05, it's 6-million-188, okay?

14              And in '07, it is 2-million-590, right?

15    A.   Yes, sir.

16    Q.   So, that one -- that one -- is an up, right?

17              I mean, a down -- a big down -- right?

18    A.   Yes, sir.

19    Q.   Okay.

20              And another one -- the next line item -- is

21    utilities.  And in '05, it's 896,000.  And in '07, it's --

22    let's just call it a million even.  Is that okay?

23    A.   That -- that -- sounds fair.

24    Q.   Okay.

25              "A" is for thousands, "M" is for millions.

Petrus - redirect

1187

1    Okay.  The next line item -- so, that one is an up.
2  That went up after you got done, correct?
3  A.  That is correct.
4  Q.  Okay.
5    The next line is repairs and maintenance.  And in
6  '05, it's 286,000.  And in '07, let's just call it -- well,
7  call it -- 403,000.  Okay?
8    That's another up after you were done, right?
9  A.  That is accurate, yes, sir.
10  Q.  Then the next one is service contracts, right?  Let's call
11  it "Service."
12    And in '05, it was 589,000, let's just call it.  And
13  in '07, it was about 500,000.
14    Is that a fair round?
15  A.  That's close -- if we're rounding, that's fair.
16  Q.  I'll just put down "494."  I don't want to be unfair.
17  A.  Okay.
18  Q.  So, that is a down, but not by much, right?
19  A.  That's correct.
20  Q.  And, then, you have your administrative expenses, right?
21  That's the next line item, which is 2.7 million in '05 and
22  1.- -- I'll just call it "7," all right?  It's 1,695.  Let's
23  call it 1.7 million in '07.
24    And that's a down, right?
25    And, then, the last one is "Other;" is that right?

Petrus - redirect

1188

1     The last one is "Other"?

2     A.  Yes, sir.  Uh-huh.

3     Q.  And that's, like, miscellaneous expenses.

4           And in '05, that's 147,000, roughly, and in '07 it's

5     about 103,000, right?

6           And that's a down, as well, true?

7     A.  Correct.  Yes, sir.

8           MR. SHONKWILER:  Can I -- I just want to object for

9     the record that some of these numbers are right and some are

10    not exactly right.

11          In particular, the 2007 -- the 2.590 million -- I'm

12    not seeing that.

13          MR. S. KULWIN:  You're not seeing that?

14          MR. SHONKWILER:  No.

15          THE COURT:  Well, you can address it on recross, if

16    you would like.  The witness has just testified.

17          MR. SHONKWILER:  Okay.

18          MR. S. KULWIN:  No, I want it to be accurate, Judge,

19    if I could.

20          Which one -- which one -- are you complaining about?

21    The payroll?

22          Oh, I see.  It's 2359?  I'm sorry.

23          No, no.  It's 2359?  Okay.  I will change that.

24    BY MR. S. KULWIN:

25    Q.  It's not 259, it's 2359.  I missed a number.  I'm sorry.

Petrus - redirect

1189

1    But it the still went down significantly?

2              THE COURT:  Are you asking the witness to confirm

3    that, Mr. Kulwin?

4              MR. S. KULWIN:  Yes, please.

5              THE COURT:  All right.

6              Then why do not ask you him that.

7    BY MR. S. KULWIN:

8    Q.  Mr. Petrus, is that right, it's 2359?

9              Can you see it on there?

10   A.  Yes, yes.

11             Can you just expand this?

12             MR. S. KULWIN:  Expand it.

13   BY MR. S. KULWIN:

14   Q.  There you go.

15   A.  Yes, sir, that's correct.

16   Q.  All right.  I apologize for that error.

17             Now, in '05, the expenses included expenses for

18   30,000 square feet of ballrooms, meeting rooms and things of

19   in a nature, true?

20   A.  You would have to go back to the definition of what was in

21   the -- in the -- outline.

22   Q.  Right.

23             You mean, in the common elements?

24   A.  That's correct.

25   Q.  Well, it included the meeting rooms, the function rooms,

Petrus - redirect

1190

1    the ballrooms, the executive lounge, storage areas, laundry

2    facilities.

3             Those expenses, at a minimum that was 30,000 square

4    feet, right?

5             MR. SHONKWILER:  Object to form.

6             THE COURT:  Sustained.

7    BY THE WITNESS:

8    A.  I --

9             THE COURT:  I sustained it, Mr. Petrus.

10            THE WITNESS:  Thank you.

11   BY MR. S. KULWIN:

12   Q.  When you removed the common elements of the ballrooms, the

13   meeting rooms and function rooms -- we talked about this

14   earlier -- in '05, the expenses covered maintaining all of

15   that space; and, in '07, you didn't have expenses for

16   maintaining that space in the condo budget, right?

17            MR. SHONKWILER:  Objection.  Asked and answered, in

18   part; and, also, in part, lack of foundation.

19            MR. S. KULWIN:  I'm laying the foundation.

20            THE COURT:  Overruled.

21            You may answer, if you can, Mr. Petrus.

22   BY THE WITNESS:

23   A.  Yes.

24            When the adjustments were made in 2007 -- as, again,

25   there were expenses that were direct line items to banqueting

Petrus - redirect

1191

1   that were taken out; but, also, all of the line expenses --

2   and, again, I'll try and make this point --

3   Q.  No, no.

4   A.  Let me just --

5           MR. S. KULWIN:  Judge, may I ask him -- can I ask

6   him, please -- we'll move things along if we just --

7           THE WITNESS:  No, but if I can just --

8           MR. S. KULWIN:  I'm just asking him --

9           THE COURT:  I think he is trying to answer it.

10          If you want to withdraw your question and ask

11  something else, you may.

12          But we can talked about this --

13          MR. S. KULWIN:  I will withdraw the question.

14          THE COURT:  Mr. Kulwin, we talked about this the

15  other day.  When you ask very, very broad questions, you run

16  the risk of getting broader answers.

17          MR. S. KULWIN:  I will try to do --

18          THE COURT:  So, you may withdraw it and ask another

19  question.

20          MR. S. KULWIN:  I will withdraw it and try to do

21  better, Judge.  Thank you.

22          Thank you.  I'm sorry, Judge.

23  BY MR. S. KULWIN:

24  Q.  Mr. Petrus, when you -- I'm not interested necessarily in

25  how each line item went.  I'm going to get to that.

Petrus - redirect

1192

1    I just want to know that the 2005 expenses included

2  expenses for maintaining the 30,000 square feet that, in '07,

3  was gone.  Is that right?

4  A.  I can't -- I can't -- assume that.

5  Q.  You were going to charge the condo association, in '07,

6  for maintaining space that was not part of the common elements

7  any longer; is that right?

8           MR. SHONKWILER:  Object to form.

9  BY THE WITNESS:

10  A.  No, no, that's not -- that's not --

11           THE COURT:  Sustained on form.

12  BY MR. S. KULWIN:

13  Q.  Are you saying that in '07 there are expenses -- do I

14  understand you correctly you're saying that in '07 there are

15  expenses -- for maintaining the 30,000 square feet that's no

16  longer in the common elements?

17           MR. SHONKWILER:  That's not what he said, your Honor.

18  Objection.  Mischaracterizes the testimony.

19           THE COURT:  Overruled.  He may answer.  You may

20  clarify it.

21  BY THE WITNESS:

22  A.  No.

23  BY MR. S. KULWIN:

24  Q.  Is that what you're saying?

25  A.  What I'm saying is that in 2007, we removed all of the

Petrus - redirect

1193

1    direct expenses that were outlined in 2005 -- in this outline

2    that we're both looking at here -- and, also, we removed and

3    modified all of the other line expenses.

4          The difficulty is that it's very hard to determine in

5    the 2005 budget if water chemical treatment expense is

6    banquets or is it all areas of the hotel.

7    BY MR. S. KULWIN:

8    Q.  When you answered it --

9    A.  And that's a very important point, I think, that we've got

10   to delineate here.

11   Q.  When you answered in your deposition back in 2011, you

12   didn't feel compelled to make that point.  You were asked:

13   "Did you remove the expenses?"

14          You said, "Yes."

15   A.  I removed the expenses?

16          MR. SHONKWILER:  Objection.

17          THE COURT:  Sustained on form.

18   BY MR. S. KULWIN:

19   Q.  In 2011 when we talked about this, you were asked:  "Did

20   you remove the expenses," right?

21          Do you remember the question I read to you a moment

22   ago?  Were you asked that?

23   A.  I was asked that.

24   Q.  And did you make these points then?

25   A.  Yes.

Petrus - redirect

1194

```
 1          Can I -- can I -- complete my statement, though, when
 2    I --
 3    Q.  It's a real simple question.
 4          MR. SHONKWILER:  Your Honor, objection.  He has got
 5    to be allowed to answer the question.
 6    BY THE WITNESS:
 7    A.  No, I --
 8          THE COURT:  The answer was, "No."
 9          Ask your next question.
10    BY MR. S. KULWIN:
11    Q.  I apologize.  I didn't hear the answer.  It was "No"?
12    A.  No.
13    Q.  The bottom line of it, though, is, sir -- all I'm getting
14    at is -- you're saying, if I understand you, you can't tell in
15    the '05 expenses what really is part of the 30,000 square
16    feet.
17          So, you know you took some out, but you're not sure
18    what else was in there.  Basically, that's correct, true?
19    A.  It's very hard to determine --
20    Q.  Okay.
21    A.  -- right --
22    Q.  Right.
23    A.  -- in a 2005 budget --
24    Q.  I got it.
25    A.  -- what is solely banquets and what is commingled.
```

Petrus - redirect

1195

```
 1   Q.  I got it.

 2   A.  That is correct.

 3   Q.  But you ultimately did some type of analysis trying to

 4   ascertain that, because you wanted to do the best you could to

 5   get all of the expenses relating to the 30,000 square feet out

 6   of the '07 budget, right?

 7   A.  That is accurate.

 8   Q.  Okay.

 9          And the analysis that you did is not in writing

10   anywhere, true?  Is that correct?

11   A.  The analysis that I did?

12   Q.  A handwritten analysis -- any type of written analysis --

13   you don't have any written analysis explaining your

14   methodology of how you tried do that, correct?

15   A.  In my -- my -- calculations and my research --

16   Q.  Yeah, right.

17   A.  -- right?

18          Inquiries that I made?

19   Q.  Right.

20          You don't have any written analysis of that, correct?

21   A.  No.  No, sir.

22   Q.  Okay.  Good.

23          Now, one thing we know for sure, though, is that one

24   of the things that you took out of the '07 budget is about

25   $900,000 for the market -- for the parking management fee --
```

Petrus - redirect

 1   right?

 2   A.  No, that didn't come out of the '07 budget.

 3   Q.  No, no, it came out of the '05 budget.

 4   A.  You said, "'07."

 5   Q.  Right.  Okay.

 6          One of the things you took out of the '05 budget was

 7   the $900,000 for the parking management fee, correct?

 8          MR. SHONKWILER:  Objection.  Asked and answered.

 9          THE COURT:  Sustained.

10   BY MR. S. KULWIN:

11   Q.  You took out the $900,000 for the parking management fee,

12   correct?

13          MR. SHONKWILER:  Objection.

14          THE COURT:  It is the same question.

15          Sustained.

16          MR. S. KULWIN:  May I --

17   BY MR. S. KULWIN:

18   Q.  Was one of the expenses in the '05 budget the parking

19   management fee?

20          MR. SHONKWILER:  The object- --

21   BY MR. S. KULWIN:

22   Q.  Was it?

23   A.  Can you go back to the document, please?

24   Q.  Sure.

25          MR. SHONKWILER:  Your Honor, I'm going to make the

Petrus - redirect

1197

 1   same objection.  This question, too, has been asked and

 2   answered.

 3            THE COURT:  Mr. Kulwin, we have been through a lot of

 4   this already.

 5            MR. S. KULWIN:  Judge, I'm --

 6            THE COURT:  I will overrule that objection, but I

 7   will just remind you we have been through a lot of this.

 8            MR. S. KULWIN:  I'm just trying -- thank you, Judge.

 9   BY MR. S. KULWIN:

10   Q.  The 900,000, sir, was that part of the parking -- was that

11   parking management fee in there in '05?

12   A.  No.  It states, "Valet Parking."  I'm not -- you asked --

13   Q.  No, no, the expense, sir.

14   A.  The expense?

15            Go down -- can you scroll down?

16   Q.  Right here (indicating), 903,000.

17            That was in '05, right?

18   A.  Parking management fee --

19   Q.  Right.

20   A.  -- 903,000.

21   Q.  And in '07, that was gone, right?

22   A.  That's correct.

23   Q.  Okay.

24            Now, I want to go back now very quickly and, then,

25   I'm going to -- all right.  I got just a couple more points on

Petrus - redirect

1198

1    these numbers.  Then I'm going to move ahead.

2            I want to go back to Plaintiff's Exhibit  13 for a

3    second.  Okay?

4            MR. S. KULWIN:  In particular, Page 3286.  Okay?

5            And if you could blow up the food and beverage

6    section.

7    BY MR. S. KULWIN:

8    Q.  So, the food and beverage revenues in your projection

9    are -- would you mind reading them for me, Mr. Petrus?

10           MR. SHONKWILER:  Objection.  Asked and answered.

11           MR. S. KULWIN:  Judge, I'm laying a foundation for a

12   couple of --

13           MR. SHONKWILER:  In fact, we've already seen them

14   written on this very easel.

15           THE COURT:  Are you going to rewrite all of these,

16   again?

17           MR. S. KULWIN:  No.  I'm am going to just lay a

18   foundation for --

19           THE COURT:  If you have written them once, why do you

20   not go back to what you have already done?

21           MR. S. KULWIN:  I don't think I have, Judge.  I don't

22   think I have them.

23           I have them on a summary chart.

24           MR. SHONKWILER:  That's it (indicating).

25           THE COURT:  There you go.

Petrus - redirect

1199

1     MR. S. KULWIN:  Fine.

2     It's just more confusing this way, Judge.  If I could

3 just take this line --

4     THE COURT:  I am not going to let you rewrite that

5 entire chart that you did before.

6     MR. S. KULWIN:  That's not my intent to do that,

7 Judge.

8     THE COURT:  All right.

9     I do not want you wasting time.

10     MR. S. KULWIN:  I'm going to write two lines, if I

11 could just have some leeway to do it.  I promise.

12     THE COURT:  Write your line, Mr. Kulwin.

13     MR. S. KULWIN:  Thank you.

14 BY MR. S. KULWIN:

15 Q.  Can you tell me what the projected revenue for 2008 for

16 all of the F&B is, sir?

17 A.  2008?

18 Q.  It's the first line.

19     8761?

20 A.  8761 is the total revenue, not commissions, that's

21 correct.

22 Q.  All right.

23     That's 8,761,000.

24     MR. S. KULWIN:  And, now, if you could go to the

25 expenses for the food and beverage, Mike?

Petrus - redirect

1200

```
 1              (Brief pause.)
 2              MR. S. KULWIN:  It would be this line item
 3   (indicating).
 4              There it is.  Can you just highlight the food and
 5   beverage line -- the 8147?
 6              There you go.
 7   BY MR. S. KULWIN:
 8   Q.  And, so, the projection for the food and beverage expenses
 9   related to this number is, in your projection -- in this one
10   scenario is -- 8-million-147, right?
11              That's what it says, correct?
12   A.  Those are departmental expenses.  But in -- let me just
13   finish here because I think we're confusing the folks here
14   because these -- this is a departmental revenue, departmental
15   expense and we're confusing this with --
16   Q.  I'm not --
17   A.  -- a budget --
18   Q.  I'm not.
19   A.  -- a common budget.
20              MR. SHONKWILER:  I'm sorry, can the witness please --
21   BY THE WITNESS:
22   A.  -- we're talking about a premise that's based on
23   commissions.  And this is -- this is -- getting to be very
24   confusing for folks because you are --
25              MR. S. KULWIN:  Judge, I'm going to ask that he stop
```

Petrus - redirect

1201

```
 1   referring to "folks" --
 2   BY THE WITNESS:
 3   A.  -- I mean, this --
 4           THE COURT:  Let him finish his answer.
 5           Let him finish his answer.
 6   BY THE WITNESS:
 7   A.  There's a technical part of this and I feel badly for
 8   these folks because it's total --
 9           MR. S. KULWIN:  Judge --
10   BY THE WITNESS:
11   A.  -- it's total -- it's total -- confusion because you're
12   talking about departmental expenses, and we're taking snippets
13   of something that are out of context, sir.
14           MR. S. KULWIN:  First, I move to strike it.  It's
15   non-responsive.  And the comment --
16           THE COURT:  I am not going to strike it.  I will
17   strike the reference to "folks."
18           You can talk about -- leave that out.
19   BY MR. S. KULWIN:
20   Q.  Listen to the question, Mr. Petrus.  All I'm asking you
21   for is, in your projections, you projected in that scenario
22   food and beverage revenue -- you don't know what I'm getting
23   at yet, so just stay with me -- food and beverage revenue of
24   8-million-761; and, food and beverage expenses of
25   8-million-147; is that correct?
```

Petrus - redirect

1202

1   A.  Food and --

2   Q.  Is that correct?

3   A.  Food and -- and let me just clarify, sir.

4           The food and beverage department revenues are, as

5   stated; and, the departmental expenses --

6   Q.  Right.

7   A.  -- right -- that are stated are what you have written

8   there.

9   Q.  That's all I'm asking you.

10          And the percentage of the expenses to the revenue for

11  the food and beverage department, the expenses make up 93

12  percent, correct?

13  A.  Of?

14  Q.  Of those?

15  A.  Of that -- of that, which is stated?

16  Q.  Right.

17  A.  But I hope that we're going to take -- the balance of this

18  is not taken out of context.

19          MR. S. KULWIN:  Judge, I move to strike that.  I

20  asked him is that the percentage.

21          THE COURT:  I think he is trying to clarify, when you

22  are talking about percentage of, what.  Overruled.

23          MR. S. KULWIN:  Okay.  Let me clarify.

24  BY MR. S. KULWIN:

25  Q.  All I'm asking you, sir, is the food and beverage expenses

Petrus - redirect

1203

1    -- in your projection, in this scenario -- 93 percent of the

2    food and beverage revenue departmentally that you're

3    projecting on that document?  That's the only question.

4    A.   That is correct, sir.  Yes, sir.

5    Q.   Okay.

6              Now, we also know, sir, that the expenses --

7              THE COURT:  Can you please identify for the record

8    what you are putting on the Elmo, Mike -- I mean, Joe?

9              MR. S. KULWIN:  Yes, Judge.

10             It's Demonstrative -- formerly "Summary" -- Exhibit

11   2, redacted per your earlier ruling.

12             THE COURT:  Well, it is Demonstrative 2, then?

13             MR. S. KULWIN:  I'm sorry, it's Demonstrative 2.

14             Thanks, Mike.

15             THE COURT:  It is not a summary chart.

16             MR. S. KULWIN:  Right.  Okay.

17   BY MR. S. KULWIN:

18   Q.   So, we also know that after you got done -- we established

19   this yesterday -- the expenses between 2005 and 2007 went down

20   4-million-682?

21             MR. SHONKWILER:  Your Honor, asked and --

22             THE COURT:  Sustained on form.

23             MR. SHONKWILER:  And, also, asked and answered.

24   BY MR. S. KULWIN:

25   Q.   Sir, as of 2000- -- as of 2007 -- the expenses between the

Petrus - redirect

1204

```
 1   two -- I will rephrase it.
 2           In 2005, the expenses listed in the property report
 3   were 10.8 million, as reflected in this document -- this
 4   demonstrative exhibit, right?
 5           MR. SHONKWILER:  Objection.  Asked and answered.
 6           THE COURT:  Overruled.
 7           You may answer, if you can, Mr. Petrus.
 8   BY MR. KULWIN:
 9   Q.  And -- I'm sorry.
10   A.  Yes.
11   Q.  And the expenses in the 2007 property report are 6.1?
12   A.  It's stated 6.136605.  Yes, sir, that's correct.
13   Q.  And the difference between the two reflects a reduction of
14   expenses of $4,682,303, right?
15   A.  That's correct.
16   Q.  Okay.
17           Now, the last point on this point and I'll move to
18   something else.
19           So, we have '05 to '07 expenses going down 4
20   million --
21           MR. SHONKWILER:  Your Honor --
22   BY MR. S. KULWIN:
23   Q.  -- 682 --
24           MR. SHONKWILER:  -- he is writing what is on the
25   demonstrative on another demonstrative.  This has been asked
```

Petrus - redirect

1205

1    and answered.

2              THE COURT:  Overruled.

3    BY MR. S. KULWIN:

4    Q.  -- -682,303.  Okay?

5              Now, the income --

6              MR. S. KULWIN:  Take this down.

7    BY MR. S. KULWIN:

8    Q.  The income --

9              MR. S. KULWIN:  Mike, back to Exhibit H, please, on

10   Plaintiff's Exhibit 7.

11   BY MR. S. KULWIN:

12   Q.  The income reflected on 2002 for the ballroom rentals and

13   all these things that the property owners were told about, is

14   5-million-53 -- what is it, 825?

15   A.  625.

16   Q.  625?  Right.

17             Okay?

18             And if you do that calculation -- well, let me just

19   ask you one other thing.

20             If you multiply 5,053,625, that's the number I wanted

21   to do, times 93 percent --

22             MR. SHONKWILER:  I'm going to object right now, your

23   Honor, because there's no explanation for why there's a 93

24   percent number or why it's being multiplied.

25             MR. S. KULWIN:  I just laid the foundation a second

Petrus - redirect

1206

1    ago.

2            THE COURT:  Overruled.

3    BY MR. S. KULWIN:

4    Q.  If you multiply by that 93 percent number that we had from

5    your projections, the result is 4-million-7, roughly --

6    4,688,971.

7            Are you okay if I say 4-million-7?  Is that okay with

8    you?

9            MR. SHONKWILER:  I am going to object.  Is this a

10   question?

11           MR. S. KULWIN:  Yes, it's a question.

12           MR. SHONKWILER:  What's the question?

13           MR. S. KULWIN:  Judge --

14           THE COURT:  Rephrase your question.

15   BY MR. S. KULWIN:

16   Q.  Sir, do you want to use a calculator or accept my

17   representation that 93 percent of 5,530,000, et cetera, is,

18   roughly, $4.7 million?

19   A.  If we're talking about a hypothetical ballpark?

20   Q.  You'll accept it?

21   A.  Fine.  Yes, sir.

22   Q.  Let's just call it 4.7 million.  Okay?

23           The last thing on this note.  We are about -- that

24   4-million-7 number, 93 percent of the 5-million-53 -- using

25   the overhead -- using the expense ratio from your

Petrus - redirect

1    projections -- is almost exactly the $4.6 million number that

2    the revenue -- that the expenses -- went down between the 2005

3    report and the 2007 report, correct?

4            MR. SHONKWILER:  Objection, Judge.

5            MR. S. KULWIN:  Can we have that up on the screen,

6    Joe?

7            I mean -- yes, can we switch --

8            MR. SHONKWILER:  Objection to form, your Honor.

9            THE COURT:  Sustained on form.

10           MR. S. KULWIN:  Okay.  I'll just back up a little bit

11   and put the foundation in.

12           THE COURT:  It was form, not foundation.

13           MR. S. KULWIN:  Okay.  Form.

14   BY MR. S. KULWIN:

15   Q.  The -- you can see up there that expenses between the 2005

16   report and the 2007 report for the hotel condominium

17   association dropped 4.682 million, roughly; is that correct,

18   up there, Mr. Petrus?  Is that right?

19   A.  According to this report, yes.  4,682,303, right.

20   Q.  And we also established a moment ago that in your

21   projection -- the 8,7, here (indicating), okay -- that in your

22   projections in that year, you were projecting, roughly,

23   departmentally -- just departmentally -- food and beverage,

24   the expenses made up 93 percent of the revenue -- that's what

25   we established a moment ago -- departmentally, true?

