1361

```
 1                    IN THE UNITED STATES DISTRICT COURT
                         NORTHERN DISTRICT OF ILLINOIS
 2                             EASTERN DIVISION

 3    JACQUELINE GOLDBERG,              ) Docket No. 09 C 6455
                                        )
 4                         Plaintiff,   )
                                        )
 5              vs.                     )
                                        )
 6    401 NORTH WABASH VENTURE, LLC,    )
      a Delaware Limited Liability      )
 7    Company, et al.,                  ) Chicago, Illinois
                                        ) May 20, 2013
 8                        Defendants.)   9:05 o'clock a.m.

 9                              VOLUME SIX
                     TRANSCRIPT OF TRIAL PROCEEDINGS
10          BEFORE THE HONORABLE AMY J. ST. EVE, AND A JURY

11    APPEARANCES:

12    For the Plaintiff:        KULWIN, MASCIOPINTO & KULWIN, LLP
                                BY:  MR. SHELLY B. KULWIN
13                                   MR. JEFFREY R. KULWIN
                                161 North Clark Street, Suite 2500
14                              Chicago, Illinois  60601

15    For the Defendants:       NOVACK AND MACEY, LLP
                                BY:  MR. STEPHEN NOVACK
16                                   MR. JOHN F. SHONKWILER
                                100 N. Riverside Plaza, Suite 1500
17                              Chicago, Illinois  60606

18    Also Present:            MS. ALEXIS ROBINSON

19    Court Reporter:          MR. JOSEPH RICKHOFF
                               Official Court Reporter
20                             219 S. Dearborn St., Suite 1232
                               Chicago, Illinois  60604
21                             (312) 435-5562

22              * * * * * * * * * * * * * * * * *

23                       PROCEEDINGS RECORDED BY
                         MECHANICAL STENOGRAPHY
24              TRANSCRIPT PRODUCED BY COMPUTER

25
```

1362

```
 1              THE CLERK:  09 C 4655, Goldberg vs. 401 North Wabash
 2   Venture.
 3              THE COURT:  Good morning.
 4              MR. J. KULWIN:  Good morning, your Honor, Jeff Kulwin
 5   and Shelly Kulwin on behalf of the plaintiff.
 6              MR. NOVACK:  Good morning, Judge, Steve Novack and
 7   John Shonkwiler for the defendants.
 8              Could I raise a personal question before we start --
 9              THE COURT:  You may.
10              MR. NOVACK:  -- the proceedings?
11              I noticed that earlier there was some lists of names
12   that counsel was giving you for people that might be coming.
13   And I've got some family members coming for the closings.
14              THE COURT:  We will --
15              MR. NOVACK:  Who do I give that to?
16              THE COURT:  We will reserve the front row on your
17   side for you.
18              How many individuals?
19              MR. NOVACK:  I have five people coming.
20              THE COURT:  Okay.
21              I think we can just hold the first row -- or you can
22   give them to Katie and she will provide them to the Court
23   Security Officer.  But the first row on your side is all
24   yours.
25              MR. NOVACK:  Thank you.
```

```
 1              THE COURT:  So, where to begin with all of your
 2    motions?
 3              I ruled on some jury instructions already.
 4              So, let us start with -- any additional jury
 5    instruction issues, I will take up, when we talk about jury
 6    instructions likely after court today.
 7              Let us take up what I think will be easy and
 8    straightforward -- famous last words -- plaintiff's motion to
 9    bar certain testimony from Mr. Howie.
10              Have you seen the motion?  It is Docket No. 348.
11              MR. SHONKWILER:  Yes.
12              THE COURT:  I am guessing this is not an issue, but I
13    have been wrong --
14              MR. SHONKWILER:  We do not --
15              THE COURT:  -- in this case before.
16              MR. SHONKWILER:  We do not intend to bring up any
17    new -- introduce any new -- opinions from Mr. Howie.  And
18    Mr. Howie will not be responding to any of Mr. Levin's
19    testimony.
20              THE COURT:  Okay.
21              And he is not going to comment on any testimony that
22    was given here in court.
23              He has not -- I do not think he has been here.
24              MR. SHONKWILER:  He has not been here, but his
25    familiarity with transcripts, I suppose, could be relevant,
```

1364

1    depending on what questions he's asked by the plaintiff.

2            THE COURT:  On cross?

3            MR. SHONKWILER:  I suppose.

4            I don't think he ought to be barred from discussing

5    them, in any event.

6            THE COURT:  Do you plan on eliciting any testimony or

7    opinions from him on direct examination regarding testimony

8    here in court, other than what I have ruled on the original

9    Daubert, of course?  He relied on certain facts that, it

10   seemed apparent at the time, were facts that you were going to

11   put evidence in at trial -- property report facts, et cetera.

12           So -- and I said certainly he can -- an expert, under

13   Seventh Circuit law, can -- rely on facts that he or she does

14   not have personal knowledge of, as long as there is evidence

15   introduced at trial.

16           So, putting that aside -- because he can certainly

17   rely on those facts, to the extent he relied on them when he

18   gave his original opinions -- do you intend to elicit any

19   testimony from him about testimony that has taken place during

20   the trial?

21           MR. SHONKWILER:  Apart from what you just said, your

22   Honor, no.

23           THE COURT:  Okay.

24           So, I think this is probably moot.

25           Mr. Kulwin, was there something in particular you

1  were trying to get at with this motion or -- it sounds like it

2  is moot to me.

3           MR. J. KULWIN:  I apologize.

4           I think the concern was, Judge, that one of the

5  circumstances that the plaintiff contends undercuts Mr.

6  Howie's opinion is the fact that he did not look at or

7  consider any of the facts or evidence in this case; and,

8  instead, was provided a very limited set of assumptions from

9  defense counsel -- or from defendants, excuse me -- and based

10 his opinions using his experience and those, I believe, three

11 or four assumptions.

12          THE COURT:  I think it was more -- there were more --

13 than three or four, but they were assumptions that were based

14 on evidence they intended to present at trial, which has come

15 in.

16          So, certainly he can rely on those.

17          MR. J. KULWIN:  I think the concern is, is that when

18 asked on cross-examination, "You just relied on these

19 assumptions to reach your opinions, didn't you?" and, then, on

20 redirect, you know, Mr. Howie, then, backing and filling his

21 opinions with, "Well, I did read Mr. Reiss' testimony and that

22 further supports my opinion"; or, "Yes, I also read

23 Mr. Petrus' testimony and that further supports my opinions."

24          And that would be improper under the rules because

25 that reliance on that evidence -- that testimony -- was not

1  disclosed in advance of trial.  And we've had no opportunity

2  to test Mr. Howie's bases for his opinions in relying on that

3  type of testimony.

4        So, that was our concern, which is why we filed it

5  in advance.

6        MR. SHONKWILER:  Your Honor, I think that would be

7  fine if cross and redirect went that way.  It sounds like the

8  way it ought to go.  And there's nothing improper about the

9  witness saying, "What I've read and what I've heard is

10 confirmed or been consistent with," and they can cross him and

11 -- if they think it isn't.

12       But, either way --

13       THE COURT:  I am going to have to hear your cross.  I

14 am going to have to hear your cross to see if you open any

15 doors.  I am going to have to hear.

16       Before he gives any opinions, if you think you are

17 going to elicit testimony along those lines, let us have a

18 sidebar first.

19       So, I am denying, as moot, the motion without

20 prejudice to renew after we have heard his testimony.  And

21 that is Record 348.

22       So, the next motion, then, is an issue that kind of

23 crosses with what we were talking about last week at the end

24 of the day.  And this is plaintiff's motion in limine to bar

25 cross-examination of plaintiff on certain subjects, Record

 1   346.

 2          This goes hand in hand with the issue of the loss of

 3   use.  And you gave me the deposition transcripts.

 4          Just bear with me one second while I pull this out.

 5          (Brief pause.)

 6          THE COURT:  Let us talk first about the three to six

 7   percent issue, which was raised not in this motion, but in a

 8   separate motion.  So, let us talk first about the three to six

 9   percent.

10          And I got the defendants' paper regarding that.

11          Go ahead, Mr. Novack.

12          MR. NOVACK:  Judge, there's a couple things on this.

13          First is the issue that, I think, we gave at the

14   sidebar -- reserved at the sidebar -- which is whether

15   Mrs. Goldberg can testify as to the fact that she's got

16   support for the three to six percent and that she's calculated

17   the three to six percent from documents that she did not

18   produce.

19          And putting more teeth to it, right at the start of

20   that line of questioning, Mr. Kulwin asked if she relied on

21   any documents in creating those calculations.  And she said,

22   "Yes, my tax returns."

23          That's when I objected and we went to sidebar.

24          So -- but what she is trying to do is to defend this

25   number -- justify this number -- or say that this number comes

1368

1   from documents.  But she did not produce any documents with

2   respect to those numbers or those calculations,

3   notwithstanding our document requests that asked for all

4   documents relating to her claims; and, notwithstanding 26(a)'s

5   requirements and notwithstanding the pretrial order's

6   requirements.

7           So that just on that narrow issue of documents -- and

8   I have got a bigger argument coming, but just on the issue of

9   documents -- she should not be allowed to display, reference,

10  rely on or link her testimony in this regard in any way to

11  documents that were not produced.

12          THE COURT:  And, then, while you are addressing that,

13  you say, "her testimony in this regard."  What about letting

14  in her testimony in the first instance?

15          MR. NOVACK:  Oh, well, that's my bigger -- a bigger

16  -- argument is, is that -- and this is what was covered in the

17  bench memo --

18          THE COURT:  Right, Document No. 344.

19          MR. NOVACK:  -- and, that is, that the law is that

20  testimony -- particularly from lay witnesses -- cannot be

21  speculative.  Even an opinion cannot be speculative.

22          And the line of proof that is trying to be made here

23  by the plaintiff is that if she had had the money that was

24  tied up in escrow, she would have used it for other

25  investments; and, if she had used it for other investments,

1369

1    she would have made three to six percent on those investments

2    because that's what she made on other investments.

3          And the problem with that is that's completely

4    speculative on just about every level that you can imagine.

5    A, she didn't make any of those investments; B, we don't know

6    what that investment would be; C, we don't know if that

7    investment would have succeeded or not; D, we don't know if it

8    really relates to the other investments; E, we know one thing

9    for sure:  That the other investments, which is just an

10   average of over 20 years of experience, starts in the early

11   1990s and goes through now.

12         But the period of time that she had this money in

13   escrow was this narrow window of 2006 to 2013 -- well, until

14   today -- most of which -- most of which -- is in the period of

15   this real estate recession, one of the largest we've ever had.

16         And, so, it's pure speculation -- and, actually,

17   illogical and, actually, defeated -- to say that, "Because I

18   made three to six percent on average, taking into account the

19   early '90s and the late '90s and the early 2000s and periods

20   of market boom," you know, distorts the reality that this

21   investment -- this hypothetical investment that she didn't

22   make -- would have had to have been made during this very bad

23   time.

24         We cited a couple of cases.  We have a Seventh

25   Circuit case that says, "Even in the circumstance where the

1370

1     investment on which the lost profits incur -- were incurred --

2     was actually made -- was actually made; there was a business,

3     an actual business -- the Seventh Circuit said, "You cannot

4     say that the profits from that business" -- that actual

5     business -- "would have matched the profits from other

6     businesses."

7           That's the Seventh Circuit's Von der Ruhr case and

8     the Park -- I'm missing the name of that other case.

9           In any event -- and this Court in the Systems

10    Development Integration case, basically, said the same thing:

11    That you cannot have a hypothesis nor speculation as a

12    substitute for proof of damages.  And that's all that's going

13    to be done here.

14          So, we've got a mythical, non-existent investment

15    that we don't know what it is, when it is, where it is, if it

16    is -- don't know if she could have bought another piece of

17    property -- to be compared against 25 years of three to six

18    percent in completely different times and, perhaps -- we'd

19    never know -- completely different properties.

20          I just couldn't conceive that the Court would allow

21    that to be the basis of a money judgment from the jury.

22          THE COURT:  Mr. Kulwin?

23          MR. S. KULWIN:  I have a number of points, Judge.

24          The first point is, is that the first thing they seem

25    to be arguing is that they're prejudiced by unfair surprise

1   because we didn't give them these documents in the Rule 26 or

2   in response to a generic interrogatory document request asking

3   for any and all documents, and never followed it up ever with

4   a specific request for damages.

5          In October of 2011, Ms. Goldberg, under

6   questioning -- extensive questioning -- from Mr. Shonkwiler in

7   her deposition, not only explained how she calculated, but

8   specifically said, when he pressed her, "Well, how could you

9   possibly know that?" she said, "It's easy.  I go to my tax

10  returns."

11         Now, at that point in time, I think the plaintiffs

12  were acting in the best of faith -- in good faith -- to think,

13  "Well, they've got the testimony."

14         THE COURT:  Did you turn over the tax returns?

15         MR. S. KULWIN:  They never asked for them.

16         THE COURT:  That was not my question.

17         MR. S. KULWIN:  No, we never did, Judge, because they

18  never asked for them.

19         And this was directly after she testified on this

20  very topic that she based it on the tax returns.

21         So, the idea -- the notion -- that they're prejudiced

22  somehow is wrong.

23         In addition, we then itemized these damages on, I

24  think, early April when we filed the Pretrial Order.  They had

25  six weeks to --

1372

1    THE COURT:  No, you did not do it then.  You put it

2  as a category.  You did not itemize them until I ordered you

3  to do so, because you had not itemized damages, which was --

4  it could have been late April, possibly May.  It is in the

5  record.

6    MR. J. KULWIN:  I think we filed it on April 17th.

7  That's just my memory.

8    THE COURT:  It is in the record.  You do not need

9  to --

10    MR. S. KULWIN:  Okay.

11    Be that as it may, they had a month.  They could have

12  raised this.  They never did.

13    So, I don't agree that they're under -- you know,

14  maybe I don't understand.  I could be wrong.  Maybe I don't

15  understand the rules of discovery.  I've always operated under

16  the assumption that as long as you don't hide the ball, hide

17  something, you put everything out there.

18    And keep in mind, Judge, that in other motions they

19  filed, they repeatedly said we have zero damages.  They took

20  the position that no matter what we said, we had no damages.

21  And they made no inquiry.

22    THE COURT:  But that does not count -- I am not

23  persuaded by that argument --

24    MR. S. KULWIN:  Okay.

25    THE COURT:  -- because that is their litigation

1373

1   position.

2        MR. S. KULWIN:  Okay.

3        Well, all I can tell you, Judge, is, is that on the

4   first issue, she testified about it over 18 months ago -- 18

5   months ago -- to this very, very specific thing.  It's not

6   like she said, "Oh, I don't know how I figure it out really,"

7   you know, and then we led them to believe that she had no

8   support; and, now, she is up here saying, "I relied on my tax

9   returns."

10        She specifically said, "I went to my tax returns."

11        On the second question about it's all -- you know,

12   all the A, B, C, Ds and Es -- I couldn't keep track of them;

13   but, basically -- all seemed to sum up to the idea that this

14   was speculative and that she's not competent to testify about

15   it.

16        Well, both of those things are erroneous as a matter

17   of fact and a matter of law.

18        As a matter of law -- and we didn't get this brief

19   until last night and we didn't have a chance, really, because

20   of personal reasons, to go over it in detail -- but in our

21   briefs in opposition to their motion in limine to bar loss of

22   use damages, I think we cited cases that show that under the

23   law, Mr. Novack is not accurate.

24        She can, as a competent person -- as a layperson --

25   testify to potential loss of use money profits.  She's

1374

1    competent to do it.  She's particularly competent to do it

2    since she's been doing it for 18 years and she's a Certified

3    Financial Planner and a CPA.

4         In addition, they're in no way hypothetical,

5    speculative or theoretical.  And not only is Mr. Novack wrong

6    about the real estate crash making it completely impossible

7    for her to earn these returns, it's actually the exact

8    opposite.  Because anybody who is familiar with the real

9    estate crash knows one thing:  While real estate values were

10   dropping and people were being thrown out of their homes, the

11   number one highest demand for anything was rental property.

12        Indeed, during the crash years --

13        THE COURT:  But how are you going to prove that?  Do

14   you not need an expert to prove something like that?

15        MR. S. KULWIN:  I'm just responding to his argument,

16   Judge.  He says that it's speculative because that couldn't

17   have happened.  It's equally -- just as it's speculative for

18   him to say, "She never could have gotten that," I'm just

19   responding.  He's wrong.  As a matter of objective fact, he's

20   just completely wrong.

21        And we know from Ms. Goldberg that it's not

22   speculative.  She's not saying, "I earned four to six percent

23   back in the day when things were great."  She's saying, "Now,

24   between -- in the last several years, I have looked at my tax

25   returns."  And that's what she is saying, Judge.  That's what

1375

1    she testified to.

2           So --

3           THE COURT:  Mr. Novack, what about the fact that she

4    testified about these numbers in her deposition in October of

5    2011 and the argument that Mr. Kulwin is making, that you

6    should have been noticed on it --

7           MR. NOVACK:  Well, there's no --

8           THE COURT:  -- at that point?

9           MR. NOVACK:  I'm sorry.

10          There's no question she uttered those numbers.  So,

11   we're not surprised that she's arguing three to six percent.

12   She said three to six percent in the deposition.

13          But in the deposition, she did not say that she

14   calculated that number on the basis of any documents,

15   including the tax returns.  She did not say the numbers came

16   from the tax returns.

17          What she said is, "Look, this is just an estimate.  I

18   can't be certain.  I'd have to go look at records, including

19   tax returns."  But she hadn't done that yet.

20          We were perfectly within our rights to say, "You

21   know, what?  We're okay with the state of the record."

22          The state of the record is, is that there's testimony

23   completely unsupported by documents.  And we have no

24   affirmative burden -- Rule 26(a) is self-executing, we have no

25   burden -- to ask.

1   Our document requests -- to any extent we had a

2   burden -- we asked for it.  We don't have to follow up and

3   tell them, "Oh, by the way, you didn't produce the documents

4   that we asked you for."

5   She did -- and the critical thing here is she did --

6   not say at the deposition what she was trying to -- was about

7   to -- say here, was that, "I based that three to six percent

8   on the tax returns."

9   She said the opposite:  "I didn't look at any records

10  yet.  I haven't looked at them."

11  Well, that's what makes her not able to look at it

12  now.

13  MR. S. KULWIN:  May I be heard, Judge?

14  THE COURT:  Yes, briefly.

15  MR. S. KULWIN:  So, if I understand Mr. Novack's

16  position, he is saying, "Hmm, the tax returns will support

17  these things.  That's what she is saying.  She is saying, 'If

18  I go back into my tax returns, I can tell you the exact

19  number,'" which is exactly what she said.  And his position

20  is, is, "Great.  We don't ask.  We'll stick our heads in the

21  sand and we'll never ask for those documents, so that at

22  trial, when she gives this testimony, which we know she's

23  going to give, we can say it should all be barred because

24  we're prejudiced."

25  And that, Judge, if that's the rule, then surprise on

1    me because that is very difficult for me to believe -- that a

2    defendant can say -- and he just said it; he just admitted

3    it -- he could say, "Oh, great, we're happy with the record

4    right now.  We know that she relies on her tax returns.  We're

5    not going to ask.  And, then, at trial we'll say, 'We're being

6    surprised.  We're prejudiced.'"  And all of this goes to

7    weight, not admissibility.

8           And, so, you know, what?  He can cross-examine her,

9    just like we were forced to cross-examine these Trump

10   executives who, every time they were asked a question, would

11   say, "Well, you know -- " and Mr. Petrus, repeatedly -- "I

12   relied on industry trends and things of that nature."  No

13   documents at all.  Nothing.  Zero.  And I was forced to

14   cross-examine him.

15          Did they produce any documents?

16          We asked them specific times, over and over and over,

17   again, "Give us the documents that you have," and they gave us

18   nothing.  And now -- but, yet, they came in and testified.

19   All --

20          THE COURT:  Well, you are comparing apples and

21   oranges a little bit here.

22          MR. S. KULWIN:  I --

23          THE COURT:  He did not testify he relied on --

24          Please do not mumble under your breath to me, Mr.

25   Kulwin.

1378

1   MR. S. KULWIN:  No, Judge, I was just saying apples

2   and oranges.

3   THE COURT:  You are mumbling under your breath.

4   Please do not do that.

5   MR. S. KULWIN:  I am not.

6   THE COURT:  There you go, again.  Please do not do

7   that, Mr. Kulwin.  We are in Week Two.  You should know better

8   than that by now.

9   MR. S. KULWIN:  Yes, Judge.

10  THE COURT:  Mr. Novack, do you want to comment on

11  that?

12  MR. NOVACK:  He didn't object to that testimony on

13  the basis that documents weren't produced.  He chose to do

14  that on cross-exam.

15  THE COURT:  You do not have to comment on the

16  Mr. Petrus' testimony because that is different.

17  MR. NOVACK:  Oh, I thought that's what you were

18  asking me.

19  THE COURT:  No, his overall statement about the

20  burden was on you to ask for it --

21  MR. NOVACK:  Well --

22  THE COURT:  -- than him to produce it.

23  MR. NOVACK:  -- I repeat:  It is not our job to tell

24  them what to do, to make sure they can get their evidence in.

25  If they don't lay a proper foundation, I shouldn't be

1379

1    the one to say, "Hey, by the way, you forgot to ask this

2    question," or, "You should have done this to get a

3    foundation."

4         The rule is that she cannot testify on the basis of

5    documents not produced, particularly when they were requested.

6    And there's no requirement to do a follow-up.

7         There was no trick here.  I didn't ask -- or Mr.

8    Shonkwiler, you know, didn't ask -- Questions A, B and Z, but

9    that doesn't mean that we waived not asking Questions A, B --

10   we had no burden to ask more questions.

11        We were content that we learned all we had to learn

12   from her, about the basis on which she had calculated.  And

13   she just said, you know -- I mean, it couldn't have been more

14   clear -- that this was sort of out of the -- pulled out of

15   left field, this number -- that was witnessed, the fact that

16   when they tried to amend that itemization -- which you didn't

17   allow them to do -- they tried to raise the percentages.  So,

18   it must have been when she went and looked at her tax returns,

19   the percentages weren't even right, from what she had said.

20        THE COURT:  I agree.

21        I am precluding testimony regarding loss of use for

22   two reasons.  One, the burden is on you -- and I have said

23   that in prior rulings -- to turn over the documentation that

24   is relied upon.

25        I read the deposition transcript excerpts that you

1  gave to me and your client even said in there at one point,

2  when she was pushed about how she estimated costs, that she

3  did not know; she would have to go back and spend some time

4  looking over her records.

5       None of these were produced.  And, as I said at

6  sidebar last week and said in court before then, it is unfair

7  to start bringing up testimony -- damages testimony -- now,

8  relying on documents, where those documents have not been

9  produced, because how can they test her assumptions or what

10  she is relying on?

11      I also agree with Mr. Novack's argument that this --

12  given that it is not rooted in documents, that they do not

13  have the documents -- that she cannot just testify off the top

14  of her head because it is too speculative in nature.

15           MR. S. KULWIN:  On that note --

16           THE COURT:  I am granting your request with respect

17  to that.

18           MR. S. KULWIN:  On that note, Judge, when Mr. Novack

19  raised his objection, we weren't talking about damages.  She

20  should be allowed to testify that, in analyzing investments,

21  that's how she does it.

22           THE COURT:  She can testify how she does it.

23           MR. S. KULWIN:  With the three to six percent, that's

24  how she does it.

25           THE COURT:  Well, I do not understand what you are

1381

1    saying.

2            MR. S. KULWIN:  What I'm saying is when he stood up

3    to object, we weren't anywhere close to damages.  We were

4    asking her, "How do you determine what a good investment is?"

5            And she was saying, "Well, I look at my past

6    investments and I try to get a three to six percent return."

7            THE COURT:  Well, that testimony is fine -- how she

8    determines a good investment.

9            MR. S. KULWIN:  All right.

10            THE COURT:  But I do not think that is what the

11    objection was over.  She was going into the specifics.

12            Okay.  The other motion I need to decide before we

13    bring in the jury --

14            Danny, please tell them just a few more minutes,

15    please.

16            THE COURT SECURITY OFFICER:  Yes, Judge.

17            MR. NOVACK:  Is there a -- is this for --

18            THE COURT:  -- is the motion to bar cross-examination

19    of plaintiff on certain subjects.

20            Yes?

21            MR. NOVACK:  I just want to make sure I understand

22    the Court's ruling, based on what Mr. Kulwin just said.

23            THE COURT:  She wants to testify, according to Mr.

24    Kulwin -- and I do not think this is what the objection was

25    over -- but in assessing an investment, how does she determine

1    something that is good to her; and, what is good to her is

2    something she thinks is going to give her a three to six

3    percent return.

4              I think that testimony is fine.

5              MR. NOVACK:  But I'm hoping that she can't, then,

6    say, "Because that's what I make in the past on all my

7    investments," because that is the --

8              THE COURT:  Well, that is -- right.  That is a

9    separate question.

10             MR. S. KULWIN:  Well, but, Judge, what she's going to

11   say is she didn't pick that out of the air.  She picked that

12   out of the air based on her experience doing that, not for

13   damages purposes.

14             THE COURT:  Again, I think that is fine to say based

15   on her experience doing it --

16             MR. S. KULWIN:  Thank you, Judge.

17             THE COURT:  -- but without elaborating or going

18   further.

19             MR. S. KULWIN:  Right.

20             MR. NOVACK:  I mean --

21             THE COURT:  It also goes to your point of how

22   sophisticated of an investor she is, which --

23             MR. NOVACK:  But just one more question, if I may?

24   Is loss of use damages out of the case now?

25             THE COURT:  I have not heard all the evidence yet,

 1    but if the only evidence that you are basing loss of use on is

 2    her own testimony, it is out of the case.

 3            So, next, the motion in limine to bar cross-

 4    examination of plaintiff on certain subjects.  This pertains

 5    to Defendants' Exhibit 522, the August 11th, 2006, letter from

 6    Judy DeAngelis -- D-e-A-n-g-e-l-i-s -- to Mr. Berkhoff.

 7    Ms. DeAngelis was the plaintiff's attorney in connection with

 8    the underlying real estate deals.

 9            There are two issues that you have raised in your

10    motion:  The attorney letter I have just referenced and the

11    real estate crash, the buyer's remorse.

12            I have already addressed the real estate crash and

13    buyer's remorse and why that comes in on cross-examination as

14    to motive.  They are free -- and I am not revisiting it.  I

15    have already ruled.  I think it was Motions in Limine 14 and

16    15.  I have ruled on that.  That is in.  There is no basis to

17    reconsider that ruling.

18            The attorneys' letters I have not ruled on directly,

19    other than I would not let you use them in opening statements.

20            Go ahead, Mr. Kulwin, with respect to your argument

21    on attorneys' letters --

22            MR. S. KULWIN:  Well, I --

23            THE COURT:  -- if you want to elaborate on anything.

24            MR. S. KULWIN:  I don't have much to elaborate,

25    Judge.  I won't burden the record with it.

1    To begin with, okay, she doesn't have to show -- they

2    want to cross-examine her and say, "Didn't you know that there

3    was -- that they could change it? And didn't your attorney

4    try to change it?"

5    I'm going to the substance first.

6    THE COURT: Right.

7    MR. S. KULWIN: "And didn't they say they wouldn't

8    change it? So, you had no business thinking you were going to

9    get these because you knew that you couldn't change it."

10    That all goes to reasonable reliance. Reliance.

11    There's no reliance element in either of these statutes. It

12    doesn't go to anything else. So, that's the first argument.

13    The second argument is the fact that -- and it's also

14    immaterial on another ground. The fact that her lawyer is

15    trying to negotiate a contract -- with no evidence, by the

16    way, that Ms. Goldberg told her to do that or was aware she

17    was doing that or endorsed that she was doing that, as opposed

18    to any real estate lawyer doing whatever she wants to do,

19    okay -- is -- it's immaterial. This is a fraud case. Okay?

20    The fact that while they don't know they're being

21    defrauded, they're trying to negotiate terms of the contract,

22    is literally meaningless. What is the difference? It

23    doesn't -- what? They're going to argue that, "Because they

24    tried to negotiate the contract, they knew we were going to

25    cheat them"? It really makes zero sense.

1385

1    The third thing, which is even more troublesome, is

2    neither of these people are witnesses in the case.  You

3    don't -- we have no foundation whatsoever as to why Ms.

4    DeAngelis wrote this letter; what she was basing it on; what

5    motivated her to do it.

6        And Ms. Goldberg's not going to testify about that

7    because she shouldn't be forced to waive the attorney-client

8    privilege to explore with Mr. Novack why she's doing it.

9    Okay?

10       And, similarly, she shouldn't be able to -- she

11   shouldn't be forced to -- waive or assert the attorney-client

12   privilege, to talk about what she talked to Ms. DeAngelis

13   about -- if she did -- about anything Mr. Berkhoff's firm

14   wrote back; what her understanding was; why she thought other

15   provisions in the contract covered her or protected her.

16       In addition, Mr. Berkhoff's firm -- even though it

17   was written by Mr. Cohen, I guess; he's still at Piper -- I

18   mean, this is the same thing.  I couldn't call those people to

19   depose them.  They asserted the attorney-client privilege.

20       I tried to call Mr. Berkhoff as a witness in this

21   case.  You said, "No, it will inject the attorney-client

22   thing.  It is too prejudicial to get into it."

23       There is no other way for Ms. Goldberg to respond to

24   these questions that he is going to ask her without talking

25   about what she ultimately talked to Ms. DeAngelis about.

1386

1    Now -- I mean, you know, on this particular letter.

2    And, so, that's everything.

3    THE COURT:  Mr. Novack?

4    MR. NOVACK:  Thank you, Judge.

5    There were three objections.  Two were made timely,

6    as part of the Pretrial Order, hearsay and relevance.  Then

7    authenticity came up shortly before the trial, but that was

8    not an objection asserted.

9    Authenticity is resolved because, under the Seventh

10   Circuit law, a party that produces a document -- which is how

11   we got this document -- self-authenticates it just by the act

12   of doing that.

13   THE COURT:  And my guess is Mr. Kulwin was not

14   asserting that in the motion; and, the fact that, as we talked

15   about before the opening statements, she was copied on this

16   and she produced it.

17   I do not think authenticity is going to be an

18   objection.

19   MR. S. KULWIN:  No.  We are not saying it's

20   authenticity.

21   THE COURT:  Okay.

22   So, the hearsay and the relevance.

23   MR. NOVACK:  Right.

24   Hearsay is answered, I think, in two very quick, easy

25   points.  The first is, is that this is a party admission.

1387

1      This is a letter that comes from the agent of Mrs. Goldberg,

2      her lawyer.  And she's bound by -- and we cited this case in

3      connection with our Proposed Instruction 22, as a case that

4      happened to be written by your Honor, Horowitz, from 2012.

5      "Clients are generally bound by their attorneys' acts or

6      omissions during the course of the legal representation that

7      fall within the apparent scope of the attorney's authority."

8              So, even if this could be deemed to be a hearsay --

9      potentially, hearsay -- document, it, just like if this was a

10     letter from Mrs. Goldberg, herself -- and it is -- would not

11     be hearsay.

12             But the real point here is --

13             THE COURT:  And you would have to lay the proper

14     foundation for that, obviously.

15             MR. NOVACK:  That she hired her, et cetera?

16             THE COURT:  Correct --

17             MR. NOVACK:  Sure.

18             THE COURT:  -- that she was an agent acting within

19     the scope of her authority.

20             But, go ahead.  What is the real point?

21             MR. NOVACK:  And the second point is that this is not

22     an issue that even raises the specter of hearsay because we're

23     proving an operative event.  The operative event is that Mrs.

24     Goldberg asked for a change, and the specific change was,

25     "Change that provision in the agreement that says that

1388

1    this could be -- that changes could be -- made to the common

2    elements in discretion -- "

3            THE COURT:  This is Paragraph 9 --

4            MR. NOVACK:  4(a).

5            THE COURT:  -- of the letter, correct?

6            MR. NOVACK:  Oh, yes, that's correct.

7            THE COURT:  The condominium documents?

8            Okay.

9            MR. NOVACK:  That's correct.

10           And what it's asking is, "No, instead of that," and

11   she references Paragraph 4 in the Item 9.

12           She said, "Instead of that, I want the right to

13   approve all the changes you make to the declaration."

14           The declaration, again, being the thing that sets

15   forth the common elements.

16           "And I'd rather -- I want to have the right to

17   disapprove it.  I want to get five days to do that or else,"

18   you know, "and this whole contract will be subject to my

19   approval."

20           The seller said, "No, we won't agree with that."

21           She had an opportunity, after that, to rescind the

22   deal.  She didn't.

23           So, this is the event that we're trying to prove, not

24   whether the words in here were true.  It's not being offered

25   to say that, "Aha," this was a good paragraph or a bad

1   paragraph.  The fact is, it's a paragraph.  The fact is, it's

2   a letter.  The fact is, the letter was delivered to the

3   seller's lawyer.  That's the event that we're proving.

4           And it's also what makes all of this argument about

5   attorney-client privilege sort of a red herring, because the

6   intent here, you know, of the lawyers is irrelevant.  It's the

7   fact that this happened.  Mrs. Goldberg, nevertheless, made

8   the deal.

9           So, it's not hearsay at all.

10          THE COURT:  And Mr. Kulwin has argued with respect to

11  relevance.  Let us assume all of that is true, that --

12          MR. NOVACK:  Well, here's --

13          THE COURT:  -- there is no reliance element.  So,

14  what is the relevance?

15          MR. NOVACK:  Well, reliance is one issue.  Let's

16  assume it's not in the case.  There's causation.  There's

17  damages.  We're going to argue that what the defendants did

18  didn't cause the problem that she thought existed.  It was her

19  agreement to allow the changes to be made that caused the

20  situation.

21          And just to get -- give -- you some more teeth on

22  this and why it's relevant for about five different reasons --

23  number one, one of the very first things that was said by

24  Mr. Kulwin in the opening statement in his timeline -- he

25  jumped to the end of the timeline -- and he said, "Mrs.

1390

1  Goldberg wrote an e-mail in February of '08, after she got the

2  fourth amendment, and she said, 'He does not have the right to

3  revise that.'"

4          Well, this is perfect impeachment that he did -- A,

5  he did -- have the right; she knew he had the right; she tried

6  to change that right; she failed in changing that right; and,

7  she went forward with the deal, anyway.

8          Second, she testified that these elements were

9  important to her.

10         Well, we want to be able to argue -- just like they

11 can argue against this, but we want to be able to argue --

12 that, in the end of the day, it wasn't really that important

13 because she agreed that the common elements could be changed.

14         So, they couldn't have been that important because

15 she went in, eyes wide open, that they could be taken out.

16         She testified that her understanding of the contract

17 was that while some changes could be made, only -- I think she

18 called them "field changes" or if the city code changed or if

19 there was a zoning problem.

20         But, here, she is addressing the very clause that

21 we're talking about and this is proof that she knew it was

22 more than just the field changes and the code.

23         So, it's all relevant for that as cross, as

24 impeachment, as argument in my closing.

25         It also goes to punitive damages because here, we're

1   going to say, "We weren't malicious.  We didn't do something

2   dastardly.  We -- the contract gave us the right to do it and

3   we were exercising that right."

4          It goes to emotional distress.  How much emotional

5   distress could she have when what happened is what she agreed

6   in writing to, after trying to get it changed?

7          Materiality follows suit.

8          THE COURT:  Do you want to briefly respond, Mr.

9   Kulwin?

10         MR. NOVACK:  So --

11         THE COURT:  I am sorry, I thought you were done.

12         MR. NOVACK:  I could be done.

13         THE COURT:  Do you want to briefly respond?

14         MR. S. KULWIN:  Judge, I mean, there's nothing in

15  this paragraph that he is talking about that talks, "You can

16  take away half of what you sold me, I'm agreeing to that,"

17  number one.

18         Number two, there's nothing that -- there's no

19  evidence that -- it was her reasonable expectation that that's

20  what -- that this clause meant that he could do that.

21         And the only way that she could articulate that, one

22  way or the other, is saying, "After I got Berkhoff's letter

23  back, I talked to Judy DeAngelis.  We sat down and talked

24  about what it meant.  She explained -- " I'm not saying this

25  is going to be her testimony; I'm saying this is the only way

1    she could do it -- "She explained to me that, you know, what

2    this means is field changes, they can make minor changes, but

3    it doesn't mean that they can take away all of the common

4    elements that you are buying.  And, so, don't worry.  Go

5    ahead."

6          How can she -- you know, the only way that she can do

7    that is by talking about what she talked to her attorney

8    about, or asserting the -- so, she has to waive the

9    attorney-client privilege to rebut this or she has to assert

10   it.

11         And, you know, what's good for the goose is good for

12   the gander.  And -- that's one.

13         And, two, on the issue of causation, again, you know,

14   the defendants are trying to try this case as a breach of

15   contract case.  God love them.  They're entitled to do that.

16   None of this is irrel- -- none of this is material.

17         If they lied to us going in and she ended up giving

18   them the money because she was lied to, that's the proximate

19   cause, period.  So, that's first.

20         Second, on materiality, as I just said, how does he

21   connect it up?  His materiality argument is based on the

22   notion that Ms. Goldberg understands precisely what

23   Ms. DeAngelis is saying.  And, I will say, I don't think it

24   says anywhere in here, "Oh, by the way, on the common elements

25   that you think you're buying -- the ballrooms, the meeting

1393

1    rooms and function rooms -- we may take that away.  That is

2    what that paragraph means."  There is no evidence of that.

3    None.

4         And he never deposed Ms. DeAngelis on that.  And I

5    never deposed Mr. Cohen on that.

6         Mr. Cohen might not have thought that that's what it

7    meant.  Who knows what it meant?  The only way we could ever

8    know what it meant is if I had been allowed to depose

9    Mr. Cohen -- which I wasn't -- or if -- I, then, would have

10   deposed Ms. DeAngelis.  But I saw no need to since Mr. Cohen

11   wasn't coming here.  And, then, if Mrs. Goldberg was deposed

12   on whether or not she discussed all of this with Ms. DeAngelis

13   and what her understanding was.  And the only way she can do

14   that is by revealing attorney-client privileged

15   communications, which is unfair.

16        THE COURT:  Mr. Novack, briefly respond to the

17   attorney-client issue only.

18        MR. NOVACK:  Well, Judge, again, the point here is

19   that the request was made on behalf of Mrs. Goldberg.

20        If I lay the proper foundation -- which, I think, I'm

21   sure I will -- that she was acting within the course of her

22   duties, Mrs. Goldberg -- whether she knew or didn't know all

23   the intricate details -- is bound by what her lawyer did.  And

24   what her lawyer did was ask for this change.

25        And Mrs. Goldberg testified the common elements were

1394

1    very important to her.  This paragraph says, "We don't want

2    you to change those common elements."

3          Why do I say that?  Because it says, "We don't want

4    you to change the declarations," and the common elements are

5    in the declarations.  "Don't change those declarations without

6    our approval."

7          And the seller said, "No."

8          And, so, their side -- the buyer's side -- of this

9    knew that the common elements could be changed.  They asked

10   that that not happen.  They were told, "No."  And they,

11   nevertheless, went forward.

12         And there's nothing in here, by the way -- the

13   opposite of what Mr. Kulwin was saying, there's nothing here

14   -- that says, "We don't want you to be able to change -- make

15   those field changes and those zoning changes."

16         It says, "No changes whatsoever to the declaration."

17   That includes common elements -- the guts of this case.

18         THE COURT:  Assuming you can lay the proper

19   foundation for Defendants' Exhibit 522, I will permit this

20   line of questioning for several reasons.

21         Even if this does -- Exhibit 522 does -- not come in

22   under an exception to the hearsay rule, it certainly could

23   come in to notice to the plaintiff -- if you get that

24   foundation -- that she was aware of this.

25         It is directly relevant.  One, one of the elements

1395

1   you have to prove under the fraud claim is that the plaintiff

2   was actually deceived into -- that there was actual deception

3   here.  It is relevant to that.

4           It is directly relevant to punitive damages.

5           It is also responsive to, as Mr. Novack pointed out,

6   to some of the arguments that have been made that the elements

7   were important to her; that the provision only allowed code

8   changes.  It is directly relevant to those issues, that you

9   have injected here and put forth.

10          And it is very relevant to punitive damages.

11          I also addressed this in ruling on Plaintiff's Motion

12  in Limine No. 19, and I will incorporate my rulings there,

13  rather than reiterating them.

14          You have to lay the proper foundation, though.

15          MR. NOVACK:  On that subject, so we don't have to

16  have another sidebar, I thought -- I may have misheard, I

17  thought -- you said that I have to show that she was aware of

18  this at the time.  And I respectfully suggest that all I have

19  to do is have her acknowledge that she hired her, that she was

20  aware that she was doing work for her, that she was -- you

21  know, it was within her scope of her authority to consider

22  issues of the contract.

23          Because, again, I am going to -- I just want to --

24  quote the legal principle:  "Clients are generally bound by

25  their attorneys' acts or omissions during the course of the

1396

```
 1   legal representation that fall within the apparent -- " not
 2   even the actual, the apparent " -- scope of their attorneys'
 3   authority."
 4          And there's no requirement that the client know
 5   exactly what's happening.
 6          THE COURT:  I will have to hear the testimony and
 7   hear what basis you are seeking to have it admitted under.
 8          If you are -- I agree with you, if you are -- just
 9   seeking to have it admitted as a statement of an agent, then
10   you have -- if you get all of that, then you have -- laid your
11   foundation.
12          MR. S. KULWIN:  Okay.
13          THE COURT:  So, I will have to hear it during the
14   course.
15          I am going to take a two-minute break.
16          Let us line up the jury.
17          Bring Mrs. Goldberg back.
18          MR. NOVACK:  And could I -- I am sorry, before you
19   bring the jury in, just so -- we have three -- I think it's
20   three -- motions for judgment as a matter of law at the close
21   of their case.
22          THE COURT:  Okay.
23          MR. NOVACK:  And they have some complicated -- not --
24   we think easy, but comp- -- connect-the-dots-type of legal
25   issues that are going to be raised.
```

```
 1              We have a written -- three written motions in
 2    progress.  We are just waiting until the evidence is done, to
 3    plug in that stuff.  And I'm just wondering if we go pretty
 4    much through today on testimony, we have the jury instruction
 5    conference, we have these motions and I'm just throwing out
 6    there, is there any possibility that it would be appropriate,
 7    if you will, to give the jury the day off tomorrow, so that we
 8    can do all this stuff and come back Wednesday for closings --
 9    if there is a jury case left -- because if everything we are
10    going to argue to your Honor wins, there will be no jury.
11              THE COURT:  Do not count on it.  We will see.  But
12    let us see where we are today.  My guess is I will end up
13    taking your motions under advisement.
14              But let us see where we are today.
15              MR. NOVACK:  Thank you.
16              THE COURT:  Two minutes.
17              And if you would line up the jury, please.
18              (Brief recess.)
19              THE COURT:  Mr. Kulwin, your client approached and
20    wanted to say something to me, but I did not want her to
21    without you here.
22              MR. S. KULWIN:  She just wanted to know if she could
23    go to the restroom, Judge.  I'm sorry.  I apologize.
24              THE COURT:  Go ahead.
25              MR. S. KULWIN:  I apologize, Judge.
```

Goldberg - direct

1398

```
1              (Brief pause.)

2              THE COURT:  Bring in the jury, please, Danny.

3              (Jury in.)

4              THE COURT:  You may be seated.

5              Good morning, ladies and gentlemen.  Sorry for the

6    delay this morning.  We had some legal matters that we had to

7    take up before court.

8              We will proceed now.

9              When we broke on Friday afternoon, Mrs. Goldberg was

10   testifying.  We are continuing today with her testimony.

11             Mrs. Goldberg, you are still under oath, ma'am.

12             Mr. Kulwin, you may proceed.

13             MR. S. KULWIN:  Thank you, your Honor.

14      JACQUELINE GOLDBERG, PLAINTIFF HEREIN, PREVIOUSLY SWORN

15                   DIRECT EXAMINATION - Resumed

16   BY MR. S. KULWIN:

17   Q.  Jackie, I believe when we left, you had just looked at

18   some property reports.  And I want to go back to those, if we

19   could.  I am going to hand them up to you.

20             And just to speed things along, I am going to hand

21   you what's marked as -- in evidence as -- Plaintiff's Exhibit

22   , -- I believe this is, 3.

23             2 -- Plaintiff's Exhibit  2 -- the first amended

24   property report dated February 25th, 2004.

25             I'm going to direct your attention to Section 3.1
```

Goldberg - direct

1399

1    and, then, up to that point (indicating).

2           And I have tagged it, just to move things along.

3           (Document tendered.)

4    BY MR. S. KULWIN:

5    Q.  Now, do you see the description there of common elements

6    in Section 3.1 of the first amended property report?

7    A.  Yes.

8    Q.  And could you read it out loud for the jury slowly, up

9    until the point where I've tagged it.  Okay?

10   A.  Starting with, "The common elements"?

11   Q.  Yes, starting with "The common elements," going over to

12   the next page.

13          MR. NOVACK:  Excuse me.

14          I wonder, Mr. Kulwin, if could tell us what page of

15   the exhibit you are on?

16          THE WITNESS:  9.

17          THE COURT:  Page 9 of Plaintiff's Exhibit  2.

18          MR. NOVACK:  Thank you.

19   BY MR. S. KULWIN:

20   Q.  Go ahead.

21   A.  "The common elements include, without limitation and, if

22   applicable, any of the following items located at the

23   property:  The walls, roofs, hallways, interior and exterior

24   stairways, passenger elevators, service elevators, entrances

25   and exits, security system, life-safety equipment and systems,

Goldberg - direct

1400

1    mechanical equipment areas, utility rooms, water heaters

2    serving multiple units, the front desk area, concierge's area,

3    bell desk area, offices, housekeeping closets on each floor of

4    the condominium-containing units, laundry facilities, lobby

5    facilities, meeting function rooms and ballrooms, storage

6    areas, the executive lounge, mailboxes, if any."

7    Q.  Now, Jackie, when you brought this property report home

8    after the meeting on August 2nd, 2006, after you had signed

9    the purchase agreement, did you see that description in the

10   property report?

11   A.  Yes.

12   Q.  Did you also see it during the two-day period you had to

13   revoke the contract, if you wanted to?

14   A.  Yes, that's really when I saw it.

15   Q.  Now, at any time during any of your meetings with the

16   Trump brokers in July or August, 2006, did anyone ever tell

17   you or suggest to you that Donald Trump might decide to keep

18   the facilities that were listed in that section for himself?

19   A.  No.

20   Q.  Had they done so, would you've agreed to buy the units?

21          MR. NOVACK:  Objection --

22   BY THE WITNESS:

23   A.  No.

24          MR. NOVACK:  -- to the hypothetical.

25          THE COURT:  Overruled.

Goldberg - direct

1401

1   BY MR. S. KULWIN:

2   Q.  What was the answer, ma'am?

3   A.  No.

4   Q.  Were each of these items something you considered in

5   deciding -- that was important to you in deciding -- to buy

6   these units?

7   A.  Yes.

8   Q.  Now, aside from the stream of income that some of these

9   facilities provided, were there any other reasons why these

10  items factored into your decision to buy?

11  A.  Yes.  I would have ownership of part of a hotel jointly

12  with other people, and that was -- to me, it was -- a new kind

13  of thing.  It wasn't a condominium.  It was interesting.  It

14  was exciting.

15          And, incidentally, there was -- there was -- another

16  factor having to do with my decision -- it was sort of the

17  extra something -- and that was that the Trump reputation --

18  the Trump hotel reputation -- was known all over the world.

19          This was going to be -- I believed this was going to

20  be -- a destination restaurant for people coming from out of

21  town.

22          I don't know if I've answered you completely?

23  Q.  You have.

24  A.  Okay.  Thank you.

25  Q.  I want to show you Plaintiff's Exhibit  75.

Goldberg - direct

1402

1    And, again, just to speed things along -- it's in

2    evidence -- I've tagged some of the pages so we can speed

3    things along.

4         I just want to ask you to leaf through this, ma'am.

5         (Document tendered.)

6    BY MR. S. KULWIN:

7    Q.  And, tell me, did you receive brochures like this prior

8    even to purchasing either of the units?

9         MR. NOVACK:  I'm going to object to foundation, to

10   say, "Did you receive materials like this" is too vague.

11        THE COURT:  Overruled.

12        You may answer "Yes" or "No," ma'am.

13        And, then, you can lay more of a foundation.

14   BY THE WITNESS:

15   A.  Yes, I received them.

16   BY MR. S. KULWIN:

17   Q.  Okay.

18        And when you say, "Yes," you received them, did you

19   receive these very type of brochures?

20   A.  I received brochures that had these same pictures in them.

21   Q.  And the same descriptions?

22   A.  And the same descriptions.

23   Q.  Okay.

24        What, if anything, did these brochures tell you about

25   what you were buying?

Goldberg - direct

1403

A.  This was going to be a beautiful, well-located piece of
real estate, a beautiful building, something that would be
very attractive.

All the inside -- all the pictures indicate it's
going to be something that people want to go to.

And, outside of that, there were -- there were --
some descriptions of the inside.

The laundry facilities are mentioned somewhere.  I
think I remember that.

There were descriptions of the building.  There was
also a description of the rental program, which would be
involved.

Q.  We'll get to the rental program in a second.

Let me ask you this:  Did reviewing these brochures
factor into your decision that buying an interest in this
hotel, in addition to your hotel condominium units, was a good
investment idea?

A.  Oh, yes.

Q.  Now, if you turn to the page --

MR. S. KULWIN:  If I may approach?

THE COURT:  You may.

MR. S. KULWIN:  Thank you.

BY MR. S. KULWIN:

Q.  And, again, I've tagged it, just to -- I got it mixed up.
If I can have it for just one second?

                        Goldberg - direct
                                                              1404

 1              (Brief pause.)

 2    BY MR. S. KULWIN:

 3    Q.  If you could turn to the "Gentlemen," on Page 7, Exhibit

 4    75, DFS 4433.

 5              If you could turn to this.

 6              It's, actually, right up there, Jackie.

 7    A.  I'm looking at it.

 8    Q.  You're looking at it.

 9              Can you see it okay?

10    A.  Yes.

11    Q.  Good.

12              Now, I'm showing you a page from the brochures that

13    you received.

14              Did you see this list of hotels at the time you were

15    looking into buying these hotel units?

16    A.  Yes.

17              MR. NOVACK:  I would ask that we be advised of which

18    exhibit number and which particular page is being addressed at

19    this point?

20              MR. S. KULWIN:  That's what I just did.  It's 75.

21    And I read the Bates number.

22              THE COURT:  Correct.  It is in the record --

23              MR. S. KULWIN:  Thank you.

24              THE COURT:  -- Exhibit 75.

25    BY MR. S. KULWIN:

Goldberg - direct

1405

1    Q.  All right.

2         What did this list tell you, if anything, about the

3    Trump organization and Mr. Trump?

4    A.  That, over the years, the Trump organization had been very

5    successful; and, because they kept building new facilities,

6    they certainly -- of different kinds, residential hotels,

7    resorts, that they were -- a very competent and successful

8    firm.

9         It gave me a lot of confidence in dealing with them.

10   Q.  Let me ask you a question, Ms. Goldberg.  Would you have

11   gone ahead with your purchase had you known that the Trump

12   organization had no real experience running hotels?

13   A.  No.

14   Q.  Let's go back to Plaintiff's Exhibit  7, if we could.

15        MR. S. KULWIN:  Mike, can I have Exhibit H of Exhibit

16   7?

17        THE COURT:  This is Plaintiff's 7?

18        MR. S. KULWIN:  Plaintiff's 7, your Honor.

19   BY MR. S. KULWIN:

20   Q.  Jackie, up on the screen you will see Exhibit H of

21   Plaintiff's Exhibit  7.

22        Now, let me ask you:  This was something that you saw

23   when you were purchasing the condos?

24   A.  Yes.

25   Q.  Okay.

Goldberg - direct

1406

1    A.  This was in the -- this looks like it was from the

2    third --

3    Q.  Report?

4    A.  -- property report.

5    Q.  Okay.

6            Let me ask you, you see these budget numbers --

7            MR. S. KULWIN:  And, Mike, can you scroll down

8    slowly?

9            Keep going.  Keep going.

10   BY THE WITNESS:

11   A.  Yes.

12   BY MR. S. KULWIN:

13   Q.  You see all those.

14           Let me ask you, Jackie, would you have gone ahead

15   with your purchase had Trump told you that they really had no

16   experience in preparing budget numbers like this?

17   A.  No, I would not have gone ahead.

18   Q.  Would you have gone ahead in buying it if they had told

19   you not only they had no experience, they didn't have anybody

20   on their staff who really had the ability to put together a

21   hotel budget like this?

22   A.  No.

23   Q.  Did anything in the property reports that you received or

24   the marketing materials that you received tell you that the

25   Trump organization had no real experience running hotels?

Goldberg - direct

1407

1   A.  Everything, the opposite.

2   Q.  What do you mean?

3   A.  That it not only didn't tell they they didn't have

4   experience, everything told me they did have experience and

5   success -- and successfully done.

6   Q.  Okay.

7       Did anything tell you that they had no exp- -- in

8   those property reports or marketing materials that really they

9   didn't have anybody on their staff who could actually put

10  together a good hotel budget, which would advise people of

11  what their common assessments would be?

12  A.  No.

13  Q.  Did you hear from any of the salespeople at any time,

14  while they were selling you, that, you know, "Don't rely on

15  the property reports or, you know, you can't -- these budget

16  numbers or the marketing materials -- because you know, what?

17  Trump really doesn't have any real experience running a

18  hotel"?

19       MR. NOVACK:  Judge, this is argument.

20       THE COURT:  Rephrase your question.

21       MR. S. KULWIN:  Sure, your Honor.

22  BY MR. S. KULWIN:

23  Q.  Did any of the salespeople that you were dealing with ever

24  tell you, "You know, I know these brochures look good, but

25  Trump really doesn't have any experience running hotels"?

Goldberg - direct

1408

1   A.  No.

2   Q.  Did anyone tell you, "You know, when you're reviewing the

3   property reports, keep in mind that Trump has no experience

4   putting together budgets like this"?

5   A.  No.

6   Q.  Had you been told those things, would you have bought your

7   units and an interest in the hotel?

8           MR. NOVACK:  Objection.

9   BY THE WITNESS:

10  A.  No.

11          MR. NOVACK:  Asked and answered.

12          THE COURT:  Overruled.  The answer can stand.

13  BY THE WITNESS:

14  A.  No.

15  BY MR. S. KULWIN:

16  Q.  Would you have had questions about your confidence in

17  investing in this hotel and buying this real estate if you

18  know -- had known -- that, really, the Trump organization had

19  no experience?

20  A.  No.

21  Q.  Now, here's another, if I can -- going back to Exhibit 75.

22          MR. S. KULWIN:  I'm checking.  Please hold.

23          If I may have a moment, Judge?

24          THE COURT:  You may.

25          (Brief pause.)

Goldberg - direct
1409

1   BY MR. S. KULWIN:

2   Q.  Now, did you see these FAQs -- F-A-Qs -- when you were

3   purchasing?

4   A.  Yes.

5   Q.  Okay.

6         And after reviewing these FAQs and other questions

7   that were put on these FAQs, what was your understanding of

8   how the rental program worked?

9   A.  That every time -- they were going to use a point system

10  to make sure everybody was -- was -- everybody's unit was --

11  rented equally over time.

12        The point system worked something like this:  You

13  would get -- there would be a point credited to your account

14  every time your unit was used.  And the next time there was an

15  opening, if you were the first one with the least number of

16  points, you would be picked first -- your unit would be used

17  first.

18  Q.  Did you see this in the FAQs (indicating):  "How does an

19  owner stay in a personal guest room affect the rental

20  program?"

21        Answer:  "When an owner or the designated guest of an

22  owner occupies their personal guestroom, the reservation

23  system does not assign any rotation points for that night.

24  Therefore, you are encouraged to stay in your personal

25  guestroom since the reservation system will make up for the

                              Goldberg - direct
                                                                  1410

1    'vacancy' of the room after your departure."

2              Do you recall seeing that at the time?

3    A.  Yes.

4    Q.  And how did you understand that to mean, other than what

5    it obviously says?

6    A.  That anybody who wanted to use their unit could use it for

7    some temporary stay without being penalized, as far as the

8    rental system was concerned.

9    Q.  Now, were these representations in this marketing

10   material, was that another factor that you considered in

11   deciding to purchase your hotel condominium units?

12   A.  Yes, although it wasn't something for myself that I

13   considered it.  But, at some point down the road, I felt it

14   would be a selling feature for another -- for somebody I might

15   want to sell it to.

16   Q.  Can you explain what you mean to the jury, please, by "a

17   selling feature" and why that was?

18   A.  It's an extra something that they get, that's a benefit of

19   coming from owning this unit.

20   Q.  Now, did anyone from the Trump organization, while you

21   were in the process of buying your units -- including the

22   brokers -- ever tell you that you could expect that this

23   program was going to be changed right before it was time to

24   close?

25   A.  No.

Goldberg - direct

1411

1   Q.  Or that it could be changed to give the Trump organization

2   complete discretion to rent things any way they wanted,

3   without regard to this rotation point system?

4   A.  No.

5   Q.  Or that they were going to -- that they were going to --

6   consider at some point taking away the ability of the owners

7   staying without any adverse impact?

8   A.  Are you talking about using the unit?

9   Q.  Right.

10  A.  No.

11  Q.  Had they told you that those things were subject to

12  change, would it have affected your decision to purchase these

13  things?

14  A.  Yes, because then I wouldn't know where we are.

15  Q.  I want to go now to the August 8th meeting, because I

16  think we covered the August 2nd meeting.

17          The August 8th meeting -- did you meet with people

18  from the Trump organization or the brokers on or about August

19  8th, 2006?

20  A.  Yes.  That -- I think that -- was the meeting with --

21  where Robert Shearer couldn't come.  And --

22  Q.  I'm talking about the second meeting, Jackie.  I

23  apologize.  The second time you purchased the unit.  I

24  apologize.

25  A.  Oh, that -- at that point.

                            Goldberg - direct

1              Who was there?

2     Q.  Yes.  I'm asking you who was there, that second time you

3     purchased the unit?

4     A.  Robert Shearer and -- well, Tere Proctor usually

5     participated in part of these conversations.  I think she was

6     in and out at every one of them.  And my -- my -- real estate

7     broker.

8     Q.  And who is that?

9     A.  Terry Vogue.

10    Q.  And where did the meeting take place?

11    A.  At the IBM Building.

12    Q.  Okay.

13             And did you receive property reports -- the three

14    property reports -- from '04 and '05 at that meeting, as well?

15    A.  Yes.

16    Q.  Did anyone tell you there was any difference between what

17    was in the property report you received on August 2nd and

18    these property reports?

19    A.  No.  And they looked similar to me.

20    Q.  And did you see -- as you've read before -- those same

21    common elements that were described in those property reports,

22    as had been in the earlier ones, during that two-day period

23    that you had to revoke?

24    A.  Yes.

25    Q.  At any time during the August 8th meeting did anyone tell

Goldberg - direct

1413

1   you -- from the Trump organization or these brokers tell

2   you -- that the common elements -- the ballrooms, meeting

3   rooms, laundry facilities, things of that nature, that were

4   outlined in the property reports -- might be something that

5   Mr. Trump would consider keeping for himself have down the

6   road?

7   A.  No.

8   Q.  Did they -- had they told you that, would you have agreed

9   to buy?

10  A.  No.

11  Q.  Did anyone tell you that the -- during those meetings --

12          MR. S. KULWIN:  I'll strike that.

13  BY MR. S. KULWIN:

14  Q.  Did anyone tell you during those meetings -- and I'm going

15  to shorten it -- any statements like what I asked you about

16  before -- that the Trump has no ability to run hotels, they

17  have no ability to do budget numbers -- anything like that?

18  Hear anything like that?

19  A.  Never.

20  Q.  Had you known or had they told you or suggested to you

21  that, "Look, Mr. Trump might end up keeping the ballrooms, the

22  meeting rooms and all these things from the commercial area --

23  from the common elements -- for himself," would you have

24  bought the second unit?

25  A.  No.

Goldberg - direct

1414

1   Q.  Had they told you that, "The budget numbers might not be

2   reliable because Trump really has no experience in running a

3   hotel or doing such numbers," would you have bought the unit?

4   A.  No.

5   Q.  Did anyone tell you at that meeting that the description

6   of the marketing -- of the -- sorry -- that the description of

7   the reservation program, the marketing materials, the

8   description of the reservation program, the rotation points,

9   the owner's ability to stay, things of in a nature -- did

10  anyone tell you that that was going to be changed down the

11  road or might be changed down the road?

12  A.  No.

13  Q.  Actually, I'm going to take these back so they don't fall

14  and you have it up there.

15  A.  Okay.

16  Q.  Jackie, I've put up on the board there Plaintiff's Exhibit

17  60-B in evidence.

18          Do you recognize this document?

19  A.  Yes.

20  Q.  Okay.

21          And is this the purchase agreement that you signed

22  for the second unit, 2240?

23  A.  Yes.

24  Q.  And is the total purchase price for it --

25  A.  926,687.

Goldberg - direct

1415

1   Q.  Okay.

2           MR. S. KULWIN:  Could you go up a little bit, Mike?

3           Yes, keep going down, please.

4           This one here, 971.

5           Stop.  It is 971, please.

6   BY MR. S. KULWIN:

7   Q.  With all of the extras, is this the total price that you

8   were supposed to pay for the second unit?

9   A.  Yes.

10  Q.  And if you look, there's a number of payments that you

11  needed to make:  92,668 at the time you signed the contract;

12  46,000, you know, for a second installment; 46,000 for a third

13  installment; $9,000, along the way, and so forth and so on.

14          To the best of your knowledge, did you make all of

15  these payments?

16  A.  Yes.

17  Q.  Okay.

18          And can you tell us for the two units that you

19  purchased, all told, can you recall how much it was -- the

20  deposits that you made, total?

21  A.  A little -- just the deposits?

22  Q.  Just the deposits.

23  A.  20 percent of the -- for the -- for the two units, 20

24  percent of the purchase price; and, for the fixtures and

25  furniture, 75 percent.

Goldberg - direct

1416

 1    Q.  And does that total $516,000, to the best of your

 2    recollection?

 3    A.  Yes, it does.

 4    Q.  Now --

 5              MR. S. KULWIN:  You can take that down.

 6    BY MR. S. KULWIN:

 7    Q.  Jackie, as you understood it, were you supposed to get

 8    paid interest on these deposits while you were waiting --

 9    while the building was being built?

10    A.  Yes.

11    Q.  And did you receive something called 1099s from the Trump

12    organization advising you about -- actually, take that back.

13              Did you receive --

14              MR. S. KULWIN:  I'll withdraw that question.

15    BY MR. S. KULWIN:

16    Q.  Did you receive 1099s advising you how much interest had

17    been earned on those deposits, as you were waiting for the

18    building?

19    A.  Yes, I did.

20              MR. S. KULWIN:  If I may have one moment, Judge?

21              THE COURT:  You may.

22    BY MR. S. KULWIN:

23    Q.  Can you recall approximately how much interest accrued

24    over that time period?

25    A.  Approximately, $45,000.

Goldberg - direct

1417

1    Q.   Okay.

2         And did you -- were you required to pay taxes on that

3    money?

4    A.   Yes.

5    Q.   And did you?

6    A.   Yes.

7    Q.   Have you ever received that money?

8    A.   No.

9    Q.   Now, did there come a point in time in -- that you learned

10   that the Trump organization had made changes to the common

11   elements, after you had purchased your units?

12   A.   Yes.

13   Q.   And approximately when was that?

14   A.   I actually got a fourth amended property report in late

15   2007, but I didn't actually -- I looked at -- I opened it and

16   looked at it.  It looked like a routine thing -- just an

17   update -- and put it on the side, because I was particularly

18   busy at that point.  So, I didn't really hear any -- I didn't

19   really recognize that it had been changed until I got a phone

20   call from Terry Vogue.

21   Q.   Before you tell me about the phone call, can you tell us

22   approximately when that was -- what month and year?

23   A.   I -- it would be January, February of 2008.

24   Q.   Now, you received a phone call --

25   A.   Probably February.

Goldberg - direct

1418

1    Q.  Okay.

2           You received a phone call from Terry Vogue, that's

3    your broker you referenced before, right?

4    A.  Right.

5    Q.  Was anybody else on the line at the time you got the call,

6    besides you and Terry?

7    A.  No, not that I know of.

8    Q.  Okay.

9           Can you tell the ladies and gentlemen of the jury

10   what was said during the conversation?

11          MR. NOVACK:  I'm going to object on hearsay grounds.

12          THE COURT:  What is your response?

13          MR. S. KULWIN:  Any statements made to Ms. Goldberg

14   go to her state of mind, your Honor.

15          Also, Ms. Vogue will be here right after her to fill

16   that in.

17          And, also, it's for contextual purposes.  And her

18   part of the conversation is not offered for the truth.

19          THE COURT:  Okay.

20          So, you are offering it to show what she knew and for

21   her state of mind?

22          MR. S. KULWIN:  Correct.

23          THE COURT:  Ladies and gentlemen, the testimony you

24   are about to hear is not being offered for the truth of what

25   was said to Mrs. Goldberg, but it is being offered to show

Goldberg - direct
1419

1    what was said to her and to her state of mind at the time.

2           MR. S. KULWIN:  May I proceed, Judge?

3           THE COURT:  You may answer.

4    BY MR. S. KULWIN:

5    Q.  Okay.  Can you tell us what was said during the

6    conversation?

7    A.   Terry told me that she had seen an recall article in the

8    Tribune --

9           MR. NOVACK:  I am going to object, your Honor.  It's

10   a motion in limine matter which, regrettably, I will ask for a

11   sidebar discussion on.

12          THE COURT:  I think you need to move beyond -- go to

13   just what was said to her, not what may have been seen or --

14          MR. S. KULWIN:  I think we're going to have --

15          THE COURT:  -- is that part of it?

16          MR. S. KULWIN:  That's part of it, Judge.

17          THE COURT:  Okay.

18          Let us go to sidebar.

19          (Proceedings had at sidebar:)

20          THE COURT:  Okay.  What are you seeking for her to

21   elicit from her?

22          MR. S. KULWIN:  She is going to say that Ms. Vogue

23   called her and said there was an article in the Tribune that

24   -- about a lawsuit that other buyers had brought; that they

25   were complaining that the common elements -- the interests in

Goldberg - direct

1420

1   the hotel had been removed; and, she's going to say -- I think

2   she's going to say -- "I was flabbergasted.  I told her to

3   look into it."

4          And, then, I am going to show her the article and

5   say, "To the best of your knowledge, is this what she was

6   referring to?"

7          "Yes, I saw it later on.

8          "What did you tell her to do?

9          "I told her to find out if there's any truth to it.

10  I have trouble believing it."  Okay?

11         And, then, afterwards she is going to say Terry Vogue

12  sent her an e-mail, which, I believe, is in evidence in this

13  case -- I think the defendants put it into evidence -- and

14  she's going to go over that e-mail.  And, then, she's going to

15  talk about her response -- the one that Mr. Novack showed in

16  his opening statement -- and I'm going to ask her -- what he

17  said was true -- what did she really mean?

18         And it's very important that she be able to refer to

19  the Tribune article, in light of what he said.  Otherwise, the

20  jury is going to think she's making it up.

21         MR. NOVACK:  Well, I think we're bumping up right

22  against what was not supposed to happen, which is to talk

23  about that NKJ litigation.

24         THE COURT:  Well, I am not admitting the article --

25         MR. S. KULWIN:  Right.

Goldberg - direct

1421

```
 1              THE COURT:  -- into evidence --

 2              MR. S. KULWIN:  I understand.

 3              THE COURT:  -- even for state of mind.

 4              MR. S. KULWIN:  But can she -- I'm sorry.

 5              THE COURT:  She can -- given the comments that were

 6   made the other day, on May 14th, and my ruling, yes, you are

 7   correct that she may say -- that she got reference to -- that

 8   she had this call, that she was referring to a Tribune

 9   article, but not going into the detail of everything that is

10   in the Tribune article --

11              MR. S. KULWIN:  Right.

12              THE COURT:  -- just the fact that there was --

13              MR. NOVACK:  A lawsuit?

14              THE COURT:  -- a lawsuit --

15              MR. NOVACK:  Singular.

16              THE COURT:  -- and that is what brought this to her

17   attention.

18              MR. S. KULWIN:  But one second, Judge.

19              It's important to put in context that it's a lawsuit

20   against Trump.

21              THE COURT:  Oh, absolutely.

22              MR. S. KULWIN:  Right, for --

23              THE COURT:  Absolutely.

24              MR. S. KULWIN:  -- for -- I mean, alleging that

25   the interest -- because that's why she has this suit.
```

Goldberg - direct

1422

1   THE COURT:  Correct, correct.

2   MR. S. KULWIN:  That's all she's going to say.

3   (Proceedings had in open court:)

4   MR. S. KULWIN:  And, Joe, I am sorry, could you read

5   me the last question back, please?

6   THE COURT:  Go ahead, Joe.

7   (Record read.)

8   BY MR. S. KULWIN:

9   Q.  Go ahead, Mrs. Goldberg.

10  A.  Terry told me that she had seen a Tribune article which

11  said that Trump was being sued for -- I don't know what the

12  exact cause was, but because he violated -- he -- because of

13  the common element -- common elements -- of the -- of the

14  program being taken back -- being eliminated from the things

15  that were going to be sold to the purchasers.

16  BY MR. S. KULWIN:

17  Q.  I want to show you now what I've marked as 87-A, for

18  identification only.  And I don't want you to actually read

19  out loud anything in the article, but did there come a point

20  in time when you learned that this was the article that Ms.

21  Vogue was referring to?

22  (Document tendered.)

23  BY THE WITNESS:

24  A.  Yes.

25  BY MR. S. KULWIN:

Goldberg - direct

1423

1    Q.  And can you tell us what the date on that article is?

2    A.  I don't see it.

3    Q.  Right there (indicating).

4    A.  Oh, February 12th.

5    Q.  What year?

6    A.  2008.

7    Q.  Thank you.

8         Now, after she told you that, what, if anything, did

9    you say?

10        MR. NOVACK:  I'm going to object to that as that's

11   not evidence of her hearing something for her state of mind.

12   This is her -- her -- own out-of-court statement.

13        MR. S. KULWIN:  It's her portion of the conversation,

14   Judge.

15        THE COURT:  Overruled.

16        You may answer, Mrs. Goldberg.

17   BY THE WITNESS:

18   A.  I said, "Terry, I can't believe this.  I've got to -- I've

19   got to get a -- I've got to get a call in to Judy.  Can you

20   get any more information -- "  I think I remember asking her,

21   "Can you get any more information on this?"

22   BY MR. S. KULWIN:

23   Q.  Okay.

24        And did she tell you she would?

25   A.  She said she'd try.

Goldberg - direct

1424

1    Q.  Subsequent to that conversation, did you hear from Ms.

2    Vogue, again?

3    A.  Yes, I did.

4    Q.  By phone or e-mail?

5    A.  I think the next contact was an e-mail.

6    Q.  All right.

7         Let me show you what I've marked -- I think it's in

8    evidence already -- as Plaintiff's Exhibit  88 -- I'm sorry,

9    87.  I apologize.

10        MR. S. KULWIN:  Before you put it up, Mike --

11        Do you guys want to check?  I'm pretty sure it's in

12   either as a defense exhibit or a Plaintiff's Exhibit .

13        MR. SHONKWILER:  I don't see it on my list.

14        87?

15        MR. S. KULWIN:  Yeah.

16        MR. SHONKWILER:  That's plaintiff's or defendants'?

17        MR. S. KULWIN:  It's also a defense exhibit.

18        Judge, may we have a moment to confer?

19        THE COURT:  It is not in under the number Plaintiff's

20   87.  If it's marked as a defendants' exhibit, also, you will

21   have to tell me that number.

22        MR. S. KULWIN:  Is 592 on the list, Judge -- defense

23   exhibit?

24        THE COURT:  Yes, 592 has been admitted.

25        MR. S. KULWIN:  Okay.

Goldberg - direct

1425

1    And, Judge, since it's the same one as Exhibit 87,

2  can I move 87 in, as well?

3    THE COURT:  Do you agree it is the same one as

4  Plaintiff's 87?

5    MR. SHONKWILER:  One moment.

6    MR. NOVACK:  Yes.  I was going to say, "Yes."

7    THE COURT:  I will admit it once we have confirmation

8  it is the same.

9    MR. NOVACK:  It is, Judge.

10    THE COURT:  Or, I guess, the better question is:  Do

11  you have any objection to it?

12    MR. NOVACK:  We have no objection.  It's our exhibit,

13  Defendants' Exhibit 592.

14    THE COURT:  Okay.

15    I will admit Plaintiff's 87, then.

16    (Plaintiff's Exhibit  No. 87 received in evidence.)

17  BY MR. S. KULWIN:

18  Q.  Can you see it up there, Jackie?

19    Can you see it?

20  A.  Yes.

21  Q.  Is this the e-mail that Terry sent you?

22  A.  Yes.

23  Q.  Can you tell us what the date on that e-mail is?

24  A.  February 14, 2008.

25  Q.  And that's two days after the Tribune article?

Goldberg - direct

1    A.   Right.

2    Q.   And what time is she sending it to you?

3    A.   Before 4:00 a.m. in the morning.

4    Q.   Now, if you read the first sentence of the second

5    paragraph, "While" -- do you see that?

6         Can you read that out loud for the ladies and

7    gentlemen of the jury?

8    A.   "While touring the property, I discussed the Tribune

9    article with Kiyoko Binosi from the Sales Center.  As you

10   might expect, there was very little information disclosed or

11   volunteered.  I was committed to understanding the background

12   for the article; and, after several backdoor inquiries, I was

13   able to piece the information so that it made some sense to

14   me, that I could share with you."

15   Q.   Okay.

16        Now, the reference to the Tribune article, what did

17   you understand her to -- what article did you understand her

18   to -- be referring to?

19   A.   The one that she had spoken to me about two days before.

20   Q.   The February 12th article --

21   A.   The February 12th article.

22   Q.   -- that I just showed you about the lawsuit against Mr.

23   Trump?

24   A.   Right.

25   Q.   The Trump organization?

Goldberg - direct

1427

1   A.   Right.

2   Q.   Okay.

3            Now, after reviewing that e-mail, what, if anything,

4   did it tell you about whether or not Ms. Binosi had confirmed

5   whether the Trump organization had actually removed these

6   ballrooms and meeting rooms and function rooms from the common

7   elements?

8   A.   I believe that she was telling me that they really had

9   done it.

10  Q.   And what, if anything, did it tell you about whether the

11  Trump organization had actually changed the reservation

12  system, to eliminate or highly modify the rotation point

13  system?

14  A.   I -- yes, the rotation system had been changed and I --

15  and I wasn't -- I wasn't sure exactly what it was going to be.

16  Q.   Okay.

17           Now, ultimately, shortly after that, did you write an

18  e-mail back to Terry Vogue in response to this e-mail?

19  A.   Yes.

20  Q.   Let me show you what's been marked as Plaintiff's Exhibit

21  29 in evidence.

22           Can you tell us the date of this e-mail?

23  A.   February the 14th, the same day that she had called me

24  that morning.

25  Q.   Now, by the way, this says from Arthur Goldberg.  Why does

Goldberg - direct

1428

 1    it say from Arthur Goldberg?

 2    A.   My -- this was my husband's e-mail and he used to do all

 3    the e-mailing; but, after he had a stroke, I just took over

 4    his.

 5    Q.   Okay.

 6          And what's the subject of the e-mail on the subject

 7    line?

 8    A.   "Re:  Trump Update."

 9    Q.   Okay.

10          Now, if you could read the first sentence, starting

11    with "Terry," all the way to where it stops at the word "own."

12          MR. S. KULWIN:  Can you highlight that, Mike?

13    BY THE WITNESS:

14    A.   "Terry, if -- "

15    BY MR. S. KULWIN:

16    Q.   One second, please.

17          MR. S. KULWIN:  I guess I can't make it any bigger.

18          Go ahead.  That's what I wanted to do.  That's

19    perfect.

20    BY MR. S. KULWIN:

21    Q.   Can you read the highlighted portion?

22    A.   "If the net revenue or loss for the public areas was

23    originally to be shared by the hotel condo owners, Trump has

24    no right to revise that and change the property agreement on

25    his own."

Goldberg - direct

1429

1   Q.  I want to ask you -- before I get to the next question --

2   Jackie, how did you feel when you first heard that Ms. Binosi

3   had confirmed that these things were being removed?

4   A.  I thought I was in never-never land.

5   Q.  What do you mean?

6   A.  We have -- we have -- an agreement.  All of a sudden, it's

7   all been turned topsy-turvy.

8   Q.  Okay.

9        Now, in this, you say, "If the net revenue or loss to

10  the public areas."

11       What are you talking about, net revenue or loss?

12  A.  Well, in any venture, you may -- you may -- lose money or

13  you may make money.  You hope to make money, but you're ready

14  to lose, if that's -- if that's -- what happens.

15       So, I'm just saying whichever way it was.

16  Q.  When you purchased the interest in the hotel along with

17  your hotel units, were you prepared for the risk of taking a

18  loss?

19  A.  That's part of the package, yes.

20  Q.  Okay.

21       Now, if you could, I want to draw your attention to

22  in the middle, where it starts with, "It may be somewhere in

23  the earlier documents."

24  A.  Oh, yes.

25       MR. S. KULWIN:  Mike, keep highlighting, please.

Goldberg - direct

1430

1     "However, I don't think there would be a court case."

2     Thank you.

3  BY MR. S. KULWIN:

4  Q.  Can you read that out loud, please?

5  A.  "It may be somewhere in the earlier documents that Trump

6  had the right to revise.  However, if so, I don't think there

7  would be a court case."

8  Q.  Okay.

9     Now, first of all, what court case are you referring

10 to in this e-mail?

11 A.  The Tribune court case.

12 Q.  The one that we just talked about -- about Mr. Trump being

13 sued by others?

14 A.  Yes.

15 Q.  Now, were you in court for opening statements in this

16 case?

17 A.  In our case?

18 Q.  Yes, in our case.

19 A.  Yes.

20 Q.  And were you present when Mr. Novack talked to the jury

21 about this very sentence?

22 A.  Yes.

23 Q.  And did you hear him tell you -- tell them -- that you

24 were admitting that Mr. Trump had the right to revise these

25 documents in this e-mail?

Goldberg - direct

1431

```
 1   A.  I heard him say that.  He was mistaken.
 2   Q.  Okay.
 3        And did you hear him say that you were admitting that
 4   the court case you're referring to, is that you don't have a
 5   potential court case?
 6        Did you hear him say that, too?
 7   A.  Yes.
 8   Q.  And was that true?
 9   A.  No.
10   Q.  What are you saying here?
11   A.  What I'm saying, that there wouldn't have been a court
12   case -- I didn't think there would be a court case -- if there
13   was something in the earlier documents.
14   Q.  In other words, you wouldn't think that people could
15   sue -- would sue -- Mr. Trump for taking away all these
16   interests if he had the absolute right in the documents to do
17   it?
18        MR. NOVACK:  Objection.  That's leading.
19        THE COURT:  Sustained.
20   BY THE WITNESS:
21   A.  That's correct.
22        THE COURT:  I sustained.
23        MR. S. KULWIN:  I'm going to rephrase it, Judge.
24        THE COURT:  Okay.
25   BY MR. S. KULWIN:
```

Goldberg - direct

1432

1    Q.  Again, what did you mean by this sentence, sir -- ma'am?

2            Go ahead.

3            MR. NOVACK:  Well, asked and answered.  She already

4    explained what she meant.

5            THE COURT:  Overruled.

6            You may answer that, if you can.

7    BY THE WITNESS:

8    A.  If -- it's just -- I suppose it might be possible there's

9    something in the earlier documents that mean they could --

10   that -- that -- that talked about this.  But there -- it

11   wouldn't be -- there wouldn't be -- a court case if there was

12   something you could -- like that, in the earlier documents.

13   BY MR. S. KULWIN:

14   Q.  Okay.

15           MR. S. KULWIN:  You can take it down.

16           May I have one second?

17           THE COURT:  You may.

18           (Brief pause.)

19   BY MR. S. KULWIN:

20   Q.  Now, after this e-mail exchange, did you go back and

21   review all the documents, like you said you were going to in

22   your e-mail?

23   A.  Yes, I did.

24   Q.  Did you find anything in the documents that led you to

25   believe that Mr. Trump had the absolute right to take these

Goldberg - direct

1433

 1   things away?

 2           MR. NOVACK:  I'm going to object.  That's just

 3   irrelevant.

 4           MR. S. KULWIN:  Based on relevance.  Based on --

 5           MR. NOVACK:  That's the issue the jury's going to

 6   decide.

 7           THE COURT:  Sustained on form.

 8   BY MR. S. KULWIN:

 9   Q.  Did you find anything in these documents which led you to

10   believe -- based on your understanding of it -- that allowed

11   Mr. Trump the right to take these things away absolutely?

12   A.  Not as far as I could tell.

13   Q.  Now, let's talk about the e-mail.  I asked you whether you

14   had any understanding about whether the rotation points -- let

15   me show you what I have marked as Plaintiff's Exhibit  45.

16           MR. S. KULWIN:  Mike, can you pull up -- well, first,

17   pull up -- the first page of it.

18           In evidence.

19   BY MR. S. KULWIN:

20   Q.  If you could just review this for a moment and tell me

21   whether you recognize it.

22           (Document tendered.)

23   BY THE WITNESS:

24   A.  Yes.

25   BY MR. S. KULWIN:

Goldberg - direct

1434

1    Q.   What is it, ma'am?

2    A.   It's the agreement that was sent out to the unit buyers to

3    retain Trump -- the Trump management company -- as the -- it's

4    the agreement to be -- I'm sorry.

5    Q.   It's all right.

6    A.   It is the agreement between the unit owners and the

7    management company as to how the management was to be done.

8    Q.   For the rental program?

9    A.   For the rental program.

10   Q.   Okay.

11        And if you could turn to Page 7 and 8?

12        (Brief pause.)

13        MR. S. KULWIN:  Can you highlight the bottom?

14   BY MR. S. KULWIN:

15   Q.   "Priority of Rental," 3.6, can you read out loud, as far

16   as that, slowly, please?

17   A.    "Hotel manager shall make reasonable efforts to equitably

18   allocate unit reservations and occupancy among the

19   participating units, based on such factors as hotel manager

20   deems appropriate in hotel manager's sole -- " I think the

21   next word is "discretion."

22        MR. S. KULWIN:  Go to the next page, please, Mike,

23   and highlight the top.

24   BY THE WITNESS:

25   A.   " -- in his sole discretion; provided, however, that hotel

Goldberg - direct

1435

 1   manager shall have the absolute right to accommodate hotel

 2   guest preferences and requests, and to depart from internal

 3   policies and procedures concerning the allocation of

 4   reservations at any time, in its sole discretion, as hotel

 5   manager deems necessary to manage the hotel and to administer

 6   the rental program."

 7        Shall I continue?

 8   Q.  No, you can stop there.

 9        "Sole discretion," was that what you understood the

10   program was going to be?

11   A.  No.

12   Q.  What did you understand it was going to be?

13   A.  I understood that it would go on a rotation system.

14   Q.  Using a computer?

15   A.  Using a computer.

16   Q.  All right.

17        MR. S. KULWIN:  If we can turn to Section 8.8, Mike,

18   on Page 23.

19   BY MR. S. KULWIN:

20   Q.  All right.

21        Can you read that, please, to the ladies and

22   gentlemen of the jury?

23   A.  "Entire agreement.  This agreement constitutes the entire

24   agreement between the parties with respect to the subject

25   matter contemplated herein, and supersedes all oral statements

Goldberg - direct

1436

1   and prior writings with respect to the subject matter

2   contemplated herein, including, without limitation, any

3   promotional items or reference materials regarding the rental

4   program, such as Frequently Asked Questions, circulars or

5   similar rental program overview statements."

6   Q.  That's enough.

7          When you first saw this, what was your reaction to

8   this?

9   A.  They not only had --

10         MR. NOVACK:  Judge, I'm going to object.  I don't

11  think there's a foundation that she saw this.

12  BY MR. S. KULWIN:

13  Q.  You saw this in the agreement?

14  A.  I saw this.

15  Q.  Okay.

16         What was your reaction to it?

17         THE COURT:  I think you need to establish when.

18  BY MR. S. KULWIN:

19  Q.  Approximately when did you see it?

20  A.  Oh, this was after the fourth -- the fourth -- amended

21  property report came out.  And at the time I knew that they

22  had taken away -- that Trump was attempting to take away --

23  the common element rights ownership.

24         This was -- this was -- different.  This had to do

25  with the rotation system that remained -- which still was part

Goldberg - direct

1437

1   of the unit owners' agreement.  However, at this point I had

2   already -- I already knew that I -- that I -- had to do

3   something about the contract.  So, I hadn't -- I didn't sign

4   this and send it back.  I didn't sign the fourth amended

5   property report and send -- the acknowledgment of receiving

6   the fourth amended, because I knew I -- I couldn't -- I

7   couldn't go forward with this kind of a program without -- at

8   this point.

9   Q.  Okay.

10  A.  Am I saying too much?

11  Q.  A little bit.  Just a little bit too much.

12          But let me ask you, so, did you see this in

13  approximately February of '08, March '08, somewhere around

14  there?

15  A.  It was after the -- the -- Terry Vogue commentaries.

16  Q.  Okay.

17          In '08?

18  A.  In '08.

19  Q.  Okay.

20          What was your reaction when you saw this clause?

21  A.  I was back in never-never land.

22          However, I felt I was -- I felt that not only was --

23  Q.  Well, why don't we stop there.  Okay?

24  A.  Okay.

25  Q.  Let me ask you a question.  When you were given the --

Goldberg - direct

1438

1    MR. S. KULWIN:  Can we go back to "Frequently Asked

2    Questions"?

3    Plaintiff's Exhibit  75.  I apologize.

4    BY MR. S. KULWIN:

5    Q.  When you saw these frequently asked questions a couple of

6    years before, did anybody from Trump tell you, "Listen, we're

7    going to ultimately send you the rental management thing for

8    this, tell you that you couldn't really believe any of this --

9    that's in the frequently asked questions"?

10    Did anyone ever tell you, "Don't believe any of this"

11    at the time?

12    A.  No.

13    Q.  Or, "When you have to sign up for the rental agreement,

14    you're going to have to sign a document that says none of this

15    that we told you means anything"?

16    Did anyone tell you that?

17    A.  No.

18    Q.  Now, following all of these events in February of 2008 --

19    I just want to jump ahead -- did there come a pint in time, in

20    your own mind, when you decided that you had to decide what

21    you're going to do to go forward?

22    If you can just answer that question, did there come

23    a point in time?

24    A.  Yes.

25    Q.  Did you consider your options at that time?

Goldberg - direct

1439

1    A.  Yes.

2    Q.  And what did you consider your options to be?

3    A.  There were three.

4           I could walk away from the deal all together.  There

5    was no way I would do that.  I had a lot of money invested

6    in -- in it.  And just in the down payments that were

7    required.

8           I could accept the revised arrangement, which I

9    didn't want to be in business with somebody who would cheat

10   me.  And I would have been -- how do I know he is not going do

11   it, again?

12          Or I could take it to court.

13          Those were the only three -- well, I did try one

14   other thing later on.

15   Q.  Don't go into that, please.

16   A.  Okay.

17          But I felt those were the only three options; and,

18   one, I wouldn't consider at all; and, what do I do about the

19   other two?

20          And I didn't want to make the decision at that time.

21   I thought, "I have had no explanation."  I would have expected

22   some kind of a letter coming saying this is what we have to

23   do.

24          These are -- we're going to be partners in this

25   arrangement.  You don't make a one-sided deal when there's --

Goldberg - direct

1440

1    where you're all partners together.

2              I would have expected some kind of explanation.  I

3    never got one, just stonewalled.

4              But I did think, "Okay, he hasn't -- " or the Trump

5    organization hasn't -- "reneged on the deal yet.  They don't

6    renege on it until they actually come to delivery and they

7    don't deliver what you're going to get.  So, I really have

8    some time to see if I can't find a better solution."

9    Q.  Okay.

10             Now, when you say, "When it comes to deliver," are

11   you talking about when it was time to close?

12   A.  Yes.

13   Q.  And just for clarity, at closing you were required to pay

14   the full balance?

15   A.  That's correct.

16   Q.  Okay.

17             And that would have occurred -- what was your

18   understanding of when that was supposed to occur?

19   A.  In 2009.

20   Q.  Okay.

21             June of 2009?

22   A.  Originally, I think it was -- it might have been earlier.

23   But the final date was -- ended up -- 2009.  I think around

24   June.

25   Q.  And, again, just so we're clear, one of your options was

Goldberg - direct
1441

1    just to walk away and lose your money.  But was it your

2    understanding if you walked away and lost your money, you

3    would still have to pay for the units or you would just lose

4    your money?

5    A.  I didn't even think about that.

6    Q.  Okay.  All right.

7         Now, earlier -- I just want to go back to it very

8    briefly, it's a little bit out of rotation, but earlier -- we

9    had discussed -- and we didn't finish with it last week --

10   about how, back when you were analyzing an investment

11   opportunity -- a real estate condo opportunity -- how you went

12   about doing that.

13        Do you remember those questions last week?

14   A.  Yes.

15   Q.  Okay.

16        And I believe you mentioned that there was -- you

17   would try to get three to six percent.

18        Can you explain what you mean to the ladies and

19   gentlemen of the jury?

20   A.  In -- in the -- it partly depended on what kind of

21   investment I was making, what I would expect to return.

22        My experience with the --

23        MR. NOVACK:  Objection.  I'm going to --

24        THE COURT:  Sustained.

25        Be careful here.

Goldberg - direct

1442

1       MR. S. KULWIN:  I guess two things, Judge.  Can I get

2   a clarification?  And, then, I'm going to have to talk to her

3   real briefly and tell her what she can't say?

4       THE COURT:  Why do you not ask you another question;

5   and, then, if we need to do a clarification, we will.

6       MR. S. KULWIN:  Okay.  Sure.

7   BY MR. S. KULWIN:

8   Q.  Without going back into your experience yet, Jackie, how

9   would you analyze a real estate investment like the ones you

10  made here?

11  A.  I would start with the cost of -- well, outside of looking

12  over the property and deciding I'm interested, I would start

13  with the cost of the -- the purchase cost and any other costs

14  involved.  And, then, I would look at what the annual rentals

15  might -- would be likely to be.  And, then, I would look at

16  what are the expenses.  And, usually, you can get a whole

17  listing of those expenses, one way or another.

18      Of course, I had some idea, anyway, because at this

19  point, I was experienced in having done it.

20      But, anyway, you subtract the expenses from the

21  annual rental, and whatever is left is profit; or, it may be a

22  loss, too.  But let's say that there's a profit at this,

23  generally speaking.

24      And, then, I would determine what -- how much of

25  that -- what was that percentage of the total cost of the

Goldberg - direct

1443

1    property.  That's how I got my percentages.

2    Q.  And what percentage were you aiming for?

3    A.  Between three and six.

4    Q.  Jackie, how long has this litigation -- this case -- been

5    going on for you?

6    A.  Seven years.

7    Q.  Can you tell the ladies and gentlemen of the jury how, if

8    at all, you know, this litigation has affected you?

9    A.  I've been angry.  I have been -- felt like I have been --

10   conned.  I have worried about what the solutions -- what

11   solutions -- I could make.

12           It has affected my -- just, now, I have to worry

13   about whether my husband's caregivers are there on time, so I

14   can come and spend all day here; and, how is he -- I mean,

15   there's a lot of worry going into something like this.

16           I didn't worry as much sometimes as I did at others,

17   and I tried not to be angry about it.

18   Q.  Was it difficult for you to decide to undertake to sue

19   somebody like Donald Trump?

20   A.  Yes.  Yes, that's why it took --

21           MR. NOVACK:  I'm going to object as irrelevant.

22           THE COURT:  Overruled.

23           The answer can stand.

24   BY THE WITNESS:

25   A.  That's one of the reasons I waited so long to make a

Goldberg - cross

1444

1    decision.  But somebody had to stand up to him.

2    BY MR. S. KULWIN:

3    Q.  Is that why you went ahead?

4         Is that one of the reasons you went ahead?

5    A.  That's one of the reasons.

6         MR. S. KULWIN:  If I may have a moment, Judge?

7         THE COURT:  You may.

8         (Brief pause.)

9         MR. S. KULWIN:  At this time, your Honor, I have no

10   further questions.

11        THE COURT:  Did you say "no further questions"?

12        MR. S. KULWIN:  At this time, your Honor, yes.

13        THE COURT:  Okay.

14        Let us take our morning break.

15        (Jury out.)

16        THE COURT:  We will pick up in about ten minutes.

17        MR. S. KULWIN:  Thank you, your Honor.

18        (Brief recess.)

19        THE COURT:  Are you ready?

20        Mr. Novack, are you ready?

21        MR. NOVACK:  Yes, Judge.

22        THE COURT:  Mrs. Goldberg, you may come back up.

23        (Jury in.)

24        THE COURT:  You may be seated.

25        Mr. Novack, cross-examination.

1    MR. NOVACK:  Thank you, your Honor.

2                    CROSS-EXAMINATION

3    BY MR. NOVACK:

4    Q.  Good morning, Mrs. Goldberg.

5    A.  Good morning.

6    Q.  Mrs. Goldberg, you will recall that Mr. Kulwin asked you a

7    series of questions this morning, basically saying to you when

8    the salespeople talked to you about buying these units, did

9    any of them say to you, "Yeah, these amenities are in the

10   common elements now, but we're going to take them out later."

11        Do you recall that?

12   A.  Yes.

13   Q.  And you said you wouldn't have bought if they had said

14   that to you, correct?

15   A.  That's true.

16   Q.  Now, you expected them to tell you the truth, right?

17   A.  Yes.

18   Q.  You wouldn't want them to have told you something that was

19   false, would you?

20   A.  No.

21   Q.  So, if, at the time that you were talking to them in

22   2006 -- which is over a year earlier than the fourth

23   amendment -- if at that time they weren't intending to take

24   those common elements out, you would not have expected them to

25   tell you that they were, would you?

                                Goldberg - cross
                                                                    1446

 1              MR. S. KULWIN:  Objection.  Argumentative.  Form.  It
 2    calls for speculation.
 3              THE COURT:  Sustained on form.
 4              Rephrase it.
 5    BY MR. NOVACK:
 6    Q.  Mrs. Goldberg, you said that you wanted them to tell you
 7    the truth --
 8    A.  I expected that they would --
 9    Q.  -- right?
10    A.  -- yes.
11    Q.  So, if the facts were that they had no intention of taking
12    those common elements out at the time -- following me so far?
13    A.  Yes.
14    Q.  -- would you have expected them to tell you that they were
15    going to take them out?
16              MR. S. KULWIN:  The same objection, Judge.
17              THE COURT:  Overruled.
18              You may answer, if you can.
19    BY THE WITNESS:
20    A.  At the time -- I'm sorry.  Please repeat your question.
21              MR. NOVACK:  Could you read it?
22              Judge, could you ask the court reporter to read it
23    back?
24              THE COURT:  Yes.
25              Joe, would you read it back, please?

Goldberg - cross

1447

1     (Record read.)

2  BY THE WITNESS:

3  A.  I wouldn't have ex- -- I wouldn't have thought that they

4  would have known any differently at the time than what they

5  told me.

6  BY MR. NOVACK:

7  Q.  Well, then --

8  A.  So, I wouldn't have expected them to say anything about it

9  at all.

10 Q.  Well, that's right.  Thank you.

11     Now, you had discussions with your lawyers in

12 preparation for your testimony, correct?

13 A.  Yes.

14 Q.  Okay.

15     And you've said already that you're a Certified

16 Public Accountant, certified financial planner, right?

17 A.  Yeah.  A little rusty, but, yes.

18 Q.  And you provide your tax, accounting and financial

19 planning services through your own company, correct?

20 A.  Yes.

21 Q.  And the company is called Arthur Financial Services, Inc.?

22 A.  Yes, "Service."

23 Q.  "Service, Inc.," singular.  Okay.

24     I'll try to be as precise as you.

25     And that's a corporation, correct?

Goldberg - cross

1448

1  A.  Yes.

2  Q.  Okay.

3       You're the sole owner?

4  A.  Yes.

5  Q.  Even though your husband Arthur's name is in the name of

6  the company, he is not an owner, correct?

7  A.  He is not a member.  I gave him the name because -- I gave

8  it that name because -- he was the first -- my first

9  customer -- my first client.

10 Q.  Okay.

11      And you've been performing tax accounting and

12 financial planning services for clients since about 1979,

13 right?

14 A.  Yes, about then.

15      I'm not sure it was '79, but about then.

16 Q.  Around that time.

17      So, close to 30 years or so?

18 A.  Yes.

19 Q.  And you get paid for your services from some of your

20 clients, correct?

21 A.  Yes.

22 Q.  Now, you're also engaged in real estate investing.  We've

23 heard that, right?

24 A.  Yes.

25 Q.  Now, in his opening, Mr. Kulwin said that that's a hobby.

Goldberg - cross

1449

1      Is that what you consider that to be?  Is that a

2  hobby?

3  A.  No, I wouldn't call it a hobby.  It's --

4  Q.  It's real estate investing?

5  A.  -- it's a side interest, but, yeah.

6  Q.  It's real estate investing?

7  A.  Well, if you can call a hobby -- a side interest a

8  hobby -- then it's a hobby.  But, basically, it's another

9  interest.

10  Q.  Great.

11      And you've been doing that for almost 20 years,

12  right?

13  A.  Real estate?

14  Q.  Yes.

15  A.  Since '95.

16      Current -- that's -- yeah, about 15 years.

17  Q.  Okay.

18      And, as part of that, you buy properties for current

19  income and for long-term gain, through possible resale --

20  A.  Yes.

21  Q.  -- right?

22      And in your direct testimony, you said that one of

23  the reasons for holding property long-term is to take

24  advantage of long-term capital gains rates upon sale, correct?

25  A.  Oh, yes, but --

Goldberg - cross

1450

1    Q.  How long do you have to hold the property to get long-term

2    capital gains rate?

3    A.  The current law is one year.

4    Q.  One year?

5    A.  Just over.

6    Q.  Okay.

7           And over these 20 years, you've owned a number of

8    income-producing properties, right?

9    A.  Yes.

10   Q.  Including some buildings and a number of condominium units

11   for investment purposes?

12   A.  Yes.

13   Q.  And each time you purchased an investment property, you

14   did so with cash; no mortgages, right?

15   A.  No.  One, I have had one mortgage, which is still in

16   existence on one property.  But none of the ones downtown.

17   It's one in Evanston.

18   Q.  Okay.

19          And all told over the years, you've paid over $11

20   million in cash buying those properties, correct?

21   A.  Let me think about that.  I have to add it.

22          A little under 11.

23          Oh, not counting the Trump properties.

24   Q.  Well, you did close on one of the Trump properties, didn't

25   you?

Goldberg - cross

1451

1   A.  Then I probably -- then it's probably -- over 11.

2   Q.  Over $11 million, correct.

3           And one of those properties was an apartment building

4   you sold, which later became a condominium or a co-op?

5   A.  I'm --

6   Q.  Let me make that more clear.

7           Along the way, you bought an apartment building that

8   you later sold, correct?

9   A.  No.  I haven't sold that -- I have only had one apartment

10  building and I still own it.

11  Q.  Well, what is the building that you were involved in, that

12  later became a condo or a co-op building?

13  A.  It was a con- -- I think you're talking about River Plaza

14  at 405 North Wabash, which was a condo- -- which was a

15  condominium -- when I bought it.  It didn't later --

16  Q.  How many units are in that building?

17  A.  How many units in the building?

18          Something -- somewhere around 500.  I had -- I had --

19  over time, bought seven of them.

20  Q.  Didn't you own a three-story condo building at one point

21  -- or a building that became a condo building?

22  A.  No.

23  Q.  Let me see if I can refresh your recollection.

24          MR. S. KULWIN:  A page, please?

25          MR. NOVACK:  I'm going to have her look at Page --

Goldberg - cross

1452

1   this is the October deposition, Page -- 6, Line --

2           MR. S. KULWIN:  Line, what?

3           MR. NOVACK:  -- 7.

4           It's the October deposition.

5   BY MR. NOVACK:

6   Q.  Do you recall giving your deposition?

7   A.  Yes, I do.

8   Q.  You actually had two sessions.  Do you recall that?

9   A.  I only remember one.

10  Q.  There was one in July and, then, there was another when

11  you came back in October?

12  A.  I'm sorry?

13  Q.  You don't recall that?

14  A.  Not -- I remember the -- I remember the -- deposition with

15  Mr. Shonkwiler.

16  Q.  Yes, Mr. Shonkwiler from my office was at the deposition.

17  A.  I don't remember it being in two -- in two -- parts.

18  Q.  Well, I may be able to refresh your memory on that.

19  A.  Okay.

20  Q.  Maybe that's the first thing to do.

21          So, I'm going to show you, Mrs. Goldberg, the

22  transcripts from each of two deposition sessions.

23  A.  Okay.

24  Q.  And see if that jogs your memory.

25          MR. NOVACK:  It's okay if I come up?

Goldberg - cross

1453

1    THE COURT:  Yes, it is.

2    (Document tendered.)

3    BY MR. NOVACK:

4    Q.  Do you see that that deposition transcript is dated

5    July --

6    A.  Yes.

7    Q.  -- the 21st, 2011?

8    A.  Yes.

9    What's the date of the next one?

10   Q.  And, then, let me show you the next one.

11   You see that that's dated October 25, 2011?

12   A.  I do.  I see that.

13   Q.  Does that jog your memory?

14   A.  No.  I remember -- I very much remember -- the Shonkwiler

15   thing, but not the other one.

16   Q.  Do you have trouble remembering things sometimes, Mrs.

17   Goldberg?

18   A.  Perhaps if you asked -- if you showed me some of the

19   questions and answers, it might help.

20   Q.  Well, let me ask you that question, again.

21   Do you have sometime, from time to time, a memory

22   problem?

23   A.  Not usually.

24   Q.  Do you think that if you gave two depositions, that would

25   be something you'd remember?

Goldberg - cross

1454

1    A.  I would have thought so, yes.

2    Q.  But you don't remember?

3    A.  (Shaking head.)

4    Q.  Okay.

5          Well, in any event, I'm going to refer to the October

6    deposition transcript.

7          MR. NOVACK:  And, again, I'm going to have her look

8    at Page 6, Line 7.

9          Would it be okay if I just read this to her, for

10   purposes of refreshing her recollection?

11         MR. S. KULWIN:  No.

12         THE COURT:  Well, you should not read it --

13         I am sorry?

14         MR. S. KULWIN:  I'm sorry.  Go ahead.

15         THE COURT:  I did not hear you.

16         MR. S. KULWIN:  I apologize.  I think you are about

17   to say "not out loud."  I apologize.

18         THE COURT:  Not out loud, if you are just using it to

19   refresh her recollection.

20         Mrs. Goldberg, please read it to yourself, ma'am.

21         THE WITNESS:  Yes.

22         MR. S. KULWIN:  You know, what?

23         MR. NOVACK:  Let me do it the other way, then.

24   BY MR. NOVACK:

25   Q.  You said that you did not buy a three-story building that

Goldberg - cross
1455

1    became a condominium.  So, I want to refer you back to the

2    October deposition.

3              Do you recall giving a deposition?

4              You recall you were under oath, of course --

5    A.  Yes.

6    Q.  -- right?

7              And I want to just ask you if you remember

8    Mr. Shonkwiler asking you, "And there was another property in

9    Evanston that, I think, you said was either a condominium or a

10   co-op?"

11             And the answer was:  "That's correct, some years ago,

12   which I owned briefly"?

13             MR. S. KULWIN:  Judge, I object.  It's not

14   impeaching.  His original question was:  "Did you own a

15   three-story building that turned into a co-op?"

16   BY THE WITNESS:

17   A.  Okay.  I --

18             MR. S. KULWIN:  It doesn't impeach.

19             THE COURT:  Sustained.

20             But I think you may have refreshed her recollection

21   with it.

22   BY MR. NOVACK:

23   Q.  Is your recollection refreshed on that?

24   A.  I -- not -- not the overall thing; but, on that building,

25   yes, I know which one you're talking about.

Goldberg - cross

1456

1      It was a building that -- shall I explain?

2  Q.  Please.

3  A.  It was a single unit in a three-story, I believe it was, a

4  co-op.  It could have been a condominium.  I think it was a

5  co-op.  And, for a brief time, I owned one unit in that

6  building.

7  Q.  Okay.

8      And turning to another property, one of the

9  properties that you still own is an apartment building,

10  correct?

11  A.  Yes.

12  Q.  And it has multiple apartment units in it?

13  A.  Yes.

14  Q.  And you rent those apartments to tenants, correct?

15  A.  Yes.

16  Q.  You're the landlord?

17  A.  I'm the landlord and I use a manager to manage the

18  property.

19  Q.  You have a third-party property manager to help you run

20  the building?

21  A.  Yes.

22  Q.  Okay.

23      Now, you don't live in that building, correct?

24  A.  No.  I -- correct, I -- do not.

25  Q.  Okay.

Goldberg - cross

1457

```
 1           And you also own some vacant land that you hold for
 2    investment purposes, correct?
 3    A.  I -- I -- have a piece of vacant land that I've just taken
 4    a building down on for development in another way, but that's
 5    the only thing -- only vacant land I own.
 6    Q.  And, besides those, the other properties you invest in are
 7    residential condominiums, correct?
 8    A.  More than that.  I have some commercial property, too.
 9    Q.  Ah, okay.
10           What kind of commercial property?
11    A.  Basically, one or one-and-a-half story buildings adjacent
12    to each other in Evanston.
13           They're just commercial property.  They're rented to
14    restaurants.
15           One is a restaurant and some exercise studios.
16    Q.  Okay.
17           So, you own that building.  You're the landlord and
18    your tenants operate retail --
19    A.  Right.
20    Q.  -- features?
21           And, other than those, then, the other ones are
22    residential condominium units?
23    A.  Yes.
24    Q.  And with respect to the residential condominium units,
25    what you do there is you buy the units, but you rent them to
```

Goldberg - cross

1458

1    someone else?

2    A.  Yes.

3    Q.  You don't live in them?

4    A.  Actually, the first one we -- the first one we bought --

5    the first time I ever bought one was we were thinking of, when

6    my husband retired, we might want to spend -- we might want to

7    move into the city.

8            So, the first one really was bought for other

9    reasons.  We ended up never living there.  My husband had a

10   stroke, a lot of things changed and we -- but at that point,

11   that was my first introduction to a condo invest- -- as a

12   potential investment.  And, from there, I added more to the --

13   in that building, and so on.  And, then, continued with other

14   areas.

15   Q.  Okay.

16           But in each case you buy not to live in but to rent

17   to someone else?

18   A.  Yes.

19   Q.  And you rent them to tenants?

20   A.  Yes.

21   Q.  And, again, you're the landlord --

22   A.  Yes.

23   Q.  -- for them?

24           And over the years, you've owned at least eight of

25   such residential condo units that you rented to others,

Goldberg - cross

1459

1   correct?

2   A.  Yes, counting the Trump one.

3   Q.  Right.

4           And all of those units are either in Trump Tower,

5   where you have one, or the River Plaza building, which is next

6   door to the Trump Tower?

7   A.  Right.

8   Q.  And in the River Plaza, you at one time owned seven units,

9   correct?

10  A.  Yes.

11  Q.  And you bought all seven of those in the 1990s; am I

12  right?

13  A.  I think I -- the last one might have been in 2000.  I'm

14  not sure.  But in approximately, right, yes.

15  Q.  Okay.

16          And you later sold three of them, correct?

17  A.  Four.

18  Q.  Pardon?

19  A.  Four.

20  Q.  You sold four?

21  A.  Yes.

22  Q.  And you still own the three?

23  A.  Yes.

24  Q.  Now, do you sit on the condominium board at River Plaza?

25  A.  I have.

Goldberg - cross

1460

1    Q.  Do you sit on that board now?

2    A.  No.

3           Well, there are two boards involved.  I sat on one

4    for a couple of years and I now sit on another one.  It's the

5    garage area of the condominium.  It's that garage board.

6    Q.  Okay.

7           And you have a property manager who you pay to help

8    you run the River Plaza units that you own and rent, correct?

9    A.  Yes.

10   Q.  And that's Terry Vogue?

11   A.  Yes.

12   Q.  And Ms. Vogue performs a lot of duties there.  She shows

13   your units to new tenants who are considering renting them?

14   A.  Yes.

15   Q.  Takes care of getting any new tenants to sign lease

16   agreements?

17   A.  Yes.

18   Q.  When a tenant has a problem -- for example, something

19   needs repair -- the tenant calls Ms. Vogue first?

20   A.  Yes.

21   Q.  And you trust Ms. Vogue to do all these things for you,

22   correct?

23   A.  Yes, I do.

24   Q.  In fact, you've worked with her regularly over the years,

25   correct?

Goldberg - cross

1461

1   A.  Yes.

2   Q.  And she was your broker at Trump Tower, correct?

3   A.  Yes.

4   Q.  She was the broker with respect to all three of the

5   purchase agreements that you ended up signing --

6   A.  Yes.

7   Q.  -- right?

8           One of those was the residential and the two were the

9   hotel units, the subject of this case?

10  A.  Right.

11  Q.  And Ms. Vogue also had other clients that bought units at

12  Trump Tower?

13  A.  Yes.

14  Q.  And, actually, she was the one who introduced you to the

15  Trump salespeople --

16          MR. S. KULWIN:  Judge --

17  BY MR. NOVACK:

18  Q.  -- in the first place, correct?

19          MR. S. KULWIN:  -- I'm going to object to the last

20  question and move to strike that answer on the basis of an

21  earlier ruling.

22          THE COURT:  I think we are going to have to have to a

23  sidebar because I am --

24          (Proceedings had at sidebar:)

25          THE COURT:  I am not sure what ruling you are

1    referring to that Mrs. Vogue --

2           MR. S. KULWIN:  Jeff?

3           MR. J. KULWIN:  Judge, we moved in limine to keep out

4    evidence of other buyers -- of Terry Vogue's other clients --

5    of their views of Trump Tower, their views of the real estate

6    industry, and you granted those motions.

7           MR. NOVACK:  I have no intention of asking that.

8           THE COURT:  Yes.

9           MR. S. KULWIN:  That's why just bringing up the other

10   buyers implies that she had other buyers that didn't, and it

11   should be stricken.

12          THE COURT:  No, but that was not the focus of the

13   motion.  The focus of the motion was what the other buyers

14   thought of the property, not the fact that she had other

15   buyers.

16          MR. S. KULWIN:  The focus of the motion was not just

17   what they thought of it, but the other people closed and

18   didn't sue.  We raised both issues, I believe.

19          Didn't we?

20          MR. J. KULWIN:  Yes.  That was a separate motion,

21   actually.

22          THE COURT:  But even this does not go to that.

23          Are you going any further with this?

24          MR. NOVACK:  No.

25          THE COURT:  Okay.

Goldberg - cross

1463

1    This can stand as is.

2    And I assume you are going to abide by the other

3 rulings?

4    MR. NOVACK:  Of course.

5    MR. S. KULWIN:  Thank you, your Honor.

6    (Proceedings had in open court:)

7 BY MR. NOVACK:

8 Q.  Now, the first unit you contracted to buy at Trump Tower

9 was a residential unit, not the hotels, right?

10 A.  Yes.

11 Q.  And you signed a contract to buy that unit before signing

12 the purchase agreements for the HCUs, correct?

13 A.  Yes.

14 Q.  In fact, I guess you bought -- you signed the contract on

15 the residential about three years before signing the purchase

16 agreements on the HCUs?

17 A.  Yes.

18 Q.  And you bought that unit for investment purposes, correct?

19 A.  Yes.

20 Q.  The residential one, just like your River Plaza units?

21 A.  Right.

22 Q.  And you don't live in the Trump Tower residential unit,

23 correct?

24 A.  I do not.

25 Q.  Never have?

Goldberg - cross

1    A.   Never have.

2    Q.   And you rent it to a tenant?

3    A.   Yes.

4    Q.   And you don't sit on the residential condominium board at

5    Trump Tower, do you?

6    A.   No.

7    Q.   You never have, correct?

8    A.   I never have.

9    Q.   Okay.

10        Let's talk about the purchase agreement that you

11   signed at Trump Tower for the two HCUs.

12        Do you understand what I'm referring to?

13   A.   Yes.

14   Q.   Now, these were not the first two real estate purchase

15   agreements that you had ever signed, right?

16   A.   Correct.

17   Q.   In fact, you had signed a real estate purchase agreement

18   in connection with all of the other properties that you had

19   bought over the last 20 years?

20   A.   Yes.

21   Q.   And you had already previously signed the purchase

22   agreement for the residential unit at Trump Tower?

23   A.   Yes.

24   Q.   Okay.

25        And each of the two hotel purchase agreements that

Goldberg - cross

1465

 1    you signed had an attorney approval rider; is that correct?

 2    A.  Yes.

 3    Q.  And I want to put that up.

 4              THE COURT:  Can you please identify for the record

 5    what you are putting on the Elmo?

 6              MR. NOVACK:  I'm putting up a -- your Honor, I'm

 7    putting up a -- blowup of the second paragraph of the attorney

 8    rider.  It's what I showed in the opening statement.

 9              MR. S. KULWIN:  Judge --

10              THE COURT:  In Plaintiff's Exhibit  --

11              MR. NOVACK:  Exhibit -- sorry.

12              MR. S. KULWIN:  Your Honor, I don't believe --

13              MR. NOVACK:  It's Exhibit 539.

14              MR. S. KULWIN:  I don't believe it is a blowup,

15    Judge.  I believe it's something that's been retyped by

16    Mr. Novack's office and it's misleading to say this is a

17    blowup.  I think if he is going to blow it up, he should blow

18    up -- he should show the actual document.

19              MR. NOVACK:  Well, I can --

20              MR. S. KULWIN:  He's blown it up like it's, you know,

21    six feet tall.

22              THE COURT:  Mr. Novack?

23              MR. S. KULWIN:  The actual document, as you can see,

24    is much smaller.

25              MR. NOVACK:  Judge, I'm just making it easy for all

Goldberg - cross

1466

1   of us to follow along with the reading.

2           I can put up the -- put it up in it's original format

3   first, so that everybody can see that.

4           THE COURT:  Why do you not do that; and, then, you

5   can get the witness to confirm if the language is identical.

6   But why do you not put up Defendants' 539 first --

7           MR. NOVACK:  I will do that.

8           THE COURT:  -- showing what the paragraph looks like

9   in the actual document.

10          MR. NOVACK:  And what this is, your Honor, for the

11  record, part of Exhibit 539.  It's the last page.  It's Page

12  DEF 25.

13  BY MR. NOVACK:

14  Q.  And, then, just because we're all now far away from this

15  document, I would like to ask you, Mrs. Goldberg --

16          MR. S. KULWIN:  Judge, I move to strike that lead-in

17  comment; and, also --

18          THE COURT:  Sustained.  I will strike it.

19          The jury should disregard it.

20          MR. NOVACK:  Well, Judge, what I would like to do is

21  put up something we retyped, to make it easier for everybody

22  to read, which is the second paragraph.  And ask --

23          THE COURT:  Is there any objection to that?

24          MR. S. KULWIN:  There is, Judge.  It's a

25  demonstrative exhibit.  We haven't seen number one and number

Goldberg - cross

1467

1   two.  He was going to confirm with her that they were both the

2   same.

3          THE COURT:  Why do you not show the document that you

4   have typed to Mrs. Goldberg and ask her if it is the same as

5   the language in defendants' Exhibit 539?

6          MR. NOVACK:  You know, what, Judge?  I'm just going

7   to use the document and I'm going to read it out loud.

8          THE COURT:  Okay.  That is fine.

9   BY MR. NOVACK:

10  Q.  Well, first of all, Mrs. Goldberg, is that your signature

11  on the document?

12  A.  Yes.

13  Q.  Is this the document that you signed?

14  A.  Yes.

15  Q.  Now, will you agree with me, ma'am, that the first

16  paragraph -- do you have that in front of you?

17          Can you see it right on the screen?

18  A.  I can see.

19  Q.  Would you agree with me, ma'am, that the first paragraph

20  is merely an identification paragraph, stating your name and

21  the contract that the rider is attached to?

22  A.  Yes.

23  Q.  Okay.

24          And I'm going to read the second paragraph and I'd

25  like you to follow along.  And if I read it incorrectly,

Goldberg - cross

1468

1   you'll let me know.

2          "This purchase agreement is contingent upon approval

3   as to its form, other than dates and the purchase price, by

4   purchaser's attorney by 5:00 o'clock p.m., Chicago time, on

5   the 10th day after the date of seller's acceptance of the

6   purchase agreement.

7          "If written notice of disapproval is received by

8   seller from purchaser or purchaser's attorney within such time

9   period, then this purchase agreement shall be deemed null and

10  void, and the earnest money and any other amounts paid by

11  purchaser to seller shall be returned to purchaser.

12         "If no written notice of disapproval is received by

13  seller within such time period, then this contingency shall be

14  deemed waived and this purchase agreement shall remain in full

15  force and effect."

16         Did I read that correctly?

17  A.  Yes.

18  Q.  And you agreed to that provision, correct?

19  A.  Yes.

20  Q.  Now, that provision provides for a ten-day period for the

21  attorney to review; does it not?

22  A.  Yes, it does.

23  Q.  And yesterday you testified -- Friday, sorry, you

24  testified -- that there was a two-day approval period.

25         Do you remember that?

Goldberg - cross

1469

1   A.  That was from my approval.  I had two days if I didn't go

2   to the -- didn't send it to an attorney.  But if I sent it to

3   the attorney, the attorney had the extra time to approve

4   the -- to go over the -- document.

5   Q.  And where is that two-day provision?

6           MR. S. KULWIN:  Judge, objection.  I think it was put

7   into evidence and Ms. Goldberg identified it.  It's on the

8   acknowledgment receipt to the property reports.

9           THE COURT:  Overruled.

10          MR. S. KULWIN:  It's a misleading question.

11          THE COURT:  She can answer, if she can.

12  BY THE WITNESS:

13  A.  I think that I had -- okay.

14          I don't remember whether it was from the salespeople

15  or whether it was in the document.  But I know I had two days

16  if I didn't go to the attorney.

17  Q.  Well, first of all, you did go to an attorney, correct?

18  A.  Yes, I did.

19  Q.  So, the two-day provision didn't apply to you?

20  A.  Not -- no, not any further, as far as I understood it.

21  Q.  Okay.

22          All right.  So, you understood that you had ten days

23  for approval --

24  A.  Yes.

25  Q.  -- right?

Goldberg - cross

1470

1    And that approval could be given by purchaser or
2 purchaser's attorney, correct?
3 A.  Yes.
4 Q.  Okay.
5 A.  I'm not sure that the purchaser -- the purchaser's
6 attorney is the approver.  I think I'm the approver.
7 Q.  You would have to give the approval?
8 A.  The purchaser's attorney can make an objection or
9 something.
10    I'm not sure I fully understand what you're after.
11    But, as I understood it, I had -- as long as I
12 went -- as long as the thing went -- to the attorney to look
13 over and do whatever she does, then I had a ten-day period.
14 Q.  Okay.
15    You had a ten-day period to decide whether to go
16 forward with this or not?
17 A.  Yes.
18 Q.  Okay.
19    And at the time that you signed the first of the two
20 purchase agreements, you were given the three amendments for
21 the property report that had been issued by that date,
22 correct?
23 A.  Yes.
24 Q.  And you had also been given the property report, correct?
25 A.  Yes.

Goldberg - cross

1471

1    Q.   Okay.

2         And that ten-day period -- approval period -- that we

3    just talked about gave you and your attorney the opportunity

4    to review the purchase agreement, right?

5    A.   Uh-huh.

6    Q.   To review the property report, right?

7    A.   Right.

8    Q.   To review the three amendments to the property report,

9    correct?

10   A.   Yes.

11   Q.   And anything else you wanted to review, correct?

12   A.   The documents that I was given, the sales brochures, and

13   so on.

14   Q.   Right.

15        But you could have looked at anything --

16   A.   I could have looked at anything --

17   Q.   -- you wanted during the ten days --

18   A.   -- right.

19   Q.   -- correct?

20        Okay.

21        And, then, you had that ten-day period, after making

22   that review with your attorney, to decide, "I'm going to stick

23   with this" or "I'm going to ask for my earnest money back,"

24   correct?

25   A.   Yes.

Goldberg - cross

1472

1    Q.  Okay.

2         Now, the three amendments that you were given and

3    that you looked at during that ten-day period show that the

4    common monthly charges contained in the estimated budgets for

5    the hotel units that you were considering buying had changed

6    several times, correct?

7    A.  Well, they certainly were different in the third one.

8         Oh, the -- the -- overall budget?  Yes, it had gone

9    down and, then, it had gone up in the third -- it had -- from

10   the first property report -- amended property report -- it had

11   gone down quite a -- in the second one; and, then, back up in

12   the third one.

13   Q.  Okay.

14        Are you finished?  I'm sorry.

15   A.  Yes.

16   Q.  Why don't we take a look at that?

17        So, the first exhibit I want to show you is Exhibit

18   601.  This is in evidence.  And that's the first amendment to

19   the property report.

20        And if you -- I -- put on your ledge over there --

21   and I hope that's convenient for you; if not, I can help you

22   with it -- a binder of the --

23   A.  These (indicating)?

24   Q.  -- the exhibits.

25   A.  That's this one (indicating).

Goldberg - cross

1473

1   Q.  Yes.

2           And I'm asking you if you would turn to Exhibit 601.

3           Do you have Exhibit 601 in front of you now?

4   A.  Yes.

5   Q.  And that's the first amendment to the property report and

6   that's dated February 25, 2004, correct?

7   A.  Yes.

8   Q.  Okay.

9           And I would like you to turn in the book or wait for

10  me to put this up on the screen and read it that way,

11  whichever is your choice.

12          But I'm going to direct your attention to the page

13  that has the number "69" at the bottom of it.

14          And the numbers run consecutively.  It's toward the

15  very end.

16          MR. NOVACK:  Judge, we seem to have lost our screen

17  here.

18          THE COURT:  It is back up.

19          MR. NOVACK:  Thank you.

20  BY THE WITNESS:

21  A.  That page isn't in here.

22          I'll read it from here.  66, '7 and, then, 70.

23  Q.  It's actually these numbers at the very bottom

24  (indicating).

25  A.  Oh, I'm looking at the wrong one.  Okay.

                        Goldberg - cross
                                                                    1474

 1   Q.  May I help you get it?

 2   A.  Yes.

 3            I can read it from here.  It's okay.

 4   Q.  Okay.

 5            (Brief pause.)

 6   BY MR. NOVACK:

 7   Q.  Okay.  So, let's look at that page for just a second.

 8            And that has an entry for the common charges?  Do you

 9   see that?

10            It's actually the first number on the --

11   A.  Yes, I do.

12   Q.  -- on the page.

13            And, by the way, just to make it clear, this is

14   Exhibit H to the first amendment.  And it's entitled,

15   "Estimated Operating Budget"?

16   A.  Yes.

17   Q.  That's one of the pages you looked at when you reviewed

18   the first amendment?

19   A.  Right.

20   Q.  Okay.

21            And the first number on there is called "Common

22   Charges"?

23   A.  Yes.

24   Q.  And that's the number that determines the common charges

25   that each individual unit owner would pay, correct?

Goldberg - cross

1475

1    A.  That's correct.

2    Q.  Because you take your percentage of that number?

3    A.  Yes.

4    Q.  And your percentage was under a half a percent, correct?

5    A.  Yes.

6    Q.  Okay.

7            And that number, am I correct, is $3,286,012?

8    A.  Yes.

9    Q.  And that's the number you knew your charges would be based

10   upon --

11   A.  Right.

12   Q.  -- right?

13           MR. S. KULWIN:  Judge, misleading.

14   BY THE WITNESS:

15   A.  Yes.

16           MR. S. KULWIN:  It doesn't take into account the

17   other reports.

18           THE COURT:  I cannot hear you.

19           MR. S. KULWIN:  I am sorry.

20           Objection.  Misleading.  It doesn't take into account

21   the other reports.

22           THE COURT:  Overruled.

23           She may answer or clarify.

24   BY MR. NOVACK:

25   Q.  And, now, I would ask you if -- and maybe so you don't

Goldberg - cross

1476

1    have do that, I would just put on the board -- I'm going to

2    jump to the second amendment, which is Exhibit 602, if you do

3    want to look at it.

4              And I'm going to give the same page that corresponds

5    to the first amendment.

6              MR. S. KULWIN:  Sorry, could we have a clarification

7    of what exhibit this is?

8              MR. NOVACK:  And this comes from Exhibit 602.

9              MR. S. KULWIN:  What year?

10             MR. NOVACK:  And Exhibit 602 is the -- and you can

11   verify this, Mrs. Goldberg -- it's the second amendment.

12             MR. S. KULWIN:  Okay.

13             MR. NOVACK:  -- which is dated February 25, 2000- --

14   I'm sorry.

15             The second amendment is January 10, 2005.

16             Strike that.

17             August 18, 2004.  Now I got it.

18   BY MR. NOVACK:

19   Q.  So, that was about six months after the first amendment,

20   right?

21             The first amendment being February of '04 and the

22   second amendment being August of '04?

23   A.  Those are the dates.  I received all three at the same

24   time.

25   Q.  No, I understand that.

Goldberg - cross

1477

1  A.  Okay.

2  Q.  But the second amendment came six months after the first?

3  A.  Yes.

4  Q.  Okay.

5        And the second -- the budget for the second --

6  amendment shows a common charge number of $3,830,120 --

7  A.  Right.

8  Q.  -- right?

9        And I'd ask you to accept what I'm going to do with

10  these calculations.  But I brought a calculator if you want to

11  double-check my work.

12  A.  That kind, I can't --

13  Q.  Pardon?

14  A.  I'm not used to that type.  I use the one they call

15  Reverse Polish -- if you know the term -- which is a Hewlett

16  Packard.

17  Q.  Okay.

18  A.  These numbers go --

19  Q.  Let me tell you the calculation that I did.

20  A.  Okay.

21  Q.  And if there's any question, we'll figure out a way for

22  you to double-check.

23        But the common charges in the first amendment were

24  $3,286,012?

25  A.  Right.

Goldberg - cross

1478

1    Q.  And, in the second amendment, 3,830,012?

2    A.  Right.

3    Q.  So, if you subtract the 3,286,012 number in the first

4    amendment, from the 3,830,120 number in the second amendment,

5    there's a difference of $544,108?

6    A.  That -- I'll accept that.

7    Q.  That sounds right.

8            And if you divide that $544,108 by the number that

9    was in the first amendment -- the 3,286,012 -- that yields a

10   16.5 percent increase.

11           Will you accept that?

12           Does that sound about right?

13   A.  Roughly, yes.  It's probably about right.

14   Q.  Okay.  Thank you.

15           And now I'd like to have you turn to see what

16   happened in the third amendment, which is Exhibit 603.  And

17   that's the amendment that was issued January 10, 2005.

18           And for that one, I'm going to put up the same

19   estimated budget page, Exhibit H.

20           And now -- and this third amendment, by the way, this

21   is the amendment that was in existence at the time you signed

22   the purchase agreements --

23   A.  Right.

24   Q.  -- right?

25           And this time the common charges increased to

Goldberg - cross

1    $4,755,633.  Do you see that?

2    A.  Yes.

3    Q.  Then, again, I want to give you the same math

4    calculation -- arithmetic -- that I did before.

5         So, if you subtract 3,830,120, the amount of the

6    second amendment, from 4,755,633, which was the third

7    amendment, the difference is $925,513.

8         Do you accept that?

9    A.  Yes.

10   Q.  Okay.

11        And if you divide that number by the 3,830,120 that

12   was in the second amendment, that shows an increase of 24

13   percent.

14        Do you agree with that?

15   A.  About -- approximately -- yes.

16   Q.  Okay.

17        And, so, just from these budgets that were in the

18   property report amendments that you saw, you could see that by

19   the time you signed your purchase agreements, the estimated

20   common charges for the building had increased over 40 percent

21   in a little less than a year, right?

22   A.  Yes.

23   Q.  So, you knew before you signed the first purchase

24   agreement -- I should say -- sorry.

25        MR. NOVACK:  Strike that.

Goldberg - cross

1480

BY MR. NOVACK:

Q.   You knew before your first purchase agreement became

effective -- in other words, before that ten-day period ran

out -- and before you even signed the second purchase

agreement, you knew that the estimated monthly expenses for

hotel unit owners could and probably would change over time?

A.   Of course.

Q.   Now, in addition to these budgetary changes to the common

charges, the seller had already also made multiple changes to

the common elements, themselves, correct?

A.   You know, at this point they're pretty far into the

project.  And I -- I -- would assume that their budgetary

projections would have become more accurate.

          So, I would have -- I would have -- given more weight

to the third one, if that's -- if that answers your question.

          MR. NOVACK:  Your Honor, I didn't ask a question.

          THE COURT:  Do you want to clarify it with her?

          MR. NOVACK:  I'm sorry?

          THE COURT:  Do you want to --

          MR. NOVACK:  I want it stricken.

          THE COURT:  -- follow up?

          Mr. Kulwin?

          MR. S. KULWIN:  I think she responded.  He asked an

open-ended question.  She responded.

          THE COURT:  Overruled.

Goldberg - cross

1481

1    The answer can stand.

2    BY MR. NOVACK:

3    Q.   Now, what I was asking you was not about those numbers

4    that I showed you --

5    A.   Oh, sorry.

6    Q.   -- I was asking you that, in addition to those budgetary

7    changes that we've just identified -- the 40 percent -- the

8    seller had already answered made multiple changes to the

9    common elements, themselves, correct?

10   A.   I would have expected they had made changes, because there

11   was so many -- they were building.  They would have had

12   building changes, things of that sort.

13   Q.   Right.

14        But I want to focus on a couple of those now, if I

15   may.  And the first one I'm going to show you is in the first

16   amendment.  So, that's Exhibit 601 that you have in front of

17   you.  And it's going to be Page 33, but I'm going to put it up

18   on the screen for you.

19        And there is -- Mrs. Goldberg, this is -- the same

20   Page 9 that you testified about with Mr. Kulwin a little bit

21   ago?

22   A.   Yes.

23   Q.   This is what showed you that the meeting rooms and

24   ballrooms were in the common elements, correct?

25   A.   Yes.

Goldberg - cross

1482

1   Q.  And you know from looking at this document that -- well,

2   first of all, you see in this document that there are

3   certain -- certain -- of the words in here are underlined in

4   bold?

5   A.  Yes.

6   Q.  And you see in here that certain words are crossed out?

7   A.  Yes.

8   Q.  So -- and you knew that what this was -- because the

9   document said so -- this is showing you -- showing the

10  reader -- the changes that were made to the declaration in its

11  previous version --

12          MR. S. KULWIN:  Objection.

13  BY MR. NOVACK:

14  Q.  -- correct?

15          MR. S. KULWIN:  Whether to what they're showing some

16  hypothetical reader, Judge.

17          THE COURT:  Rephrase your question.

18          Sustained on form.

19  BY MR. NOVACK:

20  Q.  And you could see from this, couldn't you, Ms. Goldberg,

21  that what was being shown to you was changes that had been

22  made from the prior version of the declaration?

23  A.  Yes.

24  Q.  Okay.

25          And you understood that, right?

Goldberg - cross

1483

1    A.  Well, I looked at the particular change, yes.

2    Q.  Okay.

3           And what it was showing was that the ballrooms and

4    function rooms and executive lounge were being added to the

5    common elements by this first amendment?

6    A.  Yes.

7    Q.  Previously, they had not been part of the common elements,

8    right?

9    A.  That's correct.

10   Q.  Okay.

11          And, also, what is shown in there is that the -- I'm

12   sorry -- that the health club of the building, which used to

13   be in the common elements, was being removed from the common

14   elements by this same first amendment, correct?

15   A.  Yes.

16   Q.  Okay.

17          So, you knew at the time that you signed the first --

18   I'm sorry.

19          You knew, before the first agreement became effective

20   and before you signed the second agreement, that common

21   elements removed -- I'm sorry, that amenities were being moved

22   in and out of the common elements, correct?

23   A.  There was one that was moved out, but it went to -- it

24   still went to -- it still went to the owners in a different

25   way -- to the owners in a different way.

Goldberg - cross

1484

1     The one -- there were functions -- there were things

2  moved in, yes.

3  Q.  And the health club --

4  A.  But --

5  Q.  The health club was moved --

6         MR. S. KULWIN:  Judge, I don't think she's finished

7  with her answer.

8         THE COURT:  Sustained.

9         I do not think she is finished.

10  BY THE WITNESS:

11  A.  However, my concentration wasn't on the earlier ones, but

12  on the most recent, which would have been the -- these were in

13  the first one.

14         In the second and third one -- well, let me get to

15  the end of this.

16         Basically, what hadn't been changed or what was

17  changed was going forward to the third.

18         The third one did not change -- the third one was

19  what I concentrated on.  I looked at the earlier ones to see

20  what was in them.  The third one actually had added something,

21  which was the parking revenue.

22         But the third one was the one that would be the one I

23  would rely on.  And it showed the income from all of these

24  things still being there.  The income was still showing in

25  that third property report.

Goldberg - cross

1485

```
 1   BY MR. NOVACK:
 2   Q.  Mrs. Goldberg, before the first purchase agreement was
 3   effective and before you signed the second agreement, you knew
 4   that common elements, as shown on Page 9 of the first
 5   amendment that you saw, showed some common elements -- in
 6   particular, the health club -- being taken out of common
 7   elements, and some common elements -- function rooms,
 8   ballrooms -- being put in, correct?
 9           MR. S. KULWIN:  Objection.  Asked and answered,
10   Judge.  And argumentative.
11           THE COURT:  Overruled.
12           MR. S. KULWIN:  And misstates what's in the document.
13           THE COURT:  Overruled.
14           You may answer, if you can, Mrs. Goldberg.
15   BY THE WITNESS:
16   A.  I --
17   BY MR. NOVACK:
18   Q.  Can you answer that "Yes" or "No," ma'am?
19   A.  No.
20   Q.  You can't answer that "Yes" or "No"?
21   A.  Not if -- not if -- what I relied on was what was in the
22   latest one.
23   Q.  I didn't ask you what you relied on, ma'am.  I only asked
24   you what you observed.
25   A.  Yes.  That, I did.
```

Goldberg - cross

1486

1   Q.  That, you did.  Okay.

2         Now, as we discussed just a few minutes ago, you had

3   this ten-day period after you signed the purchase agreements

4   to have a lawyer review everything with you and, then, approve

5   or disapprove, right?

6   A.  Yes.

7   Q.  And you did have a lawyer review the purchase agreements,

8   correct?

9   A.  Yes.

10  Q.  You hired Judy DeAngelis; is that right?

11  A.  That's correct.

12  Q.  Are is she a lawyer that had worked for you before?

13  A.  Yes.

14  Q.  Had she worked on your other real estate investments?

15  A.  Some of them, yes.

16  Q.  Approximately, how many of them?

17  A.  Probably, at least, four.

18  Q.  Over how many years?

19  A.  Over the past -- over the period of ten years.

20  Q.  So, she had been your lawyer on various transactions going

21  back about ten years?

22  A.  No, not ten years.  I have to correct that.  Not before --

23  only -- she had only done the River Plaza ones -- units.  None

24  of the others.

25  Q.  And River Plaza --

Goldberg - cross

1487

1   A.  Was '95 to 2000, about.

2   Q.  -- was '95 --

3   A.  To 2000.

4   Q.  So, '95 is, what?  About 11 years before 2006?

5   A.  Yes.

6   Q.  So, was she your lawyer on various of these transactions

7   for about 11 years?

8   A.  Not -- not -- on all of them, but on most.

9   Q.  Okay.  Okay.

10          And when you hired her, you expected her to look out

11  for your interests --

12  A.  Yes.

13  Q.  -- is that correct?

14          And you authorized her to represent you in connection

15  with the deals that she was hired to represent you on?

16  A.  I think I asked her to look over the documents and see if

17  they were okay.

18  Q.  Okay.

19  A.  And see if there was anything that should be changed.

20  Q.  Okay.

21          And that's what you did in connection with the --

22  A.  In essence, yeah.

23  Q.  -- in connection with the two Trump purchase agreements at

24  issue in this case?

25  A.  Yes.

Goldberg - cross

1488

1    Q.  Okay.

2            And during that ten-day period --

3            MR. NOVACK:  Strike that.

4    BY MR. NOVACK:

5    Q.  And she actually did what you asked her to do, didn't she?

6    A.  We didn't -- we didn't -- talk about it.  I found that she

7    had -- I did find out later that she had -- sent in some

8    requests for changes, which some of it were accepted and some

9    weren't.

10           It was a -- you know, she was trying to improve the

11   contract for me.  That was fine.  I didn't go any further than

12   that.

13   Q.  Okay.

14           I would like to ask you to turn to Exhibit 522.  And

15   this is, as of yet, not in evidence.  So, I can't put it up on

16   the screen just yet.

17           So, if you give me one second, I hope I will get a

18   loose copy, so you don't have to use that book.

19           (Brief pause.)

20           (Document tendered.)

21   BY MR. NOVACK:

22   Q.  Now, as I said, the letter's not yet in evidence, but is

23   it a document that purports to be a letter from Judy

24   DeAngelis?

25   A.  That's what it looks like.

Goldberg - cross

1489

1    Q.  And is it dated August 11, 2006?

2    A.  Yes.

3    Q.  Is it addressed to Mr. Adam Berkhoff, as attorney for the

4    seller?

5           MR. S. KULWIN:  Objection.  Objection.

6           Judge, he's reading the document that's not in

7    evidence.  He is supposed to be asking her does she recall

8    ever seeing it.

9           THE COURT:  I think he is trying to lay the

10   foundation.

11          MR. S. KULWIN:  Right, but without -- I would just

12   ask that he do it without reading it out loud.

13          THE COURT:  He is not getting into the substance.

14   So, he is okay.

15          But you are right, he should not be reading the

16   substance.

17          MR. NOVACK:  I am not going to read it.

18          THE COURT:  Please do not do that.

19          Do you need the last question read back?  Mrs.

20   Goldberg?

21          THE WITNESS:  What was the last --

22          THE COURT:  I am not sure she is aware there is a

23   question pending because of the objection.

24          Do you want to rephrase it or do you want it read

25   back?

Goldberg - cross

1490

1      MR. NOVACK:  Read back, please.

2      THE COURT:  Joe, would you please read that back.

3      (Record read.)

4  BY THE WITNESS:

5  A.  Yes.

6  BY MR. NOVACK:

7  Q.  And it shows two copy recipients on it; is that correct?

8  A.  Yes.

9  Q.  And you were one of those copy recipients?

10 A.  I don't know if I was or not.  I don't remember this

11 letter.

12     MR. S. KULWIN:  Judge, at this point I'd ask to be

13 heard.

14     THE COURT:  Okay.  We can have a sidebar.

15     (Proceedings had at sidebar:)

16     MR. S. KULWIN:  If she doesn't recall receiving the

17 letter, Judge, you know, if she doesn't recall receiving it or

18 seeing it, how does it come into evidence?

19     MR. NOVACK:  Well, first of all, I just can't even

20 believe this.  In response to his or in his paper trying to

21 keep this out, he said she is going to admit seeing this

22 letter.

23     THE COURT:  I thought you did say that.

24     MR. S. KULWIN:  No, I said --

25     THE COURT:  And that you produced it from her files.

Goldberg - cross

1        MR. S. KULWIN:  We did produce it, but she -- I never

2   said -- I said, "I don't know what she's going to testify to."

3        And I didn't tell her to say anything.  She's up

4   there.  She doesn't remember the letter.  If she doesn't

5   remember the letter, he can't put it into evidence.

6        MR. NOVACK:  That's not true.  This letter is

7   authenticated by the fact that they produced it.  This is,

8   obviously, a letter based on what she said she authorized her

9   lawyer to do.  She said, "I authorized her to try to make

10  changes, if they were needed."  That's what this is.

11        I would like -- the first thing I do when I go back

12  there is just to move it into evidence.

13        MR. S. KULWIN:  Well, my response to that, Judge, is,

14  is that just because it's in her file doesn't mean she ever

15  looked at it.

16        Judy DeAngelis could have sent her a lot of stuff she

17  stepped into, but she didn't look at it.  She doesn't remember

18  it being cc'd.

19        THE COURT:  Why is that not a weight issue?  This

20  came from her files.  You have told me that already.

21        MR. S. KULWIN:  Right.

22        Because I'll tell you why it's not a weight issue.

23  He also can't lay the foundation --

24        THE COURT REPORTER:  Slow down.

25        MR. S. KULWIN:  He got her to say she authorized her

Goldberg - cross

1492

 1   attorney, if she wanted to try to make the contract better,

 2   that was fine.

 3            He has not established or even come close to

 4   establishing review of this contract:  "Ms. Goldberg, did you

 5   authorize your attorney to request all of these changes?  Did

 6   you authorize her?"

 7            And if he can't do that, then it's outside the scope

 8   and it doesn't come in, number one.

 9            And, number two, if she doesn't remember it, it also

10   doesn't come in.

11            MR. NOVACK:  A, she just says she authorized her to

12   do this.

13            MR. S. KULWIN:  No.

14            MR. NOVACK:  B, the jury may not believe her that she

15   didn't see it.  It shows a copy to her.  They heard how she

16   looks at every detail.  And it's admissible.

17            They can argue all they want.  I'm going to argue

18   that even assuming she never saw it, it doesn't matter.  Her

19   lawyer on her behalf tried to make this change and didn't get

20   it done and they closed, anyway -- I mean, they didn't

21   rescind, anyway.

22            MR. S. KULWIN:  He has to lay the foundation that she

23   authorized these specific things.  He can't do it, number one.

24            And, number two -- number two -- saying that the jury

25   can decide whether to believe her or not, there are all sorts

Goldberg - cross

1493

1    of documents that we wanted to get in that, without

2    foundation, you can't just throw something out there and say,

3    "Well, did do you it?"

4            She's testified, "I don't remember it.  And I

5    didn't -- " and I imagine she'll testify -- "I didn't

6    authorize these specific things."

7            And if he can't get her to say that, there's no

8    relevance to this and it shouldn't come into evidence.

9            MR. NOVACK:  If a client authorizes a lawyer to do X,

10   the client's bound by what the lawyer does, whether she knew

11   that exact thing within the scope was being done.

12           She said already this is within the scope.  This

13   is -- it's exactly what she told her to do.  "I had her look

14   at it and if she thought there were any changes to be made,

15   she should try to get those changes done."

16           MR. S. KULWIN:  One last point.

17           MR. NOVACK:  She doesn't have to say it because a

18   client cannot -- exactly in advance, what every change is

19   going to be.

20           MR. S. KULWIN:  If I -- if some client hires me and

21   says, "Shel, I want you to go negotiate a deal on a settlement

22   in a case."

23           And I go, "Okay."

24           And I write back to Mr. Novack and say, "Ms. Goldberg

25   is going to give up the case, settle for nothing and pay all

Goldberg - cross

1494

1    your fees," and I cc her on it, because she authorized me to

2    settle the case, she's authorized me to write that?  It's

3    ludicrous.  Okay.

4            She has to say, "I authorized these specific things."

5    If he can't get her to say it, it doesn't come in.

6            MR. NOVACK:  I just couldn't disagree more.  She

7    doesn't have to go through every -- it's going to the -- they

8    can argue -- they're free to argue that this is a nullity

9    because she didn't know about it.

10           We're going to argue -- that's why we asked for

11   Instruction No. 22, that you haven't ruled on yet, based on

12   the law --

13           THE COURT:  It is ten after 12:00.  Can you go to

14   something else and come back to this?  Otherwise, I am going

15   to break for lunch now.  I just want to take a quick look at

16   some of the law on admitting this under an agent.

17           I think you are there, but --

18           MR. NOVACK:  I would -- I really don't want to go to

19   a different one.

20           THE COURT:  Okay.  We will break for lunch.

21           (Proceedings had in open court:)

22           THE COURT:  Ladies and gentlemen, we are going to

23   break for lunch.  We will pick up at 25 after 1:00, please.

24           (Jury out.)

25           THE COURT:  We will pick up at 25 after.

                               Goldberg - cross
                                                                    1495

 1              (Whereupon, a recess was taken at 12:11 o'clock p.m.,

 2        until 1:25 o'clock p.m. of the same afternoon.)

 3                          *   *   *   *   *

 4    I certify that the foregoing is a correct transcript from the
      record of proceedings in the above-entitled matter.
 5

 6    /s/ Joseph Rickhoff              May 20, 2013
      Official Court Reporter
 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1496

1                    IN THE UNITED STATES DISTRICT COURT
                      NORTHERN DISTRICT OF ILLINOIS
2                            EASTERN DIVISION

3    JACQUELINE GOLDBERG,              ) Docket No. 09 C 6455
                                       )
4                         Plaintiff,   )
                                       )
5               vs.                    )
                                       )
6    401 NORTH WABASH VENTURE, LLC,    )
     a Delaware Limited Liability      )
7    Company, et al.,                  ) Chicago, Illinois
                                       ) May 20, 2013
8                        Defendants.)   1:25 o'clock p.m.

9                    TRANSCRIPT OF TRIAL PROCEEDINGS
            BEFORE THE HONORABLE AMY J. ST. EVE, AND A JURY
10
     APPEARANCES:
11
     For the Plaintiff:          KULWIN, MASCIOPINTO & KULWIN, LLP
12                               BY:  MR. SHELLY B. KULWIN
                                      MR. JEFFREY R. KULWIN
13                               161 North Clark Street, Suite 2500
                                 Chicago, Illinois  60601
14
     For the Defendants:         NOVACK AND MACEY, LLP
15                               BY:  MR. STEPHEN NOVACK
                                      MR. JOHN F. SHONKWILER
16                               100 N. Riverside Plaza, Suite 1500
                                 Chicago, Illinois  60606
17
     Also Present:               MS. ALEXIS ROBINSON
18
     Court Reporter:             MARY M. HACKER
19                               NANCY C. LA BELLA
                                 Official Court Reporters
20                               219 S. Dearborn St.
                                 Chicago, Illinois  60604
21                               (312) 435-5564
                                 (312) 435-6890
22

23
                     * * * * * * * * * * * * * * * * *
24
                         PROCEEDINGS RECORDED BY
25                       MECHANICAL STENOGRAPHY
                     TRANSCRIPT PRODUCED BY COMPUTER

1497

1       (Proceedings out of the hearing of the jury:)

2           THE COURT:  With respect to Defendants' Exhibit 522,

3   I will admit it under 801(d)(2)(D) as a party admission

4   through an agent once you get confirmation from her that she

5   was copied on this.  You asked that question and she did not

6   answer it.

7           But you have laid the sufficient foundation that the

8   attorney who sent this, Ms. DeAngelis, was acting within the

9   scope of her authority.  The Seventh Circuit has said that

10  there's no requirement of firsthand knowledge or personal

11  involvement necessary to establish the agent/servant

12  exception.

13          I'm relying on U.S. versus Swan, 486 F3d 260, a 2007

14  Seventh Circuit opinion, and Williams versus Pharmacia, 137

15  F2d 944, a 1998 Seventh Circuit opinion, as well as the

16  advisory notes to Rule 801(d)(2)(D), Wright and Miller on

17  evidence is also consistent with this.  You just need to get

18  that additional foundation question.

19          MR. S. KULWIN:  If I may just correct the record on

20  something I said earlier this morning because I misspoke, and

21  probably not going to make the Court very happy, but over the

22  lunch break we looked at for the first time -- because a brief

23  had been filed somewhat late last evening and I was not

24  available to look at it -- the authentication issue.  And we

25  reviewed all the cases that the defendants have cited on

1498

1    whether this letter self-authenticates, and we've concluded

2    that under the facts of this case it doesn't even come close

3    to self-authenticating.

4         All of the cases that Mr. Novak cites are situations

5    where a corporation produces documents or a corporate officer

6    produces documents, and the mere fact that it's in the

7    corporation's possession self-authenticates it.

8         Ms. Goldberg is not a corporation and, therefore, we

9    don't believe the document self-authenticates.  And,

10   therefore, you would require Ms. DeAngelis to lay the

11   foundation for it.

12        THE COURT:  Well, you've -- go ahead.

13        MR. NOVACK:  Judge, the legal principle is set in

14   stone in the Seventh Circuit.  A party that produces a

15   document in discovery -- and it doesn't have to be the one

16   that created the document.  The party that produces the

17   document in discovery impli- -- I think the word starts with,

18   implicitly authenticates it and that the Court says that's

19   enough.

20        And we cited I don't know how many Seventh Circuit

21   and district court cases on that point.  And that would be

22   true if Ms. DeAngelis was not the agent.  But having her as

23   the agent, and if it satisfies the hearsay exception because

24   it's the agent, this is Mrs. Goldberg's letter and she

25   produced it.

1    MR. S. KULWIN:  We looked at all those cases, Judge.

2  That's one of the things we went back and did because I found

3  that if it's -- and again, the brief was filed late last

4  night, we didn't have a chance to look at it.  We looked at it

5  and all those cases -- and if Mr. Novack wants to correct me,

6  I'm certainly willing to be corrected -- dealt with

7  corporations or corporate officers, not individuals.  So

8  that's No. 1.

9    And it does not self-authenticate.  It has -- you

10  have to have someone say, I'm the one who wrote this letter,

11  I'm the one who put this information in it at or near the

12  time, and Ms. Goldberg can't do that.

13    And that's, again -- my understanding from looking at

14  the cases is it has to be a corporation; it doesn't just go to

15  individuals, which makes sense because a corporation, you

16  know, keeps things in the ordinary course of business, things

17  of that nature.

18    I'll also add, I'll also add, that the defendants

19  consistently objected to numerous documents being produced --

20  being admitted into evidence.  I want to revisit all of those

21  on the grounds that if the witness didn't recognize them --

22  the executives of Trump -- if the executives of Trump did not

23  recognize the documents, we couldn't put them into evidence.

24    And they repeatedly said because you don't know --

25  you know, and as a result, only portions of exhibits were

1500

1    allowed to be put in, portions had to be kept out.  And I
2    don't understand why it would be that they could get the --
3    they can get this in --
4         THE COURT:  Well, I haven't heard them make one
5    authentication objection.  And don't be silly, Mr. Kulwin,
6    we're not revisiting all of the evidentiary issues before.
7         I'm dealing with Defendants' Exhibit 522.  You've
8    known about this for quite some time, and to come in and say
9    you're not objecting to authenticity and then to turn around
10   -- it's a little bit disingenuous with the Court.
11        MR. S. KULWIN:  I believe -- and I'll check our
12   pretrial order right now, Judge -- we'll check it right now --
13   I believe we did raise an objection in the pretrial order on
14   authentication.
15        THE COURT:  You told me this morning you're not
16   objecting to authenticity.  That's my point.
17        MR. S. KULWIN:  I understand that, but it's not like
18   it was close to being admitted yet.  You hadn't looked at -- I
19   didn't waive it.  I went back and looked at the law.  It
20   hasn't been admitted yet.  I'm allowed to raise an objection
21   before it's admitted.  I didn't waive it.  I made a mistake, I
22   misspoke.  I went back and checked.  I'm not being
23   disingenuous in the least.
24        If we originally wrote on authentication -- when Mr.
25   Novack said, you know, it's cardinal law in the Seventh

1    Circuit that these documents self-authenticate, you know, I

2    hadn't had a chance to look at the brief, we hadn't had a

3    chance to do the research.  We did the research, and based on

4    the cases that we've seen -- if I'm wrong I will admit it, but

5    based on the cases that we've seen it only self-authenticates

6    if it's a corporate document.

7              MR. NOVACK:  Judge, over a month ago we did the

8    pretrial order.  The only two objections that were registered

9    --

10             THE COURT:  That's what I'm looking at.

11             MR. NOVACK:  -- against this document was relevance

12   and hearsay.  And then we heard a statement that there's no

13   authentication evidence in the sidebar -- objection in the

14   sidebar.

15             And the legal argument doesn't make any sense and --

16             THE COURT:  Bear with me while I'll look for the --

17             MR. S. KULWIN:  Mr. --

18             THE COURT:  -- final pretrial order.

19             MR. S. KULWIN:  If Mr. Novack represents that there's

20   no objection there, I doubt that he's wrong.

21             THE COURT:  Yes, there was no objection there.  And

22   you specifically told me this morning.

23             Even if you hadn't said that and failed to object in

24   the final pretrial order, you produced it; it came from

25   Mrs. Goldberg's records.

Goldberg - cross

1502

1        I will admit the document, again with the caveat that

2   you ask the question confirming that she's copied on it.

3        Please bring in the jury, Danny.  And, Mrs. Goldberg,

4   you may come back up now.

5        JACQUELINE GOLDBERG, CALLED IN HER OWN BEHALF

6                      PREVIOUSLY SWORN

7        (Jury entered the courtroom.)

8        THE COURT:  You may be seated.

9        Mr. Novack, you may continue.

10       MR. NOVACK:  Thank you very much, your Honor.

11                 CROSS EXAMINATION (resumed)

12  BY MR. NOVACK:

13  Q.  Good afternoon, Mrs. Goldberg.

14       Mrs. Goldberg, you had said something earlier in the

15  testimony in answer to my question that I wanted to follow up

16  with you on.

17       I had asked you if you had seen on the first

18  amendment that the health club had been taken out of the

19  common elements.  You said that it had, and then you offered,

20  but it went from there to something else that the unit owners

21  owned.  Do you recall saying that?

22  A.  Yes.

23  Q.  I would like you to please look -- and I tagged over the

24  recess so it would be easy for you -- in the exhibit book do

25  you see the two blueish tags on the side?

Goldberg - cross

1503

1    A.  Yes.

2    Q.  What we're going to look at is Exhibit 601, and in

3    particular Page 3 of the declaration that's in 601 --

4    A.  Okay.  I have the page.

5    Q.  -- which has the Bates Stamp No. 28 on it.

6    A.  Yes.

7    Q.  And I would like you to direct your attention first to the

8    -- well, first of all, we're in the section here called

9    Definitions.  If you look back two pages you'll see that this

10   section starts with the word Definitions; it's Article i.  Is

11   that correct?

12   A.  What page number is that?  5?

13   Q.  Pardon?

14   A.  5 of the original -- page?

15   Q.  It's just two pages before the first of those blue tags.

16          THE COURT:  If you want to walk up and assist her,

17   you may.

18          MR. NOVACK:  Thank you.

19          THE WITNESS:  I found it.

20          MR. NOVACK:  You did.  Okay.

21   BY MR. NOVACK:

22   Q.  So we're in a section called Definitions.

23   A.  Yes.

24   Q.  And we're in the declaration.  If you would turn back one

25   page you'll see the heading is Declaration of Condominium

Goldberg - cross

1    Ownership.

2    A.  I see common elements and common expenses.  Is that you

3    what referred to?

4    Q.  I was referring to that title page, which just shows that

5    this is the declaration.  Is that correct?

6    A.  Yes.

7    Q.  Okay.  And then if you turn another page over, please, to

8    the blue tag.  So we're in the Definition section of the

9    declaration.  Are you with me?

10   A.  Yes.

11   Q.  Okay.  And on that page, No. 3, the definition at the top

12   of the page is the health club property --

13   A.  Right.

14   Q.  -- correct?

15        And it says in there that a health club property is

16   that portion of the project within which the health club will

17   be located and occupying either or both of floors 13 and 13

18   Mezz of the building.  The health club property is located

19   within the project but will not comprise any portion of the

20   property unless it is annexed to the property pursuant to

21   Article xii here up.

22        If you look on the next page, do you see the

23   definition of project?

24   A.  Yes.

25   Q.  And do you see that the definition of project is that this

Goldberg - cross

1  is the entire mixed use, mixed ownership complex of which the

2  property is a part, including the residential condominium

3  property, et cetera?

4      Do you see that?

5  A.  Yes.

6  Q.  So the project is everything in the building and the

7  property is the hotel condominium.  Do you understand that?

8  A.  Yes.

9  Q.  Okay.  And going back to the previous page, so the health

10  club property is within the project, meaning it's within the

11  whole building, but it's not in the property, meaning it's not

12  in the hotel condominium at all?  Do you see that?

13  A.  That's what it looks like.

14  Q.  Okay.  So doesn't that refresh your recollection that the

15  health club property not only didn't go to the owners but it

16  didn't even go to the hotel condominium property?

17  A.  You know, I'm a little vague on this, but I seem to

18  remember that the health club property had been moved and --

19  from its location had been moved and that seemed to be the

20  reason for taking it out of the common elements.

21  Q.  You mean it was --

22  A.  And that was -- I think the physical location was changed.

23  But for some reason, when I saw that the health club was no

24  longer there, I had gotten some information and it seemed to

25  be a reasonable -- a sensible reason.  They were no longer

Goldberg - cross

1506

 1    occupying the same space.

 2    Q.  But that does not mean that the health club property

 3    continued to be owned by the unit owners?

 4    A.  No, but that --

 5    Q.  Oh.  Thank you.

 6           MR. S. KULWIN:  Judge, I don't think she was finished

 7    with her answer.

 8           THE COURT:  Were you finished with your answer?

 9           THE WITNESS:  No.

10           THE COURT:  Okay.  You may finish.

11    BY THE WITNESS:

12    A.  That seemed to me to be a reasonable explanation for why

13    it wasn't there.

14    BY MR. NOVACK:

15    Q.  Okay.  Now, do you still have Exhibit 522 in front of you,

16    the letter that we talked about right before the lunch break?

17    A.  Yes.

18    Q.  And I wanted to -- we're not sure if we got an answer from

19    you.  Does that letter show you as one of the copy recipients?

20    A.  It does.

21    Q.  Okay.  And you produced that document to the defendants

22    during discovery in this case, correct?

23           MR. S. KULWIN:  I'll object as to what was produced

24    during discovery.  My understanding was that who produces what

25    in discovery is not relevant.  That's what I was asking Mr.

Goldberg - cross

1507

1   Petrus about --

2          MR. NOVACK:  I'm just completing my foundation.

3          THE COURT:  See if you -- that may have been for the

4   Court's purpose.

5          MR. NOVACK:  I would just -- I would offer this

6   document into evidence.

7          THE COURT:  Other than what you've already raised

8   with the Court, any objections?

9          MR. S. KULWIN:  Not other than what we've already

10  raised.

11         THE COURT:  Okay.  For the reasons I've already

12  ruled, I will admit the document.

13         (Said exhibit was received into evidence.)

14         THE WITNESS:  Your Honor --

15         THE COURT:  You shouldn't address me directly without

16  talking to your lawyer first, Mrs. Goldberg.

17         MR. S. KULWIN:  You can't talk with me now.

18         THE WITNESS:  Oh.

19         THE COURT:  If you don't understand something, you

20  can certainly respond to Mr. Novack's questions.

21  BY MR. NOVACK:

22  Q.  Now, Mrs. Goldberg, this is a letter from your lawyer,

23  Judy DeAngelis, correct?

24  A.  Right.

25  Q.  And she was sending that letter in her capacity as your

Goldberg - cross

1508

1   attorney, correct?

2   A.  Yes.

3   Q.  And she was asking the seller to make some changes to the

4   purchase agreement that you had signed?

5   A.  That's correct.

6   Q.  Okay.  And altogether the letter asks the seller to make

7   20 such changes, correct?

8   A.  Yes.

9   Q.  Okay.  I want to look at one of them, and it's on Page 3

10  of the letter.  Are you on Page 3?

11  A.  Yes.

12  Q.  And do you see Item No. 9 on that page?

13  A.  Yes.

14  Q.  That's the one I'm going to be asking you about, so I'm

15  going to frame it a little bit.

16          And I'm going to read Item No. 9 from that letter.

17  (Reading:)

18    Paragraph 4:  Condominium documents shall be modified to

19  provide -- I'm sorry.  I'll start that again.  (Continuing:)

20    Paragraph 4:  Condominium documents shall be modified to

21  provide that this contract is subject to purchaser's approval

22  of all final condominium documents required by the act,

23  including but not limited to the recorded declarations and

24  bylaws for this property, the proposed budget, floor plan and

25  property report.  Purchaser shall have five business days

Goldberg - cross

1509

1    after receipt of the condominium documents within which to

2    approve of said documents.

3               Did I correctly read that?

4    A.  You read it correctly.

5    Q.  And that's the provision that Ms. DeAngelis was asking the

6    seller to include in the contract, correct?

7    A.  Yes.

8    Q.  And it was seeking a change to Paragraph 4 -- that's the

9    paragraph referred to in there, right?

10   A.  Yes.

11   Q.  -- to make -- and it was seeking the change to that

12   paragraph to make your purchase agreement subject to your

13   approval of all of the final condominium documents, including

14   the declaration and the property report, right?

15   A.  Yes.

16   Q.  And the declaration is the document that sets forth the

17   common elements, correct?

18   A.  Yes.

19   Q.  And she was making that suggestion because the purchase

20   agreement that you had signed gave the seller the right to

21   make changes to the condominium documents, correct?

22   A.  Under certain circumstances, yes.

23               MR. S. KULWIN:  Judge, could I be heard for one

24   second?  It has nothing to do with the evidence at all.  It's

25   a personal --

Goldberg - cross

1510

```
 1           THE COURT:  Yes.
 2    (Proceedings had at sidebar:)
 3           MR. S. KULWIN:  I commented to Mr. Kulwin that she
 4   looked distressed and he said to me I think what she was
 5   trying to ask the Judge before was whether she could go to the
 6   bathroom.  I don't know.  You tell me.
 7           THE COURT:  Okay.  Do you want to ask her if she
 8   needs a break or do you want me to ask her?
 9           MR. S. KULWIN:  A restroom break, not --
10           THE COURT:  Pardon me?
11           MR. S. KULWIN:  A restroom break.  Not a break in
12   general, just a restroom break.
13           THE COURT:  Okay.
14           MR. NOVACK:  I feel uncomfortable asking that
15   question.
16           THE COURT:  Are you okay if I ask her that at
17   sidebar?
18           MR. S. KULWIN:  Yes.
19           THE COURT:  Are you okay with that?
20           MR. NOVACK:  Yes.
21           THE COURT:  Okay.
22    (Discussion had off the record.)
23           (Further proceedings in open court:)
24           THE COURT:  Go ahead, Mr. Novack.
25   BY MR. NOVACK:
```

Goldberg - cross

1511

1  Q.  Now, Mrs. Goldberg, you said in your direct testimony that

2  the only changes that could be made or what you called -- and

3  I may fumble a little bit on these words because I'm not sure

4  I got them -- I'm not trying to put words in your mouth; I'm

5  trying to get you back to this concept -- that you said that

6  you believed that the provision that allowed the change to the

7  condominium documents only could change things that you called

8  I think it was field changes or changes required by the city

9  code?

10 A.  And possibly other -- there could be other changes

11 necessary, too --

12 Q.  Now, can you point --

13 A.  -- that might arise.

14 Q.  I'm sorry.  I'm not trying to talk over you.

15 A.  Okay.

16 Q.  If I do, just stop me.  Okay?  Your voice sometimes is

17 soft and I just didn't hear you.

18      Now, would you point to us -- and we've got the

19 purchase agreement in front of you; it's in Exhibit 539.  Can

20 you point to any provision that says what you just said, that

21 these changes could be -- would be limited to the field

22 changes or the code changes or the other one you just said?

23 A.  You say Section 539 in here?

24 Q.  Well, look, there's -- 600, 601, 602 and 603 are all the

25 property reports.  The agreements are in 539 and 540.  I don't

                          Goldberg - cross
                                                              1512

 1   know where you're getting this from, so --

 2              MR. S. KULWIN:  Judge, I object to that.

 3   BY MR. NOVACK:

 4   Q.  -- I leave it to you to --

 5              MR. S. KULWIN:  Judge, I move to strike that.

 6              THE COURT:  I'll strike the commentary.  Ask a

 7   question.

 8   BY MR. NOVACK:

 9   Q.  Do you recall, ma'am, whether this is something you read

10   in the property report or an amendment to the property report?

11   A.  Are you talking about the condominium documents being

12   modified under these circumstances?

13   Q.  Yes.

14   A.  I think the place I remember reading it was in -- was in

15   the contract.  I may be mixing up different areas, but I think

16   it was in the contract.

17   Q.  Well, could you point us to that section, please?

18   A.  Do I have a contract here?

19   Q.  Exhibit 539 is one of your purchase agreements and 540 is

20   the other.

21   A.  On Page 2 of 539 -- I think this was the one -- sellers

22   granted the right to make changes to a floor plan -- shall I

23   continue?

24   Q.  Could you please point me to which subparagraph you're

25   reading from?

Goldberg - cross

1513

1   A.   Paragraph (a) on page -- on their Page 2 of 539.  3(a) --

2            THE COURT:  Mrs. Goldberg, when you turn away from

3   the microphone like that, will you just --

4            THE WITNESS:  Oh, I'm sorry.

5            THE COURT:  -- be careful so we can all hear you,

6   please.

7            THE WITNESS:  Yes.

8            THE COURT:  Thank you.

9     (Brief pause.)

10           THE COURT:  I think she answered your question.

11           MR. NOVACK:  Okay.  I just wasn't sure.  Thank you,

12  ma'am.

13  BY MR. NOVACK:

14  Q.   Now, please turn to Exhibit 601 again, please.  That's in

15  the other book.

16           MR. S. KULWIN:  Can we have what exhibit --

17           THE COURT:  601, he said.

18  BY MR. NOVACK:

19  Q.   And I'm wondering if could you turn to the very last page

20  of that document, that Exhibit 601, last page.  And I'm going

21  to put this in context.  If you turn back four pages and

22  you'll see a page, the cover sheet of which is Exhibit K.

23  A.   Okay.  You're going to have to direct me again because --

24  Q.   Okay.  I'll come right over.

25           So just so you know the page I'm talking about, what

Goldberg - cross

1514

1    section it's in, it's in a section called Exhibit K to the

2    property report, conceptual description of material terms of

3    the declaration of covenants, conditions, restrictions and

4    easements.

5         So this is a part of the property report, first

6    amendment, that's explaining the material --

7         MR. S. KULWIN:  I'm going to object to what it's

8    explaining.

9         THE COURT:  It's cross-examination, though.  She can

10   respond.

11   BY MR. NOVACK:

12   Q.  -- that is explaining -- giving a description of the

13   material terms of the declaration?  Do you see that?

14   A.  Yes.

15   Q.  Okay.  And the declaration, again, is the document that

16   sets forth the common elements, correct?

17   A.  Yes, it is.

18   Q.  Okay.  So now if you'll turn to the last page of that

19   exhibit, and Item No. 5 is what I'm going to read from.  And

20   you follow along and tell me if I'm reading correctly, okay?

21   A.  Yes.

22   Q.  The heading of Paragraph No. 5 says:  (Reading:)

23     Declaration Subject to Change.  The declaration is, and at

24   all times shall remain, subject to change by the developer,

25   and the material terms of the declaration identified in this

Goldberg - cross

1515

1    summary are likewise subject to change by the developer, from

2    time to time.

3            MR. S. KULWIN:  Judge, I'm going to object and --

4    because I think that Mr. Novack may have mixed his apples and

5    oranges and it's misleading.  And I can confer with him, if

6    you would like.

7            THE COURT:  Why don't you confer with him for a

8    moment.

9            MR. S. KULWIN:  I could be wrong.

10           (Discussion had off the record.)

11           MR. NOVACK:  I hadn't --

12   BY MR. NOVACK:

13   Q.  Mrs. Goldberg, I had not realized I said what Mr. Kulwin

14   said, and rather than go back to the record let me just say

15   this:  When I was identifying Exhibit K, I meant to identify

16   it as an exhibit to the property report because that's what it

17   says.

18           Let's go back -- let's do this again.  This is the

19   cover sheet for the page that I asked you to look at while I

20   was reading, correct?

21   A.  Uh-huh.

22   Q.  And you can see, can you not, that it's entitled

23   Exhibit K to property report for 401 North Wabash Avenue Hotel

24   Condominium?

25   A.  Yes.

Goldberg - cross

1516

1  Q.  So do you understand that this document is Exhibit K to

2  the property report?

3  A.  Yes.

4  Q.  Okay.  And it says that it is giving a conceptual

5  description of material terms of declaration of covenants,

6  conditions, restrictions and easements.  So it's an Exhibit K

7  to the property report but it's describing the declaration.

8  Do you get that?

9  A.  Yes.

10  Q.  Okay.  And then just so the record is clear, I'm going to

11  read Paragraph 5 again, and you again tell me if I'm doing it

12  correctly.  The title is Declaration Subject to Change.

13  (Reading:)

14    The declaration is, and at all times shall remain, subject

15  to change by the developer, and the material terms of the

16  declaration identified in this summary are likewise subject to

17  change by the developer, from time to time.

18          Did I read that correctly?

19  A.  Yes.

20  Q.  And again, the declaration is the document that sets forth

21  the common elements, correct?

22  A.  Yes.

23  Q.  And nowhere in this paragraph that I've just read did it

24  say that the changes would be limited to field changes or code

25  changes or anything else, correct?

Goldberg - cross

1517

1    A.  That's correct.

2    Q.  Okay.

3        MR. NOVACK:  May I consult with my partner for one

4    second?

5        THE COURT:  You may.

6        (Brief pause.)

7    BY MR. NOVACK:

8    Q.  And it is true, isn't it, ma'am, that neither you nor your

9    attorney exercised the right to disapprove the purchase

10   agreements?

11   A.  That's true.

12   Q.  Okay.  Now, I would like to direct your attention back to

13   the time that you were considering purchasing the two hotel

14   condominium units.  Do you understand the period I'm trying to

15   talk about now?

16   A.  Yes.

17   Q.  And that was several years after you had signed the

18   purchase agreement for a residential unit at Trump Tower,

19   correct?

20   A.  Right.

21   Q.  And you testified earlier today or Friday that you had an

22   initial meeting about HCUs, the hotel condominium units, with

23   Mr. Shearer at the end of July or very early August, 2006?

24   A.  Right, yes.

25   Q.  But, Mrs. Goldberg, even before meeting with Mr. Shearer

Goldberg - cross

1518

1   you were intrigued by the HCU concept, weren't you?

2   A.  Yes, I was.

3   Q.  And that was before you heard anything about the meeting

4   rooms and ballroom revenues being a part of the association

5   budget, right?

6   A.  I knew that there would be some -- some items that would

7   -- that would be included with the ownership of the hotel.  I

8   didn't know what specific ones they were until I spoke to Mr.

9   Shearer.  And then I knew that there would be food service,

10  that there would -- I expected to be laundry, possibly

11  cleaning, several other things.

12          It wasn't until I found out that the ballrooms and

13  meeting rooms were included that I got really interested in a

14  purchase.

15  Q.  Now, how did you know that the -- just take one for an

16  example.  How did you know the laundry facilities were going

17  to be in the common elements before you talked with Mr.

18  Shearer?

19  A.  I didn't say I knew it.  I said I would have expected that

20  in a hotel.  I would have expected that a number of things

21  would be included.  I didn't know what specific ones they

22  were.  It would depend on what the hotel had to offer.  But,

23  yes, I was very interested in purchasing an interest in a

24  hotel.

25  Q.  So you're saying that you expected the hotel to have

Goldberg - cross

1519

1    certain of these features?

2    A.  Yes.

3    Q.  But not that you expected them to be in common elements?

4    A.  Yes, part of what we would be sharing in the hotel,

5    certainly.

6    Q.  And what was that -- that wasn't based on anything that

7    any person, buyer on behalf of Trump told you, was it?

8    A.  Not until I spoke to Mr. Shearer and I asked what the --

9    Q.  Right, but you had --

10           MR. S. KULWIN:  Judge, I don't believe she's

11   finished.

12           THE COURT:  Let her finish her answer, please.

13   BY THE WITNESS:

14   A.  I didn't know for sure.  I just -- because of my

15   experience just of being in hotels, I knew what they had.

16   BY MR. NOVACK:

17   Q.  But you had no experience prior to this one with hotel

18   condominiums, had you?

19   A.  There had been -- I don't know that there were any hotel

20   condominiums in existence before then --

21   Q.  Right.

22   A.  -- except the one in New York.  I did know about that one.

23   Q.  You knew about that one before you --

24   A.  Well, I knew that --

25   Q.  -- saw Mr. Shearer?

Goldberg - cross

1   A.   -- Mr. Trump had a hotel condominium in New York.

2   Q.   Okay.  Now, I take it there were several reasons why you

3   had an interest in looking into buying an HCU unit at the

4   Trump Tower prior to your meeting --

5   A.   Yes.

6   Q.   -- with Mr. Shearer?

7   A.   It was an interest.  I was -- because I was often at River

8   Plaza, I could see the start of the construction.  It was --

9   it was an interesting proposition, and I would hear

10  conversations one way or another about these things.

11  Q.   Right.  And one of the reasons -- and again, I want to

12  focus on the period of time prior to meeting with Mr. Shearer

13  for the first time.

14  A.   All right.

15  Q.   Do you understand that?

16  A.   Before the first time?

17  Q.   Before the first meeting -- well, before the first meeting

18  about HCUs at the end of July 2006.

19  A.   Okay.

20  Q.   Okay?

21  A.   Yes.

22  Q.   All right.  And one of the reasons for your interest was

23  that you were comfortable with the investment you had made in

24  the residential unit?

25  A.   Yes.

Goldberg - cross

1521

1   Q.  And another reason was that that unit that you bought, the

2   residential condominium, had actually increased in value since

3   you had made your initial investment?

4   A.  I never checked that.  It may have.  I don't know.

5          I don't think I ever -- first of all, we did some

6   remodeling -- we did a little remodeling work when I first

7   bought it.  It took awhile to rent.  I don't -- I don't

8   remember that that had any -- that I ever even looked at what

9   the valuations might be at that time.

10  Q.  And wasn't another reason because Terry Vogue had advised

11  you that the rental market was not that strong in the

12  residential condo market at that time and that you should

13  consider the hotel option?

14  A.  I don't know that Terry ever suggested that, nor was I

15  even concerned about the rental market.  My properties were

16  renting.  I had no concern about what the market was like.

17  Q.  Okay.  You had never heard that Ms. Vogue said that?

18  A.  I don't -- I don't know.

19  Q.  Okay.  And another reason for your interest was that you

20  thought the Trump product was more expensive and more elegant

21  and you were interested in being at that level?

22  A.  It was a different level, yes.

23  Q.  And, of course, another reason is you thought it might be

24  a good investment for any number of reasons?

25  A.  Well, that's always the -- one of the considerations.

Goldberg - cross

1    Q.   Right.

2         And then, of course, another reason is Trump's

3    reputation?

4    A.   Absolutely.

5    Q.   And you had some beliefs about his reputation when you

6    were considering buying those units, again, before you even

7    talked with Mr. Shearer, correct?

8    A.   Yes.  I should say, not Mr. Trump's reputation but the

9    reputation of the Trump organization.  This was -- these were

10   signature hotels.

11   Q.   Okay.  And the Trump organization had a name, as you

12   understood, that was well known and an established hotel that

13   you considered a destination hotel?

14   A.   I considered that this would be a destination hotel, yes.

15   Q.   Right.  And you even, if I remember correctly in your

16   testimony with Mr. Kulwin, said that you thought this would be

17   a destination restaurant?

18   A.   No.  I didn't know anything -- I didn't even -- no, not

19   restaurant.

20   Q.   I must have misheard you then.  We'll check the record.

21        So for these reasons, maybe even others, you made an

22   appointment to meet with Mr. Shearer to discuss the hotel

23   condominiums, possibly you buying them?

24   A.   Yes.

25   Q.   And the first of those meetings was on July 30 or 31,

Goldberg - cross

1523

1 2006?

2 A.  I think it was the last day of July.

3 Q.  July 31?

4       And that meeting was with Mr. Shearer, correct?

5 A.  Yes.

6 Q.  He was at that one?

7 A.  And Ms. Vogue was there, too.

8 Q.  Right.

9       And then the second meeting, just to get these dates,

10 was on August 2, 2006?

11 A.  I -- it was either the 2nd or the 3rd, yes, in 2006.  It

12 was a couple days later.

13 Q.  Right.

14       Your purchase agreement for the first unit was signed

15 on August 2nd.  Does that refresh your recollection that the

16 meeting was on that date?

17 A.  Yes.

18 Q.  Okay.  Mr. Shearer was not at that meeting, correct?

19 A.  Correct.

20 Q.  The Trump salesperson at that meeting was Kiyoko Binosi?

21 A.  Yes.

22 Q.  And then the third meeting was on August the 8th, is that

23 right?

24 A.  Yes.

25 Q.  And that was the date that you signed the second purchase

Goldberg - cross

1524

1   agreement?

2   A.  Right.

3   Q.  And Mr. Shearer was at the August 8 meeting?

4   A.  I think that's correct.

5   Q.  Okay.  And it's true, isn't it, you don't have any notes

6   that you took at any of those three meetings to help you

7   remember what happened or what was said?

8   A.  I think the main thing I had were the brochures I brought

9   home.

10  Q.  But you didn't take any notes of what was said at the

11  meeting?

12  A.  I don't think so.

13  Q.  Okay.  And your recollection of those meetings is only a

14  general recollection, correct?

15  A.  Except for certain parts of it where we really got very

16  interested, which had to do with Mr. -- when I first asked Mr.

17  Shearer -- when he first told me about the common elements.

18  Another time was when I was considering whether I -- Tere

19  Proctor had suggested I take a unit on a -- the second unit on

20  a floor with the meeting rooms, and that was -- I gave that

21  serious consideration.

22          I remember those things.  There are probably other

23  small things that I remember, but otherwise it would be

24  general.

25  Q.  Do you remember giving your deposition on July 21st, 2011?

Goldberg - cross

1525

1  A.  I don't remember.  Apparently I did two depositions.  I

2  don't -- I just don't remember the -- one of them.

3  Q.  Well, with --

4  A.  I accept that I did.  I just don't remember it.

5  Q.  Without regard, I'm going to look at Page 75, lines 12 to

6  24.  And I'm just wondering, regardless of which date it

7  happened to be, do you recall being asked by Mr. Shonkwiler:

8  (Reading:)

9    And then the same question about the third meeting:  Is it

10  possible that some of those discussions you're remembering

11  happened at the third meeting instead of the first?

12            And then --

13  A.  No, not the one with Mr. Shearer about the --

14  Q.  No.  That was -- I was only asking whether you remember

15  that question being asked some time ago.  I wasn't asking it

16  of you.

17  A.  Oh.

18  Q.  Let me read the answer.  Do you recall answering:

19  (Reading:)

20    I remember specific parts of the conversation that occurred

21  at the first meeting.  There were other parts that may have

22  come in at any of the other meetings.  I just don't remember

23  specifically.  My memory is general as to what was told to me.

24            MR. S. KULWIN:  Judge, I object on two grounds.  It's

25  improper impeachment because he's asking if she remembers the

Goldberg - cross

1526

1   question and the answer as opposed to did she say this.

2   That's No. 1.

3            And No. 2, it's not impeaching because it's taken out

4   of context.  And it doesn't impeach.  She says she remembers

5   specific parts of the conversation.

6            MR. NOVACK:  Her ultimate conclusion is, my memory is

7   general as to what was told me.

8            THE COURT:  Rephrase it to, were you asked this

9   question and did you give this answer.  That is the proper way

10  to do it.

11  BY MR. NOVACK:

12  Q.  So were you asked this question and did you give this

13  answer, ma'am:  (Reading:)

14    And then the same question about the third meeting:  Is it

15  possible that some of those discussions you're remembering

16  happened at the third meeting instead of the first?

17            Answer:  I remember specific parts of the

18  conversation that occurred at the first meeting.  There were

19  other parts that may have come in at any of the other

20  meetings.  I just don't remember specifically.  My memory is

21  general as to what was told to me.

22            MR. S. KULWIN:  I move to strike it, Judge.  It's not

23  impeaching.  She specifically says her --

24            THE COURT:  That's a question for the jury.

25            You may answer the question, ma'am, if you can.

Goldberg - cross

1   BY THE WITNESS:

2   A.  I think actually what he's telling me, which I wouldn't

3   have thought much about, is almost exactly what I said just

4   now.  You're telling me -- it's like I'm listening to myself

5   saying the same things.

6   BY MR. NOVACK:

7   Q.  So you remember saying it?

8   A.  I don't specifically remember saying that, but I'm saying

9   what I would have said.

10  Q.  All right.  And isn't it true, ma'am, that it's hard for

11  you to separate which meeting was which?

12  A.  In some respects, yes.

13  Q.  And isn't it true that you can't really be sure at which

14  of the meetings the statements about the ballrooms and related

15  revenues were made?

16  A.  No.  I would not have gone forward with the sale.  I would

17  have gone home to think about it a little longer.

18  Q.  I'm going to ask you if you recall this question being

19  asked at Page 75, line --

20          MR. S. KULWIN:  Same objection as to whether she

21  recalls, Judge.

22          MR. NOVACK:  Pardon?

23          THE COURT:  Rephrase it as to whether -- not that she

24  recalls but was she asked the question and did she give that

25  answer.

Goldberg - cross

1528

1    BY MR. NOVACK:

2    Q.  I'm going to ask you, ma'am -- and I'm looking at Page 75,

3    lines 2 through 10.

4    A.  Which exhibit?

5    Q.  Did you --

6            THE COURT:  Can you help her out with the exhibit?

7    BY MR. NOVACK:

8    Q.  This is the July 21, 2011 deposition.

9            THE COURT:  Does she have it before her?

10           MR. NOVACK:  No.

11           THE COURT:  Okay.  You don't have the transcript

12   before you, ma'am.  He's just going to read the question and

13   answer.

14           THE WITNESS:  Okay.

15           THE COURT:  Go ahead.

16   BY MR. NOVACK:

17   Q.  The question is and was:  (Reading:)

18     And do you think it's possible that some of the discussions

19   you are remembering about revenue, ballroom, laundry facility,

20   health club, rotations or expenses were made at that second

21   meeting instead of the first?

22     Answer:  I don't recall.

23           Do you recall being asked that question and giving

24   that answer -- I'm sorry.

25           Did you -- were you asked that question and did you

Goldberg - cross

1529

1    give that answer?

2    A.  I wouldn't be surprised at what -- either.

3    Q.  In fact, ma'am, you cannot be sure that you heard about

4    the meeting room and the ballroom being in the common elements

5    at the first meeting, can you?

6    A.  Yes, I can.

7    Q.  I'm going to Page 53, Line 22.

8          MR. S. KULWIN:  I'm sorry, what page?

9          MR. NOVACK:  Page 53, Line 22 through Page 54,

10   Line 3.

11   BY MR. NOVACK:

12   Q.  And I'm going to ask you if you were asked this question

13   and did you give this answer:  (Reading:)

14    Question:  Did you know all of those things that you just

15   told me about common elements when you met with Mr. Shearer

16   back in July 2006?

17    Answer:  I think I learned a lot of this along the way.  So,

18   no, I can't say for sure.  I think I may have had a general

19   idea.

20          MR. S. KULWIN:  Judge, I object.  That doesn't

21   impeach her about what she heard at the first meeting on

22   August 2nd.

23          THE COURT:  Sustained.  I'll strike that and the jury

24   should disregard it.

25   BY MR. NOVACK:

Goldberg - cross

1530

1   Q.  And it's true, isn't it, that the first time that you saw

2   anything in writing that indicated that the ballroom and

3   meeting room and related revenue and expenses were in the

4   common elements was after the second meeting, which is the

5   meeting at which you were given the three amendments?

6   A.  No.

7          MR. S. KULWIN:  Judge, I think there's some confusion

8   about the second meeting.  Does he mean the second meeting

9   when she made the first purchase on August 2nd or the second

10  meeting on August 8th?  I think it's confusing.

11         THE COURT:  Did you understand the question,

12  Mrs. Goldberg?

13         THE WITNESS:  You better repeat it.

14  BY MR. NOVACK:

15  Q.  I believe you have identified three meetings, is that

16  correct:  July 31, August 2nd and August 8th?

17  A.  I think there was another meeting but I don't remember

18  much about it; that might have been when I took my husband

19  down to see something or other.  Outside of that, are you --

20  if you're just asking about those first three meetings, I

21  don't have any problem.

22  Q.  Okay.  And I asked you whether it was true that the first

23  time that you saw anything in writing that said that the

24  ballroom and meeting rooms, et cetera, would be in the common

25  elements was after the second meeting, when you received for

Goldberg - cross

1531

1     the first time the property report?

2              MR. S. KULWIN:  Can we get a --

3     BY THE WITNESS:

4     A.  No.

5              MR. S. KULWIN:  Can we get a date?

6              THE COURT:  Overruled.

7     BY MR. NOVACK:

8     Q.  But it's true, isn't it, Mrs. Goldberg, that Mr. Shearer

9     never told you how much would be earned from any of the

10    facilities at the hotel?

11    A.  I don't recall him telling me how much would be earned.

12    Q.  In fact, he never even made a general statement or

13    suggestion as to any particular amount of revenue that might

14    be earned, correct?

15    A.  Not that I recall.

16    Q.  And actually, Mr. Shearer did not tell you anything at all

17    about the amount of any revenue that might be earned, correct?

18    A.  He did not, as far as I recall.

19    Q.  And neither he nor any other Trump salesperson that you

20    ever talked to performed any calculations showing you income

21    or revenue you could expect to receive from owning a hotel

22    unit, correct?

23    A.  I don't think -- yes, I did not rely on the Trump

24    salespeople for that information.

25    Q.  And neither Mr. Shearer nor any other Trump salesperson

Goldberg - cross

1532

1    ever told you you would make a profit from owning a hotel

2    condominium at Trump Tower, did they?

3    A.  No, they didn't promise a profit.

4    Q.  And you knew that you weren't going to be receiving any

5    checks out of the ballroom or meeting room revenues, correct?

6    A.  Not directly.  I was going to be receiving -- well, the

7    system was that the hotel unit owners would be paid -- it

8    would go to the -- it would go to the association and the

9    association would be paying -- would be paying the unit

10   owners.  And I think, if I remember right, it was every three

11   -- once every three months, something like that.

12   Q.  Well, let's make sure we're on the same page here.

13        Are you talking about revenues that would be received

14   by renting your particular unit?

15   A.  Combination of that plus the revenues from the common

16   elements.

17   Q.  Is it your testimony, ma'am, that you were going to

18   receive cash payments that would come out of the revenues from

19   the ballroom?

20        MR. S. KULWIN:  Judge, objection.  She's already

21   testified.  It's asked and answered.  It would come from both

22   -- to the association.

23        THE COURT:  Overruled.  You may answer that, if you

24   can.

25   BY THE WITNESS:

Goldberg - cross

1533

1    A.  I thought all the -- any revenues coming to the owner

2    would be going to the association and distributed by the

3    association to the owner.

4    BY MR. NOVACK:

5    Q.  Let's go back to the third amendment to the property

6    report, which was the amendment that was in existence at the

7    time you signed the contracts.  And that's going to be

8    Exhibit 603.

9         And I'm going to put up on the screen Exhibit H to

10   the third amendment, which is the estimated operating budget.

11   Just give me a second to get that.

12        (Brief pause.)

13   BY MR. NOVACK:

14   Q.  Now, you remember seeing that document before you

15   completed the purchase of -- I'm sorry.  Strike that.

16        You remember seeing that document before the first of

17   your purchase agreements became effective and before you

18   signed the second purchase agreement, correct?

19   A.  Yes.

20   Q.  And you could see from that document that it's got the

21   revenues from the meeting, ballroom rentals right in there in

22   the budget?

23   A.  Yes.

24   Q.  That's over $5 million, right?

25   A.  Yes.

Goldberg - cross

1534

1   Q.  And right above that is common charges, and that's

2   $4,755,633, right?

3   A.  Yes.

4   Q.  And we've already established that those are the common

5   charges for all of the unit owners, of which you would have a

6   share according to your percentage --

7   A.  Correct.

8   Q.  -- right?

9          And you understood -- particularly as an accountant,

10  you understood that that number was part of what balanced this

11  budget, correct?

12  A.  Which number?

13  Q.  The 4,000,755 that would be coming from unit owners.

14  A.  Yes.

15  Q.  With that number in, this thing balances?

16  A.  Yes, I did (sic).

17  Q.  With that number out what would the case be?

18         If the unit owners didn't pay in those common

19  charges, would this budget be in balance?

20  A.  No.

21  Q.  Well, what would it be?

22  A.  It would be out of balance.  It would be -- it wouldn't

23  have the same income.

24  Q.  There would be a shortfall --

25  A.  Shortfall.

Goldberg - cross

1535

1   Q.  -- right?

2           And that's even after including the $5 million,

3   right?

4   A.  Yes.

5   Q.  $5 million go in -- that $5 million is not enough to even

6   break even, right?

7   A.  That's correct.

8   Q.  So the unit owners had to make up the shortfall that other

9   sources of revenue, including the ballrooms, couldn't make on

10  their own, right?

11  A.  Well, not entirely.  Where is the -- where is the room

12  rents, when you rent out the rooms for the hotels?  That's not

13  in here.

14  Q.  Well, the condominium association doesn't get that, does

15  it?  The association doesn't get room rentals.  That's what

16  unit owners like you would get, isn't that correct?

17  A.  Yes, but that's part of what makes a profit or a loss to

18  the unit owner.

19  Q.  I'm not asking about that now.  Let's stick with me.

20          The revenues from the ballroom and the meeting rooms

21  on their own, without the contribution of almost another

22  $5 million from the unit owners, was not enough to balance

23  this budget, correct?

24  A.  Not that budget, no.

25  Q.  Okay.  So it took unit owners to come out of their pocket

Goldberg - cross

1536

1    every month and write a check in order to balance -- in order

2    to break even, right?

3    A.   That's correct.

4    Q.   So given that, ma'am, does that refresh your recollection

5    that you couldn't have expected to get cash from the -- out of

6    the revenue?

7         All of that cash from that ballroom revenue was being

8    put into the budget to cover expenses --

9    A.   Wait a minute.

10   Q.   -- right?

11   A.   Not -- no -- yes, it's covering expenses, but part of the

12   expenses are covered -- are also going to offset costs.

13        For example, here's what I mean:  You have

14   housekeeping, you have front desk, you have front service.

15   All of that is listed in this budget, so it's being paid --

16   but the money is coming -- that you're paying the people who

17   are working there is basically being offset by the income that

18   the owners are getting from the room rentals.

19        This isn't a budget that says what the -- what the

20   owners can expect to get.  This is a budget that says, these

21   are the costs of this thing.  It doesn't say anything about

22   the income that's coming in to offset it.

23   Q.   Well, isn't that what the top part of that budget is, the

24   --

25   A.   No.

Goldberg - cross

1537

1    Q.   -- income that's coming in to offset it?

2    A.   That doesn't show room rentals.

3    Q.   I'll ask you again, ma'am --

4    A.   You know, I'm -- I think we are misunderstanding -- I'm

5    misunderstanding you here, because these are part of the costs

6    of running a hotel down below.

7    Q.   Including running the ballrooms, right?

8    A.   Including running -- yes, including running --

9    Q.   So you agree that some --

10        MR. S. KULWIN:   Judge, I don't think she was finished

11   with her answer.

12        THE COURT:   Were you finished with that last answer?

13   BY THE WITNESS:

14   A.   The thing that doesn't show in this operating budget is

15   the income that's coming into the rooms.

16   BY MR. NOVACK:

17   Q.   Is it your testimony --

18   A.   This is strictly --

19   Q.   Is it your testimony, ma'am, that the income that comes in

20   to a particular unit owner's room goes to the association --

21   the condominium association?

22   A.   Well, the condominium association is going to administer

23   it, but essentially it's going to go to the owner.

24        The way this budget is set up, it doesn't say

25   anything about that.  It is strictly an operating budget.

Goldberg - cross

1538

1    That's -- these are the costs that are coming in in the

2    general sense and -- these are the incomes that are coming in

3    in the general sense.  Part of them are from the owners, part

4    are from the owner's monthly assessments, or wherever it's

5    done, part of it is parking, some other stuff.

6         The payroll, though, isn't paying just for these

7    items; it's paying all the people that service the hotel.  And

8    there's nothing in -- this is an operating budget only for the

9    -- for running the hotel.  It does not show the income from

10   the owners -- I mean, to the owners.

11   Q.  Are you finished?

12   A.  Yes.

13   Q.  Mrs. Goldberg, you're an accountant.  Don't budgets have

14   to have a balance between income and expenses?

15   A.  Well, they -- you have one here.

16   Q.  You do?  We do?

17        If you were to take out some portion of that meeting

18   and ballroom revenue and pay it to the unit owners, which is

19   what you're saying you thought was going to happen, wouldn't

20   this budget be completely out of balance?

21   A.  I didn't say that's what was going to happen.

22        What's happening here is they are applying the

23   expense -- the income coming in from the common charges and

24   the meeting rooms and so on to the expenses, but they aren't

25   showing anything about other income to the unit owners.  And,

Goldberg - cross

1539

1   in essence, it's -- what this has done is it's -- it separated

2   -- this budget has separated those items from the unit owners

3   -- from the unit owner income.  The unit owner income is being

4   recorded separately and paid to the owners separately.  But

5   now the owner's costs of running the hotel aren't included in

6   what they're getting.  It's included in the operating budget

7   only.

8   Q.  Mrs. Goldberg, if --

9   A.  I'm having -- I'm having trouble explaining this, I guess.

10  Q.  Mrs. Goldberg, you started off because you testified that

11  you understood you would actually get a check, a cash payment,

12  that would be derived from the meeting and ballroom revenues?

13         MR. S. KULWIN:  Objection.  Misstates her answer,

14  Judge, and it's misleading.  Argumentative.

15         THE COURT:  Overruled.  She may answer.

16         If you can answer that, ma'am.

17  BY THE WITNESS:

18  A.  I'm sorry.  Repeat that question.

19  BY MR. NOVACK:

20  Q.  Did you not already say, to start this whole thing off,

21  that you understood that you as a unit owner would get a cash

22  payment, I think you said quarterly, derived from the revenues

23  from the meeting and ballroom rentals?  Is that what you said?

24  A.  If I said that, I combined a couple of things and I -- and

25  I may have misspoken.

Goldberg - cross

1540

1    Q.  Okay.  Thank you.

2           Now, it's true also, isn't it, that you had no

3    detailed discussions with Kiyoko Binosi?

4    A.  I had just -- some general discussions with her.  I

5    couldn't say whether they were detailed or not.

6    Q.  And actually you can't recall what was said in any

7    conversations with her, right?

8    A.  You know, we had some general discussion on the contract.

9    I think the -- there was a change in the purchase price.  That

10   might have been a discussion with her.  The final purchase

11   price you show is the one we actually had, but we might have

12   discussed -- there had been a reduction before -- just before

13   I made my first purchase in the -- what the -- what the

14   selling prices were.

15   Q.  I'm going to refer back to your deposition, this time at

16   Page 197 of the October deposition, starting at Line 7.

17          MR. S. KULWIN:  May I have a second?

18          THE COURT:  Yes.

19          MR. S. KULWIN:  What page?

20          MR. NOVACK:  197.

21          MR. S. KULWIN:  What line?

22          MR. NOVACK:  7.

23   BY MR. NOVACK:

24   Q.  This is Mr. Shonkwiler's question.  I'm going to ask you

25   if this was asked of you and whether you gave this answer:

Goldberg - cross

1541

1    (Reading:)

2      Okay.  And do you recall any conversations you had with

3    Kiyoko Binosi, one of the other sales agents there?

4      Answer:  No.  I think Kiyoko stood as a stand-in for Robert

5    on that second one because he couldn't be there for some

6    reason, the second meeting, and we -- I had already determined

7    coming in I had -- I had determined I was going to buy a unit

8    and he -- for some reason he couldn't be there.  I think we

9    had talked to him on the phone or something.  He said, well,

10   Kiyoko could take care of it.  But I don't remember having any

11   detailed discussion with Kiyoko.

12   A.  I -- that's probably exactly what I said.

13   Q.  Thank you.

14   A.  I just told you -- can I finish?

15   Q.  Yes, of course.

16   A.  Okay.  I just told you that I think I may have had some

17   discussion with her but I don't remember specifically.

18   Q.  Now, when you were considering purchasing these hotel

19   units, the very important thing to you was the estimated

20   amount of the ongoing expenses you would be charged as an

21   owner, correct?

22   A.  That's one of the features, yes.

23   Q.  Okay.  And it was important to you, wasn't it?

24   A.  Yes.

25   Q.  Okay.  Because you knew you would be writing checks to the

Goldberg - cross

1542

1   condominium association, correct?

2   A.   Yes.

3   Q.   And you would have obligations for real estate taxes?

4   A.   Right.

5   Q.   Okay.  And before you signed the purchase agreement, you

6   understood that you would be charged three types of expenses

7   regardless of whether you rented your units or not, right?

8   A.   Yes.

9   Q.   And just to get those out, one is the monthly common

10  charge, or assessment, correct?

11  A.   Yes.

12  Q.   That's the one we've been talking about?

13  A.   Right.

14  Q.   The other is what's called fixed hotel expenses?

15  A.   Yes.

16  Q.   And the third was real estate taxes?

17  A.   Yes.

18  Q.   Okay.  And in making your decision, you wanted to be as

19  confident as possible that the money that could come in from

20  renting those units would be equal to or greater than the

21  expenses you would have to pay, right?

22  A.   Yes.

23  Q.   And you knew that these three expense items could go up or

24  down from time to time, correct?

25  A.   Yes.

Goldberg - cross

1543

1    Q.  But you asked your Trump Tower salesperson, Mr. Shearer,

2    to give you some estimates, right?

3    A.  I -- well, the -- the information I got from him would

4    have been the operating budgets that were in the property

5    reports.

6    Q.  Didn't he give you a -- one piece of paper that had some

7    handwriting on it?  Do you recall that?

8    A.  Yes.  I think that was the one where they had reduced the

9    price on the unit.

10   Q.  Well, let me see if we can get it up there and have some

11   questions about it.

12   A.  If we're talking about the same document.

13   Q.  So just quickly, let's -- this is Exhibit 512, admitted

14   into evidence.

15   A.  Yes, that's the one.

16   Q.  That's the one.  You got this through Mr. Shearer.

17          And just focusing on the part that deals with

18   expenses, this shows that -- the handwriting shows that the

19   charges for your expenses were going up from the time that

20   this particular document had been originally typed, correct?

21   A.  Yes, it does.

22   Q.  And you asked Mr. Shearer to give you this before you

23   would sign the purchase agreement for unit 3228, correct?

24   A.  I don't remember whether I asked him before or after.  But

25   I certainly did get the document from him.

Goldberg - cross

1544

1   Q.  Okay.  And let's focus for a minute on one of those three

2   expenses, and that's the monthly common charge.  Do you know

3   what I'm talking about?

4   A.  Yes.

5   Q.  Okay.  Now, before buying these units at Trump Tower you

6   had owned several condominium units.  We've already discussed

7   that.  So you're already very familiar with monthly

8   condominium charges, correct?

9   A.  Yes.

10  Q.  In fact, you've paid a monthly common charge for every

11  condominium unit that you've ever owned, right?

12  A.  Yes.

13  Q.  And your prior experience as a condominium owner was that

14  condominium assessments usually increased, correct?

15  A.  In -- most of the time.  Sometimes they can get a bargain

16  on something and they -- it goes down.  But mostly it goes

17  up --

18  Q.  Okay.

19  A.  -- especially with inflation.

20  Q.  And they're --

21         MR. S. KULWIN:  I don't think she was finished with

22  her answer.

23  BY THE WITNESS:

24  A.  Especially with inflation one expects costs to go up.

25  BY MR. NOVACK:

Goldberg - cross

1545

1    Q.  Okay.  And that's one of the factors.  There are some

2    other factors that could cause the common charges to go up

3    over time as well, correct?

4    A.  Yes.

5    Q.  Improvements the building might be needing?

6    A.  Yes, repairs, all sorts of things.

7    Q.  Right.

8          And in this case, Trump Tower, the building hadn't

9    even been completed at the time that you were considering

10   buying, correct?

11   A.  Right.

12   Q.  And you knew that that made it even more likely that there

13   could be changes in common expenses because there had been no

14   history?

15   A.  Yes.

16   Q.  Okay.  And as we already learned a few minutes earlier,

17   there had already been two increases in common charges, one 16

18   1/2 percent, one 24 percent?

19   A.  Yes.

20   Q.  And the reason why you asked for this information about

21   the expenses is so you could calculate how many nights per

22   month you would have to rent your unit in order to break even

23   on your unit, correct?

24   A.  I don't know that that was the reason I asked but I did do

25   that calculation.

Goldberg - cross

1546

1   Q.  Right.  And you did that calculation on your own -- or

2   with Ms. Vogue?

3   A.  Yes.

4   Q.  The Trump people didn't do the calculation for you?

5   A.  Right.

6   Q.  And in making your calculation you and Ms. Vogue actually

7   did an investigation of comparable hotels in the area to see

8   if -- to see what room rental rates were and what the

9   occupancy rates were, correct?

10  A.  Yes.

11  Q.  And you gathered information about how much other hotel

12  rooms in Chicago were renting for?

13  A.  I did.

14  Q.  And then you took an average to see how many days a month

15  your rooms would have to be rented in order to break even?

16  A.  Yes, I did.

17  Q.  And Exhibit 534 that I'm going to show you -- Exhibit 534

18  in evidence is a table -- this is a table that you prepared

19  showing numbers from the Ritz Carlton, the Four Seasons, the

20  Peninsula and Trump New York, correct?

21  A.  Yes.

22  Q.  Those were numbers that you were looking to to help you in

23  your calculation, right?

24  A.  Yes.  You know, I didn't --

25  Q.  And based -- I'm sorry?

Goldberg - cross

1547

1    A.  I didn't remember Trump New York being in there.  It's

2    been a lot of years since I looked at this.

3    Q.  All right.  And based on that information and the

4    information that you had on the estimate of your three

5    expenses, you determined that you would have to rent your unit

6    about ten times or so a month in order to break even, correct?

7    A.  That's the neighborhood, I think, if I remember right.

8    Q.  Okay.

9    A.  Yes.

10   Q.  And that was encouraging to you, wasn't it?

11   A.  Yes.

12   Q.  And you thought you had a good chance of exceeding the

13   break even number of rentals per month?

14   A.  Yes, I did.

15   Q.  And within a few days after doing those calculations you

16   decided to purchase the units, correct?

17   A.  Yes.

18   Q.  And you never changed your mind about the decision once

19   you reached those conclusions in the calculation?

20   A.  No, I didn't.

21   Q.  And those calculations, that's what led you to make your

22   decision, right?

23   A.  Well, part of it.

24   Q.  Part of it?

25   A.  Yes.

Goldberg - cross

1548

1  Q.  Okay.  But, Mrs. Goldberg, on the other hand, you did not

2  do any similar calculations or investigations with respect to

3  having the ballroom, function room and other hotel amenities

4  in the common elements, correct?

5  A.  That's correct.

6  Q.  And one reason for that was that you recognized there was

7  uncertainty as to those numbers, right?

8  A.  There's uncertainty in any of those numbers, including the

9  ones that I -- that I researched with the hotel.

10 Q.  Okay.  And even though you asked Mr. Shearer to give you

11 updated information about the three expenses, you did not ask

12 him for any information about the anticipated operations of

13 the ballroom or the meeting rooms, et cetera, right?

14 A.  No.  I took that from the property reports.

15 Q.  And you also didn't do any financial analysis on your own

16 with other hotels, similar to what you did about room

17 occupancy and rental rates?  You didn't go to the Peninsula or

18 the Four Seasons or the Ritz Carlton to find out how their

19 ballroom and meeting room revenues were experiencing, did you?

20 A.  I did not, and I doubt if they would have given me that

21 information had I tried.

22 Q.  But you didn't ask?

23 A.  I did not ask.

24 Q.  Now, when the fourth amendment was issued, the effect on

25 your estimated monthly common charges, that monthly common

Goldberg - cross

1549

1    expense that you would have to make, it was not very

2    substantial, was it?

3    A.   I'm sorry.   Repeat, please?

4    Q.   When the fourth amendment came -- the fourth amendment

5    changed some of the budget numbers --

6    A.   Yes.

7    Q.   -- right?

8             But the impact on your estimated monthly charges was

9    not very great, was it?

10   A.   I never even tried to evaluate it.   Once I saw that --

11   what had been done by the Trump organization, I knew I did not

12   want to be in business with this company.

13   Q.   So you made your decision right then, right there, that

14   you were not going to buy this unit?

15   A.   Not right then.   Not until after I got -- I didn't even --

16   not until after I had done a little more work on this and

17   gotten a little more information, because initially I couldn't

18   believe it.

19   Q.   You didn't really make your ultimate decision until

20   sometime in 2009, right?

21   A.   I knew I didn't want to be in business with Trump right

22   then, but I may have -- I was afraid I was going to be stuck

23   with it or else I would have to go to court, so -- but I

24   didn't -- I didn't then do any further analysis on the income

25   statements.

Goldberg - cross

1550

1    Q.  Now, when you say you didn't want to be in business with

2    him, that's -- February of '08 is the time period you're

3    talking about --

4    A.  Right.

5    Q.  -- for the starting -- thinking through that?

6    A.  Right.

7    Q.  In November of '08 you closed on the residential purchase,

8    didn't you?

9    A.  Yes.

10   Q.  And by November of '08 the prices that comparable units in

11   the building were selling for were about four to $600,000

12   higher than what you had paid for your unit, weren't they?

13   A.  I didn't check.  I don't know.

14   Q.  Mrs. Vogue didn't tell you that?

15   A.  I didn't -- I don't know if she did or not.  It wasn't

16   important.  I made the decision.  I was looking more toward

17   the rental than I was toward what the value was.  I wasn't

18   looking to sell it at that time.

19   Q.  Now, the first amendment -- sorry.

20          The fourth amendment, which is going to be

21   Exhibit 604 -- let me put this up on the screen.

22          Now, this is the estimated budget from the fourth

23   amendment, and if you look at the top item in the budget, that

24   shows that the common charges had increased to $5,636,605,

25   right?

Goldberg - cross

1551

1  A.  Yes.

2  Q.  And doing the same kind of a calculation that we did

3  earlier today, if you take that 5,636,605 and you subtract

4  from it the common charge figure that was in the third

5  amendment, third amendment being the one that was in place

6  when you signed, that common charge is 4,755,633.

7          The difference is an increase of 880,972.  Does that

8  sound about right?

9  A.  I accept your number.

10 Q.  Okay.  And if you divide that number by the 4,755,633,

11 you'll see that that's a change of 18.5 percent, correct?

12 A.  I accept that.

13 Q.  Okay.  And that is just two percent over the 16.5 percent

14 increase that we already saw earlier had happened between the

15 first and the second amendment, right?

16 A.  True.

17 Q.  And it's actually less than the 24 percent increase that

18 we saw between the second and third amendment, right?

19 A.  Yes.

20 Q.  Indeed, the fourth amendment's 18 1/2 percent change was

21 much less than the over 40 percent change that we saw

22 occurring between the first and third amendments, right?

23 A.  I accept what you're saying.

24 Q.  Okay.  And now let's take a look at how the fourth

25 amendment affected your particular units' monthly common

Goldberg - cross

1552

1    charges.

2            And the first thing to look at here -- can you see

3    where it shows the numbers for unit 2238?

4    A.  Yes.

5    Q.  And that unit is the first of the two units that you

6    contracted to buy, correct?

7    A.  Right.

8    Q.  Okay.  And that shows a monthly common charge in the

9    amount of 1,535, is that correct?

10   A.  Yes.

11   Q.  And I'm wondering -- I'm going to write down that number

12   and give that to you.  So that's the common monthly charge

13   that was in place at the time you signed up for that unit.

14           And now what I would like to show you is --

15           MR. S. KULWIN:  Was that '05?  I thought you said

16   '07.  I'm sorry.

17           MR. NOVACK:  January 10, '05.

18           MR. S. KULWIN:  '05.

19   BY MR. NOVACK:

20   Q.  So the next document I want to show you is the comparable

21   page from the fourth amendment, okay?

22   A.  Wait.  Which page am I -- which amendment am I looking at

23   here?

24   Q.  That's the third.

25   A.  Okay.

Goldberg - cross

1553

1    Q.   And can you see on there what the common charge is for

2    unit 2238 in the fourth amendment?

3    A.   Yes.

4    Q.   $1,626?

5    A.   Right.

6    Q.   So let me give that number to you.

7            Ma'am, will you agree with me that the difference in

8    the common monthly charge for unit 2238 resulting from the

9    budget in the fourth amendment was $91?

10   A.   Yes.

11   Q.   Okay.  Now I want to do the same thing for unit 2240.  And

12   so we'll start with the numbers from the third amendment.

13           And can you see 2,240 on there?

14   A.   I do.

15   Q.   And is that number $760?

16   A.   Yes.

17   Q.   Okay.  So I'm going to write that number down, $760, and

18   that's the number from the third amendment.

19           And then the fourth amendment comparable page shows

20   $898, correct?

21   A.   Yes.

22   Q.   Okay.  And the difference between those two numbers, the

23   increase resulting from the fourth amendment on your second

24   unit, is $138?

25   A.   That's correct.

Goldberg - cross

1554

1   Q.  Okay.  Now, $91, the increase on the first unit, plus

2   $138, the increase on the second unit, is $229, correct?

3   A.  Yes.

4   Q.  And that's an increase of just under ten percent for the

5   collective monthly charges for both your units, is that right,

6   because the collective charge was $2,295?

7   A.  I'll accept that.

8   Q.  Okay.  Now, you had already agreed to pay $2,211,187 in

9   cash to buy both of those units, correct?

10  A.  Yes.

11  Q.  And you're not suggesting that a $229 per month increase

12  of the monthly common charge was a material increase for you,

13  would you?

14  A.  You know, you've gone to a lot of work showing me what

15  that increase was.  I wasn't interested any more in being a

16  partner with Trump.  I didn't follow it after that.  I didn't

17  follow these numbers.

18          But there's something that you're not taking into

19  account.  If these costs are estimated to go up, so is the

20  income in the rooms going to go up.  This is -- usually this

21  is an inflation factor.  And they may not go up evenly or at

22  the same time, but the income is going to go up to -- along

23  with the room charges.

24          So this is not -- was not a concern to me.  It wasn't

25  a concern to me because I didn't want to be in business here

Goldberg - cross

1555

1   any more.  I didn't follow this once I found out what had

2   happened.

3   Q.  But going back to when you signed up, if the collective

4   monthly common charges were going to be $229 higher, that

5   wouldn't have changed your decision to buy these units, would

6   it?

7   A.  No, it would not.

8   Q.  Okay.  And if I represented to you that if you took all

9   three of the expenses together, all three of them, common

10  charges, fixed hotel costs, real estate taxes, and that the

11  total difference resulting from the fourth amendment was $425

12  per month, that's also -- isn't it also the case that if that

13  $425 increase had been in existence when you decided to buy

14  these units, you still would have bought them?

15  A.  No.  I would have gone based on what my calculations

16  showed me when I calculated what kind of rents I needed to get

17  in, how many nights a week I needed to get in.  I don't know

18  at what point I might have said, no, it's not enough.  But it

19  -- this wasn't a factor.

20  Q.  Wouldn't you have been able to cover a $425 a month cost

21  by renting out your units one or two nights a month more?

22          MR. S. KULWIN:  Objection.  It calls for speculation,

23  Judge.

24          THE COURT:  Sustained.

25          THE WITNESS:  Does that mean I answer?

Goldberg - cross

1    THE COURT:  You do not have to answer it,

2  Mrs. Goldberg.

3    THE WITNESS:  Thank you.

4  BY MR. NOVACK:

5  Q.  What was the average -- in your calculation where you

6  concluded that it would take only about ten days to cover the

7  costs, what was the average revenue per night that you would

8  be receiving?

9  A.  I -- it's -- I don't remember any more.  That's too long

10  ago.  I would have to start over again.

11  Q.  Do you remember what the hotel room -- average hotel rooms

12  were going for at that time?

13  A.  I've checked them a number of -- I've checked hotel room

14  costs a number of times.  I can't be sure.

15    I know that locally in a good hotel -- an upper level

16  hotel you're probably -- you could be paying as much as 600,

17  $650 a night today.  I assume that's similar there at that

18  point.  I don't remember.  I've just had to do that too many

19  times.

20  Q.  I'm sorry, I missed that.  What was that number you gave?

21  A.  I'm talking currently.  650 would not be unusual for a

22  night in a hotel -- in a luxury hotel today.

23  Q.  So a couple nights would cover the additional 425,

24  wouldn't it?

25  A.  I was not putting those things together.  I wanted out.

Goldberg - cross

1  Q.  I'm only focusing on the time you signed the agreements,

2  not --

3  A.  I don't know what it was.  I don't -- I don't recall what

4  the number was at that specific time.

5  Q.  Okay.

6  A.  You had actually had them -- had the items up on the board

7  and I'm assuming it was like $400, but I didn't look at it

8  just now.

9  Q.  Now, one of the things you said that resulted from

10  removing the ballrooms, the function rooms and other related

11  amenities, how it harmed you is because you wanted to be an

12  owner, right?

13  A.  Yes.

14  Q.  Because, according to your testimony, the owner could

15  control those aspects of the hotel, right?

16  A.  That's correct.

17  Q.  But if those amenities were in the common elements, it

18  would be the condominium association board that would exercise

19  control over them, not individual unit owners, right?

20  A.  You're talking about the residentials -- the residential

21  units now?

22  Q.  No.  I'm talking about the banquet rooms, the ballrooms,

23  the meeting rooms --

24  A.  Okay.  Repeat your question, please.

25  Q.  The question is, is -- I'm trying to get at who would

Goldberg - cross

1558

1    actually control those operations.  It wouldn't be you as an

2    individual unit owner, correct?

3    A.   The unit owners would control who did the managing, and I

4    would have expected that the Trump organization would do the

5    management.  They do a -- they have a great reputation, they

6    do a good job on managing, and I would have expected the unit

7    owners to continue retaining the Trump organization for the

8    hotel units' management.

9    Q.   And you had no experience running a hotel, had you?

10   A.   None.

11   Q.   And you don't -- aren't aware of any other purchasers at

12   that time who had run hotels?

13   A.   I had no idea who the other purchasers were.

14   Q.   Okay.  So you were relying on Trump, but you know that

15   owners have control over managers, right?

16   A.   Yes.

17   Q.   In fact, that's your experience with the managers that

18   manage your buildings, right?

19   A.   Yes.

20   Q.   So for an example, if a manager wanted to make a major

21   repair, the manager would have to come to you and say, is it

22   okay if I make this repair?

23   A.   I would have to go to the board that would represent the

24   owners, yes.

25   Q.   I'm talking about in your experience in your buildings.

Goldberg - cross

1559

1    You would have to make the decision?

2    A.   In -- not -- oh, I see.  Yes, right.

3    Q.   And the same thing would happen at Trump Tower if the

4    condominium association board had control over those rooms, is

5    that correct?

6    A.   The manager would have to go to the condominium board to

7    decide.

8         Well, it would depend on the contract.  To some

9    extent a manager is given judgment -- they can use their own

10   judgment up to some number.  But there's usually some number

11   beyond which they would have to go to the board.

12   Q.   Right.  And you knew, when you signed the purchase

13   agreements, that major decisions would have to be made from

14   time to time by the association board with respect to the

15   operations of the ballrooms, the function rooms and the

16   related food and beverage operations, right?

17   A.   Yes.

18   Q.   So are you saying you would rather have the condominium

19   board make those decisions than the Trump organization?

20   A.   It would depend.  However -- it would depend on what the

21   item was.

22   Q.   Now, let's talk about the laundry facilities for a minute.

23        Now, first of all, no one from Trump ever told you

24   that laundry facilities would generate a profit, correct?

25   A.   That's correct.

                                Goldberg - cross
                                                                        1560

1    Q.  And, in fact, you're not even certain Mr. Shearer said

2    anything about whether there would be revenue from laundry

3    facilities, correct?

4    A.  That's correct.

5    Q.  And you didn't see any written materials that said that

6    unit owners would receive revenue from laundry facilities, did

7    you?

8    A.  Well, the written materials said that you would be

9    receiving revenues from the -- from all of the accessory

10   units.

11   Q.  Well, that's -- let's take a look at that.  Let's go back

12   to the third amendment.  And this is the one, again, that --

13   this is the one that was in existence at the time you signed

14   the agreements.  And up at the top are all the items of income

15   that were coming into the association.  Is laundry listed

16   there?

17   A.  No.

18   Q.  So am I right, ma'am, that you never saw any written

19   materials that said that unit owners would receive revenue

20   from laundry facilities?

21   A.  I never saw specific items for each specific common

22   element.

23   Q.  And there was nothing in the purchase agreements that said

24   there would be revenue from laundry facilities, was there?

25   A.  The revenue was always an overall thing, not a specific

Goldberg - cross

1561

1     thing.  Overall to the common elements, not specific to each

2     specific common element.

3     Q.  Now, in your testimony this morning you said that there

4     was something in the written marketing materials that talked

5     about laundry facilities.  Do you remember that testimony?

6     A.  Yes.

7     Q.  And I don't remember exactly what bundle of materials Mr.

8     Kulwin had given you for that.  Maybe he can --

9             MR. NOVACK:  Could I put that back up in front of

10    her, please?

11            MR. S. KULWIN:  75.  We'll stipulate there's nothing

12    on laundry facilities.

13            MR. NOVACK:  Are you going to make that stipulation?

14            MR. S. KULWIN:  Sure.  I mean, I -- you're showing

15    her --

16    BY MR. NOVACK:

17    Q.  Well, let's go back.  You testified this morning that

18    there was something in the marketing materials you saw about

19    laundry facilities?

20    A.  I thought I saw something in the marketing materials about

21    laundry facilities.  I don't remember what it was in detail.

22    Q.  Well, I was going to ask you to go through this and see if

23    you could find it.  Mr. Kulwin said he might have something to

24    say about that.

25            MR. S. KULWIN:  I -- I don't know.  She would have to

Goldberg - cross

1562

1   look at it.  I thought -- I don't want to make -- I don't want

2   to speak out of turn.  So if she wants to --

3              THE COURT:  Okay.

4              MR. S. KULWIN:  I'm sorry.  I'm not sure.

5              (Brief pause.)

6   BY MR. NOVACK:

7   Q.  So this is the exhibit that Mr. Kulwin had given you, so

8   please direct us to the reference to laundry facilities in

9   there, please.

10  A.  I'm going to be looking -- it could be awhile.

11             THE COURT:  Do you want her to look through the

12  entire document?  Is that what you're asking?

13             MR. NOVACK:  Yes.  I don't know any other way to do

14  that.

15             THE COURT:  Okay.  Let's take our afternoon break

16  then.

17             (Jury exited the courtroom.)

18             THE COURT:  We'll pick up in 15 minutes.

19             MR. S. KULWIN:  Judge, before you go, only because we

20  have a witness waiting, does Mr. Novack have some idea about

21  how long he's going to go?

22             THE COURT:  Good question.  Mr. Novack?

23             MR. NOVACK:  I've got --

24             THE COURT:  Do you think you're going to take the

25  rest of the afternoon?

1    MR. NOVACK:  I don't believe so.

2    THE COURT:  Okay.  Do you think we'll get to another

3  witness?

4    MR. NOVACK:  I believe so, unless there's a long

5  redirect.

6    THE COURT:  An hour?

7    MR. NOVACK:  I would think an hour.

8    THE COURT:  Okay.

9    MR. S. KULWIN:  Okay.  Thanks, Judge.

10    THE COURT:  We may or may not get to it.

11    MR. S. KULWIN:  Okay.

12    THE COURT:  You may step down, ma'am.  And then come

13  back and look through the document, like he asked, while we're

14  waiting for the jury to come in.

15    THE WITNESS:  Okay.

16    THE COURT:  Thank you.

17   (Brief recess was taken.)

18   (Jury in.)

19    THE COURT:  You may be seated.

20    Mr. Novack, you may continue.

21  BY MR. NOVACK:

22  Q.  Ms. Goldberg, did you get a chance to look through

23  Exhibit 75?

24  A.  I went through the first number of pages and stopped at

25  the first reference I came to in the laundry.  I have that one

Goldberg - cross

1564

1   on page -- under residences -- I don't know.  The DFS 004380.

2   Q.  May I see it?

3   A.  Yes.  Under the amenities.

4   Q.  And there's nothing in there, is -- well, you -- there's

5   nothing in there that says that those amenities were going to

6   be part of the common elements, is there?

7           MR. S. KULWIN:  Objection.

8   BY THE WITNESS:

9   A.  He didn't -- you didn't ask me that.

10          MR. S. KULWIN:  He asked her to look through the

11  materials to see if there's any reference to --

12          MR. NOVACK:  I'm moving on to the next question.

13          THE COURT:  He is following up.  Overruled.

14          You may answer it if you can.

15          Do you need it read back?

16          THE WITNESS:  Read -- yes, please.

17          THE COURT:  Nancy, would you read it back, please.

18    (Record read.)

19  BY THE WITNESS:

20  A.  You didn't ask me that.  You asked me if there was a

21  reference in --

22  BY MR. NOVACK:

23  Q.  I --

24  A.  Something in the documents that showed laundry facilities.

25  And that's all I looked for.

Goldberg - cross

1565

1   Q.  I asked that as a prefatory question.  Now, that we see

2   it, I have a follow-up question.

3   A.  All right.

4   Q.  I get that this says laundry.  It says dry cleaning and

5   laundry valet services?

6   A.  Yes.

7   Q.  Is there anything in there that says "and that will be

8   owned by the unit owners"?

9   A.  Not in that particular reference.

10  Q.  Okay.

11  A.  However -- may I continue?

12  Q.  I have no question pending right now.

13          MR. S. KULWIN:  She didn't finish her answer.

14          THE COURT:  Did you finish your answer to the

15  question:  Is there anything in there that says "and that will

16  be owned by the unit owners"?

17          THE WITNESS:  No, I didn't finish.

18          THE COURT:  You may finish.

19  BY THE WITNESS:

20  A.  Since I had seen the laundry facilities listed as one of

21  the amenities, the natural thing to do is say, oh, here's a

22  place where they offer it.  And that's what I -- I just made

23  that assumption, and I think it's a natural assumption.

24  BY MR. NOVACK:

25  Q.  Thank you.

Goldberg - cross

1566

1      Now, one more thing about laundry facilities.  The
2  property report did not explain what was meant by the two
3  words "laundry facilities," did it?
4  A.  Not that I recall.
5  Q.  And you really didn't know anything about what that meant,
6  did you?
7  A.  No, I didn't, except that they did laundry.
8  Q.  For example --
9  A.  And I had been in hotels where they do laundry.
10  Q.  For example, it did not say whether that was referring to
11  a coin-operated laundry for the general public, did it?
12  A.  I don't know that it was defined at all.
13  Q.  And you did not ask anybody at the Trump organization to
14  explain that to you, did you?
15  A.  It seemed to be obvious on the surface.  There was no
16  reason to ask.
17  Q.  Well, there was no indication though whether it would be a
18  laundry facility that would be available for use by the
19  guests, whether it was going to be marketed to the public,
20  whether it was going to be for pay or not?  None of that was
21  in there, correct?
22  A.  If that's one of the amenities that's mentioned, it's very
23  logical to assume it's going to be used by the guests.
24  Q.  Okay.  Now, let's talk for a minute -- I want to direct
25  your attention to the hotel rental program's rotation system.

Goldberg - cross

1567

1    Do you know what I'm talking about?

2    A.  Yes.

3    Q.  And that system -- or the change that you say was made in

4    that system is one of the things that you're complaining

5    about?

6    A.  Yes.

7    Q.  But let me ask you this for starters:  You're not sure

8    exactly what Mr. Shearer told you about how many -- about how

9    rental opportunities would be allocated to owners, right?  I'm

10   talking about what Mr. Shearer said.

11   A.  I don't remember in detail or -- I don't remember that he

12   mentioned it in detail --

13   Q.  Okay.

14   A.  -- exactly how it would work.  What I relied on was the

15   hotel -- was the material I took home where it explained the

16   system.

17   Q.  Right.  And that -- and that material said that owners who

18   occupied their units would not lose their spot in the rotation

19   system for having done so --

20   A.  That's correct.

21   Q.  -- right?

22          And that was a benefit, if you will, for unit owners

23   that chose to occupy their units?

24   A.  Yes.

25   Q.  And, conversely, it was a detriment, if you will, to the

Goldberg - cross

1568

 1   other unit owners?

 2   A.  It -- it could be.  That was something I thought about.

 3   But I thought, no, everybody got the same -- everybody knew

 4   the deal right at the front; and if you accepted it, then it's

 5   fair to everybody.

 6   Q.  But you certainly had no intention of ever staying in the

 7   hotel units you purchased, right?

 8   A.  I did not.

 9   Q.  You've never stayed in one of your condominiums you owned

10   downtown?

11   A.  No, I haven't.

12   Q.  Not in the 20 years that you've owned those units,

13   correct?

14   A.  It's 18 years.  And I would say -- I haven't, but I have a

15   family member who has.

16   Q.  Okay.

17   A.  So we have used it personally.

18   Q.  But at Trump, you had no intention and you hadn't stayed

19   there; so the changes that were made actually benefited you

20   because it opened up more rental opportunities for you not to

21   have to account for the fact that other unit owners were

22   occupying their units, correct?

23   A.  Well, that has -- wait a minute.  The -- the unit that I

24   owned was a residential condominium.  I don't see how the --

25   there's an effect from one set of units to the condominium --

Goldberg - cross

1    I'm sorry.  I don't understand where you're going here.

2    Q.  I'm saying at the time that you were intending to buy

3    these units --

4    A.  Yes.

5    Q.  -- the change that was made, if anything, inured to your

6    benefit because you were not going to be one of the owners

7    that occupied your unit?

8    A.  I didn't consider that.

9    Q.  Well, likewise, I'm sure, when you signed up to purchase,

10   you didn't consider that either, did you?

11   A.  No -- if you're asking me did I think it was fair, I

12   thought it was a fair system at the beginning.

13   Q.  Well --

14   A.  At the time that they changed it, it might have benefited

15   me, but -- and I did think about it; but I finally decided,

16   no, it was fair because -- because we all had the same offer

17   and we accepted it.  We were willing to go with that.  And I

18   felt that I also would benefit down the road if I ever sold

19   the unit because that might be something that would be useful

20   to the next tenant.

21   Q.  Well, unless the next person that you were trying --

22   A.  Might be the same, but who knows.

23   Q.  If the person who you were trying to sell to happened to

24   be like you and had no intention of staying there, that would

25   not be a selling point, would it?

Goldberg - cross

1570

A. No, it wouldn't. But when you go to market, you want to
have the widest possible number of people trying to buy your
unit as -- you want to have everybody available to buy your
unit interested. This means some segment of that group would
be interested in staying -- would be interested in staying
there at some times.

Q. But there's some segment in the buying public, such as
you, who knew up front they weren't going to stay there; they
would actually be more encouraged to buy by the change that
was made, correct?

A. They might be more encouraged, but that wouldn't make a --
a smaller group of potential buyers.

Q. Let's go back to the time you signed. If at the time you
were considering buying these units, if the system had been
the way it was changed to be, would you still have bought?

A. I would have because then everybody who is buying is still
getting the same deal. That wouldn't have -- I would still
have bought the units if it was only that one.

Q. No. I'm saying -- you're complaining about the change
that was made because you thought the change that was made was
not fair, right?

        MR. S. KULWIN: I'll object to which change. There
were two changes.

        THE COURT: Sustained.

BY MR. NOVACK:

Goldberg - cross

1    Q.  The change that you're complaining about is the change

2    that accompanied the fourth amendment; isn't that correct?

3    A.  Yes.

4    Q.  And that change --

5            MR. S. KULWIN:  Judge, I'll object.  This doesn't

6    apply to the fourth amendment.  There's a rental management

7    agreement that's separate from the fourth amendment.  He's

8    trying to confuse her.

9            MR. NOVACK:  I'm not trying to confuse anybody.

10           THE COURT:  Do you want to rephrase --

11   BY MR. NOVACK:

12   Q.  You understood --

13           THE COURT:  -- your question?

14   BY MR. NOVACK:

15   Q.  You testified earlier for Mr. Kulwin that that change in

16   the rental agreement came right around the time of the fourth

17   amendment, didn't you?

18   A.  Yes.

19   Q.  And so you knew when I just asked you about that, that's

20   the change I was talking about, didn't you?

21   A.  I do know that's the change you're referring to.

22   Q.  Okay.  And I'm asking you, if instead of that change

23   having occurred after you signed, it had changed -- the change

24   had occurred before you signed, that wouldn't have changed

25   your decision to buy the unit, would it?

Goldberg - cross

1572

1    MR. S. KULWIN:  Judge, I'm going to object.  He still

2  hasn't identified which of the two changes he's talking about.

3    THE COURT:  Sustained.

4  BY MR. NOVACK:

5  Q.  What was the change, Mrs. Goldberg, that was made right

6  around the time of the fourth amendment?

7  A.  They discarded the -- the mechanical system that they had

8  established earlier.

9  Q.  You were testifying for Mr. Kulwin about the change that

10  instead of unit occupiers being penalized for occupying their

11  unit, they would no longer be penalized.  Do you understand

12  that change?

13  A.  Yes.

14  Q.  And that is a change that was made right around the time

15  of the fourth amendment, right?

16  A.  Right.

17  Q.  And that's the change that you said you didn't think was

18  fair, correct?

19  A.  I said -- I think I -- that's correct.

20  Q.  Because you said every owner should be treated the same,

21  right?

22  A.  Yes.

23  Q.  With respect to that change, had that change been made

24  before you signed so that when you were considering this, unit

25  occupiers would not be penalized for using their unit, would

Goldberg - cross

1573

1  you still have bought the unit?

2  A.  It would have depended on what the system was at the time.

3  Q.  Well, I'm saying if that were the system.

4  A.  The system had changed too?  No, it would have been a

5  negative in my consideration because -- the system that they

6  changed to allowed for favoritism in rental system.  Do you

7  want me to go further?

8  Q.  Are you aware of a single instance of favoritism?

9          MR. S. KULWIN:  Objection, Judge, calls for

10 speculation.  How would -- we would have to look at all the

11 documents over the last five years.

12         THE COURT:  Sustained.

13         THE WITNESS:  Means I can answer?

14         THE COURT:  No.

15         THE WITNESS:  Can't answer.  Okay.

16 BY MR. NOVACK:

17 Q.  Now, I'm going to put up on the screen -- or if you choose

18 to, it's in the book there -- Exhibit 591.

19         Can you see that?

20 A.  Yes.

21 Q.  And this is an e-mail that you discussed in your testimony

22 in your direct examination, correct?

23 A.  Right.

24 Q.  And I want to focus on the bottom e-mail of that page,

25 which is the e-mail from you to Ms. Vogue.  So we'll focus

Goldberg - cross

1574

1    first on that bottom one.

2         And you testified this morning that this e-mail was

3    referring to a -- or you meant it to be referring to a Tribune

4    article and another lawsuit that was pending, correct?

5    A.  Yes.

6    Q.  And you said that I was mistaken in what I said about it.

7    Do you remember that?

8    A.  No, not really.

9    Q.  No?

10        But I want to ask you, just looking at the words

11   here, not what you may have meant, just looking at the words,

12   would you agree with me that there's no reference in this

13   e-mail to an article?

14        MR. S. KULWIN:  Judge, I object.  It's out of

15   context, and it's argumentative.  And I'd like to be heard on

16   this.  I think there's a major problem with this question, if

17   I may.

18        THE COURT:  Mr. Novack, why don't you try rephrasing

19   your question.

20        MR. NOVACK:  Well, I'm not sure that I know how to.

21        THE COURT:  My guess is you do.

22   BY MR. NOVACK:

23   Q.  Are you familiar with the words that are in this e-mail?

24   A.  Yes.

25   Q.  Does the word "article" appear in it?

Goldberg - cross

1575

1   A.  I don't recall "article" being in here.

2   Q.  And does it say in here that there is another lawsuit

3   pending?

4           MR. S. KULWIN:  Judge, I'm going to object.  I am

5   going to object.  I would like to be heard, if I may.

6           THE COURT:  Okay.  We can go to sidebar.

7     (Proceedings heard at sidebar:)

8           MR. S. KULWIN:  Maybe it's just me, Judge, but I

9   think as a lawyer he has an obligation to only ask good faith

10  questions.  For him to ask questions and to lead this jury to

11  believe that there is no article or imply that there is no

12  article and she's not referring to an article, when he himself

13  put into evidence the exhibit that came up before that she

14  specifically is referring to about the article, and he knows

15  there's an article, that refers to the very core of the case,

16  and you let into evidence for obvious reasons, it's bad faith.

17  We should be able to put in article in.

18          MR. NOVACK:  I'm not suggesting that there isn't an

19  article.  I'm just saying that this e-mail, which was the only

20  thing I saw when I prepared my opening statement, doesn't

21  reference an article, doesn't reference another lawsuit.

22  It's -- and that's all I'm trying to do.  I'm not saying --

23          THE COURT:  But you know there is another article.

24  You know there is an article that she referred to.

25          MR. NOVACK:  But I was the reader of this, and I

Goldberg - cross

1576

1    didn't know that when I read this.

2           MR. S. KULWIN:  That's disingenuous because it was a

3    defense exhibit that he put into evidence.  Ms. Vogue's very

4    e-mail came -- it's a defense exhibit.

5           THE COURT:  I am going to sustain the objection.  And

6    I assume in closing, you are not going to come back and say,

7    oh, and Mr. Novack said this in opening with respect to --

8           MR. S. KULWIN:  That I --

9           THE COURT:  I assume you are not going to make a big

10   deal about his reference to this particular document.  He is

11   trying to clean up his opening statement.

12          MR. S. KULWIN:  I understand that, but -- I

13   understand that he's trying to clean it up.  And that would be

14   great if he could clean it up, but he can't clean it up.  And

15   I don't think I should be barred from saying in my closing

16   argument that this was a misleading assertion and that it's

17   implematic of the defense in this case.  Not him personally.

18   I'm not attacking --

19          THE COURT:  I will take up closings later.  But I am

20   not going to let you argue that.  But let's move on from that

21   because you know there is a newspaper article.  And I have

22   made certain rulings about that.  And you are going to push it

23   up against a wall, but they are going to ask me to admit the

24   article.  And I do not think you want that.

25          MR. S. KULWIN:  Okay.

Goldberg - cross

1577

1     (Proceedings heard in open court:)

2   BY MR. NOVACK:

3   Q.  Now, I'd like to direct your attention to about midway

4   down the e-mail.  Well, let's count up from the bottom.  Six

5   lines up from the bottom.  And you'll see there, there's a

6   sentence there that begins with "it may be somewhere"?

7   A.  Uh-huh.

8   Q.  Let me read that whole sentence.  You wrote, It may be

9   somewhere in the earlier documents that Trump had the right to

10  revise.  However, if so, I don't think there would be a court

11  case.

12          Do you remember writing that?

13  A.  Yes.

14  Q.  And you testified that what you meant by that is, is that

15  there -- nobody would have filed a court case if it was, in

16  fact, somewhere in the documents, right?

17  A.  I beg your pardon?

18  Q.  Did you testify this morning that what you meant by that

19  is, is that no one would file a lawsuit if Trump had the right

20  to revise in the documents?

21          MR. S. KULWIN:  Judge, I'm going to object.  I think

22  I know where Mr. Novack is going here, and I think it's

23  inadmissible and I think it's prejudicial.  And I'd like to be

24  heard.  I'm sorry.

25          THE COURT:  Answer that yes or no if you can, and

Goldberg - cross

1578

1    then we will see.

2              THE WITNESS:  What if I say not quite?

3              THE COURT:  That will do as well.

4    BY THE WITNESS:

5    A.  Okay.  Not quite.

6    BY MR. NOVACK:

7    Q.  Well, let's go to the beginning of that.  You said it may

8    be somewhere in the earlier documents that Trump had the right

9    to revise?

10   A.  I did say that.

11   Q.  You stand by that now, that it may be somewhere in there?

12   A.  It may be, yes.

13   Q.  Okay.  And then you went on to say, However, if so, I

14   don't think there would be a court case.

15   A.  That's correct.

16   Q.  Did I read that correctly?

17   A.  Yes.

18   Q.  Okay.  And you would agree, wouldn't you, that if, in

19   fact -- according to what you wrote, if Trump did have the

20   right to revise, there couldn't be a lawsuit?

21   A.  There might still be a lawsuit because the right to revise

22   might be questioned.

23   Q.  No, I understand that.  But you said -- you said there

24   wouldn't be a lawsuit if there was a right to rely; but you

25   know that anybody can file a lawsuit, right?

Goldberg - cross

1579

1   A.  Yeah, that's one reason there might not have been a

2   lawsuit, but there could have been others too.

3   Q.  But anybody can file a lawsuit; and just filing it doesn't

4   mean the party is correct; isn't that right?

5   A.  Oh, that's true.  But I think you generally go in with the

6   idea that you have something to go in on.  You don't start a

7   lawsuit unless you think you have good reason.  It's too

8   expensive.

9   Q.  But if the true facts are -- just say that that's how the

10  facts are resolved -- the facts are resolved, Trump did have

11  the right to make that revision --

12          MR. S. KULWIN:  I am going to object.

13          MR. NOVACK:  Can I finish?

14          MR. S. KULWIN:  He's opening a door here.

15          THE COURT:  I will sustain on form now.

16          MR. NOVACK:  Judge, Mr. Kulwin was allowed to ask her

17  what she meant by it.  It seems that I should be able to

18  cross-examine her about what she meant by that.

19          THE COURT:  I do not disagree with that, but I

20  sustained it on form.  So you need to rephrase if you want to

21  pursue that, Mr. Novack.

22          MR. NOVACK:  Okay.

23  BY MR. NOVACK:

24  Q.  You would agree, wouldn't you, that these two things that

25  I'm about to say can't coexist:  There can't be both the right

Goldberg - cross

1580

1    in Trump to make these revisions and a successful lawsuit?

2    Those two cannot exist together, correct?

3            MR. S. KULWIN:  I'll object, Judge, on -- not only on

4    form, but I'm going to ask to open a door here if he keeps

5    up --

6            THE COURT:  Sustained.  And it is argumentative now.

7            MR. NOVACK:  Okay.

8    BY MR. NOVACK:

9    Q.  Now, looking further down the e-mail, two lines up --

10   three lines up from the bottom, you have a sentence that says,

11   I would have to think about whether that is fair, but it might

12   be since their no-longer-usage makes it more difficult to

13   supply ordinary hotel guests.

14           Do you see that?

15   A.  Yes.

16   Q.  So you were saying that as of that moment, you hadn't

17   concluded whether the change that was being made was fair or

18   not; is that right?

19   A.  No.  I accepted the change at the beginning, but once --

20   but at the point where they took it out and I said any fair

21   system -- any fair system is okay.  However, I want to think

22   about whether this is still fair because now you have a

23   different circumstance.  The --

24   Q.  What I'm saying --

25           MR. S. KULWIN:  Judge, I don't believe she finished.

1          THE COURT:  Sustained.  She was not done yet.

2    BY THE WITNESS:

3    A.  The people who bought at the beginning -- who bought units

4    at the beginning all had the same opportunities.  That was

5    fair.  Now, there are people who aren't going to have the

6    same -- new -- now that has changed.  They aren't going to

7    have the same opportunities that they were given in the first

8    contract.  Those opportunities were changed.  And once I --

9    once I thought about that, I said, no, it's not fair.  This is

10   not a fair system.  This is -- sorry.  I have to figure out

11   which --

12   BY MR. NOVACK:

13   Q.  But that's something you thought about after you wrote the

14   e-mail, correct?

15   A.  It's -- I decided after I wrote the e-mail, yes.

16   Q.  Correct.  After the e-mail.

17          At the time you wrote the e-mail, you said it might

18   be fair since the longer usage makes it more difficult --

19          MR. S. KULWIN:  Objection, asked and answered.

20   BY MR. NOVACK:

21   Q.  -- for ordinary hotel guests?  You wrote that, correct?

22          THE COURT:  Overruled.  You may answer if you can.

23   BY THE WITNESS:

24   A.  You better repeat it.  I was rereading at the time.

25   BY MR. NOVACK:

Goldberg - cross

1582

1    Q.   I understand that after the e-mail, you came to a

2    conclusion.  But when you were writing the e-mail, you did

3    say --

4    A.   I said --

5    Q.   -- it might be fair; you were considering longer use by

6    particular owner occupiers might make it fairer to do this,

7    correct?

8    A.   I was -- I thought maybe I should think about this and

9    decide whether it was still fair.

10   Q.   Okay.  And one of the things that you say in here also is

11   that you heard from your lawyer's secretary that the fourth

12   amendment was okay with your lawyer, correct?

13   A.   No.

14   Q.   Let me ask you if you wrote these words:  I did not get an

15   answer from Judy, but her assistant told me that the amendment

16   seemed to be okay with Judy.

17            Did you write that?

18   A.   Yes --

19   Q.   Okay.

20   A.   -- I did.

21   Q.   Now, let's look at Exhibit 592.

22            And this is the e-mail that Terry Vogue sent to you

23   and two others.  And I just want to read a few things out of

24   there, and you'll tell me if I'm reading it correctly.

25            I'm in the second paragraph:  Regarding the amenities

Goldberg - cross

1583

1    of the hotel, such as the restaurants, conference rooms,

2    banquet rooms, ballroom and spa, Trump made the decision to

3    retain ownership and revise the property report to reflect

4    that those amenities are no longer the property of or

5    responsibility of the hotel association.  One of the valid

6    points that Kiyoko mentioned was that Trump wanted to have

7    complete control of the decisions and responsibility for the

8    maintenance and management of those areas of the hotel and not

9    leave the decisions or authority in the hands of the hotel

10   board.

11            Did I read correctly so far?

12            And then she goes on to say:  Knowing how important

13   his branding is to him, I can understand his wanting to retain

14   the financial responsibility for the upkeep of the --

15   A.  You skipped a line.

16   Q.  Wanting to retain the ownership rights to ensure his

17   standard and will would prevail.

18            Have I read that correctly?

19   A.  Yes.

20   Q.  And then at the bottom of the e-mail, Mrs. Vogue concludes

21   by saying to you -- this is after your e-mail and after her

22   e-mail, after seeing the article -- I think you're going to

23   really enjoy your condos at Trump and the beautiful amenities

24   available on site.

25            Have I read that correctly?

Goldberg - redirect
1584

1    A.   Where is that?

2    Q.   It's in the last paragraph, the second to last sentence.

3    A.   Yes.

4    Q.   Okay.

5              MR. NOVACK:  Judge, if I may have one moment?

6              THE COURT:  You may.

7       (Brief pause.)

8              MR. NOVACK:  No further questions, Judge.

9              THE COURT:  Redirect.

10             MR. S. KULWIN:  May I have one moment, Judge?

11             THE COURT:  You may.

12      (Brief pause.)

13             MR. S. KULWIN:  Would you like some water, Jackie?

14   Are you okay?

15             THE WITNESS:  I'm okay for now.

16                        REDIRECT EXAMINATION

17   BY MR. S. KULWIN:

18   Q.   All right.  Jackie, real quick.  You were asked a number

19   of questions about whether you expected -- when you were

20   meeting with the people at Trump -- whether you expected them

21   to tell you about plans to change the common elements if there

22   were no such plans.  Do you remember those questions by

23   Mr. Novack?  He asked you that?

24   A.   Yes.

25   Q.   Okay.  Let me ask you:  Did anyone reveal to you while you

Goldberg - redirect

1585

1   were talking to them at Trump that two to three years before

2   Mr. Trump decided to offer these hotel facilities, the

3   ballrooms, the meeting rooms and the function rooms for sale

4   to people like you, that he thought it would be disastrous if

5   the condo owners like you actually got to own those

6   facilities?  Did anyone tell you that?

7          MR. NOVACK:  Judge, I'm going to object.  It's

8   argumentative.  He can ask a negative about every fact in the

9   case.

10         THE COURT:  I will sustain that on form.

11  BY MR. S. KULWIN:

12  Q.  Mrs. Goldberg, did anyone reveal to you while you were

13  talking to the Trump people that Mr. Trump believed it would

14  be disastrous if the hotel owners such as you owned the

15  ballrooms, the meeting rooms and the function rooms?

16  A.  No.

17         MR. NOVACK:  I'm going to object.  That

18  mischaracterizes the evidence.  It doesn't relate to the time

19  frame.

20         THE COURT:  Overruled.  You may answer if you can,

21  ma'am.

22  BY THE WITNESS:

23  A.  No.

24  BY MR. S. KULWIN:

25  Q.  Would you have wanted someone to tell you that if that had

Goldberg - redirect

1586

```
 1   been the case?

 2   A.  Oh, yes.

 3   Q.  Had you known, would that have given you some concern

 4   about whether Mr. Trump was actually going to go through with

 5   selling you the facilities?

 6           MR. NOVACK:  I'm going to object.

 7           MR. S. KULWIN:  It goes to --

 8           MR. NOVACK:  Argumentative.

 9           THE COURT:  What is your response?

10           MR. S. KULWIN:  It's not, Judge.  He asked her

11   whether anybody -- if there's no plans, would you expect him

12   to tell it.  I'm now asking her, they should have told her

13   what they did know, Mr. Trump.

14           THE COURT:  Overruled.  You may answer if you can.

15   BY MR. S. KULWIN:

16   Q.  Would you like to hear it again?

17   A.  Yes.

18   Q.  Had you known that -- I'm sorry.

19           Had you known what I just said, would it have given

20   you some concern about whether the Trump organization was

21   actually going to sell these facilities to you if Mr. Trump

22   felt that way?

23   A.  I would have been concerned.

24   Q.  Okay.  Thank you.

25           And would you have -- had you known that -- excuse
```

Goldberg - redirect

1       me.  Strike that.

2                Let me ask you this:  Did anyone tell you at the time

3       when you were purchasing your HCUs that almost three years

4       before you purchased, Mr. Trump believed that a condo -- that

5       his brand would be seriously harmed if the condo board owned

6       the facilities?  Did anyone reveal that to you?

7                MR. NOVACK:  Objection.  He's putting in this word

8       owned, and the testimony was always about operated and run.

9                THE COURT:  Sustained.

10               MR. NOVACK:  There was never testimony that Mr. Trump

11      said it would be a disaster if they owned it.

12               MR. S. KULWIN:  Actually, Judge, Mr. Trump made that

13      very correction.

14               THE COURT:  Rephrase your question.

15      BY MR. S. KULWIN:

16      Q.  Jackie, did anyone ever tell you that years before you

17      purchased an interest in the hotels, that Mr. Trump believed

18      it would be disastrous if the condo board owned these

19      facilities?  Did anyone ever tell you?

20      A.  No.

21               MR. NOVACK:  I'm going to make the same objection.

22               THE COURT:  Overruled.  That is a question for the

23      jury.

24      BY THE WITNESS:

25      A.  No.

Goldberg - redirect

1588

1    BY MR. S. KULWIN:

2    Q.  Is that something you would have wanted to know?

3    A.  Yes, I would have.

4    Q.  Had they told you that information, would that have given

5    you concern that they were going to actually go through with

6    the deal?

7    A.  I would have been concerned.

8    Q.  Thank you.

9         Did anyone tell you while you were shopping that --

10   that two or three years before, Mr. Trump had seen many times

11   before when condo boards ran these hotel facilities, it

12   created turmoil and the whole thing went to hell?  Did anyone

13   tell you that?

14        MR. NOVACK:  Judge, I'm going to object.  The

15   testimony was not that that had -- that he had seen that three

16   years before this.  That was said at the deposition, which was

17   years after.

18        MR. S. KULWIN:  No, Judge.  We specifically went over

19   that with him in his cross-examination, and he said he was

20   referring to, at the time, years before 2006; at the time he

21   was approving the inclusion.

22        THE COURT:  Overruled.  You may answer if you can.

23   BY MR. S. KULWIN:

24   Q.  Anyone ever tell you that?

25   A.  You're going to have to repeat it.

Goldberg - redirect

1589

1   Q.  Okay.

2   A.  I'm getting lost in the cross talk.

3   Q.  Don't worry.

4       Did anyone tell you that before you purchased your

5   units and these hotel facilities, Mr. Trump had seen --

6   personally had seen -- hotel condo developments where the

7   condo boards had owned these facilities and in his view the

8   hotel had gone to hell?  Did anyone tell you that?

9   A.  No.

10  Q.  Is that something you would have wanted to know?

11  A.  Yes.

12  Q.  Would that have caused you concern about whether or not

13  Mr. Trump was going to go through with delivering on these

14  facilities?

15  A.  Yes.

16  Q.  Now, when you purchased these facilities -- I think your

17  e-mail that we looked at before, you mentioned the net

18  revenues or losses.  You were aware that there could be

19  losses.  Remember that?

20  A.  Yes.

21  Q.  Did anyone from the Trump organization at the time you

22  were purchasing ever say to you, we'd like to really protect

23  you from those losses; are you sure this is something you want

24  to buy?

25  A.  No.

Goldberg - redirect

1  Q.  Did you understand the risks of what you were buying when

2  you bought it?

3  A.  Yes, I did.

4  Q.  Did you want anyone to protect you from those risks or is

5  that what you wanted to do?

6  A.  No.  I was looking to -- I was willing to take the risk

7  for the possible reward.

8  Q.  You were asked some questions about the attorney approval

9  period and how during that ten-day period, you could walk away

10  if you wanted to and you didn't walk away.  Do you remember

11  those questions?

12  A.  Yes.

13  Q.  At any time during that ten-day attorney period, did

14  anyone tell you any of those things I just asked you about,

15  that Mr. Trump thought it would be a disaster if you owned it,

16  that he thought it would hurt his brand and all those things?

17  Did anyone tell you that during that ten-day period?

18  A.  No.

19       MR. NOVACK:  I'm going to object.  We can take this

20  every step of the way.  We're getting to the point where he's

21  make his closing argument multiple times.

22       THE COURT:  I am sustaining on form.

23  BY MR. S. KULWIN:

24  Q.  During the ten-day period when your attorney could review

25  the contract, and you, did anyone tell you any of the things

Goldberg - redirect

1591

 1    about what Mr. Trump thought about this that I just went over

 2    with you?

 3              MR. NOVACK:  I'm going to object to that question.

 4              THE COURT:  Sustained on form.

 5              MR. S. KULWIN:  I'll redo it.

 6    BY MR. S. KULWIN:

 7    Q.  During the ten-day attorney period, Jackie, did anyone

 8    tell you that Mr. Trump believed that if the condo board owned

 9    these facilities, it would be bad for his brand?  Did anyone

10    tell you that?

11              MR. NOVACK:  Objection.  That's misstating the

12    evidence in this record.

13              THE COURT:  Overruled.  You may answer if you can.

14    BY THE WITNESS:

15    A.  No, no one told me.

16    BY MR. S. KULWIN:

17    Q.  Did anyone tell you during that ten-day attorney approval

18    period that Mr. Trump -- excuse me -- believed that if a condo

19    board owns these type of facilities, the whole hotel could go

20    to hell?  Anyone tell you that?

21    A.  No.

22    Q.  You were asked a bunch of questions about whether the --

23    between each -- each amended report, the common charges kept

24    going up.  Do you remember those questions?

25    A.  Yes.

Goldberg - redirect

1592

1    Q.  Was that one of the reasons why you were so attracted to

2    the idea, that there was going to be this $5 million of

3    ballroom and other rental revenue coming into the common

4    association which would always -- also be going up?

5    A.  Yes.

6    Q.  You were asked some questions about whether or not the

7    budget balanced and how the money was going to come through.

8    Do you remember those questions?

9    A.  Yes.

10   Q.  Let me ask you this:  When you saw that $5 million, did

11   you assume that if they got $5 million of revenue, they

12   anticipated making a profit on that $5 million?

13   A.  Yes.

14   Q.  And did you believe that that profit -- the difference

15   between the $5 million and the expenses -- that net would then

16   go to help keep the condominium association -- common charges

17   down and did you assume that?

18   A.  Yes.

19   Q.  And did you also assume that because Trump was running the

20   hotel and because he had such a great reputation, that those

21   numbers would keep going up?

22          MR. NOVACK:  He's leading.  Objection.

23          THE COURT:  Sustained.  You are leading.

24          MR. S. KULWIN:  Thank you, your Honor.

25   BY MR. S. KULWIN:

                          Goldberg - redirect
                                                                  1593

1    Q.  What was your belief about that $5 million over the coming

2    years?  Did you think it was going to go up or down?

3    A.  I was sure it --

4          MR. NOVACK:  Objection.

5    BY THE WITNESS:

6    A.  -- would go up.  And I'll tell you why.

7          THE COURT:  I'm sorry.  What is the objection?

8          MR. NOVACK:  No foundation.

9          THE COURT:  Sustained.

10   BY MR. S. KULWIN:

11   Q.  Did you have a belief at the time -- first answer this --

12   did you have a belief at the time when you were looking at the

13   $5 million number about whether those numbers would -- that

14   $5 million in rental revenue from the ballrooms, the meetings

15   would go up?  Did you have a belief about it at the time?

16   Just say yes or no, please.

17   A.  Yes.

18   Q.  What was that belief?

19   A.  I believed it would go up.

20         MR. NOVACK:  Objection.

21         THE COURT:  Overruled.

22   BY MR. S. KULWIN:

23   Q.  Can we hear the answer again?

24   A.  I believed that the income would be likely to go up.

25   Q.  And did you also believe -- and what was your belief about

Goldberg - redirect

1594

1   whether or not if the income kept going up over the years the

2   profits would go up?

3   A.  I believed the profits would go up.

4   Q.  And what was your belief, if any, about whether the rising

5   profits from those ballrooms, rental rooms, meeting rooms,

6   function rooms would help lower the common assessments over

7   time?

8   A.  I believed it would lower them over time.

9   Q.  And did you think that that would make owning the units as

10  well more profitable because you would have lower assessments?

11  A.  I did believe it would be more profitable.

12  Q.  You were asked some questions about whether you knew the

13  common elements had been taken out of the property report.  Do

14  you remember those questions?

15  A.  Yes.

16  Q.  Okay.

17          MR. S. KULWIN:  Can I have Plaintiff's Exhibit 1B.

18          Some time today, guys.

19          Or is it 1A?  1B or 1A?  It's 1A.  You're right.

20          Can I have one moment, Judge?

21          THE COURT:  Yes.

22    (Brief pause.)

23  BY MR. S. KULWIN:

24  Q.  I want to show you Exhibit 1A -- 1B, which is the

25  original -- the very first property report that Trump issued,

Goldberg - redirect

1595

1   dated September 24, 2003.  You also received that when you

2   bought your units, correct?

3   A.  Yes.

4   Q.  I want you to turn to page 3.

5           MR. S. KULWIN:  Mike, can we have page 3 up, office

6   property.  And highlight the office property, please.

7   BY MR. S. KULWIN:

8   Q.  Now, in the first property report that included the health

9   clubs, what does it say about office property?  Why don't you

10  read it right there?  I'm sorry.

11  A.  That portion of the building designed for use as

12  commercial office space and comprising floors 17 through 26 of

13  the building, as well as certain ancillary facilities related

14  thereto.  The office property is located within the project

15  but does not comprise any portion of the property.

16  Q.  Now, ma'am, was that -- Jackie, was that what you were

17  referring to when you said the building had been reconfigured

18  and the location had changed when the health club was removed

19  as a common element in the first amended property report?

20  A.  Yes.

21  Q.  Were you familiar with the fact that this office space had

22  been eliminated?

23  A.  Yes.

24  Q.  Okay.

25          Now, between the first amended property report and

Goldberg - redirect

1596

1    the second amended property report and the third amended

2    property report, were any common elements, to your knowledge,

3    changed after this first change?  To your knowledge?  Did the

4    common elements stay the same in each one?

5    A.  No.

6    Q.  Between the first one -- I'm sorry.  The first amended in

7    2004 -- oh, right.  No.  Okay.

8            All right.  Okay.

9            And let's go through the time period.  The first

10   amended property report was February of 2004.  Do you remember

11   that?

12   A.  Yes.

13   Q.  Okay.  The second one was in August 2004.  So that's about

14   six months, correct?

15   A.  Yes.

16   Q.  Okay.  The third one was in January of '05, right?

17   A.  Yes.

18   Q.  So that now we're almost a year past when that first

19   health club thing was taken out, right?

20   A.  Right.

21   Q.  Now, the third -- by the time you were looking at -- to

22   buy, it was already August '06, correct?

23   A.  Right.

24   Q.  So now the last time that they had changed any common

25   elements and the only time they changed any common elements

Goldberg - redirect
1597

1    was about two years before you had bought, correct?

2              MR. NOVACK:  Objection, leading.

3              THE COURT:  Sustained.

4    BY MR. S. KULWIN:

5    Q.  What's the last time -- by the time you were looking to

6    buy in August '06, based upon your review of the property

7    reports, was the last time that they had changed anything

8    concerning the common elements at least over two and a half

9    years before?

10             MR. NOVACK:  Same objection, your Honor.

11             THE COURT:  Sustained.  You are leading.

12   BY MR. S. KULWIN:

13   Q.  When was the last time -- let me just look at it.

14             MR. S. KULWIN:  Can I have the first amended and --

15   okay.

16   BY MR. S. KULWIN:

17   Q.  I'm going to show you the first amended property report,

18   which is Plaintiff's Exhibit 2.

19             What's the date on this, ma'am?

20   A.  February 25th, 2004.

21   Q.  Okay.  Now, when were you looking to buy?

22   A.  In August of 2006.

23   Q.  And approximately how long is it from August of -- from

24   February 20 -- 2004 to August of '06?

25   A.  About two and a half years.

Goldberg - redirect

1598

1    Q.   And during the interim in all that time period, to your

2    knowledge, did Trump ever remove anything from the common

3    elements, to your knowledge?

4    A.   Only the -- only the one item.

5    Q.   The health club?

6    A.   The health club.

7    Q.   Which had happened in February of '04?

8    A.   Right.

9    Q.   As a result of the office space?

10   A.   Right.

11   Q.   During that same two and a half year time period, was

12   there any similar structural or space change in the building

13   at any time during that two and a half year period, to your

14   knowledge?

15   A.   Not that I know of.

16   Q.   Was there any such similar structural change or space

17   change at all between August of '06 and October of '07 when

18   they took those facilities out of the common elements, to your

19   knowledge?

20   A.   Not that I know of.

21   Q.   You were asked some questions about whether the property

22   reports or the contract allowed Mr. Trump to make changes.  Do

23   you remember those questions?

24   A.   Yes.

25   Q.   Okay.  When you -- when -- to the extent that you saw

Goldberg - redirect

1599

1    those -- that language in that -- in those documents, did you

2    interpret that in any way to mean that he could take away part

3    of -- half of what he sold you?

4          MR. NOVACK:  Objection, your Honor.

5          THE COURT:  Sustained on form.

6          MR. S. KULWIN:  Yes, ma'am.

7    BY MR. S. KULWIN:

8    Q.  Was it part of your expectation at all that a potential

9    change could include taking away $5 million of revenue and all

10   the common elements concerning the ballrooms and things of

11   that nature?

12   A.  It was not -- it was not.

13   Q.  To your knowledge -- you were asked a bunch of questions

14   about condominiums and all of your real estate experience.

15   Had you ever heard, in all of your experience, anything like

16   that ever happening before, in all your experience?

17         MR. NOVACK:  Objection, relevance.  What she's heard

18   is -- it's --

19         MR. S. KULWIN:  Goes to --

20         MR. NOVACK:  It's hearsay.

21         THE COURT:  Rephrase it.

22   BY MR. S. KULWIN:

23   Q.  In all your experience in dealing with real estate between

24   1995 and 2007, had you ever heard anything like a situation

25   where a seller, based on language that allowed him to modify

                            Goldberg - redirect
                                                                    1600

 1    things of that nature, took away half of what you were buying?

 2              MR. NOVACK:  Objection.

 3              THE COURT:  Sustained on "heard."  I think you need

 4    to rephrase it.  Was it ever her experience?

 5              MR. S. KULWIN:  Yes, your Honor.  Perfect.

 6    BY MR. S. KULWIN:

 7    Q.  Again, Ms. Goldberg, based on all of your experience in --

 8    sorry.

 9              Ms. Goldberg, Jackie, between 1995 and 2007, in all

10    of your -- all the real estate dealings that you had, was it

11    ever your experience that a seller, in trying to modify a

12    deal, took away half of what they were promising to sell you?

13              MR. NOVACK:  Objection, your Honor.  That doesn't

14    make it any more likely or not in this case --

15              MR. S. KULWIN:  That --

16              MR. NOVACK:  -- by the agreements.

17              MR. S. KULWIN:  It's a reasonable expectation.

18              THE COURT:  Overruled.  It goes to her state of mind.

19    You may answer if you can.

20    BY MR. S. KULWIN:

21    Q.  Ever seen that?

22    A.  I have never seen that.

23              May I go further?

24    Q.  Yes.  Go ahead.

25    A.  I had never seen a time when somebody who offered to sell

Goldberg - redirect

1601

1   something could change the substance of what he was selling.

2   Q.  Okay.  Thank you.

3         Now, you were asked some questions about whether your

4   common assessments went up or down -- the proposed common

5   assessments went up or down between 2005 and 2007.  Do you

6   remember that -- those questions?

7   A.  Yes.

8   Q.  Let's see if we can get some --

9         MR. S. KULWIN:  I'm going to need one second, Judge,

10  if I may.

11        THE COURT:  You may.

12    (Brief pause.)

13        MR. S. KULWIN:  Sorry, Judge.  It might take one

14  second.

15  BY MR. S. KULWIN:

16  Q.  I'm going to show you first the '07 --

17        MR. S. KULWIN:  May I have this on?  Thanks.

18  BY MR. S. KULWIN:

19  Q.  Now, this is for '07, all right, Jackie.  Your unit would

20  be 2238?

21  A.  Yes.

22  Q.  Right there?

23  A.  Yes.

24  Q.  And what's your percentage ownership there?

25  A.  .3465 percent.

Goldberg - redirect

1  Q.  Okay.  And now we go to '05.  What's your percentage

2  ownership in '05?

3  A.  .03 --

4  Q.  8 --

5  A.  I'm sorry.  0.3874 percent.

6  Q.  So if I understand it then, your common assessments,

7  between '05 and '08, went up; but your percentage ownership of

8  the building went down, correct?

9  A.  Yes.

10  Q.  And were you aware, of course, that during that time --

11  something Mr. Novack didn't share with you -- were you aware,

12  of course, that during that time, Mr. Trump had added 54 more

13  units to the building?

14  A.  I knew he had added more units.

15  Q.  And, of course, that would have taken out approximately

16  about a hundred thousand square feet from the common elements

17  that had to be maintained.  Were you aware of that?

18  A.  Yes.

19  Q.  So weren't you a bit surprised when your ownership

20  interest went down and the common elements got smaller that

21  your common assessments went up?

22          MR. NOVACK:  Objection.  This is leading.

23          THE COURT:  Sustained.

24  BY MR. S. KULWIN:

25  Q.  Were you surprised?

1   A.  Yes.

2          MR. NOVACK:  Oh, jeez.

3      (Brief pause.)

4          MR. S. KULWIN:  One moment, please, your Honor.

5   Thank you.

6      (Brief pause.)

7   BY MR. S. KULWIN:

8   Q.  Ma'am, you were asked some questions by Mr. Novack about

9   whether or not you did a similar calculation that he showed

10  you with your room and vacancy things with the ballrooms and

11  meeting rooms.  Do you remember those questions?

12  A.  Yes.

13  Q.  And I believe you answered, I relied on the property

14  report.  Do you remember that?

15  A.  Yes.

16  Q.  Okay.  Let me show you the January 10 -- 20 -- January 10,

17  2005, property report and, in particular, the notes for common

18  charges.

19         THE COURT:  Can you identify it, please, by exhibit

20  number for the record?

21         MR. S. KULWIN:  Yes, ma'am.  This is Plaintiff's

22  Exhibit 7, note one to Exhibit H.

23  BY MR. S. KULWIN:

24  Q.  And when you looked at Exhibit H, did you see that Trump

25  was providing you with that type of occupancy information that

Goldberg - redirect

1604

1  Mr. Novack was asking you about?

2          That was in there, correct?

3  A.  Yes.

4  Q.  And that's what you relied on, what was in the property

5  report?

6  A.  Yes.  Although I understood it to be an estimate.

7  Q.  Right.

8          You were asked some questions about what you thought

9  was fair, what you thought wasn't fair concerning the changes

10 in the management agreement that you learned about in 2008.

11 Do you remember that?

12 A.  Yes.

13         MR. S. KULWIN:  Can I have Exhibit 45.  Can we switch

14 now?  Does she have to switch?

15         THE COURT:  You want to go back to the computer?

16         MR. S. KULWIN:  Yes.  Thank you, your Honor.

17 BY MR. S. KULWIN:

18 Q.  I've got up here on the board Plaintiff's Exhibit 45, the

19 proposed rental management agreement.

20         MR. S. KULWIN:  And, Mike, if you can go to page 7.

21         And can you highlight the bottom.

22 BY MR. S. KULWIN:

23 Q.  And if you can read that to yourself, please, Jackie.  And

24 tell me when you're done, Jackie, so he can go to the next

25 page.

Goldberg - redirect

1605

1   A.  Okay.

2           MR. S. KULWIN:  Go to the next page, please.

3           Can you highlight up to --

4   BY MR. S. KULWIN:

5   Q.  Can you read that to yourself too?

6     (Brief pause.)

7   BY THE WITNESS:

8   A.  Okay.

9   BY MR. S. KULWIN:

10  Q.  You were asked some questions about -- the thing about

11  whether owners could stay, if it was fair or not.  Did you

12  ever think that it was fair when you learned that Trump had

13  changed the program from a computerized automatic equal

14  allocation of room rentals with a rotation point system to

15  giving Trump absolute discretion to decide?

16  A.  Not fair.

17          MR. NOVACK:  I'm objecting on relevance.  The issue

18  of whether something is fair or not is not in this case.

19          THE COURT:  Sustained on that question.

20  BY MR. S. KULWIN:

21  Q.  All right.  Did you ever think -- did you ever believe

22  that it was, as he pointed out in that e-mail, that you --

23  that that was something that was okay with you in 2007?

24  A.  No.

25  Q.  Okay.

Goldberg - redirect

1606

1  A.  It was not okay.  I'm not finished.

2  Q.  All right.

3  A.  This --

4  Q.  I --

5  A.  This allowed -- this system allows for favoritism.

6  There's no way at all it can be a fair system.

7          MR. S. KULWIN:  If you can go to page 23.

8          And Section 8.8, where it says frequently asked

9  questions.

10  BY MR. S. KULWIN:

11  Q.  And if you can read this one.

12          This agreement constitutes the entire agreement

13  between the parties with respect to the subject matter

14  contemplated -- meaning the rental program -- herein and

15  supersedes -- meaning overrules -- all oral statements and

16  prior writings with respect to the subject matter

17  contemplated -- the rental agreement -- including, without

18  limitation, any promotional items or reference materials

19  regarding the rental program, such as frequently asked

20  questions circulars or similar rental program overview

21  statements.

22          Okay.  Let me ask you:  Was that okay with you?

23          MR. NOVACK:  Judge, this was asked and answered.

24          MR. S. KULWIN:  Rehabilitation, Judge.

25          THE COURT:  Overruled.  You may answer.

Goldberg - redirect

1607

1   BY THE WITNESS:

2   A.  No, it wasn't okay.

3   BY MR. S. KULWIN:

4   Q.  By the way, had you ever seen anything in your experience

5   where a developer or someone selling you something gave you

6   circulars and brochures telling you, this is how it works and

7   then when it came time to sign the agreement said, you can't

8   hold us to any of that?  Ever see anything like that?

9   A.  No.

10              MR. NOVACK:  Objection.

11              THE COURT:  Sustained on form.

12  BY MR. S. KULWIN:

13  Q.  Was that -- have you ever experienced anything like that?

14              MR. NOVACK:  Same objection.

15              THE COURT:  Sustained.  Same reasons.

16              MR. S. KULWIN:  Sure.

17  BY MR. S. KULWIN:

18  Q.  In your dealings in real estate, was it ever your

19  experience that you saw something like this?

20  A.  No.  I would have considered it like a get out of jail

21  free card.

22  Q.  You -- finally, you were asked some questions --

23    (Brief pause.)

24  BY MR. S. KULWIN:

25  Q.  Do you see 87 up there?  If you go -- well, first, let's

Goldberg - redirect

1608

1    go to the top.

2              This e-mail isn't addressed just to you, is it?

3    A.  No.

4    Q.  It's addressed also to Mike and Marie, correct?

5    A.  Yes.

6    Q.  Do you know who Mike and Marie are?

7    A.  I've heard them spoken of by Terry Vogue.  They were

8    customers or --

9    Q.  But you don't know them?

10   A.  I don't know them.

11             MR. S. KULWIN:  Let's go down to the bottom now.

12             Keep going.  Keep going.  Stop.

13             Can you highlight the last sentence, the photos I

14   sent.

15   BY MR. S. KULWIN:

16   Q.  Jackie, were you buying any condo 1836 that you were aware

17   of?

18   A.  No.

19             MR. S. KULWIN:  If I may have a moment, Judge?

20             THE COURT:  You may.

21    (Brief pause.)

22   BY MR. S. KULWIN:

23   Q.  You were asked a bunch of questions about these property

24   reports.  I'm just wondering -- here's just one example.

25   Okay.  There's a big -- there's a big --

Goldberg - redirect

1609

```
 1           MR. S. KULWIN:  Mike, bring up -- I don't care.  Try
 2    Exhibit 2, front page.
 3    BY MR. S. KULWIN:
 4    Q.  Now, you got a bunch of property reports.  Did all of them
 5    have this kind of -- did all the ones from the city have this
 6    kind of bold language on it?
 7           MR. NOVACK:  Objection.
 8           THE COURT:  What is your objection?
 9           MR. NOVACK:  That's vague, to ask whether --
10           THE COURT:  Sustained.
11    BY MR. S. KULWIN:
12    Q.  All right.  I'll go through each one.
13           Did the 2004 first amendment have this language on
14    it?
15    A.  I don't remember which one I first read.  But this
16    language was on it.
17    Q.  Okay.
18           MR. S. KULWIN:  Can we go to the August 14th --
19    August 18th one, which I think is -- if you could highlight
20    "refer."
21           MR. NOVACK:  Judge, I request a sidebar before he
22    goes further on this.
23           THE COURT:  Okay.
24      (Proceedings heard at sidebar:)
25           MR. NOVACK:  Judge, the language that he's focusing
```

1    on says the property report has binding representations.

2         THE COURT:  Has?

3         MR. NOVACK:  Binding representations.  We cited the

4    law, and I know you overruled our request for an instruction

5    on it, but the law is the law is the law.  Property reports

6    are not contracts.  They contain no binding obligations.

7         MR. S. KULWIN:  I'm just --

8         MR. NOVACK:  This is a misleading thing.  What does

9    that mean, binding obligations?  You know, it doesn't mean

10   that everything in there is a promise or an obligation.

11        MR. S. KULWIN:  And also doesn't mean that everything

12   in there is subject to change.  And he brought up it was

13   subject to change and you didn't hear all this oral stuff from

14   people and blah, blah, blah.  These are all in evidence.  And

15   that's what it says.  That's up for the jury to decide,

16   what's -- what's her reasonable expectation after seeing

17   something like that.

18        MR. NOVACK:  That's a disclosure that's required by

19   law.  But if in the same thing that's supposed to be binding,

20   it says we can change, that trumps it.  Sorry about the pun.

21   And now we're going to get into that same situation where we

22   need that kind of an instruction because they're going to

23   think this thing is now a contract.

24        MR. S. KULWIN:  No.  I'm not ever going to argue that

25   this thing is a contract.  I'm going to argue these are

Goldberg - redirect

1611

1    representations that she was entitled to take into

2    consideration along with anything else Mr. Novack has pointed

3    out.

4         MR. NOVACK:  This case isn't about what her

5    reasonable expectations were or what she may have seen in some

6    other deal.  This case has got a provision that says that the

7    changes can be made.  She tried to get it out.  She didn't get

8    it out.  And now they're trying to go through whether the

9    change is fair, which is not an issue in this case.

10        THE COURT:  When did she first see that?

11        MR. S. KULWIN:  The day she bought it.

12        THE COURT:  And when --

13        MR. S. KULWIN:  These --

14        THE COURT:  So why wouldn't that be relevant to her

15    expectations at the time and whether or not she was actually

16    deceived?  Why wouldn't that be relevant to that?  I know it

17    is not a contract issue.  The Court is deciding the breach of

18    contract.  And to the extent you want to make argument about

19    that to me, you can.  But why wouldn't that be relevant to the

20    element of her actual deception if that's something she saw at

21    the time?

22        MR. NOVACK:  Because this phrase "binding

23    representations" is in collision course with the fact that

24    they had the right to make the changes.  He just can't -- the

25    two can't exist.  It's a boilerplate mandated by law.  If

Goldberg - redirect

1612

1  there are binding representations in there, they're in there.
2  The whole point was that oral doesn't matter.  It's only
3  what's in writing.  But what's in writing has to itself have
4  those binding representations.  They're going to say if
5  there's binding representations, go to the writing.  You go to
6  this writing, you got an unsigned document that has a change
7  clause in it.  The Seventh Circuit in that Levy case said that
8  you can't view a property report, which is what this is, as
9  creating binding obligations on either party.
10      MR. J. KULWIN:  The Levy case he's referring to
11  stated a plaintiff can't sue on a breach of contract solely
12  for a representation on a property report.  It was not a
13  consumer fraud case that addressed whether or not a
14  representation in a property report was true or untrue.
15      MR. S. KULWIN:  And let me just supplement that.
16  Mr. Novack wanted to highlight on the very last page in the
17  very last paragraph -- and he highlighted it with this jury,
18  these can be changed -- I forgot what the exact language is.
19  She's allowed to read that in context with this.
20      THE COURT:  I will let the testimony come in.
21  Whether or not it warrants a jury instruction or not, I don't
22  know.  This is not an issue that has been briefed, and you
23  have not asked me to interpret this provision of the contract
24  as a matter of law.  I don't know if a jury instruction will
25  be warranted on it, but I will let you go into it as to her

                              Goldberg - redirect
                                                                    1613

 1    state of mind on whether or not she was actually deceived at
 2    the time.
 3              MR. S. KULWIN:  I don't want to even take that risk,
 4    Judge.  Then I'm not going to take that risk.
 5              THE COURT:  Okay.
 6       (Proceedings heard in open court:)
 7              THE COURT:  Whenever you're ready.
 8              MR. S. KULWIN:  Thank you, your Honor.
 9    BY MR. S. KULWIN:
10    Q.  Last point, Jackie.
11              That change with the health club, that took place in
12    the first amended property report?
13              MR. S. KULWIN:  Can we bring that up?  That would be
14    PX 2, I believe.
15    BY MR. S. KULWIN:
16    Q.  And that's February 25th, 2004.  Do you see that?
17    A.  Yes.
18    Q.  And the original property report, the very first one that
19    Trump sent out, was -- it's noted here, September 24, 2003,
20    about five months earlier, right?
21    A.  Yes.
22    Q.  So the only change in the common elements that you saw in
23    all the property reports that you were given --
24              MR. NOVACK:  Asked and answered.
25              THE COURT:  Sustained.

                              Goldberg - recross
                                                                    1614

 1          MR. S. KULWIN:  And with that, I have no further

 2    questions.

 3          THE COURT:  Recross.

 4      (Brief pause.)

 5          MR. NOVACK:  I had the wrong exhibit.

 6                        RECROSS EXAMINATION

 7    BY MR. NOVACK:

 8    Q.  I'm putting Exhibit 592 back up on the screen.  This is

 9    the e-mail from Terry Vogue to you and to Michael and to

10    Marie.  And Mr. Kulwin just asked you a question about it.  He

11    focused on the last sentence and he asked you if you were

12    buying unit 1836.  You said no.  But the sentence right before

13    that, Ms. Vogue says, I think -- I shouldn't be moving this.

14          I think you all -- and I'm emphasizing the word

15    all -- I think you all are going to really enjoy your condos

16    at Trump and the beautiful amenities available on site.

17          She was making that statement to everybody to whom

18    she addressed that e-mail, wasn't she?

19    A.  It was a general statement, yes.

20    Q.  Okay.

21    A.  But I point something out to you.  I think there are three

22    recipients of that e-mail.  And actually if they're -- the

23    others are married, it's six.

24    Q.  Okay.  Now, Mr. Kulwin put up on the screen a page from

25    the fourth amendment showing the costs for your units after

Goldberg - recross

1615

1   the fourth amendment, correct?

2   A.  Yes.

3   Q.  That's the same page I put up for you --

4   A.  Yes.

5   Q.  -- correct?

6          Now, when Mr. Kulwin was asking you the questions --

7   not me, but when he asked you the question, you said when you

8   looked at that, you were very surprised to see that the costs

9   were higher and the percentages were lower.

10         Ms. Goldberg, do you remember that when I asked you

11  that question, you said you didn't even pay attention to those

12  numbers and it didn't matter to you?

13  A.  When you're speaking of the fourth amendment, that is

14  true.  I did not really care.  It doesn't mean I didn't look

15  at it.  But I didn't care.  In fact, I looked at very little

16  in that fourth amendment.

17  Q.  That's what you had said to me.  But when Mr. Kulwin asked

18  you, you didn't say that?

19         MR. S. KULWIN:  Objection, asked and answered,

20  argumentative.

21         THE COURT:  Sustained.

22  BY THE WITNESS:

23  A.  I --

24         THE COURT:  Sustained.

25  BY MR. NOVACK:

Goldberg - recross

1    Q.  Now, you've agreed that when you signed these purchase

2    agreements, you knew there was a provision that allowed for

3    changes, correct?

4            MR. S. KULWIN:  I'm going to object.  It's outside

5    the scope of the redirect.

6            THE COURT:  How is this within the scope of

7    Mr. Kulwin's redirect?

8            MR. NOVACK:  He asked her a series of questions about

9    whether she was surprised when they took away things from her.

10           THE COURT:  Overruled.

11           MR. S. KULWIN:  I never asked her if she was

12   surprised, Judge.  I asked her whether she would have wanted

13   to know.

14           THE COURT:  Overruled.  You may answer if you can.

15           MR. NOVACK:  I think she answered.

16   BY THE WITNESS:

17   A.  I'm sorry.  The question again, please?

18   BY MR. NOVACK:

19   Q.  I asked you --

20   A.  I'm getting tired.  I'm sorry.

21   Q.  I'm sorry.

22           THE COURT:  She did not answer.

23   BY THE WITNESS:

24   A.  I didn't answer.  What was the -- please repeat the

25   question.

Vogue - direct

1617

1    BY MR. NOVACK:

2    Q.  The question was:  When you signed these purchase

3    agreements, you knew that the -- there was a provision in

4    there that allowed the seller to make changes to the

5    condominium documents --

6    A.  Yes.

7    Q.  -- of the common elements?

8    A.  Yes.

9    Q.  So really, Mrs. Goldberg, isn't it the case that you just

10   don't like these particular changes?  Isn't that what this

11   case is all about?

12   A.  No.

13   Q.  Thank you.

14            THE COURT:  Thank you, Mrs. Goldberg.  You may step

15   down.

16            Is your next witness here?

17            MR. S. KULWIN:  She is.

18            THE COURT:  Let's at least get started.  I doubt we

19   will finish, but we can get her started.

20     (Brief pause.)

21            THE COURT:  Please step forward.

22              TERRY VOGUE, PLAINTIFF'S WITNESS, SWORN

23                        DIRECT EXAMINATION

24   BY MR. S. KULWIN:

25   Q.  Can you state your name and spell your last name for the

Vogue - direct

1618

1    record.

2    A.   Terry Vogue, V-o-g-u-e.

3    Q.   How old are you, Ms. Vogue?

4    A.   64.

5    Q.   Where do you reside?

6    A.   Chicago, Illinois.

7    Q.   Tell the ladies and gentlemen of the jury what your

8    profession is.

9    A.   I'm a real estate broker and property manager.

10   Q.   Do you hold any licenses?

11   A.   Yes, I have a managing broker's license.

12   Q.   When did you receive it?

13   A.   1996 in June.

14   Q.   How long have you been a real estate broker?

15   A.   I got my original license in '96, and I got my broker's

16   license in '98.

17   Q.   Are you currently employed?

18   A.   Yes.  Baird & Warner.

19   Q.   What's Baird & Warner?

20   A.   Baird & Warner is a real estate firm here in Chicago.  I'm

21   in their Chicago office, Michigan Avenue.

22   Q.   Okay.  And can you tell the jury what type of things you

23   do as a real estate agent?

24   A.   Yes.  I meet with my clients to qualify and see that I

25   understand what their interests are.  I do marketing for sales

Vogue - direct

1619

1   and rental properties.  And I do research for my buyer clients

2   for sales and rental properties.

3   Q.  You represent both buyers and sellers?

4   A.  Yes, sir.

5   Q.  Do you know Jackie Goldberg?

6   A.  Yes, sir.

7   Q.  How long have you known Jackie?

8   A.  I've known Jackie almost 20 years now.

9   Q.  Have you performed any work for her?

10  A.  Yes, quite -- yes, sir.

11  Q.  Can you tell the ladies and gentlemen of the jury what

12  type of work you've performed for her?

13  A.  Yes.  I -- I do property management for Mrs. Goldberg's

14  units in 405 Wabash and at Trump, which she has one unit; and

15  I do her real estate purchases and mostly the sales of her

16  investments.  So I work with her for everything, for

17  management, for sales and for purchases on her investment

18  properties.

19  Q.  And how are you paid for your work?

20  A.  I'm compensated through Baird & Warner for my brokerage.

21  And Mrs. Goldberg compensates me at $75 a month retainer fee

22  and $50 a month per contract work that I do regarding

23  renovations or special issues that come up.

24  Q.  Did there come a point in time when Ms. Goldberg became

25  interested in buying a hotel condominium in Trump Tower?

Vogue - direct

1620

1   A.   Yes, sir.

2   Q.   Can you recall when that was?

3   A.   During 2005 to 2006.

4   Q.   Did you ultimately arrange an appointment with -- at the

5   sales office of Trump Tower for Ms. Goldberg?

6   A.   Yes.

7   Q.   And can you recall when that appointment -- that first

8   appointment was?

9   A.   I believe the first appointment was July 31st of 2006.

10  Q.   And where did it take place?

11  A.   It took up in the Trump sales office in the IBM Plaza.

12  Q.   Besides you and Ms. Goldberg, was anyone else present?

13  A.   Robert Shearer.  He's the sales associate with Trump.

14  Q.   S-h-e- --

15  A.   S-c-h-e-a-r-e-r, I believe.

16  Q.   To the best of your knowledge, can you tell the ladies and

17  gentlemen of the jury who said what to whom during that

18  meeting?

19  A.   Robert initially showed Jackie and I the model on display

20  in the sales office and showed where the different tiers was,

21  the penthouse, the residences, the condos, the amenities, and

22  just gave us a full overview of the project.

23       And then we went in to discuss just the hotel program

24  in its entirety.  We -- he talked about ownership in hotel

25  amenities.  He talked about rotations for the nightly use.  We

Vogue - direct

1621

1   talked about common elements.  We talked about the pricing,

2   original pricing, costs, purchase prices, things like that,

3   units that were available, floor plans.

4   Q.  Did Mr. Shearer discuss at all the area of the building

5   where the -- you call the hotel amenities, the meeting rooms,

6   ballrooms, the lounges were located?

7   A.  Yes.  They're on the 16th floor.

8   Q.  Did you discuss at all the income that might be generated

9   by those areas?

10  A.  Yes.  He was very encouraging.  He got Mrs. Goldberg all

11  excited to think that she was going to own part of a hotel.

12  We talked about the banquet rooms.  We talked about the

13  convention centers, the weddings, the business center that

14  would be located on that floor.  So there was a lot of revenue

15  to be generated from the 16th floor hotel amenities,

16  ballrooms, weddings, et cetera.

17  Q.  At one point during that conversation, did you comment to

18  Ms. Goldberg comparing those type of revenues as opposed to

19  the revenues she would be getting from just renting the rooms?

20  A.  I told her that it would be trump change compared to the

21  revenue she would be incurring -- making from the hotel units.

22  Q.  In other words, the hotel units would be small compared to

23  the revenues?

24  A.  Absolutely.

25  Q.  Trump change?

Vogue - direct

1   A.  Well, the reason I believed that was because it had all

2   the convention facilities all in one package so there was a

3   lot -- and they encouraged it as well.

4   Q.  Did you discuss anything during that meeting about the

5   rental program?

6   A.  Yes, we did.

7   Q.  Can you tell us what was discussed about that?

8   A.  Mrs. Goldberg was very concerned about the rotation

9   program that Trump had in place.  So she was looking for

10  assurances of fair rotations.  So we discussed how they would

11  go about being fair with the rotations.  So we were told that

12  they had a very sophisticated computer system that would track

13  all of the occupancy dates, whether it be by the unit owner

14  itself or rented through their sales reservation office.

15      And we talked about the fact that if an owner used

16  it, it would be without a rotation point to be used against

17  her in the future on the rotation schedule.  And that there

18  would be a hundred dollar a night use fee for, I think,

19  basically maid service.

20  Q.  Did you and Ms. Goldberg receive any documents at all

21  during that first meeting, the July 31st meeting?

22  A.  Yes.  We received brochures.  We received marketing

23  materials and sale prices, owner costs.

24  Q.  Did there come a point in time after that where you had

25  another meeting at the Trump sales office in the IBM building

Vogue - direct

1623

1   concerning the possibility of Ms. Goldberg actually buying a

2   unit?

3   A.   Yes.

4   Q.   Do you remember when that was?

5   A.   That was on August 2nd, 2006.

6   Q.   And where did that meeting take place?

7   A.   That, again, was at the sales office, IBM Plaza.

8   Q.   The best you can recall, who was present at the meeting?

9   A.   Kiyoko Binosi, Terry Proctor, Mrs. Goldberg and myself.

10  Q.   Was Mr. Shearer present?

11  A.   No, he was not.

12  Q.   And who is Kiyoko Binosi?

13  A.   Kiyoko is the other sales agent and -- with Robert.

14  Q.   And who is Terry Proctor?

15  A.   She is the project sales manager.

16  Q.   Can you tell the ladies and gentlemen of the jury what you

17  recall about that conversation?

18  A.   Well, we had the original information that we received

19  from Robert, so we went back.  Mrs. Goldberg had thought about

20  it, and we went back to get more detailed information about

21  purchasing a unit.

22          And I'm trying to think -- we met with Terry to

23  discuss the prices.  Kiyoko was not able to answer many of our

24  questions.  That's how Terry became involved in the meeting.

25  So Mrs. Goldberg had a lot of questions, very specific

1  questions about the amenities, about the rotations, about many

2  of the things we had discussed with Robert.  We wanted to

3  clarify it with Ms. Proctor.

4  Q.  At the conclusion of that meeting, what, if anything, did

5  Ms. Goldberg decide about purchasing a unit?

6  A.  She --

7  Q.  At that meeting.

8  A.  She decided -- this is still the July 31st --

9  Q.  No.  The second meeting.

10  A.  August 2nd.  Okay.  So Ms. Proctor had satisfactorily

11  answered her -- all her questions, and I believe we went to

12  contract that day.  I'm sorry.  I'm a little punchy.

13  Q.  I'm sorry?

14  A.  I said I'm a little punchy.

15  Q.  You've been sitting out there for a long time.  I'm sorry

16  about that.

17  A.  Yes.  The August 2nd meeting was our return visit to

18  review everything in detail and let Mrs. Goldberg make a

19  decision of whether she was ready to make a purchase.

20  Q.  And was she ready?

21  A.  And she was ready, yes.

22  Q.  Now, Ms. Vogue, at any time during with -- your meetings

23  with Mr. Shearer on July 31st or with Ms. Binosi and

24  Ms. Proctor on August 2nd, did anyone ever state or suggest to

25  you or Ms. Goldberg that Mr. Trump might change the common

Vogue - direct

1625

1    elements that included the hotel facilities, the meeting

2    rooms, the ballrooms, the function rooms and all the revenue

3    that came with?  Did anyone suggest that to you?

4    A.  No.

5    Q.  Did anyone suggest to you during that meeting that

6    Mr. Trump maybe, down the line, would consider owning all of

7    that or putting it into the commercial areas?  Anyone suggest

8    that to you?

9    A.  No.

10   Q.  At any time during those meetings, either of those

11   meetings, did anyone tell you that Trump's rental rotation

12   program might be changed down the road to a completely

13   discretionary program?

14   A.  No.

15   Q.  Or that an owner might be penalized for staying in their

16   rooms?

17   A.  No.

18   Q.  At the conclusion of the August 2nd meeting, was

19   Ms. Goldberg given property reports?

20   A.  Yes, she was.

21   Q.  Okay.

22   A.  We received property reports, a copy of her signed

23   paperwork and I believe another brochure.

24   Q.  Did there come a point in time after that meeting that you

25   met again with the brokers for Trump -- for Trump Tower?

1626

1    A.  Yes.

2           THE COURT:  Mr. Kulwin, before we go any further, we

3    are going to end for the day.  We will pick back up tomorrow

4    morning.

5           Ladies and gentlemen, we are done for the day.  We

6    will pick up tomorrow morning.  I do anticipate plaintiff will

7    rest her case tomorrow.

8           Remember, please do not discuss anything about the

9    case, don't communicate with anyone, don't read any kind of

10   media coverage or listen to it or watch any.

11          I will see you tomorrow morning at 9:15, please.

12          Have a great evening.

13     (Jury out.)

14          THE COURT:  Ms. Vogue, please be back here a little

15   after 9:00, and we will continue and finish your evidence in

16   the morning.

17          THE WITNESS:  Thank you.

18          THE COURT:  I would like to spend a few minutes with

19   you.  There are only a few jury instructions left, a couple I

20   took under advisement.  I don't think it will take us long.

21          I also want to talk to you about tomorrow.  So I will

22   be back in a few minutes.  I do not think this will take us

23   very long.  I have ruled substantively on all of the

24   instructions, with the exception of the agency instruction.

25   That, I will give you a chance to look at tonight, unless you

1627

1    are ready to address it now.

2          So I will be back in just a few minutes, and we will

3    discuss the jury instructions.

4          MR. S. KULWIN:  Judge, do I have time to run down the

5    hall?

6          THE COURT:  Yes, you do.

7      (Recess taken.)

8          THE COURT:  I am working off the set of instructions

9    that were e-mailed back to me with my changes that have been

10   incorporated.  So there are just a few I took under

11   advisement.  And then I have defendant's proposed 22.

12         Before we get into instructions though, how much

13   longer do you think you have with Ms. Vogue tomorrow?

14         MR. S. KULWIN:  15 minutes.

15         THE COURT:  So we will finish her.  And then

16   Mr. Howie?

17         MR. S. KULWIN:  I only have about 15 minutes in my

18   direct.

19         THE COURT:  Okay.

20         MR. S. KULWIN:  And then he'll have his cross and

21   then his direct.

22         THE COURT:  After Mr. Howie, do you plan on calling

23   any other witnesses?

24         MR. S. KULWIN:  No.

25         THE COURT:  So you will rest then.

1628

1    I know you have got some for Mr. Howie, which you

2    could either put in through cross or recall him, whatever your

3    preference is.  Do you have any other witnesses besides

4    Mr. Howie?

5         MR. NOVACK:  We do not.

6         THE COURT:  So you will rest tomorrow.  We will get

7    to, I anticipate, closing arguments tomorrow and instructions

8    on the law.  And I will give you the opportunity, after they

9    have closed, to make your arguments on directed verdict.  I

10   can tell you, if you are giving detailed, substantive legal

11   arguments, Mr. Kulwin is going to need a chance to respond.

12   And I will likely take them under advisement.  I am not going

13   to delay closing arguments for them.  But I will give you the

14   opportunity, you can file them and make some brief argument.

15        MR. NOVACK:  So would we be going directly from

16   resting to the closings?  Or are we going to do the closings

17   Wednesday morning?

18        THE COURT:  We are not doing closings Wednesday

19   morning.  We are doing closings tomorrow, especially given

20   that you will be done in the morning.

21        MR. S. KULWIN:  So would we do them at like

22   1:00 o'clock, Judge?

23        THE COURT:  It depends on when you finish with the

24   testimony.  If you are done with testimony at 10:30, you are

25   doing yours before lunch.  So let's see where you are.

1629

1    Okay.  Here we are on the instructions -- and, again,
2    I have ruled on the majority of these.  I issued another
3    ruling this morning based on the majority of what you filed
4    over the weekend, except for defendant's proposed instruction
5    22, which I had not heard from you yet on, Mr. Kulwin, and I
6    wanted to give you the opportunity to address.
7        But let's start with the ones I already ruled on.  I
8    took a few under advisement.
9        Jury instruction No. 3, which is at page 4 of what I
10   gave you, there are a couple of bracketed provisions left in
11   here.  A stipulation is an agreement.  I think you stipulated
12   once or twice.  They were not formal written stipulations, but
13   there were stipulations.  So I will give that instruction that
14   a stipulation is an agreement between both sides that certain
15   facts are true.  I do not believe your stipulations were
16   regarding testimony, were they?
17       MR. S. KULWIN:  I don't remember at this point.
18       MR. NOVACK:  I can't remember a single stipulation,
19   frankly.
20       THE COURT:  You said a couple of times, I'll
21   stipulate to that.  I do not believe it was about testimony.
22       MR. NOVACK:  I think, weren't those either at sidebar
23   or -- I don't remember a stipulation during the -- frankly in
24   front of the jury.
25       MR. S. KULWIN:  I think there was one or two.

1630

1    THE COURT:  Yes, I think you are right.

2    I have not taken judicial notice of anything, so I am

3  going to take that out.

4    Page --

5    MR. NOVACK:  Well, back on 3, Judge, this one that a

6  person would have given certain testimony.

7    THE COURT:  I have taken that out.  That's why I

8  asked was it a stipulation about facts or testimony.  It was

9  not about testimony.

10    Page 11, the next one I took under advisement, these

11  are the factors regarding witnesses.  The witness' age was

12  taken under advisement, given Mrs. Goldberg's age.  You would

13  like that in, Mr. Kulwin?

14    MR. S. KULWIN:  No, we would like it out.

15    THE COURT:  You would like it out.  Mr. Novack -- I

16  thought it was the opposite -- do you want that in?

17    MR. NOVACK:  Yes.

18    THE COURT:  The witness' age?  Go ahead and make your

19  argument for it, please, now that you have seen the evidence.

20    MR. NOVACK:  I think there were a number of times

21  where she lost her -- where she was not able to remember

22  things that one would think could be remembered.  She didn't

23  have details.  We were going to argue that, not that she's --

24  I don't think we'll argue that she's -- well, I don't want to

25  limit myself.  We'll definitely argue that she doesn't

1631

1    remember clearly what happened.  And I think age goes to that.

2            MR. S. KULWIN:  I think, Judge, you noted when this

3    first came up that that's typically for small children.

4            THE COURT:  Typically.

5            MR. S. KULWIN:  And --

6            THE COURT:  Occasionally it is available -- it is

7    certainly available --

8            MR. S. KULWIN:  Right.

9            THE COURT:  -- for the other end of the spectrum.

10           MR. S. KULWIN:  And I would say that -- with all

11   respect -- that Ms. Goldberg had a far greater grasp of the

12   details than Mr. Trump did.  Unless you are going to put one

13   in there for someone's hair design, I think we should keep

14   this one out.

15           MR. NOVACK:  I don't know why a comment like that

16   would be made.

17           THE COURT:  I agree.  It is not helpful --

18           MR. S. KULWIN:  Because I'm jealous, Judge.

19           THE COURT:  -- or productive.

20           MR. S. KULWIN:  But I just don't think it's

21   applicable here.

22           THE COURT:  I do not either, especially given that

23   the witness' memory is another factor, which is what I am

24   hearing you argue.  And you can certainly raise that.

25               Instruction No. 11, there is certain language left in

1632

1   brackets still.  I do not believe you used any statements not

2   under oath -- if you look at the second paragraph here -- to

3   attempt to impeach.  I think it was all prior deposition

4   testimony.

5          MR. S. KULWIN:  It was all prior deposition testimony

6   or sworn affidavits, Judge.  Nothing that we used was --

7          THE COURT:  So I think "not under oath" in the second

8   paragraph would come out.  "Or acted in a manner" should come

9   out as well.  I guess the other question is, are there any

10  other non-parties whose prior deposition testimony you used in

11  an attempt to impeach them?

12         MR. S. KULWIN:  I believe Mr. Shearer is a non-party,

13  although he's an agent of a party, so that -- I think Jeff

14  impeached him once.

15         THE COURT:  Is this paragraph relevant, the second

16  paragraph dealing with non-party witnesses?  Certainly the

17  first --

18         MR. NOVACK:  I guess we still have two witnesses that

19  conceivably that could happen with.

20         THE COURT:  Correct.  But based on what we have so

21  far, I am not sure this is relevant.

22         MR. NOVACK:  I agree.

23         THE COURT:  Okay.  The last --

24         MR. NOVACK:  Made a statement not under oath?

25         THE COURT:  No, I mean the whole paragraph.  The

1633

```
1   first paragraph pertains to statements given by a party or a
2   witness.  I believe all of the impeachment has been made of
3   statements who are a party -- or attempted impeachment -- who
4   are parties.
5           MR. NOVACK:  So far I think it has not happened.
6           THE COURT:  I will keep it under brackets, but that
7   likely is coming out.
8           And then the last paragraph I think should come in.
9           MR. S. KULWIN:  Yes.
10          THE COURT:  Is there any objection to that?
11          MR. S. KULWIN:  No.
12          MR. NOVACK:  No objection.
13          THE COURT:  Other than the "conduct."  I will take
14  out the "conduct."  It is just "statements."
15          Page 17, summaries.  I do not believe we have had
16  summaries.
17          MR. S. KULWIN:  No, we didn't, Judge.
18          THE COURT:  And you do not intend to introduce any
19  through the remaining witnesses?
20          MR. S. KULWIN:  No, Judge.
21          THE COURT:  Mr. Novack, do you intend to introduce
22  any summary charts?
23          MR. NOVACK:  No, not as evidence.
24          THE COURT:  I will assume you are withdrawing it
25  since --
```

1634

1    MR. S. KULWIN:  We're still going to use them as

2  demonstrative exhibits.

3    THE COURT:  That is the next instruction.

4    So agreed 17 on page 18, demonstrative exhibits,

5  rather than describing these, I recommend just indicating --

6  because it was very clear you were talking about them as

7  demonstratives -- certain demonstrative exhibits have been

8  shown to you.  Those exhibits are used for convenience only.

9  Are you okay with that?

10    MR. S. KULWIN:  Yes, Judge.

11    THE COURT:  Mr. Novack, are you okay --

12    MR. NOVACK:  Yes.

13    THE COURT:  I will make those changes.

14    Page 19, jury instruction No. 18, the second

15  paragraph I do not believe is relevant.

16    MR. S. KULWIN:  Correct, Judge.

17    THE COURT:  Is there any objection to my taking that

18  out?

19    MR. NOVACK:  No.

20    THE COURT:  Okay.  I will take that out.

21    Page 23, instruction 22, the last paragraph, If you

22  do communicate with me, you should not indicate in your note

23  what your numerical division is, if any.  I will take the

24  brackets out.  I will give that.

25    Instruction 24 I took under advisement.  Bates

1635

1    numbers were referenced multiple times throughout the trial,

2    so I will give your agreed proposed jury instruction No. 24.

3    Mr. Kulwin, is there any objection to that?

4              MR. S. KULWIN:  No, Judge.

5              THE COURT:  Mr. Novack?

6              MR. NOVACK:  No.

7              THE COURT:  25 I also took under advisement.  This

8    was more to be given during the course of the trial.  And, as

9    you know, I tell them every day not to do that.

10             MR. S. KULWIN:  I don't think we need it now, Judge.

11             THE COURT:  I do not think we do either.  Mr. Novack?

12             MR. NOVACK:  I guess only -- only if they don't reach

13   a verdict the first day.

14             THE COURT:  Let me modify this to include in --

15             MR. S. KULWIN:  My only suggestion is if they don't

16   reach a verdict the first day, give it to them before they

17   went home.

18             THE COURT:  Then I have to bring them back in.

19             MR. S. KULWIN:  Oh, I see.  You're right.  Give it.

20   I'm wrong, as usual.

21             THE COURT:  Agreed proposed 27 -- I'm sorry.  It is

22   jury instruction 26 on page 27.  I do not think we need this,

23   given this deals with stipulations of fact, given the prior

24   instruction.

25             MR. S. KULWIN:  Agreed.

1    MR. NOVACK:  I agree with that.

2    THE COURT:  Okay.  I will take it out.

3    28 I do not think we need in.

4    MR. S. KULWIN:  Yes.

5    THE COURT:  I gave a version of this.  Do you want me

6  to modify this and give a version here?

7    MR. S. KULWIN:  Sure.

8    THE COURT:  I told them this before you read

9  Mr. Weiss' deposition.

10    MR. S. KULWIN:  We would like you to, Judge, if you

11  could.

12    THE COURT:  I will modify this to give -- what was

13  the date of his --

14    MR. S. KULWIN:  Andrew Weiss was given -- we'll give

15  it to you in a second, Judge.

16    THE COURT:  Okay.

17    Page 29, jury instruction No. 28 on the use of

18  interrogatories.  I do not think this is proper.

19    MR. S. KULWIN:  Judge, I don't know --

20    THE COURT:  I think --

21    MR. S. KULWIN:  I don't know about the "evidence will

22  now be presented to you."  Evidence was presented to them.

23    THE COURT:  And that is covered under the impeachment

24  instruction, so I am not going to give jury instruction 28.

25    No. 29, I am not sure this is necessary.  I think the

1637

1   jury was not here when you needed certain cautions.

2       MR. S. KULWIN:  I would like this instruction.

3    (Laughter.)

4       THE COURT:  That does not surprise me.

5       Mr. Novack, what is your position on jury instruction

6   No. 29?

7       MR. NOVACK:  Since I don't think you did any of that

8   in front of the jury, they'll just wonder if they missed

9   something.

10      THE COURT:  I am not going to give this.

11      MR. NOVACK:  Unless, of course, you end up giving it

12  tomorrow.

13      THE COURT:  Unless you get in trouble tomorrow.

14      Jury instruction 31 is the next one I took under

15  advisement.  I am not sure how this is relevant.  You wanted

16  me to wait until I saw the evidence.

17      MR. S. KULWIN:  Yes, Judge.  I think it's highly

18  relevant because -- especially -- even though you struck some

19  of the comments, Mr. Trump -- and I'm not criticizing -- but

20  he went out of his way to say at least -- I don't know; we

21  count in the transcript three or four times -- everybody is

22  happy, everybody closed, et cetera, et cetera.  And the jury

23  might justifiably wonder where is everybody else.  And that's

24  not something they should be considering.  And this is, to us,

25  a very important instruction.

1638

1       THE COURT:  Given the reference to the newspaper

2   article, you are probably right, although I do not think the

3   last sentence here is relevant because that almost sounds like

4   do not speculate about her motivation.  There has been plenty

5   of testimony here about her motivation, which is relevant, I

6   think.

7       MR. S. KULWIN:  So you want to take out the last

8   sentence?

9       THE COURT:  Just take out the last sentence.

10      MR. S. KULWIN:  That's fine, Judge.

11      THE COURT:  Mr. Novack?

12      MR. NOVACK:  You know, I'm just wondering if this is

13  going to make them think about stuff they're not thinking

14  about right now.

15      THE COURT:  No, because I tell them not to consider

16  it.

17      MR. NOVACK:  No, I know that.  Sometimes when you

18  tell somebody don't think about a pink elephant, that's all

19  they think about.

20      THE COURT:  Not juries.  Is there any objection to

21  giving this with taking out the last sentence?

22      MR. S. KULWIN:  None from the plaintiff.

23      MR. NOVACK:  Can I think about this just for a few

24  minutes?

25      THE COURT:  You may.

1639

1    MR. NOVACK:  And then before we stop --

2    THE COURT:  And then the only other instruction that

3  I have under advisement is defendant's proposed 22 dealing

4  with agency.  I know this was filed late last night.  If you

5  want time to look at it, Mr. Kulwin, and let me know in the

6  morning --

7    MR. S. KULWIN:  We would, Judge.

8    THE COURT:  -- that is fine with me.

9    MR. S. KULWIN:  And there -- I guess there was one

10  other -- are you done, Judge?

11    THE COURT:  I am.  That is all I had for you.  I have

12  a proposed verdict form that I will give you to take home with

13  you.

14    MR. S. KULWIN:  I guess one question was -- is I

15  think the punitive damages one has some brackets on page 2 of

16  it.

17    THE COURT:  Okay.

18    MR. S. KULWIN:  I don't know if --

19    THE COURT:  Let's turn to that.

20    MR. S. KULWIN:  It's page 44.  I don't think you need

21  the first bracket.

22    THE COURT:  So you are talking about A, the

23  corporation through its management?

24    MR. S. KULWIN:  No, no.  Instruction --

25    THE COURT:  Oh, 44.

1640

1     MR. S. KULWIN:  Instruction 42, page 44.

2     THE COURT:  Okay.

3     MR. S. KULWIN:  In assessing the amount, I don't

4  think you need that.

5     THE COURT:  I think you are right.

6     MR. S. KULWIN:  Okay.

7     THE COURT:  Wait.  Let's get Mr. Novack's input on

8  that.

9     MR. NOVACK:  I'm fine with taking that out.

10    MR. S. KULWIN:  Okay.  And I don't know if you need

11 the bracketed part at the end.  I think the amount of punitive

12 damages must be reasonable is sufficient.

13    MR. NOVACK:  No, I think the last part is very

14 important.

15    THE COURT:  I agree.  I am going to leave that in.

16    MR. S. KULWIN:  Hold on, Judge.

17    There's brackets on instruction 43 around all of A

18 through D, and I assumed that would all be applicable here and

19 that the brackets --

20    THE COURT:  Yes.

21    MR. S. KULWIN:  And that the brackets around S on

22 omissions and acts -- around the Ss would come out as well

23 since we're alleging multiples.  I think it should be as to

24 the "statements or omissions."

25    MR. NOVACK:  Judge, B doesn't seem to apply to this

1641

1   case.

2           MR. S. KULWIN:  Oh.

3           THE COURT:  Let's go through them one by one.  The

4   corporation, through its management, authorized the doing and

5   the manner of the -- it should be, I think, statements or

6   omissions.

7           MR. S. KULWIN:  Right.  I agree, Judge.

8           THE COURT:  Are you okay with that change,

9   Mr. Novack?

10          MR. NOVACK:  Yes.

11          MR. S. KULWIN:  I agree with Mr. Novack.  I don't

12  think we --

13          MR. NOVACK:  Wait.  If --

14          THE COURT:  Or --

15          MR. NOVACK:  If you find that -- going back above

16  2 -- A, there's a 2, if you find as to the acts or omissions.

17          MR. S. KULWIN:  That should be statements as well.

18          THE COURT:  I will change acts to statements.

19          MR. S. KULWIN:  And then I agree with Mr. Novack, I

20  don't think B applies.

21          THE COURT:  Is that still your position, Mr. Novack?

22          MR. NOVACK:  It is.

23          THE COURT:  Then I will take B out.  What about C,

24  the statement or omission?

25          MR. S. KULWIN:  Yeah, I think you have to leave that

1642

1     in.

2              THE COURT:  Yes, I think we do too.

3              MR. NOVACK:  Judge, I'm just thinking aloud right

4     now, but I'm wondering if the word "statement" should be

5     "representation" because statement makes it sound like you can

6     get punitive damages because somebody said something as

7     opposed to --

8              THE COURT:  Mr. Kulwin?

9              MR. S. KULWIN:  I think in the Land Act -- I think we

10    can get punitive damages in that; I have to check.  But it's

11    an untrue statement.

12             THE COURT:  I do not think punitives are available

13    under the Land Act.  I thought it was only the Fraud Act.

14             MR. NOVACK:  That's true.

15             MR. S. KULWIN:  That's fine.

16             THE COURT:  I will change it to representations.

17             MR. J. KULWIN:  All representations?

18             THE COURT:  Rather than acts.  I will change acts to

19    representations.

20             And then C, was there any objection with the

21    modification of act to representation, leaving that in?

22             MR. S. KULWIN:  That's fine with us, Judge.

23             MR. NOVACK:  No objection.

24             THE COURT:  And then D, which will become C --

25             MR. NOVACK:  No objection.

1643

1           MR. S. KULWIN:  No objection.

2           THE COURT:  Okay.  So I will make those changes.

3           Did you have something else, Mr. Kulwin?

4           MR. S. KULWIN:  I did.  I had one more thing, Judge.

5           THE COURT:  And I am not sure if you saw -- I think I

6   gave this to you, but just take a look at the social media

7   instruction, which is at page 47.  I added that.  I am not

8   sure when I added it in the course, but --

9           MR. S. KULWIN:  It's fine with us, Judge.  I don't

10  want anybody --

11          MR. NOVACK:  No objection.  And we also have no

12  objection to No. 31, which is the one I asked you to wait for

13  me on.

14          THE COURT:  Okay.  Thank you.

15          MR. S. KULWIN:  I guess the last one, Judge -- and

16  this is in the form of a motion to reconsider -- I think that

17  we don't need the first sentence.

18          THE COURT:  Which instruction are you on?

19          MR. S. KULWIN:  It's the one -- absence of documents

20  on page 48.

21   (Brief pause.)

22          THE COURT:  Go ahead, Mr. Kulwin.  Absence of

23  documents on page 48, what is your --

24          MR. S. KULWIN:  My problem, Judge, is I think the

25  first sentence cures the problem that you are concerned about.

1    The second sentence then starts to undercut our

2 defense because we are going to argue that the absence of

3 documents -- we're not going to say they destroyed them or

4 they threw them away, but we were going to argue at length --

5 and we have throughout this case -- that the complete absence

6 of documents should be considered in evaluating the

7 credibility of their --

8    THE COURT:  You can certainly argue that.

9    MR. S. KULWIN:  I know.

10    THE COURT:  I agree.

11    MR. S. KULWIN:  What I'm concerned about is -- "any

12 absence of documents does not create inference of destruction"

13 is fine.  But failure to produce, we're not -- no one is going

14 to argue that.  And it's taken care of by no party in this

15 case contends that any other party destroyed or failed to

16 produce documents as required.  Period.

17    MR. NOVACK:  Judge, I think you need both sentences

18 because the first one says nobody is complaining about it; but

19 the second sentence basically says to them and you shouldn't

20 on your own reach that inference on your own.

21    THE COURT:  What about Mr. Kulwin's suggestion of

22 putting a period after destruction and taking out "or failed

23 to produce documents"?

24    MR. NOVACK:  Well, I think each one of those would be

25 ugly if a juror reached that inference.

1645

```
1              THE COURT:  Okay.  Let me think about it.
2              MR. S. KULWIN:  Okay.
3              THE COURT:  I will tell you in the morning.
4              MR. S. KULWIN:  Thank you.  I have a couple of other
5    just general questions.
6              THE COURT:  Okay.
7              MR. NOVACK:  I have to amend a statement that I
8    did -- if I can do that now?
9              MR. S. KULWIN:  Sure.
10             MR. NOVACK:  We may call Mr. Shearer back after --
11   because Ms. Vogue has said some things about him that we think
12   need to be clarified.
13             THE COURT:  Okay.  You are on notice.  You may call
14   him back.
15             MR. S. KULWIN:  Just a --
16             THE COURT:  Are these about jury instructions?
17             MR. S. KULWIN:  No.
18             THE COURT:  Anything else on jury instructions?
19             MR. NOVACK:  Is this the whole universe here?
20             THE COURT:  Other than defendant's 22, which I have
21   not ruled on yet --
22             MR. NOVACK:  Right.
23             THE COURT:  -- this is the whole --
24             MR. NOVACK:  The universe may less, but there's
25   nothing else?
```

1646

1        THE COURT:  Well, no, it might be more because

2    defendant's proposed 22 is not in what I have just given you.

3    Or it is in there?  It is not in my version.

4        So it might be less.  And I am going to move the

5    order around.  Once we make these changes, we can send an

6    e-mail back to you so you have them.

7        I do not care, once I have approved an instruction,

8    if you use it in closing arguments.  You can put it up and

9    project it.  I do not care if you use them.  I am fine with

10   that.

11       MR. S. KULWIN:  Okay.

12       MR. NOVACK:  And are you going to be preparing

13   verdict forms?

14       THE COURT:  I have them right here.  I did prepare a

15   draft.  I am going to give it to you before you go home

16   tonight.  We can talk about it tomorrow.

17       MR. S. KULWIN:  Here -- a couple of questions.

18       THE COURT:  Yes.

19       MR. S. KULWIN:  During trial, because you said that

20   it would be argument, I believe, we had to cover up certain

21   parts of what we were using as summaries and that are now

22   demonstratives.  But in closing arguments, that's our

23   argument.  So we would like to unredact them.

24       THE COURT:  Well, you just cannot call it summary

25   because it is not a summary.

1647

1    MR. S. KULWIN:  No.  I apologize, Judge.  We're still

2    going to call them demonstrative.  We're going to take out the

3    word summary.  But there was a number of other redactions that

4    they said was argumentative, was not supported by the

5    evidence, that we do believe is supported by the evidence.

6    THE COURT:  I will make a general statement because I

7    do not remember each and every demonstrative.  But you can use

8    those for argument at the end.

9    MR. S. KULWIN:  Good.

10   THE COURT:  But since it is not what was shown as a

11   demonstrative, I think you need to distinguish it somehow

12   between Plaintiff's Demonstrative 1 and whatever slide you are

13   using for argument.

14   MR. S. KULWIN:  I think, Judge, during the trial, you

15   specifically told me to strike the word summary.  And I think

16   I did refer to them all as demonstratives.  But we'll make

17   sure the numbers are correct.

18   THE COURT:  But my point is, if the demonstrative

19   exhibits were shown to the jury for demonstrative purposes, if

20   you are now going to unredact some things for argument

21   purposes, you cannot still call it Demonstrative 1.  You need

22   to --

23   MR. S. KULWIN:  Give it a new number?

24   THE COURT:  Exactly.

25   MR. S. KULWIN:  Okay.  We'll do that, Judge.  So

1648

1    that's my first question.

2         My second question is, Judge, you know, both parties

3    have been getting daily, although I'm sure Mr. Novack is far

4    more up to snuff on what's in the daily.  I haven't myself

5    even had a chance to read them yet.  And my concern is, I

6    don't think it's appropriate to show clips of the transcript

7    in closing argument.

8         THE COURT:  Did you plan on doing that?

9         MR. NOVACK:  I hadn't, but now he's intriguing me

10   about it.

11        MR. S. KULWIN:  Okay.  I withdraw it.  Erase it.  No,

12   if he's not going to do it, that's fine.  I'm not going to do

13   it.  I think it raises all sorts of problems about context and

14   all sorts of other things.

15        MR. NOVACK:  Well --

16        THE COURT:  The problem when you do that is they are

17   going to come back and ask for the transcripts.  And I am not

18   giving them transcripts.

19        MR. S. KULWIN:  And they do that anyway, and you're

20   not going to give it to them, so I just want to make sure we

21   didn't do that.

22        THE COURT:  Why don't you talk to each other and I --

23        MR. NOVACK:  Let me give you a real-life example --

24   and I think we heard it here and I made a number of objections

25   which your Honor overruled -- that when he was asking her did

1649

1    anybody tell you that Trump said X.  What he said is X wasn't
2    what Trump said because he changed the word from operate to
3    own.  And that is the kind of thing that I think I would like
4    to be able to say, look, you heard that; he's going to say it
5    was owned; I'm going to say it's operated; look, here it is.
6            MR. S. KULWIN:  Well, the problem with that is --
7    there -- is multifaceted -- but one of the problems is, Judge,
8    that then he's going to start showing this and I'm going to
9    bring up on the board, you know, the 18 times Mr. Trump said
10   something else that he finds misleading; and, oh, by the way,
11   I will say that Mr. Trump in his deposition, which is an
12   admission, and I showed it in opening statement, said I didn't
13   say if they operated; I said if they owned it.  So I think
14   it's a bad idea.
15           MR. NOVACK:  Judge --
16           THE COURT:  I am not going to let you do it.
17           MR. NOVACK:  If the deposition hasn't been read into
18   this record, he can't use that in closing.
19           THE COURT:  Correct.  I am not going to let you do it
20   here though.  It is just going to lead to problems in this
21   case.  You can read it and make an argument to the jury as you
22   heard them say without showing the testimony or without
23   reading and pulling up the transcript and reading it.  You can
24   use testimony obviously, and I do not care if you quote
25   verbatim, but I do not want you putting the transcript up.

1    MR. NOVACK:  Can we say, now, I wrote this down and

2 here is what I wrote down?

3    THE COURT:  You can say that if you want.

4    MR. S. KULWIN:  Great.

5    Now, you had commented -- so I better ask now -- I'm

6 not going to let you make this argument.  Unfortunately I've

7 already written part of the argument and I was going to make

8 this argument so I want to talk to you about it; and that is

9 this:  I am not going to impugn Mr. Novack.

10    THE COURT:  That was part of my concern.

11    MR. S. KULWIN:  I'm not going to sit there and go

12 he's a liar or -- I'm not going to do that.  I do think it's

13 fair game though, Judge, if a party gets up in opening

14 statement and says, This is what this means; and the evidence

15 is, in our view -- and he's entitled to a different view --

16 directly contrary to that and that we view that assertion

17 as -- they told you in opening, this is what the evidence is

18 going to be and they told you that she admitted she had no

19 case.  We should be able to say now, folks, okay, you can

20 judge the tenor of everything they've said by what they've

21 said here.  It was misleading.  It was inaccurate.  And let's

22 start right there.  I'm not going to use those exact words,

23 but it's going to be something like that.  And I think it's

24 fair game, Judge.  I'm not going to say Mr. Novack is a liar

25 or Novack and Macey are bad guys.

1651

1    THE COURT:  Well, that is certainly what it sounded

2    like you were saying at sidebar.

3    MR. S. KULWIN:  Absolutely not, Judge.

4    THE COURT:  That you were going to attack Mr. Novack

5    and say that he just misrepresented something and --

6    MR. S. KULWIN:  No.

7    THE COURT:  -- you can impute that to the Trump

8    organization, which I am not going to let you do.

9    MR. S. KULWIN:  I apologize.  I am talking over you.

10   THE COURT:  You would think after a week and a half,

11   you would know better.

12   MR. S. KULWIN:  I'm slow, Judge, very slow.

13   MR. NOVACK:  He just gave you a preview of exactly

14   that.  He said I'm going to say it was misleading, it was

15   unfair, and it shows exactly how you should judge the whole

16   case.  He should be able -- and he's free to talk about what

17   his witness said from the witness stand and evidence that's in

18   the record.  Opening statements are not evidence.  You told

19   the jury that from the get-go.  And to make a closing argument

20   be an attack on an opening, no.  Just do -- just do the

21   evidence.

22   THE COURT:  I think it is fair to say you heard in

23   opening this and here is what the evidence showed to counter

24   that.  But I do not want you making personal attacks on

25   Mr. Novack.

1652

1     MR. S. KULWIN:  Let me just make sure so I don't

2  cross the proverbial line.  I can say, In opening statement,

3  the defendants -- I'm not going to refer to Mr. Novack -- the

4  defendants asserted that Ms. Goldberg admitted she had no

5  case.  Put this document up there.  You heard her.  You heard

6  what the truth was, and you can judge the entire defense case

7  there.  I should be able to say that.

8     THE COURT:  You can say that.

9     MR. S. KULWIN:  Thank you.

10     THE COURT:  That is not attacking.

11     MR. S. KULWIN:  That's it.

12     THE COURT:  Okay.  I just have a few minutes left.  I

13  am going to give you these draft verdict forms.  Look at them

14  tonight, and we can talk about them in the morning.

15     Did you have anything else you needed to --

16     MR. NOVACK:  I just want to know if there are any --

17     THE COURT:  You are doing Mr. Kulwin now.

18     MR. NOVACK:  -- time limits?

19     THE COURT:  Is there anything else that you need an

20  answer to tonight?

21     I don't impose time limits.  Having said that, how

22  long do you anticipate your closing is going to be, ballpark?

23     MR. S. KULWIN:  Ballpark, I would say between 60 and

24  90.  And then I'll have rebuttal.

25     THE COURT:  Mr. Novack?

1653

 1        MR. NOVACK:  That's fine.  But what I don't want to
 2   have happen is counsel saves all the big part of his argument
 3   to the rebuttal.
 4        THE COURT:  It has to be true rebuttal.
 5        MR. S. KULWIN:  Right.  But I can't imagine, Judge --
 6   I'm not going to waste my time resaying what I've already
 7   said.  I can't imagine that Mr. Novack is not going to cover
 8   the waterfront.  I can't think of a topic that wouldn't come
 9   up.
10        THE COURT:  I would certainly hope at this stage, you
11   are not going to waste the jury's time.  And you know that
12   they are not going to want that.
13        MR. S. KULWIN:  That hurt, Judge.
14        MR. NOVACK:  And I want to ask two more questions.
15        THE COURT:  Yes.
16        MR. NOVACK:  One is, I think it's -- there's not
17   going to be any further evidence on loss of use.  Is that out
18   of the case?
19        THE COURT:  That is out of the case, and you will see
20   I took that out of the verdict form.
21        MR. NOVACK:  And can we have a requirement that if
22   Mr. Kulwin is going to ask for a judgment, that he say in his
23   opening -- not in his rebuttal, in his opening -- the dollar
24   amount, if any, that he's going to ask for and what the
25   categories are?

1654

```
 1              MR. S. KULWIN:  He doesn't have to worry about that.

 2              THE COURT:  My guess is you may see a chart on that.

 3              MR. S. KULWIN:  I would think so.

 4              THE COURT:  Anything else?

 5              MR. NOVACK:  So my point in this opening is not

 6   that -- well, maybe -- I just don't want to be sandbagged, not

 7   saying there would be an intentional, but to leave out

 8   arguments in opening to be able to have the only word on it is

 9   something that shouldn't be permitted.

10              THE COURT:  All I can tell you is I expect your

11   rebuttal to be a true rebuttal.  And I may give you a time

12   limit on rebuttal after I see how long -- a reasonable time

13   limit -- but after I see how long you go on your initial

14   closing and how long Mr. Novack goes.  I tell you right now,

15   it is not going to be the same length as your first closing.

16              MR. S. KULWIN:  No, I'm not even thinking about that,

17   Judge.

18              THE COURT:  So we will play it --

19              MR. S. KULWIN:  I just --

20              THE COURT:  -- by ear.

21              MR. S. KULWIN:  As long as it's like -- if you say,

22   your time limit is 20 minutes and I'm like at 21 minutes and

23   you can see me wrapping up, you're not going to say, "Stop,

24   freeze."

25              THE COURT:  That is not my practice.
```

1655

1    MR. S. KULWIN:  Okay.  Good.  That's all I want to

2 know.

3    THE COURT:  Anything else that needs to be answered

4 tonight?

5    MR. S. KULWIN:  I'm done, Judge.

6    MR. NOVACK:  Nothing further, Judge.

7    THE COURT:  Okay.  So please be here tomorrow morning

8 by 9:00 o'clock and make sure you are ready to address the

9 verdict form, as well as the one remaining instruction.

10    MR. S. KULWIN:  Okay.

11    THE COURT:  I will see you tomorrow morning.

12    (Trial adjourned until May 21, 2013, at 9:00 a.m.)

13

14                    *    *    *    *    *

15

16 We certify that the foregoing is a correct transcript from the
   record of proceedings in the above-entitled matter.

17

18 /s/ Mary M. Hacker                    May 21, 2013
   Official Court Reporter

19

20

21 /s/ Nancy C. LaBella                  May 21, 2013
   Official Court Reporter

22

23

24

25