1656

```
 1                    IN THE UNITED STATES DISTRICT COURT
                        NORTHERN DISTRICT OF ILLINOIS
 2                            EASTERN DIVISION

 3   JACQUELINE GOLDBERG,            ) Docket No. 09 C 6455
                                     )
 4                      Plaintiff,   )
                                     )
 5             vs.                   )
                                     )
 6   401 NORTH WABASH VENTURE, LLC,  )
     a Delaware Limited Liability    )
 7   Company, et al.,                ) Chicago, Illinois
                                     ) May 21, 2013
 8                      Defendants.) 9:00 o'clock a.m.

 9                            VOLUME SEVEN
                    TRANSCRIPT OF TRIAL PROCEEDINGS
10          BEFORE THE HONORABLE AMY J. ST. EVE, AND A JURY

11   APPEARANCES:

12   For the Plaintiff:         KULWIN, MASCIOPINTO & KULWIN, LLP
                                BY:  MR. SHELLY B. KULWIN
13                                   MR. JEFFREY R. KULWIN
                                161 North Clark Street, Suite 2500
14                              Chicago, Illinois  60601

15   For the Defendants:        NOVACK AND MACEY, LLP
                                BY:  MR. STEPHEN NOVACK
16                                   MR. JOHN F. SHONKWILER
                                100 N. Riverside Plaza, Suite 1500
17                              Chicago, Illinois  60606

18   Also Present:              MS. ALEXIS ROBINSON

19   Court Reporter:            MR. JOSEPH RICKHOFF
                                Official Court Reporter
20                              219 S. Dearborn St., Suite 1232
                                Chicago, Illinois  60604
21                              (312) 435-5562

22                * * * * * * * * * * * * * * * * *

23                      PROCEEDINGS RECORDED BY
                        MECHANICAL STENOGRAPHY
24              TRANSCRIPT PRODUCED BY COMPUTER

25
```

1    THE CLERK:  09 C 6455, Goldberg vs. 401 North Wabash

2    Venture.

3    THE COURT:  Good morning.

4    MR. S. KULWIN:  Good morning, Judge, Shelly Kulwin

5    and Jeff Kulwin on behalf of the plaintiff.

6    MR. NOVACK:  Good morning, Judge, Steve Novack and

7    John Shonkwiler for the defendants.

8    MR. SHONKWILER:  Good morning, your Honor.

9    THE COURT:  I sent you, via e-mail, a revised verdict

10   form this morning.  Hopefully, you got it.  If not, I have a

11   hard copy I can give you.  And we have a few jury instruction

12   issues that remain.

13   One thing I changed in the jury instructions -- and

14   you will see it in the final copy -- in the punitive damage

15   instruction, as well as the elements instruction for the fraud

16   claim, there were references to Count 2.  I have changed that

17   to "the fraud act claim" and taken out any reference to Count

18   2.

19   The instruction that I agreed upon with respect to

20   "no party in this case contends that any other party destroyed

21   or failed to produce documents, as required," I am going to

22   leave that second sentence in.

23   There is nothing in there that precludes you from

24   arguing, Mr. Kulwin, what you want to argue with respect to

25   the lack of documentation.  I think that just makes crystal

1658

1    clear what they cannot infer from that, which are claims that

2    are not before the Court.

3            The other outstanding instruction is the agent

4    instruction.  I did not -- I asked you to look at that

5    proposal, Mr. Kulwin, and let the Court know what your

6    position on the agent instruction is.

7            MR. S. KULWIN:  Well, Judge, with the modifications

8    that we would like to propose, we're okay with it.

9            THE COURT:  Okay.

10           MR. S. KULWIN:  If I can tell what you my

11   modifications are?

12           THE COURT:  Please.

13           MR. S. KULWIN:  As you read -- I will just read

14   slowly.  We would like to say, "An agent is a person, like an

15   attorney or a real estate broker, who, by agreement with

16   another called a principal, represents the principal in

17   dealings with third persons," and, then, et cetera, et cetera,

18   and it goes on.

19           We would take the second sentence out.

20           THE COURT:  I am taking the second sentence out.

21   That is argumentative.

22           MR. S. KULWIN:  "The actions of the agent within the

23   scope of her authority," that's fine.

24           And, then, just take the last sentence out and I

25   think we're fine.

1659

 1          THE COURT:  I am sorry, say that, again.

 2          "The actions of the agent within the scope of her

 3   authority are considered to be the actions of the principal."

 4          You are okay with that?

 5          MR. S. KULWIN:  Yes, that is fine.

 6          And, then, the last sentence seems to be unnecessary.

 7          THE COURT:  The last paragraph has two sentences.

 8   So, you mean just the very last sentence?

 9          MR. S. KULWIN:  Just the very last sentence of the

10   last paragraph.

11          THE COURT:  Okay.

12          Let us start with that.

13          Mr. Novack --

14          MR. NOVACK:  The last sentence, I think that's just a

15   correct statement of the law, as we cited -- that there's no

16   requirement.

17          THE COURT:  Was that in the Pattern -- the last

18   sentence?

19          I do not -- let me check the Illinois Pattern that

20   you cite.

21          What is your response to Mr. Kulwin's proposed

22   modification to the first paragraph?

23          MR. NOVACK:  Well --

24          THE COURT:  "An agent is a person, like an agent or a

25   real estate broker"?

```
 1              MR. SHONKWILER:  "Like an attorney."

 2              MR. NOVACK:  "Like an attorney."

 3              THE COURT:  "Like an attorney or -- "

 4              MR. NOVACK:  I'm okay with that part.

 5          The real estate broker -- I'm not sure that a real

 6   estate broker is that kind of an agent.  A real estate broker

 7   is -- I just think they're different than -- certainly

 8   different than -- attorneys.

 9              THE COURT:  Well, I am not going to give examples,

10   then.  And you can argue it.

11              MR. S. KULWIN:  Okay.  Great.

12              MR. NOVACK:  Well, then, I would --

13              MR. S. KULWIN:  That's fine, Judge.  We are fine with

14   that, too.

15              MR. NOVACK:  I guess I would accept both, rather than

16   neither.

17              THE COURT:  So, "An agent is a person" -- you will

18   agree, then -- "An agent is a person," rather than "like," I

19   would prefer to use "such as an attorney or a real estate

20   broker," and, then, leave in the rest, "who, by agreement

21   with"?

22              MR. S. KULWIN:  Sure.

23              THE COURT:  Okay.

24          You are okay with that modification?

25              MR. NOVACK:  Yes.
```

```
 1              THE COURT:  All right.

 2              So, I will make that change.

 3              And, then, let me just double-check the Pattern with

 4   respect to the last sentence.

 5              MR. S. KULWIN:  Judge --

 6              THE COURT:  If it is in the Pattern, I will leave it

 7   in.

 8              Yes?

 9              MR. J. KULWIN:  Judge, one issue on the verdict

10   forms, if that's okay?

11              THE COURT:  On -- okay.  Let us finish the

12   instructions.

13              MR. J. KULWIN:  Sure.

14              THE COURT:  I will definitely get to the verdict

15   form.

16              MR. J. KULWIN:  Sure.

17              THE COURT:  Anything else on this instruction?

18              MR. S. KULWIN:  No.

19              MR. NOVACK:  No, your Honor.

20              THE COURT:  The one last instruction where there is

21   an outstanding issue, we talked about the impeachment

22   instruction yesterday and whether or not that middle paragraph

23   should stay in with respect to non-party witnesses.

24              MR. NOVACK:  Judge, which one is this?

25              THE COURT:  It is on Page 12 of "prior inconsistent
```

1 statements or acts," Jury Instruction No. 11, on Page 12.  It

2 is Pattern 1.14.

3          We had left open the question of the middle

4 paragraph.

5          MR. S. KULWIN:  Right.

6          THE COURT:  I am not sure that there have been any

7 non-party witnesses who were impeached.

8          MR. S. KULWIN:  Mr. Shearer.

9          THE COURT:  Was he impeached or just refreshed?

10          MR. S. KULWIN:  He was impeached, I believe.

11          MR. NOVACK:  I don't --

12          MR. S. KULWIN:  I think -- I'm sorry.

13          He might have been refreshed.

14          Honestly, I can't recall, to be honest with you.  We

15 can check the transcript.

16          The issue became, I think -- and Jeff would know

17 better than me; so, maybe I should be quiet --

18          But correct me if I'm wrong, Jeff.

19          -- I think it had to do something that -- what he

20 remembered about a particular meeting.

21          Do you recall?

22          MR. J. KULWIN:  I remember him being refreshed.  I

23 don't recall him being impeached.

24          THE COURT:  Yes, okay.

25          MR. J. KULWIN:  But I have the excerpt and I will

1663

1   view it this morning.

2           THE COURT:  Okay.

3           Go ahead and check.  I think it was just refreshed.

4           MR. S. KULWIN:  That's fine.

5           MR. NOVACK:  So, that would only leave Ms. Vogue or

6   Mr. Howie.

7           THE COURT:  Correct.

8           Did you impeach Mr. Levin?

9           MR. S. KULWIN:  Levin, no.

10          THE COURT:  Levin.

11          MR. S. KULWIN:  He agreed with everything you said,

12  right?

13          MR. NOVACK:  Yeah, I think.

14          THE COURT:  Okay.

15          MR. NOVACK:  I don't think we did.

16          THE COURT:  So, that only leaves -- I will leave it

17  in until the very end.  We will see what Mr. Howie or Ms.

18  Vogue does.

19          Okay.  Any other changes on the jury instructions?

20          MR. NOVACK:  Not from the defendants.

21          MR. S. KULWIN:  Not for the plaintiffs.

22          THE COURT:  Okay.

23          The verdict form.

24          Mr. Kulwin, you had a comment?

25          MR. J. KULWIN:  Yes, your Honor.

1         On the verdict form that you gave us yesterday and

2    was sent around this morning, it separates the two defendants

3    with a separate line for each one.

4         When we were preparing the Pretrial Order, we had

5    prepared instructions and issues relating to each separate

6    defendant, and the defendants told us at that time that they

7    were -- they thought that was confusing and they were not

8    raising an issue between the two defendants, that they were

9    one and the same for purposes of this case.

10         We would propose that they -- both defendants -- be

11    included on the same line for each count because there has

12    been no evidence or testimony about what each separate

13    defendant did, based on our discussions in the Pretrial Order

14    preparation.

15         THE COURT:  Are you okay with that?

16         MR. NOVACK:  We are.  And that's consistent with how

17    we handled it.

18         THE COURT:  Okay.

19         So, it should just say "defendants" and lump -- and

20    put them together?

21         MR. NOVACK:  Right.

22         MR. S. KULWIN:  Yes.

23         THE COURT:  All right.

24         So, I will include, "Defendants 401 North Wabash

25    Venture, LLC and Trump Chicago Managing."

1       Then I think I need to modify the jury instructions,

2  as well, because they specifically say, "If you find that

3  plaintiff has proved each of these elements by a preponderance

4  of the evidence as to the defendant whom you are considering."

5       MR. S. KULWIN:  Right.  That would have to be

6  changed.

7       THE COURT:  So, I will make those modifications --

8       MR. S. KULWIN:  Okay.

9       THE COURT:  -- on the elements instructions.

10       Any other comments on the jury instructions?

11       MR. NOVACK:  I had two, Judge.

12       THE COURT:  Let me just finish with plaintiff first.

13       MR. S. KULWIN:  No, Judge.

14       But going back to your thing about the

15  modifications -- and I know you are very busy, too -- we were

16  going to -- obviously, both sides are going to -- put them up

17  on the board.

18       THE COURT:  I am going to do them as we are speaking.

19       MR. S. KULWIN:  Okay.  I just wanted to be sure.

20       THE COURT:  And I will e-mail them to you, so you can

21  --

22       MR. S. KULWIN:  Great.  That's perfect.

23       MR. NOVACK:  So, that's what you're doing with that

24  computer.  Everybody here is -- everybody in the courtroom is

25  -- wondering.

1666

1         (Laughter.)

2         THE COURT:  That is one of the many things I am doing

3    up here.

4         Anything else from plaintiff on the verdict form?

5         MR. S. KULWIN:  No.

6         THE COURT:  Okay.

7         Yes, Mr. Novack, what was your --

8         MR. NOVACK:  Two things, Judge.

9         One is at the very end, I believe there's a typo, if

10   you will.  It says, "Award the plaintiff against each

11   defendant -- "

12        THE COURT:  Page 3?

13        MR. NOVACK:  Page 3, it says, "against each

14   defendants."

15        MR. S. KULWIN:  Oh.

16        MR. NOVACK:  And I know you didn't mean that.

17        THE COURT:  I did not.

18        "Against defendants," thank you.  I will take out

19   "each."

20        MR. NOVACK:  And the other thing is really just a

21   reservation or a non-agreement.

22        I understand why you are using the word "damages" for

23   purchase deposits and payments for -- because, for the jury,

24   it wouldn't make sense to do anything else.  But our position

25   is those recision-type monies back to put people in status quo

 1     is not damages.

 2             I don't want to argue it.  I just want to reserve.

 3             THE COURT:  Okay.

 4             MR. NOVACK:  I just don't want to be later said to

 5     have -- well, you agree.

 6             THE COURT:  I understand.

 7             Okay.  I will make these changes.

 8             The jury is here.

 9             Is Ms. Vogue here?

10             MR. S. KULWIN:  She is.  I will bring her in.

11             THE COURT:  All right.

12             We will take a quick break and --

13             MR. S. KULWIN:  Two minutes.

14             THE COURT:  -- give you time to run down the hall and

15     come back.

16             MR. S. KULWIN:  Thank you, Judge.  It's my age.  I'm

17     sorry.

18             (Brief recess.)

19             THE COURT:  Bring in the jury, please, Danny.

20             (Jury in.)

21             THE COURT:  You may be seated.

22             Good morning, ladies and gentlemen.

23             We are continuing today with the presentation of

24     evidence.  When we broke yesterday, Ms. Vogue had just taken

25     the stand.

Vogue - direct

1668

1           Ms. Vogue, you are still under oath, ma'am.

2           THE WITNESS:  Thank you.

3           THE COURT:  You may continue, Mr. Kulwin.

4           MR. S. KULWIN:  Thank you very much, your Honor.

5      TERRY VOGUE, PLAINTIFF'S WITNESS, PREVIOUSLY SWORN

6           DIRECT EXAMINATION - Resumed

7  BY MR. S. KULWIN:

8  Q.  Good morning, Ms. Vogue.

9  A.  Good morning.

10  Q.  I think when we left off yesterday, we had been talking

11  about -- we had just finished the August 2nd meeting.  And my

12  question is, now:  Did there come a point in time, after the

13  August 2nd meeting, that you met, again, with the Trump

14  salespeople at the Trump Tower sales office?

15  A.  Yes.

16  Q.  And do you recall when that was?

17  A.  August 8th, 2006.

18  Q.  And who was present at the meeting?

19  A.  Mrs. Goldberg, myself, Robert Shearer and Tere Proctor.

20  Q.  Can you tell the ladies and gentlemen of the jury what was

21  discussed?

22  A.  Mrs. Goldberg was very, very excited about her purchase of

23  her first hotel unit.  So, she was considering a purchase of a

24  second unit.

25           And we scheduled an appointment to go back and speak

Vogue - direct

1669

1    with Trump about what the options were for a second hotel

2    condo unit.

3            We had a specific interest in a unique space, which

4    would be -- we had three options.  One was an outdoor space,

5    so the -- they could have cigar parties, if they wanted.

6            The second was an adjoining room to the hotel unit

7    she had purchased a week earlier.

8            And the third was to purchase on the convention

9    floor, where all the business amenities and services would be

10   hosting conventions, and so there would be additional revenue.

11           That's what we were looking for:  What would be a

12   unique space, that would generate additional revenue for her

13   to purchase?  And those are three options, which we discussed.

14           And I might add that Mrs. Proctor -- I preferred the

15   outdoor space, Jackie was considering the adjoining unit space

16   and Ms. Proctor -- preferred that or highly recommended that

17   we purchase on the 16th Floor of the Convention Business

18   Center because of all the revenues that the hotel would be

19   generating from the amenities of the Business Center and the

20   use of the rooms.

21   Q.  At any time during that discussion on August 8th, Ms.

22   Vogue, did anyone tell Ms. Goldberg or you that she could not

23   rely on any of the property reports that had been given to

24   her, that contained a representation that she was going to be

25   obtaining an ownership interest in the hotel, with the HCU

Vogue - direct

1670

1 purchase that she was making?

2 A.  No.

3 Q.  Or that she could not trust or rely on the budget

4 reflecting what was now $6 million-plus in revenue the condo

5 association was going to be receiving from these facilities?

6 A.  No.

7 Q.  Or that the rental program would not run on a rotation

8 point system that allocated rental opportunities fairly and

9 equitably?

10 A.  No.

11 Q.  Did anyone at that meeting advise Ms. Goldberg that any of

12 the property reports that she received on August 2nd -- I

13 mean -- yes, on August 2nd -- had changed since the date of

14 the last one, which was January of 2005?

15 A.  No.

16 Q.  Did anyone tell her that she could expect significant

17 changes in the common elements that were being offered for

18 sale to her at that time?

19 A.  No.

20 Q.  Did Ms. Goldberg ultimately sign a purchase contract for

21 the second unit at that time?

22 A.  Yes, she did.

23 Q.  And did she receive another set of the same property

24 reports that she had received on August 2nd?

25 A.  Yes, she did.

Vogue - direct

1671

1    Q.  Did there come a point in time several months after that

2    meeting when you learned that Trump was not going to deliver

3    the common elements -- the hotel ballrooms, the meeting rooms,

4    the function rooms, the revenues that went with it -- that

5    they had represented they were giving in the original property

6    reports that they gave Ms. Goldberg?

7    A.  Yes, I did.

8              MR. SHONKWILER:  Object to form, your Honor.

9              THE COURT:  Sustained on form.

10   BY MR. S. KULWIN:

11   Q.  Did there come a point in time, Ms. Vogue, that you

12   learned that the Trump organization was going to make changes

13   in the common elements, removing the hotel facilities and

14   revenue that went with it from the common elements?

15             MR. SHONKWILER:  Objection.  Leading.

16             THE COURT:  Just answer "Yes" or "No."

17             And, then, follow up --

18   BY THE WITNESS:

19   A.  Yes.

20             THE COURT:  -- with a non-leading question.

21   BY MR. S. KULWIN:

22   Q.  Sorry, what was the answer?

23   A.  Yes, I did learn of it.

24   Q.  And when was that, approximately?

25   A.  I learned of it on February 14th, 2008.

Vogue - direct

1672

1   Q.  Can you tell us how you learned of it?

2   A.  I had sold multi- -- several -- units in Trump Tower and

3   another client of mine had purchased another hotel unit for

4   their personal use, and they were residing in their California

5   home.  And we were closing, I believe, that week and they sent

6   me an e-mail showing an article that had been published in the

7   Chicago Tribune regarding lawsuits.

8           And, so, after reading it, I contacted the Trump

9   sales office to meet with me in the hotel.

10  Q.  Hold on one second, before we get to that conversation.

11          I want to show you what's been marked previously as

12  Plaintiff's Exhibit 87-A and ask you:  Is this a reprint of

13  the article that you saw back in -- that came with the e-mail

14  in -- February of 2008?

15          (Document tendered.)

16  BY THE WITNESS:

17  A.  Yes, it is.

18  BY MR. S. KULWIN:

19  Q.  Can you tell us what the date on that article is?

20  A.  If I can find it.

21          It's February 12th, 2008.

22  Q.  And, Ms. Vogue, you said that this article mentioned a

23  lawsuit.  Can you tell us more about that, please?

24          MR. SHONKWILER:  Objection, your Honor.  This is the

25  subject --

Vogue - direct

1673

1    THE COURT:  Sustained.

2    You are going to have to rephrase that and be mindful

3    of prior rulings.

4    MR. S. KULWIN:  Sure.

5    I'll try to lead just a little bit to keep it narrow,

6    Judge.

7    THE COURT:  Yes, that is a good idea.

8    MR. S. KULWIN:  Okay.

9    BY MR. S. KULWIN:

10   Q.  Did the article refer to a lawsuit that other Trump buyers

11   had filed against Trump over the removal of the hotel

12   facilities from the common elements?

13   A.  Yes, it did.

14   MR. SHONKWILER:  Objection.

15   THE COURT:  Overruled.

16   BY MR. S. KULWIN:

17   Q.  The answer, ma'am?

18   A.  Yes, it did.

19   Q.  And did it also refer to allegations in the suit about

20   changes to the rotation point system -- things of that nature

21   regarding -- the reservation system?

22   A.  Yes, it did.

23   Q.  Now, following your receipt of that e-mail, did you speak

24   with Ms. Goldberg?

25   A.  Yes, I did.

Vogue - direct

1674

1    Q.  And was that a telephone conversation?

2    A.  Yes, it was.

3    Q.  Was anyone else on the line?

4    A.  No.

5    Q.  Can you tell us what was said?

6         MR. SHONKWILER:  Objection.  Hearsay.

7         THE COURT:  Why is this not hearsay?

8         MR. S. KULWIN:  Ms. Goldberg's half of the

9    conversation is already in evidence, and it's also offered

10   for -- you know, to keep it in context.

11        Ms. Vogue is on the stand and she is telling her part

12   in it.

13        MR. SHONKWILER:  Well, then, what's the point of it,

14   then, your Honor?  Mrs. Goldberg has testified.

15        THE COURT:  Overruled.

16        You may answer.

17   BY MR. S. KULWIN:

18   Q.  Go ahead, Ms. Vogue.

19   A.  Could you repeat the question?

20   Q.  Sure.  Sorry about that.

21        Can you tell us what was said in the conversation

22   when you called Ms. Goldberg about the article?

23   A.  Yes.

24        I told her I had received an article from another

25   client who had purchased a hotel condo unit and sent me an

Vogue - direct

1675

1  article from -- by the Tribune, and it was basically changing

2  all the reasons she purchased her unit for.

3        And I didn't want to do it initially via e-mail.  I

4  wanted to have a communication directly with her, to see how

5  she wanted to respond.

6  Q.  And did you discuss with her at that time the article

7  referred to a lawsuit?

8  A.  Yes, I did.  That was the purpose of my call.

9  Q.  And what did she say, to the best you can recall?

10  A.  She was very disturbed.  She was very upset.  She felt

11  very betrayed and defrauded and asked me to pursue getting

12  more information.

13  Q.  And did you do that?

14  A.  Yes, I did.

15  Q.  How did you do that?

16  A.  I contacted the sales office and asked to have a meeting

17  at the Trump hotel with Kiyoko Binosi.

18  Q.  Okay.

19        And did you ultimately meet with Ms. Binosi?

20  A.  Yes, I did.

21  Q.  Where did you meet with her?

22  A.  In the Trump hotel.

23  Q.  And was anyone else present?

24  A.  No.

25  Q.  And can you tell us what was said at that time?

Vogue - direct

1676

1    MR. SHONKWILER:  Objection.  Hearsay.

2    THE COURT:  What is your response?

3    MR. S. KULWIN:  A, Ms. Binosi is an agent of Trump.

4 So, therefore, it's an admission.

5    B, Ms. Vogue is on the stand giving her half.

6    If that doesn't work, I have a follow-up.

7    THE COURT:  If that does not work, what?

8    MR. S. KULWIN:  I have a follow-up.

9    MR. SHONKWILER:  She's an independent contractor,

10 your Honor.

11    MR. S. KULWIN:  Judge, in light of what we were just

12 talking about before, I don't believe that they're independent

13 contractors.

14    THE COURT:  You need to establish a foundation for

15 agency, if that is the theory you are going to pursue.

16    MR. S. KULWIN:  Sure.

17    THE COURT:  Sustained so far.

18 BY MR. S. KULWIN:

19 Q.  Ms. Vogue, had you dealt with Ms. Binosi before that?

20 A.  Yes, I had.

21 Q.  And in what capacity had you been dealing with Ms. Binosi?

22 A.  With the purchase of hotel -- Trump hotel -- units.

23 Q.  And was she the person that was representing Trump in all

24 of these meetings, to the best of your knowledge?

25 A.  She always was representing Trump, yes.

Vogue - direct

1677

Q.   And were all the discussions you had with her about the

purchase and sale of hotel condominium units within the Trump

building?

A.   Except for the one in the hotel.

          MR. S. KULWIN:  Your Honor?

          THE COURT:  Ask your next question.  We will see if

there is an objection.

BY MR. S. KULWIN:

Q.   Can you tell us what was said?

          MR. SHONKWILER:  Objection.  Hearsay.

          THE COURT:  Overruled, in light of other evidence

that has come in, as well.

          You may answer, if you can.

BY THE WITNESS:

A.   Yes.  I was wanting clarification on the article that I

had read.  Mrs. -- and both of my clients that had made

purchase units in the hotel, because what we were told during

the representation and what I represented reassured my clients

was not going to be delivered.  And I felt a professional

ethical duty to do my due diligence, to give them the

information they needed to make an informed decision about

what they wanted to do about it.

          So, I met with Kiyoko over in the hotel and did a

walk-through, because I had not seen it since the ballrooms

and the conference area and all the amenities that they had

Vogue - direct

1678

1    purchased had been completed.  And during our walk-through, I

2    asked her about all these changes in the fourth amendment.

3    And I started with the rotations.

4            And I then learned at that meeting that Mr. Trump had

5    included all of his unsold or unfinished units in the rotation

6    schedule as no longer -- I expected that it was going to be

7    when they closed, it would be theirs -- and I was very

8    surprised that the rotation -- the number of units that were

9    included in the rotations -- were not what we were expecting.

10           Also, we were told during the sales process that if

11   the owners purchased, they would not be charged any rotation

12   points for their personal use.

13           That, too, had been changed.

14           And the third thing was they would now be getting

15   charged a point.  So, they would now -- between the amount of

16   units, but just personal use of it, it made me very concerned.

17           We then went through the business areas in the hotel

18   rooms and I asked her what the status of that was.  And she

19   told me that Mr. Trump had decided to reconsider and retain

20   ownership of the hotel amenities.  He felt that he was

21   concerned -- what she told me was he was concerned -- about

22   his brand name and that he did not trust turning his name over

23   to a hotel association board, and he wanted to manage it and

24   retain the own- -- management of it; and, therefore, the

25   ownership was no longer an option.

Vogue - direct

1679

1    Q.  Subsequent to that conversation, did you write an e-mail

2    to Ms. Goldberg?

3    A.  Yes.

4    Q.  And did you also include the people who had sent you the

5    Tribune article in that e-mail?

6    A.  Yes, I did.

7    Q.  Let me show you what I've marked as -- what I've marked up

8    there as -- Plaintiff's Exhibit 87.

9         Do you recognize this?

10   A.  Yes, I do.

11   Q.  Is this the e-mail you wrote?

12   A.  Yes, it is.

13   Q.  And can you tell us the date?

14   A.  February 14th, 2008.

15   Q.  And what time was it?

16   A.  3:49 a.m.

17   Q.  And what were you, in God's name, doing writing e-mails at

18   3:49 a.m.?

19   A.  I was getting -- after I met with Ms. Binosi, I didn't

20   know what to do and how to do it.  So, I spent the rest of the

21   day giving serious thought as to what I was going to

22   communicate to my clients and what the conversation with Ms.

23   Binosi entailed.

24        And I thought I would do it in the morning and I

25   couldn't sleep.  So, just so I could get some sleep, I got up

Vogue - direct

1680

 1    and sent the e-mail.

 2            It was quiet and I was focused and I could send the

 3    e-mail.

 4    Q.  Okay.

 5            Now, following you sending this e-mail, did you get a

 6    response from Ms. Goldberg via e-mail?

 7    A.  Yes.  Yes, she did respond.

 8    Q.  I want to show you now Plaintiff's Exhibit 29.

 9            Is this the e-mail -- can you see it okay?

10    A.  No.  If you can make it larger, it would help.  Thank you.

11    Q.  Now can you see it okay?

12    A.  Yes, I can.

13    Q.  Is this the e-mail that you received from Ms. Goldberg in

14    response to your e-mail?

15    A.  Yes, it is.

16    Q.  And what's the date, please?

17    A.  February 14th, 2008, at 12:04 p.m.

18    Q.  The first sentence there, she says, "That the net revenue

19    (or loss) for the public areas was originally to be shared by

20    the hotel condo owners.  Trump has no right to revise that and

21    change the property agreement on his own."

22            Did you understand what Ms. Goldberg was telling you

23    at that time?

24    A.  Yes, I did.

25    Q.  And turning your attention specifically to the "net

Vogue - direct

 1    revenue (or loss)," did you know what she meant?

 2              MR. SHONKWILER:  Lack of foundation.  Calls for

 3    speculation, your Honor.

 4              THE COURT:  Sustained.

 5    BY MR. S. KULWIN:

 6    Q.  What was your understanding of what she meant?

 7    A.  My understanding was that --

 8              MR. SHONKWILER:  Objection.

 9              The same -- I'm sorry, the same -- objection.

10    There's no foundation that Ms. Vogue understands what Ms.

11    Goldberg meant by this e-mail.

12              THE COURT:  Overruled.

13              You may answer, if you can.

14              THE WITNESS:  Thank you.

15    BY THE WITNESS:

16    A.  My understanding was that when Mrs. Goldberg went to

17    contract, because the hotel condominium was such a unique

18    concept here in Chicago, that there would be a risk involved.

19              And, so, my understanding of this response to her was

20    that she signed a purchase agreement with the understanding

21    that the hotel amenities -- that was her number one reason for

22    buying two -- purchasing two -- hotel units.

23              So, with all the marketing material and information

24    she had, to make an informed decision back in 2006, this was

25    just coming out of nowhere -- and without any notice, without

Vogue - direct

1682

1    any written letter, without any bullet point of changes -- she

2    expressed her concern and her upset.

3             MR. SHONKWILER:  Judge --

4    BY THE WITNESS:

5    A.  So, she was willing to take a risk, she agreed and signed

6    to a purchase agreement and she put her money on her word.

7    And that means everything to her.

8             MR. SHONKWILER:  I object and move to strike the

9    entire answer.  It's gone way beyond anything they've

10   established that Ms. Vogue has personal knowledge of.

11            THE COURT:  I am going to strike from, "So, with all

12   the marketing materials on," and the jury should disregard it.

13            It is not responsive and no foundation.

14            THE WITNESS:  Okay.  I'm sorry.

15            MR. S. KULWIN:  That's all right.

16            Can I have one moment, Judge?

17            THE COURT:  You may.

18            (Brief pause.)

19   BY MR. S. KULWIN:

20   Q.  Ms. Vogue, you earlier talked about the Tribune article

21   and the lawsuit.

22            To the best of your understanding -- I just want what

23   your understanding was -- was that the court case that

24   Ms. Goldberg was referring to in this e-mail?

25            MR. SHONKWILER:  Objection, your Honor.

Vogue - direct

1683

1      THE COURT:  Sustained.

2      MR. SHONKWILER:  Foundation and speculation.

3      MR. S. KULWIN:  Okay.  I'll try to fix it.

4  BY MR. S. KULWIN:

5  Q.  When you got this e-mail, you read it, right?

6  A.  Yes.

7  Q.  You formulated an understanding, in your mind, of what it

8  meant, right?

9  A.  Yes.

10  Q.  You dealt with Ms. Goldberg now for how many years?

11  A.  Almost 20.

12  Q.  You had just spoken to her about this Tribune article and

13  the lawsuit the day before?

14  A.  Yes.

15      MR. S. KULWIN:  Can you put it back up, Mike?

16      Can you highlight just the court case?

17      Can you highlight the court case, please?

18      Thank you.

19  BY MR. S. KULWIN:

20  Q.  When you got this, was it your understanding that the

21  court case that Ms. Goldberg was referring to was the one that

22  was referred to in the Tribune article?

23  A.  Yes, it was.

24  Q.  Ms. Vogue, you've known Ms. Goldberg for a long time?

25  A.  Yes, I have.

Vogue - direct

1684

1  Q.  How frequently did you communicate with her?

2  A.  I would say at, minimally, three times a week.

3  Q.  Have you had a chance to observe her over the last few

4  years since this event occurred?

5  A.  Yes, I have.

6  Q.  And, first of all, is Ms. Goldberg a very outwardly

7  expressive person of her emotions?

8  A.  Not at all.

9  Q.  Were you able to observe -- don't tell me what you think

10  or what your opinions are.  I don't want any of that.  Okay?

11  So, don't do that, please; just your observations of her over

12  the last few years, since this occurred -- what have you

13  observed with respect to if she's had any stress, concern,

14  worry -- things of that nature -- about these events?

15          MR. SHONKWILER:  Your Honor, I object.  The witness

16  is not qualified to give a lay opinion on this issue.

17          THE COURT:  Overruled.  It is her observations.

18  BY MR. S. KULWIN:

19  Q.  You can answer, Ms. --

20  A.  Working with her as intimately as I do, I noticed that

21  when she got the information, she was very, very upset, very

22  disturbed and she felt defrauded.  She felt hurt.

23          And it caused her to not be able to -- it took up a

24  lot of her time addressing this issue:  What to do, how to go

25  forward.

Vogue - direct

1685

1    She has responsibilities to her other clients.  She

2  takes care of her husband and her brother.  And, so, it was --

3  it just took an emotional toll and the ordeal was something

4  that I don't think that she'll ever be able to return to.

5         Her trust, especially, was a problem.

6         MR. SHONKWILER:  Your Honor, I object.  Those are not

7  observations and the testimony was not responsive.

8         THE COURT:  Certainly the portion with respect to

9  responsibilities to other clients, I am striking and the jury

10  should disregard it.  That is not an observation.

11         MR. S. KULWIN:  Okay.

12         May I have one second, Judge?

13         THE COURT:  You may.

14         (Brief pause.)

15         MR. S. KULWIN:  Judge, I have to show something to

16  opposing counsel, if that's okay --

17         THE COURT:  Okay.

18         MR. S. KULWIN:  -- before I display it.

19         (Brief pause.)

20         MR. S. KULWIN:  Judge, I am going to lay some

21  foundation.  There may be an objection.  I am not going to

22  show it until I lay the foundation.

23         THE COURT:  Okay.

24         MR. S. KULWIN:  May I approach, please?

25         THE COURT:  You may.

Vogue - direct

1686

 1   BY MR. S. KULWIN:

 2   Q.  Ms. Vogue, I'm handing you what's been marked as part of

 3   Plaintiff's Exhibit 79.

 4           It's got Bates numbers at the bottom, Plaintiff 0068

 5   and 0066?

 6           Have you ever seen these before?

 7           (Documents tendered.)

 8   BY THE WITNESS:

 9   A.  Yes, I have.

10   BY MR. S. KULWIN:

11   Q.  And can you -- without describing them, can you -- tell us

12   what they are?

13   A.  They're the floor plans for the hotel units -- they are

14   floor plans for the hotel units that Mrs. Goldberg purchased.

15           MR. S. KULWIN:  At this time, your Honor, we'd --

16   BY MR. S. KULWIN:

17   Q.  And do you know where these came from?

18   A.  The sales office.

19   Q.  The Trump sales office?

20   A.  Yes, sir.

21           MR. S. KULWIN:  At this time, your Honor, we'd move

22   this portion of Plaintiff's Exhibit 79; specifically, these

23   floor plans, 38 P 0066 and floor plan 40 P 0068 into evidence.

24           THE COURT:  Is there any objection?

25           MR. SHONKWILER:  No.

Vogue - direct

1687

1     THE COURT:  They are admitted.

2         (Plaintiff's Exhibit No. 79 received in evidence.)

3     MR. S. KULWIN:  I'm going to display them, Judge.

4     THE COURT:  Okay.

5  BY MR. S. KULWIN:

6  Q.  And, now, can you tell us what the floor plan here

7  represents?

8  A.  This is a south-facing one bedroom, one bath, with a

9  bathroom and an owner's closet.

10  Q.  In Trump Tower?

11  A.  In Trump Tower, yes.

12  Q.  And is this a comparable or is this actually the unit that

13  Ms. Goldberg was purchasing, or is it just a measurement of

14  the unit she was purchasing -- a layout?

15  A.  Well, there were two different layouts.  So, I'd have to

16  see them back to back.  But this is one of them.

17         I'm not sure if this is 38 or 40.

18  Q.  Okay.

19         This is 38.

20  A.  Okay.

21  Q.  Oh, I'm sorry.  This (indicating) is 38.

22  A.  Okay.  Thank you.

23  Q.  Okay.

24         And can you tell us how many square feet is this at

25  the bottom?  Do you see that?

Vogue - direct

1688

1   A.  Yes.  It's 1220 square feet.

2   Q.  And can you recall the purchase price Ms. Goldberg paid

3   for this?

4   A.  This is a little over a million.  A million-one-fifty, I

5   believe.

6   Q.  1,171 or something?

7   A.  A-million-150, somewhere in there.  A million.

8   Q.  All right.

9       You are going to have to talk a little bit slower --

10  A.  I'm sorry.

11  Q.  -- and a little bit louder.

12  A.  It's a million -- a million-one-fifty, is my recall.

13  Q.  Okay.

14      And, now, I'm going to show you plan 40.

15  A.  Uh-huh.

16  Q.  Do you see this one?

17  A.  Yes, I do.

18  Q.  Okay.

19      And does this depict the studio that Ms. Goldberg

20  purchased?

21  A.  Yes, it does.

22  Q.  And can you tell us -- do you see at the bottom how many

23  square feet it was?

24  A.  604 square feet.

25  Q.  And do you recall what she paid for this one,

                              Vogue - cross
                                                                    1689

 1    approximately?

 2    A.   I believe around 957.

 3    Q.   Okay.

 4           MR. S. KULWIN:   At this time, your Honor, I have no

 5    further questions.

 6           THE COURT:   Cross-examination.

 7                          CROSS-EXAMINATION

 8    BY MR. SHONKWILER:

 9    Q.   Good morning, Ms. Vogue.

10    A.   Good morning.

11    Q.   Ms. Vogue, I do hope I can figure out how to get this on.

12           Good.

13           Plaintiff's counsel showed you this e-mail, right?

14    A.   Yes.

15           THE COURT:   Identify the exhibit number for the

16    record.

17           MR. SHONKWILER:   This is Defendants' Exhibit 592,

18    your Honor.

19    BY MR. SHONKWILER:

20    Q.   And it shows you sent it at 3:49 in the morning, right?

21    A.   That's correct.

22    Q.   Now, is it your testimony today that the reason you sent

23    this at 3:49 in the morning was because this was urgent?

24    A.   No, that's not what I said.

25    Q.   Okay.

Vogue - cross

1690

1       So, you're not implying -- you didn't mean to suggest

2   or say that the reason you sent this early in the morning was

3   because this was an e-mail of particular importance?

4   A.   Correct.

5   Q.   Okay.

6       It had nothing to do with that?

7   A.   It had to do with the priority of it, yes.  I wanted them

8   to have it first thing in the morning.

9   Q.   Okay.

10      But isn't it true that you e-mail at very early

11  morning hours sometimes?

12  A.   Sometimes, I do.

13  Q.   And you produced some e-mails in this case from your

14  files --

15      MR. S. KULWIN:  Judge, I am going to object as to

16  what she produced.

17      MR. SHONKWILER:  Your Honor --

18      MR. S. KULWIN:  They are not in evidence.

19      THE COURT:  Rephrase it.

20  BY MR. SHONKWILER:

21  Q.   There are e- -- you e-mailed Ms. Goldberg about the

22  transaction at issue in this lawsuit, didn't you?

23  A.   I sent multiple e-mails to her about the transactions,

24  yes.

25  Q.   And you had numerous e-mails with Ms. Goldberg, right?

Vogue - cross

1   A.  Correct.

2   Q.  You corresponded with her regularly?

3   A.  That's correct.

4   Q.  Some of these e-mails that we're looking at today came out

5   of your files, right?

6   A.  That's correct.

7   Q.  Okay.

8           And the question is:  You regularly e-mail very early

9   in the morning, sometimes for no reason at all, right?

10  A.  No.

11  Q.  Well, is it true -- do you recall sending an e-mail at

12  1:00 a.m. on August 4th -- this is two days after Ms. Goldberg

13  bought her first unit -- at 1:00 a.m. just to tell Mr. Shearer

14  that Ms. Goldberg had decided to use a different attorney?

15  A.  I -- I -- believe I would have done that, yes.

16  Q.  I didn't hear the answer.

17  A.  I believe I did that, yes.

18  Q.  Okay.

19          Why was that so important?

20  A.  I didn't -- that wasn't important.  I am a real estate

21  broker.  I spend much of my day with clients on the street.

22          So, the only time I get to do my paperwork and

23  communicate with my clients is via e-mail; and, yes, it is

24  done very late in the evening or early mornings.

25  Q.  That's typically the way you do it?

Vogue - cross

1692

 1    A.   That's typically the way I do it.   It depends on my day.

 2    But, yes.

 3    Q.   Whether they're urgent or whether they're entirely benign;

 4    isn't that correct?

 5    A.   That's correct.

 6              When I can do it, I do it.

 7    Q.   Isn't that correct, whether they're urgent or they're

 8    entirely benign, you typically e-mail these things at very

 9    early morning hours?

10    A.   I do my e-mailing whenever I can.

11              If it's early morning, yes, that's correct.

12    Q.   You've worked with Ms. Goldberg on many purchase

13    transactions?

14    A.   Yes.

15    Q.   And Ms. Goldberg is a savvy and experienced buyer, in your

16    opinion, isn't she?

17    A.   Yes, she is.

18    Q.   She also likes to crunch numbers, doesn't she?

19    A.   Yes, she does.

20    Q.   Are you aware that she has a Hewlett Packard calculator

21    that she likes to use?

22    A.   No, I'm not.

23    Q.   When you and Ms. Goldberg are evaluating a purchase, you

24    typically leave the number crunching to her, right?

25    A.   Yes.

Vogue - cross

1693

1   Q.  Now, you testified yesterday and this morning --

2           MR. SHONKWILER:  Well, strike that.

3   BY MR. SHONKWILER:

4   Q.  You certainly testified yesterday about a July 31st

5   meeting with Robert Shearer.  Do you remember that?

6   A.  Yes.

7   Q.  And that was the first of three meetings that you and

8   Ms. Goldberg had with sales agents at Trump, the latter two

9   resulting in purchase agreements being signed for hotel

10  condos, right?

11  A.  Yes.

12  Q.  Actually, though, Ms. Goldberg's interest in hotel condo

13  units developed long before that appointment on July 31st with

14  Mr. Shearer; is that correct?

15  A.  That's correct.

16  Q.  Ms. Goldberg had been enamored with the Trump Tower

17  project for some time.  Do you recall that?

18  A.  She was interested for some time, yes.

19  Q.  Construction started in 2005.

20          Do you remember that?

21  A.  Yes.

22  Q.  And you watched it -- both of you watched that building --

23  go up from next door at River Plaza; is that right?

24  A.  It's correct for me.  I can't speak for Mrs. Goldberg.

25  She doesn't live next door.

Vogue - cross

1694

1  Q.  Well, but you both spent time at River Plaza --

2  A.  Yes.

3  Q.  -- because that's where Ms. Goldberg has several

4  condominiums that you manage, right?

5  A.  That's correct.

6  Q.  And don't you recall that both you and Ms. Goldberg stood

7  and beholded this new construction going up right next door to

8  River Plaza?

9  A.  Yes, we did.

10  Q.  And discussed about how interested Ms. Goldberg was in the

11  Tower?

12  A.  Yes.

13  Q.  Before you and Ms. Goldberg went to that July 31st meeting

14  with Mr. Shearer, you had already looked at floor plans and

15  monthly expense information for certain hotel condo units?

16  A.  Correct.

17  Q.  Do you recall that?

18  A.  Uh-huh.  Yes.

19  Q.  And Mr. Shearer was e-mailing that information to you, at

20  your request, long before that July meeting.

21         Do you remember that, too?

22  A.  Yes.

23  Q.  And the e-mails he sent you included -- always included --

24  the same information:  The price and the monthly expenses.

25         Do you recall that?

Vogue - cross

1695

1   A.  Yes.

2   Q.  Okay.

3        Now, based on your interest -- your interest and

4   Ms. Goldberg's interest, I should say -- in the hotel condos,

5   you and Ms. Goldberg made that appointment with Mr. Shearer in

6   July; isn't that right?

7   A.  Yes.

8   Q.  And you personally initiated and set up that meeting?

9   A.  That's correct.

10  Q.  Now, you both had -- both you and Ms. Goldberg had -- a

11  pretty good idea, when you walked into that meeting, what

12  information you wanted about the units; isn't that right?

13  A.  That's right.

14  Q.  You wanted to know the prices and the monthly expenses and

15  you wanted floor plans, right?

16  A.  Yes.

17  Q.  And that's what you asked Mr. Shearer for?

18  A.  Yes.

19  Q.  And the information he had given you in the past was the

20  same, correct?

21        MR. SHONKWILER:  Let me strike that question.

22  BY MR. SHONKWILER:

23  Q.  It's the same kind of information about expenses that we

24  just referred to, that he had given you by e-mail in the past,

25  right?

Vogue - cross

1696

1   A.  Yes.

2   Q.  Now, you and Ms. Goldberg had some particular units in

3   mind when you walked into that meeting.

4        Do you recall that?

5   A.  No.

6   Q.  Well, by the time that you and Ms. Goldberg set up that

7   meeting, Ms. Goldberg was already very interested in

8   purchasing a hotel condo, right?

9   A.  Yes, that's true.

10  Q.  Yes.

11       Even if she didn't know which one yet --

12  A.  Correct.

13  Q.  -- right?

14       All right.

15       When you -- even before you got any information from

16  Mr. Shearer about the price -- the monthly expenses and the

17  price -- you and Ms. Goldberg were pretty certain that Ms.

18  Goldberg was going to buy at least a hotel condo unit, you

19  just didn't know which one, right?

20  A.  We went to get the information so she could make an

21  informed decision.  And I don't believe when we walked in the

22  door it was that she was going to purchase without the

23  information.

24  Q.  Well, I think the question was a little different.

25       Do you recall from your discussions with Ms. Goldberg

Vogue - cross

1697

```
 1   -- before that meeting and perhaps even walking over to it --

 2   that Ms. Goldberg was pretty certain she was going to buy a

 3   hotel condominium unit, she just didn't know which one yet?

 4          MR. S. KULWIN:  Objection.

 5   BY THE WITNESS:

 6   A.  She was looking forward to purchasing.

 7          THE COURT:  I am sorry?

 8          MR. S. KULWIN:  Objection.  Asked and answered,

 9   Judge.

10          THE COURT:  The answer can stand.

11          MR. SHONKWILER:  I didn't hear the answer.

12   BY THE WITNESS:

13   A.  I said she was looking forward to purchasing.

14   BY MR. SHONKWILER:

15   Q.  And she was looking forward to purchasing at least one

16   unit.  She wasn't certain yet, but that was her plan, right?

17   A.  That was her intent, yes.

18   Q.  And that's before you ever met with Mr. Shearer on July --

19   not before you ever met.

20          MR. SHONKWILER:  Strike that.

21   BY MR. SHONKWILER:

22   Q.  It was before the July 31st meeting?

23   A.  Correct.

24   Q.  Now, at that meeting, Mr. Shearer told you about hotel

25   amenities.
```

Vogue - cross

1698

1      I think that was your testimony, right?

2  A.  Correct.

3  Q.  Like the ballrooms and the spa?

4  A.  Correct.

5  Q.  Now, I'm showing you a page of Plaintiff's Exhibit 75.

6  It's in evidence.  It's Page 4381.

7      You recognize this, right?

8  A.  Vaguely.

9  Q.  Well, this is a page out of one of the glossy brochures

10  that Trump used to sell the units, right?

11  A.  Yes.

12  Q.  Okay.

13      And this one as called "Hotel."

14      Do you remember there were slip sheets that went into

15  this big folder and one of them said "Hotel"?

16  A.  I do.

17  Q.  So, this one describes the hotel.  It's -- one of the

18  things it says it has is it's going to have an executive

19  lounge with a terrace, right?

20  A.  Uh-huh.

21  Q.  A health spa, valet outdoor -- indoor -- parking, a

22  conference center, amenities including grand ballrooms, junior

23  ballrooms, pre-function areas, meeting rooms, executive

24  lounge.

25      Do you remember seeing materials like this?

Vogue - cross

1699

1   A.  Yes.

2   Q.  Okay.

3        Although the building wasn't up yet at that time, you

4   met with Mr. Shearer, right?

5   A.  Yes.

6   Q.  All right.

7        Now -- and this was the kind of thing that Mr.

8   Shearer was showing to you -- pages from brochures like this

9   one, right?

10  A.  Yes.

11  Q.  All right.

12       Now --

13       (Brief pause.)

14       MR. SHONKWILER:  Your Honor, may I approach the

15  witness?

16       THE COURT:  Yes, you may.

17       MR. SHONKWILER:  All right.

18       I'm going to show the witness copies of Defendants'

19  Exhibits 601 and 603.

20       MR. S. KULWIN:  Those are the same as Plaintiff's --

21  they are the property reports, right?

22  BY MR. SHONKWILER:

23  Q.  Would you start just by looking at Exhibit 601, Ms. Vogue?

24       (Document tendered.)

25  BY MR. SHONKWILER:

Vogue - cross

1700

1    Q.  Mr. Shearer wasn't showing you this document at that

2    meeting, was he?

3    A.  I did not read the property reports.

4    Q.  Okay.

5             And Mr. Shearer didn't show this document to you at

6    that first meeting?

7    A.  We're talking the July 31st meeting?

8    Q.  Right.

9    A.  No, he did not.

10   Q.  Mr. Shearer did not show you an operating budget for the

11   hotel condominium at that first meeting, right?

12   A.  Correct.

13   Q.  He didn't show you anything from the property report,

14   right?

15   A.  Not that I recall.

16   Q.  Ms. Goldberg didn't even get one until the next meeting,

17   after she signed -- or at the time she signed -- her first

18   contract, right?

19   A.  I believe that to be true.

20   Q.  Now, if Ms. Goldberg looked at that operating budget, it

21   was something she flipped to after that July 31st meeting and

22   it was not something Mr. Shearer pointed to her, right?

23            MR. S. KULWIN:  Judge, I will object.  Lack of

24   foundation.

25            THE COURT:  Sustained.

Vogue - cross

1701

1   BY MR. SHONKWILER:

2   Q.  Do you know whether that's true -- that Ms. Goldberg ever

3   looked at this hotel condominium budget in the property

4   report?

5   A.  I don't know the answer.

6   Q.  All right.

7           Well, wasn't it your understanding, Ms. Vogue, at the

8   time of that July 31st meeting that if something was in the

9   Trump hotel, then it was in the hotel condominium?

10          It was the same thing, right?

11          MR. S. KULWIN:  Objection.  Vague.

12          Objection.  Vague, your Honor.

13          THE COURT:  Overruled.

14          You may answer, if you understand it and can.

15  BY THE WITNESS:

16  A.  I'd like you to restate it.

17  BY MR. SHONKWILER:

18  Q.  Well, I showed you a brochure that discussed what some of

19  the amenities of the hotel would be.

20  A.  Yes, but they changed.  So, I'm not sure.

21  Q.  The amenities of the hotel.

22          This (indicating) describes the hotel?

23  A.  Right.

24          Okay, yeah.

25  Q.  Sorry?

Vogue - cross

1   A.  Yes.

2   Q.  Okay.

3        And the question is:  Wasn't it your understanding at

4   that time -- at the time of the July meeting -- that if

5   something was in the Trump hotel, then it was in the Trump

6   hotel condominium?

7   A.  Yes.

8   Q.  Okay.

9        But that was a misunderstanding on your part, right?

10  A.  No.

11  Q.  Okay.

12       Your testimony is today you still believe everything

13  that's in the Trump hotel is also in the Trump hotel

14  condominium?

15  A.  My understanding is that when we were there, this was to

16  be included in the hotel condominium.

17       As of now, it is not any longer included in the hotel

18  condominium.

19       Is that your question?

20  Q.  That was your testimony yesterday.  And I want to examine

21  in more detail what happened at that meeting.

22       So, my question was:  Is it still your understanding

23  today that everything that's in the Trump hotel -- all these

24  things that are physically in the hotel when you walk in the

25  door --

Vogue - cross

1703

1   A.   Uh-huh.

2   Q.   -- are also part of the hotel condominium?

3           MR. S. KULWIN:  Objection.  Asked and answered,

4   Judge.

5           THE COURT:  Overruled.

6           You may answer, if you can.

7   BY THE WITNESS:

8   A.   They're part of the hotel.

9   BY MR. SHONKWILER:

10  Q.   Okay.

11          And is every physical component that's part of the

12  hotel also part of the hotel condominium?

13          Is that your understanding today?

14          MR. S. KULWIN:  Judge, I'm just going to object.  I

15  do not think --

16          THE COURT:  Sustained.

17  BY MR. SHONKWILER:

18  Q.   But, in any event, at the time that was your understanding

19  and you're not sure today whether you have changed your mind

20  one way or another, correct?

21          MR. S. KULWIN:  Judge, I'm going to object.

22  Argumentative and misstates her testimony.

23          MR. SHONKWILER:  Your Honor, it's not argumentative.

24  The witness said she understood.

25          THE COURT:  Rephrase.  Rephrase your question.

Vogue - cross

1   BY MR. SHONKWILER:

2   Q.  At the time of the July meeting, you understood -- your

3   understanding was they were one and the same, correct?  You

4   said that?

5   A.  I understood that they were going to be owned by the hotel

6   association.

7   Q.  I'm sorry, you testified a minute ago -- correct me if I'm

8   wrong -- that at the time of that July meeting, your

9   understanding was that if something was in the Trump hotel, it

10  was also in the hotel condominium, right?

11          MR. S. KULWIN:  Judge, I'm going to object.  She's

12  testified parts of it were.  She's answered this question

13  three times.  He's badgering the witness.

14          MR. SHONKWILER:  Your Honor, the witness got up and

15  testified that she was told certain things would be in the

16  hotel condominium.  And it's now explained that it's

17  questionable, at the least, as to whether she even knows what

18  that is.

19          THE COURT:  Overruled.

20          You may answer, if you can.

21  BY MR. SHONKWILER:

22  Q.  Is it true that you're not certain whether everything

23  that's physically in the Trump hotel is also in the Trump

24  hotel condominium?

25          MR. S. KULWIN:  Judge, I'm going to object on

Vogue - cross

1705

```
 1   relevance.  She's never testified that everything in the hotel

 2   is in the hotel condominium.  She said specifically --

 3          MR. SHONKWILER:  The answer --

 4          MR. S. KULWIN:  May I?

 5          -- specifically, the ballrooms, meeting rooms,

 6   function rooms and all those -- that's what she testified to

 7   on direct.

 8          MR. SHONKWILER:  Mr. Kulwin is testifying now --

 9          MR. S. KULWIN:  I'm not.

10          MR. NOVACK:  -- and rehabilitating his witness.

11          THE COURT:  Overruled to the objection.

12          You may answer the question, if you can.

13   BY THE WITNESS:

14   A.  I remember certain amenities that were specific to the

15   hotel association.

16          There are amenities in the building that is universal

17   to both the residential and hotel.  Things, for instance, the

18   valet parking.  I didn't pay any attention to it.  I don't

19   know the answers.

20          So, I'm trying to answer you honestly.  I don't

21   remember each detail of -- there were so many brochures and

22   things kept changing and I didn't read them.

23   BY MR. SHONKWILER:

24   Q.  So, at the time, then -- in July 31st -- you now know that

25   you misunderstood if you thought that the hotel physically and
```

Vogue - cross

1706

1    everything in it was also part of the hotel condominium,

2    right?

3            MR. S. KULWIN:  Judge, objection.

4    BY THE WITNESS:

5    A.  No.

6            THE COURT:  I did not hear your objection.

7            MR. S. KULWIN:  I'm going to withdraw it, Judge.

8            THE COURT:  Okay.

9    BY MR. SHONKWILER:

10   Q.  Well, you said at the time of that meeting you thought

11   everything in the hotel was also in the hotel condominium.

12           I'm asking you now whether you understand that that

13   was a misunderstanding on your part?

14   A.  Are we talking ownership or use?  Because I -- I -- think

15   that's where I'm getting hung up on the question, without it

16   being clear.

17   Q.  How is that different, in your mind?

18   A.  Well, because if the hotel owners own the hotel amenities,

19   then there was revenue and income.

20           The conference room is there, the ballrooms are

21   there, the services are there and they're open to the

22   residential owners, they're open to the hotel owners, the

23   hotel guests and the public.  So, I'm not really just clear on

24   your question and how to answer it accurately.

25   Q.  And, so, the distinction is important, isn't it,

1  because --

2  A.  I'd like you to be really clear with me, yes.

3  Q.  The distinction is important because if it's not in the

4  hotel condominium, it's not a common element and the owners

5  don't have an ownership interest, right?

6          Isn't that what you just told me?

7  A.  Say it, again.

8  Q.  If it's not in the hotel condominium, if it's not a common

9  element and the unit owners don't own an interest in it --

10  isn't that what you just told me?

11          MR. S. KULWIN:  Judge, I'm going to object to the "if

12  it's not in the hotel condominium."  I don't think it's clear

13  and I don't think the witness understands.

14          MR. SHONKWILER:  Well, that's the question.  That is

15  the very question.

16          THE COURT:  Sustained on form.

17          Rephrase your question.

18  BY MR. SHONKWILER:

19  Q.  You just explained to me that there's a difference between

20  hotel components that the unit owners can use and components

21  that they own, right?

22  A.  Yes.

23  Q.  And the difference is, they don't own it unless it's in

24  the hotel condominium and it's, thus, a common element; isn't

25  that right?

Vogue - cross

1708

1   A.   I believe so.

2   Q.   Okay.

3        But there are some things in the hotel that people

4   can use, that aren't owned by the hotel condominium owners,

5   because they're not part of the hotel condominium, right?

6   A.   I would believe that's right.

7   Q.   Okay.

8        So, if your understanding was different from that

9   back in July, 2006, you misunderstood, correct?

10       MR. S. KULWIN:  Judge, I'm going to object because --

11       THE COURT:  Sustained.  Argumentative.

12  BY MR. SHONKWILER:

13  Q.   Do you understand that today -- that there is a

14  distinction between those two things --

15       MR. S. KULWIN:  The same objection, Judge.

16       MR. SHONKWILER:  I haven't even got the question out.

17       THE COURT:  Let him finish the question.

18  BY MR. SHONKWILER:

19  Q.   You do understand today that there is a distinction

20  between the things that are in the hotel, that people can use

21  physically, and things that are owned by the hotel condominium

22  association, and they're not one and the same, right?

23       MR. S. KULWIN:  Objection.

24  BY THE WITNESS:

25  A.   That distinction --

Vogue - cross

1709

```
 1            THE COURT:  Overruled.
 2            Wait.  Ms. Vogue, if there is an objection, just let
 3    me rule first, please.
 4            THE WITNESS:  Okay.
 5            THE COURT:  Overruled.
 6            You may answer, if you can.
 7    BY THE WITNESS:
 8    A.  I'm sorry, repeat.
 9            THE COURT:  Do you want it read back?
10            THE WITNESS:  Yes --
11            MR. SHONKWILER:  Please.
12            THE WITNESS:  -- please.
13            THE COURT:  Joe, would you read it back, please?
14            (Record read.)
15    BY THE WITNESS:
16    A.  It seems like that would be correct.
17    BY MR. SHONKWILER:
18    Q.  And do you also understand that the documents explains to
19    you which one is which, this property report that you just
20    looked at, right?
21    A.  As I said, I have not read the property report.
22    Q.  Do you understand that that's the document that tells you
23    which one is which -- which one is part of the condo and owned
24    by the unit owners and which are used -- can be used -- but
25    are not owned?
```

Vogue - cross

1      Do you understand that?

2   A.  I understand the concept.  I don't understand your

3   question.  I'm sorry.

4   Q.  Well, this document that Mr. Shearer did not show you at

5   the July meeting -- the property report -- is the one that

6   tells you which things are owned and which things can merely

7   just be used?

8          MR. S. KULWIN:  I am going to object.  Calls for

9   speculation.  She said --

10         THE COURT:  Sustained.

11  BY MR. SHONKWILER:

12  Q.  You don't know?

13         MR. S. KULWIN:  Judge, you sustained.

14         THE COURT:  Sustained.

15         She said she has not read it.

16  BY MR. SHONKWILER:

17  Q.  Now, Ms. Vogue, you did represent Ms. Goldberg for the two

18  purchase -- hotel condo purchase -- agreements she signed in

19  August, 2006?

20  A.  Yes, I did.

21  Q.  For those purchases, Ms. Goldberg was represented by an

22  attorney, Judy DeAngelis, right?

23  A.  Yes, she was.

24  Q.  This is Defendant's Exhibit 522.

25         MR. S. KULWIN:  May I see it?

1         MR. SHONKWILER:  I'm sorry?

2         MR. S. KULWIN:  Could I see it?

3         (Brief pause.)

4  BY MR. SHONKWILER:

5  Q.  This letter is dated August 11th, 2006?

6  A.  Can you make it a little larger, please?

7         Thank you.

8         MR. J. KULWIN:  I'm sorry, what?

9         THE COURT:  She wants you to make it larger.

10        THE WITNESS:  Could you make it larger?

11        MR. SHONKWILER:  Oh, sure.

12        THE WITNESS:  I don't have any reading glasses on.

13  BY MR. SHONKWILER:

14  Q.  This is a letter from Judy DeAngelis dated August 11th,

15  2006.

16        That was three days after Ms. Goldberg signed her

17  second hotel condo purchase agreement, right?

18  A.  Yes, I believe so.

19  Q.  And this letter is Ms. DeAngelis' letter to the attorneys

20  representing the seller -- the Trump developer -- right?

21        MR. S. KULWIN:  Objection, Judge.  How would she

22  know?  This is a lawyer named Adam Berkhoff.

23        THE COURT:  Sustained.

24  BY MR. SHONKWILER:

25  Q.  Well, do you recall ever seeing this letter before?

Vogue - cross

1712

```
 1   A.  Yes, I do.
 2   Q.  Okay.
 3           And what do you remember --
 4           MR. SHONKWILER:  Strike that.
 5   BY MR. SHONKWILER:
 6   Q.  Do you recall that this is a letter from Ms. DeAngelis,
 7   right -- and I'm flipping to the last page -- with a copy to
 8   you, right?
 9   A.  Correct.
10   Q.  Okay.
11           And you recall that this is a letter in which Ms.
12   DeAngelis goes through a number of changes that she was asking
13   the seller's attorney to make to the purchase agreement,
14   right?
15           MR. S. KULWIN:  Judge, I'm going to object.  There's
16   no foundation if she knows who the seller's attorney is.
17           THE COURT:  Sustained.
18   BY MR. SHONKWILER:
19   Q.  Do you recall that this is a letter from Ms. DeAngelis
20   negotiating provisions of the purchase agreement that Ms.
21   Goldberg had just signed?
22           MR. S. KULWIN:  Judge, I'm going to object.  She
23   doesn't know who the letter is to.
24           MR. SHONKWILER:  Well, that's the question.
25           MR. S. KULWIN:  No foundation.
```

Vogue - cross

1          THE COURT:  You may answer, if you know.

2   BY THE WITNESS:

3   A.  Try, again.  I'm sorry.  Just please rephrase or --

4   BY MR. SHONKWILER:

5   Q.  Well, you said you recall this letter.

6          Let's do it this way:  What is it?

7   A.  I recall receiving a copy of the letter; and, after the

8   purchase agreement was sent to Ms. DeAngelis, it's typical in

9   purchases that there be an attorney review period.  And this

10  was my understanding to be Ms. DeAngelis' response after

11  reviewing the con- -- the purchase agreement to the -- to

12  Trump's attorney.

13  Q.  Okay.

14         And, in this letter, she is discussing provisions of

15  the purchase agreement that she wanted changed, right?

16  A.  I did not read the letter in detail or I don't remember

17  the detail of it.  So -- but my understanding is it was her

18  working with Trump to resolve open issues that she had --

19  Mrs. Goldberg had -- that I asked her to address and she had

20  addressed to the Trump attorney.

21  Q.  Okay.

22         But you said you don't remember reviewing this

23  letter?

24  A.  I recall reviewing it, but as you can see, it was 2006.  I

25  don't recall exactly what it said.

Vogue - cross

1714

1  Q.  Well, tell me if you recall -- tell me if you recall --

2  that Ms. DeAngelis -- one of the provisions she was

3  negotiating was Paragraph 4 of the common documents, and that

4  she was asking them to change it so that purchaser would have

5  an approval right here for all final condominium documents?

6        Do you recall that that was one of the items she was

7  negotiating?

8  A.  I -- I -- can see that it was.

9  Q.  Okay.

10       And do you know that Paragraph 4 is the paragraph of

11  the purchase agreement that says the seller can change the

12  common elements?

13       MR. S. KULWIN:  Judge, I'm going to object.  It

14  mischaracterizes what's in that paragraph.

15       THE COURT:  Overruled.

16       You may answer, if you can.

17  BY THE WITNESS:

18  A.  It is my experience that with developer contracts, there

19  are certain provisions that they can change and there are

20  others they cannot change.

21       If it's a field change or a zoning issue, yes, my

22  understanding is that they can make certain changes.

23       But I don't ever recall there being a purchase

24  agreement that had an open-ended, they-could-do-anything-

25  they-want change.

Vogue - cross

1715

1    Q.  You don't remember that that was one of the items that

2    Ms. DeAngelis was negotiating?

3    A.  I didn't know the specifics of what she was -- I did not

4    know the specifics of what she was -- negotiating.

5    Q.  But didn't you and Ms. Goldberg have a rather extensive

6    discussion about this very negotiation process and the fact

7    that some of Ms. DeAngelis' requests had been refused by the

8    seller's attorney?

9    A.  I am aware that some were refused.

10   Q.  And do you remember discussing that at length with Ms.

11   Goldberg at the time?

12   A.  No, I did not discuss this letter with Ms. Goldberg.

13   Q.  Okay.

14          MR. SHONKWILER:  Your Honor, this is not in evidence,

15   but it's Plaintiff's Exhibit 88-99.  I'd just like to use it

16   right now, to try to refresh the witness' recollection.

17          THE COURT:  You may.

18   BY MR. SHONKWILER:

19   Q.  Ms. Vogue, would you please take a look at this e-mail --

20   all three pages.

21          (Document tendered.)

22   BY MR. SHONKWILER:

23   Q.  And tell me if this refreshes your recollection about

24   whether you were discussing with Ms. Goldberg this very letter

25   and seller's refusal of some of these requests?

Vogue - cross

1716

1           MR. S. KULWIN:  Can we have a Bates number on that,

2   please?  Can you just have her read the Bates number?

3           The Bates number, please?

4           THE COURT:  You want the Bates number?

5           MR. S. KULWIN:  It would be helpful, Judge, because

6   this is the middle of a big --

7           THE COURT:  Okay.

8           Let her read it.  And, then, before you ask another

9   question, why do you not go up and read the Bates number,

10  please.

11          (Brief pause.)

12  BY THE WITNESS:

13  A.  Okay.

14          MR. SHONKWILER:  I can take that.

15  BY MR. SHONKWILER:

16  Q.  Having read that, Ms. Vogue, do you recall now that you

17  and Ms. Goldberg did have a discussion about Ms. DeAngelis'

18  requests for changes to the contract and the seller's

19  attorney's refusal of some of those requests?

20  A.  Yes.

21  Q.  Okay.

22          So, your testimony before that you did not --

23          THE COURT:  Mr. Shonkwiler, before you ask your next

24  question, read the Bates number in, please.

25          MR. SHONKWILER:  The Bates number PX 8899 is TV 149

Vogue - cross

1717

 1     through TV 151.

 2              THE COURT:  Thank you.

 3              MR. S. KULWIN:  Thank you.

 4     BY MR. SHONKWILER:

 5     Q.  So, your testimony a few minutes ago that you did not have

 6     such a with Ms. Goldberg was not correct, right?

 7     A.  I did not recall it.

 8     Q.  All right.

 9              Your memory of that -- you had forgotten it, but now

10     you remember it?

11     A.  That's correct.

12     Q.  Okay.

13              I'd like to ask you a few questions about it.

14              Ms. Goldberg was concerned that some of Ms.

15     DeAngelis' requests for changes were rejected.  Do you recall

16     that part of it?

17     A.  Yes, I do.

18     Q.  And you told her, "If you're not comfortable and not

19     satisfied, you can withdraw your offer and get your money

20     back."

21              Do you recall that part of the conversation?

22     A.  That would be my understanding, yes.

23     Q.  And you supported whatever decision Ms. Goldberg made as

24     to whether to withdraw or go through with it, right?

25              You told her that?

Vogue - cross

1718

1    A.  Yes.

2    Q.  And you wanted to be sure that if she went forward, that

3    she was comfortable with and excited about the purchase, as

4    she had been all along, right?

5    A.  Yes.

6    Q.  And she decided she was comfortable and she went through

7    with it.

8            Do you recall that?

9    A.  Yes.

10   Q.  With both purchases because this letter came after she had

11   signed both purchase agreements, right?

12   A.  Yes.

13   Q.  And, so, she was comfortable enough to sign those; is that

14   your recollection?

15   A.  Based on the information she had received at that time.

16   Q.  But she -- okay.

17           But she was not totally comfortable, right?

18           Do you recall that?

19   A.  I'm not saying that.  I'm saying based on the information

20   she received, she was comfortable --

21   Q.  Okay.

22           But she wasn't --

23   A.  -- at that time.

24   Q.  Do you recall that she wasn't totally comfortable?

25   A.  She still had some concerns because her attorney was not

Vogue - cross

 1   able to fill in the blanks.

 2         She, basically, said Trump -- this is what they're

 3   saying and that there was not specific details that she could

 4   answer Mrs. Goldberg's questions with.

 5   Q.  Okay.

 6   A.  So, acting in good faith on the agreement, she believed

 7   in -- that it was substantially what she had agreed to.

 8         She did not know exactly what all the -- the legalese

 9   was; and, so, her attorney said, "You either want to go

10   forward or -- " no, that wasn't even at this point.  No.

11         At that point, she felt comfortable on Trump's word

12   and representations made by the sales staff that, yes, like I

13   said, some changes do get made, and she was trusting in the

14   disclosures that she was making the decision on, that she

15   would still proceed going forward at that time.

16   Q.  You remember all this now, that those were discussions you

17   had at the time?

18   A.  Because I read the letter, yes.

19   Q.  Okay.

20         And you remember that she was, though, concerned

21   about some of the provisions that were refused -- some of the

22   changes?

23   A.  I don't know what provisions were changed.

24   Q.  Okay.

25   A.  I didn't read it.

Vogue - cross

1720

 1    Q.  Let me just ask the question.

 2            You recall that she was concerned that some of the

 3    requests from Ms. DeAngelis had been refused?

 4    A.  Some had.

 5            MR. S. KULWIN:  Objection.  Asked and answered,

 6    Judge.

 7            THE COURT:  Overruled.

 8    BY MR. SHONKWILER:

 9    Q.  Is that right?

10    A.  Okay.

11    Q.  And that she was not totally comfortable at the time.

12            Even though she was comfortable enough to go through

13    with the two purchases, she was not totally comfortable

14    because she decided not to go forward with a third purchase.

15            Do you recall that?

16            MR. S. KULWIN:  Judge -- never mind.

17            I withdraw it.

18    BY THE WITNESS:

19    A.  I recall her decision not to go with the third was that

20    she had as much invested in Trump at that time, that she did

21    not want to pursue going to a third contract.

22    BY MR. SHONKWILER:

23    Q.  But do you recall that it was specifically her concern

24    over the rejection of some of these requests, that caused her

25    to decide that she was not inclined to buy a third?

1        Do you recall that?

2    A.  I just remember that she wasn't as confident, after

3    getting the response from the Trump organization, as she was

4    enthusiastic.  She was still excited about the opportunity.

5    She still believed in the purchases.  But she did not want to

6    pursue anything further.

7    Q.  Do you recall the connection between those two, though --

8    that her concern over the rejection of some of Ms. DeAngelis'

9    requests led her to be inclined not to buy a third?

10   A.  As I said --

11        MR. S. KULWIN:  Objection.

12   BY THE WITNESS:

13   A.  -- I did not discuss with her Ms. DeAngelis'

14   communications.

15        I know where she felt and how she felt; but, as far

16   as specific discussions and reasons, she told me she was at

17   her limit and that was it.  She did not give me any specific

18   information or reason that you're asking me to say she did.

19   She didn't.

20        She just said she's -- that's as far as she was

21   willing to go.

22   Q.  I want to show this to you one more time and ask if it

23   refreshes your recollection that it was Ms. Goldberg's concern

24   over the fact that some of her requests for changes --

25        MR. S. KULWIN:  Objection, Judge.

Vogue - cross

1722

```
 1  BY MR. SHONKWILER:
 2  Q.  -- had been denied, that led her to decide she was not --
 3          MR. S. KULWIN:  Judge --
 4  BY MR. SHONKWILER:
 5  Q.  -- inclined to buy a third unit?
 6  A.  Her confidence in Trump had --
 7          THE COURT:  Wait, wait.  Ms. Vogue, hold on.  There
 8  is on objection.
 9          MR. S. KULWIN:  I just want to know what you are
10  showing her.
11          MR. SHONKWILER:  The same thing.
12          THE COURT:  The same Bates numbers that were read in
13  a moment ago.
14          Okay.  Go ahead.
15  BY THE WITNESS:
16  A.  Her confidence in Trump had been compromised; and, yes,
17  she was reluctant to go forward.
18  BY MR. SHONKWILER:
19  Q.  In part because of --
20  A.  In response to the communications between the two
21  attorneys.
22  Q.  Okay.
23          And do you recall why it was that her -- that her --
24  as you say, that she had lost -- what did you say, she lost --
25  A.  Confidence.
```

Vogue - cross

1723

1    Q.   Confidence.

2              Do you recall what it was that nine months after you

3    read the October, 2007, fourth amendment, she closed on a unit

4    in Trump Tower?

5    A.   That was her residential condo.

6    Q.   She had confidence -- that was owned by Trump, right?

7    A.   Yes.

8    Q.   Okay.

9              The same building, the same owner?

10   A.   Uh-huh.

11   Q.   Run by the same manager?

12   A.   Uh-huh.

13   Q.   You don't recall whether anything else about whether there

14   was a difference there?

15   A.   Oh, there was a huge difference between the two.

16   Q.   Well, in terms of the confidence you said she lost.

17             Do you recall any discussions about that?

18   A.   Well, she had signed the original purchase agreement back

19   in 2003.  This is now 2006 -- or whatever the date is.

20   Q.   Ms. Vogue, just a few questions about your relationship

21   with Ms. Goldberg.  I think you've testified to some of it.

22             You've known her for 20 years; is that right?

23   A.   Approximately, yes.

24   Q.   She's one of your clients and you do work for her, right?

25   A.   That's correct.

Vogue - cross

1724

```
 1   Q.  And she pays you for your work, correct?

 2   A.  Yes, she does.

 3   Q.  And you've also received commissions from some of the

 4   purchases that she made, for which you represented her as a

 5   broker, right?

 6   A.  Correct.

 7   Q.  Okay.

 8           Now, she's also someone you consider a friend, right?

 9   A.  I would say.

10   Q.  She asked you to testify here today and yesterday,

11   correct?

12   A.  Actually, no.

13   Q.  Did you come here voluntarily?

14   A.  Actually, no.

15   Q.  You're here --

16   A.  I mean, yes, I did come voluntarily, yes.

17   Q.  Okay.

18           And are you being represented today by her attorneys?

19   A.  Yes.

20   Q.  Are you paying them or are they representing you for free?

21   A.  Can I answer your question how I -- I asked -- I knew that

22   at some point I was -- because I had been subpoenaed and

23   deposed, that I may be a witness.  And I wasn't sure if I was.

24           I had sent a communication to her attorneys asking if

25   I was going to be a witness or not, because if I was, then I
```

Vogue - cross

1725

 1    couldn't attend the trial; and, if I wasn't, then I could.

 2           And they responded back to me that they were still

 3    considering and they would get back to me.

 4           There was no compensation involved, if that answers

 5    your question.

 6    Q.  So, you're not paying the attorneys out of your own funds?

 7    A.  No, I'm not.

 8    Q.  Did you meet and talk with Ms. Goldberg's attorneys before

 9    your testimony here today?

10    A.  Yes, I did.

11    Q.  And did you meet and talk with Ms. Goldberg about your

12    testimony -- but before your testimony -- about what was going

13    to happen at trial?

14    A.  No, I haven't.

15    Q.  You haven't since, when?

16           You say you haven't.  When was the last time you met

17    with Ms. Goldberg and talked about this case?

18    A.  I have not met with -- the attorneys told me that once

19    they did determine that I was going to be a witness, that I

20    could not have any communications with Ms. Goldberg related to

21    this.

22    Q.  Not by e-mail?

23    A.  (No response.)

24    Q.  Do you recall having e-mail correspondence with Ms.

25    Goldberg about this lawsuit, while it was going on?

Vogue - cross

1726

 1          MR. S. KULWIN:  Judge --

 2     BY THE WITNESS:

 3     A.  I don't.

 4          MR. S. KULWIN:  -- he is misrepresenting.  She

 5     testified that once she was designated as witness for trial,

 6     not back during the litigation.

 7          MR. SHONKWILER:  I don't think I even asked that

 8     question.

 9          THE COURT:  Overruled.

10          You may answer, if you can.

11     BY MR. SHONKWILER:

12     Q.  Do you recall that you had e-mail correspondence with Ms.

13     Goldberg while this lawsuit was going on, about the lawsuit?

14     A.  Can you give me a date?

15     Q.  Not right now, I'm sorry, I can't.

16     A.  I don't recall.

17     Q.  I will try to give you one.

18          Okay.  You also represented Ms. Goldberg when she

19     purchased the residential condominium --

20     A.  That's correct.

21     Q.  -- back in 2003?

22     A.  Uh-huh.

23     Q.  And do you recall that she paid 1.4 million for that unit,

24     all in cash?

25     A.  I know she paid in cash.  I don't remember the exact

Vogue - cross

1    number, but it sounds about right.

2    Q.  Do you recall that when you and Ms. Goldberg went in for

3    one of your meetings with the sales agents about the hotel

4    condo purchases, that you learned that the value of her

5    residential condominium had increased by some one million to

6    $1.5 million?

7    A.  Yes, I do recall that.

8    Q.  You gave some testimony, Ms. Vogue, about how, in one of

9    those meetings -- or maybe more than one -- with the sales

10   agents you discussed Ms. Goldberg's interest in being on the

11   meeting rooms floors to the hotel, right?

12   A.  Wrong.  We discussed it.

13        Ms. Proctor brought it up, yes.

14   Q.  You remember discussing that?

15   A.  I remember discussing it, yes.

16   Q.  And you testified that the reason you were -- that there

17   was interest is because of the extra revenue that would be

18   generated from the ballroom and meeting room amenities; is

19   that right?

20   A.  As I said earlier, Mrs. Goldberg was interested in a

21   unique space that would give her better rotation on the

22   schedule and, therefore, have higher revenues come as a return

23   on an investment.

24   Q.  Revenues --

25   A.  Three options:  The adjoining unit, the outdoor space unit

Vogue - cross

1728

1  and Ms. Proctor introduced that she consider purchasing on the

2  16th Floor, because she heard in our conversation when I said

3  that the conventions would be coming to town, the weddings, et

4  cetera, et cetera, et cetera, it would be -- you know, that

5  was to buy in the hotel, in general.

6      It was Ms. Proctor that initiated the -- for her

7  consideration the -- purchase on the 16th Floor.  Because of

8  the Business Center, she recommended it would be a good thing

9  to generate additional revenue; yes, I do remember that

10 conversation.

11 Q.  And the reason why being on the meeting room floor would

12 generate additional revenue is because there would be

13 additional rental revenue because people who were in the

14 meeting rooms might want to stay in rooms that were close to

15 the meeting rooms, right?

16 A.  At that time, it was her ownership in the meeting rooms;

17 and, yes, it was also because it would be more convenient, in

18 her opinion, to be on that floor.

19     In my opinion, I took issue with that.

20 Q.  Okay.  That's fine.  I just --

21 A.  And she didn't consider it, for the reason that I took

22 issue with.

23 Q.  All right.

24     Try to listen to what I'm asking very carefully.  It

25 wasn't exactly what I was asking.

Vogue - cross

1729

```
 1          You gave testimony -- okay -- that Ms. Goldberg

 2   wanted to be on the meeting --

 3          MR. SHONKWILER:  Well, strike that.

 4   BY THE WITNESS:

 5   A.  She didn't want to.

 6          MR. SHONKWILER:  Strike it.  Strike it.

 7   BY MR. SHONKWILER:

 8   Q.  I'll start over.

 9   A.  Yeah.

10   Q.  Let me ask it this way:  You understood that the

11   connection between being on the meeting room floor and getting

12   more revenues was people who were in the meeting rooms for

13   meetings might want to stay in a room close to the meetings,

14   right?

15   A.  That was Ms. Proctor's opinion, not necessarily Ms.

16   Goldberg's.

17   Q.  Okay.

18          So, the benefit of being on the meeting room floor --

19   if there was one -- was that there would be extra rental

20   revenue from the people staying in the room, right?

21   A.  That was Ms. Proctor's opinion, not necessarily Mrs.

22   Goldberg's.

23   Q.  Okay.

24          But people who have units on the meeting room floors,

25   it was never your understanding that they would get more
```

Vogue - cross

1730

1  revenue from the use of the meeting rooms and amenities,

2  right?

3  A.  I didn't believe that to be true.

4  Q.  Well, there's no relationship at all between those two

5  things, right?

6       If the unit owner gets revenue from the ballrooms,

7  the unit owner gets revenue from the ballrooms, no matter what

8  floor they are on, right?

9  A.  Correct.

10  Q.  Okay.

11       So, if you testified before -- and I'm going on

12  memory of my notes; so, I'm not saying you did this and I

13  don't want to put words in your mouth, but if you testified

14  before -- that she was interested in being on a meeting room

15  floor because of the extra revenue that would be generated

16  from the amenities, you didn't mean that, right?

17  A.  I mean, Ms. Proctor brought that up as a consideration for

18  Ms. Goldberg to factor into their -- her -- one of three

19  unique option spaces, yes.

20  Q.  Ms. Proctor told you that you would get more revenue from

21  the amenities if you were on the same floor as the meeting

22  rooms?

23  A.  She said that the rotation would be higher for those that

24  were in -- for conventions or parties or whatever.  But she

25  was focusing on the business amenities of that floor and the

Vogue - cross

1731

1  convenience, in her opinion -- that it would be convenient for

2  those who were attending conventions or meetings, that it

3  would generate more revenue because they would want to.

4        So, to me, I did not agree.  And I don't believe

5  Mrs. Goldberg agreed.

6  Q.  Okay.

7  A.  It was brought up for consideration.

8        To say she was interested in it, like I said, it came

9  from Ms. Proctor, who was encouraging her to purchase on that

10 floor for the business amenity reasons.  That is the truth.

11 Q.  And to be specific about it, what she said was the benefit

12 was that you get more rental income from more people staying

13 in you room, not that you would get more amenity revenue

14 because you were on that floor, correct?

15 A.  That was part of it, yes.

16 Q.  Well, that was all of it, wasn't it?

17 A.  No.

18 Q.  Okay.

19       So, it is your testimony that Ms. Proctor told you

20 you will get -- "Ms. Goldberg, if you own on the same floor as

21 the meeting room, you will get more of the amenity revenues"?

22 A.  We didn't dissect it.

23 Q.  Well --

24 A.  So, there is no way -- it was her opinion that if there

25 were conventions, there would be more rotations for Ms.

Vogue - cross

1732

1    Goldberg from that floor.

2    Q.  "Rotation" means rental revenue?

3    A.  Correct.

4    Q.  That's all she was saying?

5    A.  That's correct.

6           She was trying to imply that there would be more

7    rental rotation, so that would be the advantage for her buying

8    on that floor.

9    Q.  Okay.

10          And that's rental program money.  That's different

11   from --

12   A.  Right.

13   Q.  -- amenity money?

14   A.  That's why I wanted to be clear.

15   Q.  Okay.

16          You testified yesterday Ms. Goldberg was very

17   concerned about the rotation program that Trump had in place.

18          Do you remember that testimony?

19          MR. S. KULWIN:  Judge, could we get some foundation

20   about when she was concerned?  February of '08?  July of '06?

21          THE COURT:  Do you want to clarify, Mr. Shonkwiler?

22          MR. SHONKWILER:  All right.

23          (Brief pause.)

24   BY MR. SHONKWILER:

25   Q.  Yesterday you were testifying about the July 31st meeting

Vogue - cross

1733

1    with Mr. Shearer and you said at the time of that meeting,

2    Ms. Goldberg was very concerned about the rotation program

3    that Trump had in place.

4         Do you remember giving that testimony?

5    A.  Yes.

6    Q.  Okay.

7         Well, there wasn't a rotation program in place as of

8    that time, was there?

9    A.  No.

10   Q.  So, what did you mean by that?

11   A.  What I meant was Mr. Shearer -- Mrs. Goldberg was very

12   concerned about how the rotation program was going to be

13   structured or, you know, input, so that she would know she had

14   fair rotations when the hotel opened.

15   Q.  Okay.

16        And you testified, I think, today that she was also

17   very concerned -- very concerned -- when it was changed by the

18   fourth amendment, right?

19   A.  That is true, yes.

20   Q.  Okay.

21        But this is Defendants' Exhibit 591 (indicating).

22        Ms. Vogue, this is an e-mail from you to Kiyoko

23   Binosi -- okay -- just about the same time that you said you

24   were discovering the fourth amendment changes; and, at the

25   same time that Ms. Goldberg was very concerned about the

Vogue - cross

1734

```
 1    rotation system.
 2              Isn't that right?
 3    A.  That is correct.
 4    Q.  Okay.
 5              And your e-mail to Ms. Binosi finishes with, "Jackie
 6    is fine with the program so long as it is equally fair to all
 7    parties participating."
 8              Do you remember that?
 9    A.  Yes.
10    Q.  Okay.
11              And Ms. Goldberg's e-mail at the bottom, that
12    prompted your e-mail to Ms. Binosi, said, "Any rotation system
13    that is fair is okay," right?
14    A.  Yes.
15    Q.  All right.
16              Does that change your recollection that she was very
17    concerned at this time about the rotation system?
18              MR. S. KULWIN:  Judge, I'm going to object.  It's not
19    impeaching.  She is talking about equally fair.
20              THE COURT:  Sustained on form.
21              Rephrase.
22    BY MR. SHONKWILER:
23    Q.  Well, Ms. Goldberg wasn't that concerned at the time;
24    isn't that the truth?
25    A.  Ms. Goldberg didn't have the information to know exactly
```

Vogue - cross

1735

1    what the rotation program was going to be, compared to what it

2    was when she signed her purchase agreement.

3    Q.  She had the fourth amendment?

4    A.  I can't speak to her knowledge of the fourth amendment,

5    other than what I received in that e-mail that I read had

6    changed, and what Ms. Binosi told me had changed.

7    Q.  Well, you said she didn't have information, but earlier

8    today you said you and/or Ms. Goldberg were very concerned

9    about the rental system right at this time period, in

10   February -- February 14th, 2008?

11   A.  Correct.

12   Q.  That was your testimony this morning?

13   A.  Yes, correct.

14   Q.  Okay.

15          But the truth is neither you nor Ms. Goldberg, on

16   February 14th, 2008, were very concerned about it, right?

17          MR. S. KULWIN:  Objection, Judge.  Asked and answered

18   twice.

19          THE COURT:  Sustained.

20   BY MR. SHONKWILER:

21   Q.  Well, let me go back to your testimony that Ms.

22   Goldberg -- you don't know what information she had.

23          Do you recall that the fourth amendment came out in

24   October, 2007?

25   A.  Yes.

Vogue - cross

1736

1   Q.  Okay.

2           So, this is four months later, in February '08,

3   right?

4   A.  Yes.

5   Q.  And this is the time when you said you both became very

6   concerned about the rental program, right?

7   A.  Correct.

8   Q.  Okay.

9           And that's --

10  A.  We still did not have the details.

11  Q.  Okay.

12          And that's still your -- you did not have the

13  details, but the fourth amendment tells you everything there

14  is to know; is that right?

15          MR. S. KULWIN:  Judge, I'm going to object.

16          THE COURT:  Sustained.

17  BY MR. SHONKWILER:

18  Q.  Okay.  How about the rental management agreement?  Do you

19  know that that was issued around the same time as the fourth

20  amendment?

21  A.  I was not aware of these changes or the contents of the

22  fourth amendment until I received the e-mail from my other

23  client.

24          That is when I became aware of the changes.

25  Q.  Are you aware --

Vogue - cross

1737

1  A.  I did not read the property report.

2  Q.  Or the rental --

3  A.  I don't know when she was informed of what she was

4  informed of.

5  Q.  Okay.

6        And you're not aware that the rental program -- the

7  rental program agreement -- was issued in October of 2007?

8  A.  I was not aware that it was -- that it was -- changed --

9  had been changed then, no.

10  Q.  Okay.

11        And you are not aware that the fourth amendment to

12  the property report also discussed the rental program?

13  A.  I'm aware that it included it.  I'm saying I was not aware

14  of it at the time when it happened.

15        I was not aware of it until my meeting with Ms.

16  Binosi in the Trump Hotel.  That's when I got the details.

17        MR. SHONKWILER:  Just give me one moment, your Honor,

18  please.

19        THE COURT:  Okay.

20        (Brief pause.)

21  BY MR. SHONKWILER:

22  Q.  Now, when Ms. Goldberg was deciding whether to buy the

23  hotel condominium units, do you recall that you and Ms.

24  Goldberg did financial investigations -- research -- into

25  these units and what kinds of revenues you might get from

Vogue - cross

1738

1  owning a hotel condo?

2  A.  I did a lot of research.

3  Q.  Do you recall doing research about -- what other luxury

4  hotels in the area, such as the Peninsula and the Four

5  Seasons, about -- their room rates and occupancy rates?

6  A.  Yes, I did.

7  Q.  Do you also recall that you even called the Trump

8  International Hotel and Tower in New York, which is a hotel

9  condo there, and asked them some questions?

10  A.  No, I did not.

11  Q.  And you inquired at the time you were doing this research

12  about room rates and occupancy rates at other hotels, right?

13  A.  In Trump?  In the New York call, I did make a call to

14  Trump.  They did not answer.

15        I was referred to a broker in New York, who had full

16  history of the Trump hotel condo, from beginning to end.  And,

17  so, that's where I got my information about it.

18        It was not from Trump, but it was from a well-known

19  broker in New York, who sold and continued to have sales in

20  Trump New York.

21  Q.  Okay.

22        And you've learned from that call the occupancy rate

23  was pretty high and, depending on the season, it could

24  fluctuate a little, right?

25  A.  Yes.

Vogue - cross

1  Q.  And you learned that the people there were happy with the

2  income they were making from their hotel invest- --

3          MR. S. KULWIN:  I'm going to object at this point.

4  Is this cross-examination?  Is this rebuttal?

5          If it is, I'm objecting on hearsay grounds as to what

6  she learned from some broker -- unknown broker -- in New York.

7          MR. SHONKWILER:  The point is the kind of research

8  that was done and the kind of research that was not done.

9  That's the only point of the testimony.

10          MR. S. KULWIN:  But, then --

11          THE COURT:  What about the hearsay objection?

12          MR. SHONKWILER:  What she learned is, again,

13  important only insofar as it goes to what they were interested

14  in learning, not as to the truth of it.

15          THE COURT:  Okay.

16          So, you are only offering it to show what actions she

17  took --

18          MR. SHONKWILER:  Right.

19          THE COURT:  -- and not for the truth of what she was

20  told?

21          MR. SHONKWILER:  Right.

22          THE COURT:  Okay.

23          Overruled.

24          Ladies and gentlemen, the testimony you are hearing

25  about the actions that Ms. Vogue took, in speaking with

Vogue - cross

1740

```
1    someone at the New York Trump, that testimony is not being
2    offered for the truth of what she was told, but, rather, to
3    show what actions she took.
4              MR. SHONKWILER:  I can ask a new question, then.
5    BY MR. SHONKWILER:
6    Q.  The gentleman in New York told you things about occupancy
7    rates and the rooms, right?
8    A.  That is correct.
9    Q.  And about the seasons and when the occupancy rates were
10   higher --
11   A.  Yes.
12   Q.  -- certain times of year?
13          Okay.
14          Do you remember him telling you Chicago might even be
15   more successful because of the convention business in Chicago,
16   right?
17   A.  Yes.
18   Q.  And all that would drive more room occupancy, right?
19   A.  That's correct.
20   Q.  Which would drive more rental income, from being in the
21   rental program, right?
22   A.  Correct.
23   Q.  And did you pass that information along -- that you got
24   from New York -- to Ms. Goldberg?
25   A.  Yes, I did, enthusiastically.
```

Vogue - cross

1741

1    Q.  And do you recall, also, that you and Ms. Goldberg were

2    researching hotels in Chicago, to see what their occupancy

3    rates were?

4    A.  Yes.

5    Q.  And do you recall, also, you did some math and the two of

6    you concluded that if she rented her room about ten times a

7    month, she could cover the estimated expenses at that time,

8    right?

9    A.  I don't recall that, but --

10   Q.  You don't recall --

11   A.  -- like you said, she does the math.

12   Q.  Right.

13   A.  So, if she had done it, she would have probably told me.

14   And it's likely, but I don't recall it.

15   Q.  Okay.

16        You don't recall the result, but you recall the

17   process, right?

18   A.  A result that she's the numbers person and I'm --

19   Q.  Right.

20        And this is Defendants' Exhibit 588 (indicating).

21        This is an e-mail from you to Ms. Goldberg on August

22   5th.  So, this is three days after she bought her first unit

23   and three days before the second?

24   A.  Uh-huh.

25   Q.  All right.

Vogue - cross

1742

1    And you're e-mailing her at 2:00 in the morning.

2 That was your routine, right?

3 A.  It appears so.

4 Q.  And you're saying, "Hi, Jackie."

5    And, then, you go on to give her information about

6 occupancy rates at the Ritz, you have information about the

7 Four Seasons, January's the slowest month, weekends and

8 holidays.  Weddings also got a special mention.  Convention

9 guests.

10    Is your recollection you're telling Ms. Goldberg here

11 about some of the research into occupancy and trends that

12 might affect how many rentals she could get if she owned a

13 hotel unit?

14 A.  Yes, based on the information that I had at that time,

15 that was what I shared with her.

16 Q.  And how much rental income she could get as a result?

17 A.  I could not speak to the exact income.  I had no way of

18 knowing.

19 Q.  But that was --

20 A.  It would have been what the rates were.

21 Q.  But that's what you were analyzing -- you and Ms.

22 Goldberg -- right?

23 A.  We were analyzing what the occupancy was typically in the

24 different units.

25    Rates were not disclosed or discussed or compared to.

Vogue - cross

1743

1    They were just -- they were just -- a tool.

2         Like you can see in the e-mail, it says, "Most of it

3    is the occupancy, not the rates."

4    Q.  Okay.

5         And this is another e-mail that came from your files.

6    Do you recall that?

7    A.  Is this a different one?

8         It looks like it's the same one.

9         What do you want me to focus on?

10   Q.  You don't recall whether this is one of them that came

11   from your files?

12   A.  Oh, it came from my file.

13   Q.  It did?

14   A.  Yeah.

15   Q.  Okay.

16        And there were other e-mails from your files that

17   were right around this very same time period, right?

18        For example, here's -- I'm sorry, this is Defendants'

19   Exhibit 587 (indicating).

20        Here's another e-mail (indicating), the day before.

21   So, this is two days after the first purchase agreement.  And

22   here, again, you're talking to Mr. Shearer about monthly

23   expenses, right -- monthly common charges, purchase prices?

24        You're looking at a second unit potentially?  Is that

25   what you're doing here?

Vogue - cross

1744

1   A.   Based on the date, I would say that's correct.

2   Q.   Okay.

3         Is this another e-mail that came from your files?

4   A.   Could you clarify it comes from my files?

5         I have -- I mean, I wrote the e-mail, but I don't

6   know where you got it.

7   Q.   Okay.

8   A.   So, when you're saying coming from my files or their

9   files, I don't -- I'm not clear on your question.

10  Q.   Do you recall that you were asked to gather some e-mails

11  from your files while this case was going on?

12  A.   Yes.

13  Q.   Okay.

14        But you just don't remember whether this specific one

15  came from your files?

16  A.   That's correct.

17  Q.   Or, I guess, it conceivably could have come from Mr.

18  Shearer's files, for example?  You don't --

19  A.   I don't -- it's -- anything -- yeah, I don't recall.

20  Q.   All right.

21        But, in any event, you were e-mailing Ms. Goldberg at

22  this time period; and, in particular, you were analyzing what

23  kind of rental income Ms. Goldberg might expect to earn if she

24  owned hotel condos, right?

25  A.   (No response.)

Vogue - cross

1745

1   Q.  It's what we just discussed.

2   A.  We just looked -- if I recall that, that was the costs and

3   her expenses.  That wasn't the income.

4           Unless you overlooked it, it was fine print there.

5   Q.  All right.

6           But I'm not referring back now to the last five

7   minutes of testimony.

8   A.  Oh, okay.  I thought you were looking at them.

9   Q.  Do you remember the analysis you went through together,

10  looking at room rental and occupancy rates and calling New

11  York?  Do you remember that?

12  A.  Uh-huh.

13  Q.  Okay.

14          Now you don't, however, have an e-mail to Ms.

15  Goldberg during this time period where you say anything about

16  amenity income, correct?

17  A.  Other than that the convention business would be the

18  source of revenue, at that time I had no idea what the revenue

19  or the income would be.  So, I would not have said anything

20  about it.

21  Q.  Are you talking about the references to conventions in the

22  e-mails we just looked at?

23  A.  Uh-huh.

24  Q.  Okay.

25          But you understand, don't you, that in this context

Vogue - cross

1746

 1    you're talking about conventions that drive rental income and

 2    that drive up occupancy rates?

 3             We discussed that, right?

 4    A.  Uh-huh.

 5    Q.  Okay.

 6             We're not talking about conventions that drive

 7    amenity rentals, and none of your e-mails with Ms. Goldberg in

 8    this time period said a word about amenity income, right?

 9             MR. S. KULWIN:  Objection.  Asked and answered, your

10    Honor.

11             THE COURT:  Overruled.  I am not sure it has been --

12    BY THE WITNESS:

13    A.  Correct.

14             THE COURT:  -- answered.

15    BY THE WITNESS:

16    A.  This was about rental income.

17    BY MR. SHONKWILER:

18    Q.  I heard the "correct," but I didn't hear the rest.

19    A.  I said these communications were regarding rental income,

20    not amenities.

21    Q.  And you didn't have any e-mails with Ms. Goldberg during

22    this time period -- August 4th, August 5th, around the dates

23    of your purchase agreements for the HCUs, didn't have any --

24    about amenity income, right?

25    A.  No.

Vogue - cross

1747

```
 1              (Brief pause.)

 2              MR. SHONKWILER:  Can I just have a minute to confer?

 3              THE COURT:  You may.

 4              (Brief pause.)

 5              MR. SHONKWILER:  We may be done, your Honor, but it

 6   would be helpful for us -- for organization purposes -- if we

 7   could have our morning break?

 8              THE COURT:  That is fine.  We will take our morning

 9   break.

10              (Jury out.)

11              THE COURT:  We will pick up at about 11:00 o'clock.

12              MR. S. KULWIN:  I just --

13              THE COURT:  You may step down.  Be back a little bit

14   before 11:00.

15              MR. S. KULWIN:  Just for scheduling purposes, Judge,

16   I'm not going to have much with Ms. Vogue, and I'm not going

17   to have much with Mr. Howie.  I don't know what they are going

18   to do.

19              THE COURT:  Okay.

20              MR. S. KULWIN:  I mean, I --

21              THE COURT:  We will see.

22              MR. S. KULWIN:  Yeah, I just wanted to give you a

23   heads up.

24              THE COURT:  Okay.

25              We will see where we are.  And if we end up taking an
```

Vogue - cross

1748

1   early lunch and, then, starting with closings afterwards, I am

2   okay with that.  Let us see where we are.

3           MR. S. KULWIN:  I just wanted to let you know.

4           THE COURT:  Thank you.

5           MR. S. KULWIN:  Thank you, Judge.

6           (Brief recess.)

7           (Jury in.)

8           THE COURT:  You may be seated.

9           Mr. Shonkwiler, you may continue.

10          MR. SHONKWILER:  Thank you, your Honor.

11  BY MR. SHONKWILER:

12  Q.  Ms. Vogue, you are aware that the seller issued a fourth

13  amendment to the property report.  And you've testified you

14  didn't read it, but you are aware it was issued in late 2007?

15  A.  Yes, that's correct.

16  Q.  And you recall that Ms. Goldberg asked you to get an

17  explanation from the Trump people as to why the meeting rooms,

18  ballrooms and related hotel operations were removed from the

19  common elements?

20          MR. S. KULWIN:  Objection, Judge, as to foundation.

21  When?

22          THE COURT:  Sustained.

23          Lay a foundation.

24  BY MR. SHONKWILER:

25  Q.  Well, do you recall that at some point in time, after the

Vogue - cross

1749

1  property report -- the fourth amendment to the property report

2  -- came out, you were asked by Ms. Goldberg to get an

3  explanation from the Trump people about that report?

4         MR. S. KULWIN:  The same objection, Judge.

5         THE COURT:  Overruled.

6         You may answer, if you recall.

7         And, then, lay your foundation.

8  BY THE WITNESS:

9  A.  Yes.

10  BY MR. SHONKWILER:

11  Q.  In February, 2008, you met with Kiyoko Binosi, one of the

12  Trump sales agents, to discuss the changes in the fourth

13  amendment, right?

14  A.  Yes.

15  Q.  And one of the changes you discussed with her was the

16  decision of the developer to retain ownership of the

17  conference rooms, banquet and ballrooms, right?

18  A.  I don't recall our conversation being that, specifically,

19  referred to them as the amenities of the hotel association.

20  Q.  And you wanted to know from Ms. Binosi why the decision

21  was made about the amenities?

22  A.  Yes.

23  Q.  Okay.

24         And Ms. Binosi told you some reasons, didn't she?

25  A.  She told me one.

Vogue - cross

1750

1    Q.  Well -- and you testified earlier today that she told -- I

2    think the word you used was "reconsidered."

3            Is that the word you used -- that Trump had

4    reconsidered his decision?

5    A.  I -- I -- can't parse the words.  I remember that she said

6    that he decided -- reconsidered -- he, let's say "decided," to

7    retain ownership of the hotel amenities because he had concern

8    about protecting his brand name and turning it over to the

9    hotel association board.

10           That was the reason she gave me.

11   Q.  And "decided" is a better word than "reconsidered," isn't

12   it?

13   A.  I think it's more appropriate, yes.

14   Q.  Okay.

15           Because you don't know what Mr. Trump was thinking

16   before February, 2008, about that subject, do you?

17   A.  (No response.)

18   Q.  You didn't talk to him, right?

19   A.  Well, prior to 2008, when Mrs. Goldberg decided to

20   purchase, it was the ownership -- the hotel condo unit's

21   ownership -- had a piece of the amenity revenue.  So, it was

22   very shocking to me to learn from Kiyoko that he decided to

23   risk -- retain ownership of the hotel amenities; and,

24   therefore, that they wouldn't have their revenue sharing,

25   which is why Mrs. Goldberg bought.

Vogue - cross

1751

1  Q.  You were shocked by that change --

2  A.  Yes.

3  Q.  -- when you learned about it in February of 2008, from

4  Ms. Binosi?

5  A.  The first I knew of it was the e-mail from my client.

6       So, yes, that was the time I learned about it.

7  Q.  All right.

8       This is Defendants' Exhibit 592 (indicating).  I

9  think Mr. Kulwin showed you this?

10  A.  Uh-huh.

11  Q.  And, here, you're reporting back on what Ms. Binosi told

12  you, right?

13  A.  Yes.

14  Q.  All right.

15       And you're explaining regarding the amenities of the

16  hotel such as the restaurants, conference rooms, banquet

17  rooms, ballrooms and spa?

18  A.  Uh-huh.

19  Q.  Okay.

20       And you're explaining there that Trump made the

21  decision to retain ownership, right?

22  A.  Yes.

23  Q.  This was shocking to you; is that what you said?

24  A.  I believe the word "shocking" was used when I gave Mrs.

25  Goldberg the e-mail.

Vogue - cross

1752

1    I don't recall it having anything do with Ms. Binosi.

2    Q.  Well, this e-mail is to Ms. Goldberg and your other

3    clients --

4    A.  Okay.

5    Q.  -- right?

6    But you're not expressing shock in this sentence.

7    One of the --

8    MR. SHONKWILER:  Strike that.

9    BY MR. SHONKWILER:

10    Q.  "One of the valid points -- " these are your words,

11    right -- "that Kiyoko mentioned was that Trump wanted to have

12    complete control of the decisions and the responsibility for

13    the maintenance and management of those areas of the hotel,

14    and not leave the decisions or authority in the hands of the

15    hotel board.  Knowing how important this is to him, I can

16    understand his wanting to retain the ownership rights to

17    ensure his standard and will would prevail."

18    A.  Uh-huh.

19    Q.  Do you remember that?

20    A.  Well, you didn't finish the paragraph, sir.

21    Q.  Okay.

22    Is there -- if I keep reading, will I find --

23    A.  Yes, you will.

24    Q.  -- the expression of what you described as "shock"?

25    A.  Uh-huh.

Vogue - cross

1753

1   Q.   Okay.

2        "Kiyoko also made a reference that there was some

3   concern about the financial responsibility for the upkeep,

4   marketing and servicing of those amenities.  I'm sure that his

5   interest in keeping the revenue generated from those amenities

6   was also a consideration."

7   A.   That was my point.

8   Q.   Okay.

9   A.   The whole -- that summed it up.  It, to me, was my -- I

10  was being sarcastic, at whatever time of day it was, that I

11  sent that thing.

12       So, maybe the word "valid," being that it was the

13  time of day, you can't hang on every word I use sometimes,

14  especially in the middle -- but the whole point was I was

15  shocked that he had so totally changed the purchase agreement

16  and all the reasons that Mrs. Goldberg purchased her unit.

17       And that's why I said at the very end, "I'm sure his

18  interest in keeping the revenue generated from those amenities

19  was also a consideration."

20       This was not meant to be literal.  It was meant to be

21  me expressing -- when I say "valid," I mean, knowing Mr.

22  Trump, he does take extreme pride in how his hotels are

23  maintained.  He takes enormous pride in his branding.

24       All of the things that she said were, to me, very in

25  keeping with Mr. Trump's MO and operations of his hotel

Vogue - cross

1754

1  portfolios.

2          So, when I said "valid," the word "valid" was to

3  say -- and this is coming from Ms. Binosi, who is a sales

4  associate.  So, I was not going to respond to her the way I

5  responded had I been having that same conversation with Mr.

6  Trump.

7          So, I don't want you to parse my words out of

8  context.

9          MR. SHONKWILER:  Your Honor, at this point I've been

10  trying to follow, but it's gone way beyond the answer to the

11  question.  I move to strike --

12  BY THE WITNESS:

13  A.  The question -- all right.  Let me answer --

14          THE COURT:  Wait, wait, please.

15          I am going to strike the last portion as non-

16  responsive.

17          Ask your next question, please.

18  BY MR. SHONKWILER:

19  Q.  So, you were being sarcastic or cynical or what was the

20  word you used for "valid"?  You weren't being sincere when you

21  said that?  You didn't mean it was valid?

22  A.  I mean, you're taking it out of context.

23  Q.  Well, the context is right here.  Tell me which part I

24  should read, that shows that that's sarcastic to you?

25  A.  It was what I believed Ms. Kiyoko had been told by the

Vogue - cross

1755

 1    Trump organization or by her -- her -- her manager.

 2            So, it was valid, what she was saying to me, as what

 3    she was probably told to tell me or others.

 4            So, from coming out of Kiyoko, I under- -- I was

 5    trying to say I understood what she was saying.  It wasn't

 6    that I agreed with anything that he did.  It wasn't agreed

 7    with anything.  All I meant was that it was what Ms. Kiyoko --

 8    Ms. Binosi -- had been instructed to say, if asked the

 9    question.

10            So, the "valid" was only limited to my getting the

11    information from what she was told.

12    Q.  Okay.

13            And if we find an expression of shock in this e-mail,

14    you are saying it's from that last sentence about the --

15    A.  No, I'm saying that that was where the sarcasm comment

16    came in, because when he's considering taking back all these

17    amenities and rotations, I said, "I'm sure his interest in

18    keeping the revenue generated from those amenities was also a

19    consideration," meaning he didn't make all these changes

20    without factoring in the revenue that these -- that my client

21    was -- is the reason she purchased.

22    Q.  Okay.

23            And, then, you close this e-mail saying, "I hope this

24    information has helped to clarify the reason behind the fourth

25    amendment revisions," okay, "and if you have any further

Vogue - cross

1756

1    questions," you say they should call you.

2         You also say, "I think you all are going to really

3    enjoy your condos at Trump and the beautiful amenities

4    available on site."

5         And that's a sincere statement from you, Ms. Vogue,

6    isn't it?

7    A.  Yes.

8         Again, it is -- what I wanted -- what I was trying to

9    accomplish in that paragraph was that based on the information

10   that I had received that day, I tried to give them an honest

11   update of what I understood the changes to their purchase

12   agreements would mean.

13        And that -- did I believe it was a beautiful hotel?

14   Yes.

15        Did I believe it could still possibly be -- my one

16   client who bought it for ownership, they never questioned it.

17   They didn't care -- the ones that sent the article.

18        Ms. Goldberg, on the other hand, who purchased for

19   investment, it was a deal breaker.  She did not sign the

20   fourth amendment.  She did not agree to the terms.

21        So, I left it in their hands to make their decision.

22        And I said, "If you have any other questions for

23   clarification, let me know."

24   Q.  All right.

25        Nowhere in this e-mail did you tell Ms. Goldberg or

Vogue - cross

1757

1  your other clients that you doubted the explanation, right?

2  A.  I didn't doubt that what Ms. Binosi told me is what she

3  was either instructed to tell me to she gave me from her --

4          MR. SHONKWILER:  At this point, your Honor, I am

5  sorry.  I did really want to try to get the answers to the

6  questions I'm asking and I think this is non-responsive and I

7  move to strike.

8          MR. S. KULWIN:  Judge, I object.  It is responsive.

9          THE COURT:  That answer was non-responsive.

10          Ask your question, again.

11          Or would you like the question read back?

12          THE WITNESS:  Read it back.

13          THE COURT:  Okay.

14          Joe, would you read it back, please?

15          (Record read.)

16  BY THE WITNESS:

17  A.  That is correct.

18  BY MR. SHONKWILER:

19  Q.  Okay.

20          And, likewise, in this e-mail, you did not tell Ms.

21  Goldberg or your other clients that you thought they were

22  getting a lousy deal?

23  A.  (No response.)

24  Q.  I'm not asking what you thought anymore.  I'm just asking

25  what you said.

Vogue - cross

1758

1        It's not in this e-mail, right?

2    A.  Say it, again.

3    Q.  Is that correct?

4    A.  Re- -- I'm sorry?

5    Q.  Nowhere in this e-mail did you recommend to Ms. Goldberg

6    not to close, right?

7    A.  It would be her decision, that's correct.

8    Q.  Or to file a lawsuit, right?

9    A.  That's correct.

10   Q.  In fact, the decision to file a lawsuit came much, much

11   later, right?

12         MR. S. KULWIN:  Objection, Judge.  Lack of

13   foundation.

14   BY THE WITNESS:

15   A.  I don't know.

16         MR. S. KULWIN:  Objection.

17         THE COURT:  She said she did not know.

18   BY MR. SHONKWILER:

19   Q.  At the time you sent this e-mail, you believed that Ms.

20   Goldberg would close on her HCUs, right?

21   A.  No.  I knew that she was in a state of reconsideration.

22   And my expectation was, being that when I had received all the

23   calls from the Trump sales office to sign the fourth

24   amendment, she refused to sign it.  My inclination was to

25   believe she would not close.

Vogue - cross

1759

1  Q.  Then why did you close this e-mail by saying, "I hope you

2  will enjoy" -- "I think you all are going to really enjoy your

3  condos"?

4  A.  If it worked for them and they were willing to go forward,

5  then I would hope they would enjoy it.

6         If it didn't work for them and they didn't, then,

7  they didn't.

8  Q.  Now, your testimony --

9  A.  The one client -- the one client -- did close and is

10 enjoying her condo.

11 Q.  Okay.

12        And, so, earlier when you said, "My purchasers were

13 concerned that everything they ever cared about was taken

14 away," that's not true.  All your purchasers weren't feeling

15 that way, were they?

16        MR. S. KULWIN:  Judge, I object.  I object, Judge.

17        MR. SHONKWILER:  The witness testified --

18        MR. S. KULWIN:  I object and I would ask that that be

19 stricken.

20        THE COURT:  Yes, I will strike it.

21        MR. SHONKWILER:  Your Honor, the --

22        THE COURT:  I am going to strike it as argumentative.

23        And I also think you have to be careful here.

24        MR. SHONKWILER:  Well, I'd like a sidebar because

25 there was testimony earlier this morning.

Vogue - cross

1760

```
 1              THE COURT:  Ask your next question and we will see if
 2    it is argumentative or not.
 3    BY MR. SHONKWILER:
 4    Q.  Ms. Vogue, you testified that your purchasers -- meaning,
 5    the three people to whom this e-mail was addressed to --
 6              MR. S. KULWIN:  Judge, I'm going to object.
 7              THE COURT:  Let him finish his question, please.
 8    BY MR. SHONKWILER:
 9    Q.  -- it says, "Everything they cared about had been taken
10    away from them by the fourth amendment."
11              Isn't that what you testified to?
12    A.  I testified this morning that everything Ms. Goldberg
13    cared about was taken away.
14    Q.  Okay.
15              So, if you said "my purchasers" --
16              MR. S. KULWIN:  Judge, I'm going to object.
17              THE COURT:  Let him ask the question first, please.
18    I cannot rule on it unless I hear the whole question.
19    BY MR. SHONKWILER:
20    Q.  If you said earlier, "My purchasers felt that way," you
21    misspoke?
22              MR. S. KULWIN:  I'm going to object, Judge.
23              THE COURT:  Sustained.  That is argumentative.
24    BY MR. SHONKWILER:
25    Q.  It's not true at that all of your purchasers felt that
```

Vogue - cross

1761

1  way, right?

2  A.  That's correct.

3       MR. S. KULWIN:  Objection, Judge.

4       THE COURT:  The answer can stand.

5  BY MR. SHONKWILER:

6  Q.  We discussed earlier some marketing brochures, such as the

7  ones that Mr. Shearer gave you at the July 31st meeting.

8       Do you remember that?

9  A.  I remember receiving brochures.

10 Q.  Okay.

11      And do you recall that none of the brochures for the

12 Trump Tower hotel say anything about what will be in the

13 common elements of the hotel condominium?

14      Do you recall that?

15 A.  What I recall was receiving the brochures and not spending

16 time reading the details of the brochures.  I was relying on

17 Mr. Shearer's representations.

18 Q.  Do you recall, that was the question?

19      The question is:  Do you recall it?  If you don't,

20 you can say so.  But do you recall that none of the marketing

21 materials had any mention about what was in or out of the

22 common elements, right?

23 A.  I don't recall what the specifics were.

24 Q.  And none of the marketing materials said anything about

25 there being revenues from amenities that would flow to the

Vogue - cross

1762

1    unit owners, right?

2    A.  It wasn't documented, but it was still premature.  Like I

3    said, that was 2003.

4    Q.  Okay.

5            But you said this was very important to your client;

6    that she was very excited about this, right?

7    A.  But the building hadn't been built yet, so how could they

8    give us an estimate of what the revenues would be?

9    Q.  Well, they didn't say that there would even be revenues in

10   the marking materials, right?

11   A.  It was represented by the -- by Mr. Shearer and Ms.

12   Proctor and Ms. Binosi.

13   Q.  Okay.

14           Right now, in your recollection -- your testimony

15   under oath today -- is that you recall all of those people

16   saying that?

17   A.  They all discussed the income revenue for the hotel

18   amenities being owned by the hotel condo owners.

19   Q.  And you're certain that was not testimony about rental

20   income?

21           MR. S. KULWIN:  Judge --

22   BY MR. SHONKWILER:

23   Q.  We discussed the difference earlier today?

24           MR. S. KULWIN:  I object.  Argumentative.

25           THE COURT:  Overruled.

Vogue - cross

1    You may answer that, if you can.

2    BY THE WITNESS:

3    A.  My understanding was that the ownership in the hotel

4    amenities was for the hotel condo purchasers.

5         I also understood that the rotations would be for the

6    hotel condo purchasers.

7         The revenue for the units was separate from the

8    revenue from the amenities.

9    Q.  And you understand that now, but the question was:  Are

10   you certain it was explained to you that way by those people

11   back in 2006?

12        MR. S. KULWIN:  I'm going to object.  Asked and

13   answered.

14        THE COURT:  Sustained.

15        MR. SHONKWILER:  Well, your Honor --

16        THE COURT:  She has answered.

17   BY MR. SHONKWILER:

18   Q.  And the other question that I don't think we ever got

19   answered is:  Do you recall ever seeing in any marketing

20   materials any mention of what would be in the common elements

21   or whether there would be revenue?

22   A.  I did not receive -- I did not read the brochures or the

23   marking materials.

24   Q.  You never read the brochures and marketing materials?

25   A.  No.

Vogue - cross

1764

1   Q.  Okay.

2        Well, you've testified this morning that you felt a

3   professional obligation to do due diligence when you saw a

4   Tribune article in February of 2008, right?

5   A.  That's correct.

6   Q.  To do due diligence on behalf of your client, right?

7   A.  Correct.

8   Q.  Now, you've also testified, however, that you never read

9   the property report?

10  A.  Correct.

11  Q.  Is that still your recollection?

12  A.  That's still true, yes.

13  Q.  Okay.

14       And you didn't read it when Ms. Goldberg purchased

15  and you didn't read it when the fourth amendment came out,

16  either, right?

17  A.  That's correct.

18  Q.  And none of the amendments in between, either, right?

19  A.  That's correct.

20  Q.  Okay.

21       And you said the common elements were the most --

22  some of the most -- important things to your client, Ms.

23  Goldberg.  Do you remember that?

24  A.  The hotel amenity common elements, yes.

25  Q.  And are you aware, aren't you, that the document that

Vogue - cross

1765

1   tells you whether something is in the common elements or not

2   is the property report?

3           MR. S. KULWIN:  Objection.  Asked and answered

4   several times.

5   BY THE WITNESS:

6   A.  I'm a broker.  I'm not their --

7           THE COURT:  Wait.  There is an objection.

8           THE WITNESS:  I'm sorry.

9           MR. S. KULWIN:  Objection.  It's been asked and

10  answered several times, Judge.

11          THE COURT:  Sustained.

12          Let us move on.

13  BY MR. SHONKWILER:

14  Q.  You knew that Trump had the right, under the contract, to

15  make changes to the common elements, Ms. Vogue?

16          MR. S. KULWIN:  That was also asked and answered,

17  Judge.  The same objection.

18          THE COURT:  Overruled.

19          You may answer that, if you can.

20  BY THE WITNESS:

21  A.  I believe that Trump had the right to make necessary field

22  changes or zoning issues that are standard and customary in

23  development contracts.

24          I did not believe or understand or even know, for

25  that matter, that they had the right to change the terms of

Vogue - cross

1766

1    the amenities or the things that they were purchasing.

2    BY MR. SHONKWILER:

3    Q.  All right.

4         But you knew that one of the terms Ms. DeAngelis was

5    trying to negotiate a change to was that very term, right?

6         MR. S. KULWIN:  Objection.  Asked and answered this

7    morning.

8         THE COURT:  Sustained.

9         MR. SHONKWILER:  Your Honor, respectfully, the

10   witness just gave testimony --

11        THE COURT:  Sustained on the last question.  We have

12   been through the letter.  We are not going through it, again.

13        MR. SHONKWILER:  All right.

14   BY MR. SHONKWILER:

15   Q.  Is it your testimony that Ms. Goldberg was not concerned

16   at all about that right to change because she thought it would

17   only be field changes?

18        MR. S. KULWIN:  I'm going to object, Judge.  This is

19   the same ground we've gone over.

20        THE COURT:  Sustained.

21   BY MR. SHONKWILER:

22   Q.  Is it your recollection, Ms. Vogue, that your client was

23   not concerned about Trump's right to change --

24        MR. S. KULWIN:  The same objection, Judge.

25        MR. SHONKWILER:  I have not asked this question.

Vogue - cross

1          THE COURT:  Overruled.  That is a separate question.

2     BY THE WITNESS:

3     A.  Repeat the question, please.

4     BY MR. SHONKWILER:

5     Q.  Is it your testimony that Ms. Goldberg was not concerned

6     about Trump's right to change?

7     A.  At what period of time?

8     Q.  When she signed these purchase agreements and found out

9     that that term could not be negotiated away?

10         MR. S. KULWIN:  Judge, it's the same question.

11    Objection.  Asked and answered.

12         THE COURT:  Overruled.

13         You may answer, if you can.

14    BY THE WITNESS:

15    A.  Mrs. Goldberg, based on the representations that were

16    being made by the Trump sales staff, was very specific.  And,

17    so, when she signed the purchase agreement, she was agreeing

18    to the representations that had been made in the sales office

19    by the sales staff, without having read the fourth amendment

20    or heard the ability of the developer to make any change he

21    wanted.

22    BY MR. SHONKWILER:

23    Q.  So, you both went into this contract not knowing what was

24    in the contract or the property report --

25         MR. S. KULWIN:  Judge --

```
 1   BY MR. SHONKWILER:

 2   Q.  -- relying --

 3        MR. SHONKWILER:  I don't have the question out, your

 4   Honor.

 5        THE COURT:  Let him finish.

 6   BY MR. SHONKWILER:

 7   Q.  -- relying solely on the representations that you recall

 8   salespeople made at those meetings?

 9        MR. S. KULWIN:  Objection, Judge.  She said that she

10   wasn't aware whether Ms. Goldberg reviewed the property

11   reports.  We have testimony --

12        THE COURT:  Sustained.

13   BY MR. SHONKWILER:

14   Q.  You can testify as to yourself, though, Ms. Vogue.

15        Did you go into this -- we're talking now --

16        MR. SHONKWILER:  Strike that.

17   BY MR. SHONKWILER:

18   Q.  This is a client who you say you have professional

19   obligations on behalf of, right?

20   A.  Right.

21        MR. S. KULWIN:  Objection.  Asked and answered.

22        THE COURT:  Overruled.

23   BY MR. SHONKWILER:

24   Q.  You're saying that your client, who you have a

25   professional obligation for, entered into contracts for which
```

Vogue - cross

1769

```
 1   you had never read the contract or the property report, and

 2   you were relying solely on representations that you're now

 3   recalling for us, that agents made at meetings; is that right?

 4   A.  It's out of context, but partially correct.

 5   Q.  Well, you're a broker and you know, don't you, that what's

 6   in the contract is what governs a transaction between the

 7   parties, right?

 8   A.  There was no representation, when the contract was signed,

 9   that the amenities that she was purchasing was going to be

10   revoked before she closed.

11   Q.  That was --

12   A.  That is not in the contract.

13   Q.  That representation -- the contract does state that the

14   developer has a right to change the property reports.

15           Are you aware that --

16           MR. S. KULWIN:  Judge --

17   BY MR. SHONKWILER:

18   Q.  -- that it states that?

19           MR. S. KULWIN:  -- he is misstating the contract.  He

20   is not reading it in its entirety.  She is not a lawyer.  I

21   object as argumentative and misleading.

22           MR. SHONKWILER:  The witness just said --

23           THE COURT:  Overruled.  Overruled.

24           You may answer, if you can.

25   BY THE WITNESS:
```

Vogue - cross

1    A.  Say it, again, sir.

2    BY MR. SHONKWILER:

3    Q.  The question is:  The contract that she signed said the

4    developer could make changes to the property reports.  Are you

5    not aware that it said that?

6    A.  I am aware that developers have the right to make changes

7    in contracts, but the scope of that is unprecedented.

8            So, I didn't concern myself that there would be

9    changes years later that would be included in that.

10           Usually, it's a field change, it's zoning, it's

11   adding more hotel rooms, then, because they didn't get the

12   commercial space.  So, I did not look for that.  I did not

13   anticipate that.

14           And when we fill in the blanks, that's why it goes

15   into attorney review.  I am not -- I'm not -- qualified to

16   make those decisions or even make an opinion on them.

17   Q.  Okay.

18           So, to be clear, though, you're talking about

19   contracts generally in the industry.  I'm asking about this

20   contract your client signed.

21   A.  It would be one and the same.

22   Q.  Are you aware --

23   A.  No.

24   Q.  You're not aware because you didn't read it?

25   A.  Correct.

Vogue - cross

1771

```
 1   Q.  Okay.

 2           You said, "Nobody told me -- nobody told me or

 3   Mrs. Goldberg -- that these things could change."

 4           MR. S. KULWIN:  Judge --

 5   BY MR. SHONKWILER:

 6   Q.  But if that was in the contract, then you were told,

 7   correct?

 8           MR. S. KULWIN:  "If."

 9           Objection.  Calls for speculation.

10           THE COURT:  Sustained.

11           And now you are getting argumentative.

12           MR. SHONKWILER:  Okay.

13   BY MR. SHONKWILER:

14   Q.  One more question about the contract and the

15   representations that you recall being made to you.

16           Do you recall reading or hearing a single word about

17   the right to change being limited to field changes?

18   A.  There was no discussion about the right to change verbally

19   in representations ever about anything.

20   Q.  So, the answer to that is "No"?

21   A.  No.

22           MR. S. KULWIN:  Judge, objection.  The answer is what

23   it is.

24           THE COURT:  Overruled.

25   BY MR. SHONKWILER:
```

Vogue - cross

1772

1   Q.  Was your answer "No," ma'am?

2   A.  My answer is there was no representations, prior to or

3   during the contract or the purchase signing, that there would

4   be any changes made of any kind.

5   BY MR. SHONKWILER:

6   Q.  Okay.

7           The question was, though, was it represented to you

8   in writing or orally that any right that there was to amend

9   would be limited to field changes?

10  A.  I'm not clear on the question because field changes or --

11  are amenity changes.  There were no -- there were no --

12  representations on changes, period.

13  Q.  Okay.

14          But you testified that your understanding was that it

15  was limited to field changes?

16  A.  That was based on my experience as a broker who has dealt

17  with developers before.  That was not based on representations

18  made by the Trump people.

19  Q.  Okay.

20          Because as far as you know, there weren't any,

21  right -- by the Trump people?

22          MR. S. KULWIN:  Objection.  Asked and answered.

23          THE COURT:  Sustained.

24          That one has been asked and answered.

25  BY MR. SHONKWILER:

1   Q.  Was there any representation in writing or orally that

2   there would be no change?

3   A.  There was no representations about any change.

4   Q.  One way or another?

5   A.  Correct.

6   Q.  Do you recall becoming concerned in 2009 that the hotel

7   condominium units Ms. Goldberg was under contract to purchase

8   lost value?

9   A.  No, because I had not paid -- I had not been in the sales

10  or done any sales since that transaction.  So, I had not been

11  following the market or what the rates were -- what they were

12  going for.

13  Q.  I am sorry, I didn't hear.

14          MR. SHONKWILER:  Could you read back the answer?

15  BY THE WITNESS:

16  A.  I said I had not -- you asked the question --

17          MR. SHONKWILER:  Ms. Vogue, I was hoping the court

18  reporter would read back the last answer.

19          THE WITNESS:  Okay.

20          THE COURT:  You can read it back.

21          THE WITNESS:  Could you read the question for me?

22          (Record read.)

23  BY MR. SHONKWILER:

24  Q.  But you recall in 2008 and 2009 real estate values

25  declined, right?

1    MR. S. KULWIN:  Judge, objection.  Relevancy, if he

2  can't connect it up.  And he can't.  There is no foundation.

3    THE COURT:  Overruled.

4    I think that is what he is trying to do.

5    Overruled.

6  BY MR. SHONKWILER:

7  Q.  Do you recall that?

8  A.  I recall that, yes, after 2008, the real estate market did

9  take a decline.

10    However, that -- from my personal experience -- was

11  based on residential sales.  It had nothing to do with hotel

12  condominiums, their rates, their occupancy or their purchases.

13  Q.  Okay.

14    But do you recall that you learned in 2009 that hotel

15  condominium units, the ones -- the very units -- that your

16  client was under contract to buy, had lost hundreds of

17  thousands of dollars in retail value?

18  A.  No.

19  Q.  You don't recall that?

20  A.  No.

21    How would I know?

22  Q.  Well, do you recall giving this testimony in --

23    MR. S. KULWIN:  Page and line, please?

24    MR. SHONKWILER:  Page 67 and Page 68.

25    We're at 67, first.

Vogue - cross

1775

1      You know, I want to lay one more bit of foundation

2  before I read this.

3  BY MR. SHONKWILER:

4  Q.  Do you recall a Crain's article that you read sometime in

5  late 2008 or early 2009, about the building?

6  A.  I vaguely -- I read a lot of articles, but I do vaguely --

7  remember reading something, but I don't recall the details.

8  Q.  Okay.

9      I'm raising that just for timing, but your testimony

10  --

11  A.  What was the timing, again?

12  Q.  The question now is about whether you recall being

13  concerned in 2008 -- late 2008 or early 2009 -- that the hotel

14  units your client was under contract to purchase had declined

15  several hundred thousand dollars in value?

16  A.  I didn't know and it didn't concern me.

17  Q.  Okay.

18      Do you recall giving this testimony at your

19  deposition?

20      MR. S. KULWIN:  Judge, I'm going to object before he

21  reads it because the lines that he is reading is out of

22  context on Page 64.  He is taking it completely out of

23  context.

24      I'd ask for him to start reading earlier on, on Page

25  64, Line 2:  "What do you remember about the Crain's article?"

Vogue - cross

1776

```
 1          MR. SHONKWILER:  Well, this isn't about the Crain's
 2   article.  The Crain's article is only there because it
 3   prompted Ms. Vogue to remember the timing.
 4          THE COURT:  Let me see this.  Let me see the
 5   transcript.
 6          (Document tendered to the Court.)
 7          THE COURT:  Where do you plan on reading, Page 68?
 8          MR. SHONKWILER:  Starting at 67, your Honor, and then
 9   68.
10          (Brief pause.)
11          THE COURT:  Overruled.
12          You may ask.
13   BY MR. SHONKWILER:
14   Q.  Ms. Vogue, do you remember being asked these questions
15   under oath and giving these answers at your deposition?
16          THE COURT:  I think you need to lay a little more
17   foundation about her deposition before you do that, that --
18   BY MR. SHONKWILER:
19   Q.  Do you recall --
20          THE COURT:  -- she took it, it was under oath and the
21   date.
22   BY MR. SHONKWILER:
23   Q.  Do you recall giving a deposition in this case?
24   A.  Yes, I do.
25   Q.  Do you recall being sworn under oath and that you gave
```

1   sworn testimony throughout that deposition?

2   A.  Yes.

3   Q.  And it was on April 2nd, 2003?

4   A.  The deposition was in 2003?

5   Q.  April 2nd, 2003.

6           MR. S. KULWIN:  '3?

7           MR. SHONKWILER:  I'm sorry, 2013.  I misspoke.

8   BY THE WITNESS:

9   A.  I'm sorry, please repeat or --

10          THE COURT:  Why do you not start over with the last

11  question?

12          MR. SHONKWILER:  All right.

13  BY MR. SHONKWILER:

14  Q.  Do you remember the date of your deposition --

15          MR. SHONKWILER:  Why don't we strike that.

16  BY MR. SHONKWILER:

17  Q.  You do remember giving a deposition under oath in this

18  case; do you not?

19  A.  I do remember.

20  Q.  Do you recall giving it sometime within the last year?

21          MR. S. KULWIN:  Judge, it's -- I will tell him it's

22  October 25th, 2011.

23          MR. SHONKWILER:  2011?

24          MR. S. KULWIN:  2011, that's what it said.

25  BY MR. SHONKWILER:

Vogue - cross

1778

1  Q.  Do you recall giving a deposition on October 25th, 2011?

2  A.  I recall giving a deposition, whatever date it happened.

3  I don't remember the date.

4  Q.  And do you remember under oath at that deposition giving

5  these answers to these questions:

6       "What I'm trying to get at now -- "  this is the

7  question:  "What I'm trying to get at now is did the Crain's

8  article prompt you to be concerned about the resale --

9  potential resale -- value of the property?"

10      Answer:  "Yes.

11      "Okay.  And did you share that concern with Ms.

12  Goldberg at the time -- at that time?

13      "Yes."

14      Question:  "Do you know whether she shared your

15  concern?"

16      Answer:  "Yes.

17      "And what do you remember her telling you about

18  that?"

19      Answer:  "She wanted more answers.  She asked me to

20  do what I could do to get more answers to her questions, so

21  she could make an informed decision."

22      Now, I'm jumping ahead to the next page, Page 68,

23  Line 15:

24      "Were you concerned -- do you remember whether you

25  were concerned -- that the property may have lost hundreds of

Vogue - cross

1779

1   thousands of dollars of resale value?"

2           Answer:  "Yes."

3           THE WITNESS:  Can I say something?

4           THE COURT:  Let him finish his question.

5   BY MR. SHONKWILER:

6   Q.  Was that your testimony?

7   A.  When you asked me that question, sir, I was, in my mind,

8   thinking of residential sales, not hotel condo unit sales.

9   So, I did answer that question.  Because up until that point,

10  somewhere in 2008 it started to be a little bit of a decline.

11          But I don't recall you asking me about hotel condo

12  sales.  I thought your question was about residential sales.

13          And I had been doing fine, I believe, is what I said

14  in my deposition.

15  Q.  Well, at the time Ms. Goldberg closed on her residential

16  property at Trump Tower, in fact, the price had gone up from

17  the sale -- the value of the unit had gone up from the sales

18  price, hadn't it?

19  A.  Yes, it had.

20  Q.  And you recall that you and Ms. Goldberg discussed that,

21  right?

22  A.  That it had gone up?

23  Q.  Yes.

24  A.  Yes.

25  Q.  Okay.

Vogue - cross

1    A.  But that that was earlier, also.

2    Q.  Well, she closed in November of 2008, right?

3    A.  Yes.  But our conversation was held when that question was

4    asked and we discussed it in the Trump sales office.  She was

5    waiting for Tere Proctor to get some information.

6          And she asked Kiyoko, "Do you know what the current

7    sales price of my unit would be today?"  That's the context of

8    when that question was discussed, not -- not -- when you're

9    saying.

10         (Brief pause.)

11   BY MR. SHONKWILER:

12   Q.  I just want to be clear because I think we're talking

13   about two different meetings at once.

14         You do recall that there was a discussion with

15   Ms. Binosi and Ms. Goldberg and others around the time that

16   Ms. Goldberg signed her HCU purchase agreements, that the

17   value of her residential unit at that time had gone up

18   approximately 1 to 1.5 million?

19         You remember that, right?

20   A.  I remember there being a discussion that her residential

21   unit had gone up in price, yes.

22   Q.  Well --

23   A.  I don't remember the number.

24   Q.  You also remember that at the time Ms. Goldberg closed on

25   her residential unit -- which was two years after that, in

Vogue - redirect

1781

1 November, 2008 -- both you were also aware that the value of

2 that unit at the time was higher than the purchase price?

3 A.  To be honest with you, I had not sold anything since the

4 hotel condo unit.  So, I had not been tracking Trump prices

5 because I didn't have any clients and there was no reason for

6 me to be.

7 So, I did not know what the status of her residential

8 value was at that time in 2008, when she closed.

9 (Brief pause.)

10 THE COURT:  Are you finished?

11 MR. SHONKWILER:  We are, your Honor.

12 THE COURT:  Redirect.

13 MR. S. KULWIN:  Thank you, your Honor.

14 REDIRECT EXAMINATION

15 BY MR. S. KULWIN:

16 Q.  Okay.  Ms. Proctor -- let's start from the top.

17 You were asked some questions about an attorney

18 review period.  Do you remember that?

19 A.  Yes, I do.

20 Q.  When does the attorney review period occur?

21 A.  It's typically after the purchase agreements have been

22 signed, within ten business days, I believe.

23 Q.  So, that would have been within ten days after Ms.

24 Goldberg signed in 2006?

25 A.  Yes.

Vogue - redirect

1    Q.  And when was it that you found out that the Trump

2    organization was taking out all the common elements and

3    changing the rotation point program?

4    A.  In approximately February of 2008.

5    Q.  Two years later?

6    A.  Yes.

7    Q.  Okay.

8         You were asked some questions about Ms. Proctor

9    talking about a series of questions about wasn't Ms. Proctor

10   talking about the revenues that would come from the hotel

11   room, as opposed to the meeting rooms, when she was trying to

12   convince Ms. Goldberg about buying on the convention floor.

13        Do you remember all those questions?

14   A.  Yes.

15   Q.  Let me ask you.  When Ms. Proctor was describing why

16   Ms. Goldberg should buy on the convention floor, wasn't she

17   telling you how much business they anticipated getting in the

18   convention rooms and the meeting rooms and the function rooms?

19   A.  Yes, because we were looking for the -- we were

20   considering the three options.  And Ms. Goldberg's goal was to

21   find which one would generate the most revenue.

22        And Ms. Proctor had said it would be the -- was

23   encouraging it to be -- the business center.

24   Q.  And wasn't it the discussion between Ms. Proctor and you

25   folks about how much revenue was going to be coming from

Vogue - redirect

1783

 1    the convention -- all the activity and business that was going

 2    to be in the convention area --

 3            MR. SHONKWILER:  Objection.  Leading.

 4            THE COURT:  Sustained.

 5    BY MR. S. KULWIN:

 6    Q.  When Ms. Proctor was discussing with you folks her

 7    recommendation that Jackie -- listen to the question -- Jackie

 8    consider getting a room on the convention floor, okay --

 9    A.  Uh-huh.

10    Q.  -- where all the rooms were, did she describe how they

11    were anticipating getting a lot of business in those rooms --

12    the convention rooms, the meeting rooms, the function rooms?

13    A.  Yes, she --

14            MR. SHONKWILER:  Objection, your Honor.

15            THE COURT:  Sustained.

16    BY MR. S. KULWIN:

17    Q.  What did she describe?

18    A.  Well, being that we were focused on generating revenue, we

19    looked at both the rotation of the units -- and that was the

20    whole point of it -- that the business people would be on that

21    floor participating in things.

22            She also talked about the business center, where

23    there would be a whole office setup for meetings, conference

24    calls, et cetera, et cetera, which my understanding was that

25    it was going to add additional revenue to the amenities

```
 1    separate, from the rotations.
 2    Q.  Okay.
 3          You were asked some questions that contained the
 4    assumption that when Ms. Goldberg was purchasing her unit
 5    there, whether or not -- whether -- excuse me -- that there
 6    was no rental rotation program in place.
 7          Do you remember those questions?
 8    A.  Yes.
 9    Q.  Okay.
10          MR. S. KULWIN:  Can we have PX 75, again, the FAQs?
11          (Brief pause.)
12    BY MR. S. KULWIN:
13    Q.  And I want to show you something from the brochure.  I
14    know you looked at the brochure, but I want to show you
15    something.
16          MR. S. KULWIN:  If you could highlight the --
17    BY THE WITNESS:
18    A.  I'm sorry, Mr. Kulwin, I just --
19    BY MR. S. KULWIN:
20    Q.  Do you need help?
21    A.  No.
22    Q.  Are you okay?
23    A.  I just --
24    Q.  Don't spill anything.  It's expensive.
25          (Laughter.)
```

```
 1              THE WITNESS:  Thank you.  I'm sorry.

 2              Could you make that larger?

 3              Thank you.

 4  BY MR. S. KULWIN:

 5  Q.  Can you read that to yourself?

 6              (Brief pause.)

 7  BY THE WITNESS:

 8  A.  Okay.

 9  BY MR. S. KULWIN:

10  Q.  Ms. Vogue, is that consistent with what was described to

11  you --

12              MR. SHONKWILER:  Your Honor, this is beyond the scope

13  of cross.

14              MR. S. KULWIN:  No.  He specifically pointed out

15  there was no rental program in place when she bought in '06.

16              THE COURT:  Overruled.

17              You may answer, if you can.

18              THE WITNESS:  Can I get a second to read it?

19              THE COURT:  She needs to read it.

20              MR. S. KULWIN:  Sure --

21              THE WITNESS:  Thank you.

22              MR. S. KULWIN:  -- and, then, I will ask you the

23  question.

24              (Brief pause.)

25  BY THE WITNESS:
```

Vogue - redirect

1786

1   A.  Okay.

2   BY MR. S. KULWIN:

3   Q.  One more point on this.

4        Can you read that one (indicating), too, to yourself?

5        (Brief pause.)

6   BY THE WITNESS:

7   A.  Yes.

8   BY MR. S. KULWIN:

9   Q.  Was this how Mr. Shearer and Ms. Proctor and Ms. Binosi

10  described how the rental reservation system was going to work?

11  A.  Yes.

12  Q.  You were asked some questions about when --

13       MR. S. KULWIN:  Can we have 29, please?

14  BY MR. S. KULWIN:

15  Q.  -- when Ms. --

16       MR. S. KULWIN:  And can you blow up the last

17  sentence?

18       Can you highlight that last sentence, please?

19  BY MR. S. KULWIN:

20  Q.  You were asked some questions about when Ms. Jackie

21  Goldberg wrote back to you about the point system in 2008 and

22  she said, "Any rotation that is fair" -- "system that is fair

23  is okay."

24       Do you remember being asked some questions about

25  that?

1   A.  Yes.

2   Q.  Based on your understanding of what was discussed, did you

3   believe that Ms. Goldberg was telling you it would be fair if

4   Trump had complete discretion to rent the rooms any way they

5   wanted?

6           MR. SHONKWILER:  Objection.  Calls for speculation.

7           THE COURT:  Sustained.

8   BY MR. S. KULWIN:

9   Q.  Based on your understanding of what she was saying here,

10  was there -- your understanding -- was she communicating to

11  you in any way, based on your understanding of what you read,

12  that it would be fine with her if Trump took complete

13  discretion to rent the rooms any way they wanted?

14  A.  No.

15          MR. SHONKWILER:  Well, just for the record, objection

16  that that's no less speculative.

17          THE COURT:  Yes.

18          Sustained.

19          It is also leading.

20          MR. S. KULWIN:  Thank you, your Honor.

21          MR. SHONKWILER:  Move to strike the answer.

22          THE COURT:  I will strike it and the jury should

23  disregard it.

24  BY MR. S. KULWIN:

25  Q.  What was your understanding what she was saying here?

Vogue - redirect

1788

A.  My understanding was that when she learned that there had
been changes made, that she was -- she wanted a fair rotation
and that had been changed.

        And I believe that she was anticipating or waiting
for the next disclosure, if you will, of what the new rotation
system was.

        So, I don't think she had a final -- she says, "If
it's fair, then it will be okay."  And if she got the revised
version of what it was going to be, as opposed to what it was
presented to be, then she was would still not sign the fourth
amendment and could make an informed decision.

Q.  And did she ever sign the fourth amendment?

A.  No, she did not.

Q.  You were asked some questions about when the October --
when the fourth amendment came out, and whether it came out in
October of 2007, a few months before this February e-mail
exchange with you and Ms. Goldberg.

        Do you remember that?  Do you remember being asked by
Mr. Shonkwiler some of those questions?

A.  The effective date was 2007, and I learned about it on
February 8th.

Q.  Remember he asked you some questions about that?

A.  Yes.

Q.  Okay.

        When you spoke with Ms. Goldberg at this time, what

Vogue - redirect

1789

```
 1   was your understanding, based on her tone of voice and what

 2   she said, as to whether she had ever heard of the changes that

 3   had been detailed in the Tribune article that you had sent her

 4   two days before?

 5   A.  No, she had no idea.

 6            (Brief pause.)

 7   BY MR. S. KULWIN:

 8   Q.  You were asked some questions about this e-mail, Defense

 9   588, dated August 5th, 2006.  And I believe the questions were

10   were, "Didn't all the research that you had done about room

11   rates and things of that nature lead Ms. Goldberg to decide to

12   buy a second unit?"  Do you remember -- don't answer that.

13            Just do you remember those questions?

14   A.  Yes, I do.

15   Q.  Okay.

16            Now, if you turn -- if you look up to the sentence,

17   "From -- "

18            MR. S. KULWIN:  Go up, Mike -- sorry, down --

19   whatever it's called.

20   BY MR. S. KULWIN:

21   Q.  -- "From what -- "

22            THE COURT:  Can you please identify for the record

23   what exhibit you are reading from.

24            MR. S. KULWIN:  This is Defense Exhibit 588.

25            THE COURT:  Thank you.
```

Vogue - redirect

1790

```
 1            MR. S. KULWIN:  Mike, can you highlight "From" and
 2    all the way to the end.
 3    BY MR. S. KULWIN:
 4    Q.  Okay.
 5    A.  Okay.
 6    Q.  And this is an e-mail that Jackie sent back to you after
 7    you had told her all about the great rental rates at all of
 8    these other hotels, right?
 9    A.  I -- can I just take a second to read it?
10    Q.  Yeah, take a second to read it.
11    A.  Thank you.
12            (Brief pause.)
13    BY THE WITNESS:
14    A.  Okay.
15    BY MR. S. KULWIN:
16    Q.  So, this was an e-mail that --
17            MR. S. KULWIN:  If you can go back down a second,
18    Mike, without losing the highlighting.  Show the bottom part,
19    "Hi Jackie."
20    BY MR. S. KULWIN:
21    Q.  Have you read this already?  This part, the bottom part?
22    Take a look at that.  It's what Mr. Shonkwiler was showing
23    you.
24    A.  Could you high- -- the last paragraph?
25    Q.  Just read it.
```

Vogue - redirect

1    A.  Oh, the whole article.  Okay.

2    Q.  Yeah, just read it so you can remind yourself.

3            (Brief pause.)

4    BY MR. S. KULWIN:

5    Q.  Whenever you're ready.

6    A.  I'm reading.

7            (Brief pause.)

8    BY THE WITNESS:

9    A.  Okay.

10   BY MR. S. KULWIN:

11   Q.  In this e-mail that you write to Jackie on August 5th,

12   2006, you're telling her you had done research into all of the

13   room rentals of the various hotels, right?

14   A.  Yes.

15   Q.  And you go up --

16           MR. S. KULWIN:  Down, Mike.  Whatever.

17   BY MR. S. KULWIN:

18   Q.  And, then, she responds to you shortly thereafter, right?

19   A.  Yes.

20   Q.  Okay.

21           And if you could read out loud -- well, you don't

22   have to read it out loud.  I'm sure the jury can read it.

23           And despite the fact that you've given her all this

24   information about all these great hotel room rates, she's

25   still saying, "I'm a bit queasy about getting another one.

Vogue - redirect

1      It's a hard investment to evaluate."

2             Do you see that?

3             MR. SHONKWILER:  Objection, your Honor.  Leading.

4             THE COURT:  Sustained.

5    BY MR. S. KULWIN:

6    Q.  Okay.

7             What does she say in the line, "From what I see

8    below"?  Can you just read that out loud?

9    A.  She replies, "From what I see below, you got some useful

10   information which may be very useful.  Since this is a hard

11   investment to properly evaluate, I am queasy about putting too

12   big an investment here.  I'm off now, Jackie."

13   Q.  Okay.

14            So, when Mr. Shonkwiler asked you had Ms. Goldberg

15   concluded from the rental rates that you had given her to

16   already buy another condo, this indicates that she's still

17   evaluating?

18            MR. SHONKWILER:  Objection.  The question was never

19   asked.  Nothing like it.

20            THE COURT:  It is leading.

21            Sustained.

22   BY MR. S. KULWIN:

23   Q.  What was she telling you here, despite receiving all those

24   revenues, about whether she --

25            MR. SHONKWILER:  Objection.  Asked and answered.

```
 1   BY MR. S. KULWIN:
 2   Q.  -- was still evaluating?
 3           THE COURT:  Overruled.
 4           You may answer, if you can.
 5   BY THE WITNESS:
 6   A.  My understanding of what she's saying here is that, yes,
 7   this is good and encouraging information, but she still has a
 8   queasy feeling about going forward.
 9   BY MR. S. KULWIN:
10   Q.  Right.
11           And when you -- when you -- by August 8th and she had
12   had the opportunity to, again, read the property reports and
13   think about it some more, she decided to go forward, correct?
14           MR. SHONKWILER:  Objection.  Foundation for reading
15   property reports.
16   BY MR. S. KULWIN:
17   Q.  Were you aware that she was reading the property
18   reports -- Ms. Goldberg?  Is that something she would do?
19           MR. SHONKWILER:  Well, the question is, is that
20   something she did do.
21           THE COURT:  Sustained.
22           MR. S. KULWIN:  You know, what?  I'll move on.
23   BY MR. S. KULWIN:
24   Q.  The bottom line is, ma'am, after she wrote this e-mail,
25   after she had already gotten all of this information about
```

Vogue - redirect

1   room rentals, she was still evaluating; but, yet on August

2   8th, did she go ahead and buy?

3   A.  No.

4   Q.  No, on August 8th, did she go ahead and buy?

5   A.  On August 8th.  Yes, she did.

6   Q.  Okay.

7   A.  She was still in.

8   Q.  You were asked some questions --

9          MR. S. KULWIN:  Can we have PX-29.

10  BY MR. S. KULWIN:

11  Q.  -- whether or not there were ever any e-mails about --

12  from Ms. Goldberg, about -- the rental revenue from the hotel

13  facilities:  The ballrooms, the meeting rooms, the function

14  rooms.

15         Do you remember those questions?  He asked you that?

16  A.  Yes.

17         MR. SHONKWILER:  Objection.  Your Honor, the question

18  was about the 2006 purchase time period.  This is two years

19  later.

20         MR. S. KULWIN:  It's still -- he asked whether there

21  were any e-mails.

22         MR. SHONKWILER:  No, no, no, no.  It was all about

23  what went into the thought process --

24         MR. S. KULWIN:  Well, then he --

25         MR. SHONKWILER:  -- when they were purchasing and

1    what they discussed.

2              THE COURT:  Overruled.

3              MR. S. KULWIN:  Okay.

4    BY MR. S. KULWIN:

5    Q.  And in 2008 -- in February, 2008 -- that was way before

6    any discussion about real estate crashes that had occurred in

7    2009; right, Ms. Gold- --

8    A.  Correct.

9    Q.  -- Ms. Vogue?  Yeah.

10             And what does Ms. Goldberg say in 2008, after she

11   learns about the facilities being removed?  What does she say?

12   Read it out loud, please:  "If the net."

13   A.  "If the net revenue or -- (or loss) for the public areas

14   was originally to be shared by the hotel condo owners, Trump

15   has no right to revise that and change the property agreement

16   on his own."

17   Q.  Thank you.

18             And you were asked some questions about your own

19   e-mail about things Ms. Binosi told you and you saying she had

20   some valid points.  Remember all those questions?

21   A.  Yes.

22   Q.  What was your understanding of where Ms. Binosi, if you

23   had one, was getting all this information she was relating to

24   you?

25   A.  My assumption was the sales office.

Vogue - redirect

1796

1   Q.  But what was your assumption about where they were getting

2   it from?  What organization?

3   A.  The Trump organization.

4   Q.  You were asked a series of questions about whether -- that

5   seemed to imply to me -- you can tell me -- whether you

6   somehow failed in your due diligence because you didn't check

7   the property reports against what Mr. Shearer and Ms. Proctor

8   and Ms. Binosi had told you about the hotel revenue from the

9   rooms being shared by all the common elements?

10          MR. SHONKWILER:  Objection.  Leading.

11          THE COURT:  You may answer that "Yes" or "No."

12          And, then, ask a non-leading question.

13          MR. S. KULWIN:  Sure.

14  BY MR. S. KULWIN:

15  Q.  Do you remember those questions?

16          Let me rephrase it.

17          Do you remember being -- you were asked a number of

18  questions, were you not, by Mr. Shonkwiler --

19  A.  Uh-huh.

20  Q.  -- about whether or not you failed to exercise or

21  should -- didn't -- exercise due diligence because you didn't

22  read the property reports to check whether the representations

23  made by Ms. Binosi, Mr. Shearer and Ms. Proctor about the

24  hotel facilities being owned by the hotel condo owners were

25  accurate.

Vogue - redirect

1    Do you remember those questions he asked you about

2  that?

3  A.  Yes.

4  Q.  Okay.

5    Ms. Vogue, in your experience in dealing with sales

6  agents from developers who are building new facilities, have

7  you had a custom and practice of assuming that they're telling

8  you the truth?

9    Isn't that what they do?  You don't think they're

10  lying to you, do you?

11  A.  No.

12  Q.  Did you have any reason to believe that Ms. Vogue,

13  Mr. Shearer, Ms. Binosi were lying to you about those hotel

14  facilities --

15  A.  Not based on my experience of working with them, no.

16  Q.  You were asked a number of -- going back to these e-mails,

17  you were asked all these questions about you having all these

18  e-mails you wrote in the morning.

19    Do you remember those questions?

20  A.  Yes.

21  Q.  And how there were all these e-mails going back and forth

22  around -- you know, in 2006, in 2007, in 2008.  Remember all

23  those questions?

24  A.  Yes.

25  Q.  Let me ask something, Ms. Vogue.  I know you're getting

1   tired.  You'll be done soon.

2   A.  No, that's okay.

3   Q.  Let me ask you, how many hundreds of people work for you?

4   A.  Hundreds?  None.

5   Q.  Huh?

6   A.  No hundreds of people work for me.

7   Q.  How many people work for you?  You personally.

8   A.  Me.

9   Q.  You?

10  A.  I work for me.

11  Q.  Let me ask you this:  How many $880 million properties

12  have you ever built personally?

13          MR. SHONKWILER:  Your Honor, this is irrelevant.

14          THE COURT:  Sustained.

15  BY MR. S. KULWIN:

16  Q.  How many, if any, different developments are you doing --

17  building -- if any?

18          MR. SHONKWILER:  Objection.  Relevance.

19          MR. S. KULWIN:  I think it goes right to relevance.

20          THE COURT:  Overruled.

21          You may answer, if you can.

22  BY MR. S. KULWIN:

23  Q.  Ms. Vogue, how many building developments are you doing,

24  if any, at any one time?

25  A.  Am I doing?

Vogue - redirect

1799

```
 1   Q.  Yeah.

 2   A.  None.

 3   Q.  Right.

 4        Do you travel much where you're unavailable by phone,

 5   like you're up in the air in a personal jet or anything?  Do

 6   you do that?

 7   A.  No, not very often.

 8   Q.  You were asked --

 9        MR. S. KULWIN:  Can I have one moment, Judge?  I'm

10   almost done.

11        THE COURT:  Yes.

12        (Brief pause.)

13   BY MR. S. KULWIN:

14   Q.  I want to put up on the board -- well, I take that back.

15   I don't think it's in evidence.

16        I want to show you --

17        (Brief pause.)

18        MR. S. KULWIN:  May I have a moment just to check,

19   Judge?  I don't want to show anything that's not in evidence.

20        THE COURT:  Yes.

21        MR. S. KULWIN:  Literally, I'm almost done.

22        (Brief pause.)

23        MR. S. KULWIN:  If I may approach, Judge?

24        THE COURT:  Yes.

25   BY MR. S. KULWIN:
```

Vogue - redirect

1800

1    Q.   You were asked a series of questions about whether this

2    letter between you and Ms. Goldberg dated August 15th

3    refreshed your recollection about --

4              (Document tendered.)

5    BY MR. S. KULWIN:

6    Q.   -- whether she was concerned about going forward with a

7    third purchase because of the rejection -- the alleged

8    rejection -- of the Trump organization's request by

9    Ms. DeAngelis.  Do you remember those questions?  They asked

10   you if that refreshed your recollection.

11             Do you remember those questions?

12   A.   Uh-huh, I do remember the questions.

13   Q.   Okay.

14             Now, you received an e-mail from Ms. Goldberg

15   directly dealing with whether or not she was going -- why she

16   wasn't going through with a purchase on a third unit on August

17   30th, 2006.

18             Do you recall that?

19   A.   Vaguely, yes.

20   Q.   Let me show you what's been marked as PX-88102, Bates

21   stamped TV 154.

22             (Document tendered.)

23   BY MR. S. KULWIN:

24   Q.   Do you recognize that document, Ms. Vogue?

25   A.   Yes.

Vogue - redirect

1801

1       I'm trying to read it for a second --

2    Q.  Okay.

3    A.  -- so I can answer your question.

4          (Brief pause.)

5    BY THE WITNESS:

6    A.  Okay.

7    BY MR. S. KULWIN:

8    Q.  Okay.

9          Do you recognize this?

10   A.  Yes, now that I read it.

11   Q.  Is this an e-mail that Ms. Goldberg sent to you on or

12   about August 30th, 2006?

13   A.  Yes.

14         MR. SHONKWILER:  Objection, your Honor.  He's

15   refreshing the witness' recollection.

16         THE COURT:  The last answer can stand.

17         Overruled.

18         MR. S. KULWIN:  I'll be more than happy to move it

19   into evidence, Judge.

20         THE COURT:  I do not think that is what he is asking

21   for, but the last answer can stand.

22         Ask your next question, please.

23         MR. S. KULWIN:  Before I do that, I'll move this into

24   evidence.

25         THE COURT:  Is there any objection?

1    MR. SHONKWILER:  I'm not sure which document you

2  have.

3    MR. S. KULWIN:  88102, Bates stamp --

4    THE COURT:  Why don't you show it to him, please.

5    MR. S. KULWIN:  Sure, your Honor.

6    MR. SHONKWILER:  Is this the whole thing?

7    MR. S. KULWIN:  That's all I got.

8    (Brief pause.)

9    THE COURT:  Is there any objection?

10    MR. SHONKWILER:  I'm not sure if this is the whole

11  document or not.

12    MR. S. KULWIN:  Just to move it along, let me just

13  refresh her recollection with it.

14    THE COURT:  Okay.

15    MR. S. KULWIN:  I want to get things going here.

16  BY MR. S. KULWIN:

17  Q.  Does this refresh your recollection as to why Ms. Goldberg

18  didn't want to go forward with the -- a third purchase?

19  A.  Yes, it does.

20  Q.  Did it have anything to do at all with the rejection of

21  anything that happened with Ms. DeAngelis, according to this?

22  A.  No.

23    MR. S. KULWIN:  If I can have one second, Judge --

24    THE COURT:  Yes.

25    MR. S. KULWIN:  -- to review my notes.  I think I'm

Vogue - redirect

1803

1  done, but I just want to -- oh, no, I'm not.  I forgot

2  something.

3  BY MR. S. KULWIN:

4  Q.  You were asked a number of questions, ma'am, about what

5  you said in your deposition, and it started with a reference

6  to the Crain's Chicago business article.

7          Remember those questions?

8  A.  Yes.

9  Q.  Do you remember what the Crain's Chicago business article

10 that was referred to while you were talking referenced?

11         MR. SHONKWILER:  Objection, your Honor.  It was no

12 relevance to the Crain's article except that it gave a time

13 frame on Ms. Vogue's testimony about something relevant.

14         MR. S. KULWIN:  Not --

15         THE COURT:  Overruled.

16 BY MR. S. KULWIN:

17 Q.  Do you remember what it was about, Ms. Vogue?

18 A.  I believe it was about the market values.

19 Q.  Let me see if I can refresh your recollection.

20 A.  I don't --

21         MR. SHONKWILER:  Objection, your Honor.  This is also

22 the subject of a limine.

23         MR. S. KULWIN:  He opened the door, Judge.

24         THE COURT:  I am not sure what the article says.

25         MR. SHONKWILER:  Well, maybe we should discuss it

Vogue - redirect

1804

1    before --

2              THE COURT:  Why don't you let her read it.

3              Do you have a copy of it?

4         MR. SHONKWILER:  No.

5         MR. S. KULWIN:  Nobody has a copy of it.

6         THE COURT:  Okay.

7              Bring the deposition over.  Let her read that.

8              Mr. Kulwin, come over for a sidebar while she is

9    doing that.

10             (Proceedings had at sidebar:)

11        THE COURT:  What is your objection?

12        MR. SHONKWILER:  There's an article in Crain's.  The

13   reason it was brought up was because --

14             (Brief pause.)

15        MR. S. KULWIN:  She's refreshing --

16        THE COURT:  She is reading her deposition transcript.

17        MR. SHONKWILER:  The question I was reading from the

18   transcript started with, "What I'm trying to get at now is did

19   the Crain's article prompt you to be concerned?"  And what was

20   relevant is what followed about her concern about the loss of

21   value of the units.

22        THE COURT:  What are you going to ask her?

23        MR. S. KULWIN:  Judge, if you read the entire section

24   from --

25             THE COURT:  I did earlier, from where you pointed

Vogue - redirect

1805

 1    out.

 2              MR. S. KULWIN:  Okay.

 3              And if you go past where -- to the next page, she

 4    was -- am I talking too loud?

 5              THE COURT:  No, you are fine.

 6              MR. S. KULWIN:  She was obviously confused by the

 7    questioning.  What she was referring to in the deposition

 8    clearly was this article had come out, again.  It was just

 9    another report about that same lawsuit.

10              And she was confused about it because if you go to

11    the next page -- and I want to bring out and clarify -- if I

12    can borrow that for one second.  She's got mine.

13              Thank you, your Honor.

14              If you go to the next page --

15              MR. J. KULWIN:  It's the page before.

16              MR. S. KULWIN:  No, it's not.

17              I have to go get mine, Judge, I think.

18              THE COURT:  Go get yours.

19              MR. S. KULWIN:  Okay.  Thanks.

20              (Brief pause.)

21              MR. S. KULWIN:  This is what I'm trying to get out.

22    Here's what I'm trying to get out, Judge.

23              And it's right here on Page 69.  The continuation of

24    this question at Page 69, Line 6:  "And do you know anything

25    more about what Mrs. Goldberg's concerns were around that time

Vogue - redirect

1806

 1    about the potential resale values of property?"

 2            I don't even recall us having a conversation of any

 3    consequence about resale values.  She was not looking forward

 4    to closing.  She was clearly confused by the questioning with

 5    the bringing up of the Crain's article, and I'm trying to

 6    rehabilitate that.

 7            THE COURT:  I think the next question and answer,

 8    though, undermines what you are trying to argue.

 9            MR. S. KULWIN:  I don't -- I don't think so because

10    they tried to make it look like they had a specific

11    conversation.  Okay?

12            The next answer is that there were generic people.

13    He tried to make it appear as though after she read this

14    Crain's article, Ms. Goldberg and her had this big

15    conversation about the resale value.  And they want to do this

16    so they can make this buyer's remorse argument.

17            MR. SHONKWILER:  It's what she said.

18            MR. S. KULWIN:  Well, I'm entitled to clarify and put

19    it into context.

20            MR. SHONKWILER:  The Crain's article -- the substance

21    of that article -- doesn't lend any clarification to that

22    substance.

23            MR. S. KULWIN:  Without --

24            THE COURT:  I do not think this transcript does what

25    you are claiming it does.

 1          You can ask her as she sits here today, did she have

 2     this conversation; and, ask her today from her memory.  But I

 3     do not think this necessarily contradicts what you are trying

 4     to do.

 5          So, instead of getting her to testify about her past

 6     testimony, which is not the proper thing to do with past

 7     testimony, you can ask her as she sits here, did she have this

 8     conversation, and try to clarify it.

 9          (Proceedings had in open court:)

10          MR. S. KULWIN:  May I have one moment, your Honor?

11          THE COURT:  Yes.

12          (Brief pause.)

13     BY MR. S. KULWIN:

14     Q.  Ms. Vogue, after -- you were asked some questions about

15     the events that happened in 2009, late 2008, concerning

16     Ms. Goldberg's closing on her residential condo.

17          Do you remember those questions?

18     A.  Yes.

19     Q.  And various issues about values.

20          Do you remember those questions?

21     A.  Yes.

22     Q.  After Ms. Goldberg got the e-mail, after you had that

23     discussion with her in February of 2008, what was your

24     understanding about whether she was even looking forward

25     towards going through with such a closing on the hotel condos?

Vogue - recross

1808

1    Was she going to do it, in other words?

2    A.  Yes.

3    Q.  What?

4    A.  We're talking about the residential property or --

5    Q.  No, no, not the residential.  I'm sorry.

6    A.  Okay.

7    Q.  After she got the e-mail, in February of 2008 --

8    A.  Okay.

9    Q.  -- what was your understanding about what her position of

10   whether she was going to go forward and close on those hotel

11   condominiums?

12   A.  That -- that she was not.

13   Q.  And as a result of that, do you recall her ever having a

14   conversation with you about the potential resale value of any

15   hotel condominiums after February of 2008?

16   A.  I don't believe that we had a conversation after 2008, no.

17          MR. S. KULWIN:  I have no further questions, Judge.

18          THE COURT:  Redirect -- recross, I mean.

19                        RECROSS EXAMINATION

20   BY MR. SHONKWILER:

21   Q.  Were you aware back in February, 2008, that Ms. Goldberg

22   wasn't scheduled to close until sometime in 2009?

23   A.  Yes.

24   Q.  Yes?

25   A.  Yeah.

Vogue - recross

1809

1  Q.  Do you recall that that was when her closing was

2  scheduled?

3  A.  No.  I don't think I realized that at 2008.

4  Q.  In 2008, you didn't realize it, but do you realize it now?

5          MR. S. KULWIN:  Objection as to what she realizes

6  now.  It's not relevant.

7          THE COURT:  Sustained on relevance grounds.

8  BY MR. SHONKWILER:

9  Q.  Do you know, Ms. Vogue, that Ms. Goldberg's closing was

10  scheduled 14 months after the e-mail you're --

11          MR. S. KULWIN:  Objection, Judge.

12  BY MR. SHONKWILER:

13  Q.  -- talking about in February, 2008?

14          MR. S. KULWIN:  Objection, Judge.  Asked and

15  answered.

16          THE COURT:  Overruled.

17          You may answer that, if you can.

18  BY THE WITNESS:

19  A.  I know that there -- not specifically to Ms. Goldberg, but

20  I know that there were projected dates.  But I also know that

21  there were delays and extensions of delivery dates.  So,

22  closings were not something that I thought were written in

23  stone.

24  BY MR. SHONKWILER:

25  Q.  But do you know that?

Vogue - recross

1810

```
 1   A.  Do I know, what?

 2   Q.  Is the answer to the question yes, that you're aware that

 3   it was over 12 months after the e-mail you're testifying

 4   about, February, 2008?

 5            MR. S. KULWIN:  Objection.  Asked and answered,

 6   Judge.  That's --

 7            THE COURT:  Overruled.

 8            I am not sure she answered that particular question.

 9   BY THE WITNESS:

10   A.  I'm sorry, could you just repeat it one more time for me?

11   BY MR. SHONKWILER:

12   Q.  Are you aware closing for those units was scheduled over

13   12 months after this February, 2008, e-mail we're talking

14   about?

15   A.  I don't recall the -- I don't recall when the dates were

16   scheduled --

17   Q.  And do you recall --

18   A.  -- because --

19   Q.  -- Ms. Goldberg telling you, at the time that you sent

20   that e-mail about your discussion with Ms. Binosi, that she

21   was not going to close?

22   A.  In 2008, I know she was not going to close.

23   Q.  I'm asking about February, 2008, the day you sent that

24   e-mail to Kiyoko Binosi.

25   A.  Can I see the e-mail, again?
```

Vogue - recross

1811

1  Q.  Well, right now I just want to ask your memory of

2  whether --

3  A.  I don't remember the contents of the e-mail on February

4  8th, sir.  I don't -- I'm not -- I don't want to answer that I

5  don't know what I'm answering.

6  Q.  I think -- well, I think -- you just testified that you

7  understood she didn't want to close at the time you sent that

8  e-mail.  Is that right?

9  A.  Well, she did not sign the fourth amendment.  And, so, my

10  assumption was she was not looking to close.

11  Q.  When was that?  Are we talking --

12  A.  When we started receiving requests for the signatures of

13  the receipt that she signed and approved of the fourth

14  amendment changes.

15  Q.  At the time that you had a meeting with Ms. Binosi and

16  reported back to your client, it was your understanding that

17  she did intend to close, right?

18        MR. S. KULWIN:  Objection, Judge.  Asked and answered

19  several times now.  She said "No."

20        THE COURT:  Overruled.

21        You may answer it, if you can.

22  BY THE WITNESS:

23  A.  In 2008, my understanding was that she was in negotiations

24  with Trump to see if there were options that she could close

25  on a Trump unit --

Vogue - recross

1812

```
 1              MR. S. KULWIN:  Judge, I'm going to object --
 2   BY THE WITNESS:
 3   A.  -- but not the hotel.
 4              MR. S. KULWIN:  -- at this point.  We're getting into
 5   something --
 6   BY THE WITNESS:
 7   A.  I don't know.
 8              MR. S. KULWIN:  Please.
 9              We're getting into settlement.
10              THE COURT:  That was not responsive.
11   BY THE WITNESS:
12   A.  I don't understand the question, how to answer it.
13              THE COURT:  Try, again.  She does not understand.
14   BY MR. SHONKWILER:
15   Q.  At the time you sent the e-mail to your clients reporting
16   on your discussion with Ms. Binosi, it was your understanding
17   Ms. Goldberg still did intend to close?
18              MR. S. KULWIN:  Judge, the reason I'm objecting is I
19   believe it's going to elicit an answer that's --
20              MR. SHONKWILER:  It's a simple question, your Honor.
21              THE COURT:  Do you understand the question?
22   BY THE WITNESS:
23   A.  My understanding of the question is, in 2008, after I went
24   through the meeting with Kiyoko, that Mrs. Goldberg was not
25   going to go forward and close on those units.
```

1    BY MR. SHONKWILER:

2    Q.  February, 2008, when you sent the e-mail reporting about

3    what Ms. Binosi told you?

4    A.  That's where I'm getting confused, is I didn't have the

5    meeting with Ms. Binosi in February 8.  I believe it was after

6    the 14th or the 12th, when I got the other e-mail.  So,

7    February 8th date is just not ringing a bell to me that I know

8    what the context was.

9    Q.  Let's just talk -- instead of days, let's talk about the

10   date that you sent the e-mail reporting to your clients about

11   your discussion with Ms. Binosi.

12           At the time you sent that, your understanding was

13   Ms. Goldberg intended to close on her HCUs?

14   A.  No --

15           MR. S. KULWIN:  Object- --

16   BY THE WITNESS:

17   A.  -- I don't believe she was intending to close at that

18   time.

19   BY MR. SHONKWILER:

20   Q.  Didn't you finish that e-mail by saying, "I know you're

21   going to enjoy these condos"?

22           MR. S. KULWIN:  I'm going to object.

23           THE COURT:  Sustained.

24   BY THE WITNESS:

25   A.  That's taken out of context.

Vogue - recross

1814

1     THE COURT:  Sustained.  Sustained.

2   BY MR. SHONKWILER:

3   Q.  Ms. Vogue, when I asked you about a Crain's article, you

4   said you didn't remember it and you read a lot of articles.

5           Do you remember that?

6   A.  Yes.

7   Q.  And, then, when plaintiff's counsel asked you, you said

8   you remembered it was about market trends?

9   A.  I believe so, yes.

10  Q.  Did your memory -- your memory was recovered during that

11  20 minutes or so?

12          MR. S. KULWIN:  Judge, objection.  Argumentative.

13          THE COURT:  Sustained.

14          MR. SHONKWILER:  Well, your Honor, we don't have

15  anything further for the witness.

16          THE COURT:  Thank you, Ms. Vogue.  You may step down,

17  ma'am.

18          (Witness excused.)

19          THE COURT:  Please call your next witness.  We will

20  get started.

21          MR. S. KULWIN:  We might even finish.

22          THE COURT:  I cannot hear you.

23          MR. S. KULWIN:  We might even finish.

24          Your Honor, we call Brent Howie.

25          THE COURT:  Please come forward, Mr. Howie.

Howie - direct

1815

1    ROBERT BRENTON HOWIE, PLAINTIFF'S WITNESS, SWORN

2    DIRECT EXAMINATION

3    BY MR. S. KULWIN:

4    Q.  Sir, can you state your name and spell your last name for

5    the record.

6    A.  Yes.  It's Robert Brenton Howie, H-o-w-i-e.

7         Too loud?

8    Q.  No.  Too quick.  We're in Chicago.  We kind of go a little

9    slower.  So, wait for the question to end.

10        MR. NOVACK:  Judge, I'm going to object.

11        THE COURT:  Sustained.

12        MR. NOVACK:  This is about the third time he's talked

13   about Chicago as if something is wrong with people that are

14   not from Chicago.

15        MR. S. KULWIN:  I love people who are not from

16   Chicago.

17        THE COURT:  I will strike the commentary.

18        Let us move on.  It is 20 after 12:00.

19   BY MR. S. KULWIN:

20   Q.  Where do you live, Mr. Howie?

21   A.  I live in Belleair, Florida.

22   Q.  You were retained as an expert by the defendants in this

23   case; is that correct?

24   A.  That's correct.

25   Q.  And they've provided compensation to you to review some

Howie - direct

1816

1    facts that they -- and assumptions that they -- gave to you to

2    form some opinions in this case, correct?

3    A.   That is correct.

4    Q.   And the opinions focus in the hotel condominium business,

5    correct?

6    A.   That is correct.

7    Q.   And you've worked in that business since 2000- -- since

8    1980?

9    A.   That is correct, also.

10            MR. S. KULWIN:   Sorry, Judge.

11            (Brief pause.)

12            MR. S. KULWIN:   Let's see if I can find your report.

13   I got it.

14            (Brief pause.)

15   BY MR. S. KULWIN:

16   Q.   And you've worked as a consultant to developers of new

17   hotel condominiums, as well as when they've been converting

18   hotels into hotel condominiums for at least the past ten

19   years, correct?

20   A.   That is correct.  Approximately ten years.

21   Q.   Right.

22            And your work as a hotel consultant for a developer

23   typically begins in the pre-construction phase of the project,

24   right?

25   A.   Typically, that's correct.

Howie - direct

1817

1   Q.  And by pre-construction, you mean before the developer

2   actually begins building the building, before the shovels go

3   in the ground.  That's what pre-construction means?

4   A.  Correct.

5           Obviously, that wouldn't apply to conversions that we

6   also consult --

7   Q.  Right.

8   A.  -- on.  Yes, sir.

9   Q.  We're talking about what's called green field.  There's

10  nothing there but land?

11  A.  Yes, sir.

12          MR. SHONKWILER:  Objection, your Honor.  These

13  questions are leading.

14          THE COURT:  Sustained.

15          MR. S. KULWIN:  Judge --

16          THE COURT:  Ask in a non-leading --

17          MR. S. KULWIN:  Judge, I'd ask to be heard on that.

18          THE COURT:  No.  Let us try to ask in a non-leading

19  manner.

20          MR. S. KULWIN:  I can't go forward, Judge.  I ask to

21  be heard.  I'm sorry.  He's an adverse witness.  He's an agent

22  of the defendant.  And --

23          THE COURT:  Please ask your next question.

24          MR. S. KULWIN:  Thank you.

25          THE COURT:  Let us see if you can do it.

Howie - direct

1818

1   BY MR. S. KULWIN:

2   Q.   In that pre-construction phase, sir, you assist and advise

3   developers regarding the layout and design of the hotel

4   condominiums and the layout and design of the facilities and

5   amenities, including those areas required to operate a

6   full-service hotel and rental program?

7           MR. SHONKWILER:  Same objection, your Honor.

8           THE COURT:  Overruled.

9           That is a background question.  I will let that

10  stand.

11          You may answer, if you can, sir.

12  BY THE WITNESS:

13  A.   That is correct.

14  BY MR. S. KULWIN:

15  Q.   And you do that in a process called condominium mapping?

16  A.   That necessarily is not the same process, no, sir.

17  Q.   Part of your work is doing what's called condominium

18  mapping, right?

19  A.   That's correct.

20  Q.   And what's included in condominium mapping, is it not, is

21  the practice of separating essential hotel components in the

22  commercial areas of the property from condominium-owned areas?

23  A.   That is --

24  Q.   Is that part of it?

25  A.   That is correct.

1   Q.  Okay.

2       And by essential hotel components, you mean

3   revenue-generating components, like hotel, like ballrooms,

4   function rooms, meeting rooms?

5       MR. SHONKWILER:  Objection.  Leading.  No longer

6   background.

7       THE COURT:  Overruled.

8       You may finish the question.

9   BY MR. S. KULWIN:

10  Q.  Is that right, Mr. Howie?

11  A.  We commonly -- at least I commonly -- refer to them as

12  commercial components.

13  Q.  Okay.

14      But that's what you're talking about, right?

15  A.  Commercial --

16  Q.  Those type of things?

17  A.  Commercial components, yes.

18  Q.  Okay.

19      Now, you know Charles Reiss, who used to be -- do you

20  know Charles Reiss, who used to be an executive at Trump?

21  A.  I have met Mr. Reiss.

22  Q.  And how do you know him?

23  A.  I met him at a conference back, I believe, in 2005.

24  Q.  Okay.

25      And who hosted that conference?

Howie - direct

1820

1   A.  A law firm from California known as JMBM.

2   Q.  And do they specialize in the hospitality hotel business?

3   A.  I know they have a division that specializes in the

4   hospitality division, yes.

5   Q.  And, to your knowledge, did they have that conference --

6   this law firm, JMBM, has that conference every year?

7   A.  They have conferences every year.  They do not have -- as

8   far as I know, they do not have -- conferences regarding

9   condominium hotels every year.

10  Q.  Okay.

11          But you attended such a conference concerning hotel

12  condominiums in Los Angeles in 2005, right?

13  A.  I believe the conference -- there was a conference in Los

14  Angeles in 2005.  However, the conference specifically

15  regarding condominium hotels, I believe, was in Palm Springs

16  area.

17  Q.  In 2005?

18  A.  In 2005.

19  Q.  Okay.

20          And hotel condos were a topic of conversation at that

21  conference, correct?

22  A.  That was the purpose of the conference, yes.

23  Q.  Including with respect to the issue of who should control

24  what in hotel condominium developments, like commercial or,

25  you know, things of that nature, true?

Howie - direct

1821

1   A.  I don't believe that was -- that was -- discussed at the

2   conference.  If it was, I do not recall.

3   Q.  Okay.  Let me see if I can refresh your recollection.

4            Turning your attention to Page 216 --

5            THE COURT:  Is that his deposition?

6            MR. S. KULWIN:  Yes, ma'am.

7            I'm just going to refresh his recollection with it.

8            THE COURT:  Okay.  Go ahead.

9            MR. S. KULWIN:  I can approach, I assume?

10           THE COURT:  You may.

11           (Document tendered.)

12  BY MR. S. KULWIN:

13  Q.  Can you just read this page, Mr. Howie, if that's okay?

14  A.  I'm sorry, which section?

15           MR. SHONKWILER:  What page are you showing the

16  witness?

17           MR. S. KULWIN:  216.

18           And that (indicating) --

19           THE WITNESS:  Okay.

20  BY THE WITNESS:

21  A.  "I don't recall whether -- "

22  BY MR. S. KULWIN:

23  Q.  No, don't read it out loud.

24  A.  Oh, I'm sorry.

25  Q.  Read it to yourself.

Howie - direct

1822

1    A.  I'm sorry, I apologize.

2    Q.  Read it to yourself, please.

3            (Brief pause.)

4    BY THE WITNESS:

5    A.  Answer?

6    BY MR. S. KULWIN:

7    Q.  Have you read it now?

8    A.  Yes.

9    Q.  I have a question for you.

10           I see what you're saying.  You don't recall if it's

11   that specific conference -- is that what you're saying? -- you

12   discussed that issue of control?

13   A.  Yes.  Yes.

14   Q.  Okay.

15           But it was discussed at some of the conferences; you

16   just don't remember if it was that one?

17   A.  It was discussed in a subsequent conference, I believe, in

18   2006.

19   Q.  Now, in any event, Mr. -- that conference, the one in

20   2005, that you met Mr. Reiss at, was attended substantially by

21   people who wanted to learn more about hotels and condominiums?

22   A.  That is correct.

23   Q.  And hotel -- I meant to say hotel condominium

24   developments.  Right?

25   A.  Yes.

Howie - direct

1823

1    Q.   Okay.

2         And Mr. Reiss gave the opening address at that

3    conference; did he not?

4    A.   Yes, he did.

5    Q.   And there were hundreds of attendees in that group at that

6    conference, right?

7    A.   Yes.

8    Q.   Including you?

9    A.   That's correct.

10   Q.   And Mr. Reiss spoke to those hundreds of people in that

11   keynote address who were looking to learn more about hotel

12   condominiums, including you, at that conference, true?

13   A.   Well, I was actually at the conference to speak --

14   Q.   Right.

15   A.   -- relative to hotel condominiums.  I was not there as in

16   attendance or as a guest to learn more.

17   Q.   I understand that.

18        But you were at the speech that Mr. Reiss gave at the

19   hotel condominium conference in 2005 for the hundreds of

20   people?

21   A.   Yes.  I was in the audience, yes.

22   Q.   Okay.

23        Now, while working as a consultant to these hotel

24   condo developers, you're closely -- you are also closely --

25   involved in planning, drafting and, if needed, amending the

1  documents necessary to the development and operation of the

2  product, correct?

3  A.  Yes.  In working with other professionals on those

4  matters, yes.

5  Q.  And that would include the declaration of the condominium

6  and related documents, right?

7  A.  That's correct.

8  Q.  And the rental management agreement?

9  A.  That's correct.

10  Q.  And the condominium association's budget?

11  A.  That's correct.

12  Q.  And the hotel operating budget?

13  A.  That's correct.

14  Q.  And you've been involved in a number of hotel condo

15  projects over the years while you've been in business?

16  A.  Yes, sir.

17  Q.  And in all those years, Mr. Howie, you've never seen a

18  developer remove multiple pieces of the common elements

19  promised to purchasers after approximately 50 percent of the

20  units were sold, correct?

21          MR. SHONKWILER:  Same objection to leading questions.

22          THE COURT:  Overruled.

23          You may answer, if you can.

24  BY THE WITNESS:

25  A.  I have not seen these exact set of circumstances, no.

Howie - direct

1825

```
 1   BY MR. S. KULWIN:

 2   Q.  That's not my question.

 3          My question is:  After -- in all those years, you've

 4   never seen a developer remove multiple pieces of the common

 5   elements promised to purchasers after approximately 50 percent

 6   of the units were sold; is that correct?

 7          MR. SHONKWILER:  Objection to form and to the word

 8   "promised."  Vague and confusing.

 9          MR. S. KULWIN:  I think he understands it, Judge.

10          THE COURT:  Overruled.

11          You may answer it, if you can.

12   BY THE WITNESS:

13   A.  I can only respond to developments that we were involved

14   with.

15   BY MR. S. KULWIN:

16   Q.  And you never saw it?

17   A.  Of the developments that we were involved with, we have

18   not seen that, no.

19   Q.  Okay.

20          And you've never had an experience working as a hotel

21   condominium consultant that -- where the condominium documents

22   didn't clearly define, when they were first sent out to

23   prospective buyers, the commercial areas and the common

24   element areas, right?

25   A.  I'm sorry, could you repeat that?
```

Howie - direct

1826

1   Q.  Fair request.

2           In your experience working over the last 20 or 30

3   years in this field, on the projects that you've worked on,

4   when you work on the documents, before they were sent out to

5   purchasers, those condominium documents always clearly defined

6   what were commercial areas and what were common elements?

7   That's been your experience, right?

8           MR. SHONKWILER:  Objection.  Relevance.

9           MR. S. KULWIN:  It's highly relevant, Judge.

10          MR. SHONKWILER:  There's no claim in this case

11  relating to that question.

12          MR. S. KULWIN:  Well, that's wrong.

13          THE COURT:  Sustained on form.

14          You need to rephrase it.

15          MR. S. KULWIN:  Sure.

16  BY MR. S. KULWIN:

17  Q.  In your experience, you've worked with hotel condominium

18  developers, right?

19  A.  Yes, sir.

20  Q.  One of the things you've done is worked on the declaration

21  of condominiums, right?

22  A.  That's correct.

23  Q.  That document defines what's commercial areas, like

24  ballrooms, things of that nature, and what's common elements,

25  right?

1   A.  That's correct.

2   Q.  And, in your experience, before those documents are sent

3   out to potential buyers, they clearly define what's commercial

4   and what's common elements?

5        MR. SHONKWILER:  Same objection, your Honor.  There's

6   no claim about anything being not --

7        MR. S. KULWIN:  Judge --

8        MR. SHONKWILER:  -- clearly defined in this case.

9        THE COURT:  Overruled.

10       You may answer, if you can.

11  BY THE WITNESS:

12  A.  They clearly define what is actually decided upon at

13  that -- at that -- point in time, yes.

14  BY MR. S. KULWIN:

15  Q.  Good.

16       And you've seen situations where condominium

17  documents have been amended to expand commercial areas to add

18  more things to the commercial areas, right?  You've seen that

19  happen?

20  A.  Among others, yes.

21  Q.  But you've never seen that occur where the commercial

22  areas were expanded by taking anything away from the common

23  elements; isn't that right?

24       MR. SHONKWILER:  Objection.  Asked and answered.

25       THE COURT:  Sustained.

Howie - direct

1828

1    MR. S. KULWIN:  This is a different question.

2    THE COURT:  That one was not a different question.

3    MR. S. KULWIN:  I'll rephrase.

4    BY MR. S. KULWIN:

5    Q.  Have you ever seen commercial areas expanded by taking

6    things away from the common elements?

7    MR. SHONKWILER:  Objection.  Asked and answered.

8    THE COURT:  Overruled.

9    You may answer, if you can, sir.

10   BY THE WITNESS:

11   A.  Again, not at properties that we have worked on, no.

12   MR. S. KULWIN:  I have no further questions.

13   THE COURT:  Let us break for lunch, ladies and

14   gentlemen.  We will pick back up at 1:45, please.

15   (Jury out.)

16   THE COURT:  Mr. Howie, please be back here by about

17   20 to 2:00.

18   MR. S. KULWIN:  I was wondering, Judge, could I ask a

19   scheduling question or no?

20   You are still planning on going ahead, I hope?

21   THE COURT:  I am sorry?

22   MR. S. KULWIN:  You are still planning on going ahead

23   with closings, I hope?

24   THE COURT:  If we get there, yes --

25   MR. NOVACK:  Judge, I have --

1    THE COURT:  -- definitely.  I doubt you will both get

2    in, but it may be that you get yours in.  We will see.

3    MR. NOVACK:  I would like to beg your indulgence.  I

4    have two concerns that are serious to me.

5    THE COURT:  Okay.

6    MR. NOVACK:  May I?

7    THE COURT:  Yes.

8    MR. NOVACK:  And they're sort of related, and I'd

9    like to get them both out on the table.

10   The first, Judge, is the risk of being in a situation

11   where I either have to rush my closing to get it done this

12   afternoon or break it up between this afternoon and tomorrow

13   morning.

14   THE COURT:  I will not make you do either one.  That

15   is why I just said we may just get in one closing and not the

16   other.

17   MR. NOVACK:  Well, I -- if I can finish?

18   THE COURT:  But I am not going to make you rush.

19   MR. NOVACK:  I'm concerned about that, as well:  That

20   one closing goes in, the jury goes home and has heard one --

21   but only one -- closing, and have a night to --

22   MR. S. KULWIN:  I agree with him.

23   THE COURT:  Let us see where we are on timing.

24   MR. NOVACK:  I want to give you my second concern.

25   THE COURT:  Go ahead.

1    MR. NOVACK:  My second concern is, is that we have

2  some motions.  And right now I'm not talking about a big

3  directed verdict, but we have two isolated motions that are

4  extremely critical, that I'm telling you in good faith I

5  believe we have an excellent chance of prevailing on.

6    And I know you said, well, we will let the jury go

7  out, we'll deal with that later.  I have been in this

8  situation where a judge in this building denied a motion for

9  JAML before the jury went out.  The jury went out.  They came

10  back with a verdict.  And months later, that verdict was

11  overturned on the same grounds as the motion for the directed

12  verdict; and, in the meantime, every newspaper in the country

13  reported that verdict, which never should have happened.

14    And I'm very concerned about that.  And I think both

15  of these problems can be solved if we take this afternoon --

16    MR. S. KULWIN:  No.

17    MR. NOVACK:  -- to address those motions.

18    THE COURT:  As I told you before -- you can tell war

19  stories all you want; we can all tell war stories; but, that

20  is not what we are here for -- I will hear your motions when

21  you raise them.

22    You described them as raising significant legal

23  issues.  Mr. Kulwin is going to have the opportunity to

24  respond to them.  He has not seen them.

25    I have not seen them.  It is doubtful I will be able

Howie - direct

1831

1  to give you a ruling, if they are that significant of legal

2  issues, on the fly.  I said I would likely have to take them

3  under advisement and send the issue to the jury.

4         I do not know that until I see them.  That is the

5  best I can tell you, Mr. Novack.  I will certainly hear you

6  out and read whatever you file when you file it.  But without

7  any inkling as to what that is, I have no idea.  So, I just

8  have to see and hear you out.

9         MR. NOVACK:  I'm not asking you to rule.  I'm asking

10 you to give me the opportunity to have that time period to

11 allow you to decide if this is something you do want to rule

12 on before the jury goes out, before we address the jury.

13        THE COURT:  I certainly told you I will give you the

14 time to present them today at the close of the evidence.  And

15 we will take it from there.  You can present them.  I am

16 pretty sure Mr. Kulwin is not going to have a written response

17 or be able to research the issue in the interim.  I am not

18 going to hold the jury over for days for that time.  You are

19 in litigation.

20        I will see you at quarter till.

21        MR. S. KULWIN:  Thank you, your Honor.

22        (Whereupon, a recess was taken at 12:37 o'clock p.m.,

23    until 1:45 o'clock p.m., of the same afternoon.)

24                   *    *    *    *    *

25

1832

1    I certify that the foregoing is a correct transcript from the
     record of proceedings in the above-entitled matter.

2

3

     /s/ Joseph Rickhoff                    May 21, 2013
4    Official Court Reporter

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1833

```
 1                  IN THE UNITED STATES DISTRICT COURT
                       NORTHERN DISTRICT OF ILLINOIS
 2                           EASTERN DIVISION

 3    JACQUELINE GOLDBERG,              ) Docket No. 09 C 6455
                                        )
 4                         Plaintiff,   )
                                        )
 5              vs.                     )
                                        )
 6    401 NORTH WABASH VENTURE, LLC,    )
      a Delaware Limited Liability      )
 7    Company, et al.,                  ) Chicago, Illinois
                                        ) May 21, 2013
 8                       Defendants.)     1:45 o'clock p.m.

 9                  TRANSCRIPT OF TRIAL PROCEEDINGS
           BEFORE THE HONORABLE AMY J. ST. EVE, AND A JURY
10
      APPEARANCES:
11
      For the Plaintiff:        KULWIN, MASCIOPINTO & KULWIN, LLP
12                              BY:  MR. SHELLY B. KULWIN
                                     MR. JEFFREY R. KULWIN
13                              161 North Clark Street, Suite 2500
                                Chicago, Illinois  60601
14
      For the Defendants:       NOVACK AND MACEY, LLP
15                              BY:  MR. STEPHEN NOVACK
                                     MR. JOHN F. SHONKWILER
16                              100 N. Riverside Plaza, Suite 1500
                                Chicago, Illinois  60606
17
      Also Present:             MS. ALEXIS ROBINSON
18
      Court Reporter:           Nancy C. LaBella
19                              Mary M. Hacker
                                Official Court Reporters
20                              219 S. Dearborn St.
                                Chicago, Illinois  60604
21                              (312) 435-6890
                                (312) 435-5564
22

23            * * * * * * * * * * * * * * * * *

24                     PROCEEDINGS RECORDED BY
                       MECHANICAL STENOGRAPHY
25               TRANSCRIPT PRODUCED BY COMPUTER
```

Howie - cross

1834

```
 1      (Proceedings out of the hearing of the jury:)
 2              THE CLERK:  09 C 6455, Goldberg v. 401 North Wabash
 3   Venture.
 4              THE COURT:  Mr. Howie, please come back up, sir.
 5              Mr. Shonkwiler, are you ready?
 6              MR. SHONKWILER:  Yes, your Honor.
 7              THE COURT:  Bring in the jury, please.
 8      (Jury in.)
 9              THE COURT:  You may be seated.
10              Cross-examination.
11     ROBERT BRENTON HOWIE, PLAINTIFF'S WITNESS, PREVIOUSLY SWORN
12                          CROSS-EXAMINATION
13   BY MR. SHONKWILER:
14   Q.  Afternoon, Mr. Howie.
15   A.  Hello.
16   Q.  What do you do for a living?
17   A.  I'm president of a Florida-based company called Provident
18   Hotels and Resorts or also Provident Management Corporation.
19   Q.  What kind of work does Provident do?
20   A.  Provident is a hospitality company.  But we actually
21   specialize in a very small space in the hospitality industry,
22   that being the condominium hotel industry.
23   Q.  When you say condominium hotel -- I'm afraid I've been
24   saying hotel condominium all week, and I might continue to;
25   but those mean the same thing?
```

Howie - cross

1835

1   A.  As far as I know, yes, they mean the same thing, yes.

2   Q.  Does Provident work exclusively on hotel condominiums?

3   A.  We do work exclusively with hotel condominiums, yes.

4   Q.  And how many years has that been the case?

5   A.  We've actually been operating or involved with condominium

6   hotels for over 30 years.  Our first venture into condominium

7   hotels was in 1980, so we're talking approximately 33 years.

8   Q.  Are you one of Provident's founders?

9   A.  Yes, I am.

10   Q.  Typically what kind of services do you provide to your

11   clients?

12   A.  We started out -- once we started out in the condominium

13   hotel business, basically we started out operating condominium

14   hotels.  That was our first foray into that.  And we operated

15   condominium hotels pretty much exclusively up through the

16   early 2000s.  In the early 2000s and a little bit before that,

17   condominium hotels started gaining in popularity.  And there

18   were more and more condominium hotels being developed.  So

19   what we decided to do was to really offer our services on a

20   consulting basis to consult with developers because we have

21   that -- we had that expertise.  At that time we had 30 years

22   approximately -- well, not quite 30 years, but we had

23   extensive expertise; and we saw there was a need for those

24   type of services in a growing industry.  So we started

25   offering consulting services as well as in addition to

Howie - cross

1836

1    services of actually operating our own condominium hotels.

2    Q.  When you say operating, does that mean the same thing as

3    managing a condominium hotel?

4    A.  Yes, that means the same thing as managing, yes.

5    Q.  How many hotel condominium developments have you worked on

6    in one of those capacities?

7    A.  Since 1980, approximately two dozen.

8    Q.  Can you name some of the clients you've worked for?

9    A.  Yes.  We've worked for U.S. Home Corporation, which was a

10   national builder.  I believe recently they changed their name

11   to Lennar or were purchased out by Lennar.  We've also worked

12   for a company called Gencom Group.  Gencom at one point, I

13   believe, was the single largest owner of the Ritz-Carlton

14   properties in the United States.  We worked for a company

15   called NJR Development, which is an affiliation of Opus South,

16   which is -- at one point was the largest independently owned

17   development company in the country, developing various type of

18   products.  Flagler Group was one of our clients, who was based

19   in Miami.  They do multiple types of real estate developments

20   in south Florida, including Brazil.  Those are just a couple.

21   Q.  Let's talk about your consulting work first.  What sorts

22   of consulting services do you provide to clients?

23   A.  We really offer an array of services, some that relate

24   specifically to -- that you would encounter in a typical hotel

25   property, but then specifically those that are unique to

Howie - cross

1837

1    condominium hotel developments.

2         We do consult on the actual property itself, the

3    nature of the property and the layout and design and location

4    of certain facilities and certain amenities.  From that point

5    in time, we basically take -- once that's established, we then

6    take those amenities and do what we call a mapping process,

7    which entails going through each of those different components

8    and identifying them.

9         We also assist in the operating budgets for the

10   condominium associations.  We also consult regarding the

11   contract between the manager and the condominium association.

12   And then we also consult on the rental program, which is

13   typically entered into -- either the developer or an operator

14   that they designate, if that unit owner decides to put their

15   unit in the rental program.  Those are some of the highlights.

16   Q.  Sorry if you mentioned this, but do you help your clients

17   prepare property report documents as well?

18   A.  We refer to them in Florida as condominium documents.

19   However, for purposes of this, I think -- property documents I

20   think are synonymous.  Yes, we work with other professionals

21   also that are engaged by the developers in the preparation of

22   those condominium documents, yes.

23   Q.  Can you explain to the jury please what you mean by

24   mapping?

25   A.  Mapping is a very -- is a very unique process.  Frankly,

Howie - cross

1838

1   it can be a very complicated process.  But it's a very

2   important process for the ultimate successful operation of a

3   condominium hotel.  Mapping basically means you go through an

4   entire development top to bottom, and you focus on every

5   single independent component within that development, as small

6   as maybe a maid closet or a storeroom on one of the floors, a

7   structural component, such as like the roof, things such as

8   hallways, things also include like amenities, like the

9   swimming pool, restaurants, ballroom spaces and things like

10  this.

11           You would go through every single one of those

12  components and identify them as far as which stakeholder in

13  the property would be responsible for and would control each

14  of those components.  That's an exercise that, again, is

15  unique to condominium hotels.  It's one that is typically --

16  or is not performed in either a straight hotel development or,

17  frankly, condominiums.

18  Q.  If as a result of your mapping process, for example, you

19  decided that one of the facilities ought to be controlled by

20  the developer, what area would you map it into?

21  A.  Well, backing up a little bit.  There's, in essence --

22  generally speaking, there's -- as I mentioned the term

23  stakeholders before.  There's basically three different

24  stakeholders in a condominium hotel.  You have the unit

25  owners, you have the condominium association and then you also

Howie - cross

1839

1    have the commercial, basically the commercial components.

2          So when we actually go through the mapping process,

3    we basically divide up all of -- every component of the

4    property and put them in each one of those individual slots.

5          If I understand you correctly is where do we

6    typically map the components that are actually assigned to the

7    developer?  Is that -- was that the question?  I'm sorry.

8    Q.  Yes.

9    A.  Typically the developer is -- is retained.

10   Q.  Well --

11   A.  Pardon?

12   Q.  I'll ask a new question.

13         If you were going to have a facility controlled by

14   the developer, which of the areas would you map it into?

15   A.  The developer typically is the one responsible for the

16   rental program.  So if it's a facility that is controlled by

17   the developer that typically would be a function of the rental

18   program, then that would be assigned to the developer.

19   Q.  And would that go in the commercial area then?

20   A.  That would definitely go into the commercial component,

21   yes.

22   Q.  Okay.  So how many areas are we talking about?  Common

23   elements is one; is that right?

24   A.  Common element is one.

25   Q.  Commercial area?

Howie - cross

1840

1  A.  Commercial area is two.

2  Q.  Are there others?

3  A.  Yes, the actual condominium unit.

4  Q.  Okay.  So you have units, right?

5  A.  That's correct.

6  Q.  Common elements.

7       And commercial area?

8  A.  Commercial areas, yes.

9  Q.  And the common elements is controlled by who?

10  A.  The condominium association.

11  Q.  Commercial area, you said, was controlled by the developer

12  generally?

13  A.  The developer generally, yes, oftentimes.

14  Q.  And the units, by the individual unit owners?

15  A.  Yes, the purchasers, yes.

16  Q.  Or purchasers.

17       So the mapping process, is this the process by which

18  you decide which of these three areas each of the physical

19  components of the building should go into?

20  A.  Yes.

21  Q.  Is that process different for a hotel condominium than it

22  would be for a traditional hotel or a residential condominium?

23       MR. S. KULWIN:  Judge, I'll object, lack of

24  foundation that he has any experience in residential

25  condominiums.

Howie - cross

1841

```
 1          THE COURT:  Sustained.  Lay a foundation.
 2   BY MR. SHONKWILER:
 3   Q.  Let's start with a new question.
 4          Is mapping an important process when you're planning
 5   a hotel condominium?
 6   A.  Yes, it is.
 7   Q.  Why is that?
 8   A.  Well, it's -- it's -- again, it's -- it's a complicated
 9   structure.  And when you map the development, actually at the
10   same time what you're doing is you're really laying the
11   foundation for how the property is going to operate going
12   forward.  It sets out the parameters of basically each area,
13   who is going to use those areas, who needs to control those
14   areas, who ultimately needs to own those areas, and then, at
15   the very end, who is going to be responsible to pay for costs
16   associated with those areas.  That's the first step of each of
17   those.
18   Q.  Is mapping a term that you came up with or is it an
19   industry term?
20   A.  Frankly, I'm not sure.  I don't believe we particularly
21   came up with it, although it was -- basically has been
22   commonly used through -- in some circles.  But I'm not so sure
23   if it's -- if we came up with it or if it was something
24   that -- that was derived by someone else.
25   Q.  What do you consider to be your industry?
```

Howie - cross

1842

A.   Our industry is the hospitality industry.  However, the
products that we offer to our guests basically are developed
under the condominium form of ownership.

Q.   So you said mapping is something known in some -- a term
known in some circles, I think you said?

A.   Yes.  Again, the condominium hotel business is very
specialized.  And it is still -- it's a subset of the
hospitality market.  Although it became more popular several
years ago, I think it still remains basically a subset.  And
it's a -- what we've seen is definitely a different group of
professionals that basically focus in that particular industry
as opposed to just the hotel industry.

          MR. S. KULWIN:  I'll object unless he's got a basis
for how all the people who work in both industries -- I'll
object.  There's no foundation for the fact that he knows all
the people who work in both industries.

          THE COURT:  Sustained.

BY MR. SHONKWILER:

Q.   How long have you and your company been involved in
mapping for your clients?

A.   Well, actually if you include our clients, those
developers that brought us in to manage the properties, one of
the services that we provided to those clients included the
actual mapping.  And in a very simplistic way, that began back
in the 1980s.  As far as offering services on a consulting

Howie - cross

1843

1   basis, that began in the mid 2000s.

2   Q.  And has the mapping process changed over the years that

3   you've been doing it?

4   A.  Absolutely.  Again, we've been in this business for

5   30 years.  I believe it's safe to say that -- that my company

6   and myself are one of the founders of this business.  Many of

7   the concepts, including mapping, have really evolved over

8   time.  And, in fact, in our own individual situation, my own

9   individual situation, is that through the years, we've

10  basically learned -- I mean, we've learned from our

11  experience.  There really wasn't much precedent out there.

12  Certainly not 30 -- you know, 25 years ago.  So we basically

13  learned as we went and basically kind of evolved.

14          So many of the -- many of the concepts regarding

15  condominium hotels didn't just pop out of the air.  They

16  basically came over time.  And mapping was one of those.

17  Q.  Let's talk about property reports in your consulting

18  engagements.  Do you typically help your clients prepare

19  property reports, including the condominium declaration?

20  A.  Yes.  We assist other professionals that are involved with

21  that process, yes.

22  Q.  Is the property report documents -- you called them

23  condominium documents, right?

24  A.  Correct.

25  Q.  Are those the documents in which the developer explains

Howie - cross

1844

1    how the property is mapped?

2    A.   That is correct.

3    Q.   Including which of the facilities -- including which

4    facilities are in the common elements, right?

5    A.   Yes.

6    Q.   And which facilities are in the commercial property?

7    A.   Yes.

8    Q.   And which are considered individual units?

9    A.   Yes.

10   Q.   Okay.  Have you worked on luxury high-rise hotel

11   condominiums?

12   A.   Yes.

13   Q.   What kinds of businesses typically hire you to perform

14   consulting services?

15   A.   Almost predominantly developers.

16   Q.   Do you work with developers only in Florida?

17   A.   No.  We also worked with developers with properties in

18   California and also Hawaii.

19   Q.   Let's move from the consulting part of your work to the

20   managing part.  Can you just give us a brief explanation of

21   what kinds of management services you provide to your clients?

22   A.   Typically at each of our locations, we operate under three

23   different types of management -- actually two different types

24   of management services.

25            We have a management contract with condominium

Howie - cross

1845

1    associations to manage what common elements there are within a

2    condominium hotel.  And then we also have individual

3    management agreements -- rental management agreements with

4    unit owners who choose to participate in the rental program.

5    Q.  Is management a large part of Provident's business?

6    A.  It is the majority part of our business, yes.

7    Q.  From a time -- from -- in what sense?  The number of

8    clients?  The time spent?  Or the revenue generated?

9    A.  From a revenue perspective, from a business perspective, I

10   would say maybe 95 percent of our business is related towards

11   operating the condominium hotels that we currently manage.

12          If you go from a client perspective, of the two dozen

13   clients approximately that we've serviced over the years,

14   probably just less than half of those were consulting

15   assignments.

16          So from a client perspective, it's a much bigger

17   percentage.  But from a business perspective, a revenue

18   perspective to the company, it's a lot smaller.

19   Q.  How long do your management engagements typically last?

20   A.  They typically last a long time.  We've managed properties

21   for -- the same properties for 30-plus years.

22   Q.  Now, backing up a bit.  You have a bachelor's degree; is

23   that right?

24   A.  In accounting, yes.

25   Q.  In accounting.  Has your entire professional career,

Howie - cross

1846

1   Mr. Howie, been devoted to Provident and its predecessor

2   business, I think it was called Bieder; is that right?

3   A.   Bieder, B-i-e-d-e-r.

4   Q.   Has your entire career been devoted to your work for those

5   organizations?

6   A.   Yes.  Actually it's the same organization.  Right out of

7   school, I took a position with a company called Bieder

8   Management Services.  Eventually that changed -- they -- we

9   changed our name to Provident Management Corporation.  So

10  my -- but initially Bieder Management Services also managed --

11  or initially managed residential condominium as well.

12         But, yes, my whole career -- I started out in an

13  accounting position with Bieder Management Services; but my

14  whole career has been with the same company.

15  Q.   And for the past 30 years has been devoted to hotel

16  condominiums only, correct?

17  A.   Yes, since 1982.

18  Q.   Do you hold any professional licenses?

19  A.   Yes.  I have a Florida community association manager's

20  license.

21  Q.   And what do you need to do to obtain a community

22  association manager's license?

23  A.   You have to go through some education, some courses and

24  then ultimately you have to pass a state examination.  And

25  then every year, you need to also take continuing education

Howie - cross

1847

1    courses as well and pass those.

2    Q.  What does that license allow you to do?

3    A.  It allows one to be able to manage a condominium

4    association, a homeowners' association or other similar type

5    community association.

6    Q.  Do you sometimes do public speaking engagements on hotel

7    condominium subjects?

8    A.  Yes, I do.

9    Q.  Do you ever speak at the national conference for hotel

10   condominiums?

11   A.  I've spoken at several national conferences on hotel

12   condominiums.

13   Q.  Are you aware of any national conferences that took place

14   before 2005?

15   A.  I'm not aware of any.  If there were I was unaware.

16   Q.  You were asked earlier about whether you met a gentleman

17   named Charlie Reiss.  Do you remember that?

18   A.  Yes, I do.

19   Q.  You did meet Mr. Reiss at a conference?

20   A.  Yes.

21   Q.  Was Mr. Reiss working for the Trump organization at the

22   time?

23   A.  At the time he was working for the Sunshine Group, I

24   believe.

25   Q.  And was that -- the conference that you saw Mr. Reiss at,

Howie - cross

1848

1  was that about mapping?

2  A.  I don't recall mapping being discussed at that conference,

3  but it was about a variety of topics specifically relative to

4  condominium hotels.

5  Q.  And did you talk to Mr. Reiss about anything in

6  particular?

7  A.  Nothing.  Just pleasantries.

8  Q.  Now, you're here today to give your expert opinion on

9  certain issues relating to hotel condominiums, right?

10  A.  That's correct.

11  Q.  Have you ever been asked to testify as a witness in a case

12  before?

13  A.  No, I have not.

14  Q.  Are you getting paid for your work in connection with this

15  case?

16  A.  Yes, I am.

17  Q.  Are you getting paid on an hourly basis?

18  A.  Yes, sir.

19  Q.  Is that the same way you charge your consulting clients?

20  A.  Typically, no.  Typically the consulting assignments are

21  on a retainer basis that we would -- we would negotiate a set

22  fee, and then it would be paid over a period of time.

23  Q.  Mr. Howie, do you have an opinion, based on your

24  experience, as to whether it is in the best interests of the

25  unit owners, the association and the developer to include

Howie - cross

1849

1  facilities that are essential to the successful hotel

2  operations, including ballrooms, function rooms and meeting

3  rooms, in the common elements of a hotel condominium?

4  A.  Yeah, they should not be included in the common elements

5  of a hotel condominium.

6  Q.  Can you elaborate on that, please?

7  A.  Yes.  And, again, this goes back to the mapping process.

8  As I said, one of the determinations we try to make is

9  basically who needs those facilities to operate and who

10  controls those facilities and, frankly, who pays for those

11  facilities.

12        Generally the commercial facilities within a

13  condominium hotel are basically specifically designed to

14  support the rental program, the rental program only.  They're

15  not there relative to -- to support anything with the

16  individual units unless they decide to join the rental

17  program.  They're not there as a benefit to the condominium

18  association.  They only benefit and serve a purpose to the

19  rental program.

20        In many cases it's the developer or an affiliate that

21  basically owns and operates the actual rental program.  So our

22  philosophy is that, well, if those areas are necessary for the

23  developer or the affiliate to perform its function, then

24  those -- that entity should be responsible for that facility.

25  They should own that facility.  They should be able to control

1  that facility and they should be responsible financially to

2  pay for any costs associated with that facility.

3  Q.  Did you also form an opinion in this case as to whether --

4  strike that.

5      Do you also have an opinion as to whether

6  sophisticated developers, such as the Trump organization, who

7  are experienced in developing and managing residential

8  condominiums or traditional hotels but inexperienced in

9  developing and managing hotel condominiums would typically be

10  aware of the importance of putting essential hotel functions

11  in the commercial area, not in the common elements?

12  A.  We've dealt with many different developers --

13  Q.  My question is do you have an opinion first.

14  A.  Yes, I have an opinion, yes.

15  Q.  Yes, you do?

16  A.  Yes, I do.

17  Q.  What is that opinion, please?

18  A.  The opinion is -- is based on our actual experience in

19  dealing with developers.  We found that the developers of

20  other type products -- and that includes residential

21  condominiums; that includes hotels; that includes other types

22  of commercial developments -- are unaware of the issues

23  relative -- that come across relative to mapping.  And they're

24  unaware of the issues of making sure that the commercial

25  components of a condominium hotel should not be part of common

Howie - cross

1851

1  element.

2  Q.  Did you prepare a written report in this case that set

3  forth those two opinions you just summarized for us?

4  A.  Yes, I did.

5  Q.  And when did you issue that report?

6  A.  I believe it was in -- end of January, early February.

7  Q.  Have any of your opinions changed since then?

8  A.  No, they have not.

9  Q.  Now, as for the first opinion -- and that is your opinion

10  that it is not in the best interests of the developers, the

11  unit owners or the association to include essential hotel

12  facilities in the common elements -- the question is:  Can you

13  tell me first, please, what would you consider to be essential

14  hotel facilities?

15  A.  Essential hotel facilities are facilities that are within

16  a condominium hotel building that are necessary for the

17  successful performance of the rental program or the hotel

18  operation.  Without those areas, the likelihood of having

19  optimum success for the property to compete as a hotel would

20  not exist.

21  Q.  What are some examples of essential hotel facilities?

22  A.  Essential hotel facilities are often things as basic as

23  housekeeping areas, storerooms, you know, back-of-the-house

24  areas that aren't necessarily public spaces but they're

25  required -- they're necessary to operate a hotel.  And it also

Howie - cross

1852

1  includes public areas as well, including restaurant areas and
2  including ballrooms and meeting spaces, sometimes
3  administrative office spaces and things like that; the areas
4  that you would need to have available to you to operate a
5  rental program or a hotel.
6  Q.  Why, in your opinion, is it in everyone's best interests
7  not to include as common elements any of the hotel --
8  essential hotel facilities, such as meeting rooms and ballroom
9  facilities?
10 A.  Well, what we've seen is that -- that the overall
11 benchmark of success in our opinion is -- for a condominium
12 hotel property -- is can the property effectively operate and
13 compete as a hotel property.  If they can, then -- and they're
14 set up that way, then basically it benefits not only the --
15 obviously the hotel operator -- it certainly benefits them --
16 but it also benefits the unit owners as well because those
17 unit owners would participate -- to have the opportunity to
18 participate -- and the majority typically do -- participate in
19 the rental program.  And the revenues that are generated from
20 the hotel operation flow through to those unit owners.  So the
21 successful operation of the hotel has a direct benefit to the
22 unit owners and then indirectly as well to the condominium
23 association.
24 Q.  If the hotel fails, how does that affect the unit owners?
25 A.  If -- in our opinion, if the property is mapped, keeping

Howie - cross

1853

1  each of these areas separate -- common element, unit and the

2  commercial areas -- the unit owners are not affected by the

3  failure of the rental program -- of the hotel operation

4  financially, with the exception of if the hotel failed, there

5  wouldn't be a rental program; however, the owners would still

6  have the opportunity -- they would still own their unit.

7  Their assessments would not change within the condominium

8  association and they would have to basically find other ways

9  to rent their unit out if they wanted to rent them out.

10  Q.  I think you explained the success of the hotel in the

11  long-term is good for everyone.

12       My question is:  Why does it promote the success of

13  the hotel to have meeting and ballroom facilities in the

14  commercial areas as opposed to the common elements?

15  A.  For the operator to be held accountable to the success of

16  the rental program to the unit owners, we feel that they need

17  to have full control of all of the facilities that you would

18  need to compete with other hotels.  And the ballrooms and the

19  meeting space is a significant one.  I mean, the ballrooms and

20  meeting space can bring in a lot of business.

21       But the largest chunk of that business, from our

22  experience, that they bring in are typically the room nights

23  associated with these conferences and meetings and things like

24  that.  So that basically would flow back to the unit owners.

25  So if a unit owner participates in the rental program, even

Howie - cross

1854

1 though the developer does control or own the ballroom spaces,

2 they also do benefit.

3 But we firmly believe that for a condominium hotel to

4 be successful, you need to be able to compete in the

5 marketplace and you need to be able to compete with other

6 hotels and you need to have control of the same things that

7 other hotels have. Clearly other hotels have control of their

8 own meeting space without dealing with a potential third

9 party. And we think the same should hold true in a

10 condominium hotel.

11 Q. Are there any other reasons other than what you've just

12 explained why it is not in the best interests, in your

13 opinion, of unit owners to have the meeting and ballroom

14 facilities in the common elements?

15 A. Obviously everybody prefers to be optimistic and we -- and

16 look forward to the upside of revenues. But there's always a

17 downside. Ballrooms and meeting spaces sometimes, especially

18 during certain economic situations, are not profitable. And

19 if they're not profitable, then -- if they're part of the

20 common elements the -- any shortfalls would have to then be

21 absorbed by the unit owners, typically through their

22 assessments.

23 If it's not included as part of the common elements,

24 the success or the failure or making money or losing money

25 doesn't affect them. Their fees stay the same all the time

Howie - cross

1855

1    and they're not impacted in any adverse way.

2    Q.  Mr. Howie, you were asked to assume for purposes of giving

3    your professional opinions in this case that Trump Tower

4    Chicago contains two ballrooms, including a grand ballroom,

5    and various function spaces, which are used to host business

6    conferences, weddings and other business and social events.

7    Do you recall that?

8    A.  Yes.

9    Q.  How should those facilities that I've just described at

10   Trump Tower be mapped in your expert opinion?

11   A.  Well, I consider those essential facilities for the

12   operation of the hotel or the rental program; so they should

13   be mapped as commercial components.

14   Q.  For the reasons you just explained?

15   A.  Yes.

16   Q.  In your opinion, is it potentially problematic for the

17   hotel condominium association to have responsibility for

18   operating essential hotel facilities?

19   A.  I believe it is, yes.

20   Q.  Can you elaborate on that, please?

21   A.  Yes.  If -- if -- if the ballrooms and meeting spaces are

22   common element, then they fall really within the oversight of

23   the condominium board of directors who typically -- or may or

24   may not be skilled basically in the management or even

25   oversight of the ballrooms and the ballroom space.

Howie - cross

1856

1        And, frankly, if it's -- if it's included as a common

2   element, it's almost -- for them to fulfill their fiduciary

3   duty, they're almost compelled to get involved.  Even -- yes,

4   they can theoretically hire a management company, as often is

5   done by standard condominium associations to -- you know, to

6   operate that; but you can't shun your responsibilities as an

7   owner.  And you're still involved.  You still have to make

8   decisions.

9        So what a board of directors is -- is once they get

10  involved, if they're a common element, they almost have to get

11  involved.  They're compelled to get involved.  And that might

12  be -- likely could be putting them into an arena that they're

13  really not accustomed to or comfortable with.

14  Q.  Is that opinion you just explained based on your 30 years

15  of experience managing and planning hotel condominiums?

16  A.  Yes.

17  Q.  Can you give us a few examples of projects where you have

18  mapped meeting and ballroom facilities like those that you

19  have been asked to assume exist at Trump Tower as commercial

20  elements?

21  A.  The Ritz-Carlton in Kapalua; the Ritz-Carlton at Rancho

22  Mirage, California; Hyatt Regency, Clearwater Beach; The

23  Mutiny Hotel in Miami.

24       Other projects that weren't built:  A 1300-unit

25  project in Orlando called The Blue Rose; a beachfront property

Howie - cross

1857

1  called Indigo; a smaller property in Clearwater Beach called

2  Pelican Pointe, I believe.

3          Those are the ones that specifically come to mind.

4  Q.  Do you recall whether every project that you have worked

5  on in that capacity for a developer mapped the essential hotel

6  facilities as commercial areas?

7  A.  Every project that we consulted on, yes.

8  Q.  Do you recall ever having a project early on in your

9  career that varied from that formula?

10 A.  Yes, absolutely.

11 Q.  You do?  Okay.  Maybe I misheard you.

12 A.  Yes.

13 Q.  Let me ask --

14 A.  Well --

15 Q.  Let me ask the question again.

16          Have you -- on every project that you've worked on

17 for a developer to help the developer map the facilities, have

18 you always mapped essential hotel facilities as commercial

19 areas?

20 A.  Well, I think as I mentioned early on, this is an evolving

21 concept.  And the concept of mapping, again, evolved over

22 time.  In the very early stages of our involvement in the

23 industry, the commercial components were a common element.

24 And we then -- and that's where we got our experience because

25 we were managing these properties; and we saw firsthand the

Howie - cross

1858

1  complications and the difficulties that came from these areas

2  being common element.  So once we realized that, in future

3  developments -- and it got perfected, if you will; and it's

4  not perfect by any means but it got improved all along as

5  subsequent properties came about.

6  Q.  Do you believe this mapping philosophy that you formed

7  over the years and you've described to us here today has

8  developed into a best practice among people with particular

9  expertise in hotel condominium development?

10  A.  In one variation or another, yes.

11  Q.  And how large would you say that hotel condominium

12  industry is?

13  A.  Offhand, I don't know.

14  Q.  Now, you had a second opinion that you summarized for us.

15  I'd like to come back to that.  That's the opinion that

16  sophisticated developers, including those with experience

17  comparable to what the Trump organization had when it planned

18  Chicago Trump Tower, typically do not appreciate the

19  importance of mapping essential hotel facilities in the

20  commercial area of the building.

21         What is the basis for that opinion?  What experience

22  are you drawing from?

23  A.  Our basis is working from -- firsthand working from what

24  we believe are sophisticated developers, many of which, if not

25  all of which that we've dealt with from a consulting

Howie - cross

1859

```
 1   standpoint, were unaware that this was even something to be
 2   considered.
 3   Q.  Now, to be clear, when a client comes to you, they're
 4   coming to a company that holds itself out as being a hotel
 5   condominium consulting and specialist company, right?
 6   A.  We hold ourselves out primarily as a condominium hotel
 7   management company that also does consulting.
 8   Q.  Okay.  Now, can you give examples of some of the
 9   developers who you have advised over the years who were
10   experienced developers but who did not understand the nuances
11   of hotel condominium mapping as you've described it this
12   afternoon?
13   A.  Yes, absolutely.  I touched upon them earlier.  I believe
14   Gencom Group.  They are a hospitality company that owns
15   hotels, a lot of different types of hotels.  As I also
16   mentioned, they, I think, at one point were the largest owner
17   of Ritz-Carlton, at least I was told that.  Ritz-Carlton was
18   in the United States.  Obviously very well sophisticated in
19   the hotel business.  We assisted them with the map -- you
20   know, with the mapping process.
21           I also mentioned NJR Development, a corporation which
22   was -- I guess they're not necessarily a subsidiary but
23   related company to Opus South or Opus, which I think is the --
24   a major real estate development company, a very large
25   privately owned company.  I know they've developed high-rises
```

Howie - cross

1860

1  office buildings, including here in downtown Chicago.  They've

2  also developed residential condominiums, and they also

3  developed hotels.  Mapping process was new to them.

4         An organization called Taylor Woodrow based out of

5  London, the U.K., they're an international developer.  They

6  develop properties all over the world.  They also were

7  unaware -- and they're mainly developers of residential

8  properties.  They were also unaware of the mapping process.

9         The project in Orlando, the CMA was the developer.

10  That was a combination of three international developers, one

11  from France, one from Israel and one from -- I can't recall

12  the South American company -- one from South America.  They

13  were three independently experienced developers.  We provided

14  the same service to them.

15         Ricardo Daneen, the Mutiny Hotel, a company called

16  Flagler.  They do extensive hotel developments in Brazil and

17  various developments in Miami.  We assisted them as well.

18  Q.  Were you asked to assume certain facts for purposes of

19  giving your opinions in this case about the Trump

20  organization's development experience?

21  A.  Yes.

22  Q.  And do you recall what you were asked to assume about what

23  development experience -- or development and management

24  experience, for that matter -- the Trump organization had when

25  it began planning the Chicago Trump Tower?

Howie - cross

1861

1    A.  I was to assume that the Trump organization had

2    development experience, meaningful development experience, in

3    residential condominiums and hotels and also in one

4    condominium -- one condominium hotel in New York.

5    Q.  Were you asked to assume anything about the New York hotel

6    condominium?

7    A.  Yes.  The New York hotel condominium had very little or

8    minimal commercial areas; and, specifically, the condominium

9    hotel in New York did not contain any ballroom or meeting

10   spaces.

11   Q.  Is it important to your opinion that the New York hotel

12   condominium -- the New York Trump Hotel condominium did not

13   have ballrooms, conference rooms or any other facilities that

14   were on the scale of Chicago Trump Tower?

15   A.  Relative to -- it was important relative to the facilities

16   that are -- that exist at the Trump Tower Chicago.

17   Q.  Why is that?

18   A.  Well, if the -- the property in New York didn't have any

19   to speak of and so the issue of having to identify that area

20   or map that area, as we talked about, didn't exist because

21   it -- the facilities didn't exist.  So if they didn't exist,

22   there was no need to map them as one thing or another.  They

23   do exist at the Trump Chicago property, so it was something

24   that needed to be mapped.

25   Q.  Were you also asked to assume that New York Trump Hotel

Howie - cross

1862

1   condominium was the only hotel condominium that Trump

2   developed and that was up and running and managed by Trump at

3   the time that the Chicago Trump Tower building was planned?

4   A.  Yes.

5   Q.  And was that significant to you?

6   A.  Yes.

7   Q.  And why was it significant that that was the only hotel

8   condominium up and running?

9   A.  Just significant to evaluate the experience of the

10  developer.

11  Q.  Now, you said you were asked to assume that the Trump

12  organization had experience with residential condominium

13  development, right?

14  A.  That's correct.

15  Q.  In your experience, did -- do developers who have

16  experience in residential condominium planning typically have

17  an awareness of the best practices you have described for

18  mapping hotel condominium projects?

19  A.  Residential condominium properties?  No, they don't.

20  Q.  What have you observed in that respect from your

21  experience working with developer clients that supports that

22  opinion?

23  A.  The process doesn't exist.  In a residential condominium,

24  there's basically just almost one determination.  You

25  determine what is the unit and what is part of the unit.  And

1  then by default, everything else is common element.  That's

2  the -- that's clearly the majority of the situations.

3  Q.  Is that because residential condominiums are not running

4  hotels?

5  A.  That's true.  Residential condominiums do not -- normally

6  do not run hotels, yes.

7  Q.  You also were asked to assume that the Trump organization

8  had developed a few traditional hotels before it planned

9  Chicago Trump Tower.  From what you have observed through your

10  work, does that type of experience typically lead to an

11  understanding of hotel condominium mapping?

12  A.  No, it doesn't.

13  Q.  And when I say traditional hotels, do you understand what

14  I'm talking about?

15  A.  Yes.

16  Q.  And that is a hotel that is not a condominium, right?

17  A.  Yeah, exactly.  It's single ownership.  There's one owner

18  for the whole development, yes.

19  Q.  Based on your professional experience, does the fact that

20  the Trump organization amended a property report to change

21  mapping after units had been sold strike you as unusual or

22  surprising?

23         MR. S. KULWIN:  Judge, I don't believe this was

24  disclosed.  I would have to check.

25         THE COURT:  Do you want to show him where in the

Howie - cross

1864

1    report it was disclosed?

2            MR. SHONKWILER:  One moment, your Honor.

3            THE COURT:  Okay.

4      (Brief pause.)

5            MR. SHONKWILER:  If it's here, it's in this sense:

6    It's in the sense that --

7            MR. S. KULWIN:  Judge, I --

8            THE COURT:  I'm sorry?

9            MR. S. KULWIN:  If he's going to argue it, can we go

10   outside --

11           THE COURT:  Yes.  If you are going to argue, we need

12   to do it at sidebar.  Did you show Mr. Kulwin what you were

13   referring to?

14           MR. SHONKWILER:  Regarding to the second opinion that

15   has just been explained.  And it's a conclusion from the --

16           MR. S. KULWIN:  The answer is he didn't show it to

17   me, Judge.

18           MR. SHONKWILER:  I can show him.

19           THE COURT:  Let's have a sidebar then if we need to.

20           MR. S. KULWIN:  I just need to see what he's

21   referring to, Judge.

22           THE COURT:  Show Mr. Kulwin first.

23           MR. S. KULWIN:  Thank you.

24      (Brief pause.)

25           MR. S. KULWIN:  We better go to sidebar.

1    THE COURT:  Okay.

2    (Proceedings heard at sidebar:)

3    MR. SHONKWILER:  Your Honor, he doesn't say in

4  there -- he doesn't say -- he doesn't give an opinion one way

5  or another on explicitly as to whether it would surprise him

6  to find something out.  What he gives his opinion on is

7  experience with the developers who have the same experience

8  that he has assumed Trump has.  And what he says is

9  invariably, they make these mistakes until it's explained to

10  them.

11    THE COURT:  Mr. Kulwin?

12    MR. S. KULWIN:  There's absolutely no opinion in here

13  that he's familiar with them being amended, why they were

14  amended, under what circumstances they were amended.  I had no

15  opportunity to cross-examine him in his deposition about that.

16  It's totally undisclosed and surprise to us, Judge.

17    MR. SHONKWILER:  Our understanding is in the

18  deposition, you did ask him if he's ever seen another

19  developer amend a property report.

20    MR. S. KULWIN:  If I asked him, generally speaking,

21  did you ever see a developer amend a property report, that

22  doesn't mean it's disclosed here.

23    THE COURT:  I do not see it here.

24    MR. SHONKWILER:  He also asked him in his

25  examination -- he asked him whether he had seen a developer

Howie - cross

1866

1    change common elements.

2            THE COURT:  He asked what?

3            MR. SHONKWILER:  If he had ever seen a developer move

4    common elements into an amendment.

5            MR. S. KULWIN:  He said no and --

6            THE COURT:  If you want to have him explain what he

7    talked about on direct, you can do that.  But I agree with

8    Mr. Kulwin.  This is not explaining that.  I will sustain the

9    objection.

10     (Proceedings heard in open court:)

11            THE COURT:  Go ahead.

12   BY MR. SHONKWILER:

13   Q.  You explained, Mr. Howie, that some of your consulting

14   work is to help developers prepare property reports, right?

15   A.  Synonymous with condominium documents, yes.

16   Q.  Condominium documents.  And when you do that, you start

17   with them -- in every engagement you've ever had except for

18   one, you started with the developer at the very beginning of

19   that process; is that right?

20   A.  Yes, that's correct.

21   Q.  The very first property report, right?

22   A.  That's correct.

23   Q.  And then after that, in each of those engagements except

24   for one, you have stayed with that developer all the way

25   through any amendments to that property report?

Howie - cross

1    MR. S. KULWIN:  Judge, I object.  He's leading him

2  right into --

3    MR. SHONKWILER:  This is all in the report.

4    MR. S. KULWIN:  No.

5    MR. SHONKWILER:  Yes.

6    THE COURT:  Show to him where it is in the report.

7    (Brief pause.)

8    MR. SHONKWILER:  Wait a minute.

9    Your Honor, okay.  We don't need a sidebar for this

10  one.  The opinion that he gave in the report and that he

11  testified about to Mr. Kulwin was that he helps prepare

12  property reports.  Mr. Kulwin asked him questions about the

13  amendments that he has seen in his experience to property

14  reports and whether they included certain elements.

15    MR. S. KULWIN:  I didn't, Judge.  I never asked him

16  anything about amendments.  I asked him whether he had ever

17  seen commercial elements expanded and common elements taken

18  away.

19    MR. SHONKWILER:  You can't do that without a change,

20  without an amendment.

21    MR. S. KULWIN:  That hasn't been established.

22    MR. SHONKWILER:  Well, sure it has.

23    MR. S. KULWIN:  And there aren't even property

24  reports in Florida.

25    THE COURT:  You may pick up on what was covered on

1    direct examination.

2    BY MR. SHONKWILER:

3    Q.  Mr. Howie, you were asked by Mr. Kulwin if you had ever

4    seen common elements moved to commercial areas in a property

5    report.  Do you remember that?

6    A.  That's correct.

7    Q.  Okay.  And that can only happen if there's a property

8    report amendment, right?

9    A.  Yes.

10   Q.  Okay.  And when you're engaged by a developer, okay,

11   you're engaged from the beginning, right?

12   A.  That's correct.

13   Q.  And you're engaged from the beginning of creating a

14   property report to the end of the process of creating a

15   property report, right?

16   A.  Typically, yes.

17   Q.  And your experience -- the extent of your experience with

18   seeing changes to property reports is within that universe of

19   your engagements where you've been writing them; is that

20   right?

21          MR. S. KULWIN:  I'm going to object, leading and

22   argumentative.

23          MR. SHONKWILER:  I can read it.  It's in the --

24          THE COURT:  Sustained on form.  Rephrase that

25   question.

Howie - cross

1869

BY MR. SHONKWILER:

Q.  Am I right that your knowledge -- the extent of your knowledge about property report changes comes from your experience working on property reports?

A.  Yes.

Q.  And if you are working on a property report from the beginning of the process to the end and you're the only person advising the developer, then your advice is there the whole time, right?

A.  Our advice is there the whole time, yes.

Q.  Yours meaning Provident's?

A.  Yes, right.

Q.  And so when you answered the question about what changes you have seen, you were drawing only from that experience, right?

A.  Yes.

Q.  Is there going to be any need for you to -- strike that.

Has there ever been any need for you in your experience from the beginning of the process to the end of the property report process to change the philosophy you were applying to that process?

A.  No, there was not.

Q.  In other words, you're responsible for that decision, meaning the decision of what goes into the common elements for the whole process?

Howie - cross

1870

1   A.  Yes.  That was part of our responsibility, was to define

2   that, yes, that's correct.

3   Q.  And as part of your preparation for your testimony in this

4   case, you didn't go out researching other projects to see

5   whether people amend property reports, did you?

6   A.  No, I did not.

7   Q.  And you don't know one way or another about that, right?

8   A.  No, I don't.

9   Q.  Now, have you ever been retained by the Trump organization

10  to do any work other than the testimony that you're giving

11  today?

12  A.  No, sir.

13  Q.  Had you ever worked for the Trump organization in any

14  capacity related to development or planning?

15  A.  No, I have not.

16  Q.  Same goes for your company?

17  A.  That's correct.

18          MR. SHONKWILER:  Just one moment, your Honor, please.

19          THE COURT:  Yes.

20    (Brief pause.)

21  BY MR. SHONKWILER:

22  Q.  Mr. Kulwin said there were no property reports in Florida.

23  But you do work on property reports, don't you?

24  A.  Yeah, I believe the synonymous term is condominium

25  documents.  They contain the same components, yes.

Howie - redirect

1871

1   Q.  Condominium documents.  And you understand that's what I'm

2   talking about?

3   A.  Yes, I do.

4   Q.  Okay.  Thank you.

5           THE COURT:  Redirect.

6           MR. S. KULWIN:  I guess.  I may have forgotten.

7                    REDIRECT EXAMINATION

8   BY MR. KULWIN:

9   Q.  Okay, Mr. Howie.  Let's go.

10          You were asked some questions about your experience.

11  Do you remember those questions?

12  A.  Yes.

13  Q.  Okay.  First things first, so the jury understands,

14  95 percent of your work for your company over the last

15  30 years is managing property, not doing condominium mapping,

16  right?

17  A.  95 percent of our revenues.

18  Q.  Right.  And revenues are what you use to make money,

19  right?

20  A.  That's correct.

21  Q.  Yeah.

22          You said you worked on two dozen projects.  Do you

23  recall in February 27, 2013, you attached a list of projects

24  to your report about how many projects you actually worked on?

25  Do you remember that?

```
 1            MR. SHONKWILER:  I'm sorry, counsel.  I can't hear.
 2            MR. S. KULWIN:  Sorry, Judge.  I'm losing my voice.
 3            THE COURT:  Do you want to stand a little closer to
 4   the microphone, please.
 5            MR. S. KULWIN:  Sure.  No problem.
 6   BY MR. SHONKWILER:
 7   Q.  You said that -- excuse me.
 8            MR. S. KULWIN:  May I have a moment, please?
 9            THE COURT:  Yes.
10     (Brief pause.)
11   BY MR. S. KULWIN:
12   Q.  And --
13            THE COURT:  Are you okay?
14            MR. S. KULWIN:  I am, Judge.  I'm just having a
15   little -- I'm fine.  I'll keep going.
16   BY MR. S. KULWIN:
17   Q.  Let me show you Exhibit B to your report -- and excuse my
18   frog -- but is this the list of hotel condominium projects you
19   listed back then?
20   A.  What I listed was a representative list, and that's what
21   it says.  Not a complete list.  A representative list.
22   Q.  Of the ones that were most relevant to your report, right?
23   A.  Not necessarily.
24   Q.  You left off some ones that were highly relevant to your
25   report?
```

Howie - redirect

1873

1    A.  No, I just --

2           MR. SHONKWILER:  Objection, no foundation for knowing

3    that this witness has a relevance knowledge in terms of the

4    legal issues in the case.

5           THE COURT:  Overruled.  You may answer if you can,

6    Mr. Howie.

7    BY THE WITNESS:

8    A.  I listed -- basically representative list of ones that

9    we've probably did the most work on.

10   BY MR. S. KULWIN:

11   Q.  Okay.  So these are the ones that you did the most work

12   on?  These are the key ones, right?

13   A.  I'm not sure how you define key, but those are the ones

14   that we were most involved with, yes.

15   Q.  Okay.  So of your -- of the 5 percent of work that you've

16   done over the past 30-plus years while you've been working,

17   within that 5 percent of work that you've done, you've got

18   these developments as the ones you did the most work on,

19   correct?  Is that right?

20   A.  It's not 5 percent of the work.  It's 5 percent of the

21   revenues that we've earned, yes.

22   Q.  Of the 5 percent of the revenue that your firm has

23   generated over the last 30 years, these ones that are listed

24   here are the ones you did the most work in the area of this

25   so-called condo mapping?

Howie - redirect

1874

1   A.  I'd say that's safe to say, yes.

2   Q.  Okay.  Now, of those ones -- let's talk about the ones you

3   listed here.  Okay.  One of the ones that I believe you list

4   here -- correct me if I'm wrong -- has to do with Sandalwood

5   in Pinellas Coast?  You did some work for the Sandalwood

6   Pinellas Coast hotel condominium?

7   A.  Yes, that was the first condominium hotel that we've ever

8   managed.

9   Q.  You didn't do any mapping for that, right?

10  A.  No.  As I said earlier, in the early stages it was all

11  common element.  That function didn't exist.

12  Q.  We're going to get to the early stages.

13      Now, you got one on here -- so that's -- of the ones

14  that you listed -- and I counted them -- you listed 19.  Okay.

15  So two, Sandalwood and Pinellas, that had nothing to do with

16  mapping, right?  That was one of the early ones, right?

17  A.  Yes.  I believe I listed that since that was the first one

18  we ever did.

19  Q.  It would be easier -- just stay with me.  Those two have

20  nothing to do with condo mapping, right?

21  A.  That's correct.

22  Q.  Let's go to the next 17.  One Ocean Resort, that one never

23  even got built, right?

24  A.  That was an existing property that the developer was

25  considering converting it to a condominium hotel.

Howie - redirect

1875

1  Q.  But it never happened?

2  A.  The conversion never happened.

3  Q.  You mentioned Indigo Beach Resort, but that one never got

4  turned into a hotel condominium either, right?

5  A.  Ultimately it was never built, no.

6  Q.  Yeah.  Never built.  Okay.  Then you mentioned the blue

7  resort -- by the way, so far all of these are in Florida,

8  correct, the ones that I've mentioned so far?

9  A.  Yes.

10 Q.  The blue resort, is that right?  The blue?

11 A.  The blue?

12 Q.  The Blue Rose Resort?

13 A.  Oh, The Blue Rose, yes.

14 Q.  That one never got built either, correct?

15 A.  That's correct.

16 Q.  Then you mentioned, let's see, Miramar Lakes, also in

17 Florida.  That one never got built either, correct?

18 A.  That's correct.

19 Q.  Then you mentioned Sailport.  That's the one you did for

20 U.S. Homes, right?  You mentioned how you did this work for

21 U.S. Homes?

22 A.  That's correct.

23 Q.  You didn't do any condo mapping for that one either,

24 right?

25 A.  There was a commercial unit in that facility; however, we

Howie - redirect

1876

1  did not do the mapping of the amenities, no.

2  Q.  Right.  Because U.S. Homes is a big company and they did

3  it in-house, right?

4  A.  No.

5  Q.  They had consultants that helped them with it before you

6  got there?

7  A.  No.  The property -- Sailport was never mapped by anyone.

8  Q.  Oh, okay.  So no one ever mapped it.  And was it a hotel

9  condo or no?

10  A.  It's a hotel condominium that we still manage, yes.

11  Q.  So no one ever mapped it?

12  A.  No.

13  Q.  Okay.  And were there commercial areas?

14  A.  There was one commercial unit, yes, which was an office.

15  Q.  An office.  So really there was no mapping on that one

16  that you list on your representative clients because there

17  were no hotel amenities to map in that one, right?

18  A.  Well, they had amenities.  It's just that they were not

19  mapped.

20  Q.  Right.  I thought the only amenities were -- well, what

21  were the amenities?

22  A.  Amenities such as a front desk area, you had housekeeping

23  areas, you had a convenience store, you had a pool, you had

24  tennis courts, you had a beach, meeting room.

25  Q.  How big was that meeting room?

Howie - redirect

1877

1    A.   Relatively small.

2    Q.   And how much revenue was generated at that hotel for that

3    out of all those, quote/unquote, amenities, if any?

4    A.   How much revenue to our company?

5    Q.   No, no.  How much revenue at the hotel was generated by

6    those so-called amenities that weren't mapped?

7            MR. SHONKWILER:  Objection to so-called amenities.

8            THE COURT:  Sustained on form.  Rephrase it.

9    BY MR. S. KULWIN:

10   Q.   How much revenue was generated by the beach, the pool, the

11   administrative office, the small storage areas and the small

12   meeting room at that hotel condominium, if any?

13   A.   Independently of what the customer pays for their room

14   revenue?

15   Q.   Yeah.

16   A.   Very little.

17   Q.   Yeah.  Okay.

18           Another one of the ones on your list was Enclave

19   Suites in Orlando, Florida, right?

20   A.   Yes.

21   Q.   You didn't do any mapping there either, right?

22   A.   No.  Mapping was part of our involvement there, yes.

23   Q.   Really?  And they had, what, a front desk, a lobby and

24   some administrative offices?

25   A.   They had multiple pools, they had a restaurant, meeting --

1878

1    no meeting space, you know, hot tubs, Jacuzzis, things of that

2    nature.

3    Q.   How much revenue was generated -- well, let me ask this:

4    Was there anywhere close to $5 million of revenue coming out

5    of those things?

6    A.   That was a long time ago, but not that I recall, no.

7    Q.   How long ago was that?

8    A.   That was in the mid '80s.

9    Q.   Okay.

10   A.   Mid to late '80s.

11   Q.   Land's End was another one that you worked on?

12   A.   Yes.

13   Q.   For US Lend Lease in the late '80s and you didn't do any

14   mapping for that one?

15   A.   That was another early version, yes.

16   Q.   Another one that you listed was Fisher Island, right?

17   A.   Yes.

18   Q.   Now, Fisher Island, it really isn't a hotel condominium if

19   I understand it correctly, is it?  Really?  Just answer that

20   question.  Do I have it wrong, is it a hotel condominium?

21   A.   They are condominium units that are offered on a transient

22   basis.

23   Q.   Right.  But Fisher Island is owned by a bunch of really,

24   really wealthy people who actually own the whole island,

25   right?

Howie - redirect

1879

1   A.  They own -- they have condominiums primarily on Fisher

2   Island so they own the condominium unit and the common

3   elements, yes.

4   Q.  Right.  But they own the whole island, don't they, pretty

5   much?

6           MR. SHONKWILER:  Objection, relevance.

7           THE COURT:  Sustained.

8           MR. S. KULWIN:  It goes to whether it's a hotel

9   condominium.

10  BY THE WITNESS:

11  A.  I'm not --

12  BY MR. S. KULWIN:

13  Q.  Let me ask you -- I'll try it again.

14          Fisher Island, do I have it wrong or is that the one

15  that is basically -- it's a giant resort, right?  It's a giant

16  resort, right?  Fisher Island?

17  A.  I would not define it as that, no.  It's a --

18  Q.  Go ahead.

19  A.  It's an island that has various components to it, which

20  includes residential condominiums, it includes transient

21  condominiums and it includes a private owners' country club.

22  Q.  Right.  But the transient condominiums and the residential

23  condominiums and the country club are on grounds that

24  everybody who is on the island owns, right?

25          MR. SHONKWILER:  Same objection, relevance.

1        MR. S. KULWIN:  It goes to whether --

2    BY THE WITNESS:

3    A.  It's actually --

4        THE COURT:  Wait.  Sir, there is an objection.

5        MR. S. KULWIN:  It goes to whether or not -- while

6    he's talking about his great hotel condominium experience,

7    this is a hotel condominium.

8        THE COURT:  Overruled.  You may answer if you know.

9    BY THE WITNESS:

10   A.  I do not know factually who owns the island.

11   BY MR. S. KULWIN:

12   Q.  All right.  So you're not sure about that one.  Okay.

13       MR. SHONKWILER:  Objection to the commentary.

14       THE COURT:  Sustained.  I will strike it and the jury

15   should disregard it.

16   BY MR. S. KULWIN:

17   Q.  The Inn at Four Greens, you have that one on your list.

18   Remember that one?  That wasn't built either?

19   A.  No, that's correct.

20   Q.  And that was in Florida.  The Resort at Marina Village,

21   which is in Florida, you didn't do any mapping on that one,

22   did you?

23   A.  No.

24   Q.  Rather than go through the whole nine yards here,

25   basically the way I counted it up, all the ones on your

Howie - redirect

1881

1  representative list that you listed, you basically did

2  condominium mapping for five places, right?  Two --

3  A.  No.

4  Q.  -- Ritz-Carltons -- according to this list -- the two --

5  correct me if I'm wrong.  You did the two Ritz-Carltons, one

6  in Hawaii and one in California; that's two, right?

7  A.  Correct.

8  Q.  Aqualea, that's three, right?

9  A.  Right.

10  Q.  Mutiny, that's four, right, in Florida?

11  A.  Right.

12  Q.  And Ocean Point in Key Largo, also Florida, right?  Is

13  that correct?

14  A.  Well, we also did -- those projects all got built.

15  Q.  Right.

16  A.  But the mapping function that we provided were -- we also

17  provided to properties that also ultimately did not get built.

18  Q.  So of the projects that are on your representative list

19  that actually went up and got built, you did five in 30 years,

20  right?  Condominium mapping.  Five in 30 years.  Do I have it?

21  Do you want to look at the list?

22         Oh, you have the list.

23    (Brief pause.)

24  BY THE WITNESS:

25  A.  I believe there were six.

```
 1   BY MR. S. KULWIN:

 2   Q.  Which one did I miss?

 3   A.  The Enclave Suites.

 4   Q.  I'm sorry?

 5   A.  Enclave Suites.

 6   Q.  Enclave Suites?

 7   A.  Right.

 8   Q.  Okay.  So six.  And what's Enclave Suites?

 9   A.  That was the one you referred to earlier.  It's a

10   condominium hotel that was in -- is in Orlando.

11   Q.  And how big is it?

12   A.  321 units.

13   Q.  When did you do that mapping?

14   A.  Mid '80s.

15   Q.  Mid '80s?

16   A.  Yes.

17   Q.  Did it have a lot of amenities, ballrooms, meeting --

18   A.  We just described those.  It was -- they had multiple

19   pools, a restaurant, spas, you know, Jacuzzis and things of

20   that nature.

21   Q.  And revenue from them for the hotel?

22   A.  Well, the restaurant revenue was meaningful.

23   Q.  The?

24   A.  The restaurant revenue was meaningful.

25   Q.  You understand that in the -- maybe I can refresh your
```

Howie - redirect

1883

1    recollection.  You didn't really have very much involvement in

2    Enclave Suites, did you?

3    A.  We managed that property, yes.

4    Q.  But when it came to condominium mapping, you didn't do

5    much?

6    A.  It's -- as I said earlier, is that those projects that we

7    were engaged by the developer to manage and operate, again, we

8    were involved at the front end, the preconstruction stages, so

9    we assisted them through the development.  But since we

10   ultimately were going to manage and operate those properties,

11   it was not a separate independent consulting assignment.  It

12   was part of the entire engagement.

13   Q.  I'm sorry.  Were you asked this question -- you gave a

14   deposition in this case, right?

15   A.  Correct.

16   Q.  That was in February of this year, right?

17   A.  I believe so.

18   Q.  Were you asked this question and did you give this

19   answer -- page 15- --

20        MR. SHONKWILER:  Can you tell me the page, please,

21   counsel?

22        MR. S. KULWIN:  Can I tell you the date?

23        MR. SHONKWILER:  Page.

24        MR. S. KULWIN:  Page 151, line 19.

25   BY MR. S. KULWIN:

Howie - redirect

1884

1   Q.  Question:  Now, you weren't involved in any mapping on

2   that project, right?  We're talking about, I believe, the

3   Enclave Suites.

4           Answer:  I don't recall we were.  We may have had

5   some limited -- we may have had limited involvement, but I

6   don't recall specifically.

7   A.  At the time I did not recall.

8   Q.  But -- that's correct.  You recall now that you had some

9   limit -- so six in 30 years?

10  A.  And I believe I mentioned also in my deposition, there was

11  a smaller property called Pelican Pointe I believe.

12  Q.  Called what?

13  A.  Pelican Pointe.

14  Q.  Pelican Pointe?

15  A.  Pelican Pointe I believe, yes.

16  Q.  How big was Pelican Pointe?

17  A.  70-some rooms.

18  Q.  Did they have ballrooms?

19  A.  No.

20  Q.  Meeting rooms?

21  A.  Small one.

22  Q.  Big conference rooms?

23  A.  No.

24  Q.  Food service, big food service with catering?

25  A.  No.

Howie - redirect

1885

```
 1   Q.  Did Enclave Suites have meeting rooms, ballrooms, large
 2   meet -- conference rooms?
 3   A.  They had a meeting room, again, not extensive.
 4   Q.  But no food service other than the restaurant?
 5   A.  They had a restaurant, yes.
 6   Q.  You were asked some questions about whether residential
 7   developers have knowledge of whether or not commercial areas
 8   should be owned by a hotel as opposed -- I'm sorry.
 9          You were asked some questions about whether people
10   with experience, developers with experience in residential
11   condominium development would understand or know that
12   commercial areas shouldn't be part of the common elements in a
13   hotel condo.  Do you remember that question?
14   A.  That has been our experience.
15   Q.  Yeah.  Your experience though -- you have zero experience
16   in Chicago, right?  Zero?
17   A.  That's correct.
18   Q.  You have -- in fact, you have zero experience in anywhere
19   but Florida and one project in California and one project in
20   Hawaii, right, when it comes to hotel condos?
21   A.  That's correct.
22   Q.  You have no experience in residential condos, right?
23   A.  That's not correct.
24   Q.  Oh.  You've advised developers in building residential
25   condos?
```

Howie - redirect

1886

1    A.  As I mentioned earlier, when the company was known as

2    Bieder Management Services when it was first formed, it was a

3    residential condominium management company.  And at that time,

4    we managed over 60 residential condominiums.

5    Q.  And how long did you keep doing that for?

6    A.  We did that up through 1982.

7    Q.  So you have no residential condominium -- you have no

8    experience with residential condominium developers, you

9    know -- let me rephrase it.

10          You have no experience with residential condominium

11   development since 1982; is that correct?

12   A.  That's correct.

13   Q.  And certainly it was limited to Florida, again, right?

14   Nothing in Chicago or anywhere else for that matter, true?

15          MR. SHONKWILER:  Objection, relevance.

16          MR. S. KULWIN:  It goes to his experience, Judge.

17          MR. SHONKWILER:  His experience in developing

18   residential condominiums in particular states?

19          MR. S. KULWIN:  Well, I'm going to connect that up in

20   a second, Judge.

21          THE COURT:  Overruled.  You may answer if you can.

22   BY MR. S. KULWIN:

23   Q.  Is that true, Mr. Howie?

24   A.  We were involved with residential condominiums throughout

25   the whole state of Florida, but I don't believe we were -- had

1   any properties that we managed outside of the state, no.

2   Q.  So -- and the number of developers that you've actually

3   worked with who got into hotel condominiums that you were

4   actually involved in mapping are how many?  How many

5   developers have you worked with that you got into in a built

6   project in a hotel condominium, how many different developers?

7          MR. SHONKWILER:  I'm going to object to all of the

8   questioning about whether something was built.  It's been

9   established it has nothing to do with what his testimony is

10  today or the basis for it.

11         MR. S. KULWIN:  Really?  Oh, okay.  I'll rephrase

12  that then.

13         THE COURT:  Okay.

14  BY MR. S. KULWIN:

15  Q.  So it's your testimony to this jury that condominium

16  mapping, the way it works, the experience that you've had is

17  just as valuable whether the project gets built or doesn't get

18  built?

19  A.  Well, we perform the exact same function.

20  Q.  Right.  So you perform this condominium mapping, you make

21  these decisions -- developers make these decisions before the

22  shovels even hit the ground, right?

23  A.  Typically, yes.

24  Q.  In all of your experience, right?

25  A.  Virtually all.

Howie - redirect

1888

1  Q.  Yeah.  Virtually all.

2       And I believe you said that it was your opinion that

3  the Trump organization wouldn't have any knowledge of that

4  condominium concept, that mapping concept, in your opinion

5  based on the facts that you understand, right?

6  A.  I believe what I said was that -- that developers, even

7  developers of residential condominiums, even developers of

8  hotels, do not -- are not aware or understand the importance

9  of the mapping process.  That's what I said.

10 Q.  So we're clear, you're not telling the jury that that's

11 your opinion with respect to Trump?  You don't know, correct?

12 You don't know?

13 A.  That's my opinion based on my personal experience in

14 working with developers --

15 Q.  Right.

16 A.  -- yes.

17 Q.  But so I'm clear, you never worked with Trump, right?

18 A.  That's correct.

19 Q.  So you literally don't know if Trump would have been

20 familiar with the concept of we have to decide what's going in

21 the commercial and what's going in the common elements before

22 we send out a property report?  You don't know?

23 A.  No, I don't know that.

24 Q.  Yeah.  And, of course, you didn't read any of the

25 depositions in the case, right?

Howie - redirect

1889

1   A.  That's correct.

2   Q.  You didn't read any of the documents in the case, right?

3   Other than you looked at one property report for informational

4   purposes, true?

5   A.  That's correct.

6   Q.  You particularly didn't read Charles Reiss' deposition,

7   correct?

8   A.  That's correct.

9   Q.  You have no idea, do you, that Mr. Reiss and Mr. Trump did

10  an extensive investigation into the hotel --

11          MR. SHONKWILER:  Objection.  That's a summary --

12  argumentative summary of testimony that was two days ago.  And

13  it can't possibly lead to a relevant question.  And it's

14  inaccurate.

15          MR. S. KULWIN:  Actually it very much can, Judge,

16  because his opinion is based on assumptions.  And I am now

17  going to challenge those assumptions and undercut them through

18  my questioning.

19          THE COURT:  You may challenge the assumptions.  I am

20  sustaining the objection on form, the way you are asking the

21  question.

22          MR. S. KULWIN:  Thank you, your Honor.

23  BY MR. S. KULWIN:

24  Q.  So you're not aware, for example, whether or not Mr. Reiss

25  did an extensive investigation into the hotel condominium

Howie - redirect

1890

1    business in places like Florida and all over the country in

2    1993?  You don't know that, do you?

3    A.  I was unaware of that, yes.

4    Q.  Were you aware -- did anyone tell you when they were

5    giving you your assumptions that before Trump built the Trump

6    New York project, which is a hotel condominium, that Mr. Reiss

7    did an extensive investigation into every -- to everything he

8    could find out about what went right and what went wrong in

9    hotel condominium developments in the 1980s through 1993?

10              MR. SHONKWILER:  Objection.  There's no testimony in

11   the record -- no evidence in the record and it's irrelevant.

12   He's gone beyond the point of asking him whether he assumed or

13   knew facts.

14              MR. S. KULWIN:  Judge, if he wants me to give him the

15   cite page and verse I will.  That was precisely his testimony

16   and I'm challenging his assumption.

17              THE COURT:  Overruled.  You may answer if you can.

18   BY THE WITNESS:

19   A.  The assumptions that my opinion were based on were those

20   that I -- exclusively those that I described earlier.

21   BY MR. S. KULWIN:

22   Q.  Right.  So you didn't know that?

23   A.  I did not know that.

24   Q.  No one told you that?

25   A.  No.

Howie - redirect

1891

1    Q.  Okay.  And let me give you a hypothetical.  Okay,

2    hypothetically speaking, assume you have a sophisticated

3    developer who is a leading real estate developer in the United

4    States of America.  With me so far?

5    A.  Yes.

6    Q.  Assume that at the time he's about to build -- assume he

7    decides to build a close to $1 billion hotel condominium.  Got

8    me?

9    A.  Yes.

10   Q.  Assume that at the time he does that, he has on staff,

11   okay, a man that he's worked with for 15 years.  With me so

12   far?

13   A.  Yes.

14   Q.  Assume that this man works for him all during the

15   development of this project and before he did that project had

16   worked with him exclusively in researching and developing a

17   hotel condominium in the city of New York.  Got me?

18   A.  Yes.

19   Q.  Assume that this man in developing the property report and

20   the hotel budgets and things of that nature was consulting all

21   along with a professor of hotel accounting.  With me so far?

22   A.  Yes.

23   Q.  Assume that this man also attended conferences in which

24   hotel condominiums were discussed at which this hypothetical

25   developer has hired an expert who attends the same

1    conferences.  You got me so far?

2         MR. SHONKWILER:  Objection on relevance grounds and

3    the form of this extended hypothetical.  It's so many degrees

4    removed from what this witness testified about.

5         MR. S. KULWIN:  I'm going exactly to his assumptions.

6         THE COURT:  Overruled.

7    BY MR. S. KULWIN:

8    Q.  You with me so far, Mr. Howie?

9    A.  I believe so.

10   Q.  Now, assume that guy who helps the developer actually

11   within five months of leaving the developer is giving a speech

12   to hundreds of people at a conference that's regularly held

13   for hotel condominiums.  Okay?

14        MR. SHONKWILER:  Objection.  Mr. Kulwin has now

15   confirmed he's actually not giving a hypothetical.  It's a

16   dramatic presentation of his argumentative version of

17   evidence, some of which has come in and some of which hasn't.

18        MR. S. KULWIN:  It's a hypothetical test to his

19   assumption.  I'm now going to wind it up with an opinion.

20        THE COURT:  Overruled.

21        MR. S. KULWIN:  Thank you.

22   BY MR. S. KULWIN:

23   Q.  Are you with me so far, Mr. Howie?

24   A.  Yes.

25   Q.  Under those circumstances, with those facts, would it be

Howie - redirect

1893

1  your opinion that the developer in question would literally be

2  completely unfamiliar with the idea of condo mapping?

3  A.  I think --

4         MR. SHONKWILER:  Objection.  He's speculating about

5  what somebody knows in his hypothetical -- speculating about a

6  hypothetical developer's knowledge.

7         THE COURT:  Sustained.  You can use your assumptions

8  to test the opinions that he has given here.  But not new

9  hypotheticals to give new opinions.  It is the way you phrased

10  it.

11         MR. S. KULWIN:  Okay.

12  BY MR. S. KULWIN:

13  Q.  Under the facts that I've just given you, sir, would it be

14  your opinion -- what opinion would you have as to whether

15  that -- let me back up.

16         You were given certain factual assumptions to go by

17  to form your opinions here, correct?

18  A.  For my report.

19  Q.  Yeah.  The same -- which is what the opinions that you

20  gave here are, right?

21  A.  Yes.

22  Q.  Okay.  Now I've given you a bunch of different

23  assumptions, correct?

24  A.  Correct.

25  Q.  You've heard them, true?

Howie - redirect

1   A.  If I recall them all, yes.

2   Q.  You understand them, right?

3   A.  Generally.

4   Q.  Okay.  Given those assumptions, would it be your opinion

5   literally that this developer in the assumptions I gave you

6   would have no idea about a condominium mapping?

7   A.  It's very possible.

8   Q.  Possible?

9   A.  Very possible.

10  Q.  Okay.  And when you say possible, do you mean that you're

11  sure they wouldn't or sure they would or what is the

12  percentage?

13          MR. SHONKWILER:  Objection.

14  BY MR. S. KULWIN:

15  Q.  What's the percentage?

16  A.  I cannot give you a --

17          MR. SHONKWILER:  Objection.

18          THE COURT:  Overruled to what is the percentages.  If

19  you can answer it.

20  BY THE WITNESS:

21  A.  I cannot give you a percentage.

22  BY MR. S. KULWIN:

23  Q.  You don't know?

24  A.  Well, based on our experience in dealing with other

25  sophisticated developers, it's certainly very, very possible,

Howie - redirect

1895

1    if not probable that -- that this concept -- they would not be

2    totally aware or aware of this concept, in my opinion.

3    Q.  Had any of those other developers have -- already

4    developed a hotel condo when you worked for them?  Any of

5    them?

6    A.  No.

7    Q.  Okay.  Had any of those hotel developers have a man

8    working for them who had actually done re- -- extensive

9    research into the field of hotel condominiums?

10   A.  I wouldn't know.

11   Q.  Have any of those condo developers that you're --

12   first-time hotel condominium developers ever actually built

13   from the ground up a hotel condominium before they worked with

14   you?

15   A.  I don't believe so.

16   Q.  Have any of those condominium developers operated a hotel

17   condominium for nine years in New York City before they came

18   to you?

19   A.  No.

20   Q.  Have any of those hotel -- last one.  I promise.

21        Did any of those hotel condominium guys that you were

22   dealing with, okay -- I'll withdraw it.

23        Okay.  Let's now go to another area that you talked

24   about.  This idea of condominium mapping came to you in the

25   early '80s, right?

Howie - redirect

1896

1   A.  It evolved.

2   Q.  It evolved.  But by the '80s -- by the end of the '80s, it

3   had kind of gone from evolving to actually kind of forming and

4   it was already flying?

5   A.  Absolutely not.

6   Q.  '91?

7   A.  I would say more like the late '90s it was getting

8   traction.

9   Q.  Okay.  And when you say --

10  A.  But it was still evolving.

11  Q.  Still evolving.  When you say getting traction, your firm

12  was kind of offering this out there; pitching it, right?

13  A.  No.

14  Q.  Oh, okay.  So you're saying by the late '90s, the field

15  was familiar with it, true?

16  A.  They were becoming familiar with it.  Late '90s it was

17  still at the relative infancy of the latest boon, if you will,

18  of condominium hotels.

19  Q.  Did you have a lot of knowledge of what was going on in

20  the field in, say, California, northern California?

21  A.  No.

22  Q.  How about Texas?

23  A.  No.

24  Q.  How about Illinois?

25  A.  No.

Howie - redirect

1    Q.  How about New York?

2            MR. SHONKWILER:  Objection, relevance.

3            MR. S. KULWIN:  Goes to his --

4            THE COURT:  Overruled.

5    BY MR. S. KULWIN:

6    Q.  Mr. Howie?

7    A.  No.  But I do believe that the concepts remain the same

8    regardless of the location of the development.

9    Q.  That's not my question.  I'm not doubting the concepts may

10   or may not remain the same.

11           Do you have any knowledge of in any of those states

12   or really any other state other than Florida where you were

13   doing work except for those two isolated instances --

14           MR. SHONKWILER:  Objection, asked and answered and

15   argumentative.

16           THE COURT:  Sustained on asked and answered.

17   BY MR. S. KULWIN:

18   Q.  Do you have any knowledge, sir, about whether developers

19   of hotel condominiums in any other state other than Florida

20   had already begun to grasp the concept of condominium mapping

21   by 1997?  Do you know?

22   A.  Well, I would say indirectly, yes, I would know or I

23   ultimately did know.  At that time I didn't know.  But

24   ultimately I did know.

25   Q.  You ultimately did know?

Howie - redirect

1898

1  A.  Yes, because --

2  Q.  Did you do --

3  A.  Because --

4  Q.  Did you do research?

5       MR. SHONKWILER:  Objection.  The witness was

6  answering.

7       THE COURT:  Did you finish your answer, Mr. Howie?

8       THE WITNESS:  No.

9       THE COURT:  Go ahead.  Finish your answer.

10  BY THE WITNESS:

11  A.  Because when we started -- when I started attending

12  conferences -- and these conferences were attended by

13  developers from probably all of those states that you just

14  mentioned, maybe all of them -- those developers that I

15  interacted with at these conferences clearly did not

16  understand that concept.

17  BY MR. S. KULWIN:

18  Q.  You talked to -- and what was the latest year that that

19  happened?

20  A.  The latest conference I attended?

21  Q.  No.  The latest year where you went to a conference where

22  you talked to everybody there and nobody understood

23  condominium mapping.

24  A.  Well, I didn't talk to everybody at the conference.  But I

25  talked to a significant number of people at the conference

Howie - redirect

1899

1  regarding condominium hotels and there were many issues,

2  including condominium mapping, that they were unaware of.

3  Q.  And what year was that, the latest year that happened?

4  A.  2006 or '7.

5  Q.  Really?  Isn't it true, sir, that by 2003, it had almost

6  become an article of faith in your business as a consultant

7  that condominium -- hotel condominium developers should always

8  own the commercial areas?  Isn't that what you said?  Article

9  of --

10  A.  I believe I said more like 2005 rather than 2003.

11  Q.  Actually the question was -- page 223, line 22.

12          MR. SHONKWILER:  Can you wait a second, counsel,

13  please.

14          223, line?

15          MR. S. KULWIN:  22.  The question was -- and I'll

16  show it to you if you want.

17          MR. SHONKWILER:  Go ahead.

18  BY MR. S. KULWIN:

19  Q.  Here, let me just -- I'll show it to you first.

20          That way you can -- maybe it refreshes your

21  recollection.

22  A.  Well, initially I stated 2005.  And then you said 2003,

23  2004, 2005.  And I stated, yes, that's correct.

24  Q.  Okay.  So you understood --

25  A.  Is that --

1    Q.   Certainly at the latest it was -- the latest, given that

2    question, the absolute latest, it was an article of faith in

3    the industry that everyone was familiar with according to you

4    in your deposition that it was in the developer's economic

5    interest to maintain the commercial areas for themselves,

6    correct?

7    A.   I wouldn't define it as an article of faith.  Those --

8    those -- those individuals that were in the know, if you will,

9    industry people within condominium hotels, yes.  The concept

10   of not including commercial components within the common

11   elements was -- was well-accepted.

12   Q.   And last question on this point:  Charlie Reiss was an

13   industry person in the know in the hotel condominium business

14   at that time, correct?

15        MR. SHONKWILER:  Objection, speculation, no

16   foundation whatsoever.

17        THE COURT:  Overruled.  If you know, you may answer.

18   BY THE WITNESS:

19   A.   Yeah.  I personally do not know the level of expertise of

20   Mr. Reiss.

21   BY MR. S. KULWIN:

22   Q.   Do they often ask people at the Butler conference when

23   they hold their specialty conferences on hotel condominiums

24   who have little or no expertise in hotel condominiums to give

25   the keynote speech?

1     MR. SHONKWILER:  Objection, foundation, calls for

2 speculation.

3          THE COURT:  Sustained.

4          MR. S. KULWIN:  I'll lay the foundation.

5 BY MR. S. KULWIN:

6 Q.  Mr. Reiss gave the keynote speech at a conference for the

7 Butler law firm, true?

8          MR. SHONKWILER:  Objection, asked and answered.

9          THE COURT:  He is trying to lay his foundation.

10 Overruled.

11 BY MR. S. KULWIN:

12 Q.  True, Mr. Howie?

13 A.  Yes.

14 Q.  It was in 2005, true?

15 A.  Yes.

16 Q.  It was attended by hundreds of people, true?

17 A.  Yes.

18 Q.  And he gave the keynote speech to hundreds of people,

19 right?

20 A.  He gave the opening speech.

21 Q.  The opening speech.  And there were hundreds of people in

22 attendance, true?

23 A.  Yes.

24 Q.  And it was a conference on hotel condominiums, correct?

25 A.  That's correct.

Howie - redirect

1902

```
 1   Q.  And the people who were in attendance were there trying to
 2   learn about the hotel condominium development field from
 3   people in the know, true?
 4           MR. SHONKWILER:  Objection, calls for speculation.
 5           THE COURT:  Sustained.
 6   BY THE WITNESS:
 7   A.  I assume that's why --
 8           THE COURT:  I sustained it, sir.
 9           THE WITNESS:  Oh, I'm sorry.
10   BY MR. S. KULWIN:
11   Q.  Well, they weren't there at the convention to listen to
12   Mr. Reiss talk about his thoughts about how the Mets were
13   going to do that year?
14           MR. SHONKWILER:  Objection.
15           THE COURT:  Sustained.  Let's move on, Mr. Kulwin.
16           MR. S. KULWIN:  Thank you, your Honor.
17           THE COURT:  Actually we are going to take our
18   afternoon break.
19     (Jury out.)
20           THE COURT:  We will pick up in about ten minutes.
21     (Recess taken.)
22     (Proceedings out of the hearing of the jury:)
23           THE COURT:  Ready, Mr. Kulwin?
24           MR. S. KULWIN:  Oh, yes, your Honor.
25           THE COURT:  Do you have a sense of how much longer
```

1    you have?

2              MR. S. KULWIN:  20 to 25, maybe.

3              THE COURT:  Okay.

4              MR. S. KULWIN:  Maybe quicker.

5              THE COURT:  And then this is your last witness,

6    correct?

7              MR. S. KULWIN:  It is.

8              THE COURT:  You're going to rest.

9              Do you plan on calling any witnesses?

10             MR. NOVACK:  No.

11             THE COURT:  You're not going to call Mr. Shearer?

12             MR. NOVACK:  No.

13             THE COURT:  Okay.  Bring in the jury, please.

14      (Jury entered the courtroom.)

15             THE COURT:  You may be seated.

16             MR. S. KULWIN:  Thank you, your Honor.

17             THE COURT:  Go ahead, Mr. Kulwin.

18             MR. S. KULWIN:  Oh, thank you, your Honor.

19                  REDIRECT EXAMINATION (resumed)

20   BY MR. S. KULWIN:

21   Q.  I want to go back to the evolution of condominium mapping.

22   In 1980, when you first started -- when you were leaving

23   residential, you got involved with a developer in a hotel

24   condo situation, I think it was Sandalwood?

25   A.  Yes.  That was our first property, yes.

Howie - redirect

1   Q.  And in that situation they developed this hotel

2   condominium, the developer did, and they hired you to manage

3   it, correct, while they still owned it, before they turned it

4   over to the owner -- to the condo owners, right?

5   A.  I don't recall.

6   Q.  Let me see if I can help you out there.

7          Didn't the developer hire you and then when you --

8   when they turned it over to you -- when they turned it over to

9   the condo association you had a management agreement to keep

10  running it?

11  A.  Yeah.  We had a management agreement to manage the

12  condominium association.

13         The best of my recollection, the managing of the

14  rental program for the hotel operation didn't occur until the

15  units were actually sold and closed to the unit owner.  So I

16  don't believe we -- for the developer that we operated the

17  hotel.

18  Q.  Okay.  So you didn't do it while the developer owned it,

19  but you were doing --

20  A.  I'm pretty sure, no, that we didn't do it for -- almost

21  positive that we didn't do it for the developer.

22  Q.  But you did do it for the association?

23  A.  For the unit owners who chose to participate in the rental

24  program, yes.

25  Q.  Well, maybe I'm -- maybe I got the wrong project.  If I

Howie - redirect

1905

 1  can have a second.

 2     (Brief pause.)

 3  BY MR. S. KULWIN:

 4  Q.  All right.  Well, let me see if I can get this right.

 5  Sandalwood was your first project?

 6  A.  Yes.

 7  Q.  There was a pool, an outside deck on the beach and a

 8  building itself that was associated with the hotel?

 9  A.  Yeah.  It was a small project.  I believe it was about

10  40 units.

11  Q.  Okay.  They may have had a small rec room?

12  A.  As I recall, yes.

13  Q.  Maintenance staff that took care of the property?

14  A.  Yes.

15  Q.  Okay.  And you were hired to manage that hotel condo after

16  the conversion was done by the developer?

17  A.  Yeah, we were hired to manage the condominium association

18  and also to offer rental services to owners who wished to

19  participate in the rental program.

20  Q.  My understanding was -- correct me if I'm wrong -- weren't

21  you hired to manage the whole thing after the conversion by

22  the developer?

23  A.  Collectively with those two -- two agreements we, in

24  essence, were managing the whole thing, yes.

25  Q.  And then after the developer had sold out, you continued

Howie - redirect

1906

1   to manage the property for a short time for the association,

2   right?

3   A.   That's correct.

4   Q.   And then you were fired by the association, correct?

5   A.   Under specific circumstances you could say that, yes.

6   Q.   Well, actually, here is what you said, Page 23, Line 18:

7   (Reading:)

8     Question:  So you were fired basically?

9     Answer:  Basically.

10  A.   But I qualified why before I said that, yes.

11  Q.   You did, and I want to talk to you about that.

12          What happened was that you and the ownership kind of

13  were butting heads on various issues, right?

14  A.   A specific issue.

15  Q.   Okay.  And the lesson that you drew and your company drew

16  from that experience was, you know what, things work a lot

17  better if the developer owns the commercial areas, right?

18  A.   No.

19  Q.   Well, it was immediately after that that you started

20  coming to the conclusion that this condo mapping thing and

21  developers owning the commercial units -- areas, would be a

22  good thing?

23  A.   No.  There's a distinction.  The conclusion was not that

24  the area should be owned by the developer.  The conclusion was

25  that those areas should not be owned by the association.

Howie - redirect

1907

1   Q.  So you're saying it's okay if a third party other than the

2   owner runs the commercial areas; your problem is letting the

3   association run it, right?

4   A.  That's correct.

5   Q.  So for -- because, for example, a lot of owners hire

6   management companies to run hotels?

7   A.  Let me qualify my previous answer, that it's okay, in my

8   opinion, if it's not the developer.  It can be a third party

9   as long as that third party is the one responsible for

10  operating the rental program.

11  Q.  Okay.  That's your thing, they have to run the rental

12  program, right?

13  A.  Yes.

14  Q.  Okay.  But let's go back for a second.

15          A lot of hotels are owned by X and managed by Y,

16  true?

17          MR. SHONKWILER:  Objection.  Vague, irrelevant.

18          THE COURT:  Sustained.  Rephrase it.

19  BY MR. S. KULWIN:

20  Q.  Okay.  A lot of hotels in your experience, or if you know,

21  are owned by an owner developer who then hires a management

22  company that has no ownership interest, true?

23  A.  That happens a lot, yes.

24  Q.  And the owner relies on the management company for all of

25  its hotel expertise to do the right thing to the best

1    interests of the hotel, right?

2    A.  Yes, because the owner is the one that -- he actually owns

3    the rental operation, or the hotel operation, yes.

4    Q.  They own everything?

5    A.  Well, they don't own everything.

6    Q.  Well, they own everything that they didn't sell?

7            MR. SHONKWILER:  Objection.  Vague and confusing.

8            THE COURT:  Sustained.

9    BY MR. S. KULWIN:

10   Q.  The owner owns -- in a hotel situation they -- forget the

11   condos for a second.  They own everything --

12           MR. SHONKWILER:  I'm sorry.  I didn't hear what you

13   just said.

14   BY MR. S. KULWIN:

15   Q.  Forget the condos.  In a hotel situation the owner owns

16   the entire property and all the revenues that are gleaned from

17   it, unless they've sold portions of it off, right?

18   A.  That's correct.

19   Q.  Okay.  And they rely on a management company to run the

20   entire hotel to the best of its ability to derive profits for

21   the owner, true?

22   A.  That's correct.

23   Q.  And the owner doesn't really have to have any particular

24   expertise at all in running a hotel if they hire a really top

25   notch management company, correct?

Howie - redirect

1909

1   A.  They don't have to, no.

2   Q.  And if the owner was a little bit uncertain about how to

3   grade or evaluate how a management company that he -- he or

4   she, I should say, selected to manage its hotel property, they

5   could always hire a consultant to help them evaluate the

6   management company that they've hired to run the hotel, true?

7   A.  That's true.

8   Q.  And that happens, correct?

9   A.  As far as I know, yes.

10  Q.  Yes.

11          So, now, hypothetically speaking -- let me run this

12  one by you:  Assume, if you will, that there's a hotel

13  condominium.  With me?

14  A.  Yes.

15  Q.  Assume that the condo board -- that the condo association

16  owns the -- some of the commercial areas:  Ballrooms, meeting

17  rooms, function rooms, things of that nature.  With me?

18  A.  Yes.

19  Q.  Assume that they hire a top notch management company to

20  manage the entire rental program in the hotel.  With me?

21  A.  Yes.

22  Q.  Also assume they hire that exact same management company

23  to manage the meeting rooms, ballrooms and things of that

24  nature.  Got it so far?  Same management, right?

25  A.  Yes.

Howie - redirect

1910

 1   Q.  Okay.  Assume also that the condo board of this

 2   association are very wealthy, sophisticated people and have

 3   the option, if you will, to hire a consultant, such as

 4   yourself, to help them evaluate the abilities and facilities

 5   of the management company that's running both the rental

 6   program and the ballrooms and meeting rooms.  Got it?

 7   A.  Yes.

 8   Q.  And last assumption, assume that there's absolutely

 9   nothing in the condo board's interest to do anything to damage

10   the hotel condo, and similarly the management company has

11   every desire to maximize the profits and the abilities of the

12   hotel.  Got it?

13   A.  I think so.

14   Q.  Okay.  Isn't it true, sir, that under those circumstances,

15   unless you have a condo board that really, really is going out

16   of its way to purposely try to sabotage a situation, that

17   could work, couldn't it?  And it worked well?

18   A.  I don't agree.

19   Q.  And have you ever seen it tried in a situation under those

20   facts?

21   A.  Under those exact facts?

22   Q.  Yep, those --

23   A.  Not that I recall.

24   Q.  Have you ever seen it tried in a complex hotel situation

25   run by an experienced -- highly experienced, considered one of

1  the best in the country, management companies doing both for

2  the hotel condo association?  Have you ever seen that happen?

3  A.  I'm not sure I understand the question.

4  Q.  Have you ever experienced a situation where you were --

5  you went -- you were familiar with the hotel condominium

6  project, where the association owned the meeting rooms, the

7  ballrooms, the function rooms, very high end, very

8  sophisticated group of people, and they have hired a top notch

9  management company to run both the rental program and the

10  ballrooms, meeting rooms and things of the like?  Have you

11  ever seen that?

12  A.  We would not have experienced that because on the

13  properties that we're involved with, we set them up so that

14  doesn't happen, so that those areas are not in common

15  elements.  So the situation that you described wouldn't exist

16  because the properties that we're involved with are set up so

17  that does not happen.

18  Q.  So the short answer is, you've never seen it tried and you

19  don't know if it works because you've never seen it?

20  A.  Well --

21     (Brief pause.)

22        MR. S. KULWIN:  I think you can answer.

23        THE COURT:  There's no objection.  You can answer.

24  BY THE WITNESS:

25  A.  We know what doesn't work.  Going back to the experience

1   you mentioned earlier regarding Sandalwood, that we know it

2   doesn't work when you have a third party, in this case an

3   association board that has influence over a hotel operation or

4   a rental program.

5          I believe the difference is between what you

6   described as an association hiring -- trying to make an

7   analogy that it's no different for the association to hire a

8   management company than a developer hire a management company

9   or an owner of a hotel to manage -- a management company.  I

10  think the owner of a hotel would have a huge problem if a

11  third party unaffiliated with the hotel owner owned key

12  facilities within that property.

13         So I think the two situations are similar in that

14  fashion.  A hotel would not want to have a third party owning

15  their function space.  And the same thing in a condominium

16  hotel; the operator of the condominium hotel would not want to

17  have a third party owning conference and ballroom space.

18  BY MR. S. KULWIN:

19  Q.  A couple points on that one.  If I heard you right, your

20  conclusions in that regard arose out of your experience that

21  you just talked about in the early 1980s at that one hotel

22  condo, correct?

23  A.  I wouldn't say our conclusions were reached then but our

24  concerns began then.

25  Q.  Okay.  And how big was that resort again?

Howie - redirect

1913

1    A.   Small.

2    Q.   How big?

3    A.   40-some units.

4    Q.   Okay.  And no meeting rooms, ballrooms, function rooms,

5    right?

6    A.   That's not relative to our concern.

7    Q.   No, but I'm just saying --

8    A.   No, but that fact was not relative to our concerns.

9    Q.   Okay.  And now, let me -- and that -- and so by 2003 that

10   experience was over 23 years old, right, by 2003?

11   A.   That single experience was.

12   Q.   And let me ask you this:  With respect to this whole third

13   party thing, your company, when you get hired as a management

14   company for some of these hotel condominiums, actually

15   purchases at times parts of the commercial area that you're

16   managing, isn't that right?

17   A.   That's correct.

18   Q.   And you do that to make money, true?

19   A.   We purchase to make money?

20   Q.   Yeah.

21   A.   Well, it depends on each of the situations.

22   Q.   But generally speaking, you purchase these commercial

23   areas that -- in hotels where you've got to manage things so

24   that you can assist in making money, right?

25   A.   Oh, we don't purchase those areas for the purpose of

1   making money.  In those situations we will -- except for one

2   that I can think of, we were already managing the property.

3   We were already making money and we purchased those areas for

4   other reasons.

5   Q.  The main reason being is that you didn't want to be

6   subject to a lease; you wanted the control of ownership?

7             MR. SHONKWILER:  Objection.  This is beyond the scope

8   of his report.

9             MR. S. KULWIN:  It goes to the basis of why he thinks

10  this mapping is so important.  I'm not going to have much more

11  with it, Judge.

12            MR. SHONKWILER:  I don't see how it does.

13            THE COURT:  I think you're going too far.  Sustained.

14            MR. S. KULWIN:  Okay.

15  BY MR. S. KULWIN:

16  Q.  At the end of the day, sir, if you're managing a rental

17  program, it is easier for your company if the developer

18  retains the commercial areas as opposed to the condo board

19  because they're an easier group to deal with than a bunch of

20  condo owners, right?  It makes your job easier, true?

21  A.  There's nothing easy about this business.

22  Q.  Be that as it may, it certainly is easier to deal with one

23  developer than a condo board, right?

24  A.  I wouldn't use the word easier.

25  Q.  Well, let me ask you this question:  The only time you

Howie - redirect

1915

1    ever -- the only time you were ever fired in your entire

2    career was when the condo board was running the deal, true?

3    A.  Yes, because they were interfering -- that was our primary

4    concern.  They were interfering with our ability to do our

5    job, and we confronted the condo board and said you need to

6    stop interfering.  What we're doing is -- you manage it or we

7    manage it.  They decided that they would manage it.

8    Q.  Right.  So in your opinion they were interfering.  In

9    their opinion they were protecting their best interests,

10    right, in their opinion?

11           MR. SHONKWILER:  Objection.  Calls for speculation.

12           THE COURT:  Sustained.

13    BY MR. S. KULWIN:

14    Q.  So in your opinion --

15    A.  Since --

16           THE COURT:  I sustained it.  Ask your next question.

17    BY MR. S. KULWIN:

18    Q.  And, sir, if a condo board does own certain interests,

19    they do have the benefit of ownership, right?

20           They have the control and they have the ability to

21    look out for their own best interests in the way they think

22    best, isn't that right?

23    A.  And the obligations -- other obligations that go with

24    ownership, yes.

25    Q.  Right.  They could lose money, right?

Howie - recross

1916

```
 1   A.  Correct.

 2   Q.  They could make money, too?  Right?

 3   A.  Correct.

 4   Q.  Okay.  And they could go into that with their eyes open

 5   and make that decision for themselves if they want, correct?

 6   A.  Make what decision for themselves?

 7   Q.  Whether to own hotel facilities or not, if it's offered to

 8   them?

 9        MR. SHONKWILER:  Object to form.

10   BY THE WITNESS:

11   A.  Well, the owners don't make that decision.

12        THE COURT:  Overruled.

13   BY MR. S. KULWIN:

14   Q.  I'm sorry, what was the answer?  I apologize.

15   A.  The owners don't make that decision.

16        MR. S. KULWIN:  Can I have a moment?

17        THE COURT:  You may.

18    (Brief pause.)

19        MR. S. KULWIN:  I have no further questions.

20        THE COURT:  Recross, Mr. Shonkwiler.

21             RECROSS EXAMINATION

22   BY MR. SHONKWILER:

23   Q.  Now, Mr. Howie, Mr. Kulwin asked you some questions about

24   whether you knew certain facts.  You're not here as a fact

25   witness today, are you?
```

Howie - recross

1    MR. S. KULWIN:  I'll object, Judge.  That's

2  immaterial.

3    THE COURT:  Overruled.  You may answer, sir.

4  BY THE WITNESS:

5  A.  Not that I'm aware of, no.

6  BY MR. SHONKWILER:

7  Q.  You don't have any factual knowledge of Mr. Reiss' condo

8  hotel development experience, do you?

9  A.  Other than I mentioned earlier.

10  Q.  And you have no knowledge, no factual knowledge of anybody

11  at the Trump organization's experiences?

12  A.  No, I don't.

13  Q.  Okay.  And you're not here to testify about what anyone

14  knew or didn't know, right?

15  A.  That's correct.

16  Q.  You're here as an expert to talk about your observations

17  from your hotel condo planning and management expertise,

18  right?

19  A.  That's correct.

20  Q.  Now, some of the questions you were asked suggested that

21  your management expertise is somehow less important to your

22  knowledge of condominium mapping, but that's not true, is it?

23    MR. S. KULWIN:  Judge, I'll object.  Leading.  This

24  is his expert at this point.

25    THE COURT:  This is in direct response to your

1   direct.  Overruled.

2          You may answer, sir, if you can.

3          THE WITNESS:  I'm sorry, can you repeat that?

4   BY MR. SHONKWILER:

5   Q.  Well, some of the questions suggested that your management

6   experience is somehow less important to your knowledge of

7   condominium mapping, but that's not correct, is it?

8   A.  No.  It's the opposite, actually.

9   Q.  From management is where you have the best opportunity to

10  see what goes right and what goes wrong, right?

11  A.  Exactly.  And we have 30 years experience of -- over

12  30 years now experience of managing condominium hotels and we

13  use what we've learned from that hands-on day-to-day

14  experience to -- as a basis for our consulting.

15  Q.  You were also asked some questions about condos that never

16  got built.  I want to make sure everybody understands.

17  Mapping describes a planning process, right?

18  A.  That's correct.

19  Q.  And management describes what you do once the building is

20  up and running?

21  A.  That's correct.

22  Q.  Okay.  So whether a building gets built, first of all, is

23  not your decision unless you're the developer, right?

24  A.  That's correct.

25  Q.  And whether it ultimately gets built and up and running

Howie - recross

1919

1    has nothing to do with the mapping and planning process that

2    precedes that, right?

3    A.   That's correct.

4    Q.   So all of your mapping experiences, whether they are for

5    buildings that got built or not, is equally relevant to

6    everything we're talking about today, right?

7    A.   That's correct.

8    Q.   Does it matter at all to your opinions that we've heard

9    today whether a property or a developer is based or located in

10   one state or another?

11   A.   That is not relative to my opinions, no.

12   Q.   Now, as a matter of fact, I think the condo -- the condo

13   hotel concept originated in Florida, is that right?

14   A.   I'm not sure exactly where it originated but it was -- it

15   was either in Florida or possibly -- most likely in Florida.

16   I really can't think of anywhere else it would have been

17   originated actually.

18   Q.   Do you know whether the majority of hotel condos in the

19   country are located in Florida?

20   A.   I don't know if it's the majority but I would say a

21   substantial amount are located in --

22          MR. S. KULWIN:  I will object to lack of foundation.

23          THE COURT:  Sustained.

24          MR. SHONKWILER:  I asked if he knew -- okay.

25   Sustained.

1    BY MR. SHONKWILER:

2    Q.  You were asked questions about whether you had been

3    involved in residential condominium development over the past

4    several decades.  Your answer I think was no, right?

5    A.  The last several decades?

6    Q.  Yeah.  Is that right?

7    A.  Yes.

8    Q.  That's because you've had an awful lot of work that's kept

9    you full-time busy doing just condo hotel work, right?

10   A.  Well, we made the conscious decision to focus on just

11   condo hotel work, yes.

12   Q.  Was part of that decision based on the fact that you were

13   getting work in that area?

14   A.  We saw a lot of opportunity in that area.  We saw it as a

15   -- when we first got involved in it as an industry that had

16   potential.  We also saw it as an industry that we wanted to

17   commit ourselves to because we felt we could improve it.

18   Q.  Now, Mr. Kulwin also asked you if you had any experience

19   with condo hotels in Chicago.  Isn't it true there are only

20   two of them in Chicago?

21          MR. S. KULWIN:  Objection.  Lack of foundation, your

22   Honor.

23          THE COURT:  You may answer yes or no, and then lay

24   his foundation.

25   BY THE WITNESS:

1   A.  I don't know.

2          MR. SHONKWILER:  Mr. Howie, nothing further.

3          Your Honor, we're done.

4          THE COURT:  Thank you, Mr. Howie.  You may step down,

5   sir.

6          THE WITNESS:  Thank you, your Honor.

7     (Witness excused.)

8          THE COURT:  Mr. Kulwin?

9          MR. S. KULWIN:  Your Honor, at this time the

10  plaintiff has no further witnesses to call.  Before we

11  officially rest, if we can indulge the Court to allow us to

12  review --

13         THE COURT:  I would do it quickly.

14         MR. S. KULWIN:  -- all our exhibits to make sure that

15  they're in.

16         THE COURT:  How about you -- is there any objection

17  to Mr. Kulwin resting subject to moving for the admission of

18  certain documents that aren't objected to?

19         MR. NOVACK:  No.

20         THE COURT:  Or do you want him to look through

21  everything now while we're waiting before he officially rests?

22         MR. NOVACK:  Well, that prevents -- I don't want to

23  answer your Honor in front of the jury.

24         THE COURT:  Okay.  Look through your exhibits.  Let's

25  take a five-minute break.

1    (Jury exited the courtroom.)

2          THE COURT:  Five minutes, Mr. Kulwin.  You really

3    should have done it before now.  But five minutes.

4    (Brief recess was taken.)

5          THE COURT:  Did you figure it out, Mr. Kulwin?

6          MR. S. KULWIN:  Yes, Judge.

7          THE COURT:  Okay.  Are you going to move any exhibits

8    in?

9          MR. S. KULWIN:  I was just going to re-move all of

10   them in by number but -- that's what I wanted to do.  I just

11   --

12         THE COURT:  Re-move?

13         MR. S. KULWIN:  Here was my concern, Judge -- I'm

14   sorry.  I should have maybe explained myself better.

15         It's happened to me before that even though there's a

16   list of exhibits that the Court has admitted, sometimes if you

17   don't re-move them in and then it turns out one was missing --

18   that's what I want to do and that's what I was in the process

19   of doing right now.  And we're almost through.  I was going to

20   read the numbers off.

21         I'm not going to -- Mr. Novack doesn't have to waive

22   his directed verdict if he lets me rest subject to me just

23   confirming that everything that we moved in is in.

24         THE COURT:  Why don't you tell me what you want to

25   move in.  I have the list that you moved in your first day.

1    MR. S. KULWIN:  Sure, Judge.

2    THE COURT:  And I'll tell you if it's in or not.

3    MR. S. KULWIN:  Okay.  1-A?

4    THE COURT:  It's in.

5    MR. S. KULWIN:  B?

6    THE COURT:  In.

7    MR. S. KULWIN:  2?

8    THE COURT:  Yes.

9    MR. S. KULWIN:  3?

10    THE COURT:  Yes.

11    MR. S. KULWIN:  4?

12    THE COURT:  Yes.

13    MR. S. KULWIN:  6?

14    THE COURT:  6 through 12?

15    MR. S. KULWIN:  Yes.  13?

16    THE COURT:  I don't see 13.

17    MR. S. KULWIN:  If 13 was moved in -- those were the

18    projections --

19    THE COURT:  Okay.  They may have been.  I have that

20    on a separate list.

21    MR. S. KULWIN:  Yes.  There was some -- that was an

22    objected to one?

23    THE COURT:  Yes.  13 is in.

24    MR. S. KULWIN:  Okay.  21?

25    THE COURT:  Yes.

1924

 1    MR. S. KULWIN:  25-A and B?

 2    THE COURT:  Yes.

 3    MR. S. KULWIN:  26 and 26-B?

 4    THE COURT:  No.

 5    MR. S. KULWIN:  Okay.  29?

 6    THE COURT:  Yes.

 7    MR. S. KULWIN:  45?

 8    THE COURT:  Yes.  You skipped over 33 and 43, too.

 9    MR. S. KULWIN:  Whoops!  Right, 33 and -- you're

10  right, 33 and --

11    THE COURT:  33 and 43.

12    MR. S. KULWIN:  Correct.  Thank you, your Honor.

13    THE COURT:  And then 45.

14    MR. S. KULWIN:  45.

15    THE COURT:  47, 48.

16    MR. S. KULWIN:  Right.  60-A and B?

17    THE COURT:  Yes.

18    MR. S. KULWIN:  Okay.  The next one we have is 72 --

19  no --

20    MR. SHONKWILER:  That one is not on my list.

21    MR. S. KULWIN:  Okay.

22    THE COURT:  Not on mine either.

23    MR. S. KULWIN:  Okay.  Is 73 -- one of them was in, I

24  know.

25    THE COURT:  73 is in and 62 is in.

1925

1    MR. S. KULWIN:  Okay.  All right.

2    75 and 76, I moved both of those in.

3    THE COURT:  Yes, those are both in.

4    MR. SHONKWILER:  75 was without the first page?

5    MR. S. KULWIN:  Right, without the first page.

6    THE COURT:  Right, without the cover letter.

7    MR. SHONKWILER:  76 is in?

8    THE COURT:  Yes.

9    MR. S. KULWIN:  79-2?

10   THE COURT:  Yes.

11   MR. S. KULWIN:  79-20, that went in this morning.

12   MR. SHONKWILER:  I have 79-3.

13   THE COURT:  I have 79-3.

14   MR. SHONKWILER:  I don't have 79-20.  I think you

15   wanted to move that in but then --

16   THE COURT:  I don't have 79-20 unless those were the

17   two floor plans.

18   MR. S. KULWIN:  Yes, Judge.

19   THE COURT:  Okay.  Then that was in.

20   MR. J. KULWIN:  We'll mark those 79-20.

21   MR. S. KULWIN:  And 80 and 81?

22   THE COURT:  Yes -- no -- yes, both of those.

23   MR. S. KULWIN:  87?

24   MR. SHONKWILER:  I don't see that one.

25   MR. S. KULWIN:  That's the 2/14/08 e-mail.

1926

 1              THE COURT:  That was in, yes.  May 20th I admitted

 2      that.

 3              MR. S. KULWIN:  That's it, right?

 4              THE COURT:  Is that it?

 5              MR. S. KULWIN:  Oh, there were a couple of pages in

 6      125 that we put in.

 7              MR. SHONKWILER:  I have Pages 3237 through 3244?

 8              THE COURT:  I'm not sure of the exact pages but there

 9      were several pages admitted from there.

10              MR. S. KULWIN:  And we'll get those Bates numbers.

11              THE COURT:  Okay.  Anything else?

12              MR. S. KULWIN:  I don't --

13              THE COURT:  So it doesn't sound like there's anything

14      you need to move in.

15              MR. S. KULWIN:  I just wanted to be sure, Judge, I'm

16      sorry.  Yes.

17              THE COURT:  All right.  So I'm going to bring the

18      jury back in.  I'll have you rest.

19              MR. S. KULWIN:  Okay.

20              THE COURT:  We can do a sidebar, you can orally move.

21      And then I want you to confirm for the jury you're not going

22      to call any witnesses, you're done, and I'll send them home

23      for the day.

24              MR. NOVACK:  My suggestion, Judge, would be that you

25      announce to the jury that both sides have rested.  What I

1927

1    don't want it to look like to them is that he's had a case and

2    I don't have a case because my case went in in his case.

3           THE COURT:  I can ask you if you have any additional

4    witnesses and you can confirm no.  What I don't want you to do

5    is come back tomorrow morning and say, aha, I have another

6    witness.

7           MR. NOVACK:  No, no.  I'm suggesting with the jury in

8    the box and all of us standing here, you say to the jury that

9    both sides have rested.

10          MR. S. KULWIN:  Judge, it's my case.  Ask me if I

11    rest, I rest.

12          THE COURT:  Okay.

13          MR. S. KULWIN:  Then you can ask him, do you have any

14    additional witnesses.

15          THE COURT:  You can say you rest.  I'll confirm you

16    don't have any witnesses -- any additional witnesses --

17          MR. NOVACK:  That's the point.  I don't want them to

18    think I've got -- you know, that I'm the defendant in a

19    criminal case that says I don't have a case.

20          THE COURT:  Bring in the jury, please.

21          MR. NOVACK:  Oh, and I wanted to move -- I want to

22    move before I --

23          THE COURT:  That's why I said we'll go over to

24    sidebar.

25          MR. NOVACK:  Thank you.  I missed it.  Sorry.

1928

1    (Jury entered the courtroom.)

2         THE COURT:  You may be seated.

3         Mr. Kulwin, any additional witnesses or documents you

4    want to move in?

5         MR. S. KULWIN:  No, your Honor.  At this time the

6    plaintiff rests.

7         THE COURT:  Okay.  Let's have a sidebar, please.

8    (Proceedings had at sidebar:)

9         THE COURT:  Why don't you briefly move in and then

10   you can elaborate once we let the jury go.

11        MR. NOVACK:  Judge, we move at this time for judgment

12   as a matter of law on plaintiff's Consumer Fraud Act claim.

13        We move for judgment as a matter of law on

14   plaintiff's claims and punitive damages.

15        And we move for judgment as a matter of law on

16   plaintiff's claim of emotional damages and, alternatively, to

17   bar plaintiff's attorney from suggesting to the jury a

18   specific award of emotional damages.

19        THE COURT:  You've written ones I will take?

20   (Documents tendered.)

21        THE COURT:  I'll take these under advisement.  You

22   will get a chance to look at them.

23        MR. S. KULWIN:  Okay.

24        MR. NOVACK:  Here's one.

25        THE COURT:  Did you file these?

1929

1     MR. NOVACK:  We have not and we will.  But I

2  certainly can serve a copy on Mr. Kulwin right now.

3     And these copies do not have certificates of service.

4     THE COURT:  That's okay.

5     MR. NOVACK:  We will attach them when we

6  electronically file.

7     THE COURT:  Okay.

8   (Further proceedings in open court:)

9     THE COURT:  Mr. Novack, do you have any additional

10  witnesses to call or documents to move into evidence?

11     MR. NOVACK:  Judge, all of our witnesses testified

12  during the plaintiff's case and we have no additional

13  witnesses or documents.  So, therefore, we rest.

14     THE COURT:  Ladies and gentlemen, we are done with

15  the evidentiary portion of the case, so you're done a little

16  bit early today.

17     When you come back tomorrow morning we'll have

18  closing arguments.  Plaintiff goes first, then you'll hear

19  from the defendant, and then the plaintiff will have the

20  opportunity for a brief rebuttal.  I'll instruct you on the

21  law and you'll begin your deliberations.

22     So you've heard all of the evidence in the case that

23  you're going to hear.  Remember, please don't do any

24  independent research.  Everything is in the case that you will

25  have to deliberate with.  I will instruct you on the law

1  tomorrow after you've heard all the closing arguments.

2          Please don't communicate with anyone about the case,

3  don't go on Facebook about the case or any other social media.

4  Please don't read, watch or listen to any media coverage of

5  the case.  Enjoy the beautiful day.  I'll see you tomorrow

6  morning at 9:15.

7    (Jury exited the courtroom.)

8          THE COURT:  I have your three motions for judgment as

9  a matter of law.  Obviously I haven't had the time to read

10  them yet, but if you want to elaborate on anything, I will let

11  you.

12          And, Mr. Kulwin, I realize you haven't had a chance

13  to read them yet either.

14          MR. NOVACK:  Judge, did you say you want --

15          THE COURT:  Did I say what?

16          MR. NOVACK:  Did you say you want me to elaborate

17  now?

18          THE COURT:  If you want to, yes.  You said you wanted

19  to.

20          MR. NOVACK:  Yes, Judge.

21          And the reason is that I think at least two of these

22  motions can be addressed fairly -- I think very promptly, and

23  I think at least will raise, as you'll see, a need for you to

24  address some issues promptly.

25          So the motion for judgment as a matter of law on

1931

1     plaintiff's Consumer Fraud Act.  Judge, actual damages are the

2     central element under the Fraud Act.  We cite the

3     Thrasher-Lyon case as one case in support of that.

4             For purposes of the act, actual damages is the same

5     as compensatory damages.  We cite the Greisz case from the

6     Seventh -- Northern District for that.

7             This Court actually twice said the same thing during

8     the pretrial conference at Document No. 307, Pages 95 to 96.

9             Further, actual damages under the Fraud Act must

10    arise from purely economic injuries.  Again, the Thrasher

11    case, Cooney out of the First District and Morris from the

12    First District.

13            None of plaintiff's purported damages are actual

14    damages under the act.  Remember, the loss of use damages are

15    no longer in the case.  And that's really the building block

16    for this motion.  What remains are a couple items.  I'll deal

17    with them one by one.

18            The return of the earnest money is not actual

19    damages; that is rescission and return to the status quo.  In

20    fact, this Court so held in Docket No. 298, stating that now

21    that the plaintiff has elected her remedy, it's an equitable

22    remedy and there are no money damages left.

23            Therefore, those -- any damages, if any, have to be

24    separate from the damages that flow from rescission -- not

25    damages -- from the return of earnest -- from return of money

1   to put parties in the status quo.  That is so held in Haymer,

2   which I've cited, and Pena, two Northern District of Illinois

3   cases that say that if there's rescission, the money return

4   portion is equitable and there needs to be some separate,

5   separate and apart actual damages.  There are none here.

6        And your Honor said in that Docket No. 298 that --

7   you said you didn't see any other damages apart from the

8   return of the earnest money.

9        The next category that remains in the case are

10  attorneys' fees and interest, and the law says that those are

11  not actual damages.  And we cited Petty, Illinois from the

12  First District, Movitz, Northern District of Illinois, and

13  again your Honor's Docket No. 298, when you said that an

14  equitable remedy is what there is for the return of earnest

15  money plus interest.

16       The next category that remains right now that we're

17  moving for that on a separate motion is emotional damages.

18  And the law under the Consumer Fraud Act on that is that

19  emotional damages alone cannot constitute the requisite

20  economic damages that the Consumer Act demands as an element

21  of the claim.

22       And for that we cite four cases, all from the

23  Northern District:  Thrasher-Lyon -- I'm sorry, two from the

24  -- three from the Northern District, one from the First

25  District.  Thrasher-Lyon, Northern District, Morris from the

1933

1 First District, Worix from the Northern District, and

2 X-Y-D-A-K-I-S -- I can't pronounce it -- also Northern

3 District.

4         And then the final remaining category is punitive

5 damages, and for that you need actual damages.  And we've

6 cited for that Pena, Northern District, Petty at the First

7 District, and a case that my scribbles won't allow me to read

8 but it's in the brief.  And those cases hold that you cannot

9 get punitives without actuals.

10         So if you add all that together, we believe we're

11 entitled to a judgment as a matter of law under the Consumer

12 Fraud Act, without regard -- without the Court having to reach

13 the question of whether we're innocent or guilty of the

14 substantive allegations.

15         It's all a matter of missing -- the missing requisite

16 actual economic damage element.

17         THE COURT:  Okay.  Next motion?

18         MR. NOVACK:  Your Honor, the next motion is our

19 motion for judgment as a matter of law on plaintiff's

20 emotional distress damages.  And the building blocks here

21 start with the fact that in order to prove a right to

22 emotional damages, the damages have to be proved to a

23 reasonable certainty under a very strict standard that the

24 Seventh Circuit has set.  And we cite for that the Haslund

25 case from the Seventh Circuit, 2004, and Scott versus Peterson

1934

1    from the Northern District.

2          And the reason for this rule, explained in

3    Ruffin-Thompkins, Seventh Circuit 2005, and your Honor's case

4    called Bassett from 2010, is that these types of claims are

5    too easy to manufacture to just allow the normal rules.  And

6    so this heightened standard comes into play.

7          In this case the evidence is completely and totally

8    insufficient.  It is a very weak case supported by no

9    documentary evidence, no dollar evidence, no medical evidence,

10   no evidence that any doctor was consulted, no evidence that

11   any work was missed.

12         And, in fact, I can -- because it's so easy to do --

13   and I put this on Page 2 of the motion.  This is the entire

14   testimony from Mrs. Goldberg:  (Reading:)

15     Question:  Jackie, how did you feel when you first heard

16   that Ms. Binosi had confirmed that these things were being

17   removed from the common elements?

18     Answer:  I thought I was in Never Never Land.

19     Question:  What do you mean?

20     We have -- we have an agreement.  All of a sudden it's all

21   been turned topsy-turvy.

22         The third -- there are only three questions.  Those

23   are the first two.  The third one is:  (Reading:)

24     Can you tell the ladies and gentlemen of the jury how, if at

25   all, you know, this litigation has affected you?

1935

1    Answer:  I've been angry.  I have been -- felt like I had

2    been conned.  I had worried about what the solutions -- what

3    solutions I could make.  It has affected my -- just now I have

4    to worry about whether my husband's caregivers are there on

5    time so I can come and spend all day here and how is he.  I

6    mean, there's a lot of worry going into something like this.

7    I didn't worry as much sometimes as I did at others and I

8    tried not to be angry about it.

9         That is it from Mrs. Goldberg.

10         Ms. Vogue testified today.  We don't have the

11   transcript but we took our notes as best as we could, and what

12   she said was that she observed plaintiff -- she observed that

13   plaintiff was feeling upset, disturbed, stressed and

14   defrauded.  She also noted that plaintiff is not outward about

15   her feelings.  That's it, Judge.  No other evidence offered.

16         There was -- Ms. Vogue did not base anything she said

17   on what excited utterances or other commentary comes from

18   Mrs. Goldberg.  It was all -- she just looked at her and

19   concluded from that that she must have felt these things.

20         These are conclusory.  She's not qualified to do it.

21   She's not medically trained.  And it contradicts the only

22   testimony from Mrs. Goldberg on the point, because the most

23   she said is that she thought she was in Never Never Land.  She

24   didn't say anything at all about these things that Ms. Vogue

25   imagines by looking at her.  So they are sort of contradictory

1936

1    in that regard.  And that's the sum and substance.

2         And again, we had no family members to come in and

3    testify about any emotional distress that they witnessed, no

4    doctors, no nurses, no psychiatrists, no psychologists, no

5    medical bills, no testimony that she even went to a doctor, no

6    testimony that she missed work, no testimony that she couldn't

7    perform her day-to-day functions.  Nothing of the kind.  No

8    headaches, no -- no need for medications and the like.

9         And then on top of that there's no causation because

10   -- well, I'm going to get to the litigation distress, but

11   neither Mrs. Goldberg nor Ms. Vogue tied whatever they said to

12   anything that defendant did.

13        All that we had about Ms. Vogue was that she was

14   asked, after the fourth amendment came out, what did you

15   observe.  But there was nothing that linked the fourth

16   amendment to it.  Any number of things could have happened

17   after that fourth amendment came out that could have

18   contributed to whatever it is these conclusory things that

19   Ms. Vogue said she saw.

20        And the first question that Mr. -- well, strike that.

21   So there's no causation either.

22        The next point -- and for causation, by the way, we

23   cited two cases that have observed that there has to be this

24   causation and emotional distress.  One of them again is your

25   Honor's Bassett case and the other one is Lancaster, also from

1937

1    the Northern District.

2         Now, as a separate point but a strong one, there's

3    substantial case law that says that emotional distress damages

4    that result from the litigation that the plaintiff files is

5    not recoverable per se, period, end of report.  Stoleson from

6    the Seventh Circuit, Zimmerman from the First Circuit and

7    Knussman from the Fourth Circuit all hold that.

8         The next prong of the emotional distress is the Land

9    Sales Act.  And in addition to all the other arguments, all of

10   which apply equally to emotional distress under that, not

11   until the itemization that your Honor ordered did the

12   plaintiff ever link the possibility that she was asking for

13   emotional distress damages under the Land Sales Act.

14        Previously she had said she was seeking it under the

15   Consumer Fraud Act only, and then in the itemization the

16   narrative of what she said she was claiming was Consumer Fraud

17   Act language.  So --

18        THE COURT:  Are you seeking emotional damages under

19   the Land Sales Act?

20        MR. S. KULWIN:  Yes, your Honor.

21        MR. NOVACK:  We then, after getting that, did some

22   research.  We were unable to find a single case, not one, that

23   awarded emotional distress damages under the Land Sales Act.

24        As far as we know, if emotional distress damages were

25   to be awarded in this case under that act, this would be the

1938

1    first time.  And we would suggest to the Court that such new

2    law should not be created generally, but particularly the

3    flimsy nature of the evidence in this case.

4         There's no emotional distress damages available under

5    the Fraud Act for the reasons I argued a bit earlier, which is

6    that there has to be economic actual damage in order to get

7    emotional distress damage under the Fraud Act.

8         We also covered in our emotional distress motion some

9    alternatives, the first being that if emotional distress

10   survives for the Land Sales Act -- strike that.  I didn't mean

11   to say it that way.

12        If the Land Sales -- if the emotional distress is

13   barred under the Land Sales Act, then the earnest money part

14   of the case should not go to the jury for the same reasons

15   that your Honor didn't let it go to the jury under the breach

16   of contract claim, which is because it is an equitable remedy.

17        Under the Land Sales Act they seek, in addition,

18   interest and attorneys' fees, but those do not support a jury

19   either.  And I cite to --

20        THE COURT:  Is there a fee shifting provision in the

21   Land Sales Act?

22        MR. S. KULWIN:  I'm sorry, Judge?

23        THE COURT:  Is there a fee shifting provision in the

24   Land Sales Act?

25        MR. S. KULWIN:  There is, Judge.  And the Land Sales

1939

```
 1   Act, I believe -- and I'll check for sure -- says that you're
 2   entitled to I believe -- what is it --
 3           MR. J. KULWIN:  I think it's any and all damages
 4   arising out of the --
 5           MR. S. KULWIN:  It does not say that you're not
 6   entitled to emotional distress.
 7           THE COURT:  The attorneys' fees would be an issue for
 8   the Court.
 9           MR. S. KULWIN:  Right.  The attorneys' fees, but the
10   attorneys' fees are an issue for the Court in a consumer fraud
11   case as well.  We filed a fee petition.
12           MR. NOVACK:  The last alternatives that we raise in
13   the emotional distress -- No. 1, that if you leave it in --
14   and, Judge, I just strongly urge that -- and I know you'll do
15   it, read that Seventh Circuit standard, compare it
16   side-by-side with this evidence.
17           But if your Honor were to leave it in, that counsel
18   should not be allowed to ask for a specific amount of
19   emotional distress damages.  There's just nothing to tie
20   together a dollar amount.
21           There's no evidence -- you can't say, well, she had a
22   thousand dollars in meds, so, you know, the jury can award a
23   multiple of that.  There's just nothing -- there's no base for
24   awarding a number.  And it's in the discretion of the Court
25   whether to allow that or not one way or the other.
```

1    And I do note that in justifying or trying to justify

2    why they never disclosed an amount or an itemization for

3    emotional distress, the plaintiff over and over again said,

4    it's too hard to compensate, it's vague, you don't know what

5    to do.  And I guess I would sort of say that's right.  So you

6    can't say a number to the jury.  I'm not even sure how the

7    jury computes emotional damages in a case like this where

8    there's been no evidence.

9    The motion goes on to say, but in all events,

10   $500,000, which is the number that the itemization says is

11   just completely off the charts -- we cite, I don't know,

12   eight, ten cases showing the, you know, nominal numbers that

13   apply in this situation.

14   And ultimately if all else fails, then we would like

15   a cautionary instruction similar to what Judge -- well, we

16   actually would propose exactly what Judge Kennelly said in the

17   Evoy case in 2006.  He issued a -- and it's on Page 14 of our

18   motion.  But I hesitate to even go there.  Judge Shadur once

19   said, as soon as a lawyer says to a judge, but in the

20   alternative, then everybody says, well, let's focus on the

21   alternative.

22   We think it would be erroneous, your Honor, with all

23   respect, to let this issue go to the -- stay in the case.  We

24   should have judgment as a matter of law.  It's double

25   dangerous to leave it in the case to go to a jury without any

1941

1     possible guidance to them as to what that number could

2     possibly be.

3               I think I may have left out an alternative that I --

4     in my consumer fraud motion.  I think --

5               THE COURT:  Do you plan on asking for a specific

6     amount?

7               MR. S. KULWIN:  For?

8               THE COURT:  For emotional damages?

9               MR. S. KULWIN:  That was our --

10              THE COURT:  Do you plan on asking for a specific

11    amount?

12              MR. S. KULWIN:  That's what our plan was, yes.

13              THE COURT:  Okay.

14              MR. NOVACK:  And I guess if, again, ultimately -- if

15    emotional damages are going to the jury, I would ask that the

16    Court, consistent with this law that we've now briefed, issue

17    an instruction about the heightened standard, because right

18    now that verdict form just makes it seem to say that it just

19    flows the same way as --

20              THE COURT:  The heightened standard for what?  I

21    missed your --

22              MR. NOVACK:  The heightened standard for proof that

23    is required for emotional distress damages.

24              MR. S. KULWIN:  There's no such thing.

25              THE COURT:  And what -- something beyond

1    preponderance?  Is that what you mean by heightened standard?

2         MR. NOVACK:  Well, it's a heightened standard, strict

3    standard, that the Seventh Circuit set out in the cases we've

4    cited.  Reasonable degree of certainty is one of the buzz

5    words and there are others.

6         The third motion -- I'm not sure I want to spend time

7    elaborating that one.  That's not one that is as urgent.  I

8    mean, that's the whole case, you know.  That argues that there

9    is no evidence of the intent of the defendants' requisite for

10   a finding of fraud.

11        I mean, that one -- your Honor has seen that evidence

12   over and over again.  We have tried to synthesize it.  I think

13   we've done a good job of it in the papers, but I don't think

14   it's a good use of our time for me to try to review all of the

15   evidence in the case right now.

16        So if it's okay with your Honor, we'll just stand on

17   our written one for that.

18        THE COURT:  That's fine.

19        MR. S. KULWIN:  Well --

20        THE COURT:  I know you haven't read them, so if you

21   want to --

22        MR. S. KULWIN:  I'll give you just a couple points

23   and then I would like to obviously read them and consider them

24   and perhaps ask leave to file a written response as well which

25   -- it is what we're going to do, Judge.  To begin with, we're

1943

1    going to ask for leave to file a written response.

2         THE COURT:  I'll certainly give you that.

3         MR. S. KULWIN:  Right.  And --

4         THE COURT:  But some of these -- the punitives is

5    probably separate, but some of these issues Mr. Novack is

6    asking for a ruling before it goes to the jury, and it's going

7    to the jury tomorrow.

8         MR. S. KULWIN:  I understand that.

9         Judge -- and I don't know if it -- we'll do our best,

10   but here's our initial reaction.  And again, this is subject

11   to looking at it, reading it, looking at the cases.  So I

12   don't want to be hemmed in by it, but this is my initial

13   reaction to it subject to further review.

14        Many of the arguments, if not all of the arguments

15   that Mr. Novack has made, with the exception of a couple, have

16   been repeatedly raised in the past.  The whole concept of the

17   actual damages has been beaten into the ground time and time

18   again.

19        And I can't recall it by chapter and verse, but it

20   deals with, we're not required to elect remedies.  There's a

21   Supreme Court case also as well that says when the funds

22   aren't being held by the defendants -- and in this case it's

23   undisputed that they're not -- we're seeking damages to get

24   the monies.  So I really think that those are dead letter

25   arguments, make weight arguments, and -- he needs to put that

1    in, though, because if he doesn't have that, he can't -- as

2    he's admitted in his argument, he can't build from there.

3    Once that building block falls, all of his other arguments go

4    down the tubes.

5            So that's -- except for his argument about the

6    insufficient nature of the evidence on emotional damages,

7    which again, subject to further review -- so you've ruled on

8    that, not just once but twice.  You ruled on it in summary

9    judgment and you ruled on it in a motion in limine against the

10   defendants both times.

11           On the question of compensatory damages, in terms for

12   emotional damages, they tried to keep this case from ever

13   getting to a jury by saying she had no damages at all.  They

14   made this precise argument.  And they also argued, where is

15   your damages?

16           We pointed out that Mrs. Goldberg was going to

17   testify pretty much the way she did.  You said that was

18   sufficient then.  There's nothing to change that ruling.

19           I'll go on to say this, Judge -- and again, we want

20   to check the law.  I don't know which cases Mr. Novack is

21   looking at but, you know, I believe -- and again, I apologize

22   if I'm wrong, it's subject to checking -- but I believe that

23   when you're victimized by fraud, it's almost defamation

24   per se like.  Having done a number of defamation cases, the

25   reason they allow juries to calculate those damages is because

1945

1  when you -- for example, when you're defamed it is very hard

2  to articulate.  And almost -- I would say of the 20 or 30

3  defamation plaintiffs I've had, none of them were going for

4  psychiatric care or medical treatment.  And this is very

5  similar.  You're being victimized by a fraud.

6           And I'll also note, by the way, that -- again,

7  nothing against psychology or psychiatry.  Mrs. Goldberg, she

8  wasn't cross-examined on this at all, by the way.  The

9  defendants did not ask her one question.  They did not

10  challenge her expression of how she was feeling.

11          And when I said the litigation, I just didn't mean

12  the filing of the case; I meant the entire chain of events,

13  and I think it was clear from the context of how she felt from

14  the get-go.  And what was the defendants' cross on that?

15  Zero.  They did not ask her one question.

16          Toward that same end, they didn't ask Ms. Vogue any

17  questions.  They accepted it.  And, therefore, her emotional

18  pain at this point, feeling conned, which is a victim of

19  fraud, you know, worrying, okay -- Ms. Vogue knowing that, you

20  know, at the time, at the time she was extremely upset, very

21  disturbed, and went on, and then in the years that followed

22  handling this, not the lawsuit but having to fight with and

23  deal with getting monies back and trying to get her money back

24  and being put through all this, has very serious impact on

25  her.

1946

1    You know, Mr. Novack would have you believe that a

2    volume of testimony is what's key.  Perhaps if Mrs. Goldberg

3    had been up there for three hours talking about every little

4    ache and pain, and Ms. Vogue was, you know, going, well, I

5    remember the day we did this and I remember the day we did

6    that, you know, I think the Court would have found it -- and I

7    think it would have alienated the jury, quite frankly, okay?

8    You know, she laid it out there very clearly.

9         And that's just what juries are for.  They are here

10   to do this very thing.  This is not some economic case, like a

11   breach of contract case, which is what Mr. Novack wants to

12   turn it into.

13        And I will note, too, Judge, regardless of the -- you

14   know, his fear of the Kennelly, Shadur -- although I have the

15   same fear, so to speak.  You know, I don't want that

16   cautionary instruction to be given, but it certainly would

17   cure all of the ills of which he is concerned.

18        I think, leave it to the Court to say.  This jury,

19   they have watched the evidence.  I think they are perfectly

20   capable of making the decisions they need to make.

21        And really, this -- and again, subject to reviewing

22   all the cases, I'm going to file something if we can, but this

23   is just a rehash of everything you've denied before.  Now

24   they're at it for the third time.

25        MR. NOVACK:  May I reply?

1    THE COURT:  Go ahead, briefly.

2    MR. NOVACK:  Judge, if there's a rehash, actually,

3    your Honor has made two rulings that we think lead naturally

4    irrevocably to a judgment as a matter of law with respect to

5    the Fraud Act claim.

6        In the breach of contract count your Honor held there

7    had been an election of remedies, and you said that left them

8    only with the earnest money claim and that that earnest money

9    claim is not actual damages, it's an equitable remedy.

10       When they tried to get benefit of the bargain damages

11   in on the remaining two counts, your Honor wouldn't let them

12   because you said they had elected their remedy.

13       You only get one election of remedy when it comes to

14   affirming or disaffirming a contract.  You don't get to affirm

15   a contract on one count and disaffirm it on another count.

16   There's only one chance.  You either close and pay your

17   purchase price and sue for the difference in damages or you

18   say, I'm not closing, I want to undo it.  That's the election.

19   It applies across the board.

20       So you've already held the elements that -- mean that

21   there are no actual damages left for the Fraud Act claim.

22   MR. S. KULWIN:  Your Honor, with all respect to Mr.

23   Novack, that's just simply inaccurate.  And it's misstating

24   what you have held, as I recall it.

25       And I don't have the benefit of the three briefs that

1948

1    he does, but as I recall it is, is that -- I think your ruling

2    was, and I'll check, but you're not -- and I think this is

3    what the law is -- you're not limited to contract damages in a

4    fraud claim.  And that's why you let this case go to the jury

5    in the first place.

6         This argument that he's making is literally no

7    different than the argument he made in summary judgment, the

8    argument to strike the jury demand, the argument for the

9    motion in limine.  It's the same thing over and over again.

10        And I got to prepare for closing argument tomorrow,

11   and I'm working on two hours sleep as it is and I'm about to

12   fall over here.  I mean, I don't think we -- you know, with

13   all respect, I don't think we should have to answer -- I

14   commend Mr. Novack in raising the same argument and being

15   persistent, but it is time to call it a day and let's get the

16   case to the jury.

17        THE COURT:  Okay.  I'm going to take these under

18   advisement for now.  I have to read them.

19        MR. NOVACK:  Judge, I know -- the difference, though

20   -- I'm -- I don't want to be accused of rehashing when I'm

21   not.  It's bad enough to be accused of it when I am.

22        The new game in town is loss of use is out of the

23   case.  We've never been able to make the argument that loss of

24   use damages are not in the case.  Now --

25        MR. S. KULWIN:  Judge, that's --

1949

1    MR. NOVACK:  That's a new fact that changes
2  everything.
3         MR. S. KULWIN:  It changes nothing.
4         MR. NOVACK:  That's why I told you the other day that
5  we had a motion but it depended on something.
6         And also, the contention that it's too late for --
7  they don't have enough time -- Judge, every jury trial the
8  defendant is in a box.  The defendant can't make the directed
9  verdict -- judgment as a matter of law motion until there's a
10 close, and that close always comes right before this --
11        THE COURT:  Right, I understand.
12        MR. NOVACK:  And so it's his case.  He should know
13 the law to support his claim.  And I'm not trying to give a
14 war story.  It --
15        THE COURT:  If we're going to start digressing --
16        MR. NOVACK:  So --
17        THE COURT:  You were earlier.  We're not going to
18 digress there, though.
19        MR. NOVACK:  So those are those motions.  Judge,
20 you're taking them under advisement.
21        There are two things that I --
22        MR. S. KULWIN:  Before he goes to the two things,
23 Judge, can I just make one point?
24        THE COURT:  Briefly.
25        MR. S. KULWIN:  Very briefly.

1     This loss of use that he's talking about, when you

2  denied summary judgment, when you denied striking the jury

3  demand, it was after that that you asked for an articulation

4  of the damages and the loss of use.  So now he's coming up

5  with this new theory of, ah, now that they asked for something

6  when you asked us to articulate damages that you've now taken

7  away, that changes everything.  That changes nothing.  I'm

8  sorry.

9           THE COURT:  Okay.  What is your last point?

10          MR. NOVACK:  To avoid sidebars tomorrow in closings,

11  Section 4(a) of the purchase agreement is the section that has

12  the reservation of the right to change the common elements --

13          THE COURT:  I'm well aware of that.

14          MR. NOVACK:  Throughout the case in three rulings

15  that I -- I remember and have with me today, your Honor has

16  said that that's what that provision says and that's -- kind

17  of the way I look at it, that's the law of the case.  And

18  that's why I asked for an instruction so that we didn't have

19  to put up on an ELMO that provision, just say that's what

20  we've got in this case.

21          We didn't get that instruction, and tomorrow I intend

22  to put up on the board the part of that provision -- and I

23  want to put only a part of that provision up -- that says the

24  reservation of rights.  There's a proviso that follows that

25  that gets us right into the Condominium Act Section 22,

1951

1   75 percent approval that we have a motion -- a motion in

2   limine by agreement was granted by your Honor that that can't

3   be raised.

4        The only approval that that can possibly refer to is

5   that Section 22 approval which is out of the case.  And you

6   ruled it out of the case on -- at least one of your written

7   opinions and through the -- so I don't want to put this up and

8   have an argument, oh, boy, you opened the door now.  Now we

9   can say to the jury, oh, no, they had to get 75 percent

10  approval or whatever the case may be.

11       And I wanted to avoid all this, frankly, with a

12  simple instruction from the Court that says, yeah, that's what

13  the contract says because that's what courts are supposed --

14  it's an issue for the Court, not for the jury.

15       And so I want to preview this now so we know the

16  groundrules tomorrow and we don't have a brouhaha on it.

17       MR. S. KULWIN:  Well, you know, Mr. Novack,

18  unfortunately, is a day late and dollar short.

19       You ruled that the contract clause is only relevant

20  to one thing:  Fraudulent intent.  They could argue, if they

21  had any evidence, which they chose not to put in, that, you

22  know, we were thinking about making this change, we weren't

23  sure, that's why we have documents like talking about it.

24  Those documents are not evidence of actually doing the fraud,

25  and since we had this contract clause, you know, we were

1952

1  entitled to do that.  Okay?  There's zero evidence of that,

2  zero.  That's number -- none.  They put no evidence in.

3       Their position in this case has always been -- and

4  Mr. Novack said it on television just the other day on CNN --

5       THE COURT:  I'm not watching television.  You have to

6  tell me what's going on in here.

7       MR. S. KULWIN:  But, in any event, their position is

8  and has been from the beginning that we never, ever intended

9  to change -- I'm sorry.  We never, ever intended to change

10  this.  Suddenly in 2006 the Lone Ranger, Mr. Petrus, came in,

11  opened our eyes to this, and that's why we changed it.  So the

12  contract clause doesn't play at all in this case.

13       Now, he wants to put it up on the board?  He can.  I

14  am going to argue, and I am entitled to argue, that that

15  contract clause does not do what the defendants have been

16  trying to get this jury to believe, which is, bar Mrs.

17  Goldberg's claims.

18       THE COURT:  It doesn't bar a fraud claim.

19       MR. S. KULWIN:  Right.  And I am going to argue -- we

20  don't have an instruction --

21       THE COURT:  But the objection is, are you going to

22  reference this -- if I understand the objection, are you going

23  to reference this Section 22 of the condo act and 75 percent?

24       MR. S. KULWIN:  No, absolutely not.

25       THE COURT:  Okay.  I think that's your objection.

 1    MR. NOVACK:  That's all.

 2    MR. S. KULWIN:  Well, that's only part of his

 3  objection, Judge, because what he wants to do is, he wants to

 4  put up -- and he's got it very conveniently cut out -- he

 5  wants to put up that we have the absolute right to make

 6  changes, and he wants to take out, but we have to get your --

 7  not the condo association's -- you, Ms. Goldberg's, your

 8  approval where required by law.

 9    Now, he could have, if this was a contract case,

10  called an expert witness to say what that means.  Okay?  You

11  haven't ruled what that means.  That's not been put in front

12  of -- he just said, he just said, it could only mean.  Well,

13  where is the evidence, Judge?  This is a trial.  Where is his

14  evidence that it could only mean?  Okay?  It doesn't --

15  there's no evidence.

16    And this jury shouldn't be forced to swallow it whole

17  and go back and go, well, the contract -- because they're

18  going to think --

19    THE COURT:  I'm sorry.  I'm not sure I understand

20  what else you're asking me.  I thought you were asking that he

21  not be permitted to go into what he started to the other day,

22  the reference to the Section 22, you have to have 75 percent.

23    MR. NOVACK:  Yeah.

24    THE COURT:  And you're right, I ruled on that.

25  That's out.  But it sounds like maybe I missed something that

1   Mr. Kulwin is -- thinks you're going to do something else?

2          MR. NOVACK:  No.

3          THE COURT:  Are you asking for anything else?

4          MR. NOVACK:  I'm asking -- here's what I'm asking

5   for:  I want to be able to put up on the board --

6          THE COURT:  Section 4(a).

7          MR. NOVACK:  -- 4(a) without the proviso.

8          THE COURT:  Without the 75 percent proviso?

9          MR. NOVACK:  Right.

10         And, Judge, you -- and when Mr. Kulwin says, where do

11  I get off doing that?  Page 22 of your Honor's memorandum

12  opinion and order on the motion to dismiss says, Section 22

13  contains no such requirement and plaintiff points to no

14  provision that would require defendant to obtain plaintiff's

15  approval.  They made this argument once before and you

16  rejected it and dismissed the breach of contract count on that

17  basis.

18         THE COURT:  But I just thought he said he's not going

19  to go into that.

20         MR. S. KULWIN:  Here's what the plan is, Judge.  The

21  plan is, when you dismissed the breach of contract count, I

22  guess -- I don't know.  I can't recall what Mr. -- he wants to

23  put in here that -- he wants to give the jury this, while

24  they're also getting the full exhibit later on -- and, by the

25  way, let me point out, he has never once --

1955

1    THE COURT:  Help me out here.  Let's not get

2    sidetracked.

3        I'm not sure what you're asking me to rule on before

4    closings, because I thought Mr. Kulwin just admitted -- I

5    mean, you can certainly use Section 4(a).  It's in evidence.

6    I have addressed what it's relevant to.

7        It's not -- legally it's not a complete defense to

8    the fraud case, but there are other things it can be used for,

9    as I addressed in the motions in limine.

10        MR. NOVACK:  Right.  And I came here and I said I

11    want to put up that portion of that section, and I want them

12    not to be able to say to the jury, oh, he forgot this section

13    because --

14        THE COURT:  Is this the one here --

15        MR. NOVACK:  And I think I heard him say he isn't

16    going to do that.

17        MR. S. KULWIN:  I am going --

18        THE COURT:  The "this section" is the 75 percent

19    approval?

20        MR. S. KULWIN:  No.  In my opinion --

21        THE COURT:  Is that right, Mr. Novack?  What's the

22    "this section" you're referring to?

23        MR. NOVACK:  The "this section" is except for

24    approvals as required by law under the act and the only thing

25    is 22.

1956

```
 1          And you've already ruled on this, and I'll give you
 2   the -- it's your -- it's Document 37, if we can all remember
 3   that early in the case.  They made this argument.  They said
 4   the contract --
 5          THE COURT:  Which argument?  I'm sorry.  I'm having a
 6   hard time following you.
 7          Which argument?  And maybe you need to give me the
 8   rest of Section 4(a).
 9          MR. S. KULWIN:  Here, Judge.
10          MR. NOVACK:  Here, actually, I've got it in big print
11   --
12     (Document tendered.)
13          THE COURT:  Okay.  Bear with me one second.
14     (Brief pause.)
15          THE COURT:  And this is Section 4-A.
16          MR. S. KULWIN:  I have a point when you're ready,
17   Judge.
18     (Brief pause.)
19          THE COURT:  Okay.  So the provision doesn't refer to
20   Section 22.  It's if required by law.
21          MR. S. KULWIN:  Right.  And what they didn't do,
22   Judge, is, they didn't bring in either, A, any evidence what
23   that means, B, any factual evidence.  Remember --
24          THE COURT:  So what do you want to argue is required
25   by law?
```

1957

1    MR. S. KULWIN:  What I want to do is -- they don't

2  know.  There's no evidence on it.

3    What I want to argue, and I think I am entitled to

4  argue, is that the contract clause is a red herring.  I've

5  asked witness after witness, is there anything in this clause

6  that allows you to lie to somebody up front, and they've said

7  no.  And I want --

8    THE COURT:  And that's fine.

9    MR. S. KULWIN:  And I want to argue that.

10    And then what I want to further say is, okay, they've

11  never shown you this clause, folks.  Here's the clause.  What

12  does it mean?  Why don't you go back and look at the evidence.

13  Oh, that's right, there is no evidence.  They haven't produced

14  any evidence.

15    THE COURT:  What does what mean?

16    MR. S. KULWIN:  The clause, this -- I want to show

17  them the whole clause and say what does it mean, go look at

18  the evidence.  Oh, right, there is no evidence because they

19  didn't introduce any evidence.  So you know what it's worth in

20  this case?  Nothing.  Forget it.  It's a red herring.

21    And I'll say this, too, Judge:  You know, Mr. Novack

22  --

23    THE COURT:  There was evidence because they asked

24  some of the employees about the clause.

25    MR. S. KULWIN:  And what -- no.  What you said was

1  they can't say what it means.  They can say what they

2  understood it means.  And I'm going to --

3          THE COURT:  And they did.

4          MR. S. KULWIN:  Right, and so did Mrs. Goldberg.  She

5  said, that's not what it means to me.  And that's what

6  Ms. Vogue said, that's not what it means to me.  And so you

7  have got conflicting people saying what it means.  Okay?

8          But there's no evidence in this case telling this

9  jury exactly what it does mean.  And I want to tell them,

10 you're not going to be instructed on a contract claim because,

11 guess what, there is no contract claim.

12         And further, Judge, the ruling that he's referring to

13 has been since superseded, because what you said about this

14 clause, this very clause, when you thought this case was going

15 to the jury on the contract claim, you said, you get that

16 clause, Mr. Novack, but then Kulwin gets his clause which

17 says, implied covenant of good faith.

18         So if he wants to argue this and he wants to say --

19 he wants some kind of instruction that says --

20         THE COURT:  That's separate because this goes to

21 intent.

22         MR. S. KULWIN:  Right.  You're right.

23         THE COURT:  The implied covenant of good faith is a

24 separate breach of contract.

25         MR. S. KULWIN:  You're absolutely right, Judge, and

1   that's my point.

2           My point is, he can't get up -- if he wants to show

3   his portion of that, that's fine.  I'm entitled, and I plan on

4   showing the entire thing to the jury with the "if required by

5   law."

6           THE COURT:  And what is your objection to that?

7           MR. NOVACK:  Judge, my objection is the jury looks at

8   that, they're going to think, unless instructed by you to the

9   contrary or unless they don't get to see this, which is my

10  first choice, that, oh, this means they did have to go to

11  Mrs. Goldberg for approval.  But that's not what that clause

12  said.

13          And your Honor said Section 22 contains no such

14  requirement, that is, approval by her.  And plaintiff points

15  to no provision that would have required defendant to obtain

16  her approval before making the modification, because you held

17  that what that said when it said notice or approval is

18  required -- as required by law, that what that meant was the

19  75 percent approval required by Section 22 of the condo act.

20          THE COURT:  Are you reading from the motion to

21  dismiss ruling?

22          MR. NOVACK:  Yes, I am.

23          THE COURT:  Record 37?

24          MR. NOVACK:  Yes.

25          MR. S. KULWIN:  Judge, I don't have that right in

1960

1    front of me but I will say this, okay?  So what?  That's in

2    the contract case.  And you're right, we can't raise it in the

3    contract case.

4         But if he's going to use this -- remember what he's

5    using it for.  He's using it for -- he's really not using it

6    for fraudulent intent any more because again, Judge -- and I

7    want to go slow here -- he put in no evidence in this case

8    that anybody decided to remove these elements, okay, in

9    advance before she bought thinking, we're thinking about doing

10   it and, therefore, if we do it, we didn't have any intent

11   because of this clause.

12        Their argument is -- and has been throughout this

13   case -- the clause gives them the right to do it.  And the

14   implicit argument, although they never make it because, with

15   all respect, they want the jury to think that the clause bars

16   the claim -- the only thing that they can be using it for is

17   materiality.

18        The only thing they can be saying is, when Mrs.

19   Goldberg saw that clause -- and, in fact, Mr. Novack crossed

20   her on it -- when you saw that clause you knew that you

21   couldn't rely, okay -- that you couldn't -- it was -- you

22   couldn't possibly think that you were going to get what was in

23   the property reports because this told you.  And she said, no,

24   that's not what I thought, that's not what I thought.

25        THE COURT:  Is that what you plan on using it for, or

1961

1   do you plan on using it for the intent of your --

2           MR. NOVACK:  Judge, we had this argument the other

3   day about Exhibit 522 and I ticked off all of the things that

4   this would go to.  Intent is one, materiality is one,

5   causation is one.

6           THE COURT:  Is that a yes, you do plan on using it

7   for -- you plan on --

8           MR. NOVACK:  Yes.

9           THE COURT:  -- using this particular provision for

10  materiality as well?

11          MR. NOVACK:  Right, because it couldn't be material

12  that she was getting specific common elements when she knew

13  that the common elements that were in existence at the time

14  could be changed.

15          THE COURT:  Okay.

16          MR. S. KULWIN:  And --

17          MR. NOVACK:  And if I could just respond?

18          Two things.  One, Mr. Trump -- and it was probably

19  asked and answered as many times, at least three times if not

20  more -- said we had the right to do that because we had that

21  provision in the contract.

22          THE COURT:  Right.

23          MR. NOVACK:  He said it over and over again.

24          THE COURT:  I know.  There was testimony there.

25          MR. NOVACK:  So there is testimony about it.

1           MR. S. KULWIN:  But he didn't --

2           MR. NOVACK:  And what I'm trying to do is avoid a

3   misunderstanding.

4           Now, here's what Mr. Kulwin just said is clear today.

5   He, meaning me, he's going to say this allows him to make the

6   changes without approval.

7           THE COURT:  Right.

8           MR. NOVACK:  And I'm going to say, now I'm Mr.

9   Kulwin, that that's not what it meant.

10          Judge, why should the jury go back there and start

11  scratching their heads and having a debate among themselves

12  and say, gee, what does that mean?  Isn't that for the Court

13  to give that instruction?

14          THE COURT:  It depends on if it's ambiguous or not.

15          MR. S. KULWIN:  A, and B, that would be all fine and

16  good if we were in a contract case.  We're not.  And my point

17  --

18          THE COURT:  Has there been any testimony on what that

19  other provision means?

20          MR. S. KULWIN:  No.

21          THE COURT:  On what it -- I don't think you asked

22  anybody about the rest of that provision.

23          MR. S. KULWIN:  Nobody asked anybody.  There's no

24  evidence about it and --

25          MR. NOVACK:  I didn't dare to get to it.

1963

1      THE COURT:  Okay.  Last word and then we'll talk in

2   the morning.

3      MR. S. KULWIN:  The only reason I need to know,

4   Judge, is because I -- I'm trying to write a closing argument

5   here.

6      Here's my point -- my point is basically this, okay:

7   He can use it for whatever he wants.  He can argue up and

8   down.  But one thing is clear -- and it's crystal clear -- the

9   only evidence in this case about that clause is what people

10  believed.

11      And, therefore, it goes to fraud issues, intent and

12  materiality.  And if that's the case, I'm entitled to tell

13  this jury, folks, there's no evidence about what it means.

14  It's up to you to weigh it for whatever you think it's worth.

15  In my view it's worth nothing, it's meaningless, okay?

16      Because here's the thing:  They want you to believe

17  -- and, Judge, you have to say that their argument in this

18  case has been at least -- has led many people on this jury to

19  believe, gosh, there's a clause in this contract that bars

20  Mrs. Goldberg from bringing any kind of claim.  And I want to

21  be able to say, no, they're 100 percent wrong on that.  That's

22  argument and you don't need to instruct them.

23      You want to consider it?  Consider it.  But let's

24  look at the evidence.  And I want to put the whole thing up --

25      THE COURT:  And you can make all of that so far.  But

1964

1  what do you plan on doing with the last portion of Section

2  4(a) that says "if required by law," because we haven't heard

3  anything on that.  We haven't heard anybody's belief about

4  that.  We haven't -- we haven't heard anything.

5          MR. S. KULWIN:  Because -- here's why, Judge:  The

6  reason that goes up there is because -- if it doesn't go up

7  there, she has -- Mrs. Goldberg has no big -- she said she --

8  he asked -- Mr. Novack asked her, you saw this clause.  He

9  didn't say, you saw this clause up to this point.  In fact, he

10  never asked one witness, he never showed one witness the

11  clause ever.

12          He said, isn't it true there's a clause.  Fine.  Then

13  he has to swallow the whole clause, because what Mrs. Goldberg

14  said and Ms. Vogue today said, when I look at a law clause,

15  which includes the "as required by law," my understanding --

16          MR. NOVACK:  Oh, no.  No witness said that.

17          MR. S. KULWIN:  Let me finish.  Judge, can you ask

18  him to let me finish, please?

19          THE COURT:  Let him finish.

20          MR. S. KULWIN:  Thank you.

21          When I look at the clause that you're telling me, the

22  clause in the contract, what Ms. Vogue said is, I've never

23  seen anything like it.  The clause that you're talking about

24  is a standard clause, it's in all sorts of contracts.  I've

25  been dealing with developers my whole life and you know what?

1  It doesn't mean that you can do what you say it did.  And Mrs.

2  Goldberg said the exact same thing.  And that undercuts the

3  materiality argument.

4        And the reason Mr. Novack is pounding so hard is,

5  let's face it, he wants to put that up there.  And I don't

6  know what kind of argument he's going to make, but it's going

7  to be very similar to the one he made in opening statement,

8  which was to wit, look at her e-mail.  She said they knew they

9  had the right to make the changes absolutely and she doesn't

10  have a court case.  And that's what he's trying to lead this

11  jury to believe -- am I yelling?

12        THE COURT:  Yes.

13        MR. S. KULWIN:  I'm sorry.  I can't hear myself,

14  Judge, and I very much apologize.  I really -- I have -- I've

15  had issues since I was a kid.  I'm sorry.  Okay?  Just throw

16  something at me next time.  I apologize, I really do.

17        Okay.  He has tried to lead this jury to believe,

18  okay, that this clause bars the contract.  And now he wants to

19  finish it off by putting this up there without giving me any

20  type of opportunity to say, who could reasonably believe that

21  that's the case.  He's going to say, how could you not?  Look,

22  she --

23        THE COURT:  Last word and then I'll see you tomorrow

24  morning.  Last word.

25        MR. NOVACK:  Judge, both Ms. Vogue and Mrs. Goldberg

1966

1    in the same wording said, no, the clause that's in there, that

2    I know, says there's -- that I can't make a change if there's

3    field changes and city code changes.  That's not in here.

4         And I asked Mrs. Goldberg which provision has the

5    field changes and the code changes and she pointed to

6    Paragraph 3(a), not 4(a).

7         Nobody has said on this stand, certainly not

8    Mrs. Goldberg, oh, I wasn't worried about that because I knew

9    that he was going to give me an approval because it's required

10   by law.  That's not what their defense was.

11        MR. S. KULWIN:  He never showed it to us.

12        MR. NOVACK:  And your Honor said -- and if they were

13   to say -- if he was to say in closing, oh, no, ladies and

14   gentlemen, look, it's required notice, I would have to say

15   that's not right because Judge St. Eve has held in writing

16   that that is not plaintiff's approval, that's three quarters

17   approval, and she's ruled that out of the case.  I obviously

18   can't say that.  So I'll be naked.

19        I think the right thing to do is to put it in without

20   that clause and not allow anybody to mention that clause or

21   argue from it.  I mean, what I really would like is an

22   instruction of what the contract clause means, but I know

23   you've rejected that so I'm going to this now.

24        MR. S. KULWIN:  No, Judge.

25        THE COURT:  Well, the reason I rejected it is you

1967

1  filed it -- you're asking me to interpret a contract that you

2  didn't ask me to interpret before.  And --

3          MR. NOVACK:  But you -- I'm sorry.

4          THE COURT:  I'll go back and look at the motion to

5  dismiss.  I'm done with you guys.  I'll see you tomorrow

6  morning, 8:35.

7          MR. NOVACK:  Please.  I want to make sure he's not

8  going to use these summary Exhibits 5 and 6.  Those were the

9  ones with these big numbers and projections that you wouldn't

10 let him use in opening, and there was no --

11         MR. S. KULWIN:  No.

12         THE COURT:  Are you going to use them for closing?

13 They are certainly not summaries.

14         MR. S. KULWIN:  No, they're not summaries, Judge.

15 They're demonstrative exhibits and I am not going to use -- it

16 depends what he says in his argument.  I'm not using it in my

17 opening close but --

18         THE COURT:  Okay.  If you want to use it in rebuttal,

19 front it with me.

20         MR. S. KULWIN:  Okay.  I'll front it with you before

21 our rebuttal.

22         MR. NOVACK:  Thank you, Judge.

23    (Trial adjourned until May 22, 2013, at 9:00 a.m.)

24

25

1968

1        *    *    *    *    *

2

3    We certify that the foregoing is a correct transcript from the
     record of proceedings in the above-entitled matter.
4

5
     /s/ Nancy C. LaBella                    May 21, 2013
6    Official Court Reporter

7
     /s/ Mary M. Hacker                      May 21, 2013
8    Official Court Reporter

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25