1969

1           IN THE UNITED STATES DISTRICT COURT
            NORTHERN DISTRICT OF ILLINOIS
2                    EASTERN DIVISION

3    JACQUELINE GOLDBERG,          ) Docket No. 09 C 6455
                                   )
4                    Plaintiff,    )
                                   )
5              vs.                 )
                                   )
6    401 NORTH WABASH VENTURE, LLC,)
     a Delaware Limited Liability  )
7    Company, et al.,              ) Chicago, Illinois
                                   ) May 22, 2013
8                    Defendants.)    8:55 o'clock a.m.

9                      VOLUME EIGHT
            TRANSCRIPT OF TRIAL PROCEEDINGS
10      BEFORE THE HONORABLE AMY J. ST. EVE, AND A JURY

11   APPEARANCES:

12   For the Plaintiff:       KULWIN, MASCIOPINTO & KULWIN, LLP
                              BY:  MR. SHELLY B. KULWIN
13                                 MR. JEFFREY R. KULWIN
                              161 North Clark Street, Suite 2500
14                            Chicago, Illinois  60601

15   For the Defendants:      NOVACK AND MACEY, LLP
                              BY:  MR. STEPHEN NOVACK
16                                 MR. JOHN F. SHONKWILER
                              100 N. Riverside Plaza, Suite 1500
17                            Chicago, Illinois  60606

18   Also Present:           MS. ALEXIS ROBINSON
                             MS. CHRISTINA KIM
19
     Court Reporter:         MR. JOSEPH RICKHOFF
20                           Official Court Reporter
                             219 S. Dearborn St., Suite 1232
21                           Chicago, Illinois  60604
                             (312) 435-5562
22
                 * * * * * * * * * * * * * * * * *
23
                     PROCEEDINGS RECORDED BY
24                   MECHANICAL STENOGRAPHY
              TRANSCRIPT PRODUCED BY COMPUTER
25

1    THE CLERK:  09 C 6455, Goldberg vs. 401 North Wabash
2  Venture.
3    THE COURT:  Good morning.
4    MR. S. KULWIN:  Good morning, your Honor, Shelly
5  Kulwin and Jeff Kulwin on behalf of the plaintiff.
6    MR. NOVACK:  Good morning, Judge, Steve Novack and
7  John Shonkwiler on behalf of the defendants.
8    MR. SHONKWILER:  Good morning, your Honor.
9    THE COURT:  Good morning.
10    We are here on closings this morning, which will
11  begin when the jury is here.
12    I addressed two issues that were raised with the
13  Court yesterday.  I issued an order regarding the use of
14  Section 4(a).
15    I am going to give the proposed jury instruction that
16  Judge Kennelly gave in Envoy, I think, was the case.
17    I received your response at some point early this
18  morning and have reviewed it and did a lot of my own work on
19  the plaintiff's three motions that were filed last night.
20    I am denying your request, Mr. Novack -- I will grant
21  you leave to file the additional jury instruction regarding
22  emotional damages, but I am not going to give that
23  instruction.  Instead, I am going to give this instruction
24  that I am handing to you and that I will enter on the docket
25  today --

1971

```
 1              (Document tendered.)

 2          THE COURT:  -- which is consistent with Seventh

 3   Circuit law and addresses some of your concerns.  We will

 4   leave it up to the jury to decide.

 5          The instruction will read, "Plaintiff must prove

 6   demonstrable emotional distress in order to recover damages

 7   for emotional distress."  And it is directly from Seventh

 8   Circuit case law, Stevens vs. Housing Authority of South Bend,

 9   5663 F.3d 300 at 308.  That is a 2011 Seventh Circuit case.

10   And it is quoting from Biggs vs. Village of Dupo, 892 F.2d

11   1298 at 1305.

12          She cannot establish emotional distress damages based

13   simply on conclusory statements regarding emotional damages.

14   Plaintiff cannot recover for any emotional damages caused by

15   her decision to bring this litigation.

16          That is supported by the other case law that I have

17   cited at the bottom of this proposed instruction and that I

18   will put on the docket today.

19          MR. S. KULWIN:  May I just make one request, Judge?

20          THE COURT:  You may.

21          MR. S. KULWIN:  Thank you, your Honor.

22          The cases that we looked -- that you are citing --

23   deal with just the mere bringing of the litigation.

24          THE COURT:  The mere, what?

25          MR. S. KULWIN:  Bringing of the litigation.
```

1972

1    THE COURT:  Correct.

2    MR. S. KULWIN:  However, we believe that if you are

3    going to give this, you should add a sentence that says, "This

4    does not mean, however, that Ms. Goldberg cannot recover

5    emotional damages, in part, for having to make efforts to

6    recover her money, including litigation," because that's what

7    the case law says.

8    What the cases say is the mere filing of the suit;

9    but, when you're doing consumer fraud, trying to get your

10   money back is compensable, whether -- otherwise, they're going

11   to think that all of her efforts between whenever she -- you

12   know, first found out about this, up to then, are not

13   recoverable.

14   THE COURT:  What the Seventh Circuit said -- the

15   Stoleson vs. U.S. case at 708 F.2d 1217 at 1223 -- is the main

16   case in this area, that other case law has picked up on.  And

17   what that court said is, "An alleged tortfeasor should have

18   the right to defend himself in court without -- " I am sorry,

19   let me go back.

20   "It would be strange if stress induced by litigation

21   could be attributed in law to the tortfeasor.  An alleged

22   tortfeasor should have the right to defend himself in court

23   without thereby multiplying his damages more than five-fold."

24   So, I do not think what you just said would be

25   accurate.

1973

1    I certainly think you can argue the stress of trying

2    to recover her money, separate and apart from this --

3    MR. S. KULWIN:  Well, could we just have something at

4    the end of this saying, "This does not preclude her from

5    recovering emotional distress damages for efforts to recover

6    her money unrelated to the litigation" -- you know, unrelated

7    to the actual filing of the suit, taking depositions, sitting

8    in court?

9    THE COURT:  I do not think that is necessary.  I

10   think you can argue based on this, because this makes clear it

11   is caused by her decision to bring this litigation.

12   MR. S. KULWIN:  Could we -- my last shot, Judge.

13   Could we at least say, "the filing" -- "from the date of the

14   filing" -- or "her decision to file this lawsuit," as opposed

15   to "this litigation"?

16   The jury might not understand "litigation."  They

17   might think it encompasses more.

18   THE COURT:  "To bring this lawsuit," I am okay with

19   that.  I will change "litigation" to "lawsuit."

20   MR. S. KULWIN:  Okay.

21   MR. NOVACK:  Judge, would --

22   MR. S. KULWIN:  And by doing that, Judge, I just want

23   to say we still object to the --

24   THE COURT:  I understand.

25   MR. S. KULWIN:  -- instruction.

1974

1      THE COURT:  I understand.

2      MR. NOVACK:  I wonder if we could get a clean copy,

3  that we'll be able to put up on the screen?

4      THE COURT:  Yes.

5      I will e-mail you a clean set of everything, too.

6      Mr. Kulwin, do you have any better sense of the

7  length of your closing?

8      MR. S. KULWIN:  Yes, Judge.

9      I'm shooting for one hour and fifteen minutes.

10      THE COURT:  Okay.

11      MR. S. KULWIN:  It might go a few minutes past --

12      THE COURT:  That is fine.  I am not going to cut you

13  off.  It is just for planning purposes.

14      MR. S. KULWIN:  It might go longer, because I have to

15  talk slower.

16      THE COURT:  I am sorry?

17      MR. S. KULWIN:  It might go longer because the court

18  reporters have all told me I better talk slower.

19      MR. NOVACK:  And I'm wondering, Judge, if it would be

20  possible that we have, at a minimum, a bathroom break between

21  his closing and mine?

22      THE COURT:  That is my intention, to take our morning

23  break -- after Mr. Kulwin's closing, take our morning break --

24  your closing and we will see where we are on time.

25      Rebuttal will likely be after lunch -- rebuttal and

1975

1  instructions -- but let us see where we are on timing.

2          MR. S. KULWIN:  Okay.  That's fine with me, Judge.

3          THE COURT:  Danny, is everybody here?

4          THE COURT SECURITY OFFICER:  No, Judge.

5          THE COURT:  Okay.

6          MR. S. KULWIN:  So, I have time to walk down the

7  hall?

8          THE COURT:  Yes, you have time to take a quick break.

9          (Brief recess.)

10          THE COURT:  The jury is all here.

11          Are you ready?

12          MR. S. KULWIN:  Ready, your Honor.

13          THE COURT:  Bring in the jury, please.

14          (Jury in.)

15          THE COURT:  You may be seated.

16          Good morning, ladies and gentlemen.

17          As I indicated at the close yesterday, you will be

18  hearing closing arguments today and, then, I will instruct you

19  on the law.

20          Closing arguments are not evidence.  It is the

21  attorneys' opportunity to address you, again, and to argue

22  their cases to you about what they believe the evidence has or

23  has not shown.

24          Just a couple of things before we begin with

25  closings.  First of all, if the evidence, as the lawyers

S. Kulwin - Opening Argument

1976

1  describe it to you, is different from what you remember, your

2  memory is what counts.

3         Second, I will instruct you on the law at the end of

4  the case, after you have heard the arguments and before your

5  deliberations.

6         I will also give each one of you a set of those

7  instructions to take back into the jury room with you.  That

8  is the law that applies in this case, the law that I will

9  instruct you on at the end of the case.

10        And, finally, thank you for the attention you have

11 paid throughout this case and thank you for being here early

12 every morning.  It helps to keep things moving and we are

13 starting right on time this morning because of that.

14        With that, Mr. Kulwin, closing argument.

15        MR. S. KULWIN:  Thank you very much, your Honor.

16          OPENING ARGUMENT ON BEHALF OF THE PLAINTIFF

17 BY MR. S. KULWIN:

18        May it please the Court, counsel, ladies and

19 gentlemen of the jury.

20        Ten days ago, I stood in this very spot and told you

21 what we believed the evidence would show.  What I didn't tell

22 you, because I couldn't tell you, because I didn't know to

23 tell you, was that Donald Trump, the president and owner of

24 the Trump organization and both of these defendants, would

25 come into this courtroom and lie, evade, spout infomercials

S. Kulwin - Opening Argument

1977

1   and, literally, make up conversations out of thin air, all in

2   a vain effort to avoid answering any direct questions about

3   the simple, crystal clear fact that he never, ever intended to

4   give away 30,000 square feet of prime real estate in his

5   prized development, the Trump Tower Chicago -- real estate he

6   knew had to be worth between 30 and 40 million dollars, as

7   well as an income stream of $5 million, with the potential

8   profits of over $1 million a year -- to a bunch of hotel condo

9   owners he didn't know, but who he knew could fire the Trump

10  organization from running the food and beverage operation in

11  the Trump hotel, and, to use the words -- to use his own

12  words -- "give them the opportunity" to create his own

13  nightmare scenario of putting a Burger King in the lobby of

14  the Trump hotel.

15          Nor could I tell you and nor would I have believed

16  that Mr. Trump, again, in a somewhat ludicrous attempt to

17  distance himself from and avoid responsibility for material

18  misrepresentations and omissions by his organization,

19  misrepresentations and omissions that he was almost

20  exclusively responsible for -- with one exception -- would get

21  on this very witness stand and portray himself as an amnesiac-

22  afflicted absentee president who was not the sophisticated,

23  highly-experienced hotel developer and operator, a condominium

24  expert, a hotel condominium pioneer who had successfully built

25  an award-winning hotel condominium in the toughest market in

S. Kulwin - Opening Argument

1978

1  the world -- New York City -- as he is portrayed here

2  (indicating); but, instead, as a bumbling amateur in the hotel

3  business, who ran an organization filled with executives who

4  were utterly incompetent when it came to operating hotels and

5  who were incapable of putting together a reliable hotel

6  condominium budget or even understanding such complex concepts

7  in the hotel business as:  A, guess what?  Food and beverage

8  operations sometimes don't have good years, they fluctuate up

9  and down; B, hotel condo boards might fire a management

10 organization; C, the Trump brand could be damaged if the hotel

11 condo board runs the hotel; and, that he only had his eyes

12 open to these allegedly stunning revelations when a

13 silver-haired lone ranger-like savior, with a few years of

14 experience running a hotel condo in the sprawling metropolis

15 of Tampa, Florida, schooled him on the dark and mystical

16 intricacies of running a hotel when it was combined with a

17 condominium.

18       Nor could I tell you or even believe that, indeed,

19 Mr. Trump, from this very witness stand (indicating), again,

20 in an effort to avoid the responsibility for the material

21 omissions and misrepresentations made in this case, would

22 reveal to all of the world that everything represented in the

23 glossy brochures his organization had distributed to

24 unsuspecting hotel condo buyers, like Jackie Goldberg, was a

25 bunch of hooey; that he was the Wizard of Oz, the emperor

S. Kulwin - Opening Argument

1979

1    without clothes; or, that at one point, while trying to imply

2    or say that Jackie Goldberg was foolish to think that the

3    Trump Chicago ballrooms would ever yield any profit because,

4    after all, according to Mr. Trump from that very witness

5    stand, "You know, the grand ballroom at the Trump Hotel, it's

6    really not that grand.  It's kind of, you know, mediocre,

7    ugly.  It's got a big pole in the middle of it.  Who would

8    want to rent it?"

9         Where was that quote in the glossy brochures?  Where

10   is the quote there that says, "Yeah, it looks really great,

11   but, you know, not so much.  Don't forget to miss the pole"?

12        And why would Mr. Trump engage in this type of simply

13   ridiculous testimony?  For the same reason anyone does,

14   whether they are a billionaire or a two-bit con artist:  To

15   avoid telling the truth.  Because, ladies and gentlemen, the

16   truth is, as the evidence in this case has shown, when it

17   comes to the question of the day, the question that you will

18   have to decide -- whether it is more likely true or not that

19   the defendants in this cause made material misrepresentations

20   and/or omissions, and/or untrue statements in the condo

21   documents and marketing materials given to Jackie Goldberg, to

22   induce her to sign purchase agreements for two hotel

23   condominiums in Trump Tower -- the simple answer is:  You bet

24   your life they did.  You bet your life.

25        Good morning, ladies and gentlemen.  Over the next

S. Kulwin - Opening Argument

1980

1  several moments, I'm going to be talking to you about the

2  evidence in this case and how it proves that it is more likely

3  true than not that the defendants are liable for both claims

4  in this case.

5        Before I do, I want to take a moment to thank you for

6  your service in this cause as jurors during this trial and

7  before, in the other cases that you served on.

8        When you look around the world today, you see all

9  sorts of examples of "justice."  In some places, it's simply a

10  bullet.  In others, it's the most powerful prevail, no matter

11  what.

12        But not here.  Not in America.  Only here, regardless

13  of who you are, if you feel you have been wronged, you can

14  bring your case to court.  Only here are you assured of a fair

15  hearing, first by a court and then by a jury.  And only here,

16  when people come to resolve their disputes, not through

17  violence, not through brute power, but in a wood-paneled

18  courtroom, as beautiful as it is like this, governed by the

19  rules of evidence, presided over by an impartial judge, with a

20  group of fellow citizens -- you in this case -- to decide the

21  facts.

22        None of that -- none of that -- don't underestimate,

23  none of that -- could occur.  This is the heart of not just

24  our legal system or our economic system, our government.  None

25  of that can occur without the willing participants -- citizens

S. Kulwin - Opening Argument

1981

1    like you.

2         So, on behalf of myself, counsel for both sides,

3    Judge St. Eve and all of the court personnel -- and, most

4    importantly, my client, Jackie Goldberg -- I want to thank you

5    all for the attention you've paid thus far and for the

6    attention I know you're going to be paying during these

7    important arguments and your consideration of the evidence

8    when you go back for your deliberations.

9         Thank you very much.

10        Okay.  There's a lot of evidence for us to review.

11   Let us begin.

12        Before I talk about what this case is about, given

13   what's gone on here for the last several days, I think it is

14   critical to tell what you it is not about.

15        This is not a breach of contract case.  You will not

16   be asked to judge any contract claims.  There are none.  You

17   will not be instructed on the law on contracts.  And, so,

18   important:  This case is not about any contract clause that

19   may exist in any contract.

20        By the way, the defendants have never even bothered,

21   if you recall, to show you during this trial that contract

22   clause.  They have not called one witness -- not one witness

23   -- to lay out, "Here's the clause.  This is what it means."

24        The defendants want you to believe that because there

25   is, allegedly, some clause in a contract that allows them to

S. Kulwin - Opening Argument

1982

1    make changes in the condominium documents without getting

2    Jackie Goldberg's prior approval, that they have the absolute

3    right to take away all the ballrooms, the meeting rooms, the

4    function rooms, the laundry facilities, $5 million in gross

5    revenues and give it to Mr. Trump, which, as we all now know,

6    is exactly what they did, because Mr. Trump owns all the

7    commercial property, where that went.

8            Let me tell you about that, ladies and gentlemen.

9    That notion -- that concept -- is 100 percent wrong.  And

10   defendants' counsel will not get up here and tell you anything

11   different.

12           The fact that you have a clause in a contract, like

13   the one that supposedly exists here, does not allow you to

14   deceive somebody -- either by lying to them about something

15   important relating to that contract or by concealing a

16   material fact about the deal -- into signing that contract;

17   so, that when you subsequently complain after they materially

18   change the deal, they can just say, "Oh, I've got a contract

19   clause.  I'm good."  It doesn't work that way.

20           Let me give you an example.

21           Let's say you want to buy a fiery red convertible.

22   Let's say that's your dream.  It's not mine, but let's say

23   it's yours.  Okay?

24           You go to a Chevrolet dealer, where the car dealer

25   shows you glossy brochures of three different types of a fiery

S. Kulwin - Opening Argument

1983

1    red convertible that he can sell you.  You fall in love with

2    one.

3            You see in the contract, though, that the contract

4    allows the dealer the absolute right, in his sole discretion,

5    to deliver any color car he wants once you sign the contract,

6    because you can't depend on his supply.

7            You object.  You say, "Wait a second, whoa, whoa,

8    whoa.  I want the red one."

9            He says, "Can't control it.  Take it or leave it.

10   We're GM.  We're Chevrolet.  What are the odds?"

11           You know, you think to yourself, "He's right, what

12   are the odds that General Motors Chevrolet can't come up with

13   a red car in Chicago, Illinois?"

14           So, you sign the contract.

15           Sure enough, delivery day comes.  What do you know,

16   it's a blue car.

17           Obviously, you're very upset.  Could you bring a

18   contract claim against that guy for breaching a contract for

19   delivering a blue car?  Absolutely not.  You couldn't.  Why?

20   Because he has a clause that says, "I can deliver any car I

21   want."  You signed it, tough luck.  And he would be right.

22           And that's what this guy did.  He complained.  The

23   guy waves his contract clause.  He goes, "I win."

24           To make him feel better, though, the dealer says,

25   "You know, it's better that I sold you a blue car instead of a

S. Kulwin - Opening Argument

1984

 1    red car.  Do you want to know why?  Those red cars, police

 2    always give guys driving red cars tickets.  It's very risky.

 3    They also get stolen all the time.  Really risky.  Okay?  You

 4    really, for your own good, take a blue one."

 5           And although the dealer claims he has the absolute

 6    right to sell you any car he wants, he says, "You know, what?

 7    I'm a great guy.  I'm a car dealer.  I want to look out for

 8    people.  I'm a car dealer.  I will give you a $5,000

 9    discount."

10           Now, all of a sudden, this is starting to smell to

11    you.  You start looking around.  And what do you know?  You

12    find out that before he ever offered to sell you those red

13    cars, he had bought the only one he had left for himself

14    because he, too, loves red cars.

15           And what he also didn't tell you was he couldn't get

16    any more red cars and he knew it when he was showing you the

17    glossy brochures.

18           Why was he offering the red car, then?  Let's think.

19    I know.  Because he was trying to lure people like you into

20    the dealership to buy a red car, to sign his contract, so that

21    he could dump his blue cars.

22           And guess what you also found out?  You found out

23    that he had a whole bunch of blue cars that he had to get rid

24    of and, if he didn't dump them quick, he was going to be in a

25    lot of financial trouble.

S. Kulwin - Opening Argument

1985

1    So, because he knew those things, because he knew he

2    had no red cars left, because he knew he couldn't sell you any

3    more red cars when he offered to sell them to you, anyway,

4    that, ladies and gentlemen, is what's known in the business as

5    consumer fraud.  And that is one of Ms. Goldberg's claims

6    here.

7        And that kind of stuff has been going on for so

8    long -- it has been going on so long and why they passed this

9    statute -- that it actually has a name.  And I'm sure all of

10   you have heard it before; and, if not, let me just say it out

11   loud.  It's called the Bait and Switch.

12       Come on down, here's the bait (indicating).

13       Now for the switch (indicating):  "I'm sorry, here's

14   the blue one."

15       That is a material misrepresentation of fact.  That

16   is consumer fraud.

17       And you want to know, ladies and gentlemen, if that

18   car happened to be a condominium, if it was a piece of real

19   estate, it would also be a violation of the Interstate Land

20   Transfer Act, which is Ms. Goldberg's second claim.

21       You cannot make untrue statements in property reports

22   when you are selling condominiums.  That, if you do, is a

23   violation of the Interstate Land Transfer Act.

24       Now, what does the contract clause do for that dealer

25   when you find this out and he starts waving it around?

S. Kulwin - Opening Argument

1986

1       What can you do for -- what does it do for him

2  legally?

3       Let me tell you what it does for him:  Nothing, nada,

4  zero, zilch, nil.  You cannot use a contract clause to

5  immunize yourself from fraud.  It is a bunch of hooey, it is a

6  red herring in this case and you can just take it and flush it

7  down, blah, blah, blah.

8       All right.

9       And, of course, that makes sense.  Think about it.

10  If the defendants in this case had a contract clause that gave

11  them the absolute right to do what they did here, then what

12  are we doing here?  Why are we all sitting here?  What are we

13  deciding?

14       This is how it would have gone.  Jackie Goldberg

15  would have said, "You changed the deal."

16       Mr. Trump would have said, "I got a contract clause.

17  See you.  Bye."

18       What are we doing here?  Is this, like, what are we

19  going to do, kicks and giggles here?  What is this, a civics

20  class?  I don't think so.

21       You're here to decide whether there were material

22  misrepresentations and omissions that induced Ms. Goldberg to

23  sign those contracts.  That's what you're here to decide.

24       You're here to decide whether there are untrue

25  statements in the property report.  That's what you're here to

S. Kulwin - Opening Argument

1987

1    decide.

2        Because if there are and if those are material and if

3    it is something that she -- it would have made a difference to

4    her, that's what "material" means, and she signed it, then

5    they have violated the Consumer Fraud Act and the Interstate

6    Land Transfer Act.

7        And I'm going to call it the "Land Act" from now on

8    because it's way too long of a sentence for me.

9        And that's what this case is about, nothing else.

10   Don't be fooled.

11       Now, there was somebody who five years ago understood

12   that perfectly.  Not after the lawsuit was filed, not after

13   they got on the stand, not after they had to come up with

14   excuses or something.  There was someone who was keen enough,

15   sharp enough to get that as soon as she thought about it.

16       Remember Jackie's e-mail?  Remember what she says?

17   "It may be somewhere in the earlier documents that Trump had

18   the right to revise.  However, if so, I don't think there

19   would be a court case."

20       Hello.  Ding, ding, ding, ding, ding.  That is

21   exactly what she's saying there.  She's saying there, "Wait a

22   second.  If they have the absolute right, how can people sue?

23   How can they have a case?"  It would just go away.

24       She got it back then.  She understood back then.

25       And, oh, by the way, let's look at this contract

S. Kulwin - Opening Argument

1988

1      clause that you've never seen, ever, in this case.

2              Or not.  There you go.

3              This is the clause:  "Seller reserves the right -- "

4      in very small print, by the way; and, it's under her

5      signature, not above, but, anyway -- "Seller reserves the

6      right, in its sole and absolute discretion, to modify the

7      condominium documents, together with the articles of

8      incorporation of the association, and the statement of record

9      required by the Interstate Land Sales Full Disclosure Act, the

10     HUD report, provided -- "

11             MR. NOVACK:  Objection, Judge, before he reads

12     anything more.

13             THE COURT:  Sustained, Mr. Kulwin, in light of the

14     Court's ruling.

15             MR. S. KULWIN:  I'm not going to argue that, Judge.

16     It's in evidence.  I can read it.  I'm not going to argue it.

17             THE COURT:  Sustained.

18     BY MR. S. KULWIN:

19             You read it, ladies and gentlemen.  You take a look

20     at it.

21             What does that clause mean?  What does it mean?

22             Why don't you go back, when you're doing your

23     deliberations, and look at the evidence on it.  Pore through

24     it.  Give it a close look.

25             "Oh, wait.  That's right.  There is no evidence on

S. Kulwin - Opening Argument

1989

1  it."  Zero, none, nothing.  Just defense counsel waiving it

2  around saying, "This is how it works."

3          Mr. Trump says, "I have the absolute right to do

4  this.  It says right here."

5          Ms. Goldberg says and Ms. Vogue says, "That's not how

6  I read it."

7          You know, they didn't even show her that clause when

8  she was testifying, you might recall.  She said, "The only

9  clause I understand is, in all my years of dealing with real

10 estate, you make, like, modest changes.  You don't take half

11 away of what you sold me," or something.  That's a reasonable

12 expectation.  Okay?

13         Ms. Vogue thought the same thing.

14         Mr. Levin said, of course -- the expert who testified

15 that there were misrepresentations undisputed in these

16 documents, undisputed testimony, no counter expert, he

17 testified -- "In 30 years, I have never seen a developer do

18 this."

19         And when he was crossed, "Ah, Yeah, but you only have

20 worked on 50 or 60 properties here in Chicago?

21         "Yeah.  Well, I called my partner down in Florida.

22 He's worked on -- his company's done 250,000 deals.  They've

23 never seen it, either."

24         And, oh, by the way, remember when I called the

25 so-called expert that the defendants called yesterday?  He's

S. Kulwin - Opening Argument

1990

1  been in the hotel condo business for 30 years.  He's never

2  seen it, either.  He's never, ever seen them take away common

3  elements and put it in the commercial areas.  It is

4  unprecedented.

5          So, was Ms. Goldberg and Ms. Vogue reasonable and

6  rational, when they see -- even if they saw this clause in the

7  fine print with their magnifying glass -- to think, "That's

8  not what it means"?

9          Of course they were.  Nobody in their right mind

10  would sign a deal that says, "I'm really interested in this,

11  I'm going to buy it, but you can deliver whatever you want.

12  Good luck.  Thank you.  Here's my money."

13          It is simply ridiculous.

14          And, again, let's remember, folks, it doesn't matter.

15  It is a red herring.  It is irrelevant because if they lied to

16  her, deceived her, said untrue things to her to get her to

17  sign the contract, you know what that clause is worth?  Zip.

18          So, don't waste your time going back there trying to

19  interpret.  There's no evidence for you to do that.  There's

20  no -- unless you guys are contractual legal experts, and I

21  don't think you are or you wouldn't have been on the jury.

22  Okay?  You're not going to get any instructions telling you

23  how to interpret it.

24          You know why?  Because it's a big red herring.  If

25  they don't have the absolute right to do it, forget about it.

S. Kulwin - Opening Argument

1991

1    Okay.  Finally on this point, ladies and gentlemen,

2    you know, at the beginning of this case, the defendants

3    asserted that Jackie Goldberg admitted --

4    MR. S. KULWIN:  Did I already click back to it?  Do I

5    have to click backwards?  Okay.

6    BY MR. S. KULWIN:

7    -- admitted it.

8    Remember, Mr. Novack stood up and said, "What are we

9    doing here?  Jackie Goldberg wrote this back in February of

10   '08:  'It may be somewhere in the earlier documents that Trump

11   had the right to revise.  If so, I don't think there would be

12   a court case.'"

13   Remember he pointed that out to you at the very end

14   of his closing -- opening statement, rather.

15   And what was he arguing?  What was he telling you?

16   He was telling you, "Look, Jackie Goldberg admits

17   that Trump had the right to change the documents and she

18   admits she doesn't have a court case.  So, what are we doing

19   here?"  Those were his exact words:  "What are we doing here?"

20   The implication being that she knew she had no case,

21   that she knew Trump was right and that she had brought this

22   case dishonestly because she knew she had none.  That was the

23   assertion.

24   Of course, what do we know now?  We all know --

25   undisputed testimony -- that that was completely false.  You

S. Kulwin - Opening Argument

1992

1  saw Terry Vogue's e-mail two days -- several hours before

2  this.  And we're going to see it, too.

3          Okay.  Do you remember this (indicating)?  "While

4  touring the property, I discussed the Tribune article with

5  Kiyoko Binosi," February 14th, 2008, nine hours before Jackie

6  wrote that e-mail.  Okay?

7          What is she talking about?

8          Well, we have undisputed testimony about that, too.

9  We know exactly what she was talking about.  On February 12th,

10  there was an article in the Chicago Tribune.

11          And what did it say?  It talked about other buyers

12  bringing a suit against Mr. Trump for, what?  For taking out

13  the common elements -- taking out the ballrooms, the meeting

14  rooms, the function rooms from the common elements -- and for

15  changing the rental agreement.

16          That's what she's talking about.

17          And both Ms. Goldberg and Ms. Vogue looked at that

18  article and said, "That's the one we were talking about."  And

19  it was literally two days before that.

20          And were they challenged on that in their testimony?

21  Absolutely not.  That testimony is undisputed.

22          And, of course, it makes perfect sense.  They both

23  testified these people -- whoever they are, Mike and Marie --

24  sent Terry Vogue the Tribune article.

25          "What's this?"

S. Kulwin - Opening Argument

1993

1       Terry Vogue goes, "I'm going to go ask Kiyoko

2   Binosi."

3       And what does Kiyoko Binosi say?  More proof of

4   what's in the article.

5       She starts explaining why Mr. Trump did this -- why

6   he took away all the common elements.

7       So, obviously, we know that that's what the article's

8   about.  We've got the article.  We've got Ms. Vogue.  We've

9   got Ms. Goldberg.  We've got Ms. Binosi.  Four for us, zero

10  for them.  We win.  It's undisputed, period.

