

In the

# United States Court of Appeals
## For the Seventh Circuit

No. 13-3057

JACQUELINE GOLDBERG,

                    *Plaintiff-Appellant*,

v.

401 NORTH WABASH VENTURE LLC and TRUMP CHICAGO
  MANAGING MEMBER, LLC,

                    *Defendants-Appellees*.

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 09 C 6455 — **Amy J. St. Eve**, *Judge*.

ARGUED APRIL 14, 2014 — DECIDED JUNE 10, 2014

Before WOOD, *Chief Judge*, and POSNER and FLAUM, *Circuit Judges*.

POSNER, *Circuit Judge*. Trump International Hotel and Tower Chicago (we'll call it "Trump Tower Chicago" for short) is a 92-story building in downtown Chicago, completed in 2009. It contains 486 residential condominium units, 339 hotel condominium units (occupying floors 14 and 17 through 27 of the building)—the focus of the appeal—plus

retail space, a health club, ballrooms, meeting rooms, restaurants, bars, a hair salon, and other facilities commonly found in conventional hotels. Some of these facilities, along with structural features such as the roof and the elevators, are what are called "common elements." All common elements are shared facilities. The condominium units are not common elements; they are owned individually, rather than by the building's owners or by the condominium association, which is to say the units' owners collectively. When the owner of a hotel condominium unit is not occupying the unit, the building management can rent it to a visitor, and the rental income is divided with the owner, with the owner's share of the income being credited against his annual maintenance fee.

The developers and owners of Trump Tower Chicago—the defendants in this lawsuit—are entities ultimately controlled by Donald Trump. For simplicity we'll ignore the labyrinth of corporate forms and pretend there is a single defendant called TrumpOrg. The plaintiff is a wealthy and financially sophisticated Chicago businesswoman—a certified public accountant and certified financial planner—who in 2006 signed an agreement to buy two hotel condominium units in Trump Tower Chicago from TrumpOrg for some $2.2 million. (To simplify exposition, we'll pretend there was one agreement, covering both units.) Goldberg wasn't interested in staying in either of the units herself. She had bought them as an investment, hoping their value would increase and also that her income from the rental of the units by the management of the condo hotel (the condo hotel is a component of Trump Tower Chicago, which also as we noted contains a residential complex) would reduce her annual maintenance costs. She already owned other condominium

Case: 1:09-cv-06455 Document #: 454 Filed: 07/02/14 Page 3 of 20 PageID #:13614
Case: 13-3057    Document: 00712263608    Filed: 07/02/2014    Pages: 20

No. 13-3057 3

units—including a *residential* condominium unit in Trump Tower Chicago—also as investments rather than as places in which she might live or stay. Although she was 80 years old when she signed the purchase agreement, there is no suggestion that she was mentally impaired. She was 87 when she testified at the trial of this case, and there was no indication of any impairment then either.

The purchase agreement, in what the parties call the "change clause," gave TrumpOrg "the right, in its sole and absolute discretion, to modify the Condominium Documents." These are documents that among other things specify the rights in the common elements that the purchaser acquires under the agreement along with the hotel condominium unit itself—"provided that Seller shall notify Purchaser or obtain the Purchaser's approval of any changes in the Condominium Documents … when and if such notice or approval is required by law." After reviewing the purchase agreement with her attorney, the plaintiff asked TrumpOrg to give her the right to terminate the agreement and get her deposit back if she disapproved of any changes that TrumpOrg made in the agreement. TrumpOrg refused. The plaintiff signed the agreement anyway, even though TrumpOrg had already made three changes, one of which modified common elements by adding meeting rooms and ballrooms to, but removing the health club from, the common elements.