Petrus - redirect

1208

```
 1              Is that right?
 2    A.  Yes, yes.
 3    Q.  And if you take that 93 percent that you were projecting
 4    and apply it to the income that was coming out of -- that was
 5    supposed to go to the condo association -- you end up with
 6    approximately, of that 5-million-3, 4.7 million would have
 7    been expenses, right?
 8              93 percent times 5 million; do you understand?
 9              MR. SHONKWILER:  I object to the form "would have
10    been expenses."
11              THE COURT:  Sustained.
12              MR. SHONKWILER:  It's a hypothetical.
13    BY MR. S. KULWIN:
14    Q.  Of that number -- of the 5 million number -- using your 93
15    percent expense-to-revenue ratio, using that ratio, 93 percent
16    of the 5 million would equal approximately 4.7 million,
17    correct?
18    A.  That's what that indicates, but --
19    Q.  Thank you.
20    A.  -- let me just finish.  Again --
21    Q.  Thank you.
22              MR. S. KULWIN:  Judge, there's no question pending.
23              MR. SHONKWILER:  Your Honor, can the witness please
24    finish his answer?
25              MR. S. KULWIN:  He can answer it on redirect.
```

Petrus - redirect

1209

1    MR. SHONKWILER:  That's a loaded question.  It was a

2    very long one.  I would like the witness to be able to answer.

3         THE COURT:  Were you done with your answer?

4         THE WITNESS:  No, I was not done.

5         THE COURT:  Okay.  You may finish.

6    BY THE WITNESS:

7    A.  Again, what we're doing here is we're taking data from an

8    income statement and we're comparing it to a condo budget.

9    That is -- that is very -- that's confusing.  That's not the

10   way it works.

11        The income statement is a hypothetical situation.

12   And I think to present facts that are misleading to these

13   folks here --

14        MR. S. KULWIN:  Judge --

15   BY THE WITNESS:

16   A.  -- about the --

17        THE COURT:  I will sustain the reference to "these

18   folks."

19        MR. S. KULWIN:  -- he is making a closing -- it is

20   just misleading.  He is making a closing argument.  He is not

21   answering a question.

22   BY THE WITNESS:

23   A.  This --

24        THE COURT:  You asked the question and prefaced it

25   with, "What we have established."  So, he is allowed to

Petrus - redirect

1210

1   address that.

2   BY THE WITNESS:

3   A.  This is taking two different pieces of information that

4   are not related.  That is really the issue here.

5        And it's unfair to demonstrate something, where you

6   are taking a hypothetical and you are taking a flow-through

7   analysis and to belabor people with that level --

8        MR. S. KULWIN:  Again, Judge --

9        THE COURT:  I will sustain the reference to "others."

10       THE WITNESS:  Okay.

11   BY THE WITNESS:

12   A.  -- that level of information that you apply from taking it

13   from one document to another, isn't fair and it isn't

14   accurate.

15   BY MR. S. KULWIN:

16   Q.  Okay.

17        Given that answer, Mr. Petrus, real quick -- and,

18   then, I'll leave this subject, real quick -- in your

19   projections, you were dealing with food and beverage revenue

20   for the entire department for the hotel, right?

21   A.  The entire department.  And these are revenues, these are

22   not commissions.  And if you --

23   Q.  I'm not asking about commissions, sir.

24   A.  But I think that's where there's some confusion here --

25   Q.  No.

Petrus - redirect

1211

```
 1   A.  -- because if you go back and read the condo document, the
 2   F&B is based on commissions.
 3   Q.  No.
 4   A.  Please read through that.
 5   Q.  Sir, we established earlier that the F&B in the condo
 6   document included rentals and food.
 7   A.  That's correct.  And how much --
 8   Q.  And right now --
 9   A.  -- and how much rental -- how much rental -- is in the
10   condo document, sir?
11   Q.  Mr. Petrus --
12   A.  Petrus.
13   Q.  Mr. Petrus --
14   A.  Thank you.
15   Q.  -- real simple, okay?  It's real simple.
16        In your projections -- we established this just a
17   moment ago, in your food and beverage projections -- you had
18   banquets, you had minibars, you have all of those things that
19   we talked about.  And you projected revenue at 8.7 million.
20        You also projected departmentally expenses for all
21   those things at 8.1 million.
22   A.  That's correct.
23   Q.  93 percent of revenue.
24   A.  That's correct.
25   Q.  That was your projection, right?
```

Petrus - redirect

1212

```
 1              And all I'm asking you is real simple.  You say it's
 2    misleading.  That's your opinion.  But the reality of it is,
 3    is that using that 93 percent number of expense-to-revenue on
 4    the budget for 2005, you come up with $4.7 million --
 5              MR. SHONKWILER:  Object to form.
 6    BY MR. S. KULWIN:
 7    Q.  -- is that correct first; and, then, I'll ask my last
 8    question on this point.  Is that correct?
 9              MR. SHONKWILER:  Objection, your Honor, to form and
10    argumentative.
11              THE COURT:  Sustained on form.
12              THE WITNESS:  It is --
13              THE COURT:  Sustained.
14              I sustained it, Mr. Petrus.
15              THE WITNESS:  I'm sorry.
16    BY MR. S. KULWIN:
17    Q.  Using the 93 percent expense-to-revenue ratio in your cash
18    flow projections for the food and beverage department, applied
19    to the $5 million of revenue in Exhibit H of the 2005 budget,
20    the number for removed -- the number of expense-to-revenue
21    ratio is $4.7 million; is that correct?
22              MR. SHONKWILER:  The same objection.
23              THE COURT:  Overruled.
24              You may answer, if you can.
25              THE WITNESS:  Yes.
```

1  BY THE WITNESS:

2  A.  That number is correct in an income statement format.

3  BY MR. S. KULWIN:

4  Q.  Thank you.

5  A.  Not in a condo budget format.

6  Q.  Thank you.

7  A.  And if you went back -- if I can finish my statement, sir,

8  if you went back -- and took the income statement in your

9  hypothetical example, and you applied a commission of 5

10 percent to $8 million of revenue, what does that produce?

11 Q.  Sir, thank you very much.

12 A.  $400,000.

13 Q.  Thank you very much for your answer.

14 A.  If you apply the same commission analysis and structure --

15           MR. S. KULWIN:  Judge --

16           THE COURT:  Mr. Petrus, there is no question.

17           THE WITNESS:  Thank you.

18           MR. S. KULWIN:  Thank you very much for your answer,

19 sir.

20           THE WITNESS:  Thank you.

21           THE COURT:  Let us move on to another topic.

22           MR. S. KULWIN:  I am, Judge.

23           THE COURT:  Good.

24 BY MR. S. KULWIN:

25 Q.  Now, sir, you testified that you've been in the hotel

Petrus - redirect

1214

1  business for, what, 30 years?

2  A.  I'm actually a third generation hotel restaurant person;

3  and, personally, I've been in the business for 35 years.

4  Q.  Forgetting your first two generations, you've been in the

5  business for 35 years, right?

6  A.  That's correct.

7  Q.  Okay.

8       Have you ever been the president of a hotel chain?

9  A.  I have not.

10  Q.  Have you ever financed or developed or built a hotel?

11  A.  Again, not a "Yes" or "No" answer.  It all depends on what

12  you consider to be "developed."

13  Q.  I will break it down.

14       Have you ever financed a hotel building?

15  A.  Personally?

16  Q.  Yes.

17  A.  Out of my own personal finances?

18  Q.  Arranged financing for the building of a hotel; have you

19  done that?

20  A.  I have participated in that, yes, sir.

21  Q.  Have you supervised and ran the entire process, from soup

22  to nuts, to get the financing?

23  A.  Yes, sir.

24  Q.  How many times?

25  A.  Twice.

Petrus - redirect

1215

1    Q.   Okay.

2            How many times before 2003?

3    A.   How many times before --

4    Q.   2006.

5    A.   Before 2006?

6            Once.

7    Q.   Okay.

8            Do you happen to know how many times Mr. Trump put

9    together a financing package to build a tall 25-story or more

10   building before 2006?

11           MR. SHONKWILER:  Objection.  Relevance and beyond the

12   scope.

13           THE COURT:  Sustained.  Beyond the scope.

14   BY THE WITNESS:

15   A.  I wouldn't know.

16           THE COURT:  I sustained it, sir.

17           THE WITNESS:  I am sorry.

18   BY MR. S. KULWIN:

19   Q.  Are you aware of the level of Mr. Trump's experience,

20   compared to yours, as of 2006 in the area of building hotels

21   and residential buildings?

22           MR. SHONKWILER:  The same objection.

23   BY MR. S. KULWIN:

24   Q.  Building.

25           THE COURT:  Sustained.

Petrus - redirect

1216

```
 1              We are going beyond the scope of the cross-
 2    examination.  Sustained.
 3    BY MR. S. KULWIN:
 4    Q.  Sir, you said that you ran a hotel condo and now there
 5    are -- I'm sorry, that when you arrived at Trump, there was
 6    only one hotel condo and now there are eight.
 7              Do you remember those questions, sir?
 8    A.  Yes, sir, I do.
 9    Q.  Okay.
10              In 2006, when you arrived, you had run one hotel
11    condo, correct?
12    A.  I had one -- I had run one -- hotel condo directly, yes,
13    sir.
14    Q.  Right.
15              And that was in Tampa, Florida, right?
16    A.  Outside of Tampa, Florida, yes, sir.
17    Q.  And how large of a city is Tampa, Florida?
18    A.  Tampa, Florida, is probably -- the metropolitan area --
19    one million people.
20    Q.  Okay.
21              And when you arrived in New York City, Mr. Reiss -- I
22    mean, the Trump organization -- had been running the Trump
23    International Hotel for nine years -- hotel condo, correct --
24    nine years; is that correct, sir?
25    A.  Um --
```

Petrus - redirect

1217

```
1    Q.  It opened in '97.

2    A.  '97 to 2006?  That would be accurate.

3    Q.  Right.

4    A.  Mr. Reiss was not running the --

5    Q.  I understand.

6    A.  -- the condo, though.  Just to clarify that.

7    Q.  And by 2006, how many property reports had you written for

8    hotel condos?

9    A.  How many -- excuse me, one more time on that.

10   Q.  By 2006, how many property reports had you helped write

11   for hotel condos?

12   A.  (No response.)

13   Q.  2006.

14   A.  I don't recall.

15   Q.  Any?

16   A.  I don't recall.

17   Q.  Can you think of one?

18   A.  I -- directly --

19   Q.  Yeah.

20   A.  -- writing the property report myself or --

21   Q.  Working with.

22   A.  -- or working with a lawyer to --

23   Q.  Working with others, working with consultants to write

24   one.

25   A.  One.
```

Petrus - redirect

1    Q.  One?

2    A.  Yes, sir.

3    Q.  One?

4    A.  Yes, that's correct.  That's correct.

5    Q.  All right.

6         Now, the one that you worked on, you were on the

7    condo board down in Tampa, correct?

8    A.  At one time, I was.

9    Q.  Right.

10        Who owned the banquet facilities and things of that

11   nature down in Tampa?

12   A.  That was owned by the owner/developer.

13   Q.  Right.

14        Now, you also testified -- or the implication of your

15   testimony, correct me if I'm wrong -- is that when you arrived

16   at the Trump organization in 2006, they really didn't

17   appreciate the complexities and all the aspects of running a

18   hotel, in the context of a hotel condo situation.

19        Did I understand your testimony correctly?

20        MR. SHONKWILER:  Your Honor, objection.  Misstates

21   the evidence.

22        THE COURT:  Sustained on form.

23        Rephrase it, Mr. Kulwin.

24   BY MR. S. KULWIN:

25   Q.  Mr. Petrus, did I understand your testimony that when you

1   arrived at the Trump organization, the organization did not

2   understand the complexities of running a hotel in a hotel

3   condo setting?

4   A.  I think there was a -- there was a -- significant

5   difference between running Trump International New York, that

6   had -- that did not have -- banquet and meeting space.

7   Q.  I'm sorry?  I missed the last part.

8   A.  I mean, there was a difference between running Trump

9   International New York -- right -- that did not have banquet

10  and meeting space, and running a building that had the

11  multi-dimensional aspects of this building, 92 stories,

12  retail, restaurants, bars, lounges, meeting space.

13          MR. S. KULWIN:  Can we switch back, please?

14  BY MR. S. KULWIN:

15  Q.  Okay.  I'm showing you what's part of Plaintiff's Exhibit

16  75, Bates stamped 4433.

17          Do you see that?  Okay?

18  A.  (No response.)

19  Q.  You see that, don't you?

20  A.  Yes, I can see it here.  Thank you.

21  Q.  And as we scroll through it, this is -- it says this is --

22  a listing of all of the projects that the Trump organization

23  had been doing, including several hotels and resorts.

24          Does it say anything in there about, 'They don't

25  appreciate -- " wait.  Let me rephrase it.

Petrus - redirect

1220

```
 1              I will stop with that.

 2              You see that, correct?

 3              MR. SHONKWILER:  Objection to the form.  There's no

 4  time period identified.

 5              THE COURT:  Sustained.

 6              Rephrase.

 7              MR. S. KULWIN:  Sure.

 8  BY MR. S. KULWIN:

 9  Q.  You see the listings that are in the brochure -- that's in

10  this brochure -- of Trump's were accomplishments and what

11  they've done before 2003, right?

12  A.  I'm not sure of the context of this document, to be honest

13  with you.  So, I really can't comment on that.

14              MR. S. KULWIN:  Let's go to -- can you go to -- Page

15  1 of it -- of this exhibit?

16              Let's scroll through it.

17  BY MR. S. KULWIN:

18  Q.  I've put up on the board a brochure that the Trump

19  organization was handing out to potential buyers in 2003.

20              Have you ever seen this?

21  A.  You might want to scroll through it so that I can answer

22  you.

23  Q.  Have you ever seen this particular picture?

24  A.  This photo?

25  Q.  Yeah.
```

Petrus - redirect

1221

```
 1   A.   Oh, I've seen that photo many times.

 2            Thank you.

 3            MR. S. KULWIN:  Can we go to the next page?  And can

 4   you blow up the --

 5   BY MR. S. KULWIN:

 6   Q.   This talks about how the architects are designing this

 7   spectacular building.

 8            Have you ever seen this before?

 9            MR. SHONKWILER:  I'm going to object, your Honor,

10   that this is beyond the scope.

11            MR. S. KULWIN:  Judge, it goes directly to the

12   testimony -- his testimony about -- I'm comparing what he says

13   he found and his opinion of their abilities, to what they were

14   telling the general public.  That's the point of it.

15            THE COURT:  I will give you a little leeway.

16            MR. S. KULWIN:  Thank you.

17   BY MR. S. KULWIN:

18   Q.   Have you ever seen this page before, sir?

19   A.   I can't say that I've seen this specific paragraph and

20   page that you're showing me.

21            MR. S. KULWIN:  Can you go to the next page?

22   BY MR. S. KULWIN:

23   Q.   And this is talking about Mr. Trump's announcement of the

24   project.  And he's sitting there posed confidently.

25            Have you ever seen him here -- this photo and this
```

Petrus - redirect

1222

1    brochure?

2    A.  I've seen the photo.

3    Q.  Okay.

4    A.  Quite honestly, I can't say that I've seen this specific

5    document that you're putting up here.

6    Q.  Have you ever seen in this brochure his statement, "With

7    every building I have ever built, I have undertaken a personal

8    challenge"?

9         Have you ever seen that?

10   A.  Have I ever seen that in any document?

11   Q.  In any of the brochures for Trump Tower that were being

12   distributed before you arrived or after you came?

13   A.  Just to make sure that I understand how you're framing up

14   the question, have I ever seen that statement in any

15   publication or --

16   Q.  No.

17   A.  -- or specific to the project that we're talking about

18   here?

19   Q.  Specific to the project we're talking about.

20   A.  I can't say that I've seen this.

21   Q.  Okay.

22        MR. S. KULWIN:  The next one, please.

23   BY MR. S. KULWIN:

24   Q.  Okay.  Have you ever seen this document that describes the

25   ultimate in dramatic urban living that the Trump people were

Petrus - redirect

1223

```
 1    issuing before you arrived?

 2    A.  I'm not trying to circumvent --

 3    Q.  I'm just asking you about this project.

 4            Have you ever seen this document?

 5    A.  No.  I think my reference here is that I can't say that

 6    I'm familiar with this particular marketing piece.

 7    Q.  Okay.

 8            I am only asking about --

 9    A.  And I'm not trying to be argumentative with you.

10    Q.  I am only asking about Trump Chicago, sir.

11    A.  But, also, I think Page 2 and 3, if I haven't seen that, I

12    probably haven't seen Page 4.

13    Q.  Okay.

14            Well, let's find out.  We will go to Page 4.

15            MR. SHONKWILER:  Objection.  At this point, your

16    Honor, this is the fourth page of the same document the

17    witness has said repeatedly --

18            THE COURT:  Sustained.

19            MR. SHONKWILER:  -- he hasn't seen.

20            THE COURT:  And it is time to move on.

21            Sustained.

22    BY MR. S. KULWIN:

23    Q.  Have you ever seen any of the -- any brochure that the

24    Trump organization was issuing before you, Mr. Petrus, arrived

25    on the scene, that stated that they didn't have the ability or
```

Petrus - redirect

1224

1    organizational skill to run a hotel within a hotel condo?

2              MR. SHONKWILER:  Objection.  Relevance.  Beyond the

3    scope.

4              THE COURT:  Sustained.

5    BY MR. S. KULWIN:

6    Q.  Sir, did you ever see any type of brochure whatsoever

7    issued by the Trump organization which stated that it did not

8    have the organizational skill or understanding of the hotel

9    business?

10             MR. SHONKWILER:  The same question -- the same

11   objection.

12             MR. S. KULWIN:  It goes directly to his statement,

13   that until 2006 they were completely --

14             MR. SHONKWILER:  Objection.  There was no

15   statement --

16             MR. S. KULWIN:  May I finish, Judge?

17             -- that they were completely in the dark about how to

18   run a hotel and a hotel condo.

19             MR. SHONKWILER:  Your Honor, there's been no such

20   testimony.

21             THE COURT:  Sustained.

22   BY MR. S. KULWIN:

23   Q.  Sir, are you aware that the hotel condo in New York won

24   numerous awards for its service before you ever arrived?

25   A.  The hotel in --

Petrus - redirect

1225

1    Q.  Sir, just answer this question.

2           Are you aware that they won numerous awards for their

3    service before you arrived?  It's a "Yes" or "No."

4           You either were aware or you were not aware.

5    A.  I was aware that they had been recognized before; but,

6    also --

7           MR. S. KULWIN:  Judge, I would --

8    BY THE WITNESS:

9    A.  -- in the process --

10          MR. S. KULWIN:  -- move to strike anything after "I

11   was aware."

12          THE COURT:  The answer can stand.

13          Ask your next question.

14          MR. S. KULWIN:  Now, can we go to 25-B, please?

15          May I have one moment, Judge?

16          THE COURT:  Yes.

17          (Brief pause.)

18          MR. S. KULWIN:  Mike, 25-B.

19   BY MR. S. KULWIN:

20   Q.  You were asked a number of questions about --

21          MR. S. KULWIN:  If you would go to the next page, the

22   bottom.

23          Go to the next page, please.

24          No, I'm sorry.

25   BY MR. S. KULWIN:

Petrus - redirect

1226

1  Q.  You were asked a number of --

2          MR. S. KULWIN:  And can you highlight the bottom here

3  (indicating), the date?

4  BY MR. S. KULWIN:

5  Q.  You were asked a number of questions, Mr. Petrus, about

6  the ongoing process of putting the budget together for the

7  fourth amended property report.

8          Do you remember those questions?

9  A.  I've been asked several, yes, sir.

10 Q.  Okay.

11         And just to be clear, the final budget that you --

12 that went into the October, 2007, document, is dated June 4th,

13 2007; is that correct?

14         Is that the date on there?

15 A.  I'm not sure if I would know if that -- if this is the

16 final iteration of it.

17 Q.  I'll represent to you that this is in the fourth amended

18 report that was filed.

19 A.  Okay.

20         If that is the case, then, that is it.

21 Q.  Okay.

22         And one of the people that you worked with in putting

23 that budget together was, of course, Mike Levchuck, correct?

24 We talked about that; is that right?

25 A.  This is the person that put together the 2007 budget?

Petrus - redirect

1227

```
 1   Q.  One of the people you worked with was Mike Levchuck; isn't

 2   that right?

 3   A.  Michael Levchuck, as it relates to putting the amendment

 4   together?

 5   Q.  Yes.

 6            You worked with him, correct?

 7   A.  Michael had a limited level of input into the budget.

 8   Q.  Okay.

 9            And were you aware -- and you consulted with PKG - -J

10   -- to do your survey of the Chicago market, right?

11   A.  It's "PKF."

12   Q.  PKF.

13   A.  And, yes, they were one of the sources that we have

14   consulted with.  That is correct, right.

15   Q.  Are you aware of Smith -- the Smith organization -- that

16   Mr. Reiss used back in '03, '04?

17            Are you aware of that organization?

18   A.  You're probably referring to STR --

19   Q.  Okay.

20   A.  -- which is Smith Travel Research.

21   Q.  Yeah.

22   A.  Is that the organization?

23   Q.  That's correct.

24   A.  And, yes, they are a provider of revenue information --

25   Q.  Right.
```

Petrus - redirect

1228

1   A.   -- of hotel revenue.

2   Q.   Okay.

3   A.   Not of banquet revenue, by the way.

4   Q.   And you know that they just specialize just in hotels,

5   they know nothing about food and beverage?

6   A.   They're -- what they track is room revenue.

7   Q.   And, so, you're saying that this Smith thing -- that he

8   didn't track any kind of banquet revenue with that?

9   A.   You know, I can't say what Charlie Reiss or Russ Flicker

10  did prior to my arrival.

11  Q.   Now --

12  A.   I think we've talked about this before.

13  Q.   Right.

14       Now, you testified a couple of times that the budget

15  process took six to nine months to put together the '07

16  budget, right?

17  A.   Approximately.

18  Q.   Okay.

19       Did you start in June or July?

20       Because by August, Mr. Shonkwiler was asking you that

21  you -- showed you that you already -- let me rephrase the

22  question.

23       When Mr. Shonkwiler was cross-examining you, he

24  showed you a document that indicated that, at least, by August

25  3rd, you had already started.

Petrus - redirect

1229

1    Do you remember that?

2  A.  Yes, sir, that's correct.

3  Q.  Okay.

4    So, did you start -- was that your first start or

5  were you starting in July?

6  A.  You know, I wish my memory was that good.

7  Q.  Roughly.

8  A.  I'm not going to agree to something that I can't sit here

9  and tell you is -- is -- my recollection.

10 Q.  You certainly didn't start any later than August

11 because --

12 A.  Sure.

13 Q.  -- you had worked --

14 A.  Sure.

15 Q.  -- right?

16 A.  That's a fair statement.

17 Q.  Okay.

18    So, let's see.  Six months from August of '06 would

19 be August, September, October, November, December, January.

20    If you only worked on it six months, you'd be done

21 with the budget in January of '07, right?

22 A.  Right.

23    Again, my statement was --

24 Q.  Six to --

25 A.  -- approximately six to nine months.

Petrus - redirect

1230

```
 1   Q.  Okay.  Good.

 2           And if you worked nine months on it, starting in

 3   August, February, March, April you'd be done, right?

 4   A.  (No response.)

 5   Q.  Right?

 6   A.  If you -- again, this was an approximation, right?

 7           No one sat here and counted months.  You asked me,

 8   "Give me an idea as to how long it took."

 9           I said, "Six to nine months."

10           It could be ten.  It could be eleven.  It could be

11   four.

12           But no one sat here and calculated the exact number

13   of months, because I can't even remember the starting date.

14   Q.  Didn't Mr. Shonkwiler ask you a couple of times how long

15   it took --

16   A.  And I said the same exact answer:  Six to nine months,

17   approximately.

18           MR. S. KULWIN:  Can I finish the question?

19           MR. SHONKWILER:  Objection, your Honor.  That has now

20   been asked and answered.  It's turning into an argument.

21           THE COURT:  Finish your question.

22   BY MR. S. KULWIN:

23   Q.  Didn't Mr. Shonkwiler ask you a number of questions about

24   how long the process was, and didn't you repeatedly say, 'It

25   was a long process, six to nine months"?
```

Petrus - redirect

1231

1   A.   Approximately.

2        MR. SHONKWILER:  Objection.  Asked and answered.

3        THE COURT:  Overruled.

4        It can stand.

5   BY MR. S. KULWIN:

6   Q.   So, if that estimate that you gave him of -- more than

7   once -- was accurate, you'd be done at the earliest with the

8   budget -- you would have been done at the earliest -- in

9   January of '07; and, at the latest, April of '07 -- if the

10  estimate is correct, right?  If it's correct.