11      When Jackie Goldberg wrote that e-mail, it is

12  completely obvious -- obvious -- what she was talking about.

13  What she was saying was crystal clear, undisputed.

14      "You know, maybe there's something in those property

15  reports.  I certainly don't remember seeing anything that gave

16  them the right to do this.  But, if so, there couldn't be a

17  court case, the one in the Tribune article."

18      There's no evidence that she was even thinking, when

19  she wrote that article -- wrote that e-mail -- at that point

20  in time about what they are saying.  It is completely

21  ridiculous.

22      And, so, ladies and gentlemen, that's how the

23  defendants started out this case.  That's how they started out

24  this case.

25      Their position was that it was inaccurate, it was

S. Kulwin - Opening Argument

1994

1  misleading and it was untrue.  And you should view all of the

2  evidence of this case through that prism.

3        Indeed, Judge St. Eve is going to tell you that in

4  judging witnesses -- the reasonableness of witness'

5  testimony -- you should judge it in light of all the evidence

6  in the case.

7        So, when you're evaluating the testimony of

8  defendants' executives in this case -- especially, with

9  respect to Mr. Trump and Mr. Petrus -- don't forget how the

10  defendants started this case:  Trying to mislead you, trying

11  to misrepresent the facts to you, trying to give you

12  inaccurate information.  Take a close look at what they say

13  and think about what they did at the beginning of this case.

14        Okay.  Now, let's get to the case.  Let's get to what

15  the case is really about.  Two counts:  Consumer fraud and

16  deceptive practices, Interstate Land Sales Act.  I'm going to

17  call the first one the Fraud Act.  I am going to call the

18  second one the Land Act.  We have the burden of proof to prove

19  both of those claims.

20        What is our burden?  Well, Judge St. Eve talked to

21  you about it at the beginning of the case, and she's going to

22  talk to you about it, again, at the end of the case.  And I

23  have said it many times.

24        MR. S. KULWIN:  Judge, could we have a moment?  I

25  believe one of the jurors would like a pen.

S. Kulwin - Opening Argument

1995

1    THE COURT:  Does somebody need a pen?

2         (Brief pause.)

3    THE COURT:  Thank you, Danny.

4    MR. S. KULWIN:  Thank you.

5  BY MR. S. KULWIN:

6         So, what is she going to tell you?  She is going to

7  tell you on each of the elements of these claims, we have to

8  prove that it is more likely true than not that it occurred.

9         What does that mean?  It's not beyond a reasonable

10 doubt.  It's not even close.  It's like this.  Imagine a

11 scale.  Here's the scale (indicating).  You put the evidence

12 on both sides.  If this one (indicating) goes up a little bit

13 and this one (indicating) goes down a little bit, this is more

14 likely true than not (indicating), because it is.  It's just

15 like this.  This is more likely true than not.  That's the

16 standard.

17        I submit to you, ladies and gentlemen, that Jackie

18 Goldberg, the evidence shows that she has overwhelmingly

19 carried her burden on each element in the case on those

20 standards:  More likely true than not.

21        What type of evidence has she brought?  Well, she's

22 brought two general types of evidence.  I'm not talking about

23 testimony and the documents.  We're going to talk about that,

24 too.  But she's brought two general types of testimony:

25 Direct evidence and circumstantial evidence.

S. Kulwin - Opening Argument

1996

1           Direct evidence is you go outside, it starts to rain,

2    you're getting all wet.  You have direct evidence that it's

3    raining.

4           Circumstantial evidence is you go outside, you get

5    your newspaper, you read it, you go to bed, everything's dry,

6    everything's good.  You wake up the next morning, your car is

7    all wet.  You left your windows open.  There's water in your

8    car.  The grass is wet.  The sidewalk is wet.  The neighbors,

9    all as far as you can see, the pavement is wet.

10           Did you see it rain?  No.

11           Do you know it rained?  Absolutely.

12           That's called circumstantial evidence.  You can

13    deduce it.  You can reasonably infer it from the facts.

14           And Judge St. Eve is going to tell you to do that,

15    too.  She is going to say, "Use your common sense.  Reasonably

16    infer things from the facts."

17           And, ladies and gentlemen, I've been trying cases for

18    30 years.  Believe me, use your common sense.  I'll trust on

19    that.  Use it here.

20           Now, is there any difference between direct and

21    circumstantial evidence?  No.  None, zero.

22           Judge St. Eve is going to tell you they are

23    absolutely equal under the law.  You can give them both

24    exactly the same weight.  And I urge you to do so.

25           All right.  So, what do we have to prove under the

S. Kulwin - Opening Argument

1997

1    Consumer Fraud Act -- the Fraud Act?

2              Well, Ms. Goldberg has to prove that the defendants

3    submitted two -- submitted -- I mean, made a deceptive act to

4    get her to sign the two HCU contracts; and, that, therefore,

5    she paid out $516,000; and, also, lost $45,000 in interest

6    that was due on it, as a result.  Okay?

7              What is a deceptive act?

8              MR. S. KULWIN:  Can we blow this up?

9    BY MR. S. KULWIN:

10             All right.  So, here is what we have to do.  We have

11   to show that the defendants engaged in a material deceptive

12   act; that they intended -- defendants intended -- for the

13   plaintiff to rely on it; that the deception occurred in the

14   course of conduct involving trade or commerce; that

15   Ms. Goldberg sustained actual damages; and, that the damages

16   were proximately caused by the defendants.  That's what we

17   have to show.  Okay?

18             So, what is deceptive act?  A deceptive act -- let's

19   skip -- we're going to skip -- the first two for a second

20   because -- let's go to the last three first.  They're easier.

21             First, that the deception occurred in the course of

22   conduct?  Well, we're going to get to the deception, but

23   certainly in the course of conduct involving commerce,

24   certainly it involved commerce, obviously.  They were, you

25   know, selling things back and forth across the state.  That's

S. Kulwin - Opening Argument

1998

1   undisputed.  Don't worry about that.

2           Did she sustain actual damage?  Well, that's

3   undisputed, too.  I mean, she paid the $516,000.  She lost her

4   $45,000 in interest.  So, that's undisputed.

5           MR. S. KULWIN:  Can you lift it up a little bit,

6   Mike, so they can see the last one?

7   BY MR. S. KULWIN:

8           Were such damages proximately caused by the

9   defendants' deception?

10          Well, what that means is if she was deceived into

11  paying the money, it was proximately caused.

12          Well, obviously she paid the money.  Our position is

13  she was deceived into doing it.  So, that brings us right back

14  to the first two:  The deceptive act and intended to rely.

15  And that, ladies and gentlemen, is where all the action in

16  this case is.

17          Okay.  So, what does that first element mean?  What's

18  a deceptive act?  Okay?

19          The Judge will tell you that if the defendants know

20  and fail to disclose a material fact and/or misrepresent

21  information about the hotel condominiums or the hotel condo

22  building before Ms. Goldberg signed the purchase agreements.

23          What makes something material to make a

24  misrepresentation or omission a deceptive act?  The Judge is

25  going to tell that you that if it's a buyer -- if Ms. Goldberg

S. Kulwin - Opening Argument

1999

1    would have acted differently if she knew the information

2    before she signed the contract, that's material; or, if she

3    would have done -- taken a different course.  Okay?  Either

4    something she'd consider important or if she would have taken

5    a different course and not buy.

6            Basically, it is, is it something important to a

7    reasonable buyer, like Ms. Goldberg?

8            So, let's look at the evidence on that.

9            MR. S. KULWIN:  Can you blow that up?

10   BY MR. S. KULWIN:

11           The first thing is these (indicating) are some of the

12   misrepresentations and material omissions that we're

13   complaining about.  The common elements in the property report

14   told Ms. Goldberg that what she was buying came with an

15   ownership interest in laundry facilities, lobby facilities,

16   function rooms and ballrooms, storage areas and the executive

17   lounge.  That's what it told her.

18           And as you recall from Exhibit H to this document --

19   this is the first amended property report -- it's not repeated

20   in the second two, it's incorporated in the second two.  So,

21   it didn't change in the two reports that she got before she

22   bought, first, second and third.  That's what they told her.

23           And, as you recall, we looked at that budget many

24   times, in the top part where the income is, that told her that

25   there's going to be $5 million of revenue that covered that.

S. Kulwin - Opening Argument

2000

1   Okay?

2          Now, there's no dispute in this case that she got the

3   property reports.  There's no dispute that it was distributed

4   by Trump -- you know, the defendants in this case, Trump.

5          There's no dispute, by the way, that the agents of

6   Trump are the brokers from Koenig & Strey -- Mr. Shearer,

7   Ms. Proctor -- so, things they sent to her are, also -- you're

8   going to get an agency instruction that anything that they

9   said is actually, like, Trump saying it.  There's no dispute

10  about that.

11         Is there any dispute about whether Ms. Goldberg

12  thought these were important?  You know, was it something she

13  would have wanted to know before she bought?  Was it material

14  to her?

15         Here we go.  The first sentence five years ago, the

16  day she found out:  "Terry, if the net revenue or loss for the

17  public areas" -- meaning the ballrooms, the function rooms,

18  you know -- "was originally to be shared by the hotel condo

19  owners, Trump has no right to revise that and change the

20  property agreement on his own."

21         I don't know how much more crystal clear she could

22  be.  That is undisputed evidence.  They never even asked her.

23  Undisputed.  It was important.

24         And you saw her take the stand.  She told you it was

25  important to her.  She told her.

S. Kulwin - Opening Argument

2001

1    And how was her demeanor on the stand?  She was calm.

2 She was quiet.  She was respectful.  She answered every

3 question without arguing.  Okay?

4    Compare that to Mr. Trump.  Do you know how many

5 times his testimony was stricken?  I do.  Jeff counted.

6 Twenty-six times.  It has to be a world record.  Okay?

7    Did you hear anything on cross-examination of

8 Ms. Goldberg that gave you any reason to believe, to question

9 her honesty, her integrity or that you couldn't rely on her --

10 this 87-year-old mother of four, who's been married to the

11 same man for 60 years, who's lived in the same neighborhood

12 for 50 years, who worked her way through college as a hat

13 check girl and a waitress; who, at the age of 53, went back

14 and got a college degree so she could have a backup income

15 because her husband got ill?

16    A woman who told you that when she signed the deal --

17 when she was told the deal about the rental agreement and saw

18 that owners weren't going to get -- owners who stayed in their

19 rooms weren't going to get -- points against them, and that

20 that -- even though she knew it was financially against her

21 interest, because she was never going to stay in the rooms,

22 what did she tell you about that?

23    She said, "Well, you know, that was the deal I made

24 and that's fair.  So, I'm sticking with that.  That's okay.

25 They shouldn't change that.  Don't try to help me.  Don't take

S. Kulwin - Opening Argument

2002

 1    it away for my benefit.  We all made a deal.  Let's stick with

 2    it."  That's who she is.

 3         Contrast that with Mr. Trump who always, always,

 4    always is figuring out the angles for his own financial

 5    benefit, and then has the gall -- the gall -- to come in here

 6    and testify from there (indicating) and say, "She cheated me

 7    out of $500,000.  I can't believe she's suing me.  I did it

 8    for their good.  I took these things to help them.  I wanted

 9    to protect them from the risk of hotel ownership."

10         Yeah, right.  Donald Trump, public benefactor, friend

11    to man.

12         Ladies and gentlemen, he took that stuff for one

13    reason:  Greed.  He wanted it.  He never was going to give it

14    up.

15         Now, you also heard the testimony of Ms. Vogue, who

16    corroborated Ms. Goldberg's testimony.  Is she friends with

17    her?  Yes.  Are they close?  True.  Does she work for her for

18    the stunning salary of $75 a month?  Right, she does.

19         Despite aggressive questioning, did she ever waiver

20    from the one basic thing she knew in her heart like you know

21    the dates of your children's births?  No.  Not once.

22         "They told us we were getting the common interest --

23    the hotel facilities with the common elements.  Jackie was

24    excited.  She was happy.  That's why she did it."

25         And we're going to have more about that later.

S. Kulwin - Opening Argument

2003

1       So, what do you hear?  Use your common sense, ladies

2  and gentlemen.  Judge St. Eve is going to tell you.

3       Why would Jackie Goldberg also buy two hotel

4  condominiums when she already owned -- if they didn't come

5  with a hotel interest when she already owned -- seven

6  residential condominiums?  It makes no sense unless, of

7  course, they told her, "You're going to be partners with

8  Donald Trump in a hotel and you're going to get 5 million --

9  you're going to have a piece of the action on $5 million -- of

10  gross revenues in a hotel run by one of the best hoteliers in

11  the country"?

12       Now, that is common sense.

13       And did she tell you that all these things were

14  material to her -- that it was important?  You bet.

15       Okay.  Now, I want to go back to those common

16  elements for a second.  That's where I want to go.

17       Take a look at that (indicating), the laundry

18  facilities, the first one.  That's the easiest one.  That is

19  the easiest one.

20       What do we know about the laundry facilities?

21       Well, remember when I got on the stand to play the

22  witness?  I was Mr. Weiss.  What did Mr. Weiss say, Mr.

23  Trump's right-hand guy -- one of his right-hand guys -- to

24  this day?  "Laundry facilities?  Laundry facilities?  There

25  were never any plans for any laundry facilities in this

S. Kulwin - Opening Argument

2004

1  building ever, never, none, 0, zip."

2        And what else do we find out?  If you look at

3  Plaintiff's Exhibit 6 when you go back -- Plaintiff's Exhibit

4  6.  There's a memo in '04 from Russ Flicker.  I forgot who he

5  was.  And he says, "We're not -- " I think it was between him

6  and a guy in New York -- "Oh, laundry facilities?  Absolute

7  nightmare, Russ.  Don't do it.

8        "Okay.  We're not doing it anymore."

9        That was in October of '04.

10        The budget with the property report that incorporated

11  these things in January of '05, it came out two months later.

12  Do you see it crossed out?  No, you don't, not at all.

13        So, is it a misrepresentation?  Did they tell her

14  something that was untrue?  Absolutely.  There are no laundry

15  facilities.

16        Now, what if -- what if -- Mr. Weiss didn't know that

17  it was in the property reports?  What if he didn't know?

18        Guess what?  It doesn't matter.  The Judge is going

19  to tell you -- and this is very, very important; don't be

20  confused, the Judge is going to tell you, okay -- that if a

21  person works for a corporation, everything they know if

22  they're a manager -- and Mr. Weiss is an executive guy --

23  everything they know, the corporation knows.

24        Why?  Because, otherwise, corporations could do this:

25  "'Hey, Bill, you go steal the money.  I'll pretend I don't

S. Kulwin - Opening Argument

2005

1    know.'  I don't know.  Bill knows, but I don't know.  So, the

2    corporation doesn't know, so the corporation can't get

3    prosecuted -- can't get sued."

4            That's why they say if one person knows, they all

5    know.

6            So, once Weiss knows, then these defendants -- the

7    Trump organization -- knows there are no laundry facilities,

8    that, ladies and gentlemen, undisputed, is a misrepresentation

9    of fact and it is concealment of a material omission because

10   they didn't tell her that they weren't even in the plans.

11           Was it material to her?  They are going to say, "Oh,

12   come on.  Laundry facilities?  She wasn't going to even get

13   any money from laundry facilities."

14           You know, was it important to her?  Let's look at two

15   things that prove beyond a doubt that that's wrong.

16           Remember when Mr. Novack was cross-examining Ms.

17   Goldberg and he said, "You didn't see any laundry facilities

18   in the brochures, did you?  You didn't see any laundry

19   facilities?"

20           They gave her a big stack of brochures.  And I am

21   sitting over here and I'll tell what you I'm thinking.  I am

22   going, "Gosh, you know, were there laundry facilities in those

23   brochures?"

24           I looked at them 50 times in the last six months, I

25   don't remember.

S. Kulwin - Opening Argument

2006

1          And I didn't think Mr. Novack thought there were.

2    But what do you know?  Jackie Goldberg, uncoached, unprepared,

3    out of the blue on cross-examination says, "There they are

4    (indicating).  They're right there (indicating)."

5          Do you think it was important to her?

6          Let me ask you this question.  How about this one --

7    try this one on for size.  Remember why she said in 2008 one

8    of her main reasons for backing out of the deal was?  She

9    said, "I don't trust these people anymore.  They're crooks.

10   They're crooks."  Okay?

11         What do you think?  Do you think she would want to

12   know?  Do you think it would have been an important piece of

13   information, do you think it would have been material for her,

14   if she's reading that property report in 2008 and she sees

15   laundry facilities and someone tells her, "You know, I know

16   they're telling everybody there's laundry facilities.  But,

17   guess what?  They ain't there.  There's none in the plans.

18   There never were.  They just threw it in there."

19         Do you think she would have gone through with the

20   deal?  Really?  Seriously?

21         She would have run out of the room with her hair on

22   fire.  She would have said exactly what she said in February

23   of '08:  "These guys are crooks."

24         Was it a misrepresentation to put laundry facilities?

25   You bet.

S. Kulwin - Opening Argument

2007

1          Was it material?  No question about it.

2          Are they liable under consumer fraud for just that?

3    You bet.

4          And let me tell you this, folks:  We don't have to

5    prove -- you're not going to get an instruction that says we

6    have to prove -- all of these or that we have to prove these

7    and what's in the rental program.  We don't.  One

8    misrepresentation that's material, that's it.  We're done.

9    The next count.

10         But in case there's any question in your mind --

11   okay -- that's (indicating) that e-mail I was telling you

12   about:  "Operating the laundry is an absolute nightmare, it

13   should be avoided at all costs," October 25th, 2004.

14         Compare that to the third property report that Jackie

15   was relying on.  Okay, remember, it incorporates the first

16   one.  You won't see the common elements in the third one, but

17   it incorporates what's in the first one that came out in

18   February.  It's dated January of '05, two months later.  A

19   complete and utter lie two months later.  Okay?

20         Now, remember this (indicating)?  Okay.  These are

21   the rest of the things that they lied to her about.

22         "Oh, yes, Jackie, you're going to get control of the

23   ownership facilities, you're going to get ballrooms, shared

24   ownership of the laundry, storage areas, $6 million."

25         Now, Mr. Trump says, "Ah, $5 million, that's nothing

S. Kulwin - Opening Argument

2008

1    to me."  I should be so lucky.

2              $6 million in gross revenue pouring into the condo

3    association, that she thought she was going to participate in,

4    fair allocation of the rental things, unrestricted use of the

5    health club.

6              I got to stop for a second.  I know I'm going to

7    waste time and I got to hurry, but this one just kills me.

8    First, they tell her, "Yeah, you basically get a health club

9    membership if you buy.  Yeah, that's what you get.  Yeah,

10   yeah, that's the ticket.  Sure."

11             Then when they change the deal, "No, you can only use

12   the health club if you're in the hotel."  And, "Oh, by the

13   way, remember we told you that if you stayed in the hotel, it

14   didn't count against you?  It does count against you.  So,

15   welcome to Trump.  You can't use the health club if you're not

16   staying in the hotel.  If you stay in the hotel, you can't

17   rent your rooms later on."

18             Thank you very much, Mr. Trump.  Thanks for looking

19   out for me.

20             Now, the bottom line on all of these comes down to a

21   simple question -- the bottom line whether these were

22   misrepresentations and material omissions comes down to one

23   simple, actual question:  What did the president know and when

24   did he know it?

25             The president in this case being Donald Trump, the

S. Kulwin - Opening Argument

2009

1    president of the Trump organization.

2           If Donald Trump knew that he wasn't going to share

3    the ownership, that there weren't -- that he wasn't going to

4    share the $6 million, or any of those other things, if he knew

5    then -- remember, he's the corporation, he is the

6    defendants -- that's the corporate agency instruction you're

7    going to get -- if he knew, these -- and, then, he still

8    distributed those property reports promising them, then you

9    know -- then you know -- that these defendants have committed

10   a material misrepresentation and omission.  You know it.

11   Okay?

12          So, what did he know and when did he know it?

13          Well, there's two ways to answer that question.

14   Let's first look at some of the facts; and, then, how do you

15   always find the truth when you are dealing with big business?

16   Follow the money.  That's how you know.  Follow the money.

17          When you go back there, think to yourself:  Let's

18   follow the money.

19          Okay.  What do we know for sure?  We know -- these

20   are undisputed facts, we know -- in October, 2003, that

21   Mr. Trump had to get rid of the office space, right?  We all

22   know that.  350,000 square feet, a giant pole in his hotel.

23   We know that.

24          Okay.  I'm moving.

25          We also know that Mr. Trump and Mr. Reiss met.

S. Kulwin - Opening Argument

2010

1    Mr. Reiss recommended putting ballrooms and adding condo units

2    to sell.

3            We also know that he had to do it.  Otherwise -- he

4    had to sell those condos because now that he couldn't get an

5    anchor tenant for that space, he had financing issues.

6            How are you going to build an $840 million hotel

7    without $640 million financing, which you couldn't get if he

8    had no anchor tenant?

9            How do you do it?  You sell more condos.

10           We also know -- okay -- that Mr. Reiss didn't decide

11   to put those things in.  He testified here in court.  He

12   testified in his sworn deposition.  And as Judge St. Eve will

13   tell you, that you can use that as evidence the same way.

14           What kind of authority did Mr. Reiss have?  Remember

15   what he said?  "I don't have ultimate authority for anything."

16   He didn't decide to put those in the common elements,

17   Mr. Trump did.

18           What did Mr. Trump say?  Did he know that those

19   things were in the common elements before Jackie Goldberg

20   bought her unit in August of '06?

21           Well, just so you're sure:

22           "And you were aware that in the property reports that

23   were issued after you decided to eliminate the office space to

24   people like Ms. Goldberg, that it included an ownership

25   interest in the ballrooms, the meeting rooms that were now

S. Kulwin - Opening Argument

2011

1    planned for the hotel?  You knew that, right?"

2          Answer:  "Yes, I did."

3          "And I want to be clear.  You knew the budget

4    reports -- I mean, the property reports we just talked about

5    -- immediately after the ballrooms and things that were added,

6    those things were included in the common elements; you knew

7    that, right?

8          "Yes, I did."

9          So, he knew.  He knew when those reports were being

10   issued to Jackie what was in there.  So, we got that out of

11   the way.

12         We also know that he approved eliminating the office

13   space, adding the ballrooms to the hotel and all those things.

14         But did he do it knowing?  Did he know that the

15   revenue stream -- the 5 million -- attached to it?  Of course

16   he did.  Of course he did.

17         First, Mr. Trump admitted that he authorized the

18   inclusion of ballrooms into the common elements.  He admitted

19   it.  And that he knew it.  He was aware of it before she

20   purchased it.  Okay.  You've got that.  All right?

21         And, of course, he said he talked to Mr. Flicker and

22   Mr. Reiss about it.  Okay?

23         Mr. Reiss left in August of '04.  Mr. Flicker left in

24   January of '05.  He could not have been talking to them about

25   it after Jackie bought because they weren't there anymore.

S. Kulwin - Opening Argument

2012

1    So, we know.  Okay?

2            Is it more likely true than not that Donald Trump

3    knew that the organization was offering these ballroom

4    facilities and such, with the $5 million, before she bought?

5    It's not only more likely true than not, folks, it is

6    undisputed in this case.

7            So, given that he knew -- given that he knew -- is it

8    more likely true than not that Donald Trump never intended to

9    share ownership, never intended to give away $6 million in

10   revenues?

11           It's a very important question.  It is a key

12   question, aside from the laundry facilities -- which also you

13   could just base your decision on that -- it is a key question

14   in this case.

15           Why?  Because if he knew that he wasn't ever going to

16   go through with it, then those property reports that told

17   Jackie she was going to get an ownership interest in all those

18   things and the money, they are materially misleading, they

19   contain misrepresentations and they contain material

20   omissions.  So, did he know?

21           Now, let's follow the money.  What did we hear about

22   those facilities?  30,000 square feet in the middle of the

23   Trump International Hotel.  Estimated value, based on the

24   square footage that he was charging for the condos, 30 to 40

25   million dollars.  Check it out.

S. Kulwin - Opening Argument

2013

1      These are Jackie's units (indicating).  This one, No.

2  38, is 1220 square feet.

3      And you will have this back in the -- it's an

4  exhibit.  I can't remember which number.  Okay?

5      It says 1220 square feet.  She paid $1.2 million for

6  it.

7      And this one (indicating) is, I think -- I can't

8  read it -- 604 square feet.  She paid 930-or-something

9  thousand dollars for it.  Get yourself a calculator or get

10  someone who is good with a pencil, divide those numbers up,

11  and you know what you get?  You get per square foot cost in

12  that hotel, for that kind of space, somewhere between, on the

13  high end, $1500 a square foot; on the low end, 1100.  Multiply

14  that times 30,000.  You're between 30 and 45 million dollars.

15      Did Donald Trump know that that was what it was

16  worth?  Seriously, do I really have to ask you that question?

17  Really?  A real estate developer, a man who measures his worth

18  by his net worth, he didn't know?  Of course he knew.  Mr.

19  Billionaire knows exactly where every penny is.

20      This is the guy who writes every check.  Do you

21  remember he does that?  There's checks.  There's thousands of

22  them.  He knows where every dime is, because they're like his

23  family -- those dollars.  All right?

24      Did he know what the potential profit was?  Of course

25  he did.  Mr. Reiss did all this research it on it.  Do you

S. Kulwin - Opening Argument

2014

1   remember he did all the research?  He called all around

2   Chicago.  He didn't know that the ballrooms were profitable?

3   Of course he knew the ballrooms were profitable.

4           You know, Mr. Reiss did the same thing that Mr.

5   Petrus claimed was so innovative when he got there.  He did

6   his research, he did his homework, he used Professor Mike --

7   Professor Mike, the hotel professor, the professor of hotel

8   accounting -- and he put it together.

9           You don't think he shared that with Donald Trump?

10  Ludicrous.  Ludicrous.

11          You don't think Donald Trump counts every dime?

12          Do you remember when Petrus said, "Oh, yeah, I was

13  trying to convince him to pay the $500,000.  I had to spend

14  weeks trying to explain it to him."  That's not because he's

15  dumb.  It's because, hey, if we're Donald Trump and giving up

16  $500,000, he is going to want to know every detail, because he

17  holds them tight.  He is in the business of getting, not in

18  the business of giving.

19          So, did he know about that $5 million?  You bet.

20          So, is it more likely true than not that Mr. Trump

21  knows, "If I'm putting those things in the common elements,"

22  he is giving away $40 million of real estate, a $5 million

23  revenue stream?

24          And, remember, I did all those numbers that showed

25  that the estimated profit in the first year was $1.3?

S. Kulwin - Opening Argument

2015

1          And, remember, Mr. Petrus went to that service that

2   predicted 2.5 million?

3          Did he know?  You bet he knew.

4          Would Donald Trump agree to give away $40 million of

5   real estate and a $6 million revenue stream, with one to two

6   million dollar profit in it, in the first year alone, in his

7   prime project -- the brilliant, award winning Trump Tower --

8   to a bunch of hotel condo owners that he doesn't know for

9   nothing?

10         You know, the prices on these condos didn't go up

11  when he did that.  Do you really think he would do that?  Do

12  you think it's more likely true than not that he would do

13  that?

14         Of course he wasn't going to do that.  It is

15  absolutely ludicrous.

16         And here's this (indicating).  Why else would he do

17  it?  Remember he testified -- he testified -- what he knew

18  before he did it.  He said, "If you let the condo board own

19  it -- " remember I said, "Run it? "

20         He said, "No."

21         I said, "Own it.

22         "Own`it.

23         "If you let them own it, they could destroy the

24  hotel -- those knuckleheads."

25         That's what he said.  He said that, "They could put a

S. Kulwin - Opening Argument

2016

1    Burger King in the lobby."  That's what he said.

2         He said, "They could fire us and I wouldn't be too

3    happy about that."  That's what he said.

4         "It would be bad for business.  It would be bad for

5    the hotel. "

6         I said, "Would it be bad for business?"

7         He said, "It would be bad for the hotel."

8         I said, "But you, too?"

9         He said, "Yes."

10        Okay?

11        He knew it would hurt his brand.  He knew it.  He

12   admitted it.

13        And he knew that he'd risk giving up control of

14   running the food and beverage operations of the Trump hotel,

15   where he could get fired and, then, one day wake up to read

16   the newspaper that said, "Ritz Carlton takes over running the

17   food and beverage operations at the Trump hotel."

18        How do you like them apples?

19        So, let me ask you:  Is it more likely true than not

20   that Donald Trump was ever going to take that risk?  That

21   Donald Trump was ever going to give away that money?  That

22   Donald Trump was ever going to walk away from that real

23   estate?

24        More likely true than not?  Ladies and gentlemen, I

25   submit to you the evidence is overwhelming.  It isn't even

S. Kulwin - Opening Argument

2017

1    close.  Of course he wouldn't.  Of course he wouldn't.

2          So, what did he say about all this when I asked him?

3    Not much.

4          I asked him, "What about that, Mr. Trump?  Didn't you

5    think about the 40 million?  Didn't you think about the 5

6    million?"

7          What did he say?  He said, "You know, I really didn't

8    give it a thought.  5 million, that's not too much to me."

9          "I didn't give it a thought?  I didn't give it a

10   thought?"  Seriously?  Really?

11         Why would a guy who is giving away $40 million in

12   real estate, a $6 million revenue stream, why would he not

13   give it a thought?  Why would it be no big deal to him?

14         Let's see.  I know.  Now the contract clause is

15   relevant because he is sitting there thinking, "I got a

16   contract clause.  I got a get-out-of-jail-free card."

17         That's what Ms. Goldberg called it, a get-out-of-

18   jail-free card.

19         "I can pull this later on, after I've lured everybody

20   in to buy it.  If they complain, I'll say, 'I've got a

21   contract clause.  I've got a gay of lawyers.  What are you

22   going to do, sue me?  You going to sue me?  Go ahead and sue

23   me.  Let's see.'"

24         That's what he was thinking.  That's why he didn't

25   give it any thought.

S. Kulwin - Opening Argument

2018

1      That contract clause, that ain't evidence that they

2  can win absolutely.  That's evidence of the fraud.  That's why

3  he was willing to do it, because he thought he was protected.

4      Do you remember how upset he was?  "I can't believe

5  she's suing me.  I can't believe she's suing me."

6      He wasn't complaining that he thought it was unfair

7  she was suing him, he was complaining because he scammed it.