The year after she signed the agreement, TrumpOrg made another set of changes (the "Fourth Amendment," as the parties term it), which greatly curtailed the owners' rights in the hotel facilities. The plaintiff was furious. She testified that she thought she'd been conned. She refused to

close; that is, she refused to pay the balance of what she owed for the two units that she had agreed to buy, and take title to them. TrumpOrg did not seek to compel her to close, as by suing her for breach of contract and seeking specific performance as a remedy. But neither did it return her down payment, some $516,000. After protracted fruitless negotiations, in January 2010 TrumpOrg canceled the purchase agreement and claimed the earnest money as liquidated damages, but left it in an escrow account in Deutsche Bank. There it remains, pending the outcome of this litigation, which the plaintiff had instituted in an Illinois state court in 2009. The suit sought damages not limited to the $516,000, but in the millions of dollars, under a variety of Illinois laws and also the Federal Interstate Land Sales Full Disclosure Act, 15 U.S.C. §§ 1701 *et seq.*; but the claim under that Act has been abandoned on appeal, so we'll ignore it. Her Illinois claims are based on the Illinois common law of contracts; the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505; the Illinois Condominium Property Act, 765 ILCS 605; and the Illinois Securities Law of 1953, 815 ILCS 5.

The parties being of diverse citizenship, the defendant was able to remove the case to the federal district court in Chicago and did so. Lengthy pretrial proceedings ensued, in the course of which the district judge granted summary judgment for the defendant on the securities-law claim, and (after the summary judgment ruling, but shortly before trial) dismissed the claim of "unfair" conduct because the plaintiff had "not sufficiently alleged or pursued during discovery an 'unfair practice' claim." (The consumer-fraud act, which tracks the Federal Trade Commission Act, 15 U.S.C. § 45(a)(1), punishes "unfair" as well as "deceptive" acts or

No. 13-3057 5

practices. 815 ILCS 505/2.) Her other claims were tried—the deceptive practice consumer-fraud act and federal Land Act claims to a jury, the breach of contract and Condo Act claims to the judge. The jury returned a verdict for the defendant on the fraud and Land Act claims, and the judge rendered judgment for the defendant on the breach of contract and Condo Act claims. Thus the plaintiff obtained no relief, precipitating this appeal.

When as in this case some issues are to be tried by a jury and some by the judge, the jury trial is conducted first and the jury's findings (unless invalidated) are binding in the bench trial. E.g., *Byrd v. Blue Ridge Rural Electric Cooperative, Inc.*, 356 U.S. 525, 537–38 (1958); *In re Rhone-Poulenc Rorer, Inc.*, 51 F.3d 1293, 1303 (7th Cir. 1995). So we begin with the trial of the claim of deception, as that was the only claim (apart from the now-abandoned federal Land Act claim) tried by the jury. The plaintiff's theory was bait and switch: that TrumpOrg had promised to prospective purchasers of the hotel condominium units—in marketing materials, in "Property Reports" (formal documents given to buyers along with the purchase agreements and other condominium documents), and in the original draft of the purchase agreements—common-element rights in the hotel facilities, and had specified the terms on which units would be rented when the owners weren't occupying them, but had planned to eliminate most of the promised benefits by invoking the "change clause."

The plaintiff argues that just as in a conventional bait and switch—in which for example a retail store advertises a washing machine at a low price intending to attract consumers who will be told that all the machines have been sold and

Case: 1:09-cv-06455 Document #: 454 Filed: 07/02/14 Page 6 of 20 PageID #:13617
Case: 13-3057    Document: 00712263608    Filed: 07/02/2014    Pages: 20

6                                                                  No. 13-3057

will be urged to buy a more expensive substitute—the list of rights in the original draft of the purchase agreement was intended to lure prospective investors like her into signing the agreement, after which the rights would be watered down. In effect a less valuable product would be substituted for the product she was led to think she was getting. Bait and switch is a deceptive practice because it involves the seller's making a representation to prospective customers that he knows to be false.

There is considerable doubt, unnecessary to resolve however, whether this theory could support a finding of fraud in the circumstances of this case, in which the seller declared up front, in the change clause, that it might "switch." It would be a pretty innocuous bait and switch if the seller in our example advertised the low-priced washing machines but added "and by the way we may raise the price before you arrive at the store." With such warning, what deception?