11  A.   Again, let me make sure that I'm reiterating this.  I

12  said --

13       MR. S. KULWIN:  Judge --

14  BY THE WITNESS:

15  A.   -- approximately.

16       And when you ask me what the starting date was, if I

17  can't sit here and tell you what the exact starting date is,

18  I'm probably not going to be able to tell you exactly what the

19  finish date is.

20       This is an estimation.  It does go back -- how many

21  years now are we talking about?  Six years that we're going

22  backwards.  And you're asking me to define something --

23       MR. S. KULWIN:  Move to strike, Judge.

24  BY THE WITNESS:

25  A.   -- that it's almost impossible to do.

Petrus - redirect

1232

```
 1            MR. S. KULWIN:  Move to strike.
 2            THE COURT:  The answer can stand.
 3   BY MR. S. KULWIN:
 4   Q.  Sir --
 5            THE WITNESS:  Thank you.
 6   BY MR. S. KULWIN:
 7   Q.  -- I'm not asking you for a precise date stamp.  It's real
 8   simple.  You said six to nine months.  You told your lawyer
 9   that.
10            If that's true and you started in August -- as you
11   also told your lawyer -- you'd be done by January of '07 to
12   April of '07.  That's the only question.
13            Is that true?
14   A.  The salient --
15            MR. SHONKWILER:  Objection.  Asked and answered.
16            THE COURT:  Sustained.
17   BY THE WITNESS:
18   A.  -- word, sir, is "approximate."
19            THE COURT:  Mr. Petrus, it has been answered.
20            Let us move on, Mr. Kulwin.
21   BY MR. S. KULWIN:
22   Q.  Sir, you said it was -- one of your -- do I understand
23   correctly one of your -- factors in deciding to move this
24   thing was -- I couldn't figure it out.
25            Was one of the factors that the condo board could
```

Petrus - redirect

1233

1   terminate Trump from running the ballrooms, which would create

2   havoc in the hotel?

3   A.  Yes, and that would be absolutely --

4   Q.  Was that one of your --

5           MR. S. KULWIN:  Judge --

6           MR. SHONKWILER:  Your Honor, can the witness answer

7   the question?

8           MR. S. KULWIN:  I asked him if it was one of his

9   factors.  And, now, he is giving a speech.

10          MR. SHONKWILER:  He's giving an answer to the

11  question --

12          THE COURT:  And he said, "Yes."  It can stand.

13          Ask a followup question, if you want.

14          MR. S. KULWIN:  Thank you, Judge.  Okay.

15  BY MR. S. KULWIN:

16  Q.  Sir, isn't it just common sense that if the condo board

17  owns the space and they have to execute a management agreement

18  with the Trump organization, they could fire it at some point?

19          MR. SHONKWILER:  Objection.

20  BY MR. S. KULWIN:

21  Q.  Isn't it common sense?

22          MR. SHONKWILER:  Common sense to, whom?

23          THE COURT:  Sustained.  It is argumentative.

24  BY THE WITNESS:

25  A.  Common sense to, whom?

Petrus - redirect

1234

```
 1              THE COURT:  I sustained it, Mr. Petrus.
 2              THE WITNESS:  I'm sorry.
 3    BY MR. S. KULWIN:
 4    Q.  Sir, you stated that one of the people you spoke with
 5    about all of this -- this decision with the common elements --
 6    was Ivanka Trump.
 7              Do you remember that?
 8    A.  Yes, sir.  That's correct.
 9    Q.  This is a list of people that the defendants said had
10    relevant knowledge about this case.  Can you --
11              (Document tendered.)
12    BY MR. S. KULWIN:
13    Q.  -- see if Ms. Ivanka Trump is on that list?
14              MR. SHONKWILER:  Objection, your Honor.  There is no
15    foundation that the witness understands the discovery that's
16    exchanged between the lawyers.
17              THE COURT:  Sustained, and sustained on form.
18    BY MR. S. KULWIN:
19    Q.  I want to be clear.  You stated that about the common
20    elements removal that's at issue in this case, you had a
21    conversation which included Ivanka Trump; is that right?
22    A.  At some point in time; that is correct.  And I think there
23    was a document that showed that she participated in meetings
24    pertaining to several elements tied to the project.
25    Q.  And my question simply is:  Looking at Plaintiff's Exhibit
```

Petrus - redirect

1235

```
 1    1 --
 2              MR. S. KULWIN:  Is this 1, Jeff?
 3              MR. J. KULWIN:  Yes.
 4              MR. S. KULWIN:  Plaintiff's Exhibit 1?
 5              Okay.
 6              MR. SHONKWILER:  The same objection.  This is the
 7    discovery document, your Honor, for which there's no
 8    foundation.
 9              MR. S. KULWIN:  I'm just asking if she was on the
10    list, Judge.
11              THE COURT:  Sustained.
12              This is a discovery issue.  We have talked about this
13    before.  It is not a jury issue.
14              MR. S. KULWIN:  May I be heard?
15              THE COURT:  No.  Let us move on.
16    BY MR. S. KULWIN:
17    Q.  You talked about how the common elements -- I mean, the
18    common assessments, you were asked some questions about that,
19    and you were asked -- you talked about what the effect on the
20    common assessments were.
21              Do you remember those questions?
22    A.  Yes, sir.  Thank you.
23              MR. S. KULWIN:  If I may have a moment, Judge?
24              THE COURT:  You may.
25              (Brief pause.)
```

Petrus - redirect

1236

1    BY MR. S. KULWIN:

2    Q.   Okay.  I'm going to show you Demonstrative Exhibit 7 as

3    redacted.

4             The fact of the matter is, sir, despite all of your

5    efforts to harmonize things --

6             MR. SHONKWILER:  Object to the commentary, your

7    Honor.

8             THE COURT:  Sustained.

9             I will strike it.  The jury should disregard it.

10   BY MR. S. KULWIN:

11   Q.   Did you make efforts to harmonize it, sir, to make sure

12   that the common charges after these things were removed were

13   about the same?  Isn't that what Mr. Shonkwiler talked to you

14   about?

15   A.   I think the -- the effort that was in place was to be

16   certain that the end result, the net impact to unit owners was

17   not going to be punitive.

18   Q.   Okay.  Not punitive.

19            But the overall common charges went up about $880,000

20   for all the condo owners, correct, in the first year, true?

21   Isn't that right?

22   A.   According to this document here, yes, that's correct.

23   Q.   And let me show you Demonstrative Exhibit 3, which we

24   looked at yesterday, just to remind us.  And we went over

25   this, and the net revenue that we talked about yesterday that

Petrus - redirect

1237

```
 1    was lost as a result of the removal was about $865,000,
 2    correct?  That's what this chart reflects, true?
 3               MR. SHONKWILER:  Objection, your Honor.
 4    Mischaracterizes the demonstrative.
 5               THE COURT:  Sustained on form.
 6               Rephrase.
 7    BY MR. S. KULWIN:
 8    Q.  Does this reflect, sir, as it states, Summary Exhibit 3, a
 9    $865,000 difference when you start comparing these numbers?
10    How's that?
11               Is that what it says?
12    A.  Well, I think the characterization that 865,000 is profit,
13    I think that's a misrepresentation.
14    Q.  Okay.  Fine.  You can accuse me of misrepresentation, sir.
15               800- --
16               THE COURT:  Mr. Kulwin, we are not going to do that.
17    Please ask your question.  Do not argue with the witness.
18    BY MR. S. KULWIN:
19    Q.  Be that as it may, sir, the $865,000 number there is
20    approximately the same as the amount the common assessments
21    went up, correct?  That's a fair statement, isn't it?
22               MR. SHONKWILER:  Object to the relevance.
23               THE COURT:  Overruled.
24               You may answer, if you can.
25    BY THE WITNESS:
```

Petrus - redirect

1238

1   A.  The two numbers are -- are -- relatively close.

2   BY MR. S. KULWIN:

3   Q.  Yeah.

4            Now, you were shown Defense Exhibit 580.

5            (Brief pause.)

6   BY MR. S. KULWIN:

7   Q.  This was also shown to you by Mr. Shonkwiler a moment ago,

8   correct?

9   A.  That is correct, yes, sir.

10  Q.  And one of the things that you're trying to clarify there

11  under "main areas to clarify" is the F&B fee, right?  Right?

12  A.  That is correct, yes, sir.

13  Q.  One of the things that you were trying to determine while

14  you were there is, how much are we going to give the unit

15  owners for taking away this other, what you called yesterday,

16  obligated equity?  Do you remember that?

17           MR. SHONKWILER:  Object to form.

18           THE COURT:  Overruled.

19           You may answer, if you can.

20  BY THE WITNESS:

21  A.  I'm not sure if the characterization that it's equity is

22  appropriate.  I mean, what this is demonstrating here is that

23  we were looking at different scenarios in trying to determine

24  what a fair and reasonable amount would be to incorporate into

25  the budget.  It was --

Petrus - redirect

1   BY MR. S. KULWIN:

2   Q.  Mr. Pet- --

3   A.  It was a fluctuating number.

4   Q.  Right.

5   A.  And I think this just demonstrates that on this date,

6   which is -- whatever the date is here on the top --

7   Q.  Mr. Petrus --

8   A.  -- that it was -- the consideration here was $200,000.

9   Q.  Mr. Petrus --

10  A.  And it was increased by $300,000 over the course of time.

11  Q.  Mr. Petrus, didn't you yesterday say, when I was

12  questioning you after I showed you your deposition, that you

13  called it -- you framed it -- as you were trying to look at

14  amount to -- because "we felt we had obligated equity that

15  they had lost"?  You didn't -- didn't you say that?  Wasn't

16  those your words?

17  A.  Yes, sir.

18  Q.  Okay.

19  A.  That's correct.

20  Q.  Good.

21  A.  Right.

22  Q.  And so, what you were trying to do over this course of

23  time -- one of the things that you had to do -- one of the

24  things that you had to do -- if you were going to change this

25  budget is do an analysis and figure out, once you reached this

Petrus - redirect

1240

1    conclusion about the obligated equity, "How much we're going

2    to give them," right?  That's one of the things you had to do,

3    true?

4    A.   That's correct.

5    Q.   Okay.

6            And you were doing that in August, September,

7    October -- throughout the whole process, right?  You were

8    working on that, true?

9    A.   In that approximate --

10   Q.   Yeah.

11   A.   -- six- to nine-month --

12   Q.   Right.

13   A.   -- window of time that we talked about earlier.

14   Q.   Now, you also said that ultimately when you went to

15   Mr. Trump, when you decided that you wanted to put this --

16   when you decided that was going to be $500,000, you had to go

17   to Mr. Trump for his approval because he was going to have to

18   be writing the checks, right?  Isn't that what you testified

19   to a moment ago?

20   A.   That's correct.

21   Q.   Okay.

22           And, so, when Mr. Trump -- when the money is coming

23   out of Mr. Trump's pocket, he wants to be consulted before

24   anything is done, right?  When it's coming out of his personal

25   pocket, right?

Petrus - redirect

```
 1              MR. SHONKWILER:  Objection to form.

 2              THE COURT:  Sustained on form.

 3    BY MR. S. KULWIN:

 4    Q.  Based on your experience in dealing with him back then --

 5    when you first got there, back then -- was your understanding

 6    in '06, when you first were dealing with him, that if we were

 7    -- '06, '07 -- that if we were going to commit Donald Trump to

 8    paying $500,000 a year plus inflation out of his own pocket,

 9    we had to get that approved by him, right?

10              MR. SHONKWILER:  Objection to the reference to "his

11    own pocket."

12              THE COURT:  Sustained.

13              Rephrase.

14    BY MR. S. KULWIN:

15    Q.  The $500,000, I thought I heard you say on Mr.

16    Shonkwiler's examination, was coming out of Mr. Trump's

17    pocket, basically out of his own personal money.  Did I hear

18    that right?

19    A.  I'm not sure if I would characterize it as his own

20    personal money.  Out of the organization's money.

21              But yes, it was my responsibility to have to go to

22    Donald and explain to him the risks that were associated with

23    keeping the ownership with the condo, number one; and, also,

24    separate from that, the budget modifications that would result

25    in him paying the association on an annualized basis basically
```

Petrus - redirect

1242

1  $500,000 escalated per year in perpetuity.

2  Q.  Him paying.  The "him" in that answer is --

3  A.  The --

4  Q.  -- Donald Trump?

5  A.  The organization.

6  Q.  So, now it's organization?

7  A.  Yes.

8  Q.  Who owns the organization?  Who?

9  A.  Donald Trump.

10  Q.  Okay.

11  A.  Right.

12  Q.  So, to get Donald Trump to make that kind of commitment of

13  $500,000 when you were there in 2006, you knew you'd have to

14  explain it to him, give him the facts, give him the analysis,

15  and get his approval; is that right?

16  A.  That is accurate, yes, sir.

17  Q.  You were asked some questions about percentage ownership.

18  Remember that?  And the common elements impact.  Remember

19  those questions?

20  A.  Yes, sir.

21  Q.  Okay.

22         Going back to this number at the bottom here -- oh,

23  no, not this number.  I'm sorry.

24         This number, the increase in the first year of the

25  condo association's budget after the ballrooms were

Petrus - redirect

1243

1    eliminated.

2              THE COURT:  Can you please identify for the record --

3              MR. S. KULWIN:  Yes, your Honor.

4              THE COURT:  -- what you just put on the Elmo.

5              MR. S. KULWIN:  Demonstrative Exhibit 7.

6              If I may have one moment, Judge?

7              THE COURT:  You may.

8              MR. S. KULWIN:  Thank you.

9              (Brief pause.)

10   BY MR. S. KULWIN:

11   Q.  Now, whatever her percentage ownership, she would have to

12   pay this percent of her -- in the first year, that would be

13   her percentage of this, correct?  The extra charges, true?

14   A.  Whatever the delta is, that is -- that is accurate, right.

15   Q.  And by "delta," you mean her percentage times that number,

16   right?  Is that what you mean by "the delta"?

17   A.  Whatever the net amount is.  And according to the

18   percentages that are outlined in the property report, the

19   responsibility of each unit owner would be whatever that

20   stipulated percent is.

21   Q.  Okay.

22             And I've got it, so -- okay.  Thank you.

23             And if that was -- I believe you said that her

24   percentage ownership was something like, I don't know, for

25   both units together would be, like, half a percent, right?

Petrus - redirect

1244

1  A.  You know --

2  Q.  Can't remember?  Okay.

3  A.  -- you'd have to go back to the document.

4  Q.  All right.  Never mind.

5          Now, going back very quickly to this crash issue --

6  and I've only got a couple questions about it -- certainly by

7  November of 2008, the crash had occurred, right?  The real

8  estate crash, by November of 2008.  Is that your

9  understanding?

10  A.  The economic crisis -- right -- that was spurred by Lehman

11  Brothers was in September.

12  Q.  Right.

13  A.  Now, whether or not you would want to correlate everything

14  before or after that, I think that would be up to an

15  interpretation.

16  Q.  Certainly there was a panic in the markets at that time,

17  true?

18  A.  After September 15th, I think there was a pretty

19  definitive --

20  Q.  Right.

21  A.  -- movement.

22  Q.  Okay.

23          And -- okay.  Thanks.

24          You mentioned -- I just want to clarify.  You

25  mentioned that the rental management agreement was sent out in

Petrus - redirect

1245

1    mid-2007.  In fact, it was sent out in October of 2007 with

2    the property report; was it not?

3    A.  You know, I can't recall.

4    Q.  Now, you also talked about how originally -- originally --

5    the rotation point system was an automatic computerized system

6    with very little discretion except for an isolated thing like

7    the people who wanted to stay in their wedding room the next

8    year.  Originally.

9    A.  That's always been the case, by the way.

10   Q.  Right.  Okay.

11   A.  There's been no exception to that.

12   Q.  Okay.  Right.  Yeah.

13          The hotel can always, regardless of a computerized

14   system or a fully discretionary system, for those of us who

15   want to remember our wedding night, we can get our room back?

16   A.  Right.

17   Q.  Right.  Okay.

18          So -- but then, with the new rental management

19   agreement, that system was taken out and it went to a more of

20   a discretionary system, right?

21   A.  No, that's not accurate.

22   Q.  Okay.

23          It gave the hotel more discretion; no?

24   A.  No.  No.

25   Q.  Okay.

Petrus - redirect

1246

```
 1    A.   That's not accurate.
 2    Q.   But there was a vote, wasn't -- didn't you say that there
 3    was a vote among the unit owners --
 4    A.   Only --
 5    Q.   -- to go back to the original system?
 6    A.   Only pertaining to their -- to the impact of owner
 7    occupancy.  Right?
 8    Q.   Right.
 9    A.   So, if you owned your --
10    Q.   Right.  No, I got it.
11              MR. SHONKWILER:  Please, your Honor, let the witness
12    answer the question.
13              THE COURT:  Let him finish his answer.
14    BY THE WITNESS:
15    A.   It's only pertaining to that one specific element -- right
16    --
17    BY MR. S. KULWIN:
18    Q.   Okay.
19    A.   -- that was switched at the owner's request by vote.
20    Q.   Okay.
21              And, so, basically the Trump organization had
22    decided, including you, that it was probably a good idea to
23    change it to penalizing them if they stayed, and then the
24    owners voted and said, "We don't want that," right?
25    A.   That's correct.
```

Petrus - redirect

1    Q.  Okay.  I apologize for the error.

2           And you said you couldn't remember how many voted for

3    or against, right?

4    A.  I don't recall.

5    Q.  Is there a document?

6    A.  I'm not aware of --

7    Q.  Okay.

8           And was there any discussion at the Trump

9    organization before you changed -- removed -- the common

10   elements about putting that to a vote of the people who had

11   already bought?

12   A.  I don't recall there was any discussion around voting on

13   that particular element.

14          MR. S. KULWIN:  If I may have a moment, Judge?

15          THE COURT:  I did not hear you.

16          MR. S. KULWIN:  If I may have a moment?

17          THE COURT:  Yes.

18          (Brief pause.)

19   BY MR. S. KULWIN:

20   Q.  You talked -- last point.

21          You talked about the amendments after the hotel

22   opened.  Remember that?

23   A.  That -- yes.  Yes, that's correct.

24   Q.  Okay.

25          Whenever -- as the -- the more and more units are

                              Petrus - redirect
                                                                    1248

    1   sold, after a certain number are sold, it changes the

    2   ownership interests of the people who already owned, right?

    3   Because --

    4   A.  That is not the way it works.

    5   Q.  Okay.

    6           But you do have to amend at some point to reflect

    7   more sales, don't you?

    8   A.  No.  That's not -- that's not correct.

    9   Q.  Did the common elements change in any of those -- in that

   10   sixth, seventh or eighth amendment; do you know?

   11   A.  I can't -- I don't recall if there was any update in the

   12   budget itself.

   13   Q.  Okay.

   14   A.  I don't -- don't recall that.

   15   Q.  Okay.  Good.

   16           MR. S. KULWIN:  Nothing further, your Honor.  Thank

   17   you.

   18           THE COURT:  Recross.

   19           MR. SHONKWILER:  Just one moment to gather my notes,

   20   please, your Honor.

   21           THE COURT:  Yes.

   22           And let us try to be brief so we can finish Mr.

   23   Petrus before lunch.

   24           (Brief pause.)

   25                         RECROSS EXAMINATION

Petrus - recross

1249

1   BY MR. SHONKWILER:

2   Q.  Mr. Petrus, Demonstrative Exhibit 7, that Mr. Kulwin

3   showed you, represents the common charges from the third

4   amendment to the fourth amendment --

5           (Brief pause.)

6   BY MR. SHONKWILER:

7   Q.  Let me start that over.

8           Demonstrative Exhibit 7, that Mr. Kulwin showed you,

9   represents the total common charges from the third amendment

10  to the fourth amendment went up $880,000 -- $880,972 -- for

11  all owners; is that -- do you recall that?

12  A.  I recall him exhibiting that, yes.

13  Q.  Now, do you know off the top of your head whether that

14  number is correct or not?

15          MR. S. KULWIN:  Judge, I'll object.  It's misleading.

16  These numbers --

17          THE COURT REPORTER:  I can't hear you, Mr. Kulwin.

18          MR. S. KULWIN:  I'll object to misleading and form

19  and foundation.

20          THE COURT:  Sustained on form.

21          Rephrase it.

22  BY MR. SHONKWILER:

23  Q.  Do you know one way or another whether that number is

24  right, without looking at the documents?

25  A.  I'm just looking at this document here and looking at the

Petrus - recross

1250

1     subtraction.

2     Q.  Earlier we looked at Exhibit F to the property report,

3     which, as you'll recall, lists all of the monthly expenses by

4     unit.  Remember looking at this?

5     A.  Yes, sir, I do.

6     Q.  This is the third amendment, and this is the document we

7     looked at earlier.

8          And before we talk about this, let me ask you, the

9     total common charges are shared by all unit owners according

10    to the percentage of ownership that they have for the entire

11    condominium.  That's shown in this column, right?

12         MR. S. KULWIN:  Objection.  Asked and answered, and

13    to form.

14         THE COURT:  Overruled.

15         You may answer, if you can.

16    BY THE WITNESS:

17    A.  Yes.  That is correct, sir.

18    BY MR. SHONKWILER:

19    Q.  So, if there is a total $880,000 difference between the

20    third and fourth amendment shared by all unit owners, then it

21    would only be a very small percentage -- namely, one of these

22    -- that each unit owner would share of that total amount,

23    right?

24    A.  That's correct.

25    Q.  All right.

1    Now, Exhibit -- I'm sorry, this exhibit, as I said,

2    is the third amendment.  This was the number in the property

3    report that was current when Ms. Goldberg bought her units.

4    And Unit 2238 was one of those units.  And under the third

5    amendment, her estimated monthly common charges -- in other

6    words, her share of all those common charges -- was $1,535; is

7    that right?

8    A.  That is correct, sir.

9    (Brief pause.)

10    MR. SHONKWILER:  This, your Honor, is Defendants'

11    Exhibit 604.  It's the fourth amendment.

12    THE COURT:  Okay.  It is in evidence.  You may

13    publish it.

14    BY MR. SHONKWILER:

15    Q.  Mr. Petrus, now I'm showing you a page from that same

16    exhibit in the fourth amendment.  And this shows that the

17    share of the total difference in common charges that will be

18    paid by Unit 2238 is now $1,626; is that right?

19    A.  That is correct, sir.

20    Q.  Okay.

21    And $1,626 minus the third amendment share of

22    $1,535 -- I guess I need a calculator, too; I shouldn't for

23    this one, but I do -- is $91; is that right?

24    A.  That -- that is the difference in all of the adjustments

25    that were made.  That's correct.

Petrus - recross

1252

1   Q.  Okay.

2              And, so, Unit 2238 -- which is the more expensive of

3   the two units Ms. Goldberg had a contract to purchase -- the

4   total difference to her per month in her common charges as a

5   result of all the budget amendments was $91 a month, correct?

6              MR. S. KULWIN:  Objection.

7   BY THE WITNESS:

8   A.  That --

9              MR. S. KULWIN:  Misleading, Judge.  She had two

10  units.  It's misleading.  Lacks foundation.

11             THE COURT:  I think he said one.

12             Clarify.

13  BY MR. SHONKWILER:

14  Q.  For this one unit, the total difference per month to

15  Ms. Goldberg as a result of all the budget amendment changes,

16  in terms of the common elements and what her share would be

17  per month for this unit, was $91?

18             MR. S. KULWIN:  Objection, Judge.  It also doesn't

19  take into account that they'll change from year to year and go

20  up.

21             THE COURT:  Overruled.

22             You may answer, if you can.

23  BY THE WITNESS:

24  A.  That is 100 percent accurate, sir.

25  BY MR. SHONKWILER:

Petrus - recross

1253

1    Q.  On the unit that had the purchase price of $1.3 million,

2    right, sir?