8  And he couldn't believe that an 87-year-old grandmother,

9  represented by some lawyer that he never heard of, had the

10  gall to bring him into federal court and sue him.  And get to

11  a jury, no less.  Talk about stunned.

12      Remember when Petrus said he was stunned when he

13  found about the hotel.  He is still reeling, he is so stunned,

14  because he planned it out perfectly -- himself, personally.

15      And if they say to you, "Oh, we called all these

16  other people and they said he never heard of it," why would he

17  tell them?  Most of them come and go like shopkeepers over

18  there.

19      No, that's why he did it.  No question about it.  He

20  never thought about it.

21      And when I -- then they tell this whole ridiculous

22  story about, "Oh, well, there's different executives and it's

23  so complicated and we're calculating and meeting."

24      Please, he's talking all about that?  Really?

25  Seriously?

S. Kulwin - Opening Argument

2019

1    And, then, I say to him and all the other executives,

2  "Hey, folks, where are the memos?  Where are the documents?

3  Where are the notes?"

4    You know, the Judge is going to tell you that I'm not

5  accusing them of destroying anything.  And they're not

6  accusing us of destroying anything.  And I'm not, either.  And

7  I'm not.  So, forget about that.  That's not what I'm saying.

8    I'm asking you this:  What corporate organization

9  undertakes a $1 billion project, makes decisions involving $40

10  million that affect all the people who are buying into it and

11  doesn't write anything down?

12    Remember what he said?  "We don't write things down.

13  We get things done."

14    Who wrote that one for him, the guy from the show?  I

15  mean, my God, what a pat line.

16    So, think to yourself:  Let's see, what large

17  organization that deals with large amounts of money never

18  writes anything down?  Let's think for a second?

19    GM?  No.

20    General Electric?  No.

21    Any of those real estate development companies that

22  Mr. Howie was talking about?  No.

23    Okay?

24    I can only think of one organization that doesn't

25  write anything down when they're doing business -- a large

S. Kulwin - Opening Argument

2020

1  organization:  The Mafia.  That's who doesn't write anything

2  down.

3           MR. NOVACK:  Judge, I object to that.

4           THE COURT:  Sustained.

5           I will strike that comment.  The jury should

6  disregard it.

7  BY MR. S. KULWIN:

8           People who don't want to be found out don't write

9  things down.  They're not stupid.  And Donald Trump may be a

10  lot of things, but he ain't dumb.

11           Remember what Mr. Petrus said when I asked him about

12  his documents?  He used these exact words:  "You mean, a paper

13  trail?"  Really, a paper trail?

14           "No, I meant documents."

15           And he says, "A paper trail."  A paper trail.

16           "You mean, like where they can go through it and

17  figure out what we actually did?"

18           That's their thought process.

19           Okay.  I've got to move on because I'm running out of

20  time here.

21           Do you want to know how to think -- how to get a look

22  into how the Trump organization thinks, how Mr. Trump thought

23  when he was doing this?  Check this out.

24           MR. S. KULWIN:  Blow that up, Mike.

25  BY MR. S. KULWIN:

S. Kulwin - Opening Argument

2021

1        Don't you just love this (indicating).  I love this.
2   I love this.  Okay?
3        This is the reservation management agreement.
4   Remember how, in the beautiful brochures, the FAQ questions?
5   "Oh, stay as long as you want.  No points against you.  Equal
6   allocation.  No discretion."  You know, "All fair.  Come on
7   down, be in the Trump with us."
8        Now, two years later, after we got your money, "Oh,
9   you got to sign this deal.  And you know, what?  You can't
10  hold us responsible for anything we said to you in any
11  brochure, orally or in writing, including specifically the
12  Frequently Asked Questions."
13       I mean, come on.  It's practically a confession that,
14  "We're crooks."
15       My God, I never heard of anything like that.  "Hey,
16  come do business with me.  Yeah, give me your money.  Great.
17  Here's the deal.  Sign up.
18       "Wait, you're saying that everything you told me was
19  a lie before.  You want me to sign this and let you off the
20  hook?"
21       "Yep, that's what you got to do if you want to get
22  the product."  Okay?  Unbelievable.
23       And, of course, I have told you about Mr. Levin, who
24  told you that they were all misrepresentations.
25       Were there material omissions?  Were there lies?  Of

S. Kulwin - Opening Argument

2022

1    course there was.

2         Here's the last thing I will tell you about that --

3    okay -- before we get to the last element.

4         Let me ask you.  Let me ask you.  Do you think Jackie

5    Goldberg would want to know, when she was looking at all those

6    beautiful brochures, when she was looking at those property

7    reports that Donald Trump thought this:  "This is a terrible

8    idea.  If you buy into this and you get this, this whole thing

9    is going down the tubes?"

10        Was that in the brochure?  No.

11        "This is awful.  These things are money losers.  You

12   are going to tank out on it."

13        Was that in the brochure?  No.

14        "I've seen this in other hotel condos.  They've all

15   tanked.  They've all done terrible."

16        Do you remember what he said:  "They've all gone to

17   hell."  And he knew it from the inception of the project.

18   That's what I asked him:  "Are you sure it's from the

19   inception of the project?  From the inception of the project?"

20        Many, many times he had seen it.

21        Do you think that that's something she would have

22   wanted to know?  Do you think that Jackie Goldberg, as careful

23   as she is, looking at all these things, would have said, "Oh,

24   here's something.  Here's Donald Trump's opinion on it.

25   Terrible idea. Go to hell.  Disaster.  Ruin his brand.  He

S. Kulwin - Opening Argument

2023

1    could get fired.  He's not happy about that.  Oh, yeah, I

2    think I'll just sign up.  I'm sure he'll deliver."

3           Another material omission that made the

4    representations in the property report false -- misleading,

5    rather.  Okay?

6           The second element.  I'm not going to pull it up

7    because I have to click too many times.

8           The second element, we don't have to prove they

9    intended to cheat her.  That's not an element.  Don't worry

10   about that.  It ain't there.  It ain't there.  We have to

11   prove that he intended to have her rely on it.  We have to

12   prove that when they put that stuff in the property report,

13   they wanted her to read it and think, "Wow, this is pretty

14   good.  Maybe I'll do this."  That's what we have to prove.

15          Did they do that?  Did they do that?  Undisputed

16   testimony.

17          "Mr. Reiss, why did you put this stuff in the

18   property report?

19          "It's what we're selling.  The market demanded it.

20   It would help sell the units."

21          "Ms. Cremer, why did you put the thing about the

22   award-winning service in the brochures?"

23          Quote:  "For buyers who would find buying an interest

24   in a hotel appealing."

25          Hmm, it sounds like she just defined Jackie Goldberg.

S. Kulwin - Opening Argument

2024

1          "And when did you do it, Ms. Cremer?"

2          And this was not -- I did not press Ms. Cremer.  I

3   asked her very softly.

4          She was up and down very quickly.  I didn't try to

5   force her into saying it.

6          "Oh, right after we amended the property report and

7   put the common elements in."

8          Did they intend her to rely?

9          What's the explanation?  Why else would they do it?

10  What was the point?

11         Why are you giving it away, just for kicks?  Come on

12  now.

13         Okay, ladies and gentlemen, is the evidence

14  overwhelming here that they made material misrepresentations,

15  material omissions to get Jackie Goldberg to buy these things,

16  that they intended her to rely on them?  You bet it is.

17         Did Donald Trump know?  Absolutely.  No question

18  about it.

19         Okay.  Let's go to the Land Act now.  This one's even

20  quicker.

21         MR. S. KULWIN:  Okay.  Blow that up.

22  BY MR. S. KULWIN:

23         In the Land Act, we have to prove one of two things:

24  That the property report that they provided to Jackie, when

25  she signed the purchase agreements, contained an untrue

S. Kulwin - Opening Argument

2025

 1    statement of material fact or omitted the stated material fact

 2    or -- a big "or" -- write down "or" -- or that the defendants

 3    employed a scheme to defraud?

 4            Forget about No. 2.  We're not trying to prove that.

 5    I don't need to try to prove a big scheme to defraud.  I got

 6    Donald Trump, the man with ultimate authority.  Okay?

 7            So, ask yourself:  Is there an untrue statement in

 8    the property reports?

 9            Well, we know that.

10            At a minimum, there's the laundry facilities.  But

11    there's all the other things, as well.

12            Okay.  Was it material?  We already covered that.  Of

13    course, it was material.

14            Jackie Goldberg would have wanted to know all that

15    information, and all the other information that Donald Trump

16    didn't reveal, including that he didn't think the grand

17    ballroom was very grand.  That would have been a nice thing to

18    know.  Okay?

19            So, there's no question that it's material.  Okay?

20    And if you find that there are untrue statements in that

21    property report, and that Jackie Goldberg thought it was

22    information she would have wanted to know before buying, and

23    that the defendants made those statements or concealed those

24    facts, game set, match.  Check for us.

25            I want to talk about damages now.

S. Kulwin - Opening Argument

2026

1          There's three types of damages -- three types:

2    Actual, compensatory and punitive.

3          Actual is easy.  What's actual?  She paid in 516,

4    right?  She lost the 45,000 interest.  Add it up.  It's, like,

5    about 561.  No question about that.  Those numbers aren't

6    disputed.

7          What about the compensatory damages?  What's that all

8    about?  Emotional damages?

9          You can't speculate about them.  The Judge is going

10   to tell you, "Don't speculate about them."  She can't support

11   it with just conclusory statements that she didn't feel good.

12   Okay?

13         But what did she tell you?  She told you she felt

14   conned.  Conned.

15         I want to break compensatory damages down into two

16   parts.  It's not in the instructions, but I am going to break

17   them down into two parts for you -- okay -- one that are

18   applicable to every victim of a fraud and one that's

19   particularly unique to Jackie Goldberg.

20         Let's do the first one, victims of fraud.  Remember

21   how Jackie Goldberg got into the business of buying

22   condominiums?  She decided to get one for her and her husband.

23   She was 69 years old in 1995.  It didn't work out.  So, she's

24   stuck with a condominium.  What is she going to do with it?

25         She decides to start renting it out.  And what do you

S. Kulwin - Opening Argument

2027

1    know?  She makes some money.  "What the heck, I'm making a

2    little bit of money here.  I'm making four percent.  Wow, this

3    is really cool."

4          So, what does she do?  She buys another one and

5    another one and another one.

6          She was fortunate enough to have the funds.  Her

7    husband had done well selling his business.  She told you

8    about that.  And, pretty soon, at the age of, you know, 70,

9    72, she's running a little real estate thing.

10         Does she need to do it?  No.

11         Does she even need to be working?  No.

12         What era does she come from?  I'll tell what you era

13   she comes from.  She grew up in the Depression, folks.  If

14   anyone who knows anybody that's been through the Depression,

15   once you've been through the Depression, you never stop

16   working ever.  That's what you do, you work.  You make

17   something of yourself.  You don't just sit back and brag about

18   how much money you got and tell everybody how rich you are

19   and, you know, do all those things.  You work.

20         And she was, you know, getting pretty proud of

21   herself.  She made a friend, Terry Vogue.  They have become

22   very close.  They do all this managing, going around, blah,

23   blah, blah.

24         And, then, all of a sudden, this little -- this woman

25   who thinks, "You know, I'm pretty sharp.  I got some knowledge

S. Kulwin - Opening Argument

2028

1    here about real estate.  I've done pretty good here."  Okay?

2              In 2003, when she's 77 years old, she meets Donald

3    Trump.  Okay?

4              And a couple years after that -- okay -- he says,

5    "So, you like real estate?"

6              He doesn't actually talk to her personally, but this

7    is what's coming through the brochures.

8              "Ah, you like real estate?  I like real estate.  Come

9    on into the room here.  Let's talk.  Let's chat a little bit.

10   So, you've been in real estate, huh?"

11             "Yeah, I'm pretty good at real estate.

12             "How would you like to have an interest in my hotel?

13   I'm Donald Trump, you know?  Want to have an interest in my

14   hotel with me?  Want to be partners with me, the big guy?

15   Come play on my street.  You know real estate?  Come on in."

16             So, she does.  She comes on in.  Okay?  All right?

17   And he scams her.  He cons her.  He gets her money and then he

18   tells her, "Sorry, I got a contract clause.  Yeah, baby, I got

19   a contract clause."

20             Can you imagine?  The thought of, like, my

21   grandmother being in the same room with that guy.  Yuk.

22             Okay.  So, here we go.

23             MR. NOVACK:  Judge, I'm going to object to this part.

24   He is making it personal to him.

25             THE COURT:  Sustained.

S. Kulwin - Opening Argument

2029

1          I will strike the last comment and the jury should

2   disregard it.

3   BY MR. S. KULWIN:

4          Okay.

5          So, here we go.  Now, what does that do?  What is it

6   like to feel conned, to feel like you've been taken advantage

7   of?  What did it feel to her?

8          She was confused.  She was angry.  She was upset.

9          I'll tell what you it's like.  She thought that she

10  kind of knew a little bit about the business.  She has a

11  justifiable pride in that, as she should.  And, then, one day

12  she goes into this new deal.

13         Do you remember how excited she was about it?  Do you

14  remember Terry saying how excited she was?  To have that kind

15  of excitement about a now project, 77 years old, God love her.

16  Okay?  So excited.

17         Then she finds out she's been scammed and conned.

18         What did he steal from her?  He got her money, but

19  what else did he steal from her?

20         He stole from her what every perpetrator of a fraud

21  steals from a fraud victim.  He stole one of the most valuable

22  things you can take from somebody -- something that is almost

23  impossible to have.  He stole her trust.  He stole her faith

24  in other people.

25         Do you want to know what that's worth?  It's

S. Kulwin - Opening Argument

2030

1    incalculable.

2          MR. NOVACK:  Judge, that's not -- there's no request

3    for damages for stealing trust or losing --

4          MR. S. KULWIN:  Judge, that is part of the victim of

5    a fraud.  She said she felt conned.  It's emotional damage and

6    it's absolutely compensable.

7          THE COURT:  Sustained on the last phrase.  I will

8    strike it.

9          The jury should disregard it.

10         MR. S. KULWIN:  Which phrase is that, Judge?

11         THE COURT:  The last phrase, "He stole her faith in

12   other people.  Do you want to know what that's worth?"

13         MR. S. KULWIN:  Okay.

14   BY MR. S. KULWIN:

15         He stole her trust.

16         MR. NOVACK:  Objection, again.  They're not seeking

17   damages --

18         THE COURT:  That comment is okay.  Let us see where

19   he goes with it.

20         MR. S. KULWIN:  Okay.

21         THE COURT:  And, ladies and gentlemen, I will

22   instruct you at the end of the case, as I indicated, on what

23   the damages are here and what the plaintiff is seeking, in

24   terms of recoverable damages.

25   BY MR. S. KULWIN:

S. Kulwin - Opening Argument

2031

1          That's what he took from her.

2          And that's what she meant when she said she felt

3   conned and she was angry.

4          Now, let me tell you something.  What do you do?  Do

5   you go to a doctor for that?

6          "Hey, Doc, he stole my trust.  You got any pills for

7   that?"

8          Do you go to a psychiatrist?  Really?  Seriously?

9   Lay down on the couch for who knows how long, talking about

10  how you don't have trust anymore, that you feel humiliated and

11  embarrassed?  I don't think so.

12         Her?  No way.

13         Now, I want to tell you about one other aspect that

14  is unique to her.  I am not going to hold some pity party here

15  and say, "Oh, big billionaire preyed on Jackie Goldberg.

16  She's an old woman."

17         Forget it.  I wouldn't insult her.

18         She's a woman with indomitable spirit, that you saw

19  and the evidence showed.  She carries herself with great

20  dignity, as you saw.  I wouldn't insult her by saying, "Feel

21  sorry for her.  She got ripped off by some rich guy."  Forget

22  that.

23         But the fact of the matter is, ladies and gentlemen,

24  she's not invulnerable.  She has reached a stage in her life

25  that we are all going to some day, a stage in her life where

S. Kulwin - Opening Argument

2032

1    she's older.

2            You know, there's two times in your life when you

3    start to get -- when you're kind of -- the world gets a little

4    bit scary for you:  When you are very, very young, and as you

5    get farther along in years.  In between, you start out.

6    You're invulnerable.  The world can't touch you.

7            And, then, as the years go by, you take a couple

8    bruises, a couple of knocks, you fall down, you get up; and,

9    then, you get to that point in your life where, at a certain

10   age, things shake you up more than they used to.

11           And, ladies and gentlemen, to get conned like this at

12   her age, I submit to you, she's not an emotional person.

13   She's not going to go up here on the stand and cry.  She's not

14   going to do that.

15           I submit to you, ladies and gentlemen, that was real.

16   If you have any doubt that what she said about how she felt

17   about what happened here or how what Terry Vogue said, how she

18   observed about what she felt about what happened here, is

19   inaccurate, then you think about those two things because you

20   can take it to the bank.  It is right as rain.  Right as rain.

21           All right.  So --

22           MR. S. KULWIN:  Got it on there, Mike -- the damage

23   chart?

24   BY MR. S. KULWIN:

25           So, what our first thing is, these are the actual

S. Kulwin - Opening Argument

2033

 1    purchase deposits and payments.

 2            MR. S. KULWIN:  Can you put that up, Mike, with the

 3    500,000 -- 516.  Oh, yeah, I should do it.  Sorry about that.

 4    BY MR. S. KULWIN:

 5            516,457.  Okay?  That's part of her actual damages.

 6            Here's (indicating) more of her actual damage, the

 7    interest that's paid on deposits that's been sitting with

 8    Trump:  $45,000.

 9            Here's the compensatory damages I was just talking

10    about (indicating).

11            Now, you have to decide what that is.  I will only

12    suggest it to you.  The Judge will say don't listen to me,

13    make up your own mind.

14            I endorse that.  I'd say not less than $500,000 for

15    what she's gone through.

16            A juror:  (Indicating)?

17            MR. S. KULWIN:  Judge, he'd like to move up.

18            THE COURT:  Yes, you can certainly move.

19            A JUROR:  Thank you.

20            THE COURT:  Anybody else, if you need to move, go

21    right ahead.

22    BY MR. S. KULWIN:

23            But I leave it to you.  I leave it to you, folks.  If

24    you think that's not enough, award more.  If you think it's

25    too much, award less.  I trust in your good instincts.  I

S. Kulwin - Opening Argument

2034

1    really do.

2              Now, we have to talk about punitive damages.

3              And I'm almost done.  Okay?

4              Punitive damages, which are awardable here in this

5    case -- punitive damages are awardable.  Okay?

6              And what's the purpose of them?  "The purpose of

7    punitive damages is if you believe that justice and the public

8    good require it, you may award an amount of money which will

9    punish the defendants and discourage them and others from

10   similar conduct."

11             What are the factors you have to consider?

12             One, the facts and circumstances of the defendants'

13   conduct.

14             Two, the vulnerability of the defendant -- of the

15   plaintiff.

16             Three, the duration of the misconduct.

17             There's a couple others that don't really apply here.

18             So, four, whether the defendant tried to conceal his

19   misconduct.

20             What's the facts about that?

21             Well, real quick, what are the facts and

22   circumstances?  He lured her in.  He got up her hopes.  He

23   scammed her.  He humiliated her.  He told her to go jump when

24   she said that she felt cheated.

25             I submit to you, the question that you are trying to

S. Kulwin - Opening Argument

2035

1  answer, when you are looking through all those things, is:

2  How reprehensible was that conduct?  How reprehensible was it?

3        I leave it to you to decide.  I submit the evidence

4  shows it was pretty reprehensible.

5        The vulnerability of the plaintiff, we just discussed

6  to some degree.  She is not a doddering old fool who got

7  scammed by some telephone salesman, but she certainly took

8  away her self-respect and her trust.

9        Did he try to conceal it?  Did he try to conceal it?

10        There's the $500,000 -- "Oh, I will give you

11  $500,000," in the conversation.

12        Yeah, sure, that's the ticket, just $500,000.

13        "Meanwhile, I'm getting back $40 million of profit;

14  and, by the way, I forgot to tell you, it's a-million-three in

15  profit."

16        And, again, if it was his absolute right to do it,

17  what is he doing it for?  Why is he giving away the $500,000?

18  Because he doesn't want anybody asking questions.  He wants to

19  look like things are the same.  That's why.  Okay?

20        And, then, what about this?  He comes in here with

21  these ludicrous stories.  He talked -- he sits up there and he

22  treats the oath in this courtroom -- this courtroom, a federal

23  courtroom -- and he gets up there and he acts like it's some

24  boardroom where he is, like, "I will say anything.  Blue,

25  green, orange, red," whatever fits the moment.

S. Kulwin - Opening Argument

2036

1          Does he take his oath seriously?  Right.

2          "Mr. Trump, in October of 2011, can you recall who

3   told you that it was a bad idea to have these facilities in

4   the common elements?"

5          He can't recall the details, he can't recall the

6   people.

7          October, 2011, sworn interrogatories under oath.

8          A year later, 2012, "Mr. Trump, can you recall who

9   told you that it was a bad idea to have a hotel facilities in

10  common elements?

11         "I can't remember.  Don't know."

12         On the stand, "Got it.  Jim Petrus told me.  That's

13  the guy.

14         "I'm in front of the jury.  Jim Petrus told me, yeah,

15  that's the ticket."

16         "How, in God's name, did you suddenly remember that

17  after two years?"

18         "Real simple.  Jim Petrus came into my office and

19  reminded me that he had reminded me.

20         "What?

21         "He came to me and he reminded me that he was the one

22  who told me.

23         "Any memos on that?  Any discussions?  Any notes?

24         "No.

25         How do you know that's a complete and total lie?

S. Kulwin - Opening Argument

2037

1      Let's go back to Mr. Petrus' testimony.  He was

2  willing to say a lot, but they ever asked him, "Hey, Mr.

3  Petrus, are you the guy who reminded Mr. Trump that you were

4  the guy who reminded him to put the stuff?"

5       Zero, nothing.  Trump made it out of complete thin

6  air.  A total lie.

7      Okay.  Actual and potential harm is another thing you

8  have to consider.  She was harmed.  She certainly was harmed.

9  No question about it.

10      All right?

11      So, then, the next question that we have and

12  here's -- the next question we have is:  What amount of money

13  should you award to deter him and others?  What's the amount?

14  Okay?

15      This is your total and actual compensatory damages.

16  What's the total?  What's the punitive damages you should

17  award?

18      I'm going to suggest a number.  It's a suggestion.

19  If you think it's too high, do less.  If you think it's too

20  low, do more.

21      I'd say not less than $5 million.

22      Let me tell you something, ladies and gentlemen.  Do

23  I think $5 million will deter Donald Trump?  No, probably not.

24      Do you remember what he said?  He said on the stand,

25  when I was asking him about the $5 million number -- the $5

S. Kulwin - Opening Argument

2038

1  million from the ballroom --  "I don't know, I didn't really

2  think about it.  $5 million, that ain't too much to me."

3          Do I think it will deter him?  I don't know.

4          But it might deter others.  Okay?  And that's part of

5  what you're supposed to do here.  So, you people have a unique

6  chance.  You have a chance to do something extremely

7  important:  To send a message not just to Mr. Trump -- not

8  just to him -- the other executives at his company, but to

9  tell all the others like them, who have turned our values

10 upside down for the last several years.  You can say to them

11 -- these people -- these people who do these things -- "You

12 have crossed the line;" who sit there and say to them, "The

13 measure of your conduct is not, was not and should never be 'I

14 know it is wrong, but can I get away with it?'"

15         Because that, today, ladies and gentlemen, is what's

16 going on around here.  It isn't whether it's right or wrong,

17 like it used to be in the old days.  It's, "Can I get away it

18 with it?  Can I get caught?  And if I do get caught, can I

19 spin it?  Can I cover it up?  Can I turn it upside down and

20 inside out, so that by the time you can figure out what the

21 heck is going on, they're so confused, they're so frustrated,

22 they just throw up their hands and go, 'Ah, that's just how it

23 is and that's how it always will be.'"

24         That's the message you have the opportunity to

25 send -- that message to those people (indicating), right here,

S. Kulwin - Opening Argument

2039

1    right now, today.

2         Jackie Goldberg -- oh, and are the defendants

3    responsible for Mr. Trump's conduct?  Again, he is the

4    corporation.  You're going to get an instruction that says if

5    a manager or management authorized fraudulent conduct or

6    approve it, then they're responsible.  So, you don't have to

7    worry about that.  Donald Trump not only authorized it, he not

8    only approved it, he did it.  He's the guy.

9         You know, ladies and gentlemen, I don't know, maybe

10   I'm getting old.  But I when I hang out with someone like

11   Jackie Goldberg -- and I'll tell you, here's a person of real

12   integrity --

13              MR. NOVACK:  Judge, I'm going to object.

14              MR. S. KULWIN:  I'll withdraw it, Judge.

15              THE COURT:  Okay.

16         I will strike it.  The jury should disregard it.

17   BY MR. S. KULWIN:

18         The evidence has shown this is a person of real

19   integrity, true honesty, from an era when things were

20   different, when people truly believed that you reached out

21   your hand across the table and you shook hands, that's the

22   deal.  That's what's fair.  That's what's right.

23         It's not like that anymore, ladies and gentlemen.

24   It's not like that anymore.  You have a chance right here

25   today to finally say, "Let's start heading back that way

S. Kulwin - Opening Argument

2040

1   because that's where we all need to belong."

2           Ladies and gentlemen, on behalf of myself, my partner

3   Jeff Kulwin, my assistants Mike Cohen and Christina Kim, and

4   most importantly -- most importantly -- on behalf of Jackie

5   Goldberg, who I am proud to represent, thank you very much.

6           Thank you very much.

7           I will be back after Mr. Novack has a chance to

8   speak.  Don't make up your minds until I get to speak, again,

9   one more time.

10          Thank you very much.

11          THE COURT:  We will take our morning break.

12          (Jury out.)

13          THE COURT:  We will pick up at five till 11:00.

14          MR. NOVACK:  Thank you, your Honor.

15          Judge, I have a couple things to ask you at this

16  point.

17          THE COURT:  Yes?

18          MR. NOVACK:  The first is, is that notwithstanding

19  what you said in your order or you said yesterday --

20          THE COURT REPORTER:  Mr. Novack, one more time.

21          MR. NOVACK:  I said that notwithstanding the

22  proceedings we had last night and what's -- your written order

23  this morning, Mr. Kulwin put right up there, with yellow

24  highlighting on it, the approval proviso in that contract

25  which was not supposed to be shown; and, then, after your

1   Honor properly sustained my objection and said, "Take that

2   down" -- in other words, saying, "Don't go there" -- he then

3   says to the jury, "Okay, you go get it on your own.  When you

4   get back there, you figure out what that language means.

5           MR. S. KULWIN:  No.

6           MR. NOVACK:  And I'm asking you to do one of two

7   things:  Either instruct the jury that they are not to

8   consider that language; or, give the instruction I've been

9   asking for -- about what the contract provision means; or,

10  allow me to say to them -- because I'm going to put up a

11  blowup of that language, without that language, and I'm going

12  to say -- I want to say to them -- "And the reason I'm not

13  putting that other language up is because the Court has

14  already ruled in this case that that language is irrelevant

15  and not to be considered."

16          Any one of those, I think --

17          THE COURT:  Well, I am not going to instruct them on

18  what the contract means because, as I have explained, I have

19  not interpreted it.  So, I am not going to instruct them on

20  that.

21          Mr. Kulwin, do you want to respond?

22          MR. S. KULWIN:  Yes, I do, Judge.

23          I read your order this morning.  Your order said I

24  could not argue that they had to get her approval.  And I did

25  not argue that.  I displayed an exhibit.  I didn't mention

2042

1    that language.  I didn't reference that language.

2           I displayed an exhibit that is in evidence,

3    unredacted.  It's not redacted.  Mr. Novack never asked for it

4    to be redacted.  It was going to go back to the jury

5    unredacted.  And I said, "You look at it.  You figure it out."

6           And the reason I said that wasn't to say, "They have

7    to get her approval."  It was to say, "This is all

8    meaningless."

9           The context of my argument was crystal clear.  It was

10   to say, "They've never shown it to you.  Here it is.  Look at

11   it.  Can you understand it?

12          "No.

13          "And you want to know why?"

14          And I even said this:  "There's no evidence

15   interpreting it."

16          I did not argue approval.  I'm not going to argue

17   approval in rebuttal.  And, you know, what?  I have been very

18   careful in this case, I think.  I have --

19          THE COURT:  Wait, wait, we are not going to go --

20          MR. NOVACK:  Judge, it's right -- it's true that he

21   didn't --

22          THE COURT:  Wait, Mr. Novack.

23          While you may not have directly violated the language

24   in the order, you certainly violated the spirit of it, which

25   we have been talking about.

1       I will permit you to argue, Mr. Novack, that you are

2   not showing them the rest of the clause, because that is not

3   at issue in this case.

4       And what is relevant to the case, based on the

5   evidence and the law here, is the language that you showed me

6   you are going to highlight.  You may argue that.

7       And whether or not I give any additional instruction,

8   I will wait until the end of arguments to make that

9   determination.

10      MR. NOVACK:  May I state, as part of that, that the

11  Court -- that the Judge -- has already ruled that that

12  language is not relevant?

13      Because if all I say to them is, "Look -- " and

14  you've told them what I say isn't evidence, it's argument,

15  they might say, "Well, I'm not going to listen to that guy.  I

16  am going to go read that on my own."

17      I would just like to say neutrally that the Court has

18  already ruled that that language is irrelevant and not to be

19  considered in this case.

20      MR. S. KULWIN:  Towards what end, Judge?

21      This is what he's been -- you know, no offense, but

22  this is ironic.  He has been using this clause throughout the

23  proceedings to try to mislead the jury.

24      I'm not saying him personally, but to try to make an

25  argument that's misleading -- that the clause bars the claims.

1          Now, he wants to put it up there and go, "Oh, look at

2    this.  See this?  Absolutely, positively crystal clear."

3          He wants them to go back there and say, "I don't know

4    about misrepresentation.  Kulwin's saying this."

5          You know, the contracts -- that's exactly what he

6    wants them to do.  That's why he edited it out in the first

7    place.