Illinois law is clear that bait and switch is a form of fraud, of deception, not any other type of improper act—that it occurs, violating the state's consumer-fraud act, when a seller makes "an alluring but insincere offer to sell a product or service which the advertiser in truth does not intend or want to sell. Its purpose is to switch customers from buying the advertised merchandise, in order to sell something else, usually at a higher price or on a basis more advantageous to the advertiser." *Williams v. Bruno Appliance & Furniture Mart, Inc.*, 379 N.E.2d 52, 54 (Ill. App. 1978), quoting 16 C.F.R. § 238.0 and quoted in *Chandler v. American General Finance, Inc.*, 768 N.E.2d 60, 69 (Ill. App 2002). The *Chandler* opinion goes on to observe that a "common thread … [in the bait and

No. 13-3057 7

switch cases is that] the targets are unsophisticated customers." *Id*. The plaintiff in our case was highly sophisticated.

Still, the plaintiff's bait and switch theory was presented to the jury—which rejected it. The defendant presented plausible evidence that an employee of TrumpOrg who had no experience with condominium hotels had at the outset of the Trump Tower Chicago project decided to make the hotel facilities common elements of the hotel condominium units, but that later this employee had been replaced. His replacement had the relevant experience and persuaded Donald Trump that the predecessor employee's idea had been terrible because the hotel condominium association elected by the owners of the hotel condominium units might well mismanage the hotel facilities.

The plaintiff argues that the district judge committed serious procedural errors at the jury trial, notably by allowing the defendant's expert, Brent Howie, to testify about Donald Trump's state of mind. That is a distortion of Howie's testimony. He is the president of a company that manages condominium hotels, and is therefore qualified to testify about the problems that developers of this relatively recent type of condominium project are likely to encounter. Donald Trump is of course a highly experienced real estate developer, but he is not infallible—he has had many successes in the real estate business but also failures. See, e.g., Janice Castro, "Trump Trips Up," *Time*, May 6, 1991, pp. 46–47. Howie admitted that he had never worked with Trump and had no idea what Trump's knowledge or state of mind was concerning the Trump Tower Chicago project. He testified merely that in his experience even sophisticated real estate develop-

ers often are unaware of the importance of excluding hotel facilities from the common elements.

An expert witness is not permitted to parrot what some lay person has told him and testify that he believes the person was being truthful. *In re James Wilson Associates*, 965 F.2d 160, 172–73 (7th Cir. 1992); *United States v. Pablo*, 696 F.3d 1280, 1288 (10th Cir. 2012); *Redman v. John D. Brush & Co.*, 111 F.3d 1174, 1179 (4th Cir. 1997); Jennifer L. Mnookin, "Expert Evidence and the Confrontation Clause After *Crawford v. Washington*," 15 *J. Law & Policy* 791, 802–03 (2007). A business expert can however testify about the state of knowledge prevalent in a business that he has studied, and in Howie's case is also a member of. E.g., *Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp.*, 559 U.S. 662, 674–75 and n. 6 (2010); *Berckeley Investment Group, Ltd. v. Colkitt*, 455 F.3d 195, 218 (3d Cir. 2006); cf. *Frigaliment Importing Co. v. B.N.S. International Sales Corp.*, 190 F. Supp. 116, 119–20 (S.D.N.Y. 1960) (Friendly, J.); David L. Faigman, "Expert Evidence in Flatland: The Geometry of a World Without Scientific Culture," 34 *Seton Hall L. Rev.* 255, 259–60 (2003).