3    A.  That is -- that is correct, sir.

4    Q.  Now, Mr. Kulwin read some deposition testimony to you --

5    some testimony from your deposition -- where you were asked

6    this question.  And when you --

7            MR. S. KULWIN:  Judge, I object.  You can't read out

8    loud from his deposition.

9            THE COURT:  I am not sure where you are going with

10   this.

11           MR. SHONKWILER:  Well, approach it from a different

12   angle --

13           THE COURT:  Let us try that.

14           MR. SHONKWILER:  -- and we will see.

15   BY MR. SHONKWILER:

16   Q.  You've explained that you made line-by-line reconstruction

17   of expense items in the budget to take it from the fifth --

18   the third -- amendment to the fourth amendment; is that right?

19           MR. S. KULWIN:  Objection.  Objection.  Asked and

20   answered, and form.

21           THE COURT:  Overruled.

22           You may answer, if you can.

23   BY THE WITNESS:

24   A.  That is correct, sir.

25   BY MR. SHONKWILER:

Petrus - recross

1254

1   Q.  And as a result of all that work you did, you came up with

2   a number in the fourth amendment for each of those expenses

3   that did not include any expenses that would be associated

4   with owning ballroom and meeting room facilities as common

5   elements, right?

6   A.  That is correct, sir.

7   Q.  So, in that sense, it is true that the changes you made

8   from the third amendment to the fourth amendment, among other

9   things, removed, if you will, any dollars of expenses that

10  might have been in those line items relating to the ownership

11  of those common elements, right?

12  A.  That is accurate.

13  Q.  And there also were many other factors that led you to

14  make changes to those same line items, right?

15  A.  Absolutely.

16  Q.  And, so, the changes you made sometimes reflected a

17  certain degree of change related to the removal of the

18  ballroom and meeting room facilities, right?

19  A.  That's correct.

20  Q.  And sometimes those same line items reflected changes

21  caused by entirely different factors, right?

22  A.  Totally different elements.

23  Q.  And there is no way for you, or anyone else for that

24  matter, to say exactly how many dollars of each there were?

25          MR. S. KULWIN:  Objection, your Honor.  There's no --

Petrus - recross

1255

1    THE COURT:  Sustained as to "anybody else."

2  BY MR. SHONKWILER:

3  Q.  Get rid of the "anybody else" part.  Any way for you to

4  tell exactly how many dollars of each line item you changed

5  were attributable to common element changes or other factors;

6  is that right?

7  A.  Absolutely.

8  Q.  And, so, the demonstrative exhibit you were shown, which

9  identifies the difference between the overall expenses in the

10  third amendment and the overall expenses in the fourth

11  amendment -- which is this number here, 4,682,383 -- does not

12  show a number that you can attribute solely to a single

13  factor, correct?

14  A.  I could not pinpoint exactly what that would be.  That's

15  correct.

16  Q.  And, in particular, it is a number that cannot be

17  attributed solely to the factor of removing ballrooms and

18  meeting room facilities from the common elements?

19    MR. S. KULWIN:  Argumentative.  Form, Judge.

20    THE COURT:  Overruled.

21    You may answer, if you can.

22  BY MR. SHONKWILER:

23  Q.  Is that correct?

24  A.  That is correct.

25  Q.  And, so, to the extent that you ever gave sworn deposition

page

Petrus - recross

1256

```
 1   testimony that the changes you made from the third amendment
 2   to the fourth amendment removed revenue related to meeting
 3   rooms and ballrooms, that is a truthful statement, right?
 4              MR. S. KULWIN:  Objection.  Asked and answered.
 5              THE COURT:  Sustained.
 6              And improper to ask him.
 7              MR. S. KULWIN:  And improper.
 8              THE COURT:  Improper use of prior testimony.
 9   BY MR. SHONKWILER:
10   Q.  Let me just phrase it this way:  The truth is, that is one
11   of the factors that was reflected in your budget amendment?
12   A.  That is one of the factors.
13   Q.  But not the only factor?
14   A.  But not the only factor.  That is correct, sir.
15   Q.  So, if the question is, is that the only factor, the
16   answer is "No"?
17   A.  That is correct.
18   Q.  This is Defendants' Exhibit 578.  Mr. Kulwin asked you a
19   question about this.  Following up --
20              MR. S. KULWIN:  Judge, I didn't ask him any questions
21   about this at all.  None.  And I would say it's outside the
22   scope of the redirect.
23              MR. SHONKWILER:  Your Honor, the question was -- with
24   reference to this document, which has this date on it -- and
25   the questions were, "You must have started working on the
```

Petrus - recross

1257

1    budget amendments at this point because you had made some

2    amendments."

3             THE COURT:  You did reference this document.  I am

4    not sure you showed it, but you --

5             MR. S. KULWIN:  I didn't.

6             THE COURT:  -- did reference it.

7    BY MR. SHONKWILER:

8    Q.  And it is true that as of this date, August 3rd, 2006, you

9    had begun making some revisions to the payroll expense line

10   items of the budget, right?

11   A.  That is correct, sir.

12   Q.  And you don't know exactly what date you started making

13   those amendments?

14   A.  I cannot identify the specific date.

15   Q.  But it is also true about this document that it shows that

16   all of the revenue items -- all the revenue dollars -- related

17   to meeting and ballroom rentals and spa commissions are

18   still --

19             MR. S. KULWIN:  Judge, this is outside of the scope

20   of --

21             THE COURT:  Sustained.

22             You are going outside now.

23   BY MR. SHONKWILER:

24   Q.  You do recall, in any event, Mr. Petrus, that as of that

25   date, you had not begun the process of discussing whether

Petrus - recross

1258

 1    there --

 2           MR. S. KULWIN:  Also --

 3    BY MR. SHONKWILER:

 4    Q.  -- would be any common elements change?

 5           MR. S. KULWIN:  Also outside the scope, Judge.

 6           THE COURT:  Overruled.

 7           You may answer that particular question.

 8    BY THE WITNESS:

 9    A.  As of that date, that was not a consideration.

10           (Brief pause.)

11           MR. SHONKWILER:  Just a couple more things, your

12    Honor.

13           (Brief pause.)

14    BY MR. SHONKWILER:

15    Q.  You were shown Plaintiff's Exhibit 13, and then I think we

16    also -- Mr. Kulwin also -- wrote some of the numbers from this

17    exhibit up on the easel.

18           Now, these numbers -- the numbers taken off the

19    exhibit -- and you've explained that these were projections

20    that you performed at some point in time for how many total

21    dollars could be expected or estimated to be attributed to all

22    of the food and beverage operation for the hotel?

23    A.  That is accurate.

24    Q.  Okay.

25           And the line item, for example, that says "Banquets,"

Petrus - recross

1259

```
 1   you testified, includes some revenue for estimated rental and

 2   some revenue for the estimated banquet food and beverage sales

 3   that would be done through those banquet facilities, right?

 4   A.  Right.

 5   Q.  Okay.

 6           So --

 7   A.  That would be embedded in the $6.5 million estimate there.

 8   Q.  Right.

 9           So, one component of this is the gross sales of food

10   and beverage in those places?

11   A.  That's correct.

12   Q.  The banquet places?

13   A.  That's correct.

14   Q.  Okay.

15           The third amendment budget to the hotel condominium,

16   on the other hand, does not include those food and beverage

17   revenues, correct?

18   A.  That is correct, sir.

19   Q.  They are not in here?

20   A.  Not -- not included in the numbers that are here.

21   Q.  Based on anything you know about this or based on anything

22   you can tell from reading it or the notes, based on all your

23   knowledge of the property report, you have no reason to

24   believe that any of that revenue is in here, correct?

25           MR. S. KULWIN:  Judge, I'm going to object.  It's
```

Petrus - recross

1260

```
 1  argumentative --
 2          THE COURT:  Sustained.
 3          MR. S. KULWIN:  -- and misleading.
 4  BY MR. SHONKWILER:
 5  Q.  What's in here is a small percentage, something called a
 6  commission, correct?
 7          MR. S. KULWIN:  Objection, Judge.  Asked and
 8  answered, misleading and lacks foundation.
 9          THE COURT:  Overruled.
10          The commission part was not asked.
11          You may answer that, if you can.
12  BY THE WITNESS:
13  A.  Yes.
14  BY MR. SHONKWILER:
15  Q.  Included in this number is a small commission.  You said
16  industry standard might be five percent.  And that's five
17  percent of the gross numbers that you're projecting, these
18  numbers here or in this Exhibit 13, right?
19  A.  That is accurate.
20  Q.  And that is one of the principal reasons why these two
21  documents do not represent the same thing?
22  A.  It's the apples and oranges.
23  Q.  Okay.
24          And to the extent that there is a 93 percent number
25  anywhere in this document, that number cannot be applied in a
```

Petrus - recross

1261

1    way -- to this document, in any way --

2    A.  We're --

3    Q.  -- that would help you compare the two or draw any

4    meaningful conclusion from them; is that right?

5    A.  We're -- we're only confusing the issue because we're

6    commingling --

7            MR. S. KULWIN:  Judge, I'm going to object to

8    "confusing the issue."  It's argumentative, and he's just

9    making an argument to the jury.

10           THE COURT:  Sustained.

11           MR. S. KULWIN:  Move to strike.

12           THE COURT:  I will strike that portion of the answer.

13           (Brief pause.)

14   BY MR. SHONKWILER:

15   Q.  Just a couple more questions about something that we

16   started with.

17           (Brief pause.)

18           MR. S. KULWIN:  Judge, if Mr. Shonkwiler is going to

19   show some handwritten notes, can I see them first?

20           THE COURT:  I cannot hear you.

21           MR. S. KULWIN:  I apologize.

22           MR. SHONKWILER:  These are our notes, your Honor.

23           MR. S. KULWIN:  If he's going to show some notes --

24           MR. SHONKWILER:  No.

25           MR. S. KULWIN:  I apologize.

Petrus - recross

1262

 1    MR. SHONKWILER:  Not on purpose.

 2  BY MR. SHONKWILER:

 3  Q.  Mr. Petrus, we just -- as we just discussed, the

 4  difference between the expenses in the third amendment and

 5  fourth amendment, that's this number here (indicating), that

 6  Mr. Kulwin showed you, right?

 7  A.  That is correct, sir.

 8  Q.  And you've explained that in your math, that was due to a

 9  number of different factors --

10    MR. S. KULWIN:  Asked and answered.

11    MR. SHONKWILER:  I've got to just lead into the next

12  question.  That's all.

13    THE COURT:  Sustained on form.

14  BY MR. SHONKWILER:

15  Q.  And this number, the difference, is not attributable to

16  any single factor, correct?

17    MR. S. KULWIN:  Objection.  Asked and answered, and

18  form.

19    THE COURT:  Overruled.

20    You may answer, if you can.

21  BY THE WITNESS:

22  A.  That is correct, sir.

23  BY MR. SHONKWILER:

24  Q.  Okay.

25    So, the math on this page leads you to this number

Petrus - recross

1263

 1    (indicating), which has been called in this demonstrative a

 2    net profit lost in year one when it's $865,000?

 3    A.  Again, the word "profit" is probably misleading.

 4         MR. S. KULWIN:  Judge, I'm going to object to him

 5    making an argument.  "Misleading."

 6         THE COURT:  Overruled.

 7         MR. S. KULWIN:  It wasn't asked.

 8         (Brief pause.)

 9    BY MR. SHONKWILER:

10    Q.  So, Mr. Petrus, if someone were to figure out -- were to

11    try to figure out -- how much in expense was saved by removing

12    the common elements, would this calculation tell you that?

13         MR. S. KULWIN:  Judge, I'll object for lack of

14    foundation.  If someone were do it.  There's no --

15         THE COURT:  Rephrase on form.  "If someone."

16         MR. SHONKWILER:  All right.

17    BY MR. SHONKWILER:

18    Q.  If you were to try to calculate, Mr. Petrus, how much

19    profit was lost between the third amendment and fourth

20    amendment, this demonstrative would not help you do it, would

21    it?

22    A.  That would not be an accurate representation.

23    Q.  Okay.

24         THE COURT:  Are you close, Mr. Shonkwiler?

25         MR. SHONKWILER:  Yes.

1      THE COURT:  I do want to finish by lunch with this

2   witness.

3           (Brief pause.)

4   BY MR. SHONKWILER:

5   Q.  One more question similar to the last, but I left out a

6   couple of words, I've been notified; and, we want to make sure

7   the record is clear.

8           MR. S. KULWIN:  Judge, I'll object to the record

9   being clear.

10          THE COURT:  Ask your question, please.

11  BY MR. SHONKWILER:

12  Q.  Mr. Petrus, if someone wanted to try to calculate whether

13  and how much profit was lost between the --

14          MR. S. KULWIN:  Objection to "someone," Judge.  Form.

15          THE COURT:  Sustained.

16  BY MR. SHONKWILER:

17  Q.  If you, Mr. Petrus, wanted to try to calculate whether and

18  how much profit was lost between the third amendment and the

19  fourth amendment by reason of the removal of common elements,

20  would this help you do it?

21          MR. S. KULWIN:  Objection.  Asked and answered,

22  Judge.  He just answered it.

23          THE COURT:  Overruled.  The "whether" part was not.

24          You may answer, sir.

25  BY THE WITNESS:

Petrus - recross

1265

1    A.  No, it would not.

2            MR. SHONKWILER:  Okay.  Your Honor, we don't have

3    anything further for Mr. Petrus.

4            THE COURT:  Ladies and gentlemen, we are going to

5    break for lunch.  We will pick up at 1:30.  And I promise you

6    I will get you out of here before 4:00.

7            (Jury out.)

8            THE COURT:  Mr. Petrus, you are excused.

9            (Witness excused.)

10           THE COURT:  I will see you at 1:30.

11           (Whereupon, a recess was taken at 12:30 o'clock p.m.,

12       until 1:30 o'clock p.m., of the same afternoon.)

13                    *    *    *    *    *

14   I certify that the foregoing is a correct transcript from the
     record of proceedings in the above-entitled matter.

15

16   /s/ Joseph Rickhoff                    May 18, 2013
     Official Court Reporter

17

18

19

20

21

22

23

24

25

1266

<pre>
 1                    IN THE UNITED STATES DISTRICT COURT
                       NORTHERN DISTRICT OF ILLINOIS
 2                           EASTERN DIVISION

 3   JACQUELINE GOLDBERG,              ) Docket No. 09 C 6455
                                       )
 4                        Plaintiff,   )
                                       )
 5             vs.                     )
                                       )
 6   401 NORTH WABASH VENTURE, LLC,    )
     a Delaware Limited Liability      )
 7   Company, et al.,                  ) Chicago, Illinois
                                       ) May 17, 2013
 8                       Defendants.)    1:30 o'clock p.m.

 9                    TRANSCRIPT OF TRIAL PROCEEDINGS
             BEFORE THE HONORABLE AMY J. ST. EVE, AND A JURY
10
     APPEARANCES:
11
     For the Plaintiff:          KULWIN, MASCIOPINTO & KULWIN, LLP
12                               BY:  MR. SHELLY B. KULWIN
                                      MR. JEFFREY R. KULWIN
13                               161 North Clark Street, Suite 2500
                                 Chicago, Illinois  60601
14
     For the Defendants:         NOVACK AND MACEY, LLP
15                               BY:  MR. STEPHEN NOVACK
                                      MR. JOHN F. SHONKWILER
16                               100 N. Riverside Plaza, Suite 1500
                                 Chicago, Illinois  60606
17
     Also Present:               MS. ALEXIS ROBINSON
18
     Court Reporter:             Nancy C. LaBella
19                               Mary M. Hacker
                                 Official Court Reporters
20                               219 S. Dearborn St.
                                 Chicago, Illinois  60604
21                               (312) 435-6890
                                 (312) 435-5564
22

23              * * * * * * * * * * * * * * * * *

24                    PROCEEDINGS RECORDED BY
                      MECHANICAL STENOGRAPHY
25               TRANSCRIPT PRODUCED BY COMPUTER
</pre>

Weiss - deposition

1267

1     (Proceedings out of the hearing of the jury:)

2          THE CLERK:  09 C 6455, Goldberg v. 401 North Wabash

3   Venture.

4          THE COURT:  Is your witness here, Mr. Kulwin?

5          MR. S. KULWIN:  Yes.  We're going to read that little

6   thing first.

7          THE COURT:  Okay.  Are you ready?

8          MR. S. KULWIN:  Yes.

9          THE COURT:  Are you ready?

10         MR. NOVACK:  Yes.

11         THE COURT:  Okay.  Bring in the jury.

12    (Jury in.)

13         THE COURT:  You may be seated.

14         Ladies and gentlemen, the other day when a deposition

15   transcript was read to you, there was a small portion that was

16   inadvertently left out by the lawyers, and they are going to

17   read it now.

18         MR. S. KULWIN:  Thank you, your Honor.

19         MR. J. KULWIN:  The deposition of Andrew Weiss.

20      ANDREW WEISS, TESTIFIED THROUGH HIS DEPOSITION

21                        EXAMINATION

22   BY MR. J. KULWIN:

23   Q.  Would it be fair to say after Mr. Petrus had sent his

24   e-mail of May 1st, 2007, that we looked at earlier, the

25   decision was made to remove the meeting rooms -- excuse me --

Weiss - deposition

1268

1   to remove the meeting, function room and ballrooms from the

2   common elements to the commercial property?

3   BY MR. S. KULWIN:

4   A.  I don't know when the final decision to remove the food

5   and beverage operations in the common elements was made --

6   Q.  Well --

7   A.  -- but certainly the budget that circulated by Mr. Petrus

8   on May 10th shows the removal of it, and it was accepted at

9   that time and further conversations about it, I think, were

10  finished.  I think at that point, the decision had been made.

11  Q.  Was the decision made prior to his May 1st e-mail, if you

12  know?

13  A.  I don't know.

14  Q.  Okay.  But clearly the topic is not being discussed here

15  in Exhibit 12?

16  A.  Right.

17  Q.  It's being assumed that the decision was made?

18  A.  Yes.  As I view it, by May 10th, the decision was made.

19          MR. J. KULWIN:  Thank you.

20          THE COURT:  Please call your next witness.

21          MR. S. KULWIN:  Your Honor, at this time the

22  plaintiffs call Robert Levin.

23          THE COURT:  Please come forward.

24          Please, raise your right hand, sir.

25           ROBERT LEVIN, PLAINTIFF'S WITNESS, SWORN

Levin - direct

1269

1    DIRECT EXAMINATION

2   BY MR. S. KULWIN:

3   Q.  Good afternoon.

4        Sir, can you state your name and spell your last name

5   for the record.

6   A.  Robert Levin, L-e-v-i-n.

7   Q.  How old are you, Mr. Levin?

8   A.  I'm 60 years old.

9   Q.  Mr. Levin, were you retained as an expert witness for

10  Ms. Jacqueline Goldberg in this case?

11  A.  I was.

12  Q.  And can you please tell us briefly your educational

13  history?

14  A.  I'm a graduate of Chicago Public Schools.  I have a

15  bachelor of science degree from the University of Illinois in

16  Urbana and a master's of business administration degree from

17  the University of Wisconsin in Madison.

18  Q.  What has been your primary profession during the course of

19  your career?

20  A.  I've been a property -- I've been in the property

21  management business.

22  Q.  Do you currently hold any professional licenses?

23  A.  I hold a number of them.  I'm a professional condominium

24  manager.  I'm a certified property manager.  And I'm a

25  managing broker in the State of Illinois.

Levin - direct

1270

1   Q.   How long have you been in the condominium business?

2   A.   Over 30 years.

3   Q.   Where have you primarily worked as a property manager?

4   A.   In the Chicagoland area.

5   Q.   And for what company?

6   A.   Wolin-Levin.

7   Q.   Are you the Levin in Wolin-Levin?

8   A.   I am.

9   Q.   What type of work does Wolin-Levin perform?

10  A.   Primarily residential property management.

11  Q.   Would that include condominium management as well?

12  A.   It was about 90 percent of the business.

13  Q.   Where is Levin -- Wolin-Levin located?

14  A.   In the River North area of Chicago.

15  Q.   How long has Wolin and Levin operated as a management

16  firm?

17  A.   Over 60 years.

18  Q.   And how long has it operated as a condominium management

19  firm?

20  A.   About 25 years.

21  Q.   Approximately how many properties are managed by

22  Wolin-Levin?

23  A.   When I left, it was around 200 condominium properties and

24  50 rental properties.

25  Q.   And how many units?

Levin - direct

1271

1   A.   Approximately 20,000.

2   Q.   How many individuals at the time you left were employed by

3   Wolin-Levin?

4   A.   Approximately 90.

5   Q.   And did Wolin-Levin provide services to existing luxury

6   condominium buildings here in Chicago?

7   A.   They did.

8   Q.   Did they also provide services to developers who were

9   building luxury condominium buildings in Chicago?

10  A.   We did.

11  Q.   How would you define a luxury condominium building?

12  A.   In general I'd define a luxury condominium building as a

13  unit that has a value of over $400 a square foot.

14  Q.   So a $400,000 condominium -- a luxury condominium would be

15  about a thousand square feet?

16  A.   Yes.

17  Q.   Where are the luxury condominium buildings for which

18  Wolin-Levin performed services typically located in Chicago?

19  A.   Mostly Lakeview, River North, Streeterville and Museum

20  Park.

21  Q.   And just to be clear, Streeterville, is that the area

22  around Michigan Avenue by Water Tower?

23  A.   East to the lake.

24  Q.   Right.  Not east.  You mean west?

25  A.   Michigan east -- Michigan east to the lake.

Levin - direct

1272

1    Q.  East to the lake.  Okay.

2            What are the duties and responsibilities of a

3    condominium property manager firm like Wolin-Levin?

4    A.  We try to maximize the asset value of the building and

5    provide as much comfort for the owners that live there.

6    Q.  Did Wolin-Levin work on new construction condominium

7    projects?

8    A.  We did.

9    Q.  Approximately how many new construction condominium

10   projects have you worked on in your career?

11   A.  Over 20.

12   Q.  Were any of those new construction development projects in

13   excess of a hundred million dollars?

14   A.  They were.

15   Q.  Did there come a point in time when Wolin-Levin was

16   purchased by another entity?

17   A.  Yes.

18   Q.  When was that?

19   A.  In May of 2004.

20   Q.  And what was the name of the entity that purchased

21   Wolin-Levin?

22   A.  First Service Residential.

23   Q.  And what kind of work does First Service perform?

24   A.  First Service Residential is a publicly-held firm that

25   manages over 1.2 million condominiums in the United States and

Levin - direct

1273

1   Canada.

2   Q.  Were you ever employed by First Service?

3   A.  I was.

4   Q.  What type of work did you perform for them?

5   A.  I was the president of their Chicago office.

6   Q.  How long did you hold that position?

7   A.  Five years.

8   Q.  What type of work did you do for them?  I'm sorry.  I just

9   asked that question.  I apologize.

10          What type of work are you performing now?

11  A.  I'm retired.  I do a lot of things, among them is I'm on

12  the board of directors of the Better Government Association.

13  I consult pro bono for not-for-profit organizations so that

14  they can run better.  And I've also invested in foreclosed

15  condominium properties along the lake to either rent or sell.

16  Q.  Before we get to your opinions in this case, do you recall

17  approximately when you were retained as an expert in this

18  case?

19  A.  I do.

20  Q.  When was that?

21  A.  Approximately November 2011.

22  Q.  And who retained you?

23  A.  The Kulwin firm.

24  Q.  Have you ever worked with Ms. Goldberg or the firm of

25  Kulwin, Masciopinto & Kulwin before?

Levin - direct

1274

1  A.  I have not.

2  Q.  What work were you retained to perform in this matter?

3  A.  I was retained to form opinions on -- I was -- opinions on

4  the condominium atmosphere as it retained -- as it retained

5  to -- not retained -- as it pertained to the Trump Tower hotel

6  condominium.

7  Q.  Would that include custom and practices of the industry?

8  A.  The customs and practices of the industry is correct.

9  Q.  How are you being paid for your work?

10  A.  Hourly.

11  Q.  Can you please tell us how you went about forming your

12  opinions in this case?