8          And, quite frankly, when they came to us -- you

9    didn't grant a motion in limine.  That wasn't what it was.  We

10   didn't contest that.  When they came in and said, "Are you

11   going to raise the 25 percent -- " whatever it was, we said,

12   "No."  It was a motion in limine, by agreement.  Who knew?

13         THE COURT:  But this is broader than the Section 22

14   of the Illinois Condo Act and the 75 percent.  This is

15   broader.  And, as we talked about last night and as I ruled

16   this morning, that is not an issue in the case.

17         I think it is sufficient, Mr. Novack, if you say,

18   "That's not an issue.  You have not heard any evidence on

19   this.  It is not relevant to what is before you."

20         And you may not argue contrary in your rebuttal.

21         I will see you in ten minutes.

22         (Brief recess.)

23         (Proceedings out of the hearing of the jury:)

24         THE COURT:  Ready, Mr. Novack?

25         MR. NOVACK:  Judge, I would like to make a motion

Novack - closing

2045

 1    before we start, for the record.

 2            I thought about this, I've talked to my client about

 3    this, and the combination of what we saw there with theatrics

 4    and using the word "crook" over and over again and "mafia" and

 5    personal attacks on counsel and personal anecdotes by Mr.

 6    Kulwin, I'm going to move for a mistrial.

 7            THE COURT:  Your motion is denied.

 8            MR. NOVACK:  Thank you, Judge.

 9            THE COURT:  I cured it with instructions, and I'm

10    allowing you to address the contract issue in your closing.

11            Bring in the jury please, Danny.

12            (Jury entered the courtroom.)

13            THE COURT:  You may be seated.

14            Ladies and gentlemen, you've heard from Mr. Kulwin.

15    Now you'll hear from the defendants and hear their closing

16    argument.

17            Just a reminder that closing arguments are not

18    evidence, just the attorneys' argument.

19            Mr. Novack?

20            MR. NOVACK:  Thank you, Judge.

21         CLOSING ARGUMENT ON BEHALF OF DEFENDANTS

22            MR. NOVACK:  Good afternoon, everybody.

23            First of all, on behalf of myself, on behalf of my

24    clients, I want to thank you personally, each and every one of

25    you, for the amount of time you've put into this and, from

Novack - closing

2046

1    what I could see, the attention that you've put into it.  I

2    appreciate that attention.  I know we all do.  And I know I

3    look forward to being able to address you now with that same

4    attention.

5          I want to thank the Court and the Court staff for all

6    their courtesies as well.

7          And I guess I would say to you that this is kind of

8    the favorite part of most lawyers, to be able to do this.

9    There's also some angst to it.  When you sit and listen to the

10   other lawyer, you want to jump up every time something is said

11   that you don't agree with, but our rules don't allow that.

12   But they allow me to now summarize.

13         I can't address everything that was said, because if

14   I took the hour-and-a-half that he did, I wouldn't have

15   anything for myself.  So I'm going to rely on you.  You've

16   heard the evidence.  You know when the arguments you just

17   heard were not supported by the evidence.  And I look forward

18   to you sort of being my eyes and ears in that regard.

19         I'm working with a microphone here.  The court

20   reporter was good enough to ask me to put it on.  I'm not used

21   to it, I'll be honest with you, and I don't know if I'm going

22   to be speaking too loud or not loudly enough.  If I come off

23   too loud, somebody just do something and I'll back off or I'll

24   -- even though I know she doesn't want me to do it, I'll take

25   this off.

Novack - closing

2047

1      Before I start I want to get a couple things out of

2  the way.  I want to talk about what is not relevant here.

3  What is it that you guys just shouldn't even think about any

4  more?  And it may be hard because Mr. Kulwin, unfortunately,

5  kept repeating these things over and over again.

6      It just does not matter that Mrs. Goldberg is an

7  elderly woman who lives in Evanston.  It's irrelevant.  It

8  doesn't matter that the defendants are from New York.  That

9  doesn't matter.  It doesn't matter that the defendants are

10  owned by a celebrity.  That doesn't matter.

11      What matters, ladies and gentlemen, is the evidence.

12  And the Judge is going to tell you that you decide the case

13  solely on the basis of the evidence that you've heard and the

14  law that the Judge is going to instruct you on, not on the

15  basis of sympathy or anything of the kind.

16      And I have come to know that when lawyers argue

17  sympathy and talk about such things as being a grandmother --

18  which, by the way, is a wonderful thing.  I'm married to one;

19  she's right over there.  But that's not relevant to the case,

20  and it's not relevant that Mrs. Goldberg is a grandmother.

21  It's admirable.  I like you for that.  It has nothing to do

22  with the case.

23      And all these personal attacks on Donald Trump?  Now,

24  he can comment on his testimony.  You heard his testimony.

25  But these personal attacks, we know that's just out of line.

Novack - closing

2048

1    The use of the word "crooks" and "mafia?"  When

2  lawyers do that and when lawyers attack the other lawyer, it

3  usually means they don't really have confidence in the facts

4  or the law.  That's what it means.

5    He even went so far as to say that in Mrs. Goldberg's

6  e-mail, which you saw, that she called Mr. Trump a crook.

7  Read that e-mail over and over and over again, look and look

8  and look.  You won't see the word "crook" in there or anything

9  like it.

10    And I think you should in your own mind challenge

11  what he told you and make sure there's evidence to support it.

12    I mean, the attacks on Donald Trump are particularly

13  curious, aren't they?  Donald Trump wasn't sued here.

14  Mrs. Goldberg didn't sue Donald Trump for fraud.  She sued

15  these entities.

16    So -- but that just is an unfortunate little bit of

17  background.  I hadn't planned on saying one of those words.

18    Now what I want to do, ladies and gentlemen, let's

19  get to the evidence.  That's what matters and that's what I

20  want to talk about, because the evidence is going to prove

21  that we win.  That's what the evidence is going to do.

22    And I want to start with that e-mail.  I want to

23  start with the e-mail, that Exhibit 591 that Mr. Kulwin spent

24  so much time on, and that he says somehow destroys our whole

25  case.  And he says there's a big issue as to whether

Novack - closing

2049

1    Mrs. Goldberg was referring to her lawsuit -- or the one she

2    was considering, I should say, or this one lawsuit.  And, by

3    the way, one lawsuit.  That's the only thing that is

4    confronting you other than this case.  There was one other

5    lawsuit, one other -- how many --

6              MR. S. KULWIN:  Judge, I'm going to object at this

7    point to that statement.

8              THE COURT:  Overruled.

9              MR. NOVACK:  You saw how many units were sold here.

10   So we got two lawsuits, this one and that one.

11             MR. S. KULWIN:  Judge, I'm going to object to this

12   line of argument.

13             MR. NOVACK:  I'm moving on.

14             THE COURT:  Okay.  Move on.

15             MR. NOVACK:  And we know that Mrs. Goldberg, because

16   she said it, was considering filing a lawsuit from the get-go.

17   As soon as she found out the changes had been made, what did

18   she say?  I don't want to be in business with that man any

19   more and I had three options, and one of the options she said

20   was a suit.

21             So this big issue about whether this was the suit she

22   was considering or another suit, that's the issue that counsel

23   spent so much time on.  And I want to talk about it.  I may

24   have to come back over here.  That's about the best I can do.

25             So Mr. Kulwin says it really matters whether she was

Novack - closing

2050

 1    talking about the lawsuit she was considering or the lawsuit

 2    that was already on file.  And I'm here to tell you, it

 3    doesn't matter, it doesn't matter.  That's what we lawyers

 4    call a red herring.  That isn't the issue, because either way

 5    what she was saying -- and this part is true.  This is where

 6    we agree with Mrs. Goldberg.  If Trump had the right to make

 7    the changes, there cannot be a lawsuit about making the

 8    changes.

 9           MR. S. KULWIN:  Judge, I'm going to object.  That

10    specifically is what you said -- this morning's order was.

11           THE COURT:  Overruled.  That is not what I said.

12           MR. NOVACK:  And I'm sorry we have to go back now,

13    but I don't -- I don't want to have been interrupted and lose

14    the point.  So I'm going to say what I said before.

15           We agree with Mrs. Goldberg that if Trump had the

16    right to make the changes, there can't be a lawsuit about

17    making the changes.  And that fact is true whether she was

18    talking about the lawsuit she was considering bringing or

19    somebody else's lawsuit.  That's the difference.  And it just

20    doesn't matter.  What does matter, what does matter, is

21    whether the defendants had the right to make those changes.

22           And now I want to point out to some other language in

23    this e-mail -- I'm going to try to do some yellow highlighting

24    and hope it's going to work out, because some of the other

25    things that are in this e-mail are extremely important.

Novack - closing

2051

1           In fact, this e-mail is all over the place.  And it

2     does start out, just as counsel said -- she says Trump had no

3     right to revise that and change the property agreement on his

4     own.  She did say that.  But then she goes on to say, well,

5     wait a minute, it may be somewhere in the earlier documents

6     that Trump had the right to revise.  I don't know.  Maybe she

7     wasn't sure at that time.  But that's what she said, it may be

8     somewhere in the documents.

9           And then she goes on to say, if so, in other words,

10    if Trump had the right to make the change -- and here's the

11    punch line -- I don't think there would be a court case.

12    That's the point.  That's the point.

13          And she also goes on to say that her lawyer was okay

14    with the fourth amendment.  This fourth amendment this case is

15    all about, her lawyer looked at it at the time, in 2008, and

16    that the amendments seemed to be okay with Judy.  Judy is Judy

17    DeAngelis.  You remember, she was the lawyer representing

18    Mrs. Goldberg at the time.

19          So -- and counsel very quickly slid over this but it

20    was important wording.  He said I made a misrepresentation to

21    you.  Well, I didn't.  I didn't.  There's nothing in this

22    e-mail that references the article -- there was an article.

23    We learned that during the trial.  But this e-mail doesn't say

24    there was an article.  This e-mail doesn't say she's talking

25    about another lawsuit.  We picked up on her words, the words

Novack - closing

2052

 1    she used, to say what we said.

 2            Now, there was an article and there was another

 3    lawsuit.  And Mrs. Goldberg said that she was referring to

 4    that.  Maybe she was.  Because, as I said, it doesn't matter

 5    if she was referring to that lawsuit or the one she was

 6    considering.  Let's give her that.

 7            The important thing is that she said with what we

 8    agree:  You can't have both of them.  You can't have the right

 9    to change and a lawsuit about the right to change.  And that

10    takes us to the issue now, a relevant issue in this case

11    finally, which is, did the defendants have the right to make

12    that change.  And on that issue there just cannot be a doubt

13    because Mrs. Goldberg signed two purchase agreements that said

14    exactly that.

15            And let's take a look at that provision.  Now, we're

16    going to look at the provision in this case, not in a red car,

17    blue car, car salesman case.  I don't want to spend time on

18    that case because I don't know the facts.  You don't know the

19    facts.  We don't know the law because the Judge is not going

20    to give instructions on the car case.  He wants to talk about

21    the car case because he thinks it's easier to prove that case.

22    Well, then he should go sue the car dealer.

23            We want to talk about the facts in this case.  And so

24    the first thing we're going to do is put up the actual section

25    as it appeared in the agreement.  And this is important.  The

Novack - closing

2053

1   heading of that section is called Condominium Documents;

2   Declaration of CC&Rs.

3           And, by the way, if you can lower that just a little

4   bit to see what's at the top of that page?

5           On this particular page Mrs. Goldberg's signature

6   appears.  She happened to sign on this particular page.  So we

7   know she knows what's in the contract.  Here on the very page

8   of this important provision is her signature.

9           And so the heading is Condominium Documents and

10  Declaration.  And the first part of the section defines what

11  is meant by condominium documents.  And it says that the term

12  condominium documents includes a number of documents,

13  including the property report and the declaration.  And what's

14  important about that is the declaration, as we all know now,

15  that's the document that sets forth the common elements.

16          So now I would like you to put up the relevant

17  language of that section.

18          And I'm going to read this to you but, first of all,

19  you'll see at the bottom we stopped this language and left

20  some language out.  We did that because that language is not

21  relevant to the case.  You're never going to hear any

22  testimony about it and you're not going to hear any argument

23  from Mr. Kulwin that that language is relevant.  It's

24  established in the case already that the language is not

25  relevant.  And I want you to focus on what is relevant, and

Novack - closing

2054

1    here's what is relevant.  Listen to the language and read

2    along.  (Reading:)

3         Seller reserves the right -- and seller is 401

4    Wabash, one of the defendants.  Seller reserves the right, in

5    its sole and absolute discretion, to modify the condominium

6    documents, together with the Articles of Incorporation of the

7    association and the statement of record required by the

8    interstate Land Sales Full Disclosure Act, the HUD report.

9         And remember again that condominium documents means

10   to include the declaration.  In turn, the declaration is what

11   sets forth the common elements.  So what this language is

12   saying, as plain as can be said, the seller reserves the right

13   to change the common elements.  And it's unqualified.  It

14   doesn't say only in certain circumstances.  That's the

15   section.

16        Now, Mrs. Goldberg testified -- she said, well,

17   there's some limitations.  In fact, I'm going to try to

18   paraphrase her -- use her words.  She said, it's only for

19   things in the field or if the city code requires it.  But

20   there's nothing like that in this provision.  And so I said to

21   her, well, where in the purchase agreement do these

22   limitations appear?  And she did not say that they are in this

23   section.  She did not say they are in Section 4(a).  She said

24   they were in Section 3(a).  So let's look at that section.

25        And Section 3(a) is -- doesn't have a title,

Novack - closing

2055

1    condominium documents or declaration or common elements.  This

2    section has nothing to do with those things.  This section is

3    entitled Construction and Warranty.  And what this section

4    deals with is Mrs. Goldberg's particular unit, the physical

5    attributes of her unit, and it's talking about how that was

6    going to be built and what changes could happen to those -- to

7    that construction.  So that has nothing whatsoever to do with

8    the changes involved in this case.

9         And then the next thing I want to show you -- you saw

10   this at the trial, in evidence -- is what the property report

11   which she read also told her about whether the declaration and

12   the common elements could be changed.

13        And so, this was Exhibit 601, and it appeared in that

14   first amendment, which is one of the two amendments that

15   Mrs. Goldberg said she read very, very carefully.

16        And what -- and toward -- at the very bottom,

17   Paragraph 5, I'll read that.  (Reading:)

18        The declaration -- she's talking about this document --

19   this document is talking about the declaration with the common

20   elements.  The declaration is, and at all times shall remain,

21   subject to change by the developer, and the material terms of

22   the declaration identified in this summary are likewise

23   subject to change by the developer, from time to time.

24        And this also has no limitations.  So from the

25   get-go, from the very get-go, when she signed this purchase

Novack - closing

2056

1  agreement and reviewed these property reports, from the get-go

2  the purchase agreements that she signed gave defendants the

3  right to change the common elements in their sole and absolute

4  discretion.

5       Let's pause here for just a moment to review the

6  evidence as to how that provision got in because that's

7  important, too.

8       And the evidence starts with Mrs. Goldberg and just

9  who she is.  And I emphasize the word "is" because it's

10 irrelevant what she was prior to that or how she got there.

11 When she -- you know, when she was younger -- she has a great

12 story to tell, an admirable story.  I don't take a thing away

13 from it.  But what she did to get to be who she was is simply

14 not relevant to this case.

15      What is relevant is that at the time that she signed

16 these agreements, she was already the successful business

17 woman that you have seen she became.  So when she came to the

18 negotiating table she brought with her her advanced accounting

19 degree, her CPA license, her accounting and certified

20 financial planning skills, her 20 years of experience as a

21 real estate investor and a property owner and landlord on the

22 numerous properties she bought and for which she paid more

23 than $11 million in cash without a single mortgage.  That's

24 the sophisticated person who signed the purchase agreements

25 that had the reservation of change.  And she did all of this

Novack - closing

2057

1    not alone but with the help of a lawyer, an experienced

2    lawyer.

3            Now, in addition to the provisions I've shown you,

4    the purchase agreement gave Mrs. Goldberg something very, very

5    important, and that was that ten-day period within which she

6    could review the purchase agreement in detail, she could

7    review the property reports and the amendments in detail, she

8    could review anything else she thought was appropriate.  She

9    could think about everything and she could do all of that with

10   a lawyer.  And at the end of that ten-day period she could

11   walk away from the deal.  She could get her earnest money

12   back, no questions asked.

13           And let's put up that ten-day provision.  I won't

14   read it because you've seen it, you've heard it, but just to

15   remind you that it's there.  That's the provision that gave

16   her ten days to think it over, do what she wanted with her

17   lawyer and change her mind if she wanted to.

18           And she took advantage of that ten-day period.  She's

19   smart, she knows the drill.  She's been through it many times.

20   So she brought in her lawyer, Judy DeAngelis, to help her.

21           Now, this is the same lawyer who had represented

22   Mrs. Goldberg in connection with many of her condominium

23   purchases over the last ten years.  And she retained her to

24   help her with this very contract and to see if any changes

25   needed to be made and, if so, to try to get them made.

Novack - closing

2058

1        And one of the instructions you're going to get from

2   the Judge -- and you'll see this -- will tell you that the

3   actions of an attorney that are done within the scope of the

4   attorney's authority, those are considered to be the actions

5   of the principal, in this case, Mrs. Goldberg.

6        Well, she already told you that what Judy was doing

7   was in the scope of her authority.  That's what she was hired

8   to do.

9        And so during the ten-day period Mrs. Goldberg read

10  the property report, she read the amendments and she

11  particularly focused on the first and third amendments.

12       And you know what?  Remember this?  When she took

13  that stand we almost immediately saw just how detailed she was

14  in reading those documents, because right out of the box, when

15  Mr. Kulwin showed her what he thought were the complete copies

16  of those amendments, she said, wait a minute, this isn't what

17  I saw, this isn't complete.  And she went on to say that it

18  was missing some aerial photographs and she remembered that

19  those were with the materials.

20       So we know that provisions in these written materials

21  and contracts, they don't get by Mrs. Goldberg.  And when she

22  read the property reports she could see as plain as day two

23  extremely important things, two things that go to the heart of

24  this case.

25       The first one was that the common elements had

Novack - closing

2059

1    already changed after the original property report.  In

2    particular, Mrs. Goldberg admitted that she saw that the first

3    amendment changed the common elements from the original

4    property report in two very important ways.

5            First, she saw that the first amendment added the

6    ballrooms and the meeting rooms and the function rooms that go

7    to the heart of this case.  And let's stop here for a moment.

8            You'll recall that we heard testimony from Mr. Levin.

9    Mr. Levin was that so-called expert that Mr. Kulwin called to

10   the stand.  And I'll talk more about him later, but for now

11   let's just be reminded that he said that he had never seen a

12   situation where a condominium developer changed the common

13   elements after filing the initial property report.

14           Mr. Howie said a similar thing.  But Mr. Levin said

15   it as if there must be something wrong with that.  But if that

16   were so, and if developers could never change the common

17   elements, well, guess what?  We wouldn't even be here today,

18   because it was the very -- that very change to the common

19   elements in this case that brought the meeting rooms and the

20   ballrooms and the related revenue into the common elements in

21   the first place.

22           So if there was something wrong with that change,

23   then we should back up to the beginning and there aren't any

24   meeting rooms and ballrooms in the common elements.  But we

25   know that there was nothing wrong with that.  That's how they

Novack - closing

2060

1    got in.  They got in by that change.

2         The other thing that she saw as to the common

3    elements was that not only did the first amendment add these

4    common elements, it took away some common elements.  It took

5    away in particular the health club.  The health club used to

6    be a part of the common elements, and after this first

7    amendment that Mrs. Goldberg saw, before she signed up, they

8    took that out.

9         Now, Mrs. Goldberg tries to explain that away by

10   saying the office space was eliminated, so that's why.  Well,

11   the office space was removed, but there's still a health club.

12   And there's no evidence that the two were linked in any way.

13        And anyway, it doesn't matter why this common element

14   was removed.  The important thing is it was removed,

15   Mrs. Goldberg saw it was removed before her purchase

16   agreements became effective and she signed anyway.

17        So the very change that she says couldn't be done, in

18   other words, to use Mr. Kulwin's example, the blue car,

19   changing red to blue, she had already seen the Trump

20   organization change the red to blue.  They took away the

21   health club and she knew it.  So she saw that was happening.

22        So the very -- first important thing she saw when she

23   read these documents, things were moving in the common

24   elements, things were moving out of common elements.  It was

25   fluid.  Because, after all, this is a building that wasn't

Novack - closing

2061

1   even going to be completed for many years down the road.  You

2   expect to have those kind of changes.

3           The second thing that she learned was that the common

4   charges, those things that she said were so important to her

5   decision to buy, that those, too, had changed and she saw that

6   they had substantially increased before her agreements became

7   effective.

8           Mr. Kulwin tried to make a big point during the

9   testimony that when the fourth amendment came around, it

10  increased the common charges by $880,000, or about 18 1/2

11  percent.  But here's the real deal:  The documents that

12  Mrs. Goldberg read during this ten-day period showed that the

13  common charges had already increased by over 40 percent.

14          So the second thing she learned was that common

15  charges could change; they already increased by over

16  40 percent.  And knowing that defendants had already made the

17  major changes that she saw, both to the common elements and to

18  the common charges, Mrs. Goldberg's attorney tried to change

19  that Section 4(a) that we saw that gave the right to make

20  those changes.

21          She and her attorneys said, well, wait a minute,

22  they've made a bunch of these changes already, that's enough,

23  I don't want any more changes.  I don't want to be surprised

24  down the road if they take some of this stuff out.

25          And so Judy DeAngelis, who was acting on behalf of

Novack - closing

2062

1   Mrs. Goldberg and with her authority, submitted a written list

2   of 20 changes that she wanted to make, including -- and let's

3   put that up here.

4           This is the first page, just to get us back to this

5   exhibit.  This is Mrs. Goldberg's attorney writing the

6   seller's attorney asking for 20 changes.  And let me say

7   something about that document.

8           That letter is so devastating to Mrs. Goldberg's

9   case, so much so that in the many hours of direct testimony

10  that Mrs. Goldberg gave under Mr. Kulwin's questioning, she

11  never once mentioned this letter.  Mr. Kulwin didn't show it

12  to her, so I had to do that on cross-examination.  And when I

13  did, when I did, she acted like she had never seen it.  She

14  said she didn't remember seeing it.  She basically gave it the

15  back of her hand.

16          But what did we learn a little bit later in the case?

17  Something we didn't know when Mrs. Goldberg was on the stand

18  -- I should say I didn't know.  But then came Ms. Vogue.  And

19  you remember who Ms. Vogue is?  She's Mrs. Goldberg's agent.

20  You'll hear more about that in the Court's instructions.

21          But what did Ms. Vogue say about that?  Well, first

22  she said the same thing that Mrs. Goldberg did.  And, by the

23  way, you had to notice this.  You had to notice that Ms. Vogue

24  was like a parrot repeating the same things you heard from

25  Mrs. Goldberg and volunteering it.  In answer to Mr.

Novack - closing

2063

1   Shonkwiler's questions she would volunteer, in effect,

2   argument about the case, about Mrs. Goldberg's position in the

3   case.

4          She is what you call a biased witness.  I'm not

5   saying she's a bad person.  She just came here on her own --

6   she wasn't subpoenaed by anybody -- on her own to make the

7   case for Mrs. Goldberg.

8          Why is that?  She's been working for her for

9   20 years.  She's her property manager, she's her broker, her

10  friend.  They tried to pooh-pooh the money she got by saying

11  $75 a month?  Oh, wait a minute, first of all, it's $75 per

12  unit per month, seven, eight units, and it's called a

13  retainer.  And she said that, it was a retainer.  Retainer

14  means you don't have to do any work for it; you just get that

15  no matter whether you're called out to the property or not.

16  And then if you're called out to the property, she said,

17  there's another $50 charge every time you have to do that.  So

18  the $75 per unit per month was for doing nothing.

19         And on top of that, where were the real bucks?  The

20  real bucks were the commissions that she got from buying

21  properties and selling them for Mrs. Goldberg.

22         Now, we know that just in -- on the buy side,

23  $11 million.  Imagine what the commission on $11 million is.

24  And that doesn't take into account when she sold the four

25  units that she sold.  Over half of the units she had at that

Novack - closing

2064

1   River Park place, money came in.  Another commission off of

2   that.

3           So when Mr. Shonkwiler first asked Ms. Vogue about

4   the letter, you heard an echo from what Mrs. Goldberg said.

5   Oh, no, I don't recall seeing that.  Mr. Shonkwiler said,

6   really?

7           And so he showed her a number of e-mails from right

8   around that time, right around that late July, early August

9   time period, when Mrs. Goldberg was considering purchasing and

10  when this letter was dated, August 11th.

11          And what did she find in those e-mails?  She found

12  correspondence in writing going back and forth between

13  Mrs. Goldberg and Ms. Vogue about what?  About this letter,

14  this letter from Judy DeAngelis asking for 20 changes and

15  commenting on the fact that the seller didn't agree to a lot

16  of the stuff.

17          And Ms. Vogue said, you know what?  Mrs. Goldberg was

18  uncomfortable about that, disappointed about that.  And so Mr.

19  Shonkwiler said, does this now refresh your recollection that

20  you saw this letter, you had these conversations?  Well, she

21  had no choice at that point and she said, yes, it did.  So

22  Mrs. Goldberg was not right when she said she had never seen

23  that letter because she's communicating about it with Terry

24  Vogue.

25          And so I want to put that letter -- a page of the

Novack - closing

2065

1    letter, which is Page 3 -- I want you to see Item 9, because

2    that's the one that's most relevant to our case here.

3            This is the ninth out of 20 changes that Ms.

4    DeAngelis was seeking on behalf of Mrs. Goldberg.  And they

5    wanted this change because Mrs. Goldberg wanted to be able to

6    say no to exactly what happened here.

7            If the Trump organization decided to remove -- years

8    later decided to remove these common elements, she wanted to

9    be able to say, no, you can't do it.  I wanted a red car, not

10   a blue car.  I want to say no.

11           And, by the way, if Mrs. Goldberg really thought that

12   that provision 4(a) that you've now seen was such a nothing,

13   an innocent, benign nothing of a provision because it really

14   only applied to changes in the field or by city code, why is

15   her lawyer asking to change it?  I don't think you should

16   believe Mrs. Goldberg when she says that's what she thought.

17           But the lawyer did ask for it, it was very important,

18   and the defendants did not agree to make the changes,

19   insisting instead on keeping the right to do that, keeping the

20   right to remove things from the common elements as the seller

21   saw fit.

22           And you heard from Ms. Vogue that Mrs. Goldberg was

23   uncomfortable with the fact that defendants wouldn't make that

24   change.  She was disappointed -- she didn't like it, but just

25   as the defendants had the right to say no to the requested

Novack - closing

2066

1    change, Mrs. Goldberg had the right to walk away from the

2    deal.

3              That's the beauty of contracts.  It takes two to

4    tango.  Nobody, neither side, is forced to enter them.  And if

5    they can't agree on a provision, she didn't like the

6    provision, she didn't have to do the deal.

7              But Ms. Vogue said that they specifically discussed

8    the fact that the changes weren't agreed to and that

9    Mrs. Goldberg was disappointed about it, but according to

10   Ms. Vogue, she said, you know what, I'm going to make the deal

11   anyway.  Conscious, conscious decision.

12             But she did have two choices.  She could have said,

13   no, I don't want to do a deal that would allow taking away the

14   common elements.  And had she done that, she would have gotten

15   back all of her earnest money, she wouldn't have bought, no

16   questions asked, and none of us would even be here today.

17             But she decided to go the other way.  It was her

18   choice.  She said, I'm going to go ahead with the deal even

19   though she knew these changes could come, both additions to

20   the common elements, subtractions from the common elements.

21             She knew the agreement gave the defendants the right

22   to do that in the future.  Nobody forced a gun to her head to

23   make the deal.  She did it.  But later, but later, when they

24   did exactly what she said could be done and removed those

25   amenities from the common elements, she changed her mind.  And

Novack - closing

2067

1    now she's asking you -- you saw the itemization.  She wants

2    her earnest money back.

3           Well, that's not how it works.  She doesn't get to

4    make one deal, later change her mind and ask a jury for a

5    different one.

6           And now, after learning all that she learned and

7    reading the materials, not only did she stick with the first

8    purchase agreement, she signed the second one and she got

9    another ten-day period on that, didn't revoke that one either.

10          So she's asking for a do-over on both of these

11   purchase agreements.  We ask you, the only right thing, hold

12   her to the deal that she made.

13          Now, here's an area that Mr. Kulwin and I agree on:

14   This isn't a breach of contract case.  They are not claiming

15   -- you wouldn't have known this, by the way, through the seven

16   or eight days of trial that we had, because we heard over and

17   over again, from the opening statement on, to the

18   demonstrative exhibits that you saw, that this was a case,

19   according to them, about changes made after the contract was

20   signed, reneging on the deal, taking things out of the deal,

21   breach of contract type language.

22          And it's not until now that he comes clean and says,

23   this isn't a breach of contract case.  They are not alleging

24   any breach.  And we just saw the provision.  There couldn't

25   possibly be a breach.  There couldn't be a breach of contract

Novack - closing

2068

1    here because defendants did just what they were permitted

2    under the agreements.

3         So what is the case?  It's this misrepresentation

4    case.  And I'm going to put the instructions back up for you

5    just a little bit later, but you're not going to get an

6    instruction from the Judge that says that just because changes

7    were made, you must rule for the plaintiff.  No.

8         The instructions will tell you that you have to find

9    something more.  You have to find change plus, and the plus is

10   that at the time they put those common elements in, they never

11   intended to keep them in.  They have to prove that, not just

12   that there was a change.

13        We agree there was a change made.  But they agree

14   that we could do it.  They agree that that's not a breach.

15        So she has to prove, and it's her burden to prove --

16   they have to convince you that it's more likely than not that

17   these misrepresentations were made.  Do you know what that

18   means?  That means we don't have to put any evidence on at

19   all.  We could have chosen not to have any of our witnesses

20   testify or say anything about our case.  But we didn't.  We

21   did bring a lot of evidence.

22        But if at the end of the day there's kind of a tie

23   here, you're not sure -- you say, I can't go in the minds of

24   these defendants, I don't know that they had that intent --

25   then you have to rule for us.  It's not like baseball, where a

Novack - closing

2069

1    tie goes in favor of the runner.  A tie goes in favor of the

2    defendants.  It's their burden to convince you.