The plaintiff complains about the judge's refusal to instruct the jury that the "change clause" was not a complete defense. For Donald Trump had, in the course of his protracted cross-examination by the plaintiff's lawyer, said that it was. We suggested earlier that it might indeed be a complete defense in the circumstances of this case, considering the plaintiff's business savvy and professional advice. But Trump was not competent to offer a legal opinion. No matter. TrumpOrg's lawyer acknowledged in his closing argument that the plaintiff's bait and switch theory was a valid theory of consumer fraud that could override the change

No. 13-3057 9

clause (though, the lawyer added, it was factually unsupported). He told the jury: "You have to find change plus, and the plus is that at the time they [meaning the defendants] put those common elements in, they never intended to keep them in. They [now meaning the plaintiff's lawyers] have to prove that, not just that there was a change." Given Trump's testimony about the change clause, the instruction requested by the plaintiff's lawyer would have been appropriate. But it was not essential, given the acknowledgment to the jury by the defendant's lawyer; its omission was not a reversible error.

So the jury's rejection of the bait and switch theory stands, and we must consider the effect of that rejection on other claims made by the plaintiff. Obviously one that it wipes out is the deception facet of the charge that the defendant violated the consumer-fraud act. Another is breach of contract. There is no basis in the explicit terms of the purchase agreement for inferring a breach of contract; and while Illinois law reads into every contract a duty of good faith, e.g., *Northern Trust Co. v. VIII South Michigan Associates*, 657 N.E.2d 1095, 1104 (Ill. App. 1995), the duty relates to the performance of the contract, not to fraud in its inception. As explained in the case just cited, "problems involving the obligation of good faith and fair dealing generally arise where one party to a contract is given broad discretion in performance. The covenant of good faith requires that a party vested with contractual discretion exercise that discretion reasonably, not arbitrarily, capriciously, or in a manner inconsistent with the reasonable expectation of the parties. Parties to a contract, however, are entitled to enforce the terms of the contract to the letter and an implied covenant of

good faith cannot overrule or modify the express terms of a contract." *Id*. (citations omitted).

Although the plaintiff's appeal challenges the judge's rejection of the claim of breach of contract, the challenge is limited to a contention that the plaintiff was entitled to a jury trial. The outcome would have been the same, since the finding of no deception was the finding of a jury and would bar relief on the contract claim just as on the consumer-fraud claim. But we think it worth pointing out the error in the plaintiff's procedural contention. The relief sought for the alleged breach of contract was rescission—that is, the nullification of the contract and the restoration of the parties to the position they would occupy had there been no contract. Rescission is an equitable, not a legal, remedy. This is true under both Illinois law, e.g., *23–25 Building Partnership v. Testa Produce, Inc.*, 886 N.E.2d 1156, 1163 (Ill. App. 2008); *Barbers, Hairstyling For Men & Women, Inc. v. Bishop*, 132 F.3d 1203, 1204–05 (7th Cir. 1997) (Illinois law), and federal law. E.g., *Grupo Mexicano de Desarrollo, S.A. v. Alliance Bond Fund, Inc.*, 527 U.S. 308, 324–25 (1999); *Arber v. Essex Wire Corp.*, 490 F.2d 414, 422 (6th Cir. 1974). And there is no right to trial by jury in an equity case. *Tull v. United States*, 481 U.S. 412, 417–18 (1987); *Parsons v. Bedford*, 28 U.S. (3 Pet.) 433, 446–47 (1830) (Story, J.).

There is, it is true, "legal" as well as equitable rescission. Suppose a court orders rescission and one provision of the order requires the defendant to return the plaintiff's down payment or earnest money (as sought by the plaintiff in this case), and the defendant refuses. The plaintiff can ask the court to hold the defendant in contempt, but alternatively he can sue the defendant for the money; and that would be con-

No. 13-3057                                                                 11

sidered a suit for damages. *Sherzer v. Homestar Mortgage Services*, 707 F.3d 255, 261 n. 4 (3d Cir. 2013); *Williams v. Homestake Mortgage Co.*, 968 F.2d 1137, 1140 (11th Cir. 1992). But the court in this case did not order rescission, and so there is no issue of the defendant's owing the plaintiff money and refusing to pay it. The plaintiff argues that because her $516,000 in deposit money was held in escrow rather than being in the defendant's possession, her claim for its return is a damages claim. The argument makes no sense. A judgment of rescission would direct (if necessary order, after joinder of the escrow agent as a defendant) the escrow agent to return the money to the plaintiff. She isn't entitled to the money because she isn't entitled to rescission.