13  A.  I went -- as I would with any condo developer, I went

14  through the same procedures of investigating the property

15  report, the budget and marketing materials.

16  Q.  And did you also use your professional experience and

17  apply it to that review?

18  A.  I did.

19  Q.  Do you believe your professional experience was sufficient

20  for you to reach your opinions?

21  A.  I did.

22  Q.  Do you believe that the information you reviewed was

23  sufficient for you to reach your opinions?

24  A.  I did.

25  Q.  Did you review the information in a manner consistent with

Levin - direct

1275

1  the generally accepted methods within the condominium

2  industry?

3  A.  I used the same methods as I would with any developer when

4  I reviewed the information forwarded to me.

5  Q.  Is that the same methodology you've used during your

6  professional career?

7  A.  It is.

8  Q.  Do you have any experiences in the hotel condominium

9  business?

10 A.  I do not.

11 Q.  Based on the work that you have done in this case, is

12 there any significant difference between developing hotel

13 condominiums and residential condominiums?

14 A.  Except for the management of ballroom, the ballroom part

15 of the condominium, I would say the difference between the

16 Trump Hotel condominium and the condominiums I've worked with

17 for over 30 years is exactly parallel.

18 Q.  And what is the basis for that opinion?

19 A.  In reviewing the marketing materials, property reports and

20 budgets versus the same property reports, marketing materials

21 and budgets I've reviewed over a hundred times for

22 condominiums in the past.

23 Q.  Focusing on situations when Wolin-Levin was hired by

24 condominium developers before units were being sold, did any

25 of your work involve reviewing the information which was going

Levin - direct

1276

1   to be provided to potential buyers?

2   A.   Yes.

3   Q.   How often would that occur?

4   A.   It happened all the time.

5   Q.   Did any of the work you did for developers in those

6   situations involve reviewing information in property reports?

7   A.   Yes.

8   Q.   What is a property report?

9   A.   A property report is like the bible for a condominium

10  association.  It's forwarded to each owner when they purchase

11  the unit, and it's passed on as each unit is sold.  It is

12  everything the condominium encompasses.  It has the bylaws, it

13  has the rules, regulations, percent of ownership, everything a

14  condo owner would need.  And it's always referred to when

15  questions come up.

16  Q.   Did any of the work you did for developers in those

17  situations involve reviewing the description of the common

18  elements being sold to condominium buyers?

19  A.   All the time.

20  Q.   Did any of the work you did for developers in those

21  situations involve reviewing information in the estimated

22  operating budgets provided in the property reports?

23  A.   All the time.

24  Q.   What information is included in an estimated operating

25  budget?

Levin - direct

1277

1  A.  The estimated operating budget is a preview of what the

2  developer thinks the first year of operations of the

3  association are going to be once all the units are sold.

4  Q.  Did any of the work you did for developers involve

5  situations reviewing those -- reviewing marketing materials?

6  A.  Yes, all the time.

7  Q.  What type of information is included in the condominium

8  marketing materials?

9  A.  The marketing materials are pictures of -- basically a

10  picture of what is going to be in the condominium.  It -- it's

11  a marketing piece that basically highlights the aspects of the

12  condominium.

13  Q.  When working with developers during the sales of new

14  construction projects, did you become familiar with the fact

15  that developers reserved the right to make certain changes to

16  the project as it was being built?

17          MR. NOVACK:  Objection, leading.

18          THE COURT:  Sustained.

19  BY MR. S. KULWIN:

20  Q.  When working with developers during the sales of new

21  construction projects, what, if any, familiarity did you have

22  regarding reserving the right to make changes in projects?

23  A.  It's in all the standard contracts with developers to

24  potential buyers.

25  Q.  Okay.  And when you say it's in all the standard

Levin - direct

1278

1   contracts, what type of clause is there concerning the

2   condominium documents, for example, in those contracts?  Is

3   there a standard clause?

4   A.  I can't say it's standard; but in form, they're all about

5   the same.  It's part of a custom and practice of the industry.

6   Q.  Okay.  And based on your experience, what type of changes

7   are contemplated by those type of provisions?

8   A.  In my experience over 30 years, you know, the changes were

9   always very minor.  And, in fact, the contract has never come

10  up as, you know, a situation I was asked to review.

11          MR. NOVACK:  Your Honor, I have to make a little bit

12  of a belated objection.  This kind of got past me.  That last

13  opinion he gave or the last comment he made --

14          MR. S. KULWIN:  Judge --

15          MR. NOVACK:  -- about a clause being in contracts

16  relating to changes was not in his report, his deposition or

17  the hearing.

18          THE COURT:  Mr. Kulwin?

19          MR. S. KULWIN:  No, Judge.  The -- he --

20          THE COURT:  Was it disclosed is the question?

21          MR. S. KULWIN:  Yes, it was, Judge.

22          THE COURT:  Find where it was and show it to me,

23  please.  Or show it to Mr. Novack first.

24    (Brief pause.)

25          MR. NOVACK:  Nothing that was just shown to me

Levin - direct

1279

1    discloses that, your Honor.

2          THE COURT:  Okay.  Let's go to sidebar.

3      (Proceedings heard at sidebar:)

4          THE COURT:  The question was about changes in

5    construction and the answer -- or in the reports.  Was it

6    property reports or contracts?

7          MR. S. KULWIN:  The condominium documents in the

8    contracts.

9          THE COURT:  I think it was more specific than that.

10         Could you go back and read the last question and

11   answer.  We may have to go back a couple.

12     (Record read.)

13         THE COURT:  Contracts for condominiums.  So where in

14   his report was it disclosed that he had familiarity with

15   contracts for hotel condominiums, saw changes made and they

16   were typically minor changes?

17         MR. J. KULWIN:  He doesn't say that that way, Judge.

18   What he says is that he's a real estate broker; that he

19   reviewed the purchase contracts that are at issue here that,

20   of course, include those type of clauses; that even after

21   reviewing that information, he concluded that information was

22   misrepresented; and that he's never seen a developer make

23   these kinds of changes before.  All those opinions were

24   disclosed.

25         THE COURT:  That is very different than what he just

Levin - direct

1280

1    said.  I am going to strike that opinion.

2      (Proceedings heard in open court:)

3            THE COURT:  Ladies and gentlemen, you just heard a

4    series of questions and answers from this witness regarding

5    working with hotel developers and the contracts involved in

6    those and what types of changes he typically saw.  I am

7    striking that testimony, and you should completely disregard

8    it.

9    BY MR. S. KULWIN:

10   Q.  Sir, did you review the purchase contracts in this case?

11   A.  Not in detail.

12   Q.  But did you review them?

13   A.  I looked at them.  They looked pretty much like a

14   condominium contract.

15   Q.  And during your career, did you observe how sophisticated,

16   experienced developers evaluate information and decisions

17   regarding condominium projects?

18   A.  I did.

19   Q.  Based on your work in this case, do you have a

20   professional opinion regarding whether the Trump organization

21   is a sophisticated and experienced developer?

22   A.  I do.

23   Q.  What is that opinion?

24   A.  That the Trump organization --

25            MR. NOVACK:  Could I --

Levin - direct

1281

```
 1   BY THE WITNESS:
 2   A.  -- is a sophisticated --
 3          MR. NOVACK:  Can I ask to hold up for one second?
 4          THE COURT:  Yes.
 5     (Brief pause.)
 6          MR. NOVACK:  Thank you, Judge.
 7          THE COURT:  Go ahead.  You may answer.
 8   BY THE WITNESS:
 9   A.  My opinion is the Trump organization is a sophisticated
10   development company.
11   BY MR. S. KULWIN:
12   Q.  What is the basis of that opinion?
13   A.  That upon my review of the marketing materials, property
14   report, site of the building, quality of construction, that
15   they rate as a top-line developer.
16   Q.  During your career were you able to identify a custom and
17   practice regarding how developers evaluate information and
18   make decisions about condominium projects?
19   A.  I do.
20   Q.  And what is the -- what is a custom and practice?
21   A.  A custom and practice is an age-old way that things are
22   done in the condominium field.  It's where buyers are
23   satisfied with the outcome and developers are satisfied with
24   the outcome.
25   Q.  Is there a custom and practice for when developers
```

Levin - direct

1282

1    evaluate the information needed to make final decisions

2    regarding the information in a property report?

3    A.  Could you restate the question?

4    Q.  Sure.

5          Is there a custom and practice for when -- at what

6    time developers evaluate the information needed to make final

7    decisions regarding the information in a property report?

8    A.  Yes.

9          MR. NOVACK:  Judge, I'm going to object to that.

10   That's broad as to which decisions, what stage.

11         MR. S. KULWIN:  I'm going to lay --

12         THE COURT:  The answer can stand and then ask more

13   specific questions.

14   BY MR. S. KULWIN:

15   Q.  What is that custom and practice?

16   A.  The custom and practice is, based on my experience, that

17   soon after a developer buys a property, they lay the

18   groundwork immediately to put together marketing materials,

19   budgets and formulate property reports.

20   Q.  Do they -- why is that a custom and practice, in your

21   experience?

22   A.  Developers want to sell a product to potential buyers, and

23   they have to have their I's dotted and T's crossed before they

24   sell the first unit.

25   Q.  Is there a custom and practice for when developers make

Levin - direct

1283

1   final decisions about information that are going to be in

2   estimated operating budgets in property reports?

3   A.   They do.

4   Q.   And what is that custom and practice?

5   A.   Custom and practice is the budget is included in the

6   property report that goes out to buyers before they purchase a

7   unit.  So, before the first unit is sold or purchased, the

8   contract is signed, the information is all together.

9   Q.   Why is that a custom and practice, in your experience?

10  A.   Because buyers want to know what they're purchasing when

11  they purchase a condominium.

12  Q.   Is there a custom and practice for when developers

13  evaluate the areas of a property that they're developing that

14  are going to be included as common elements sold to

15  condominium buyers?

16  A.   They do.

17  Q.   And what is that custom and practice?

18  A.   The common elements -- limited common elements and owned

19  areas of a building are all decided very early on, as soon as

20  they begin putting the condominium documents together.  It

21  goes along with the marketing materials and budget at the same

22  time.

23  Q.   And based on your experience, why is that a custom and

24  practice?

25  A.   As I said before, before the first contract is signed,

Levin - direct

1284

1   before the condos are available for sale, they have to have

2   their I's dotted and T's crossed and everything ready to go.

3   Q.  In your 30 years of experience working with developers and

4   buyers in new construction of residential condominiums, have

5   you ever seen a developer, after the property report is

6   published and units start to be sold, change the description

7   of the common elements?

8   A.  Never.

9   Q.  Now, turning your attention to when you would work with

10  condominium boards after units were sold, what type of work

11  would you perform after the building was up and running?

12  A.  After the building is up and running and the developer

13  turned it over to the owners, we were the management company

14  for the new board.  And, you know, we managed the building to

15  its highest and best use and tried to make it as comfortable

16  for the owners to live there.

17  Q.  Why do condominium boards hire firms like Wolin-Levin to

18  assist them with managing a building?

19  A.  Most condominium board members aren't professional

20  property managers.  They come from all industries, practices.

21  And they really don't know how to run a building, especially a

22  luxury building.  So they ask professional property managers

23  like me or people in my company to run the building for them.

24  Q.  Based on the work you've done for condominium boards, do

25  you have a professional opinion regarding whether the

Levin - direct

1285

1    ownership interests in the hotel ballrooms, meeting rooms,

2    food and beverage operation was an important, unique and

3    valuable aspect of the condominium ownership in this project?

4    A.  Yes.

5    Q.  And what is that opinion?

6    A.  That the ballrooms, meeting rooms and all the other things

7    that were proposed by the developer were valuable commodities

8    to the potential buyer.

9    Q.  And why was that?

10   A.  Through the marketing materials, the property report and

11   the budgets, you know, they, to me, were selling a hotel, not

12   a hotel room.  And the owners' expectations were they were

13   going to buy in a hotel.

14           MR. NOVACK:  I'm going to object and move to strike

15   that.  That has been barred, the expectations.

16           THE COURT:  Sustained.  I am going to strike that

17   answer, and the jury should disregard it.

18   BY MR. S. KULWIN:

19   Q.  Mr. Levin, I'm not asking about buyers' perceptions.  I'm

20   asking you with respect to how the things were designed, what

21   was the design, why did you think based on the design that

22   they were valuable and unique?

23           MR. NOVACK:  Objection, that's leading.

24           MR. S. KULWIN:  Well, I'm trying to avoid --

25           THE COURT:  Overruled.

Levin - direct

1286

BY THE WITNESS:

A.   In my review of all the materials, it was my professional
feeling that the owners --

BY MR. S. KULWIN:

Q.   No.  Don't --

A.   It's my professional feeling that purchasing in the Trump
condominium hotel --

Q.   No.  Based on your experience, sir, can you tell us
whether -- why you believed that the actual ownership of the
interests -- without giving me your perceptions from buyers or
your beliefs about buyers -- that the percept- -- that the
owning of the interest itself was valuable and unique?

A.   The ballrooms, meeting rooms, function rooms, ancillary
income were important aspects in bringing income into the
hotel condo.

Q.   Okay.  Why is ownership important and control?  Ownership
and control, why is that important?

A.   Well, everybody wants to own things.  Control is basically
being able to make decisions on your own with -- without
recourse from outside parties.

Q.   When you say without recourse from outside parties, what
do you mean?

A.   Meaning, you make decisions and other people can't change
the opinion.  You make -- you can't change the decision.
Sorry.

Levin - direct

1287

1    Q.  In your experience, do condominium boards hire and fire

2    professionals to assist them in operating buildings?

3    A.  All the time.

4    Q.  Do you have an opinion as to whether condominium boards

5    are able to run revenue-producing facilities of a condominium

6    property?

7    A.  Could you repeat the question?

8    Q.  Do you have an opinion as to whether condominium boards

9    are capable of -- of running revenue-producing facilities of a

10   condominium property?

11   A.  With outside consultants or outside contractors to help

12   them do that.

13   Q.  And have you seen that happen in your experience?

14   A.  It happens all the time.

15   Q.  Can you give me some examples?

16   A.  Buildings will have a parking garage.  And they hire a

17   parking management company to manage the garage.  And the

18   building gets the income from the garage, but they pay a fee

19   to have the garage run for them.

20   Q.  How about recreational facilities or restaurants?

21   A.  Some large buildings have a health club that's run by a

22   health club expert company, and they pay them a fee to run the

23   health club as they see fit.

24   Q.  Do you have a professional opinion -- you've reviewed the

25   marketing materials and property reports in this case that

Levin - direct

1288

1    were distributed to Ms. Goldberg, correct?

2         You reviewed --

3    A.  I have.

4    Q.  Do you have a professional opinion whether there were

5    misrepresentations in the property reports provided to

6    Ms. Goldberg when she signed the purchase agreements?

7    A.  I do.

8    Q.  And what is that opinion?

9    A.  The opinion is that the whole atmosphere between the third

10   and the fourth amendment of the property report changed the

11   entire manner in which the association would be run from the

12   fourth amendment on.

13   Q.  And what other misrepresentations --

14        MR. NOVACK:  I'm going to object at this time, your

15   Honor, and ask that that last answer be stricken.  Can we --

16   I'm afraid to do this here.  I will.

17        THE COURT:  No, do not do it there.  I think we are

18   okay, but if you need to go --

19        MR. NOVACK:  I would like to, please.

20        THE COURT:  Okay.

21    (Proceedings heard at sidebar:)

22        MR. NOVACK:  His description of what a

23   misrepresentation was is completely contrary to the

24   instructions that are going to be in this case.  He said it's

25   a misrepresentation because the fourth changed things from the

Levin - direct

1289

1    third.  There's nothing wrong with the change.  He's just

2    given them -- they now think that an expert believes, and it's

3    sanctioned, that mere change equals misrepresentation.  That's

4    what he said.

5           MR. J. KULWIN:  Your Honor, this was a motion in

6    limine that your Honor denied.  The defendants moved to bar

7    Mr. Levin from using the word misrepresentation, and your

8    Honor said that he could use the word misrepresentation

9    provided that he did not speak to the state of mind of the

10   defendants.

11          THE COURT:  Correct.

12          MR. J. KULWIN:  He's not offered any opinion

13   regarding the state of mind.

14          THE COURT:  I will tell them that at the end of the

15   case, I will instruct them on the law on legally what a

16   misrepresentation means in this case.

17          MR. S. KULWIN:  Thank you, your Honor.

18     (Proceedings heard in open court:)

19          THE COURT:  Ladies and gentlemen, at the end of this

20   case, as you heard me say before, I will instruct you on the

21   law that applies in this case.  And part of the instructions

22   will include discussing with you misrepresentations and

23   legally what that requires in this case.

24          MR. S. KULWIN:  May I continue?

25          THE COURT:  Go ahead.  You may.

Levin - direct

1290

1        MR. S. KULWIN:  Thank you, your Honor.

2        Jeff -- may I consult with Mr. Kulwin for a minute?

3        THE COURT:  You may.

4    (Brief pause.)

5    BY MR. S. KULWIN:

6    Q.  Mr. Levin, I have a question about the design of the

7    marketing materials, the design of it.  Okay?  Not buyers'

8    perceptions of it.  The design of it.  Got it?  Are you with

9    me?

10   A.  I think so.

11   Q.  Okay.  Good.

12        Do you have an opinion regarding whether the property

13   reports and marketing materials issued by the Trump

14   organization before the fourth amended property report were --

15   were designed to lead buyers to conclude they were purchasing

16   an ownership interest in the hotel ballrooms, meeting rooms

17   and food and beverage operations?

18   A.  Yes.

19        MR. NOVACK:  May I --

20   BY MR. S. KULWIN:

21   Q.  And what is that --

22        MR. NOVACK:  I wanted to have the question read back,

23   your Honor --

24        THE COURT:  Nancy, can you read it back.

25        MR. NOVACK:  -- before deciding whether to object.

Levin - direct

1291

1    (Record read.)

2            THE COURT:  Is there an objection?

3            MR. NOVACK:  There is not, your Honor.

4            THE COURT:  You may answer, sir, if you can.

5    BY MR. S. KULWIN:

6    Q.  You can answer, sir.

7    A.  The answer to the question is the marketing materials are

8    like the picture of what you're buying.  The property report

9    lists the common elements, limited common elements.  It lists

10   everything that is included in the hotel -- the hotel -- your

11   investment.  And then the budget describes in detail, you

12   know, what is in the -- what the association pays for.

13           And in this case, the property report and the budget

14   noted to me that those ancillary parts of the building, the

15   common areas we have been talking about, were included as part

16   of the condo hotel and would lead one to believe that they

17   were buying into those portions of the building.

18           MR. NOVACK:  Move to strike that last part.

19           THE COURT:  I am going to strike the last portion

20   about what it would lead one to believe.  There is no bases to

21   give that opinion.  The jury should disregard it.

22   BY MR. S. KULWIN:

23   Q.  And, again, without any information about what it would

24   lead a buyer to conclude -- just on the design, Mr. Levin --

25   what about the marketing materials led you to that conclusion,

Levin - cross

1292

1    that they were -- that they were designed to lead buyers to

2    conclude that they were buying an interest in a hotel?

3    A.   The marketing materials, you know, explained all the

4    different parts of the building in the same genre, for lack of

5    a better word, of the things you would get in your hotel room,

6    together.

7         MR. S. KULWIN:  If I may have a moment, your Honor?

8         THE COURT:  You may.

9      (Brief pause.)

10        MR. S. KULWIN:  At this point, Judge, we have no

11   further questions.

12        THE COURT:  Cross-examination.

13        MR. S. KULWIN:  We will tender the witness.

14        THE COURT:  Mr. Novack.

15        MR. NOVACK:  Yes, ma'am.  Thank you.

16                     CROSS-EXAMINATION

17   BY MR. NOVACK:

18   Q.   Good afternoon, Mr. Levin.

19   A.   Good afternoon, Mr. Novack.

20   Q.   Mr. Levin, I take it you met with Mr. Kulwin to prepare

21   for your testimony here?

22   A.   I have.

23   Q.   With both Mr. Jeffrey Kulwin and Mr. Shelly Kulwin?

24   A.   I have.

25   Q.   And you said you're getting paid for your time here.  You

Levin - cross

1293

1   were hired by Mr. Kulwin's firm to give testimony here; is

2   that correct?

3   A.  Yes.

4   Q.  And you're being paid for that?

5   A.  Yes, I am.

6   Q.  And I noticed that you were here all week in the

7   courtroom.  You're being paid for all the time you've spent

8   here this week?

9   A.  Not all the time.  I -- the Trump deposition was on me.

10  Q.  What's that?

11  A.  Mr. Trump's deposition I'm not charging for.  I wanted to

12  familiarize myself, since it's the first time doing this, with

13  what it's like to be in a courtroom with a jury and everything

14  else so I'd be comfortable in my testimony today.  Yesterday I

15  was supposed to be deposed, so I was here.  Today I was

16  supposed to be deposed, so I was here.  But I will be paid for

17  it.

18  Q.  Okay.  Now, you said in your direct exam that your primary

19  employment throughout your career was with Wolin-Levin, right?

20  A.  That's correct.

21  Q.  And you said that you are the Levin in that name; is that

22  right?

23  A.  Yes.

24  Q.  But you were not the founder?  You were not the Levin who

25  founded that firm, are you?

Levin - cross

1294

1   A.  Well, the firm has been around over 60 years; and I'm

2   60 years old.  I think one could easily figure out I'm the

3   SOB, the son of the boss.

4   Q.  Okay.  Now, you testified --

5   A.  I did own a hundred percent of the company when it was

6   sold though.  I was the sole owner.

7   Q.  You got that stock from your dad?

8   A.  No.  I had to buy it, and I had to buy Mr. Wolin out.  But

9   we aren't here for that.

10  Q.  Okay.  Now, in your direct testimony you testified that

11  you worked on a lot of different condominium projects over the

12  years, correct?

13  A.  I did.

14  Q.  And your primary work in that regard has been as the

15  property manager of those condominium buildings, right?

16  A.  Not specifically the property manager.  I did have a small

17  portfolio of buildings myself.  But I got involved in any

18  major issue in buildings, and I worked with all the

19  developers.

20  Q.  Maybe you didn't hear my question.  I had asked whether

21  your primary work has been as property manager?

22  A.  My primary work over most of my career was managing

23  property.  I would say in the last 15 years, it was more of

24  running the company and keeping a small cadre of very high-end

25  condominiums for myself because I had a relationship with the

Levin - cross

1295

1    boards.

2    Q.  Was your primary employment, sir, in the property

3    management business?

4    A.  Yes.

5    Q.  Okay.  And all of those buildings that you had managed and

6    projects that you had managed have been residential

7    condominium projects and buildings, correct?

8    A.  They have.

9    Q.  And it's true, isn't it, that you've never managed any

10   hotel condominiums, correct?

11   A.  I never have.

12   Q.  Okay.  And you never worked with any of the developers of

13   hotel condominiums, correct?

14   A.  I don't think I have.  There might have been developers I

15   worked for; but if they had a condo hotel, I wasn't part of

16   it.

17   Q.  You were not a part of it?

18   A.  I was not part of it.

19   Q.  And you have no experience in managing hotels, correct?

20   A.  That's correct.

21   Q.  And you have no experience in developing hotels either,

22   right?

23   A.  That's also correct.

24   Q.  In fact, you have not worked on any development projects

25   in any capacity that were either hotels or hotel condominiums,

Levin - cross

1296

1  right?

2  A.  That's correct.

3  Q.  In fact, other than staying in hotels, you have no

4  experience at all in connection with hotels, do you?

5          MR. S. KULWIN:  I'll object, asked and answered and

6  argumentative.

7          THE COURT:  Overruled.  You may answer if you can,

8  sir.

9  BY THE WITNESS:

10  A.  You're right.  Correct.

11  BY MR. NOVACK:

12  Q.  All right.  And you've also never had any experience in

13  hotel condominium documents, correct?

14  A.  Not until these.  Not -- not until I was given hotel

15  condominium documents for the Trump condominium Chicago.

16  Q.  But in this 30 years of your career that you talked about

17  on your direct examination, you never had any experience in

18  hotel condominium documents, did you?