3              And they are going to have to convince you that we

4    had this secret intent, this secret plan, bring these things

5    out later, take a -- put them in today.  What does he call it,

6    the bait and switch?  That's what she has to prove.  Switch

7    alone is not enough.  Change alone is not enough because they

8    have the right to change.

9              Well, you saw no evidence whatsoever of the bait

10   side.  You saw no evidence whatsoever of a secret plan, a

11   secret intent, a plan that says, here it is today, tomorrow

12   it's going to be gone.

13             You did see evidence that they put it in and later

14   took it out, but that's not enough.

15             So who did you hear from that would know about this?

16   Well, the first witness you heard from was Charlie Reiss.

17             Unlike Ms. Vogue, unlike Mrs. Goldberg, unlike the

18   Trump organization today, Mr. Reiss has no financial interest

19   in the outcome of this case whatsoever.  This is what we call

20   a neutral third party witness.

21             He used to work for Trump.  He hasn't been there in

22   about nine years.  He works for a competitor now.  Left, he

23   said, on some kind of bad terms; we didn't get the details of

24   that.  He's not going to make one dollar more if we win this

25   case and he's not going to make one dollar less if we lose the

                                    Novack - closing
                                                                        2070

 1   case.

 2           And you saw him.  He was straightforward.  He was not

 3   evasive.  He was honest.  And you learned that he was the

 4   executive at Trump that made the decision to put these in in

 5   the first place.

 6           Sure, Mr. Trump said, yeah, ultimately I approved it.

 7   You could say a lot of things about Mr. Trump, and I'll talk

 8   about this later.  He wasn't involved in the details, but he

 9   doesn't walk away and say, I'm not responsible and I'm not

10   going to stand behind my executives' decisions.  The buck

11   stops with him and he said, yeah, I guess I approved it.

12           But Mr. Reiss told you he made that decision on his

13   own without talking with Mr. Trump.  And why would he say that

14   if it weren't true?  So he's the one who made the decision.

15   He believed that the decision was right.  He thought it was a

16   good thing for everybody to put those in the common elements.

17   And after everything that's happened and they've been taken

18   out, he says, I wouldn't even change my decision today.  That

19   was his decision.

20           Reasonable minds might disagree about whether that

21   was a good decision or not.  Our expert says it wasn't a good

22   decision but he -- and Mr. Petrus says it wasn't a good

23   decision, but he thought it was the right thing.  He didn't

24   put it in to bait anybody.  He said it was the right thing to

25   do at the time.

Novack - closing

2071

1          He also said that no one at the Trump organization,

2     including Donald Trump, no one ever said that those amenities

3     would later be taken out.  He wasn't putting these in with the

4     intent -- the secret intent that they would come out.  And he

5     didn't know about any such secret intent because no such

6     secret intent existed.

7          And it turns out he was a unit owner.  He bought in

8     that building.  And he was long gone from Trump when they were

9     removed.  And he said he doesn't even think he was harmed by

10    that.

11         Now, he thought it was a good idea to put them in,

12    but when they came out he says, that didn't harm me.  I'm a

13    unit owner just like -- he's a unit owner just like

14    Mrs. Goldberg.  He's not unhappy that it was taken out because

15    he probably knows what Mr. Trump later testified.  The

16    defendants lost money off of those amenities the first couple

17    years --

18              MR. S. KULWIN:  Judge, I'll object.

19              MR. NOVACK:  The unit owners --

20              MR. S. KULWIN:  I'll withdraw it.

21              THE COURT:  You're withdrawing it?

22              MR. S. KULWIN:  Yes, Judge.

23              THE COURT:  Okay.

24              MR. NOVACK:  Judge, we've had now three or four

25    interruptions and you overruled every one.  And I would hope

Novack - closing

2072

 1    you would caution Mr. Kulwin not to break up my flow.  I

 2    didn't do that to him except on occasions where you agreed

 3    with me.

 4              THE COURT:  He withdrew that one.  Let's move on,

 5    please.

 6              MR. NOVACK:  Okay.

 7              So we heard from Charlie Reiss.  Who else did we hear

 8    from?  Jill Cremer.  And Mr. Kulwin pointed this out when she

 9    was on the witness stand.  She's the only executive that we

10    heard from who was at Trump when the common elements were put

11    into the -- I'm sorry, when these amenities were put into the

12    common elements, and the only one who was there at that time

13    and was also there when they came out.  She was there from

14    soup to nuts.  She was a high executive working in New York,

15    and she denied vehemently participating in or knowing about

16    any plan or secret intent.

17              And then you heard from Jim Petrus.  Now, Mr. Petrus

18    wasn't even at Trump when these things were put into the

19    common elements.  He sure wasn't a part of any kind of a bait.

20    He wasn't there when the bait supposedly was laid.

21              And he was the executive who came late in the day,

22    June of 2006, who first came up with the idea to take them

23    out.  And he told you -- he looked at you and said, that was

24    my idea, my idea.  Nobody told me to do that.  Nobody

25    suggested it.  I came up with it on my own.

Novack - closing

2073

1          Well, wait a minute.  How about Mr. Trump?  Did he

2    tell you to do that?  No.  Did he come over and say, hey, Jim,

3    I want you to rethink this whole business about the common

4    elements?  No.

5          Jim Petrus on his own -- and this is a guy that had

6    prior hotel condominium experience -- he looked at it and

7    said, I don't think this is right.  I think it's in the best

8    interest of everybody, Trump organization, association unit

9    owners, to take these out.

10         He explained the reasons why he thought it was smart

11   to take them out, and he laboriously worked on it for months

12   and months and months and then he took the idea to Mr. Trump.

13   After all, he was going to ask Mr. Trump to have the seller

14   agree to pay a half a million dollars forever and he needed

15   approval.  So he went to Mr. Trump.  And he sold the idea to

16   Mr. Trump, and Mr. Trump agreed.

17         Now, Mrs. Goldberg's lawyer took Mr. Petrus to task

18   for saying the profits and losses from these type of

19   operations are unpredictable and they are potentially

20   volatile.  He says, how could you say that while at the same

21   time you were projecting profits?  Well, he was projecting

22   profits, but he was acknowledging this is our best estimate,

23   it may not happen, these things can be volatile.

24         And again, the proof is in the pudding because, as

25   Mr. Trump testified --

Novack - closing

2074

1          MR. S. KULWIN:  Judge, I'm going to object to him

2   talking about what happened afterwards.  It's inadmissible,

3   what the alleged loss is.  Mr. Trump's testimony in that

4   regard was stricken.

5          MR. NOVACK:  It's in the record and it's

6   rehabilitating of Mr. Petrus, the exam that he did -- the

7   attack he made on Mr. Petrus for saying at the same time he's

8   predicting profits, he's saying there could be losses.

9          THE COURT:  Overruled.

10         MR. NOVACK:  Well, here we go again, so I'm going to

11  have to back up a little bit.

12         The proof that Mr. Petrus was right when he said,

13  even though I thought there were going to be profits, I can be

14  wrong and there can be losses.  And he was looking out for

15  everybody in case there were.  And there were.

16         So he was right in both of the things he did.  He

17  thought there would be profits, but he knew there might be

18  losses and there turned out to be losses.

19         And Mrs. Goldberg did not call a single witness to

20  contradict the three witnesses I just talked about with

21  respect to the fact that there was no plan to take these out

22  later.

23         So not having anybody who she could say acted in

24  concert with Mr. Trump on this, her case reduces to one thing:

25  It reduces to the fact that Donald Trump, on his own, had a

Novack - closing

2075

secret intent that he kept from everyone, kept it from his

most trusted executives, his right-hand man, Mr. Weiss, as Mr.

Kulwin called him, who had been there 30-some years with this

man -- he kept it from him, he allowed Mr. Reiss to put the

amenities in in order to generate sales but with the secret

intent that he would take them out after making the sales.

Now, again it's Mrs. Goldberg's burden to prove that

kind of a theory, but look what she has to prove.  She came

nowhere close to proving that Mr. Trump had that secret

intent.

First of all, for Mr. Trump to have pulled this off,

he had to hope that someone like Mr. Reiss would come along

and come up on his own with the idea of putting these things

in the common elements in the first place.

Then he had to hope that that guy would leave the

company later in time for somebody else to be hired, and then

hope that the somebody else who got hired came up on his own

with the idea of taking these things out.

Now, just sort of repeating that, it shows how

outlandish it is, how unbelievable that that's what could have

been going on and those are the predictions Mr. Trump had to

have made.

But on top of all of that, there are so many -- I

wouldn't have the time to tell you all the holes in that

theory, but let me tell you a few.

1        First of all, it's all speculation.  There are no

2   witnesses.  There isn't anybody who came forward when asked

3   under oath about it that said, you know what, you know, I was

4   out drinking and I overheard that this was going on.  No, you

5   didn't hear that.  You didn't hear that there were any

6   discussions about it.  Not even one of those three people even

7   suspected something like that.

8        And remember that two of the three of those

9   executives who you heard from, they don't even work there and

10  have been gone for years and years.

11       Now, another problem is this with this theory:  If

12  the whole point of putting the amenities into the common

13  elements in the first place was to lure people into thinking

14  they were going to get these things and then he would later

15  pull the rug out, well, Mr. Trump, who you now heard is this

16  shrewd mastermind, he sure went about this in a funny way,

17  didn't he?

18       And remember, everyone in this case that you heard

19  from agreed that the whole point of marketing materials is to

20  feature the best selling points.

21       Remember that building block we all learned?  Jill

22  Cremer explained it.  And even Mrs. Goldberg's so-called

23  expert, Mr. Levin, when I got to the end of his examination

24  the last question I asked him -- and I had good reason for

25  asking, you'll hear it, and the good reason is because these

Novack - closing

2077

1    marketing materials are silent.

2           And I said to him -- or asked him, do you agree with

3    me that that's what marketing materials are for, to highlight

4    the best features?  And he said absolutely.  That we agree

5    with, Mr. Novak.  And that's the last question I asked him.

6           But what we learned is that the marketing materials

7    are absolutely, totally silent on who owns the common elements

8    or what amenities are in the common elements.

9           There's nothing in these marketing materials that

10   said, hey, Mr. -- or Mrs. Potential Purchaser, guess what?  If

11   you buy, not only do you get your unit but you get a profit

12   sharing -- share in the ballrooms and the revenues from the

13   food and beverage.  There's not a word of that in the

14   marketing materials.  So if Mr. Trump had this plan of luring

15   people in by this, he kept that secret, too.

16          And instead of being the great promoter and marketer

17   that Mr. Kulwin portrays him as -- and which he is, by the

18   way.  He is a world class promoter and marketer.  I guess he

19   just blew this one.  He just blew it, unless, of course, he

20   was telling the truth when he said that the common elements

21   would include those amenities at the time and that he didn't

22   really -- that he didn't mean secretly to take them out later.

23          And on that latter point, again I would say to you

24   that the proof is right in front of us.  And that's because

25   this whole idea of bait and switch, put it in, make your

Novack - closing

2078

 1    sales, take it out, would be defeated completely because the

 2    fact is that the business decision to remove the items, which

 3    was approved by Mr. Trump, that decision, we heard it, was

 4    made in May of 2007, at a time when there was still over 180

 5    hotel condominium units that had not yet been sold.

 6         If you put on those units -- and I'm not telling you

 7    that this was the price -- and, by the way, Mr. Kulwin said to

 8    you in his opening that the prices of these units went up over

 9    time.  Did you hear that in the evidence?  There wasn't a

10    single piece of evidence about these units going up in price

11    when the fact is they went down.  Disregard that, too, ladies

12    and gentlemen.

13         But if we just took her two units, a little over a

14    million, a little under a million, and we cut the price in

15    half so that it's $500,000 apiece, 180 units was about

16    $100 million of product left to be sold.

17         So if having these amenities in the common elements

18    was such a big selling point and this was part of this whole

19    secret scam of baiting people by putting them in, but then as

20    soon as the sales are completed we'll take them out, well,

21    then Trump shot himself in the foot big time because he took

22    it out too soon, didn't he?  He took it out when he still had

23    $100 million worth of units -- probably more, but $100 million

24    worth of units to sell.  What kind of a con artist is that?

25         So after that he had to sell that without what

Novack - closing

2079

1    Mrs. Goldberg tells you is the biggest selling point.  But the

2    truth is, it wasn't.  It was never a selling point.  It was

3    never a selling point, and the proof of that is it wasn't in

4    the marketing materials, and it wasn't a selling point because

5    it was taken out when there was lots to sell.

6         So to get around all of that logic, Mr. Kulwin

7    focuses on one aspect of Mr. Trump's testimony.  And that was

8    -- and he didn't deny it -- he always knew going back to the

9    inception of the Chicago project that it would be a disaster,

10   not good, for the condominium association to operate those

11   hotel facilities.  And I want to repeat that:  To operate

12   those hotel facilities.

13        In other words, to have them be the manager of food

14   and beverage, for them to be the manager of the meeting rooms

15   and the ballrooms.  And he said that.  And nobody disagrees

16   with that.  That's the most obvious point in the case, that it

17   makes no sense for a condo association and a board that has

18   day jobs that aren't related to this, to actually do the

19   running and the operating.

20        But that's not the issue.  The issue is not whether

21   the condo association could run the facilities, because it was

22   always understood they would have a manager.  The issue was

23   whether Mr. Trump realized back in 2005, when these were put

24   in, did he focus on, did he think about, did anybody talk to

25   him about, hey, wait a minute, I know that they're going to

Novack - closing

2080

1      hire us to do this, so the issue isn't whether they're going

2      to operate it.  They're not going to operate it.  But if

3      they're the owners, they can interfere with our operation.

4             Here's what they could do -- this is what Mr. Petrus

5      told him -- they could fire us as the manager and put somebody

6      else in who may not be as good.  They could fire us and decide

7      to manage on their own.  Not good.  They could leave us in but

8      they could interfere with the budget and say -- when we go to

9      them to say we want to make a major repair in the ballroom,

10     they could say, well, we're not putting up the money.

11            You remember that Mrs. Goldberg admitted that that's

12     how she works with her property managers.  I asked her, if

13     your property manager, let's say Terry Vogue, wanted to make a

14     major repair, could she do that on her own or would she have

15     to come to you?  Oh, no, she would have to come to me for

16     approval, because an owner has that right.  She should have

17     that right if she's the owner.  And she could say yes or she

18     could say no.

19            So if the condo association had that right, they

20     could say yes or they could say no to Trump.  But that's

21     something that Trump didn't focus on back in early 2005, when

22     he basically rubber-stamped the decision that Mr. Reiss had

23     made to put these elements in.

24            And Mr. Trump testified that the first time he

25     realized that was when Mr. Petrus came to him sometime in 2007

Novack - closing

2081

1    and made him focus on it, told him, this is what I'm concerned

2    about, what do you think.  Mr. Reiss didn't say that to him,

3    so he didn't think about it back then.  Mr. Petrus says it to

4    him in '07, and he thinks about it and he comes to agree with

5    Mr. Petrus.  Okay.  If that's what you think, I agree with

6    that.  It's okay to take these out and it's okay for me to pay

7    the $500,000 a year to do that.

8           So when Mr. Kulwin says, because he's really been a

9    little loose and vague -- when he argues it, when he tries to

10   get witnesses to confirm it, he always throws in the word

11   "own."  And he says, isn't it true that -- and he went through

12   this whole thing -- you'll remember this.  He says to

13   Mrs. Goldberg, says to Ms. Vogue, if you had been told that

14   Mr. Trump thought it was a disaster for the condominium owners

15   to own that -- those amenities at the time, would you have

16   bought this unit?  No.  If he had told you that he thought it

17   was a disaster to own that when you were considering this,

18   Ms. Vogue, would you have recommended it?  No.  But Mr. Trump

19   never said that he thought at that time it was a disaster for

20   the unit owners to own it.  He only said it was a disaster if

21   they operated it.

22          So when I sit down, one of the things you're going to

23   hear again is just that from Mr. Kulwin.  I don't have a

24   chance to come back up and say, wait a minute, remember the

25   distinction between operate and own.  So I want you guys to

Novack - closing

2082

1    think about that.  And again, be my eyes and ears on that

2    point.

3           And then the other thing they did is, Mrs. Goldberg

4    -- or Mr. Kulwin hired somebody that he calls an expert to try

5    to convince you not to believe -- strike that.  I said that

6    wrong.

7           They hired this expert and he testified so that you

8    wouldn't believe the testimony that we put forward that this

9    change was made -- the decision to make the change was made in

10   2007.  And the expert said, no, those decisions are made from

11   the get-go, up front, very beginning in time, and that the

12   people -- the developers never changed their mind.

13          And again, and I'll say what I said a little bit ago,

14   if that were true we wouldn't be here, because the only way

15   that these events got in the common elements was because the

16   developer changed its mind and put them in.

17          But beyond that, what else do we know about this

18   so-called expert?  Was he an expert?  We know he was not an

19   expert.  And for that -- you don't take my word for that.

20          Mr. Levin himself admitted on cross-examination,

21   after Mr. Kulwin presented him as an expert, he admitted in

22   cross-examination that he's not an expert on hotel

23   condominiums.  He acknowledged that his only experience was

24   with residential condominiums, his only experience was with

25   residential developers and residential condominium documents.

Novack - closing

2083

1        And he also admitted while he never saw common

2   elements of this type being removed, he was never in a

3   situation where those types of amenities were in the common

4   elements to begin with.

5        Well, we all know that if something is not in, it

6   can't be taken out.  So for him to say, I never saw it taken

7   out where he never saw it put in either, tells you nothing.

8   You don't need an expert to tell you that.

9        And, of course, he tried to get around all of that by

10  saying, oh, well, it doesn't matter because condominium --

11  residential condominium documents and hotel condominium

12  documents are the same.  The situation is exactly the same.

13       But if that were true, then I guess he really would

14  be an expert in hotel condominium documents.  If he's an

15  expert in residential documents and hotel documents are the

16  same, he would be an expert in hotel documents.

17       So I went back at him again and I said, well, wait a

18  minute, does that mean you are an expert in hotel because

19  you're now saying these things are the same?  And he said

20  again, no, I am not an expert in hotel condominiums or hotel

21  condominium documents.

22       So Mrs. Goldberg's lawyer brought before you someone

23  that he was vouching to you was an expert -- that's what he

24  said in his opening, I'm going to bring an expert -- but who,

25  by his own admission, turned out not to be an expert.

Novack - closing

2084

1           Now, while we're on the subject of experts, let's

2    talk about Mr. Howie.  He truly was an expert in hotel

3    condominiums, been doing it for 30 years, been working with

4    hotel condominium developers, hotel condominium documents.

5           And what he told you completely supports Mr. Trump's

6    testimony, which was that he did not appreciate the fact that

7    a condominium -- he didn't think about or appreciate at the

8    time that hotel condominium associations could fire the

9    managers and create all that havoc.

10          But in that regard Mr. Howie explained that in his

11   experience he has seen many, many developers who had lots and

12   lots of residential condominium experience but who didn't

13   appreciate that very fact and didn't realize the importance of

14   it.

15          Now, he admitted that he didn't know for sure what

16   was in Mr. Trump's mind, but what he was saying was that

17   people like that, who don't have that experience, make that

18   same mistake.  And he's seen it in his own experience over the

19   30 years that he's been doing this stuff.

20          And Mr. Kulwin tried to make the case that Trump does

21   have all that experience.  And he showed you the brochure that

22   had all the hotels and resorts and other properties that the

23   Trump organization was involved in, and he in his colorful way

24   said, and nobody says on there that we really have a bunch of

25   knuckleheads -- I think that was his word -- who work for us,

Novack - closing

2085

1    so don't pay attention to this.

2           But what he didn't ask Mr. Howie, what he didn't ask

3    these other witnesses, were those hotels and resorts

4    condominiums?  Well, you know from the evidence that they

5    weren't.  There were only two hotel condominiums at the time

6    that the Trump organization had been involved in:  The one in

7    New York and the Chicago Trump Tower that was then being

8    built.

9           What that reduces to is, they had no experience in

10   hotel condominiums of this kind because the New York hotel did

11   not have meeting rooms and function rooms and ballrooms and

12   food and beverage operations.  It just didn't.  The very first

13   time that the Trump organization had to focus on those kinds

14   of issues was in the Chicago Trump Tower.  They were starting

15   fresh on that.

16          And so the facts that Mr. Howie was asked to assume

17   were true.  We asked him to assume that the Chicago Trump

18   Tower was the first one that had these kinds of amenities that

19   they had had experience in.

20          We never once said to you -- no witness said it.  No

21   matter how many times Mr. Kulwin tries to say it, we never

22   said we didn't have hotel experience.  We never said that Mr.

23   Trump was inexperienced in operating hotels.  He was

24   experienced.  He just wasn't experienced, nor was the

25   organization, in hotel condominiums.

Novack - closing

2086

1          So let's talk about the misrepresentations that they

2    have to prove.  And I'm going to put up here the instructions

3    that the Court is going to give you again to show again that

4    just changing doesn't create liability but, instead, there has

5    to have been knowing intent that it was a misrepresentation.

6          The first one is the consumer fraud count

7    instruction.  And this particular instruction talks about the

8    very first element of the claim, a material deceptive act.

9    And you go down a couple lines:  They have to prove that the

10   defendants failed to disclose and/or misrepresented

11   information about the hotel condominium or HCUs before, before

12   -- I'm emphasizing that -- plaintiff signed the purchase

13   agreements.  What happened afterwards is irrelevant.  It's

14   what happened -- they have to have made that misrepresentation

15   before.

16         Then if you put the other one up, this is the second

17   element, the one that says that they have to prove the

18   defendants intended for plaintiff to rely on the deception.

19   Plaintiff must convince you that defendants knew and failed to

20   disclose and/or misrepresented material facts for the purpose

21   of inducing plaintiff to sign the purchase agreements.  Again,

22   before she is committed to the purchase, not after.  Before

23   August 2nd, 2006.

24         And then the third instruction relates to the Land

25   Sales Act.  And Paragraph No. 1, just like the other one, says

Novack - closing

2087

1    that the property -- that plaintiff has to prove that the

2    property report which defendants provided to plaintiff when

3    she signed the purchase agreements contained an untrue

4    statement of material fact, or, that defendants employed a

5    scheme to defraud plaintiff into signing.

6         So all three of these instructions -- you can take

7    them down.  All three of them are consistent that the fraud

8    has to be before she signs.  Just changing it cannot possibly

9    satisfy that.

10        So what's the clincher on this point?  And you heard

11   Mr. Kulwin refer to Mr. Levin in his opening statement.  He

12   said, Mr. Levin -- and he wasn't even cross-examined about

13   this.  He's the expert.  He concluded that there was a

14   misrepresentation.  They're putting all their eggs in that

15   Mr. Levin basket because he's the guy that supposedly was

16   synthesizing all this and he concludes that there's a

17   misrepresentation.

18        But his testimony seals the fact that plaintiff

19   loses.  His testimony is what makes the plaintiff lose because

20   he testified that he did have an opinion of misrepresentation

21   and he explained it.

22        Now, I wrote this down to keep track of it, to help

23   me remember what he said.  I know a lot of you take notes.  I

24   don't know if you took this particular one down, but I took it

25   down because it's so devastating to plaintiff's case.

Novack - closing

2088

1           And here's what he said, here's what he said:  He
2    said, my opinion is that the whole -- I'm sorry.
3           What's he explaining?  He's explaining the
4    misrepresentation, his opinion that there was a
5    misrepresentation.  My opinion is that the whole atmosphere
6    between the third and the fourth amendment of the property
7    report changed the entire manner in which the association
8    would be run from the fourth amendment on.
9           Now, why didn't I cross-examine him about that?
10   Because he just exposed this case for the lie that it is.
11          What does he say the misrepresentation was?  He says
12   the misrepresentation occurred between the third and the
13   fourth amendment, between the third and the fourth amendment,
14   after -- and because it was changed.
15          The change occurred in 2007.  Mrs. Goldberg signed in
16   August of 2006.  So the thing that Mr. Levin gives his
17   so-called expert opinion on as being the misrepresentation
18   doesn't satisfy the test that Judge St. Eve is going to tell
19   you they have to meet in order for you to come back with a
20   verdict in her favor.
21          His testimony is the opposite.  He's back to breach
22   of contract, isn't he?  He's saying that the misrepresentation
23   is what happened after she signed.  That's the end of their
24   case.  I think you're going to agree with that when you think
25   about that and remember that.

Novack - closing

2089

1      There was nothing in there about what was going on in

2   their minds, in defendants' minds, before she signed.  It's

3   all about a change that occurred afterwards.

4      Now, I'm going to turn to materiality.  You're going

5   to get an instruction on materiality.  Mr. Kulwin explained

6   it.  Would a buyer, including Mrs. Goldberg here, have done

7   anything differently if there hadn't been this so-called

8   misrepresentation?

9      The fact is material if a buyer here, Mrs. Goldberg,

10  would have acted differently if she had known the truth.  Now,

11  we say she did know the truth.  But she's saying, well, she

12  didn't know this, didn't know it to be changed.

13      But you know what?  We know that she would not have

14  acted differently because she admitted that on the witness

15  stand yesterday.  She said -- day before yesterday.  Sorry.

16  And here's what I mean by that -- and it all starts with the

17  budgets.  You've seen these budgets ad nauseam, probably sick

18  of them.  But let's start there because we know one thing

19  about Mrs. Goldberg:  Numbers, numbers, numbers.

20      And you just look at those top two numbers.  You know

21  that the $5 million figure -- excuse me.

22      Do you have a copy of that for me?

23      (Brief pause.)

24      MR. NOVACK:  I'm going to work off of a copy rather

25  than walking in front of you.

Novack - closing

2090

1        But you know that that $5 million figure, the second

2    figure on there, that's the revenue figure from the ballroom

3    and the meeting rooms.  And the number above it, 4,755,000 and

4    change, that is the common charges.  And we know that the

5    common charges are what's needed to make up a shortfall if the

6    other revenues don't meet all the expenses.  We heard that.

7    Mrs. Goldberg told you that.

8        So if these meeting room $5 million revenues go down,

9    the common charges have to go up.  And there's no suggestion

10   in this case -- nobody has ever said that these revenues were

11   ever large -- could be large enough to get rid of the common

12   charges entirely.  In other words, they would have to almost

13   double to eliminate the common charges.

14       And Mrs. Goldberg agreed that the impact on her was

15   only $229 a month when the fourth amendment came out.  And I

16   asked her, if the estimated common charges for her two units

17   had been $229 higher in the third amendment, would she still

18   have signed the purchase agreement.  And she said yes.  She

19   said yes.

20       So that the change in the common charges, which is

21   the change driven by taking out the revenues, was not material

22   to her.

23       But to get around that admission, to get around that

24   and to meet her burden of proof on materiality, Mrs. Goldberg

25   and her agent, Ms. Vogue -- and you heard the same testimony

Novack - closing

2091

1    from both of them -- they tried to convince you that the major

2    thing that they were excited about in these hotel units was

3    the revenue from the meeting rooms and ballrooms.  Both of

4    them said that.  They were excited, excited, excited.

5           Well, they say that now.  They say that at the trial.

6    They say that when they think they can win the case by saying

7    it.  But the written record, the written record was that that

8    is just not so.

9           Remember again Ms. Vogue on the stand.  And Mr.

10   Shonkwiler showed her the e-mails that were being communicated

11   back and forth between Mrs. Goldberg and Ms. Vogue in that

12   August -- early August period, when she's deciding whether or

13   not to make these purchases.  Not one of them -- I'm going to

14   repeat that -- not one of those e-mails said anything at all

15   about the common elements that they now tell you was the thing

16   they were most excited about.

17          You would expect, wouldn't you, that if that's what

18   they were most excited about, it would somehow find its way

19   into the e-mails that they were exchanging about the

20   information that was governing their decision to go forward or

21   not?

22          Instead, consistent with Mrs. Goldberg's unwavering

23   focus on the expenses she would have to pay and the rental

24   income from her units -- that's completely different from the

25   ballroom revenues.  Consistent with that, that's what was in

Novack - closing

2092

1    those e-mails.

2         And those e-mails not only went between Mrs. Goldberg

3    and Ms. Vogue, but they also went with Mr. Shearer.  There are

4    e-mails, Ms. Vogue told us, where she was asking and Mr.

5    Shearer was telling her information about the expenses but

6    nothing about the revenues.

7         And consistent with that, you heard Mr. Shearer's

8    testimony.  Now, here again we've got a dispassionate,

9    uninterested witness.  He doesn't make another penny if we

10   win, he doesn't lose a penny if we lose.

11        He was never employed by Trump organization.  He was

12   with Koenig & Strey, an independent large broker who was the

13   sales agent for the Trump Tower at the time, and he hasn't

14   been there for years.  He hasn't been selling these units for

15   years.  So he's not affiliated with the Trump organization.

16        And he said that in his meetings Mrs. Goldberg made

17   specific requests for information.  She did.  But what did she

18   want to see?  Floor plans, views, price and monthly estimated

19   costs, not anything to do with common elements.

20        He also said that he didn't make any sales pitches to

21   Mrs. Goldberg because she knew exactly what she wanted.  He

22   also said that when he did give sales pitches to other buyers,

23   he only used the information in the sales brochures and

24   marketing materials, not what was in the property reports.

25        And again, we know that there was nothing in the

Novack - closing

2093

1    sales materials or marketing materials about the ownership or

2    the common elements or the food and beverage revenues or

3    anything of the kind.

4         And the fact that there was nothing in those e-mails

5    about the common elements or the revenues from the ballrooms

6    is also consistent with the testimony from both Mrs. Goldberg

7    and Ms. Vogue about why Mrs. Goldberg was interested in buying

8    hotel units in the first place.

9         Mrs. Goldberg told you that before ever meeting Mr.

10   Shearer or knowing anything about common elements, she was

11   interested in buying because of a number of things unrelated

12   to common elements.  She was happy with her residential

13   condominium investment.  And you know what?  While we're

14   there, let me stop for a second.

15        When I was cross-examining Mrs. Goldberg she said in

16   her testimony -- she was adamant about this -- she did not

17   care about what happened to the pricing of those units or the

18   value of the units after she bought it.  She only cared about

19   the income revenue that she would get from rentals.