We note for future reference (an issue discussed by the parties though academic in light of our ruling on the deposit money) that *if* the plaintiff were entitled to her $516,000 back she would be entitled to interest on it. Under Illinois law interest is recoverable if specified in a contract, *Kouzoukas v. Retirement Board of Policemen's Annuity & Benefit Fund of City of Chicago*, 917 N.E.2d 999, 1015 (Ill. 2009); *Tri-G, Inc. v. Burke, Bosselman & Weaver*, 856 N.E.2d 389, 410–11 (Ill. 2006), and the purchase agreement provided for a return of Goldberg's earnest money, plus interest, as liquidated damages in the event of a breach by TrumpOrg. The interest could be considerable, depending on how it was calculated, a question not discussed by the parties. One possibility would be the yield on what would have been the plaintiff's likeliest alternative investment. Another would be the default prejudgment interest rate in Illinois, which is 5 percent. 815 ILCS 205/1, 205/2. A pretrial "itemization of damages" that the plaintiff filed in the district court requested an interest rate of between 3 and 6 percent, which is broadly consistent with

the default rate. Other possibilities are the Illinois Condo Act's disclosure provision, which specifies prejudgment interest of 9 percent, the rate specified elsewhere in Illinois law for interest on judgments, 765 ILCS 605/22; 735 ILCS 5/2-1303, and the Illinois Securities Law's prejudgment interest rate, which is 10 percent unless the security provides otherwise. 815 ILCS 5/13(A)(1). And in an equity case the court can award whatever interest rate it chooses that would not be an abuse of discretion. *Finley v. Finley*, 410 N.E.2d 12, 19 (Ill. 1980).

We add that if interest were awarded in a case like this, it would not be a form of damages; it would be a means of placing the parties in the positions they would have occupied had there never been a contract, which is the objective of rescission. The reason for adding interest would be that the parties can't actually be returned to the positions they occupied back when the contract was signed. The past cannot be recreated. Time runs in only one direction—and it's forward, not backward. Rescission aims to place the parties where they would be today had there not been a contract between them.

We turn to the claims that the district judge dismissed without a trial. One is that the alleged bait and switch was an unfair act, whether or not it was deceptive. Section 2 of the Illinois consumer-fraud act, 815 ILCS 505/2, like section 5(a)(1) of the Federal Trade Commission Act, 15 U.S.C. § 45(a)(1), on which section 2 is, as we noted, modeled, forbids unfair acts separately from deceptive ones. An example is oppressive methods of debt collection, *Robinson v. Toyota Motor Credit Corp.*, 775 N.E.2d 951, 960–61 (Ill. 2002) (citing *FTC v. Sperry & Hutchinson Co.*, 405 U.S. 233 (1972)), which

No. 13-3057                                                        13

need not (though they often do) involve deception. But until the instructions conference the plaintiff's only theory of consumer fraud was bait and switch in its conventional sense. The jury rejected it; advised by counsel and clearly informed by the purchase agreement that by signing it she was in effect buying a pig in a poke, she made a risky investment by agreeing to purchase a product that the seller had reserved the right to change in a manner that might reduce its value to her (though probably not by a great deal, as will become clear). She had signed with her eyes open.