19  A.  No.  But when I read them, they were --

20  Q.  Not --

21  A.  -- similar to condominiums.

22          I'm sorry.

23  Q.  Let me ask the question once more.

24  A.  Fine.

25  Q.  In your entire career as a business person -- just in your

Levin - cross

1297

1    entire career -- put aside this case.  In this case you were

2    acting as a litigation testifier, right?

3    A.  Right.

4           MR. S. KULWIN:  Judge, may I have that question back?

5    I might have wanted to object.

6           THE COURT:  Which one?

7           MR. S. KULWIN:  The one he just asked.

8           THE COURT:  Nancy, would you please read it back.

9      (Record read.)

10   BY MR. NOVACK:

11   Q.  So --

12   A.  What's a litigation testifier?

13   Q.  I don't know.  You answered the question "right."

14   A.  Then I might have been wrong because I don't necessarily

15   understand what a litigation testifier is.

16   Q.  You were hired in this case to give testimony, correct?

17   A.  Yes.

18   Q.  You were not hired in this case to develop a project?

19   A.  That's correct.

20   Q.  You were not hired in this case to manage a property?

21   A.  Correct.

22   Q.  You were not hired in this case to create condominium

23   documents?

24   A.  Correct.

25   Q.  So put this case to one side.  Can you do that for me?

Levin - cross

1298

1   A.  Sure.

2   Q.  Thank you.

3         Putting that to one side, isn't it true, sir, that in

4   your entire career, you had never had any experience

5   whatsoever in hotel condominium documents?

6   A.  I agree.

7   Q.  Thank you.

8         And it's also true that in preparing for your work in

9   this case, in preparing for your opinions, you did not do any

10  research on hotel condominiums or hotel condominium documents?

11  A.  Outside of Trump, correct.

12  Q.  Right.  You didn't go out and do any work to learn

13  anything about hotels or hotel condominium documents, correct?

14  A.  We agree.

15  Q.  Okay.  And you did not talk to any hotel condominium

16  specialists or professionals to help you prepare your opinions

17  in this case, correct?

18  A.  That's correct.

19  Q.  For example, you did not talk to Mr. Brent Howie, the

20  hotel condominium expert who will be testifying later in this

21  trial --

22         MR. S. KULWIN:  Judge, I'll --

23  BY MR. NOVACK:

24  Q.  -- correct?

25         MR. S. KULWIN:  I'll object.  It's argumentative and

Levin - cross

1299

1   that's their expert.

2           THE COURT:  Just a yes or no if you have spoken with

3   him.

4   BY THE WITNESS:

5   A.  I have never spoken with him.

6   BY MR. NOVACK:

7   Q.  Okay.  And you don't consider yourself to be an expert

8   with respect to hotel condominiums, correct?

9   A.  That's correct.

10  Q.  You don't consider yourself to be an expert with respect

11  to hotel condominium documents, correct?

12  A.  That's correct.

13  Q.  Okay.  Now, you do consider yourself to be an expert with

14  respect to residential condominiums, right?

15  A.  I do.

16  Q.  And an expert with respect to residential condominium

17  documents, right?

18  A.  I do.

19  Q.  So when you said in your direct testimony there really

20  aren't any differences between the two, that must not be right

21  or you'd be an expert in both, correct?

22          MR. S. KULWIN:  Judge, I'll object to that.  That's

23  argumentative.

24          THE COURT:  Sustained.  Argumentative.

25  BY MR. NOVACK:

Levin - cross

1300

1    Q.  And because you're not an expert in hotels or hotel

2    condominiums or hotel condominium documents, when your

3    deposition was taken in this case, you were unable to give any

4    professional opinions concerning the matters stated in

5    Mr. Howie's report, correct?

6            MR. S. KULWIN:  Objection, form, Judge.

7            THE COURT:  Sustained.

8    BY MR. NOVACK:

9    Q.  It's true, sir, that you were unable previously -- prior

10   to today, you were unable to give any professional opinions

11   concerning the matters stated in Mr. Howie's report; is that

12   correct?

13           MR. S. KULWIN:  Same objection, Judge.

14           THE COURT:  Sustained.  You are asking him to comment

15   on another person's testimony.  That is not proper.

16   Sustained.

17   BY MR. NOVACK:

18   Q.  Now, some of the opinions and the testimony that you gave

19   when Mr. Kulwin was asking you questions a little earlier

20   related to the Trump Tower hotel ballrooms, meeting rooms and

21   related types of amenities, correct?

22   A.  Correct.

23   Q.  And it's true though, isn't it, that you've never worked

24   on a condominium of any kind -- and by this I mean to include

25   residential -- where the building's facilities were marketed

Levin - cross

1301

1    to the public for profit in a large commercial operation such

2    as the rental of ballrooms for weddings, parties, conventions

3    and the like, correct?

4    A.  Correct.

5    Q.  And you know the Trump Hotel does that, right?

6    A.  Yes.  I do now.

7    Q.  Okay.  And you know that the Trump Hotel has party and

8    wedding planners on staff, correct?

9    A.  I can't comment on that.

10   Q.  Do you remember at the hearing -- the prior hearing that

11   you gave testimony at that you --

12           MR. S. KULWIN:  Judge, I think that Mr. Levin is

13   concerned about -- that's why he's saying that.

14           THE COURT:  Mr. Novack, do you want to try to

15   rephrase your question?  I am not sure what the concern is

16   but --

17           MR. NOVACK:  Could you read my last question back?

18           THE COURT:  You may.

19     (Record read.)

20   BY MR. NOVACK:

21   Q.  But you've never been involved in a condominium project

22   that had wedding and party planners on staff?

23   A.  Agreed.

24   Q.  And, sir, you know that the Trump Tower hotel has food and

25   catering facilities on site that are able to feed hundreds of

Levin - cross

1302

1   people at a time at events?

2   A.   I assume so.

3   Q.   And you have never been involved in a situation like that,

4   have you?

5   A.   I have not.

6   Q.   And you know that the Trump Hotel has full lobby

7   facilities, concierge and bellhop services 24/7, correct?

8   A.   That's what the marketing materials said.  I've never been

9   in the hotel.

10   Q.   And the condominium and residential properties you've been

11   involved in don't have those facilities, correct?

12   A.   Many of the job positions -- some of them may have.  They

13   don't have bellhops, but they have doormen and concierges.

14   Q.   And you know that the Trump Hotel has 24-hour room

15   service, right?

16   A.   That's what the marketing materials said.

17   Q.   You don't know that?

18   A.   I've never been there.

19   Q.   Do you remember, sir, that there was a hearing in this

20   case that you testified at under oath?

21   A.   Yes.

22   Q.   Right in this courtroom, wasn't it?

23   A.   Sitting in this seat.

24   Q.   And do you remember that I asked you a question during

25   that --

Levin - cross

1303

1        MR. S. KULWIN:  Page and line, please.

2        MR. NOVACK:  I'm sorry.  It's page 57 and it's going

3    to be starting at line 10.

4        MR. S. KULWIN:  May we have a moment, Judge.

5      (Brief pause.)

6        MR. S. KULWIN:  Okay.

7    BY MR. NOVACK:

8    Q.  And did I ask you this question:

9        And you know that the Trump Hotel has a 24-hour room

10   service?  You know that it's open to the public for walk-ins

11   to come in and rent a room at any time, right?

12       Do you remember me asking you that?

13   A.  I don't remember; but since you're reading it, I'll assume

14   it's correct.

15   Q.  And do you remember giving the answer:  Yes, I do?

16   A.  Okay.

17   Q.  Okay.

18   A.  And --

19   Q.  And, of course, that is not the case --

20       MR. S. KULWIN:  I don't think he's finished with his

21   answer.

22   BY THE WITNESS:

23   A.  No, I'm just saying I see where you're going, but the

24   parallel is the same.  I'm assuming that they have all these

25   things, and I understand they're there.

Levin - cross

1304

BY MR. NOVACK:

Q.  Okay.

A.  I see no reason why it would be any different at a luxury
hotel, four star, five star, whatever it is, that they
wouldn't have it.

Q.  Okay.  And that's not the case in residential
condominiums, correct?

A.  Generally speaking, that's correct.

Q.  And you know that hotels have daily, weekly and monthly
rental programs, right?

A.  I do.

Q.  Residential condominiums do not, correct?

A.  Not any high-end condominiums.

Q.  And it's true, isn't it, sir, that over the course of your
career, you've never worked for a single condominium
development that physically contained commercial-scale
conference and banquet facilities capable of earning or losing
hundreds of thousands of dollars or more per year; is that
correct?

A.  I agree.

Q.  So we can agree, can't we, sir, that Trump Tower is
different from every other condominium building you've ever
had any experience with?

        MR. S. KULWIN:  I'll object for lack of specificity.
In what respect?

Levin - cross

1305

1    THE COURT:  Mr. Novack?

2    MR. NOVACK:  Well, all the buildup that I made was

3    leading to that question.  And that's the question I want to

4    ask if it's possible.

5    THE COURT:  Sustained.  Rephrase it to be a little

6    more specific.

7    BY MR. NOVACK:

8    Q.  Well, you would agree, sir, that it's the first time that

9    you have reviewed a condominium hotel, correct?

10   A.  Correct.

11   Q.  And that, therefore, it would be different than your past

12   history in managing condominiums?

13   A.  A condominium hotel is different than a condominium, in

14   that, the ancillary income and common elements are included.

15   Aside from that, a condominium and the condominium hotel, as I

16   looked at the documents, are very parallel.

17   Q.  But despite that parallelism that you seem to have

18   concluded, you do not consider yourself an expert on hotel

19   condominium documents, correct?

20   A.  Correct.

21   Q.  Okay.  Now, when you were talking with Mr. Kulwin about

22   your opinion that condominium developers come to their

23   decisions as to what they want to have in common elements from

24   the outset of the project, do you remember that testimony?

25   A.  Absolutely.

Levin - cross

1  Q.  Okay.  And you said that everybody wants to have their I's

2  dotted and T's crossed up front, right?

3  A.  Yes, I did.

4  Q.  The condominium developers.

5       And the condominium developers that you had

6  experience with in coming to that opinion were all residential

7  condominium developers, right?

8  A.  They were.

9  Q.  Okay.  And your testimony, I take it -- or your opinion

10  here is, is that there's probably something askew or unusual

11  if a developer would make a change some time into the

12  development of the project after setting forth in the

13  declaration what the common elements would be, right?

14  A.  I had never seen a developer change a common element once

15  the original declaration agreement was written, went to press

16  and offered to the prospective buyers.

17  Q.  All right.  Now, is it your opinion that there was

18  something wrong in this development when the developer of the

19  Trump Tower Chicago put the ballrooms and meeting rooms into

20  the common elements?

21       MR. S. KULWIN:  Judge, can we be heard before he

22  answers that question because I think we're going to go

23  someplace that Mr. Novack doesn't want to go?  Otherwise he

24  can answer.  I'm just saying.  Given the question.

25       THE COURT:  Do you want to have a sidebar?

Levin - cross

```
 1            MR. S. KULWIN:  Please.
 2      (Proceedings heard at sidebar:)
 3            MR. S. KULWIN:  I have told Mr. Levin that he's not
 4   to answer any questions that even come close -- even come
 5   close -- to saying anything at all about the intent of these
 6   developers.  And I fear that that question is getting awfully
 7   close.  That's my only concern.
 8            MR. NOVACK:  And I don't --
 9            MR. S. KULWIN:  And then I'll get in trouble.
10            THE COURT:  And you don't want to do that.
11            MR. S. KULWIN:  I don't want to do that.
12            MR. NOVACK:  Thank you.
13            THE COURT:  Okay.  You are going --
14            MR. NOVACK:  I'm going to ask it a different way.
15   And I hope, if I get close again --
16            MR. S. KULWIN:  I'm going to -- yeah, absolutely.
17            THE COURT:  Okay.
18      (Proceedings heard in open court:)
19            THE COURT:  Go ahead, Mr. Novack.
20   BY MR. NOVACK:
21   Q.  Now, if I heard you right, you said you've never seen a
22   situation where a change was made after the original property
23   report set the common elements structure, correct?
24   A.  Correct.
25   Q.  Let me ask you, if I may, just a few questions about that.
```

Levin - cross

1308

1      How many -- I think -- if I understand you correctly,

2  you are familiar with the full property report history,

3  starting with the original property report through all

4  amendments, for about a hundred buildings in Chicago; is that

5  correct?

6  A.  Probably over a hundred buildings.

7  Q.  Over a hundred.  So are we into the 200 or are we closer

8  to the 100?

9  A.  100 to 125, 150.

10 Q.  Okay.  So you understand, sir, there are about 5,000

11 condominium buildings in the City of Chicago?

12 A.  I do.

13 Q.  Okay.  And among those, there are somewhere between 500

14 and 700 high-rise condominium buildings, correct?

15 A.  I think that's correct.

16 Q.  But for only about 100 to 150 of those 5,000 buildings

17 have you read the original property reports and all the

18 amendments in their entirety, correct?

19 A.  That's correct.  I didn't manage them all.

20 Q.  Okay.  So that means, sir, that you have not looked at the

21 property report and amendment history for 4,900 or so

22 condominiums in Chicago, right?

23 A.  I believe the precedent for 125 is pretty consistent,

24 but --

25           MR. NOVACK:  I move --

Levin - cross

1309

```
 1   BY THE WITNESS:
 2   A.  -- to answer your question, that's correct.
 3           MR. NOVACK:  I move to strike that answer.
 4           THE COURT:  I will strike it.  The jury should
 5   disregard the first part.
 6   BY MR. NOVACK:
 7   Q.  So let me ask you again, sir:  You have not looked at the
 8   property report amendment history for 4,900 or so condominiums
 9   in Chicago, correct?
10           MR. S. KULWIN:  Judge, I object to --
11   BY THE WITNESS:
12   A.  We --
13           MR. S. KULWIN:  -- lack of foundation and it calls
14   for speculation.  Mr. Novack is representing that he's looked
15   at the 4,900, and he doesn't know either.
16           THE COURT:  Overruled.  You may answer, sir, if you
17   can.
18   BY THE WITNESS:
19   A.  No --
20   BY MR. NOVACK:
21   Q.  Is that true, sir?
22   A.  -- I haven't read the 4,900 property reports.
23   Q.  Okay.  So you could not say here today to this jury that
24   none of those 4,900 other condominium developments did not
25   involve situations where common elements were changed after
```

Levin - cross

1310

1    purchase agreements were signed, correct?

2    A.  I grant you that.

3    Q.  Okay.  And you'll agree that property reports are amended

4    all the time, right?

5    A.  They are amended.

6    Q.  And common elements are set forth in the condominium

7    declaration, correct?

8    A.  Correct.

9    Q.  And the declaration is a part of the property report?

10   A.  That's correct.

11   Q.  And in getting back to the 100 or 150 or so situations in

12   which you do know that no changes were made, isn't it true,

13   sir, that not a single one of those buildings contained

14   commercial-scale conference and banquet facilities capable of

15   earning or losing hundreds of thousands of dollars per year?

16           MR. S. KULWIN:  Objection, asked and answered.

17           THE COURT:  Overruled.  You may answer if you can,

18   sir.

19   BY THE WITNESS:

20   A.  Correct.

21   BY MR. NOVACK:

22   Q.  So while you may never have seen a situation where

23   ballrooms, meeting rooms and related food and beverage

24   operations were removed from the common elements, it's also

25   true that you've never seen a situation where large

Levin - cross

1311

1    commercial-scale ballrooms, meeting rooms and related food and

2    beverage operations geared to the general public were ever

3    even included in the common elements, correct?

4    A.  Obviously.

5    Q.  Okay.  And you'll agree that if they weren't in the common

6    elements, there would be nothing to remove, right?

7    A.  Agreed.

8    Q.  Okay.  So it really means, sir, that you've never seen a

9    situation where common elements that contained large

10   commercial-scale ballrooms and related food and beverage

11   operations geared to the public were not removed, right?

12   A.  Well, there were condominiums that had ballrooms, but they

13   weren't for revenue-generating sources.  So we're close.

14   Q.  So -- but here's what I'm trying to ask you:  You may

15   never have seen a situation where those amenities were

16   removed, but you haven't seen a situation where they were not

17   removed either, correct?

18   A.  Right.

19   Q.  Okay.  Now, you talked about the fact that the property

20   reports and marketing materials that were issued prior to the

21   fourth amendment -- fourth amendment being the one that took

22   the amenities out, you understand that, right?

23   A.  Yes, I do.  Very well.

24   Q.  Okay.  So you testified that the property reports and

25   marketing materials prior to that time, you said, were

Levin - cross

1312

1    designed to give the impression that the buyers, anybody who

2    bought, would be getting an undivided ownership interest in

3    the -- in those amenities, correct?

4    A.  Very well put.

5    Q.  Now, before the fourth amendment was issued, the

6    purchasers were getting that undivided interest, correct?

7    A.  They were.

8    Q.  And a -- you would agree with me -- strike that.

9             And would you agree with me that if a developer does

10   not have some kind of secret intent or plan --

11            MR. S. KULWIN:  Judge, he's asking him point-blank

12   what we just talked about.

13            MR. NOVACK:  Can I preview with you what it is to

14   make sure it's okay?

15            MR. S. KULWIN:  I don't mind if he wants him to

16   opine --

17            THE COURT:  Can you preview it with Mr. Kulwin and

18   see if it is going to raise that concern?

19     (Brief pause.)

20            MR. NOVACK:  May we?

21            THE COURT:  Yes.

22     (Proceedings heard at sidebar:)

23            MR. NOVACK:  So I want to ask him that if the

24   developer that puts in the report that there's going to be

25   that undivided interest didn't have any kind of secret plan or

Levin - redirect

1313

```
 1   intent for that not to be true, that there's nothing wrong

 2   with putting that in the materials.

 3              THE COURT:  I think you are getting to the

 4   developer's intent then.  So I would stay away from that.

 5              MR. NOVACK:  Okay.

 6              MR. S. KULWIN:  Thank you, Judge.

 7      (Proceedings heard in open court:)

 8              MR. NOVACK:  Would it be okay if I conferred with my

 9   co-counsel --

10              THE COURT:  Of course.

11              MR. NOVACK:  -- before I wrap up, and even if I'm

12   going to wrap up?

13              THE COURT:  You may.

14      (Brief pause.)

15              MR. NOVACK:  Judge, I have no further questions.

16              THE COURT:  Redirect.

17              MR. S. KULWIN:  Just a few, Judge.

18                        REDIRECT EXAMINATION

19   BY MR. S. KULWIN:

20   Q.  Mr. Levin, you were asked some questions about whether you

21   ever reviewed property reports and marketing materials dealing

22   with hotel condominiums as opposed to residential

23   condominiums.  Do you remember those questions?

24   A.  I do.

25   Q.  And based on your experience of reviewing property reports
```

Levin - redirect

1314

1   that were being issued in numerous, numerous residential

2   condominium projects, in your opinion, was there any

3   difference between those that you reviewed and the property

4   reports that were issued in this case?

5   A.  There were no differences.

6   Q.  Okay.  You were asked some questions about whether you

7   were just simply hired here to, you know, give opinions or be

8   a litigation testifier.  Do you remember those questions?

9   A.  Yes, I do.

10  Q.  Did you use the same methodology in reviewing all the

11  documents in forming your opinions here that you used whenever

12  you were hired by a developer or a condo board to do similar

13  things?

14  A.  Exactly the same methodology.

15  Q.  You were asked some questions about whether you ever spoke

16  with a man named Brent Howie.  Do you remember those

17  questions?

18  A.  Correct.

19  Q.  Did you attend Mr. Howie's deposition?

20  A.  I did.

21  Q.  Did you read his report?

22  A.  I did.

23  Q.  Based on you being at the deposition and reading his

24  report, did you reach any opinion or conclusion as to whether

25  he disagreed with your view on -- strike that.

Levin - redirect

1315

1    Based on those -- based on attending his

2  deposition --

3        MR. NOVACK:  I have an --

4        MR. S. KULWIN:  Wait.  I'll rephrase it.

5  BY MR. S. KULWIN:

6  Q.  After attending Mr. Howie's deposition, on the question of

7  whether common elements are normally changed in condominium

8  development projects, did you -- did it cause you to reach any

9  different conclusion?

10       MR. NOVACK:  Judge, I object to that.  That's not in

11 his report.  It was not covered at deposition or hearing.

12       THE COURT:  Sustained.  Also I sustained your

13 objection to his question along similar lines.  So sustained.

14 And you are going outside of the scope of the cross-

15 examination.

16       MR. S. KULWIN:  Okay.

17 BY MR. S. KULWIN:

18 Q.  You were asked a number of questions about whether the

19 Trump Hotel condominium project has room service, bellhops,

20 and things of that nature.  Do you remember those questions?

21 A.  I do.

22 Q.  And was all of that described in the marketing materials

23 you reviewed?

24 A.  They were.

25 Q.  And did that -- was that a factor in any conclusion you

Levin - redirect

1316

1    reached concerning what the design of those marketing
2    materials were designed to do?  If you understand the
3    question.
4    A.   The marketing materials were designed to tell people that
5    there were 24-hour service, bellhops, et cetera, et cetera.
6    Q.   And --
7    A.   And they were provided, you know, to the condominium hotel
8    owners.
9    Q.   And did it inform you in any way concerning your opinion
10   that such materials were designed to lead -- that such
11   materials were designed to lead buyers to believe that they
12   were buying an interest in a hotel?
13   A.   That's exactly what they did.
14   Q.   You were asked some questions about whether you were
15   familiar with all the property reports in the other -- I don't
16   know what -- where this number comes from -- but the other
17   4,900 residential condominium buildings that you personally
18   weren't involved in.  Do you remember those questions?
19   A.   Yes, I do.
20   Q.   Sir, in your work in the business, did you become familiar
21   with the custom and industry of the practice concerning
22   changing out common elements, in addition to the buildings
23   that you've reviewed personally?
24           Did you become familiar with that custom and
25   industry -- custom and practice?

Levin - recross

1317

1  A.  Yes.  That's how I came up with the custom and practice.

2  It was developed on my knowledge of 100, 125, 150 condos, not

3  4,900.

4  Q.  Right.  But have you ever heard within the industry from

5  anyone else that you've done business with that this has ever

6  happened?

7  A.  I called the former president of the company in Florida

8  where they managed 250,000 units and asked him if he ever

9  noticed common elements were changed, and he also agreed that

10  they weren't.

11  Q.  Okay.

12        MR. S. KULWIN:  If I may have a moment, Judge?

13        THE COURT:  Yes.

14    (Brief pause.)

15  BY MR. S. KULWIN:

16  Q.  Mr. -- finally, Mr. Levin, of the 4,900 residential

17  condominium developments to which Mr. Novack referred, are you

18  familiar with how many of those are luxury high-rise

19  condominium buildings as opposed to four-flats or six-flats or

20  things of that nature?

21  A.  We didn't manage small buildings.  I'd say luxury

22  high-rises were over 50.

23        MR. S. KULWIN:  Nothing else, Judge.

24        THE COURT:  Recross, Mr. Novack.

25                     RECROSS EXAMINATION

Levin - recross

1318

1   BY MR. NOVACK:

2   Q.  Didn't you also say though, sir, that 500 to 700 of those

3   buildings were high-rise apart- -- high-rise condo buildings?

4   A.  Yes.

5   Q.  Okay.  Now, you mentioned something about somebody in

6   Florida that you talked to.  When was that?

7   A.  When I was doing my research after I was hired and there

8   were common elements that were changed, I wanted to make sure

9   to myself when I came to the conclusion that I've never seen

10  common elements changed that I wasn't sitting alone coming to

11  that conclusion.  So I asked a resource, my ex-partner from

12  Florida.

13  Q.  He too is not a hotel condominium expert, correct?

14  A.  I don't think so.  They were a huge company.  I really

15  don't know all their properties.

16          MR. NOVACK:  I'll be right back.

17     (Brief pause.)

18  BY MR. NOVACK:

19  Q.  Mr. Levin, you talked about the marketing materials with

20  Mr. Kulwin just a minute ago.  In your experience over the

21  years, would you agree that marketing materials highlight the

22  best features in properties that are being sold?