20        And she said that she didn't know whether her

21   residential unit had increased after she signed the purchase

22   agreement.  She was unwavering on that.

23        But when Ms. Vogue gave her testimony, you'll

24   remember this, she testified that in one of those three

25   meetings in early August, late July, when they were thinking

Novack - closing

1    about and talking about buying the hotel units, it was

2    Mrs. Goldberg, Mrs. Goldberg who asked Kiyoko Binosi, what's

3    happened with the purchase prices on that residential unit.

4    And she was told it had increased a million to a

5    million-and-a-half dollars.

6         So it wasn't that Mrs. Goldberg was not interested.

7    What she said was just not so because she went out of her way

8    to ask the question about it.

9         Now, the second reason that Mrs. Goldberg said she

10   was interested in the hotel units was because she was

11   interested in upgrading the level of the kind of unit she

12   would own.  She said Trump was high quality, it was a

13   different level, and she wanted to get in on that.

14        And third, she wanted to buy units in Trump Tower

15   because of Trump's superior reputation in running hotels.

16        In fact, Ms. Vogue testified -- she was there -- that

17   when Mrs. Goldberg and she went to the very first meeting with

18   Mr. Shearer, before she knew -- or Ms. Vogue knew anything

19   about this revenue stream from food and beverage and the

20   banquet rooms, et cetera, before she had any idea about that,

21   she went there already intent on purchasing a unit.  It was

22   just a question of which one.  Her mind was made up.  So it

23   wasn't material to her decision to buy that she later learned

24   about these common elements.

25        And what was relevant to her, what drove her

Novack - closing

2095

1   decision, and it's consistent with the fact that all of her

2   financial analyses, calculations, investigations were focused

3   on one thing:  Could she rent her room -- her rooms, as it

4   turned out, enough times each month to cover expenses?  And

5   she concluded she could easily do that.  Those were the

6   investigations she made.  She made no similar financial

7   analysis or calculation or investigation about the revenues

8   from the ballrooms.

9        In fact, she admitted that once she concluded from

10  her analysis about the expenses and the room rentals that she

11  could rent enough to break even, her decision was basically

12  made and she never varied from that decision.

13       So what was material to her purchase was that; it was

14  not the ballroom revenues.  She would have bought these even

15  if there weren't any amenities in the common elements.

16       Let me quickly cover a couple of the other areas.

17       Laundry facilities.  This one is real easy.  The

18  first thing here is that the description of the common

19  elements did not represent that there would be laundry

20  facilities at the building.

21       Judge, could I go back to the table for a second?

22       THE COURT:  Of course.

23       MR. NOVACK:  Thank you.  I'm sorry about this.

24       (Brief pause.)

25       MR. NOVACK:  I don't think I'm going to be able to

Novack - closing

2096

1    get that any bigger.  I'm going to work from over here.  I

2    don't mean to turn my back on you.

3            Actually, this was part of what Mr. Kulwin showed you

4    -- I mean, this is the full thing of what -- the part that Mr.

5    Kulwin showed you in his opening -- in his closing argument.

6    And what Mr. Kulwin highlighted started with laundry

7    facilities and continued through the ballrooms.  And that

8    language is in there.  Of course it is.

9            But here's what Mr. Kulwin did not highlight for you,

10   and this is the most important part of the page:  The common

11   -- and I'm starting right here, first line:  The common

12   elements include, without limitation -- and here's the

13   important part so I might inflect a little bit -- and if

14   applicable, if applicable, any of the following, any of the

15   following items located at the property.

16           Let's pause there for a second.  What that is saying

17   is that not everything that's going to come after that

18   language is necessarily going to be in the common elements.

19   Of the things that are listed, only those things, only if they

20   are applicable and located at the property, would they be in

21   the common elements.

22           So if something in this listing -- and there's all

23   kinds of stuff here, utility rooms, water heaters, mailboxes

24   -- if they are actually at the property, this is telling you

25   who is going to own it.

Novack - closing

2097

1              If they are at the property the unit owners, through

2    common elements, will own the laundry facilities.  But if

3    there aren't any laundry facilities because there aren't any

4    laundry facilities, nobody is going to own it.  The issue of

5    ownership is irrelevant, it's moot.  That's why it says "if

6    applicable."  If it didn't say "if applicable," then maybe it

7    would be a representation.  But it says "if applicable."

8              So that's the first thing that I wanted to mention to

9    you and remind you of about the part of the common elements

10   that are laundry facilities.

11             The second thing is that it is true that there were

12   no laundry facilities, and it is true that was decided pretty

13   early on.

14             The reason for that decision, by the way -- it was in

15   the e-mail -- is that it turns out to be that whoever owns

16   laundry facilities -- that whoever owns the laundry facilities

17   would have lost money.  It was a good thing for this hotel

18   condominium, which is what the word property means, located at

19   the property -- it was a good thing for the owners that those

20   laundry facilities were not there, because if they were, that

21   provision truly did say that it would be the unit owners that

22   would own it.

23             So the unit owners were protected here.  It turned

24   out to be a good thing that the developer didn't go forward

25   with the laundry facilities.  I guess the developer could have

Novack - closing

2098

1    put laundry facilities in there and said, well, I'm not the

2    one that's going to be paying for it, I'll stick it to the

3    unit owners.  But they didn't do that.  They made a good

4    business decision that turned out to be good for everybody.

5         The other thing that's important is, as Mrs. Goldberg

6    admitted, no one ever told her that the laundry facilities

7    would be revenue producing.

8         And actually, let's put that -- let me put that back

9    up.  Because look at some of the items that were in there:

10   Fire escapes, pipes, flues, shafts, electrical wiring,

11   elevators.  We know from common sense none of those are

12   revenue producing.  And there's not a word in there that says

13   that laundry facilities would be revenue producing.  Laundry

14   facilities could be for the convenience of everybody.  Hey,

15   we'll throw in the laundry and nobody would make any money off

16   of it.

17        And then when I challenged Mrs. Goldberg to find any

18   reference in the marketing materials to laundry facilities --

19   and you remember Mr. Kulwin said this.  He said he was curious

20   about that and it looked like I was surprised by it.  I was.

21   Absolutely was I surprised by that.  I could have sworn there

22   was nothing in those marketing materials that said laundry

23   facilities.

24        And so I was content to let her spend all the time

25   that she spent looking for it.  And then, sure enough, she

Novack - closing

2099

1   finds something and I probably looked taken aback.  I probably

2   wasn't playing very good poker at that time and you saw that I

3   was surprised.  I really wasn't expecting that because my

4   information was different.

5        And in the heat of the moment and on my feet here at

6   the trial, nobody is perfect, but when I got back to the

7   office and it bothered me, I took another look at that page.

8   And let's -- let's let you take another look at that page.

9        And it turns out, ladies and gentlemen, this was not

10  a hotel condominium marketing material.  This page deals with

11  the residential condominium, not the hotel condominium.  And

12  it does say -- it surely says under the heading Amenities

13  there would be dry cleaning and laundry, valet services, but

14  it's not talking about the hotel condominium.  And you

15  remember that Mrs. Goldberg bought a residential condominium.

16  Probably why she's got that piece of paper.

17       So I was taken aback and surprised for no good reason

18  at all, because it turns out that there are no hotel

19  condominium marketing materials that say laundry facilities.

20       Now, the laundry happens to be in a column that's

21  headed with the word Amenities, and in that column there's

22  some hotel things.  And they're telling the residents, you'll

23  get luxury hotel services.  And then a couple down from that

24  there's a facility, it's a health and fitness spa in the

25  hotel.  So somebody could say, well, wait a minute, maybe even

Novack - closing

1    though this is a residential marketing material, it's talking

2    about laundry facilities that were going to be in the hotel.

3            So I got nervous again.  But the very next page of

4    Exhibit 75, which is what Mrs. Goldberg was looking at -- you

5    just had to turn one more page.  Remember she said, oh, I

6    stopped after I got to that page.  Now, we've got the same

7    type of a piece of paper like the one you just saw about

8    residences, but look at the heading on that one.  That's the

9    hotel.  And it's got amenities, just like the other one did,

10   services and amenities.  Take a moment, look at it.  What's

11   missing?  Well, this isn't a test.  There's nothing in there

12   about laundry facilities.

13           So the relevant marketing material item that deals

14   with the hotel, which is what we're talking about here, does

15   not say that there's laundry facilities.  And we're back to

16   where we started, that there's nothing about laundry

17   facilities in any marketing material.

18           And when Mr. Kulwin told you today, when she saw that

19   marketing material and those -- I'm sorry.  When she saw

20   laundry facilities in those marketing materials, that

21   contributed to her decision to buy.  That was important to

22   her, so important that when it wasn't even in existence she

23   came to that conclusion?

24           Let's talk about the rotation system.  That's that

25   part of the rental agreement.  And the first thing that

Novack - closing

2101

1  Mrs. Goldberg complains about is that the system went from

2  what she said was a purely automated system to one that could

3  be overridden in specific instances.

4       And while she blurted out without any evidence

5  whatsoever that this would lead to favoritism, she didn't have

6  a single example of favoritism, she didn't have any reason why

7  it would lead to favoritism.  She just made that conclusion.

8       The only competent evidence that you heard, the

9  testimony you heard about that so-called favoritism, Mr.

10 Petrus told you that, A, there still is an automated system

11 but in special circumstances it can be overridden.  We don't

12 dispute that.  But he gave you an example of the kind of

13 thing.

14      What if a couple, a young couple that gets married,

15 stays their honeymoon night in Unit 1573 and then comes back a

16 year later and says, jeez, can we get that same room, we're

17 celebrating our anniversary?  Would you rather have them say,

18 sorry, Charlie, this is all automated and it's out of our

19 hands.  Would that be good for the hotel?  Would that be good

20 for the unit owners?

21      So Mr. Petrus said in those cases they can override

22 and say, you know what, it may not be Unit 1573's turn but

23 we're going to move them up there.  Is that favoritism?  It's

24 good business sense.

25      The second complaint she has, pretty ironic.

Novack - closing

2102

1    Remember, that change helped unit owners like her who don't

2    stay at their units.  It helped her, the change.  It was worse

3    for her when she signed up.  And now she's here to tell you

4    this was material to her and we should be defrauders because

5    we made a change that helped her.

6         She admitted, however, that if that change had been

7    in place when she purchased, she still would have purchased.

8    Not material.  She wouldn't have changed.

9         And finally, the only evidence on the rental

10   management agreement is that there was a change made.  But

11   remember, a change alone isn't fraud.  They didn't even try to

12   prove, like they did and failed with respect to the

13   ballrooms -- they didn't even try to prove that there was some

14   secret intent to change the rental agreement.  There's no

15   evidence of that.  They didn't even try and fail.  They just

16   didn't try.  So there can be no proof of that.

17        And the same is true of the storage space that she

18   says changed and the health club membership.  No evidence

19   whatsoever that these things were planned and secret intent

20   about down the road.  All we have is a change.

21        You've heard a lot of testimony from plaintiff's

22   side, a lot of argument by her counsel about whether

23   particular changes were fair or unfair and whether the changes

24   would benefit or not benefit the unit owners.

25        Well, the short answer to that is that whether things

Novack - closing

2103

1    are good or bad, fair or unfair, that's not an issue in this

2    case.  You will not see the word fair or any derivative of it

3    anywhere in any instruction that you're going to get from the

4    Court.

5          The question is whether there was a

6    misrepresentation, not whether the changes that were made were

7    fair or not.  And while we think the evidence has shown that

8    everything defendants did was fair, that's not an issue for

9    you to decide.

10         And on this point, Mrs. Goldberg also says that this

11   could -- the change on the ballroom, et cetera, could not have

12   been in the interest of unit owners, because if it were Trump

13   would have hyped it and would have said, great news, we took

14   away the ballroom.

15         Well, the truth is that when the ballroom was put in,

16   there was no hype at that end either.  Trump behaved the same

17   taking them out as he did when he put them in.

18         Now, Mrs. Goldberg says that she did not close

19   because she didn't want to be partners with or in business

20   with Trump.  That's what she says the reason was.  That

21   couldn't have been the reason because she closed on her

22   residential investment unit, the one that we heard went up in

23   value a million to a million-and-a-half dollars.  That's why

24   she closed on that unit.

25         But she was going to be Trump's partner there, too,

Novack - closing

2104

1    on the residential side.  That unit, just like the hotel

2    units, are in the same building, the building managed by

3    Trump.  The common elements in that residential condominium

4    were owned by the unit owners.  Mrs. Goldberg even said she

5    was on the board -- I'm sorry, strike that.  That was a

6    mistake.

7         So the condominium association would manage those

8    elements.  Same partnership.  So that reason doesn't work.

9         And try as she may, she didn't have a good

10   explanation for why she did not officially walk away from

11   these deals sometime before 2009.  She heard about the changes

12   the beginning of '08, and she said that the minute she heard

13   about them she knew she was washing her hands of Trump.  She

14   didn't want to be in business with him any more.

15        She didn't say that to anybody.  She didn't -- well,

16   I shouldn't say she didn't say it to anybody.  She didn't tell

17   Trump, hey, I'm not going to close on that unit, go ahead and

18   see if there's somebody else that wants it.  She sat back, as

19   she said, considering what she wanted to do, but she knew --

20   the one thing she knew she was going to do was not close.  She

21   may not have known she was going to file a lawsuit, but she

22   knew she wasn't going to close.  So that reason doesn't hold

23   water.  The partnership reason fails, that reason fails.

24        She didn't close because by 2009 -- and you heard Mr.

25   Kulwin say this -- there was a heavy real estate crisis by

Novack - closing

2105

1    2009.  That's why she didn't close.

2           Now, Mrs. Goldberg's counsel went at Trump hard in

3    his closing argument and attacked his credibility, but the

4    truth is, Mr. Trump candidly admitted, candidly admitted that

5    his recollection of his meeting with Mr. Petrus was refreshed

6    after he met with Mr. Petrus, which happened to be after he

7    signed the interrogatories and after he gave his deposition.

8           What's wrong with that?  Use your common sense.

9    Doesn't everyone sometimes have trouble remembering five or

10   six-year-old meetings, particularly somebody who might be

11   pretty busy during those five to six years?

12          And isn't it common sense?  Haven't we all

13   experienced it?  One of the best ways of remembering a

14   meeting, what was said at it, is you talk to somebody who was

15   also there.  It's so common, you -- one person says, hey,

16   wasn't that said?  Yeah.  And that reminds me about that.

17   Yeah.  And then we said this, right?  Yeah.  What's wrong with

18   that?

19          I mean, Mrs. Goldberg couldn't even remember that she

20   gave a second deposition in this case where she answered

21   questions -- hundreds of pages of questions.  She didn't even

22   remember the deposition, let alone what she said at it.

23   There's just nothing wrong with it.

24          And the point about Trump -- he says portraying

25   himself as not knowing what was going on in his business?  He

Novack - closing

2106

1    didn't say that.  What he said was, it's impossible for me,

2    given the number of projects we have, the number of decisions

3    that have to be made on each project, it's simply

4    impossible -- maybe some common sense here, too -- simply

5    impossible to make every decision.  So I trust my executives.

6    I leave those decisions to my executives.

7         And when I approve what they do, I don't always go

8    through and think and rethink and second-guess.  That's why

9    I've got executives.  That's all he was saying.

10        Mrs. Goldberg's lawyer made a big deal about the

11   period between May of '07, when the decision was made to take

12   them out, and October, when the decision was announced through

13   the amendments.

14        Mr. Petrus explained two layers of lenders.

15   Attorneys for those lenders had to give their approvals.

16        And you can't tell -- you can't tell somebody who is

17   looking to buy a unit that you're going to make a change that

18   you don't know you're going to make.  You can't do that.

19        In any event, there was no evidence put in by

20   Mrs. Goldberg as to how many sales, if any there were, in that

21   several month period.

22        One more thing about Ms. Vogue, and then we're going

23   to turn to damages and then we're going to be done.

24        Remember Ms. Vogue, how excited and animated she was

25   about learning about the common elements.  We've already shown

Novack - closing

1   that at the time there are no e-mails to support that, and the

2   e-mails actually defeat it.

3           But then comes Exhibit 592, please.  Now we're

4   fast-forwarding to February of 2008.  And this is the e-mail

5   that Ms. Vogue sends to Mrs. Goldberg and these two other

6   clients of hers, telling them about the fact that there was

7   this article and that there is another lawsuit and that the

8   items from the common elements had been removed, the same

9   items that she says she was so excited about early on, almost

10  the most important thing with respect to that decision.

11          Nowhere in there does she express any displeasure,

12  aggravation, disappointedness, that this had happened.

13  Nowhere in there does she say, how dare he do that.  Remember,

14  this was the reason we bought these in the first place, this

15  was the thing we were most excited about.  You guys better

16  walk from -- not walk, you better run from this deal.  It

17  doesn't say that.

18          What does she say?  She says in that middle paragraph

19  -- let's see if I can highlight this for you.  She says one of

20  the valid points that Kiyoko mentioned -- she didn't say one

21  of the invalid points; she didn't say this was all a bunch of

22  hooey.  She's reporting on what she was told and she's saying

23  that this was a valid point.

24          Now, when she was asked about that on

25  cross-examination, what did you hear from Ms. Vogue?  What did

Novack - closing

2108

1  you hear from her?  Oh, yeah, I know it says valid, but what I

2  was really saying was that she thought it was valid.  Well, it

3  doesn't say that.  And she said, well, but I was being

4  sarcastic.  Really?  Look at that.  One of the valid -- can't

5  we all read English?

6       This is just another example of Mrs. Goldberg and her

7  agent trying to change writings.  They tried to change the

8  provision that let's us make changes.  They're trying to

9  change these documents.  I don't see anything sarcastic in

10 here.

11      She says, I'm sure that his interest in keeping the

12 revenue generated from those amenities was also a

13 consideration.  Well, sure -- I'm sure it was.  He was paying

14 $500,000.

15      And then not only does she not say, Mrs. Goldberg, I

16 think you should not close, Mrs. Goldberg, I think you should

17 sue, Mrs. Goldberg, we got to somehow get around this.  No.

18 She says, I think you all -- that means all three of them --

19 are going to really enjoy your condos at Trump and the

20 beautiful amenities available on site.  And then she talks

21 about a particular great view.

22      That doesn't sound like somebody who just had the rug

23 pulled out from under her on the thing she was most excited

24 about.  Just like she had no evidence back in August of '06 in

25 writing that she cared about this, even now she's not.

Novack - closing

2109

1        And let's go to Exhibit 591; that's the e-mail from
2   Mrs. Goldberg.  And this was the e-mail we've seen now over
3   and over again, but we haven't really focused on the top
4   portion of this e-mail chain.

5        This is Ms. Vogue forwarding Mrs. Goldberg's e-mail
6   to the Trump salesperson, Kiyoko Binosi.  She's reporting back
7   to her -- remember, she's the one that Ms. Vogue got the
8   information from that she passed along to Mrs. Goldberg.  Now
9   she's passing on to Ms. Binosi what Mrs. Goldberg said in
10  response.

11       And let's see what she said and see if these are
12  words that sound anything at all like from a person who
13  believes that the thing she was most excited about and that
14  would cause Mrs. Goldberg to buy these in the first place had
15  been taken away, or whether she's telling her, hey, I don't
16  think we got a deal any more, or you guys better change this
17  or else.  (Reading:)

18       Kiyoko, attached is an e-mail from Jackie Goldberg in
19  response to my e-mail updating her with the information I
20  obtained during our tour of the hotel yesterday.  When I asked
21  if the unsold units were going to be on the rotation list, I
22  forgot to ask if those units were going to be charged the one
23  point per each night of occupancy as well.  Jackie is fine
24  with the program so long as it's equally fair to all parties
25  participating.

Novack - closing

2110

1          Thank you for confirmation of the revised policy,

2   exclamation point.

3          This sounds like it's business as usual.  We're still

4   on board, telling her what she would be fine with.

5          The written documents completely defeat this notion

6   that these units were bought only because of those common

7   elements.

8          Everything I have said, all the evidence you've

9   heard, I believe support only one verdict on liability, and

10  that is for the defendants.

11         I guess I could sit down.  Ah, but there's one thing.

12  Just because that's what I think, just because that's what I'm

13  arguing, and just because I think I'm really persuasive, I

14  don't know what's in your minds.  I don't know how you're

15  going to come out.  You may end up disappointing me and ruling

16  in favor of the plaintiff.  So I have to discuss damages.  And

17  by my doing that, it doesn't mean I think you're going to

18  award damages or find liability.  It's just because I have to

19  be a careful lawyer and I've got to cover the bases.

20         So I'm going to spend just a few minutes -- is it

21  okay to keep going or would you want to break and -- this is

22  new.  I can start this after --

23         THE COURT:  My preference would be -- you've been

24  going two hours -- is to give the jury a break and let you

25  finish.

Novack - closing

1          How much longer do you have?

2          MR. NOVACK:  I think this is only another --

3          THE COURT:  Ten minutes?

4          MR. NOVACK:  -- ten minutes, fifteen minutes,

5   something like that.

6          THE COURT:  Okay.  It's 1:00 o'clock.  You've been

7   going two hours, so let's take a break.

8          Ladies and gentlemen, we'll break for lunch now.

9   We'll pick back up at about ten after 2:00 and finish up.

10          (Jury exited the courtroom.)

11          MR. S. KULWIN:  Are we okay to go?  You don't have to

12   talk to us, do you?

13          THE COURT:  Just briefly.  Ten after 2:00.

14          Mr. Novack, you'll finish --

15          MR. NOVACK:  I will.

16          THE COURT:  -- ten minutes?

17          MR. NOVACK:  I believe so.

18          THE COURT:  You have 45 minutes for rebuttal, no

19   more, and then I'll instruct them.  See you at ten after 2:00.

20          MR. S. KULWIN:  Okay.  Thank you.

21          (Whereupon, a recess was taken at 1:05 o'clock p.m.,

22       until 2:10 o'clock p.m., of the same afternoon.)

23                *      *      *      *      *

24

25

2112

1   We certify that the foregoing is a correct transcript from the
      record of proceedings in the above-entitled matter.

2

3

4   /s/ Joseph Rickhoff               May 22, 2013
      Official Court Reporter

5

      /s/ Mary Hacker                May 22, 2013
6   Official Court Reporter

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

2113

```
 1                  IN THE UNITED STATES DISTRICT COURT
                      NORTHERN DISTRICT OF ILLINOIS
 2                          EASTERN DIVISION

 3   JACQUELINE GOLDBERG,              )  Docket No. 09 C 6455
                                       )
 4                       Plaintiff,    )
                                       )
 5              vs.                    )
                                       )
 6   401 NORTH WABASH VENTURE, LLC,    )
     a Delaware Limited Liability      )
 7   Company, et al.,                  )  Chicago, Illinois
                                       )  May 22, 2013
 8                       Defendants.)     2:10 o'clock p.m.

 9                  TRANSCRIPT OF TRIAL PROCEEDINGS
           BEFORE THE HONORABLE AMY J. ST. EVE, AND A JURY
10
     APPEARANCES:
11
     For the Plaintiff:           KULWIN, MASCIOPINTO & KULWIN, LLP
12                                BY:  MR. SHELLY B. KULWIN
                                       MR. JEFFREY R. KULWIN
13                                161 North Clark Street, Suite 2500
                                  Chicago, Illinois  60601
14
     For the Defendants:          NOVACK AND MACEY, LLP
15                                BY:  MR. STEPHEN NOVACK
                                       MR. JOHN F. SHONKWILER
16                                100 N. Riverside Plaza, Suite 1500
                                  Chicago, Illinois  60606
17
     Also Present:               MS. ALEXIS ROBINSON
18
     Court Reporter:             Nancy C. LaBella
19                               Official Court Reporter
                                 219 S. Dearborn St., Room 1222
20                               Chicago, Illinois  60604
                                 (312) 435-6890
21

22

23              * * * * * * * * * * * * * * * * * *

24                    PROCEEDINGS RECORDED BY
                      MECHANICAL STENOGRAPHY
25             TRANSCRIPT PRODUCED BY COMPUTER
```

2114

 1    (Proceedings out of the hearing of the jury:)

 2          THE CLERK:  09 C 6455, Goldberg v. 401 North Wabash

 3    Venture.

 4          MR. NOVACK:  I would like to ask one thing before

 5    they come out.

 6          THE COURT:  Yes.

 7          MR. NOVACK:  The Mafia is already on the Internet,

 8    the reference to the Mafia.  And I would just ask if you

 9    direct Mr. Kulwin not to make inflammatory comments during his

10    rebuttal.

11          THE COURT:  I fully expect you not to make

12    inflammatory comments.

13          MR. S. KULWIN:  You already sustained the objection,

14    Judge.  I'm not going to say anything.

15          MR. NOVACK:  Well, not that one -- there's all

16    different kinds of words that can be used and all different

17    kinds of things that can be said.

18          MR. S. KULWIN:  Well, I will say that I did not say

19    it to get on the Internet.  I said it to make an argument.

20    That's all I'll say.  You sustained the objection.  You

21    thought it was wrong and it's done.

22          THE COURT:  Behave during your rebuttal, please.

23          MR. S. KULWIN:  I will, Judge.

24          THE COURT:  Bring in the jury, please.

25    (Jury in.)

Novack - Argument

2115

1          THE COURT:  You may be seated.

2          Ladies and gentlemen, Mr. Novack is going to finish

3     his closing argument.  Then we will hear a rebuttal from the

4     plaintiff, and then I will instruct you on the law.

5          ARGUMENT ON BEHALF OF THE DEFENDANTS (Resumed)

6     BY MR. NOVACK:

7          Good afternoon, everybody.

8          Where I left off was I was just introducing my

9     remarks about damages and saying that I'm not agreeing that

10    there should be any damages but just don't want to take things

11    for granted.

12         So let's talk about emotional distress damages first.

13    Now, what are they?  It's not just that a plaintiff is

14    emotional.  There has to be distress.  There has to be

15    consequences.  For example, headaches or sleeplessness or

16    stomach problems or hives or neuroses, can't get out of bed in

17    the morning, can't go to work, doctors' visits, other

18    symptoms, if you will.  Consequences.

19         And that's what you have not heard one word about.

20    All you heard was the plaintiff saying, I thought I was in

21    never-never land.  That's just because she says she couldn't

22    believe what happened.  That's not emotional distress.

23         She said she thought things were topsy-turvy.  Same

24    thing.

25         She said she was angry.  Well, if somebody does

Novack - Argument

2116

1    something that you don't think is right and you get angered,

2    that doesn't mean you suffer emotional distress.  We've all

3    been angry.  And she had no consequences.

4         She said she felt conned.  Well, that's just her view

5    on what happened.  But, again, she doesn't say how that caused

6    her emotional distress or any consequences.

7         Same with worry.

8         That's all.  That's it.  That's what you heard.

9         The other things about worrying about how to get her

10   husband taken care of while she's here on trial and things

11   that happened during litigation, the judge is going to

12   instruct you, she does not get emotional distress damages for

13   anything that happened as a result of litigation.

14        Now, what don't we have?  What don't we have?  You

15   didn't have -- she didn't bring in a single family member to

16   say that she was involved in emotional distress.  She didn't

17   bring in any medical personnel, no doctors, no nurses, no

18   psychologists, no psychiatrists to say it.  She doesn't even

19   say she had to go to a doctor.  She didn't say she missed a

20   single day of her business activities or anything else.  We

21   can assume from the fact that she didn't say that, none of

22   that happened.

23        So let me show you the instructions that relate to

24   emotional distress damages.

25        No. 2, first, please.

Novack - Argument

2117

1          And this one actually relates to all compensatory

2    damages.  You'll see the whole thing in the jury room, and

3    you'll hear the judge read it.  I'm just going to focus on the

4    second sentence, which says, Your award must be based on

5    evidence and not speculation or guesswork.

6          No. 1, please.

7          I'm going to read the -- this entirely.  Plaintiff

8    must prove demonstrable emotional distress in order to recover

9    damages for emotional distress.

10          In other words, demonstrable, the kinds of things I

11    was talking about.  Consequences.

12          She cannot establish emotional distress damages based

13    simply on conclusory statements regarding emotional damages.

14          But that's all you heard.

15          Plaintiff cannot recover for any emotional damages

16    caused by her decision to bring this lawsuit.

17          Exactly what I had said.

18          And then No. 4.

19          No. 4 says, Any figures proposed by counsel in their

20    arguments are not evidence as to the amounts of damages you

21    should award, but rather constitute arguments, which you are

22    free to disregard in your deliberations.

23          With respect to emotional damages, you heard a

24    $500,000 number.  There was no explanation how he came up with

25    that number.  He could have said $2.  He could have said $2

Novack - Argument

2118

1    zillion.  There's not any evidence that one penny was spent

2    because of this alleged but non-existent emotional damages.

3            Turn to punitive damages for a moment.  The

4    instructions will tell you that you must find that defendants'

5    conduct was fraudulent, intentional or willful and wanton.

6    It's not enough just to find liability under the Consumer

7    Fraud Act.

8            The instructions will show you -- and let's put up

9    No. 3 real quick.

10           And the very first sentence proves that point.  The

11   judge is going to instruct you that in addition to

12   compensatory damages, the law permits you under the Fraud Act

13   claim, under certain circumstances, to award punitive damages.

14           So there has to be certain circumstances.  Something

15   special, something beyond simply finding the liability.  If

16   that was enough, we wouldn't be having that kind of an

17   instruction.  So you have to find that there was something

18   particularly egregious here that would merit punitive damages.

19           The instruction goes on to give you a list of things

20   that you should consider in deciding whether punitive damages

21   are meritorious.  And I won't go over every one, but letter B,

22   the vulnerability of the plaintiff.  Well, Mrs. Goldberg was

23   not particularly vulnerable here.  She had a lawyer.  She read

24   all the documents.  Her eyes were wide open.  She knew

25   everything that was going on.  That does not apply.

Novack - Argument

2119

1          No. D -- I'm sorry, E, whether the harm was physical

2    as opposed to economic.  Well, here, it was all economic.

3    There's no physical injuries.

4          F is whether defendants tried to conceal the

5    misconduct.  Well, there was no concealment here.  The

6    contract spelled out in as clear as terms as possible that the

7    seller was reserving the right to make these changes.  And

8    when Mrs. Goldberg signed that contract, knowing that, she

9    therefore was aware that these changes could happen.  There

10   was no concealment.  It wasn't the changes came out without

11   telling her they could be made.  She knew the changes could be

12   made.  And when the amendment did come out, the fourth

13   amendment, the changes were fully and publicly disclosed.