What is deceptive is also unfair. But to have instructed the jury, as the plaintiff would have liked the judge to do, that it could find the defendant's conduct to have been either deceptive or unfair, or both, would have been confusing. If the conduct was deceptive, it violated the consumer-fraud act. If it wasn't, it didn't, because the charge of unfairness was a charge of deception by another name. As the district judge explained in refusing the plaintiff's eleventh-hour request for a jury instruction on unfairness distinct from deception, "Plaintiff has never previously asserted a theory based on the fairness of the elimination or the changes made in and of themselves, but instead has consistently grounded her recovery in Defendants' misrepresentations, omissions and concealment … which induced her to sign her Purchase Agreements. Because Defendants were not on notice of this theory and have not defended the case based on this theory, Defendants will suffer unfair prejudice if Plaintiff can now—on the eve of trial—pursue this new theory."

We come next to the Illinois Securities Law of 1953, which parallels the federal securities statutes and, so far as bears on this case, requires registration with state authorities

of any "investment contract." 815 ILCS 5/2.1, 5/5. The plaintiff argues that the purchase agreement she signed was an investment contract, just as if it had been a contract to purchase shares of stock in TrumpOrg, because she was investing in a pool of commingled assets—the health club, the ballrooms, etc.

In all probability the claim is time barred. The applicable statute of limitations is three years from the "date of sale." 815 ILCS 5/13(D). The plaintiff signed the purchase agreement in August 2006 but didn't bring suit until September 2009—three years plus one month later. She argues that each of the additional installment payments that she made, in October 2006 and February 2008 respectively, was a new "sale" and therefore restarted the three-year limitations period. This dubious theory, whereby "every step toward the completion of a sale [is] a sale," was endorsed a half century ago by Illinois's intermediate appellate court, see *Silverman v. Chicago Ramada Inn, Inc.*, 211 N.E.2d 596, 599 (Ill. App. 1965), but was abandoned in later decisions, which make the statute of limitations begin to run on the date of sale, provided the parties' rights were fixed at that time. *Doll v. Bernard*, 578 N.E.2d 1053, 1056 (Ill. App. 1991); *Frantzve v. Joseph*, 502 N.E.2d 396, 397–98 (Ill. App. 1986). The installment payments in this case didn't alter any legal rights. Those rights were fixed in the purchase agreement, and the date of that agreement was therefore the date of sale and thus the date on which the statute of limitations began to run.

The plaintiff's security claim would fail even if timely for the reason given by the district judge: the purchase agreement wasn't an "investment contract" and was therefore not a security under Illinois law (which adopts federal law on

No. 13-3057                                                                                              15

this point, *Ronnett v. American Breeding Herds, Inc.*, 464 N.E.2d 1201, 1203 (Ill. App. 1984)), because it didn't involve a "common enterprise." *SEC v. W.J. Howey Co.*, 328 U.S. 293, 299 (1946). That means an enterprise in which "multiple investors … pool their investments and receive pro rata profits." *Stenger v. R.H. Love Galleries, Inc.*, 741 F.2d 144, 146 (7th Cir. 1984). "The owner of a condominium does not own an undivided share of the building complex in which his condominium is located. He owns his condominium, and if it is rented out for him by the developer he receives the particular rental on that unit rather than an undivided share of the total rentals of all the units that are rented out. The nature of his interest thus is different from that of a shareholder in a corporation that owns rental property." *Wals v. Fox Hill Development Corp.*, 24 F.3d 1016, 1018 (7th Cir. 1994); see also 2 Louis Loss et al., *Securities Regulation* § 3(A)(1)(d)(iv), pp. 987–90 (4th ed. 2007). The only thing that's different about this case is revenue-generating hotel facilities—but remember that TrumpOrg removed these facilities from the common elements.

And had the hotel facilities remained in the common elements, the expected revenue from them to a condominium owner (at least one who like the plaintiff owned no more than two condominium units) was so small that the owner couldn't have "expect[ed to] earn a profit solely through the efforts of" TrumpOrg's administration of those facilities; and without such an expectation the condominium units could not be securities. *SEC v. W.J. Howey Co., supra*, 328 U.S. at 298. Had there been no change clause and so no changes to the common elements in the Fourth Amendment, the plaintiff's annual maintenance fees of $54,000 per unit would have fallen by only between $1400 and $1700—at most 3

percent. "The possibility of *some* rental reduction is not an 'expectation of profit'" that converts a real-estate contract into a security. *United Housing Foundation, Inc. v. Forman*, 421 U.S. 837, 857 (1975) (emphasis added); see also SEC Release No. 33-5347, "Offers and Sales of Condominiums or Units in a Real Estate Development," 38 Fed. Reg. 1735–36 (Jan. 18, 1973).