23  A.  We agree.

24          MR. NOVACK:  No further questions, Judge.

25          THE COURT:  Thank you, sir.  You may step down.  You

```
 1    are excused.
 2              THE WITNESS:  Thank you.
 3              THE COURT:  We are going to take a five-minute
 4    recess.
 5       (Recess taken.)
 6       (Proceedings out of the hearing of the jury:)
 7              THE COURT:  Ready, Mr. Kulwin?
 8              MR. S. KULWIN:  Yes, your Honor, although I misplaced
 9    something, I think.
10       (Brief pause.)
11              MR. S. KULWIN:  Got it.
12              THE COURT:  Okay.  We're going to go until about
13    3:45.
14              MR. S. KULWIN:  Okay, Judge.
15              THE COURT:  Bring in the jury, please.
16              Mrs. Goldberg, if you would like to come up, please,
17    ma'am, you may.
18              MR. S. KULWIN:  Your Honor, there is a stipulation.
19    Do you want to wait -- I want to read it to the jury, about
20    something she was going to testify to that the defendants said
21    they would stipulate.
22              THE COURT:  You may read it to the jury when they're
23    here, but wait for the jury.
24              MR. S. KULWIN:  Okay.
25              THE COURT:  Why don't I get her sworn in first and
```

Goldberg - direct

1320

```
 1    then you can read --
 2            MR. S. KULWIN:  We'll do it on Monday, if we get
 3    there.
 4            THE COURT:  Okay.
 5            Do you have water for your client?
 6            MR. J. KULWIN:  I'll get it.
 7            (Jury entered the courtroom.)
 8            THE COURT:  You may be seated.
 9            Mrs. Goldberg, raise your right hand, ma'am.
10    JACQUELINE GOLDBERG, CALLED IN HER OWN BEHALF, DULY SWORN
11                    DIRECT EXAMINATION
12    BY MR. S. KULWIN:
13    Q.  Can you state your name and spell your last name for the
14    record?
15    A.  Jacqueline Goldberg, G-O-L-D-B-E-R-G.
16    Q.  And, Jackie, how old are you?
17    A.  87.
18    Q.  Are you married?
19    A.  Yes.
20    Q.  How long have you been married?
21    A.  About 64 years.
22    Q.  And where do you reside?
23    A.  I've lived in Evanston for the last about 50 years.
24    Q.  Do you have any children?
25    A.  I have four.
```

Goldberg - direct

1321

1  Q.  Can you tell the ladies and gentlemen of the jury your

2  educational background?

3  A.  It gets complicated.

4  Q.  Go ahead.

5  A.  I graduated high school and I -- I had been living in a

6  children's home, and the people behind the home were able to

7  obtain stipends for college; I guess you would call it

8  scholarships.  So the first year I went to Herzl Junior

9  College in Chicago.  Then I went to the University of Illinois

10 for a year.  At that point the money was gone and I started

11 working my way through school.

12 Q.  What school did you go to at that point in time?

13 A.  Roosevelt University and -- where I met my husband, and we

14 married.  And my husband had just graduated and was going to

15 graduate school.  He went to the University of Wisconsin -- we

16 both went.  And I attended one semester there and then the

17 money was gone.  And so I started to work.  I got a job there

18 for $40 a week, and that helped support my husband through his

19 school.

20      When he finished he had a doctorate degree in

21 physical chemistry.  We came back to Chicago.  He had a job.

22 Then I went back to school and finished my graduate -- my

23 undergraduate work.  I needed one semester; that was enough to

24 complete it.

25      After that we had children --

Goldberg - direct

1322

1    Q.  Before you go on, what year did you graduate and from

2    where did you graduate when you came back --

3    A.  Roosevelt University in 19 -- I think it was '53.

4    Q.  Okay.  Go on.  After that?

5    A.  I --

6    Q.  Let me ask you this question -- I'm sorry.  Can you tell

7    us your employment background?  What happened after college?

8    A.  It was also during college because --

9    Q.  Go ahead.

10   A.  The college -- the funding paid for my schooling but it

11   didn't pay for my support, so I worked part of the time there,

12   and I had a lot of jobs.  I was a waitress, I was a hatcheck

13   girl in a nightclub in Chicago, I did statistical typing.

14   There were other kinds of jobs.  I had a whole bunch of them.

15   Q.  Okay.  And between 1953, when you graduated college, and

16   1979, what did you do in terms of -- what were you doing?

17   A.  Essentially I raised -- I just was a housewife and raised

18   my children.

19   Q.  Did there come a point in time in approximately 1978,

20   1979, that you returned to school?

21   A.  Yes.

22   Q.  And what school did you return to?

23   A.  I returned to Roosevelt University.  We had had a medical

24   incident, my husband was affected, and I realized that -- he

25   was insured if he died, but if he didn't, I wouldn't -- I

Goldberg - direct

1323

1   wouldn't be able to raise the four children and I better get

2   some kind of an ability to support the family, if necessary.

3   So I went back to Roosevelt and got a master's degree in

4   accounting.

5   Q.   Okay.  And did you have any -- did you have any other

6   degrees?

7   A.   I beg your pardon?

8   Q.   Do you have any other degrees besides a master's degree in

9   accounting?

10  A.   Well, yes.  I passed the CPA exam and I'm also a certified

11  financial planner; I passed that exam.

12  Q.   Now, what type -- did you start a business after you got

13  out of -- after you got your master's degree?

14  A.   I did start my own financial planning business.

15  Q.   And what kind of work did you do?

16  A.   Basically -- mostly tax work, and I helped people who were

17  trying to ensure a comfortable old age with their investments,

18  or perhaps they had other needs, like saving for children's

19  colleges, things like that.

20  Q.   And are you still employed doing that today?

21  A.   I am.  I'm not doing any CPA work except occasional taxes.

22  I've had -- I've cut back on the amount of work I do, and

23  mostly I'm still just doing financial help with people's

24  investments.

25  Q.   And what does working -- helping people with financial

Goldberg - direct

1324

1    investments -- what does that involve?  What type of work is

2    that?

3    A.  Determining what their needs are, their requirements are,

4    where they -- what are their goals, and then what funds do

5    they have and what abilities do they have to invest.

6            THE COURT:  Mr. Novack?

7            MR. NOVACK:  Judge, obviously Mrs. Goldberg's

8    background -- some of her background would be relevant, but

9    the last few things she's been talking about, I just don't see

10   how they relate to the case.

11           MR. S. KULWIN:  The investment relates to the case,

12   Judge.

13           THE COURT:  Overruled.  The last few questions --

14           MR. NOVACK:  Thank you, Judge.

15           THE COURT:  -- relate.

16   BY MR. S. KULWIN:

17   Q.  Go on, Ms. Goldberg.

18   A.  I'm sorry, where are we?

19   Q.  You were telling us about what type of work is involved in

20   --

21   A.  Oh.

22   Q.  Right.

23           THE COURT:  I thought she was finished.  You may want

24   to ask another question.

25           MR. S. KULWIN:  I'll ask another question, Judge.

Goldberg - direct

1325

1  BY MR. S. KULWIN:

2  Q.   In addition to doing that type of work, do you do any

3  other type of work with respect to investments?

4  A.   Yes.  I manage some trusts, charitable trusts.  Do you

5  want more information on that?

6  Q.   Yes, please.

7  A.   My husband's associate established two trusts and he asked

8  me to manage them.  They were both for the benefit of the --

9  one was a family member, one was a friend that he wanted to be

10  -- wanted to assure of a comfortable retirement.  And when the

11  trust was no longer effective for that person, it was to go to

12  a charity.

13          And I did -- I also managed a family trust that we

14  established after my husband sold his business, which is a

15  charitable trust.

16  Q.   Now, did there come a point in time when you began making

17  investments in real estate?

18  A.   Yes, in 1995.

19  Q.   Okay.  And what type of investments were those?

20  A.   Well, we had been considering -- thinking about when my

21  husband would retire, we bought our first condominium

22  apartment in downtown Chicago with a view of spending weekends

23  there to see if at some point we might want to live down in

24  the city.  But we never did live in that apartment.  We

25  started renting it out.

Goldberg - direct

1326

1    And along the way this -- these looked like good

2  investments.  It's certainly a field of investing that I

3  hadn't been in before but that I was interested in doing.  And

4  we added several other condominium apartments and gradually,

5  as we could do it, other investments in buildings, commercial

6  and residential.

7  Q.  And with respect to those -- since 1995, excluding the

8  hotel condominiums at issue here, approximately how many

9  condominiums have you purchased, excluding the hotel

10 condominiums involved in this case?

11 A.  Seven.

12 Q.  Okay.  And what type of condominiums were they?

13 A.  They were all residential condominiums.

14 Q.  And do you still own all of them?

15 A.  No.

16 Q.  How many do you still own?

17 A.  Three.

18 Q.  And how long did you own the others?

19 A.  I think it was about ten years before I sold the first

20 one.

21 Q.  And is that consistent with your investment philosophy

22 when it comes to condominiums?

23 A.  Yes.  When you're dealing with residences or property --

24 any kind of buildings, you don't buy for the short-term.  You

25 tend to -- you're looking long term.  These are expensive and

Goldberg - direct

1327

1  you want to research them carefully, and you don't -- you

2  don't want to have to worry about is the economy good or bad

3  this year.  You look for the long term.

4  Q.  Now, can you tell us where these condominiums that you've

5  described that you purchased, where they were located?

6  A.  The seven condominiums that we did were in the same

7  building, downtown, just north of the river, near Wrigley --

8  near the Wrigley building -- right next to the Wrigley

9  building, in a single building.  It was called River Plaza.

10  Q.  And is that near where Trump Tower now stands?

11  A.  Yes.  It's right next-door.

12  Q.  And did there come a point in time that you purchased a

13  residential condominium in Trump Tower?

14  A.  Yes.

15  Q.  And when was that?

16  A.  In 2003, when -- near the time they first started selling

17  them.

18  Q.  And that's not related to the hotel?  That's different

19  from the hotel condominiums?

20  A.  No.  This is strictly residential.  The hotel is in -- the

21  building is in several sections; one of them is residential,

22  another one is hotel, so on.

23  Q.  All right.  Now, in determining -- you mentioned a little

24  bit about how you do it, but in determining whether to buy a

25  condominium, do you engage in any kind of financial analysis,

Goldberg - direct

1328

1    kind of like figuring out whether it's a good investment or

2    not?

3    A.  Oh, yes.

4    Q.  What do you do?

5    A.  Depending on the kind of investment, but I start out with

6    what does it cost, what kind of rental can I expect, what are

7    the expenses, including real estate taxes, potential repairs,

8    electricity, any expenses.  And then I determine what's the

9    likely profit or income.

10          I also have to consider further down the road at some

11   point if I sell it, what kind of a market is it likely to be

12   facing, what sort of tax -- there's some tax benefits because

13   you have depreciation along the way, and down the road you

14   will -- that will affect whether you sell -- if you sell at a

15   gain you have to recover some of that depreciation in terms of

16   taxability.

17          So along the way -- there's some tax benefits along

18   the way.  And then if you sell at a gain you also have a

19   different tax bracket that you apply.  Capital gains have a

20   lower tax rate than ordinary income.  So there are a number of

21   -- there's a lot of stuff you look at.

22   Q.  Okay.  On that capital gains thing, if you hold the

23   property more than a certain amount of time, is the taxes on

24   it when you sell it lower or higher?

25   A.  The tax rate goes down because you have a long term

Goldberg - direct

1329

1  capital gain, which is less expensive than a short-term

2  capital gain.

3  Q.  Now, do you attempt to calculate any overall return on

4  your investment when you buy condominiums?

5  A.  Yes.

6  Q.  And --

7  A.  And I don't usually concern myself with what I might do

8  ten years from now when I sell it.  I am concerned about what

9  is the annual income going to be, what kind of percent.  And I

10 look for between three and six percent as a return on an

11 overall basis, because in any one year it may be more or less,

12 but what it's likely to be over time.

13 Q.  And when you say you look for a three or four percent --

14 three to six percent return, can you give me like an example,

15 for someone like me to understand it a little bit better?  Use

16 $100, for example.

17 A.  Okay.

18 Q.  Or a thousand.

19 A.  Let's say the building costs $100 and it brings in 20 a

20 year, and of that 20, $16 goes out in maintaining the building

21 one way or another.  I'm left with $4.  That would be four

22 percent.

23 Q.  Okay.  Now, over the years have you kept track of how you

24 have done on these real estate investments in terms of return?

25 A.  Every year when I do my tax return.

Goldberg - direct

1330

1  Q.  And what do you mean?

2          MR. NOVACK:  Judge, I'm going to object here.  And

3  this is something we've raised before and it may or may not

4  require a discussion, but this relates to documents --

5          THE COURT:  Yes.

6          MR. S. KULWIN:  We would like to have a discussion

7  about it, if we could.

8          THE COURT:  Okay.  Can you go to a different topic

9  and come back to this?

10          MR. S. KULWIN:  Yes, sure.

11  BY MR. S. KULWIN:

12  Q.  Did there come a point in time when you became -- and I'm

13  going back a little bit to a different subject -- to the same

14  subject.  But did there come a point in time when you began to

15  consider buying a condominium in Trump Tower, not the hotel

16  condominium but any condominium?

17  A.  Well, the first condominium that I purchased, because it

18  was being built right next-door -- essentially next-door to

19  Trump -- to River Plaza, I -- I started to think about adding

20  that -- adding a condominium there.

21  Q.  Okay.  Can you tell us what happened, how that came about?

22  A.  Yes.  I have a building manager that -- for the River

23  Plaza apartments and we were discussing the Trump building and

24  what -- and the offering there, and we thought we would go

25  over and take a look to see what was available.

Goldberg - direct

1    We went to -- it was in the old -- they had offices

2  in the old Sun-Times building at the time, and I spoke to a

3  salesman, Robert Shearer, who gave me marketing materials and

4  information to look at.  And it was very -- it looked like a

5  very attractive investment.  Took the things home with me and

6  looked them over and came back sometime later, not too much

7  later, and decided to purchase one.

8  Q.  And were -- was Trump at that time offering as well hotel

9  condominiums for sale?

10  A.  I think they were, but that wasn't what my primary goal

11  was.  I knew that there would be hotel condominiums.  I don't

12  know if they were offering them at that time or not.

13  Q.  Now, did you ultimately close on that condominium?

14  A.  Yes.

15  Q.  And approximately when was that, if you recall?

16  A.  Yes.  That was in the fall of 2008.  It took about five

17  years.

18  Q.  And based on the contract you signed, the condominium

19  documents that you reviewed for that purchase, did Trump

20  deliver what they had promised you with respect to that

21  condominium?

22  A.  In essence, they did.

23  Q.  And in November of 2008 did you then pay the balance of

24  the purchase price for --

25  A.  Yes, I did.

Goldberg - direct

1332

1    Q.  And what was the balance due at that time, if you recall,

2    approximately?

3    A.  I would have to -- I would have to calculate it.  The

4    purchase price had been 1,100,401.  I had put down I think

5    20 percent.  There was also -- there were some closing costs,

6    too, which ran somewhere around $35,000.  Whatever that

7    balance was, that's what I paid.

8    Q.  And would that be approximately 8 or $900,000 at that time

9    in November of --

10   A.  Yes, yes, that would be the neighborhood.

11          MR. S. KULWIN:  Now, Judge, at this point, between

12   the next set of questions and the other set of questions -- I

13   know it's difficult but is it possible we could talk about

14   this issue?

15          THE COURT:  We can talk about this issue.  It's not

16   difficult.  I was just trying to avoid another --

17          MR. S. KULWIN:  Okay.

18          THE COURT:  -- sidebar.  But we can talk about it.

19     (Proceedings had at sidebar:)

20          MR. NOVACK:  Our position has been and continues to

21   be that she was obligated to produce documents to us.  We

22   issued a first document request almost -- shortly after the

23   case was filed, asked for all documents relating to claims.

24   Not a single piece of paper came to us concerning these other

25   investments.  26(a) disclosures came, not a single disclosure

Goldberg - direct

1333

1    of this.  And it's unfair.

2         It's prejudicial for her to try building a case of

3    loss of use damages based on information that's in writing

4    that we haven't had a chance to see and to cross-examine her.

5         MR. S. KULWIN:  I guess the first thing I would say,

6    Judge, it was disclosed in her deposition over, what, two

7    years ago, the precise way she did it, exactly how she does

8    it, when she was cross-examined by Mr. Shonkwiler.

9         In addition, I believe at that time she was asked --

10   I'll have to check, but I believe -- and Jeff can correct me

11   if I'm wrong -- she was asked what she used to come up with

12   that and she said her tax returns, I believe.  Is that

13   accurate?

14        THE COURT:  Did you turn over her tax returns?

15        MR. S. KULWIN:  After her deposition we thought they

16   would ask for her tax returns.  They didn't.  And then when

17   the issue came up next they said, we don't want discovery on

18   that because she doesn't have any claim for damages.

19        Their position has been consistently throughout this

20   case -- and they actually made a motion right before trial on

21   this, and I believe you denied it --

22        THE COURT:  Did you say you don't want discovery on

23   damages?

24        MR. SHONKWILER:  No, never.

25        THE COURT:  Was that ever in writing?

Goldberg - direct

1334

1    MR. S. KULWIN:  No, they didn't say, we don't want

2  discovery on damages, but they took the position throughout

3  the trial that she had no damages.  For four years, when we

4  litigated this case, they told us she has no damages, all

5  she's entitled to is her 516,000.  She was questioned about

6  this issue at her deposition at length.  She disclosed exactly

7  what she just testified to.

8        THE COURT:  But the obligation is on you, under

9  Rule 26, to produce documents.  I don't have her deposition

10  transcript.  We're not going to be able to get into this area

11  today.

12        We have a half-hour left.  Let's move on to another

13  topic.  You can give me her deposition transcript with the

14  relevant sections marked and I will look at it.

15        MR. S. KULWIN:  Okay.

16        THE COURT:  But under the rules you have an

17  obligation -- whether their position is she's not entitled to

18  damages or not, that's certainly a litigation position.

19        The rules put an obligation on you to produce the

20  documents.  And they asked at the

21  beginning for all documents relating to the claims in your

22  complaint.  The rules -- and I've cited them in one of my past

23  rulings, exactly where they require you to produce the

24  documents.  And if you didn't produce documents backing up her

25  three to six percent argument, then it's not fair to let you

Goldberg - direct

1335

1   go into it now during trial when they don't have anything to

2   cross and test her on that.

3            MR. S. KULWIN:  Well --

4            THE COURT:  I'm not going to waste any more jury

5   time.

6            MR. S. KULWIN:  Judge --

7            THE COURT:  Mr. Kulwin, wait.  We're going to skip

8   through it today.  You can give me the transcript.  I know

9   I've had excerpts of it at various times.  I don't know if I

10  have all of the excerpts.  So give me a complete transcript of

11  it and I'll read it over the weekend and we'll talk about it

12  on Monday.  But you can't go into it now.

13           MR. NOVACK:  Let me just say one thing before we

14  break.  Even if she said, which she did, three to six percent,

15  that is no substitute --

16           THE COURT:  I understand.

17           MR. SHONKWILER:  One final point of clarity.  The

18  discussion of three to six percent and the discussion of what

19  are your damages are completely separate parts of the

20  deposition and were not ever tied together, not by me, not by

21  the witness.

22           THE COURT:  Okay.  I'll look at the deposition and

23  make that decision.

24           (Further proceedings in the hearing of the jury:)

25           THE COURT:  Go ahead, Mr. Kulwin.

Goldberg - direct

1336

1    MR. S. KULWIN:  Thank you, your Honor.

2    May I just tell Ms. Goldberg that we're skipping that

3  --

4    THE COURT:  Just ask another question that doesn't

5  open to that.

6    MR. S. KULWIN:  Okay.

7  BY MR. S. KULWIN:

8  Q.  We're going to skip ahead, Ms. Goldberg.  Prior to

9  purchasing the residential condo at Trump Tower had you ever

10  heard of Donald Trump?

11  A.  Yes.

12  Q.  What did you know about him?

13  A.  He had a reputation of building hotels, and there may have

14  been other buildings -- certainly one hotel that was well

15  known and the reputation of that hotel was excellent.  It was

16  a first class, well-run hotel.

17    As far as I knew, he was a good businessman.  I also

18  saw him in a movie with Whoopi Goldberg, in a small part.

19  That was -- that's about what I knew about him.

20  Q.  Did there come a point in time when you became interested

21  in investing further in Trump Tower after you had bought your

22  residential condo?

23  A.  About three years later I was comfortable with the

24  investment I had already made and I thought I would look into

25  doing a -- look into the hotel unit condominiums.  This was a

Goldberg - direct

1337

1   new -- new type of investment for me.  I had -- along the way

2   I had done some commercial property in a small apartment

3   building I had purchased, but this was a new -- again, a new

4   thing.  But it looked interesting and I thought might be a

5   good investment, particularly since it was -- it was also sort

6   of the next step up.  It was a -- these things -- the Trump

7   things are much more expensive, they are at a much more

8   elegant level, and I wanted to try those out.

9           So, yes, I got interested and I went and again spoke

10  to Robert Shearer.

11  Q.  Before we get to that conversation, had you read anything

12  about the hotel condo aspect of the project before you decided

13  to take a look at it?

14  A.  I probably had seen some literature but I don't remember

15  anything specific.

16  Q.  Okay.  So you were saying that you made an appointment to

17  see Mr. Shearer again?

18  A.  Yes.

19  Q.  Can you tell us approximately when that was?

20  A.  That was in the summer -- August -- basically about August

21  of 2006.

22  Q.  And who did you contact at that time?

23  A.  Robert Shearer.

24  Q.  And did you meet with him?

25  A.  Yes.

Goldberg - direct

1338

1    Q.  Was anyone else present at the time?

2    A.  Yes.  Again, I went with my building manager and we met

3    with Mr. Shearer and discussed the aspects of the --

4    Q.  Do you remember where the meeting took place?

5    A.  Yes.  It was at the IBM building, which was across the

6    street.

7    Q.  Okay.  And was there anyone else present besides

8    Mr. Shearer and you and Terry Vogue at the meeting?

9    A.  Tere Proctor, who I think was some kind of a manager of

10   the Trump sales at that time.  She would -- she came in and

11   out of the various conversations we had.

12   Q.  And can you tell the ladies and gentlemen of the jury, the

13   best you recall, what was discussed in the meeting?

14   A.  Anything I could think of to ask about the hotel units and

15   whatever Mr. Shearer presented.  And he gave me some brochures

16   and some floor plans, which I took home to look at and study.

17   And we went back --

18   Q.  Before you get to when you went back, I want to stay with

19   that meeting for a second, if we could.

20           Was there anything discussed about the hotel

21   amenities?

22   A.  Oh, yes.

23   Q.  Can you tell us what that was?

24   A.  Oh, yes.  Along the way either I asked or he told us about

25   the amenities at the hotel.

Goldberg - direct

1339

```
 1            Now, I knew there would be some but I didn't know
 2   what they were.  And when he mentioned the ballrooms and the
 3   meeting rooms, which I did not know were going to be
 4   included -- I hadn't expected that because I hadn't realized
 5   that they were doing this -- they changed the plans somewhat
 6   in there.
 7            I really got -- both Terry and I got pretty excited
 8   about it.  This was another stream of income to come in.
 9   Q.  Do you remember any particular figure being discussed in
10   that meeting about the income stream from the hotel interests?
11   A.  No, I -- I don't remember if it was discussed.  I found it
12   in the -- some of the documents.
13   Q.  Okay.  What documents did you find it in?
14   A.  Not sure.
15   Q.  Okay.
16   A.  I remember where I saw them later, but I don't remember if
17   I had that document at the time.
18   Q.  Okay.  And what was the number?  Do you remember what it
19   was, the revenue stream?
20   A.  Somewhere around 5 million.
21   Q.  Now, at some point in time did you go back and meet with
22   Mr. Shearer after that initial meeting, or try to?
23   A.  We went back a few days later.  Mr. Shearer wasn't there.
24   He -- I forget why he couldn't be there.  At that time I met
25   with Tere Proctor and Kiyoko -- I can't remember her last --
```

Goldberg - direct

1340

1   Binosi, Kiyoko Binosi -- and we discussed possible selections,

2   looking at floor plans and which ones would be -- might be --

3   I would be interested in.

4           And I purchased a floor plan -- I mean, I purchased a

5   unit then.  It was a two-room unit with a bedroom and a living

6   room and a kitchen, little kitchenette, and a fireplace.