14   Again, in as clear as terms as possible.  So nothing was

15   concealed in this case.

16         And there's nothing special here because in this

17   case, it's the opposite.  She was told the changes could come.

18   She voluntarily, after she couldn't get it changed, took the

19   risk that a change that she didn't like could be made.  And

20   that's all that happened.  It's exactly what she expected.

21   And these matters couldn't have been material because if those

22   common elements, the specific ones, were so material to her,

23   she wouldn't have signed a contract that said that they could

24   be changed.  This does not arise to anywhere near the level

25   necessary for punitive damages.

Novack - Argument

1          The final thing I'll say about punitive damages is,

2    counsel said something like, you ought to send a message.

3    Send a message to this world of financiers.  Stop doing these

4    bad things.  Well, when the instruction says that you can

5    award an amount necessary to punish these defendants and

6    discourage them or others from this kind of wrongful conduct,

7    it's talking about the facts of this case.  The facts of this

8    case.  This isn't the chance for you to decide that Wall

9    Street is bad or you're sick of the stock market issues and

10   we're going to show these fat cats.  That's not what your job

11   is.  Your job is to deal with the facts and the circumstances

12   of this case.  And when you consider all this evidence, even

13   if you were to find liability -- which, again, we don't think

14   you should -- there aren't the kinds of extenuating

15   circumstances or aggravated wrongs here that would merit

16   punitive damages.

17          In the end on damages, ladies and gentlemen, if you

18   should find -- and I hope you don't and I don't think you

19   should -- liability here, then put her in the position she

20   would have been in had she discovered these things during that

21   ten-day period.

22          What would have happened if she had learned during

23   the ten-day period that there was an intention to take these

24   common elements away?  She wouldn't have made the deal, she

25   says.  She would have gotten her earnest money back.  That's

Novack - Argument

2121

1   the meritorious award to be given if you should happen to find

2   for the plaintiff.  Nothing more.

3          In conclusion then -- oh, I'm sorry, there's one

4   more.  Put up No. 4, please.

5          This is the last instruction I'll show you.  And this

6   relates to two numbers that you heard, the $500,000 figure for

7   alleged emotional distress, and the $5 million figure for

8   punitive damages.  And the instruction that the judge is going

9   to read to you says, Any figures proposed by counsel are not

10  evidence as to the amounts of damages you should award, but

11  rather constitute arguments, which you're free to disregard in

12  your deliberations.

13         So if you should decide to give emotional distress

14  damages or punitive damages -- and, again, I just say to you

15  that that would not be appropriate under the evidence -- don't

16  just take his number for it.  He hasn't shown you how you get

17  that number.  Don't listen to that number.

18         So in conclusion, we're sort of back where we

19  started.  Mrs. Goldberg went into this deal with her eyes wide

20  open.  The benefit of counsel.  She knew that the common

21  elements could change.  She assumed the risk that a change

22  that she didn't like could occur.

23         Now that exactly what she said defendants could do

24  has happened, she does not deserve anything.  You should find

25  not guilty under the circumstances.  There's only one possible

Kulwin - Closing Argument

2122

1   verdict, and that is not guilty.

2        When I stop now, Mr. Kulwin gets another period of

3   time to talk to you.  I cannot come back up and rebut.

4   Please, remember what I said, remember what the evidence was,

5   be my eyes and ears to what he's saying.  Don't just agree

6   because he's saying it.  And please ignore his repeated pleas

7   for sympathy.  You swore an oath not to decide this case on

8   the basis of sympathy but only on the evidence.  And I think

9   when you look at only the evidence, your verdict will be not

10  guilty.

11       Thank you again for all the attention.  You were very

12  attentive during a very lengthy closing argument, and I really

13  appreciate it.  My clients and I will be ever grateful that

14  you did this regardless of the verdict.

15       Thank you very, very much.

16       THE COURT:  Mr. Kulwin, rebuttal.

17       MR. S. KULWIN:  Thank you, your Honor.

18        CLOSING ARGUMENT ON BEHALF OF THE PLAINTIFF

19  BY MR. S. KULWIN:

20       Ladies and gentlemen, there's a number of points I

21  want to make.  I intend to be quick about it, but they are

22  important points.  And you've exercised spectacular patience

23  up until this point.  And I very much appreciate it and Jackie

24  does too.  So just for a few minutes.

25       First things first, not guilty?  This isn't a

Kulwin - Closing Argument

2123

1    criminal case.  It's a civil case.  The standard is more

2    likely true than not.  So let's just start there.  Okay.

3         Counsel spent a great deal of time talking about the

4    contract clause.  He began with it, he talked a lot about it,

5    and he just finished with it.  All this talk about she went in

6    with her eyes opened, she assumed the risk that something

7    could happen, she knew they could make changes.  I don't get

8    it.

9         Jeff, could we have it up?

10        He tells you all this while simultaneously telling

11   you this -- bring it down a little bit, Jeff.

12        To satisfy the first element of the fraud claim, a

13   material deceptive act, plaintiff must prove by a

14   preponderance of the evidence -- more likely true than not --

15   that defendants knew and failed to disclose and/or

16   misrepresented information about the hotel condominiums or

17   HCUs before the plaintiff signed the purchase agreements.

18        Before.  Before.  Before.

19        What in God's name does the contract clause have to

20   do with it if everything we're trying to decide is before she

21   signs the contract?

22        Let me tell you what it has to do with.  Nothing.

23   Zip.  So why does he keep bringing it up over and over and

24   over and over and over and over and over again?  My God, he

25   hasn't stopped talking about it for eight days when he knows

Kulwin - Closing Argument

2124

1    that's the law.  And he just put -- that's the same law on the

2    Interstate Land Act.  Why does he do it?  He does it because

3    he's hoping that one of you, some of you, or all of you will

4    go back into the room, forget what the case is about and say

5    this:  Well, you know, she did sign a contract.  They can make

6    changes.  Buyer beware.  That's life.  She's a sophisticated

7    person.

8         How many times did he mention $11 million?

9    $11 million.  He must have talked about it 40 times.  You

10   would think she's Donald Trump.  How many times did I mention

11   his wealth?  Once.  They're the ones who want to make the case

12   about who's wealthy and who's not.

13        Let's be clear here.  What's relevant there is

14   exactly two things.  What did they know before she signed the

15   contracts, what didn't she know before they signed the

16   contracts -- she signed the contract.  Everything else is a

17   bunch of hooey.

18        And let me say this:  Then they try to mix it all up,

19   throw it in the air and confuse you even more because then he

20   says, oh, well, Levin says the changes happened afterwards;

21   what happens afterwards is completely irrelevant because she

22   signed -- what?  Whoa.  Whoa.

23        What Levin said was -- Levin said the custom and

24   practice in the industry is that sophisticated developers like

25   Trump make up their minds about what's going into the common

Kulwin - Closing Argument

2125

1    elements before a shovel hits the ground because they want to

2    know what's going on.  That's, well, the first thing he said.

3    He then said, in all of my experience in 30 years in the real

4    estate business, managing thousands of properties and doing

5    over 50 condominium -- luxury condominium conversions, unlike

6    Mr. Howie and his four or five, okay, I've never seen the

7    common elements get ripped out like this.  Ever.

8          So, once again, the defendants try to focus on one

9    little thing and do what?  Mislead.  Misrepresent.  It just

10   keeps going.

11         What he's saying is, look, custom and industry.  You

12   always decide.  Look, I've never seen it before.  It's

13   mind-boggling.  Put the two together.  If they always decide

14   and I've never seen it and then it happens, what does that

15   tell me?  It tells me they misrepresented in the first ones

16   because they -- it only makes sense, they had to have planned

17   this before.  Based on custom and industry.  He doesn't say I

18   know that's their intent.  He puts it together from the facts.

19   You can do the same.

20         Okay.  Now, on and on -- seriously?  Really?  Did he

21   stand up here and try to convince you that he didn't say what

22   he said in opening statement and that it still makes sense?

23   Did he really try to convince you that Jackie Goldberg

24   actually did think that Trump was right when he took this

25   stuff away and that's what she was writing in that e-mail?

Kulwin - Closing Argument

2126

1    Really?  After he knows, we know, everybody knows, that there

2    was an article in the Chicago Tribune two days before she

3    writes the e-mail about other buyers who have sued Trump for

4    the very same thing.  Is he really trying to still tell you,

5    well, maybe she really was thinking about her case?  Come on.

6           Ladies and gentlemen, view all of their recollection

7    of the evidence and all of their spins on the evidence through

8    that particular prism.

9           I'm eliminating things.

10          Okay.  Oh, counsel says Mr. Trump didn't say it would

11   be a disaster if they owned it; he said if they operate it.

12   Oh, no, no, no, no, no, no, no, no, no.  No.  You saw it in

13   the video in opening statement.  I asked him:  So, sir, what

14   you're really saying is -- what you're really saying is --

15          MR. NOVACK:  Objection, Judge, to the transcript.

16          THE COURT:  What are you reading --

17          MR. NOVACK:  You said we could not read from --

18          MR. S. KULWIN:  I'm refreshing my recollection.

19          THE COURT:  He said he is refreshing his

20   recollection.  He is not reading.

21          MR. NOVACK:  Okay.

22          THE COURT:  And if that is the deposition transcript,

23   that is not in evidence.

24          MR. S. KULWIN:  I'm refreshing my recollection of

25   what I said in opening statement.

Kulwin - Closing Argument

2127

```
 1              THE COURT:  Okay.
 2   BY MR. S. KULWIN:
 3              And what was said was, I asked him:  So what you're
 4   saying, sir, is if they operate it, it's bad for the hotel?
 5   And he said, I didn't say operated.  I said owned it.
 6   Directly.  That's what he said.
 7              MR. NOVACK:  Judge, that's a misstatement of the
 8   evidence.
 9              MR. S. KULWIN:  It's not a misstatement.
10              THE COURT:  Ladies and gentlemen, your recollection
11   of what the evidence is is what controls here.  You are just
12   hearing lawyer argument now.
13   BY MR. S. KULWIN:
14              Here's another -- here's another way to twist
15   something.  They try to make Terry Vogue look like she's
16   biased.  Let's listen.  Let's call it like it is.  Is she
17   close with Jackie?  Yeah.  That's how she could observe what
18   affected her.  Does she love her?  Yes, she probably does.
19   They've known each other for many, many years.  But according
20   to counsel, she's making $75 a unit times seven units for
21   doing nothing.  Check your notes.  $75 a month, not $75.
22              And when we're talking about bias and getting paid,
23   what the heck do you think Mr. Petrus is getting paid?  How
24   much money is he making?  And who paid for his airfare out
25   here?  And who represents him?  And who with his dark, silvery
```

1    voice kept arguing with me time and time again while he made

2    closing arguments to you; you know, you're really misleading

3    these folks here and misrepresenting them; I feel badly that

4    you're misrepresenting these folks.  What a bunch of hooey

5    that was.  I couldn't tell if that guy was a hotel manager or

6    direct from central casting.

7         Then there's this one -- whoa.  Check this one out.

8    Let's see.  Mr. Trump -- Mr. Trump couldn't remember -- where

9    is it, Jeff, this one?

10        He couldn't remember on October 19th, 2011, who told

11   him, oh, great idea, we should take these out of the common

12   elements.  Couldn't remember.  Then he couldn't remember on

13   April 18th, 2012.  So almost a year exactly apart.  Now, both

14   of these are under oath.  So he's literally sitting down at a

15   desk in his office going, hmm, who told me about that?  I

16   can't remember.  I got an idea.  I'm sitting in my office.  I

17   have all the time in the world.  Maybe I'll ask some people.

18   No.  Under oath, under penalties of federal perjury, he signed

19   it, I don't remember.

20        Then he gives a deposition under oath, under

21   penalties of federal perjury with his lawyer sitting right

22   there -- and not in my office, folks.  In his boardroom.  I

23   had to fly there.  He did not come here.  Who told you,

24   Mr. Trump?  I don't remember.  And then counsel says, what's

25   wrong with that?  What's wrong with twice under oath saying

Kulwin - Closing Argument

2129

1    black and then walking into court under oath and saying white?

2    What's wrong with that?  What's wrong with that?  What's wrong

3    with just chatting it up with one of your fellow buddies,

4    going, you know, I can't really remember this, can you?  I got

5    a -- he goes, it isn't the best way to refresh your

6    recollection?  No, that's not the best way to refresh your

7    recollection.  You know what the best way to refresh your

8    recollection is?  You go to the documents.  Let's look at a

9    memo from the meeting or I'll look at my calendar or maybe I

10   made a note.  Did Mr. Trump do -- oh, that's right.  Mr. Trump

11   can't do that.  He doesn't write things down; he gets things

12   done.  Come on now.  Really?  Seriously?  Are they really

13   trying to sell you on that?

14        That comment is emblematic of the Trump organization.

15   They do not get -- they do not understand that lying under

16   oath here or there or there is a big deal.  I lied under oath.

17   Gone.  Doesn't matter.  That is their ethic.  That is what

18   they do.  And that is what they did here.  That's why they

19   keep talking about, we've got the right to change, we've got

20   the right to change.  You know what they don't have the right

21   to do?  Lie.  Conceal.  Misrepresent.  And that's what

22   happened in this case.

23        Then there's this whole story about -- this whole

24   story about Jackie Goldberg did this because the real estate

25   crash, the real estate crash.  I got to tell you, I was

Kulwin - Closing Argument

2130

1    fascinated with all that testimony we heard through all the

2    experts about the real estate crash and the impact it had on

3    property values.  It was just stunning.  Didn't you all find

4    it interesting?  Oh, that's right; there wasn't any.  None.

5    Zero.  Oh, once again, the defendants, rather than actually

6    dealing with the facts, just make up the facts.

7         And they talk all about how -- how where's her

8    research, where's her research about -- about the common

9    elements and revenues when she's thinking about buying.  Where

10   is all that?  All she cares about is the rental rates.  Where

11   is the research?  And where is it in the brochures -- if it's

12   such a big deal, why isn't it in the brochures?

13        Two things.  Why does she need to do research on the

14   common elements revenue?  Why does she need to do that?  Guess

15   where it was.  I'll just use this as an example because I

16   don't want to go get it.  It was in the property report.

17   Remember?  You get $6 million of revenue, which you can assume

18   there's a profit on.  What more research does she have to do?

19   What, does she got to go call up the Ritz, how you guys doing?

20   She couldn't have gotten it.  Petrus is in the business and

21   couldn't get it.  What, is she supposed to hire PKF like they

22   did to find out it was expected to make two and a half million

23   dollars a year?

24        She could do research on rental rooms because she

25   makes a phone call.  And guess why she had to do that.

Kulwin - Closing Argument

2131

1    Mr. Shearer told you that.  Mr. Novack just talked about it, I

2    believe -- I can't recall but I think -- because the Trump

3    salespeople were not allowed to talk about revenue.  They

4    weren't allowed to give you predictions on how much you would

5    make on revenue in the marketing brochures or in their pitch.

6    So they got around it by just putting that beautiful,

7    delicious, tantalizing number in the property report for

8    sophisticated investors like her.

9         Remember, they -- Mr. Reiss talked about -- this

10   isn't just like a monolithic market.  There are some people,

11   condo at Trump Tower, sounds good to me, use it every once in

12   a while.  I'm not going to rent it.  I don't want people

13   sleeping in my bed.  I don't care what else it comes with.

14   I'm good with this.  Other people were going into it as an

15   investment.  Hello.

16        And what did Reiss say?  We put it in the property

17   report for those buyers who found buying an interest in a

18   hotel appealing, to attract them, that segment.  And that's

19   what Ms. Cremer said on the stand too.  That's why they put it

20   in the marketing material.  And he talks all about, it's not

21   in the marketing material, it's not in the marketing material.

22   Ms. Cremer said it was.  She pointed it out.  Award-winning

23   services.  I said, why is that there?  She said, to attract

24   people who are interested in buying an interest in a hotel.

25   Doesn't get any simpler than that.  It really doesn't.

Kulwin - Closing Argument

2132

1    She made up her mind before she ever went to the

2    first meeting?  What?  What?  She goes to the meeting.  She's

3    interested in buying hotel condo units because it's a

4    different type of investment.  Okay.  So how many times have

5    you gone to the store and said to yourself, gee, I think I'm

6    going to buy an Italian suit?  I've never had an Italian suit,

7    whether it's a female suit, a woman's suit or a blouse or even

8    to buy a necklace, whatever it is.  You think, I really want

9    to buy this.  You walk in.  You're thinking, this looks good.

10   This looks good.  And then they tell you, boy, are you lucky

11   you're here.  Why?  It's 40 percent off.  40 percent off.  Oh,

12   let's go.  I'm buying.  Right now, I am buying.  That's how it

13   works, ladies and gentlemen.  Anybody who has ever gone

14   shopping or been in a store knows that.  You're not in the

15   store unless you're interested in the first place.  But it's

16   what pushes you over the edge, what makes you buy, the grab,

17   the bait.

18       Now, sometimes the bait is not bait.  Thank God most

19   of the time -- or all I'd be doing for the rest of my life is

20   standing up in front of people like you -- 99 percent of the

21   time when you go into the place and they offer to sell you

22   something, thank God they actually sell it to you.  But that's

23   not what happened here.

24       Okay.  So they got a problem with laundry facilities.

25   What are they going to do?  There are none.  There never were

Kulwin - Closing Argument

2133

1    any plans for any.  It's an untrue statement.  It's false.

2    It's just that simple.  They knew it was false.  So what do

3    they come up with?  Get out your magnifying glasses.  You see,

4    if you look, there's those two words over there.  If

5    applicable.  What does that mean?  If applicable.  And, oh, by

6    the way, did anybody here testify about if inapplicable?  I

7    don't remember ever anyone saying if applicable.  Mr. Weiss

8    didn't say it in his deposition.  Mr. Petrus was on the stand

9    forever, never said anything about it.  Mr. Reiss never said

10   anything about it.  You know who testified about that?  You

11   just heard it.  Counsel for defense.  That's like a lawyer's

12   argument.  If applicable.

13          And if you don't like that -- if you're not sure I'm

14   right about that, let me ask you this:  If they absolutely,

15   positively knew there was no laundry facility in the hotel

16   ever, why put it in there?  Why?  Why would you do that if

17   you're not trying to tell people there are?  What?  Well,

18   maybe they'll guess that it's not applicable.

19          And, wait.  It gets better because when Mr. -- when

20   defense counsel wants the brochure -- when defense counsel

21   wants the hotel to be part of the residential, that's good.

22   When he doesn't want it to be, that's bad.

23          Let me give you an example.  So when Jackie Goldberg

24   said, I don't want to be partners with these guys, okay, I

25   don't trust them, what do you mean?  You closed.  We're

Kulwin - Closing Argument

2134

 1    partners.  We're in business.  You closed on a residential

 2    condo.  It's all one big deal.  Right?

 3              Put aside that there's no business partnership in a

 4    residential condominium, as defense counsel well knows.  Put

 5    aside that she's not, like, owning an interest of something

 6    being operated by the Trump Hotel that she's expecting revenue

 7    from.  Put all of that aside.  Okay.  It's got nothing to do

 8    with anything.  Why did Jackie Goldberg close on her

 9    residential condominium?  Here's a novel concept for those

10    folks out in New York at Trump, get this one --

11              MR. NOVACK:  I'm going to object, your Honor.  He's

12    mocking New York now.  He's done that over and over and over

13    again.

14              MR. S. KULWIN:  I can't mock New York?

15              THE COURT:  Overruled.  I think you are getting --

16    you need to bring it back in, Mr. Kulwin.

17              MR. S. KULWIN:  I thought it was every Chicagoan's

18    right to do that.

19    BY MR. S. KULWIN:

20              Okay.  Put that aside.  I'll stop mocking New York.

21    I'm sorry.  I love New York.  New York, New York.  Okay.  Put

22    that aside.

23              MR. NOVACK:  Judge, he's now just making it worse.

24              THE COURT:  I am going to strike the commentary.  The

25    jury should disregard it.

Kulwin - Closing Argument

2135

1          Let's move on, Mr. Kulwin.

2          MR. S. KULWIN:  Yes, ma'am.  Yes, your Honor.

3     BY MR. S. KULWIN:

4          Okay.  So here's a novel concept out at Trump Tower:

5     She closed because she had a valid contract that said you pay,

6     we deliver, you buy.  She didn't go, you ripped me off in the

7     last deal, I'm going to go get myself some fancy lawyer and

8     figure out a way out of here.  It wouldn't even occur to her.

9     I made a deal.  I might not like the people who sold it to me,

10    but I made a deal.

11         So it's November 2009.  Lehman Brothers has just

12    tanked.  The market's going down.  It's -- I don't know what

13    it is.  People are wondering whether there's any money coming

14    out of ATM machines.  And where is she?  She's at a closing

15    writing a check for 900,000 and whatever dollars to the Trump

16    organization who just got done ripping her off because that is

17    her commitment.  Hello, Trump.  Why don't you look it up?

18         MR. NOVACK:  Judge, before he -- I'd just like -- I

19    don't want to interrupt every time, but this over and over

20    again personal attacks --

21         MR. S. KULWIN:  Oh --

22         MR. NOVACK:  -- sarcasm, laughing --

23         MR. S. KULWIN:  Wait, wait.

24         MR. NOVACK:  -- it's not professional or appropriate.

25         THE COURT:  Whether it is objectionable as a legal

Kulwin - Closing Argument

2136

1    matter is separate from some of the issues you have raised.

2            Let's try to keep it to a rebuttal, to the facts in

3    the case, Mr. Kulwin.

4            MR. S. KULWIN:  Yes, Judge, I will.

5    BY MR. S. KULWIN:

6            So then there's this -- okay -- defense counsel --

7    and, by the way, I'm getting -- you heard that there are all

8    these personal attacks, personal attacks, personal attacks.

9    First of all, I've never personally attacked counsel.  I don't

10   even use his name.  He's the one who's always saying,

11   Mr. Kulwin told you this and Mr. Kulwin told you that.  So

12   let's just throw that out the door.  That's number one.

13           Number two, I don't care about Donald Trump.  I'm not

14   personally attacking him.  I don't even know the guy, other

15   than the six hours I spent with him here.  We're not buddies.

16   I'm not personally attacking him.  I'm talking about the

17   evidence.  The evidence.  He got on the stand and lied.

18   That's the evidence.  You decide.  You decide if the cockamamy

19   stories he told from the witness stand are worthy of belief.

20   Don't rule against him because you don't like him.  Who cares?

21   I don't care if you don't like him or not.  Judge whether he's

22   honest.  Judge whether he's the kind of guy you could think

23   would do what we're saying he did.  Judge whether the

24   circumstantial evidence in this case shows that this guy,

25   Donald Trump, was not going to give up $40 million of property

Kulwin - Closing Argument

2137

1    and go, you know, I never really thought about it.  Right.

2         Okay.  Then there's this:  Remember how counsel just

3    said that, oh, you know, the rotation system hasn't changed.

4    It hasn't changed.  You heard Mr. Petrus.  It hasn't changed.

5    Right now they're operating it and it's just the way as it was

6    in the fax.  You know what?  Petrus is right.  It is.  Here's

7    the misrepresentation.  Watch for the material omission.  Wait

8    for it.  Now.  Here's the material omission:  Why is it like

9    it now?  Why is it like it now the way it was in the fax?

10   Remember.  Think.  Because there was a vote.  That's why.

11   There was a vote.  Remember?  There was a vote among the

12   current owners who couldn't stand the idea of changing it from

13   the way it was.

14        MR. NOVACK:  Objection.  There's no evidence --

15        MR. S. KULWIN:  Absolutely.

16        THE COURT:  Again, ladies and gentlemen, your

17   recollection of what the evidence is in this case is what

18   controls here, not what the lawyers are saying.

19   BY MR. S. KULWIN:

20        That's why it changed.  That's exactly why it

21   changed.  And Trump lost the vote even though -- what does he

22   own?  A hundred units?  Everybody must have voted against it.

23   And when they talk about, don't you want to be able to give

24   the people for their honeymoon suite their room for that

25   occasional change?  It was like that before.  It was like that

Kulwin - Closing Argument

2138

1    before.  They had the discretion to change one room here or

2    there on those special occasions.  Although I have to tell

3    you, based on their conduct in this case, I got a feeling that

4    that bride and groom came in from North Dakota to get that

5    room, they'd end up in a broom closet in the basement for the

6    same price.

7             MR. NOVACK:  Objection, your Honor.

8             THE COURT:  Sustained.  I am going to strike that.

9             Mr. Kulwin --

10            MR. S. KULWIN:  Okay.

11   BY MR. S. KULWIN:

12            He talks about there's no -- we didn't prove any

13   intent.  We didn't prove any intent that they intended to

14   change the rotation system.

15            Who does this if they're not worried about something?

16   Who -- can you highlight this?

17            Who says, This agreement -- this is the rental

18   management agreement, the rotation point system.  This

19   agreement supersedes all oral statements and prior writings

20   with respect to the subject matter contemplated herein,

21   including, without limitation, any promotional items or

22   reference materials regarding the rental program, such as

23   frequently asked questions.

24            What are they worried about?  I could not talk to

25   you, I never talked to you, I have no interest in talking to

Kulwin - Closing Argument

2139

1    you about whether what they did is fair or unfair.  I could

2    care less.  They're the ones who keep talking about what is

3    fair or unfair.  They're the ones who keep talking about how

4    altruistic they were, how beneficial they were, protect the

5    buyers from horrors of -- the horrors and the degradation of

6    owning an interest in the Trump Hotel and the food and

7    beverage.  They're the ones that talked about that.

8          I'm only interested in one thing:  What did they know

9    and when did they know it.  What did they know and when did

10   they know it.  And I submit to you, the evidence has shown,

11   through circumstantial evidence, very strongly that Donald

12   Trump knew he was never going to go through with this deal

13   because he wouldn't give up $40 million of property or a

14   $6 million cash flow without even thinking about it unless he

15   knew one thing -- remember, he said I didn't even give it much

16   thought.  The only way he would do that is if he knew one

17   thing.  I got a contract clause, baby.  I am home free.  And

18   that's exactly what the circumstantial evidence in this case

19   shows.

20         Counsel mentioned that it's to be expected that

21   Mr. Trump might not remember all the details when he's on --

22   of what happened in 2006 or -- you know, when these elements

23   were being removed or in 2004 when they were being put into

24   the common elements or what the numbers were.  He's a very,

25   very busy guy.  I agree.  He's a very busy guy.  But, really?

Kulwin - Closing Argument

2140

1    Seriously?  This is a man who admitted on the stand the

2    following things:  It was my decision whether we would keep

3    the spire or not on the top of the building.  It was my

4    decision on what architect was going to be used.  I

5    interviewed them.  I hired them.  It was my decision about

6    what broker we were going to use.  I interviewed them and I

7    hired them.  It was my decision to sign every check that the

8    Trump organization issues.  Let's say that again.  Donald

9    Trump testified under oath, he signs every check the Trump

10   organization issues.  Signs every check but can't really

11   remember talking about giving away $40 million of property and

12   $6 million in cash flow.

13        And then there's this -- okay -- how detail-oriented

14   is this guy?  What kind of micromanager is this guy?  Every

15   photo that's used in every piece of marketing material -- at

16   least until Charlie Reiss was working there, which was for a

17   long, long time -- had to be brought up to Mr. Trump in his

18   office so he could examine it and make sure it looked the

19   right way.  And this guy gave away $40 million of property and

20   a $6 million cash flow without thinking about it?  I submit to

21   you, ladies and gentlemen, the evidence says it ain't so.

22        Counsel brought up this May 10th of 2007, onward -- I

23   didn't talk about it in my opening close, but as long as he

24   brought it up -- he said, oh, well, the lenders had to review

25   the property reports; what could they do?  What could they do?

Kulwin - Closing Argument

2141

1    What could they do?  What evidence did you hear that the

2    lenders could change anything to do with the common elements?

3    Nothing.  Zip.  Another one of counsel's testimonials

4    unsupported by any evidence whatsoever.

5          Here's what they could do:  They could do what they

6    did when they eliminated the office space and move people

7    down.  They could write them a letter saying, you know, this

8    change may be coming; you should know this.  They could tell

9    their brokers, you know, when you hand out the property

10   reports, you could put a slip in there that says, I know this

11   says they're in the common elements; we're contemplating a

12   change; if it's approved by our lenders, that won't be there.

13   They could do that in May.  They could do that in June.  They

14   could do that in July.  They could do that in August.  They

15   could do that in September.  They didn't do any of it.

16         And you know what's worse?  When I asked them, did

17   anybody happen to bring up at any of the meetings you were at,

18   you know, this kind of might be unfair to people who are

19   buying them?  No, we didn't even talk about it.  We didn't

20   even talk about it.  Welcome to Trump world.

21         You know, he sits up here and he puts up this Terry

22   Vogue e-mail; and he picks it apart like it's, you know, the

23   Dead Sea scrolls.  If you look at this one word here and that

24   one word there and you really kind of look at it the right way

25   and put a really deep magnifying glass on it, you know, you're

Kulwin - Closing Argument

2142

1    going to come to the conclusion that she's just an out-and-out

2    liar and that Jackie over here, she's just making it all up.

3    That's right, folks.  She came to federal court to make it all

4    up, to have fun; she's here for kicks.  Okay.

5          But you know what, ladies and gentlemen?  At least

6    Ms. Vogue and Ms. Goldberg have writings.  At least they have

7    them to look over.  When I asked Mr. Petrus how did you come

8    up with this idea -- if all of your projections -- PX 13 --

9    every one of your projections -- and he admitted it on the

10   stand -- every one of your projections is predicting profits,

11   profits, profits, from the F and B and all those things going

12   forward, where is the -- where are the documents that tell you

13   about these industry trends you're talking about that let you

14   know with your secret 3D glasses when you looked at that, oh,

15   yes, it all says profits but it could tank and, therefore, we

16   must take them away from the hotel owners to protect them?  He

17   said -- this is a direct quote -- he said, Do you mean a paper

18   trail?  Do you mean a paper trail?  I leave it to you to --

19   to -- oh, thanks.