It's not as if the plaintiff had been induced to buy the condos because of the potential income from the common elements; none of the marketing materials mentions this possibility. See *United Housing Foundation, Inc. v. Forman*, *supra*, 421 U.S. at 852; *SEC v. W.J. Howey Co.*, *supra*, 328 U.S. at 300. She bought them as speculative real estate investments, hoping also to earn some rental income from them, which is different from sharing returns common to all the hotel condominium owners.

Goldberg asks us to certify to the Supreme Court of Illinois the question what is required to establish a "common enterprise" in Illinois, without which as we noted her investment could not have been a security. We have said that the "most important consideration" in deciding whether to certify is whether we find ourselves "genuinely uncertain about a question of state law that is vital to a correct disposition of the case." *State Farm Mutual Automobile Ins. Co. v. Pate*, 275 F.3d 666, 671 (7th Cir. 2001). Goldberg's claim under the Illinois Security Law fails on multiple grounds unrelated to the issue on which she has requested certification, and so resolution of that issue is not vital to a correct disposition of this case. Nor is there any other reason for certification.

Case: 1:09-cv-06455 Document #: 454 Filed: 07/02/14 Page 17 of 20 PageID #:13628
Case: 13-3057    Document: 00712263608    Filed: 07/02/2014    Pages: 20

No. 13-3057 17

The last issue presented by the appeal, and the most puzzling, is the claim that the changes made in the rights in the shared facilities after the plaintiff signed the purchase agreement violated a provision of the Illinois Condo Act relating to information that must be provided to the prospective buyer of a condominium unit. The required information includes "a projected operating budget for the condominium unit to be sold to the prospective buyer, including full details concerning the estimated monthly payments for the condominium unit, estimated monthly charges for maintenance or management of the condominium property, and monthly charges for the use of recreational facilities." 765 ILCS 605/22(c). The required information would seem to encompass financial benefits that might accrue to the buyer from the common elements of the condo hotel. But that information *was* provided to the plaintiff; her complaint is that TrumpOrg violated the separate requirement in the Condo Act that once the contract of sale is executed, "no changes or amendments may be made in any of the items furnished to the prospective buyer which would materially affect the rights of the buyer or the value of the unit without obtaining the approval of at least 75% of the buyers then owning interest in the condominium … [and] failure on the part of the seller to make full disclosure as required by this Section shall entitle the buyer to rescind the contract for sale at any time before the closing of the contract." 765 ILCS 605/22.

Notice that two separate violations are specified—changes that though they would materially affect a buyer's rights or the value of the unit bought are made without the approval of 75 percent of the owners of units; and failure to make all the required disclosures. A remedy (rescission) is prescribed for the latter violation but not for the former. The

plaintiff points out that one of the things TrumpOrg failed to disclose was that the change to the common elements was made without obtaining the approval of 75 percent of the condo owners. But information about whether that approval was obtained isn't among the items requiring full disclosure, see 765 ILCS 605/22(a)–(e), so its omission can't be a basis for rescission. And unlike similar statutes in other states, see, e.g., Hawaii Stat. § 514B-10(c); Neb. Stat. § 76-837(b); see also Uniform Condominium Act § 4-117, the Illinois Condo Act doesn't contain a general provision creating remedies for violations of it; remedies are specified only for violation of particular provisions—and the 75 percent requirement is not one of them.