7   Q.  Okay.

8   A.  All of which I thought would be very appealing to a

9   tenant, a potential renter.

10  Q.  Okay.  And at that meeting where you made that decision to

11  purchase it, did you receive any documents at that time?

12  A.  Yes.  I --

13  Q.  What did you receive?

14  A.  I received the property reports.  There were three sets.

15  I had already gotten the original property report when I

16  bought the first apartment, but these were -- at this point

17  there had been several amended property reports and I took the

18  three of them home.

19          I also took home some other documents.  I don't

20  remember very clearly what they were, but I took these home to

21  examine.

22          I had signed a contract for the one unit and I was

23  considering another one.  I have to say that the revenue

24  stream, the additional revenue stream coming in from the

25  rentals of the ballrooms and so on, that whole group, the

Goldberg - direct

1341

1  parking revenues, all -- several things, sort of gave it --

2  well, it was like another stream of income that didn't depend

3  just on the rentals.  It was going to -- it was a separate

4  kind of a thing, and it helped to make -- it helped to make

5  the whole prospect look very attractive.

6  Q.  Let me ask you this question:  Was it -- what was your

7  understanding when you signed the contract and they gave you

8  these property reports whether, if after reviewing the

9  property reports, you wanted to back out of the deal you had

10  that opportunity?

11  A.  I had a couple of days to review and back out if -- on my

12  own.  And then if I -- I was going to submit them to my

13  attorney for review, and my attorney -- if I did that and my

14  attorney wanted me -- felt that it wasn't a good investment or

15  something was wrong, then I had another -- I think it was

16  another eight days -- I think there was ten days altogether

17  where you could back out.

18  Q.  Okay.  And so when you came back from the meeting with

19  Mr. Shearer you mentioned that you reviewed some things --

20  when you came back -- not Mr. Shearer.  I apologize.

21        When you came back from the meeting where you signed

22  the first purchase contract what, if anything, did you review

23  when you got home at that time?

24        MR. NOVACK:  Judge, I'm just going to make an

25  objection.  Once again, I'm a little bit slow.

Goldberg - direct

1   I don't think there's a foundation for the

2   understanding that Mrs. Goldberg just testified about and I'm

3   wondering if we can get one.  Her earlier standing of --

4         THE COURT:  Mr. Kulwin, do you want to go back and

5   lay a little more foundation --

6         MR. S. KULWIN:  Sure.

7         THE COURT:  -- about her understanding of the

8   contract and the property reports.

9         MR. S. KULWIN:  Well, I'll do the -- yeah -- yes.

10  BY MR. S. KULWIN:

11  Q.  Jackie, when you signed the contract you just said you had

12  an understanding that you had a couple of days to back out and

13  then an attorney review.  Where did you get that understanding

14  from, that you could do that?  Was it in the contract?  Did

15  someone tell you?

16  A.  I don't recall if it was from the -- from Tere Proctor or

17  from the -- something I signed by itself or -- but I was

18  informed one way or another that I had that time.

19  Q.  And when you came back -- when you went -- and so after

20  you signed this and you went home with the documents that you

21  said they gave you, the additional amended property reports,

22  what, if anything, did you do with respect to those property

23  reports?

24  A.  I -- well, I looked for -- I looked through the first

25  document for the features that had been indicated, and they

Goldberg - direct

1343

1   were -- they were in there.  I looked at the budget.  Now,

2   some things I just skimmed through, but the things that looked

3   important to me, I looked at.

4           And then I checked them in the second document, and

5   then again in the third.  And I spent more time with the third

6   document because that was the most recent and should have been

7   the most up to date.

8           And I looked at the plans, the -- I looked -- they

9   have individual designs of different apartments, what they all

10  were, what floor -- you know, the percentage of ownership that

11  it was, just all kinds of stuff.

12  Q.  The first thing I want to do is, I want to show you -- you

13  mentioned that you think there was a document that you might

14  have gotten when you purchased the -- when you signed the

15  first purchase agreement.

16          MR. S. KULWIN:  Judge, may I approach?

17          THE COURT:  You may.

18          MR. S. KULWIN:  Mike, can I have Exhibit 81?

19  BY MR. S. KULWIN:

20  Q.  You can look at it right on there, okay?  And -- I keep

21  forgetting that you have that up there.  All right.

22          I'm showing you now what's marked as Plaintiff's

23  Exhibit 81 in evidence, and if you see at the bottom it says,

24  purchaser cancellation.  Do you see that?

25  A.  Yes.

Goldberg - direct

1344

1 Q.  Okay.  Is that where you got -- is that your signature up

2 at the top, 8/2/06, or is that somebody else's?

3 A.  No, that's my signature.

4 Q.  Okay.  And is that where you got the idea that there had

5 been a cancellation?

6 A.  It could have been.

7        MR. S. KULWIN:  May I have one moment, your Honor?

8        THE COURT:  You may.

9        (Brief pause.)

10 BY MR. S. KULWIN:

11 Q.  Now, I want to show you the originals of what are

12 Plaintiff's Exhibit 2, I believe 4 and 7.

13        MR. S. KULWIN:  If I may have one more moment, Judge.

14 I'm sorry.

15        (Brief pause.)

16 BY MR. S. KULWIN:

17 Q.  2, 4 and 7.

18        And I'm going to ask you -- this is No. 2; this is

19 the first amended property report of February 25th, 2004.

20 This is No. 4, which is the August 18th, 2004 amended property

21 report.  And this is Plaintiff's 7, the January 10th, 2005 --

22 A.  Uh-huh.

23 Q.  Do you recognize these -- first of all, is this how you

24 received the documents, in these nice bound --

25 A.  Yes, it is.

Goldberg - direct

1345

1    Q.  Okay.  And do you recognize those documents?

2    A.  The first one looks right.  The second one looks right.

3    There's something missing here.

4    Q.  Okay.

5    A.  There had been like overhead pictures of the --

6    Q.  It might be in the extra copy.

7    A.  There were, I think, four pages of pictures --

8    Q.  One second.

9    A.  Oh.

10   Q.  I'll see if I can find it.

11          (Brief pause.)

12          MR. S. KULWIN:  If I may have a moment, Judge?

13          THE COURT:  You may.

14          (Brief pause.)

15          MR. S. KULWIN:  I'm sorry, Judge.  There's one

16   document that we're having trouble locating.

17   BY MR. S. KULWIN:

18   Q.  Ms. Goldberg, are you referring to the fold-outs that had

19   floor plans?

20   A.  Yeah -- no, not floor plans.  It was like a picture from

21   an airplane looking down at the site.  And there were either

22   three or four of those in here.

23          Outside of that, this looks right.  The numbers look

24   right -- well, numbers --

25   Q.  Okay.

Goldberg - direct

1346

1    A.  I just checked a couple of -- I just checked the income

2    from the meeting room rentals and they were varied in each

3    document.

4    Q.  And in the third one -- are you talking about the

5    estimated budget, the income?

6    A.  Yes, in the budget.

7    Q.  And what was in the third one when you looked at it at the

8    time, the third one?

9    A.  There was --

10   Q.  January of '05.  Why don't you take a look.

11   A.  The estimated room rental was back up, and I think that's

12   the one that had in -- the parking revenues had been added and

13   --

14   Q.  One second, Ms. Goldberg, Jackie.

15          MR. S. KULWIN:  Can we have Exhibit H from

16   Plaintiff's Exhibit 7 -- ah, this is it.

17          THE WITNESS:  Oh, that's it.

18   BY MR. S. KULWIN:

19   Q.  Jackie, I'm going to show you what's Plaintiff's Exhibit

20   3.  And this is also a copy of the first amended property

21   report, but this is the one that also, I think, has to be

22   filed with the federal government.

23          Is this the fold-out that you're referring to, these

24   things?

25   A.  It was -- not quite.  This is similar.

Goldberg - direct

1347

1    Q.  Okay.

2    A.  But this is the kind of -- this is what I was looking for,

3    this --

4    Q.  This thing?

5    A.  Yeah.

6    Q.  Okay.  Now, we're talking about the meeting with -- we're

7    in August; I think it's the second meeting now when you went

8    back to buy something?

9    A.  Yes.

10   Q.  Do you remember what was discussed at the meeting?

11          MR. NOVACK:  Judge, could we get more foundation on

12   this meeting as far as its --

13          THE COURT:  Sustained.  Include who else was there.

14   BY MR. S. KULWIN:

15   Q.  Who else was present at the second meeting when you bought

16   your first unit?  The best you can recall, who was there?

17   A.  Tere Proctor, Kiyoko, Terry Vogue, myself.  I may have

18   been -- there were other people around but they -- I don't

19   think any of them were in our conversation.

20   Q.  Okay.  And can you recall what was discussed at that time?

21   A.  I --

22          MR. NOVACK:  Judge, I'm objecting unless we have a

23   date for this.

24          THE COURT:  See if you can get an approximate date or

25   exact, if she remembers.

Goldberg - direct

 1          MR. S. KULWIN:  Sure.

 2  BY MR. S. KULWIN:

 3  Q.  Do you remember approximately what year this was?

 4  A.  2006.

 5  Q.  And do you recall what month it was?

 6  A.  This -- the first meeting was at the end of July.  The

 7  second meeting was at the beginning of August, maybe the 2nd

 8  or 3rd, something like that.

 9  Q.  All right.  Based on -- now that you've explained that,

10  Jackie, can you tell the ladies and gentlemen of the jury, to

11  the best you can recall, what was said at that time, the best

12  you can recall?

13  A.  We had general conversation about the investment.  Tere

14  Proctor suggested to me -- and I was thinking about a second

15  one.  I normally would not have -- normally wouldn't have done

16  two.  I would have stepped in rather than jumped in, but I had

17  been particularly intrigued because of the extra income from

18  the ballrooms and the use of the laundry and the parking, and

19  so on.

20          And so I told her I was thinking about a second unit,

21  and Tere Proctor was the one who suggested I might be

22  interested in one on the same floor as some of the meeting

23  rooms because they would have a lot -- they would probably

24  have a good rental rate since people going to -- at the

25  meetings might like to be on the same floor.

Goldberg - direct

1349

1    I decided against it.  I took one -- I selected a

2  different one, which was next to the unit I had already

3  purchased.  Outside of that, I don't remember much of the

4  conversation.

5  Q.  Okay.  Let me show you what I'll mark -- what's been

6  marked into evidence as -- I believe it's Plaintiff's Exhibit

7  60-A.

8  A.  Can you make it -- that's better.

9  Q.  And I'm going to -- I'm going to actually hand you the

10 physical copy as well, and I'm also going to bring up 60-B in

11 evidence.  If you need to look at the actual hard copy as

12 well, here's 60-A and 60-B.  Maybe in a minute or two, okay?

13      But focus on the screen first, if you could.  And let

14 me ask you:  What was the purchase price for this first unit

15 that you were buying?

16 A.  It's showing here $1,149,500.

17 Q.  And were there --

18      MR. S. KULWIN:  Can you go down a little bit, Mike?

19 BY THE WITNESS:

20 A.  Yeah, there was an additional fee for the furniture and

21 fixtures of the room.  That was 90,000.

22 BY MR. S. KULWIN:

23 Q.  And was that the total price there?

24      MR. S. KULWIN:  Mike, can you highlight the total?

25 BY THE WITNESS:

Goldberg - direct

1350

1  A.  Yes.  That -- yes, the highlighted number.

2  BY MR. S. KULWIN:

3  Q.  Okay.  Now, you see below it how there's like additional

4  numbers.  Can you go down?

5  A.  Yeah.  They required about 20 percent in various down

6  payments.

7  Q.  And over a period of time?

8  A.  Yes.  Initially I paid ten percent, and then subsequently

9  there were two more payments of five percent each.

10  Q.  Okay.  And was the second payment due about -- as it says

11  in here, did you pay the second payment around six months

12  after the first payment, roughly?

13  A.  Yes.

14  Q.  And then the third payment would have been about --

15  A.  That would have been in 20 -- I think that was 2007 or '8.

16  Q.  2007 --

17  A.  '7, '7.

18  Q.  All right.  And was the balance at that point $919,000 on

19  this unit?

20  A.  As it's shown.

21      MR. S. KULWIN:  Mike, can you highlight that?

22  BY THE WITNESS:

23  A.  Yes.  That looks right.

24  BY MR. S. KULWIN:

25  Q.  All right.  Now, with respect to that purchase price, how

Goldberg - direct

1   did you plan on paying for it?  Were you going to finance it

2   or were you just going to pay for it?

3   A.  I don't like financing.  I pay by check.  I didn't plan to

4   finance it.

5   Q.  And what was your plan for using it?

6   A.  I didn't plan to use it.

7   Q.  What did you plan to do with it?

8   A.  Rent it as a hotel unit through the program that they had

9   shown me.

10  Q.  And what was your understanding of the program?

11  A.  That there would be a fair way to rent the various units

12  so that everybody had about the same rental.  And it was done

13  with a system of points, and the one with the -- people with

14  the lowest points would be the ones that -- the units with the

15  lowest points would be the ones that would be rented first.

16  Q.  Did they mention --

17  A.  Also --

18  Q.  Go ahead.  I'm sorry.

19  A.  Also, some people might want to -- some of the owners

20  might want to stay in their unit on occasion.  That would not

21  be a detriment.  They wouldn't be -- they would have the same

22  rights without -- whether they -- whether they used their unit

23  or whether they didn't use their unit during the year.

24  Q.  Now, earlier we discussed -- or a moment ago we discussed

25  that you had seen this ownership interest in the hotel and

Goldberg - direct

1352

1    this $5 million revenue stream.  Was that an important factor

2    in your decision to buy this unit?

3    A.   It was the important factor in the first one and it was

4    the compelling factor in the second one.

5    Q.   At any time during your meeting with Mr. Shearer on

6    July 31st -- in late July of 2006 or your meetings with Ms.

7    Proctor and Ms. Binosi in August of 2006, did anyone ever

8    suggest to you that Trump's agreement to deliver this interest

9    in the hotel, along with this revenue stream as part of your

10   purchase of your HCU, was subject to change down the road?

11   Did anyone ever say that to you?

12              MR. NOVACK:  Judge, I'm objecting to compound.

13              THE COURT:  Sustained.  Rephrase it.

14              MR. S. KULWIN:  I'll rephrase it, Judge.

15   BY MR. S. KULWIN:

16   Q.   At any time in your discussion with Mr. Shearer in the

17   very first meeting, not the meeting you bought but the very

18   first meeting, did he ever suggest to you that it was -- that

19   Trump's agreement or their offer to sell the interest in the

20   hotel, you know, the revenue stream, the ballrooms, things of

21   that nature, was subject to change down the road, that they

22   were going to change it down the road or might change it down

23   the road?  Did anyone ever suggest that to you?

24   A.   No, but I had read the property report which indicated

25   that there -- sure, there could be field changes or there

Goldberg - direct

1353

1 could be changes for city codes, if the code -- if this

2 building was going to take five years to build, if the city

3 code had changed and they were required to do something, they

4 might have to do something.

5    And -- but in the property report it specified --

6 there was specifications there as to what changes could be

7 made.  But nobody suggested anything to me about changing it.

8 Q.  Okay.  And when you're talking about these code changes

9 and things of that nature, are you referring to the fact that

10 it was possible that if the city code changed --

11    THE COURT:  Leading, sustained.  Rephrase it.

12    MR. NOVACK:  Sustained, your Honor.

13  (Laughter.)

14    MR. S. KULWIN:  Okay.

15 BY MR. S. KULWIN:

16 Q.  What do you mean by a field change?

17 A.  When you start to build -- this was going to be a huge

18 building.  I forget how many stories.  90?  Something like

19 that.

20    Anyway, as you build it you might have to move a pipe

21 or change the size of a room a little bit in order to do a

22 better job.  These are field changes.  You find them when

23 you're actually putting it together.  City code changes are --

24 if the city code changes you have to move a doorway or you

25 have to add something.

Goldberg - direct

1354

1  Q.  Okay.  Did anyone suggest to you, either in the documents

2  that you understood as you read them or in the conversations

3  in that first meeting -- well, let me rephrase it.

4          Did anyone suggest to you -- focus on the meeting.

5  We'll get to the documents momentarily.  Focus on the meeting.

6  Did anyone suggest to you, Mr. Shearer or anybody from the

7  Trump organization or the brokerage firm that you were dealing

8  with there, did anyone ever suggest to you that the interest

9  in the hotel that was specified in the common elements that

10 they were offering to sell, that that -- that Trump would

11 change that or had the right to change that down the road?

12          MR. NOVACK:  Judge, that's been asked and answered

13 already.

14          THE COURT:  Sustained.  She did answer.

15          MR. S. KULWIN:  Could I have a moment?

16          (Brief pause.)

17          MR. S. KULWIN:  Would this be a good time, Judge?

18          THE COURT:  Yes.  We're going to break for the week,

19 ladies and gentlemen.  We will pick up Monday morning at 9:15,

20 please.

21          I do anticipate that certainly by next Wednesday at

22 the latest you'll be able to begin your deliberations.  I'll

23 give you a better sense on Monday at the end of the day when I

24 see where we are.

25          You have the weekend before you return.  Remember,

1355

1    please do not do any independent research about anything you

2    have heard or seen here.  Don't communicate with anybody about

3    the case or let anybody communicate with you.  No placing on

4    your social media, Facebook, anything like that.

5              Have a great weekend.  Monday morning at 9:15,

6    please.

7              (Jury exited the courtroom.)

8              THE COURT:  You may step down.

9       (Witness temporarily excused.)

10             THE COURT:  If you have the deposition transcript and

11   want to provide that --

12             MR. S. KULWIN:  We'll send it over right now.

13             THE COURT:  You can send it over.  That's great.

14   Just give me an indication of where it is in the transcript.

15             MR. S. KULWIN:  We'll tab it, Judge.

16             THE COURT:  Is there anything else I need to address

17   today?  And then I have one very brief sidebar issue for you,

18   very brief.

19             MR. S. KULWIN:  Okay.  I have one thing to address,

20   Judge.

21             Can the defendants tell us now whether they are

22   actually going to actually call those people?

23             THE COURT:  Do you know if you're going to call them?

24   Mr. Flicker --

25             MR. NOVACK:  Judge, we think there's a possibility

1356

1    for both Flicker and Weiss.  We're not sure.  And so assume

2    yes.  But as soon as we know if it's the other way, we will

3    let you know.

4             THE COURT:  Howie is first, though, right?

5             MR. NOVACK:  We'll make Howie first for a lot of

6    reasons, including his trial --

7             THE COURT:  Okay.  How long do you think you have

8    with Ms. Goldberg?

9             MR. S. KULWIN:  Maybe another hour, if that.

10            THE COURT:  Okay.  My guess is between Ms. Goldberg

11   and Howie that will easily take up all of Monday morning and

12   likely spill over into the afternoon.

13            MR. NOVACK:  I actually thought they had two other

14   witnesses they were calling on Monday.

15            MR. S. KULWIN:  Yes.  We have Ms. Vogue.

16            THE COURT:  Okay.  You are calling her?

17            MR. S. KULWIN:  Yes, we are.

18            THE COURT:  Okay.  And --

19            MR. S. KULWIN:  That's it.

20            THE COURT:  That's it.  Ms. Vogue will be your last

21   -- Mr. Howie will be --

22            MR. S. KULWIN:  Yeah.  And maybe Proctor, but we'll

23   exchange that information --

24            THE COURT:  Okay.  I thought he was off.

25            MR. S. KULWIN:  She.

1357

1    THE COURT:  I thought Proctor was --

2    MR. S. KULWIN:  No, that was Manolo.

3    THE COURT:  I didn't have Proctor listed here.

4    MR. S. KULWIN:  I guess here's my only request,

5    Judge -- and maybe I'm climbing up a greasy pole here -- but

6    the difficulty is that -- as you know, there's quite a bit to

7    do over the weekend and they have -- and Mr. Flicker and Mr.

8    Weiss had extremely lengthy depositions, and to have to

9    prepare their cross-examinations only to find out, you know,

10   Monday morning they're not coming when we also have to prepare

11   for Mr. Howie --

12   MR. NOVACK:  We'll tell them over the weekend, but

13   this becomes kind of unusual because they -- they won't tell

14   us about their case, which goes before our case.  They won't

15   tell us who is going to be --

16   MR. S. KULWIN:  That's --

17   THE COURT:  Well, you know Vogue is coming and

18   possibly Proctor.  Flicker and Weiss, if you're just calling

19   one of them, do you have a sense of who it would be?

20   MR. NOVACK:  I want to say but I don't want to get

21   misled.  I want to say that if we only do one, it would be

22   Weiss, but I can't be 100 percent sure.  We'll let them know

23   before Monday.  We'll do that.

24   THE COURT:  Let them know by noon on Sunday and copy

25   --

```
 1              MR. NOVACK:  Definitely.

 2              THE COURT:  -- and copy Katy or Shannon, somebody

 3   from my chambers, on it so that we have the communication.

 4              MR. S. KULWIN:  Okay.  Thank you, Judge.

 5              MR. NOVACK:  Judge, thank you.  Have a good weekend.

 6   Thank you for a very civil week.

 7              THE COURT:  I have one brief --

 8              MR. S. KULWIN:  I guess I should say thanks, too,

 9   Judge, for not throwing me in jail.

10              THE COURT:  -- one brief comment -- I've never thrown

11   a lawyer in jail yet, Mr. Kulwin.  I don't plan on starting.

12              I have just one very brief thing at sidebar and then

13   we'll be done.  Thank you.

14     (Proceedings had at sidebar:)

15              THE COURT:  This is very brief.  Just very briefly,

16   be careful with the documents that you are projecting to

17   everybody in the audience because Mrs. Goldberg's home address

18   is on there.

19              MR. S. KULWIN:  Oh, my God!

20              THE COURT:  And we have the press here.  And I think

21   her Social Security number was on one of them.  But the home

22   address is -- just be very, very cautious of -- I don't care

23   if you redact those, but be very cautious of what you're

24   projecting.

25              MR. NOVACK:  Judge, my brain trust back here says we
```

1359

1   need to reserve the right to make decisions on witnesses after

2   we hear their case, because Proctor or Vogue may say something

3   that generates something --

4           THE COURT:  That's true.

5           MR. S. KULWIN:  Let me say this about that:  We are

6   calling Vogue.  We are definitely calling Vogue.  We've told

7   you we're not calling Manalo.

8           Proctor is, at most, a five or eight-minute, 15, 20

9   -- and we can decide that by tonight.  And we're willing to do

10  that if we can find out from you in fairness --

11          THE COURT:  He's trying to be careful under the rules

12  he doesn't waive anything.

13          MR. NOVACK:  It's not just who is being called, it's

14  what they're going to say.

15          THE COURT:  He's trying under the rules not to waive

16  anything.  Try to give, based on the testimony we've heard so

17  far, an indication as to whether or not you're going to call

18  them by noon on Sunday.  E-mail it and copy Katy or Shannon.

19          MR. S. KULWIN:  I guess the only point I will make --

20  and not to belabor it -- is nothing Ms. Vogue would say, that

21  I can think of, would impact any testimony from Mr. Weiss or

22  Mr. Flicker.  He never dealt with either of them -- she never

23  dealt with either of them.  She's a broker.

24          THE COURT:  You should be here Monday morning at

25  9:00 o'clock.

1360

1        MR. S. KULWIN:  Okay.  Thank you, Judge.

2        MR. NOVACK:  Have a great weekend.

3        THE COURT:  You, too.

4      (Trial adjourned until May 20, 2013, at 9:00 a.m.)

5                    *    *    *    *    *

6

7  We certify that the foregoing is a correct transcript from the
   record of proceedings in the above-entitled matter.

8

9
   /s/ Nancy C. LaBella                May 17, 2013
10  Official Court Reporter

11
   /s/ Mary M. Hacker                  May 17, 2013
12  Official Court Reporter

13

14

15

16

17

18

19

20

21

22

23

24

25