20         That's what's gone; that's not what's left, right?

21   I'm almost done.

22         Okay.  Who asks a question like that?  He goes to the

23   top of that e-mail that Terry sends to Kiyoko Binosi and says

24   Jackie is okay if it's fair.  Well, there's a stunning

25   admission.  I'm okay with the rotation system if it's fair.

Kulwin - Closing Argument

2143

1   When you go back and look at it, look back at that first

2   sentence:  He can't do this.  It's wrong.  Terry conveniently

3   doesn't say to Kiyoko, Jackie is okay with you taking all the

4   hotel facilities and the revenue out of the common elements.

5   Because she wasn't because that's what that e-mail proves.

6          I just want to talk to you a couple of minutes about

7   damages.  Okay.  Just a couple of minutes.  And then I'm going

8   to be quiet and you'll literally never have to hear from me

9   again for --

10         MR. NOVACK:  Judge, I can't hear.

11         THE COURT:  Keep your voice up, please.

12  BY MR. S. KULWIN:

13         You will literally never have to hear from me again

14  for the rest of your lives, probably, unless by some miracle

15  we run into each other.  Okay.

16         All right.  Look, compensatory damages.  I don't know

17  how to value what a fraud victim experiences when they lose

18  their trust, when they get conned, when they get ripped off.

19  I want you people to use your common sense.  Draw on your life

20  experiences.  Evaluate Ms. Goldberg on the stand, how she

21  appeared, how she said it.  Evaluate Terry Vogue.  It's up to

22  you to decide whether she was lying or not.  Go ahead and

23  evaluate it.

24         If you want to fault her for not going to a shrink,

25  for not coming in here and complaining about I've got

Kulwin - Closing Argument

2144

1    neuroses, I've got neuralgia, I got backaches, I cry, you want

2    to fault her for that, for being a strong person and doing the

3    best she could?  That's up to you.  You make that decision.

4    You use your common sense.  I trust you.  You do what you

5    think is right.  I suggested $500,000.  He's got a complaint?

6    He's got a complaint about how I came up with the number?

7            The defense didn't seem to have much of a complaint

8    about the fact that Mr. Petrus couldn't figure out how he came

9    up with the $500,000 F and B fee.  How'd he come up with that?

10   Where's the analysis on that?  Where's the documentation of

11   that?  There isn't any.  Because you know what it was?  It was

12   just something to make people not see what Trump was doing.

13   So I submit to you, that is up to you.  And I do not take

14   issue with any of the instructions he brought up.  Absolutely

15   right.  I'm not the judge.  You're the judge of the facts.

16           Punitive damages?  I don't know how -- I'm getting

17   old, but I was here this morning and I think I remember

18   everything I said.  When did I ever talk about financiers?

19   When did I ever talk about fat cats on Wall Street?  I never

20   talked about any of those things.  I talked about a cadre of

21   people who believed that the ends justified the means; who

22   believed that it's not what you do but whether you can get

23   away with it; who believe that if you get caught, you don't

24   own up to it.  You spin, you evade, you confuse, you distract,

25   you bring up the litigation and you hope they give up.  That's

Kulwin - Closing Argument

2145

1   what I said.  And as sure as I am standing here, you folks can

2   send a message to those people.  And as sure as I am standing

3   here, there's a lot of people who need that message,

4   including --

5           MR. NOVACK:  Judge, objection.  There's no evidence

6   in the record of anybody other than the defendants in this

7   case.

8           THE COURT:  Sustained.  You are going beyond.

9   BY MR. S. KULWIN:

10          As sure as I am standing here, there are people who

11  need that message.  And you can send it.

12          MR. NOVACK:  Judge, I just --

13          MR. S. KULWIN:  Judge, I am allowed --

14          MR. NOVACK:  Objection was sustained.

15          MR. S. KULWIN:  -- to argue deterrence.  That's what

16  the instruction says.  I don't have to identify a specific --

17  do you want me to name names?

18          THE COURT:  No.

19          MR. S. KULWIN:  I'm not going to.

20          THE COURT:  I know.  You are not going to.

21          Ladies and gentlemen, shortly, very soon, I will

22  instruct you on the law, including the law on punitive

23  damages.

24  BY MR. S. KULWIN:

25          Indeed, ladies and gentlemen, the judge is right --

Kulwin - Closing Argument

2146

1    and please look at the verdict forms.  Don't trust me.  That's

2    what they say.  Okay.  So there's that.

3          She's not vulnerable because she went in with her

4    eyes open?  She's vulnerable because she went in with her eyes

5    open and guess what?  They were holding something in the other

6    room she didn't know about.  That's what makes her vulnerable.

7          They didn't conceal?  What were those performances by

8    Mr. Petrus and Mr. Trump on the stand?  What is the $500,000?

9    You know, they talked a lot about, oh, we didn't decide this

10   till May of '07.  And for a while there, they were riding that

11   horse -- there was that document.  You're probably going to

12   see it when you go back there.  That budget.  Look, it still

13   says $5 million in the -- in the -- I waited for it and waited

14   for it and he never brought it up.  You want to know why?  You

15   want to know why he never brought it up?  Because then he

16   would have to answer this question -- he knew I would get up

17   and say, well, where's the memo of the meeting that followed

18   the next day asking about -- talking about that very --

19   where's the memo of the meeting?  What are you really talking

20   about with that budget?  Why else would you leave out some

21   piece of evidence that you thought was so critical to your

22   case?

23          Ladies and gentlemen, your patience has been

24   astonishing.  I don't know how jurors do it.  I really don't.

25   It's tough.  And you've been great.  And you've been great for

1   this whole week.  And I want to conclude with two things.

2          Trying cases sometimes, it can be a passionate

3   business.  And I, as some of you may have noticed, can be a

4   passionate person and somewhat zealous and possibly even

5   aggressive and possibly even more aggressive.  That's

6   possible.  If I have done anything during the course of this

7   trial or through any of these proceedings that bothered any of

8   you, accept my apologies.  But do me a favor, don't hold it

9   against her.  Hold it against me.  Go home and say that lawyer

10  is a big jerk.  Don't hold it against -- don't hold it against

11  her.  Hold it against me.  Because you know what I know?  I

12  know this:  If you folks look at the facts, if you use your

13  common sense, if you put it all together and don't get

14  distracted by all the folderol that we have seen for the last

15  ten days, which is part of why I get the way I get, if you do

16  that -- and I know you're doing that -- I am going to sleep

17  like a baby tonight, like a real baby tonight.

18         On behalf of myself, on behalf of Jeff and Christina

19  and Mike and most importantly Jackie Goldberg and her family,

20  thank each and every one of you very much.  And good luck.

21         I'm done.

22         THE COURT:  Ladies and gentlemen, you have seen and

23  heard all the evidence and arguments of the attorneys.  Now I

24  will instruct you on the law.  I will also give each one of

25  you a set of these instructions back in the jury room.

Jury Instructions

2148

1        You have two duties as a jury.  Your first duty is to

2  decide the facts from the evidence in the case.  This is your

3  job and yours alone.

4        Your second duty is to apply the law that I give you

5  to the facts.  You must follow these instructions even if you

6  disagree with them.  Each of the instructions is important and

7  you must follow all of them.

8        Perform these duties fairly and impartially.  Do not

9  allow sympathy, prejudice, fear or public opinion to influence

10  you.  You should not be influenced by any person's race,

11  color, religion, national ancestry or sex.

12        Nothing I say now and nothing I said or did during

13  the trial is meant to indicate any opinion on my part about

14  what the facts are or about what your verdict should be.

15        In this case the defendants, 401 North Wabash Venture

16  LLC and Trump Chicago Managing Member, LLC, are corporations.

17  All parties are equal before the law.  Corporations are

18  entitled to the same fair consideration that you would give

19  any individual person.

20        The evidence consists of the testimony of the

21  witnesses, the exhibits admitted in evidence, and the

22  stipulations.

23        A stipulation is an agreement between both sides that

24  certain facts are true.

25        Certain things are not to be considered as evidence.

1   And I will list them for you.

2          First, if I told you to disregard any testimony or

3   exhibits or struck any testimony or exhibits from the record,

4   such testimony or exhibits are not evidence and must not be

5   considered.

6          Second, anything that you may have seen or heard

7   outside the courtroom is not evidence and must be entirely

8   disregarded.  This includes any press, radio, Internet or

9   television reports you may have seen or heard.  Such reports

10  are not evidence, and your verdict must not be influenced in

11  any way by such publicity.

12         Third, questions and objections or comments by the

13  lawyers are not evidence.  Lawyers have a duty to object when

14  they believe a question is improper.  You should not be

15  influenced by any objection, and you should not infer from my

16  rulings that I have any view as to how you should decide the

17  case.

18         Fourth, the lawyers' opening statements and closing

19  arguments to you are not evidence.  Their purpose is to

20  discuss the issues and the evidence.  If the evidence as you

21  remember it differs from what the lawyers said, your memory is

22  what counts.

23         Any notes you have taken during this trial are only

24  aids to your memory.  The notes are not evidence.  If you have

25  not taken notes, you should rely on your independent

Jury Instructions

2150

1   recollection of the evidence and not be unduly influenced by

2   the notes of other jurors.  Notes are not entitled to any

3   greater weight than the recollections or impressions of each

4   juror about the testimony.

5        In determining whether any fact has been proved, you

6   should consider all of the evidence bearing on the question

7   regardless of who introduced it.

8        You will recall that during the course of this trial,

9   I instructed you that I admitted certain evidence for a

10  limited purpose.  You must consider this evidence only for the

11  limited purpose for which it was admitted.

12       You should use common sense in weighing the evidence

13  and consider the evidence in light of your own observations in

14  life.

15       In our lives we often look at one fact and conclude

16  from it that another fact exists.  In law we call this an

17  inference.  A jury is allowed to make reasonable inferences.

18  Any inference you make must be reasonable and must be based on

19  the evidence in the case.

20       You may have heard the phrases direct evidence and

21  circumstantial evidence.  Direct evidence is proof that does

22  not require an inference, such as the testimony of someone who

23  claims to have personal knowledge of a fact.  Circumstantial

24  evidence is proof of a fact or a series of facts that tends to

25  show that some other fact is true.

Jury Instructions

2151

1          As an example, direct evidence that it is raining is

2    testimony from the witness who says, "I was outside a minute

3    ago and I saw it raining."  Circumstantial evidence that it is

4    raining is the observation of someone entering a room carrying

5    a wet umbrella.

6          The law makes no distinction between the weight to be

7    given to either direct or circumstantial evidence.  You should

8    decide how much weight to give to any evidence.  In reaching

9    your verdict, you should consider all the evidence in the

10   case, including the circumstantial evidence.

11         You must decide whether the testimony of each witness

12   is truthful and accurate in part, in whole or not at all.  You

13   must also decide what weight, if any, you give to the

14   testimony of each witness.

15         In evaluating the testimony of any witness, including

16   any party to the case, you may consider, among other things,

17   the ability and opportunity the witness had to see, hear or

18   know the things that the witness testified about; the witness'

19   memory; any interest, bias or prejudice the witness may have;

20   the witness' intelligence; the manner of the witness while

21   testifying; and the reasonableness of the witness' testimony

22   in light of all the evidence in the case.

23         You may consider statements given by a party or

24   witness under oath before trial as evidence of the truth of

25   what he or she said in the earlier statements, as well as in

Jury Instructions

2152

1   deciding what weight to give his or her testimony.

2          With respect to other witnesses, the law is

3   different.  If you decide that, before the trial, one of these

4   witnesses made a statement that is inconsistent with his

5   testimony here in court, you may consider the earlier

6   statement only in deciding whether his or her testimony here

7   in court was true and what weight to give to his or her

8   testimony here in court.

9          In considering a prior inconsistent statement, you

10  should consider whether it was simply an innocent error or an

11  intentional falsehood and whether it concerns an important

12  fact or an unimportant detail.

13         It is proper for a lawyer to meet with any witness in

14  preparation for trial.

15         You may find the testimony of one witness or a few

16  witnesses more persuasive than the testimony of a larger

17  number.  You need not accept the testimony of the larger

18  number of witnesses.

19         The law does not require any party to call as a

20  witness every person who might have knowledge of the facts

21  related to this trial.  Similarly, the law does not require

22  any party to present as exhibits all papers and things

23  mentioned during the trial.

24         You have heard witnesses give opinions about matters

25  requiring special knowledge or skill.  You should judge this

Jury Instructions

2153

1    testimony the same way that you judge the testimony of any

2    other witness.  The fact that such person has given an opinion

3    does not mean that you are required to accept it.  Give the

4    testimony whatever weight you think it deserves, considering

5    the reasons given for the opinion, the witness' qualifications

6    and all of the other evidence in the case.

7            Certain demonstrative exhibits have been shown to

8    you.  Those exhibits are used for convenience and to help

9    explain the facts of the case.  They are not themselves

10   evidence or proof of any facts.

11           You must give separate consideration to each claim

12   and each party in this case.

13           When I say a particular party must prove something

14   "by a preponderance of the evidence," or when I use the

15   expression "if you find" or "if you decide," this is what I

16   mean:  When you have considered all of the evidence in the

17   case, you must be persuaded that it is more probably true than

18   not true.

19           If you decide for the defendants on the question of

20   liability, then you should not consider the question of

21   damages.

22           During the course of the trial, you have seen that

23   the attorneys and witnesses sometimes referred to a numbering

24   system which appears on some documents used during the trial.

25   These numbers were placed on the documents by the parties to

Jury Instructions

2154

1    keep track of documents for purposes of the case.

2         A deposition is the sworn testimony of a witness

3    taken before trial.  The witness is placed under oath to tell

4    the truth and lawyers for each party may ask questions.  The

5    questions and answers are recorded.

6         The deposition of Andrew Weiss was taken on

7    July 20th, 2011, and was presented to you during the trial.

8    Deposition testimony is entitled to the same consideration and

9    is to be judged, insofar as possible, in the same way as if

10   the witness had been present to testify.

11        Do not place any significance on the behavior or tone

12   of the voice of the person who read the questions or answers.

13        The defendants, 401 North Wabash Venture LLC and

14   Trump Chicago Managing Member, LLC, are corporations and can

15   act only through their officers and employees.

16        Any act or omission of an officer or employee within

17   the scope of his or her employment is the act or omission of

18   the corporation.  An employee is acting within the scope of

19   his or her employment if:

20        A, the employee's conduct is of a kind he or she is

21   employed to perform or reasonably could be said to have been

22   contemplated as part of his or her employment; and, B, the

23   employee's conduct occurs substantially within the authorized

24   time and space limits of his or her employment; and, C, the

25   employee's conduct is motivated, at least in part, by a

Jury Instructions

2155

1    purpose to serve the employer.

2          A corporation knows what its employees know about

3    subjects that are within the scope of their duties and

4    responsibilities.

5          You should decide this case based on the claims

6    asserted by the plaintiff against the defendants in this case.

7    You should not consider or speculate about whether other

8    parties could have brought suit against defendants or whether

9    other parties may be responsible under the claims plaintiff

10   alleged.

11         An agent is a person, such as an attorney or a real

12   estate broker, who, by agreement with another, called the

13   principal, represents the principal in dealings with third

14   persons or transacts business, manages some affair or does

15   some service for the principal.

16         The actions of the agent within the scope of her

17   authority are considered to be the actions of the principal.

18         An agent is acting within the scope of her authority

19   if she is engaged in an activity which has been assigned to

20   her by her principal or if she is doing anything that may

21   reasonably be said to have been contemplated as part of that

22   activity which benefits the principal.  It is not necessary

23   that an act or failure to act must have been expressly

24   authorized by the principal.

25         No party in this case contends that any other party

Jury Instructions

2156

1   destroyed or failed to produce documents as required.  Any

2   absence of documents does not create an inference of any

3   party's destruction or failure to produce documents.

4          This lawsuit arises out of two purchase agreements

5   that plaintiff entered into with the defendant 401 North

6   Wabash Venture LLC to buy two luxury hotel condominium units,

7   or HCUs, in the Trump Tower.  Plaintiff claims that defendants

8   induced her to sign the purchase agreements by representing

9   and/or concealing important facts about the hotel condominium

10  and HCUs.

11         Defendants deny that they misrepresented or concealed

12  information.

13         You will be considering two claims alleged by

14  plaintiff.  The first claim alleges that defendants violated

15  the Illinois Consumer Fraud and Deceptive Business Practices

16  Act.  The second claim alleges that defendants violated the

17  federal Interstate Land Sales Full Disclosure Act.  Defendants

18  deny each of these claims.  I will now explain each of the two

19  claims in greater detail.

20         Plaintiff claims that defendants violated an Illinois

21  statute called the Consumer Fraud and Deceptive Business

22  Practices Act, or the Fraud Act as I will refer to it.  I will

23  refer to it as the Fraud Act claim in these instructions.

24         The Fraud Act statute prohibits deceptive acts,

25  including the use or employment of any deception, fraud, false

1  pretense, false promise, misrepresentation or the concealment,

2  suppression or omission of any material fact with intent that

3  others rely upon the concealment, suppression or omission.

4       To prove a violation of the Fraud Act, plaintiff must

5  prove each of the following elements by a preponderance of the

6  evidence:

7       One, defendants engaged in a material deceptive act;

8  two, defendants intended for plaintiff to rely on the

9  deception; three, the deception occurred in a course of

10  conduct involving trade or commerce; four, plaintiff sustained

11  actual damages; and, five, such damages were proximately

12  caused by defendants' deception.

13       If you find that plaintiff proved each of these

14  elements, then you must find in favor of plaintiff and against

15  the defendants on the Fraud Act claim and then consider the

16  issue of damages.

17       If you find that plaintiff has not established one or

18  more of these elements, then you must find in favor of the

19  defendants and against plaintiff on the Fraud Act claim and

20  you will not consider the issue of damages.

21       To satisfy the first element of the Fraud Act claim,

22  a material deceptive act, plaintiff must prove by a

23  preponderance of the evidence that defendants knew and failed

24  to disclose and/or misrepresented information about the hotel

25  condominium, or HCUs, before plaintiff signed the purchase

1   agreements.

2         The deception must have been material to the

3   plaintiff.  Deception is material where a buyer would have

4   acted differently knowing the information or if it concerned

5   the type of information upon which a buyer would be expected

6   to rely in making a decision whether to purchase.

7         Regarding the second element of the fraud claim, that

8   defendants intended for plaintiff to rely on the alleged

9   deception, plaintiff must prove by a preponderance of the

10  evidence that defendants knew and failed to disclose and/or

11  misrepresented material facts for the purpose of inducing

12  plaintiff to sign the purchase agreements.

13        With respect to the third element of the Illinois

14  Consumer Fraud and Deceptive Practices Act claim, you should

15  know that there is no dispute among the parties that the

16  transactions which occurred between the parties occurred in

17  the course of conduct involving trade or commerce.

18        As for the fifth element of the Fraud Act claim, the

19  defendants' alleged conduct proximately caused damages to

20  plaintiff, plaintiff must prove by a preponderance of the

21  evidence that she was actually deceived into signing the

22  purchase agreements and that her damages were actually caused

23  by defendants' deceptive acts.

24        If you decide for plaintiff on the question of

25  liability under the Fraud Act claim, you must decide how much

Jury Instructions

2159

1    money, if any, will reasonably and fairly compensate plaintiff

2    for damages proved by the evidence to have resulted from the

3    conduct of defendants.  Plaintiff has the burden of proving

4    damages to a reasonable degree of certainty and plaintiff must

5    establish a reasonable basis for computation of damages.  A

6    damages award may not be based on speculation or conjecture.

7         Plaintiff claims that defendants violated a federal

8    statute called the Interstate Land Sales Full Disclosure Act.

9    I will refer to this claim in these instructions as the Land

10   Sales Act claim.  To establish a violation of the Land Sales

11   Act, plaintiff must prove either one or both of the following

12   by a preponderance of the evidence:

13        One, that the property report which defendants

14   provided to plaintiff when she signed the purchase agreements

15   contained an untrue statement of material fact or omitted to

16   state a material fact; or, two, that defendants employed a

17   scheme to defraud plaintiff into signing the purchase

18   agreements.

19        A fact is material where a buyer would have acted

20   differently knowing the information or if it concerned the

21   type of information upon which a buyer would be expected to

22   rely in making a decision whether to purchase.

23        If you decide for plaintiff on the question of

24   liability under the Land Sales Act claim, you must decide how

25   much money, if any, will reasonably and fairly compensate

Jury Instructions

2160

1  plaintiff for damages proved by the evidence to have resulted

2  from the conduct of defendants.  Plaintiff has the burden of

3  proving damages to a reasonable degree of certainty and

4  plaintiff must establish a reasonable basis for computation of

5  damages.  A damages award may not be based on speculation or

6  conjecture.

7  You may award compensatory damages only for injuries

8  that plaintiff has proved by a preponderance of the evidence

9  were caused by defendants' wrongful conduct.  Your award must

10 be based on evidence and not speculation or guesswork.  This

11 does not mean, however, that compensatory damages are

12 restricted to the actual loss of money.  They include all

13 aspects of plaintiff's injury, even if they are not easy to

14 measure.

15 Plaintiff must prove demonstrable emotional distress

16 in order to recover damages for emotional distress.  She

17 cannot establish emotional distress damages based simply on

18 conclusory statements regarding emotional damages.  Plaintiff

19 cannot recover for any emotional damages caused by her

20 decision to bring this lawsuit.

21 In addition to compensatory damages, the law permits

22 you under the Fraud Act claim under certain circumstances to

23 award punitive damages.  If you find that defendants' conduct

24 was fraudulent, intentional and/or willful and wanton and

25 proximately caused injury and/or damage to the plaintiff, and

Jury Instructions

2161

1    if you believe that justice and the public good require it,

2    you may award an amount of money which will punish defendants

3    and discourage them and others from similar conduct.

4          In arriving at your decision as to the amount of

5    punitive damages, you should consider the following three

6    questions.  The first question is the most important to

7    determine the amount of punitive damages.

8          One, how reprehensible was defendants' conduct.  On

9    this subject, you should consider the following:  A, the facts

10   and circumstances of defendants' conduct; B, the vulnerability

11   of the plaintiff; C, the duration of the misconduct; D, the

12   frequency of defendants' misconduct; E, whether the harm was

13   physical as opposed to economic; and, F, whether defendants

14   tried to conceal the misconduct.

15         Two, what actual and potential harm did defendants'

16   conduct cause to the plaintiff in this case.

17         And; three, what amount of money is necessary to

18   punish defendants and discourage them and/or others from

19   future wrongful conduct.

20         The amount of punitive damages must be reasonable and

21   in proportion to the actual and potential harm suffered by the

22   plaintiff.

23         Defendants 401 North Wabash Venture LLC and Trump

24   Chicago Managing Member, LLC, are corporations and can act

25   only through their officers and employees.

Jury Instructions

2162

1          As to plaintiff's claim for compensatory damages

2    against the defendants, any act or omission of an officer or

3    employee within the scope of his or her employment is the act

4    or omission of the defendant corporation.

5          As to plaintiff's claim for punitive damages against

6    defendants, a different rule applies.  Punitive damages may be

7    awarded against defendants only if, one, if you find in favor

8    of plaintiff and against defendants under the Fraud Act claim;

9    and, two, if you find that as to the representations or

10   omissions giving rise to liability under the Fraud Act claim,

11   one or more of the following conditions are proved:

12         A, the corporation, through its management,

13   authorized the doing and the manner of the representation or

14   omission; or, B, the representation or omission was that of a

15   managerial employee who was acting in the scope of his or her

16   employment; or, C, the corporation, through its management or

17   a managerial employee, ratified or approved the representation

18   or omission.

19         Any figures proposed by counsel in their arguments

20   are not evidence as to the amount of damages you should award

21   but rather constitute arguments, which you are free to

22   disregard in your deliberations.

23         If you decide for defendants on the question of

24   liability, then you should not consider the question of

25   damages.

Jury Instructions

2163

1        During your deliberations, ladies and gentlemen, you

2   must not communicate with or provide any information to anyone

3   by any means about this case.

4        You may not use any electronic device or media, such

5   as the telephone, a cell phone, smartphone, iPhone, BlackBerry

6   or computer, the Internet, any Internet service, any text or

7   instant message servicing, any Internet chat room, blog or Web

8   site, such as Facebook, MySpace, LinkedIn, YouTube or Twitter,

9   to communicate to anyone any information about this case or to

10  conduct any research about this case until I accept your

11  verdict.  In other words, you cannot talk to anyone on the

12  phone, correspond with anyone or electronically communicate

13  with anyone about this case.  You can only discuss the case in

14  the jury room with your fellow jurors during deliberations.

15       Upon retiring to the jury room, you must select a

16  presiding juror.  The presiding juror will preside over your

17  deliberations and will be your representative here in court.

18       A verdict form has been prepared for you.  You should

19  take the form to the jury room; and when you have reached

20  unanimous agreement on the verdict, your presiding juror will

21  fill in and date the appropriate form and all of you will sign

22  it.

23       Here is the verdict form, ladies and gentlemen.  It

24  is a three-page document.  On page 1, the questions of

25  liability are addressed.  One:  As to the Illinois Consumer

Jury Instructions

2164

1   Fraud and Deceptive Practices Act claim, we, the jury, find in

2   favor of, you mark a space for plaintiff or a space for

3   defendants.

4          Same with respect to the second claim, the Illinois

5   Land Sales Act claim.  As to the Land Sales Act claim, we find

6   either for the plaintiff or for the defendants.

7          Page 2 deals with damages.  Only if you find

8   liability on page 1 do you turn to page 2 as to damages.  We,

9   the jury, award plaintiff Goldberg the following damages.

10  There are two entries, purchase deposits and payments and

11  emotional distress damages, and a place to total damages, if

12  any.

13         You may consider section 4 on punitive damages only

14  if you find for plaintiff on her Illinois Consumer Fraud and

15  Deceptive Practices Act claim.

16         You must first answer is she entitled to punitive

17  damages.  There is a yes or no.  And if yes, what amount of

18  punitive damages, if any, do you award the plaintiff against

19  defendants.

20         Page 3, there is a place for each of you to sign, you

21  will see first for the foreperson, the rest of you must sign

22  it and date it when you have reached a unanimous verdict.

23         I do not anticipate that you will need to communicate

24  with me.  If you do need to communicate with me, the only

25  proper way is in writing.  The writing must be signed by the

2165

1   presiding juror or, if he or she is unwilling to do so, by

2   some other juror.  The writing should be given to the court

3   security officer who will give it to me.  I will respond

4   either in writing or by having you return to the courtroom so

5   that I can respond orally.

6          If you do communicate with me, you should not

7   indicate in your note what your numerical division is, if any.

8          The verdict must represent the considered judgment of

9   each juror.  Your verdict, whether for or against the parties,

10  must be unanimous.

11         You should make every reasonable effort to reach a

12  verdict.  In doing so, you should consult with one another,

13  express your own views, and listen to the opinions of your

14  fellow jurors.  Discuss your differences with an open mind.

15  Do not hesitate to reexamine your own views and change your

16  opinion if you come to believe it is wrong.  But you should

17  not surrender your honest beliefs about the weight or effect

18  of evidence solely because of the opinions of other jurors or

19  for the purpose of returning a unanimous verdict.

20         All of you should give fair and equal consideration

21  to all of the evidence and deliberate with the goal of

22  reaching an agreement that is consistent with the individual

23  judgment of each juror.  You are impartial judges of the

24  facts.

25         Can you please raise your right hand.

2166

 1    (Court Security Officer sworn.)

 2    (Jury exits courtroom.)

 3         THE COURT:  A couple of things.  I need all of the

 4    evidence from you and you to agree on what is going back to

 5    the jury.  I have the list of what has been admitted if there

 6    are any disputes.  And give it to Katie and she will take it

 7    back to the court security officer.

 8         Second, I need your contact information, e-mails,

 9    cell phones, where you can be reached.  You should not be more

10    than 10 or 15 minutes away from the courthouse.

11         You will hear from us when we hear from them.  I have

12    no idea how late they are going to stay tonight.  If they go

13    home, we will e-mail you and let you know that they have gone

14    home.  I do not bring the jury back into the courtroom at the

15    end of the day.  I let them go when they are ready to go.  So

16    make sure that we have your specific contact information,

17    including e-mail, and we will get in touch with you.

18         And, third, I know there are two claims that are for

19    the Court to decide, not for the jury to decide.  I told you I

20    would give you the opportunity to give me closing arguments

21    outside of the presence of the jury on those claims if you

22    want to do so or give the overlap.  If you want to rely on

23    what you have argued to the jury, that is fine with me.  And

24    if I feel like I need anything further, I will let you know.

25         MR. S. KULWIN:  I think we're in agreement again.

```
 1    No.
 2             THE COURT:  No further oral argument?
 3             MR. NOVACK:  No further oral argument by me.
 4             MR. S. KULWIN:  None by me.
 5             THE COURT:  Did you have a question for me?
 6             MR. NOVACK:  My office is about 20 minutes away.  Is
 7    it okay if I return to my office if it takes 20 minutes to get
 8    back here?
 9             THE COURT:  Can you wait just a little bit before
10    doing that today?
11             MR. NOVACK:  Oh, I'll wait today.  I was just
12    thinking of tomorrow.
13             THE COURT:  Tomorrow?  Yes.
14             MR. NOVACK:  Thank you.
15             THE COURT:  But today, if we are going to get a note,
16    you often get it within the first 15 minutes, if it is just a
17    "can you bring us some supplies" type of note.  So if you
18    could wait close by today and not go 20 minutes away.
19             MR. NOVACK:  I think I'll stay until the jury leaves
20    today.
21             THE COURT:  Okay.
22             Anything else?
23             MR. S. KULWIN:  No.
24             THE COURT:  All right.  Again, please give Katie your
25    contact information.  Give her the evidence when you are
```

2168

1    ready.  And you will hear from us when we hear from them.

2         MR. NOVACK:  Judge, thank you very much for all your

3    time on the case.

4         MR. S. KULWIN:  Same here, Judge.

5      (Whereupon, the jury began its deliberations at 3:35 p.m.)

6                    *    *    *    *    *

7

8    I certify that the foregoing is a correct transcript from the
     record of proceedings in the above-entitled matter.
9

10
     /s/ Nancy C. LaBella                    May 23, 2013
11   Official Court Reporter

12

13

14

15

16

17

18

19

20

21

22

23

24

25