There are two other possible sources of private remedies for violation of the 75 percent requirement, however. One is the provision in the purchase agreement, quoted earlier, that "Seller shall notify Purchaser or obtain the Purchaser's approval of any changes in the Condominium Documents … when and if such notice or approval is required by law." The 75 percent approval is required by law—but not the purchaser's approval. So the contractual route is closed. The remaining possibility is that a private damages remedy is available under *another* statute, namely the consumer-fraud act. That act as we know forbids unfair as well as deceptive acts, and a failure to seek a legally required approval for withdrawing promised contractual benefits would seem to be an unfair act. There might also be deception (of a kind not litigated or determined in the jury trial in this case) in concealing the failure from the other party to the contract.

The consumer-fraud act creates a private damages remedy for violations of any provision of the Act, 815 ILCS

No. 13-3057                                                                 19

505/10a(a), and thus would reach an unfair or deceptive act resulting from a violation of another statute, in this case the Condo Act. That is a form of chain liability familiar in federal law; for example, the prohibitions in 28 U.S.C. § 1981 are enforced against state actors by suits under section 1983, because section 1981 does not provide remedies against state actors for violation of its prohibitions. See, e.g., *Jett v. Dallas Independent School District*, 491 U.S. 701, 731–32 (1989); *Campbell v. Forest Preserve District*, 2014 WL 1924479 (7th Cir. May 15, 2014); *McGovern v. City of Philadelphia*, 554 F.3d 114, 120–21 (3d Cir. 2009); *Arendale v. City of Memphis*, 519 F.3d 587, 598–99 (6th Cir. 2008). But this approach to the 75 percent question was first mentioned at oral argument. Not having been argued in the plaintiff's opening brief or reply brief, it has been forfeited.

With all avenues for relief seemingly closed, the plaintiff argues that we should "imply" in the statute a right to bring a private suit for damages. A more candid formulation would replace "imply" with "create" or "interpolate." The defendant points out that such judicial interpolation is disfavored in Illinois law. *Fisher v. Lexington Health Care, Inc.*, 722 N.E.2d 1115, 1117–18, 1121 (Ill. 1999); *Cuyler v. United States*, 362 F.3d 949, 954–55 (7th Cir. 2004) (Illinois law). It is a national trend. Courts including the federal courts used to be quick to interpolate such rights, but have backed off, partly in response to business hostility to consumer litigation but also because of recognition that the omission of such a remedy need not be a legislative oversight but may instead reflect a compromise with opponents of a proposed regulatory statute. See *Rodriguez v. United States*, 480 U.S. 522, 525–26 (1987) (per curiam); John F. Manning, "What Divides Textualists from Purposivists?," 106 *Colum. L. Rev.* 70, 103–05

Case: 1:09-cv-06455 Document #: 454 Filed: 07/02/14 Page 20 of 20 PageID #:13631
Case: 13-3057    Document: 00712263608    Filed: 07/02/2014    Pages: 20

20                                                                    No. 13-3057

(2006). Their acquiescence is induced by a watering down of the remedies for a violation.

An oddity is that not only is no private remedy for violation of the 75 percent requirement specified, but there appears to be no public remedy either. The Consumer Fraud and Deceptive Business Practices Act, in contrast, specifies a public remedy. See 815 ILCS 505/7. The absence of any such specification in the Condo Act is some evidence that there is no public remedy for violation of that Act.

We need not decide, however, whether in these unusual circumstances the Supreme Court of Illinois would interpolate a private damages remedy. The plaintiff forfeited the issue by first raising the possibility of an implied statutory remedy in her reply brief. That was too late. *Fiala v. B & B Enterprises*, 738 F.3d 847, 853 (7th Cir. 2013); *EIMSKIP v. Atlantic Fish Market, Inc.*, 417 F.3d 72, 78 (1st Cir. 2005); 16AA Charles A. Wright et al., *Federal Practice & Procedure* § 3974.3, pp. 277–82 (4th ed. 2008).

The plaintiff makes some other arguments, but they are too weak to warrant discussion. The judgment in favor of the defendants on all counts in the complaint is

AFFIRMED.